| Attorney or Party Name, Address, Telephone & FAX Numbers, State Bar Number & Email Address | FOR COURT USE ONLY |
|---|---|
| Janine Jasso<br>PO Box 370161<br>El Paso, TX 79937<br>j9_jasso@yahoo.com<br><br>IN PRO PER<br><br><br><br><br>☒ *Plaintiff(s) appearing without attorney*<br>☐ *Attorney for Plaintiff(s)* | |

**UNITED STATES BANKRUPTCY COURT**
**CENTRAL DISTRICT OF CALIFORNIA - SANTA ANA DIVISION**

| In re:<br>JAMIE LYNN GALLIAN | |
|---|---|
| | CASE NUMBER: 8:21-bk-11710-SC<br><br>ADVERSARY NUMBER: 8:21-ap-010960-SC<br><br>CHAPTER: 7 |
| Debtor(s). | |

| JANINE JASSO | **PLAINTIFF'S MOTION FOR DEFAULT JUDGMENT UNDER LBR 7055-1** |
|---|---|
| Plaintiff(s), | DATE: 01/11/2023<br>TIME: 11:00 am<br>COURTROOM: 5C - Virtual<br>ADDRESS: Ronald Reagan Fed Bldg and Courthouse<br>411 West Fourth Street<br>Santa Ana, CA  92701 |
| vs.<br>JAMIE LYNN GALLIAN, an individual; J-PAD, LLC, a Calfornia Limited Liability Company, J-SANDCASTLE CO LLC, a California Limited Liaiblity Company, and DOES 1 through 100, inclusive, | |
| Defendant(s). | |

**TO THE DEFENDANT, DEFENDANT'S ATTORNEY AND OTHER INTERESTED PARTIES:**

1. Name of Defendant(s) against whom default judgment is sought (*specify name*): <u>J-Pad, LLC and</u>
   <u>J-Sandcastle Co LLC</u>

2. Plaintiff filed the complaint in the above-captioned proceeding on (*specify date*): <u>11/16/2021</u>

3. The Summons and Complaint were served on Defendant by  ☒ personal service   ☐ mail service
   on the following date (*specify date*): <u>11/22/2021</u>

4. A true and correct copy of the completed return of summons form is attached.

---

*"Bankruptcy Code" and "11 U.S.C." refer to the United States Bankruptcy Code, Title 11 of the United States Code.*
*"FRBP" refers to the Federal Rules of Bankruptcy Procedure.  "LBR" and "LBRs" refer to the Local Bankruptcy Rule(s) of this court.*

---

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

December 2017                    Page 1                    **F 7055-1.2.DEFAULT.JMT.MOTION**

5.  The time for filing an answer or other response expired on (*specify date*): 12/20/2021

6.  No answer or other response has been filed or served by Defendant.

7.  The default of Defendant:

    a.  ☐ Has not yet been entered, but is requested

    b.  ☒ Was entered on (*specify date*): 11/02/2022

8.  **A Status Conference:**

    a.  ☒ Is scheduled for (*specify date, time, and place*): February 14, 2023

    b.  ☐ Was held on (*specify date, time, and place*): _____

9.  As proof that Plaintiff is entitled to the relief requested in the complaint, Plaintiff:

    a.  ☒ Relies on the complaint and attached documents.

    b.  ☒ Attaches the following documents to establish a *prima facie* case:

        (1)  ☒ Declaration of (*specify*): Janine Jasso ISO of Mtn & Exhibits, Filed concurrently herewith

        (2)  ☐ Declaration of (*specify*): _____

        (3)  ☒ Other (*specify*): Plaintiff's Brief in support of Plaintiff's Notice of Motion and Motion

10. As further support for entry of a default judgment, Plaintiff submits a memorandum of points and authorities (optional).

11. **DECLARATION OF NON-MILITARY STATUS (**Servicemembers Civil Relief Act, 50 U.S.C. chapter 50 (§§ 3901-4043)).  The undersigned party or counsel declares under penalty of perjury, with respect to each Defendant against whom a default judgment is sought by this motion:

    a.  ☒ Defendant is not currently in military service.  The facts that support this statement are as follows (*see the court's website for information about how to verify non-military status*):

        The Defendants are corporations, specifically California limited liability companies

    b.  ☐ Defendant is currently in military service.  The facts that support this statement are as follows (*if this box is checked, the plaintiff must attach a supplement to this motion addressing the requirements in 50 U.S.C. § 3931(b)(2) to appoint an attorney for the Defendant before entering a judgment*):

    c.  ☐ I am unable to determine whether or not Defendant is in military service.  The facts that support this statement are as follows (*if this box is checked, the plaintiff must attach a supplement to this motion addressing the bond requirement in 50 U.S.C. § 3931(b)(3)*):

---

This form is mandatory.  It has been approved for use in the United States Bankruptcy Court for the Central District of California.

*December 2017*                                   Page 2                    **F 7055-1.2.DEFAULT.JMT.MOTION**

12.  Defaulting party is not an infant or incompetent party.


Plaintiff requests that this court enter a default judgment in favor of Plaintiff.  A copy of the lodged proposed default judgment is attached.


Date: 12/29/2022

Respectfully submitted,

_____
Printed name of law firm


_____
Signature

Janine Jasso
_____
Name of Attorney for Plaintiff or Plaintiff

This form is mandatory.  It has been approved for use in the United States Bankruptcy Court for the Central District of California.

December 2017                                    Page 3                          F 7055-1.2.DEFAULT.JMT.MOTION

1  Janine Jasso
   P.O. Box 370161
2  El Paso, TX 79937
   E-Mail: j9_jasso@yahoo.com
3  Plaintiff, IN PRO PER

4

5

6

7

8                    **UNITED STATES BANKRUPTCY COURT**

9            **CENTRAL DISTRICT OF CALIFORNIA – SANTA ANA DIVISION**

10

11  In Re: JAMIE LYNN GALLIAN              | **CASE NO. 8:21-bk-11710-SC**

12                                          | **Chapter 7**

13                                          | **Adversary No. 8:21-ap-01096-SC**

14  ─────────────────────────────

15  JANINE JASSO, an individual,            | **PLAINTIFF'S BRIEF IN SUPPORT OF THE NOTICE OF MOTION AND MOTION FOR ENTRY OF DEFAULT JUDGMENTS OF DEFENDANTS J-PAD, LLC AND J-SANDCASTLE CO LLC**

16           Plaintiff,

            v.

17

18  JAMIE LYNN GALLIAN, an individual; J-PAD, LLC, a California Limited Liability Company, J-Sandcastle Co LLC, a California Limited Liability Company, and DOES 1 through 100, inclusive,

19

20

            Defendants.

21

22

23

24

25

26      Plaintiff, Janine Jasso (the "Plaintiff" and/or "Creditor"), hereby submits her *Brief in*

27  *Support of Motion for Entry of Default Judgments Against Defendants J-Pad, LLC and J-*

28

                                          1

1    *Sandcastle Co LLC* (the "Motion"). Plaintiff also submits the concurrently filed *Declaration of*

2    *Janine Jasso* ("Jasso Decl.") in support of the Motion.

3

4                              **TABLE OF CONTENTS**

5

6    **I. INTRODUCTION** ................................................................. .8

7    **II. PROCEDURAL HISTORY** ....................................................... 8

8    **III. DEFAULT JUDGMENT IS APPROPRIATE HERE** .................................. 10

9          **A. JURISDICTION** ........................................................... 10

10         **B. STANDARD FOR JUDGMENT BY DEFAULT**…...……......……..……...10

11         **C. FINDING OF FACT IN FAVOR OF DEFAULT JUDGMENT** ................ ….14

12              1.  ***Chronology of the Debtor and Defendant LLCs Acts Related to The FAC's***

13                  ***Claims 2-5***  ……...…………-……………………………………14

14                  a. *Facts Related to the Concealed Transfer of the 4476 Alderport*

15                  *Condo.*…………………………………………………………………..14

16              2.  ***Facts Related to Debtor Transferring and Concealing Funds for Personal***

17                  ***Use in the Defendant JSC LLC and Defendant JP LLC to Prevent Collection***

18                  ***of Debtor's assets by Plaintiff.*** ……………………………….……...38

19                  a. *Facts Related to Debtor's Transfer of Personal Funds from Her Concealed*

20                  *Transfer of the 4476 Alderport Condo to Mr. Nickel Starting on October 31,*

21                  *2018 through July 9, 2021, the Date of Debtor's Bankruptcy Petition*…….39

22                  b. *Paragraphs 103-107 relate to Debtor's movement of $366,600, leaving*

23                  *$100 in the Debtor's Personal Chase PCS #7891 on November 3, 2018.* ….41

24                  c. *Paragraphs 108-115 relate to Debtor's movement of $355,000, leaving*

25                  *$0 in the Debtor's Personal Chase PCC #0186 on November 8, 2018.* ……42

26                  d. *Paragraphs 116-163 relate to Debtor's movement of $355,000 funds*

27                  *Debtor into Debtor's Alter Ego, Defendant JSC LLC's Chase #7860*

28

2

account, to Purchase a Mobile Home in a Concealed Transfer, Enabling

Debtor to Conceal Funds to Lisa Ryan, then Conceal Funds to and from

Fidelity and the Transfer Concealed Funds to Defendant JP LLC, leaving

$368.46 on July 9, 2021, the date of Debtor's Bankruptcy Petition. …..…….43

e. *Paragraphs 164-175 relate to Debtor's movement of $75,000 funds*

*Debtor received originally from Mr. Nickel on October 31, 2018, moved*

*into personal Chase #0186 cashier's checks, then deposited into into*

*Debtor's Alter Ego, Defendant JSC LLC, then transferred to Debtor's personal*

*Fidelity IRA, then transferred back to Defendant JSC LLC, then moved into a*

*cashier's check payable to Debtor's Alter Ego, Defendant JP LLC to open JP*

*LLC's Bank of America #1274 account to use the funds for Debtor's personal*

*expenses, leaving $2454.20 unscheduled on July 9, 2021, the date of Debtor's*

*Bankruptcy Petition.* …..………………………………………..…………52

f. *Paragraphs 176-181 relate to Debtor's movement of $96,000 of funds Debtor*

*received originally from Mr. Nickel on October 31,2018 into her personal*

*Fidelity IRA account and removing all but approximately $7300, which Debtor*

*on July 9, 2021, the date of Debtor's Bankruptcy Petition, then scheduled these*

*remaining funds in the Fidelity IRA account as qualified retirement plan assets,*

*which is not true*………………………………….……………………....…55

g. *Paragraphs 182-199 relate to Debtor's statements regarding Debtor's*

*Defendant JP LLC's January 2019 'perfected lien' on the mobile home based on*

*a $225,000 financing loan from Debtor's alter ego JSC LLC to Debtor and*

*making Debtor's alter ego Defendant JP LLC the lienholder on the mobile home*

*which helps Debtor hinder creditors collecting an asset.* ………..….…….56

3

**IV. ARGUMENT FOR EQUITABLE SOLUTIONS UNDER DEFAULT JUDGMENT**

A.    **Outside Reverse Veil Piercing is Appropriate Here Because Defendant LLCs
are Debtor's Alter-Egos** …………………..……..………………….……….63

    1.    *Unity of interest and ownership such that the separate personalities of
Debtor, JP LLC and JSC LLC do not exist.* ………………………..…..…63

B.    **Defendant LLCs Assets Are Debtor's Voidable Transfers of her Assets Hidden
in the Defendant LLCs** ……………………………………………….…….69

    1.    *The Defendant LLCs Assets Come from Debtor's First Voidable Transfer of
Her Sole Substantial Asset, the 4476 Alderport Condo*…..……………..…71

        a.    *There is No Defense to the Debtor-Nickel Transfer of the 4476
Alderport condo defaulted sublease*……………………………76

    2.    *The Defendant LLCs, As Debtor's Alter-Egos, Acted at Debtor's Direction to
Hide Transfers of Debtor's Cash from Mr. Nickel via Cashier's Checks  in
Violation of 11 U.S.C. 523(a)(2)(A)* …………………………………..…78

        a.    *The Debtor's Transfers of Cash from Mr. Nickel via Cashier's Checks
Payable to Defendant JSC LLC was Actual Fraud Pursuant to the
Husky International Supreme Court Ruling*…………………………78

        b.    *The Debtor's Transfers of $75,000 of Cash She Received from Mr.
Nickel via Cashier's Checks via Deposit into Defendant JSC LLC, and
then $96,000 of Funds Washed Through Debtor's Fidelity IRA
Rollover Account and then Transferred via a $74,999 Cashier's Check
into Debtor new Bank of America JP LLC #1274 account, which was
Actual Fraud Pursuant to the Husky International Supreme Court
Ruling.* ………………………..…………..……………………………82

        c.    *The Debtor's Defendant JP LLC January 2019 'perfect lien' on the
Mobile Home Based on Transfers of $225,000 of Cash Originating
from Mr. Nickel via Cashier's Checks Payable to Defendant JSC LLC*

1           *for Personal Expenses, While Making Defendant JP LLC the lienholder*

2           *on the Defendant JSC LLC Mobile Home was Actual Fraud Pursuant*

3           *to the Husky International Supreme Court Ruling.* ……….……...83

4       **C.**    **Debtor Was Asked in her August 8, 2021 341 Hearing to Produce Records that**

5           **Show the Flow of the $379,000 Funds from Mr. Nickel Which Would Have**

6           **Shown Her Fraudulent Transfer Scheme Using the Defendant LLCs as her**

7           **Alter-Egos and Would Have Saved Plaintiff Months of Time, Money and**

8           **Work to Trace the Funds Which Also Proved Her False Oaths With the Intent**

9           **to Hide Collectible Assets from Creditors and the Trustee.** ……….……..85

10      **D.**    **Defendant LLCs Assets Were Used by Debtor to Create False Oaths With the**

11           **Intent to Hide Collectible Assets from Creditors and the Trustee.** …………88

12         *1.*   ***Debtor Changed Her Schedules and Testified About Her Change of Ownership***

13             ***Interest in her alter-ego Defendant JP LLC Without Accounting For the***

14             ***Change, Causing Creditors to Spend An Unfair Amount of Time and***

15             ***Resources to Determine the Truth of Her Assets*** ………………….…......89

16         *2.*   ***Debtor used her alter-ego Defendant JSC LLC to Create And Schedule a***

17             ***Retirement Account Asset in the Amount of $7252.21, by Transferring Funds***

18             ***Debtor Received from Mr. Nickel to JSC LLC Chase #7860 account Which***

19             ***Debtor Then, through Defendant JSC LLC, Transferred to Debtor's personal***

20             ***Fidelity IRA Rollover Account #169-638064.*** ………………………...91

21         *3.*   ***Debtor used Defendant JSC LLC to Transfer a $14002 Distribution From***

22             ***Debtor's 401k Plan Account And Then Lied About the Transfer on Schedule***

23             ***107 Within 1 Year of Filing for Chapter 7 Bankruptcy Protection.***..………...91

24 **V. CONCLUSION**   ……………………………………………………………………… 93

# TABLE OF AUTHORITIES

**CASES**

*Benny v. Piper*, 799 F.2d 489, 495 (9th Cir. 1986); *see also Geddes v. United Financial Group*, 559 F.2d 557, 560 (9th Cir. 1977). .................................................................................. 11

*Butler America LLC v. Aviation Assurance Co., LLC* (2020) 55 Cal. App.5th 136, 146................ 64

*Cashco Fin. Servs. v. McGee (In re McGee)*, 359 B.R. 764, 770 (9th Cir. BAP 2006) ................ 11

*Curci Investments, LLC v. Baldwin* (2017) 14 Cal.App.5th 214, 221, 221 Cal.Rptr.3d 847) …8,13,63

*Davis v. Fendler*, 650 F.2d 1154, 1161 (9th Cir. 1981) .................................................... 11

*Fair Housing of Marin v. Combs (In re Combs)*, 285 F.3d 899, 906 (9th Cir. 2002). ................... 11

*Filip v. Bucurenciu*, 129 Cal. App. 4th 825 (2005) ......................................................... 77

*Fong v. U.S.*, 300 F.2d 400, 409 (9th Cir. 1962) ........................................................... 11

*In Re Brugnara Properties VI, (Brugnara Properties VI v. IRS)*, 606 B.R. 371 (N.D. California 2019) ........................................................................................................ 64

*In re Gonzalez*, 553 B.R. 467 (E.D. New York 2016) ....................................................... 11

*In re Juzwiak*, 89 F.3d 424, 430 (7th Cir. 1996) ........................................................... 86

*In re Sabban*, 600 F.3d 1219,1222 (9th Cir. 2010) ......................................................... 11

*In re Scott*, 172 F.3d 959, 969 (7th Cir. 1999) ............................................................ 86

*Husky International Electronic, Inc. v. Ritz* (2016) 578 U.S. 356, 359, 136 S.Ct. 1581, 1586............................................................................................... 11, 78, 82

*Khalil v. Developers Sur. & Indem. Co. (In re Khalil)*, 379 B.R. 163 (B.A.P. 9th Cir. 2007) ........ 89

*Leek v. Cooper* (2011)194 Cal.App.4th 399, 419, 125 Cal.Rptr.3d 56. ...................................... 64

*Misik v. D'Arco* (2011) 197 Cal.App. 4th 1065, 1069, 130 Cal.Rptr.3d 123. ................................ 63

*Nagel v. Westen*, 59 Cal.App.5th 740 (2021) ....................................................... 11, 72, 80-82, 85

*Nautilus, Inc. v. Yang* (2017) 11 Cal.App.5th 33, 37 [217 Cal.Rptr.3d 458]. ...........................76, 77

*PGA West Residential Assn., Inc. v. Hulven Internat., Inc.* (2017) 14 Cal.App.5th 156, 174 [221 Cal.Rptr.3d 353] *(PGA West)* .................................................................... 84

*Postal Instant Press, Inc. v. Kaswa Corp.* (2008) 162 Cal.App.4th 1510, 1513............................ 63

*Ravasia v. U.S. Tr. (In re Ravasia)*, 2021 Bankr.LEXIS 1033, at *18 (B.A.P. 9th Cir. Apr. 16, 2021) .......................................................................................................................................... 89

*Retz v. Samson (In Re Retz)*, 606 F.3d 1189, 1200 (9th Cir. 2010) .................................... 88

*Roberts v. Erhard (In re Roberts)*, 331 B.R. 876, 883 (B.A.P. 9th Cir. 2005) .......................... 88

*Sharma v. Salcido (In re Sharma*, 2013 Bankr. LEXIS 2286, at *20-21 (B.A.P. 9th Cir. May 14, 2013) .......................................................................................................................................... 11

*Televideo Sys.*, 826 F.2d 915, 917-18 (9th Cir. 1987) ............................................................ 11

*Toho-Towa Co., LTD v. Morgan Creek Productions, Inc.* (2013) 217 Cal.App.4th 1096, 1108, 159 Cal.Rptr.3d 469. .......................................................................................................................... 11

*Turtle Rock Meadows Homeowners Association v. Slyman (In re Slyman)*, 234 F.3d 1081, 1085 (9th Cir. 2000). .......................................................................................................................................... 64

*Union Planters Bank, N.A. v. Connors*, 283 F.3d 896, 899 (7th Cir. 2002). .................................. 86

**STATUTES**

11 U.S.C. §101, et seq. ........................................................................................................... 14
11 U.S.C. §523(a)(2)(A) ......................................................................................................... 13,94
11 U.S.C. §727(a)(3) .............................................................................................................. 13,85,94
11 U.S.C. §727(a)(4) .............................................................................................................. 13,94
11 U.S.C. §727(a)(5) .............................................................................................................. 13,94

28 U.S.C. §157(b) .................................................................................................................. 10

California Civil Code Section 187 ......................................................................................... 11

Cal. Civ. Code § 3439.04(a)(1). ............................................................................................ 71

Cal. Civ. Code § 3439.04(b). ................................................................................................. 72

Cal. Civ. Code § 3439.08 ....................................................................................................... 76

Cal. Civ. Code  5975, subdivision (a) ................................................................................... 15

Fed. R. Civ. P. 55(a) ........................................................................................................... 10, 11

Federal Rule of Bankruptcy Procedure 7055 ........................................................................ 10

Sen. Com. on Judiciary, Analysis of Sen. Bill No. 161 (2015-2016 Reg. Sess.) p. 1 ................. 81

## I.    INTRODUCTION

Plaintiff's sued Debtor and Defendants, J-Pad, LLC ("JP LLC") and J-Sandcastle Co LLC ("JSC LLC") (collectively "Defendant LLCs") in this adversary proceeding requesting the non-dischargeability of Plaintiff's second civil judgment listed in Plaintiff's First Amended Complaint ("FAC" and "DK 6"), the operative pleading, and attached the judgments to the FAC DK 6 Exhibit ("Ex.") 3 and 4 under §523(a)(2)(A) actual fraud causes of action. Plaintiff also requested the denial of discharge under §727(a)(3), §727(a)(4), and §727(a)(5) causes of action related to Debtor's use of Defendant LLCs as her alter egos to conceal Debtor's financial condition, make false oaths and avoid explaining the deficiency of Debtor's assets available to meet Debtor's liabilities.  By this Motion, Plaintiff seeks the entry of default judgment of Defendant JP LLC and Defendant JSC LLC.  Plaintiff does not seek actual damages in this Motion.  Plaintiff requests findings of fact and the equitable solution of reverse piercing of the Defendant LLCs corporate veils and adding Defendant LLCs as additional judgment debtors to Plaintiff's judgments pursuant to *Curci Investments, LLC v. Baldwin* (2017) 14 Cal.App.5th 214, 221, 221 Cal.Rptr.3d 847 ("*Curci*").

## II.    PROCEDURAL HISTORY

As more fully described in Plaintiff's FAC DK 6, the Debtor, Jamie Lynn Gallian ("Debtor") created and used her wholly-owned, single member Defendant LLCs as alter-egos from October 2018 through Debtor's petition for bankruptcy, July 9, 2021 to effectuate a series of concealed fraudulent transfers to hinder or delay or defraud Debtor's creditors which began with the transfer of the 4476 Alderport condo on October 31, 2018 on the eve of the Plaintiff's civil motion for attorney's fees and costs as a result of Debtor's dismissal of her civil complaint against Plaintiff and the other HOA Board members. The Debtor received $379,000 from the transferee, Mr. Nickel, on October 31, 2018 in a concealed exchange for the 4476 Alderport condo, to avoid

paying the Debtor's debts to the Plaintiff and the HOA. This was the first voidable transfer. Then, on October 31, 2018, Debtor deposited $366,600 of $379,000 in her JP Morgan Chase Personal Savings account and began immediately moved the cash into and out friends accounts, into cashier's checks and then, starting November 7, 2018, into and out of the Defendant LLCs bank accounts via cashiers checks and wires to hide the cash in the single-member Defendant LLCs, which had no business activity or third-party creditors.

Plaintiff will show that the Debtor has 100% ownership of the single-member Defendant LLCs since their inception on October 18, 2018. [*See* FAC ¶44, DK 29]. Debtor admitted on her bankruptcy petition that JSC LLC is her 100% owned, single-member limited liability company since its inception on October 18, 2018. FAC DK 6 ¶44, Debtor Answer DK 13 ¶44.   In Debtor's subsequent bankruptcy corporate ownership statement filed in this case on March 16, 2022, Debtor admitted that JP LLC is also her 100% owned, single-member limited liability company since she became its sole owner on October 18, 2018. Debtor further admitted that Defendant LLCs have not conducted any business.  [*See* DK 29].  There is substantial evidence of a unity of interest between Debtor and the Defendant LLCs and failing to add the Defendant LLCs to the judgments would create an unjust result.

Plaintiff was injured by the Defendant LLCs which Debtor used to do ongoing fraudulent transfers to hinder, delay and/or defraud Plaintiff from collecting the civil judgment ordered since 2018, Exhibit 4, in the amount of approximately $67,550.65 (the civil judgment plus interest), which is the original judgment debt, plus interest. [Jasso Decl. ¶4]. The criminal restitution judgment was ordered non-dischargeable pursuant to Plaintiff FAC's First Cause of Action on December 19, 2022.  [DK 85].   The criminal restitution judgment debt is approximately $14,630 (the criminal restitution judgment plus interest), is incorporated by reference in the FAC's Claims 2-5. These judgments are included in this default judgment motion to add the Defendant LLCs as

additional debtors to this judgment as well.  [Jasso Decl. ¶4]. Defendant LLCs were used by

Debtor to facilitate concealment of her personal assets in the Defendant LLCs, facilitate false

oaths in Debtor's bankruptcy petition regarding her personal, collectable assets hidden in the

Defendant LLCs, and facilitate Debtor's personal use of the assets causing Defendant LLCs loss

and deficiency of Debtor's personal assets.

## III.    DEFAULT JUDGMENT IS APPROPRIATE HERE

### A.  JURISDICTION

Jurisdiction of this adversary proceeding is conferred on this Court by 28 U.S.C. §157(b).

The FAC is brought pursuant to 11 U.S.C. § 523 and § 727. [DK 6]

### B.  STANDARD FOR JUDGMENT BY DEFAULT

Rule 55 of the Federal Rule of Civil Procedure ("FRCP"), made applicable to this

proceeding by Federal Rule of Bankruptcy Procedure 7055, provides that the Court may enter

judgment by default upon application of the party entitled to the default.  It provides in pertinent

part:

(a) Entering a Default. When a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend, and that failure is shown by affidavit or otherwise, the clerk must enter the party's default.

(b) Entering a Default Judgment.

(1) By the Clerk. If the plaintiff's claim is for a sum certain or a sum that can be made certain by computation, the clerk—on the plaintiff's request, with an affidavit showing the amount due—must enter judgment for that amount and costs against a defendant who has been defaulted for not appearing and who is neither a minor nor an incompetent person.

(2) By the Court. In all other cases, the party must apply to the court for a default judgment. A default judgment may be entered against a minor or incompetent person only if represented by a general guardian, conservator, or other like fiduciary who has appeared. If the party against whom a default judgment is sought has appeared personally or by a representative, that party or its representative must be served with written notice of the application at least 7 days before the hearing. The court may conduct hearings or make referrals—preserving any federal statutory right to a jury trial—when, to enter or effectuate judgment, it needs to

(A) conduct an accounting;
(B) determine the amount of damages;
(C) establish the truth of any allegation by evidence; or
(D) investigate any other matter.

To obtain a default judgment, a two-step process is required: (1) an entry of default (typically by the clerk of court); and (2) a judgment by default. *Cashco Fin. Servs. v. McGee (In re McGee)*, 359 B.R. 764, 770 (9th Cir. BAP 2006) (citing Fed. R. Civ. P. 55(a) and (b) and Fed. R. Bankr. P. 7055). Here, the Plaintiff has satisfied the first step as the Court has entered default against Defendant J-Sandcastle Co LLC and Defendant J-Pad, LLC [Dockets 55-56].

Regarding the second step, on a motion for default judgment, the "[w]ell-pleaded allegations are taken as admitted on a default judgment." *Benny v. Piper*, 799 F.2d 489, 495 (9th Cir. 1986); *see also Geddes v. United Financial Group*, 559 F.2d 557, 560 (9th Cir. 1977). Evidence supporting such factual allegations is not required. *See Fong v. U.S.*, 300 F.2d 400, 409 (because of the "default order, no further supporting evidence was required."). Moreover, in granting default judgments, courts are not required to make detailed findings of fact. *See Fair Housing of Marin v. Combs (In re Combs)*, 285 F.3d 899, 906 (9th Cir. 2002).

"The general rule of law is that upon default the factual allegations of the complaint, except those relating to the amount of damages, will be taken as true." *Sharma v. Salcido (In re Sharma*, 2013 Bankr. LEXIS 2286, at *20-21 (B.A.P. 9th Cir. May 14, 2013) (*quoting Televideo Sys.*, 826 F.2d 915, 917-18 (9th Cir. 1987)) (internal quotation marks and citations omitted). Thus, "a prove-up hearing is only required where the damages are unliquidated or not capable of mathematical calculation. FRCP 55(b) does not require a hearing to investigate facts not related to damages, since the default itself establishes those facts as alleged in the complaint." *In re Sharma*, 2013 Bankr. LEXIS 2286 at *22 (*citing Davis v. Fendler*, 650 F.2d 1154, 1161 (9th Cir. 1981); *Televideo Sys.*, 826 F.2d at 917-18).

In this case, the allegations in the FAC set out the facts that on the eve of the civil court granting Plaintiff's and the other Board members motion for attorney's fees for Debtor's vexatious, out-of-control fraudulent litigation tactics designed to try and grift property rights that did not (and still do not) exist, Debtor transferred the 4476 Alderport condo to Mr. Nickel on

1  October 30, 2018 and again on October 31, 2018 in a concealed fraudulent transfer scheme

2  transferring "fee" ownership interests to Mr. Nickel for $379,000, at a time when Debtor refused

3  to comply with discovery to avoid having to confess to her fraudulent litigation, had not been

4  paying her litigation debts, grifted $3,672.89 off of Bank of America, and had a total of $1,118.11

5  immediately preceding the transfer.  After receiving the cashier's checks from Mr. Nickel, Debtor

6  continued making fraudulent concealed transfers of money from her personal account, i.e., hiding

7  funds from creditors in and out of the Defendant LLCs' bank accounts and in and out of a **non-**

8  **qualified** personal Fidelity IRA account, transferring funds hidden in Defendant JSC LLC to her

9  associate, Lisa Ryan, on November 16, 2018 via three cashier's checks totaling $150,000 in order

10  for Defendant to purchase a mobile home in the name of Defendant JSC LLC in another concealed

11  transfer.  After filing for bankruptcy, Debtor lied to the Trustee claiming she paid Lisa Ryan

12  $170,000 in cashier's checks and 10,000 in cash, and Debtor lied on her subsequent bankruptcy

13  schedules about her fabricated February 25, 2021 back-dated transfer of the mobile home title

14  from JSC LLC to herself. As the documents slowly revealed, Debtor went to great lengths, using a

15  stack of cashier's checks and wire transfers between several financial institutions to

16  - use the Defendant LLCs to claim indigency and obtain a state public defender and

17  public appellate attorney regarding Criminal Case 18WM05278 in which Plaintiff

18  was one of her victims, and

19  - lie on her bankruptcy schedules filed repeatedly to hide assets in the Defendant

20  LLCs, and

21  - to use Defendant LLCs to pay Debtor's personal expenses including bail, criminal

22  court fines, court appellate costs, attorneys to continue vexatious litigation, car

23  payments, groceries, restaurants, cell phone, and withdraw cash with funds that

24  would have been available to collect if the funds were not hidden in the Defendant

25  LLCs.

26  The Plaintiff's allegations are well pled and straightforward.  By this Brief, Plaintiff

27  supplements the FAC with the Declaration of Janine Jasso filed concurrently herewith, providing

28  further support for liability. Therefore, the Court should enter judgment in favor of the Plaintiff

12

1    based on the facts established in the FAC that the debts are non-dischargeable under Section

2    523(a)(2)(A), and Defendant LLCs and Debtor are one and the same such that the Debtor should

3    be denied discharge under Sections 727(a)(3), 727(a)(4) and 727(a)(5).

4            The Plaintiff is not seeking compensatory damages in this default judgment.

5            Plaintiff submits that by entering default judgment against each Defendant JP LLC and

6    JSC LLC, the Court may enter the following equitable, non-compensatory relief:

7            (1) Findings of facts related to the Debtor's California single-member Defendant LLCs as

8                listed below;

9            (2) Finding that Plaintiff has met her burden of proof by a preponderance of the evidence

10               that the Defendant LLCs meet the legal definition of alter egos of Debtor, under *Curci*

11               *Investments, LLC v. Baldwin* (2017) 14 Cal.App.5th 214, 221, 221 Cal.Rptr.3d 847;

12           (3) Finding that as an equitable resolution provided by *Curci* case law, which is known as

13               outside reverse piercing of the corporate veil of the Defendant J-Sandcastle Co LLC,

14               the Defendant J-Sandcastle Co LLC is added an additional judgment debtor of

15               Plaintiff's criminal and civil judgments;

16           (4) Finding that as an equitable resolution provided by *Curci* case law, which is known as

17               outside reverse piercing of the corporate veil of the Defendant J-Pad LLC, the

18               Defendant J-Pad LLC is added as an additional judgment debtor of Plaintiff's criminal

19               and civil judgments;

20           (5) Finding that as Debtor and the Defendant LLCs are one and the same under the reverse

21               veil piercing type of alter-ego equitable solution, the debts owed Plaintiff are not

22               dischargeable 523(a)(2)(A) and a denial of discharge under Sections 727(a)(3),

23               727(a)(4) and 727(a)(5) is appropriate for Debtor through use of the Defendant LLCs;

24           (6) Finding that Plaintiff is entitled to collect the judgments against assets of the Defendant

25               LLCs that are <u>not</u> bankruptcy estate assets, meaning that the Defendant LLCs' asset did

26               not exist prior to the original petition date; and

27

28

13

(7) Finding the Plaintiff is also entitled to collect the judgments against Defendant LLCs' assets that have been abandoned by the Trustee or are abandoned in the future by the Trustee.

**C. FINDING OF FACT IN FAVOR OF DEFAULT JUDGMENT**

1. Debtor filed a voluntary Chapter 7 petition on July 9, 2021 in pro se under United States Bankruptcy Code, 11 U.S.C. §101, et seq, Case No. 8:21-bk-11710-SC, [Official Docket No. 1].

2. Jeffrey Golden was appointed Trustee.

3. The convicted Debtor scheduled the State of California criminal victim restitution order and judgment under OCSC Criminal Case No. 18WM05278 which the criminal court ordered her to pay Plaintiff as a condition of her probation for violating the restraining order protecting me and my family from no contact. [FAC DK 6, ¶¶23-27, Ex. 3; Official Docket No. 1, Schedule E/F, Item 4.17].  On December 13, 2022 at the hearing on the merits, the Court granted Plaintiff's Motion for Partial Summary Judgment [DK 47] on the FAC First Cause of Action for non-dischargeability of a state criminal restitution order under 11 U.S.C. §523(a)(7), and the Court's written order was filed on December 19, 2022 and served on December 22, 2022. [DKs 84,85].

4. Debtor also scheduled Plaintiff's civil court judgment owed under OCSC Case No. 30-2017-00913985, The Huntington Beach Gables Homeowners Association ("HOA") v. Bradley, Gallian, et al. [FAC DK 6 ¶¶29-30, Ex. 4; Official Docket No. 1, Schedule D, Item 2.7, Schedule E/F 4.6].

5. As more fully described in the Procedural History, above, on November 2, 2022, the Court entered the defaults of Defendant J-Pad, LLC and Defendant J-Sandcastle Co, LLC. [DKs 55,56].

> *1.*        ***Chronology of the Debtor and Defendant LLCs Acts Related to The FAC's Claims 2-5***
>
> > *a. Facts Related to the Concealed Transfer of the 4476 Alderport Condo*

6.  Plaintiff at all relevant times mentioned herein, was a homeowner and Board Member of The Huntington Beach Gables Homeowners Association ("Association" or "HOA" ). [FAC DK 6 ¶12].

7.  Debtor became the Sublessee of record of the property located at 4476 Alderport Drive, Unit 53, Huntington Beach, CA 92649 ("4476 Alderport condo") on or about March 22, 2017, by way of a recorded Assignment of Condominium Sublease ("Sublease"). The prior owner, Sandra

Bradley, was a member of the Association and Debtor's former stepmother by way of being the widow of Debtor's former stepfather. [FAC DK 6 ¶13].

8.   The 4476 Alderport condo is one of only 80 an air-space condominiums located within this tiny Association.  The Association is located within two miles of Sunset Beach and less than a mile from Huntington Harbor. The Association is a very small, non-profit organization with very low monthly dues.  The owners purchase a triple-net sublease of a unit, which is a contract of adhesion for a term of years, like renting a commercial space in a mall, requiring the sublessee to pay rent to a separate landlord, BS Investors, the property taxes and hoa assessments to the Association. The Association is a very close-knit community, where residents know their neighbors as their friends. The residents take care of the inside of their condos and patios, and the Association maintains everything outside, i.e. the common area. [FAC DK 6 ¶14].

9.   Only the Association and condominiums are located on the Orange County, California real estate Tract 10542. The Condominium Plan for the entire tract is recorded with Orange County Recorder's office as Book 13358 Page 1193, as Instrument No. 28814. [FAC DK 6 ¶12 and its Exhibit 1].

10. No Rancho Del Rey mobile homes are located on the same real estate tract as the Association. [FAC DK 6 ¶15, and its Exhibit 1, Jasso Decl. ¶12, Ex. 2, pp. 273-276, OC Assessor's Maps].

11.   The Sublessee of every unit within the Association is subject to compliance with the provisions of various governing documents, including but not limited to, the "Declaration of Covenants, Conditions and Restrictions for The Huntington Beach Gables," recorded on May 28, 1980 as file/document number 80-28926 ("CC&Rs"), Rules and Regulations adopted by the Board on August 26, 2003, and the Condominium Plan recorded on October 18, 1979 as Book 13358 Page 1193, as Instrument No. 28814.  [FAC DK 6 ¶16 and the CC&R's attached as its Ex. 2].

12.   The CC&Rs create and establish the Association as the governing body for the management, administration, and operation of the Association.  California Civil Code section 5975, subdivision (a) provides in part:

> The covenants and restrictions in the declaration shall be enforceable equitable servitudes, unless unreasonable, and shall inure to the benefit of and bind all owners of separate interests in the development.

[FAC DK 6 ¶17].

13. The equitable servitudes contained on page 2 of the CC&Rs set forth the owners'/sublessees' obligations with regard to maintenance. [FAC DK 6 ¶18 and its attached Ex. 2, p. 38] As an owner/sublessee, Article III, Section 3.1 of the CC&Rs required Debtor to abide by the covenants, conditions and restrictions set forth in the CC&Rs. [FAC DK 6 ¶18 and its Ex. 2, p. 40]. In addition, as an owner/sublessee, Article III, Section 3.2 of the CC&Rs required Debtor not to transfer her membership in the HOA in any way, except upon a sale to the purchaser of the unit and that any attempt to make a prohibited transfer is void and will not be reflected in the Association's records. [FAC DK 6 and its Ex. 2, p. 40].

14. Also, as an owner/sublessee, Article V, Section 5.1 of the CC&Rs required Debtor to pay to the Association regular and special assessments, plus interest, which shall be a continuing lien on the unit and leasehold estate, as well as the Debtor's personal obligation. Article XIV, Section 14.7 defined Debtor's assessments to included attorney's fees and costs judgments regarding legal action instituted against the owner to enforce the CC&Rs. Since the Association and the Board members had an obligation to enforce the CC&Rs, Section 5.5 required the Debtor to pay any court's judgments as special assessments, with a continuing lien against her unit since the start of her ownership of the 4476 Alderport condo sublease.  [FAC DK 6 and its Ex. 2, pp. 43, 46, 70].

15. Debtor violated the governing documents in various ways by failing to adhere to the architectural guidelines, maintenance standards, and specifications set forth in the CC&Rs and creating a nuisance in the Association's common areas. As a result, the Association receive mounting homeowner complaints and demands that the nuisance activities be abated by the Association. [FAC DK 6 ¶19].

16. Despite the Association's and Ms. Bradley's numerous attempts to bring the condominium into compliance with the CC&Rs, the Debtor refused to comply.  Due to Debtor's refusal to comply, the Association began its enforcement lawsuit in April 2017 ("Enforcement Lawsuit") to enjoin the Debtor from her actions in the common area and recover damages.  [FAC DK 6 ¶20].

17. Debtor, in apparent retaliation, cross-sued in pro per, as part of a long history of pro per litigation against her victims. Because of the recorded CC&Rs, Plaintiff became a creditor of Debtor's and

1   had a continuing lien on the 4476 Alderport condo since 2017 when Debtor cross-sued Plaintiff, and

2   the other Board members, for indemnification, apportionment of fault and declaratory relief under

3   the governing documents, in which she (falsely) claimed Plaintiff owned the 4476 Alderport condo

4   and that Plaintiff had violated the governing documents causing the condo to be out of compliance

5   with the CC&Rs.  [See Jasso Decl. ¶22, Ex. 12, p.451, CA Appellate Court Opinion, G057198].

6   After enduring false claims and defending Debtor's out-of-control litigation tactics designed to hurt

7   people rather than prove a civil claim, Debtor lost her cross-claims on demurrer. Debtor then

8   dismissed her suit against Plaintiff and the other Board members. Per the governing documents and

9   state law, known as Davis-Stirling, Plaintiff as a Board member was entitled to attorney's fees and

10  costs for defending herself against the Debtor's cross-suit in the Enforcement Lawsuit. [FAC DK 6

11  ¶29;].

12  18. Following her pattern of pro per litigation against her victims, Debtor also cross-claimed

13  against her former stepmother, Sandra Bradley, for indemnification.  Afraid for her own safety

14  after Debtor threatened her, Ms. Bradley had to obtain an elder-abuse restraining order to protect

15  herself from the Debtor.  Mrs. Bradley testified in her Elder-Abuse trial stating that she gave the

16  4476 Alderport condo sublease to Debtor in the hope that Debtor would never contact Mrs.

17  Bradley again.   Debtor also testified stating that starting on March 2, 2017, Debtor thought about

18  the Condominium Plan and read the CC&Rs and spent numerous hours **trying to figure out how**

19  **to remove the HOA**.   [Jasso Decl. ¶13, Ex. 3, p.361, lines 7-11, pp. 292, lines 10 through p. 294,

20  line 12].

21  19. Debtor, in pro per, also cross-sued the owners of the landlord, BS Investors, in the

22  Enforcement Lawsuit, which is the entity that actually has a ground lease to the property for a term

23  of years and against whom she could attempt to make potential property rights claim as the

24  successor in interest to Mr. Warmington, the builder of the HOA condominiums and original

25  sublessor.  But she never served them, which allowed her to continue vexatious litigation tactics

26  against the HOA and the volunteer Board members, based on her purported claim of fee simple

27

28

ownership and her purported claim, without proof, that HOA did not exist on the premises. The owners of BS Investors won their motion to quash. [Jasso Decl. ¶14, Ex. 4, p.381].

20. In the Enforcement Lawsuit, Debtor's unprovable, false cross-claims that the condominium sublease was a fee ownership of a townhome in a PUD was not a legitimate, honest dispute. Mrs. Bradley testified that Debtor had paid the sublease rental payment to BS Investors, the HOA dues, and property taxes, which are conditions of the triple-net condominium sublease payments. [Jasso Decl. ¶ 13, Ex. 3, p. 286, lines 14-25].

21. Furthermore, sublessees and the HOA had already proven in the 2000 civil litigation defending the suit brought by BS Investors and Houser Bros Co., OC Case No. 00CC09649, that Houser Bros. Co. owned the property in fee simple.  [Jasso Decl. ¶15, Ex. 5, p. 382, lines 18-19, the 2002 trial brief].  One of the critical issues put to the court in the 2000 case was whether the property could be converted by the sublessees into a higher, best use, such as converting the condominiums into fee simple townhomes or single-family homes or removing everything on the property and building a commercial enterprise.  The sublessees and the HOA proved that the subleases are contracts of adhesion and thus the condominiums could never be changed without the landlord's written permission. *Id.* at p. 13, lines 5-10 and p. 18, line 17 to p.19, line 20.  The sublessees argued successfully that all 80 sublessees had no right to unilaterally modify the footprints of the units or anything on the property. The sublessor, BS Investors, and BS Investor's ground lessor, Houser Bros. Co then settled the lawsuit creating a 2003 First Amendment to the subleases which tied the annual rental increase to the CPI index with a 7% cap.  [Jasso Decl. ¶¶ 7, 35, Ex. 24].

22. As proven in the 2000 case, a sublet condominium under a Condominium Plan is not the same as owning a townhome in a Planned Unit Development ("PUD").  In California, a townhouse is the ownership equivalent of a single-family home, with real property ownership of the building, ground underneath and the air above the townhome in fee simple. Furthermore, due to the

18

proximity to Sunset Beach and Huntington Harbor, townhomes located within a block of this HOA were bought and sold in 2018 between $650,000 -$800,000. Debtor's condo, based on the fair market value price per square foot of a townhome of approximate based on the sales of townhomes next to the HOA in 2018, would have been $600,000, if the 4476 Alderport condo was a townhome. Today, the sublet condo would be nearly $800,000 if it was a townhome. After failing to prove fee simple ownership of ground underneath the 4476 Alderport condo, which is in fact the common area, Debtor and Mr. Nickel created and signed an under-the-table transfer document that conveyed the condo with a remainder interest in the ground in fee by first unilaterally cancelling the Houser Bros Co-BSI ground lease. This meant that Mr. Nickel's purported purchase price of $379,000 was substantially less (47.37%) than the fair market value of their purported townhome in the HOA. [Jasso Decl. ¶16, Ex. 6, p. 419, lines 19-27 and its Ex. E pp. 431-432 (comparative sales of townhomes within 1 block), and its Ex. B, p.424-425, photos of the HOA condominium complex].

On or about October 14, 2021, Debtor filed third amended schedules, claiming personal ownership of the JSC mobile home and the ground underneath the mobile home in fee simple. Debtor admitted that, if true, the mobile home value would necessarily increase in value to well over $900,000 based on recent sales of single homes adjacent to JSC's mobile home. This shows Debtor's intent to continue her pattern of false and vexatious bankruptcy tactics in order to illicit someone else's property. [FAC DK 6 ¶69, Answer DK 13 ¶69].

Notably, this Court has already been subjected to Debtor's vexatious litigation tactic to illicitly gain money. For example: the Debtor listed a California Covid-19 Rent Program check as an exempt asset. The creditor Houser Bros Co., who owns the mobile home park, filed an Interpleader, OCSC Case No. 30-2021-01236940-CL-MC-CJC, proving no tenancy exists between Debtor and Houser Bros Co., thereby proving that the Debtor had no right to California's Covid-19

19

Rent Program funds. This Court found no basis for granting Debtor's ex parte motion for the California's Covid-19 Rent funds of approximately $25,000 to be applied to rent to Houser Bros or to force Houser Bros to accept rent check payments. *See* DK 14, Houser Bros. v. Gallian, Adversary Case 8:21-ap-01097-ES. Based on the above, Debtor attempted to illicitly claim California Covid-19 rent program funds based on a lie.

23. Debtor's apparent plan to unilaterally take ownership of the HOA condominiums in fee simple, including Houser Bros. Co's actual fee ownership of the ground, included making this false "townhome in a PUD" claim throughout her protracted *pro per* litigation against Plaintiff, the other Board members, and the HOA by out-of-control litigation tactics designed to avoid discovery rules and cause financial rape of all of the litigation victims who can do nothing to stop her destruction of the property without the court's help. For example, during the course of the Enforcement Lawsuit, the Debtor continued to refuse to comply with the governing documents, doubled-down by increasing her unsafe nuisance activities affecting all the residents in the common area, causing the homeowners to complain even more about the Debtor and threaten litigation against the Board members. Her nuisance activity in the common area caused the Association's insurance and legal fees to increase as well. As a result, the Court issued a temporary restraining order ("TRO") in September 2017 and a preliminary injunction ("PI") in January 2018. [FAC DK 6 ¶21].

24. As part of the court the TRO and PI legal proceedings against the Debtor, the state court determined that Debtor was the owner of the 4476 Alderport condominium airspace parcel and that the Association's common area included all of the property in the Association exterior to the condominium, from the walls of each condominium out. The court reviewed the governing documents. The court ordered Debtor, and any of her associates, employees, guests and tenants to comply with the TRO and PI in order to protect the Association and its vendors from further harm

by Debtor or anyone connected to Debtor.  [FAC DK 6 ¶22, see, Jasso Decl. ¶17, Ex. 7 pp. 434-437, Copy of PI, paragraph 9].

25.   The Debtor in apparent retaliation began trespassing, threatening, stalking, harassing, making false accusations targeting Plaintiff, the other Board members and family members, requiring the Association to obtain a Workplace Violence restraining order against Debtor. At the trial on the merits, the Court found that Debtor had targeted Plaintiff and other Board members and family members showing a pattern of conduct threatening the safety of all of the protected parties and issued a permanent Workplace Violence restraining order until July 30, 2022.  [FAC DK 6 ¶23].

26. The Workplace Violence restraining order was subsequently extended by the court until July 30, 2025. [Jasso Decl. ¶7, DK 49 and its Ex. A].

27.  In March 2018, the Debtor violated the Workplace Violence restraining order protecting Plaintiff and my then 7-year-old daughter.  Under Criminal Case No. 18WM05278, a criminal trial was held, and Debtor was convicted of two counts of Contempt of Court for violating the Workplace Place Violence restraining order. After Debtor violated the Workplace Violence Restraining Order, Plaintiff sought an additional personal restraining order on the advice of the Huntington Beach Police.  A separate permanent civil restraining order protects Plaintiff and my family members until December 2023. The Debtor, as part of her sentence and probation was ordered to pay victim restitution which included attorney's fees incurred for the Plaintiff's separate restraining order, medical expenses and court copy costs. [See, Paragraph III.C.3, *supra*, and FAC DK 6 ¶¶24, 26].

28.  Another example of Debtor's deceitful litigation tactics: Debtor admitted that in an effort to increase confusion for the Bankruptcy Trustee about the legitimacy of the criminal restitution judgment, the Debtor provided the Bankruptcy Trustee with a copy of Debtor's fabricated court brief filed in multiple court cases in 2021.  In it, Debtor (falsely) claimed that Plaintiff and my

21

daughter were not her victims, were not entitled to state victim restitution, and that Plaintiff illegally recorded the restitution abstract of judgment issued by the Criminal Court as provided above. Debtor projected Debtor's own fraud onto Plaintiff, as Debtor's retaliatory claims against Plaintiff and my daughter were denied by the criminal court, the civil restraining order court, the California Criminal Appellate Court and the Civil Court of Appeals for the 4th District. [FAC DK 6 ¶28; Debtor's Admission in Answer DK 13, p.4, ¶28].

29. In July 2018, the Debtor successfully fought the oral settlement that was put on the record with the HOA and Board members, to *prevent* the sale of her condo sublease via escrow which was a material term of the settlement. The state court warned Debtor that by winning her opposition to the HOA's motion, she would be subject to all of the civil procedure requirements and could end up with legal fees awarded against her. [Jasso Decl. ¶¶7, 30, Ex. 20A, p.826, lines 15-17].

30. Another example of Debtor's fabricated litigation tactics: Instead of complying with discovery requests in which the HOA was trying to determine what proof she had for any of her claims against the HOA, Debtor filed another *ex parte* motion for a restraining order against the HOA under the name, caption and bar license number of her attorney without his permission. When he discovered the Debtor's filing, Mr. Flyer notified the court to take it off calendar. The court did so and admonished Debtor for fraud. [Jasso Decl. ¶18, Ex. 8, p. 439 court minute order dtd 09.07.18].

31. The HOA moved to compel discovery. On September 27, 2018, after the court found that the Debtor was unwilling to live up to the terms of the settlement, the court ordered discovery sanctions against the Debtor for her ongoing violation of court-ordered discovery. She did not pay the sanctions of $3070, which were due on October 27, 2018. The state court then ordered the abstract of judgment on November 16, 2018 [Jasso Decl. ¶19,20, Ex. 9, p.443, first full paragraph of 9.27.18 court minute order, Ex. 10, pp. 445-447, Discovery sanctions judgment].

32. In connection with this discovery sanction, Mr. Flyer warned her in August 2018 that she had to comply with court-ordered discovery or face sanctions and possibly losing her condo sublease. [Jasso Decl. ¶21, Ex. 11, p. 449-450].

33. After a properly noticed motion for attorney's fees on August 7, 2018 scheduled to be heard on November 1, 2018, the court issued a tentative ruling on October 31, 2018 in favor of Plaintiff and the other Board members. On November 1, 2018, the Court held its scheduled hearing and found in favor of Plaintiff and the other Board members on the merits, issuing a final order of $46,138 plus 10 percent interest per annum, on November 8, 2018.  The Debtor did not pay the court judgment, and an Abstract of Judgment was issued and recorded at the Orange County Recorder's office on December 14, 2018.  [FAC DK 6 ¶30 and its Exhibit 4].

34.  Debtor immediately appealed, and the court's order was affirmed on September 15, 2020, California 4th Appellate District Division 3, Case No. G058198.  The appellate court's opinion shows the Board in good faith tried to settle with the Debtor to help stop Debtor's vexatious litigation. [Jasso Decl. ¶22, Ex. 12, p. 454, 7th full paragraph, last five sentences, footnote one lists the board members, including Plaintiff].

35. Also, on August 13, 2018, with the approval of the landlord, BS Investors, the HOA approved recording a written lien with the OC Recorder's office on the 4476 Alderport Condo sublease for the unpaid delinquent HOA special assessments. [Jasso Decl. ¶23, Ex. 13 pp. 456-477].

36.  As indicated in Paragraph 24, *supra*, the state court's PI enjoined Debtor and all of Debtor's associates, which included anyone acting for Debtor including any real estate agent, potential buyer or escrow agent of the 4476 Alderport condo from contacting the HOA members, volunteers **and management** regarding the litigation.  This PI therefore required Debtor's associates to contact the HOA attorneys that were listed on the PI with their names, address and phone number regarding any matter related to the HOA litigation, including HOA escrow disclosures and

demands as the information necessarily including the ongoing HOA litigation. [Jasso Decl. ¶17, Ex. 7, p. 434-437, copy of PI, para. 9].

37. In September 2018, Debtor's escrow agent, Cheryl Shoats of Eminence Escrow, contacted the HOA attorneys on behalf of Debtor asking for HOA litigation information for a potential buyer of the 4476 Alderport condo unrelated to Mr. Nickel, in compliance with the court's PI. As a nonprofit homeowner's association, our HOA could only give a potential buyer the litigation disclosure letters, audited financials and board minutes, which discussed the ongoing through the HOA attorney to Debtor's licensed escrow agent in compliance with the PI. This process which all hoa's must follow, protected the HOA from any claim by a seller that the HOA intentionally interfered with a prospective economic advantage under state law.  [Jasso Decl. ¶¶23, 24 Ex. 13, pp.457-460, and Ex. 14, pp. 479-482 (four HOA litigation disclosure letters from 2017 to 2019)].

38.  On October 10, 2018, Debtor's landlord, BS Investors, filed its unlawful detainer suit against Debtor after posting eviction notices to Debtor and all occupants in August 2018 that she was being evicted for nonpayment of the HOA's special assessments, which resulted in Debtor defaulting on her condominium sublease and which never cured. [Jasso Decl. ¶ 7, see also OCSC 30-2018-01024401].

39. On October 18, 2018, Debtor obtained 100% ownership interest in her single-member California limited liability company, Defendant JP LLC.  To create red herrings for the Trustee and the creditors, Debtor made false claims about her percentage of ownership in her original and subsequent bankruptcy schedules prior to Debtor's Answer of Plaintiff's FAC. [DK 29, FAC DK 6, ¶¶43,66, and 101; see also Jasso Decl. ¶11, Ex. 1, pp. 38-40, Debtor's bk schedules chart, and Item 19 on pp. 53, 64, 72, 83, and Jasso Decl. ¶82, Ex. 70, p. 1364, lines 11-15, Debtor admission she has been 100% owner of Defendant JP LLC since 10.18.18 (Deposition of Jamie Gallian, Houser v Gallian 11710 06.28.22)].

40. In addition, on October 18, 2018, Debtor created her 100% ownership interest in her single-member California limited liability company, Defendant JSC LLC. [DK 29 and FAC DK 6 ¶ 44].

41. After several weeks with no contact by Ms. Shoats, the escrow agent emailed the HOA attorneys on October 25, 2018 regarding a purported escrow information request sent by Debtor to the HOA management company in violation of the PI. The HOA attorney, Joyce Kapsal, responded on October 29, 2018, notifying Ms. Shoats that on October 26, 2018, Debtor informed the HOA attorney at court that there was no escrow due to the buyer backing out of the escrow because of the ongoing HOA litigation and to advise regarding the status of the escrow.  Ms. Shoats later admitted to Plaintiff that there was no escrow for Debtor and Mr. Nickel. [Jasso Decl. ¶¶7, 25, Ex. 15, pp.487-498, Shoats-Kapsal 10.25-10.29.18 emails].

42. On October 30, 2018, Ms. Gallian and Mr. Nickel met at the 4476 Alderport condo for the first time and spent up to six hours together.  Mr. Nickel signed the assignment of the sublease from Defendant JP LLC at his Chase bank and gave Debtor $379,000 in cashier's checks payable to Defendant JP LLC. [Jasso Decl.¶26, Ex. 16, p.502, lines 3-5, p. 504, lines 10-20, p.507, lines 19-25, Nickel 3-16-21 deposition].

43. Mr. Nickel met Debtor again on October 31, 2018 at his Chase bank in Riverside. Mr. Nickel signed papers and gave Debtor two cashier's checks for a total of $379,000.  After the purchase of the condo sublease, Mr. Nickel asked his banker to have someone check on the title and was told it was clear. He never did any research himself.  [Jasso Decl.¶ 26, Ex. 16, p.508, lines 17-19, p. 510, line 17 - p. 511, line 9].

44. As provided in Paragraph 33 above, on November 1, 2018, the state court granted the motion for attorney's fees and made the order final on November 8, 2018. [FAC DK 6 ¶30 and its Ex. 4].

45. Prior to the 4476 Aldeport condo purchase, Mr. Nickel always used a real estate agent or attorney for his prior California purchases of property located in homeowner's associations. [Jasso Decl. ¶26, Ex. 16, p. 514, line 15 – p. 515, line 9].

46. Mr. Nickel admitted in his SAC that he was fully aware that prior to the transfer of the condo, the litigation "between Ms. Gallian and the HOA and the six defendant Board Members named herein was expensive, litigious, vitriolic, and costly" [Jasso Decl. ¶27, Ex. 17, p. 626, Nickel SAC ¶22].

47. In addition to the 4476 Aldeport condo, Mr. Nickel admitted he had 3 or 4 other property purchases in the previously in California which had homeowner's associations ("hoa's").  Mr. Nickel had also sold homes. Mr. Nickel had more than 30 property transactions in Orange County, California, and had lived for many years in a condominium in Orange County. Mr. Nickel had 2 condominium sales in San Bernardino County using an escrow and title company within the last seven years.  Mr. Nickel did not use a real estate agent, escrow or title company for the Gallian-Nickel transaction that he did all in one day giving Debtor $379,000 in cashier's checks, which he had never done before. [Jasso Decl. ¶¶26, 28, N Depo, Ex. 16, p. 506, line 24 – p. 507, line 2, p.512, line. 16-p. 513, line 10, p.521, lines 20-24, Ex. 18, p 784-801 (county records)].

48.  Mr. Nickel knew that hoa's had reserve studies but did not request one from Debtor. Mr. Nickel did not ask the Debtor if there was any ongoing litigation. Mr. Nickel knew that hoa's have required assessments to take care of the property, and was told the monthly amount by Debtor. Mr. Nickel knew there was an HOA in which 4476 Aldeport condo was located because he had been looking at property there since August 2018. [Jasso Decl. ¶26, Ex. 16, p. 505, lines 1-10, p. 518, line 18 – p. 520, line 17 ].

49. Mr. Nickel had extensive experience with civil litigation regarding property. [Jasso Decl. ¶7].

50. Mr. Nickel has his own real estate flipping business known as R. Nickel Properties. [Jasso Decl. ¶26, Ex. 16, p. 521, line 25 – p.522, line 6].

51. For the transfer of the 4476 Aldeport condo sublease, Mr. Nickel did not obtain his own title policy but testified Debtor gave him papers. [Jasso Decl. ¶26, Ex. 16, p. 508, lines 7-19].

52. Plaintiff subpoenaed the records from Old Republic Title that issued Debtor a preliminary title report on the 4476 Alderport condo on October 16, 2018.  Debtor's Preliminary Title Report from Old Republic Title, which was given to Mr. Nickel, provides: a. The property located at 4476 Alderport was a condominium sublease held by the Debtor, Jamie L Gallian; b. Identified four parcels under the sublease that was recorded on the property which constituted the description of the condominium unit sublease, which is the same for all of the 80 condominiums other than specific 1-80 unit number and the 2003 First Amendment to the Sublease for Unit 53 [Jasso Decl. ¶29, Ex. 19, pp. 804-805 (parcels 1-4, which was almost identical to the recorded 2003 First Amendment for 4476 Alderport condo sublease), ¶35, Ex. 24, p.895].  The 4476 Alderport condo was properly identified as unit 53; c. Identified the recorded ground lease leased by the fee simple owner/lessor, Houser Bros Co., to the developer/lessee Robert Warmington, whose successor is BS Investors, who in turn subleases each unit to individuals who purchase the sublease; and d. Identified two unpaid, unreleased judgments of Debtor's recorded on the property. Debtor admitted at least one of these recorded judgments that attached to the property when Debtor became the owner in 2017 has never been released.  Plaintiff obtained a certified copy of the TD Bank Abstract of Judgment, OC Record No. 2017-0096952, on November 11, 2022 which still shows an unreleased lien on Debtor's property, including the 4476 Alderport condo.  [Jasso Decl. ¶29, Ex. 19, pp. 802-821, Old Republic Title Policy for 4476 Alderport condo unit 53 prepared for Debtor Jamie Gallian; Cert copy of TD Bank Recorded Abstract 2017-0096952; FAC DK 6, ¶ 42, Answer DK 13, ¶42.]

53. Debtor also admitted there was no escrow for the transfer of the 4476 Alderport condo sublease [Jasso Decl. ¶82, Ex. 71, p. 1534, lines 20-22, p. 1534, line 25 -- p. 1535, line 15, Gallian deposition 4-20-21]. Debtor further admitted that she gave Mr. Nickel her seller disclosures in a couple of black binders with all of the HOA information Debtor had.  [Jasso Decl. ¶ 82, Ex. 71, p.

27

1  1538, lines 14-19, p. 1539, lines 20-24 Gallian 4-20-21 Depo].  Unconcerned with the truth,

2  Debtor testified under oath that her property was free and clear, when she knew the 4476

3  Alderport condo was in litigation, and she received her Old Republic Preliminary Title Report

4  dated October 16, 2018 showing that Orange County records had property taxes lien and a TD

5  Bank judgment lien, and she had received HOA lien information in the mail in August and

6  September 2018 from the HOA attorneys and the landlord, BS Investors. [Jasso Decl. ¶82, Ex. 71,

7  p. 1533, lines 20-21, Ex.  Ex. 19, p. 805, para. 2, p.807, para. 10-11, Ex. 13, pp.456-477].

8  54. Despite receiving information from the Debtor about the ongoing litigation and, specifically,

9  the Plaintiff's and the other board members motion for attorney's fees scheduled on November 1,

10  2018, Mr. Nickel admitted there was no escrow and he did not obtain an escrow or real estate

11  agent for the purchase of 4476 Alderport condo defaulted sublease.  *See* Paragraph 47, *supra*; *see*

12  *also* Paragraph 71, *infra*, regarding Mr. Nickel's subsequent admission that this transaction was

13  against his better business sense.

14  55. On November 1, 2018, and notably after Debtor's two transfers of the 4476 Alderport condo to

15  Mr. Nickel on October 30, 2018 and on October 31, 2018, Debtor appeared telephonically stating

16  she had been in the hospital for the prior few days before the hearing for heart problems and said

17  nothing about the sale of the condo. Debtor argued against the tentative ruling and asked for a

18  court extension in order to sell the condo (prospectively) and settle with the HOA and the Board

19  members, claiming she wanted to sell her condo. Debtor said: "I have to sell the house, and that is

20  what I have been trying to do."  [Jasso Decl. ¶¶7, 30, Ex. 20A, p.825, lines 17-18].

21       By making these statements on November 1, 2018, Debtor intentionally made the court

22  and the attorney believe that she had not yet sold the condo, but was willing to do so, as evidence

23  by the court referring to the court's prior hearing on July 19, 2018 in which the court ruled not to

24  enforce the oral settlement put on the record: "When the settlement fell through, I, of course,

reminded her that if it doesn't get settled, that motion will be back on calendar and there may be

an award. So in view of the fact that Ms. Gallian is saying she *will* sell her house and *will* move,

I'm not opposed to giving the parties another week to see if they can put a package together that is

satisfactory to all sides." (emphasis added).    [Jasso Decl. ¶¶7, 30, Ex. 20A, p. 826, lines 15-21].

The court indicated its belief that the Debtor had not yet sold by saying: "All I'm saying is I'm

giving Ms. Gallian, because of her medical problems, a week to work out a settlement where you

can withdraw your motion.  If not, next week, it will most likely be granted." [Jasso Decl. ¶¶7, 30,

Ex. 20A, p.830, lines 14-17].  In making its ruling, the court stated, "this motion is continued until

next week. And two more things: No further briefing."  [Jasso Decl. ¶¶7, 30, Ex. 20A, p. 831, line

25 – p. 832 line 1]. Debtor then interrupted the court, suddenly announcing, "The house is sold.

The house is gone."  Debtor did not provide any information regarding the sale or the buyer.

[Jasso Decl. ¶¶7, 30, Ex. 20A, p. 832, lines 5-6].

56. As further evidence of the Debtor-Nickel fraudulent conveyance of the 4476 Alderport condo,

on Debtor's October 14, 2021 and November 15, 2021 Bankruptcy Schedule Form 106 A/B,

Form, Part 4, Item 34.5, Debtor scheduled a reversionary interest in the 4476 Alderport condo

sublease that she claims she sold to Mr. Nickel as a purported bonafide purchaser for value.  [Jasso

Decl. ¶11, Ex. 1, p. 74, Item 34.4, p. 84, Item 34.3].

57. On November 5, 2018, the HOA attorney, Pejman Kharrazian, investigated and found the

purported buyer, Mr. Nickel, contacted him by phone and followed up with a written email to

r.nickelproperties@yahoo.com requesting a copy of the purchase agreement and the front and

back of any sale proceeds to trace the funds.  Mr. Kharrazian also provided Mr. Nickel with copies

of the restraining orders, the first of which was the court's PI against the Debtor and all of her

associates, then all of the other restraining orders with no contact and stay orders, and the HOA's

First Amended Complaint in the Enforcement Lawsuit. [Jasso Decl. ¶31, Ex. 20B, p. 835-837.].

58. On November 7, 2018, Mr. Nickel faxed a signed, notarized, and unrecorded transfer document created by Debtor between Defendant JP LLC and Mr. Nickel dated October 30, 2018 and copies of the front of two cashier's checks payable to Debtor totaling $379,000. The checks did not include any identification of any property being purchased with the cashier's checks. The transfer document stated no consideration was paid and no transfer taxes were paid. [Jasso Decl. ¶32, Ex. 21, pp.838-846, Faxed Docs from Mr. Nickel on 11.7.18, after HOA attorney contacted him].

59. On November 1, 2018, Debtor emailed to the management company stating she sold the property and again without identifying Mr. Nickel, stated her buyer was impatient, tired of waiting regarding delays for escrow information purportedly sent to the management company by Ms. Shoats prior to meeting Mr. Nickel and made the decision himself to do the deal as a 'savvy investor'. Plaintiff believes Debtor and Mr. Nickel planted this false flag about a nonexistent escrow demand to make it appear as though the HOA had failed to act on her fabricated "escrow". [Jasso Decl.¶7, ¶ 25, Ex. 15, p. 485]

60. In December 2018, Plaintiff's attorney recorded an abstract of judgment for the attorney fees and costs awarded by the Court in November 2018, which Debtor never paid. *See* Paragraphs 33, *supra*.

61. Plaintiff went to the OC Tax Assessor's office and found that their records showed Debtor as the title owner of the 4476 Alderport condominium sublease. The Tax Assessor office confirmed that their records showed that Debtor paid the December 2018 property taxes owed on the 4476 Alderport condo sublease, which was listed as a lien on Debtor's October 16, 2018 Old Republic Preliminary Title Report. [Jasso Decl. ¶¶7, 29, Ex. 19, p. 805, para. 2].

62. In January 2019, the HOA motion for terminating sanctions in the Enforcement Lawsuit filed and served in November 2018 was granted. The court struck Debtor's answer due to Debtor's

ongoing refusal to comply with the state court's discovery orders and then entered default

judgment for approximately $319,000. [FAC DK 6 ¶55].

63.  On February 11, 2019, Debtor's financial declaration was reviewed and filed by the criminal

court, which granted Debtor a state public defender. [Jasso Decl. ¶7, DK 49 and its Ex. C (OCSC

Case No 18WM05278 criminal court minutes) at Exhibit Page 27, lines 3-4].

64. From November 2018, the Plaintiff and the other HOA Board members continued to try to

learn the facts regarding the purported ownership transfer of the 4476 Alderport condo asset,

especially in light of the fact that Debtor claimed she was indigent to the criminal court after the

transfer of the condo (Paragraph 43, above) and had not paid any of her judgment debts,

outstanding HOA assessments, and HOA default judgment of over $300,000 in attorneys fees,

costs and damages.  [Jasso Decl. ¶7].

65. The HOA attorney, Pejman Kharrazian, and the Board President asked Mr. Nickel to meet

with the Board in December 2018 and several times, thereafter, and asking Mr. Nickel to provide a

copy of the Debtor-Nickel purchase agreement and trace the purported purchase funds.

66. On March 20, 2019, after months of the Board President trying to set up an informal mediation

meeting, called an IDR, with Mr. Nickel and two board members, Lee Gragnano and Plaintiff,

pursuant to Mr. Nickel's request that the HOA change the members books and add him as an

owner "on his word", Plaintiff emailed Mr. Nickel requesting a copy of the purchase agreement

and the name of the escrow agent, phone number and escrow number that he mentioned in his

March 19, 2019 email. [Jasso Decl. ¶34, Ex. 23, p.880 (bottom)-881 (03.20.19 email between

Jasso-Nickel)].

67. On March 20, 2019, Mr. Nickel responded via email, admitting that there was no escrow

company for the purchase, and that he only contacted an escrow company months after the

transfer.  Mr. Nickel admitted: "***The Escrow company I used was ONLY to check that the Title to***

***my property at 4476 Alderport, HB, was in my name. This was a cash sale. Papers were signed***

*at my Bank. Title, and transaction paperwork were turned into the Recorders Office at time. The transaction for this property was a little RUSHED. Per Gallians request. We handled the payment quickly.  I WISHED I HAD NOT move so swiftly, on this purchase…Sometimes a Dad listens to the children with his heart and NOT his better sense of business…".* [Jasso Decl. ¶34, Ex. 23, p. 879-880, Jasso-Nickel emails].

68. Plaintiff contacted the Orange County recorder's office and tax assessor's office on several occasions starting in December 2018 through June 2019.  The OC tax assessor's office repeated each time that Debtor, Jamie Lynn Gallian, continued to be listed as the owner of title of 4476 Alderport.  Plaintiff saw this on the computers at the OC tax assessor's government office in Santa Ana, California.   [Jasso Decl. ¶7].

69. The HOA requested Chicago Title company perform a title search and provide a title policy regarding the 4476 Alderport condo. The policy listed the Debtor as the title owner of the 4476 Alderport condo sublease.   [Jasso Decl. ¶7].

70. In May 2019, the HOA's civil abstract of judgment of approximately $319,000 was issued and recorded.  Debtor did not pay the default judgment. [Jasso Decl. ¶27, Ex. 17, p.734-736, Nickel SAC]

71. Debtor appealed the HOA's civil default judgment. In Debtor's Appellant's Opening Brief dated June 4, 2020, Debtor admitted under penalty of perjury: "*On September 27, 2018 the Trial Court properly issued monetary sanctions against Appellant and ordered her to provide answers to four sets of discovery. [CT 1288–1291] Appellant did not comply. Instead, she sold her house in October 2018 and the new owner corrected the violations.*"  (emphasis added). Debtor, therefore, admitted that rather than pay the debts she owed, which included outstanding HOA special assessments, attorney's fees for the HOA and Plaintiff and the other Board members, and damages, Debtor transferred the property to Mr. Nickel.   Debtor's appeal regarding the HOA civil

default judgment was dismissed by the state appellate court. [FAC DK 6, ¶56, Debtor's Answer

DK ¶56, Jasso Decl. ¶33, Ex. 22, p. 868, Appellant's Open Brief Part V., first full paragraph].

72. In May 2019, Mr. and Mrs. Nickel and her daughter, April Lovejoy, finally agreed to meet

with Plaintiff and the Board President, as the HOA board representatives, in informal mediation,

known as IDR, to explain to the Board what happened, discuss the issues related to his concealed

transfer/purport claim of purchase and the next steps towards payment of the ongoing, outstanding

special assessments on the 4476 Alderport condo under the governing documents for the

judgments of the court.  Plaintiff explained that the HOA had a fiduciary duty under the CC&Rs to

collect the judgments, as special assessments against the condominium. Plaintiff explained to Mr.

Nickel that the result would be the same for any condo owner who did what Mr. Nickel and

Debtor did, including Board members. [Jasso Decl. ¶7].

73. Mr. Nickel informed us that he knew everything about the HOA and the litigation before the

purchase from Debtor, but he was still mad about the management company not calling him back

or sending him his monthly bill.  Plaintiff reminded Mr. Nickel that the HOA attorney, Pejman

Kharazzian sent him a copy of the PI which applied to  every person who associated with Debtor.

Mr. Nickel confirmed that got the email, that he knew about the PI and admitted that during any

litigation that he was involved with his legal counsel handled all communications. Mr. Nickel

claimed, despite court orders, that he had the right to call up any homeowner's association's

property management company anywhere, claim ownership and membership in any HOA. Mr.

Nickel claimed the management company had the power to and must change the HOA books to

reflect his ownership "on his word".  I explained that no one has this right, including Board

members. When I asked him if he would be okay if I did that regarding the 4476 Alderport condo,

Mr. Nickel immediately agreed he would not have accepted my claim of ownership of the 4476

Alderport condo "on my word". [Jasso Decl. ¶7].

74. I explained to Mr. Nickel about the stringent hoa Davis Stirling laws, including the Debtor's

right to privacy regarding ongoing HOA litigation that can only be disclosed to a potential buyer

through a legal HOA escrow demand, and that, as board members, we comply with these rules by getting help from the HOA attorneys.  Mr. Nickel agreed that he understood the same rules and knew all about HOA board member's duties because he had owned and lived in a California condominium in near Cal. State Fullerton for many years with his first wife. [Jasso Decl. ¶7].

75. I shared with Mr. Nickel that my family purchased a condo in the HOA that was under litigation and that the seller and I only had to open escrow agent/company, I depositted a down payment with the escrow company and waited until the litigation was over before proceeding with the sale so that the escrow agent paid all litigation debts on the condo sublease, which included the HOA as one of the creditors, in order for the seller to transfer clean title to me and for me to receive a title policy.  I explained the HOA could not communicate with me as a prospective buyer until after I signed escrow instructions and opened escrow with a licensed escrow agent due to a debtor's right to privacy and the potential for a tort claim being made by a debtor against the HOA for intentional interference with a prospective economic advantage under state law. Mr. Nickel responded immediately that he knew everything about escrows from his years of real estate transactions, explained several of his condo transactions in Long Beach, Fullerton and Big Bear, that he had real agents who handled all of it and that I did not need to explain anything to him. [Jasso Decl. ¶7].

76. Mr. Nickel claimed he regretted doing the fast transfer of the 4476 Alderport condo sublease, and that the Debtor required him to do the under-the-table transfer the day before the motion for attorney's fees or they would lose the condo. [Jasso Decl. ¶7].

77. Even with Mr. Nickel's decades of significant California condominium purchases/sales via escrow, Mr. Nickel chose to avoid a purchase agreement with escrow instructions, opening an escrow with an escrow company and engaging a real estate agent with the 4476 Alderport condo sublease. Mr. and Mrs. Nickel blamed the HOA and the board members for failing to help them with some unknown, unstated issue. I asked what the HOA could do given the fact that they chose

to conceal themselves and their purported purchase when they knew the Debtor and the

condominium was in the Enforcement Lawsuit. Neither Mr. Nickel nor Mrs. Nickel answered my

question.  [Jasso Decl. ¶7].

78. The Board minutes and HOA legal disclosure letters, provided to all buyers only via escrow,

for prospective buyers of condo subleases in the HOA regarding ongoing litigation with the 4476

Alderport condo, which includes the four disclosure letters, the December 2018 Board minutes

and the August 2018 Board minutes with the approved lien information regarding the 4476

Alderport condo sublease in compliance with the governing documents and state HOA laws.

[Jasso Decl. ¶23 Ex. 13, pp. 456-477].

79.  In October 2020, after multiple attempts to resolve the collection of the judgments with Mr.

Nickel failed, including ADR with the Hon. (ret.) Judge Thrasher who indicated this Debtor-

Nickel transfer was a CUVTA issue, Mr. Nickel sued the HOA to quiet title and remove the

HOA's and board member's judgment liens and assessment lien. The HOA cross-sued Debtor and

Mr. Nickel under California Uniform Voidable Transactions Act, Cal Civil Sec. 3439.04.  [Jasso

Decl. ¶27; Ex 17]

80. In his complaint, Mr. Nickel cited and attached the HOA's governing documents which

demonstrated Mr. Nickel's knowledge of the HOA's governing documents at the time he took the

4476 Alderport condo from Debtor, which are recorded on the property and the continuous lien on

every condo in the HOA, including the 4476 Alderport condo, under Section V, Section 5.1 of the

CC&Rs, which included all attorney's fees and expenses under CC&Rs Sections 5.4 and 14.7

related to bringing the unit into compliance with the CC&Rs since the Enforcement Lawsuit began

in April 2017.   [Jasso Decl. ¶27, Ex. 17, pp. 631, 634, 644-645, 663, Nickel SAC ¶¶40, 48, 88,

154 (citing Section V. 5.1), his attached Exhibit A, p. 682 (Section 5.1 of the CC&Rs), p. 684

(Section 5.4 of the CC&Rs), and p. 708 (Section 14.7 of the CC&Rs)].

81. However, in Mr. Nickel's SAC, Mr. Nickel (falsely) claimed that on October 31, 2018, the Gallian-Nickel assignment of the ground lease and sublease transferred the property **in fee**. Since Mr. Nickel believed he bought a townhome in fee, rather than a condominium sublease of an airspace parcel, the fair market value of the townhome at the time he believed he purchased it was approximately $600,000, when he gave the Debtor $379,000, and which would now be worth close to $800,000-$1,000,000 or more. Therefore, Mr. Nickel paid substantially less than the fair market value based on his claim of fee simple ownership of the common areas [Jasso Decl. ¶27, Ex. 17, p. 738-742, Nickel SAC ¶35, Ex. F].

82. Mr. Nickel attached to his SAC the recorded Gallian-Nickel Assignment of the Ground lease and Sublease with his notarized signature dated October 31, 2018 as Exhibit F. This document shows that no transfer taxes were paid, and no consideration was paid for the 4476 Alderport condo defaulted sublease, which is Mr. Nickel's admission that he did not pay consideration for the transferred sublease and did not pay the transfer taxes. [Jasso Decl. ¶27, Ex. 17, p.738-742, Nickel SAC ¶ 35, Ex. F].

83. The Gallian-Nickel transfer document is different from the escrow and title company's standard transfer document which escrow companies obtain from the landlord, BS Investors, pursuant to a sale of a condominium sublease via an escrow and title company that uses the Exhibit B of the 2003 First Amendment to the Condominium Sublease for unit. Comparing Mr. Nickel's transfer document to Exhibit B of the 2003 First Amendment to the Condominium Sublease for Unit 53 recorded by BS Investors and the condo sublessee pursuant to the settlement of the 2000 lawsuit, shows the stark difference between the parcels sublet under the 4476 Alderport condo unit 53's sublease, and the purported parcels Debtor granted in fee to Mr. Nickel including a conveyance of a remainder interest in the ground in fee that does not exist. [Jasso

Decl. ¶¶27, 35, Ex. 24, p.895, *see also*, Ex. 17, pp 738-742, Gallian-Nickel recorded assignment of the 4476 Alderport condo document dtd 10/31/18].

84. Due to the fact that the Debtor and Mr. Nickel refused to produce bank records in the Nickel case, Plaintiff, in February 2022, under this Adversary Case, subpoenaed the bank statements from the Debtor's and Defendant LLC's banks.  Debtor's personal Alliant Credit Union account and her personal Bank of America account were the only banks Plaintiff found for Debtor in October 2018. The Alliant Credit Union account had a balance of $4791.00, and the Bank of America account had negative $-3672.89, which combined showed her assets totaled $1,118.11 on October 31, 2018, and was approximately -$300,000 considering the discovery sanctions, the outstanding HOA assessments, and the HOA's litigation attorney's fees and costs and the Plaintiff and other Board members attorney's fees and costs.  [Jasso Decl. ¶¶36,37, Ex. 25, p. 899 (top right corner of Alliant 10.31.18 Stmt) and 26 pp.904. (BofA 10.16.18 - 11.16.18 Stmt)].

85. There have been several HOA condominium subleases in litigation before Mr. Nickel for failure to pay the HOA liens on the condominium sublease, including Plaintiff's. Every buyer was able to purchase a sublease via an escrow, communicate properly with the HOA, obtain clean title. A transparent non-fraudulent conveyance would have provided Mr. Nickel with the assurance that the HOA and the board members and their families financial solvency were not put at risk by a seller who the buyer knew was in ongoing litigation, knew that a motion for attorneys was scheduled the day after their October 31, 2018 transfer based on false claims against Plaintiff and the other board members, and further knew from the Debtor's own preliminary title report and the UD action by the landlord, BS Investors, that there was no fee simple ownership interest and that there were unpaid liens on the condominium sublease. (Jasso Decl. ¶ 7)

All Mr. Nickel had to do was open escrow and wait for the ongoing litigation to be completed, and then the HOA could have communicated with him without any risk of more vexatious litigation by the Debtor. Debtor has a pattern of pro per litigation against her targets in civil, probate, family and criminal cases.  Mrs. Bradley, the HOA, Houser Bros, Debtor's neighbors, ex-husbands and ex-boyfriends, and even her own sons have been targets.  In this case, the ongoing Enforcement Lawsuit was ending in a less than a day for the Board members and less than two months for the

HOA. Mr. Nickel had no rational reason to avoid escrow, to lie about a purchase agreement, to hid himself and the transfer and avoid communication with the HOA when he admittedly worked with real estate agents for decades buying and selling property in California through escrows. (Jasso Decl. ¶ 7)

Knowing that this tiny, financially strapped HOA and volunteer board members could not give the Debtor nor Mr. Nickel what they wanted, *i.e.* fee simple ownership of Huntington Beach property within 2 miles from Sunset Beach and a block from Humboldt Island, it begs the question: Why hurt this HOA, board members and all the HOA members? Why do an under-the-table transfer and then sue the HOA and volunteer board members who are handcuffed by numerous governing document rules, state statutes and state case law? The intentional harm to families by harming the HOA, which can only operate well if every sublessee voluntarily complies with the recorded rules, shows that the Debtor and Mr. Nickel coveted someone else's property rights, Houser Bros Co's fee simple ownership, so much that they recorded a fraudulent conveyance in a concealed transfer that is now in place with the OC Recorder's office, purportedly giving Mr. Nickel fee ownership of the common area. The logical benefit for Mr. Nickel would be a taking of property rights for purposes of a substantial, financial gain, because real townhomes in complexes next to the HOA are worth nearly $1,000,000 right now and was $600,000 at the time of the transfer. This real estate fraud scheme continues with the Debtor's attempt to take the land under the mobile home in fee simple, due to the substantial financial gain. California UVTA law was enacted and should be upheld to protect innocent creditors from people who do fraudulent conveyances to take something that does not belong to them. [FAC DK 6 ¶¶69, 84, Jasso Decl. ¶7, 15, Ex. 5, p. 385, paragraph A].

**2. *Facts Related to Debtor Transferring and Concealing Funds for Personal Use in the Defendant JSC LLC and Defendant JP LLC to Prevent Collection of Debtor's assets by Plaintiff***

86. On March 22, 2022, Debtor admitted in her corporate ownership statement that the Defendant LLCs were created on October 18, 2018 and have been single-member wholly owned California limited liability companies which she terminated on November 22, 2021. [*See* DK 29].

86. On July 9, 2021, Debtor admitted that Defendant JSC LLC was wholly owned by the Debtor since its inception, October 18, 2018. [FAC DK 6 ¶44, Debtor Answer DK 13 ¶44, Jasso Decl. ¶11, Ex. 1, p. 52, Original Petition Dk 1, Schedule A/B, Item 19].

87.  On July 9, 2021, Debtor originally scheduled her interest in Defendant JP LLC as 33%. [Jasso Decl. ¶11, Ex. 1, p.52, Original Petition DK 1, Schedule A/B, Item 19].

88. Debtor also stated in her 341a hearings that she owned one-third (1/3rd) of the Defendant JP LLC, and then  stated she owned one-seventh (1/7th) and then stated she owned seventy percent (70%). [FAC DK 66]. She also changed the percentage ownership on her Schedule A/B, Item 19 without any reason for the change. [Jasso Decl. ¶11, Ex. 1, p.53, Original Petition DK 1, Schedule A/B, Item 19, p. 72, DK 16, September 22, 2021, Schedule A/B Item 19, and  p.83, DK 22, October 14, 2021 DK 22, Schedule A/B Item 19].

89.  However, by filing Debtor's Corporate Ownership Statement Pursuant to FRBP 1007(a)(1) and 7007.1, and LBR 1007-4, DK 29, Debtor admits that she made false oaths in her 341a hearing and on her bankruptcy petition, because Defendant JP LLC has been her single-member, wholly-owned California limited liability company since October 18, 2018.  [DK 29].

90. In her Corporate Ownership Statement, Debtor's admitted that the single member Defendant LLCs entities never operated a business, by stating the Defendant LLCs "never conceptually operated as anticipated". [DK 29].

91. Debtor further admitted that she as the single member of the Defendant LLCs filed certificates of cancellation for both of them on November 22, 2021. [DK 29].

92. Defendant answered the Plaintiff's FAC on behalf of each of the Defendant LLCs as the sole member in pro per. [DKs 14, 15, 16, 17, 18, and 55-56].

93. Debtor operated Defendant JP LLC and Defendant JSC LLC as her alter-egos since October 18, 2018 in order to shield herself from personal liability while at the same time using funds of these businesses for personal purposes.  [FAC DK 6 ¶91].

a. *Facts Related to Debtor's Transfer of Personal Funds from Her Concealed Transfer of the 4476 Alderport Condo to Mr. Nickel Starting on*

1    *October 31, 2018 through July 9, 2021, the Date of Debtor's Bankruptcy*

2    *Petition*

3    94. The HOA's debtor's examination in the Enforcement Lawsuit was requested in December

4    2020, which was issued by the civil court on March 4, 2021 and was scheduled for June 3, 2021.

5    The examination included the request for Debtor to produce all documents related to the 4476

6    Alderport condo transfer, all other personal financial information, and all corporate and bank

7    records related to the Defendant LLCs. [Jasso Decl. ¶38, Ex. 27, p.910-912].

8    95. Debtor admitted that on or about July 8, 2021, Debtor refused to comply with the court-ordered

9    debtor's examination in civil Court and the attached request for production of documents related to

10   the Debtor's financial condition. A warrant was issued for her arrest and the Debtor immediately

11   filed for this Chapter 7 bankruptcy protection. [FAC DK 6 ¶65, Debtor Answer DK 13 ¶65].

12   96. Immediately prior to filing for bankruptcy, Debtor's public appellate attorney first filed the

13   Debtor's appellant's opening brief on June 18, 2021 in her appeal of the two convictions of her

14   crimes, OCSC Case No. 30-19-01119765, and second filed Debtor's appellant's opening brief on

15   July 1, 2021 in her appeal of the court's victim restitution order, OCSC Case No. 30-21-01189657.

16   [Jasso Decl. ¶ 39, Ex. 28, p. 917, ROA #84, and p. 919, ROA #15 (ROAs from these two criminal

17   appellate cases with legal counsel provided by the State of California)].

18   97. Also immediately prior to Debtor filing for bankruptcy, on May 26, 2021, the criminal court

19   issued an abstract of judgment against the Debtor for the criminal restitution debt, which Plaintiff

20   recorded at the OC Recorder's office. *See* Plaintiff's Request for Judicial Notice, DK 49 and its Ex

21   E.  In addition, on May 27, 2021, Plaintiff filed a UCC lien for the criminal restitution abstract of

22   judgment ordered under criminal Case No. 18WM05278. [FAC DK 6 ¶64].

23   98. In February 2022, per my discovery plan filed with the court in January 2022 in this case,

24   Plaintiff subpoenaed the bank records of Defendant JSC LLC from JP Morgan Chase Bank, Aliant

25   Credit Union, Wells Fargo Bank, Bank of America, the U.S. Government's Pension Benefit

26   Guaranty Corporation and Fidelity Investments starting January 1, 2018 along with real estate

27   records from the Dept. of Housing and Community Development, Old Republic Title Company

28

1  and the Orange County recorder's office regarding property related to the Debtor and any of her

2  related entities or insiders.  [Jasso Decl. ¶ 7].

3  99. Plaintiff also subpoenaed the bank records of Defendant LLCs from JP Morgan Chase Bank,

4  Alliant Credit Union, Wells Fargo Bank, Bank of America and Fidelity Investments starting

5  January 1, 2018.  [Jasso Decl. ¶7 ].

6  100.  On June 29, 2019, the HOA's bank levy writ was issued for Debtor's Bank of America

7  assets, and on February 27, 2020, the OC Sheriff returned the writ stating there were no assets. To

8  date, Plaintiff cannot find any payment of the $3672.89 funds Debtor owed to Bank of America in

9  October 2018, which is therefore still outstanding, and which do not appear to be listed by the

10  Debtor on her bankruptcy schedules.  [Jasso Decl. ¶ 40, Ex. 29, p.922-923 (bank levy)].

11  101.  Well Fargo Bank subpoena records stated that Randall Nickel cashier's check dated October

12  30, 2018 in the amount of $140,000 payable to Defendant JP LLC was used to purchase Randall

13  Nickel cashier's check dated October 31, 2018 payable to Debtor Jamie Lynn Gallian.  [Jasso

14  Decl. ¶ 41, Ex. 30, pp. 925 (WFB subpoena response declaration)].

15
16  102. On October 31, 2018, JP Morgan Chase bank subpoenaed records showing Debtor opened

17  two personal accounts, a savings account ending in #7891 and a checking account ending in

18  #0186, but immediately withdrew all of the funds as provided in more detail below.  [Jasso Decl.

19  ¶42, Ex. 31, p.927-928, a true and correct copy of the Chase Private Client Savings ("Chase PCS

20  #7981") signature cards for the savings account ending in #7891 and the Chase Private Client

21  Checking ("Chase PCC #0186") account ending in #0186 and monthly bank statements.].

22
23           b. *Paragraphs 103-107 relate to Debtor's movement of $366,600, leaving*

24      *$100 in the Debtor's Personal Chase PCS #7891 on November 3, 2018.*

25  103. On October 31, 2018, Debtor deposited $366,600 cash in the Chase PCS #7981.  The

26  remainder $12,400 cash was untraceable. [Jasso Decl. ¶42, Ex. 31, p.931, a true and correct copy

27  of Chase PCS bank account statement October 31, 2018 through November 30, 2018].

28

1    104. On November 1, 2018, Debtor transferred online $225,000 cash to Debtor's Chase PCC

2    #0186 account. [Jasso Decl. ¶42, Ex. 31, p.931, a true and correct copy of Chase PCS #7981

3    November 2018 bank statement].

4    105. On November 1, 2018, Debtor transferred online $130,000 cash to Debtor's Chase PCC

5    #0186 account.  [Jasso Decl. ¶ 42, Ex. 31, p.931].

6    106. On November 3, 2018, Debtor made two cash withdrawals, one for $10,000 cash and one for

7    $1,500 cash from Debtor's Chase PCS #7891 account, for a total of $11,500, which could not be

8    traced. [Jasso Decl. ¶ 42, Ex. 31, p. 931].

9    107. On November 3, 2018, the above four transfers and withdrawals by Debtor on October 31,

10    2018-November 3, 2018 left the Debtor's Chase PCS #7891 account balance equal to $100. [Jasso

11    Decl. ¶ 42, Ex. 31, pp. 931].

12

13    c. _Paragraphs 108-115 relate to Debtor's movement of $355,000, leaving

14    $0 in the Debtor's Personal Chase PCC #0186 on November 8, 2018_.

15    108. On November 2, 2018, Debtor's Chase PCC #0186 account balance showed $355,000 from

16    Debtor's Chase PCS #7981 account wires, described in paragraphs 114-115, supra. [Jasso Decl.

17    ¶42, Ex. 31, p.939, a true and correct copy of Chase PCC #0186 November 2018 bank statement].

18    109. On November 2, 2018, Debtor wire transferred $200,000 to Brian David Till in Milwaukee

19    who then transferred the funds back to Debtor, such that on November 5, 2018, Debtor's Chase

20    PCC #0186 account balance showed $355,000. [Jasso Decl. ¶ 42, Ex. 31, p.939].

21

22    110. On November 3, 2018 (listed on the bank statement as November 5, 2018), Debtor withdrew

23    $155,000 as follows: fifteen (15) cashier's check's payable to herself in the amount of $10,000

24    each.  $5,000 of cash could not be traced.  [Jasso Decl. ¶ 42, Ex. 31, pp. 939, 942].

25    111.  Plaintiff created a chart which shows where Debtor deposited the 15 - $10,000 each cashier's

26    checks. Defendant JSC LLC Chase Account ending in #7860 received 11 of the checks by her

27    deposits between November 16, 2018 through May 13, 2019, for a total of $110,000.  Debtor held

28

42

the other four checks and deposited one into her Alliant Credit Union ID 41 personal account, one into her personal Chase #5315 account, and two redeposited into this Chase PCC #0186 account, between November 2018 through April 2019. [Jasso Decl. ¶ 43, Ex. 32, p. 946].

112. On November 6, 2018, Debtor paid her November rent to Sumac Apartment LLC for her home on 5782 Pinon Dr. in Huntington Beach in the amount of $3400.00. [Jasso Decl. ¶ 42, Ex. 31, p. 939]

113. On November 7, 2018, Debtor withdrew $175,000 in one cashier's check, Serial Number 1085245498, payable to Defendant JSC LLC.  [Jasso Decl. ¶42, Ex. 31, pp. 939, 943].

114. On November 8, 2018, Debtor withdrew $1,600 to open/deposit into her personal Chase Total Checking account ending in #5315.  Debtor then immediately transferred $500 from this account to Defendant JSC LLC Chase #7860. [Jasso Decl. ¶ 42, Ex. 31, p.939, 951].

115. On November 8, 2018, Debtor withdrew $20,000 in two cashier's checks which Plaintiff could not locate and presumed still in Debtor's possession. This left a $0 balance in Debtor's personal Chase PCC #1086. [Jasso Decl. ¶ 42, Ex. 31, pp. 939, 944].

> d. *Paragraphs 116-163 relate to Debtor's movement of $355,000 funds Debtor into Debtor's Alter Ego, Defendant JSC LLC's Chase #7860 account, to Purchase a Mobile Home in a Concealed Transfer, Enabling Debtor to Conceal Funds to Lisa Ryan, then Conceal Funds to and from Fidelity and the Transfer Concealed Funds to Defendant JP LLC, leaving $368.46 on July 9, 2021, the date of Debtor's Bankruptcy Petition.*

116.  Debtor never provided Trustee any escrow, purchase agreement or title report related the acquisition of the mobile home from Lisa Ryan to Debtor on November 1, 2018 nor Lisa Ryan to Defendant JSC LLC on November 16, 2018. No corporate records were provided. Debtor never qualified and obtained a legal lease from the mobile home park owners prior to the purchase, as required by the park's requirements. [*See* DK 101 of Original Bk 8:21-bk-11710-SC and its Ex. S, Bates Page 278, Paragraphs 5-6].  Therefore, Lisa Ryan's concealed transfer of the mobile home to Defendant JSC LLC by signing over the title of the mobile home to Defendant JSC LLC on November 16, 2018, enabled Debtor to wash and then transfer away to Lisa Ryan $150,000 of the

43

cashier's checks and possibly additional untraceable cash of $25,000 from Debtor's concealed, purported Debtor-Nickel transfer of the 4476 Alderport condo sublease in exchange for $379,000.

Plaintiff's subpoenaed JP Morgan Chase Bank records show that on November 7, 2018, Debtor opened Defendant JSC LLC Chase Account ending in #7860 ("JSC LLC Chase #7860"). [Jasso Decl. ¶ 44, Ex. 33, pp. 948-949, a true and correct copy of Defendant JSC LLC's Chase #7860 signature card opened by Debtor].

117. On November 7, 2018, Debtor deposited the one $175,000 cashier check's in Paragraph 113, *supra*, into JSC LLC Chase #7860 account. [Jasso Decl. ¶44, Ex. 33, pp. 951, 954-955].

118. On November 8, 2018, Debtor immediately withdrew the $175,000 from the Defendant JSC LLC Chase #7860 account, via 18 cashier's checks, 17 - $10,000 each cashier's checks and 1 - $5,000 cashier's check. All 17 checks listed Jamie L Gallian as Remittitur and payable to Debtor. [Jasso Decl. ¶ 44, Ex. 33 pp. 951, 956].

119. On November 16, 2018, Debtor deposited $170,000 in the form of 17 cashiers checks of $10,000 each.  The chart attached shows that 16 out of the 17 - $10,000 each cashier's checks dated November 8, 2018, described in Paragraph 117, *supra*, were deposited this date in Defendant JSC LLC's Chase #7860 account.  The 17th cashier's check deposited, Serial #1085245412 was one of the November 3, 2018, Chase PCC #0186 $10,000 cashier's checks as detailed also in Plaintiff's Chart in Ex. 32.  [Jasso Decl. ¶ 45, Ex. 34, p.984, Chart of JSC LLC $170,000 deposit on November 16, 2018 showing amounts went to LR and her].  The 17th November 8, 2018 - $10,000 cashier's check was cashed and the funds are untraceable.

120. On November 16, 2018, Debtor immediately withdrew the $170,000 described in Paragraph 118, *supra*, in the form of four cashier's checks, showing Debtor as the Remittitur but these were checks from Defendant JSC LLC Chase #7860. The fours checks were all payable to Lisa Ryan. The date was November 16, 2018. The front of the checks lists an address for Lisa Ryan as 16222 Warmington Lane, SPC 376, Huntington Beach, CA 92649.  This address does not exist.

Three of the check's amounts were each $50,000, for a total of $150,000. The fourth check amount was $20,000.  Debtor provided Trustee and the creditors copies of the front of these four checks after her August 18, 2021 341a hearing.  On October 14, 2021, Debtor's second 341a

1    hearing was held. Debtor testified under oath that she personally paid these four checks to Lisa

2    Ryan totaling $170,000 plus $10,000 cash in November 2018. [Jasso Decl. ¶46, Ex. 35, p. 988, see

3    p. 9 lines 1-5 of the October 14, 2021 transcript of 341a hearing].

4           Plaintiff subpoenaed JP Morgan Chase Bank to trace the four checks.  The three $50,000

5    cashier's checks were endorsed by Lisa Ryan and deposited into a Bank of America account on

6    November 17, 2018.  The fourth $20,000 was endorsed by Debtor and deposited by her into

7    Debtor's personal Chase PCC #0186 account on December 31, 2018. [Jasso Decl. ¶47, Ex. 36,

8    pp.1005-1010]. Chart with attached Defendant JSC LLC's four November 16, 2018 170k cashier's

9    checks payable to Lisa Ryan].

10           See also Paragraph 110, *supra,* for Debtor's December 31, 2018 deposit of Lisa Ryan's

11    $20,000 cashier's check into Debtor's personal Chase PCC #0186, from which she then

12    transferred back $18,000 to this account.

13    121.  The November 8, 2018 single $5,000 cashier's check drawn by Gallian from Defendant JSC

14    LLC Chase Acct #7860, cited in Paragraph 116, *supra*, was payable to Gallian and cashed by

15    Gallian on November 13, 2018. Therefore, that cash could not be traced.  [Jasso Decl. ¶48, Ex. 37,

16    p. 1012, a true and correct copy of the traced and cashed Cashier's Check # 1085245528 from

17    Chase Bank.]

18    122. The November 16, 2018, single $10,000 last (or 17th) cashier's check, Serial #1085235519,

19    from Paragraph 119, *supra*, was cashed by Gallian on November 26, 2018 and the cash could not

20    be traced.  [Jasso Decl. ¶49, Ex. 38, p. 1014, a true and correct copy of the traced and cashed

21    Cashier's Check #1085245519 from Chase Bank].

22    123. On November 17, 2018 (shown on 11/19/18 in the bank statement), the Debtor deposited one

23    of her November 3, 2018 personal cashier's checks in the amount of $10,000, as described in

24    Paragraph 111 *supra*, with attached Ex. 32 Chart, into Defendant JSC LLC Chase #7860 account.

25    [Jasso Decl. ¶ 44, Ex. 33, pp. 951, 978-979, Nov. bank statement a true and correct copy of the

26    traced and deposited Debtor Cashier's Check #1085245413 into Defendant JSC LLC].

27

28

45

124. On November 17, 2018, Debtor withdrew cash in the amount of $8743.07 in the form of a cashier's check, payable to RDR Mobile Home Estates signed by Debtor and with the notated address of 16222 Warmington Lane, Spc 376, Huntington Beach, CA 92649, which, again, does not exist. This check was reissued to Debtor in April 2019, and Debtor redeposited this check on May 13, 2019, along with eight of the November 3, 2018 $10,000 personal cashier's checks as described in Paragraph 131, *infra*. [Jasso Decl. ¶44, Ex. 33, pp. 951, 980, and ¶50, Ex. 39, p.1016, Chart 39 of cashier's checks].

125. On November 26, 2018, Debtor made a cash deposit of $7812.45 into this account, which left a balance in this account of $9557.41. [Jasso Decl. ¶ 44, Ex. 33, pp. 951, 981].

126. Throughout December 2018, Debtor continued using the Defendant JSC LLC Chase #7860 account like a personal account. She made purchases at CVS, Big Lots, food purchase such as Starbucks, McDonald's, Olive Pit, and the like. She also made payments to Midland Credit Management which appears to relate to Debtor's personal debt owed under a civil judgment ordered prior to the transfer of the 4476 Alderport Condo. The total personal atm purchases and cash withdrawals totaled $8767.69. [Jasso Decl. ¶ 51, Ex. 40, p.1018-1019].

127. On December 31, 2018, Debtor electronically transferred $18,000 cash from her personal Chase PCC #0186 account into this account. [Jasso Decl. ¶ 51, Ex. 40 p.1018, and ¶52 Ex. 41, p.1028, 1032-1033 (Dec. PCC #0186 Chase statement)].

128. On December 5, 2018, Debtor withdrew of $500 cash. [Jasso Decl. ¶44, Ex. 33, p.1019].

129. On December 31, 2018, Debtor obtained a Defendant JSC LLC cashier's check payable to RDR Mobile Home Estate in the amount of $18,000 leaving balance of $606.53. Debtor redeposited this $18,000 cashier's check on April 14, 2019. [Jasso Decl. ¶ 51, Ex. 40, p. 1019 and ¶53, Ex. 42, pp.1035, 1037-1038].

130. On May 3, 2019, Defendant JSC LLC paid Debtor's personal attorney, Mr. James Casello,

$10,000 with a JSC LLC check. Mr. Casello represented Debtor in Plaintiff's personal restraining order case, *Jasso v. Gallian*, OCSC Case No. 30-2018-00986785.  [Jasso Decl. ¶54, Ex. 43, pp.1040, 1044].

131. On May 13, 2019, Debtor deposited $88,743.07 in cashier's checks.  $80,000 came from eight (8) Chase PCC #0186 November 3, 2018 cashier's checks as detailed in the chart referenced in Paragraph 124, *supra*. This also included one cashier's check in the amount of $8743.07 payable to RDR Mobile Home Estates as detailed in Paragraph 124, *supra*.  This brought the Defendant JSC LLC account balance to $107,289.60 on May 13, 2019. [Jasso Decl. ¶54, Ex. 43, pp.1040, 1043-1054].

132.  On May 13, 2019, Debtor wired $96,000 to Debtor's personal Fidelity IRA rollover account, #169-638064. [Jasso Decl. ¶54, Ex. 43, p. 1041,1055 and ¶55, Ex. 44, pp. 1058-1090 (Fidelity IRA statements).

133. On May 13, 2019, Debtor used her Defendant JSC LLC to purchase personal items such as groceries at Albertsons. [Jasso Decl. ¶ 54, Ex. 43, p. 1041].

134. On May 3, 2019 and May 23, 2019, Debtor used her Defendant JSC LLC Atm card to withdrawal $300 and $1000 in cash, respectively. [Jasso Decl. ¶54, Ex. 43, p.1040-1041].

135. Immediately after moving the funds into her personal Fidelity IRA rollover account, Debtor increased her stalking and threatening me and my family.  Specifically:

On June 10, 2019, in the Criminal Case No. 18WM05278. Judge Carillo ordered Debtor to stay 100 yards away from my home, my daughter and I as a condition of release. The Court warned Debtor to follow the court orders, or she may be incarcerated. Debtor continued to violate the stay away order stalking and threatening us. [Jasso Decl. ¶7, DK 21, Bates Page 29].

On June 21, 2019, HBPD PR#19-008061, Debtor was very angry and tried to run me over with her car while I was on foot inside the HOA, violating the 100 yards criminal stay away order.

47

1    [Jasso Decl. ¶7. DK 21, Bates Page 29].

2        On July 15, 2019, HBPD PR #19-009415, Ms. Gallian sat in her vehicle within 50 yards of

3    my home, staring at me for several minutes, her face looked very angry, all within moments of me

4    walking out my front door to leave my home in the HOA. [Jasso Decl. ¶7, DK 21, Bates Page 29].

5        On July 25, 2019, HBPD PR #19-009993. Ms. Gallian tried to run me over with her car

6    while I was on my bike inside the HOA. Ms. Gallian swore "Fuck You" at me, violating the no

7    contact and 100 yards stay away order. Police warned Ms. Gallian to follow the court orders.

8    [Jasso Decl. ¶7, DK 21, Bates Page 29].

9

10        On August 7, 2019, the criminal court found Debtor had violated the conditions of her

11    release, arrested her, and issued a criminal protective order, 100 yard stay order, and no contact

12    order for me, my daughter and my home in the HOA. The court ordered bail in the amount of

13    $50,000.  [Jasso Decl. ¶ 7, see also DK 49 and its Ex. C (Criminal court minutes) p. 35, lines 3-6].

14    136. On June 11, 2019, Debtor electronically transferred $300 cash and $1000 cash to her personal

15    Chase PCC #0186 account, which she then withdrew from her Chase PCC #0186 account. This

16    left $97.03 in this account on June 30, 2019. In July 2019, the bank withdrew its $15 service fee

17

18    bringing the balance to $82.03.  [Jasso Decl. ¶56, Ex. 45 p. 1092, and ¶57, Ex. 46 p. 1095].

19    137. On August 16, 2019, after the criminal court hearing which included an appoint of another

20    public defender, Debtor wired $89,000 into this account from Debtor's personal Fidelity IRA

21    account. [Jasso Decl. ¶ 58, Ex. 47, p. 1098, *see* Paragraphs 131-132, *supra*, to trace the funds].

22    138. On August 16, 2019, Debtor withdrew $74,999 cashier's check payable to Defendant JP

23    LLC, which Debtor deposited into Defendant JP LLC's Bank of America account ending in #1274

24    ("BofA #1274").  [Jasso Decl. ¶ 58, Ex. 47 p. 1099, 1103].

25

26    139. On August 16, 2019, Debtor withdrew $7,000 cashier's check payable to Michael Devereux

27    Esq. In September 2019, Michael Devereux Esq., who was her personal attorney in the HOA's

28

48

WV RO case, refunded $7500 to the Debtor, which Debtor deposited into Defendant JP LLC

BofA #1274 account. [Jasso Decl. ¶ 58, Ex. 47 p. 1099, and *see* Paragraph 168, *infra*].

140. On August 23, 2019, Debtor withdrew $10,860 in the form of a cashier's check payable to

Houser Bros Co. Debtor held these funds in the cashier's check and then replaced it with another

cashier's check on December 16, 2019. [Jasso Decl. ¶58, Ex. 47, pp.1099, 1106].

141.  In addition, in August 2019, Debtor used this account to $3158.67 of personal expenses,

including dog food, groceries, Signal Attorney service fees for her ongoing personal appellate

court record fees, beauty salon, and Olive Pit restaurant. [Jasso Decl. ¶58, Ex. 47, p.1098].

142. On September 3, 2019, Debtor deposited $1,100 cash back into this account after first

receiving the cash from it in June. Debtor used funds to pay for her Olive Pit restaurant meal. *See*

Paragraph 136, *supra*, showing Debtor first withdrew the $1300 cash from JSC LLC in June 2019.

[Jasso Decl. ¶ 59, Ex. 48, p. 1108-1109].

143. On October 3, 2019, Debtor then deposited $925 back into this account after withdrawals of

cash from Defendant JP LLC (*see* Paragraph 168, *infra*). Debtor used funds to pay for her

groceries plus $60 cashback and her personal Capital One account in the amount of $746.03.

[Jasso Decl. ¶ 60, Ex. 49 pp. 1118-1119].

144. On November 1st and 6th, 2019, Debtor made cash deposits totaling $2100, and then used

the account to make payments for her restaurant bill, United Airlines insurance payment, and her

personal Capital One credit card bill totaling $1078.11. [Jasso Decl. ¶61, Ex. 50, pp. 1124-1125].

145.  On December 16, 2019, Debtor had Chase bank reissue the August 2019 $10,860 cashier's

check payable to Houser Bros Co. described in Paragraph 140, *supra*, and then deposited it on the

same day.  [Jasso Decl. ¶ 62, Ex. 51 pp. 1134, 1141-1142].

146. On December 16, 2019, Debtor withdrew $13,032 in a cashier's check payable to Houser

Bros Co. and then redeposited it on December 27, 2019. [Jasso Decl. ¶ 62, Ex. 51 pp. 1134-1135, 1145-1146].

147. In December 2019, Debtor used the account for personal expenses totaling $1377.49, which included a payment for personal civil legal fees of $1000, which was later refunded to Debtor who then deposited it into Defendant JP LLC BofA #1274.  She also paid her personal United Airlines insurance, CVS with $40 cashback, McDonalds, Olive Pit restaurant, and a check in the amount of $290 payable to the Clerk of the Court on December 12, 2019 for Debtor's personal criminal court fines ordered as part of her probation sentence in criminal Case No. 18WM05278. [Jasso Decl. ¶ 62, Ex. 51 p. 1134-1135, 1140].

148. On January 7, 2020, Debtor made a payment to United Airlines in the amount of $214.83 for payment on her 401k loan. [Jasso Decl. ¶ 63, Ex. 52 p. 1152].

149. On January 9, 2020, Debtor used Defendant JSC LLC's funds to pay $3489.07 to her United Airlines Fidelity 401k plan account as additional payments on her 401k loan.  [Jasso Decl. ¶63, Ex. 52 p.1152].

150. On January 31, 2020, Debtor started using Defendant JSC LLC's funds to pay her car payment of $237.60, for a total of $2851.20 for the whole 2020 year. [Jasso Decl. ¶ 63, Ex. 52 p.1152].

151. On February 28, 2020, Debtor received a refund of additional Signal attorney services in the amount of $1562.17. [Jasso Decl. ¶64, Ex. 53 p.1159].

152.  In February 2020, Debtor also used the funds to pay her cell phone bills, her UA Fidelity 401k loan payment and her car payment, totaling $639.16. [Jasso Decl. ¶64, Ex. 53 p.1160].

153. On March 15, 2020, as part of the Covid shut down, Debtor quit or was terminated from her employment at United Airlines.  Debtor continued to use this account's funds to pay her car payment and United Airlines insurance. [Jasso Decl. ¶7, ¶ 65, Ex. 54 pp. 1162-1163].

154. In May 2020, Debtor electronically transferred $100 to her personal Alliant Credit Union account, and $500 to Defendant JP LLC BofA #1274 account, along with electronic payments on her cell phone bill and car payment totaling $1281.22.  And, in June 2020, Debtor made a personal payment on her car for $237.60 [Jasso Decl. ¶ 66, Ex. 55 pp. 1166-1167, 1171].

155. On July 27, 2020, within 1 year prior to the bankruptcy petition date, Debtor took a taxable distribution of her United Airlines 401k plan account balance in the amount of $14,002.53, which immediately changed the qualified retirement plan money to Debtor's personal assets. Debtor hid the $14,002.53 in the Defendant JSC LLC Chase #7860 account and did not disclose it. Debtor scheduled $31,922.58 as retirement plan income from a defaulted 401k loan, which, if true, would have solely been income "on paper" without any actual money distributed to Debtor.  Debtor's Fidelity 401k plan records as wells as Debtor's Defendant JSC LLC July 2020 bank statements, clearly shows that Debtor lied on her bankruptcy petition, [See Original Petition DK 1, DK 15, DK 38, DK 72, Schedule 107, Part 2, Item 5, Jasso Decl. ¶83, Ex. 72, p. 1544 ( p 22, lines 1-15  of 8.18.21 341a hearing testimony), and ¶67, Ex. 56, pp. 1174, 1185 (Chase #7860 July 2020, Fidelity 401k July 23, 2020 Payment Statement)].

156. Debtor continued using the funds to pay personal expenses, including her car payment, and in September 2020, Debtor paid a $450 check to her personal attorney, Mr. Casello, and $100 to a hair salon. [Jasso Decl. ¶68, Ex. 57, pp.1188, 1191].

157. In December 2020, Debtor paid her personal attorney, Mr. Casello, $750 check.  In addition, Debtor paid her Capital One credit card, her Home Depot credit card and her car payment for a total of $950.72 of electronic transfers. [Jasso Decl. ¶69, Ex. 58, pp. 1196, 1200].

158. In January 2021, Debtor was arrested under Criminal Case No. 18WM05278 for violating the terms of her probation, which included no contact with Plaintiff, and ultimately pled guilty. Debtor used Defendant JSC LLC to pay her personal criminal bail in the amount of $2500 with a

check, along with paying personal bills totaling $1401.70 for her cell phone, car payment, Capital One credit card and Home Depot credit card, for a total of $3,901.70 as electronic payments. [Jasso Decl. ¶70, Ex. 59 pp 1202-1204, 1207].

159. From February 2021 through July 9, 2021, Debtor used $2925.22 to pay her car payment, cell phone, and credit cards as electronic payments. [Jasso Decl. ¶71, Ex. 60 pp. 1210, 1215, 1217, 1219, 1221].

160.  On July 8, 2021, based on my calculation, there was $9376.46. [Jasso Decl. ¶71, Ex. 60 pp.1224-1226].

161. On July 9, 2021, knowing that the remaining funds in this account were the distributed 401k plan funds turn personal bankruptcy assets, Debtor withdrew $9000 in one cashier's check with Defendant JSC LLC as the name Remitter and payable to her ex-husband Ronald Pierpont plus a bank fee of $8 for the cashier's check. This left a balance in the Defendant JSC LLC Chase #7860 account on July 9, 2019 of $368.46. [Jasso Decl. ¶71, Ex. 60, p.1225].

162. On August 4, 2021, Debtor endorsed the back of the check and redeposited it into the Defendant JSC LLC bank account. [Jasso Decl. ¶ 71, Ex. 60 pp.1233, 1239-1240].

163. On August 4, 2021, Debtor then withdrew $7000 in one cashier's check payable to the man Debtor has lived with for many years, Robert McLelland, thereby continuing Debtor's pattern of hiding her personal assets of cash in and out of Defendant JSC LLC Chase #7860 account with multiple cashier's checks. [Jasso Decl. ¶71, Ex. 60, pp. 1233, 1241].

                        e. *Paragraphs 164-175 relate to Debtor's movement of $75,000 funds Debtor received originally from Mr. Nickel on October 31, 2018, moved into personal Chase #0186 cashier's checks, then deposited into into Debtor's Alter Ego, Defendant JSC LLC, then transferred to Debtor's personal Fidelity IRA, then transferred back to Defendant JSC LLC, then*

*moved into a cashier's check payable to Debtor's Alter Ego, Defendant JP*

*LLC to open JP LLC's Bank of America #1274 account to use the funds for*

*Debtor's personal expenses, leaving $2454.20 unscheduled on July 9, 2021,*

*the date of Debtor's Bankruptcy Petition.*

164. After obtaining another public defender in the State's criminal case (*see* Paragraph 137, *supra*), on August 16, 2019, Debtor obtained Chase Cashier's Check #1085736227 from Defendant JSC LLC Chase Acct #7860 in the amount of $74,999 payable to Defendant JP LLC. On August 16, 2019, Debtor deposited this Defendant JSC LLC Chase Cashier's check as part of the $75,000 opening deposit into Defendant JP LLC Bank of America checking account #1274. *See* Paragraphs 131, 132, 137, 138, *supra*, which show that the $75,000 was part of $96,000 of Debtor's November 2018 personal cashier's checks, which Debtor deposited into JSC LLC Chase #7860 in late April and early May 2019, then wired to a Fidelity IRA rollover account #169-638064, then wired $89,000 from the Fidelity IRA rollover account #169-638064 back to Debtor's JSC LLC, and then on August 16, 2019 obtained a Defendant JSC LLC cashier's check payable to Defendant JP LLC for $74,999 which was used to open this JP LLC BofA #1274 account. [Jasso Decl. ¶50, Exs. 39, p. 1015-1016, Ex. 61, pp.1242-1243, Ex. 62,pp. 1245-1246].

165. On August 23, 2019, Debtor withdrew $9,800 cash. There are no records where these funds went. These funds were untraceable/disappeared. [Jasso Decl. ¶ 73, Ex. 62 p.1248].

166. On August 28, 2019, Debtor withdrew $3,000 cash. There are no records where these funds went. These funds were untraceable/disappeared. [Jasso Decl. ¶ 73, Ex. 62, p. 1248].

167. On August 28, 2019, Debtor withdrew $30,000 cash. There are no clear records where these funds went, basically making them untraceable. [Jasso Decl. ¶ 73, Ex. 62, p. 1248].

168. On September 3, 2019, Debtor deposited $1000. On September 26, 2019, Debtor deposited $7,500. Both checks were monies from prior attorneys that refunds these funds to Debtor. [Jasso Decl. ¶ 74, Ex. 63 p. 1253].

169. From September 3, 2019-September 30, 2019, Debtor withdrew cash, paid for her groceries, restaurants and other personal items totaling $1684.50. [Jasso Decl. ¶ 74, Ex. 63 p.1253].

170. On September 29, 2019, Debtor electronically transferred $2894.93 to her personal Alliant Credit Union Account, which then Debtor used to pay her personal Alliant Visa. The Alliant Visa shows a total payment of $4894.93, which was made up of the $3894.93 plus $2,000 cash possibly from the cash funds in Paragraph 166, *supra*. [Jasso Decl. ¶ 71, Ex. 63, pp. 1253, 1255-1256].

171. In November 2019, Debtor spent $2682.37, which included withdrawals of cash, purchases of Jack In the Box, Subway and other restaurants, pet food, CVS pharmacy and hair salon. [Jasso Decl. ¶75, Ex. 64, pp. 1260-1261].

172. In December 2019, Debtor spent $9849.46, which included $5,000 to Steven Gallian, Debtor's son, cash withdrawals, and purchases of groceries, restaurants, and sporting goods. [Jasso Decl. ¶76, Ex. 65 pp.1269-1270].

173.  In January 2020, Debtor had violated the restraining orders protecting Plaintiff and my family and was arrested.  Debtor used this Defendant JP LLC BofA #1274 to pay bail. On January 28, 2020, Debtor paid bail with one JP LLC cashier's check in the amount of $7500 and another in the amount of $5,000.   In addition, Debtor paid her personal items including Capital one credit card, restaurants, cable tv bill, hair salon, Macy's, withdrew cash totaling $2745.19.  [Jasso Decl. ¶77, Ex. 66, pp. 1278-1279, 1282, 1286].

174. On March 4, 2021, Debtor's JP LLC #1274 account balance was $ 4493.70, and on July 1, 2021, Debtor's had dwindled the Defendant JP LLC BofA #1274 to a balance of $2454.20, by using $3390.77 on personal expenses such as Capital One, Kohls, Staples, restaurants, personal

54

court costs, and Zelle payments.  After filing for bankruptcy, Debtor deposited $15,000 into Defendant JP LLC on November 1, 2021 and then immediately withdrew it on November 3, 2021 via a cashier's check in the amount of $13,709.45, which is money from the Gallian-Nickel transfer sitting in a cashier's check again. [Jasso Decl. ¶ 78, Ex. 67, pp.1294, 1297, 1303 (March, July, November 2021 statements].

175. On July 9, 2021, Debtor did not schedule this Defendant JP LLC BofA #1274 account balance under Schedule A/B, Item 17 nor anywhere else. [Jasso Decl. ¶7].

   f. *Paragraphs 176-181 relate to Debtor's movement of $96,000 of funds Debtor received originally from Mr. Nickel on October 31,2018 into her personal Fidelity IRA account and removing all but approximately $7300, which Debtor on July 9, 2021, the date of Debtor's Bankruptcy Petition, then scheduled these remaining funds in the Fidelity IRA account as qualified retirement plan assets, which is not true*.

176. On April 30, 2019, Debtor's personal Fidelity IRA rollover account #169-638064 balance was $75.89. [Jasso Decl. ¶ 55, Ex. 44 p.1059].

177. On May 31, 2019, after the wire transfer of $96,000 from Defendant JSC LLC Chase #7860 account to this Fidelity IRA account on May 13, 2019 (*see* Paragraphs 131-132, *supra*), this Fidelity IRA account balance was $96,156.30. [Jasso Decl. ¶ 55, Ex. 44 p.1059].

178. On July 1, 2021, this Fidelity IRA balance was $7252.03. [Jasso Decl. ¶79, Ex. 68, p.1306].

179. On July 9, 2021, Debtor scheduled this account balance information on Schedule A/B, Item 21, and again on October 14, 2021 (falsely) claiming it was qualified retirement plan monies. [Debtor's Third Petition DK 22] and thereafter. [Jasso Decl. ¶11, Ex. 1, p.53 Schedule A/B Item 21, p.64 Item 21, p.72 Item 21, p.83 Item 21, p.97 Item 21].

180. At the time of Debtor's transfer of her personal funds from Mr. Nickel to Debtor's Defendant JSC LLC Chase #7860 account and then to Debtor's personal Fidelity IRA rollover account, Debtor knew that this Fidelity account only had $75.89.  Therefore, Debtor could have only scheduled $75.89 on Item 21 of Schedule A/B. [Jasso Decl. ¶ 7].

181. From November 16, 2018 to May 13, 2019, ten (10) of the fifteen (15) November 3, 2018 cashier's checks totaling $100,000 as detailed on Chart 32, from Debtor's personal Chase PCC #0186 account related to Mr. Nickel's $379,000 cashier's checks, were deposited into Defendant JSC LLC Chase #7860 account.  By holding cashier's checks in Defendant JSC LLC, Debtor avoided paying her judgment debts and claimed she was indigent in criminal court in January 2019 to obtain an appointed public defender and another public defender in August 2019. Debtor then wired $96,000 to this Fidelity account. Debtor knew that the funds she wired into her personally Fidelity IRA account in May 2019 were not qualified retirement plan rollover money or wages, but instead was money from Mr. Nickel on October 31, 2018. When Debtor transfer back $89,373.62 to Defendant JSC LLC Chase #7860 account in August 2019, the remaining funds in the Fidelity IRA account were not qualified retirement plan money.  Debtor repeated the lie that this money was qualified retirement plan monies on multiple amended bankruptcy Schedules A/B, Item 21. [*See* Paragraph 179, supra, *see also* Jasso Decl. ¶43, Ex. 32, ¶53-55, Exs. 42- 44, *see also,* Paragraphs 110, 131, 132, *supra*].

> g. *Paragraphs 182-199 relate to Debtor's statements regarding Debtor's Defendant JP LLC's January 2019 'perfected lien' on the mobile home based on a $225,000 financing loan from Debtor's alter ego JSC LLC to Debtor and making Debtor's alter ego Defendant JP LLC the lienholder on the mobile home which helps Debtor hinder creditors collecting an asset.*

Case 8:21-ap-01096-SC    Doc 89    Filed 12/30/22    Entered 12/30/22 15:10:07    Desc
Main Document    Page 60 of 98


182. On July 9, 2021, Debtor scheduled a mobile home, LB1081, as an asset of Defendant JSC LLC. Also [Jasso Decl. ¶11, Ex. 1, p. 50, Original Petition DK 1, Schedule A/B, Item 1.1].

183. Debtor admitted that she registered the title of the mobile home with the State of California Department of Housing and Community Development ("HCD") in the name of Defendant JSC LLC, with a purchase price of $175,000 paid on November 1, 2018. In her continued 341a hearing, Ms. Gallian stated that she submitted the change of ownership request from Lisa Ryan to Defendant JSC LLC on November 16, 2018 in the HCD office in Riverside. [FAC DK 6 ¶54; Debtor Answer DK 13 ¶54].

184. On January 8, 2020, according to the the California Secretary of State website Debtor filed a new Form LLC-12, Statement of Information, listing Debtor's live-in friend, Robert McLelland, as the sole member of this limited liability company. [FAC DK 6 ¶ 58 and its Ex. 8, p. 108].

185. In July 2020, HCD showed that there was no legal owner or lienholder on LB1081. [Jasso Decl. ¶11, Ex.1¶, p. 150].

186. On July 23, 2020, Plaintiff filed a judgment UCC lien with the California Secretary of State. [FAC DK 6, ¶60].

187. On February 1, 2021, Debtor filed a lien form with HCD on the Defendant JSC LLC mobile home in favor of Defendant JP LLC in the amount of $225,000 for the stated purpose of the $175,000 loan she made to Defendant JSC LLC and with $50,000 more for additional amounts lent to Defendant JSC LLC. Debtor back-dated the lien to August 20, 2020. Debtor did not receive anything from Defendants LLCs for the loan funds, as Plaintiff has found no repayment of the funds. There is only a constant withdrawal and shifting of funds to pay Debtor's personal expenses [Jasso Decl. ¶81, Ex. 70, p. 1342 line 19 – p. 1343, line 12 (Gallian deposition dtd 06.28.22), *see also*, Paragraphs 103-187, *supra*].

188. In April 20, 2021, Debtor sat for her deposition with the HOA's attorney, Stanley Feldsott,

57

in the UVTA case: *Nickel v. The Huntington Beach Gables HOA, et al.*, Case No. 30-20-.  Debtor

clearly answered on this date that Defendant JSC LLC owned the mobile home, as follows:

"Q: Jay Castle Co, LLC, what is the nature of that company?

A: That's an LLC that I applied for.

Q:  And when did you apply for that?

A: October 18th, 2018.

Q: Okay. Is there any assets in that company?

A: Yes.

Q: And what assets are in that company?

A: The personal property located at 16222 Monterey Lane, No. 376, APN 89165962."

[Jasso Decl. ¶ 82, Ex. 71, p.1496, lines 3-13]

189.  Mr. Feldsott also asked Debtor about Defendant JP LLC, her ownership interest and what

business JP LLC does.  Debtor never identified any lien holder interest in the mobile home.

Unwilling to tell the truth about her 100% ownership, *prior to filing for bankruptcy protection*,

Debtor only identified a unstarted, inoperative business in Defendant JSC LLC's mobile home as

follows:

"Q: What about Jay Pad? Is that one of your companies?

A: It's not mine solely. There's several owners.

Q: And what percentage do you own of Jay Pad?

A: Probably my portion now is 35 percent. Maybe a little bit less.

Q: What's the business of Jay Pad?

A: Several things. They have products. They distribute products. They're in cleaning. Let's see.

What else? They're, like, cleaning supplies for car detailing.

Q: So those would be the products they supply?

A: The products that they own and distribute, yes.

Q: Oh, okay. And their business address, is it still 2702 North Gaft Street?

A: No. It's my address.

Q: And so you -- this Jay Pad works out of your mobile home?

A: Well, we haven't really been even starting business because of Covid.

Q: Okay. When you say "we," who is the we?

A: The other members of the Jay Pad.

Q: And who are they?

A: I don't have permission to disclose that."

[Jasso Decl. ¶ 82, Ex. 71, p. 1496, lines 18-25, p. 1497, lines 1-19]

190. Immediately after Plaintiff added and served Defendant JP LLC in this adversary complaint, Debtor terminated Defendant JP LLC on November 22, 2021 and amended her bankruptcy schedules stating her ownership interest in Defendant JP LLC was 100%. [Jasso Decl. ¶ 11, Ex. 1, p. 42, Column 4 (Nov 22 Schedule A/B chart].  This shows not only that Defendant JP LLC and Debtor are one and the same, but also that the Debtor's changing story about her percentage of ownership of Defendant JP LLC in her bankruptcy schedules, in her April 2021 deposition and on her filings of Statement of Information with the Secretary of State of California, was intentionally creating red herrings to hinder the collection of her single member 100% owned Defendant JP LLC's assets of this sham corporation. [Jasso Decl. ¶7, *see also* Paragraph 39, *supra*].

191. Defendant provided the Trustee with a promissory note that was undated and unsigned between Defendant JSC LLC and Debtor that was secured by the Defendant JSC LLC mobile home held by Defendant JP LLC. Defendant admitted there have been no payments on the $225,000 loan. Plaintiff could not find any payments on the loan in Debtor's bank or and there are no corporate records.  [FAC DK 6 ¶50, Jasso Decl. ¶ 7, *see also* Paragraph 187, *supra*].

192. Based on the cashier's checks purchased by Debtor through the Defendant JP LLC BofA bank account after July 9, 2021, Plaintiff believes there are still funds hidden in Defendant JP LLC's cashier's checks payable to the State of California, Houser Bros Co., Ron Pierpont, Robert McLelland or Debtor since she began emptying the Defendant JP LLC BofA account. [Jasso Decl. ¶ 7].

193.  Since the court notified the Debtor on March 4, 2021 of her scheduled debtor's exam, Debtor was subject to an ORAP lien on all of her assets, preventing the transfer of her assets in any manner.  Because Defendant JSC LLC owned the mobile home on March 4, 2021, as admitted by Debtor in her April 20, 2021 deposition, and that Debtor operated Defendant JSC LLC as her alter ego, Debtor knew she could not legally transfer the mobile home out of the Defendant JSC LLC after March 4, 2021 to prevent the collection of the asset by her judgment creditors. Further, Debtor knew that she could use the funds in her alter-ego Defendant JP LLC after March 4, 2021 without violating the ORAP lien.

194. The day after Debtor's April 20, 2021 deposition, Debtor filed a series of motions including a motion to vacate the debtor's exam based on her need to plead the 5th Amendment regarding her right to avoid self-incrimination of a crime.  The court, well aware of Debtor's out-of-control litigation tactics, denied the motion and set the debtor's examination for July 8, 2021.  [Jasso Decl. ¶7, see OCSC Case No. 30-2017-00913985, ROA# ].

195. Debtor's public appellate attorney first filed the Debtor's appellant's opening brief in June 18, 2021 in her appeal of the two convictions of her crimes, OCSC Case No. 30-19-01119765, and second filed Debtor's appellant's opening brief on July 1, 2021 in her appeal of the court's victim restitution order, OCSC Case No. 30-21-01189657. [Jasso Decl. ¶39, Ex. 28].

196. On July 8, 2021, Debtor did not appear for the debtor's examination, and a bench warrant was issued for her arrest. [Jasso Decl. ¶7].

197. Debtor immediately filed her Chapter 7 bankruptcy petition on July 9, 2021, as provided in Paragraph III.C.1, supra., which vacated the bench warrant. [Jasso Decl. ¶ 7].

198. On July 9, 2021, Debtor scheduled the mobile home, LB1081, as an asset of Defendant JSC LLC, which held the HCD title since November 16, 2018.  [FAC DK 6 ¶54, Jasso Decl. ¶11, Ex. 1, p. 50, Petition DK 1, Schedule A/B. Item 1.1].

199. In Debtor's first 341a hearing, August 18, 2021, Debtor answered questions under oath stating that all items on the original petition were true and correct except for a certificate of title she had received a couple days before the August 18, 2021 341a hearing. This was a red herring based on a lie, because she did not sign transfer documents on behalf of her alter-ego JSC LLC in favor of herself with the UPS store notary, Mr. Gary Buysman. [Jasso Decl. ¶7, FAC DK 6 ¶67, Debtor Answer DK 13, ¶67].

200.  In creditor Houser Bros Co's objection to Debtor's Homestead, the pleadings proves that Defendant JSC LLC owned the mobile home on July 9, 2019. More importantly, Debtor admitted Defendant JSC LLC owned the mobile home in her April 20, 2021 deposition, which was only about two month after her purported 2.25.21 transfer date. [Jasso Decl. ¶11, Original Bk Case DK 95, p.13, and *see also* Paragraph 188, *supra*].

201.  Debtor used Defendant JSC LLC and Defendant JP LLC to hide funds from her creditors in sham corporations and use those funds for personal expenses. The sham corporations have no business creditors, because there has never been any business per Debtor's own admission in her March 16, 2022 bankruptcy ownership statement. [DK 29].

202. Debtor's complex movement of funds relate to Debtor obtaining $379,000 cash from Mr. Nickel for an under-the-table transfer of the 4476 Alderport condo on the eve of the Plaintiff's motion for attorney's fees, after Debtor's created vexatious litigation against Plaintiff and the other Board members by falsely claiming we owned her condominium sublease and we did the

violations of the governing documents and that she was entitled to indemnification from Plaintiff and the other board members, which was all a lie. [Jasso Decl. 7].

203. Then, Debtor moved $355,000 into Defendant JSC LLC Chase bank account to purchase the mobile home from Lisa with $150,000 in cashier's checks, created a loan from Debtor to Defendant JSC LLC in the amount of $225,000 secured by the mobile home in favor of Defendant JP LLC, which helped Debtor tie up the mobile home asset with a lien held her alter-ego, Defendant JP LLC, and recorded via a UCC lien on the mobile home asset in favor of Debtor. [Jasso Decl. ¶7].

204. Then, Debtor used the funds in Defendant JSC LLC to pay personal expenses and to wash approximately $96,000 through Debtor's Fidelity IRS investment account and back to Defendant JSC LLC Chase Bank account and then transfer to Defendant JP LLC's BofA account in order for the Debtor to fabricate a story that she was living off of her retirement funds. [Jasso Decl. ¶7].

205. Debtor's fraudulent transfer schemes with her alter egos gave Debtor the ability to instigate more vexatious litigation against her new target, Houser Bros Co., for the ground underneath the mobile home in fee simple, which Debtor admitted would gain her a property in fee simple worth over $800,000 due to its proximity to Sunset Beach and Humbolt Island, while living rent free or utilities free since November 2018. [Jasso Decl. ¶7].

Plaintiff respectfully requests the court make the above findings of fact from which the court may order an equitable solution by entering default judgment against the Defendant LLCs, by specifically added them to Plaintiff's judgments as Debtor's alter-egos as provided in *Curci*. This equitable solution is a just result as Plaintiff's judgment is nondischargeable under 523(a)(2)(A), and discharge should be denied under 727(a)(3), 727(a)(4), as provided below, due to Debtor using her alter-ego Defendant LLCs to prevent the collection of assets that were

available to pay the Debtor debts prior to her bankruptcy petition and are available for the Trustee to collect to pay creditors. [Jasso Decl. ¶7].

## IV. ARGUMENT FOR EQUITABLE SOLUTIONS UNDER DEFAULT JUDGMENT

### A.    Outside Reverse Veil Piercing is Appropriate Here Because Defendant LLCs are Debtor's Alter-Egos

Outside reverse veil piercing differs from traditional veil piercing, which is permitted pursuant to the well-known alter ego doctrine.  " 'The alter ego doctrine prevents individuals or other corporations from misusing the corporate laws by the device of a sham corporate entity ....' " (*Curci Investments, LLC v. Baldwin* (2017) 14 Cal.App.5th 214, 221, 221 Cal.Rptr.3d 847 ("*Curci*").) In appropriate circumstances, traditional veil piercing permits a party to pierce the corporate or limited liability company (LLC) veil "so that an individual shareholder [or LLC member] may be held personally liable for claims against the corporation [or LLC]." (*Postal Instant Press, Inc. v. Kaswa Corp.* (2008) 162 Cal.App.4th 1510, 1513, 77 Cal.Rptr.3d 96.) "Rather than seeking to hold an individual responsible for the acts of an entity, reverse veil piercing seeks to satisfy the debt of an individual through the assets of an entity of which the individual is an insider." (*Curci*, supra, at p. 221, 221 Cal.Rptr.3d 847.) "Outside reverse veil piercing arises when the request for piercing comes from a third party outside the targeted business entity." (Ibid.)

California Civil Code Section 187 authorizes a trial court to amend a judgment to add a judgment debtor who is found to be an alter ego of a corporation defendant. *Misik v. D'Arco* (2011) 197 Cal.App. 4th 1065, 1069, 130 Cal.Rptr.3d 123.  The alter-ego doctrine was extended to LLCs by California Corporations Code section 17703.04, subsection (b), which states "A member of a limited liability company shall be subject to liability under the common law governing alter ego liability." California courts have held that this provision allows a creditor to add a nonparty alter-ego as a judgment debtor.  "This is an equitable procedure based on the theory that the court

1    is not amending the judgment to add a new defendant but is merely inserting the correct name of

2    the real defendant." *Leek v. Cooper* (2011)194 Cal.App.4th 399, 419, 125 Cal.Rptr.3d 56.

3        In applying the alter-ego doctrine, no particular findings are necessary, but the conditions

4    under which a corporate entity should be ignored vary according to the circumstances of each

5    case. *Butler America LLC v. Aviation Assurance Co., LLC* (2020) 55 Cal. App.5th 136, 146, citing

6    *Toho-Towa Co., LTD v. Morgan Creek Productions, Inc.* (2013) 217 Cal.App.4th 1096, 1108, 159

7    Cal.Rptr.3d 469.

8        In one recent case, *In Re Brugnara Properties VI, (Brugnara Properties VI v. IRS)*, 606

9    B.R. 371 (N.D. California 2019), at p. 380, the bankruptcy court in the Northern District of

10    California cited several factors involved in determining unity of interest, including:

11    - Commingling of funds and other assets;

12    - The treatment by an individual of the assets of the corporation as his own;

13    - The failure to maintain adequate corporate records;

14    - Sole ownership of all of the stock in a corporation by one individual or the family
15      members;

16    - The use of the same office or business location;

17    - The use of the corporation as a mere shell for the business of an individual;

18    - The disregard of legal formalities and the failure to maintain arm's length
19      relationships among the related entities;

20    - The diversion of assets from a corporation by or to a stockholder or other person or
21      entity, to the detriment of creditors.

22    1. ***Unity of interest and ownership such that the separate personalities of Debtor, JP***
23       ***LLC and JSC LLC do not exist.***

24        Since October 18, 2018, Defendant LLCs were single member California limited liability

25    companies 100% owned by the Debtor [Debtor's Corporate Ownership Statement Pursuant to

26    FRBP 1007(a)(1) and 7007.1, and LBR 1007-4, DK 29]. This corporate form was filed by Debtor

27

28

under penalty of perjury on March 16, 2022 in this case.  The form was required as of the date of the answers of the Defendant LLCs.

Debtor used her April 20, 2021 deposition and her 341a hearings to create red herrings and confusion about her ownership interest in Defendant JP LLC. For example, in response to being asked who the members of Defendant JP LLC were, Debtor said "I don't have permission to disclose that".  She was the only member, so how come she could not disclose that? [Jasso Decl. ¶7, Paragraph 189, supra, and Jasso Decl. ¶ 82, Ex. 71, p. 1497, lines 16-19]

In her 341a hearing, Debtor played games by answering that the ownership of Defendant JP LLC is "depending on who you ask today".  [Jasso Decl. ¶83, Ex. 72, p. 1542, p. 14, lines 3-8 of the 341a Hearing 08.18.21].  Debtor scheduled that she had a 33% interest in JP LLC, then 1/7th interest in JP LLC, then 70% interest in JP LLC, via four different schedules, before Plaintiff filed the FAC.  Plaintiff included Debtor's testimony under oath of her changing story of the JP LLC ownership in the FAC because there was no accounting for the change, and nothing given to Debtor in exchange for Debtor's sales or purchases of her ownership JP LLC interest even though she had been asked to provide it.  She could have simply stated she was always the 100% owner like she did on her Corporate Ownership Form.

Starting November 22, 2021, Debtor started listing her ownership interest in Defendant JP LLC as 100%, and finally filed a Corporate Ownership Statement on March 16, 2022.  [Jasso Decl. ¶11, Ex. 1, p. 113, Item 19, DK 29]. This bankruptcy form filed under Dk 29 should be used as the conclusive proof of Debtor's 100% ownership of both Defendant LLCS since October 18, 2018.  [Jasso Decl. ¶ 7, *see also* Paragraphs 39-40, *supra*].

In addition, Debtor is the managing member of the Defendant LLCs, as listed on the Defendant LLCs bank signature cards, and her corporate ownership statement [Jasso Decl. ¶44, Ex. 33, p.948 and ¶73, Ex. 62, p. 1245, and DK 29].

1    Both Defendant LLCs have an operating address that is the same as Debtor's home address.

2    When the Defendant LLCs interests were created by Debtor on paper, both had the address of

3    Debtor's home address 5782 Pinon Drive, Huntington Beach, CA, 92649 and then 16222

4    Monterey Lane, Spc 376, Huntington Beach, CA, 92649 for their bank statements, and on the

5    California Secretary of State Statement of Information. [FAC DK 6 and its Ex. 8, p. 108, and Ex.

6    9, p. 110, Jasso Decl. ¶44, p. 1018 (Debtor #0186 December 2018 bank statement) ¶51, Ex. 1154

7    (JSC LLC December #7860 2018 Bank Statement), ¶73, Ex. 62 p. 1246 (JP LLC BofA #1274

8    August Bank Statement), and *see also* Paragraph ¶189, lines 25-26, *supra*, incorporated here by

9    reference wherein Debtor testified in her Deposition on 4.20.21 that Defendant JP LLC has the

10    same address as Debtor.]

11    Debtor explained in her declaration under penalty of perjury attached to her March 16, 2022

12    bankruptcy corporate ownership form, that the Defendant LLCs never operated as businesses by

13    stating "the single member entities could not conceptually operate as anticipated. The original

14    purpose of the entity's (*sic*) to acquire and manage company assets. The company (*sic*) never got

15    off the ground as planned." [Dk 29, p. 4].  Therefore, there was no arms-length legitimate business

16    activity of the Defendant LLCs between each other or the public.

17    Debtor treats the Defendant LLCs assets as her own by using ATM to withdraw cash, payment

18    of car payments, her Alliant visa and other credit cards, purchases of groceries, pet supplies,

19    restaurant meals, Starbucks, clothing store purchases, personal legal fees, and criminal court bail

20    and fines. The Defendant LLCs only activity was the holding of cash from Mr. Nickel, the mobile

21    home, money washed through the Debtor's IRA and paying Debtor's personal expenses.

22    There are no non-insider business creditor liens against any of the Debtor's assets, because as

23    Debtor stated in her Corporate Ownership Form, the businesses never actually operated.

24    Therefore, there are only judgment liens recorded by Plaintiff, the HOA and TD Bank.

25    The only other lien Plaintiff could locate is the insider lien that Debtor created claiming she

26    lent Defendant JSC LLC $225,000.  [Jasso Decl. ¶11, Ex. 1, p. 87, Schedule D. Item 2.2.]  Debtor

27    then claimed that her JP LLC held the note that was secured by the Debtor, as the sole member of

28    JSC LLC via a UCC lien dated January 14, 2019 after Plaintiff's judgment and the civil court's

1   terminating sanctions awarded and pending default judgment in favor of the HOA. [FAC DK 6,

2   ¶52, Answer DK 13, ¶52]. The only public evidence of documentation of loan, was the UCC lien

3   and Debtor filing of a lien holder form in favor of Defendant JP LLC with the Dept of Housing

4   and Urban Development on February 1, 2021, but backdated to August 20, 2020, signing as the

5   member of Defendant JSC LLC, when she was also the sole member of Defendant JP LLC.  [DK

6   29].  Therefore, Debtor used Defendant JSC LLC to create an insider lien in favor Defendant JP

7   LLC.  No payments were ever made on this loan because it would have been basically Debtor

8   paying herself. [See Paragraphs 187, 191, *supra*, and exhibits incorporated herein by reference,

9   Jasso Decl. ¶7].

10      Based on Plaintiff's calculations, Debtor transferred/deposited almost all of the funds Mr.

11  Nickel to the Defendant JSC LLC bank account starting November 7, 2018, with the deposit of a

12  $175,000 cashier's check dated November 7, 2018 and with subsequent deposits of approximately

13  $130,0000. [See Paragraphs 117-119, 123, 127, 131, supra, and exhibits incorporated herein by

14  reference, Jasso Decl. ¶7].

15      Plaintiff found a significant comingling of Debtor's funds with the Defendant LLCs bank

16  accounts. From the subpoena of Debtor's and Defendant LLCS' JP Morgan Chase bank, Bank of

17  America and Alliant Credit Union records that Debtor removed all $366,600 that she deposited

18  into her personal Chase accounts into cashier's checks by November 8, 2018, and that $355,000

19  was then deposited into Defendant JSC LLC Chase #7860 account starting on November 7, 2018.

20  Debtor continued to make deposits of Debtor's personal cash into Defendant JSC LLC Chase

21  #7860 account and used the funds for personal expenses, including bail, hair salon, restaurants,

22  cell phone bill, Home Depot credit card, Capital one credit card, Alliant Visa card, car payments,

23  and 401k loan payments prior to closing her 401k plan account on July 27, 2020, within one year

24  of filing her bankruptcy petition.  After Debtor was terminated from her employment on March

25  15, 2020, the Debtor then transferred her $14002.53 United Airlines 401k plan account balance to

26  Defendant JSC LLC and continued using all of the money in Defendant JSC LLC for personal

27  expenses.  [*See* Paragraphs 155-160, *supra*, and exhibits incorporated herein by reference, Jasso

28  Decl. ¶7].

1    There was no observance of corporate formalities.  There is no corporate documentation for

2    the transfer of funds to or from the Defendant LLCs to Debtor, or to or from Debtor's Fidelity

3    IRA, or to Lisa Ryan or the payment of Debtor's personal expenses enumerated in the Paragraphs

4    116-163, *supra*, and the exhibits incorporated herein by reference, Jasso Decl. ¶7.

5    Therefore, there is a unity of interest and ownership between Debtor and each JSC LLC and JP

6    LLC.  Specifically, Plaintiff showed that the Defendant LLCs (1) since October 2018, were solely

7    owned by the Debtor [Debtor's Corporate DK 29] despite lies she made in the 341a hearing, (2)

8    had no legitimate business activity [Debtor's Corporate DK 29], (3) the Defendant LLCs had no

9    third-party creditors prior to the bankruptcy as the only purported lien was an insider lien on the

10   Defendant JSC LLC's mobile home by Defendant JP LLC and the Debtor's ex-husband Ron

11   Pierpont which was released on July 9, 2021, (4) had no observance of corporate formalities, (5)

12   the address of the Defendant LLCs is the same as the sole owner, the Debtor, (6) the Debtor

13   misrepresented that there were changing ownership interests of Defendant JP LLC (7) Debtor used

14   these sham corporations to hide Debtor's $355,000 in cash obtained  from Mr. Nickel starting on

15   November 7, 2018, and (6) since October 2018, the Debtor, as the sole owner/member of the

16   Defendant LLCs, had total control over her assets and used the Defendant LLCs to transfer her

17   assets in her sham corporations by fraudulently moving money in and out of the Defendant LLCs

18   bank accounts and Debtor's personal Fidelity IRA account up through the date of her bankruptcy

19   petition via cash withdrawals and cashier's checks, while also using the money in the Defendant

20   LLCs for her personal expenses, including criminal bail, personal credit card debt, car payments,

21   cell phone bills, groceries, ATM cash withdrawals, to pay Lisa Ryan $150,000 in JSC LLC

22   cashier's checks in a concealed transfer of the JSC LLC mobile home, and washed money from

23   JSC LLC through her Fidelity IRA to claim a bankruptcy exemption of what is actually

24   nonqualified retirement IRA money.  Debtor planned that by Defendant JSC LLC continuously

25   receiving loaned funds from Debtor, the lien on JSC LLC in favor of JP LLC, which kept

26   increasing to a total of $263,000, to prevent collection of the mobile home asset.  [Jasso Decl. ¶11,

27   Ex. 1, pp. 53, 97 (Schedule A/B, Item 19)].

28

1    Therefore, Plaintiff respectfully requests that the Court order an equitable solution under

2    the California *Curci* doctrine that Defendant J-Pad, LLC and Defendant J-Sandcastle Co LLC are

3    the alter-egos of Debtor.  This equitable result may help the Trustee to obtain trust assets for

4    distribution to creditors, including Plaintiff.  But also, as Debtor has a pattern of hiding assets for

5    years, Plaintiff believes this will continue with post-bankruptcy assets, and therefore, Plaintiff also

6    respectfully requests and order that these Defendant LLCs are both added as judgment debtors to

7    Plaintiff's criminal restitution judgment and civil judgment.

8    **B.    Defendant LLCs Assets Are Debtor's Voidable Transfers of her Assets Hidden**

9    **in the Defendant LLCs**

10    As held by U.S. Supreme Court, in *Husky International Electronic, Inc. v. Ritz* (2016) 578

11    U.S. 356, 359, 136 S.Ct. 1581, 1586, there is a distinction between "false representation" and

12    "actual fraud" for the purposes of 11 U.S.C §523(a)(2)(A), holding that "[t]he term 'actual fraud'

13    in §523(a)(2)(A) encompasses forms of fraud, like fraudulent conveyance schemes, that can be

14    effected without a false representation."  The creditor bears the burden of proving the applicability

15    of §523(a)(2)(A) by a preponderance of the evidence." *In re Sabban*, 600 F.3d at 1222, citing

16    *Turtle Rock Meadows Homeowners Association v. Slyman (In re Slyman),* 234 F.3d 1081, 1085

17    (9th Cir. 2000).

18    Debtor has nearly 25 years of pro per litigation experience in Orange County Superior

19    Court.  Following her targeting of innocent people via pro per litigation, Plaintiff became a

20    creditor of Debtor's and had a continuing lien on the condominium sublease under section 5.1 of

21    the CC&Rs since July 2017, when Debtor cross-sued Plaintiff and the other Board members, for

22    indemnification, apportionment of fault and declaratory relief under the governing documents

23    falsely. Debtor claimed Plaintiff owned the 4476 Alderport condo and that Plaintiff had violated

24    the governing documents causing the condo to be out of compliance with the CC&Rs.  [*See*

25    Paragraph 17, *supra*, Jasso Decl. ¶7].

26    After enduring false claims and defending Debtor's out-of-control litigation tactics

27    designed to hurt me and the other volunteer board members rather than prove a civil claim, Debtor

28    lost her cross-complaint on demurrer. Debtor then dismissed her suit against Plaintiff and the other

69

1    Board members. Per the governing documents and state law, known as Davis-Stirling, Plaintiff as

2    a Board member was entitled to attorney's fees and costs for defending herself against the

3    Debtor's cross-suit in the Enforcement Lawsuit, which was filed on August 7, 2018. [See

4    Paragraph 17, and related Ex. 12, p 451-454, *supra*, Jasso Decl. ¶7].

5         But for Debtor's blatant lie that Plaintiff owned 4476 Alderport condo and that Plaintiff

6    did the violations forcing Plaintiff to spend legal fees in defense of her claims, through a

7    settlement that she never intended to live up to, and then appealing the court's granting of the

8    motion for attorney's fees based on the clock running out for a timely motion, shows that Debtor

9    with her extensive pro per litigation experience planned to put Plaintiff and the other board

10   members through spending more and more legal fees to cause financial harm, based on a claim

11   that she knew was a lie.

12        If there was any truth to her claims, she could have provided evidence in discovery and

13   tried to prove it via a trial on the merits.  But, the truth is she knew it was a lie. Plaintiff has

14   provided examples of Debtor's fraud in her continuous filings of unmeritorious ex parte motions,

15   just like her purported fee simple ownership lie. The 2000 civil case proved these sublease

16   interests as unalterable under contracts of adhesion, which do not include a fee interest in the

17   ground. Furthermore, the standard 2003 Form for transferring ownership of the sublease was

18   recorded on every unit, so Debtor and Mr. Nickel intentionally fabricate a different one that no

19   license real estate agent,  escrow agent or title company would ever do out of concern for fraud.

20   This court was subjected to her litigation tactics in the main bankruptcy case as well regarding her

21   false Covid-19 government rent funds grift.  [*See* Paragraphs 21, 30, *supra*, and see related

22   exhibits incorporated herein by reference, Jasso Decl. ¶7].

23        Debtor's attempt to cause more legal fees via protracted litigation is shown by Debtor's

24   statement in the November 1, 2018 transcript.  Debtor immediately asked for an extension of time

25   on the motion for the second time.  Debtor could have begun by telling the court: "I sold the condo

26   yesterday."  Instead, she lied about it by omission, convincing the court by saying "I have to sell"

27   that the court believed and thus continued the hearing for another week causing more legal fees.

28

1  [*See* Paragraphs 55, *supra*, and see related exhibits incorporated herein by reference, Jasso Decl.

2  ¶7].

3       Plaintiff, as a volunteer board member, incurred the legal fees to defend Debtor's

4  fraudulent cross-complaint for indemnification, apportionment of fault and declaratory relief,

5  because Debtor never intended to prove any of her claims. She could not prove them because I did

6  not own her condo and did not do anything in violation of the CC&Rs that she did. She just kept

7  filing fraudulent pleadings that were denied or taken off calendar for fraud, while claiming without

8  proof that she owned the common area in fee simple and that there was no HOA.  Then, she lied to

9  the court on November 1, 2018 causing more legal fees for additional appearances and preparation

10 for the extended hearing. Vexatious litigation is basically litigation that is based on a person's

11 intentional lies and induces the victim to defend oneself and spend legal fees and costs. That is

12 what happened here. Debtor acted fraudulently by cross-suing Plaintiff in the enforcement lawsuit

13 causing the legal fees debt based on her deceit in her cross-suit against Plaintiff.

14       **1    *The Defendant LLCs Assets Come from Debtor's First Voidable Transfer of***

15           ***Her Sole Substantial Asset, the 4476 Alderport Condo***

16 Section 3439.04(a)(1) of the California Civil Code states:

17
18       A transfer made or obligation incurred by a debtor is voidable as to a
         creditor, whether the creditor's claim arose before or after the transfer
19       was made or the obligation was incurred, if the debtor made the
         transfer or incurred the obligation […] (1) with actual intent to hinder,
20       delay, or defraud any creditor of the debtor.

21
22       A creditor can void as "actual fraud" any transfer made or obligation incurred by a debtor

23 if the debtor acted with "[w]ith actual intent to hinder, delay, or defraud any creditor of the

24 debtor." Cal. Civ. Code § 3439.04(a)(1).  Eleven (11) factors or "badges of fraud," are used to

25 determine actual fraud, prompting courts to consider whether the transfer should be voided:

26       (1) The transfer or obligation was to an insider, (2) The debtor retained possession
         or control of the property transferred after the transfer, (3) The transfer or
27       obligation was disclosed or concealed, (4) Before the transfer was made or
         obligation was incurred, the debtor had been sued or threatened with suit, (5) The
28       transfer was of substantially all the debtor's assets, (6) The debtor absconded, (7)
         The debtor removed or concealed assets, (8) The value of the consideration

71

received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred, (9) The debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred, (10) The transfer occurred shortly before or shortly after a substantial debt was incurred, and (11) The debtor transferred the essential assets of the business to a lienholder who transferred the assets to an insider of the debtor.

Cal. Civ. Code § 3439.04(b).

Here, numerous badges of fraud are present with respect to the Pre-Petition Transfers.

After obtaining the debt by fraud, Debtor, on October 30, 2018 and again on October 31, 2018, transferred the 4476 Alderport condo to Mr. Nickel when Plaintiff already had an interest in the 4476 Alderport condo pursuant to the California Appellate Court, *Nagel v. Westen*, 59 Cal.App.5th 740 (2021) decision.

Mr. Nickel knew the 4476 Alderport condo was under litigation with the HOA and the board members. Mr. Nickel knew that the Plaintiff's and the other board members' motion for attorney's fees was scheduled on November 1, 2018. Mr. Nickel knew that the Board members' motion was asking more than $50,000 and that the HOA had already incurred over $250,000 based on the HOA's budget, the audited financials, and the Board minutes. [*See* Paragraphs 46, 53, 54, *supra*, and related exhibits incorporated herein by reference, Jasso Decl. ¶ 7].

Mr. Nickel knew that the landlord, BS Investors, had started an Unlawful Detainer action against the Debtor on October 10, 2018 for outstanding HOA assessments and failure to comply with the state law resulting in numerous restraining orders against Debtor. [*See* Paragraphs 38, 73, supra, Jasso Decl. ¶ 7].

Mr. Nickel was aware that the HOA had approved recording a separate written lien on the 4476 Alderport condo for the outstanding assessments, as he admitted he received everything in black binders from the Debtor. [*See* Paragraphs 53, 73 *supra*, Jasso Decl. ¶7].

Mr. Nickel has substantial real property sales and purchases with condominiums with HOA in California and operates a business called R. Nickel Properties LLC. Mr. Nickel used a real estate agent, escrow agent and title policy for his purchases *other than* the 4476 Alderport condo. (emphasis added). [*See* Paragraphs 47, 50, supra, and related exhibits, Jasso Decl. ¶7].

Debtor created a fabricated assignment of the sublease document that gave Mr. Nickel he 4776 Alderport condo from Defendant JP LLC on October 30, 2018, for no consideration and no

1    transfer taxes paid. Debtor included a transfer of the remainder interest in the ground in fee simple

2    in this document.  The document does not match the landlord's required form, which was recorded

3    on the unit in the 2003 First Amendment to the Condominium Sublease for 4476 Alderport condo

4    and on each of the other 79 units.  [*See* Paragraphs 81, 82, 83, *supra*, and related exhibits

5    incorporated herein by reference, Jasso Decl. ¶7].

6             On October 30, 2018, Debtor received $379,000 in cashier's checks from Mr. Nickel at his

7    bank within a few hours of meeting him, where they signed the papers, payable to Defendant JP

8    LLC.  [*See* Paragraph 42, *supra*, and related exhibits incorporated herein by reference, Jasso Decl.

9    ¶ 7].

10            On October 31, 2018, the eve of the motion for attorney's fees and after Debtor provided

11    Mr. Nickel with all of the HOA documentation regarding all of the litigation which included

12    litigation disclosure letters, HOA board minutes and the title and case number of all of the cases,

13    the recorded governing documents that contain provisions for an ongoing lien on the condo unit at

14    all times, all of the audited financial information, a preliminary title report that showed the actual

15    parcels making up the 4476 Alderport condo unit which did not include a remainder interest in fee,

16    the sublease and ground lease documents, Mr. Nickel agreed to enter into a second, modified

17    transfer document that changed the name of the transferor from Defendant JP LCC to Debtor,

18    Jamie L Gallian.

19            On October 31, 2018, Mr. Nickel gave Debtor two cashier's checks totaling $379,000

20    payable to Jamie Gallian and re-signed the revised transfer document that again stated there was

21    no consideration paid and no transfer taxes were paid to the OC County Recorder's office when it

22    was recorded.  Like the October 30, 2018 document, this transfer document included a transfer of

23    a remainder interest in the ground in fee, which Debtor claimed in court that the condominiums

24    are townhomes in a PUD and the fabricated transfer document to Mr. Nickel reflect the claim that

25    the subleased condos were townhomes in a PUD, because Mr. Nickel subsequently sued the HOA

26    and the board members claiming he has a fee ownership interest in the property in his verified

27    complaint.   [*See* Paragraphs 81, 82, 83, *supra*, and related exhibits incorporated herein, Jasso

28    Decl. ¶7].

1    Mr. Nickel and Debtor kept Mr. Nickel's identity and contact information concealed.

2  Debtor lied to the state court about the sale by making the court believe that she was going to sell

3  in the future, and only admitted the sale after the state court indicated it was ruling in favor of

4  Plaintiff and the other board members. [*See* Paragraph 55*, supra*, Jasso Decl. ¶7].

5    The HOA attorneys investigated the new owner to try to determine if he existed and have

6  the HOA attorneys communicate with him to see if there was any truth to Debtor's surprise

7  statements in court.  The HOA attorney, Pejman Kharazzian, located him on November 5, 2018

8  and Mr. Nickel faxed over the October 30, 2018 transfer document and the front of the two

9  October 31, 2018 cashier's checks as his proof of purchase as a purported bonafide purchaser for

10  value.  [*See* Paragraphs 57-58, *supra*, and related exhibits incorporated herein by reference Jasso

11  Decl. ¶ 7].

12    If the property was owned in fee like townhomes in a PUD, which Mr. Nickel claims like

13  Debtor, the 4476 Alderport condo was worth approximately $600,000 in 2018.  Therefore, Mr.

14  Nickel did not intend to pay fair market value for the property and received a substantial discount

15  off of the fair market value of the property.   [*See* Paragraphs 22, 81, *supra*, Jasso Decl. ¶7, and

16  related exhibits incorporated herein by reference].

17    Mr. Nickel finally admitted that there was no purchase agreement, no escrow and no title

18  policy for the Debtor-Nickel transfer of the condo, and that Mr. Nickel knew he should have done

19  the transfer so fast and that it was against his better business sense. When I met Mr. Nickel shortly

20  after emailing, he again shared his regret over the fast transfer and claimed Debtor required him to

21  do the under-the-table transfer because of the motion for attorney's fees the next day. [*See*

22  Paragraphs 67, 76, *supra*, Jasso Decl. ¶ 7 and related exhibits incorporated herein by reference].

23    Debtor admitted in her Answer to Plaintiff FAC ¶56 that in her Appellant's Opening Brief

24  for her appeal of the approximately $319,000 default judgment, that "rather than pay the

25  judgments she owed, Debtor sold the condo to Mr. Nickel." [*See* Paragraph 71, *supra*, Jasso Decl.

26  ¶7 incorporated herein by reference; *see also,* FAC DK 6, ¶56, Debtor's Answer DK 13, ¶56; *see*

27  *also*, Jasso Decl. ¶33, Ex. 22, p. 868, Appellant's Open Brief Part V., first full paragraph].

28

74

1    Debtor scheduled a retained interest in the property in her bankruptcy schedule by claiming

2    a reversionary interest in APN 937-63-053, which is the APN number for the 4476 Alderport

3    condo. [*See* Paragraph 56, *supra*, Jasso Decl. ¶7, and related exhibits incorporated herein by

4    reference, and Jasso Decl. ¶11, Ex. 1, p. 74, Item 34.4, p. 84, Item 34.3); FAC DK 6 ¶83].

5    The day of the transfer the Debtor owed over $300,000 in potential judgments to the HOA,

6    the Board members, TD Bank judgment, HOA outstanding assessments, unpaid property taxes and

7    pending legal fees incurred by the landlord, BS Investors, for the UD action. Debtor also owed

8    Bank of America $3672.89, which combined with Debtor's Alliant Credit Union account equaled

9    approximately $1,118.11 as a combined total of Debtor's assets. *See* Paragraph 84, *supra*, Jasso

10    Decl. ¶7 and related exhibits incorporated herein by reference].

11    Debtor paid property taxes on 4476 Alderport condo in December 2018, approximately 5

12    weeks after purportedly selling to Mr. Nickel, and the Orange County Tax Assessor's office

13    continued to list Debtor as the owner of the condo through June 2019, the last time Plaintiff spoke

14    with a government employee in that office and checked their computers.  [*See* Paragraphs 61, 68,

15    *supra*, Jasso Decl. ¶7 and related exhibits incorporated herein by reference]

16    Based on Debtor's financial statement provided to the criminal court under oath, Debtor

17    obtained a state public defender in February 2019 and again in August 2019 and court-appointed

18    criminal appellate attorneys after the criminal court determined she was indigent. [*See* Paragraphs

19    63, 195, *supra*, Jasso Decl. ¶7 and related exhibits incorporated herein by reference].

20    The Debtor and Mr. Nickel refused to trace the funds of the cashier's checks payable to

21    Defendant JP LLC or to Debtor, that Mr. Nickel claims relate to his taking a concealed ownership

22    interest in Debtor's or JP LLC's assets immediately prior to court-ordered judgments in favor of

23    Plaintiff and other creditors. Debtor made motions, pleading the 5th Amendment to avoid the

24    court-ordered debtor's examination of her assets and a bench warrant was issued to gain her

25    compliance. *See* Paragraphs 94, 95, 193, 194, *supra*, Jasso Decl. ¶7 incorporated herein by

26    reference].

27    The Debtor and Mr. Nickel committed a transfer of the 4476 Alderport condo in a

28    concealed transfer without a purchase agreement, an escrow, a title policy, and with knowledge of

75

1  (a) the HOA creditor, Plaintiff creditor and the other creditors, (b) the ongoing Enforcement

2  Litigation and motions for attorney's fees, (c) Debtor's unpaid discovery sanctions, (d) Plaintiff's

3  and the other board members motion for attorney's fees of approximately $50,000 (e) Debtor's

4  unpaid HOA assessments and lien, (f) an ongoing Unlawful Detainer action against the Debtor by

5  the Landlord of the 4476 Alderport condo defaulted sublease for failure to pay the unpaid HOA

6  assessments and failure to comply with state law as evidenced by the numerous restraining orders;

7  and (g) the Debtor's lack of other assets available to pay her debts, as she was already not paying

8  several of her debts at the time of the transfer, because Debtor's assets apart from the 4476

9  Alderport condo totaled $1118.11. The transfer of the 4476 Alderport condo made her indigent as

10 determined by the criminal court in February 2019.

11              a.   *There is No Defense to the Debtor-Nickel Transfer of the 4476*

12                   *Alderport condo defaulted sublease*

13         Section 3439.08 of the California Civil Code states: A transfer or obligation is not voidable

14 under underline paragraph (1) of subdivision (a) of Section 3439.04, against a person that took in good faith

15 and for a reasonably equivalent value given the debtor or against any subsequent transferee or

16 obligee.

17         The Nautilus Court opinion appears to be the seminole case on CUVTA's good faith

18 defense.  The court held there are 4 possible ways to show there is no "good faith" defense: "After

19 analyzing those state and federal cases, we hold a transferee cannot benefit from the good faith

20 defense if that transferee had fraudulent intent, colluded with a person who was engaged in the

21 fraudulent conveyance, actively participated in the fraudulent conveyance, **or** had *actual*

22 *knowledge of facts showing knowledge of the transferor's fraudulent intent."*  (the court added the

23 emphasis). See Nautilus, Inc. v. Yang (2017) 11 Cal.App.5th 33, 37 [217 Cal.Rptr.3d 458].  The

24 *Nautilus* court held that a transferee does not take in good faith if the transferee had actual

25 knowledge of facts showing the transferor had fraudulent intent." *Id.* at p. 46. The Court stated

26 that "knowledge of facts rendering the transfer voidable would be inconsistent with the good faith

27

28

1   that is required of a protected transferee." *See Nautilus, Inc. v. Yang* (2017) 11 Cal.App.5th 33,

2   46.   In *Filip v. Bucurenciu*, 129 Cal. App. 4th 825 (2005), a spouse of debtor transferred property

3   before a judgment against the debtor. She claimed the good faith defense under Section

4   3439.08(a).   The appellate court disagreed with her and instead agreed with the lower's court

5   findings of fact that the spouse knew about the litigation and the creditor's claim for damages and

6   knew that a judgment "might be forthcoming" against the debtor. The appellate court held that

7   "[t]ransfers made under those circumstances do not evidence good faith." *Id.* at p. 890.

8

9         Prior to Debtor filing for bankruptcy, the HOA cross-sued Mr. Nickel on the basis that the

10   transfer of the 4476 Alderport condo was a CUVTA transfer.

11         Mr. Nickel admitted that he knew everything about the HOA ongoing litigation. Mr.

12   Nickel actively participated in transferring the Debtor's sole substantial asset in a concealed

13   transfer on the eve of Plaintiff's motion for attorney's fees, without a purchase agreement, escrow

14   or title policy and knowing there was an additional pending $300,000 judgment for legal fees and

15   cost and damages from the HOA.   Mr. Nickel's substantial real estate purchase/sale experience in

16   many escrows shows that he knew the benefit to Debtor of concealing the transfer meant that some

17   of the proceeds of a transparent sale would go to Debtor's creditors. Despite his 'better sense of

18   business" which includes decades of real estate transactions in California with at least 6 hoa

19   condominiums, Mr. Nickel admitted in his email to Plaintiff in March 2019 that he intentionally

20   concealed the purported purchase by deliberately doing a "rushed" transfer without an escrow,

21   escrow agent or real estate agent, which helped Debtor avoid paying her judgment debts.   Mr.

22   Nickel claims he took the property for a purported $379,000 when the fair market value of a

23   townhome was $600,000, which he believes he purchased at the time of the transfer and is now

24   claiming a fee ownership interest. Therefore, there is no evidence that the Mr. Nickel would have

25

26

27

28

1    any basis for claim he took in good faith **and** for reasonably equivalent value. *See* Paragraph 47,

2    67, 73, 81 and related exhibits incorporated herein by reference, *supra,* Jasso Decl. ¶ 7].

3        Based on the facts and law as provided above, Plaintiff has met the burden of proof by a

4    preponderance of the evidence that the Debtor-Nickel transfer of the 4476 Alderport condo

5    sublease on October 31, 2018 was fraudulent conveyance scheme that both the Debtor and Mr.

6    Nickel participated in to prevent the Debtor's creditors from collecting the debts owed from the

7    asset, which is actual fraud as defined by the U.S. Supreme Court, in *Husky International*

8    *Electronic, Inc. v. Ritz* (2016) 578 U.S. 356, 359, 136 S.Ct. 1581, 1586, for the purposes of 11

9

10   U.S.C §523(a)(2)(A).

11       ### 2. *The Defendant LLCs, As Debtor's Alter-Egos, Acted at Debtor's Direction to*

12       *Hide Transfers of Debtor's Cash from Mr. Nickel via Cashier's Checks  in*

13       *Violation of 11 U.S.C. 523(a)(2)(A)*

14           a. *The Debtor's Transfers of Cash from Mr. Nickel via Cashier's Checks*

15           *Payable to Defendant JSC LLC was Actual Fraud Pursuant to the*

16           *Husky International Supreme Court Ruling.*

17       The Plaintiff and the HOA spent years trying to collect the Plaintiff's judgments,

18   investigating the Debtor's assets.  A bank levy resulted in no collection since the Plaintiff emptied

19   the account. A wage garnishment was not possible because Debtor quit or was laid off from her

20   job on March 15, 2020.  Plaintiff recorded an abstract of judgment and UCC liens. Plaintiff

21   investigated the Debtor-Nickel transfer and worked years to try and collect the judgments against

22   the condominium via informal and formal mediation.  That effort is still ongoing. The HOA

23   requested a Debtor's ORAP exam in December 2020, which was finally scheduled by the court in

24   March 2021 for June 3, 2021.  The Debtor fought appearing for the exam claiming her 5th

25   Amendment rights to avoid self-incrimination, claiming she was sick, having other cases to attend

26   to in her constant pro per litigation with other targets. The court realized the delay tactic and order

27   her to appear under a bench warrant on July 8, 2021.  Debtor immediately filed for bankruptcy on

28   July 9, 2021. HOA and Plaintiff asked Mr. Nickel to trace the funds he claimed were purchase

1   money for the 4476 Alderport condo, but he has refused multiple times.  After Plaintiff filed the

2   FAC, Plaintiff subpoenaed the financial records from third parties regarding Debtor and the

3   Defendant LLCs, including Wells Fargo Bank, JP Morgan Chase Bank, Bank of America, Alliant

4   Credit Union, Fidelity Investments, and real property records from Old Republic Title Company,

5   the Secretary of State and the California Dept. of Housing and Urban Development (HUD). [*See*

6   Paragraphs 94-102, supra, Jasso Decl. ¶7 ].

7        The records show that Debtor deposited $366,600 into her new Chase PCS #7891 account

8   on October 31, 2018 and emptying the account except for $100 by November 3, 2021 via

9   withdrawals of cash and online transfers totaling $355,000 to her new Chase PCC #0186 account.

10  [*See* Paragraphs 103-107, *supra,* related to Chase which provide in more detail each transfers of

11  funds which take pages to describe and cite to Jasso Decl. with attached exhibits; Jasso Decl. ¶7].

12       Starting November 2, 2018, Debtor immediately wired funds to Brian Till and then

13  obtained the wire funds back by November 5, 2018.  Debtor withdrew cash in the form of cashier's

14  checks totaling $155,000 payable to herself and deposited those checks in Defendant JSC LLC

15  new Chase Acct #7860 opened on November 16, 2018, her personal Alliant Credit Union account,

16  deposited into another new personal Chase Checking ending in #5315, and redepositing some

17  funds back into this PCC #0186 account. Plaintiff created a chart attached to Jasso Decl. ¶43, Ex.

18  32.   On November 7, 2018, Debtor withdrew $175,000 in a cashier's check and deposited it into

19  Defendant JSC LLC account.  Debtor withdrew $1,600 and deposited it into Debtor's personal

20  Chase account ending in #5315, which she ten transferred $500 of it to Defendant JSC LLC

21  account #7860. Debtor then withdrew $20,000 in cashier checks that Plaintiff has been unable to

22  trace.  By November 8, 2018, this account had a $0 balance. [*See* Paragraphs 108-115, supra,

23  incorporated here by reference; Jasso Decl. ¶7].

24       The Debtor then moved the $355,000 of funds into the new Defendant JSC LLC Chase

25  #7860 account.  Through an even more complex set of transfers over a long period of time, Debtor

26  transferred funds into Defendant JSC LLC which she then withdrew the funds with stacks of

27  cashier's checks, used the account to purchase personal items, deposited funds into an almost

28

1   empty Fidelity IRA rollover account to wash the funds and pretend on her bankruptcy schedules

2   that she had "qualified retirement" funds.  These cashier's checks were used by the Debtor to

3   purchase the Defendant JSC LLC's mobile home located at 16222 Monterey Lane, Spc 376,

4   Huntington Beach, CA 92649 in another concealed transfer without an escrow, a purchase

5   agreement or a title policy.  On November 17, 2018, Debtor was able to transfer $150,000 of

6   Defendant JSC LLC's cashier's checks to Lisa Ryan who was the prior owner of the mobile home.

7   Debtor took the remaining $20,000 JSC LLC cashier's check and deposited it into her personal

8   account and then redeposited the funds back into JSC LLC to create an $18,000 cashier's check

9   payable to Houser Bros Co. but then redeposited it into the JSC LLC Chase #7860 account to then

10  send some of it to Fidelity along with cashier's check's from the November 3, 2018 withdrawal of

11  personal funds that Plaintiff traced to the JSC LLC Chase #7860 account.  Plaintiff has provided

12  charts attached to Jasso Decl. as Exhibits 34 and 36 detailing Defendant JSC LLC's cashier's

13  checks that could be traced.  The funds were ultimately used for personal items, such as criminal

14  bail, Albertson's and other grocery stores, cell phone, hair salon, Big Lots, CVS, restaurants, car

15  payments, Alliant personal visa credit card, personal Home Depot account, personal Capital One

16  credit card, appellate court record fees, personal attorney's fees, the IRS personal taxes, her United

17  Airlines 401k loan payments, her personal medical insurance, withdrawals of cash, and a $9,000

18  withdrawal in a cashier's check payable to Ron Pierpont, her ex-husband, on July 9, 2021, the date

19  of the petition which left a balance of $368.46 on the date of the petition. [*See* Paragraphs 116-

20  163, supra which are incorporated here by reference; Jasso Decl. ¶7].

21  In *Nagel v. Westen*, 59 Cal.App.5th 740 (2021), the creditor sued the debtor under California's

22  UVTA predecessor UFTA, but the findings of the appellate reference CUVTA. The case issue was

23  whether a debtor's transfer of an asset could still be a fraudulent conveyance under CUVTA if the

1  debtor was both the transferor and transferee. The California appellate court agreed with the

2  creditor that such a transfer was transfer subject to CUVTA, finding that:

3
4        "Section 3439.04(b) anticipates imaginative debtors will employ an array of tactics to
        evade payment obligations. For example, the trier of fact may look to whether "the transfer
4        or obligation was to an insider"; "the debtor retained possession or control of the property
        transferred after the transfer"; or "the debtor removed or concealed assets." These badges
5        of fraud indicate one's liability under the UVTA is not contingent upon recruiting
6        conspirators. It may include situations in which the debtor "parts" with property without
        alienating ownership rights or possession. Further, the UVTA does not limit its
7        enforcement measures to third parties. (See § 3439.07, subd. (a)(3)(C) [creditor may obtain
        avoidance, injunctive relief, receivership, or "[a]ny other relief the circumstances may
8        require"].)"  Id. at p. 750-751.

9        The Nagel court reviewed the California legislative history which considered that the terms
10
11 in the UVTA should be analyzed from the perspective of the creditor, not the debtor, and thus a

12 creditor has a potential interest to a debtor's property during litigation with the debtor which the

13 UVTA protects:

14       "[A] creditor-debtor relationship can alter an owner's power over the property owned."
        (Sen. Com. on Judiciary, Analysis of Sen. Bill. No. 161 (2015-2016 Reg. Sess.) p. 1.)
15       "Unsecured creditor-debtor relationships necessarily raise questions as to a creditor's rights
16       and remedies when the debtor manipulates property to defeat the creditor's potential
        interest in that property." (*Ibid.*) It is not surprising the UVTA defines the term "asset" not
17       from the debtor's perspective, but from that of a creditor with a potential interest in any
        property that could satisfy the underlying debt. (citations omitted). Id at p. 750.
18

19       The debtors in the *Nagel* case transferred their property at the closing stages of arbitration
20
21 and thus the court found that the creditor's "interest had already arisen at the time of transfer." Id.

   at p. 750.
22 The court found that:

23       "Creating a bright line "third-party transferee" requirement would allow debtors to
24       unilaterally extinguish this interest, and, it follows, their UVTA liability, by simply
        manipulating an asset's form or location without vesting legal title or ownership in a third
25       party. This result would contravene the UVTA's stated purpose: "to prevent debtors from
        placing, beyond the reach of creditors, property that should be made available to satisfy a
26       debt." (*Chen v. Berenjian, supra,* 33 Cal.App.5th at p. 817.)

27       The Defendant JSC LLC is the alter-ego of the Debtor, as provided in Part IV.A, *supra*.
28 Thus, the transfer of the funds to Defendant JSC LLC, which is effectively from the Debtor to the

1  Debtor in a different form, constitutes actual fraud as part of Debtor's continuation of her

2  fraudulent transfer scheme with the money given to her by Mr. Nickel for the 4476 Alderport

3  condo sublease.

4        Based on the facts and law as provided above, Plaintiff has met the burden of proof by a

5  preponderance of the evidence that the Debtor-Defendant JSC LLC transfers of cash and cashier's

6  check from November 3, 2018 through July 9, 2021 was a fraudulent conveyance scheme that

7  both the Debtor and Defendant JSC LLC participated in to prevent the Debtor's creditors from

8  collecting the debts owed from the assets, which is actual fraud as defined by the U.S. Supreme

9  Court, in *Husky International Electronic, Inc. v. Ritz* (2016) 578 U.S. 356, 359, 136 S.Ct. 1581,

10  1586, for the purposes of 11 U.S.C §523(a)(2)(A).

11                  *b.   The Debtor's Transfers of $75,000 of Cash She Received from Mr.*

12                     *Nickel via Cashier's Checks via Deposit into Defendant JSC LLC, and*

13                     *then $96,000 of Funds Washed Through Debtor's Fidelity IRA*

14                     *Rollover Account and then Transferred via a $74,999 Cashier's Check*

15                     *into Debtor new Bank of America JP LLC #1274 account, which was*

16                     *Actual Fraud Pursuant to the Husky International Supreme Court*

17                     *Ruling.*

18        On August 16, 2019, after Debtor obtained another public defender in her ongoing criminal

19  case, Debtor withdrew $74,999 a cashier's check from Defendant JSC LLC payable to Defendant

20  JP LLC to open the JP LLC BofA #1274 account.  The funds came about after Debtor hid $96,000

21  in Defendant JSC LLC Chase #7860 account that originated from the $355,000 deposited into

22  Debtor's PCC #0186 account.  The details are described in Paragraphs 131, 132, 137 and 138

23  incorporated here by reference. [Jasso Decl. ¶7].  Debtor then began a series of large withdrawals

24  of cash from August 16, 2019 through July 9, 2021, thousands of dollars a month spent each

25  month on personal items including cable tv, Macy's, restaurants, pet food, payments to her

26  personal Capital One credit card, sporting goods, groceries, funds sent to one of her sons,

27  

28

1  dwindling the account down to $2454.20 on July 9, 2021 and did not schedule this amount as her

2  personal funds. [*See* Paragraphs 164-174, supra, incorporated here by reference; Jasso Decl. ¶7].

3        Like the Defendant JSC LLC, the Defendant JP LLC is the alter-ego of the Debtor, as

4  provided in Part IV.A, *supra*.  Thus, the transfer of the funds from Defendant JSC LLC to

5  Defendant JP LLC, which is effectively from the Debtor to the Debtor in a different form,

6
7  constitutes actual fraud as part of Debtor's continuation of her fraudulent transfer scheme with the

8  money given to her by Mr. Nickel for the 4476 Alderport condo sublease.  *See* California Code

9  Section 3439.04(a) and *Nagel v. Westen*, 59 Cal.App.5th 740 (2021), as provided in detail in Part

10  IV.B.1 and Part IV.B.2, *supra*.

11        Based on the facts and law as provided above, in Part IV.B.1 and Part IV.B.2, *supra*,
12  Plaintiff has met the burden of proof by a preponderance of the evidence that the Debtor-
13  Defendant JSC LLC-Defendant JP LLC transfers of cash and cashier's check from November 3,
14  2018 through July 9, 2021 was a fraudulent conveyance scheme that the Debtor and Defendant
15  JSC LLC and Defendant JP LLC participated in to prevent the Debtor's creditors from collecting
16  the debts owed from the assets, which is actual fraud as defined by the U.S. Supreme Court, in
17  *Husky International Electronic, Inc. v. Ritz* (2016) 578 U.S. 356, 359, 136 S.Ct. 1581, 1586, for
18  the purposes of 11 U.S.C §523(a)(2)(A).

19             c.   <u>The Debtor's Defendant JP LLC January 2019 'perfect lien' on the</u>
20                  <u>Mobile Home Based on Transfers of $225,000 of Cash Originating</u>
21                  <u>from Mr. Nickel via Cashier's Checks Payable to Defendant JSC LLC</u>
22                  <u>for Personal Expenses, While Making Defendant JP LLC the lienholder</u>
23                  <u>on the Defendant JSC LLC Mobile Home was Actual Fraud Pursuant</u>
24                  <u>to the Husky International Supreme Court Ruling</u>.

25        The Debtor moved almost all of the $379,000 of funds received from Mr. Nickel on
26  October 31, 2018 through Defendant JSC LLC for personal expenses. Thousands of dollars of
27  cash and cashier's check were untraceable.

28

1    The Debtor claims she made a loan to Defendant JSC LLC to operate what she has

2    admitted in DK 29 Corporate Ownership Statement a nonexistent business, secured by Defendant

3    JSC LLC's mobile home asset.  Debtor then created a lienholder interest in Defendant JSC LLC

4    via a UCC lien and a HCD lien in favor of Defendant JP LLC.  Debtor admitted that no payments

5    were ever made on the promissory note. [*See* FAC DK ¶50; *see also* Paragraphs 182-191

6    incorporated here by reference; Jasso Decl. ¶7].

7    Based on the Schedule A/B, Item 19, Debtor states "J-Pad, LLC Holder of Security

8    Agreement, dated 11/16/18, Promissory Note ($175,000 & $88,000). Matures 2048." [Jasso Decl.

9    ¶11, Ex. 1, pp. 53, 97].  This lien is also a fraudulent conveyance scheme because Debtor, in using

10    her alter-ego Defendant LLCs, she is basically lending herself money by putting the money into

11    Defendant JSC LLC to use for personal expenses, putting a lien on the mobile home asset she hid

12    in JSC LLC based on the purported loan, and the Defendant JP LLC's holder of security lien is

13    basically an added layer of preventing the collection of the mobile home by creditors.

14    In analyzing CUVTA regarding transfers where the debtor is both the transferor and the

15    transferee, the *Nagel* court analyzed a California case, *PGA West Residential Assn., Inc. v. Hulven*

16    *Internat., Inc.* (2017) 14 Cal.App.5th 156, 174 [221 Cal.Rptr.3d 353] (*PGA West*) relevant here:

17    *"PGA West, supra,* 14 Cal.App.5th 156 presented the Fourth District with a situation

18    similar in concept (if not fact) to ours. Debtor recorded a deed of trust on his condominium. He

19    named an unincorporated sham entity as the deed's beneficiary and then foreclosed to insulate his

20    equity from a creditor's claims. Many years later the creditor tried to avoid the UVTA's seven-year

21    period of repose by arguing a transfer did not occur until debtor incorporated the sham entity.

22    Prior to then, the creditor argued, debtor had effectively given a property interest to himself. The

23    Fourth District declined to adopt the creditor's rigid characterization of the term "transfer" by

24    focusing on the legal distinctions between the debtor and the purported transferee. The debtor's

25    intent to insulate his assets and defraud creditors brought the transaction within the UVTA.

26    (See *PGA West,* at p. 174 ["although Mork never incurred a real obligation to Hulven under the

27    deed of trust and note, and Hulven apparently never really existed as a corporate entity, Mork's

28    fraudulent attempt to transfer the equity in his condominium to Hulven to insulate that asset from

84

1  potential creditors constitutes a `transfer' as defined in section 3439.01, subdivision (m)"].)"

2  *Nagel v. Westen*, 59 Cal.App.5th 740, 751 (2021)

3       The Nagel court agreed finding that "the creditor's interests should drive the court's

4  interpretation of the term "transfer" rather than the form of debtors' asset manipulations." *Ibid.*

5       Here, Debtor incorporated Defendant JSC LLC and Defendant JP LLC as single member

6  California limited liability companies prior to creating the lien on Defendant JSC LLC's assets on

7  11/16/18 and perfecting it on January 14, 2019 making Defendant JP LLC the lienholder, which

8  was another fraudulent conveyance scheme transfer from Debtor to Defendant JP LLC of her

9  lienholder interest on the mobile home.

10      Based on the facts and law as provided above, in Part IV.B.1 and Part IV.B.2, *supra*,

11  Plaintiff has met the burden of proof by a preponderance of the evidence that the Debtor-

12  Defendant JP LLC transfer of a lienholder interest in the mobile home on November 16, 2018 and

13  perfected on January 14, 2019 was a fraudulent conveyance scheme that the Debtor and Defendant

14  JSC LLC and Defendant JP LLC participated in to prevent the Debtor's creditors from collecting

15  the debts owed from the assets, which is actual fraud as defined by the U.S. Supreme Court, in

16  *Husky International Electronic, Inc. v. Ritz* (2016) 578 U.S. 356, 359, 136 S.Ct. 1581, 1586, for

17  the purposes of 11 U.S.C §523(a)(2)(A).

18  **C.    Debtor Was Asked in her August 8, 2021 341 Hearing to Produce Records that**

19  **Show the Flow of the $379,000 Funds from Mr. Nickel Which Would Have**

20  **Shown Her Fraudulent Transfer Scheme Using the Defendant LLCs as her**

21  **Alter-Egos and Would Have Saved Plaintiff  Months of Time, Money and**

22  **Work to Trace the Funds Which Also Proved Her False Oaths With the Intent**

23  **to Hide Collectible Assets from Creditors and the Trustee.**

24  Section 727(a)(3) denies a chapter 7 discharge when "the debtor has concealed, destroyed,

25  mutilated, falsified, or failed to keep or preserve any recorded information, including books,

26  documents, records, and papers, from which the debtor's financial condition or business transactions

27

28  might be ascertained, unless such act or failure to act was justified under all of the circumstances of

the case." 11 U.S.C. § 727(a)(3). This requires debtors to "produce records that provide enough information to ascertain the debtor's financial condition and track his financial dealings with substantial completeness and accuracy for a reasonable period past to present." *Union Planters Bank, N.A. v. Connors,* 283 F.3d 896, 899 (7th Cir. 2002). A creditor does "not need to prove that the debtor intended to defraud them in order to demonstrate a § 727(a)(3) violation." *In re Scott,* 172 F.3d 959, 969 (7th Cir. 1999) (quoting *In re Juzwiak,* 89 F.3d 424, 430 (7th Cir. 1996)). Where a debtor is "sophisticated in business, and carr[ies] on a business involving significant assets, creditors have an expectation of greater and better record keeping." *Union Planters Bank,* 283 F.3d at 899 (quoting *Scott,* 172 F.3d at 970).

The language of the statute "places an affirmative duty on the debtor to create books and records accurately documenting his business affairs." *Scott,* 172 F.3d at 969 (citing *Juzwiak,* 89 F.3d at 429).

On August 18, 2021, Debtor was asked to produce the records that traced the funds of the $379,000 received from Mr. Nickel, as follows:

"Q. On the schedules, on the petition date it was held in J-Sandcastle; is that correct? A.Yes, it is. Q. Okay. And did you ever transfer money to J-Sandcastle for it to purchase the property or did you pay Ms. Ryan directly and just put title in the name of J-Sandcastle? A.· No, I did transfer money to J-Sandcastle. Q. And then it was the one that purchased the cashier's check from Ms. Ryan? A. I don't recall at this time. I wasn't prepared to answer that question. I'd have to go back. I do have records of the cashier's checks that were given to Ms. Ryan for the purchase of her home. Q. We would ask that you produce those records to the trustee that show the flow of funds of the $379,000."   [See Jasso Decl. ¶83, Ex. 72, p.1540-1541, (deposition p. 9, line 18 – p.10, line 9].

1    Debtor never provided any financial or corporate records tracing the $379,000. Plaintiff's

2    months of discovery effort of the Debtor's alter-ego Defendant LLCs and having forensic

3    accounting performed to trace the Debtor's assets through the stacks of cashier's checks in and out

4    of several banks and financial investment institution are shown in this brief, Paragraphs 1-204 and

5    financial records attached as exhibits to the Jasso Decl. in support of this brief. It took a huge amount

6    of time and effort, due to the amount of cashier's checks and lack of corporate documents tracing

7    the transfer and use of the funds.

8

9    In Plaintiff's FAC, Plaintiff properly alleged that Debtor, in her operation of her various

10    businesses, including Defendants JP LLC and JSC LLC operated these businesses as her alter egos

11    since October 18, 2018, seeking to shield herself from personal liability while at the same time using

12    funds of these businesses for personal purposes. [FAC DK 6 ¶91].

13

14    In addition, during the time period immediately after the civil judgment was entered in favor of

15    Plaintiff, Debtor claimed to be indigent in Criminal court, but also claimed she made six-figure loans

16    to her LLCs, including, but not limited to, $225,000 financing loan to her J-Sandcastle Co LLC, and

17    a note promissory note held by J-Pad LLC, which was owned for some time by Debtor and J-

18    Sandcastle Co LLC, and Debtor's former husband, all of which without any independently verifiable

19    documents tracing any of the funds. [FAC DK 6 ¶92].

20

21    In addition, Debtor claimed in her bankruptcy documents provided to the Bankruptcy

22    Trustee that she received two cashier's checks from Mr. Nickel on October 30, 2018 payable to JP

23    for a total of $379,000, and again on October 31, 2018 for a total of $379,000 payable to Debtor.

24    Debtor also claimed that the JP cashier's checks were rescinded. However, since a bank's rescission

25    of a cashier's check can take up to 90 days and Debtor did not provide proof of tracing those funds

26    back to Mr. Nickel, Debtor appears to be hiding the funds from the cashier's checks in business or

27    personal bank, life insurance or investment accounts since 2018. [FAC DK 6 ¶94].

28

1    Plaintiff believes the purpose of accurate schedules and the 341a hearing requests to the Debtor

2    is to help the creditors and the Trustee easily evaluate the Debtor's and the Defendant LLCs financial

3    information Due to Debtor's failure to produce the tracing of the funds that showed the continuous

4    concealed transfer of funds and the use of the funds to pay Debtor's personal expenses through her

5    alter-ego Defendant LLCs, Plaintiff had to expend extensive amounts of time, money and effort to

6    learn that the Defendant LLCs participated in an extensive fraudulent transfer scheme to prevent,

7    hinder or delay the Plaintiff's ability to collect the civil and criminal judgments.  Thus, the failure

8    to produce the financial and corporate records should be considered a denial of discharge under the

9    facts and circumstances in this case under 11. U.S.C. §727(a)(3).

10

11

12    **D.    Defendant LLCs Assets Were Used by Debtor to Create False Oaths With the**

13    **Intent to Hide Collectible Assets from Creditors and the Trustee.**

14    Pursuant to 11 U.S.C 727(a)(4)(A), a debtor shall not receive a discharge if "the debt

15    knowing and fraudulently, in or in connection with the case—made a false oath or account." *See*

16    *Retz v. Samson (In Re Retz)*, 606 F.3d 1189, 1200 (9th Cir. 2010).

17    To prevail on a § 727(a)(4)(A) claim, a plaintiff must show, by a preponderance of the

18    evidence, that: a. The debtor made a false oath in connection with the case, b. The oath related to a

19    material fact, c. The oath was made knowingly, and d. The oath was made fraudulently. *Retz v.*

20    *Samson (In re Retz)*, 606 F.3d 1189, 1197 (9th Cir. 2010); *Roberts v. Erhard (In re Roberts)*, 331

21    B.R. 876, 882 (B.A.P. 9th Cir. 2005). The "fundamental purpose" of § 727(a)(4)(A) is to ensure

22    that the trustee and creditors have "accurate information without having to conduct costly

23    investigations." *In re Retz*, 606 F.3d at 1196.  "Materiality" is broadly defined. *Roberts v. Erhard*

24    *(In re Roberts)*, 331 B.R. 876, 883 (B.A.P. 9th Cir. 2005).  A fact is "material" if it "bears a

25    relationship to the debtor's business transactions or estate, or concerns the discovery of assets,

26    business dealings, or the existence and disposition of the debtor's property." *Retz v. Samson (In re*

27    *Retz)*, 606 F.3d 1189, 1198 (9th Cir. 2010). An omission or misstatement that "detrimentally

28    affects administration of the estate" is material. *Id*. A false statement or omission may be material

88

1    even without "direct financial prejudice to creditors." *In re Roberts*, 331 B.R. at 883. 39. A debtor

2    acts "knowingly" if he or she acts "deliberately and consciously." *Retz v. Samson (In re Retz)*, 606

3    F.3d 1189, 1198 (9th Cir. 2010).  A demonstration of fraudulent intent requires a showing that: 1)

4    The debtor made the representations (e.g., a false statement or omission in the schedules); 2) At

5    the time the debtor knew they were false; and 3) The debtor made them with intention and purpose

6    of deceiving the creditors. *Retz v. Samson (In re Retz)*, 606 F.3d 1189, 1198-99 (9th Cir. 2010).

7    Intent is usually proven by circumstantial evidence or inferences drawn from the debtor's conduct.

8    Id. at 1199. 42. "Reckless indifference or disregard for the truth" may be circumstantial evidence

9    of intent. *Id.* See also, *Khalil v. Developers Sur. & Indem. Co. (In re Khalil)*, 379 B.R. 163 (B.A.P.

10   9th Cir. 2007). The existence of "more than one falsehood, together with a debtor's failure to take

11   advantage of the opportunity to clear up all inconsistencies and omissions, such as when filing

12   amended schedules, can be found to constitute reckless indifference to the truth satisfying the

13   requisite finding of intent to deceive." *Ravasia v. U.S. Tr. (In re Ravasia)*, 2021 Bankr.LEXIS

14   1033, at *18 (B.A.P. 9th Cir. Apr. 16, 2021).

15         Debtor signed her Chapter 7 Petition, Bankruptcy Schedules, Statements of Financial Affairs

16   and other documents file with the Court under penalty of perjury, acknowledging that the

17   information provided therein was true and correct, even though she knew some of the information

18   provided was not true or correct

19         At her initial 341(a) meeting of creditors, under penalty of perjury, Debtor answered in the

20   affirmative that she signed, read and was personally familiar with the petition, schedules, state of

21   financial affairs and related documents, and that there were no errors or omissions, except the

22   current title document for the JSC LLC mobile home.  Debtor nevertheless made several material

23   omission and false oaths.

24

25         ***1.  Debtor Changed Her Schedules and Testified About Her Change of Ownership***

26         ***Interest in her alter-ego Defendant JP LLC Without Accounting For the***

27         ***Change, Causing Creditors to Spend An Unfair Amount of Time and***

28         ***Resources to Determine the Truth of Her Assets .***

89

1    Plaintiff and the HOA had to spend time and resources investigating Defendant JP LLC long

2    before she filed for bankruptcy. Plaintiff found nothing other than the Statement of Information

3    filed with the Secretary of State. Mr. Nickel allowed the HOA to request the back of the cashier's

4    checks payable to JP LLC, but both Chase bank and Wells Fargo Bank could not locate any

5    information tracing the funds. In Debtor's deposition she refused to provide the names of any other

6    members of JP LLC after she lied saying she was not the sole owner. In her 341a hearing, Debtor

7    basically played a game of hide and seek with all the creditors by stating that the members of

8    Defendant JP LLC are different "depending on who you ask today". [Jasso Decl. ¶83, Ex. 72, p.

9    1542, p. 14, lines 3-8 of the 341a Hearing 08.18.21, see also Jasso Decl. ¶7, Paragraphs 189-190,

10    *supra*.}

11    On Debtor's Schedule A/B, she stated that she originally held a 1/3 interest in JP.

12    Subsequently, Debtor stated that she held a 1/7 interest in JP. Debtor then claimed a 70% ownership

13    interest without accounting for the change in interest/value. [FAC DK 6 ¶¶66, 101].

14    Debtor was asked to give the Trustee an accounting in the 341a hearing, but she never did.

15    The Debtor did not account for the change of ownership interest in Defendant JP LLC. In

16    fact, Debtor's changes made the ownership interest seem nominal when she scheduled the amount of

17    the ownership as 1/7th. But, then she changed it again to 70% and then changed it again to 33%.

18    [Jasso Decl. ¶11, Ex. 1, pp.38-41, Column 4.]. By continuing to change the ownership percentage

19    every few weeks, Plaintiff decided to amend her complaint, add Defendant JP LLC, and then spend

20    months of effort and thousands of dollars in discovery to uncover the truth of the ownership and

21    what assets, if any, Debtor really had in Defendant JP LLC. Months later, in March 2022, Debtor

22    finally filed the required corporate ownership statement, DK 29, admitting that she owned 100% of

23    Defendant JP LLC since October 18, 2018 and terminated the LLC after Plaintiff served the

24    Defendant JP LLC with the FAC. Debtor could have simply said many times, starting with her

25    April 20, 2021 Deposition with the HOA: "I am the sole owner of JP LLC." Plaintiff has to spend

26    money to get help with the attached exhibits to the Jasso Decl. which show Debtors pattern of using

27    cashier's checks and wires between her alter-ego, Defendant LLCs, that she used to hide years of

28    fraudulent transfers. *See* Part IV.B, and the related reference Paragraphs, above.

2. ***Debtor used her alter-ego Defendant JSC LLC to Create And Schedule a
Retirement Account Asset in the Amount of $7252.21, by Transferring
Funds Debtor Received from Mr. Nickel to JSC LLC Chase #7860 account
Which Debtor Then, through Defendant JSC LLC, Transferred to Debtor's
personal Fidelity IRA Rollover Account #169-638064.***

As provided in more detail in Paragraphs 175-181 incorporated herein by reference [Jasso Decl. ¶7], on April 30, 2019, Debtor's personal Fidelity IRA rollover account #169-638064 had a balance of $75.89. After a wire transfer from Defendant JSC LLC to this Fidelity account on May 13, 2019, this account had $96,156.30.  Then, in August 2019, all but approximately $7,300 was wired back to Defendant JSC LLC.  Paragraphs 111, 131 and 132 along with Chart 32 details the tracing of the funds from Debtor's personal PCC #0186 account opened with funds from the cashier's checks from Mr. Nickel totaling $379,000 through the transfer to Fidelity on May 13, 2019, demonstrates that the funds are not qualified retirement plan funds.  The balance of the Fidelity IRA rollover account was $7252.21 on July 1, 2021.   Debtor scheduled in her original bankruptcy petition and subsequent amendments of Schedule A/B, Item 21 that this amount, estimated at $7400, was retirement or pension account. [Jasso Decl. ¶11, Ex. 1 pp. 53, 64, 72, 113, 124, Item 21]. The scheduling of these funds as asset a qualified retirement plan money is a false oath. By washing the Debtor's asset of funds from Mr. Nickel through Defendant JSC LLC and then through a Fidelity IRA account, Debtor intentionally lied to create a non-exempt asset.  The only amount that could possibly be schedule as a qualified IRA rollover amount is $75.89. By using Defendant JSC LLC, the Debtor fabricated a potential exempt asset to prevent the creditors, including the Trustee, from knowing the truth about the funds.

3. ***Debtor used Defendant JSC LLC to Transfer a $14002 Distribution From
Debtor's 401k Plan Account And Then Lied About the Transfer on
Schedule 107 Within 1 Year of Filing for Chapter 7 Bankruptcy Protection.***

As provided in Paragraph 155, *supra*, on July 27, 2020, within 1 year prior to the bankruptcy petition date, Debtor took a taxable distribution of her United Airlines 401k plan account balance in the amount of $14,002.53, which immediately changed the qualified retirement

1    plan money to Debtor's personal assets. Debtor hid the $14,002.53 in the Defendant JSC LLC

2    Chase #7860 account. Debtor scheduled $31,922.58 as retirement plan income from a defaulted

3    401k loan, which, if true, would have solely been income "on paper" without any actual money

4    distributed to Debtor.  Debtor's Fidelity 401k plan records as wells as Debtor's Defendant JSC

5    LLC July 2020 bank statements, clearly shows that Debtor lied on her bankruptcy petition, DK 1,

6    DK 15, DK 16, DK 38, DK 72, Schedule 107, Part 2, Item 5. [Jasso Decl. ¶83 , Ex. 72 p.  (341a

7    hearing testimony), and ¶67, Ex. 56, pp. 1174, 1185 (Chase #7860 July 2020, Fidelity 401k July

8    23, 2020 Payment Statement), *see also* Paragraph 155, *supra*, Jasso Decl. ¶7].

9

10          By taking a taxable distribution from a qualified retirement plan and commingling it with

11   Defendant JSC LLC, the Debtor used the Defendant JSC LLC to make a false oath about the

12   existence of actual cash funds available for the Trustee to collect, which she knew at the time of

13   scheduling her assets that this portion of the 401k funds was an actual distribution of cash and not

14   just a unpaid 401k loan on paper.

15

16          Debtor amended her schedules *nine* (9) times. [Jasso Decl. ¶11, Ex. 1, pp. 49-140].  The

17   Courts have not given much credence to Debtors who amend their schedules after they are sued

18   for a denial of discharge for false oaths. In *In re Gonzalez*, 553 B.R. 467 (E.D. New York 2016)

19   the Court state that a debtor's act of amending his schedules and related documents can be used to

20   establish that the statements in the original petition were false….A debtor's disclosure of

21   information previously omitted from the schedules is some evidence of innocent intent, but this

22   inference is slight where the debtor has amended his schedules after the trustee or creditors have

23   already discovered what the debtor sought to hide." Id. at p. 474.  Here, Debtor's used her alter-

24   egos to hide assets that may be available for the Trustee to collect on behalf of the creditors.

25   These funds could have been used to pay Debtor's debts to Plaintiff, but instead she hid them in

26

27

28

1    her alter-ego, Defendant JSC LLC, and used them for personal expenses preventing Plaintiff from

2    collecting available assets.

3        Plaintiff and the other Board members have tried for years to collect on the judgments.

4    When the Debtor was finally required to sit for a debtor's examination and produce documents

5    about her assets, she claimed she had to plead the 5th Amendment, she claimed she was ill, and she

6    claimed she was too busy with her other pro per litigation cases against new targets. As a result of

7    the court being done with her excuses, the court issued a bench warrant.  Rather than comply with

8    the debtor's examination laws and court orders, Debtor filed for bankruptcy and began lying on

9    her schedules about her assets.  Further, Debtor knew that she was using Defendant JSC LLC to

10   funnel funds to and from retirement accounts because she had been doing it for years as part of her

11   pattern of behavior.  Debtor failed to correct her schedules for the false claims regarding these

12   assets.  This shows a reckless disregard for the truth as part of her pattern of using the Defendant

13   JSC LLCs to hide and deceiving creditors and the Trustee to prevent the collection of assets.

14   Therefore, the court should find that Debtor's use of her alter-ego, Defendant JSC LLC to lie

15   about IRA and 401k plan assets which were false oaths under 11 U.S.C. §727(a)(4).

16   **V.    CONCLUSION**

17       Debtor ultimately admitted that Defendant LLCs are her 100% owned, single-member

18   limited liability companies that did not do any business since their inception on October 18, 2018.

19   [*See* FAC ¶44, Dk 29]. There is substantial evidence of a unity of interest between Debtor and the

20   Defendant LLCs and failing to add the Defendant LLCs to the judgments would create an unjust

21   result.  Therefore, based on the Plaintiff's FAC DK 6, this Brief in support of the Motion for

22   Default Judgments of Defendant J-Sandcastle Co LLC and Defendant J-Pad, LLC and attached

23   Declaration of Janine Jasso in support of this Motion, Plaintiff requests the Court find (1) that the

24   Defendant LLCs are the alter-egos of Debtor, (2) that the corporate veils of the Defendant LLCs

1  are pierced as a reverse-veil piercing and (3) add the Defendant LLCs as debtors to Plaintiff's two

2  judgments. Plaintiff requests this equitable resolution provided under California case law as part

3  of this default judgment. *See*, *Curci Investments, LLC v. Baldwin* (2017) 14 Cal.App.5th 214, 221,

4
   221 Cal.Rptr.3d 847 ("*Curci*").   This would permit Plaintiff to collect the judgments against any
5
   Defendant LLCs' assets that are not related to the bankruptcy estate. Please note, Plaintiff is in
6
7  contact with the Trustee's counsel to ensure that Plaintiff will not improperly collect non-

8  abandoned bankruptcy estate assets and will continue communication with the Trustee's counsel.

9  [Jasso Decl. ¶6].

10      In addition, Plaintiff requests findings of facts related to the Defendant LLCs acts in

11 connection with or on behalf of Debtor as they relate to Plaintiff's FAC Claims 2-5, which prove

12
   by a preponderance of the evidence that Debtor used the Defendant LLCs to do specific acts with
13
   her assets that should result in non-dischargeability of Plaintiff's civil judgment under Section
14
15 523(a)(2)(A) as well as the denial of Debtor's discharge under Sections 727(a)(3), 727(a)(4) and

16 727(a)(5).

17      DATED:  December 29, 2022

18

19                                    Janine Jasso
20                                    In Pro Per

21

22

23

24

25

26

27

28

94

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is:
7101 N. Mesa, Ste 355
El Paso, TX 79912

A true and correct copy of the foregoing document entitled: **PLAINTIFF'S MOTION FOR DEFAULT JUDGMENT UNDER LBR 7055-1** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1. TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**: Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (date) 12/30/2022 , I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

See NEF for confirmation of electronic transmission to the U.S. trustee, any trustee in this case, and to any attorneys who receive service by NEF.

☐ Service information continued on attached page

**2. SERVED BY UNITED STATES MAIL**:
On (date) 12/30/2022 , I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

| DEBTOR AND DEFENDANT | DEFENDANT J-PAD, LLC | DEFENDANT J-SANDCASTLE CO LLC |
|---|---|---|
| JAMIE LYNN GALLIAN | ROBERT L MCLELLAND, CEO | RONALD J PIERPONT, CEO |
| 16222 MONTEREY LANE, SPC 376 | 16222 MONTEREY LANE, SPC 376 | 16222 MONTEREY LANE, SPC 376 |
| HUNTINGTON BEACH, CA 92649 | HUNTINGTON BEACH, CA 92649 | HUNTINGTON BEACH, CA 92649 |

☐ Service information continued on attached page

**3. SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL (state method for each person or entity served)**: Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (date) 12/30/2022 , I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.
The Honorable Scott Clarkson, USBC, 411 West Fourth Stree, Santa Ana, CA, 92701

Courtesy copy: Aaron deLeest, adeleest@danninggill.com

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| 12/30/2022 | David Jasso | _(signature)_ |
|---|---|---|
| Date | Printed Name | Signature |

This form is mandatory  It has been approved for use in the United States Bankruptcy Court for the Central District of California.

December 2017                    Page 4                    F 7055-1.2.DEFAULT.JMT.MOTION