# EXHIBIT 4

**SUPERIOR COURT OF CALIFORNIA,
COUNTY OF ORANGE
CENTRAL JUSTICE CENTER**

**MINUTE ORDER**

DATE: 11/08/2018            TIME: 01:30:00 PM        DEPT:  C33

JUDICIAL OFFICER PRESIDING: James Crandall
CLERK:  Eric Yu
REPORTER/ERM: Karen A. Hutchison CSR# 6664
BAILIFF/COURT ATTENDANT:  Julie Carney

CASE NO: **30-2017-00913985-CU-CO-CJC** CASE INIT.DATE: 04/11/2017
CASE TITLE: **The Huntington Beach Gables Homeowners Association vs. Bradley**
CASE CATEGORY: Civil - Unlimited        CASE TYPE: Contract - Other

EVENT ID/DOCUMENT ID: 72882256

**EVENT TYPE**: Motion to Quash Service of Summons
MOVING PARTY: LPL Asset Management Corp, Hugh M Saddington, BS Investors LLC
CAUSAL DOCUMENT/DATE FILED: Motion to Quash Service of Summons, 08/31/2018

**APPEARANCES**
BRENDA K. RADMACHER, from Gordon & Rees LLP, present for Cross - Defendant,Plaintiff(s).
PEJMAN D. KHARRAZIAN, from Epsten Grinnell & Howell, APC, present for Cross -
Defendant,Plaintiff(s).
GORDON G. MAY, specially appearing for Grant, Genovese & Baratta LLP, present for
Defendant,Cross - Defendant(s).
Jamie L. Gallian, self represented Cross - Defendant, present.

Tentative Ruling posted on the Internet .

The Court hears oral argument and confirms the tentative ruling as follows:

The Motion to Quash Service of the Summons and Cross-Complaint of Cross-Complainant Jamie L.
Gallian by Cross-Defendants LPL Management Corp., Asset Management Group, and Hugh M
Saddington is GRANTED. (Code Civ. Proc. § 418.10).

Once a motion to quash service of a summons and complaint are filed, the burden is on the plaintiff to
demonstrate by a preponderance of the evidence that all jurisdictional criteria are met. (*Ziller Electronics
Lab GmbH v. Superior Court* (1988) 206 Cal.App.3d 1222, 1232).

Because Cross-Complainant Jamie L. Gallian failed to oppose this motion, she failed to meet her burden
to show that all jurisdictional criteria as to the moving Cross-Defendants was met.

Additionally, Cross-Defendants' evidence affirmatively shows that Cross-Defendants were not personally
served with process as required by Code Civ. Proc. § 415.10, or served via substituted served per Code
Civ. Proc. § 415.20, and Cross-Complainant presented zero evidence of service of process upon any of
the moving Cross-Defendants. Thus, the court lacks personal jurisdiction over Cross-Defendants.

---

CASE TITLE: The Huntington Beach Gables
Homeowners Association vs. Bradley

CASE NO: **30-2017-00913985-CU-CO-CJC**

Cross-Defendants to give notice.

DATE: 11/08/2018
DEPT:  C33

MINUTE ORDER
JASSO DECL. PAGE - 0382

Page 2
Calendar No.

# EXHIBIT 5

```
 1 │ THOMAS P. DAVIS, Bar No. 70599
   │ LAW OFFICES OF THOMAS P. DAVIS
 2 │ 580 Broadway, Ste. 301
   │ Laguna Beach, CA 92651
 3 │ Tel: 949-376-2828
   │ Fax: 949-376-3875
 4 │
 5 │ PAUL W. DAVIS, Bar No. 88607
   │ McCLUNG & DAVIS
 6 │ 580 Broadway, Ste. 215
   │ Laguna Beach, CA 92651
 7 │ Tel: 949-497-3388
   │ Fax: 949-497-3002
 8 │ .
 9 │ Attorneys for Certain Defendants
   │ and Cross-Complainants
10 │
```

**FILED**
SUPERIOR COURT OF CALIFORNIA
COUNTY OF ORANGE
CENTRAL JUSTICE CENTER

MAY 0 3 2002

ALAN SLATER, Clerk of the Court

*V. Brizuela*

BY V. BRIZUELA

```
11 │
12 │
13 │          SUPERIOR COURT OF THE STATE OF CALIFORNIA
14 │          COUNTY OF ORANGE, CENTRAL JUSTICE CENTER
15 │ CLIFFORD C. HOUSER, a general      )
   │ partner of HOUSER BROS. CO., a     )   Case No. 00CC09649
16 │ California limited partnership;    )
   │ BS INVESTORS, LLC, a California    )   ASSIGNED TO: HONORABLE
17 │ limited liability company,         )   C. ROBERT JAMESON
   │                                    )   DEPARTMENT: CX-101
18 │            Plaintiffs              )
   │                                    )
19 │                                    )
   │                                    )
20 │                                    )   DEFENDANTS' REVISED TRIAL
   │                                    )   BRIEF
21 │      vs.                           )
   │                                    )
22 │ BARBARA LASSER; et. al.            )   DATE:  May 6, 2002
   │                                    )   TIME:  9:00 a.m.
23 │            Defendants.             )   DEPT:  CX-101
   │ _____)
24 │ AND RELATED CROSS ACTIONS          )
   │                                    )
25 │ _____)
26 │
27 │                          1
   │ ─────────────────────────────────────────────────
28 │ DEFENDANTS' REVISED TRIAL BRIEF
```

I.

INTRODUCTION

This case concerns a dispute over a rental adjustment under ground leases with the owners of 80 condominiums in Huntington Beach. In March 2000, plaintiff BS Investors, announced it was increasing the rent from $189.92 per month to $739.58 per month. This was an increase of thirty percent (30%) per year for each year since the previous increase in January 1990.  This increase is far in excess of the rental adjustment permitted under the ground leases, for the reasons stated below.

II.

FACTUAL BACKGROUND

A.   Condominium Project

Huntington Beach Gables is an 80 unit condominium project.  The condominium units are modest in size, ranging from 990 square feet to 1,237 square feet.  The Project was built by Robert Warmington on land owned by Houser Bros Co. ("Houser"), one of the plaintiffs in this action.  Houser retained ownership of the land on which the condominiums were built, and Houser leased described interests in the land to the builder, Warmington, under 80 long-term separate ground leases, one for each condominium unit that was sold.  The term of the ground leases expires on December 31, 2059.   Warmington in turn subleased interests in the land to the condominium buyers in 80 separate subleases, which also expire in 2059.

///

2

DEFENDANTS' REVISED TRIAL BRIEF

B.   170% Annual Rental Limitation

The initial agreement between Houser and Warmington was that Warmington would step out of the picture when the condominium units were sold to the buyers, and Houser would enter into direct leases with each of the new condominium owners.   This arrangement was restructured for reasons that are explained in a letter from Warmington's counsel dated June 26, 1979, a copy of which is Trial Exhibit "21".   In the letter, Warmington's counsel, Steven Edwards, explained that the only financing that was available to condominium buyers at the time was financing that could be qualified with the Federal Home Loan Mortgage Corporation ("FHLMC").   Mr. Edwards further explained that FHLMC would not accept loans on leaseholds unless the leases contained a provision limiting the amount that rent could be increased in any rental adjustments.   To comply with these FHLMC requirements, a clause was added to Article 21 of the condominium subleases fixing a ceiling on rental adjustments under the subleases to 170% of the previous rent.

When the plaintiffs declared a rent increase from $189.92 to $739.58 per month effective January 2000, they completely disregarded this 170% rental limitation.   They now argue that the rental limitation does not apply to the rental adjustments in January, 2000 despite the uncontradicted evidence that the 170% limitation was intended to apply to *all* rental adjustments.

///

///

3

DEFENDANTS' REVISED TRIAL BRIEF

1      C.   Condominium Plan

2         On October 18, 1979, Houser recorded a condominium plan

3 for the Project (the "Condominium Plan").  (Trial Exhibit "3")

4 The Condominium Plan defines the terms "Unit" and "Common Area".

5 It specifically identifies the location and dimensions of each

6 condominium unit.  It also states the elevations for each unit

7 and describes the floor plans for each unit.

8      D.   Declaration of Covenants, Conditions and Restrictions

9         On May 28, 1980, Houser and Warmington recorded a

10 Declaration of Covenants, Conditions and Restrictions for the

11 Huntington Beach Gables Project. (Trial Exhibit "250")  The

12 Declaration was delivered to each homeowner when the homeowner

13 purchased the condominium unit.  The Declaration defines the

14 terms "Condominium", "Unit" and "Common Area" and establishes the

15 property rights of condominium unit owners in the Project.

16 Section 9.18 of the Declaration prohibits *any* structural change

17 in a unit without the prior written consent of the ground lessor,

18 Houser and the Homeowners Association.

19      E.   Ground Lease Terms

20         As noted above, Houser did not sell fee simple title to

21 the project land to the builder or to the individual condominium

22 buyers.  Instead, Houser, as Landlord, and Warmington, as Tenant,

23 entered into 80 separate Ground Leases for the Project, one for

24 each condominium unit.  Each Ground Lease is identical, except

25 for the identification of the condominium unit covered by the

26 ///

27                           4

28 DEFENDANTS' REVISED TRIAL BRIEF

1  ground lease.  Each Ground Lease defines the "Property Leased"

2  and the "leased land" as follows:

3      1.   <u>Property Leased</u>.  For and in consideration of the
       payment of the rents and taxes and other charges and
4      for the performance of all of the covenants and
       conditions of this Lease by Tenant, Landlord hereby
5      leases to Tenant those portions of Lots 1 and 2 of
       Tract 10542 in the City of Huntington Beach, County of
6      Orange, State of California, as shown on a map recorded
       in Book 456, Pages 49 and 50 of Miscellaneous Maps, in
7      the Office of the County Recorder of Orange County,
       California, described as follows:

8
       <u>Parcel 1</u>
9
       Unit ___, as shown and defined on a Condominium
10     Plan (the "Condominium Plan") recorded in Book 13358,
       Pages 1103, et. seq., Official Records of Orange
11     County, California, excepting that portion consisting
       of buildings and other improvements.
12
       <u>Parcel 2</u>
13
       An undivided one-eightieth (1/80) interest in the
14     Common Area as shown and defined on the Condominium
       Plan, excepting that portion consisting of buildings
15     and other improvements.

16     <u>Parcel 3</u>

17     An easement for the exclusive use and occupancy of
       those portions of the Restricted Common Area as defined
18     on said Condominium Plan for entry and staircases and
       attic space relating to said Unit, excepting that
19     portion consisting of buildings and other improvements.

20     <u>Parcel 4</u>

21     A non-exclusive easement and right to use the
       Common Area as defined on said Condominium Plan, except
22     the Restricted Common Area, excepting that portion
       consisting of buildings and other improvements,
23     (hereinafter referred to as the "leased land").

24  ///

25  ///

26  ///

27                                5

28  DEFENDANTS' REVISED TRIAL BRIEF

1    <u>Subject To:</u>

2        (a)  Current taxes and assessments.
         (b)  Covenants, conditions, restrictions,
3    reservations, rights, rights-of-way and easements of
     records.
4

5    Article 21 of each Ground Lease provides for a rental

6    adjustment every 20 years starting January 1, 2000. Under this

7    Article, the ground lease rent is to be adjusted on January 1,

8    2000, January 1, 2020 and January 1, 2040 to a sum equal to "8%

9    of the unimproved fair market value of the Leased Land".

10       F.   Condominium Subleases

11           Buyers of the condominium units at Huntington Beach

12   Gables received title to their condominium units subject to the

13   ground leases between Houser and Warmington.  When Warmington

14   sold a condominium unit in the Project, it did not assign to the

15   condominium buyer its interest as tenant under the ground leases

16   with Houser.  Warmington chose instead to sublease to the

17   condominium buyer the property interest covered by the ground

18   lease for the unit that was sold.  This sublease arrangement

19   enabled Warmington to squeeze substantial additional profit from

20   the project because the rent payable by condominium owners to

21   Warmington under each Sublease exceeded the rent payable by

22   Warmington to Houser under the each Ground Lease.

23       The subleases were presented to condominium buyers for

24   signature as one of the closing documents that buyers must sign

25   to purchase the unit.  They were predated and pre-signed by

26   Warmington.  The subleases were identical for all 80 condominium

27                              6

28   DEFENDANTS' REVISED TRIAL BRIEF

1 units, except for the identification of the unit covered by the

2 sublease.

3     Each Sublease includes the following provisions:

4         1.  <u>Property Leased</u>

5         Article 1 of each Sublease describes the property

6 that is leased and the definition mirrors the definition in each

7 of the Ground Leases.

8         2.  <u>Rental</u>

9         Article 3 provides that the tenant agrees to pay

10 the landlord initial rent in the amount of $125 per month. It

11 further provides that the rental is subject to adjustment at the

12 time and in the manner provided for in Article 21 entitled

13 "Rental Adjustment".

14         3.  <u>Rental Adjustment</u>

15         Article 21 of each Sublease provides that

16 effective January 1, 2000, 2020 and 2040, the annual rental

17 payable under the sublease shall be adjusted to a sum equal to 10

18 percent of the "unimproved fair market value" of the "leased

19 land", as of such date. It further provides "the said unimproved

20 fair market value" of the leased land shall be the value

21 determined by the Lessor (Houser) and the Landlord (Warmington)

22 in accordance with the terms and provisions of Article 21 of the

23 Ground Lease between Houser and Warmington.

24     Article 21 also provides for additional rental adjustments

25 effective on January 1st, 1990, 2010, 2030 and 2050 based on the

26 increase in a cost of living index.  These rental adjustments are

27                         7

28 DEFENDANTS' REVISED TRIAL BRIEF

1  not included in the Ground Leases between Houser and Warmington,

2  which provides for adjustments only in the years 2000, 2020 and

3  2040.

4     The final paragraph of Article 21 provides as follows:

5        Notwithstanding the foregoing, the
         annual rental shall not be adjusted
6        pursuant to the above higher than a
         sum equal to one hundred seventy
7        percent (170%) of the rent payable
         in the immediately preceding
8        twelve-month period.

9  G.   Rental Adjustments

10     1.   1990 Rental Adjustments

11        In 1990, there was a rental adjustment under

12 Article 21 of each Sublease based on the increase in the Consumer

13 Price Index between 1980 and 1990.  The rent for each condominium

14 unit was increased in 1990 from $125 per month to $189.92 per

15 month, an increase of 52%.  There was no adjustment under the

16 ground leases between Houser and Warmington in 1990, because rent

17 under the ground leases is only adjusted at 20 year intervals and

18 January 1, 2000 is the first scheduled rental adjustment date

19 under the ground leases.

20     2.   2000 Rental Adjustment

21        In March 2000, homeowners in Huntington Beach

22 Gables received a notice from BS Investors declaring that their

23 rent was to be increased effective January 1, 2000 from $189.92

24 per month to $739.58 per month.  This announced increase was

25 shocking to the Homeowners, and if sustained, the increase

26 ///

27                            8

28 DEFENDANTS' REVISED TRIAL BRIEF

1 would result in rent well beyond the means of most of the

2 Homeowners.

3     The Homeowners were informed in this notice that the basis

4 for the increase was an appraisal of "the unimproved Fair Market

5 Value of the Leased Land" at $7,100,000. The Homeowners were

6 further informed that the fair market value of their 1/80

7 interests in the leased land was $88,750 and that their annual

8 rental was 10 percent of that amount, or $8,875.00 per year

9 ($739.58 per month).

10     H.    Appraisals

11         1.    Riach Appraisal

12             The rental increase was determined by three

13 appraisers selected by the plaintiffs.  The master lessor, Houser

14 Bros, selected C.R. Wilson and Associates to perform an appraisal

15 (hereafter the "Riach Appraisal").  The appraiser, David W.

16 Riach, stated his opinion that the value of the property

17 appraised by him -- a 7.605 net acre parcel -- was $7,100,000.

18         2.    Frauenthal Appraisal

19             BS Investors, the successor to Warmington as the

20 Tenant under the master Ground Leases, selected Michael

21 Frauenthal and Associates Inc., to perform an appraisal of the

22 7.605 acre site.  He appraised the 7.605 net acre parcel at

23 $5,900,000.

24         3.    Heglar Opinion

25             The plaintiffs then selected a third appraiser,

26 Larry W. Heglar & Associates, to "basically arbitrate". Mr.

27                                9

28 DEFENDANTS' REVISED TRIAL BRIEF

1 │ Heglar reviewed the two appraisals, rejected the Frauenthal

2 │ appraisal and gave his opinion that the Riach appraisal was the

3 │ more accurate one.  Riach was Heglar's long-time professional

4 │ colleague, and like Heglar, Riach had worked as an appraiser for

5 │ the Irvine Company.  Heglar adopted Riach's conclusion that the

6 │ 7.605 acre parcel had fair market value of $7,100,000.

7 │        4.  <u>Waldron Appraisal</u>

8 │ -      After receiving the notice of rental increase from

9 │ BS Investors, the homeowners hired Michael Waldron, MAI, to

10 │ undertake an appraisal of the "unimproved fair market value of

11 │ the leased land" described in each Ground Lease and Condominium

12 │ Sublease.  Mr. Waldron appraised the leased land on a unit by

13 │ unit basis and arrived at the following opinions of value:

14 │       20 units with Floor Plan A     -- $44,000 per unit

15 │       40 units with Floor Plan B     -- $40,000 per unit

16 │       20 units with Floor Plan C     -- $37,000 per unit

17 │ Based on these values under the rent adjustment formula of

18 │ Article 21 the adjusted rentals for each of the condominium

19 │ units, before applying the 170% annual rental adjustment

20 │ limitation, is as follows:

21 │ 

| | Annual Rent | Monthly Rent |
|---|---|---|
| Plan A | $ 4,400 | $ 366.67 |
| Plan B | $ 4,000 | $ 333.33 |
| Plan C | $ 3,700 | $ 308.33 |

24 │ Under Mr. Waldron's numbers, the rent increase from the pre-

25 │ January 1, 2000 rent of $189.92 per month is as follows:

26 │ ///

27 │ <center>10</center>

28 │ DEFENDANTS' REVISED TRIAL BRIEF

1   Plan A units -- 93.1% increase (9.3% per year for each
    year since 1990 adjustment)
2   Plan B units -- 75.5% increase (7.5% per year for each
    year since 1990 adjustment)
3   Plan C units -- 62.3% increase (6.2% per year for each
    year since 1990 adjustment)
4

5       The 170% limitation puts a cap on the rent at $322.86 per

6   month (an increase of seven percent (7%) per year), so based on

7   the Waldron appraisal the adjusted rentals for Plans A and B are

8   capped at $322.86 per month and the adjusted rentals for the

9   smaller Plan C units would be slightly less at $308.33 per month.

10   III

11   LEGAL ARGUMENT

12   A.   The Condominium Subleases should be interpreted
         according to their ordinary and popular meaning, and
13       any ambiguity in the language should be interpreted
         most strongly against the parties who caused the
14       ambiguity to exist, the Master Landlord and the
         Sublessor.

15       The general rules applicable to the interpretation of

16   leases are those rules that apply to the interpretation of

17   contracts. (*Medico-Dental Bldg. Co. vs. Horton & Converse* (1942)

18   21 Cal.2d 411)   Because California recognizes the objective

19   theory of contracts, it is the objective intent of the

20   contracting parties, as primarily evidenced by the words of the

21   contract, rather than the subjective intent of one of the parties

22   that controls interpretation.  (*Titan Group vs. Sonoma Valley*

23   *County Sanitation* (1985) 164 Cal.App.3d 1122, 1127) The

24   undisclosed intention or belief of one of the parties as to the

25   meaning of the contract is immaterial where that intention or

26   belief was not communicated to the other party and is not

27   11

28   DEFENDANTS' REVISED TRIAL BRIEF

1  consistent with the intention as revealed by the words of the

2  contract or by other objective evidence.  (*Brant v. California*

3  *Dairies, Inc.* (1935) 4 Cal.2d 128, 133)

4      The language in a lease should be construed according to its

5  ordinary and popular meaning rather than its strict legal

6  meaning.  (<u>Civil Code</u> Section 1644)  Where there is ambiguity or

7  uncertainty in the lease, the lease should be interpreted most

8  strongly against the party who drafted the lease and caused the

9  uncertainty.  (<u>Civil Code</u> Section 1654; *Cooper vs. Mart*

10 *Associates* (1964) 225 Cal.App.2d 108) The rules requiring the

11 resolution of ambiguities against the drafting party applies with

12 peculiar force in case of a contract of adhesion, such as the

13 Condominium Subleases in this case.  *Graham v. Scissor-Tail*

14 (1981) 28 Cal.3d 807.  Thus the disputed sublease provisions in

15 this case must be construed according to the meaning that would

16 be placed upon them by a prospective condominium buyer presented

17 with these predrafted, presigned contracts, and any uncertainties

18 or ambiguity in the provisions must be construed in favor of the

19 condominium owners and against the seller/landlords.

20     In determining the intention of the parties to the contract,

21 the analysis begins with the language of the contract itself,

22 which is paramount (<u>Civil Code</u> Section 1638; *Hadian vs. Schwartz*,

23 supra at 844-845).  The court should favor a construction that is

24 reasonable and fair over a construction that would render the

25 contract provision unreasonable or unfair. (*Cooper vs. Mort.*

26 *Assoc.* (1964) 225 Cal.App.2d 108)

27                              12

28 DEFENDANTS' REVISED TRIAL BRIEF

1        There are three provisions that require interpretation in
2   this case:

3            (1)   What is the "leased land" that should be appraised
4                  to determine the adjusted rentals?

5            (2)   Do the Sublease and the related contractual
6                  documents permit the homeowner tenants, without
7                  the consent of the lessors, to change their
8                  existing condominium use and convert to a higher
9                  and better use, such as larger townhomes or
10                 detached dwellings?

11           (3)   Does the 170% limitation on the adjustment of
12                 annual rentals apply to the January 1, 2000 rental
13                 adjustment?

14       These lease interpretation issues will be dealt with in
15   order below.

16       **B.    The appraisers are required to appraise the "leased
             land" that is unambiguously described in the August 1,**
17           **1980 Ground Leases rather than the 7.6 acre parcel of
             land described in an earlier 1979 Ground Lease that was**
18           **canceled and superseded by the 1980 Ground Leases.**

19       Paragraph 21 of each Condominium Sublease requires the
20   appraisers to appraise the "unimproved fair market value of the
21   leased land" to determine the annual rental adjustment effective
22   January 1, 2000.  Article 21 of the Subleases further provides
23   that the leased land shall be the value determined "in accordance
24   with the terms of Article 21 of the Master Lease".  The "Master
25   Lease" referred to in Article 21 is defined in Article 1 of each
26   Sublease as follows:

27                              13

28   DEFENDANTS' REVISED TRIAL BRIEF

1          "It is understood that Houser Bros. Co., a
California limited partnership (hereinafter
2          the "Master Lessor") and Landlord have
entered into a Ground Lease dated as of
3          August 1, 1980 which is being recorded
concurrently herewith (the "Master Lease") as
4          lessor and lessee, respectively.  This lease
shall be subject and subordinate to the
5          Master Lease, provided that, pursuant to the
Master Lease, Master Lessor has agreed not to
6          disturb the subleasehold estate of Tenant in
the event of a default under the Master
7          Lease.  Tenant acknowledges receipt of a copy
of the Master Lease prior to Tenant's
8          execution of this lease."

9     The "leased land" is a specifically defined term in each of

10  the August 1, 1980 Ground Leases.  It defines the leased land by

11  reference to the condominium units and common area as shown and

12  defined on the Condominium Plan.  The definition of the Property

13  Leased in Article 1 of each of the August 1, 1980 Ground Leases

14  is followed by the words "(hereinafter referred to as the 'leased

15  land')".  Thus, the lease documents clearly and unambiguously

16  define the term "Master Lease" as the August 1, 1980 Ground

17  Leases and the term "leased land" as the individual condominium

18  units and a 1/80th interest in the Common Area shown on the

19  Condominium Plan.  Despite this, plaintiffs argue that the Master

20  Lease that should be followed is the 1979 lease between Houser

21  and Warmington that was canceled and superseded by the August 1,

22  1980 Ground Leases.  The plaintiffs contend that their appraisers

23  correctly relied on the definition of "leased land" in the

24  canceled 1979 ground lease and properly disregarded the

25  definition in the operative 1980 Ground Leases.

26  ///

27                              14

28  DEFENDANTS' REVISED TRIAL BRIEF

1    This suggestion that the terms of the canceled ground lease

2  should take precedence over the terms of the actual operative

3  Ground Leases between the parties is absurd.  The plain language

4  of the Condominium Subleases does not permit it.  The law of

5  contracts does not permit it.  Logic and common sense do not

6  allow it.  The only authority cited by the plaintiffs for this

7  bizarre contention, Civil Code Section 1642, does not permit it

8  either.  Section 1642 provides that several contracts between the

9  same parties that are made as part of substantially one

10  transaction shall be interpreted together.  For this section to

11  apply, the related documents must be "contracts between the same

12  parties".  The canceled 1979 ground lease was not a contract

13  between the plaintiffs and the homeowners -- the August 1, 1980

14  Ground Leases and Subleases were the operative contracts.  Also,

15  the 1979 ground lease was not part of the same transaction

16  between the plaintiffs and the homeowners.  The 1979 ground lease

17  was an earlier deal that was superseded by the August 1, 1980

18  Ground Leases and Subleases.  Thus, the operative contract

19  documents that are between the same parties that are part of the

20  same transaction are the August 1, 1980 Ground Leases, the August

21  1, 1980 Condominium Subleases and the recorded Condominium Plan

22  and Declaration of Covenants, Conditions and Restrictions that

23  are referenced in the Subleases.

24    As discussed in plaintiffs' motion to exclude evidence of

25  the subjective intentions of the parties, the fact that one of

26  the lease parties or drafting attorneys may have had a different

27                              15

28  DEFENDANTS' REVISED TRIAL BRIEF

1   concept of "leased land" in mind when the clause was drafted

2   based on some notion of maximizing the return on the value of

3   land is immaterial because it is the language of the lease that

4   governs, not some subjective intention that the parties or their

5   attorneys may have had concerning the contract language.  That

6   subjective intention was not disclosed to the homeowners when

7   they bought their units.  The homeowners had a right to rely on

8   the language of their Sublease and the August 1, 1980 Master

9   Ground Lease which unambiguously instructed them that it was

10  their condominium unit "as shown and defined on the Condominium

11  Plan" that would be valued for the rental adjustment in January

12  1, 2000 and not some other property or property right.  The plain

13  meaning of the lease documents controls on this issue.

14      C.   The defendant homeowners are not permitted to convert
             the use of their units from the existing condominium
15           use to larger and more valuable homes without the
             consent of the lessor and others, and the appraisers
16           may not disregard the existing condominium plan and
             value the property on the basis of a higher and better
17           use.

18           In the defendants' motion to exclude plaintiffs'

19  appraisals of evidence of the fair market value of the leased

20  land, defendants identify the cases that govern the appraisal

21  methodology that may be used in cases such as this that involve

22  appraisals of the value of leased premises.  The question in

23  these cases is whether an appraiser must appraise the property on

24  the basis of the existing use of the premises or whether the

25  appraiser may appraise the property on the basis of a more

26  valuable use different from that being made by the tenant.

27                                16

28  DEFENDANTS' REVISED TRIAL BRIEF

1   In the two recent decisions that have considered this

2   question, *Wu v. Interstate Consolidated Industries* (1991) 226

3   Cal.App.3d 1511; *Humprhey Investments v. Walsh* (1988) 202

4   Cal.App.3d 766, the court identified the governing principle that

5   determines whether an appraiser may appraise the leased property

6   on the basis of highest and best use or on the basis of existing

7   use.  Where a lease permits the tenant to change the use of the

8   premises without the consent of the lessor, such as in the cases

9   of *Eltinge & Graziado Dev. Co. v. Childs* (1975) 4 Cal.App.3d 294

10  and *Bullock's v. Security-First National Bank* (1958) 160

11  Cal.App.2d 277, and where the leases are virtually unrestricted

12  as to use, it is appropriate for the appraisers to appraise the

13  subject property at its highest and best use for purposes of

14  determining the rental adjustment.  (*Wu, supra,* 226 Cal.App.3d

15  1515)  Where the lease documents require the consent of the

16  lessor to a change in use, such as in the *Wu* case, or where there

17  are other legal impediments to a change in use, such as

18  mobilehome conversion restrictions in *Walsh*, the appraisers may

19  not disregard the existing use and the impediments to a change in

20  use, but must consider the existing use and the impediments to

21  change in use in their valuation.  Thus, the court stated in *Wu:*

22              "The lessee is only allowed to use the
             premises unless the lessor consents to
23              another use.  An interpretation that the
             rent ... is to be based upon the highest
24              and best use of the property despite the
             purposes for which lessor and lessee
25              agreed it could be used would be
             economically and commercially
26              unreasonable and violate the intentions

27                              17

28  DEFENDANTS' REVISED TRIAL BRIEF

1  of the parties." (<u>Civ. Code</u> Section 1643)

2

3  The question for lease interpretation in this case is

4  whether the lease documents permit a homeowner, without the

5  consent of the lessor and others, to alter the homeowner's use of

6  the condominium unit and convert the use to a higher and better

7  use, such as a larger townhome or detached dwelling.   The

8  plaintiffs contend that the homeowners are free to change the use

9  of their condominium units without the consent of the lessor, and

10  that there are no significant legal impediments to a change in

11  use to larger and more valuable homes.   In support of their

12  argument, the plaintiffs attempt to isolate certain provisions in

13  various lease documents while ignoring others, particularly the

14  definition of leased land and the provisions of the Condominium

15  Plan and Declaration of Covenants, Conditions and Restrictions

16  which govern the development.

17  Article 1 of each Condominium Sublease defines the property

18  leased as a condominium unit as shown and defined on the specific

19  Gables Condominium Plan.   This Article specifically provides that

20  the property leased is subject to covenants, conditions and

21  restrictions and it specifically states that "the unit is one

22  unit in a condominium project constructed on the leased land and

23  governed by a Declaration of Covenants, Conditions and

24  Restrictions (the "Declaration") recorded in Book 13618, page

25  982, Official Records of Orange County, California as amended".

26  The Covenants, Conditions and Restrictions specifically prohibit

27  18

28  DEFENDANTS' REVISED TRIAL BRIEF

1   any alterations in a unit or any expansion into the Common Area

2   defined on the Condominium Plan. A condominium owner cannot

3   change the use of his unit by enlarging it to a larger and more

4   valuable home. Each homeowner is confined to the boundary and

5   dimensions of the unit as shown on the Condominium Plan.

6       Can you imagine if a homeowner took the position that he

7   could disregard the Condominium Plan during the terms of the

8   lease and alter the size and use of his unit? The suggestion by

9   the plaintiffs that the homeowners are free to change their use

10  is simply ludicrous. The Sublease, Condominium Plan and CC&R's

11  commit the homeowners to the existing use for the term of the

12  lease until December 2059. Under *Wu*, the appraisers are legally

13  required to appraise the property based on its existing use and

14  may not appraise the property based on some hypothetical higher

15  and better use. Under *Walsh*, the appraiser cannot ignore the

16  legal impediments to a change in use. Plaintiffs' appraisers

17  failed to comply with the requirements of *Wu* or the provisions of

18  the Condominium Subleases, and their appraisals do not form a

19  valid basis for the rental adjustment announced by BS Investors

20  in this case.

21      D.   **The 170% rent limitation applies to the January 1, 2000**
22           **rental adjustment.**

23      The plaintiffs contend that the 170% limitation on

24  adjustment of annual rental does not apply to the January 1, 2000

25  adjustment. A review of the reason this limit was inserted in

26  ///

27                          19

JASSO DECL. PAGE - 0402

1  the Subleases demonstrates that the limit *does* apply to all

2  rental adjustments, including the January 1, 2000 adjustment.

3      The original sublessor, Warmington, did not add this 170%

4  limitation to the condominium subleases out of the goodness of

5  its heart.  It added this limitation because it was forced to do

6  so to sell the condominiums.  Warmington could not sell the

7  condominiums unless financing was available to the condominium

8  buyers.  Financing was available to the condominium buyers only

9  if the condominium subleases complied with the FHLMC financing

10 guidelines because lenders would not provide mortgage loans

11 unless they were assured that the loans would be purchased in the

12 secondary mortgage market.  The FHLMC financing guidelines

13 mandated that rental adjustments be subject to fixed limitations

14 on increases.  The guidelines did not allow the limitations to be

15 ignored in some adjustment years but followed in others, as the

16 plaintiffs now contend.  Rather, the guidelines required such

17 limitations for the full term of a standard 30-year mortgage

18 loan.

19     Despite this uncontradicted evidence of the purpose of the

20 rent limitation, plaintiffs argue that the 170% rental adjustment

21 does not apply to the January 1, 2000 rental adjustment.  Their

22 principal argument is that the clause that sets forth the 170%

23 limitation is part of paragraph 21(B) and that it therefore only

24 limits the CPI rental adjustments under paragraph B.  This

25 argument fails for at least two reasons.  First, the argument

26 that the rental adjustment cap modifies only B because it falls

27                                20

28 DEFENDANTS' REVISED TRIAL BRIEF

1  under B is inconsistent with several other provisions of the

2  Condominium Subleases.

3      Second, the rental adjustment cap is clear and unambiguous.

4  Turning to the second argument, the actual language of the rental

5  adjustment cap clause reads as follows:

6          Notwithstanding **the foregoing, the annual
           rental shall not be adjusted pursuant to the
7          above,** higher than the sum equal to one
           hundred seventy percent (170%) of the rent
8          payable in the immediately preceding twelve-
           month period.  [Emphasis added]

9

10     As noted above, the language of a lease provision, such as

11  this one, should be interpreted according to its ordinary and

12  popular meaning, and any ambiguities should be interpreted

13  strongly against the lessors who drafted the clause in this

14  adhesion contract.  So the question is what is the ordinary and

15  popular meaning of the language of this clause.  According to

16  *Webster's New Collegiate Dictionary*, 1976 edition, the word

17  "foregoing" means "going before".  The term "above", when used in

18  this context, means "written or discussed higher in the same page

19  or preceding pages".

20     The rental limitation clause is not part of paragraph 21(B),

21  but stands by itself.  It makes no reference to paragraph B.  It

22  is not numbered as a subparagraph of (B).  It makes no reference

23  to the CPI index.  It simply states that "the annual rent shall

24  not be adjusted ... higher than ... one hundred seventy percent

25  (170%)".  The annual rental is defined in paragraph 4 which sets

26  forth the initial rents to be paid under the Sublease.  The

27                          21

28  DEFENDANTS' REVISED TRIAL BRIEF

1  phrase "the annual rental" shows up in paragraph 21(A) which sets

2  forth the rental adjustments to take place on January 1, 2000,

3  January 1, 2020 and January 1, 2040.  The phrase "the annual

4  rental" shows up again in 21(B), which sets forth the rental

5  adjustments for January 1, 1990, January 1, 2010, January 1, 2030

6  and January 1, 2050.  Then finally the phrase "the annual rental"

7  shows up in the rental adjustment cap clause.  If the landlords

8  had intended that this final clause of Article 21 was meant to

9  modify only 21(b), it would have been simple to say so.  If the

10  plaintiffs had wanted to limit the cap to the CPI adjustments it

11  would have been easy for them to do so.  They could have drafted

12  the clause to read "the annual rental in the years 1990, 2010,

13  2030 and 2050 shall not be adjusted pursuant to the above" or

14  "the CPI adjustments under paragraph (B) shall be limited to".

15  There are myriad other ways this clause could have been written

16  to limit the 170% cap to certain rental adjustments.  The

17  draftsmen did not do this because they knew that FHLMC required a

18  limit on all rental adjustments during the 30-year term of the

19  standard mortgage loan, and if they restricted the limitation to

20  only certain adjustments, the leases were not financeable and the

21  condominium units could not be sold.

22      Furthermore, the rental adjustment cap clause is not unlike

23  many other clauses contained in the Condominium Sublease.  This

24  "dangling" paragraph format is found for example, at the last

25  paragraph of Article 17 "remedies".  It reads:

26  ///

27                              22

28  DEFENDANTS' REVISED TRIAL BRIEF

1

2

3

4

>In the event any action shall be instituted between Landlord and Tenant in connection with this lease, the party prevailing in such action shall be entitled to recover from the other party all of its costs, including reasonable attorneys fees, as fixed by the court therein.

5    Article 17 has a designated paragraph (A) that establishes a

6 remedy, a paragraph (B) that established another remedy, and then

7 a series of unlettered paragraphs that are not part of (A) or (B)

8 but which apply to both. Surely the Landlords would not argue

9 that the attorney's fees clause applies only if they elect the

10 remedy under paragraph (B) and not under (A). Like the rental

11 adjustment cap clause, the final unlettered paragraph of the

12 Article, applies to both (A) and (B). Other clear examples of

13 this can be found at the last paragraph of Article 11, several

14 dangling paragraphs found in Article 13, several dangling

15 paragraphs found in paragraph 23 and others.

16    It is fair to say that this lease was obviously a cut and

17 paste job done by several attorneys. Numbering and lettering is

18 inconsistent throughout. For example, the subparagraphs of

19 Article 1 used the designations (i), (ii) and (iii) and later in

20 that same Article paragraphs are lettered as (a) and (b). In

21 paragraph 13, capital letters are used. Under paragraph 13(D),

22 its paragraphs are lettered (a) and (b). Throughout the

23 Sublease, a number of paragraphs contain no letter or number

24 designations. In light of this, to suggest that a lay person, or

25 even a lawyer for that matter, would conclude that the rental

26 adjustment clause only modifies Article 21(B) is to stretch the

27                                23

28 DEFENDANTS' REVISED TRIAL BRIEF

1    imagination.  It should also be noted that the Sublease provides

2    in Article 26: "[t]he article headings herein are used only for

3    the purpose of convenience and shall not be deemed to limit the

4    subject to the articles hereof or to be considered in the

5    construction thereof".  For this additional reason, little

6    interpretive significance should be given to the inconsistent

7    lettering and numbering of the various provisions of this

8    Sublease.  The 170% rent limitation is not part of paragraph

9    21(B).

10    The plaintiffs have two other arguments why the 170%

11    limitation does not apply to the January 1, 2000 rent adjustment.

12    They argue that they would never have agreed to a cap in the

13    Sublease that was not also in the Ground Lease.  This argument

14    ignores the actual facts.

15    When Warmington discovered that he could not get financing

16    for the sale of the units without the FHLMC cap on all rental

17    adjustments, he tried to persuade Houser to accept a cap.  He

18    proposed as an inducement to Houser, that *both* Houser and

19    Warmington would get an increase at 10 year intervals rather than

20    the 20 year intervals in the original deal.  Thus, in the June

21    26, 1979 letter from Warmington's counsel to Houser's counsel as

22    follows:

23    "We realize that the original agreement
      between the parties did not call for an upper
24    limit to rental adjustments, so as an
      inducement to the Housers to make this
25    change, we suggest that the rental adjustment
      period be changed from 20 years to 10 years.
26    *On each such adjustment date* the rent would

27                                24

1               be adjusted upward under the appraisal
              mechanism currently provided up to a maximum
2               of 50% of the rental payable in the
              immediately preceding rental period."
3               (Emphasis added)

4       Apparently, Houser would not agree to cap his rent, so

5 Warmington, faced with the FHLMC requirement, came up with a

6 different plan that for the last ten years has netted the

7 sublessor with an additional $860,000 in profit. Warmington's

8 plan which was adopted in the revised Ground Leases and Sublease

9 was that the Sublease would include the 170% cap but that the

10 Subleases would get a rent adjustments every 10 years, while

11 Houser would get one only every 20 years. Thus, in 1990 the

12 sublessor got a rental increase that more than doubled his profit

13 from 1990 to 2000 from $50 per unit per month to $114.92 per unit

14 per month. Now the successor sublessor, BS Investors, is whining

15 that it could have a negative cash flow until its next 10 year

16 adjustment, and the plaintiffs ask the court to ignore the cap

17 Warmington was forced to insert to sell the condominium units.

18 They want the court to rewrite the contract.

19       The concerns of BS Investors are unjustified. If the rent

20 is properly adjusted following correct appraisal methodology,

21 such as that used by Mr. Waldron, BS will not have the negative

22 cash flow it complains about, and Houser's rent for the 80 units

23 will increase from $72,000 per year to $257,600 per year, a 260%

24 increase. Furthermore, in 2010 BS will get another rent increase

25 that Houser does not get. In any event, it is not a court's role

26 to guarantee the profits of these sophisticated investors. They

27                         25

28 DEFENDANTS' REVISED TRIAL BRIEF

1  have substantially profited from this deal and they should abide

2  by all its terms, not just the ones they like.

3     Finally, the plaintiffs argue that Warmington would never

4  have agreed to a cap because 1979 and 1980 were high inflation

5  years, with increases in the cost of living that exceeded 7% per

6  year. This argument fails for at least two reasons. First, the

7  historical inflation numbers show that inflation over the last 60

8  years has averaged only 4.2% per year and it has rarely exceeded

9  the 7% per year rent limitation. In fact, the CPI increase from

10 1980 to 2000 averaged only 4.25% per year, well below the 7% per

11 year cap. Warmington took little risk in agreeing to the cap,

12 and the only reason it is a significant issue is that the

13 plaintiffs' appraisers came up with values that substantially

14 exceed the fair market value of the leased land described in the

15 Ground Leases.

16     E.   **The provision in the Condominium Subleases for
            determining the rental adjustment is unconscionable and**
17     **unenforceable.**

18     In announcing to the Homeowners the extraordinary rental

19 increase under the Subleases, BS Investors relied on a provision

20 in the Ground Leases ("Article 21"), which provides for

21 determination of the rental adjustment by a purported

22 "arbitration" process. Under this provision, the unimproved fair

23 market value of the leased land is to be determined by

24 "arbitration" between the Lessor, Houser Bros., and the Tenant,

25 B.S. Investors. Article 21 provides that the Homeowners are to

26 be bound by the "award" announced by the Master Lessor and Master

27                                26

28 DEFENDANTS' REVISED TRIAL BRIEF

1  Tenant even though the Homeowners are entirely excluded from

2  participation in the decision-making process.

3      Under the case of *Scissor-Tail v. Graham* (1981) 28 Cal.3d

4  807, the arbitration provision in Article 21 is unconscionable

5  and unenforceable as a matter of law for the reasons stated in

6  defendants' opposition to plaintiffs' motion in limine for an

7  order excluding any testimony from Michael Waldron, MAI.

8      The clause is unconscionable for additional reasons, if

9  interpreted in the manner proposed by the plaintiffs.  Under the

10  plaintiffs' view, the clause permits an increase of thirty

11  percent (30%) per year for each of the last ten years on top of a

12  52% increase in 1990.  This increase is ***ten times*** the increase in

13  the cost of living over the last ten (10) years, and the

14  increases are to be borne by those least able to bear the risk of

15  those increases.  Thus the clause, as interpreted by the

16  plaintiffs, would allocate the risks of the bargain in an

17  objectively unreasonable and unexpected manner. (*Ilkchooyi v.*

18  *Best*, (1995) 37 Cal.App.4th 395, 409-411)

19      Despite this, the plaintiffs assert that the increase is not

20  substantively unconscionable and in support of this contention

21  they cite the case of *Vance v. Villa Park Mobilehome Estates*

22  (1995) 36 Cal.App.4th 698.

23      *Vance* involved mobilehome leases that provided for rent

24  increases based on increases in the Consumer Price Index and

25  operating cost increases.  The court in *Vance* found that these

26  increases were not unconscionable for the following reason:

27                         27

28  DEFENDANTS' REVISED TRIAL BRIEF

1

2

3

4

5

6

7

8

9

10

11

"In the absence of rent control,
the parties may provide for future
rent increases based on increased
expenses of operation.  Appellants'
allegation that the pass-through
are 'grossly disportionate' to
respondents' costs is contradicted
by the terms of the leases and the
very nature of the pass-through.
The increases are based upon a
combination of (1) the Consumer
Price Index, which is a reasonable
means to measure the increased cost
of goods and services generally,
and (2) actually-experienced
increased costs of the specified
items:  governmental charges and
improvements, property tax and
insurance.  The rent increases bear
a reasonable relation to costs."

12    In contrast to *Vance*, the $550 per month rent increase

13  announced by the plaintiffs bears no relation to increased costs

14  of the plaintiffs.  The plaintiffs are not paying any costs.  The

15  homeowners pay all taxes, maintenance, insurance and other costs.

16  Furthermore, the increase bears no reasonable relationship to the

17  increase in the cost of living -- the increase is ten times the

18  increase in the cost of living.  If the rent adjustment clause is

19  ///

20  ///

21  ///

22  ///

23  ///

24  ///

25  ///

26  ///

27                        28

28  DEFENDANTS' REVISED TRIAL BRIEF

1  interpreted as plaintiffs propose, without the 170% rent

2  limitation, it is unconscionable and unenforceable.

3  Dated: 5/3/2

4                                              McCLUNG & DAVIS

5                                              By: _Paul W. Davis_

6                                              Paul W. Davis, Esq.
                                               Attorneys for Certain
7                                              Defendants and Cross-
                                               Complainants

8

9  Dated: 5/3/2

10                                             THOMAS P. DAVIS,
                                               A PROFESSIONAL CORPORATION

11                                             By: _____

12                                             Thomas P. Davis,
                                               Attorneys for Certain
13                                             Defendants and Cross-
                                               Complainants

14

15

16

17

18

19

20

21

22

23

24

25

26

27                             29

28  DEFENDANTS' REVISED TRIAL BRIEF

JASSO DECL. PAGE - 0412

1

PROOF OF SERVICE BY MAIL

2

I, Kerrie Kerrigan, am employed in the County of Orange.  I am
over the age of eighteen (18) years and not a party to the within
3    action; my business address is 580 Broadway, Suite 215, Laguna
Beach, California.

4

5    On May 3, 2002, I caused to be served the within document(s)
entitled **DEFENDANTS' REVISED TRIAL BRIEF** on the interested parties
in this action by placing true copies in a sealed envelope(s)
6    addressed as follows:

7
                    Sam M. Muriella, Esq.
8                   THE BUCKLEY FIRM
                    26522 La Alameda, Ste. 200
9                   Mission Viejo, CA 92693

10                  Milford W. Dahl, Jr., Esq.
                    RUTAN & TUCKER
11                  611 Anton Blvd., Ste. 1400
                    P.O. Box 1950
12                  Costa Mesa, CA 92628-1950

13                  Thomas P. Davis, Esq.
                    LAW OFFICES OF THOMAS P. DAVIS
14                  580 Broadway, Suite 301
                    Laguna Beach, CA 92651

15       [   ]      By Personal Delivery to the addresses listed above.

16       [XXX]      By Facsimile

17       [XXX]      By Mail

18       [XXX]      As follows: I am "readily familiar" with the firm's
                    practice of collection and processing correspondence
19                  for mailing.  Under that practice it would be
                    deposited with the U.S. postal service on that same
20                  day with postage thereon fully prepaid at Laguna
                    Beach, California in the ordinary course of
21                  business.  I am aware that on motion of the party
                    served, service is presumed invalid if postal
22                  cancellation date or postage meter date is more than
                    one day after date of deposit for mailing in
23                  affidavit.

24       I declare under penalty of perjury under the laws of the State
of California, that the foregoing is true and correct and that this
25    Declaration is executed on May 3, 2002.

26

27                                              Kerrie Kerrigan

28


1

# EXHIBIT 6

<u>Randall Nickel v. The Huntington Beach Gables Homeowners Association</u>

I, Kevin Jannak, declare and state as follows:

1.     I am a over the age of eighteen.  The facts stated herein are true of my own personal knowledge except those matters stated on information and belief, and, as to those matters, I believe them to be true.  If called as a witness, I could and would competently testify to the same.

2.     I am and have been a realtor for six (6) years.  Prior to that, I was a loan officer for a mortgage lender for approximately fifteen (15) years.   My place of business is United Real Estate Professionals, 17011 Beach Blvd., Ste 230, Huntington Beach, CA, 92647.  My Realtor/BRE is #01452045. My phone number is 714-318-2194. My email is kjannakrealty@yahoo.com

3.     Since 2017, I have listed and sold several condominiums in The Huntington Beach Gables Homeowners' Association ("The Gables").  The addresses include 16065 Sherlock Lane, 4454 Alderport Drive, 16063 Warmington Lane. Two units are the three bedrooms/2 bath floor plan like 4476 Alderport.

4.     The Gables is a common interest development on leased land in a prime residential area of Huntington Beach. There is a condo plan, CC&Rs, and land lease recorded on the property.  The units are condominium airspace parcels.  The sale of a Gables unit involves the purchase of the assignment of the sublease for a term of years, expiring on December 31, 2059.  A buyer is essentially buying an airspace parcel on leased land.

5.     The lease is what is called a triple net lease, similar to commercial leases.  Each tenant/sublessee must timely pay all of the rent, property taxes and insurance, pay HOA assessments, comply with the HOA's recorded Covenants, Conditions and Restrictions (CC&Rs) and must be 100% liable for all activity on the property and, therefore, defend the landlord against all actions regarding the property.  The CC&Rs provides for an ongoing lien for the HOA assessments on the unit.

6.     There are 80 units on the property. Each building has 4 units and there are 20

- 1 -

1    buildings in the 8-acre gated-community. There are 4 different floor plans, but they all include

2    an interior and garage airspace parcel. In addition, there is an exclusive use attic airspace

3    parcel. For Unit type A, there is a restricted use common area deck and staircase entrance to

4    the deck and front door. For Unit types B, C, and D, there is a patio airspace parcel owned by

5    the buyer. Exhibit A is a map of The Gables and on page of the Condo Plan, showing the

6    buildings and each unit's floor plan.

7         7.     There are only 80 families, who share four smalls streets, a pool and jacuzzi

8    facility, over 200 trees, and a 300-foot grass greenbelt in the heart of the community. The

9    property is managed by 5 volunteer Board members who are also owners, work-full time and

10   help vendors maintain the property. The Gables employs an off-site HOA management

11   company that manages the day-to-day administrative operations, hires vendors, manages the

12   monthly meetings, assists with enforcement of the CC&Rs, performs tasks such as maintains

13   the ownership lists, the financial books, the billing and collections, and the HOA demands for

14   escrows. The Board directors and officers volunteer to help with the maintenance and upkeep

15   of the property as well. The Gables employs a landscaping company twice a week, a pool

16   company 3 times a week, a pest control company 3 times a month, the tree-trimming occurs

17   twice a year. Attached as Exhibit B are photos of The Gables.

18        8.     As a common interest development (CID), The Gables maintains all of the

19   common areas with the HOA dues. The Gables is a one of the best maintained communities in

20   Huntington Beach. The buyers I have shown the property to describe it as living in a resort

21   next to one of the best beaches in Southern California, Sunset Beach.

22        9.     As compared to other condominiums and townhomes in harbor area of

23   Huntington Beach, many buyers choose The Gables due to the significant lower fair market

24   value/purchase price in The Gables. I have explained the rent, the cost of HOA dues, property

25   taxes and insurance on top of a mortgage weigh in to lower the purchase price. Finally, the

26   financial health of The Gables homeowners' association impacts a buyer's decision to buy in

27   The Gables and a mortgage lender's willingness to lend a purchase money loan.

28

- 2 -

**DECLARATION OF KEVIN JANNAK**

10.     Buyers are concerned that they can be evicted from their Gables unit. This is possible. I have explained that every document must be read carefully and completely before buying in The Gables. I have explained that the lease is contingent on timely payment of the mortgage, lease, HOA assessments, property taxes, and insurance. I have also explained the buyer must comply with the CC&Rs as a term of the lease as well. I have explained to buyers that there is an ongoing lien on the unit for all of these financial items. I have advised buyers that the failure to pay any one of these items or noncompliance with the CC&Rs can result in eviction.

11.     I am aware that California real estate transaction law requires the seller to disclose all of these issues and documents as part of escrow. Real estate purchase documents include a Seller's Disclosure document, which make it easier for a Seller to provide all of the material information about a condominium and the condominium complex. I am aware that homeowner's associations cannot disclose information about a seller's unit directly to a buyer of a condominium outside of escrow. Therefore, I help my buyers by doing as much research as I can and answering as many questions as I can before making an offer.

12.     However, due to the stack of complicated lease and governing documents, I recommend that buyers hire an attorney for legal advice.   I also recommend working with reputable, licensed escrow companies that have experience with sales in The Gables.

13.     I have never sold a condominium without an escrow.  A buyer cannot obtain all of the legal documents for full disclosure, perform inspections, clear liens for clean title without the assistance of a license and bonded escrow agent and title officer. Due to the large number of material disclosure items, I would never recommend buying or selling a Gables condo outside of escrow.

14.     For example, the Gables Sublease Agreement includes an exhibit with the required form an assignment of the sublease must be in order to transfer a Gables condo to a new buyer. My buyers rely on the escrow agent to make sure that this proper form is used, signed by the seller and buyer and notarized, so that the title is legally recorded in favor of the

- 3 -
**DECLARATION OF KEVIN JANNAK**

1   buyer in compliance with the land lease.

2       15.    Litigation is a material issue. In 2017, The Gables condominium's fair market

3   values were also negatively affected by the HOA enforcement litigation regarding the Gables

4   condo, 4476 Alderport, and its owner. Each time I helped a buyer determine a fair purchase

5   price, I requested information about the status of the litigation. If the buyer and seller chose to

6   move forward and agreed upon a price, we then opened escrow. I immediately requested the

7   California Seller Disclosures under California real estate law and the HOA Demand which

8   also included The Gables HOA's disclosures under California's homeowner's association law.

9   I then reviewed those with my buyer.

10      16.    Generally, the banks who are willing to do a purchase money loan for buyer

11  inside The Gables units is concerned about the litigation and the financial health of

12  condominium complex.

13      17.    Regarding the financial health of The Gables, several Gables Board minutes

14  included statements that the Board was borrowing from reserves to pay for the enforcement

15  litigation, and specifically provided information that the Board would collect the legal fees

16  from the owner and the unit pursuant under the CC&Rs. The HOA also provided audited

17  financial statements as part of the HOA demand. I discussed these Board minutes and

18  financial statements with buyers in The Gables. This issue would reduce the purchase price.

19      18.    Banks who are willing to do a purchase money loan for a buyer inside The

20  Gables is concerned about the litigation and the financial health of the complex. I have

21  experienced a Lender canceling their part of the transaction because of the ongoing litigation.

22      19.    Based on the sales of The Gables condominiums in 2018, the fair market value

23  of a 3-bedroom condominium in The Gables was between $290 to $310 per square foot, or

24  approximately $332,000 and $350,000. See Exhibit C, sale of land-leased The Gables units.

25      20.    If a condominium, such as 4476 Alderport, is under enforcement litigation, this

26  fair market value is significantly decreased. See Exhibit C, sale of land-leased The Gables

27  units.

28

- 4 -

DECLARATION OF KEVIN JANNAK

21.    One community on Heil, within a half mile of The Gables, called Harbor Vista, are condominiums in CID on a land lease for a term of years like The Gables.  In 2018, the 3-bedroom condominiums had a fair market value similar to The Gables of approximately $206 to $260 per square foot. Sales in Harbor Vista have an impact on the appraised values of The Gables condominiums due to the similarities of the HOA on leased land.  See Exhibit D, sale of Harbor Vista land-leased units.

22.    I also sell townhomes in communities known as a planned unit development (PUD).  These communities differ from The Gables, because an owner has an ownership interest in the land and the air above the townhome as well as the townhome. People looking for a uniform gated community with some CC&R rules and HOA assessments, but with greater ownership interest, are more interested in purchasing a townhome in a PUD.  Some townhome communities are within a quarter of a mile of The Gables.  For buyers who are afraid of eviction, these non-land lease communities are also more desirable.  However, due to the ownership interest in the ground, townhomes in this area have a significant higher fair market value.

23.    Communities such as Tennis Estates and Las Fuentes on Saybrook and Seagate on Edinger, are planned unit development townhomes in a gated community.  They look similar to The Gables and operate under a homeowners' association.

24.    In 2018, based on sales, the Seagate PUD townhomes had fair market values ranging between approximately $530 to $670 per square foot.  The Las Fuentes PUD townhomes had a fair market value ranging between approximately $370 to $405 per square foot.   The Tennis Estates PUD townhomes had a fair market value ranging between approximately $450 to $690 per square foot. Based on my knowledge and experience with desirable Huntington Beach townhome communities and units, if The Gables was a PUD, instead of a CID on a land-lease, the fair market value of a Gables 3 bedroom unit would have been comparable to these townhomes, or between $510,000  and  $590,000.  See Exhibit E for the property sales for each of these PUDs.

- 5 -

25.      If a CID condominium, such as 4476 Alderport, is under CC&Rs enforcement litigation, the lower fair market value is further decreased. The value would decrease based on the damages and litigation costs assessed against the seller and the unit. If my buyer was interested in this unit, I would recommend waiting until the litigation is resolved before trying to buy the unit. I do not know any reputable lender who would lend a purchase money loan on a unit subject to litigation. I also do not know any reputable title company who could issue a clean title policy while enforcement litigation exists regarding the condominium. I would never recommend buying this unit "as is" until after the litigation finished.

26.      Furthermore, due to the financial position of The Gables today as a result of the uncollected litigation fees, The Gables' condominiums may have no fair market value/no equity. Based on my expertise in mortgage lending and selling condominiums, mortgagors will not approve purchase mortgage loans on a condominium in a bankrupt homeowners' association.

I make this declaration under penalty of perjury, under the laws of the State of California, that the forgoing is true and correct.

Executed this *1st* day of June 2020, at Huntington Beach, California

Kevin Jannak

- 6 -
DECLARATION OF KEVIN JANNAK

EXHIBIT A



Ex. A

20

EXHIBIT B

JASSO DECL. PAGE - 0423



Ex B



Ex B

EXHIBIT C

JASSO DECL. PAGE - 0426

## Residential Agent 1 Line

| # | Listing ID | S | Sub Type | St# St Name | City | Area | SLC | L/C Price | $/Sqft | Br/Ba | SqFt | YrBuilt | LSqFt/Ac | DOM/CDOM | V | PP | BAC | Date | MLS |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | OC18015149 | S | CONDO/A | 16066 Warmington LN #68 | HB | 17 | STD | $325,000 | $314.92 | 2/2,0,0,0 | 1032/A | 1980/PUB | | 3/3 | Y | N | 2 | 03/02/18 | CRMLSM |
| 2 | OC18144392 | S | CONDO/A | 16095 Warmington LN #1 | HB | 17 | STD | $335,000 | $275.04 | 3/1,1,0,0 | 1218/A | 1980/ASR | 1,631/0.0374 | 32/32 | N | N | 2.5 | 09/06/18 | CRMLSM |
| 3 | OC17220005 | S | CONDO/A | 16107 Warmington LN #4 | HB | 17 | STD | $295,000 | $305.38 | 2/1,0,0,0 | 966/A | 1980/ASR | | 43/43 | N | N | 2 | 02/23/18 | CRMLSM |
| 4 | OC18160014 | S | CONDO/A | 16053 Warmington LN #73 | HB | 17 | STD | $345,000 | $283.25 | 3/1,1,0,0 | 1218/A | 1980/ASR | 2,000/0.0459 | 43/43 | N | N | 2.5 | 09/14/18 | CRMLSM |
| 5 | OC18111324 | S | CONDO/A | 16094 Warmington LN #16 | HB | 17 | STD | $315,000 | $326.09 | 2/1,0,0,0 | 966/A | 1980/ASR | 0/0 | 59/59 | N | N | 2.5 | 08/07/18 | CRMLSM |
| 6 | OC18171133 | S | CONDO/A | 4493 Chase DR #31 | HB | 17 | STD | $345,000 | $280.72 | 1/2,0,1,0 | 1229/A | 1980/ASR | 0/0 | 23/23 | N | N | 2.5 | 10/10/18 | CRMLSM |
| 7 | PW18183295 | S | CONDO/A | 4447 Chase DR #12 | HB | 17 | STD | $353,000 | $307.49 | 3/2,0,0,0 | 1148/A | 1980/ASR | | 66/66 | Y | N | 2.5 | 09/05/18 | CRMLSM |
| 8 | OC18161106 | S | CONDO/A | 4454 Aldenport DR #57 | HB | 17 | STD | $332,000 | $289.20 | 3/2,0,0,0 | 1148/A | 1980/ASR | | 0/0 | Y | N | 4150 | 08/27/18 | CRMLSM |
| 9 | OC18007531 | S | CONDO/A | 4464 Aldenport DR #60 | HB | 17 | STD | $330,000 | $319.77 | 2/2,0,0,0 | 1032/A | 1980/PUB | | 19/18 | Y | N | 2 | 03/14/18 | CRMLSM |
| 10 | PW18059652 | S | CONDO/A | 4484 Aldenport DR #49 | HB | 17 | STD | $335,000 | $291.81 | 3/2,0,0,0 | 1148/A | 1980/ASR | 0/0 | 28/28 | N | N | 2.5 | 05/11/18 | CRMLSM |
| 11 | PW18157549 | S | TWNHS/A | 4438 Aldenport DR #63 | HB | 17 | STD | $330,000 | $268.51 | 2/1,0,1,0 | 1229/A | 1980/ASR | 784/0.018 | 51/51 | Y | N | 2.5 | 09/20/18 | CRMLSM |

Ex. C

# EXHIBIT D

JASSO DECL. PAGE - 0428

## Residential Agent 1 Line

| # | Listing ID | S | Sub Type | St# St Name | City | Area | SLC | L/C Price | $/SqFt | Br/Ba | Sqft | YrBuilt | LSqFt/Ac | DOM/CDOM | V | PP | BAC | Date | MLS |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | OC19053877 | S | CONDO/A | 16542 Blackbeard LN # 302 | HB | 17 | STD | $248,000 | $212.69 | 2/2,0,0,0 | 1166/A | 1980/ASR | 0/0 | 2/2 | | Y | N | 3 | 05/08/19 | CRMLSM |
| 2 | OC18297488 | S | CONDO/A | 16512 Blackbeard LN # 200 | HB | 17 | STD | $263,000↓ | $206.76 | 3/2,0,0,0 | 1272/A | 1980/PUB | | 109/109 | | Y | N | 3 | 05/24/19 | CRMLSM |
| 3 | RS19075057 | S | CONDO/A | 16542 Blackbeard LN # 202 | HB | 17 | STD | $300,000↓ | $257.29 | 2/1,1,0,0 | 1166/A | 1980/ASR | | 18Y/181 | | Y | N | 2.75 | 12/06/19 | CRMLSM |
| 4 | OC19138252 | S | CONDO/A | 16542 Blackbeard LN # 103 | HB | 17 | STD | $305,000↓ | $261.58 | 2/2,0,0,0 | 1166/A | 1979/ASR | 0/0 | 60/60 | | Y | N | 2.5 | 09/24/19 | CRMLSM |
| 5 | OC19165629 | S | CONDO/A | 16542 Blackbeard LN # 302 | HB | 17 | STD | $320,000↓ | $274.44 | 2/2,0,0,0 | 1166/A | 1980/ASR | | 5/6 | | Y | N | 2.5 | 07/29/19 | CRMLSM |
| 6 | NP19056041 | S | CONDO/A | 4852 Cabana DR # 307 | HB | 17 | REO | $269,000↓ | $230.70 | 2/2,0,0,0 | 1166/A | 1980/ASR | | 69/69 | | Y | N | 2.5 | 06/20/19 | CRMLSM |
| 7 | OC19233550 | S | CONDO/A | 4852 Cabana DR # 202 | HB | 17 | STD | $335,000↓ | $263.36 | 3/2,0,0,0 | 1272/A | 1980/ASR | 0/0 | 19/19 | | Y | N | 2.5 | 11/21/19 | CRMLSM |
| 8 | OC14036488 | S | CONDO/A | 4852 Cabana DR # 106 | HB | 17 | STD | $345,000↓ | $295.88 | 2/2,0,0,0 | 1166/A | 1980/ASR | 1,166/0.0268 | 34/34 | | Y | N | 2.5 | 03/25/19 | CRMLSM |
| 9 | IG19236181 | S | CONDO/A | 4852 Cabana DR # 204 | HB | 699 | STD | $280,000 | $240.14 | 2/2,0,0,0 | 1166/A | 1980/ASR | | 31/31 | | Y | N | 2.25 | 12/02/19 | CRMLSM |
| 10 | PW19009628 | S | CONDO/A | 4791 Lago DR # 105 | HB | 17 | STD | $199,000↓ | $236.06 | 1/1,0,0,0 | 843/A | 1980/ASR | | 18Y/188 | | Y | N | 3 | 08/12/19 | CRMLSM |
| 11 | OC19003292 | S | CONDO/A | 4861 Lago DR # 106 | HB | 17 | STD | $282,000↓ | $334.52 | 1/1,0,0,0 | 843/A | 1980/ASR | | 22/22 | | N | N | 2.5 | 03/08/19 | CRMLSM |
| 12 | OC19067821 | S | CONDO/A | 4791 Lago DR # 101 | HB | 17 | STD | $318,000↓ | $250.00 | 3/2,0,0,0 | 1272/A | 1980/ASR | 0/0 | 19/15 | | N | N | 2.5 | 05/13/19 | CRMLSM |
| 13 | OC19213249 | S | CONDO/A | 4831 Lago DR # 101 | HB | 17 | STD | $332,000↓ | $261.01 | 1/1,0,0,0 | 843/A | 1980/ASR | 0/0 | 1/1 | | Y | N | 2.5 | 09/19/19 | CRMLSM |
| 14 | PW19074739 | X | CONDO/A | 4791 Lago DR # 305 | HB | 17 | STD | $229,000↓ | $271.65 | 3/2,0,0,0 | 843/A | 1980/ASR | 0/0 | 272/272 | | Y | N | 2.5 | 12/31/19 | CRMLSM |
| 15 | OC19258999 | X | CONDO/A | 4791 Lago DR # 103 | HB | 17 | STD | $368,000 | $289.31 | 3/2,0,0,0 | 1272/A | 1980/ASR | | 31/31 | | Y | N | 2.5 | 04/30/20 | CRMLSM |
| 16 | OC20026710 | K | CONDO/A | 4831 Lago DR # 205 | HB | 17 | STD | $319,900 | $274.36 | 2/2,0,0,0 | 1166/A | 1980/ASR | 1,166/0.0268 | 49/49 | | Y | N | 2.5 | 03/28/20 | CRMLSM |

Ex. D

EXHIBIT E

## Residential Agent 1 Line

| Listing ID | S | Sub Type | St# | St Name | City | Area | SLC | L/C Price | $/SqFt | Br/Ba | SqFt | YrBuilt | LSqFt/Ac | DOM/CDOM | V | PP | BAC | Date | MLS |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 PW18222644 | S | TWNHS/A | 4098 | Delphi CIR | HB | 17 | STD | $775,000 | $405.12 | 3/2,0,1,0 | 1913/A | 1978/ASR | 2,125/0.0488 | 16/16 | | N | N 2 | 10/25/18 | CRMLSM |
| 2 PW18123171 | S | TWNHS/A | 4104 | Delphi CIR | HB | 17 | STD | $750,000 | $392.05 | 3/2,0,1,0 | 1913/A | 1979/ASR | 2,125/0.0488 | 18/18 | | N | N 2.5 | 07/10/18 | CRMLSM |
| 3 PW19266308 | X | SFR/A | 4162 | Delphi CIR | HD | 17 | STD | $811,888 | $424.41 | 3/2,0,1,0 | 1913/A | 1978/ASR | 2,250/0.0517 | 24/24 | | N | N 2.5 | 03/09/20 | CRMLSM |
| 4 PW20070186 | A | TWNHS/A | 4162 | Delphi CIR | HB | 17 | STD | $779,000 | $407.21 | 3/2,0,1,0 | 1913/A | 1978/ASR | 2,250/0.0517 | 44/44 | | Y | N 2.5 | 03/24/20 | CRMLSM |
| 5 PW17201079 | S | TWNHS/A | 4161 | Andros CIR | HB | 17 | STD | $705,000 | $368.53 | 3/2,0,1,0 | 1913/A | 1979/ASR | 1,875/0.043 | 119/119 | | Y | N 2.5 | 01/19/18 | CRMLSM |

Ex E

## Residential Agent 1 Line

| Listing ID | S | Sub Type | St# St Name | City | Area | SLC | L/C Price | $/Sqft | Br/Ba | Sqft | YrBuilt | LSz/Ft/Ac | DOM/CDOM | V | PP | BAC | Date | MLS |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | OC17257737 | S | TWNHS/A | 16365 Wimbledon LN | HB | 17 | STD | $1,310,000 | $564.66 | 3/2,0,1,0 | 2320/A | 1972/PUB | 1,830/0.042 | 72/72 | Y | N | 2.5 | 02/22/18 | CRMLSM |
| 2 | OC18037344 | S | SFR/A | 16367 Wimbledon LN | HB | 17 | STD | $1,149,000 | $495.26 | 3/2,0,1,0 | 2320/A | 1973/ASR | 1,830/0.042 | 82/82 | Y | N | 2.5 | 06/19/18 | CRMLSM |
| 3 | OC17083972 | S | TWNHS/A | 16397 Wimbledon LN | HB | 17 | STD | $1,463,000 | $690.09 | 4/2,0,1,0 | 2120/A | 1972/ASR | 1,830/0.042 | 196/196 | Y | N | 2.5 | 01/02/18 | CRMLSM |
| 4 | OC19163217 | S | TWNHS/A | 16419 Wimbledon LN | HB | 17 | STD | $995,000 | $423.04 | 3/3,0,0,0 | 2352/A | 1972/APP | 1,800/0.0413 | 283/283 | Y | N | 2.5 | 07/02/19 | CRMLSM |
| 5 | OC18175038 | S | SFR/A | 4192 Racquet Club DR | HB | 17 | STD | $1,015,000 | $449.12 | 3/2,0,1,0 | 2260/A | 1972/ASR | 2,400/0.0551 | 63/63 | Y | N | 2.5 | 11/06/18 | CRMLSM |
| 6 | NP19152295 | A | SFR/A | 4201 Davis Cup DR | HB | 17 | STD | $995,000 | $440.27 | 3/2,0,1,0 | 2260/A | 1972/ASR | 2,440/0.056 | 316/316 | Y | N | 2.5 | 06/15/19 | CRMLSM |

Ex. E

## Residential Agent 1 Line

| # | Listing ID | S | Sub Type | St# St Name | City | Area | SLC | U/C Price | $/Sqft | Br/Ba | Sqft | YrBlt | LSz/ft/Acr | DOM/CDOM | V | PP | BaC | Date | MLS |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | OC19266201 | S | TWNHS/A | 3857 Aruba CIR | HB | 17 | STD | $1,100,000 | $572.02 | 3/1,2,0,0 | 1923/OTH | 1973/PUB | 2,166/0.0497 | 67/232 | Y | N | 2.5 | 02/28/20 | CRMLSM |
| 2 | OC18811873 | S | TWNHS/A | 16172 Bimini LN | HB | 17 | STD | $1,165,000 | $566.36 | 4/3,0,0,0 | 2057/A | 1973/ASR | 1,654/0.038 | 59/65 | N |  | 15000 | 12/14/18 | CRMLSM |
| 3 | NP20063316 | S | SFR/A | 3512 Bravata DR | HB | 17 | STD | $1,168,000 | $567.82 | 4/3,0,0,0 | 2057/A | 1977/PUB | 1,778/0.0408 | 59/60 | N |  | 2.5 | 01/31/20 | CRMLSM |
| 4 | OC20070761 | A | TWNHS/A | 3622 Bravata DR | HB | 17 | STD | $1,175,900 | $621.69 | 3/3,0,0,0 | 1890/A | 1976/OTH | 1,576/0.0362 | 59/61 | Y | N | 2.5 | 04/08/20 | CRMLSM |
| 5 | PW18104312 | A | TWNHS/A | 3576 Bravata DR | HB | 17 | STD | $862,500 | $474.42 | 3/3,0,0,0 | 1818/A | 1978/PUB | 1,563/0.0359 | 59/61 | Y | N | 2.5 | 06/11/18 | CRMLSM |
| 6 | OC18042822 | A | TWNHS/A | 3518 Bravata DR | HB | 17 | STD | $1,100,000 | $582.01 | 3/3,0,0,0 | 1890/A | 1978/ASR | 1,563/0.0359 | 25/25 | Y | N | 3 | 06/06/18 | CRMLSM |
| 7 | OC20023216 | S | TWNHS/A | 3518 Bravata DR | HB | 17 | STD;TRUS | $1,125,000 | $595.24 | 3/3,0,0,0 | 1890/A | 1977/EST | 2,490/0.0572 | 19/19 | Y | N | 3 | 03/23/20 | CRMLSM |
| 8 | OC19080749 | S | TWNHS/A | 3496 Bravata DR | HB | 17 | STD | $1,199,000 | $592.10 | 4/3,0,0,0 | 2025/B | 1977/EST | 2,655/0.0612 | 149/149 | Y | N | 2.5 | 10/18/19 | CRMLSM |
| 9 | NP19245737 | S | SFR/A | 3552 Bravata DR | HB | 17 | STD | $1,235,000 | $603.32 | 4/3,0,0,0 | 2047/A | 1975/ASR | 1,512/0.0347 | 9/9 | Y | Y | 2.5 | 10/24/19 | CRMLSM |
| 10 | OC20093340 | C | TWNHS/A | 3686 Montego DR | HB | 17 | STD | $969,000 | $512.70 | 3/3,0,0,0 | 1890/A | 1973/ASR | 1,512/0.0347 | 10/24 | Y | N | 2.5 | 06/05/20 | CRMLSM |
| 11 | NP20091199 | A | TWNHS/A | 3682 Montego DR | HB | 17 | STD | $985,000 | $541.80 | 3/3,0,0,0 | 1818/A | 1973/ASR | 1,512/0.0347 | 9/9 | Y | N | 2.5 | 02/08/20 | CRMLSM |
| 12 | OC20081199 | A | TWNHS/A | 3742 Montego DR | HB | 17 | STD | $1,108,000 | $575.19 | 3/3,1,0,0 | 2047/A | 1973/PUB | 1,503/0.0345 | 13/13 | Y | N | 2.5 | 02/01/20 | CRMLSM |
| 13 | NP20048109 | A | SFR/A | 3662 Montego DR | HB | 17 | STD | $1,225,000 | $598.44 | 4/3,0,0,0 | 2057/A | 1975/ASR | 3,596/0.0826 | 69/69 | Y | N | 2.5 | 01/31/20 | CRMLSM |
| 14 | OC20092890 | A | SFR/A | 3912 Montego DR | HB | 17 | STD | $1,275,000 | $619.83 | 4/3,0,0,0 | 2047/A | 1973/ASR | 1,863/0.0428 | 116/116 | Y | N | 2.5 | 05/08/20 | CRMLSM |
| 15 | NP20042955 | U | SFR/A | 3732 Montego DR | HB | 17 | STD | $1,250,000 | $610.65 | 3/2,1,0,0 | 1856/E | 1975/ASR | 2,442/0.0561 | 11/11 | Y | N | 2.5 | 05/13/20 | CRMLSM |
| 16 | PW18095151 | S | SFR/A | 3792 Montego DR | HB | 17 | STD | $949,000 | $511.31 | 3/3,0,0,0 | 2049/O | 1977/ASR | 1,512/0.0347 | 30/246 | Y | N | 2.5 | 09/18/18 | CRMLSM |
| 17 | OC19153041 | S | SFR/D | 3716 Montego DR | HB | 17 | STD | $1,085,000 | $529.53 | 3/3,0,0,0 | 2047/A | 1977/ASR | 1,152/0.0347 | 120/126 | Y | N | 2.5 | 01/08/20 | CRMLSM |
| 18 | NP18066481 | S | SFR/A | 3806 Montego DR | HB | 17 | STD | $1,225,000 | $598.44 | 4/3,0,0,0 | 2325/A | 1973/ASR | 2,646/0.0612 | 89/89 | Y | N | 2 | 07/12/18 | CRMLSM |
| 19 | OC18214376 | S | TWNHS/A | 4012 Montego DR | HB | 17 | STD | $1,240,000 | $533.33 | 3/3,0,0,0 | 2325/A | 1974/ASR | 1,503/0.0345 | 22/22 | N | N | 2 | 11/08/18 | CRMLSM |
| 20 | PW19264109 | U | TWNHS/A | 16087 Saint Croix CIR | HB | 17 | STD | $1,100,000 | $582.01 | 3/3,0,0,0 | 1890/A | 1973/PUB | 1,791/0.0411 | 39/207 | Y | N | 2.5 | 11/12/19 | CRMLSM |
| 21 | PW20056755 | S | TWNHS/A | 16109 Saint Croix CIR | HB | 17 | STD | $1,229,000 | $601.27 | 3/3,0,0,0 | 2044/A | 1973/ASR | 2,491/0.0572 | 89/89 | Y | N | 2.5 | 09/18/18 | CRMLSM |
| 22 | OC19284585 | S | TWNHS/A | 16125 Saint Croix CIR | HB | 17 | STD | $1,150,000 | $568.74 | 3/3,0,0,0 | 2022/A | 1973/ASR | 1,512/0.0347 | 64/64 | Y | N | 2.5 | 02/24/20 | CRMLSM |
| 23 | OC19048109 | S | SFR/A | 16131 Saint Croix CIR | HB | 17 | STD | $1,299,000 | $631.50 | 4/3,0,0,0 | 2057/A | 1973/ASR | 1,863/0.0428 | 28/28 | N | N | 2.5 | 06/10/19 | CRMLSM |
| 24 | NP18234296 | S | SFR/A | 16107 Saint Croix CIR | HB | 17 | STD | $1,325,000 | $647.29 | 4/3,0,0,0 | 2047/A | 1973/ASR | 3,119/0.0716 | 29/29 | Y | N | 2.5 | 03/15/19 | CRMLSM |
| 25 | OC18092325 | S | CONDO/A | 16133 Saint Croix CIR | HB | 17 | STD | $1,375,000 | $668.45 | 4/3,0,0,0 | 2047/A | 1973/ASR | 1,863/0.0428 | 92/92 | Y | N | 2.5 | 09/04/18 | CRMLSM |
| 26 | OC20093454 | S | TWNHS/A | 16112 Tortola LN | HB | 17 | STD | $1,099,000 | $575.03 | 4/3,0,0,0 | 1826/A | 1974/ASR | 1,503/0.0345 | 97/97 | Y | N | 2.5 | 02/10/20 | CRMLSM |
| 27 | OC18342014 | S | CONDO/A | 16096 Tortola LN | HB | 17 | STD | $1,090,515 | $506.74 | 4/3,0,0,0 | 2152/ | 1973 | 2,467/0.0566 | 89/89 | Y | N | 2.5 | 06/29/18 | CLAW |
| 28 | OC19205127 | S | TWNHS/A | 16108 Tortola CIR | HB | 17 | STD | $1,165,000 | $569.96 | 4/3,0,0,0 | 2044/A | 1973/ASR | 2,542/0.0584 | 8/8 | Y | N | 2.5 | 07/11/19 | CRMLSM |
| 29 | SB18114027 | S | TWNHS/A | 16158 Tortola CIR | HB | 17 | STD | $1,240,000 | $586.37 | 4/2,1,0,0 | 2055/A | 1972/ASR | 2,555/0.0587 | 89/89 | Y | N | 2.5 | 09/25/18 | CRMLSM |
| 30 | OC18097426 | S | CONDO/A | 16106 Tortola CIR | HB | 17 | STD | $1,400,000 | $602.82 | 4/2,1,0,0 | 2057/A | 1973/ASR | 2,306/0.0529 | 59/59 | Y | N | 2.25 | 09/21/18 | CRMLSM |
| 31 | OC18239547 | S | TWNHS/A | 3605 Windspun DR | HB | 17 | STD | $1,205,000 | $606.32 | 2/2,0,1,0 | 2309/A | 1974/ASR | 2,895/0.0665 | 29/29 | Y | N | 2.5 | 12/27/18 | CRMLSM |
| 32 | OC19051742 | A | TWNHS/A | 3436 Windspun DR | HB | 17 | STD | $1,350,000 | $520.26 | 3/2,1,0,0 | 1818/A | 1977/ASR | 1,521/0.0349 | 32/32 | Y | N | 2.5 | 05/21/20 | CRMLSM |
| 33 | PW20091949 | S | SFR/A | 3588 Windspun DR | HB | 17 | STD | $742,357 | $742.57 | 3/3,0,0,0 | 1818/A | 1977/ASR | 1,783/0.0409 | 4/4 | Y | N | 2.25 | 05/13/20 | CRMLSM |
| 34 | OC19097142 | S | SFR/A | 3588 Windspun DR | HB | 17 | STD | $1,170,000 | $643.56 | 4/1,1,0,0 | 2044/A | 1978/ASR | 1,635/0.0373 | 389/389 | Y | N | 2.5 | 03/16/20 | CRMLSM |
| 35 | OC19135618 | S | SFR/A | 3506 Windspun DR | HB | 17 | STD | $1,270,000 | $621.33 | 4/3,0,0,0 | 2044/A | 1977/PUB | 1,474/0.0338 | 160/160 | Y | N | 2.5 | 10/04/19 | CRMLSM |
| 36 | OC19186142 | S | TWNHS/A | 3432 Windspun DR | HB | 17 | STD | $1,290,000 | $682.54 | 3/1,2,0,0 | 1890/A | 1977/PUB | 2,275/0.0522 | 13/15 | Y | N | 2.5 | 07/24/19 | CRMLSM |
| 37 | OC20014092 | S | SFR/A | 3446 Windspun DR | HB | 17 | STD | $1,305,000 | $690.48 | 3/2,1,0,0 | 1890/A | 1977/ASR | 1,998/0.0459 | 30/30 | N | N | 2.5 | 09/06/19 | CRMLSM |
| 38 | OC19266935 | S | SFR/A | 3456 Windspun DR | HB | 17 | STD | $1,330,000 | $649.73 | 4/3,0,0,0 | 2047/A | 1977/ASR | 1,926/0.0442 | 3/3 | Y | N | 2.5 | 01/09/20 | CRMLSM |

Ex E

# EXHIBIT 7



1  Douglas W. Grinnell, Bar No. 102082
   dgrinnell@epsten.com
2  Pejman D. Kharrazian, Bar No. 279260
   pkharrazian@epsten.com
3  EPSTEN GRINNELL & HOWELL APC
   10200 Willow Creek Road, Suite 100
4  San Diego, California 92131
   (858) 527-0111/ Fax (858) 527-1531
5
6  Attorneys for Plaintiff
   THE HUNTINGTON BEACH GABLES
7  HOMEOWNERS ASSOCIATION

**FILED**
SUPERIOR COURT OF CALIFORNIA
COUNTY OF ORANGE
CENTRAL JUSTICE CENTER

JAN 11 2018

DAVID H. YAMASAKI, Clerk of the Court

BY: _____ DEPUTY

8              SUPERIOR COURT OF THE STATE OF CALIFORNIA

9              COUNTY OF ORANGE, CENTRAL JUSTICE CENTER

10

11  THE HUNTINGTON BEACH GABLES          CASE NO. 30-2017-00913985-CU-CO-CJC
    HOMEOWNERS ASSOCIATION, a
12  California Nonprofit Mutual Benefit   Judge: Hon. James L. Crandall
    Corporation,                         Dept.: C33
13
              Plaintiff,                 [~~PROPOSED~~] ORDER GRANTING
14                                       PLAINTIFF'S MOTION FOR
       v.                                PRELIMINARY INJUNCTION
15
    SANDRA L. BRADLEY, individually and  Hearing Date: October 26, 2017
16  as Trustee of the Sandra L. Bradley Trust;  Hearing Time: 1:30 p.m.
    JAMIE L. GALLIAN, an individual; and  Dept.: 33
17  DOES 1 through 25, inclusive,
                                         FAC Filed: May 16, 2017
18            Defendants.                Trial Date: April 16, 2018

19
    AND ALL RELATED CROSS-ACTIONS
20

21

22     **TO ALL PARTIES AND THEIR ATTORNEY'S OF RECORD:**

23         On October 26, 2017, Plaintiff, THE HUNTINGTON BEACH GABLES

24  HOMEOWNERS ASSOCIATION'S ("Association") Motion for Preliminary Injunction

25  ("Motion") came on for a hearing before the above-entitled Court with the Honorable James L.

26  Crandall presiding in Department 33, on the Court's 1:30 p.m. calendar. Pejman D. Kharrazian

27  of Epsten Grinnell & Howell, APC appeared on behalf of Plaintiff Association.  Jamie L.

28  Gallian ("Gallian") appeared in pro per.

                                   - 1 -

3326323v1

1   Having read the motion, the memoranda, the declarations and supplemental

2   declarations filed by the parties, and having heard argument and oral testimony, and upon

3   satisfactory evidence having been presented, the court grants a preliminary injunction as

4   follows:

5   **IT IS ORDERED THAT** Plaintiff's Motion is granted.  Defendant Jamie L. Gallian,

6   and her agents, servants, employees, partners, associates, officers, representatives, tenants,

7   occupants, invitees, guests, or anyone acting in concert or participating with or for her are

8   enjoined from:

9       1. Making, or authorizing anyone from making on her behalf, any external

10        modifications, additions or improvements to Defendant Jamie Gallian's unit at

11        4476 Alderport Drive, Unit 53, Huntington Beach, California 92649 without prior

12        written approval of the Association;

13      2. Making, or authorizing anyone from making on her behalf, any alteration or

14        improvement to the Association's restricted use common areas or common areas

15        without prior written approval of the Association;

16      3. Maintaining, or authorizing anyone from maintaining on her behalf, any

17        landscaping, trees or irrigation in the Association's common areas, including but

18        not limited to watering landscaping in the common area;

19      4. Operating, tampering with or adjusting, or authorizing anyone from operating,

20        tampering with or adjusting on her behalf, sprinkler heads or irrigation equipment

21        in the Association's common areas;

22      5. Preventing or in any way hindering removal of irrigation equipment or sprinklers

23        or restoration of landscaping in the Association's common areas;

24      6. Obstructing, or authorizing anyone from obstructing on her behalf, the Association

25        or its vendors from maintaining the Association's restricted use common areas or

26        common areas, including but not limited to maintaining the trees or landscaping

27        anywhere in the Association;

28

- 2 -

3326323v1

7. Peering into, taking pictures of, or videotaping the inside of any resident's unit in the Association without express permission, including peering into, taking pictures of, or videotaping the inside of the fenced patio or balcony areas;

8. Placing any trash or trash containers for pick-up in the collection area until 6:00 p.m. the night preceding collection day (typically Friday);

9. Directly contacting in person, or by telephone, email, text, or any other means, any of the Association's Board members, volunteers or management <u>regarding this lawsuit</u>; and

10. _____

**IT IS FURTHER ORDERED THAT:**

1. Only The Huntington Beach Gables Homeowners Association has the sole right to maintain the landscaping, trees, sidewalks, or any other items in the community; other than the fenced-in patio areas of a unit.

2. The Association has the sole authority to maintain, alter, restore, and/or remove any landscaping or items in the common area, including but not limited to: grass, trees, plants, sprinklers, bushes, sidewalks, concrete, personal property and anything else that is outside of any building or a fenced-in patio of a unit.

All pending the trial of this action or further order of this Court.  The Court reserves jurisdiction to modify or dissolve the preliminary injunction as may be required by the interests of justice.

    **IT IS FURTHER ORDERED THAT** Plaintiff shall file with the Clerk of the Court by _/ - /6 -_____, 2018 an undertaking in the amount of $ _5000_ pending trial of this action.

**IT IS SO ORDERED;**
DATED: _/ - / / - 2018_

_[signature]_

JUDGE OF THE SUPERIOR COURT
**JAMES L. CRANDALL**

- 3 -

[PROPOSED] ORDER GRANTING PRELIMINARY INJUNCTION
JASSO DECL. PAGE - 0437

3326323v1

# EXHIBIT 8

**SUPERIOR COURT OF CALIFORNIA,
COUNTY OF ORANGE
CENTRAL JUSTICE CENTER**

**MINUTE ORDER**

DATE: 09/07/2018                TIME: 08:30:00 AM          DEPT:  C33

JUDICIAL OFFICER PRESIDING: James Crandall
CLERK:  P. Rief
REPORTER/ERM: None
BAILIFF/COURT ATTENDANT:  Julie Carney

CASE NO: **30-2017-00913985-CU-CO-CJC**  CASE INIT.DATE: 04/11/2017
CASE TITLE: **The Huntington Beach Gables Homeowners Association vs. Bradley**
CASE CATEGORY: Civil - Unlimited        CASE TYPE: Contract - Other

EVENT ID/DOCUMENT ID: 72885221
**EVENT TYPE**: Ex Parte
MOVING PARTY: Jamie L. Gallian
CAUSAL DOCUMENT/DATE FILED: Ex Parte Application - Other, 09/06/2018

**APPEARANCES**
Joyce J. Kapsal, Esq., from Epsten Grinnell & Howell, APC, present for Cross - Defendant,Plaintiff(s)
telephonically.
 Gordon G. May, Esq., specially appearing.
Jamie Gallian, present.

This matter is called in open court without a court reporter present.

Appearances are as noted above. There are no appearances by counsel from the law firm of Flyer &
Flyer at the time this matter is called.

Prior to the hearing, Mr. Flyer called the courtroom indicating the Ex Parte Application for Temporary
Restraining Order to Show Cause re: Preliminary Injunction, filed 09/06/2018, was not authorized by the
law firm of Flyer & Flyer, APLC to be filed in this case.

The court admonishes Ms. Gallian regarding fraud.

The Ex Parte Application for Temporary Restraining Order to Show Cause re: Preliminary Injunction is
ordered off calendar.

# EXHIBIT 9

**SUPERIOR COURT OF CALIFORNIA,**
**COUNTY OF ORANGE**
**CENTRAL JUSTICE CENTER**

**MINUTE ORDER**

DATE: 09/27/2018           TIME: 01:30:00 PM           DEPT:  C33

JUDICIAL OFFICER PRESIDING: James Crandall
CLERK:  P. Rief
REPORTER/ERM: (ACRPT) Cheri Violette CSR# 3584
BAILIFF/COURT ATTENDANT:  Julie Carney

CASE NO: **30-2017-00913985-CU-CO-CJC** CASE INIT.DATE: 04/11/2017
CASE TITLE: **The Huntington Beach Gables Homeowners Association vs. Bradley**
CASE CATEGORY: Civil - Unlimited       CASE TYPE: Contract - Other

---

EVENT ID/DOCUMENT ID: 72875934

**EVENT TYPE**: Motion to Compel Response to Requests for Admissions
MOVING PARTY: The Huntington Beach Gables Homeowners Association
CAUSAL DOCUMENT/DATE FILED: Motion to Compel Answers to Request for Admissions, 08/23/2018

EVENT ID/DOCUMENT ID: 72875943

**EVENT TYPE**: Motion to Compel Answers to Special Interrogatories
MOVING PARTY: The Huntington Beach Gables Homeowners Association
CAUSAL DOCUMENT/DATE FILED: Motion to Compel Answers to Interrogatories Special, 08/23/2018

EVENT ID/DOCUMENT ID: 72875946

**EVENT TYPE**: Motion to Compel Answers to Form Interrogatories
MOVING PARTY: The Huntington Beach Gables Homeowners Association
CAUSAL DOCUMENT/DATE FILED: Motion to Compel Answers to Interrogatories Form, 08/23/2018

Additional events listed on last page.

---

**APPEARANCES**
Pejman D. Kharrazian, Esq., from Epsten Grinnell & Howell, APC, present for Cross -
Defendant,Plaintiff(s).
Jamie L. Gallian, self represented Cross - Defendant, present.
 David R. Flyer, Esq., specially appearing.

Tentative Ruling posted on the Internet.

The court hears oral argument. The court, having fully considered the arguments of all parties, both
written and oral, as well as the evidence presented, now rules as follows: The Tentative Ruling, as
amended, will become the final ruling of the court. Plaintiff's requests for sanctions as to the motions to
compel further responses are denied.

The court rules as follows:

**1. Motion by Plaintiff The Huntington Beach Gables Homeowners Association for an Order to**
**Compel Responses to Form Interrogatories (Set One) from Defendant Jamie Gallian and Request**

---

DATE: 09/27/2018                              MINUTE ORDER                                    Page 1
DEPT:  C33                                             Calendar No.

CASE TITLE: The Huntington Beach Gables    CASE NO: **30-2017-00913985-CU-CO-CJC**
Homeowners Association vs. Bradley

for **Sanctions:**

Plaintiff The Huntington Beach Gables Homeowners Association's unopposed Motion to Compel Responses to Form Interrogatories and Imposition of Sanctions is GRANTED. (See Code Civ. Proc. § 2030.290, subd. (a)).

Defendant Jamie L. Gallian is ordered to serve verified responses without objections to Plaintiff's Form Interrogatories, Set No. One, within ten days. The court imposes monetary sanctions against Defendant Jamie L. Gallian in the amount of $1,535.00, payable to counsel for Plaintiff within thirty days.

**2. Motion by Plaintiff The Huntington Beach Gables Homeowners Association for an Order to Compel Further Responses to Special Interrogatories (Set One) and Request for Sanctions:**

The court GRANTS Plaintiff's Request For Judicial Notice.

Plaintiff The Huntington Beach Gables Homeowners Association's Motion to Compel Further Responses to Plaintiff's Special Interrogatories Set No. 1 is GRANTED. (See Code Civ. Proc. § 2030.300).

The court finds that Defendant is equitably estopped from asserting that the Plaintiff's motions are not timely filed, because these motions were initially timely filed, and ordered off calendar by the court in reliance upon a settlement between the parties placed on the record before the court. Once it became clear that defendant was unwilling to live up to the terms reached before the court, Plaintiff timely renewed the motions.

Defendant Jamie L. Gallian is ordered to serve further, non-evasive responses to Plaintiff's Special Interrogatories Set No. 1 without objections within ten days.

The request for monetary sanctions against Defendant Jamie L. Gallian is denied.

**3. Motion by Plaintiff The Huntington Beach Gables Homeowners Association for an Order to Compel Responses to Request for Production of Documents (Set One) and Request for Sanctions:**

Plaintiff's Request For Judicial Notice is GRANTED.

Plaintiff The Huntington Beach Gables Homeowners Association's Motion to Compel Responses to Inspection Demands and Imposition of Sanctions is GRANTED. (See Code Civ. Proc. § 2031.300, subd. (a)).

Defendant Jamie L. Gallian is ordered to serve verified responses without objections to Plaintiff's Inspection Demand, Set No. One, which fully complies with Code Civ. Proc. § 2031.210(a), and all responsive documents (whatever their source), within ten days.

The court also imposes monetary sanctions against Defendant Jamie L. Gallian in the amount of $1,535.00, payable to counsel for Plaintiff within thirty days. (See Code Civ. Proc. § 2031.300, subd. (h)).

**4. Motion by Plaintiff The Huntington Beach Gables Homeowners Association for an Order to Compel Further Responses to Request for Admissions (Set One) and Request for Sanctions:**

---

CASE TITLE: The Huntington Beach Gables      CASE NO: **30-2017-00913985-CU-CO-CJC**
Homeowners Association vs. Bradley

Plaintiff The Huntington Beach Gables Homeowners Association's Motion to Compel to Further Responses to Plaintiff's Requests For Admissions, Set No. 1, is GRANTED. (See Code Civ. Proc. § 2033.290).

The court finds that Defendant is equitably estopped from asserting that the Plaintiff's motions are not timely filed, because these motions were initially timely filed and ordered off calendar by the court in reliance upon a settlement between the parties placed on the record before the court. Once it became clear that defendant was unwilling to live up to the terms reached before the court, Plaintiff timely renewed the motions.

Defendant Jamie L. Gallian is ordered to serve further, non-evasive responses to Plaintiff's Requests For Admissions Set No. 1 without objections within ten days.

The request for monetary sanctions against Defendant Jamie L. Gallian is denied.

Defendant's request for imposition of monetary sanctions is denied.

Defendant to give notice.


A Mandatory Settlement Conference is scheduled for 10/05/2018 at 09:00 AM in Department C33.

Defendant Jamie L. Gallian's oral Ex Parte Request to advance the hearing date on her Motion for Judgment on the Pleadings, set for 12/13/2018, is granted.

The Motion by Defendant Jamie L. Gallian for Judgment on the Pleadings, set for 12/13/2018, is ordered advanced to 12/06/2018 at 01:30 PM in this department.

Court orders defendant to give notice.

CASE TITLE: The Huntington Beach Gables
Homeowners Association vs. Bradley

CASE NO: **30-2017-00913985-CU-CO-CJC**

ADDITIONAL EVENTS:

EVENT ID/DOCUMENT ID: 72875949
**EVENT TYPE:** Motion to Compel Production
MOVING PARTY: The Huntington Beach Gables Homeowners Association
CAUSAL DOCUMENT/DATE FILED: Motion to Compel Production/Inspection of Documents or Things,
08/23/2018

DATE: 09/27/2018
DEPT: C33

MINUTE ORDER
JASSO DECL. PAGE - 0444

Page 4

Calendar No.

# EXHIBIT 10

**EJ-001**

Recorded in Official Records, Orange County
Hugh Nguyen, Clerk-Recorder

97.00

Recording Requested by and When Recorded Mail to
Joyce J. Kapsal            SBN: 091950
Epsten Grinnell & Howell, APC
10200 WILLOW CREEK ROAD, SUITE 100
SAN DIEGO, CA 92131
TEL NO: 858-527-0111        FAX NO (optional): 858-527-1531
E-MAIL ADDRESS (Optional):

\* $ R 0 0 1 0 4 8 0 4 9 1 $ \*
2018000435011 2:30 pm 11/19/18
7 413 A03    2
0.00 0.00 0.00 0.00 3.00 10.00 0.000.0075.00 3.00

[X] ATTORNEY  [X] JUDGMENT   [ ] ASSIGNEE
    FOR          CREDITOR        OF RECORD

SUPERIOR COURT OF CALIFORNIA, COUNTY OF ORANGE
STREET ADDRESS 700 Civic Center Drive West
MAILING ADDRESS 700 Civic Center Drive West
CITY AND ZIP CODE Santa Ana, CA 92701
BRANCH NAME Central Justice Center

FOR RECORDER'S USE ONLY

PLAINTIFF: The Huntington Beach Gables Homeowners Association
DEFENDANT: Jamie L. Gallian

CASE NUMBER
30-2017-00913985-CU-CO-CJC

ABSTRACT OF JUDGMENT—CIVIL
AND SMALL CLAIMS          [ ] Amended

FOR COURT USE ONLY

Pursuant to California Government
Code § 68150(f), the Clerk of the
Court hereby certifies this document
accurately reflects the official court
record. The electronic signature and
seal on this document have the
same validity and legal force and
effect as an original clerk's
signature and court seal. California
Government Code § 68150(g).

1. The [X] judgment creditor    [ ] assignee of record
   applies for an abstract of judgment and represents the following:
   a.    Judgment debtor's
          Name and last known address

   Jamie L. Gallian
   4476 Alderport Drive #53
   Huntington Beach, CA 92649

   b.    Driver's license no. [last 4 digits] and state: 0742 / CA    [ ] Unknown
   c.    Social security no. [last 4 digits]: xxx-xx-3936           [ ] Unknown
   d.    Summons or notice of entry of sister-state judgment was personally served or mailed to (name and address):

   Jamie L. Gallian, 4476 Alderport Drive #53, Huntington Beach, CA 92649

2. [ ] Information on additional judgment debtors is    4. [ ] Information on additional judgment creditors is
       shown on page 2.                                         shown on page 2.
3. Judgment creditor (name and address):                  5. [ ] Original abstract recorded in this county:
   The Huntington Beach Gables Homeowners Association
   c/o Epsten Grinnell & Howell, 10200 Willow              a. Date:
   Creek Rd, Ste 100, San Diego, CA 92131                  b. Instrument No.:
   Date: November 9, 2018

   Joyce J. Kapsal
   (TYPE OR PRINT NAME)                                     (SIGNATURE OF APPLICANT OR ATTORNEY)

6. Total amount of judgment as entered or last renewed:   10. [ ] An [ ] execution lien [ ] attachment lien
   $ 3,070.00                                                  is endorsed on the judgment as follows:
7. All judgment creditors and debtors are listed on this abstract.   a. Amount: $
8. a.    Judgment entered on (date): 9/27/2018 [sanctions]     b. In favor of (name and address):
   b.    Renewal entered on (date):
9. [ ] This judgment is an installment judgment.          11. A stay of enforcement has
                                                              a. [X] not been ordered by the court.
                                                              b. [ ] been ordered by the court effective until
                                                                     (date):

   David H. Yamasaki, Clerk of the Court                  12. a. [X] I certify that this is a true and correct abstract of
                                                                     the judgment entered in this action.
   This abstract issued on (date):                            b. [ ] A certified copy of the judgment is attached.
   11/16/2018                                                 Clerk, by                          S. Wilson
                                                                                                  , Deputy

Form Adopted for Mandatory Use        ABSTRACT OF JUDGMENT—CIVIL             Page 1 of 2
Judicial Council of California                                               Code of Civil Procedure, §§ 488.480,
EJ-001 [Rev July 1, 2014]             AND SMALL CLAIMS                       674, 700.190
                                                                            Westlaw Doc & Form Builder

| PLAINTIFF: The Huntington Beach Gables Homeowners Association | COURT CASE NO.: |
|---|---|
| DEFENDANT: Jamie L. Gallian | 30-2017-00913985-CU-CO-CJC |

**NAMES AND ADDRESSES OF ADDITIONAL JUDGMENT CREDITORS:**

13. Judgment creditor (name and address):

14. Judgment creditor (name and address):

15. ☐ Continued on Attachment 15.

**INFORMATION ON ADDITIONAL JUDGMENT DEBTORS:**

16.      Name and last known address

Driver's license no. [last 4 digits] and state: ☐ Unknown

Social security no. [last 4 digits]: ☐ Unknown

Summons was personally served at or mailed to (address):

17.      Name and last known address

Driver's license no. [last 4 digits] and state: ☐ Unknown

Social security no. [last 4 digits]: ☐ Unknown

Summons was personally served at or mailed to (address):

18.      Name and last known address

Driver's license no. [last 4 digits] and state: ☐ Unknown

Social security no. [last 4 digits]: ☐ Unknown

Summons was personally served at or mailed to (address):

19.      Name and last known address

Driver's license no. [last 4 digits] and state: ☐ Unknown

Social security no. [last 4 digits]: ☐ Unknown

Summons was personally served at or mailed to (address):

20. ☐ Continued on Attachment 20.

JASSO DECL. PAGE - 0447

# EXHIBIT 11

David R. Flyer

Raquel Flyer
raquelflyer@flyerandflyer.com

## FLYER & FLYER
**A PROFESSIONAL LAW CORPORATION**
ATTORNEYS AT LAW
4120 BIRCH STREET, SUITE 101
NEWPORT BEACH, CA 92660

flyerandflyer.com

Telephone
(949) 622-8445
Fax
(949) 622-8448
Email
davidflyer@flyerandflyer.com

August 27, 2018

via email: jamiegallian@gmail.com

Jamie L. Gallian
4476 Alderport Drive, Unit 53
Huntington Beach, CA 92649

         Re:              Huntington Beach Gables HOA v. Bradley
         Our File No.   A2019

Dear Jamie,

         Receipt of your 8/25/18 email is acknowledged. You are deluding yourself if you believe that you had any justification for removing $5,000 from the retainer. You are wrong in asserting that you left a single document (in an envelope or in a binder or laying around loose) in my office. I have none of the documents necessary to represent your interests. If you believe you have documents at the Recorder's Office related to your case, then you should pick them up. I insist if you wish to retain my services that you be totally honest in statements you make to me.

         Your new problems are as follows:

         1.       You have not identified a date for your deposition. Please indicate a date at this time, so that I can convey the information to the HOA.

         2.       The HOA sent a new letter dated August 23, 2018, asserting entitlement to sanctions and to impose restrictions on your access to community facilities, which is attached.

         3.       The HOA served four motions: (1) Motion to Compel Further Responses to Special Interrogatories; (2) Motion to Compel Further Response to Requests for Admission; (3) Motion to Compel Response to Document Requests; and (4) Motion to Compel Response to Form Interrogatories, set for hearing on September 27, 2018. Monetary sanctions are sought. I comment:

         A. As to the two motions to compel further responses, these could be considered untimely, since your responses were served on January 1, 2018, and more than 45 days have lapsed before the motions were filed. It is also possible that the court could hold that the motions were previously timely set, such that they are being reset due to stay while the case was in settlement posture.

         B. As to the other two motions, there are no defenses of which I'm aware for failing to provide verified responses to discovery. If you provide the responses before the hearing of September 27, 2018, the court could excuse the sanctions, but if no responses are provided, sanctions will likely be imposed on you.

Jamie L. Gallian
August 27, 2018
Page 2

_____

     4.     You apparently served a motion for good faith settlement.  The motion is in the wrong form and cites to the wrong code sections.  I intend to take the motion off-calendar, since it is frivolous.

     You may believe that the case is only about what you want (such as preparing a motion for judgment on pleadings) which is a puerile way to look at a lawsuit involving grown-ups.  Even if you believe that you are entirely in the right, by acting childishly and ignoring the rules, you stand a very good chance of losing your case and suffering consequences including loss of your home to monetary sanctions.

     Please put the money you misappropriated back in the retainer, please provide the file documents in your sole possession, or please sign and return the substitution of attorney form whereby you take back handling of your case before a motion to withdraw is filed.  Thank you.

                        Respectfully yours,

                            /s/

                        David R. Flyer

DRF:w
[\\WKST1\All Files\A2019\correspondence\Jamie-07ltr.wpd]

# EXHIBIT 12



Home  /  Browse Decisions  /  GALLIAN v. GRAGNANO

# GALLIAN v. GRAGNANO

No. G057198.                                                    Email | Print | Comments (0)

**View Case**    Cited Cases

*JAMIE L. GALLIAN, Cross-complainant and Appellant, v. LEE GRAGNANO et al., Cross-defendants and Respondents.*

Court of Appeals of California, Fourth District, Division Three.

Filed September 15, 2020.

*Attorney(s) appearing for the Case*

*Law Offices of Steven A. Fink and <u>Steven A. Fink</u> for Cross-complainant and Appellant.*

*Gordon Rees Scully Mansukhani, <u>Craig I. Mariam</u> , <u>Brenda N. Radmacher</u> , and <u>Jonathan A. Schaub</u> for Cross-defendants and Respondents.*

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## OPINION

IKOLA, *J.*

This is an appeal from an award of attorney fees under Civil Code section 5975, which permits recovery of fees in an action to enforce the governing documents of a common interest development. The Huntington Beach Gables Homeowners Association (the HOA) filed suit against Jamie L. Gallian for enforcement of the governing documents. Gallian, in turn, cross-complained against the individual members of the HOA board of directors (the board members), seeking indemnity on the HOA's complaint. [1] The board members' subsequent demurrer was sustained, and they were dismissed from the action with prejudice.

Afterward, at a mandatory settlement conference, the HOA and Gallian entered into what they believed was a global settlement agreement that included mutual releases that bound not only the HOA, but also the board members. However, when the HOA later attempted to enforce the settlement agreement, the court deemed it unenforceable. Subsequently—now well beyond the usual 60-day time limit for an attorney fee motion—the board members filed a motion to recover attorney fees. The court found the mistaken belief that the settlement agreement was enforceable furnished good cause for the late filing and granted the motion, awarding the board members approximately $46,000 in fees. Gallian appealed the award of fees.

Gallian contends the court abused its discretion in finding good cause to permit a late filing of the fee motion because the board members were not parties to the settlement agreement, having previously been dismissed with prejudice, and thus could not have been mistaken about their having released Gallian. However, the board members' attorney was at the hearing where the settlement agreement was put on record, and the settlement agreement purported to bind the board members. Gallian also argues her cross-complaint was not to enforce the governing documents, and thus attorney fees were not available under Civil Code section 5975. However, the HOA's action clearly was, and since Gallian sought indemnity for the HOA's action, it follows that her action was for enforcement of the governing documents as well. We affirm.

## FACTS

The HOA filed suit against Gallian, alleging two causes of action: Breach of governing documents (architectural violations) and nuisance. The gist of the complaint was that Gallian had installed a patio, an air conditioning unit, and certain landscaping features in violation of the HOA's rules. About two months later, Gallian cross-complained against the board members asserting causes of action for indemnification, apportionment of fault, and declaratory relief. Specifically, Gallian alleged, "On or about April 11, 2017, Plaintiff [the HOA] filed a complaint herein against Cross-Complainant. It later filed a First Amended Complaint seeking damages and injunctive relief in connection with the allegations relating to breach of Governing Documents and Nuisance." "If [the HOA] sustained damages or is entitled to relief as alleged in its First Amended Complaint, the damages and/or entitlement to relief were caused entirely, or in part, by [the board members]." "At all times, as alleged in the First Amended Complaint, [the board members] possessed, controlled, operated and/or owned the premises and were, and are, solely responsible for all activities and/or actions and/or conduct as alleged."

The board members demurred to the cross-complaint. We are told the court sustained the demurrer with leave to amend, but neither party provided us with any record of the court's ruling. We do know, however, that on December 27, 2017, Gallian filed a voluntary request for dismissal of the board members with prejudice and the clerk of the court entered the dismissal on that date. A notice of entry of dismissal was filed and served on January 31, 2018.

Litigation continued between the HOA and Gallian, and, at a mandatory settlement conference on March 2, 2018, they entered into what they believed to be an oral settlement agreement on the record, which included mutual releases by not only the HOA and Gallian, but also the board members. Both the board members' counsel and the court interpreted the release as including a waiver of attorney fees. However, on July 19, 2018, when the HOA sought to enforce the settlement agreement under Code of Civil ~~Procedure section 664.6~~, the court found there had been no meeting of the minds and thus

refused to enforce it.

About three weeks later, on August 7, 2018, now freed from the release granted to Gallian in the failed settlement agreement, the board members moved for their attorney fees. The court granted the motion. Although the court recognized the motion for fees was facially untimely under California Rules of Court, rule 3.1702(b) (motion must be filed within the time to appeal), it found good cause to extend that deadline (Cal. Rules of Court, rule 3.1702(d)) because of the parties' attempt to reach a global settlement. It further found that Gallian's cross-complaint was an action to enforce the governing documents of the HOA, which supported a statutory fee claim under Civil Code section 5975, subdivision (c). The court awarded $46,138 in fees. Gallian timely appealed from the fee award.

## DISCUSSION

Gallian raises two issues on appeal: whether the court abused its discretion in finding good cause to permit a late filing of the fee motion, and whether Gallian's cross-complaint was an action to enforce the governing documents under Civil Code section 5975.

Pursuant to the California Rules of Court, rule 3.1702(b)(1), "A notice of motion to claim attorney's fees for services up to and including the rendition of judgment in the trial court—including attorney's fees on an appeal before the rendition of judgment in the trial court—must be served and filed within the time for filing a notice of appeal under rules 8.104 and 8.108 in an unlimited civil case . . . ." Where, as here, a party serves a notice of entry of judgment, the appeal must be filed within 60 days of service of the notice. (Cal. Rules of Court, rule 8.104(a)(1)(B).) Thus, the attorney fee motion was due no later than 60 days after January 31, 2018, the day the notice of entry of dismissal was served. The board members filed their fee motion on August 7, 2018, well past the normal deadline to file a fee motion.

However, "For good cause, the trial judge may extend the time for filing a motion for attorney's fees . . . ." (Cal. Rules of Court, rule 3.1702(d).) "[A] trial court's finding of `good cause' is generally reviewed deferentially, solely for abuse of discretion." (*Robinson v. U–Haul Co. of California* (2016) 4 Cal.App.5th 304, 327.)

The court based its finding of good cause on the parties' attempt to come to a global settlement agreement, which included mutual releases that encompassed attorney fees. Gallian contends the finding of good cause was an abuse of discretion for two reasons.

First, she argues that because the board members had been dismissed, they were not technically parties to the case anymore, and thus could not file a fee motion. That contention is easily met: "`[E]ven after a party is dismissed from the action he may still have collateral statutory rights which the court must determine and enforce,'" including "`the right to statutory costs and attorney fees . . . .'" (*Day v. Collingwood* (2006) 144 Cal.App.4th 1116, 1124.)

Second, Gallian argues the board members did not appear at the settlement conference and thus were not parties to the attempted settlement agreement. However, the attorney representing the HOA was also representing the board members, and the terms of the settlement agreement recited on the record purported to bind the absent board members. Of course, the notion that the absent board members could be bound to the terms of the attempted settlement agreement is flawed. They could not be bound because they did not personally assent to the terms of the attempted settlement agreement before the court. (*Levy v. Superior Court* (1995) 10 Cal.4th 578, 586 ["the term `parties' as used in [Code of Civil Procedure] section 664.6 (`If parties to pending litigation stipulate . . . for settlement of the case . . .') means the litigants themselves, and does not include their atttorneys of record"].) Presumably, as Gallian's argument goes, as nonparties to the attempted settlement, the board members had no excuse for delaying the filing of their motion for attorney fees. But this argument is a red herring. The issue is not whether the attempted settlement agreement was binding. The court correctly found it was not. The issue is whether the parties' attempt to settle constituted good cause to excuse the late filing of the fee motion. The court did not abuse its discretion in finding the settlement attempt constituted good cause for the delay. We would not expect a party attempting in good faith to negotiate a settlement to throw a wrench in the works by moving for an award of attorney fees during the negotiation. The court's finding of good cause was well within its wide discretion.

Beyond timeliness, Gallian contends her cross-complaint was not to enforce the governing documents, and thus attorney fees were not available to the board members as prevailing parties on the cross-complaint pursuant to Civil Code section 5975, subdivision (c) ("In an action to enforce the governing documents, the prevailing party shall be awarded reasonable attorney's fees and costs"). However, the court's simple, straightforward logic is unassailable: the HOA's complaint against Gallian was to enforce the governing documents; Gallian's cross-complaint sought *indemnity* from the board members for any liability arising from that same complaint; therefore, the cross-complaint also sought to enforce the governing documents. The court did not err.

## DISPOSITION

The judgment is affirmed. Respondents shall recover their costs incurred on appeal.

FYBEL, ACTING P. J. and THOMPSON, J., concurs.

## FootNotes

1. The board members, respondents in this appeal, are Lee Gragnano, Ted Phillips, Lindy Beck, Jennifer Paulin, Janine Jasso, and Lori Burrett.

## Comment

Your Name

Your Email

Comments

Submit

**1000** Characters Remaining

*Leagle.com reserves the right to edit or remove comments but is under no obligation to do so, or to explain individual moderation decisions.*

# EXHIBIT 13

# HUNTINGTON BEACH GABLES
# HOMEOWNERS ASSOCIATION

### OPEN SESSION OF THE BOARD OF DIRECTORS

**Minutes**
**December 9, 2017**

**Present:**    Lee Gragnano, President , Janine Jasso, Vice President, Ted Phillips, Treasurer, Lindy Beck, Secretary, Jennifer Paulin, Director and Linn Joslyn representing Elite Community Management and owners.

**Absent:**    none

### EXECUTIVE SESSION

The Board met in Executive Session to consider legal matters, litigation, matters relating to the formation of contracts with third parties, member discipline, personnel matters, or met with a member, upon the member's request, regarding the member's payment of assessments, as specified in Civil Code Section 5665.

### OPEN FORUM

### CALL TO ORDER
The Open Session was called to order at 9:40 a.m. by Mr. Gragnano, President

### APPROVAL OF MINUTES
Upon a motion Ted Phillips and a second by Janine Jasso the Board unanimously approved the October 26, 2017 minutes as written.

### FINANCIAL REPORT
November 30, 2017
Mr. Phillips reviewed the financial statement. The operating account reflected $8,040.67 balance and the reserve account showed $379,561.42.

### OLD BUSINESS
Tree Trimming
Ms. Jasso reported all tree trimming had been completed.

Deck Repair
Ms. Jasso reported the repair/replacement work was in progress on units with upper decks where leaks are found. Some repair on stairs too.  Decks will continue to be repaired as needed.  New decks are sealed with guarantee from vendor. New railing secured.

### NEW BUSINESS
Lien
Upon a motion by Janine Jasso and second by Ted Phillips, Board voted unanimously to record a lien on property APN# 937-630-045.

Pool Heater Replacement
Upon a motion by Ted Phillips and a second by Janine Jasso the Board voted unanimously to approve a proposal from Pool Perfection in the amount of $3,095.00 to replace the inoperable heater in the pool.

**THE HUNTINGTON BEACH GABLES HOMEOWNERS ASSOCIATION**
**OPEN SESSION**
**December 9, 2017**
**Page 2-**

<u>Updates for HOA Rules</u>
The Board noted that the HOA will be reviewing and revising the rules and regulations for changes in the law and will provide the proper notice and comment period to the members.

<u>Motion to Transfer Reserve Funds</u>
Ms. Jasso reported The Huntington Beach Gables Homeowner's Association is currently in litigation to bring the unit located at 4476 Alderport into compliance with the Association's governing documents. The Board properly provided notice to members regarding the possible transfer of reserve funds. Ms. Jasso noted members of the association would continue to be notified in accordance with the law regarding reserve amounts transferred for litigation expenses.

Upon a motion by Janine Jasso and Second by Ted Phillips, Board, pursuant to Civil Code Section 5515, voted unanimously to approve a transfer from reserve account to operating account if funds were needed to pay legal fees for litigation.

**ADJOURNMENT**
There being no further business to come before the Board at this time the meeting was adjourned at 10:10 a.m. by Mr. Gragnano, President.

*Lindy Beck*
_____
Board Secretary

Prepared by:
*Elite Community Management*

2

# HUNTINGTON BEACH GABLES
# HOMEOWNERS ASSOCIATION
### OPEN SESSION OF THE BOARD OF DIRECTORS

### Minutes
### August 13, 2018

**Present:**     Janine Jasso, Vice President, Lindy Beck, Secretary, Jennifer Paulin, Director
and Linn Joslyn representing Elite Community Management and several owners.
Lee Gragnano, President, Ted Phillips, Treasurer

**Absent:**

### EXECUTIVE SESSION
The Board met in Executive Session to consider legal matters, litigation, matters relating to the
formation of contracts with third parties, member discipline, personnel matters, or met with a
member, upon the member's request, regarding the member's payment of assessments, as
specified in Civil Code Section 5665.

 ### CALL TO ORDER
The Open Session was called to order at 7:05 pm.by Ms. Jasso, Vice President

### APPROVAL OF MINUTES
Upon a motion Lindy Beck and a second by Jennifer Paulin the Board unanimously approved the
June 9, 2018 minutes as written.

### FINANCIAL REPORT
June 30, 2018
Management reviewed the financial statement. The operating account reflected 26,379.85 balance
and the reserve account showed $277, 605.26.

### OLD BUSINESS
Signage
It was reported the "No lifeguard on duty sign" had been replaced.

### NEW BUSINESS
Lien
Ms. Joslyn announced the Board approved a lien on APN 937-63-053.

ACC Committee
Ms. Jasso announced the ACC had approved the installation of an air-conditioner at 16137
Warmington.

Pool Service
The Board announced that the pool would be closed the week of August 20, 2018 so that the
vendor to perform maintenance of the pool and pool pump machines.

Janitorial
Management announced the Board approved having the four benches at the corners of the
greenbelt would be cleaned once a month by the janitorial service.

**THE HUNTINGTON BEACH GABLES HOMEOWNERS ASSOCIATION**
**OPEN SESSION**
**August 13, 2018**
**Page 2-**

## OPEN FORUM

There was membership participation.

## ADJOURNMENT

There being no further business to come before the Board at this time the meeting was adjourned at 8:22 pm. by Ms. Jasso, Vice President.

_____
Board Secretary

Prepared by:
*Elite Community Management*

RECORDING REQUESTED BY AND
WHEN RECORDED MAIL TO:

The Huntington Beach Gables Homeowners Association
c/o Elite Community Management
38760 Sky Canyon Drive, Suite C
Murrieta, CA 92563

**Recorded in Official Records, Orange County**
**Hugh Nguyen, Clerk-Recorder**

129.00

\* $ R 0 0 1 0 5 3 3 9 0 4 $ \*
2018000469842 2:27 pm 12/17/18
7 413 N16   16
0.00 0.00 0.00 0.00 45.00 0.00 0.000.0075.00 3.00

### NOTICE OF DELINQUENT ASSESSMENT

NOTICE IS HEREBY GIVEN that the Board of Directors of THE HUNTINGTON BEACH GABLES HOMEOWNERS' ASSOCIATION, pursuant to the powers conferred upon it by that certain Declaration of Covenants, Conditions and Restrictions recorded in the Office of the Orange County Recorder, State of California, on May 28, 1980, as Book 13618/Page No. 982, and any amendments or restatements thereof, and Civil Code Section 5740, levied against assessments and other charges on that certain unit located at 4476 Alderport, Huntington Beach, California, 92649, more particularly known as Parcel No. 937-63-053, Unit #53 of Tract 10542, and further described in the Condominium Sublease dated August 1, 1980, by and between Robert P. Warmington, an individual, as Landlord, which interest was subsequently assigned to BS INVESTORS, LLC by mesne assignments of record, and JOHN F. TURNER AND VIRGINIA H. TURNER, HUSBAND AND WIFE AS JOINT TENANTS as Tenant, recorded on NOVEMBER 7, 1980 in Book 13824, Page 1274 inclusive, as Instrument No. 8694 of Official Records of Orange County, California, as amended by the First Amendment to Condominium Sublease recorded on August 28, 2003 as Instrument No. 2003 0010447700.

1.      The amount of the lien imposed on the unit by this notice is the sum of $6788.10, plus any additional assessments accrued and owing after the date of recordation to the date of satisfaction hereof, which includes the following:

a)      delinquent assessments and late charges in the amount of $6263.10, as of December 15, 2018; and

b)      costs of collection in the amount of $525.00.      *See attached Exhibit A*

In addition to the amounts set forth in this paragraph, this lien shall include any other delinquent payments, credits, assessments and/or interest which have become due and payable with respect to said unit, together with all costs (including attorney's fees), penalties and interest which have been accrued on such amounts prior to the recording of this notice; and this lien shall ...
assessments and interest which become due and payable with respec ...
interest accrue subsequent to the levy of this assessment and/or recor ...
OTHER COSTS MAY RESULT IN YOUR PROPERTY BEING FC ...

2.      The purported owners of the unit is Jamie ...

3.      The name and address of the trustee auth ...
Reconveyance Corporation, 525 East Main Street, El Cajon, C ...

Dated: 12/17/18      By: [signature] Janine Jasso, ...
Huntington B...

**U.S. Postal Service™**
**CERTIFIED MAIL® RECEIPT**
*Domestic Mail Only*

For delivery information, visit our website at www.usps.com®.

HUNTINGTON BEACH, CA 92649

| | | |
|---|---|---|
| Certified Mail Fee | $3.45 | |
| | $2.75 | 0450 |
| Extra Services & Fees (check box, add fee as appropriate) | | 11 |
| ☐ Return Receipt (hardcopy) | $0.00 | |
| ☐ Return Receipt (electronic) | $0.00 | Postmark |
| ☐ Certified Mail Restricted Delivery | $0.00 | Here |
| ☐ Adult Signature Required | $0.00 | |
| ☐ Adult Signature Restricted Delivery | | |
| Postage | $1.63 | 12/27/2018 |
| Total Postage and Fees | $7.83 | |

Sent To  Jamie L Gallian
Street and Apt. No., or PO Box No.  4476 Alderport
City, State, ZIP+4®  HB, CA  92649

PS Form 3800, April 2015 PSN 7530-02-000-9047      See Reverse for Instructions

A notary public or other officer completing this certificate verifies o ...
this certificate is attached, and not the truthfulness, accuracy, or vali ...

STATE OF CALIFORNIA      )
                         ) ss.
COUNTY OF ORANGE         )

On 12-17-18, before me, THOMAS G. KNAACK, Notary Public, personally appeared JANINE JASSO, who proved to me on the basis of satisfactory evidence to be the person whose name is subscribed to the within instrument and acknowledged to me that she executed the same in her authorized capacity, and that by her signature on the instrument the person, or the entity upon behalf of which the person acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

[signature]
Notary Public in and for said State

**THOMAS G. KNAACK**
**Notary Public - California**
**Orange County**
**Commission # 2159910**
**My Comm. Expires Aug 11, 2020**

RECORDING REQUESTED BY AND
WHEN RECORDED MAIL TO:

The Huntington Beach Gables Homeowners Association
c/o Elite Community Management
38760 Sky Canyon Drive, Suite C
Murrieta, CA 92563

**Recorded in Official Records, Orange County
Hugh Nguyen, Clerk-Recorder**

129.00

*  * R 0 0 1 0 5 3 3 9 0 4 $ *

**2018000469842 2:27 pm 12/17/18**

**7 413 N16   16**

**0.00 0.00 0.00 0.00 45.00 0.00 0.000.0075.00 3.00**

## NOTICE OF DELINQUENT ASSESSMENT

NOTICE IS HEREBY GIVEN that the Board of Directors of THE HUNTINGTON BEACH GABLES
HOMEOWNERS' ASSOCIATION, pursuant to the powers conferred upon it by that certain Declaration of Covenants,
Conditions and Restrictions recorded in the Office of the Orange County Recorder, State of California, on May 28, 1980, as Book
13618/Page No. 982, and any amendments or restatements thereof, and Civil Code Section 5740, levied against assessments and
other charges on that certain unit located at 4476 Alderport, Huntington Beach, California, 92649, more particularly known as
Parcel No. 937-63-053, Unit #53 of Tract 10542, and further described in the Condominium Sublease dated August 1, 1980, by
and between Robert P. Warmington, an individual, as Landlord, which interest was subsequently assigned to BS INVESTORS,
LLC by mesne assignments of record, and JOHN F. TURNER AND VIRGINIA H. TURNER, HUSBAND AND WIFE AS
JOINT TENANTS as Tenant, recorded on NOVEMBER 7, 1980 in Book 13824, Page 1274 inclusive, as Instrument No. 8694 of
Official Records of Orange County, California, as amended by the First Amendment to Condominium Sublease recorded on
August 28, 2003 as Instrument No. 2003 0010447700.

1.    The amount of the lien imposed on the unit by this notice is the sum of $6788.10, plus any additional
assessments accrued and owing after the date of recordation to the date of satisfaction hereof, which includes the following:

a)    delinquent assessments and late charges in the amount of $6263.10, as of
December 15, 2018; and

b)    costs of collection in the amount of $525.00.    *See attached Exhibit A*

In addition to the amounts set forth in this paragraph, this lien shall include any other delinquent payments, credits, assessments and/or
interest which have become due and payable with respect to said unit, together with all costs (including attorney's fees), penalties and interest
which have been accrued on such amounts prior to the recording of this notice; and this lien shall further include any delinquent payments,
assessments and interest which become due and payable with respect to said unit, together with all costs (including attorney's fees), penalties and
interest accrue subsequent to the levy of this assessment and/or recording of this Notice. FAILURE TO PAY ACCRUED ASSESSMENTS AND
OTHER COSTS MAY RESULT IN YOUR PROPERTY BEING FORCLOSED UPON.

2.    The purported owners of the unit is Jamie Gallian.

3.    The name and address of the trustee authorized by the Association to enforce the lien by sale is Cal Western
Reconveyance Corporation, 525 East Main Street, El Cajon, California, 92022-9004.

Dated: 12/17/18    By: _____

Janine Jasso, Board Vice-President
Huntington Beach Gables Homeowners Association

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which
this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

STATE OF CALIFORNIA    )
) ss.
COUNTY OF ORANGE    )

On 12-17-18, before me, THOMAS G-KNAACK, Notary Public, personally
appeared JANINE JASSO, who proved to me on the basis of satisfactory evidence to be the person whose name is subscribed
to the within instrument and acknowledged to me that she executed the same in her authorized capacity, and that by her signature on the
instrument the person, or the entity upon behalf of which the person acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Notary Public in and for said State

THOMAS G. KNAACK
Notary Public - California
Orange County
Commission # 2159910
My Comm. Expires Aug 11, 2020

EXHIBIT A

# HUNTINGTON BEACH GABLES

38760 Sky Canyon Drive Suite C

Murrieta, CA 92563

Jamie Gallian
4476 Alderport
Huntington Beach, CA  92649

**Property Address:** 4476 Alderport

**Account #:** 21776

| Code | Date | Amount | Balance | Check# | Memo |
|------|------|--------|---------|--------|------|
| Assessment | 4/1/2017 | 316.00 | 316.00 | | MONTHLY ASSESSMENT |
| Late Fee | 4/16/2017 | 10.00 | 326.00 | | |
| Assessment | 5/1/2017 | 316.00 | 642.00 | | MONTHLY ASSESSMENT |
| Payment - Mutual of Omaha | 5/1/2017 | -632.00 | 10.00 | 5697 | RBCCABLB20170501.dat |
| Payment - Mutual of Omaha | 5/16/2017 | -316.00 | -306.00 | 5745 | RBCCABLB20170516.dat |
| Assessment | 6/1/2017 | 316.00 | 10.00 | | MONTHLY ASSESSMENT |
| Payment - Mutual of Omaha | 6/5/2017 | -316.00 | -306.00 | 5731 | RBCCABLB20170605.dat |
| Assessment | 7/1/2017 | 316.00 | 10.00 | | MONTHLY ASSESSMENT |
| Payment - Mutual of Omaha | 7/3/2017 | -316.00 | -306.00 | 5762 | RBCCABLB20170703.dat |
| Payment - Mutual of Omaha | 7/13/2017 | -80.00 | -386.00 | 5787 | RBCCABLB20170713.dat |
| Assessment | 8/1/2017 | 316.00 | -70.00 | | MONTHLY ASSESSMENT |
| Assessment | 9/1/2017 | 316.00 | 246.00 | | MONTHLY ASSESSMENT |
| Assessment | 10/1/2017 | 316.00 | 562.00 | | MONTHLY ASSESSMENT |
| Payment - Mutual of Omaha | 10/3/2017 | -316.00 | 246.00 | 5810 | rcvd 9/1/17 |
| Assessment | 11/1/2017 | 316.00 | 562.00 | | MONTHLY ASSESSMENT |
| Payment - Mutual of Omaha | 11/1/2017 | -316.00 | 246.00 | 5829 | CK#5829 RCVD 10/6/17 |
| Payment - Mutual of Omaha | 11/6/2017 | -316.00 | -70.00 | 5845 | RBCCABLB20171106.dat |
| Assessment | 12/1/2017 | 316.00 | 246.00 | | MONTHLY ASSESSMENT |
| Payment - Mutual of Omaha | 12/11/2017 | -316.00 | -70.00 | 5867 | RBCCABLB20171211.dat |
| Assessment | 1/1/2018 | 316.00 | 246.00 | | MONTHLY ASSESSMENT |
| Payment - Mutual of Omaha | 1/8/2018 | -316.00 | -70.00 | 5884 | RBCCABLB20180108.dat |
| Assessment | 2/1/2018 | 316.00 | 246.00 | | MONTHLY ASSESSMENT |
| Late Fee | 2/16/2018 | 10.00 | 256.00 | | |
| Payment - Mutual of Omaha | 2/20/2018 | -316.00 | -60.00 | 5891 | RBCCABLB20180220.dat |
| Special Assessment | 2/20/2018 | 5,300.50 | 5,240.50 | | SPECIAL ASSESSMENT |
| Assessment | 3/1/2018 | 316.00 | 5,556.50 | | MONTHLY ASSESSMENT |
| Late Fee | 3/16/2018 | 10.00 | 5,566.50 | | |
| Payment - Mutual of Omaha | 3/19/2018 | -316.00 | 5,250.50 | 5921 | RBCCABLB20180319.dat |
| Assessment | 4/1/2018 | 316.00 | 5,566.50 | | MONTHLY ASSESSMENT |
| Payment - Mutual of Omaha | 4/13/2018 | -316.00 | 5,250.50 | 5932 | RBCCABLB20180413.dat |
| Special Assessment | 5/1/2018 | 189.60 | 5,440.10 | | SPECIAL ASSESSMENT |
| Assessment | 5/1/2018 | 316.00 | 5,756.10 | | MONTHLY ASSESSMENT |
| Payment - Mutual of Omaha | 5/16/2018 | -316.00 | 5,440.10 | 5947 | RBCCABLB20180516.dat |
| Late Fee | 5/16/2018 | 10.00 | 5,450.10 | | |

**Make check payable to: HUNTINGTON BEACH GABLES**

JASSO DECL. PAGE - 0463

# HUNTINGTON BEACH GABLES

### 38760 Sky Canyon Drive Suite C

### Murrieta, CA 92563

| Code | Date | Amount | Balance | Check# | Memo |
|------|------|--------|---------|--------|------|
| Assessment | 6/1/2018 | 316.00 | 5,766.10 | | MONTHLY ASSESSMENT |
| Late Fee | 6/16/2018 | 10.00 | 5,776.10 | | |
| Payment - Mutual of Omaha | 6/18/2018 | -316.00 | 5,460.10 | 5965 | RBCCABLB20180618.dat |
| Payment - Mutual of Omaha | 6/25/2018 | -189.00 | 5,271.10 | 5985 | RBCCABLB20180625.dat |
| Assessment | 7/1/2018 | 316.00 | 5,587.10 | | MONTHLY ASSESSMENT |
| Payment - Mutual of Omaha | 7/9/2018 | -316.00 | 5,271.10 | 5980 | RBCCABLB20180709.dat |
| Assessment | 8/1/2018 | 316.00 | 5,587.10 | | MONTHLY ASSESSMENT |
| Payment - Mutual of Omaha | 8/13/2018 | -316.00 | 5,271.10 | 5995 | RBCCABLB20180813.dat |
| Legal Fee | 8/15/2018 | 175.00 | 5,446.10 | | LEGAL FEE |
| Assessment | 9/1/2018 | 316.00 | 5,762.10 | | MONTHLY ASSESSMENT |
| Payment - Mutual of Omaha | 9/10/2018 | -316.00 | 5,446.10 | 6026 | RBCCABLB20180910.dat |
| Legal Fee | 9/24/2018 | 175.00 | 5,621.10 | | LEGAL FEE/PRE-LIEN |
| Assessment | 10/1/2018 | 316.00 | 5,937.10 | | MONTHLY ASSESSMENT |
| Late Fee | 10/16/2018 | 10.00 | 5,947.10 | | |
| Payment - Mutual of Omaha | 10/23/2018 | -326.00 | 5,621.10 | 5481 | |
| Assessment | 11/1/2018 | 316.00 | 5,937.10 | | MONTHLY ASSESSMENT |
| Late Fee | 11/16/2018 | 10.00 | 5,947.10 | | |
| Assessment | 12/1/2018 | 316.00 | 6,263.10 | | MONTHLY ASSESSMENT |

| Current | 30 - 59 Days | 60 - 89 Days | >90 Days | Balance: | 6,263.10 |
|---------|--------------|--------------|----------|----------|----------|
| 326.00 | 326.00 | 175.00 | 5,436.10 | | |

JASSO DECL. PAGE - 0464

# HUNTINGTON BEACH GABLES

## 38760 Sky Canyon Drive Suite C

## Murrieta, CA 92563

Jamie Gallian
4476 Alderport
Huntington Beach, CA  92649

**Property Address:** 4476 Alderport
**Account #:**      22034

| Code | Date | Amount | Balance | Check# | Memo |
|------|------|--------|---------|--------|------|
| Fine | 2/20/2018 | 400.00 | 400.00 | | |
| Fine | 8/24/2018 | 11,050.00 | 11,450.00 | | |
| Fine | 10/18/2018 | 11,000.00 | 22,450.00 | | |

| Current | 30 - 59 Days | 60 - 89 Days | >90 Days | Balance: | 22,450.00 |
|---------|--------------|--------------|----------|----------|-----------|
| 0.00 | 11,000.00 | 0.00 | 11,450.00 | | |

Elite Management | 38760 Sky Canyon Drive Suite C | Murrieta, CA 92563 | (951) 699-1220
**Make check payable to: HUNTINGTON BEACH GABLES**

12/12/2018                                                                      Page 1 of 1

JASSO DECL. PAGE - 0465



**Epsten Grinnell & Howell** APC
Attorneys Serving Community Associations

10200 Willow Creek Road, Suite 100   Tel 1.858.527.0111
San Diego, CA 92131   Tel 1.800.300.1704
Fax 1.858.527.1531

ASSESSMENT RECOVERY DEPARTMENT

September 24, 2018

Certified Article Number

9414 7266 9904 2098 2935 81

Certified Article Number

9414 7266 9904 2098 2936 28

SENDER'S RECORD

**VIA CERTIFIED MAIL RETURN RECEIPT**
**REQUESTED AND FIRST CLASS MAIL**

Jamie L. Gallian
4476 Alderport Drive
Huntington Beach, CA  92649

Re:   The Huntington Beach Gables Homeowners Association
Our Reference No.   5786.2002
Association Account No. 21776
Amount of Debt as of Date of This Letter: $5,621.10
Property Located At: 4476 Alderport Drive, Huntington Beach, CA  92649

Dear Owner:

**This communication is from a debt collector and is an attempt to collect a debt. Any information obtained will be used for that purpose.** This law firm represents The Huntington Beach Gables Homeowners Association ("Association") with respect to the account referenced above.   We are writing to advise you that as of the date of this letter you owe $5,621.10 on your assessment account with the Association.

Failure to pay your assessment account in full within thirty-five (35) days from the date of this letter will result in the recording of a lien against your property, after proper authorization by the Association's Board of Directors.  All collection costs allowed by law may be charged to your assessment account.  Because of accruing assessments, late charges, and other charges that may vary from day to day, the amount due on the day you pay may be greater.  Hence, if you pay the amount shown above, an adjustment may be necessary after we receive your payment, in which event we will inform you before depositing the payment for collection.  For further information, write the undersigned or call 1.800.300.1704.  You can also call my assistant, Olivia M. Castro at 1.858.527.0111, ext. 269.

## IMPORTANT NOTICE:   IF YOUR SEPARATE INTEREST IS PLACED IN FORECLOSURE BECAUSE YOU ARE BEHIND IN YOUR ASSESSMENTS, IT MAY BE SOLD WITHOUT COURT ACTION.

Pursuant to California Civil Code section 5720(b)(2), the Association may not foreclose until the amount of the delinquent assessments secured by the lien, exclusive of any accelerated assessments, late charges, fees and costs of collection, attorney's fees, or interest, equals or exceeds one thousand eight hundred dollars ($1,800) or the assessments secured by the lien are more than 12 months delinquent.

September 24, 2018
Page 2 of 2
Jamie L. Gallian

Under California Civil Code sections 5660 and 5670, you have the following rights:

- You have the right to inspect the Association records pursuant to California Civil Code section 5205.

- You shall not be liable to pay the charges, interest, and costs of collection if it is determined the assessment was paid on time to the Association.

- As provided in California Civil Code section 5665, you have the right to submit a written request to meet with the Association's Board of Directors to discuss a payment plan for this debt.

- You have the right to dispute the assessment debt by submitting a written request for dispute resolution to the Association pursuant to the Association's "meet and confer" program required in California Civil Code section 5900 et seq., and the Board offers to participate in dispute resolution with you.

- You have the right to request alternative dispute resolution with a neutral third party pursuant to California Civil Code section 5925 et seq. before the Association may initiate foreclosure against your separate interest, except that binding arbitration shall not be available if the Association intends to initiate a judicial foreclosure.

Very truly yours,

EPSTEN GRINNELL & HOWELL, APC

Jillian M. Wright

JMW: omc

Enclosures: Association Collection Policy and Account History

cc:    Jamie L. Gallian
       18 Meadowbrook Dr., Cota De Caza, CA  92679

       (*Via Certified Mail, Return Receipt Requested and First Class Mail with enclosures*)

JASSO DECL. PAGE - 0467

# HUNTINGTON BEACH GABLES

38760 Sky Canyon Drive Suite C

Murrieta, CA 92563

Jamie Gallian
4476 Alderport
Huntington Beach, CA  92649

Property Address:  4476 Alderport
Account #:        21776

| Code | Date | Amount | Balance | Check# | Memo |
|---|---|---|---|---|---|
| Assessment | 4/1/2017 | 316.00 | 316.00 | | MONTHLY ASSESSMENT |
| Late Fee | 4/16/2017 | 10.00 | 326.00 | | |
| Assessment | 5/1/2017 | 316.00 | 642.00 | | MONTHLY ASSESSMENT |
| Payment - Mutual of Omaha | 5/1/2017 | -632.00 | 10.00 | 5697 | RBCCABLB20170501.dat |
| Payment - Mutual of Omaha | 5/16/2017 | -316.00 | -306.00 | 5745 | RBCCABLB20170516.dat |
| Assessment | 6/1/2017 | 316.00 | 10.00 | | MONTHLY ASSESSMENT |
| Payment - Mutual of Omaha | 6/5/2017 | -316.00 | -306.00 | 5731 | RBCCABLB20170605.dat |
| Assessment | 7/1/2017 | 316.00 | 10.00 | | MONTHLY ASSESSMENT |
| Payment - Mutual of Omaha | 7/3/2017 | -316.00 | -306.00 | 5762 | RBCCABLB20170703.dat |
| Payment - Mutual of Omaha | 7/13/2017 | -80.00 | -386.00 | 5787 | RBCCABLB20170713.dat |
| Assessment | 8/1/2017 | 316.00 | -70.00 | | MONTHLY ASSESSMENT |
| Assessment | 9/1/2017 | 316.00 | 246.00 | | MONTHLY ASSESSMENT |
| Assessment | 10/1/2017 | 316.00 | 562.00 | | MONTHLY ASSESSMENT |
| Payment - Mutual of Omaha | 10/3/2017 | -316.00 | 246.00 | 5810 | rcvd 9/1/17 |
| Assessment | 11/1/2017 | 316.00 | 562.00 | | MONTHLY ASSESSMENT |
| Payment - Mutual of Omaha | 11/1/2017 | -316.00 | 246.00 | 5829 | CK#5829 RCVD 10/6/17 |
| Payment - Mutual of Omaha | 11/6/2017 | -316.00 | -70.00 | 5845 | RBCCABLB20171106.dat |
| Assessment | 12/1/2017 | 316.00 | 246.00 | | MONTHLY ASSESSMENT |
| Payment - Mutual of Omaha | 12/11/2017 | -316.00 | -70.00 | 5867 | RBCCABLB20171211.dat |
| Assessment | 1/1/2018 | 316.00 | 246.00 | | MONTHLY ASSESSMENT |
| Payment - Mutual of Omaha | 1/8/2018 | -316.00 | -70.00 | 5884 | RBCCABLB20180108.dat |
| Assessment | 2/1/2018 | 316.00 | 246.00 | | MONTHLY ASSESSMENT |
| Late Fee | 2/16/2018 | 10.00 | 256.00 | | |
| Payment - Mutual of Omaha | 2/20/2018 | -316.00 | -60.00 | 5891 | RBCCABLB20180220.dat |
| Special Assessment | 2/20/2018 | 5,300.50 | 5,240.50 | | SPECIAL ASSESSMENT |
| Assessment | 3/1/2018 | 316.00 | 5,556.50 | | MONTHLY ASSESSMENT |
| Late Fee | 3/16/2018 | 10.00 | 5,566.50 | | |
| Payment - Mutual of Omaha | 3/19/2018 | -316.00 | 5,250.50 | 5921 | RBCCABLB20180319.dat |
| Assessment | 4/1/2018 | 316.00 | 5,566.50 | | MONTHLY ASSESSMENT |
| Payment - Mutual of Omaha | 4/13/2018 | -316.00 | 5,250.50 | 5932 | RBCCABLB20180413.dat |
| Special Assessment | 5/1/2018 | 189.50 | 5,440.10 | | SPECIAL ASSESSMENT |
| Assessment | 5/1/2018 | 316.00 | 5,756.10 | | MONTHLY ASSESSMENT |
| Payment - Mutual of Omaha | 5/16/2018 | -316.00 | 5,440.10 | 5947 | RBCCABLB20180516.dat |
| Late Fee | 5/16/2018 | 10.00 | 5,450.10 | | |

JASSO DECL. PAGE - 0468

# HUNTINGTON BEACH GABLES

38760 Sky Canyon Drive Suite C

Murrieta, CA 92563

| Code | Date | Amount | Balance | Check# | Memo |
|---|---|---|---|---|---|
| Assessment | 6/1/2018 | 316.00 | 5,766.10 | | MONTHLY ASSESSMENT |
| Late Fee | 6/16/2018 | 10.00 | 5,776.10 | | |
| Payment - Mutual of Omaha | 6/18/2018 | -316.00 | 5,460.10 | 5955 | RBCCABLB20180618.dat |
| Payment - Mutual of Omaha | 6/25/2018 | -189.00 | 5,271.10 | 5985 | RBCCABLB20180625.dat |
| Assessment | 7/1/2018 | 316.00 | 5,587.10 | | MONTHLY ASSESSMENT |
| Payment - Mutual of Omaha | 7/9/2018 | -316.00 | 5,271.10 | 5980 | RBCCABLB20180709.dat |
| Assessment | 8/1/2018 | 316.00 | 5,587.10 | | MONTHLY ASSESSMENT |
| Payment - Mutual of Omaha | 8/13/2018 | -316.00 | 5,271.10 | 5995 | RBCCABLB20180813.dat |
| Legal Fee | 8/15/2018 | 175.00 | 5,446.10 | | LEGAL FEE |
| Assessment | 9/1/2018 | 316.00 | 5,762.10 | | MONTHLY ASSESSMENT |
| Payment - Mutual of Omaha | 9/10/2018 | -316.00 | 5,446.10 | 6026 | RBCCABLB20180910.dat |
| Legal Fee | | 175.00 | 5,621.10 | | |

JASSO DECL. PAGE - 0469

### Huntington Beach Gables Homeowners' Association
### Assessment Collection Policy

Being that the Board of Directors must enforce the obligation of all members to pay their assessments in a timely manner, the following assessment collection policies have been adopted, in accordance with Civil Code 1365.

1.  Regular assessments are due and payable on the first day of each month.  Each owner is responsible to pay each assessment on time, regardless of whether or not a statement or coupon is received.

2.  Other assessments, including special assessments, are due and payable on the date specified in the notice of that assessment.

3.  Assessments, late charges, interest, reasonable collection costs, and reasonable legal fees, if applicable, are the obligation of the owner of the property at the time that the assessment or other sums are levied.  Owners shall be held responsible for all such amounts unless it is determined that all assessments were paid on time to the Association.

4.  Assessments are delinquent **fifteen (15)** days after they are due.  A late fee of **$10.00 or 10% of the assessment, whichever is greater,** will be charged for any assessment which is not paid in full within **fifteen (15) days** of the due date.  A letter notifying the owner of this charge, and demanding payment, may be forwarded to the owner at their address of record with the Association.

5.  Interest on the balance due will accrue at the rate of **6%** per annum, commencing **thirty (30)** days after the assessment becomes due.

6.  Payments received will be applied to any outstanding assessments first.  Only after assessments owed are paid in full will the payments be applied to fees and costs of collection, late charges and/or interest.  When an owner makes a payment, the owner may request a receipt and the Association shall provide it.  The receipt shall indicate the date of payment and the person who received it.  The mailing address for overnight payments is:

> **Huntington Beach Gables H.O.A.**
> c/o Elite Management
> 38760 Sky Canyon Drive, Suite C
> Murrieta, CA 92563

7.  For liens recorded on or after January 1, 2006, the decision to record a lien for delinquent assessments shall be made only by the Board of Directors of the Association and may not be delegated to an agent of the association.  The board shall approve the decision by a majority vote of the board members in an open meeting.  The board shall record the vote in the minutes of that meeting.

8. At least 30 days prior to the recording of a lien upon the separate interest of the owner of record to collect a debt that is past due, the association shall notify the owner of record in writing by certified mail of their intent to lien. The letter shall advise of the following:

    a. The delinquent status of the account (account history to be included)
    b. Impending collection action
    c. The owners' right to request and participate in internal dispute resolution process (IDR)
    d. The owners' right to request a payment plan or to meet with the board to discuss a payment plan

9. If an owner, whom receives an Intent to Lien letter, fails to respond and fails to request IDR within thirty (30) days, a lien for any delinquent assessments, late charges, interest and/or costs of collection, including attorneys' fees, may be recorded against the owner's property. The owner will be charged a fee for such lien.

10. A copy of the lien will be sent to the owner at their address of record via certified mail within ten (10) days of the lien being recorded.

11. After the expiration of thirty (30) days following the recording of the lien, the lien may be enforced in any manner permitted by law, including judicial or non-judicial foreclosure, granted it meets the requirements for such action. The Association may foreclose the lien by non-judicial or judicial foreclosure sale when either 1) the delinquent assessment amount totals $1,800.00 or more, excluding accelerated assessments and specified late charges and fees, or, 2) the assessments are delinquent for more than twelve (12) months.

12. The decision to move forward with foreclosure must be made by a majority of the Board of Directors, in an Executive Session Meeting. The decision must be recorded by the Board in the minutes of the next open meeting. Before proceeding with a foreclosure sale, the owner of the property must be afforded the right to participate in IDR or Alternative Dispute Resolution (ADR).

13. Foreclosure shall be handled by a law firm, approved by the Board of Directors. The law firm shall ensure that all legal requirements are met throughout the process.

14. Should an owner satisfy a lien, the Association shall record a release of lien and provide a copy to the owner of the release within twenty one (21) days of receiving the full payment.

15. Owners may provide a secondary mailing address to the Association. The request must be in writing and mailed to the Association in a way that shall indicate the Association has received it. The owner may identify or change a secondary address at any time. However, if the address is changed during the collection process, the Association is only required to send notices to the secondary address from the point that the Association receives the request.

16. The Association has the right to request a vesting report on a property in preparation of the collection procedures. The owner may be charged for any fees involved with obtaining such report.

17. Members of the Association have the right to inspect Association records to verify their debt.

18. The Association reserves the right to change the amount of any collection fee, without notice, and reserves the right to modify or amend this collection policy at any time.

The foregoing policies and procedures were adopted by the Board of Directors at its meeting held on _NOVEMBER 28_ , _2007_ .

Signed for **Huntington Beach Gables H.O.A.**:

_Signature_

_PRESIDENT_
Board Member Title

_FRANK SPATES_
Printed Name

_11-28-07_
Date

November 3, 2011

Insurance Disclosure for: Huntington Beach Gables

General Liability Coverage
1. Name of Insurer:      Travelers Casualty Ins. Co.
2. Policy Limits:        $1,000,000 per occurrence/$2,000,000 aggregate
3. Deductible:           None
4. Inception Date:       8/3/2011      Expiration Date: 8/3/2012

Property Coverage
1. Name of Insurer:      Travelers Casualty Ins. Co.
2. Policy Limits:        $17,812,972
3. Deductible:           $5,000
4. Inception Date:       8/3/2011      Expiration Date: 8/3/2012

Fidelity Bond Coverage
1. Name of Insurer:      Great American
2. Policy Limits:        $450,000
3. Deductible:           $2,500
4. Inception Date:       8/3/2011      Expiration Date: 8/3/2012

Directors & Officers Coverage
1. Name of Insurer:      Great American
2. Policy Limits:        $1,000,000
3. Deductible:           $1,000
4. Inception Date:       8/3/2011      Expiration Date: 8/3/2012

Earthquake Coverage
1. Name of Insurer:
2. Policy Limits:
3. Deductible:
4. Inception Date:                     Expiration Date:

Umbrella Coverage
1. Name of Insurer:      Great American
2. Policy Limits:        $1,000,000 (this extends over the General Liability and Directors & Officers)
3. Deductible:           None
4. Inception Date:       8/3/2011      Expiration Date: 8/3/2012

Workers Compensation Coverage
1. Name of Insurer:
2. Policy Limits:
3. Deductible:
4. Inception Date:                     Expiration Date:

In accordance with Section 1365 of the Civil Code:
This summary of the association's policies of insurance provides only certain information, as required by subdivision (f) of Section 1365 of the Civil Code, and should not be considered a substitute for the complete policy terms and conditions contained in the actual policies of insurance. Any association member may, upon request and provision of reasonable notice, review the association's insurance policies and, upon request and payment of reasonable duplication charges, obtain copies of those policies. Although the association maintains the policies of insurance specified in this summary, the association's policies of insurance may not cover your property, including personal property or, real property improvements to or around your dwelling, or personal injuries or other losses that occur within or around your dwelling. Even if a loss is covered, you may nevertheless be responsible for paying all or a portion of any deductible that applies. Association members should consult with their individual insurance broker or agent for appropriate additional coverage."
Agent of record: Alante Insurance Programs 5530 Trabuco Road, Irvine, CA 92620Tel: (800) 370-0057; Fax: (949) 679-7249; License No. OC13480



10200 Willow Creek Road, Suite 100    Tel 1.858.527.0111
San Diego, CA 92131    Tel 1.800.300.1704
Fax 1.858.527.1531

ASSESSMENT RECOVERY DEPARTMENT

Certified Article Number

9414 7266 9904 2098 2906 58

SENDER'S RECORD

August 17, 2018

**VIA CERTIFIED MAIL RETURN RECEIPT
REQUESTED AND FIRST CLASS MAIL**

Jamie L. Gallian
4476 Alderport Drive
Huntington Beach, CA  92649

Re:    The Huntington Beach Gables Homeowners Association (CREDITOR)
Our Reference No.:  5786.2002
Association Account No. 21776
Amount of Debt as of Date of This Letter: $5,446.10
Property Located At: 4476 Alderport Drive, Huntington Beach, CA  92649

Dear Owner:

**This communication is from a debt collector and is an attempt to collect a debt.
Any information obtained will be used for that purpose.** Please be advised that this law firm
represents The Huntington Beach Gables Homeowners Association ("Association") with respect
to the account referenced above.  As of the date of this letter, you owe $5,446.10 on your
account with the Association.  Because of accruing assessments, late charges, and other
charges that may vary from day to day, the amount due on the day you pay may be greater.
Hence, if you pay the amount shown above, an adjustment may be necessary after we receive
your payment, in which event we will inform you before depositing the payment for collection.
For further information, write the undersigned or call 1.800.300.1704.  You can also call my
assistant, Olivia M. Castro at 1.858.527.0111, ext. 269.

**Unless you notify this office within thirty (30) days after receiving this notice that
you dispute the validity of the debt, or any portion thereof, this office will assume this
debt is valid.  If you notify this office in writing within thirty (30) days after receiving this
notice that the debt, or any portion thereof, is disputed, we will obtain verification of the
debt or a copy of a judgment against you (if applicable) and a copy of such verification or
judgment will be mailed to you.  Upon your written request within thirty (30) days after
receiving this notice, we will also provide you with the name and address of the original
creditor, if different from the current creditor.**

The California state Rosenthal Fair Debt Collection Practices Act and the federal
Fair Debt Collection Practices Act require that, except under unusual circumstances,
collectors may not contact you before 8 a.m. or after 9 p.m.  They may not harass you by
using threats of violence or arrest or by using obscene language.  Collectors may not
use false or misleading statements or call you at work if they know or have reason to
know that you may not receive personal calls at work.  For the most part, collectors may

ICL 3631298_1.docx       SAN DIEGO  |  COA                    EMPIRE

August 17, 2018
Page 2 of 2
Jamie L. Gallian

not tell another person, other than your attorney or spouse, about your debt.  Collectors
may contact another person to confirm your location or enforce a judgment.  For more
information about debt collection activities, you may contact the Federal Trade
Commission at 1-877-FTC-HELP or www.ftc.gov.

Very truly yours,

EPSTEN GRINNELL & HOWELL, APC

Debora M. Zumwalt

DMZ: omc

Enclosure: Account History

# HUNTINGTON BEACH GABLES

38760 Sky Canyon Drive Suite C

Murrieta, CA 92563

Jamie Gallian
4476 Alderport
Huntington Beach, CA 92649

**Property Address:** 4476 Alderport
**Account #:**   21776

| Code | Date | Amount | Balance | Check# | Memo |
|---|---|---|---|---|---|
| Assessment | 4/1/2017 | 316.00 | 316.00 | | MONTHLY ASSESSMENT |
| Late Fee | 4/16/2017 | 10.00 | 326.00 | | |
| Assessment | 5/1/2017 | 316.00 | 642.00 | | MONTHLY ASSESSMENT |
| Payment - Mutual of Omaha | 5/1/2017 | -632.00 | 10.00 | 5697 | RBCCABLB20170501.dat |
| Payment - Mutual of Omaha | 5/16/2017 | -316.00 | -306.00 | 5745 | RBCCABLB20170516.dat |
| Assessment | 6/1/2017 | 316.00 | 10.00 | | MONTHLY ASSESSMENT |
| Payment - Mutual of Omaha | 6/5/2017 | -316.00 | -306.00 | 5731 | RBCCABLB20170605.dat |
| Assessment | 7/1/2017 | 316.00 | 10.00 | | MONTHLY ASSESSMENT |
| Payment - Mutual of Omaha | 7/3/2017 | -316.00 | -306.00 | 5762 | RBCCABLB20170703.dat |
| Payment - Mutual of Omaha | 7/13/2017 | -80.00 | -386.00 | 5787 | RBCCABLB20170713.dat |
| Assessment | 8/1/2017 | 316.00 | -70.00 | | MONTHLY ASSESSMENT |
| Assessment | 9/1/2017 | 316.00 | 246.00 | | MONTHLY ASSESSMENT |
| Assessment | 10/1/2017 | 316.00 | 562.00 | | MONTHLY ASSESSMENT |
| Payment - Mutual of Omaha | 10/3/2017 | -316.00 | 246.00 | 5810 | rcvd 9/1/17 |
| Assessment | 11/1/2017 | 316.00 | 562.00 | | MONTHLY ASSESSMENT |
| Payment - Mutual of Omaha | 11/1/2017 | -316.00 | 246.00 | 5829 | CK#5829 RCVD 10/6/17 |
| Payment - Mutual of Omaha | 11/6/2017 | -316.00 | -70.00 | 5845 | RBCCABLB20171106.dat |
| Assessment | 12/1/2017 | 316.00 | 246.00 | | MONTHLY ASSESSMENT |
| Payment - Mutual of Omaha | 12/11/2017 | -316.00 | -70.00 | 5867 | RBCCABLB20171211.dat |
| Assessment | 1/1/2018 | 316.00 | 246.00 | | MONTHLY ASSESSMENT |
| Payment - Mutual of Omaha | 1/8/2018 | -316.00 | -70.00 | 5884 | RBCCABLB20180108.dat |
| Assessment | 2/1/2018 | 316.00 | 246.00 | | MONTHLY ASSESSMENT |
| Late Fee | 2/16/2018 | 10.00 | 256.00 | | |
| Payment - Mutual of Omaha | 2/20/2018 | -316.00 | -60.00 | 5891 | RBCCABLB20180220.dat |
| Special Assessment | 2/20/2018 | 5,300.50 | 5,240.50 | | SPECIAL ASSESSMENT |
| Assessment | 3/1/2018 | 316.00 | 5,556.50 | | MONTHLY ASSESSMENT |
| Late Fee | 3/16/2018 | 10.00 | 5,566.50 | | |
| Payment - Mutual of Omaha | 3/19/2018 | -316.00 | 5,250.50 | 5921 | RBCCABLB20180319.dat |
| Assessment | 4/1/2018 | 316.00 | 5,566.50 | | MONTHLY ASSESSMENT |
| Payment - Mutual of Omaha | 4/13/2018 | -316.00 | 5,250.50 | 5932 | RBCCABLB20180413.dat |
| Special Assessment | 5/1/2018 | 189.60 | 5,440.10 | | SPECIAL ASSESSMENT |
| Assessment | 5/1/2018 | 316.00 | 5,756.10 | | MONTHLY ASSESSMENT |
| Payment - Mutual of Omaha | 5/16/2018 | -316.00 | 5,440.10 | 5947 | RBCCABLB20180516.dat |
| Late Fee | 5/16/2018 | 10.00 | 5,450.10 | | |

---

Elite Management | 38760 Sky Canyon Drive Suite C | Murrieta, CA 92563 | (951) 699-1220

**Make check payable to: HUNTINGTON BEACH GABLES**

8/15/2018

Page 1 of 2

JASSO DECL. PAGE - 0476

# HUNTINGTON BEACH GABLES

### 38760 Sky Canyon Drive Suite C
### Murrieta, CA 92563

| Code | Date | Amount | Balance | Check# | Memo |
|------|------|--------|---------|--------|------|
| Assessment | 6/1/2018 | 316.00 | 5,766.10 | | MONTHLY ASSESSMENT |
| Late Fee | 6/16/2018 | 10.00 | 5,776.10 | | |
| Payment - Mutual of Omaha | 6/18/2018 | -316.00 | 5,460.10 | 5965 | RBCCABLB20180618.dat |
| Payment - Mutual of Omaha | 6/25/2018 | -189.00 | 5,271.10 | 5985 | RBCCABLB20180625.dat |
| Assessment | 7/1/2018 | 316.00 | 5,587.10 | | MONTHLY ASSESSMENT |
| Payment - Mutual of Omaha | 7/9/2018 | -316.00 | 5,271.10 | 5980 | RBCCABLB20180709.dat |
| Assessment | 8/1/2018 | 316.00 | 5,587.10 | | MONTHLY ASSESSMENT |
| Payment - Mutual of Omaha | 8/13/2018 | -316.00 | 5,271.10 | 5995 | RBCCABLB20180813.dat |
| Legal Fees | | 175.00 | 5,446.10 | | |

Elite Management | 38760 Sky Canyon Drive Suite C | Murrieta, CA 92563 | (951) 699-1220
**Make check payable to: HUNTINGTON BEACH GABLES**

8/15/2018

Page 2 of 2

JASSO DECL. PAGE - 0477

# EXHIBIT 14

# Epsten Grinnell & Howell, APC
Attorneys at Law

Respond to: San Diego office

www.epsten.com
800.300.1704

June 7, 2017

**Re:   Huntington Beach Gables Homeowners Association v. Bradley, et al.**
Orange County Superior Court Case No.30-2017-00913985-CU-CO-CJC

To whom it may concern:

The law firm of Epsten Grinnell & Howell, APC represents the Huntington Beach Gables Homeowners Association. On April 11, 2017, the Association filed a lawsuit in Orange County Superior Court (Case No. 30-2017-00913985-CU-CO-CJC) against Jamie Gallian and Sandra Bradley for injunctive relief. The pending lawsuit alleges breach of the governing documents and nuisance against the defendants related to unauthorized architectural modifications.

**The purpose of this letter is to provide general information regarding the above-referenced litigation. Neither the Association, its Board of Directors, nor its agents provide this notice with the intent to advise any unit owner regarding his/her disclosure obligations in selling his/her unit, in obtaining refinancing, or for any other purpose. All unit owners should consult with their real estate agent, loan broker, personal attorney, and/or other appropriate professional with respect to such matters.**

The court file is considered public information and those members who would like more information about the above-referenced matter may view the court files located in the Clerk's Office of the Orange County Superior Court, Central Justice Center, located at 700 Civic Center Drive, West Santa Ana, CA 92701 or on the Orange County Superior Court's website at www.occourts.org. Please do not contact the Association's attorneys, Board, or management for information regarding this lawsuit. We will not be able to discuss this matter with individual owners due to the attorney/client privilege.

Sincerely,

EPSTEN GRINNELL & HOWELL, APC

Pejman D. Kharrazian

PDK / jh

3228809v1

**San Diego**
10200 Willow Creek Rd., Suite 100
San Diego, California 92131
858.527.0111 ▫ fax 858.527.1531

JASSO DECL. PAGE - 0479

**Inland Empire**
43460 Ridge Park Dr., Suite 200
Temecula, California 92590
800.300.1704 ▫ fax 858.527.1531



Respond to: San Diego office

www.epsten.com
1.800.300.1704

July 2, 2018

**Re:** **Huntington Beach Gables Homeowners Association v. Gallian**
Orange County Superior Court Case No. 30-2017-00913985-CU-CO-CJC
Orange County Superior Court Case No. 30-2017-00962999-CU-HR-CJC

To Whom It May Concern:

The law firm of Epsten Grinnell & Howell, APC represents the Huntington Beach Gables Homeowners Association. Previously, we informed you of the Association's above-referenced lawsuit against Jamie Gallian and Sandra Bradley for injunctive relief. In October 2017, the Association settled its lawsuit with Ms. Bradley. In March 2018, the Association agreed to a settlement with Ms. Gallian. A court hearing is set on July 19, 2018 regarding the status of the settlement with Ms. Gallian.

Additionally, on December 22, 2017, a Temporary Restraining Order re Workplace Violence was issued by the Court in Orange County Superior Court Case No. 30-2017-00962999-CU-HR-CJC against Ms. Gallian. The hearing on whether this will become a permanent order is currently scheduled for August 15, 2018.

The purpose of this letter is to provide general information regarding the above-referenced litigation. Neither the Association, its Board of Directors, nor its agents provide this notice with the intent to advise any unit owner regarding his/her disclosure obligations in selling his/her unit, in obtaining refinancing, or for any other purpose. All unit owners should consult with their real estate agent, loan broker, personal attorney, and/or other appropriate professional with respect to such matters.

**These court files are considered public information and those members who would like more information about the above-referenced matters may view the court files** located in the Clerk's Office of the Orange County Superior Court, Central Justice Center, located at 700 Civic Center Drive, West Santa Ana, CA 92701 or on the Orange County Superior Court's website at www.occourts.org. Please do not contact the Association's attorneys, Board, or management for information regarding these lawsuits. We will not be able to discuss these matters with individual owners due to the attorney/client privilege.

Sincerely,

EPSTEN GRINNELL & HOWELL, APC

Pejman D. Kharrazian

PDK/jac

3595777v1

**San Diego**
10200 Willow Creek Rd., Suite 100
San Diego, CA 92131
1.858.527.0111 • fax 1.858.527.1531

**Inland Empire**
43460 Ridge Park Dr., Suite 200
Temecula, CA 92590
1.951.461.1181 • fax 1.858.527.1531

**Epsten Grinnell&Howell**
Attorneys at Law

*Respond to: San Diego office*

www.epsten.com
1.800.300.1704

August 29, 2018

**Re:** **Huntington Beach Gables Homeowners Association v. Gallian**
Orange County Superior Court Case No. 30-2017-00913985-CU-CO-CJC
Orange County Superior Court Case No. 30-2017-00962999-CU-HR-CJC

To Whom It May Concern:

The law firm of Epsten Grinnell & Howell, APC represents the Huntington Beach Gables Homeowners Association. Previously, we informed you of the Association's above-referenced lawsuit against Jamie Gallian and Sandra Bradley for injunctive relief. In October 2017, the Association settled its lawsuit with Ms. Bradley. The Association's lawsuit against Ms. Gallian is scheduled to begin trial on December 10, 2018.

Additionally, on December 22, 2017, a Temporary Restraining Order re Workplace Violence was issued by the Court in Orange County Superior Court Case No. 30-2017-00962999-CU-HR-CJC against Ms. Gallian. The hearing on whether this will become a permanent order is currently scheduled for August 31, 2018.

The purpose of this letter is to provide general information regarding the above-referenced litigation. Neither the Association, its Board of Directors, nor its agents provide this notice with the intent to advise any unit owner regarding his/her disclosure obligations in selling his/her unit, in obtaining refinancing, or for any other purpose. All unit owners should consult with their real estate agent, loan broker, personal attorney, and/or other appropriate professional with respect to such matters.

**These court files are considered public information and those members who would like more information about the above-referenced matters may view the court files** located in the Clerk's Office of the Orange County Superior Court, Central Justice Center, located at 700 Civic Center Drive, West Santa Ana, CA 92701 or on the Orange County Superior Court's website at www.occourts.org. Please do not contact the Association's attorneys, Board, or management for information regarding these lawsuits. We will not be able to discuss these matters with individual owners due to the attorney/client privilege.

Sincerely,

EPSTEN GRINNELL & HOWELL, APC

Joyce J. Kapsal

/jjk

3595777v1

**San Diego**
10200 Willow Creek Rd., Suite 100
San Diego, CA 92131
1.858.527.0111 · fax 1.858.527.1531

**Coachella Valley**
74830 Highway 111, Suite 100
Indian Wells, CA 92210
1.760.836.1036 · fax 1.760.836.1040

**Inland Empire**
43460 Ridge Park Dr., Suite 200
Temecula, CA 92590
1.951.461.1181 · fax 1.858.527.1531

# Epsten Grinnell & Howell APC
### Attorneys at Law

Respond to:  *San Diego office*

www.epsten.com
1.800.300.1704

February 27, 2019

**Re:**    **Huntington Beach Gables Homeowners Association v. Gallian**
Orange County Superior Court Case No. 30-2017-00913985-CU-CO-CJC
Orange County Superior Court Case No. 30-2017-00962999-CU-HR-CJC

To Whom It May Concern:

The law firm of Epsten Grinnell & Howell, APC represents the Huntington Beach Gables Homeowners Association.  Previously, we informed you of the Association's above-referenced lawsuit against Jamie Gallian and Sandra Bradley for injunctive relief.  In October 2017, the Association settled its lawsuit with Ms. Bradley.  Therefore, since October 2017, the Association's lawsuit has been solely against Ms. Gallian.  On February 13, 2019, the Court issued terminating sanctions against Ms. Gallian, including the striking of her answer, resulting in a default being entered against Ms. Gallian.

In a separate action filed against Ms. Gallian on December 22, 2017, the Association sought and obtained a Workplace Violence Temporary Restraining Order against Ms. Gallian, which is still in effect. The hearing on whether this will become a permanent order is currently scheduled for May 3, 2019.

The purpose of this letter is to provide general information regarding the above-referenced litigation.  Neither the Association, its Board of Directors, nor its agents provide this notice with the intent to advise any unit owner regarding his/her disclosure obligations in selling his/her unit, in obtaining refinancing, or for any other purpose.  All unit owners should consult with their real estate agent, loan broker, personal attorney, and/or other appropriate professional with respect to such matters.

**The court files are considered public information and those members who would like more information about the above-referenced matters may view the court files** located in the Clerk's Office of the Orange County Superior Court, Central Justice Center, located at 700 Civic Center Drive, West Santa Ana, CA 92701, or on the Orange County Superior Court's website at www.occourts.org.  Please do not contact the Association's attorneys, Board, or management for information regarding these lawsuits. We will not be able to discuss these matters with individual owners due to the attorney/client privilege.

Sincerely,

EPSTEN GRINNELL & HOWELL, APC

Pejman D. Kharrazian, Esq.

/pdk

3788830v1

**San Diego**
10200 Willow Creek Rd., Suite 100
San Diego, CA 92131
1.858.527.0111 • fax 1.858.527.1531

**Coachella Valley**
74830 Highway 111, Suite 100

**Inland Empire**
43460 Ridge Park Dr., Suite 200
Temecula, CA 92590
1.951.461.1181 • fax 1.858.527.1531