# EXHIBIT 15

## FW: Demand Letter; Huntington Beach Gables 4476 Alderport Drive Huntington Beach

From:  Linn Joslyn (linn@elitemanagement.com)

To:  j9_jasso@yahoo.com

Date:  Thursday, November 1, 2018, 05:26 PM PDT

FYI

Linn Joslyn, CMCA®

Community Manager

38760 Sky Canyon Drive, Suite C
Murrieta, CA 92563
Phone (951) 699-1220 / Fax (951) 699-1661

linn@elitemanagement.com

http://www.elitemanagement.com

PLEASE NOTE I AM IN THE OFFICE TUESDAY – THURSDAY, EMAILS WILL BE RETURNED ON THOSE DAYS

THANK YOU

*Accredited Association Management Company (AAMC)®*



**Follow us on our social media:**



Confidentiality Notice and Disclaimer

This transmission is intended only of the use of the individual or entity to which it is addressed and may contain information that is privileged and confidential. If the reader of this message is not the intended recipient then you are hereby notified that any disclosure, distribution, or copying of this information is

strictly prohibited. If you have received this transmission in error then please notify us immediately by telephone or fax.

---

**From:** Jamie Gallian [mailto:jamiegallian@gmail.com]
**Sent:** Thursday, November 01, 2018 5:00 PM
**To:** Pejman D. Kharrazian <pkharrazian@epsten.com>; Linn Joslyn <linn@elitemanagement.com>
**Cc:** Jessica Kaller <jessica@elitemanagement.com>
**Subject:** Re: Demand Letter; Huntington Beach Gables 4476 Alderport Drive Huntington Beach

Jessica,

Please send a final statement to 5782 Pinon Drive, Huntington Beach, CA 92649

Jamie Gallian

> On Nov 1, 2018, at 4:51 PM, Jamie Gallian <jamiegallian@gmail.com> wrote:

Cheryl,

I wanted to take a moment and thank you for diligently trying to obtain the Associations cooperation in the sale of my home.

My buyer was impatient and a very savvy investor.  The buyer was no longer accepting anymore of the Associations delay tactics nor the attorneys excuses for not providing the DEMAND letter

and the documents requested.

The court was notified today about the Association's delay in not responding to your Demand Notice.

The house was sold.

Sincerely,

Jamie Gallian

On Oct 31, 2018, at 1:10 AM, Jamie Gallian <jamiegallian@gmail.com> wrote:

Begin forwarded message:

**From:** Jamie Gallian <jamiegallian@gmail.com>

**Subject: Fwd: Huntington Beach Gables vs Gallian**

**Date:** October 31, 2018 at 12:57:23 AM PDT

**To:** "Pejman D. Kharrazian" <pkharrazian@epsten.com>, linn Gables Mgr <linn@elitemanagement.com>

Mr. Kharrazian

Ms. Joslyn

On October 22, 2018, Eminence Escrow Inc. sent a Demand Letter Request to Elite Management in regards to 4476 Alderport Drive Unit 53.

A money order was enclosed in the amount of $250.00, representing $90.00 for the DEMAND, $120.00 for 1-day response rush, $20.00 for 12 months of Association Minutes and $20.00 for litigation disclosures via Fed-EX to Elite Management.   As of October 30, 2018, you have not acted in "Good Faith" by properly returning the documents paid for in Good Faith.

A money order in the amount of $326.00 was also enclosed
representing Association Monthly Dues of $316,00 in addition to
the $10.00 late fee.

Additionally, Ms. Kapsul has past inaccurate information to the
Escrow Company concerning a previous buyer.  Ms, Kapsul also
used the excuse she was on vacation.  Since Ms. Kapsul does not
work for Elite Management, it is inappropriate to interfere with the
Demand Letter and the additional documents requested and paid
for.

Sincerely,


Jamie Gallian



Begin forwarded message:


**From:** Cheryl <cheryl@eminenceescrow.com>

**Subject: FW: Huntington Beach Gables vs
Gallian**

**Date:** October 30, 2018 at 3:13:21 PM PDT

**To:** Jamie Gallian <jamiegallian@gmail.com>



I will tell her to please proceed with the
demand


# Cheryl L. Shoats

## Escrow Officer/Manager



# Eminence Escrow Inc.

11125 Knott Avenue Suite E

Cypress, CA  90630

714-786-4411

714-894-1599 Fax

---

**From:** Joyce J. Kapsal
<jkapsal@epsten.com>
**Sent:** Monday, October 29, 2018 3:40 PM
**To:** Cheryl <cheryl@eminenceescrow.com>
**Cc:** Pejman D. Kharrazian
<pkharrazian@epsten.com>; Gordon G. May
(ggm@ggb-law.com) < ggm@ggb-law.com>
**Subject:** RE: Huntington Beach Gables vs
Gallian

Hello Cheryl,

I was on vacation and apologize for the delay
in responding to you.  We were in court with
Ms. Gallian on Friday, October 26, 2018.
When we inquired about the pending escrow,
she informed us that her seller backed out due
to the litigation.  Please advise as to the status
of the escrow.  Thanks.

Joyce

**Joyce J. Kapsal**
**Attorney at Law**
10200 Willow Creek Road, Suite 100 | San Diego,
CA 92131
Phone: 1.858.527.0111 | Fax: 1.858.527.1531 |
www.epsten.com



This message contains information which may be confidential or legally privileged. Unless you are the addressee (or are authorized to receive e-mail for the addressee), you may not use, copy or disclose to anyone the message or any information contained in the message or any attachment. If you have received the message in error, please advise the sender by reply e-mail and delete the message and any attachments and destroy all hard copies. Thank you.

Federal Law Disclosure – If you are a person receiving this email communication in relation to a debt you owe, please be advised of the following, as required by Federal law: **This communication is from a debt collector and is an attempt to collect a debt. Any information obtained will be used for that purpose.**

**From:** Cheryl [mailto:cheryl@eminenceescrow.com]
**Sent:** Thursday, October 25, 2018 12:46 PM
**To:** Joyce J. Kapsal
**Subject:** Huntington Beach Gables vs Gallian

I just wanted to get status on our escrow demand request that was sent over to the management company.  Ms Gallian had paid a $120 1 day turnaround fee so she is inquiring if we will get the demand today?  Please advise so I can let her know.

Thanks so much for your help!!

Cheryl L. Shoats

Escrow Officer/Manager



Eminence Escrow Inc.

11125 Knott Avenue Suite E

Cypress, CA  90630

714-786-4411

714-894-1599 Fax

# EXHIBIT 16

SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF ORANGE-CENTRAL JUSTICE CENTER


RANDALL NICKEL, an individual, )
                               )
            Plaintiff,         )
                               )
            -vs-               )
                               )Case No.
THE HUNTINGTON BEACH GABLES    )30-2020-01163055
HOMEOWNERS ASSOCIATION, a      )CU-OR-CJC
California corporation; et al.,)
                               )
            Defendants.        )
_____ )
THE HUNTINGTON BEACH GABLES    )
HOMEOWNERS ASSOCIATION, a      )
California nonprofit mutual    )
benefit corporation'           )
                               )
            Cross-Complaint.   )
_____ )


DEPOSITION OF RANDALL NICKEL

Taken on Tuesday, March 16, 2021, at 10:44 A.M.


REPORTED BY:

AMY M. LEMACKS

CSR NO. 13425

1

```
 1          SUPERIOR COURT OF THE STATE OF CALIFORNIA
 2        FOR THE COUNTY OF ORANGE-CENTRAL JUSTICE CENTER
 3
 4   RANDALL NICKEL, an individual, )
                                    )
 5          Plaintiff,             )
                                    )
 6             -vs-                 )
                                    )Case No.
 7   THE HUNTINGTON BEACH GABLES    )30-2020-01163055
     HOMEOWNERS ASSOCIATION, a      )CU-OR-CJC
 8   California corporation; et al.,)
                                    )
 9          Defendants.            )
     _____)
10   THE HUNTINGTON BEACH GABLES    )
     HOMEOWNERS ASSOCIATION, a      )
11   California nonprofit mutual    )
     benefit corporation'          )
12                                  )
            Cross-Complaint.       )
13   _____)
14
15
16
17
18
19
20
21       Deposition of RANDALL NICKEL, taken on behalf of
22   the Cross-Complainant, at 10:44 A.M., Tuesday,
23   March 16, 2021, before Amy M. Lemacks, CSR #13425, as
24   a Certified Shorthand Reporter within and for the
25   County of Los Angeles, State of California, via Zoom.
```

2

1  APPEARANCES

2  For the Plaintiff/Cross-Defendant RANDALL NICKEL:

3      THE MELLOR LAW FIRM
       BY:  Mark A. Mellor, Esq.
4      6800 Indiana Avenue, Suite 220
       Riverside, California 92506
5      (951) 221-4744
       mmellor@mellorlawfirm.com
6
    For the Defendants/Cross-Complainants THE HUNTINGTON
7   BEACH GABLES HOMEOWNERS ASSOCIATION; JANINE JASSO;
    LEE GRAGNANO; TED PHILLIPS; LINDY BECK; JENNIFER
8   PAULLIN; LORI BURRETT; NATIONWIDE RECONVEYANCE, LLC;
    SUPERIOR DEFAULT SERVICES INC.:
9
       FELDSOTT & LEE, APC
10     BY:  Stanley Feldsott, Esq.
            Michael Poole
11          Austin Nichter
       23161 Mill Creek Drive, Suite 300
12     Laguna Hills, California 92653
       (949) 729-8002
13     feldsott@gmail.com

14

15  For RANCHO BERNARDO dba ELITE COMMUNITY MANAGEMENT:

16     GORDON, REES, SCULLY MANSUKHANI
       BY:  Audette Paul Morales, Esq.
17     5 Park Plaza, Suite 1100
       Irvine, California 92614
18     (949) 255-6950
       amorales@grsm.com
19
    In Pro Per:
20
       Jamie L. Gallian
21     16222 Monterey Lane, #376
       Huntington Beach, California 92649
22     jamiegallian@gmail.com

23

24

25

3

**Nickel, Randall**
**Nickel v. The Huntington Beach Gables HOA**

```
 1                         INDEX
 2    Examination                                  Page
 3    Mr. Feldsott                               5, 108
 4    Ms. Morales                                    68
 5
 6
 7                       EXHIBITS
 8    Number            Description               Page
 9                   (None offered.)
10
11
12
13                UNANSWERED QUESTIONS
14               Page        Line
15               88          10
16
17
18
19
20
21
22
23
24
25
```

4

```
 1                Tuesday, March 16, 2021

 2                        oo0oo

 3                    RANDALL NICKEL,

 4      was called as a witness, and having been first duly

 5        sworn by the Certified Shorthand Reporter, was

 6              examined and testified as follows:

 7

 8                       EXAMINATION

 9   BY MR. FELDSOTT:

10      Q    Mr. Nickel, have you ever had your

11   deposition taken before?

12      A    No.

13      Q    Okay.  I'm assuming you've had an

14   opportunity to have some discussion with your

15   attorney about what a deposition is?

16      A    Yes.

17      Q    Okay.  Let me make a few preparatory

18   remarks, some of these your attorney may have covered

19   with you, some of these we like to have in the

20   record, and some of these I've just been doing for 40

21   years and the reason escapes me at this point.

22      A    Okay.

23      Q    The court reporter has administered the oath

24   to you, and although we're, I guess, electronically

25   meeting here somewhat informally, your testimony
```

5

1   carries with it the same solemnity as if you were

2   sitting in a courtroom right now testifying before a

3   judge or a jury.  It's under penalty of perjury.

4          At the conclusion of the oral portion of

5   these proceedings, you will receive in a number --

6   you'll receive a copy of your testimony where you'll

7   have an opportunity to review it, and you can make

8   any changes to your testimony that you might like.  I

9   should caution you that if you do make any changes,

10  at the time this matter comes to trial I'd have a

11  right to comment upon those.

12         Now, obviously, if you correct a spelling or

13  a punctuation that's not going to elicit a big

14  comment from me.  But if you change white to black or

15  never to always I might want to explore with you the

16  inconsistency in your testimony.

17         Now, we're going to go back talking about

18  events that occurred towards the end of 2018.  No one

19  expects you to have total recall, as nice as that

20  might be.  I don't want you to guess, but I am

21  entitled to your best recollection.  If you can give

22  an estimate, I'm entitled to that estimate.

23         Do you understand the difference between a

24  guess and an estimate?

25     A    Yes, I do.

6

1      Q      Okay.  Of course the reporter is, I think,

2    taking down what's being said.  It's very important

3    that we not speak at the same time.  She'll have a

4    terrible time trying to figure out who's saying what.

5    And so if you wait till I finish my question before

6    you start your answer, that will -- things will work

7    out a lot better.  We'll get a nice clean transcript.

8           This is not an endurance contest.  If, at

9    some point, you feel like you want to take a break,

10    just ask me.  I may want to just finish up a certain

11    line of questioning, but I will accommodate you as

12    much as possible.

13           What is your full name?

14      A      Randall Lee Nickel.

15      Q      And if, during the course of the deposition,

16    I ask a question and you don't understand the

17    question, just tell me you don't understand and I

18    will try and explain it to you.  If you answer the

19    question it will be assumed that, 1, you knew -- you

20    understood what the question was and that was the

21    question to which you were responding.

22           Do you understand that, sir?

23      A      I do.

24      Q      Okay.  Tell me a little bit about your

25    education starting with high school forward.

7

1        A     High school is a long time ago.

2        Q     **After high school did you go to -- have any**

3   **formal education?**

4        A     Yes.  I went to Orange Coast College,

5   University of South Carolina Utah, and University of

6   Alaska Juno.

7        Q     **Did you receive any degrees from any of**

8   **these institutions?**

9        A     No.  One semester short.

10       Q     **What is your current occupation?**

11       A     I'm make parts for antique cars.

12       Q     **And are these for specific people or you**

13  **have a store?**

14       A     I have an online store.

15       Q     **Pardon?**

16       A     I'm sorry.  I walked over you.  Go ahead.

17       Q     **That's okay.  Do you have a -- do you have a**

18  **store where you sell these parts?**

19       A     I have an online store, yes.

20       Q     **Now, in connection with your deposition we**

21  **had requested that you bring certain documents, and**

22  **you attorney did interpose objections to them.**

23             **Have you brought any documents?**

24       A     Some.

25       Q     **Okay.  On the request for documents looks**

8

1    **like nine categories -- there were -- will you tell**

2    **me which categories you brought documents for?**

3         MR. MELLOR:  We didn't bring any documents

4    responsive to the categories requested pursuant to

5    the notice of objections.  He was referring to the

6    copy of the First Amended Complaint that was filed

7    this morning.  Everybody should have received a copy

8    before the deposition, a courtesy copy by email, sent

9    first class mail as well.

10        MR. FELDSOTT:  Yeah.  We did just a few

11   minutes ago.

12   BY MR. FELDSOTT:

13   **Q    Okay.  So did you -- Mr. Nickel, did you**

14   **have an opportunity to see the documents that were we**

15   **requesting you bring?**

16   A    I'm not sure exactly what you're referring

17   to.  If you're referring to the paperwork that you

18   got this morning --

19   **Q    No.**

20   A    -- that's all I have -- then --

21   **Q    Okay.  I don't want to go on a chase for**

22   **documents that don't exist, and in the 19 categories**

23   **of documents some of them may not exist.  Okay?  So**

24   **my first question to you is did you ever see the list**

25   **of documents that were being requested that you bring**

9

1    to your deposition?

2          MR. MELLOR:  Mr. Nickel was given the notice

3    of deposition and document production to look at,

4    yes.

5          MR. FELDSOTT:  I was asking the deponent.

6    BY MR. FELDSOTT:

7       Q    Did you ever see the list of documents we

8    were requesting?

9       A    Yes.

10      Q    Okay.  Your attorney is sitting right there

11   with you next to you but off camera?  Pardon me?

12      A    Yes.  Yes, he is.

13      Q    Okay.  You purchased a home from

14   Ms. Gallian; is that correct?

15      A    Yes, sir.

16      Q    Did you take title in your own name or in

17   the name of some entity that you owned?

18      A    I tried to take it in my LLC, but I think it

19   was recorded in my name personally.

20      Q    Okay.  And so it's still in your name?

21      A    Yes, it is.

22      Q    When did you first meet Ms. Gallian?

23      A    October 30th, 2018.

24      Q    Are you related to her?

25      A    No.

10

1    Q    Either by blood or marriage?

2    A    Neither.

3    Q    Okay.  Prior to October 30th, 2018, you did

4    not know Ms. Gallian?

5    A    No, I did not.

6    Q    During the last three years -- I'm sorry.

7    Let me rephrase that.

8         Prior to 2019, in the last five years prior

9    to that date, had you purchased any other properties

10   in a planned development?

11   A    Yes, I had.

12   Q    Approximately how many?

13   A    Two.  In five years?

14   Q    Yes.

15   A    I believe it was two.

16   Q    Okay.  Were they both in planned

17   developments?

18   A    Yes.

19   Q    Okay.  What was the circumstances of you

20   meeting Ms. Gallian?

21   A    Talk to her about buying her property in the

22   Gables.

23   Q    Well, how did you -- did she have it listed

24   for sale?

25   A    Yes.

11

1       Q     And was this with a broker?

2       A     I believe my wife found it through Zillow or

3    Zillow.  However you want to pronounce it.

4       Q     Oh, Zillow.  So it was listed on Zillow?

5       A     Yes, it was.

6       Q     Okay.  And when did you see that listing for

7    the first time?

8       A     The 29th.  The 29th my wife found it and put

9    it on my desk.

10      Q     What's your wife's name?

11      A     June.

12      Q     Okay.  Does she have a real estate license

13   of any sort?

14      A     No.  She was a police officer.

15      Q     Okay.  So she brings you a listing on Zillow

16   on October 29th.

17            And did you call Ms. Gallian?

18      A     Yes, I did.

19      Q     And can you tell me, as best you can recall,

20   what you said to her, what she said to you?

21      A     In a synopsis, basically we'd like to come

22   by and look at your property, what's a good time?

23   That was it.

24      Q     Okay.  And did you go by and look?

25      A     Yes, we did.

12

1    Q    And when did you go by and look?

2    A    The following day.

3    Q    So that would have been on the 30th?

4    A    Correct.

5    Q    And besides you and your wife, did anyone

6  else go with you?

7    A    My daughter.  I called her on the way, see

8  if she was capable of stopping by since this was --

9  she was the one to be living there.

10   Q    Okay.  So you then went to the property on

11  the 29th or the 30th?  I'm sorry.

12   A    The 30th.

13   Q    Okay.  And how long were you there?

14   A    I'm guessing approximately six hours.

15   Q    Well, are you estimating six hours?  I don't

16  want you to guess.

17   A    To my knowledge.

18   Q    Pardon?

19   A    To the best of my knowledge, we were there

20  approximately six hours.

21   Q    Okay.  And what did you do during that six

22  hours?

23   A    Looked at property, walked around the

24  complex, looked at my daughter's eyes, see if she was

25  happy with being there.  There you go.

13

1    Q    Did you -- were you aware there was a

2    homeowner association?

3    A    Yes.

4    Q    And how were you aware of that fact?

5    A    We had been looking for property there

6    for -- since August.  So we were aware that there was

7    an HOA there.  We had bid on two other properties,

8    and my wife and my daughter liked this complex.  So

9    as a father I just wanted my daughter to be safe.  So

10   they liked it.  What would you do for your daughter?

11   Q    Well, this is your deposition.  You don't

12   get to ask me questions.

13   A    Fine.

14   Q    Things will go a lot smoother that way.

15        Did Ms. Gallian tell you why she was selling

16   the property?

17   A    Specifically she was very unhappy there, and

18   she had some neighbors that she did not like, you

19   know.

20   Q    Anything else?

21   A    Not really, no.

22   Q    Did she advise you she was in litigation

23   with the homeowner association?

24   A    I'm sorry.  Say again.

25   Q    Did she advise you at that time that she was

14

```
 1    involved in litigation with the homeowner

 2    association?

 3         A    No.  She was...

 4              MR. MELLOR:  Objection.

 5    BY MR. FELDSOTT:

 6         Q    Did you make a written offer to purchase the

 7    property?

 8         A    Yes, I did.  A written offer?  No.

 9         Q    Pardon me?  No written offer or written

10    offer?

11         A    Not at that point.  We came to an

12    agreement.

13         Q    This was an oral agreement?

14         A    Yes.

15         Q    Okay.  And what were the terms of that oral

16    agreement?

17         A    That I was -- I was just going to buy it

18    flat out straight away.

19         Q    Did you agree on a price?

20         A    Of course.

21         Q    What was the price?

22         A    I believe my estimation, the best I can

23    recall, is 379-.

24         Q    The other two properties you told me before

25    about that you purchased, did you go through an
```

15

1    escrow with these other properties?

2        A    I went through a real estate agent, yes.

3        Q    And did you request, on these other

4    properties now, did you ask information from the

5    homeowner association?

6        A    No.  That would be his job.

7        Q    Did you receive information about the

8    homeowner association from your broker in these other

9    two properties?

10        A    No.

11        Q    From anyone?

12        A    No.  And I don't recall any.

13        Q    Now, as I understand the situation, you met

14    Ms. Gallian for the first time on the 29th and on the

15    30th you purchased it from her; is that correct?

16        A    I met her on the 30th.  I talked to her on

17    the phone the 29th to set up the appointment.  I

18    bought the house the following day.

19        Q    That would have been on the 31st?

20        A    No.  The 30th I purchased the property.

21        Q    Okay.  And I think you told me you purchased

22    it for 379,000.

23            Was that all cash or was it being financed?

24    Exactly how was the 379- paid for?

25        A    Cashier's checks.

16

1      Q    And were these from lenders or was this

2  money you had in accounts?

3      A    Money in accounts.

4      Q    And so you produced cashier's checks in the

5  amounts of 379,000; is that correct?

6      A    That is correct.

7      Q    Okay.  Did you -- you know, what a

8  preliminary title report is?

9      A    Yes, I do.

10     Q    And did you order a preliminary title report

11 before paying over 379,000?

12     A    Ms. Gallian had all that paperwork in front

13 of her when I purchased the property.

14     Q    That wasn't my question, sir.  Did you --

15 pardon?

16     A    Go ahead.

17     Q    Did you request a preliminary title report

18 from a title company?

19     A    No, not at that time.

20     Q    Did Ms. Gallian give you any information as

21 to what encumbrances may have been against the

22 property?

23     A    No.  She -- I had asked her if there were

24 any liens or outstanding debts on the property, and I

25 was told, no, there weren't.

17

1    Q    Told by her?

2    A    Yes.

3    Q    Were you told by anyone else?

4    A    I went to my bank, one of my banks and asked

5    them while we were sitting there at the table, and

6    she got up and went to the restroom and I asked him

7    to run the title on it.  And he came back and said

8    it's clean.

9        And then the following day I called my

10   normal banker at Chase Bank, and I said is there any

11   liens on this property?  Is the title clean?  And he

12   called me back he said there was nothing on this

13   property.

14   Q    Okay.  The first banker you spoke to, what

15   bank was that with?

16   A    Chase.

17   Q    And who was it that you spoke to

18   initially?

19   A    The private client banker that was there at

20   the time.

21   Q    Did he have a name?

22   A    No, I do not recall.  They come and go.

23   Q    Okay.  So you have no recollection of who it

24   was you spoke to on -- at the bank your initial

25   conversation at the bank; correct?

18

1     A     No, I do not.  That is correct.

2     **Q     And did he pull a preliminary title report**

3   **for you?**

4     A     I'm not sure exactly what he did, but he did

5   what I asked him to do and came back with

6   paperwork.

7     **Q     And he gave that paperwork to you?**

8     A     I believe he did.

9     **Q     Okay.  You did not bring that paperwork with**

10  **you today?**

11    A     No, I did not.

12          MR. FELDSOTT:  Excuse me one second.

13          (Telephonic interruption.)

14          MR. FELDSOTT:  I guess they really didn't

15  want to talk to me anyway.  Turning my phone off.

16  BY MR. FELDSOTT:

17    **Q     Okay.  So then you went back.  You moved on**

18  **me.  So then you went back the next day and you spoke**

19  **to -- I think you said your regular banker; is that**

20  **correct?**

21    A     That is correct.

22    **Q     And that's also at Chase?**

23    A     I called my normal banker at Chase.  He

24  turned me over to his real estate officer, and I

25  asked him to run title and get back to me.  And he

19

1  called me ten minutes later, told me that there are

2  no liens or judgments against this property at this

3  time.

4       Q   Okay.  What day was it that you went to your

5  normal banker?

6       A   31st.

7       Q   Okay.  And was that prior to you giving any

8  money to Ms. Gallian?

9       A   It was after the fact.

10      Q   So you'd already purchased the property?

11      A   That is correct.

12      Q   And the first banker you went to, had you

13  already purchased the property then too; is that

14  correct?

15      A   I'm sorry.  Say again.  I'm sorry.  I don't

16  understand your question.  Say again.

17      Q   Okay.  I think you told me that you

18  initially went to Chase and so it wasn't your regular

19  banker.

20          Do you recall that testimony?

21      A   I do.

22      Q   Okay.  Had you already, at that time, given

23  Ms. Gallian the $379,000?

24      A   No.

25      Q   Okay.  What was the date that you went to

20

1   your -- your regular banker, as you characterized

2   it?

3       A    31st.

4       Q    Okay.  And what was his name?

5       A    I want to say the real estate officer was

6   Gonzalez.  Something Gonzalez.  I do not recall

7   exactly.  They come and go too.

8       Q    Who was your regular banker, I think you

9   described him as?

10      A    Able Pyrosko is my normal banker, and he

11  turned me over to his real estate officer.  Able

12  Pyrosko had nothing to do with it.  I dealt with his

13  real estate agent, officer.

14      Q    At the bank?

15      A    At the bank.  At the bank.

16      Q    And was he a bank employee or mortgage

17  broker?

18      A    I believe he was a hired -- he was employed

19  by Chase.  Yeah.  He is in the same building as Chase

20  Bank, same office.  Therefore, employed by Chase

21  Bank.

22      Q    You're assuming he was employed by Chase

23  Bank or did he give you a card showing he wasn't a

24  Chase Bank employee?

25      A    I don't believe I asked for one.  I just

21

1    asked him to run a title report.

2        Q    Okay.  This was on -- after you had

3    purchased the property?

4        A    Yes.  All on one day.

5        Q    But you'd already paid the 379,000 to

6    Ms. Gallian?

7        A    Yes, I had.

8        Q    Did you ever purchased any other real

9    property like that?

10       A    No.  Not like that.

11       Q    Did you ask or did Ms. Gallian give you any

12   information about the association?

13       A    I do not recall.

14       Q    Did she give you any paperwork?  The

15   association's financial statements?

16       A    No.

17       Q    Did she tell you what the monthly

18   assessments were?

19       A    Yes.

20       Q    Did she -- did you ask her what was the

21   financial condition of the association?

22       A    No.

23       Q    Did you ask to see the most recent reserve

24   study for the association?

25       A    No.

22

1    Q    Did she make any statements to you about the

2    association's reserves accounts?

3    A    No.

4    Q    When you purchased your other two

5    properties, did you get information like that prior

6    to purchase?

7    A    I bought my previous two properties in South

8    Carolina from the buyer, from the builder.  From the

9    builder in his office.

10    Q    New homes in South Carolina?

11    A    Brand-new homes.  Brand-new complex.

12    Q    This was -- was this the first home that you

13    purchased in California?

14    A    No.

15    Q    How many other homes had you purchased in

16    California prior to the Gallian transaction?

17    A    In my lifetime?  Or is there a time span I

18    can look at?

19    Q    How about ten years?

20    A    Three.  That I can recall.

21    Q    Okay.  Do you recall approximately when

22    those homes were purchased?

23    A    Within the time span you just gave me.

24    Q    Well, would they have been within the last

25    five years?

23

1    A    One property in the last five years in

2  California.

3    **Q    Did that property goes through an escrow?**

4    A    I bought it through a real estate agent

5  on-site.  Yes.

6    **Q    And did the real estate agent provide you**

7  **with -- was there a homeowner association with that**

8  **property?**

9    A    Yes, there is.

10    **Q    And did the real estate agent provide you**

11  **with any information about the association?**

12    A    No, not really.  I've known the people up

13  there for many years.  So I knew a lot of them on a

14  first name basis.

15    **Q    So did you tell the broker don't -- were you**

16  **aware of the fact that under California law the**

17  **seller is required to provide the buyer with certain**

18  **information?**

19    A    I don't understand the question.

20    **Q    At the time you purchased this other home in**

21  **five years, were you aware of the fact that**

22  **California law required the seller to provide a**

23  **prospective purchaser with certain information?**

24    A    I'm not sure what certain information you're

25  referring to.  What --

24

1    **Q    Well, how about any information?**

2    A    Again, I don't understand your question.

3    Any information?  What pertinent information are you

4    referring to?

5    **Q    Well, how about the minutes for the last**

6    **year before the purchase of the board of directors**

7    **meetings?**

8    A    Board of directors is a friend of mine that

9    I've known for many years.  His mother was my real

10    estate agent who I'd known for many years.

11    **Q    And these people who you've known for many**

12    **years told you you don't need to know any information**

13    **about the association?**

14    A    They're both attorneys.  I trust them

15    both.

16    **Q    That's not what I asked you.  Did these two**

17    **people tell you, these good friends of yours told you**

18    **you don't need to know any information about the**

19    **association, they had looked at it?**

20    A    Of course not.  Of course not.

21    **Q    What -- did they provide you with the**

22    **reserve study?**

23    A    I don't remember them ever giving me any

24    reserve study of the HOA meetings, minutes.  All I

25    wanted to know is when are my dues and when do I get

25

1    my bills.

2         Q    That's what you told them.  They were both

3    attorneys, I think you said?

4         A    Yeah.  John's been an attorney and his mom

5    was too.

6         Q    Okay.

7         A    Both half way retired.  Working in a ski

8    resort now.

9         Q    And did they tell you that they had

10   investigated the association at all?

11        A    No.

12        Q    Were you at all curious as to whether the

13   association -- either one of these associations on

14   these two properties was involved in litigation?

15        A    I knew the Big Bear property was not

16   involved in any litigation or John would have told me

17   or his mother would have told me because I've been

18   friends of theirs for years.

19        Q    Okay.  Were they receiving a commission?

20        A    His mother did, yes, as a real agent.

21        Q    Okay.  That was Big Bear property.

22             The other property was located where?

23        A    The one we're here talking about at the time

24   now.

25        Q    No.  The -- the two you purchased prior to

26

```
 1   this one, the Big Bear and there was one another I

 2   think you told me.

 3       A    You asked me if I'd bought any properties

 4   within the last five years.  You narrowed it down

 5   from ten years to the five years.  In the last five

 6   years I've bought one property in the state of

 7   California.

 8       Q    Okay.

 9       A    Other than the one we're here to discuss.

10       Q    All right.  And did you have any

11   understanding as to whether the financial condition

12   of the association could impact you financially when

13   you purchased the property?

14       A    Are we talking about the one in Huntington

15   Beach now?

16       Q    Yes.

17       A    Okay.  Thank you.  No.

18       Q    Did you have any understanding were the

19   Huntington Beach association got its money?

20       A    From the HOA dues, I would have recalled.

21       Q    And who pays the HOA dues?

22       A    The homeowners.

23       Q    Okay.  Were you -- did you ask Ms. Gallian

24   what the HOA dues were?

25       A    Yes, I did.
```

27

1     Q    **And did she tell you?**

2     A    Yes, she did.

3     Q    **Did you ask her if the association was**

4  **involved in litigation at the time you paid this over**

5  **$379,000?**

6     A    Did I ask if the HOA was in litigation with

7  whom?

8     Q    **With anyone.**

9     A    No, I did not.

10     Q    **Was there some reason why you didn't ask?**

11     A    None.  I do not recall any at this time.

12     Q    **Okay.  Were you aware of the fact -- strike**

13  **that.**

14     **What common area amenities are at Huntington**

15  **Gables?  Is there a pool?**

16     A    Yes.

17     Q    **Is there a club house?**

18     A    I don't believe so.

19     Q    **Is there, like, a pergola or some sort of**

20  **covered patio area?**

21     A    I don't see any, no.  I don't believe so.

22     Q    **Are there green belts that the association**

23  **maintains?**

24     A    Yes.

25     Q    **Is it a gated community?**

28

1     A   Yes, it is.

2     **Q**   **And was it your understanding the**

3  **association maintained the streets?**

4     A   Yes.

5     **Q**   **Was it your understanding, at the time you**

6  **gave this money to Ms. Gallian, that associations**

7  **typically put aside money for long-term expenditures**

8  **like streets, pools?  That sort of thing.**

9     A   It would be the appointed officials jobs to

10  maintain some form of reserves, yes, I would imagine.

11     **Q**   **Okay.  And would you imagine that as a buyer**

12  **you'd have some responsibility to request the reserve**

13  **study?**

14     A   I would imagine, yes.  If I felt like it.

15     **Q**   **You didn't feel like it, though, did you?**

16  **Is that your testimony?**

17     A   At the time -- at the time, no, I did not.

18     **Q**   **Okay.  And were you aware of the fact that**

19  **associations can levy special assessments against the**

20  **owners?**

21     A   I'm sorry.  You broke up.  Say again.

22     **Q**   **At the time you made the purchase from**

23  **Ms. Gallian when you gave her the 379,000, were you**

24  **aware of the fact that -- it's gone right through**

25  **me -- that the association can levy special**

1    assessments against the members in addition to the

2    regular assessment?

3        A    I would imagine they acted like any other

4    HOA that I've had to deal with, yes.

5        Q    How many other HOAs have you had to deal

6    with?

7        A    What time span?  What time span and life

8    span?

9        Q    Your life span.

10       A    I'm 70 years old almost.  It's been a while.

11       Q    Good for you.  Can you give me an estimate

12   of the number of associations you've had to deal

13   with?

14       A    That I can think of off the top of my head

15   two, three.

16       Q    These are California associations we're

17   talking about, huh?

18       A    No.  You didn't ask me that.  You asked me

19   in my life span what HOAs have I dealt with.

20       Q    Okay.  I'm asking you now California HOAs.

21       A    This would have been my, I believe, third or

22   fourth.  I can recall maybe three or four.

23       Q    In California?

24       A    In California.

25       Q    Now, earlier on in your testimony you made

30

1    reference to you had an LLC.  You recall that?

2        A    I do.

3        Q    Do you still have that LLC?

4        A    I do.

5        Q    And what is the name of that entity?

6        A    R. Nickel Properties.

7        Q    And are you the general manager of R. Nickel

8    Properties?

9        A    I am.

10       Q    And does R. Nickel Properties buy and sell

11   real estate?

12       A    Do I buy and sell real estate?

13       Q    No.  I'm asking if R. Nickels Properties

14   buys and sells real estate?

15       A    Yes, it does.

16       Q    Okay.  Does it have any employees?

17       A    Just me.

18       Q    Just you.

19            Well, in the last five years, how many

20   properties has R. Nickel Properties purchased?

21       A    One, two, three -- four.  I can recall maybe

22   four.  Maybe five.

23       Q    Okay.  And these four or five properties

24   that it purchased, does it purchase them for

25   investment or resale?

31

1    A    Investments.

2    Q    **Okay.  And is it still holding title to**

3    **these four or five properties?**

4    A    I've sold the ones in South Carolina when my

5    son was deployed.  He wasn't sure if he was coming

6    back or not.  I sold one of them.  When he returned I

7    sold the other one.  I think the only one I have left

8    other than the one we're talking about in Huntington

9    Beach, I have the one in Big Bear.

10    Q    **Okay.  So it doesn't regularly trade in**

11    **buying and selling real estate property, for example,**

12    **in Orange County?**

13    A    No.  Other than I deal with Orange County.

14    Q    **Okay.  Do you have any other entities, LLCs,**

15    **partnerships, corporations that you're involved in**

16    **purchasing real estate property?**

17    A    No.

18    Q    **The four or five properties that were**

19    **purchased by R. Nickels Properties, any of those in**

20    **California other than the Big Bear property?**

21    A    The Huntington Beach place if I ever get it

22    into my LLC.  No.

23    Q    **Okay.  Were you aware of the fact that the**

24    **board of directors of Huntington Gables had employed**

25    **a management company?**

JASSO DECL. PAGE - 0523

1    A    Yes.

2         MR. MELLOR:  Vague as to time.

3         THE WITNESS:  Oh, yeah.

4         MR. FELDSOTT:  Pardon?

5         MR. MELLOR:  I said the question is vague

6    and ambiguous as to time.  Do you mean prior to the

7    purchase?  Do you mean after the purchase?  During

8    litigation?  What are you asking?

9    BY MR. FELDSOTT:

10        Q    Well, let's start with prior to the

11   purchase, were you aware there was a management

12   company?

13        A    No.

14        Q    At the time of the purchase, were you aware

15   there was a management company?

16        A    Yes.

17        Q    And how did you become aware of that?

18        A    I asked.

19        Q    And who did you ask?

20        A    Gallian.

21        Q    And what did she tell you?

22        A    Yes, there was.

23        Q    Did she tell you the name of the management

24   company?

25        A    Yes, she did.

33

1     Q     And what was the name she gave you?

2     A     Elite.

3     Q     Okay.  Did you, at any time prior to the

4  time you handed over the $379,000 to Ms. Gallian, did

5  you contact Elite Property Management?

6     A     No.

7     Q     Did you have any understanding about what

8  Elite Property Management did?

9     A     I was told that they just took care of the

10  properties that are on-site.  They maintained the

11  yards, made repairs outside of the common area.  I

12  did ask that.  Who's responsible for the swimming

13  pool?  Who's responsible for the streets?  When does

14  trash go out?  Yes, I did ask.

15     Q     Ms. Gallian?

16     A     I did.

17     Q     Did she tell you that you pay your monthly

18  assessments to the management company?

19     A     She did.

20     Q     At the time you were handing over this

21  $379,000, did you think it might be a good idea for

22  you to check with the management company?

23     A     No.

24     Q     Prior to your handing over this money, did

25  you think it might be a good idea, like the day

34

1    before, to check with the management company?

2        A    No.

3        Q    So the only thing you knew about the

4    management company was what Ms. Gallian told you?

5        A    At the time, correct.

6        Q    And did you, at some later time, learn

7    something else about the management company?

8        A    It was the following day Lee Gragnano, said

9    he was the president of the HOA, called me to tell

10    come me to the complex and wanted -- and asked me

11    questions about the transaction.

12        Q    Okay.  This, according to your testimony, is

13    a transaction that, from start to finish, was two

14    days; correct?

15        A    Yes.  Approximately, yes.

16        Q    Well, do you have a recollection it might

17    have been three days or four days?

18        A    The transaction, I believe, was done in one

19    day.

20        Q    When you say "the transaction" now you're

21    talking about the transfer of title and assignment of

22    the lease?

23        A    The transfer of title was taken care of

24    through the bank and was recorded in the recorder's

25    office that -- well, they don't record very quickly,

35

1  but it was -- I verified it had been recorded at the

2  city.  Is that what you're asking me?

3      Q    No.  I'm trying to first understand what you

4  referred to as "the transaction."  That's when you

5  gave Gallian some money and she gave you the deed to

6  the property?

7      A    What's your definition of "the transaction"?

8  I'm sorry.  I don't follow your question.

9      Q    I'm trying to get yours.

10     A    I'm trying to answer your question.

11     Q    Oh, well, I'm glad I'm amusing you.

12          You gave Ms. Gallian the money, 379,000; is

13  that correct?

14     A    That is correct.

15     Q    And at the time you gave her the money, did

16  she give you a deed to her property?

17     A    Yes, she did.

18     Q    And did she also give you an assignment of

19  the lease?

20     A    Yes, she did.

21     Q    And had you reviewed all these documents

22  before you concluded -- and I'm going to call the

23  transaction when you exchanged the money for the deed

24  and the assignment of lease?

25     A    I looked them over quickly, yes.

36

1      Q    Well, the 379,000 was not a lot of money to
2  you?
3      A    Of course it is.
4      Q    Did Ms. Gallian tell you she needed to close
5  by October 31st?
6      A    No, she did not.
7      Q    Whose idea was that?
8      A    I guess it's just the way the time flowed.
9      Q    So you see the property on the day before;
10 correct?
11     A    Correct.
12     Q    The next day you give her $379,000, and she
13 gives you the deed and the assignment of her lease;
14 is that correct?
15     A    That is correct.
16     Q    Okay.  When did you go to your banker, the
17 first banker you went to?
18     A    30th.
19     Q    About what time?
20     A    Five.
21     Q    Okay.  Then when did you go to your regular
22 banker?  About what time?
23     A    The following day.
24     Q    The following day.
25          Was it before or after you forked over the

JASSO DECL. PAGE - 0528

1   379-?

2        A    After the fact.

3        Q    Oh.  So you'd already given her the money,

4   you'd gotten the deed, you'd gotten the assignment of

5   rent, and then you went to see your regular banker is

6   that --

7        A    Yes.

8        Q    Do I have the timeline correct?

9        A    You do.

10       Q    Okay.  Prior to filing the original suit,

11  which was October 1, 2020, had you had any dealings

12  with the management company?

13       A    The management company?

14       Q    The management company.

15       A    I remember calling them and trying to get

16  the -- yes.  So yes.

17       Q    Okay.  You said trying to call them.

18            Did you call someone at the management

19  company?

20       A    I did.

21       Q    And what was the purpose of your call?

22       A    To set up my HOA payments, make sure they

23  knew I was the new owner, take care of paperwork.

24       Q    What paperwork?

25       A    Basically let them know I was the new owner.

JASSO DECL. PAGE - 0529

1    Q    Do you recall who you spoke to?

2    A    No.  They come and go.

3    Q    Apparently like bankers.

4    A    And others.

5    Q    Okay.  So from the time you purchased the

6    property from Ms. Gallian, you had a contact with the

7    management company to let them know you were the new

8    owner; correct?

9    A    I'm sorry.  Ask that question again.

10    Q    After you purchased the property from

11    Ms. Gallian, you contacted the management company for

12    the first time to let them know you were the new

13    owner?

14    A    That is correct.

15    Q    And you don't recall who you spoke to; is

16    that correct?

17    A    No.

18    Q    Well, that was badly phrased.

19         You do remember who you spoke to?

20    A    No, I do not recall who I spoke to.

21    Q    Okay.  And you recall what they told you?

22    A    That someone would get back to me.

23    Q    Did someone get back to you?

24    A    Never.

25    Q    Okay.  Did you have any other contact with

39

1     the management company?

2         A     Any contact?  No.  God knows I tried.

3         Q     Well, I don't know about God.

4               You tried and you had no other contact with

5     the management company; is that correct?

6         A     No other contact with the management

7     company.  They would not return my calls or my emails

8     or my snail mail.

9         Q     Okay.  And what was your understanding as to

10    who the management company worked for?

11        A     The HOA.

12        Q     And what was your understanding as to -- did

13    you ever -- strike that.

14              Did you ever ask to see the contract between

15    the association and the management company?

16        A     I think was two days later Gregnano came to

17    my door, and I asked him for those papers and he had

18    said that they'll get those for me.

19        Q     And who was this again?

20        A     A fellow named Lee Gregnano.

21        Q     Okay.

22        A     He contacted me almost the following day.

23        Q     And what papers were -- was it that you

24    wanted from Lee or that he was going to give you?

25        A     I wanted a statement from the HOA.  I wanted

JASSO DECL. PAGE - 0531

1   a statement from Elite Management, who I paid my dues

2   to how, much they were, and could I get a record of

3   last year's budget.

4        **Q    And why did you want to see last year's**

5   **budget?**

6        A    It seemed like a good idea.

7        **Q    Like a good idea that maybe it was something**

8   **you should see before you hand over 379,000?**

9        A    I'm not going to speculate on that.

10       **Q    I'm not asking retrospect.**

11            **You think it might have been a good idea?**

12       A    Yes, I suppose it might have been.

13       **Q    Okay.  Did the management company ever**

14   **provide any of those documents to you?**

15       A    Never.  Oh, let me take that back.  I think

16   about five months later.

17       **Q    Later after you purchased the property?**

18       A    It would be later.

19       **Q    Was it five months after you requested**

20   **that?**

21       A    That's correct.

22       **Q    By that I mean these documents.**

23            **And your request was a couple of days after**

24   **you gave Ms. Gallian the money?**

25       A    Two days later.

41

1      Q    Okay.  Do you have any agreement with

2   Ms. Gallian in terms of the right to reacquire this

3   property?  By "this property" I'm talking about the

4   one that's involved in the suit.

5      A    I'm sorry.  Are you asking if there was an

6   agreement between us for her to buy it back?

7      Q    Yes.

8      A    There was a verbal agreement that if there

9   was any trouble with the HOA that she would give me

10  the money back.  She had not cashed the cashier's

11  checks for weeks afterward because of that.

12     Q    Okay.  And how do you know that?

13     A    I guess I'm just one of those guys that

14  trust people sometimes.

15     Q    I mean, did she tell you she wouldn't cash

16  the checks or deposit them for weeks?

17     A    I believe that was the statement, yes.

18     Q    Did you ask her how many weeks?

19     A    I don't recall.

20     Q    Can you estimate?

21     A    I'd say a month.

22     Q    Okay.  And was that to give you an

23  opportunity during that month to do an investigation

24  of the association, its finances, and operation?

25     A    Yes.

42

1      Q    **Did you conduct an investigation?**

2      A    I didn't have to.  I had the HOA attorney,

3   Pejman, call me, and I had the HOA president come to

4   my door and give me paperwork as to the status of the

5   HOA and requirements they wanted of me to clean the

6   house up so they could continue with whatever they

7   needed to continue to change title at their end.

8          MR. FELDSOTT:  Okay.  So let me go back to

9   my question.  Ms. Reporter, could you read back my

10  question?

11         (Whereupon the record was read by the Court

12  Reporter.)

13  BY MR. FELDSOTT:

14     Q    **Did you conduct an investigation of the**

15  **association's financial condition during this month**

16  **period?  I'm sorry.**

17     A    I tried to get through to the management

18  company to request the paperwork, and I was stone

19  walled.  The president of the HOA came to my house

20  two days later, and I asked him for any statements,

21  including the budget from the previous year.  And he

22  just handed me a list of repairs that the HOA and

23  their attorney wanted fixed.

24     Q    **This was with respect to the home; is that**

25  **correct?**

43

1    A    Correct.

2    Q    The management company -- I'm trying to

3    understand what is the role of the management

4    company, as you understood it, at this time after you

5    paid over the 379,000?

6    A    I'm sorry.  I don't understand your

7    question.

8    Q    Oh.  Well, you paid over 379,000 to

9    Ms. Gallian.  What was your understanding of the

10    management company's duties with respect to you?

11    A    If they basically wanted to get paid their

12    dues, which is what they function under, I would

13    imagine they wanted to find out who was going to pay

14    the bills and who the owner of the property was.

15    That is what I tried to convey to Elite Management.

16    Q    And was it up to Elite to decide -- there

17    was a question as to whether you were, in fact, the

18    owner or whether the transaction was voidable.

19        You understand that, don't you?

20    A    I do.  Yes.

21    Q    And was it your understanding it was the

22    management company that decided whether your

23    transaction with Ms. Gallian was voidable and they

24    should correct it and should not recognize you as the

25    owner?

44

1          MR. MELLOR:  Calls for speculation.

2          THE WITNESS:  Yeah.  It's really

3    ambiguous.

4          MR. FELDSOTT:  Pardon?

5          MR. MELLOR:  Can you answer the question?

6          THE WITNESS:  I -- I don't even know how to

7    answer that question.  Like I said, the following

8    couple days later Gregnano came up and I asked him

9    for the same title report.  And I'm sorry I don't

10   know what you're asking me.

11   BY MR. FELDSOTT:

12       **Q    Oh, okay.  Gregnano, was he the president or**

13   **with the management company?**

14       A    He said is he was the president of the HOA

15   and welcome to our neighborhood.

16       **Q    Okay.  Did he tell you that the management**

17   **company -- that he worked for the management**

18   **company?**

19       A    No, he did not tell me he worked for the

20   management company.

21       **Q    Did he tell you that the management company**

22   **worked for the association?**

23       A    No, he did not.

24       **Q    Was it your understanding that the**

25   **management company works for the association?**

1        A     Yes.

2        Q     And what is it that the management company,

3    you believe, failed to do and should have done with

4    respect to you and your transaction with

5    Ms. Gallian?

6        A     Well, I think the first gesture would have

7    been to return my phone calls.

8        Q     Okay.

9        A     And when I did send them a written -- a

10   written request for HOA due statements, pass due and

11   due, I got nothing.

12       Q     Okay.

13       A     So nothing wrong with doing your job.

14       Q     And when the management company doesn't do

15   its job it answers to the board of directors, doesn't

16   it?  Is that your understanding?

17       A     I would imagine, yes.

18       Q     Other than any duties or obligations that

19   the association -- strike that-that -- the management

20   may have owed to the association, is there anything

21   wrongful that the management company did to you?

22       A     They did?  It's what they didn't do.

23       Q     I'm asking you what they -- did they do

24   anything that you believe was wrongful to you?

25              MR. MELLOR:  Calls for a legal conclusion.

46

1           THE WITNESS:  Yeah.

2           MR. FELDSOTT:  I should have the record

3    reflect that counsel was prompting the witness.

4           MR. MELLOR:  How do you figure?  I just made

5    an objection, Counsel, calls for a legal conclusion.

6    How is that prompting the witness?

7           MR. FELDSOTT:  Well, I would assume if you

8    were making an objection you'd make it so everyone

9    could hear it.

10          MR. MELLOR:  I did.

11          MS. MORALES:  I join.

12          MR. MELLOR:  You heard me.

13          MR. FELDSOTT:  Can you read back the

14   question, Ms. Reporter?

15          (Whereupon the record was read by the Court

16   Reporter.)

17          MR. MELLOR:  Calls for a legal conclusion.

18          MR. FELDSOTT:  Not his belief, Counsel.

19   And that's all right.

20   BY MR. FELDSOTT:

21      **Q    Can you answer that question?**

22      A    Did I think Elite Management did something

23   wrong to me or bad to me?  Is that what you're

24   asking?

25      **Q    Yeah.**

JASSO DECL. PAGE - 0538

1      A    And I answered not returning my phone calls,

2    and the only thing I've asked them to do is their

3    job.  Is that what you're asking me to answer?

4      **Q    Okay.  Well, are you telling me they didn't**

5    **return calls and they were supposed to return your**

6    **calls because of their contract with the association.**

7            **Is that your understanding?**

8      A    I was told by -- I was told by the president

9    of the association that made contact with Elite

10   Management.  And Lee Gregnano later told me that the

11   would take care of all that personally.

12   Especially -- especially when I told him that Gallian

13   was willing to give me my money back and void the

14   transaction.  They couldn't jump any higher or scream

15   any louder don't do that.

16     **Q    So it's your testimony you told Mr. Gregnano**

17   **that Gallian was willing to give you back your money,**

18   **and he said don't do that, don't take the money from**

19   **her?**

20     A    I think the phrasing was, Oh, my God, no.

21     **Q    Did you ask him why he said that?**

22     A    I said You must really dislike this woman.

23          And he says We are just so glad you are

24   here.

25          And then I introduced him to my family and

48

1    we went about our world.

2        Q    **During the 30-day period where you could get**

3    **your money back, is there anything you learned about**

4    **the association that --**

5        A    I knew --

6        Q    **-- that would cause you to --**

7        A    I'm sorry.

8        Q    **-- you to want to get your money back?**

9        A    When their attorney called me -- Pejman

10    called me and wanted to know who I was and we talked

11    for a better part of a half hour.  And I said I think

12    this whole thing is just a pile of and I just need to

13    end it.  And you could hear his entire staff in his

14    office say, no.  Even my -- I'm on speaker phone at

15    any office and my wife is there and she -- we both

16    laughed at his whole office.

17            He said the words, No, don't do that.

18    Because evidently there was.  At the time I realized

19    there was a problem between the HOA and Gallian.  And

20    I said, well, I'm going to back out of this deal.

21    And they were yelling over the phone Don't do that,

22    oh, my God, don't do that.

23        Q    **And this is the association's attorney?**

24        A    It is.  Or was.

25        Q    **Okay.  That was Lisa -- I can never say her**

49

1  last name?

2      A    Can't pronounce his name either.  His last

3  is Pejman, with a P.

4      Q    Yeah.  First name is Lisa with --

5      A    I don't know what the first name is.  It's a

6  fellow named Pejman.

7      Q    Oh, it's a fellow.  Okay.

8      A    He gave me his phone number for his home,

9  his cell phone, and his office.

10     Q    And this was all during this 30-day period

11 where you can get your money back?

12     A    Yep.

13     Q    And did you --

14     A    Yes.

15     Q    -- have any conversations with Ms. Gallian

16 concerning the association's reaction and what --

17     A    Yes.

18     Q    You did?

19     A    I'm sorry.  I'm waiting for you to finish

20 your question.  Yes.  Yes.  Of course I contacted

21 Gallian and said What's going on?

22     Q    What did she tell you?

23     A    Oh, I can't do verbatim.  I've never been

24 good at it.  There was a problem -- go ahead.

25     Q    The substance of what the -- what she told

50

1  **you and what you said to her.  I don't expect a total**
2  **recall.**
3       A    That there was a problem between her and the
4  existing board members of the HOA.
5       **Q    Did you ask her what the problem was?**
6       A    Of course I did.
7       **Q    And what did she tell you?**
8       A    She told me the story about the Jasso that
9  ran the placed.  A lady named Jasso something.  Jasso
10  and her husband had come over and physically
11  assaulted her and threw her to the ground, and there
12  was a lawsuit going on where she was suing Jasso and
13  her husband.
14            And I go What's that got to do with you and
15  me now?
16            And she said These people are just bitter.
17            So I said Why did this guy come over and
18  throw you to the ground?
19       **Q    What did she tell you?**
20       A    It was a personal thing.
21       **Q    Personal.  Usually is.**
22            **Did she say what the personal thing was?**
23       A    She said it was -- I don't recall really.
24  All the gist of the whole thing was that she had a
25  problem with Mrs. Jasso and that Mr. Jasso came over

51

1  to, quote, take care of the problem and ended up

2  throwing her to the ground.  She ended up in the

3  hospital.  He got cited and released, and it's still

4  in litigation for assault and battery.  Sounds like a

5  bad neighbor; right?

6      **Q    Maybe.**

7          **You were aware that there were**

8  **restraining -- she told you about the restraining**

9  **order that had been issued against her?**

10         MR. MELLOR:  Vague as to time.  Vague and

11  ambiguous.

12  BY MR. FELDSOTT:

13     **Q    Did she, at any time, ever tell you the**

14  **court had issued retraining orders against her?**

15     A    She didn't have to tell me.  The neighbors

16  did.

17     **Q    Who did?**

18     A    I remember a lady -- lady.  A woman came

19  over to the house and told my -- my daughter that

20  there were retraining orders on Gallian.  And she

21  seemed, according to my daughter, very agitated and

22  disturbed.

23         So I said Do you want to get out of this

24  deal, kid?  Let me know.

25     **Q    Okay.  When you say she was that -- you're**

52

1    **talking about your daughter?**

2        A    I asked my daughter if she wanted me to get

3    out of the deal.

4        **Q    Who seemed agitated and disturbed?**

5        A    The neighbor ladies.  Lady.

6        **Q    Does she have a name?**

7        A    I don't know her.

8        **Q    Okay.  And this -- this is all --**

9        A    Go ahead.

10       **Q    -- that 30-day period where you could give**

11   **her back the title and get your money back?**

12       A    That is correct.

13           MR. FELDSOTT:  It's five after 12:00.  Do we

14   want to take a half hour lunch break?

15           THE WITNESS:  No.

16           MR. FELDSOTT:  The reporter who's working --

17   why don't we take a half hour?

18           MR. MELLOR:  Can we take five minutes?

19           THE WITNESS:  How about five minutes?

20           MR. FELDSOTT:  Well, I'd like to have lunch.

21   I think the reporter needs a break.  And it's -- it's

22   not a -- it's not a voluntary thing.  We're going to

23   break.  It's five minutes after 12:00, and we'll pick

24   up at 12:30.

25           MR. MELLOR:  Okay.  Thanks, Stan.

1          MR. FELDSOT:  Okay.

2                    (Lunch recess.)

3    BY MR. FELDSOT:

4      Q    Other than the one LLC that you told me

5    about do you have any other business entities, LLCs,

6    corporations?

7      A    I have my real estate LLC and I have my

8    vintage rubber.  It's an S Corp.

9      Q    That's the redoing antiques -- your online

10   stuff?

11     A    Correct.

12     Q    Mr. Nickel, did you ever -- there's actually

13   two leasehold estates in addition to the fee title to

14   the building.  You took assessments of both those

15   leases along with your acquisition of the subject

16   property?

17     A    As I recall, yes.

18     Q    Did you ever advise the lessor?

19          MR. MELLOR:  Vague and ambiguous as to what.

20   BY MR. FELDSOT:

21     Q    As to what I was eating to lunch.  No.

22          Did you ever advise the lessor that you were

23   now the owner of this unit?

24     A    Yes.

25     Q    Pardon?

54

1      A      Yes, I did.

2      **Q      And did you receive anything back from**

3    **them?**

4      A      I don't recall any, no.

5      **Q      Other than being nonresponsive to your**

6    **request, did the management company for the homeowner**

7    **association ever do anything to you?**

8      A      Well, did they ever do anything to me?

9    Well, I asked them several times in the brief

10   conversations and emails I ever sent them to give me

11   statements as far as the previous owner had any debts

12   on their property, did she owe you anything, was

13   there any back dues or liens or judgments.

14          And they said, no, we don't have anything on

15   record at this time.  And I said, well, the previous

16   owner -- I said one thing she was doing was she was

17   going through an escrow when I bought this place and

18   she had overnighted a request from -- I'm talking

19   about Elite Management where Elite Management was

20   sent on overnight request and fees were transacted

21   and FedExed asking for a release from Elite

22   Management and a statement of last year or years --

23   whatever she requested.

24          And they dragged their feet, told us -- told

25   Jamie, the previous owner, that whoever handled that

1   paperwork was out of the office on vacation and that

2   could not be handled overnight.  So did they do

3   anything to me?  Yeah.

4       **Q    Now is this something Ms. Gallian requested**

5   **from the management company or did you request it?**

6       A    Both of us did.

7       **Q    Okay.  Before the -- you gave her the**

8   **379,000, did you request anything from the management**

9   **company?**

10      A    Myself personally, no.  She had tried to.

11      **Q    "She" being who?**

12      A    Gallian.  Jamie Gallian, previous owner.

13      **Q    And she told you she had tried to get**

14  **information from the management company?**

15      A    I have the canceled money order here in my

16  paperwork and I'm sure you do too.  Yes.

17      **Q    And when did that occur?**

18      A    When did she request it?

19      **Q    Yeah.**

20      A    A month before or just weeks before I bought

21  the place.  I think about a month before I bought my

22  place.  Otherwise, her escrow would have gone through

23  or fallen apart on its own merit.  But Elite

24  Management would not give us a release, and they were

25  paid to overnight it and they did not.  Then they --

56

1   then they put a notice on default on my property,

2   like -- what? -- two or three months later.

3       **Q    Was it your understanding that Elite**

4   **Management made the decision to put the notice of**

5   **default against your property?**

6       A    Either that or they were puppeted into that

7   position.

8       **Q    What do you mean by puppeted?**

9       A    Told by the management of the HOA.

10      **Q    Okay.  So it's your testimony that you**

11  **believe they were directed by the HOA to provide you**

12  **this information or provide Ms. Gallian --**

13          **(Simultaneous speakers.)**

14          MR. MELLOR:  Misstates the witness's

15  testimony.  I think he said either they did it on

16  their own or they were directed by the HOA.

17  BY MR. FELDSOTT:

18      **Q    Well, I'm asking him.**

19          **Is it your understanding that the management**

20  **company records notices of default on their own or at**

21  **the direction of the board?**

22      A    I would imagine both.  In this case after

23  dealing with some of the people on board of the HOA

24  there's no doubt in my mind.

25      **Q    That what?**

57

```
1       A    That they were holding up any notices of

2   sales of property, any notices of liens or judgments

3   against the property.  We pretty much have that

4   documented that they were holding up the transaction

5   to this property going to anybody.

6       Q    So you got me confused now.  Is it your

7   understanding that Ms. Gallian, prior to your giving

8   her the 379,000, requested certain documents from the

9   management company?

10      A    Absolutely.

11      Q    And do you know if she requested that in

12  writing?

13      A    Yes, she did.

14      Q    Did she give you a copy of that request?

15      A    Yes, she did.

16      Q    Okay.  And again, that's one of the

17  documents --

18      A    Yep.  It's attached to your complaint.

19      Q    Okay.  And do you recall the date of that

20  request?

21      A    I believe it was October -- mid-October

22  sometime.  I do not have that exact information on me

23  at this moment.

24      Q    Okay.

25      A    Plenty of time.
```

58

1     Q     So -- but that was before she even knew

2   about you; is that correct?

3     A     She was dealing with -- yes.

4     Q     Was there someone else she was going to sell

5   the property to?

6     A     Yes, there was.

7     Q     And who was that?

8     A     I haven't a clue.

9     Q     In connection with this sale, was this

10  person who you don't have a clue about that Gallian

11  had requested documents from the management

12  company?

13    A     Yes.

14    Q     And she told you she did and she requested

15  it in writing; correct?

16    A     I have those documents to prove that

17  statement, yes.

18    Q     Okay.  And then when you gave her the

19  379,000 to hold for a month, that was to give you

20  time to further investigate the problem -- the

21  property?

22    A     Sure.  Yeah.  If I had any problems or if I

23  found any problems, which, of course, I did not.

24    Q     Okay.  During that 30-day period, did you

25  get any of the financial statements from the

59

1    **association?**

2        A    I couldn't get anything from Elite

3    Management or the HOA.

4        **Q    Okay.**

5            MR. MELLOR:  I'm sorry.  Madam Court

6    Reporter, would you please repeat the question and

7    the answer.  I think I missed part of it.

8            (Whereupon the record was read by the Court

9    Reporter.)

10   BY MR. FELDSOTT:

11       **Q    So you had requested -- did request it in**

12   **writing from Elite Management, certain documents?**

13       A    I sure did.

14       **Q    What documents did you request?**

15       A    Basically what we've been talking about.

16   Any liens, judgments, titles.  I wanted to let them

17   know I'm the new guy in town and I want to find out

18   if there's anything on this property immediately.

19       **Q    Okay.  And this is during that 30-day**

20   **period; correct?**

21       A    That's the first day I owned the place.

22       **Q    Well, that's if you didn't cancel the**

23   **transaction and get your money back; correct?**

24       A    Correct.

25       **Q    Okay.  Let me try again.  Did you request in**

60

1    writing documents from Elite Management after you'd

2    paid the money during this 30-day period in which

3    Ms. Gallian was going to hold your checks?

4        A    Again, yes.

5        Q    Okay.  Did request copy of the CC&Rs?

6        A    I did.

7        Q    Did you request the last 12 month's worth of

8    board minutes?

9        A    I did.

10       Q    Did you request the most recent reserve

11   study?

12       A    No.

13       Q    Did you request financial statements of the

14   association?

15       A    I did.

16       Q    And you go the nothing; is that correct?

17       A    I got nothing.  I asked the president.  Go

18   ahead.

19       Q    Okay.  And you decided to go through with

20   the deal anyway; is that correct?

21       A    Yes, that is correct.

22       Q    Now, do you recall when -- and I realize

23   that there's now a -- an amended cross-complaint

24   filed.  The original -- I'm sorry -- amended

25   complaint.  The original complaint you filed, you

61

1    recall verifying that complaint?  Do you know what a

2    verification is on a complaint?

3            MR. MELLOR:  Verify the contents if true.

4            THE WITNESS:  Yeah.  That I verified the

5    contents as true?  Yeah.

6    BY MR. FELDSOTT:

7        Q    And you did that under penalty of perjury;

8    correct?

9        A    That is correct.

10       Q    And so you read the complaint over carefully

11   before you would sign something like that?

12       A    Absolutely, yes.

13       Q    Did you have any communications with

14   Ms. Gallian during this 30-day period and your

15   problems of obtaining information?

16       A    I did.

17       Q    Were these in writing or oral?

18       A    I think both of them were just over the

19   phone requests or she would call me and ask me did I

20   get that paperwork?  So maybe she had made the

21   request and still couldn't get statements from Elite

22   Management or the HOA because she said that she was

23   trying to get those statements for me.

24       Q    Did she tell you what she was trying to do

25   to get those statements?

62

1    A    I'm sorry.  Somebody's making a lot of

2  noise.  I can't hear you.

3    **Q    Did she tell you what she was doing to try**

4  **and get you that information?**

5    A    She said that she had contacted Elite

6  Management and the HOA board to try to get the

7  statements, whatever she was trying to get, released

8  to me and she could not.

9    **Q    Okay.**

10    MR. MELLOR:  Stan, not to interrupt your

11  flow, but I see somebody knew has joined us and I

12  don't know if that person's identified themself.  So

13  I'm what they are doing.

14    MR. FELDSOTT:  Well, I don't know who's new.

15    MR. MELLOR:  Somebody by the name of Austin

16  Nichter.

17    MR. NICHTER:  I've been here the whole time.

18  Maybe it doesn't show up in your row of people

19  because I haven't been talking.

20    MR. FELDSOTT:  Anyway he's one of the

21  attorneys that works here.

22    MR. MELLOR:  Oh, okay.  All right.

23  BY MR. FELDSOTT:

24    **Q    I notice the money was given to Ms. Gallian**

25  **on the two cashier's checks; is that correct?**

63

1     A    That is correct.

2     **Q    Why the two checks?**

3     A    There weren't enough funds in one to pay it.

4     **Q    Well, did Ms. Gallian go with you to the**

5 **bank or were both these accounts at the same bank?**

6     A    They were two different banks.

7     **Q    I see.  So you had to go to one bank to get**

8 **one cashier's check because there wasn't enough in**

9 **that account so then you went to another bank to get**

10 **the other check?**

11     A    That is correct.

12     **Q    Okay.  What are the two banks?**

13     A    Wells Fargo, Chase.

14     **Q    Okay.  Before letting Ms. Gallian or**

15 **giving -- strike that.**

16          **Was your understanding with Ms. Gallian that**

17 **you would contact her within that 30-day period as to**

18 **if she could cash the checks or not?**

19     A    No, that wasn't the agreement at all.  That

20 she was going to hold the checks on her own

21 recognizance for 30 days before she cashed them out.

22 If there's was any problem she said that she would

23 gladly return them and take possession of the

24 property again.  I was hoping that wouldn't be the

25 problem.

64

1       Q    Okay.  Did you, during that 30-day period,

2  make any independent investigation as to the title of

3  the property?

4       A    I did.

5       Q    And did you find any things recorded against

6  the property?

7       A    I did not.

8       Q    And so you just decided to go ahead and not

9  get your money back with no knowledge at all about

10  the association?

11      A    Nothing was filed by Elite Management.

12  Nothing was filed by the HOA till 45 days later after

13  my initial transaction.  Somebody held it up.

14          MR. FELDSOTT:  Okay.  Let me go back.  Would

15  you reread my question, Ms. Reporter?

16          (Whereupon the record was read by the Court

17  Reporter.)

18  BY MR. FELDSOTT:

19      Q    Okay.  And your answer?

20      A    I thought I answered that.  I'm sorry.

21      Q    No.

22      A    You can read it back.

23          MR. FELDSOTT:  That's a yes or no question

24  really.  If you want to read it back.

25          (Whereupon the record was read by the Court

JASSO DECL. PAGE - 0556

1    Reporter.)

2              (Off-the-record discussion.)

3              THE WITNESS:  Ask your question again.

4              MR. FELDSOTT:  So just read the question.

5              (Whereupon the record was read by the Court

6    Reporter.)

7    BY MR. FELDSOTT:

8        Q    I'm sorry.  Not -- to not get your money

9    back with no knowledge about the association.

10       A    To answer your question, I can't give that a

11   yes or no answer to that.  I'm sorry.  I had the HOA

12   president at my door the following day, the HOA

13   attorney on the phone to me the following day.  What

14   more did you want me to -- I don't how else to answer

15   that.

16       Q    Well, you had no knowledge of the

17   association's financial condition during this 30-day

18   period which Ms. Gallian was holding the checks?

19       A    No.  I could not get that information from

20   Elite Management or the HOA.  Not that I didn't try.

21       Q    Okay.  But you didn't get it?

22       A    Not that I didn't try.

23       Q    Didn't ask you if you tried.

24       A    That's a yes or no question.  It's not --

25       Q    Okay.  Well, let me rephrase it to make you

66

1    **happy.**

2        A    Thank you.

3        **Q    You tried to get information about the**

4    **association and were unsuccessful and decided to go**

5    **through with this transaction anyway; is that**

6    **correct?**

7        A    That is correct.

8        **Q    Okay.  And did you know Elite Management**

9    **prior to you getting involved in this situation**

10   **with...**

11       A    Gables?

12       **Q    Gables, yes.**

13       A    No.

14       **Q    Okay.  And you had no knowledge of the**

15   **association either, did you?**

16       A    No.

17           MR. FELDSOTT:  Okay.  I'm going to turn this

18   over to Audette at this point.  I am not through

19   because -- for several reasons.  One, there was a

20   document request that was objected to and no

21   documents were produced, and the court will have to

22   decide if they're legally required to produce them

23   and I will want to question you on those documents.

24           And, second, we were just served, I guess

25   shortly before this deposition started, with an

67

**Nickel, Randall**
**Nickel v. The Huntington Beach Gables HOA**

1    amended complaint, and I will undoubtedly want to ask

2    you questions concerning the amended complaint.  But

3    at this point turn it over to Ms. Morales, if I said

4    that right.

5         MS. MORALES:  Thank you.

6         MS. MORALES:  So I'm Audette Morales.  I'm a

7    partner at Gordon and Rees and I represent Elite.  I

8    represent the management company.

9         And I also would like to state at the outset

10   that I am not going to be finished today because we

11   received the first amended verified complaint at

12   eight minutes before this deposition was supposed to

13   start.  It was due on the 15th -- actually, I think a

14   little bit before that.  But certainly should have

15   been served on us at the latest yesterday.

16        So we will be continuing this deposition in

17   order to address the allegations in the first amended

18   complaint, and, similarly, any documents that might

19   be produced in response to Stan's initial notice of

20   deposition.

21        In any event, I figure we can try to get

22   some matters worked through today.

23                        EXAMINATION

24   BY MS. MORALES:

25        Q    The first is do you know a person named Tim

68

1   **Mclean?**

2      A    No.

3           MS. MORALES:   And that -- for the court

4   reporter it's Tim, T-i-m, last name M-c-l-e-a-n.

5   BY MS. MORALES:

6      **Q    Who is Estella Bechtol?  It's Estella and**

7   **then B-e-c-h-t-o-l.**

8      A    You're asking me?

9      **Q    I am.**

10     A    I have no idea.

11     **Q    Who is Linn, L-i-n-n, Joslyn, J-o-s-l-y-n?**

12     A    I've heard the names, but I do not know who

13  they are.

14     **Q    Have you ever had any communications with**

15  **someone named Linn Joslyn that you know of?**

16     A    I think she works for Elite Management.  I

17  think she's the person that I initially contacted to

18  release my paperwork to me and I can't -- I think the

19  last message I ever got from Linn Joslyn, if we're

20  talking about the same person at Elite Management,

21  that they would get back to me at their earliest

22  convenience.  Never heard again.

23     **Q    Tell me when you first reached out to this**

24  **person.  And Linn Joslyn does work for Elite.**

25     A    Okay.

69

1    **Q      So when did you first reach out to her**

2    **asking for documents?**

3        A     The first week I owned the place.   In

4    fact -- no.   Go ahead.

5        **Q      Tell me what you were going to say.**

6        A     Lee Gregnano, I think his name is, the

7    president of the HOA, was going to contact that name

8    and have all the paperwork released to me himself.

9        **Q      Okay.   So the first week that you owned the**

10   **property you reached out to Elite and you spoke with**

11   **Linn Joslyn; is that right?**

12       A     I think that's her name, yes.

13       **Q      Okay.   What did you ask for in that**

14   **conversation?**

15       A     Is there any judgments on the property.   I

16   mentioned the fact that Jasso -- Jasso -- that Jamie

17   Gallian had asked for expedited paperwork to be done

18   overnight and I don't have copies of that, can I get

19   those?   A copy of the CC&Rs, which Lee said he was

20   going to get to me later that day and never did.   And

21   that she was going to get back to me with all those

22   documents and I never heard another word.

23       **Q      And then did you follow up with Linn?**

24       A     I did.

25       **Q      When was the next time that you followed up**

70

**Nickel, Randall**
**Nickel v. The Huntington Beach Gables HOA**

```
 1   with her after this first discussion that occurred
 2   the first week you owned the property?
 3        A    Couple days later I called and I got a hold
 4   of a girl that answered the phone.  I said is she
 5   really there and she said, yes, she is.  I said would
 6   you actually walk over and hand her the phone?  And
 7   she said I can't do that but I will connect you.  I
 8   hung up the phone 30 minutes later.
 9        Q    Meaning?
10        A    She never answered phone.
11        Q    She never answered the phone.
12             Who was the girl that answered the phone in
13   that call?
14        A    I don't have a clue.
15        Q    When was the next time that you reached out
16   to Linn Joslyn?
17        A    Couple days later I actually went to my
18   office and used the phone in my office to call her,
19   and I got the same little girl.  And I said there any
20   chance I can talk to Linn Joslyn today?
21             And she said is this Randy Nickel?
22             And I said, yes, it is, and she hung up on
23   me.
24        Q    When was the next time you reached out to
25   Linn Joslyn?
```

71

1    A    That's when I started contacting Pejman.  He

2  had been calling me, trying to be my friend.  And

3  then I contacted Lee Gregnano saying I'm not getting

4  anything from Elite Management.  Is there anything

5  chance in hell I can get -- any chance I can get any

6  release of any of the documents I've asked?

7    **Q    And, quickly, you just used the word**

8  **"release."  Earlier in your deposition you also used**

9  **the word "release."**

10       **Is that you meant, meaning release the**

11  **documents to you?  Is that what you mean by**

12  **"release"?**

13    A    That's the word that Gallian used.  She was

14  trying to get a release of the statements from Elite

15  Management of any liens or property judgments and she

16  could not.  So I continued using that word because I

17  figured Elite knew what I was talking about.  It was

18  their jargon.

19    **Q    Okay.  I just wanted to make sure.  I have a**

20  **question in my notes to go back and ask you what you**

21  **meant by "release."  So that's helpful.  Thank you.**

22       **Okay.  So it looks like there were three**

23  **attempts to reach Linn Joslyn; is that correct?**

24    A    Occasionally I still tried to call just

25  for -- I hate to say for fun, but I would still try

72

1    to call periodically and try to get through to a

2    human being.  Then I actually Googled their office to

3    see where on the planet they really were.

4        **Q    And on those times that you were**

5    **occasionally still trying to get through, did you**

6    **reach anyone at Elite?**

7        A    Nope.

8        **Q    Okay.**

9        A    Not in the first month.  Not in -- not in

10   the first month that we're talking about.  All this

11   is within the first month I owned that property,

12   because Jamie was going to cash out those cashier

13   checks in 30 days.  So whatever Elite Management was

14   holding up was -- I couldn't figure out why they

15   wouldn't release the paperwork.  Now we know.

16       **Q    All right.  So who else at Elite did you**

17   **speak with in that first month?**

18       A    That's pretty much it.

19       **Q    Did you send letters to Elite in that first**

20   **month?**

21       A    I did.

22       **Q    Tell me about the first letter that you**

23   **sent.**

24       A    I asked them basically what I just had asked

25   them on the phone, if they had a problem talking to

73

1    me on phone or in person?  Will they answer my

2    letter?

3       **Q      When was that?**

4       A      Never got word.  Within the first month.

5       **Q      Do you recall if it was one or two days**

6    **after you purchased or two weeks into it or four**

7    **weeks into it?**

8       A      Sure.  I gave them a week.  I gave them

9    business -- five days to do something.

10      **Q      Okay.  Did you send any other letters?**

11      A      Not that I recall at this time.  Not in the

12   first 30 days, no.  That I can recall, no.

13      **Q      And then it seemed that you indicated that**

14   **you got no response to that letter; is that right?**

15      A      That's right.

16      **Q      Did you ever email or fax or any other**

17   **communications that we haven't talked about?  We've**

18   **talked about telephone and letter.**

19            **Were there any other methods by which you**

20   **communicated with Elite?**

21      A      Fax, courier pigeon.  No, not that I can

22   think of at this time.

23      **Q      Okay.  How about after the 30 days?  When**

24   **was your -- Mark, is there something that you need to**

25   **put on record since you guys were just talking to one**

74

1   **another?**

2          MR. MELLOR:  Sure.  Yeah.  I said he

3   testified that he sent emails earlier to Stan.  And I

4   asked him to answer your question, because the scope

5   of your question was about emails and he didn't

6   understand that so I told him to tell you that.

7          MS. MORALES:  Let's not instruct him on the

8   testimony.  If he gives inconsistent testimony

9   that -- that's what it is or I can follow up about

10  his earlier testimony.  But that would be coaching

11  the witness.

12  BY MS. MORALES:

13      **Q    After the 30 days did you send any other**

14  **letters to Elite?**

15      A    I believe I sent emails.  I gave up on the

16  letters till -- I'm trying to think -- it was -- it

17  was months later.  And the lady actually emailed me

18  back saying to the fact that we're really busy here

19  and I'm sorry I couldn't get to your email.  And I

20  said I did a transaction in Germany and got a box

21  shipped to my office from Germany faster than you

22  answered my email.  That was the last time I ever

23  heard from them.

24      **Q    And you have copies of those documents?**

25      A    You bet.

75

1    Q    Okay.  So we have the letter that was sent

2  within the first week.  We have the letter that was

3  months later where Elite responded that they were

4  really busy.

5         Anything else?  Any other letters?

6    A    Not that I can recall.

7    Q    How about telephone calls after the first

8  30 days?

9    A    I think occasionally I would try but they

10  would just go unanswered.  They'd say Hit this button

11  to talk to Linn Joslyn.  It's just a joke.

12    Q    So when did we start emailing with -- when

13  did you start emailing with Elite?

14    A    Within the first week I owned the

15  property.

16    Q    Who were you emailing to?

17    A    I don't have the specific name, but I would

18  imagine it had to do with anybody in charge of the

19  billing there.

20    Q    Did you have one email address for Elite or

21  multiple email addresses for Elite?

22    A    I think they just have the one.  I do

23  believe they just have the one.

24    Q    Okay.  So did you ever enter into any

25  agreement with Elite, like a contract?  Did you ever

76

1    enter into any contract with Elite?

2        A    No.  Not that I recall.

3        Q    And we've established that your

4    understanding is that Elite was hired by the HOA, the

5    homeowner association, for the purposes of the

6    providing management services; correct?

7        A    That's their function, yes.

8        Q    What is your understanding about Elite's

9    ability to initiate litigation against homeowners?

10       A    I have no idea what their office does.

11       Q    What is your understanding?

12       A    As far as litigation.

13       Q    What is your understanding of Elite's

14   ability to record notices on behalf of the HOA?

15       A    It's their function to do that.

16       Q    How do you know that?

17       A    I've worked for people that have worked with

18   and for management companies on HOA properties, and

19   it seemed like if there was ever a notice -- if there

20   was ever a notice to go out to an infraction or if

21   there was ever someone who was late on their HOA

22   dues, they wasted little to no time to get those

23   notices out.

24       Q    So your answer is based on your experience

25   in other situations.  Not your experience with

77

1    respect to the Gables HOA and Elite; correct?

2         A    Not only just them, but the fact that I

3    couldn't get any information through the HOA

4    president, and he said he was trying to deal with

5    Elite Management to get the releases.

6         Q    Okay.  Let's go back to the question.

7         A    All right.

8         Q    What's the basis of your understanding for

9    your comment that you believe Elite had the authority

10   to record notices against the property?

11        A    They need those notices if you want to buy a

12   property or release a property.  It would be their

13   obligation, I would imagine, to find out and tell the

14   escrow office if anything -- or the homeowner

15   anything that has either been in judgment against

16   their property or a lien on their property or if

17   they're late with HOA dues.  It is their function.

18   Otherwise, it's just willy nilly just sell

19   property.

20        Q    Okay.  So we are definitely going to take a

21   step back.  So we have a couple of different things.

22   We have notices that are given to the homeowners for

23   violations and things like that.  We also have the

24   notice that is recorded in the chain of title, the

25   notice of delinquent assessment.

78

1          In your complaint -- at least the original

2     complaint.  I assume it's in the new complaint that

3     we received this morning -- you allege that Elite

4     recorded -- formally recorded with the recorder's

5     office the notice of delinquent assessment with

6     respect to your property.

7          I'm asking you whether Elite -- how do you

8     come to think that Elite had the authority to record

9     such a notice?

10     A     I have a note -- I have some paperwork here

11     from -- it's in the original and the amended from the

12     clerk recorder from Elite Management six weeks after

13     I bought the property signed by Jasso saying that

14     there were -- Huntington Beach Gables, care of Elite

15     Management recording requested by mail to -- so

16     anyway here's the document where they tried to record

17     or they did record delinquent assessment on my

18     property six weeks after I bought the place from

19     Elite Management.

20     Q     Okay.  Let's look at that document.  That is

21     Exhibit G to the original verified complaint in this

22     matter.  And it looks like what you're referring to

23     is the box in the upper left-hand corner that's

24     saying when the recording is completed it's going to

25     be sent to the Huntington Beach Gables Homeowner

JASSO DECL. PAGE - 0570

1    Association, care of Elite -- Community Management;

2    correct?

3            MR. MELLOR:  I think the document speaks for

4    itself.

5    BY MS. MORALES:

6       Q    Correct?

7       A    Have you read the document yet?

8       Q    I have read the document.

9       A    It speaks for itself.

10      Q    That's fine for your attorney to make that

11   objection.  However, you must answer the question.

12      A    Ask the question again.

13      Q    Just a moment ago you said that Elite

14   Community Management had requested the recording of

15   the document; correct?

16      A    Correct.

17      Q    I'm asking you where on that document you

18   got your information?

19      A    Top left-hand corner.

20      Q    You also referenced that Ms. Jasso was

21   involved in -- in the recording or creation of this

22   document.

23           Where did you get that information?

24      A    She signed it.

25      Q    What else on this document, other than the

80

```
 1    fact that it says recording requested by and recorded

 2    mail to the Huntington Beach Gables Homeowner

 3    Association, care of Elite Community Management,

 4    makes you think that Elite was involved in the

 5    recording of this document?

 6        A    Why is their name on the doc?

 7        Q    That's not an answer to the question.

 8             MR. MELLOR:  Is there anything else on that

 9    document that says -- that makes you think Elite

10    Management other than the top left-hand corner?

11             THE WITNESS:  Well, they sent it to the

12    recorder's office.

13    BY MS. MORALES:

14        Q    How do you know that?

15        A    Recording requested by -- stand by.  This

16    come from them.  I'm still reading, but who do you

17    think it came from?

18        Q    Well, once again, like Mr. Feldsott said,

19    I'm not the one --

20        A    Yeah.  Yeah.

21        Q    -- being deposed here today?

22             (Simultaneous speakers.)

23             THE WITNESS:  -- answer the question.  Yeah.

24    I can't say at this time.  Sorry.

25    ///
```

81

1    BY MS. MORALES:

2        Q    So that -- that's -- you don't see anything

3    on the document that indicates that it was recorded

4    by Elite.

5            Is that your answer?

6            MR. MELLOR:  No.  That misstates witness's

7    testimony.  You said what -- he believed the Elite

8    caused the document to be recorded because of the

9    left-hand corner notation causing the document to be

10    sent back to Elite after requesting the recording of

11    the document.

12            He doesn't know anything else on the

13    document that would indicate Elite requested the

14    document be recorded.  That was your question.  That

15    was his answer.

16            MS. MORALES:  Well, you did a very nice job

17    of providing testimony.  However, that is not

18    Mr. Nickel's response.

19    BY MS. MORALES:

20        Q    And I just want to be clear.  Is there

21    anything else, other than the upper left-hand corner

22    of Exhibit G to your verified complaint, that makes

23    you think Elite had anything to do with the recording

24    of this document?

25        A    At this time, no.

82

1       Q    So we have a couple other things in the

2    original verified complaint, and, unfortunately,

3    that's what we have to work with right now.  It was a

4    verified complaint, and, as we established earlier,

5    the claims and allegations in that document were

6    under oath.  So we will go through some of those with

7    the understanding that we may have additional

8    allegations to review at a later time once all of us

9    have had an opportunity to review the first amended

10   verified complaint.

11           So in paragraph 15 you talk about seeking to

12   quiet title to property, and that is a claim that you

13   asserted against all of the defendants.  I'll

14   represent that to you.  You're welcome to look at the

15   copy of the original complaint that you have in front

16   of you.  Otherwise, again, we can go on my

17   representation that that is what the allegation is.

18           So my question --

19           MR. MELLOR:  Ms. Morales, he doesn't have a

20   copy -- not to interrupt you, but he doesn't have a

21   copy of the original complaint in front of him.

22   Would you like me to get that for you?

23           MS. MORALES:  Only if you guys would like to

24   double-check my representation.  But it seems that

25   that's what he was holding up when we looked at

1    Exhibit G.  Is that not what was in front of the --

2           MR. MELLOR:  No.  He's holding up the first

3    amended complaint that you were sent this morning

4    that was filed at court.

5           MS. MORALES:  Okay.  So you can either pull

6    out a copy of the original verified complaint, or,

7    again, I'm happy to make the representation to you as

8    to the allegation.

9           MR. MELLOR:  What would you like to do?

10           MS. MORALES:  Is that question to me or is

11    that question to Mr. Nickel?

12           MR. MELLOR:  No.  It's to you.  You're

13    conducting questioning and asking him.  What would

14    you like the deponent to be looking at?

15           MS. MORALES:  If the deponent wants to look

16    at the original verified complaint to assure himself

17    of my representations he's welcome to do, and I'll

18    give you time to pull it out.  Otherwise, we'll go on

19    my recommendations.  Would you, Mark, like time to

20    pull out the original complaint for his review?

21           MR. MELLOR:  Yes, that would be great.

22           MS. MORALES:  While you're doing so, Mark, I

23    have a question that's not related to the language of

24    the complaint.

25    ///

84

1    BY MS. MORALES:

2        Q    And that is, Mr. Nickel, how come you did

3    not name Ms. Gallian in your complaint?

4            MR. MELLOR:  It calls for legal conclusion.

5            You can answer if you know.

6            THE WITNESS:  Might be because.

7            (Reporter clarification.)

8    BY MS. MORALES:

9        Q    Say it again.  I didn't understand your

10   answer.

11       A    I'm not having trouble with Ms. Gallian.

12   I've distanced myself from her.  It just seems to be

13   having trouble with Elite Management, and the

14   dealings of my homeowner association at this time.

15       Q    Are you aware that Elite has not been the

16   property -- sorry -- the manager of the property

17   since August of 2020?

18       A    They dropped out a while ago.

19       Q    Okay.  So let's go to paragraph 14 of the

20   verified complaint.

21       A    Go.

22       Q    You are speaking to quiet title for the

23   property at issue as against all claims of

24   defendants.

25            Do you see that?

JASSO DECL. PAGE - 0576

1    A    Yes, I do.

2    **Q    So what claim do you think Elite has to the**

3    **subject property?**

4         MR. MELLOR:  The complaints and the --

5         (Reporter clarification.)

6         MS. MORALES:  That's great, Mark.

7         (Reporter interruption.)

8    BY MS. MORALES:

9    **Q    Okay.  So go ahead and answer, please.**

10        MR. MELLOR:  Like I told you, Audette, when

11   we spoke about this, the complaint was drafted in a

12   rush in order to stop a foreclosure sale.  The

13   allegations with respect to quiet title were put into

14   reference Defendants, and specifically HOA is the

15   only one with certain title to the property, which

16   title has to be quieted.  So that allegation doesn't

17   have anything to do with Elite.

18   BY MS. MORALES:

19   **Q    So, Mr. Nickel -- and the answer can be**

20   **none -- what claim do you have against Elite with**

21   **respect to your cause of action for quiet title?**

22   A    I guess none at this time that I can recall

23   at this moment.

24   **Q    In pages 5 through 7 of the verified**

25   **complaint you talk about the HOA's litigation against**

86

1  **Ms. Gallian.**

2      **Do you see that?**

3    A    Getting there.  Page 5?

4    **Q    Yep.**

5    A    Go.

6    **Q    My question is what makes you think that**

7  **Elite had anything involvement in that litigation?**

8        MR. MELLOR:  Again, that complaint's been

9  amended.  Calls for a legal conclusion.

10        MS. MORALES:  That's fine, Mark.  That's

11  fine, Mark, but I'd like an answer to the question.

12        THE WITNESS:  If you want to go back to the

13  beginning of this transaction my question all along

14  has been why couldn't I get any response from Elite

15  Management?  And even before I bought the property

16  why wouldn't Elite Management not release any docs to

17  the previous owner, even when an overnight expedite

18  the fee was paid?  That's where it all began even

19  before I owned the property.

20  BY MS. MORALES:

21    **Q    So what facts are you aware of that suggest**

22  **that Elite was involved in that litigation?**

23        MR. MELLOR:  Misstates the witness's

24  testimony.

25        MS. MORALES:  It's a question it's not

87

```
 1   misstating anything.

 2   BY MS. MORALES:

 3       Q    What facts, if any, do you have to suggest

 4   that Elite was involved in that litigation referenced

 5   on pages 5 through 7 of the verified complaint?

 6           MR. MELLOR:  Well, vague and ambiguous as to

 7   the term "involved."

 8   BY MS. MORALES:

 9       Q    You can answer.

10           MR. MELLOR:  No.  I'm going to instruct him

11   not to answer because the question's vague.  It

12   doesn't make sense.  What do you mean by involved in

13   the litigation?

14           MS. MORALES:  Just that.  "Involved" is a

15   plain language word.

16   BY MS. MORALES:

17       Q    What facts do you have, in your knowledge,

18   that suggest that Elite was in any way involved in

19   the litigation that you describe on pages 5 through 7

20   of your verified complaint?

21           MR. MELLOR:  Well, those facts have been

22   alleged in the first amended complaint.  He's already

23   testified that Elite was involved in withholding the

24   information, demanded an overnight request by

25   Ms. Gallian.  They were also involved in recording
```

88

1    the notice of delinquent assessment against his

2    property after title had transferred.  I don't know

3    what more you want him to say.

4             MS. MORALES:  I don't want you to testify,

5    Mark.  I want the witness to testify and to answer

6    the question.

7             MR. MELLOR:  I understand.  I understand.

8    But you're asking him about the prior complaint

9    instead of the amended one.  You're asking him a

10   legal question when, obviously, attorneys are

11   involved in drafting a complaint, which I think is

12   really unfair to this witness.  And he's testified

13   about what Elite's involvement has been.

14            MR. FELDSOTT:  This is a verified complaint.

15   He swore to the truth of these matters and she's

16   entitled to an answer from him.

17            MR. MELLOR:  But the characterization of him

18   being involved in litigation, he never stated that.

19            MS. MORALES:  Now you're misstating --

20            MR. MELLOR:  -- verified that in the

21   original complaint.

22            MS. MORALES:  You're misstating my question.

23   Pages 5 through 7 of the verified complaint reference

24   the litigation HOA versus Gallian.  I'm asking the

25   witness of his own knowledge what facts does he have

89

1   in his knowledge as to Elite's involvement in that

2   litigation?

3          MR. MELLOR:  Okay.  Hold on just a minute.

4   Look at pages 5 through 7.  Where in those pages does

5   it allege that Elite was involved in the litigation?

6   It doesn't say that anywhere.

7          MS. MORALES:  Mark, throughout the pleading

8   it generalizes, and specifically on page 11 it says

9   Plaintiff, Randall L. Nickel incorporates by

10  reference all of the allegations contained in

11  paragraphs 1 through 36 as though fully set forth

12  here in.  This is a cause of action --

13         MR. MELLOR:  Okay.

14         MS. MORALES:  -- against all defendants.

15  I'm asking him and the answer can be none.  This is

16  not a trick question.  I deserve --

17         MR. MELLOR:  You're saying --

18         MS. MORALES:  Mark, I deserve.

19         MR. MELLOR:  Sorry.  I didn't mean to talk

20  over you.

21         MS. MORALES:  I deserve to have my question

22  answered.  When you loop everybody into a verified

23  complaint under the words "defendants" and you

24  incorporate by reference all of the allegations in

25  the factual summary of the pleading, I'm entitled to

JASSO DECL. PAGE - 0581

1  ask about those questions.  So I'm going to ask it

2  again.

3          MR. MELLOR:  Fair enough.  Hold on.  I get

4  to respond.  You asked the witness to review pages 5

5  through 7 regarding the litigation between Gallian

6  and the HOA.  And then your question was what's

7  Elite's involvement in the litigation?  Okay?  And he

8  doesn't allege in those paragraphs anywhere that

9  Elite was involved in the litigation in the verified

10 complaint.

11          So regardless of the incorporation of other

12 paragraphs, in those paragraphs that you asked him

13 look at he doesn't allege that Elite was involved in

14 litigation at all.  So I don't know what where you're

15 coming from.

16 BY MS. MORALES:

17     Q    **Mr. Nickel --**

18          MR. MELLOR:  Now --

19 BY MS. MORALES:

20     Q    **-- do you believe that Elite was involved in**

21 **the litigation HOA versus Gallian, reflected on pages**

22 **5 through 7 of your verified complaint?**

23     A    No.  None.

24     Q    **Okay.  Let's turn to pages 8 through 11.**

25 **And this is what you guys describe as HOA versus**

1   Randy Nickel the litigation that's -- or the

2   situation that has been going on that has led us to

3   this issue today.  And I have the same question for

4   you.

5           In terms of that matter, what involvement do

6   you think Elite has had?  That was terribly worded.

7           Please describe the involvement you believe

8   Elite has had with respect to the HOA versus Randy

9   Nickel matter cited on pages 11 -- or 8 through 11 of

10  your first verified complaint?

11          MR. MELLOR:  I'm just going to interpose an

12  objection that pages 8 through 11 don't describe

13  Elite's involvement in the litigation whatsoever.  If

14  you have an individual  understanding about Elite's

15  involvement in the litigation answer the question.

16  BY MS. MORALES:

17      Q    You can answer.

18      A    I think this whole thing would have not

19  gotten to this state if Elite Management had given

20  out the notices that were asked for at the very

21  beginning and even before my transaction.  We

22  wouldn't even be talking today.

23      Q    So in paragraphs 31 and 32 of your verified

24  complaint you -- no.  I'm sorry.  Page --

25  paragraph 33 of your verified complaint you talk

92

1    **about this being a cover up and a conspiracy.**

2         **Please explain to me what you think Elite's**

3    **role was in this cover up?**

4      A    Well, I'm trying to figure out how to word

5    this exactly, but every time that Gregnano or Pejman

6    would tell me they could not get any answers from

7    Elite Management I took it upon myself to keep

8    calling and asking why can't I get release or a

9    statement or some form of a doc that tells me there

10   is no judgment, liens, or any problem with this

11   property so we can get on with our lives.  Because up

12   to this point we are getting stone walled by our HOA,

13   their attorney, and Elite Management's office.

14     **Q    You mention the attorney Pejman.**

15     A    I can't pronounce his name.

16     **Q    I can't either.**

17     A    I call him Pejman.

18          MR. MELLOR:  Pejman D. Kharrazian.

19          THE WITNESS:  He told me to call him Pejman.

20          MR. MELLOR:  P-e-j-m-a-n, middle initial D,

21   last name K-h-a-r-r-a-z-i-a-n.

22          THE REPORTER:  Thank you, Counsel.

23   BY MS. MORALES:

24     **Q    Now, was that attorney counsel for the HOA**

25   **or for Elite or both?**

93

1    A    HOA.  I couldn't tell you but he told me was

2    the HOA.  He was hired by the HOA.  That's what he

3    told me.

4    **Q    In the verified complaint we talk about a**

5    **welcome party and a lot of things that happened at**

6    **the welcome party.  I want to be clear.  What do you**

7    **think Elite's involvement was in the welcome party?**

8            MR. MELLOR:  Objection.  The Plaintiff

9    didn't say anything about Elite being involved in the

10   welcome party.  Do you have any information to

11   indicate Elite was involved in the welcome party?

12           MS. MORALES:  Mark, please stop reasking or

13   restating my question.

14   BY MS. MORALES:

15    **Q    I'm asking the witness what information do**

16   **you have that would suggest that Elite was involved**

17   **in the welcome party?**

18    A    Well, up to this point I had not received

19   the statements I had asked for, be they monthly HOA

20   statements or really anything else.  And, according

21   to Gregnano and Jasso, is that they were going get me

22   those statements themselves and bring them to that

23   wonderful party on the pool deck.

24           MS. MORALES:  So I'm going to move to strike

25   that as nonresponsive.

94

```
 1   BY MS. MORALES:

 2        Q    What information did you have that suggests

 3   that Elite was involved in the welcome party on the

 4   pool deck?

 5        A    None.

 6        Q    Was anyone from Elite at the party?

 7        A    I asked them to be but they did not.

 8        Q    We also earlier talked about the notice of

 9   delinquent assessment.  We have also referenced in

10   the verified complaint, and I believe attached to it

11   as an exhibit, a notice of default.

12             Are you familiar with the notice of default?

13        A    I am.

14        Q    Do you know who signed the notice of

15   default?

16        A    No, I do not.

17        Q    Do you know if Elite is referenced anywhere

18   on the notice of default?

19        A    I'd have to bring the paperwork up.

20        Q    Let's do that.  It's Exhibit H to the

21   original verified complaint.

22             MR. MELLOR:  Okay.  Hold on just a moment.

23             THE WITNESS:  I don't see it anywhere on

24   here.  So no.

25   ///
```

95

1    BY MS. MORALES:

2        Q    Do you know who Nationwide Reconveyance

3    is?

4        A    Not personally.

5        Q    Are you familiar with what it is as a

6    company?

7        A    I am.

8        Q    What do they do?

9        A    I guess they're a title company.

10       Q    Do you have any reason to believe that Elite

11   was involved in the recording of the notice of

12   default that is Exhibit H to the original verified

13   complaint?

14       A    Not at this time.

15       Q    We also see in the original verified

16   complaint references to notices of sale, and those

17   start at Exhibit I to the original verified

18   complaint.  I'll have you take a peek at -- so it's

19   Exhibit I, J.  I and J.  Let me know when you've had

20   a chance to look at those.

21           MR. MELLOR:  Look at those.  She wants you

22   to look at all of them.

23           THE WITNESS:  I'm looking.  That I see at

24   this time, no.

25   ///

96

1   BY MS. MORALES:

2       Q    Okay.  So I'm sorry.  I did a poor job of

3   asking the question.  So I'll just make sure there's

4   a question that proceeds the answer.

5            And that is do you see anything on Exhibits

6   I and J that reference Elite in any way?

7       A    Not at this time.

8       Q    Do you have any reason to believe that Elite

9   was involved in issuing and recording the notice of

10  trustee sale?

11      A    No, not at this time.

12      Q    So when this matter started there was a

13  foreclosure sale set for -- I think it's October 5,

14  2020.  We're obviously passed October 5, 2020 now.

15           Did the foreclosure sale get continued?

16      A    Yes.

17      Q    By whom?  Who continued it?

18           MR. MELLOR:  Are you talking -- are you --

19  hold on.  I guess it's vague and ambiguous as to

20  time.  Are you talking about after the filing of the

21  complaint?

22  BY MS. MORALES:

23      Q    There was a trustee sale set October 5,

24  2020, and we establish that that date was continued.

25           Who continued it?

JASSO DECL. PAGE - 0588

```
 1              MR. MELLOR:  Well, do you know who continued
 2       it?
 3              THE WITNESS:  No, I don't know.
 4       BY MS. MORALES:
 5          Q    Is there a current foreclosure sale date?
 6          A    No.
 7          Q    Who have you been communicating with in
 8       order to ensure that the foreclosure sale is not
 9       going forward, that it does not have a current sale
10       date?
11              MR. MELLOR:  Object.  Attorney-client
12       privilege.  Calls for attorney-client privilege.
13              MS. MORALES:  So the only way that the
14       client would know about this is from communications
15       with you?  Is that your --
16              MR. MELLOR:  Is that a question to me or a
17       question to the --
18              MS. MORALES:  No, that's a question to you,
19       Mark.  Because you're asserting the attorney-client
20       privilege.  So I'm asking the only way your client
21       would know anything about the continuance of the
22       foreclosure sale is through attorney-client
23       privileged communications; is that right?
24              MR. MELLOR:  Well, that's probably a
25       question you might want to ask him.  I just wanted to
```

98

1    object that -- that I've had communications with him

2    and it may invade the attorney-client privilege.  If

3    you want to ask him have you had any communications

4    outside of your discussions with Mr. Mellor that led

5    you to believe that sale was continued, I mean, go

6    ahead and ask him that.  I don't have a problem to

7    that question.

8    BY MS. MORALES:

9        Q    Well, I could ask that question but what I

10   want to know and I don't think it's privileged the

11   fact -- I'm not asking about the communication with

12   your attorney.  I'm asking about the fact that who

13   continued the foreclosure sale, if you know?  I don't

14   want the communications with your attorney but I

15   do -- I am entitled to the fact of who continued it

16   if you know that fact.

17       A    I do not know.

18       Q    Okay.  In the verified complaint in

19   paragraph 39 there is a reference to Defendants

20   failing to maintain the CC&R provisions or maintain

21   the rules of the CC&Rs.

22            I'd like to know from you what rules you

23   think Elite did not maintain?

24            MR. MELLOR:  Calls for a legal conclusion.

25   Outside the scope of this witness's knowledge.  May

1    invade the attorney-client work product and

2    attorney-client privilege.

3            If you know you can answer outside of your

4    communications with me.

5            THE WITNESS:  No.

6    BY MS. MORALES:

7        **Q      The answer is, no, you don't know what**

8    **provisions of the CC&Rs Elite allegedly violated?**

9        A      Not at this time, no.

10       **Q      Okay.**

11           MR. MELLOR:  I'm sorry.  What paragraph in

12   the original complaint were you referring to?

13           MS. MORALES:  39.

14           MR. MELLOR:  39.  Okay.  Thank you.

15   BY MS. MORALES:

16       **Q      In the fourth cause of action in the**

17   **verified complaint you allege a cause of action to --**

18   **for negligence.  And my very, very brief scanning of**

19   **the document that was filed today and served on us by**

20   **courtesy copy emailed today looks like you are**

21   **asserting a cause of action for negligence against**

22   **Elite.**

23           **I want to know from you what duties you**

24   **think Elite had to you?**

25       A      Oh.  I was a homeowner there.  I would think

100

1    they would show common courtesy when a homeowner is

2    calling and asking for papers to get released.  Even

3    the previous owner had their escrow held up due to

4    the fact that they could not get any statements

5    released from Elite Management, even when they were

6    asked to overnight them and paid the fees.  So I kind

7    of don't get or understand what these people are

8    doing in that office all day.

9        **Q    What other duties do you think Elite had to**

10   **you other than the common courtesy to respond to**

11   **these inquiries and provide documents?**

12       A    All of the CC&Rs.

13       **Q    I'd like to know a little bit about your**

14   **emotional distress and mental suffering claims.**

15           **Could you tell us a little bit about what**

16   **you have suffered as a result of the allegations in**

17   **the complaint?  Have you seen a doctor for your**

18   **suffering?**

19       A    Yes, I have.

20       **Q    Tell us a little bit about that.**

21       A    I'm watching my family suffer.  My wife, who

22   was a retired 33-year cop, watching her go through

23   this and not being able to sleep at night.  We had to

24   sleep in separate rooms because she couldn't sleep

25   because of the anxiety.  She kept getting up all

101

```
 1    night.  So I had to go to the doctor because I
 2    couldn't sleep.
 3           Watching my daughter living there and go
 4    through living there and have notices put on your
 5    door, have dog poop pitched in your yard.
 6      Q    So the dog poop.  Who is responsible, if you
 7    know, for the dog poop on the yard?
 8      A    You can ask -- you can Janine Jasso.  She's
 9    got three cameras aimed at my back patio that she
10    sits in her house and monitors virtually -- according
11    to her neighbor, monitors those cameras all day long.
12    And when I asked the HOA they told me the cameras
13    were not working.  And then I went out and said the
14    red light's on; you're lying to me.
15           So we tried to find out through Jasso who's
16    pitching the crap in my back yard.  She said she'd
17    look into it.  So needless to say we never found out.
18    So I would go over there when the kids weren't home
19    and I live 50 miles way.  I would drive over there
20    and make sure there weren't little blue bags of crap
21    in their backyard or notices on their door.  I love
22    my daughter or we wouldn't be in this situation.
23      Q    So you don't know at this time who is
24    putting dog poop in the backyard of the property;
25    correct?
```

102

1    A    The cameras are operated by Jasso and only

2    she would know, and, no, we cannot find out.  And she

3    put those cameras in on her own recognizance with no

4    permission from the HOA.

5    **Q    So I guess I'll ask my question again from**

6    **earlier.  How come you haven't named -- oh, Jasso.**

7    **Not Gallian.  You said Jasso has the cameras or**

8    **Gallian?**

9    A    She does.

10    **Q    Okay.  I'm sorry.  I misunderstood.**

11    **So let's go back to the -- the suffering.**

12    **Not sleeping, anxiety.  What other -- what else are**

13    **you suffering from related to this matter?**

14    A    My ulcers came back.  They were days I

15    couldn't go to my office because I was afraid to

16    leave my wife at home alone.

17    **Q    And you were afraid to leave your wife alone**

18    **because what?**

19    A    She was having vertigo problems.  She was

20    being treated for it.  And I was afraid that she

21    would fall.  I couldn't go to work.

22    **Q    Are you saying -- you said you're seeing a**

23    **doctor for this.  What is the name of the doctor**

24    **you're seeing?**

25    A    Scanning.  Dr. Armor at Kaiser Permanente.

JASSO DECL. PAGE - 0594

1      Q    How do you spell his last name?

2      A    I could probably spell Pejman better but I

3    don't know.  "Armor" like armor, suit of armor.

4      Q    Okay.  Who else are you seeing in terms of

5    doctors for treatment for the issues that you've

6    raised in your complaint?

7      A    I'd have to ask my wife who she's been

8    seeing.  I know my daughter's been going to her

9    doctor through her union and --

10         MR. MELLOR:  She's just asking about your

11   doctors.

12         THE WITNESS:  My doctor.

13         MR. MELLOR:  Do you have any other doctors

14   you're seeing other than Dr. Armor?

15         THE WITNESS:  No.

16   BY MS. MORALES:

17     Q    Are you talking medication for the suffering

18   that you have experienced in relation to this

19   matter?

20     A    Sometimes I have to.

21     Q    What are those medications?

22     A    Sleeping pills and I'm trying to think of

23   the name.  Basically it's a heavy duty Tylenol-type

24   aspirin for headaches.  Stress medication, if you

25   want to call it that.

104

**Nickel, Randall**
**Nickel v. The Huntington Beach Gables HOA**

1    Q    So is that a third thing?  One is sleeping

2    pills, two is a heavy Tylenol for headaches, and is

3    three an anxiety medication?  Like, is that a third

4    thing?

5    A    Strike the third thing.

6    Q    Okay.  So it sounds like another symptom of

7    your suffering is headaches.  Is that something we

8    should add to the list?

9    A    Yes.  Read me your list.

10   Q    Not sleeping, anxiety, up all night, your

11   ulcers have come back, and headaches.

12   A    That will do it.  That will put you down for

13   a while.

14   Q    When did you start seeing Dr. Armor ever?

15   Like, has he been your doctor for a long time?  When

16   did you start seeing him?

17   A    I haven't lived in Riverside that long.  So

18   two years ago maybe when this whole thing started.  I

19   never saw a real -- I'm just one of those guys that

20   never really says I need to go to the doctor unless I

21   needed a problem solved.

22   Q    Okay.  And then you mentioned you had

23   ulcers.  Are you taking medication for your ulcers?

24   A    Not anymore.

25   Q    Okay.  It appears to me that, again, from my

105

1   **very brief skimming of the new complaint, that the**

2   **fraud allegations have been removed as to Elite.**

3         **Is that correct, Mark?**

4         MR. MELLOR:  Yes.

5         MS. MORALES:  So no fraud or

6   misrepresentation allegations as to Elite; correct?

7         MR. MELLOR:  Correct.  We don't have any

8   evidence of that at this time.

9         MS. MORALES:  Okay.  I'll skip it.  I don't

10  want to keep everybody around a long time for things

11  that it sounds like may not be part of the litigation

12  any further.

13  BY MS. MORALES:

14      **Q**    **I noticed the name Jessica, again as I**

15  **briefly skimmed the first amended verified complaint.**

16        **Who is Jessica?**

17      A    I have no idea.

18      **Q**    **Okay.**

19      A    Is there a last name attached to that?

20      **Q**    **There is not.  Okay.  Earlier today we**

21  **talked about your banker at Chase, and I have no idea**

22  **how to spell that person's name.  I'm hoping you**

23  **could help us.  The last name was something like**

24  **Periscal [ph.].**

25      A    The first fellow, I'd never had dealt with

JASSO DECL. PAGE - 0597

```
 1   him before.  The second fellow, my private banker guy
 2   fellow -- God dam.  What's his last name?  Scanning.
 3   Basically all he did is give me the phone number of
 4   the real estate person in the office to talk to.
 5          MR. MELLOR:  But she's asking for spelling
 6   of your banker's name.
 7          THE WITNESS:  I can't remember.
 8          MR. MELLOR:  Just do the best you can.
 9          THE WITNESS:  Can I look up it?
10          MR. MELLOR:  Yeah.
11          MS. MORALES:  Yeah.
12          THE WITNESS:  Able Pyrosko.
13          MR. MELLOR:  Can you spell that?
14          THE WITNESS:  I just have word the "Able" on
15   here.  A-b-e-l.  Pyrosko I think is P-y-r-o-s-k-o.
16   I'm guessing.
17          MS. MORALES:  Okay.  All right.  I think
18   that that's probably all I have at this time until I
19   can give the amended complaint the attention that it
20   deserves.  Stan, I don't know if you've had a
21   chance -- you've been listening closely so I'm not
22   sure you've had a chance to review it, but I wonder
23   if you had anything else you wanted to ask before we
24   can end this session?
25          MR. FELDSOTT:  A few questions.
```

JASSO DECL. PAGE - 0598

```
 1                    FURTHER EXAMINATION
 2   BY MR. FELDSOTT:
 3       Q     You mentioned some friends in property
 4   management companies that you knew.
 5             Do you recall that?
 6       A     I do.
 7       Q     What property management companies were
 8   they, the names?
 9       A     The names of the company I do not recall.
10   They take care of my property up in Big Bear.
11       Q     Just the one?  It sounded like you had
12   several property management companies you were
13   dealing with.
14       A     I've had a couple over my property I had by
15   Cal State Fullerton.  I had some condos over there
16   and I do not recall the name of the management
17   company that took care of those.  Again, they come
18   and go.
19       Q     All right.
20       A     Low bid wins.
21       Q     What is your current home address?
22       A     11619 Inwood Drive Riverside, California
23   92503.
24       Q     Okay.  Do you have any plans on moving in
25   the next couple of years?
```

108

```
 1      A    Why would that question come up?

 2      Q    Well, I get to ask the questions.  The

 3  question comes out --

 4           MR. MELLOR:  You can reach Mr. Nickel

 5  through my office.

 6           MR. FELDSOTT:  Yeah.  That's one problem

 7  unless he changes attorneys.  And so it's a

 8  legitimate question.  Do you have any plans on

 9  moving --

10           MR. MELLOR:  Do you have any plans on moving

11  from that address in the next two years?

12           THE WITNESS:  Not at this time.

13  BY MR. FELDSOTT:

14      Q    Okay.  Have you ever gone to a board meeting

15  at Huntington Beach Gables?

16      A    I remember going to one.

17      Q    When was that?

18      A    May 15th or 16th.

19      Q    And was there some reason why you went to

20  that meeting?

21      A    Oh, they were having a welcome home Randall

22  party.  They invited me to a party in my name to

23  welcome me to the community.

24      Q    Okay.  Was that a formal board meeting?

25      A    They said it was going to be.
```

109

1    Q    Well, was someone taking minutes?

2    A    Nobody was even there except Jasso and

3  Gregnano and my family.

4    Q    And so you think that was a board meeting?

5    A    They told me -- they referred to it as a

6  board meeting on the pool deck.

7    Q    "They" being who?

8    A    Jasso and Gregnano.

9    Q    Okay.  There's some point in time when you

10  wish you had never purchased this property?

11    A    Is  that a question or a statement?

12    Q    Question.

13    A    Of course there was.

14    Q    And when was the first time that occurred?

15    A    Boy, is that a loaded question.  I'd say

16  about six weeks after I bought the place I realized

17  what I was dealing with and what kind of people I was

18  dealing with.

19    Q    So what did you learn during that six-week

20  period that caused you to change your mind about

21  purchasing that property?

22    A    The HOA kept changing their story.  Elite

23  Management wouldn't cough up any paperwork.  And I

24  started getting notices on my door and dog poop in my

25  daughter's backyard.  So not long.

110

1       Q     Is there -- have you reviewed the

2    association's CC&Rs?

3       A     I have.

4       Q     Was there anything in the CC&Rs, to your

5    recollection, that imposed any duties on the

6    management company?

7             MR. MELLOR:  Calls for a legal conclusion.

8    May invade attorney work product and attorney-client

9    privileges not without going into any communications.

10            Do you know without any communications with

11   me --

12   BY MR. FELDSOTT:

13      Q     Okay.  Other than what your attorney may

14   have told you, to your knowledge, is there anything

15   in the CC&Rs that imposes any duties on the

16   management company to you?

17      A     I'd have to review them again but not at

18   this time.

19      Q     You don't recall any at this time.  Okay.

20            Has this litigation been the cause of your

21   anxiety?

22      A     Oh, you don't want me to answer any -- ask

23   you my questions but I'll ask again:  What would you

24   do for your family?  But you won't want to answer

25   that so I'll answer the question was does this

111

```
1    litigation cause trouble in my life?  Yes, it does.
2         Q    You understand you're the ones who initiated
3    this litigation?
4         A    I had little choice.  I had no choice.  I
5    tried to be reasonable and the people that run the
6    board were -- well, put it to you this way:  The lady
7    that runs that board was going to tell me how to
8    write off this debt because she was a -- what was the
9    term?  She was a tax attorney and she knew how to
10   write all this stuff off on taxes and she was going
11   to teach me how.
12        Q    Was she going to charge you for that?
13        A    You'd have to ask her for that.  Right now
14   she was just looking for money into her pocket.
15        Q    Did she ask you to retain her?
16        A    You'd have to ask her that.
17             MR. MELLOR:  He's asking you.  Did --
18             THE WITNESS:  No.
19             MR. MELLOR:  Did she ever ask you to retain
20   her?
21             THE WITNESS:  She was just going to show me,
22   take time to come over and show me how to write off
23   this debt on my taxes.  And that she had looked at my
24   bank accounts and saw I had ample money to pay off
25   all the debts.  I said How do you -- can I say that?
```

112

1    How did you -- how did you find out my bank

2    accounts?

3            Well, we subpoenaed your bank accounts,

4    Mr. Nickel.  Welcome to the neighborhood.

5    BY MR. FELDSOTT:

6        **Q    Is this a conversation you had with her?**

7        A    On the pool deck.  Yes, sir.

8        **Q    This was --**

9        A    Welcome to our neighborhood.

10       **Q    -- your welcome to the neighborhood?**

11       A    Yep.

12       **Q    You understand the association has filed an**

13   **action against you?**

14       A    Bring it.

15       **Q    Pardon?**

16       A    No, I have not.

17       **Q    Yeah, they have.  Anyone ever tell you that**

18   **the association has been claiming that the**

19   **transaction between you and Gallian was voidable?**

20           MR. MELLOR:  Objection.  Attorney-client

21   privilege.

22           If anyone has told you outside the

23   communications with me go ahead and answer the

24   question.

25           THE WITNESS:  No.

113

1  BY MR. FELDSOTT:

2      Q    Any of my questions that I ask you exclude

3  anything your attorney may have told you.  I'm not

4  interested in communications between the two of you.

5          So I'll ask again:  Were you aware of the

6  fact that the association's seeking to have your

7  transaction with Ms. Gallian declared voidable?

8      A    Outside of this office, no.

9      Q    This is the first time you've heard of that

10  other than something your attorney may have told you?

11      A    Again, outside of this office, no.

12      Q    Well, when you say "outside of this office,"

13  what are you talking about?  Are you at your

14  attorney's office?

15      A    I am.

16      Q    Okay.  So outside of communications between

17  you and your attorney?

18      A    That's correct.

19      Q    Okay.  When you say "outside of this

20  office," you can see that might be a little broader.

21          Let me ask I think -- Ms. Morales -- I'll

22  also ask you.  Is there some reason why you haven't

23  sued Ms. Gallian?

24      A    My beef isn't with Gallian right now.

25      Q    Pardon?

114

1      A    My complaint and my problems right now isn't

2    with Gallian.

3      **Q    Okay.  And have you since learned that the**

4    **association has withdrawn the notice of default and**

5    **notice of sale of your property that's no longer**

6    **pending?**

7           MR. MELLOR:  Attorney-client privilege.

8    BY MR. FELDSOTT:

9      **Q    Other than what your attorney may have told**

10   **you, were you aware of that fact?**

11     A    No.  Not at this time I am not.

12     **Q    You're not.  So that continues to cause you**

13   **anxiety and stress, the fact that this attempt to**

14   **foreclose the property is still pending?**

15     A    Of course it is.

16     **Q    And if it wasn't --**

17          MR. MELLOR:  I'm sorry.  Can you -- hold on

18   a second.  I'm sorry, Stan.  Court Reporter, can you

19   read back the question?

20          (Whereupon the record was read by the Court

21   Reporter.)

22          MR. MELLOR:  Thank you, Stan.

23          MR. FELDSOTT:  Yeah.  I'm not sure he

24   answered.

25          MR. MELLOR:  He answered.  I just

115

1    didn't hear -- I didn't get your question clearly.

2    So I wanted to make sure I understood the question

3    clearly.  I just asked her to read it back for me but

4    he answered.

5            THE WITNESS:  Yes, it has, Stan.

6            MS. MORALES:  What was the answer then?

7    Maybe the court reporter could read the answer

8    because I didn't think there was an answer either.

9            (Whereupon the record was read by the Court

10   Reporter.)

11   BY MR. FELDSOTT:

12       **Q    Yeah.  And if I were to tell you that the**

13   **foreclosure action has been rescinded, notice of sale**

14   **rescinded a while back, does that in any way reduce**

15   **your anxiety?**

16       A    Well, now you just told me, Stan, I'm being

17   sued by the HOA.  So what's does that do for that?

18   Pick up one stone and pick up another?

19       **Q    Well, I'd like to you answer my question.**

20       A    I thought I did.  I'm sorry.

21       **Q    It's a "yes" or "no" question.  I'm**

22   **representing --**

23       A    Go ahead.

24       **Q    I'm representing to you that the foreclosure**

25   **action, the notice of sale, all that's been undone.**

116

 1   No longer pending.  We have a lawsuit but that

 2   foreclosure, that's gone.

 3           Does that relieve your anxiety?

 4      A    No.  You just put down one stone and picked

 5   up another stone as you just told me that this will

 6   go on and on.

 7      Q    You understand you're the one suing here?

 8      A    I had -- I had no alternative.  No choice.

 9   Jasso and Gregnano, Elite Management left me no

10   choice.  I want release of my property and I want

11   this litigation to stop.

12      Q    Okay.

13      A    Let my kids live in peace over there.  Even

14   at the -- may I interject?  Even at the mediation --

15   even at the mediation Jasso and Gregnano asked me to

16   go in partnership with them to go after Gallian.

17   They asked me to fund and it got down to $150,000.

18   They asked me to fund the litigation to go after

19   Jasso -- Gallian.  And I said I got nothing on this

20   woman.

21      Q    You understand what took place at the

22   mediation is confidential and not to be disclosed?

23      A    There you go.

24      Q    Did you understand that?

25           MR. MELLOR:  It's protected -- it's --

117

```
 1   objection.  Calls for a legal analysis and

 2   conclusion.  Mediation -- what's under mediation is

 3   governed and protected under the Evidence Code.

 4   That's true.  There's no exclusivity or

 5   non-confidentiality agreement entered into regarding

 6   the mediation, Stan.  So he's just telling you what's

 7   happened.

 8   BY MR. FELDSOTT:

 9       Q    Wasn't this at JAMS with Judge Thrasher?

10       A    Yep.

11            MR. MELLOR:  It was by the HOA in their

12   condo unit.

13            MR. FELDSOTT:  Well, I didn't him ask

14   physically.

15   BY MR. FELDSOTT:

16       Q    You indicated your wife had been a police

17   officer for 30 years?

18       A    Thirty-three years.

19       Q    Thirty-three years.  And was she -- what? --

20   a detective or patrol man?  What was her job?

21       A    She started out as a patrol man.

22       Q    And ended as?

23       A    Modified duty because she got hurt on the

24   job chasing the bad guy.

25       Q    She was -- when was she hurt?
```

118

| | |
|---|---|
| 1 | A    I don't know the -- before I met her. |
| 2 | **Q    Oh, okay.  So at the time you met her she** |
| 3 | **was still employed by the police department but on** |
| 4 | **modified duty?** |
| 5 | A    Yep.  She was just coming to the end of her |
| 6 | career. |
| 7 | **Q    What would be the nature of her injury?** |
| 8 | A    I think she fell over a fence and broke her |
| 9 | knee or something to that extent.  I don't understand |
| 10 | why but chasing a bad guy.  Doing her job. |
| 11 | **Q    I see.  So how long into her 33-year career** |
| 12 | **was that before it happened?** |
| 13 | A    I'd have to speculate.  So I can't really |
| 14 | answer that.  I don't know. |
| 15 | **Q    You have no idea at all?** |
| 16 | A    What? |
| 17 | **Q    You have no idea at all?** |
| 18 | A    No.  I can't answer this question.  I have |
| 19 | really no specific date. |
| 20 | **Q    Do you have a year?** |
| 21 | A    No, I do not. |
| 22 | **Q    So you have no idea at all when it happened;** |
| 23 | **is that correct?** |
| 24 | A    Specifically, no. |
| 25 | **Q    Generally?** |

119

```
 1        A    I think five years before she retired she
 2   was still chasing the bad guy.
 3        Q    So five years before she retired, to the
 4   best of your recollection, is when she sustained this
 5   injury?
 6        A    She went on modified duty.
 7        Q    What is modified duty?
 8             MR. MELLOR:  Calls for speculation.
 9             THE WITNESS:  I don't know the definition.
10   Sorry.
11   BY MR. FELDSOTT:
12        Q    You don't -- you know what she was doing
13   when she was doing --
14        A    Patrol cop.
15        Q    When she was doing modified duty she wasn't
16   out patrolling, was she?
17        A    She handled the office at Anaheim Police
18   Department.
19        Q    So she worked in the office?
20        A    Yep.
21        Q    And how long has she been retired?
22        A    Speculating.  Guessing.
23        Q    Well, I don't want you to guess.
24             MR. MELLOR:  Don't guess.
25             THE WITNESS:  Then I don't know.
```

120

1    BY MR. FELDSOTT:

2        Q    You can give an estimate.  You know, in

3    sickness or in health but not in the kitchen.

4             When did it occur?

5        A    I'm sorry.  Go ahead.

6        Q    I'm sorry too.  Approximately when was it

7    that she retired?

8        A    I -- I can only guess.  You want me to

9    guess?

10       Q    I don't want you to guess.  I mean, was

11   it --

12       A    Then I -- then I don't know.

13       Q    Okay.  When did you meet her?

14       A    I've known her since we were children.

15            MR. MELLOR:  Did she retire in the last ten

16   years?

17            THE WITNESS:  I remember going to our high

18   school reunion in -- frig -- 2011.  I think 2011 and

19   she had just retired.  Yeah, I think that's how it

20   went down because we met -- yeah.  We met on Facebook

21   and she was going to the high school reunion and I

22   went back to the high school reunion and that's -- we

23   got together.

24   BY MR. FELDSOTT:

25       Q    That was about ten year ago?

121

```
 1        A     Okay.

 2             MR. FELDSOTT:  At this point I can't end the

 3    depo.  We're going to have to, I think, suspend it.

 4    Audette and I are going to have to meet and confer

 5    because I want to have the documents that have been

 6    objected to.  And if we're unable to work that out

 7    they'll have to be a court hearing on that.  And --

 8    because I'll want to question you on those documents.

 9             Plus, questions on the amended complaint,

10    which we haven't had an opportunity really to examine

11    it and question you on.

12             Mark, can we just deem our discussion about

13    those documents and the objections you've made as our

14    meet and confer and maybe short circuit this a

15    little?

16             MR. MELLOR:  If you feel the objections are

17    not applicable then I'd like to have a meet and

18    confer with you about before we go into motions

19    before Judge Servino.  But, regardless, if documents

20    are eventually produced and we do have to come back

21    here for questioning related to them then I want to

22    make sure that clear we're only going to allow

23    questioning as to those documents, and anything new,

24    at least in the first amended complaint, that wasn't

25    in the original complaint to begin with.
```

122

1          And I'm also going to want to assume any

2    questioning about your cross-complaint for a UVTA

3    action.  Since you're here today you filed a

4    cross-complaint.  You're more than welcome to

5    question Mr. Nickel about the elements for a UVTA

6    action to satisfy you.  So if you don't question

7    about your cross-complaint I'm going to object to any

8    questioning about that at a later date.

9          MR. FELDSOTT:  Well, I'll probably reserve

10   questioning on that till I see your amended complaint

11   as well.  And at -- but at this point we'll go ahead

12   and suspend the depo, and we'll pick up it and what

13   will be included in that will be either our agreement

14   on documents or court order, the amended complaint,

15   and possibly my cross-complaint.

16         MR. MELLOR:  Sounds reasonable.

17         MR. FELDSOTT:  Okay.  So unless Audette has

18   some questions or Ms. Gallian wants to ask some

19   questions.

20         MS. MORALES:  I do not have anything further

21   at this time but reserve as we discussed previously.

22   Thank you.

23         MR. FELDSOTT:  Ms. Gallian, do you want to

24   question anyone?  Well, anyone.  Not anyone.

25         MS. Gallian:  No.  Not at this time.  I

123

```
 1    reserve.
 2            MR. FELDSOTT:  Okay.  So I guess that's
 3    going to be it for today.
 4            MR. MELLOR:  Do you want to propose a stip?
 5            MR. FELDSOTT:  Well, do we need one for this
 6    or will you be back for the continued one?
 7            (Off-the-record discussion.)
 8            MR. FELDSOTT:  Let's go back on record.  And
 9    I guess we're going to do this per Code.  And,
10    Mr. Nickel, I guess you will get, via your attorney,
11    a PDF copy of the -- what? -- the entire transcript
12    he gets?
13            THE REPORTER:  Yes.
14            MR. FELDSOTT:  And you'll have to sign the
15    signature page and send that back to them.  I guess
16    that's the way it works.
17            THE REPORTER:  Yes.
18            MR. FELDSOTT:  Never know for sure.  Okay.
19    You're going send it directly to the deponent or his
20    attorney?
21            THE REPORTER:  That can be up to you or
22    them.
23            THE WITNESS:  Send to --
24            MR. MELLOR:  Send to me.  Because if I got
25    to print it out for him to read then send it to me.
```

124

```
 1              MR. FELDSOTT:  Okay.  Oh, they're going to
 2   print it out for him when they send to him.
 3              MR. MELLOR:  I didn't understand that.  I
 4   think the court reporter said that they're going to
 5   send him an email copy and he has to print it out.
 6              MR. FELDSOTT:  Oh, well -- well.
 7              MS. GALLIAN:  The link.
 8              MR. FELDSOTT:  By "he" -- he'll have to
 9   print it but --
10              MS. GALLIAN:  Amy, I just contact you
11   directly to get my own copy?
12              THE REPORTER:  Yeah.  I can get to have
13   after?
14              MS. GALLIAN:  Yeah.  And I'll send you the
15   email.  Thank you for -- you asked me earlier in
16   afternoon or this morning.
17              THE REPORTER:  Thank you.
18              MS. GALLIAN:  Thank you.
19              MR. FELDSOTT:  Okay.
20              MR. MELLOR:  Do you have my email?
21              THE REPORTER:  Yes.  Thank you.
22              MR. FELDSOTT:  So we're about done for
23   today, I guess.
24              MR. MELLOR:  Thanks, everybody.
25              (The deposition concluded at 2:22 P.M.)
```

125

**Nickel, Randall**
**Nickel v. The Huntington Beach Gables HOA**

1

2

3

4                                    * * * *

5

6

7          I do solemnly declare under penalty of perjury

8     that the foregoing is my deposition under oath; are the

9     questions asked of me and my answers thereto; that I have

10    read same and have made the necessary corrections,

11    additions or changes to my answers that I deem necessary.

12

13         I witness thereof, I hereby subscribe my name

14    this _____ day of _____,_____.

15

16

17                    _____
                                RANDALL NICKEL
18

19

20

21

22

23

24

25

1                       CERTIFICATION

2                          OF

3              CERTIFIED SHORTHAND REPORTER

4

5         The undersigned certified shorthand reporter

6 of the state of California does hereby certify:

7         That the foregoing deposition was taken before

8 me at the time and place therein set forth, at which

9 time the witness was duly sworn by me;

10         That the testimony of the witness and all

11 objections made at the time of the deposition were

12 recorded stenographically by me and thereafter

13 transcribed, said transcript being a true copy of my

14 shorthand notes thereof.

15         In witness whereof, I have subscribed my name

16 this date April 1, 2021.

17

18

19                _____

20                AMY M. LEMACKS
                Certificate No.: 13425

21

22

23

24

25

1    CASE NAME: _____

2    WITNESS NAME: _____

3    DATE TAKEN: _____

4                    TRANSCRIPT ERRATA SHEET

5    The reasons for making changes are as follow:
         1. To Clarify the record;
6        2. To conform to the facts;
         3. To correct major transcription errors.
7    _____

      PAGE        LINE            CORRECTION & REASON
8    _____

9    _____

10   _____

11   _____

12   _____

13   _____

14   _____

15   _____

16   _____

17   _____

18   _____

19   _____

20   _____

21   _____

22   _____

23   _____

24   _____        _____
     Signature of Deponent                    Date
25

# EXHIBIT 17

Electronically Filed by Superior Court of California, County of Orange, 07/23/2021 03:49:00 PM.
30-2020-01163055-CU-OR-CJC - ROA # 242 - DAVID H. YAMASAKI, Clerk of the Court By Kari Prumento, Deputy Clerk.

**MARK A. MELLOR, ESQ. (State Bar No. 164304)**
**THE MELLOR LAW FIRM**
6800 Indiana Avenue, Suite 220
Riverside, California 92506-4269
Telephone: (951) 222-2100
Facsimile: (951) 222-2122
www.MellorLawFirm.com

Attorney for Plaintiff, Cross-Defendant, RANDALL L. NICKEL

SUPERIOR COURT OF THE STATE OF CALIFORNIA

IN AND FOR THE COUNTY OF ORANGE, CENTRAL JUSTICE CENTER

| | |
|---|---|
| RANDALL L. NICKEL, an individual<br><br>Plaintiffs,<br><br>vs.<br><br>THE HUNTINGTON BEACH GABLES HOMEOWNERS ASSOCIATION, a California Corporation; JANINE BARBARA JASSO, individually and as Board member and Vice-President, of the Huntington Beach Gables Homeowners Association; LEE S. GRAGNANO, individually and as Board member and President, of the Huntington Beach Gables Homeowners Association; THEODORE R. "TED" PHILLIPS, individually and as Board member of the Huntington Beach Gables Homeowners Association; LINDA JEAN "LINDY" BECK, individually and as Board member of the Huntington Beach Gables Homeowners Association; JENNIFER ANN PAULIN, individually and as Board member of the Huntington Beach Gables Homeowners Association; LORI ANN BURRETT, individually and as Board member of the Huntington Beach Gables Homeowners Association; RANCHO BERNARDO CONDOMINIUM MANAGEMENT dba ELITE COMMUNITY MANAGEMENT, a California Corporation; | CASE NO.  30-2020-01163055-CU-OR-CJC<br><br>ASSIGNED FOR ALL PURPOSES TO: JUDICIAL OFFICER: HONORABLE. DEBORAH CHUANG SERVINO, DEPARTMENT C21<br><br>SECOND AMENDED VERIFIED COMPLAINT FOR:<br><br>1.  SLANDER OF TITLE AND TO CANCEL INSTRUMENT CONSTITUTING CLOUD ON TITLE TO REAL PROPERTY<br>2.  QUIET TITLE<br>3.  PRELIMINARY AND PERMANENT INJUNCTION AND TEMPORARY RESTRAINING ORDER<br>4.  NEGLIGENCE<br>5.  NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS<br>6.  FRAUD<br>7.  INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS<br>8.  CONSPIRACY<br>9.  DECLARATORY RELIEF |

THE MELLOR LAW FIRM
6800 INDIANA AVE., STE 220
RIVERSIDE, CA 92506
TEL: (951) 222-2100
FAX: (951) 222-2122
www.Mellorlawfirm.com

1

JASSO DECL. PAGE - 0621

NATIONWIDE RECONVEYANCE, LLC, a
California Limited Liability Company;
SUPERIOR DEFAULT SERVICES INC., a
California Corporation; and DOES 1 through
100, inclusive,

    Defendants.

| | |
|---|---|
| Complaint Filed: | October 1, 2020 |
| MSC Date: | April 14, 2022 8:30 a.m. |
| Trial Date: | May 23, 2022 9:00 a.m. |

Dept: C21
Judge: Deborah C. Servino

Plaintiff, RANDALL L. NICKEL alleges:

1.    Plaintiff, RANDALL L. NICKEL ("RANDY NICKEL") is an individual residing in Riverside, California and the owner of the Real Property located at 4476 Alderport, Huntington Beach, CA 92649, more particularly described as   APN #937-630-53; LOT:1 SUBD: The Gables TR#:10542 TR 10542 LOT 1 Unit 53 of Project Located on AP 178-771-03 Together with an UND 1/80 INT  in Lots 1 & 2, (hereinafter referred to as "SUBJECT PROPERTY").

2.    On information and belief, Defendant, HUNTINGTON BEACH GABLES HOMEOWNERS ASSOCIATION, ("HOA") is a California Nonprofit Mutual Benefit Corporation, organized and existing under the laws of California, as of May 23, 1980, with its principal place of business located at 38760 Sky Canyon Drive, Unit C, Murrieta, CA 92563. HOA was at all times in this Complaint and is currently doing business and duly authorized to do business, by virtue of the laws of the State of California, in Huntington Beach, California to form a residential real estate management association and to provide for the acquisition, construction, management, maintenance, and care of real and personal property held by the Association, or commonly held by the members of the Association referred to herein as the "Members," or located in the development and owned by Members, and otherwise to act and be operated as a "homeowners association."

3.    At all times mentioned in this complaint, Defendant, JANINE BARBARA JASSO, ("JASSO") was a Director, Board Member and Vice-President of the above-described HOA, located at 16025 Warmington Lane, Unit 69, Huntington Beach, CA 92649, who also acted in her capacity as a licensed attorney with the State Bar of California, California State Bar No. 170188, on behalf of the HOA.

THE MELLOR LAW FIRM
6800 INDIANA AVE., STE 220
RIVERSIDE, CA 92506
TEL: (951) 222-2100
FAX: (951) 222-2123
www.MellorLawFirm.com

2

JASSO DECL. PAGE - 0622

4.  At all times mentioned in this complaint, Defendant, LEE S. GRAGNANO, ("GRAGNANO") was a Director, Board Member and President of the above-described HOA, located at 16062 Warmington Lane, Unit 67, Huntington Beach, CA 92649.

5.  At all times mentioned in this complaint, Defendant, THEODORE R. "TED" PHILLIPS, ("PHILLIPS") was a Board member of the above-described HOA, located at 4447 Chase Drive, Unit 17, Huntington Beach, CA 92649-2297.

6.  At all times mentioned in this complaint, Defendant, LINDA JEAN "LINDY" BECK, ("BECK") and as Board member of the above-described HOA, located at 4443 Chase Drive, Unit 19, Huntington Beach, CA 92649-2297.

7.  At all times mentioned in this complaint, Defendant, JENNIFER ANN PAULIN, ("PAULIN") individually and as Board member of the above-described HOA, located at 4446 Alderport Drive, Unit 61, Huntington Beach, CA 92649-2286.

8.  At all times mentioned in this complaint, Defendant, LORI ANN BURRETT, ("BURRETT") individually and as Board member of the above-described HOA, located at 16107 Sherlock Lane, Unit 3, Huntington Beach, CA 92649-2293.

9.  On information and belief, Defendant, RANCHO BERNARDO CONDOMINIUM MANAGEMENT dba ELITE COMMUNITY MANAGEMENT ("ELITE") is a California Corporation, organized and existing under the laws of California, with its principal place of business located at 38760 Sky Canyon Drive, Unit C, Murrieta, CA 92563.  ELITE was at all times in this Complaint the Property Management company for the HOA and in addition, in charge of issuing billing statements for the HOA, collections of HOA dues, issuing assessments, advising the Board Members and managing the HOA Community and is currently doing business and duly authorized to do business, by virtue of the laws of the State of California, in Huntington Beach, California.

10.  On information and belief, Defendant, NATIONWIDE RECONVEYANCE, LLC ("NATIONWIDE") is a Limited Liability Company, organized and existing under the laws of California, with its principal place of business located at 5677 Oberlin Drive, Suite 210, San Diego, CA 92121, and the foreclosure trustee for the SUBJECT PROPERTY in charge of

THE MELLOR LAW FIRM
6800 INDIANA AVE., STE 220
RIVERSIDE, CA 92500
TEL: (951) 222-2100
FAX: (951) 222-2122
www.Mellorlawfirm.com

3

JASSO DECL. PAGE - 0623

1   recording the Notices of Default and Sale and retaining the default services company to conduct

2   the foreclosure sale on the SUBJECT PROPERTY.

3       11.    On information and belief, Defendant, SUPERIOR DEFAULT SERVICES, INC.

4   ("SUPERIOR") is a California Corporation, organized and existing under the laws of California,

5   with its principal place of business located at 15137 Woodlawn Ave., Tustin, CA 92780, and the

6   default services company for the HOA in charge of conducting the foreclosure sale.

7       12.    Plaintiff is ignorant of the true names and capacity of Defendants sued herein as DOES I

8   through 100 and therefore sues those Defendants by such fictitious names. Plaintiff will amend

9   this Complaint to allege their true names and capacities when ascertained. Plaintiff is informed

10  and believes and thereon alleges that each of the fictitiously named Defendants claims some

11  right, title, estate, lien, or interest in the Property adverse to Plaintiff's title, and their claims

12  constitute a cloud on Plaintiff's title.

13      13.    Those persons named herein as DOES 1 through 100, inclusive, are persons whose

14  identities are presently unknown to the Plaintiff, but who have acted in concert with the named

15  Defendants in doing the acts alleged herein and are liable for knowingly conspiring and

16  committing at least one act in furtherance of that conspiracy to do the wrongs alleged herein.

17      14.    Plaintiff is seeking to quiet title as of the filing of this Complaint against all claims of

18  Defendant(s) and the claims of the Unknown Defendants described in Paragraph 9, whether or

19  not, any such claim is known to Plaintiff.  Plaintiff is informed and believes and thereon alleges

20  that each of the fictitiously named defendants is negligently responsible in some manner for the

21  offenses alleged in this complaint, and that plaintiff's injuries as alleged in this complaint were

22  proximately caused by such negligence.

23      15.    Plaintiff is informed and believes and thereon alleges that at all times mentioned in this

24  complaint Defendants, JASSO, GRAGNANO, PHILLIPS, BECK, PAULIN, BURRETT,

25  ELITE, NATIONWIDE, and SUPERIOR, were the agent(s) of defendant HOA and defendant

26  Directors and Board Members, and each and all of the things in this complaint alleged to have

27  been done by him/her/them were done intentionally, individually and in the capacity of and as

28  agent for defendant HOA and the other defendant, Directors and Board Members.

THE MELLOR LAW FIRM
6800 INDIANA AVE., STE 220
RIVERSIDE, CA 92506
TEL: (951) 222-2100
FAX: (951) 222-2122
www.MellorLawFirm.com

4

JASSO DECL. PAGE - 0624

16.   Plaintiff, RANDY NICKEL, is and at all times mentioned in this complaint was a member in good standing of defendant HOA.

17.   Defendant, HOA, was formed and now exists for the purposes set forth in Article VIII of the Declaration of Covenants, Conditions And Restrictions For The Huntington Beach Gables Lots 1 And 2 Of Tract No. 10542 City Of Huntington Beach, Orange County, California executed on May 21, 1980, and recorded in the Official Records of the County of Orange, May 28, 1980, ("CC&R's") which sets forth at Articles V the covenants for assessments, and VIII, the management powers and purposes of the association, maintenance, upkeep, and repair of all common areas of the leasehold interest in all of the real property contained within The Huntington Beach Gables Project for the benefit, protection, and safety of the individual owner-members of the HOA. (A true and correct copy of the CC&R's is attached hereto and incorporated herein as Exhibit "A".)

## GENERAL SYNOPSIS

### A.  HOA v. Gallian:

18.   On or about April 11, 2017, defendant, HOA filed an action for Breach of Governing Documents (Architectural Violations) and Nuisance in *The Huntington Beach Gables Homeowners Association v. Bradley, Gallian, et al. (Gallian)*, Orange County Superior Court ("OCSC") Case No. 37-2017-00913985-CU-CO-CJC, Honorable James Crandall, Department C33, Judge Presiding, against the prior owner of RANDY NICKEL's unit, (SUBJECT PROPERTY), Ms. Jamie L. Gallian and her mother, Ms. Sandra L. Bradley, the predecessor in interest to Ms. Gallian.

19.   On July 5, 2017, Ms. Gallian filed a Cross-Complaint in the *Gallian* action, in *propria persona*, for Indemnification, Apportionment of Fault, and Declaratory Relief against the HOA and a similar Cross-Complaint on July 12, 2017, against the six defendant Board Members named herein, in their individual capacity, because she felt persecuted by the HOA.

20.   Thereafter, HOA Board Member and Attorney JASSO, prepared a Workplace Violence Temporary Restraining Action (OCSC Case No. 30-2017-00962999), writing all of the declarations for the other four Defendant Board Members PHILLIPS, BECK, PAULIN and

THE MELLOR LAW FIRM
6800 INDIANA AVE, STE 220
RIVERSIDE, CA 92506
TEL: (951) 222-2100
FAX: (951) 222-2122
www.Mellorlawfirm.com

5

JASSO DECL. PAGE - 0625

1  GRAGNANO and filed it on December 22, 2017, in Department C-66, before the Honorable

2  Thomas Stafford.

3     21.  Ms. Gallian in response, asked Judge Stafford to also hear a Permanent Restraining Order

4  Application Ms. Gallian filed on August 9, 2018, against Board Member JASSO's husband. Mr.

5  Jesus Jasso, Jr., who physically hit Ms. Gallian three (3) times, striking her wrists, hands and

6  forearms. Mr. Jasso pushed Ms. Gallian, a heavy trash can fell into Ms. Gallian causing Ms.

7  Gallian to fall to the ground causing harm to Ms. Gallian's left ankle. Ms. Gallian went to the

8  doctor multiple times and had x-rays performed twice. Ms. Gallian was taken off work causing

9  her to suffer financial loss not being able to work. On August 11, 2018, The Huntington Beach

10  Police were called to the scene charging Mr. Jasso with Battery against Ms. Gallian. (Huntington

11  Beach Police Report No. 18-011599.) Ms. Gallian signed a citizen's arrest against Mr. Jesus

12  Jasso, who was arrested by HBPD for Battery, cited and released.

13     22.  The *Gallian* litigation between Ms. Gallian and the HOA and the six defendant Board

14  Members named herein was expensive, litigious, vitriolic, and costly. It has been the subject of

15  and impetus for numerous civil harassment actions, restraining orders, police reports, Unlawful

16  Detainer action *BS Investors, LP v. Gallian,* (Oct. 10, 2018) Case No. 30-2018-01024401-CU-

17  UD-CJC and even taken up to the Fourth District Court of Appeal, Division Three, in *Gallian v.

18  Gragnano,* (Dec. 4, 2019) Case No. G057198, affirmed, and is still going on in some form, or

19  another, as of the filing of this Complaint, *see, Jasso v. Croghan,* (OCSC Case No. 30-2020-

20  01160717; Restraining Order action). The animus between the parties is palpable to this very

21  day.

22     23.  On August 7, 2018, six defendant Board Members named herein filed their Motion for

23  Attorneys' Fees in the *Gallian* action and the trial court issued a tentative ruling granting the

24  Motion on November 1, 2018 and confirmed it at the hearing on November 8, 2018.

25     24.  During the *Gallian* action and the various court hearings up to the sale of the SUBJECT

26  PROPERTY on October 31, 2018, the HOA and its Board Members were made aware because

27  of statements made in open court by Ms. Gallian that she was in the process of selling the

28

THE MELLOR LAW FIRM
6800 INDIANA AVE., STE 220
RIVERSIDE, CA 92500
TEL: (951) 222-2100
FAX: (951) 222-2123
www.Mellorlawfirm.com

6

JASSO DECL. PAGE - 0626

1   SUBJECT PROPERTY to rid herself of the involvement with the HOA, its Board, and the

2   *Gallian* litigation.

3       25.   In fact, Ms. Gallian had opened two escrows for the sale of the SUBJECT PROPERTY

4   before entering into any agreement for the sale of the SUBJECT PROPERTY to RANDY

5   NICKEL on October 29, 2018.

6       26.   Knowing of the impending Motion for Attorney's Fees hearing in the *Gallian* matter, the

7   HOA and its Board Members, JASSO, GRAGNANO, PHILLIPS, BECK, PAULIN, and

8   BURRETT conspired and sought to hold up the sale by Ms. Gallian of the SUBJECT

9   PROPERTY so as to ensure that they, collectively, could cause their anticipated judgment for

10  attorney's fees to attach itself to the SUBJECT PROPERTY and execute on its equity in order to

11  be paid themselves, reimburse the HOA coffers and cause Ms. Gallian the most personal harm

12  because of the animus the HOA and the Board Members had for her.

13      27.   To effectuate that plan and scheme, the HOA and its Board Members, JASSO,

14  GRAGNANO, PHILLIPS, BECK, PAULIN, and BURRETT elicited the help of and directed its

15  agent Management Company, ELITE, to purposefully withhold and not provide any demand for

16  12 months of the Association's Minutes, Litigation Disclosures, and demands for accounting of

17  monies owed to the HOA, made by Gallian and/or her escrow company, to effectuate the sale of

18  and close escrow on the SUBJECT PROPERTY, before the judgment lien for attorney's fees

19  could be recorded and attach to the SUBJECT PROPERTY for their benefit.

20      28.   Thereafter, on October 22, 2018, Ms. Gallian through her Escrow Company, Eminence

21  Escrow, Inc., sought to obtain and did formally demand from ELITE, on behalf of the HOA, the

22  12 months of the Association's Minutes, Litigation Disclosures, and demands for accounting of

23  any monies owed to the HOA by Gallian, in order to effectuate and complete her sale of and

24  close escrow on the SUBJECT PROPERTY with Ms. Gallian's now, second buyer in escrow. To

25  that end, Ms. Gallian obtained and Eminence Escrow, Inc. delivered, via Federal Express Priority

26  Overnight to Ms. Lynn Joslyn and "Jessica" at ELITE's Escrow Department, two money orders,

27  one for $250.00, representing $90.00 for the Demand, $120.00 for a one-day business rush,

28  $20.00 for 12 months of Association Minutes and $20.00 for litigation disclosures and a second

THE MELLOR LAW FIRM
6800 INDIANA AVE., STE 220
RIVERSIDE, CA 92506
TEL: (951) 222-2100
FAX: (951) 222-2122
www.Mellorlawfirm.com

7

JASSO DECL. PAGE - 0627

1  money order in the amount of $326.00, for the HOA's monthly dues of $316.00, in addition to a

2  $10.00 late fee charge.  (A true and correct copy of the ELITE Document Order Form, Request

3  for HOA documentation, two Money Orders dated October 22, 2018, and Federal Express

4  Priority Overnight delivered to ELITE on October 23, 2018, is attached hereto and incorporated

5  herein as Exhibit "B".)

6      29.    Despite receiving the demand from Ms. Gallian, repeated requests in writing by Ms.

7  Gallian through her escrow company, Eminence Escrow, Inc., from October 24 through October

8  31, 2018, to Ms. Lynn Joslyn at ELITE and despite paying ELITE the $120.00 rush fee to

9  overnight the requested information to close escrow and pay the HOA any monies it was owed as

10  of October 31, 2018, Ms. Lynn Joslyn and "Jessica" at ELITE's Escrow Department refused to

11  provide same to Ms. Gallian and RANDY NICKEL, just as ELITE was directed to stall and

12  refuse to do so by the HOA and its Board Members.

13      30.    On November 16, 2018, the OCSC in the *Gallian* action issued an Abstract of Judgment,

14  unrelated to the motion for attorneys' fees, against Ms. Gallian in the amount of $3,070.00. (A

15  true and correct copy of the Abstract of Judgment in the *Gallian* action filed November 15, 2018,

16  issued November 16, 2018, and recorded November 19, 2018, is attached hereto and

17  incorporated herein as Exhibit "C".)

18      31.    On December 4, 2018, in the *Gallian* action a Judgment for Attorneys' Fees in the

19  amount of $46,138.00 was entered against Ms. Gallian and Notice of Entry of Judgment was

20  filed and served on December 7, 2018. That award was the subject of appeal in the Fourth

21  District Court of Appeal, Division Three case of *Gallian v. Gragnano,* (Dec. 4, 2019) Case No.

22  G057198. The award was affirmed on appeal in that case against Ms. Gallian and the Remittitur

23  issued June 25, 2020. (A true and correct copy of the award for attorneys' fees in the *Gallian*

24  action filed December 4, 2018 is attached hereto and incorporated herein as Exhibit "D".)

25      32.    Subsequently in the *Gallian* action, on May 6, 2019, the HOA also obtained a Judgment

26  against Ms. Gallian for an award of Attorneys' Fees in the amount of $316,583.59. (A true and

27  correct copy of the award for attorneys' fees in the Gallian action filed December 4, 2018, is

28  attached hereto and incorporated herein as Exhibit "E".)

THE MELLOR LAW FIRM
6800 INDIANA AVE., STE 220
RIVERSIDE, CA 92506
TEL.: (951) 222-2100
FAX: (951) 222-2122
www.Mellorlawfirm.com

8

JASSO DECL. PAGE - 0628

33.    Based upon information and belief, HOA and the six defendant Board Members named herein were not entirely covered by Errors and Omissions insurance for the retention and payment for defense counsel fees and costs in conjunction with the *Gallian* litigation and its progeny.  In order to pay for nearly $400,000.00, in defense costs and attorneys' fees incurred by the HOA and individual Board members in the prosecution and defense of the *Gallian* action, its progeny, and in an effort to bury Ms. Gallian with venomous litigation for personal animus, upon information and belief, JASSO, individually, and as Board Member and Vice-President of the HOA Board, met and conspired with PHILLIPS, BECK, PAULIN and GRAGNANO to have the Board retain her as attorney for the HOA in certain matters, as tax preparer and tax attorney on behalf of the HOA, and provide personal photocopy services for the HOA from her own family's company, without disclosing same to and obtaining authorization from the membership first, and without disclosing actual and potential conflicts of interest on her part to the membership.

34.    As part of the HOA and JASSO, PHILLIPS, BECK, PAULIN and GRAGNANO, conspiracy and to further their own self-interests, the aforementioned Board members decided to intentionally use and erode the HOA's reserve account to fund the attorney's fees spent in the *Gallian* matters and some of which, based upon information and belief, were used to pay on JASSO's companies and JASSO directly for her accounting and legal services, so she and the other Board members would benefit personally from the HOA members' dues payments, without a Membership vote authorizing the removal of the Members monies allocated by the CC&R's for future improvements and no other purpose.

## B. **HOA v. RANDY NICKEL:**

35.    On October 31, 2018, RANDY NICKEL purchased the SUBJECT PROPERTY from its previous owner, Ms. Jamie Gallian, for his daughter and her fiancé to live. To memorialize that transaction, an Assignment of Ground Lease and Condominium Sublease was executed and recorded in the Orange County Recorder's office that same day as Document 2018-000395579. (A true and correct copy of the Assignment of Ground Lease recorded October 31, 2018, is attached hereto and incorporated herein as Exhibit "F".) That same day RANDY NICKEL paid Ms. Gallian full and fair market value consideration for the SUBJECT PROPERTY of

THE MELLOR LAW FIRM
6800 INDIANA AVE., STE 220
RIVERSIDE, CA 92506
TEL: (951) 222-2100
FAX: (951) 222-2122
www.MellorlawFirm.com

9

JASSO DECL. PAGE - 0629

1  $379,000.00, via two Cashier's checks. (A true and correct copy of the Cashier's checks dated

2  October 31, 2018, are attached hereto and incorporated herein as Exhibit "G".)

3    36.   Thereafter, on November 5, 2018, RANDY NICKEL received an email from HOA

4  attorney, Pejman D. Kharrazian, Esq. at Epstein, Grinnell, and Howell, who listed several

5  violations regarding the SUBJECT PROPERTY and asked RANDY NICKEL if he was willing

6  to work with the HOA to bring the unit back into compliance. RANDY NICKEL agreed in

7  writing to repair the alleged Gallian violations listed as follows: installation of shades, patio

8  covers, no outside air conditioning unit, no awnings, or sunshades, no roof gutter without

9  approval. All of the alleged Gallian violations occurred in 2015. Attorney Pejman D. Kharrazian,

10 Esq. also asked RANDY NICKEL for copies of the cashier's checks used in the purchase of the

11 SUBJECT PROPERTY since the HOA allegedly had a court date with Ms. Gallian the next day.

12 RANDY NICKEL complied with attorney Pejman D. Kharrazian, Esq. requests.

13    37.   Shortly thereafter, on or about November 7, 2018, RANDY NICKEL and his wife June,

14 returned to the SUBJECT PROPERTY to take measurements for new appliances. Following

15 their arrival, they were approached by the President of the HOA, GRAGNANO, regarding

16 correcting all of the violations the HOA asserted Ms. Gallian made during her ownership dating

17 back to 2015.  Mr. GRAGNANO repeatedly said he was thrilled that the NICKELS had

18 purchased the SUBJECT PROPERTY and that Ms. Gallian was gone. He explained that she did

19 not follow the HOA rules and had threatened her neighbors and HOA members to the point they

20 had to get restraining orders against her. GRAGNANO added that the HOA was dealing with her

21 in court and their only issues were with Ms. Gallian, not the NICKELS. GRAGNANO asked if

22 the NICKELS had any personal connection with Ms. Gallian and was relieved when the

23 NICKELS told him their first introduction to Ms. Gallian was only via her advertisement on

24 October 29, 2018. Mr. GRAGNANO was thankful and stated that he would like to have a

25 meeting with the other Board Members to officially welcome the NICKELS to The Gables

26 Community. GRAGNANO specifically thanked RANDY NICKEL for now being the owner and

27 getting Ms. Gallian out of the HOA for them.

28

THE MELLOR LAW FIRM
6800 INDIANA AVE., STE 220
RIVERSIDE, CA 92506
TEL: (951) 222-2100
FAX: (951) 222-2122
www.Mellorlawfirm.com

10

JASSO DECL. PAGE - 0630

38.   Without hesitation and in good faith, RANDY NICKEL made all of the repairs and corrections to the SUBJECT PROPERTY as requested by GRAGNANO and Kharrazian, on behalf of the Defendant, Board Members and HOA.

39.   Over a month and a half later, on December 17, 2018, after the sale and title transfer of the SUBJECT PROPERTY had taken place and was recorded by the Orange County Recorder's office, ELITE on behalf of the HOA proceeded to request the recording and record a Notice of Delinquent Assessment ("NDA"), against the SUBJECT PROPERTY in the amount of $6,788.10. (A true and correct copy of the NDA requested to be recorded by ELITE on behalf of the HOA and its Board Members, dated December 17, 2018, is attached hereto and incorporated herein as Exhibit "H".)

40.   When ELITE, the HOA and Board Members did so record the NDA against RANDY NICKEL's ownership of the SUBJECT PROPERTY, they were aware, each and every one, that none of the assessment fees were owed by RANDY NICKEL, all of the fees included therein were allegedly owed by Ms. Gallian to the HOA.  This was clearly evidenced by ELITE's own Statement of Account for Ms. Gallian on the SUBJECT PROPERTY which it attached to the NDA before requesting the recording. The fact that ELITE, the HOA and the individual Board Members had both actual and constructive knowledge that Ms. Gallian no longer owned the SUBJECT PROPERTY, that the assessments alleged owing were not owed the HOA by RANDY NICKEL, that no *Civil Code* section 5660 notice was ever sent certified mail to RANDY NICKEL at least 30 days prior to the NDA recording, and most importantly, that the CC&R's do not allow ELITE, the HOA, and/or the Board Members to lien a new owner's property based upon a predecessing owner's unpaid assessments manifested its intention to harm RANDY NICKEL and/or at the very least exhibited clear negligence on all of their parts. (*See,* Exhibit "A" Art. V, Art. 5.1, at p. 8-9, stating, "Each such assessment, together with such interest, costs and reasonable attorneys' fees, shall also be the personal obligation of the person who was the owner of such Unit at the time when the assessment fell due. The personal obligation shall not pass to his successors in title until expressly assumed by them.")

THE MELLOR LAW FIRM
6800 INDIANA AVE., STE 220
RIVERSIDE, CA 92506
TEL: (951) 222-2100
FAX: (951) 222-2122
www.Mellorlawfirm.com

11

JASSO DECL. PAGE - 0631

41.   RANDY NICKEL has paid all HOA dues and assessments owed to the HOA during his ownership of the SUBJECT PROPERTY, nor did he at any time ever agree to assume the assessments and/or debts of Ms. Gallian.

42.   Despite the HOA, JASSO, PHILLIPS, BECK, PAULIN, GRAGNANO, ELITE, NATIONWIDE, and SUPERIOR, having actual and/or constructive knowledge that Ms. Gallian no longer had any legal interest in the SUBJECT PROPERTY, that it had been purchased by RANDY NICKEL and title had been recorded and transferred as of October 31, 2018, prior to the recording of the NDA by ELITE, these Defendants chose nonetheless to record the NDA, a Notice of Default ("NOD"), four Notices of Sale ("NOS") and proceed against the SUBJECT PROPERTY and RANDY NICKEL's new ownership interest in a continuing attempt at obtaining the HOA's and Board Members money judgment from their dispute with Ms. Gallian.

43.   Knowing how much of the reserve account for the HOA had been spent to further the interests of Defendants and pay for their personal attorneys' fees in the *Gallian* litigation, Defendants, HOA, JASSO, PHILLIPS, BECK, PAULIN, GRAGNANO, attempted to cover up their conspiracy and expenditures from their fellow HOA members reserve account and intentionally have ELITE, NATIONWIDE, and SUPERIOR record the NDA, NOD and NOS against the SUBJECT PROPERTY in a scheme to foreclose on the SUBJECT PROPERTY and use both the delinquent assessments and the anticipated judgment against Ms. Gallian for attorney's fees incurred by the Board Members and the HOA, that was immanently to be issued by the court, as an offset to the newfound equity in the SUBJECT PROPERTY after RANDY NICKEL's cash purchase with Ms. Gallian.  The Defendants, HOA, JASSO, PHILLIPS, BECK, PAULIN, and GRAGNANO sought to reimburse the illegally obtained reserve funds account, to enrich themselves at RANDY NICKEL's expense for the attorney's fees the Board Members were awarded in the *Gallian* litigation, to hide that fact from fellow HOA members and prevent the HOA from the filing of bankruptcy by obtaining reimbursement of its attorneys' fees award.

44.   In furtherance of their plan and scheme, Defendants, HOA, JASSO, PHILLIPS, BECK, PAULIN, GRAGNANO and each of them, used the *Gallian* actions to have their attorney Pejman D. Kharrazian, Esq. at Epstein, Grinnell, and Howell, issued a subpoena in the *Gallian*

THE MELLOR LAW FIRM
6800 INDIANA AVE., STE 220
RIVERSIDE, CA 92506
TEL: (951) 222-2100
FAX: (951) 222-2122
www.Mellorlawfirm.com

12

JASSO DECL. PAGE - 0632

action for the banking records of RANDY NICKEL based upon the Cashier's checks he had

obtained from RANDY NICKEL in November 2018.  When Mr. NICKEL called Mr.

Kharrazian, Esq. to inquire about the reason for the subpoena of his banking records, he was told

"it was just discovery in the *Gallian* actions, and he didn't need to worry about it." "Just ignore

it," Mr. Kharrazian, Esq. told him. "The HOA was after Ms. Gallian not you." Mr. Kharrazian,

Esq. said.

45.    With the assurances of Mr. Kharrazian, Esq., not understanding legal procedures and

what the Defendants had planned RANDY NICKEL relied on the representations made to him

by Mr. Kharrazian, Esq., on behalf of the Defendants HOA, JASSO, PHILLIPS, BECK,

PAULIN, and GRAGNANO and did not seek counsel or seek to oppose the subpoena. In so

doing, the Defendants obtained Mr. NICKEL's confidential financial information to use to their

advantage in their scheme and plan to secrete his equity in the SUBJECT PROPERTY and

foreclose on same.

46.    On May 19, 2019, RANDY NICKEL was called out to the SUBJECT PROPERTY to

meet with Defendants, JASSO and GRAGNANO on behalf of the HOA and the other Defendant

Board Members for what was termed a "welcoming party." JASSO told Mr. NICKEL that the

HOA and Board Members wanted to welcome him and his family to the neighborhood and throw

a party for them.

47.    RANDY NICKEL, his wife June, and Daughter, April Lovejoy, Met with JASSO and

GRAGNANO out at the pool area in the HOA common area. After some pleasantries and some

drinks and snacks JASSO asked Mr. NICKEL, "what do you plan to do about the debts of Ms.

Gallian since," according to them, "you do not have clear title. Her name is still on the property

and she owes the HOA and the Board Members a lot of money." RANDY NICKEL didn't know

how to respond because this was all news to him. Ms. JASSO continued "don't panic, we're not

coming after you we are going after Janine [Gallian], but we need to get this paid and we have

your banking information, you make enough money Mr. NICKEL. You can write it off on your

taxes.  I am a Tax attorney. I do it all the time I can show you how." "We will work with you,

but, we are going to secure Ms. Gallian's debt with the condo [SUBJECT PROPERTY] so that

THE MELLOR LAW FIRM
6800 INDIANA AVE., STE 220
RIVERSIDE, CA 92506
TEL: (951) 222-2100
FAX: (951) 222-2121
www.Mellorlawfirm.com

13

JASSO DECL. PAGE - 0633

1  we can get paid." April started to cry, got up and walked away. June, visibly upset at the setup

2  and pretense of the "welcoming party" followed to comfort her. It was at this moment RANDY

3  NICKEL realized what JASSO, GRAGNANO, the other Board Members, ELITE and the HOA

4  was up to. JASSO had revealed the HOA's plan and scheme to go after Mr. NICKEL's real

5  property because they believed he was of the financial ability to pay for the debts of Gallian and

6  they could use the equity of the newly paid off SUBJECT PROPERTY to reimburse themselves

7  and cover-up their misuse of the funds and expenditures from the HOA accounts from their own

8  personal attorneys' fees award.

9      48.   Defendants undertook this scheme, conspiracy, and plan, despite the fact that they knew

10  RANDY NICKEL was now the legal owner of the SUBJECT PROPERTY, Ms. Gallian no

11  longer had any legal ownership interest in the SUBJECT PROPERTY, as of October 31, 2018,

12  Mr. NICKEL was not delinquent in his HOA fees, no *Civil Code* section 5660 notice of

13  delinquent assessment had been sent to him by the HOA, no notice of right to alternative dispute

14  resolution with the HOA had been sent to him, and most importantly, the CC&R's for the

15  Huntington Beach Gables specifically prohibit the HOA from seeking reimbursement of

16  assessment fees owed by a prior owner from a current owner and do not empower it to do so.

17  Furthermore, the NDA has expired and was of no further force and effect now being recorded

18  over one year ago and not being formally extended in writing, all collectively in violation of the

19  Davis-Stirling Common Interest Development Act, ("Davis-Sterling Act"). (*See*, Exhibit "A"

20  CC&R's Article V, Sec. 5.1, pgs. 8-9, and Sec. 5.5(g), p. 13.)

21      49.   Subsequently and in furtherance of their scheme and plan, Defendants, HOA, JASSO,

22  PHILLIPS, BECK, PAULIN, GRAGNANO, NATIONWIDE, and SUPERIOR recorded a

23  Notice of Default ("NOD") based on the NDA recorded by ELITE, dated August 30, 2019.

24  Defendants have additionally recorded and/or continued four Notices of Sale ("NOS") on

25  December 16, 2019, March 23, 2020, August 17, 2020, and one set for October 5, 2020 at 3:00

26  p.m. (True and correct copies of the NOD recorded August 30, 2019, and the NOS recorded

27  and/or postponed on December 16, 2019, March 23, 2020, August 17, 2020, and October 5, 2020

28  are attached hereto and incorporated herein respectively as Exhibits "I" through "M".)

THE MELLOR LAW FIRM
6800 INDIANA AVE., STE 220
RIVERSIDE, CA 92506
TEL: (951) 222-2100
FAX: (951) 222-2122
www.Mellorlawfirm.com

14

JASSO DECL. PAGE - 0634

50.   Defendants, HOA, JASSO, PHILLIPS, BECK, PAULIN, GRAGNANO, ELITE, NATIONWIDE, and SUPERIOR failed to follow and adhere to the rules enunciated in the CC&R's and in so doing failed to exercise due care for RANDY NICKLE in derogation of his rights and the HOA's, Board Members, and ELITE's responsibilities to him as a member of the HOA.

51.   On or about November 12, 2018, Defendants, HOA, JASSO, PHILLIPS, BECK, PAULIN, GRAGNANO, ELITE, NATIONWIDE, and SUPERIOR specifically authorized, directed, and/or participated in the above-described tortious conduct of the HOA, or specifically knew or reasonably should have known that the scheme and plan JASSO and GRAGNANO had proposed to the other HOA Board members, which was under their control could injure RANDY NICKEL but negligently failed to take or order appropriate action to avoid the harm, and/or ignore the provisions of the CC&R's and the Davis-Sterling Act designed to protect RANDY NICKEL and thereby failed to refrain from acting in a manner that created an unreasonable risk of personal injury to him and his property, in that Defendants had undertaken a plan to take RANDY NICKEL's home away from him in a vendetta against Ms. Gallian in order to repay monies Defendants, HOA, JASSO, PHILLIPS, BECK, PAULIN, and GRAGNANO expended in defense of their litigation in the *Gallian* matters.

## FIRST CAUSE OF ACTION
### (Slander Of Title And To Cancel Instrument Constituting Cloud On Title To Real Property as against all Defendants and DOES 1 through 100, inclusive)

52.   Plaintiff, RANDALL L. NICKEL incorporates by reference all of the allegations contained in Paragraphs 1 through 51 as though fully set forth herein.

## FIRST COUNT
### (Slander of Title)

53.   On or about October 31, 2018, RANDY NICKEL purchased the SUBJECT PROPERTY from its previous owner, Ms. Jamie Gallian wherein Plaintiff, NICKEL was the owner in fee of title to the SUBJECT PROPERTY described in Paragraph 1, situated in the County of Orange, State of California.

THE MELLOR LAW FIRM
6800 INDIANA AVE., STE 220
RIVERSIDE, CA 92506
TEL: (951) 222-2100
FAX: (951) 222-2122
www.Mellorlawfirm.com

15

JASSO DECL. PAGE - 0635

54.    On or about on December 17, 2018, after the sale and title transfer of the SUBJECT
PROPERTY had taken place and was recorded by the Orange County Recorder's office, the
Defendants, HOA, JASSO, PHILLIPS, BECK, PAULIN, GRAGNANO, and ELITE, willfully,
wrongfully, without justification, and without privilege caused to be recorded a Notice of
Delinquent Assessment ("NDA"), against the SUBJECT PROPERTY in the amount of
$6,788.10 (*See,* Exhibit "H".)

55.    The NDA was false and caused doubt to be cast on Plaintiff, NICKEL's title to the
property described above.  Defendants undertook this scheme, conspiracy, and plan, despite the
fact that they knew they had purposefully withheld the HOA's demand for reimbursement from
the Gallian escrow, RANDY NICKEL was now the legal owner of the SUBJECT PROPERTY,
Mr. NICKEL was not delinquent in his HOA fees, no notice of delinquent assessment had been
sent to him by the HOA, no notice of right to mediation with the HOA had been sent to him, and
most importantly, the CC&R's for the Huntington Beach Gables specifically prohibit the HOA
from seeking reimbursement of assessment fees owed by a prior owner from a current owner and
do not empower it to do so, all collectively in violation of the Davis-Sterling Act.

56.    The Defendants, HOA, JASSO, PHILLIPS, BECK, PAULIN, GRAGNANO,
NATIONWIDE, and SUPERIOR willfully, wrongfully, without justification, and without
privilege further caused to be recorded and recorded a NOD, dated August 30, 2019, based on
the NDA recorded earlier by ELITE. Defendants have additionally recorded and/or continued
four NOS on December 16, 2019, March 23, 2020, August 17, 2020, and one which is currently
set for October 5, 2020 at 3:00 p.m. (*See,* Exhibits "I" through "M".)

57.    The recordings of the NDA, NOD and NOS by Defendants directly impair Plaintiff,
NICKEL's title to SUBJECT PROPERTY in the sum asserted by the HOA of $412,958.11. (A
true and correct copy of the HOA's last and most recent September 2020 Invoice sent to
RANDY NICKEL, statement number 1069, dated August 21, 2020, in the amount of
$412,958.11, is attached hereto and incorporated herein as Exhibit "N".)

58.    The recording of the NDA, NOD and NOS made it necessary for RANDY NICKEL to
retain attorneys and to bring this action to cancel the instrument casting doubt on Plaintiff,

THE MELLOR LAW FIRM
6800 INDIANA AVE , STE 220
RIVERSIDE, CA 92506
TEL: (951) 222-2100
FAX: (951) 222-2122
www.Mellorlawfirm.com

16

JASSO DECL. PAGE - 0636

1  NICKEL's title. Therefore, Plaintiff, NICKEL is entitled to recover attorney's fees and costs

2  incurred in cancelling the instrument. The exact amount of such damages is not known to Mr.

3  NICKEL at this time, and Plaintiff will move to amend this Complaint to state such amount

4  when the same becomes known, or on proof thereof.

5  59.  Furthermore, the aforementioned recordings were motivated by Defendants, and each of

6  their animus toward Ms. Gallian and desire to recoup monies spent in defending the *Gallian*

7  actions and their common scheme, conspiracy, and plan, to exercise their judgment rights against

8  Gallian for attorneys' fees against the SUBJECT PROPERTY since they would not have to

9  chase Ms. Gallian for their monies in further expensive collection actions.  Defendants undertook

10  this course of action with oppression, fraud and malice in that despite the fact that they knew

11  RANDY NICKEL was now the legal owner of the SUBJECT PROPERTY, were on actual

12  and/or constructive notice that Ms. Gallian no longer had any legal ownership interest in the

13  SUBJECT PROPERTY, as of October 31, 2018, Mr. NICKEL was not delinquent in his HOA

14  fees, no notice of delinquent assessment had been sent to him by the HOA, no notice of right to

15  mediation with the HOA had been sent to him, and most importantly, the CC&R's for the

16  Huntington Beach Gables specifically prohibit the HOA from seeking reimbursement of

17  assessment fees owed by a prior owner from a current owner and do not empower it to do so.

18  Therefore, the awarding of exemplary and punitive damages is justified.

19  ## SECOND COUNT

20  **(Cancellation of Cloud on Title as against HOA and DOES 1 through 100, inclusive)**

21  60.  Plaintiff, RANDALL L. NICKEL incorporates by reference all of the allegations

22  contained in Paragraphs 1 through 59 as though fully set forth herein.

23  61.  Defendants' claim and assert an interest in the above-described SUBJECT PROPERTY

24  which is adverse to RANDY NICKEL. That interest is based on a fraudulently and illegally

25  recorded NDA by ELITE on behalf of the HOA which was recorded on December 17, 2018,

26  after the sale and title transfer of the SUBJECT PROPERTY had taken place on October 31,

27  2018. (*See,* Exhibit "H".)

28

THE MELLOR LAW FIRM
6800 INDIANA AVE., STE 220
RIVERSIDE, CA 92506
TEL: (951) 222-2100
FAX: (951) 222-2122
www.Mellorlawfirm.com

17

JASSO DECL. PAGE - 0637

62.    The NDA is invalid and void because Defendants, HOA, JASSO, PHILLIPS, BECK, PAULIN, BURRETT, GRAGNANO, and ELITE had actual and/or constructive knowledge that Ms. Gallian no longer had any legal interest in the SUBJECT PROPERTY, that it had been purchased by RANDY NICKEL and title had been recorded and transferred, and the CC&R's do not empower the HOA to record such an NDA against a new owner for a previous owner's debts, the Davis-Sterling Act's required notices to be given RANDY NICKEL which were never given him and a majority of the debt the HOA and Defendants seek is that owed by Ms. Gallian related to an award of attorneys' fees from the *Gallian* actions, which is not owed by RANDY NICKEL at all. Despite that knowledge, the Defendants, HOA, JASSO, PHILLIPS, BECK, PAULIN, GRAGNANO, and ELITE and each of them, chose to record the NDA against the SUBJECT PROPERTY and seek to pursue foreclosure of the NDA while bootstrapping all of the attorneys' fees owed by Ms. Gallian, into the lien illegally, since she has no ownership interest in the SUBJECT PROPERTY whatsoever.

63.    Subsequently and in furtherance of their scheme and plan, Defendants, HOA, JASSO, PHILLIPS, BECK, PAULIN, GRAGNANO, NATIONWIDE, and SUPERIOR recorded a NOD based on the NDA recorded, dated August 30, 2019.  Defendants have additionally recorded and/or continued four NOS on December 16, 2019, March 23, 2020, August 17, 2020, and one set for October 5, 2020 at 3:00 p.m.  (*See*, Exhibits "I" through "M".)

64.    The claim of the Defendant, HOA, to the above-described SUBJECT PROPERTY clouds RANDY NICKEL's title to that SUBJECT PROPERTY, depreciates the property's market value, and prevents Mr. NICKEL's from experiencing his daughter and her newlywed husband's use and enjoyment of the SUBJECT PROPERTY and premises in the manner most enjoyable to Mr. NICKEL's interest as its legal and rightful owner.

## SECOND CAUSE OF ACTION
### (Quiet Title as against HOA and DOES 1 through 100, inclusive)

65.    Plaintiff, RANDALL L. NICKEL incorporates by reference all of the allegations contained in Paragraphs 1 through 64 as though fully set forth herein.

THE MELLOR LAW FIRM
6800 INDIANA AVE , STE 220
RIVERSIDE, CA 92506
TEL: (951) 222-2100
FAX: (951) 222-2122
www.Mellorlawfirm.com

18

66.  As shown by the records of *Gallian*, OCSC Case No. 37-2017-00913985-CU-CO-CJC, an Abstract of Judgment, unrelated to the motion for attorneys' fees, against Ms. Gallian in the amount of $3,070.00 was issued against Ms. Gallian herein was filed November 15, 2018, issued November 16, 2018, and recorded November 19, 2018 (*See,* Exhibit "D".)  On December 4, 2018, in the *Gallian* action a Judgment for Attorneys' Fees in the amount of $46,138.00 was entered against Ms. Gallian and Notice of Entry of Judgment was filed and served on December 7, 2018 (*See,* Exhibit "D".) Subsequently in the *Gallian* action, on May 6, 2019, the HOA also obtained a Judgment against Ms. Gallian for an award of Attorneys' Fees in the amount of $316,583.59. (*See,* Exhibit "E".)

67.  Despite the HOA, JASSO, PHILLIPS, BECK, PAULIN, BURRETT, GRAGNANO and ELITE having actual and/or constructive knowledge that Ms. Gallian no longer had any legal interest in the SUBJECT PROPERTY following RANDY NICKEL's purchase of the SUBJECT PROPERTY on October 31, 2018, ELITE on behalf of the HOA proceeded to record a NDA against the SUBJECT PROPERTY in the amount of $6,788.10 on December 17, 2018, after the sale and title transfer of the SUBJECT PROPERTY had taken place and was recorded by the Orange County Recorder's office (*See,* Exhibit "H".)

68.  Subsequently and in furtherance of their scheme and plan, Defendants recorded a NOD based on the NDA recorded, dated August 30, 2019.  Defendants have additionally recorded and/or continued four NOS on December 16, 2019, March 23, 2020, August 17, 2020, and one which is currently set for October 5, 2020 at 3:00 p.m.  (*See,* Exhibits "I" through "M".)

69.  In violation of the Davis-Stirling Act, knowing how much of the reserve account of the HOA had been spent to further the interests of Defendants and pay for their personal attorneys' fees in the *Gallian* litigation, Defendants intentionally recorded the NDA against the SUBJECT PROPERTY in a scheme to foreclose on the SUBJECT PROPERTY and use both the delinquent assessments and the anticipated judgments against Ms. Gallian for attorney's fees incurred by the HOA, as an offset to the newfound equity in the SUBJECT PROPERTY after RANDY NICKEL's cash purchase with Ms. Gallian, in order to reimburse the illegally obtained reserve

THE MELLOR LAW FIRM
6800 INDIANA AVE., STE 220
RIVERSIDE, CA 92506
TEL: (951) 222-2100
FAX: (951) 222-2122
www.Mellorlawfirm.com

19

JASSO DECL. PAGE - 0639

1   funds account, to hide that fact from fellow HOA members and prevent the HOA from filing

2   bankruptcy and to reimburse themselves.

3     70.  Defendant, ELITE, recorded the NDA against RANDY NICKEL through extrinsic fraud,

4   negligence, and/or mistake in that Defendants, HOA and JASSO, PHILLIPS, BECK, PAULIN

5   and GRAGNANO, conspired in order to further their own self-interests and monetary

6   reimbursement, and decided to intentionally direct ELITE to withhold the escrow demand from

7   Gallian so that she could close escrow, use and erode the HOA's reserve account to fund the

8   attorney's fees spent in the *Gallian* matters and some of which, based upon information and

9   belief, were used to pay on JASSO's companies and JASSO directly for her accounting and legal

10   services, so she and the other Board members would benefit personally from the HOA members'

11   dues payments, without a Membership vote authorizing the removal of the Members monies

12   allocated by the CC&R's for future improvements and no other purpose.

13     71.  RANDY NICKEL became aware of Defendants fraudulent actions following the meeting

14   on May 19, 2019, when a NOD and NOS was posted on the SUBJECT PROPERTY thereafter.

15   (*See,* Exhibits "I" through "M".)

16     72.  Defendants undertook this scheme, conspiracy, and plan, despite the fact that they knew

17   RANDY NICKEL was now the legal owner of the SUBJECT PROPERTY, Ms. Gallian no

18   longer had any legal ownership interest in the SUBJECT PROPERTY, as of October 31, 2018,

19   Mr. NICKEL was not delinquent in his HOA fees, no notice of delinquent assessment had been

20   sent to him by the HOA, no notice of right to mediation with the HOA had been sent to him, and

21   most importantly, the CC&R's for the Huntington Beach Gables specifically prohibit the HOA

22   from seeking reimbursement of assessment fees owed by a prior owner from a current owner and

23   do not empower it to do so and the NDA has expired and is of no further force and effect now

24   being recorded over one year ago and not being extended, all collectively in violation of the

25   Davis-Stirling Act and CC&R provisions.

26     73.  Due to an unsuccessful Mediation on August 24, 2020, with the Hon. Thomas Thrasher

27   (Ret.) at JAMS Mediation Services, RANDY NICKEL has been diligently working toward a

28   resolution to protect his interest in the SUBJECT PROPERTY after discovering the facts

THE MELLOR LAW FIRM
6800 INDIANA AVE., STE 220
RIVERSIDE, CA 92506
TEL: (951) 222-2100
FAX: (951) 222-2122
www.Mellorlawfirm.com

20

JASSO DECL. PAGE - 0640

1  between the time he discovered the facts and the commencement of this action in order to not be
2  prejudiced by and/or prejudicial to the Defendants, all to no avail.

3  74.   At all times herein mentioned Plaintiff, RANDY NICKEL herein had, and continues to
4  have, a meritorious case to the actions by Defendants, and each of them, in that he was not and
5  has never been delinquent in his HOA fees, is not responsible for reimbursement of assessment
6  fees owed by a prior owner, nor the judgments against her by the HOA and its Board members
7  and was owner of the SUBJECT PROPERTY prior to Defendants' fraudulent recordings of the
8  NDA, NOD and NOS.

9

### THIRD CAUSE OF ACTION

**(Preliminary and Permanent Injunction and Temporary Restraining Order
as against Defendants, HOA, JASSO, PHILLIPS, BECK, PAULIN, GRAGNANO,
NATIONWIDE, and SUPERIOR and DOES 1 through 100, inclusive)**

75.   Plaintiff, RANDALL L. NICKEL incorporates by reference all of the allegations
contained in Paragraphs 1 through 74 as though fully set forth herein.

76.   Defendant, HOA, as the association managing the Huntington Beach Gables, was formed
and now exists for the purposes set forth in Article VIII of the Declaration of Covenants,
Conditions and Restrictions for The Huntington Beach Gables Lots 1 And 2 Of Tract No. 10542
City of Huntington Beach, Orange County, California executed on May 21, 1980, and recorded
in the Official Records of the County of Orange, May 28, 1980, ("CC&R's") which sets forth at
Articles V the covenants for assessments, and VIII, the management powers and purposes of the
association, maintenance, upkeep, and repair of all common areas of the leasehold interest in all
of the real property contained within The Huntington Beach Gables Project for the benefit,
protection, and safety of the individual owner-members of the HOA. (*See*, Exhibit "A") and as
limited by Sections 5600 and 5605 of the *Civil Code*, to make reasonable assessments to meet
management expenses.

77.   Knowing how much of the reserve account for the HOA had been spent to further the
interests of Defendants, HOA, JASSO, PHILLIPS, BECK, PAULIN and GRAGNANO and pay
for their personal attorneys' fees in the *Gallian* litigation, Defendants attempted to cover up their

THE MELLOR LAW FIRM
6800 INDIANA AVE., STE 220
RIVERSIDE, CA 92506
TEL: (951) 222-2100
FAX: (951) 222-2121
www.Mellorlawfirm.com

21

JASSO DECL. PAGE - 0641

1  conspiracy and expenditures from their fellow HOA members by hiding their use of the reserve

2  account for personal enrichment and intentionally having ELITE purposefully withhold the

3  demand amount to pay the HOA in escrow and recording the NDA against Mr. NICKEL's

4  SUBJECT PROPERTY in a scheme to foreclose on the SUBJECT PROPERTY and use both the

5  delinquent assessments and the judgments obtained against Ms. Gallian for attorney's fees

6  incurred by the HOA and its Board Members, as an offset to the newfound equity in the

7  SUBJECT PROPERTY after RANDY NICKEL's cash purchase with Ms. Gallian on October

8  31, 2018.

9      78.   Despite the Defendants, HOA, JASSO, PHILLIPS, BECK, PAULIN, GRAGNANO, and

10  ELITE having actual and/or constructive knowledge that Ms. Gallian no longer had any legal

11  interest in the SUBJECT PROPERTY following RANDY NICKEL's purchase of the SUBJECT

12  PROPERTY on October 31, 2018, ELITE, on behalf of the HOA, proceeded to record a NDA

13  against the SUBJECT PROPERTY in the amount of $6,788.10 on December 17, 2018, after the

14  sale and title transfer of the SUBJECT PROPERTY had taken place and was recorded by the

15  Orange County Recorder's office (*See,* Exhibit "H".)

16      79.   Subsequently and in furtherance of their scheme and plan, Defendants, HOA, JASSO,

17  PHILLIPS, BECK, PAULIN, GRAGNANO, NATIONWIDE, and SUPERIOR recorded a NOD

18  based on the NDA ELITE recorded, dated August 30, 2019. Defendants, HOA, JASSO,

19  PHILLIPS, BECK, PAULIN, GRAGNANO, NATIONWIDE, and SUPERIOR have additionally

20  recorded and/or continued four NOS on December 16, 2019, March 23, 2020, August 17, 2020,

21  and one which is currently set for October 5, 2020 at 3:00 p.m. (*See,* Exhibits "I" through "M")

22  all of which sum is unreasonable in that it relates to the unauthorized expenditures as alleged in

23  this Complaint and fees and judgments owed by Ms. Gallian and not RANDY NICKEL.

24      80.   Defendants, and each of them, are also prohibited under *Civil Code* section 5650 from

25  imposing and collecting a regular or special assessment and any late charges, reasonable fees and

26  costs of collection, reasonable attorney's fees, if any, and interest, if any, against RANDY

27  NICKEL because the assessments are the personal debt of Ms. Gallian *at the time the assessment*

28  *or other sums are levied.*

THE MELLOR LAW FIRM
6800 INDIANA AVE , STE 220
RIVERSIDE, CA 92506
TEL: (951) 222-2100
FAX: (951) 222-2122
www.MellorlawFirm.com

22

81.   As shown by the records of *Gallian*, OCSC Case No. 37-2017-00913985-CU-CO-CJC, an Abstract of Judgment, unrelated to the motion for attorneys' fees, against Ms. Gallian in the amount of $3,070.00 was issued against Ms. Gallian herein was filed November 15, 2018, issued November 16, 2018, and recorded November 19, 2018 (*See,* Exhibit "C".)  On December 4, 2018, in the *Gallian* action a Judgment for Attorneys' Fees in the amount of $46,138.00 was entered against Ms. Gallian and Notice of Entry of Judgment was filed December 4, 2018, and served on December 7, 2018 (*See,* Exhibit "D".) Subsequently in the *Gallian* action, on May 6, 2019, the HOA also obtained a Judgment against Ms. Gallian for an award of Attorneys' Fees in the amount of $316,583.59. (*See,* Exhibit "E".) All of these judgments occurred after RANDY NICKEL had taken legal title to the SUBJECT PROPERTY and Ms. Gallian and relinquished any and all interest in it. Despite this knowledge, both actual and constructive, Defendants, HOA, JASSO, PHILLIPS, BECK, PAULIN, GRAGNANO, NATIONWIDE, and SUPERIOR continue to pursue the SUBJECT PROPERTY for the debts of Ms. Gallian.

82.   Plaintiff, RANDY NICKEL has informed Defendants, and each of them, of the unauthorized nature of the assessment and demanded that Defendants immediately cease collection against him for the action brought against Ms. Gallian and record a Satisfaction of Assessment and Release of Lien and abandon the planned foreclosure sale of Plaintiff, RANDY NICKEL's interest in the SUBJECT PROPERTY.  Defendants refuse to do so and have repeatedly threatened RANDY NICKEL with the sale of his SUBJECT PROPERTY, with the most current NOS scheduled for October 5, 2020, unless Mr. NICKEL pays in full the unauthorized assessment and charges of $412,958.11. (*See,* Exhibit "N".)

83.   Plaintiff is informed and believes and thereon alleges that Defendant, HOA, does intend to sell and will in fact sell, RANDY NICKEL's SUBJECT PROPERTY on October 5, 2020.

84.   A subsequent action for money damages for Defendants' wrongful conduct cannot adequately compensate Plaintiff, RANDY NICKEL for the loss of Mr. NICKEL's unique SUBJECT PROPERTY and consequently Plaintiff, RANDY NICKEL has no adequate remedy at law and will suffer irreparable injury unless Defendants are enjoined and restrained by this Court from selling Plaintiff, RANDY NICKEL's SUBJECT PROPERTY.

THE MELLOR LAW FIRM
6800 INDIANA AVE., STE 220
RIVERSIDE, CA 92506
TEL: (951) 222-2100
FAX: (951) 222-2122
www.Mellorlawfirm.com

23

JASSO DECL. PAGE - 0643

## FOURTH CAUSE OF ACTION

### (Negligence as against all Defendants and DOES 1 through 100, inclusive)

85.   Plaintiff, RANDALL L. NICKEL incorporates by reference all of the allegations contained in Paragraphs 1 through 84 as though fully set forth herein.

86.   Defendants, HOA, JASSO, PHILLIPS, BECK, PAULIN, GRAGNANO, ELITE, NATIONWIDE, and SUPERIOR, as Board Members of the HOA, HOA Management Company, default services company for the HOA, the foreclosure trustee for the HOA, the HOA itself and as agents of one another, collectively have a contractual duty and a duty of care to protect the interests of members in good standing of the HOA, apply the CC&R's and Bylaws of the HOA, and the laws under the Davis Sterling Act, fairly and not in contravention of the rights of those members, in seeking the reimbursement of assessments and foreclosing on a member's unit, of which RANDY NICKEL is a member in good standing.

87.   Defendants breached that duty, despite the fact that the HOA, JASSO, PHILLIPS, BECK, PAULIN, GRAGNANO, and ELITE knew that they had purposely withheld the Demand for payment from the Gallian escrow in order to try and attach the Board Members judgment for attorneys' fees to the SUBJECT PROPERTY notwithstanding the fact that they had accepted payment from Ms. Gallian to provide that information within 24 hours.  Furthermore, Defendants, HOA, JASSO, PHILLIPS, BECK, PAULIN, GRAGNANO, ELITE, NATIONWIDE, and SUPERIOR having actual and/or constructive knowledge that the Board Members and HOA's scheme and plan was unsuccessful because Ms. Gallian no longer had any legal interest in the SUBJECT PROPERTY, that it had been purchased by RANDY NICKEL and title had been recorded by the Orange County Recorder's office and transferred, Defendants by recording the NDA, NOD and NOS and proceeding with foreclosure sale against the SUBJECT PROPERTY, for Ms. Gallian's debts, knew that what they were doing was in contravention of the CC&R's for the HOA and the Davis-Sterling Act.

88.   Defendants were negligent because they ignored and failed to conduct any form of due diligence to confirm their knowledge that RANDY NICKEL was now the legal owner of the SUBJECT PROPERTY, Ms. Gallian no longer had any legal ownership interest in the

THE MELLOR LAW FIRM
6800 INDIANA AVE., STE 220
RIVERSIDE, CA 92506
TEL: (951) 222-2100
FAX: (951) 222-2122
www.Mellorlawfirm.com

24

1  SUBJECT PROPERTY, as of October 31, 2018, RANDY NICKEL was not delinquent in his

2  HOA fees, no notice of delinquent assessment had been sent to RANDY NICKEL by the HOA,

3  no notice of right to alternative dispute resolution with the HOA had been sent to RANDY

4  NICKEL, read and applied the provisions of the Davis-Sterling Act and CC&R's for the

5  Huntington Beach Gables which specifically prohibit the HOA from seeking reimbursement of

6  assessment fees owed by a prior owner from a subsequent owner and do not empower

7  Defendants to do so and most importantly, with respect to Defendants, HOA, JASSO,

8  PHILLIPS, BECK, PAULIN, GRAGNANO, NATIONWIDE, and SUPERIOR, that the NDA

9  had expired and was of no further force and effect after being recorded over one year prior and

10 not being extended in writing and recorded by the HOA, did not authorize the recording of an

11 NOD, NOS, by Defendants, HOA, NATIONWIDE, and SUPERIOR and/or conducting a

12 foreclosure sale all collectively in violation of the Davis-Stirling Act and CC&R's. (*See,*

13 CC&R's Article V, Sec. 5.1, pgs. 8-9, and Sec. 5.5(g), p. 13, Exhibit "A".)

14    89.   Thereafter, Defendants, HOA, JASSO, PHILLIPS, BECK, PAULIN, GRAGNANO,

15 NATIONWIDE, and SUPERIOR negligently recorded a NOD based on the NDA recorded by

16 ELITE, dated August 30, 2019.  Defendants, HOA, JASSO, PHILLIPS, BECK, PAULIN,

17 GRAGNANO, NATIONWIDE, and SUPERIOR have additionally recorded and/or continued

18 four NOS on December 16, 2019, March 23, 2020, August 17, 2020, and one set for October 5,

19 2020 at 3:00 p.m.  (*See,* Exhibits "I" through "M".)

20    90.   Defendants, HOA, JASSO, PHILLIPS, BECK, PAULIN, GRAGNANO, and ELITE

21 also failed to maintain and to exercise due care for the residents' of The Huntington Beach

22 Gables Homeowners Association by depleting the reserve account when the HOA fought the

23 *Gallian* litigation between Ms. Gallian and the HOA and the six defendant Board Members

24 named herein, which was expensive, litigious, vitriolic, and costly.

25    91.   As shown in the records of *Gallian,* OCSC Case No. 37-2017-00913985-CU-CO-CJC, an

26 Abstract of Judgment, unrelated to the motion for attorneys' fees, against Ms. Gallian in the

27 amount of $3,070.00 was issued against Ms. Gallian herein was filed November 15, 2018, issued

28 November 16, 2018, and recorded November 19, 2018 (*See,* Exhibit "C".)  On December 4,

THE MELLOR LAW FIRM
6800 INDIANA AVE., STE 220
RIVERSIDE, CA 92506
TEL: (951) 222-2100
FAX: (951) 222-2122
www.Mellorlawfirm.com

25

1  2018, in the *Gallian* action a Judgment for Attorneys' Fees in the amount of $46,138.00 was

2  entered against Ms. Gallian and Notice of Entry of Judgment was filed on December 4, 2018 and

3  served on December 7, 2018 (*See,* Exhibit "D".) Subsequently in the *Gallian* action, on May 6,

4  2019, the HOA also obtained a Judgment against Ms. Gallian for an award of Attorneys' Fees in

5  the amount of $316,583.59. (*See,* Exhibit "E".) All of these judgments occurred after RANDY

6  NICKEL had taken legal title to the SUBJECT PROPERTY and Ms. Gallian and relinquished

7  any and all interest in it. Despite this knowledge, both actual and constructive, Defendants,

8  HOA, JASSO, PHILLIPS, BECK, PAULIN, GRAGNANO, NATIONWIDE, and SUPERIOR

9  continue to pursue the SUBJECT PROPERTY for the entire debt as late as September 2020 and

10  the HOA's last issued billing statement was sent to RANDY NICKEL as though he was

11  responsible for repayment of Ms. Gallian's debts. (*See,* Exhibit "N".)

12  92.  Plaintiff, RANDY NICKEL has informed Defendants, and each of them, of the

13  unauthorized nature of the assessment and demanded that Defendants immediately cease

14  collection against him for the action brought against Ms. Gallian and record a Satisfaction of

15  Assessment and Release of Lien and abandon the planned foreclosure sale of Plaintiff, RANDY

16  NICKEL's interest in the SUBJECT PROPERTY. Defendants refuse to do so and have

17  repeatedly threatened RANDY NICKEL with the sale of his SUBJECT PROPERTY, with the

18  most current NOS scheduled for October 5, 2020, unless Mr. NICKEL pays in full the

19  unauthorized assessment and charges Defendants negligently assert is owed in the amount of

20  $412,958.11.

21  93.  Plaintiff, NICKEL has standing to sue Defendant, ELITE because he had and has an

22  ownership interest in his particular condominium unit, the SUBJECT PROPERTY, as of October

23  31, 2018. This cause of action is premised on the duties arising from the HOA's Bylaws and its

24  Conditions, Covenants and Restrictions. The relevant CC&Rs (*See,* Exhibit "A"), specifically

25  state the Association shall have the right and power to employ or engage Defendant, ELITE and

26  contract such services, labor, and materials deemed reasonably necessary to operate and maintain

27  the common area and the improvements thereon and employed Defendant, ELITE the following

28  duties, including:

THE MELLOR LAW FIRM
6800 INDIANA AVE., STE 220
RIVERSIDE, CA 92506
TEL: (951) 222-2100
FAX: (951) 222-2122
www.MellorLawFirm.com

26

JASSO DECL. PAGE - 0646

e. The payment of taxes and assessments which are or could become a lien on the common area or sums portion thereof;

f. Establishing and maintaining working capital and contingency fund in an amount to be determined by the Board of Directors of the Association.

94. At all relevant times, Defendant, ELITE had assumed a duty pursuant to its contract to manage and oversee the affairs of the HOA for the Homeowners Association Members, including Plaintiff, NICKEL. According to the HOA governing documents, the CC&Rs, ELITE is hired by the owners of the HOA, of which NICKEL is a member, and is accountable to Plaintiff, NICKEL, as well as all the other owners of their respective condominium units. Defendant, ELITE has therefore duties pursuant to the *Davis-Sterling Common Interest Development Act* in conjunction with the CC&Rs. Defendant, ELITE:

a. Failed to maintain accurate and complete records to protect Plaintiff, NICKEL, a member in good standing, from Defendants seeking reimbursement of assessments and foreclosing on NICKEL's's unit for assessments owed solely by the prior owner, GALLIAN, and not to allow the HOA to chargeNICKEL, with the GALLIAN assessments which Defendantsproceeded to do illegally and in violation of the CC&Rs and the *Davis-Sterling Common Interest Development Act*.

b. Aided and abetted the HOA Board Members conspiracy further their own self-interest to intentionally use and erode the HOA's reserve account to fund the attorney's fees spent in the *Gallian* litigation and some of which was used to pay on Defendant, JASSO's companies and Defendant, JASSO directly for her accounting and legal services, so Defendant, JASSO and the other Board Members would benefit personally from the HOA members' dues payments, without a membership vote authorizing the removal of the members monies allocated by the CC&Rs for future improvements and for no other purpose.

95. As a proximate result of the negligence and carelessness of Defendants, and each of them, RANDY NICKEL has been hurt and injured in his ownership of the SUBJECT PROPERTY and his health, strength, and activity, sustaining injury to his nervous system and

THE MELLOR LAW FIRM
6800 INDIANA AVE., STE 220
RIVERSIDE, CA 92506
TEL: (951) 222-2100
FAX: (951) 222-2123
www.MellorlawIfirm.com

27

JASSO DECL. PAGE - 0647

person, all of which injuries have caused, and continue to cause RANDY NICKEL great mental,

physical, and nervous pain and suffering in an amount according to proof.

## FIFTH CAUSE OF ACTION
### (Negligent Infliction of Emotional Distress as against all Defendants and DOES 1 through 100, inclusive)

96.    Plaintiff, RANDALL L. NICKEL incorporates by reference all of the allegations contained in Paragraphs 1 through 95 as though fully set forth herein.

97.    On May 19, 2019, RANDY NICKEL was called out to the SUBJECT PROPERTY to meet with Defendants, JASSO and GRAGNANO on behalf of the HOA and the other Defendant Board Members for what was termed a "welcoming party." JASSO told Mr. NICKEL that the HOA and Board Members wanted to welcome him and his family to the neighborhood and throw a party for them.

98.    RANDY NICKEL, his wife June, and Daughter, April Lovejoy, Met with JASSO and GRAGNANO out at the pool area in the HOA common area. Both during and after that meeting RANDY NICKEL witnessed his daughter, April starting to cry, visibly upset, get up and walk away from their meeting. June, visibly upset at the setup and pretense of the "welcoming party" followed to comfort her. It was at this moment RANDY NICKEL realized JASSO and GRAGNANO had revealed the Defendants plan and scheme to go after Mr. NICKEL's real property because they believed he was of the financial ability to pay for the debts of Gallian and they could use the equity of the newly paid off SUBJECT PROPERTY to reimburse themselves and to cover-up their misuse of the funds and expenditures from the HOA accounts.

99.    All of the misrepresentations by Defendants, JASSO and GRAGNANO to Plaintiff, NICKEL and his wife and daughter, was aided and abetted by Defendant, ELITE's participation in the accounting fo the HOA and preparing and recording of the NOA, NOD and multiple NOS, unlawfully threatening to foreclose on the SUBJECT PROPERTY, thereby Plaintiff, NICKEL losing the SUBJECT PROPERTY and the $397,000.00 that he paid in full when the SUBJECT PROPERTY was purchased by Plaintiff, NICKEL.

THE MELLOR LAW FIRM
6800 INDIANA AVE., STE 220
RIVERSIDE, CA 92506
TEL: (951) 222-2100
FAX: (951) 222-2122
www.Mellorlawfirm.com

28

100. Without Defendant, ELITE's aiding and abetting, and actively participating in the scheme to unlawfully take Plaintiff, NICKEL's SUBJECT PROPERTY and witnessing the severe emotional distress caused on his family member and himself because of the prospect of losing the SUBJECT PROPERTY over a debt he does not owe, the HOA and Board Members scheme and plan would not have worked.RANDY NICKEL has had to witness and deal with the constant emotional upset and physical manifestations of illness of his family members and himself at the prospect of losing the SUBJECT PROPERTY over a debt he does not owe.

101. As a proximate result of Defendants' acts constituting a breach of duty and the consequences proximately caused by it, as hereinabove alleged, Plaintiff, RANDY NICKEL suffered severe emotional distress and mental suffering, all to his damage and has been deprived of the society, comfort, protection, services, and support of his wife, June and daughter, April, and has thereby suffered severe emotional distress and mental suffering, all to his damage according to proof.

## SIXTH CAUSE OF ACTION
**(Fraud as against Defendants HOA, JASSO, PHILLIPS, BECK, PAULIN, GRAGNANO, and DOES 1 through 100, inclusive)**

102. Plaintiff, RANDALL L. NICKEL incorporates by reference all of the allegations contained in Paragraphs 1 through 101 as though fully set forth herein.

### FIRST COUNT
**(Intentional Misrepresentation)**

103. On October 31, 2018, RANDY NICKEL purchased the SUBJECT PROPERTY from its previous owner, Ms. JAMIE GALLIAN, for his daughter and her fiancé to live. To memorialize that transaction, an Assignment of Ground Lease and Condominium Sublease was executed and recorded in the Orange County Recorder's office that same day as Document 2018-000395579. (*See,* Exhibit "F".) That same day RANDY NICKEL paid Ms. GALLIAN full and fair market value consideration for the SUBJECT PROPERTY of $379,000.00, via two Cashier's checks. (*See,* Exhibit "G".) When this transaction was consummated, there were no liens on the SUBJECT PROPERTY.

THE MELLOR LAW FIRM
6800 INDIANA AVE., STE 220
RIVERSIDE, CA 92506
TEL: (951) 222-2100
FAX: (951) 222-2122
www.Mellorlawfirm.com

29

JASSO DECL. PAGE - 0649

104. Prior thereto it was discovered that on or about August 15, 2018, Defendants, HOA, JASSO, PHILLIPS, BECK, PAULIN, and GRAGANO had Defendant, ELITE prepare a Notice of Delinquent Assessments on the SUBJECT PROPERTY with a plan and scheme to attempt to record a Notice of Delinquent Assessments on the SUBJECT PROPERTY, which they in fact did on December 17, 2018.

105. On October 22, 2018, prior to the sale of the SUBJECT PROPERTY to NICKEL and also from October 24, 2018 through October 31, 2018, Defendants, HOA, JASSO, PHILLIPS, BECK, PAULIN, and GRAGANO agreed to and directed Defendant, JASSO to contact Defendant, ELITE not to provide Plaintiff, NICKEL and GALLIAN with the documents required to be provided pursuant to *Civil Code* section 4525, such as:

    a. A copy of the governing documents;

    b. Any restrictions in governing documents limiting the occupancy on the use of a separate interest;

    c. A copy of the most recent documents distributed, such as the Annual Budget Report;

    d. A true statement in writing from Defendant, ELITE, the authorized agent, as to the amount of the Associations current and regular and special assessments and fees, any assessment issued upon the owner's interest in the common interest development that are unpaid on the date of the statement, and any monetary fines or penalties levied upon the owner's interest and unpaid on the date of the statement;

    e. A copy of a summary of any notice previously sent to the owner setting forth any violation of the governing documents that remains unresolved at the time of the request;

    f. A copy of the minutes, board meetings, excluding meetings held in executive session, conducted over the previous 12 months, that were approved by the board;

    g. A copy of the CC&Rs and Bylaws; and

    h. Other unpaid obligations of seller.

THE MELLOR LAW FIRM
6800 INDIANA AVE , STE 220
RIVERSIDE, CA 92506
TEL: (951) 222-2100
FAX: (951) 222-2122
www.Mellorlawfirm.com

30

JASSO DECL. PAGE - 0650

106.  This was all meant to delay the sale of the SUBJECT PROPERTY by Defendants as stated above, with the aiding and abetting to the scheme by ELITE and its employees, Lynn Joslyn and "Jessica" at Defendant, ELITE, to stall and refuse to supply the above-mentioned documentation to GALLIAN in order to complete the sale to Plaintiff, NICKEL when GALLIAN made the request on the above date at the office of Defendant, ELITE, located at 38760 Sky Canyon Drive, Suite C, Murrieta, California.

107.  On or about October 22, 2018, and October 24, 2018, up to sale of the SUBJECT PROPERTY to Plaintiff, NICKEL, Defendants, and each of them, on said date, time and place, Defendants, ELITE and the HOA, JASSO, PHILLIPS, BECK, PAULIN, and GRAGANO, board members by their action and scheme to refused to deliver the documents to GALLIAN and Plaintiff, NICKEL as required by *Civil Code* section 4525, represented that there were no recorded liens or liens to be recorded when NICKEL purchased the SUBJECT PROPERTY and concealed their scheme to delay the purchase of the SUBJECT PROPERTY until they could lien the SUBJECT PROPERTY by way of the Notice of Delinquent Assessment recorded on December 17, 2018, Notice of Default recorded on August 30, 219, Notices of Sale recorded on December 16, 2019, March 23, 2020, August 17, 2020, and October 5, 2020.  The total amount of these liens and/or cloud on the SUBJECT PROPERTY now total $396,315.29, according to the Notice of Sale recorded on December 16, 2019. (*See,* Exhibit "I".)

108.  When Defendants, and each of them, made the representations they knew them to be false and that Plaintiff, NICKEL obtained clear title on October 31, 2018, when he became the legal owner of the SUBJECT PROPERTY and paid $379,000.00 for same.

109.  When these liens and cloud on Plaintiff, NICKEL's good title was acquired on October 31, 2018, these Defendants, and each of them, knew by way of constructive notice that Plaintiff was the legal owner of the SUBJECT PROPERTY, was not delinquent in his HOA fees, no Notice of Delinquent Assessment had been sent to him by the HOA, no right to mediation with the HOA had been sent to him, and GALLIAN no longer had any legal ownership interest in the SUBJECT PROPERTY, and Defendant, HOA is fraudulently attempting to seek reimbursement

THE MELLOR LAW FIRM
6800 INDIANA AVE., STE 220
RIVERSIDE, CA 92506
TEL: (951) 222-2100
FAX: (951) 222-2122
www.Mellorlawfirm.com

31

JASSO DECL. PAGE - 0651

1 │ of assessment fees owned by a prior owner, GALLIAN from a current owner, Plaintiff,

2 │ NICKEL, all collectively in violation of the *Davis-Sterling Act* and the CC&Rs.

3 │    110. In furtherance of the malicious and fraudulent scheme, Plaintiff, NICKEL, his wife June

4 │ and daughter, April Lovejoy, met with JASSO and GRAGNANO out at the pool area in the

5 │ HOA common area. After some pleasantries and some drinks and snacks JASSO asked Mr.

6 │ NICKEL, "what do you plan to do about the debts of Ms. Gallian since," according to them,

7 │ "you do not have clear title. Her name is still on the property and she owes the HOA and the

8 │ Board Members a lot of money." RANDY NICKEL didn't know how to respond because this

9 │ was all news to him. Ms. JASSO continued "don't panic, we're not coming after you we are

10 │ going after Jamie [Ms. Gallian], but we need to get this paid and we have your banking

11 │ information, you make enough money Mr. NICKEL. You can write it off on your taxes. I am a

12 │ Tax attorney. I do it all the time I can show you how." "We will work with you, but, we are

13 │ going to secure Ms. Gallian's debt with the condo [SUBJECT PROPERTY] so that we can get

14 │ paid." April started to cry, got up and walked away. June, visibly upset at the setup and pretense

15 │ of the "welcoming party" followed to comfort her. It was at this moment RANDY NICKEL

16 │ realized what JASSO and GRAGNANO and the HOA was up to. JASSO had revealed the

17 │ HOA's plan and scheme to go after Mr. NICKEL's real property because they believed he was

18 │ of the financial ability to pay for the debts of Gallian and they could use the equity of the newly

19 │ paid off SUBJECT PROPERTY to reimburse themselves and cover-up their misuse of the funds

20 │ and expenditures from the HOA accounts.

21 │    111. In furtherance of their plan and scheme, Defendants and each of them, used the *Gallian*

22 │ actions to have their attorney Pejman D. Kharrazian, Esq. at Epstein, Grinnell, and Howell, issue

23 │ a subpoena for the banking records of Plaintiff, NICKEL under the guise that somehow his bank

24 │ accounts had some rational relationship to Ms. GALLIAN.

25 │    112. When Mr. NICKEL called Mr. Kharrazian, Esq. to inquire about the reason for the

26 │ subpoena of his bank records, he was told "it was just discovery in the *Gallian* actions and he

27 │ didn't need to worry about it." "Just ignore it," "We are going after Ms. GALLIAN, not you," he

28 │ was told. With the assurances of Mr. Kharrazian, Esq., and not understanding legal procedures

THE MELLOR LAW FIRM
6800 INDIANA AVE., STE 220
RIVERSIDE, CA 92506
TEL: (951) 222-2100
FAX: (951) 222-2123
www.Mellorlawfirm.com

32

JASSO DECL. PAGE - 0652

1  and what the Defendants had planned, Plaintiff, NICKEL relied on the representations made to

2  him by Mr. Kharrazian, Esq., on behalf of the above-referenced Defendants and did not

3  immediately seek counsel or seek to oppose the subpoena. In so doing, all named Defendants

4  improperly obtained Mr. NICKEL's confidential financial information to use to their advantage

5  in their scheme and plan.

6      113.  The Defendants, and each of them, knew when they made these representations

7  concerning Plaintiff, NICKEL's acquisition of the SUBJECT PROPERTY and his bank

8  statements in pursuit of the GALLIAN' debt that the representations were false, and were made

9  with the intent to deceive Plaintiff, NICKEL and to induce Plaintiff to take the actions herein and

10  with the intent to prevent Plaintiff from further inquiring into protecting his interest in the

11  SUBJECT PROPERTY and preventing Plaintiff from taking action to protect his right to privacy

12  as to his confidential bank records.

13      114.  RANDY NICKEL believed these representations of the defendants, and each of them, to

14  be true, and in reliance on these representations he was induced to do nothing in order to

15  preserve his interest in the SUBJECT PROPERTY and has now had to expend considerable

16  monies on attorneys' fees to protect his interest and suffer ill health effects of himself and

17  witness those of his family members. RANDY NICKEL would not have stood by and allowed

18  the Defendants to foreclose on the SUBJECT PROPERTY herein described and would not have

19  expended the sums herein alleged for improvements on the property if he had not relied on these

20  representations by the defendants, and each of them.

21      115.  Subsequently and in furtherance of their scheme and plan, Defendants recorded a NOD

22  based on the NDA recorded, dated August 30, 2019.  Defendants have additionally recorded

23  and/or continued four NOS on December 16, 2019, March 23, 2020, August 17, 2020, and one

24  which is currently set for October 5, 2020 at 3:00 p.m.  (*See,* Exhibits "I" through "M".)

25      116.  The true facts were that Defendants undertook this scheme, conspiracy, and plan, despite

26  the fact that they knew how much of the reserve account for the HOA had been spent to further

27  the interests of Defendants and pay for their personal attorneys' fees in the *Gallian* litigation.

28  With RANDY NICKEL now the legal owner of the SUBJECT PROPERTY, the intent to

THE MELLOR LAW FIRM
6800 INDIANA AVE., STE 220
RIVERSIDE, CA 92506
TEL: (951) 222-2100
FAX: (951) 222-2122
www.Mellorlawfirm.com

33

JASSO DECL. PAGE - 0653

1  deceive and to induce RANDY NICKEL in their attempt to cover up their conspiracy and

2  expenditures from their fellow HOA members reserve account and intentionally have ELITE

3  record the NDA against the SUBJECT PROPERTY in a scheme to foreclose on the SUBJECT

4  PROPERTY and use both the delinquent assessments and the anticipated judgment against Ms.

5  Gallian for attorney's fees incurred by the HOA, that was immanent from the court, as an offset

6  to the newfound equity in the SUBJECT PROPERTY after RANDY NICKEL's cash purchase

7  with Ms. Gallian, to reimburse themselves and the illegally obtained reserve funds account, in

8  order to hide that fact from fellow HOA members and prevent the HOA from the filing of

9  bankruptcy.

10  117. Plaintiff, NICKEL, at the time these representations were made by the Defendants, and at

11  the time Plaintiff took the actions and inactions, was ignorant of the falsity of Defendants false

12  representations and believed them to be true.  In reliance of these representations, Plaintiff was

13  induced to purchase the SUBJECT PROPERTY and refrain from contesting the service of the

14  subpoena for his confidential bank records.  Plaintiff's reliance was justified because there were

15  no liens on the SUBJECT PROPERTY when he purchased same and paid $379,000.00 for the

16  SUBJECT PROPERTY with clear and good title and the subpoena was not contested based upon

17  the representations of Defendants' Attorney, Kharrazian.

18  118. The true facts were that Defendants undertook this scheme, conspiracy, and plan, despite

19  the fact that they knew how much of the reserve account for the HOA had been spent to further

20  the interests of Defendants and pay for their personal attorneys' fees in the *Gallian* litigation.

21  With RANDY NICKEL now the legal owner of the SUBJECT PROPERTY, the intent to

22  deceive and to induce RANDY NICKEL in their attempt to cover up their conspiracy and

23  expenditures from their fellow HOA members reserve account and intentionally have ELITE

24  record the NDA against the SUBJECT PROPERTY in a scheme to foreclose on the SUBJECT

25  PROPERTY and use both the delinquent assessments and the anticipated judgment against Ms.

26  Gallian for attorney's fees incurred by the HOA, that was immanent from the court, as an offset

27  to the newfound equity in the SUBJECT PROPERTY after RANDY NICKEL's cash purchase

28  with Ms. Gallian, to reimburse themselves and the illegally obtained reserve funds account, in

THE MELLOR LAW FIRM
6800 INDIANA AVE., STE 220
RIVERSIDE, CA 92506
TEL: (951) 222-2100
FAX: (951) 222-2122
www.Mellorlawfirm.com

34

JASSO DECL. PAGE - 0654

1  order to hide that fact from fellow HOA members and prevent the HOA from the filing of

2  bankruptcy.

3      119. Plaintiff, NICKEL would not have purchased the SUBJECT PROPERTY if he was made

4  aware of the liens recorded prior to his purchase of the SUBJECT PROPERTY and Defendants

5  fraudulent attempts to foreclose on the SUBJECT PROPERTY for monies owed due to

6  delinquent assessments by the prior owner, attorney's fees judgment and interest are illegal.

7      120. As a proximate result of the fraudulent conduct of Defendants, as herein alleged,

8  Plaintiff, NICKEL, had to expend thousands of dollars in attorney's fees and costs to force these

9  Defendants to release and rescind the Notice of Default based on the NDA and multiple NOS.

10  As a further proximate result of the fraudulent conduct of Defendants, Plaintiff, NICKEL's

11  equity from the purchase of the SUBJECT PROPERTY in the amount of $379,000.00 is still

12  under attack by Defendants and Defendants continue to cloud title of the SUBJECT PROPERTY

13  by recording of a Lis Pendens on the SUBJECT PROPERTY on December 1, 2020. All to

14  Plaintiff's damages in the sum of a minimum of $500,000.00, according to proof at trial.

15      121. The aforementioned conduct of Defendants was an intentional misrepresentation, deceit,

16  or concealment of a material fact known to Defendants with the intention on the part of the

17  Defendants of thereby depriving the Plaintiff of property or legal rights or otherwise causing

18  injury, and was despicable conduct that subjected Plaintiff to a cruel and unjust hardship in

19  conscious disregard of Plaintiff's rights, so as to justify an award of exemplary and punitive

20  damages.

## SECOND COUNT
### (Suppression of Fact)

21

22      122. Plaintiff, RANDALL L. NICKEL incorporates by reference all of the allegations

23  contained in Paragraphs 1 through 121 as though fully set forth herein

24      123. Despite the HOA, JASSO, PHILLIPS, BECK, PAULIN, BURRETT and GRAGNANO

25  having actual and/or constructive knowledge that Ms. Gallian no longer had any legal interest in

26  the SUBJECT PROPERTY, that it had been purchased by RANDY NICKEL and title had been

27

28  recorded and transferred, the Defendants chose to instruct ELITE to record the NDA against the

THE MELLOR LAW FIRM
6800 INDIANA AVE., STE 220
RIVERSIDE, CA 92506
TEL: (951) 222-2100
FAX: (951) 222-2122
www.Mellorlawfirm.com

SUBJECT PROPERTY, represented that Ms. Gallian still had an ownership interest in the SUBJECT PROPERTY knowing full well that she had no interest the Defendants could attach.

124. The failure to disclose these facts concerning the true ownership and the lack of responsibility RANDY NICKEL had for the debts of a prior owner was likely to mislead and did in fact mislead RANDY NICKEL in the light of other representations concerning the SUBJECT PROPERTY made by the defendants.

125. The Defendants, and each of them, made the failures to disclose and the suppressions of information herein alleged with the intent to induce RANDY NICKEL to act in the manner herein alleged in reliance thereon, and with the intent to prevent RANDY NICKEL from further inquiring into the effect of the HOA liens on the SUBJECT PROPERTY all to his physical and financial detriment.

126. The representations and failure to disclose information and suppressions of information herein alleged made by Defendants, HOA, JASSO, PHILLIPS, BECK, PAULIN, BURRETT and GRAGNANO, and aided and abetted by Defendant, ELITE, were made with the intent to induce the Plaintiff to purchase the SUBJECT PROPERTY for $379,000.00 on October 31, 2018, to do nothing to contest the subpoenas issued for his confidential bank records, to expend sums to effect repairs to the SUBJECT PROPERTY and to act in the manner herein alleged in reliance thereon and to acquire the equity in the SUBJECT PROPERTY

127. The Plaintiff, at the time these failures to disclose and suppressions of fact occurred, and at the time Plaintiff took the actions herein alleged, was ignorant of the existence of the facts that the Defendants suppressed and failed to disclose. If Plaintiff had been aware of the existence of the facts not disclosed by Defendants, Plaintiff would not have, as he did, purchase the SUBJECT PROPERTY, made repairs and improvements to the SUBJECT PROPERTY, and not contest Defendants obtaining his confidential bank records.

128. As a proximate result of the failures to disclose information and suppressions of information herein alleged made by Defendants to suppress as setforth above, Plaintiff had to expend thousands of dollars in attorney's fees and costs to force Defendants to release and rescind the NOD based on the NDA and multiple NOS. Further Plaintiff's equity and purchase

THE MELLOR LAW FIRM
6800 INDIANA AVE., STE 220
RIVERSIDE, CA 92506
TEL: (951) 222-2100
FAX: (951) 222-2122
www.Mellorlawfirm.com

36

JASSO DECL. PAGE - 0656

price of $379,000.00, is still under attack by Defendants as they continue to cloud Plaintiff's title in the SUBJECT PROPERTY by recording a Lis Pendens on December 1, 2020, costs of repairs to the unit, all to Plaintiff's damages in the sum of $500,000.00.

129. The Aforementioned conduct of Defendants was an intentional deceit, concealment, and suppression of a material fact of the Defendants, thereby depriving Plaintiff of property or legal rights or otherwise causing injury and was despicable conduct that subjected Plaintiff to cruel and unjust hardship so as to justify an award of exemplary and punitive damages.

## SEVENTH CAUSE OF ACTION

### (Intentional Infliction of Emotional Distress as against Defendants HOA, JASSO, PHILLIPS, BECK, PAULIN, GRAGNANO and DOES 1 through 100, inclusive)

130. Plaintiff, RANDALL L. NICKEL incorporates by reference all of the allegations contained in Paragraphs 1 through 129 as though fully set forth herein.

131. Defendant Board members' conduct of recording the NDA, NOD, and multiple NOS on the SUBJECT PROPERTY over a period in excess of One (1) years' time were not related to any debt, overdue assessments, penalties, attorney's fees, costs, or interest due and owing by Plaintiff, NICKEL. When Plaintiff, NICKEL purchased the SUBJECT PROPERTY on October 31, 2018, there were no such liens on the SUBJECT PROPERTY. Any unpaid assessments pertained to GALLIAN, the previous owner of the SUBJECT PROPERTY, not Plaintiff. Furthermore, when in process of purchasing the SUBJECT PROPERTY, Defendants, and each of them, instructed Defendant, ELITE to refuse to provide any documents as they were required to provide pursuant to *Civil Code* section 4525, as set forth above. The fact is, Plaintiff, NICKEL had no constructive or actual notice of any liens, past due assessments, judgments, attorney's fees, costs, or interest due to the HOA by former owner. It was the HOA and its Defendant Board Members who enlisted Defendant, ELITE to aid and abet them by refusing to turn over the required documentation to GALLIAN required in order to delay the sale to Plaintiff, NICKEL so Defendants could perfect their liens, judgment, and attorney's fees due and owing by former owner, GALLIAN, to cloud title and prevent the sale of the SUBJECT

THE MELLOR LAW FIRM
6800 INDIANA AVE., STE 220
RIVERSIDE, CA 92506
TEL: (951) 222-2100
FAX: (951) 222-2122
www.Mellorlawfirm.com

37

JASSO DECL. PAGE - 0657

1  PROPERTY to Plaintiff, NICKEL. Nevertheless, the sale went through on October 31, 2018,

2  with no such NDA, NOD, or NOS recorded on the SUBJECT PROPERTY.

3      132. At the time Plaintiff, RANDY NICKEL purchased the SUBJECT PROPERTY from its

4  previous owner, Ms. Jamie Gallian, for his daughter and her fiancé to live, there was no mention

5  of, or recording of delinquent assessments, Judgment for Attorneys' Fees and/or recordation of

6  an Abstract of Judgment. In fact, by Defendants own actions they prevented Ms. Gallian from

7  paying her past assessments by instructing ELITE to withhold information pursuant to an escrow

8  demand paid for with a rush service fee to be responded to within 24 hours. Had Defendants not

9  tried to scheme in order to have their anticipated lien for attorneys' fees attach to the SUBJECT

10  PROPERTY, the HOA would have recovered its outstanding assessments from escrow with Ms.

11  Gallian.

12      133. The above delinquent assessments, Judgment for Attorneys' Fees and/or recordation of

13  an Abstract of Judgment were related to an action(s) against Ms. Gallian, a prior owner of the

14  SUBJECT PROPERTY and <u>after</u> the sale of the SUBJECT PROPERTY to RANDY NICKEL.

15      134. The Defendants, JASSO and GRAGNANO, and HOA Board Members further engaged

16  in this  scheme as set forth above by representing to Plaintiff, NICKEL, and his family at this so-

17  called welcome meeting was to falsely and fraudulently represent to Plaintiff, NICKEL, that

18  there were valid liens on the SUBJECT PROPERTY, Plaintiff, NICKEL did not have clear title,

19  so he should pay it because he could afford it, increased Plaintiff's severe emotional distress by

20  threatening to take Plaintiff's property and losing his $379,000.00 purchase money Plaintiff had

21  paid for the SUBJECT PROPERTY.

22      135. Defendants knew or should have known that they were prohibited under *Code of Civil*

23  *Procedure* section 5650 and specifically the CC&R's from imposing and collecting a regular

24  assessment and any late changes, reasonable fees and costs of collection, attorney's fees, and

25  interest, if any against Plaintiff, NICKEL because the assessments are the presumed debt of

26  GALLIAN at the time the assessment or other sums are levied.

27

28

THE MELLOR LAW FIRM
6800 INDIANA AVE., STE 220
RIVERSIDE, CA 92506
TEL: (951) 222-2100
FAX: (951) 222-2122
www.MellorlawFirm.com

38

JASSO DECL. PAGE - 0658

136. By reason of this unlawful assessment against Plaintiff, NICKEL and as a proximate result thereof in the manner hereinabove mentioned, Plaintiff, NICKEL suffered great mental distress and became nervous and ill, all to his damage according to proof.

137. Defendants' conduct of attempting to illegally foreclose on the SUBJECT PROPERTY was willful, malicious, and deliberate, and without probable cause and done for the purpose of causing Plaintiff, NICKEL to suffer humiliation, mental anguish, and emotional and physical distress. Defendants' conduct was done with knowledge that Plaintiff's emotional and physical distress would thereby increase and was done with wanton and reckless disregard of the consequences to Plaintiff, NICKEL. Defendants' conduct for over a one (1) year period was of such substantial quantity or enduring that no man in a civilized society should be expected to endure, especially from Defendants who had a fiduciary duty to refrain from such evil, fraudulent and despicable conduct from Plaintiff's Board Members.

138. The acts of Defendants and each of them, alleged above were willful, wanton, malicious, and oppressive, and justify the awarding of exemplary and punitive damages.

## EIGHTH CAUSE OF ACTION

**(Conspiracy as against Defendants, HOA, JASSO, PHILLIPS, BECK, PAULIN, GRAGNANO, ELITE, and DOES 1 through 100, inclusive)**

139. Plaintiff, RANDALL L. NICKEL incorporates by reference all of the allegations contained in Paragraphs 1 through 138 as though fully set forth herein.

140. On August 7, 2018, six defendant Board Members named herein filed their Motion for Attorneys' Fees in the *Gallian* action and the trial court issued a tentative ruling granting the Motion on November 1, 2018 and confirmed it at the hearing on November 8, 2018.

141. During the *Gallian* action and the various court hearings up to the sale of the SUBJECT PROPERTY on October 31, 2018, the HOA and its Board Members were made aware because of statements made in open court by Ms. Gallian that she was in the process of selling the SUBJECT PROPERTY to rid herself of the involvement with the HOA and its Board.

THE MELLOR LAW FIRM
6800 INDIANA AVE., STE 220
RIVERSIDE, CA 92506
TEL: (951) 222-2100
FAX: (951) 222-2123
www.Mellorlawfirm.com

39

JASSO DECL. PAGE - 0659

142. In fact, Ms. Gallian had opened two escrows for the sale of the SUBJECT PROPERTY before entering into any agreement for the sale of the SUBJECT PROPERTY to RANDY NICKEL.

143. Knowing of the impending Motion for Attorney's Fees hearing in the *Gallian* matter, the HOA and its Board Members, JASSO, GRAGNANO, PHILLIPS, BECK, PAULIN, and BURRETT conspired and sought to hold up the sale by Ms. Gallian of the SUBJECT PROPERTY so as to ensure that they, collectively, could cause their anticipated judgment for attorney's fees to attach itself to the SUBJECT PROPERTY and execute on its equity in order to be paid and in order to cause Ms. Gallian the most personal harm because of the animus the HOA and the Board Members had for her.

144. To effectuate that plan and scheme, the HOA and its Board Members, JASSO, PHILLIPS, BECK, PAULIN, BURRETT, and GRAGNANO elicited the help of and directed its agent Management Company, ELITE, to purposefully withhold and not provide any demand for 12 months of the Association's Minutes, Litigation Disclosures, and demands for accounting of monies owed to the HOA, made by Gallian and/or her escrow company, to effectuate the sale of and close escrow on the SUBJECT PROPERTY before the judgment lien for attorney's fees could be recorded and attach to the SUBJECT PROPERTY for their benefit.

145. Thereafter, on October 22, 2018, Ms. Gallian through her Escrow Company, Eminence Escrow, Inc., sought to obtain and did formally demand from ELITE, on behalf of the HOA, the 12 months of the Association's Minutes, Litigation Disclosures, and demands for accounting of any monies owed to the HOA by Gallian, in order to effectuate and complete her sale of and close escrow on the SUBJECT PROPERTY with Ms. Gallian's now, second buyer in escrow. To that end, Ms. Gallian obtained and Eminence Escrow, Inc. delivered, via Federal Express Priority Overnight to Ms. Lynn Joslyn and "Jessica" at ELITE's Escrow Department, two money orders, one for $250.00, representing $90.00 for the Demand, $120.00 for a one-day business rush, $20.00 for 12 months of Association Minutes and $20.00 for litigation disclosures and a second money order in the amount of $326.00, for the HOA's monthly dues of $316.00, in addition to a $10.00 late fee charge.  (*See*, Exhibit "B".)

THE MELLOR LAW FIRM
6800 INDIANA AVE., STE 220
RIVERSIDE, CA 92500
TEL: (951) 222-2100
FAX: (951) 222-2127
www.MellorlawFirm.com

40

JASSO DECL. PAGE - 0660

146. Despite receiving the demand from Ms. Gallian, repeated requests in writing by Ms. Gallian through her escrow company, Eminence Escrow, Inc., from October 24 through October 31, 2018, to Ms. Lynn Joslyn at ELITE and despite paying ELITE the $120.00 rush fee to overnight the requested information to close escrow and pay the HOA any monies it was owed as of October 31, 2018, Ms. Lynn Joslyn and "Jessica" at ELITE's Escrow Department refused to provide same to Ms. Gallian and RANDY NICKEL, just as ELITE was directed to stall and refuse to do so by Defendant, HOA and its Board Members.

147. On October 31, 2018, RANDY NICKEL purchased the SUBJECT PROPERTY from its previous owner, Ms. Jamie Gallian, for his daughter and her fiancé to live. To memorialize that transaction, an Assignment of Ground Lease and Condominium Sublease was executed and recorded in the Orange County Recorder's office that same day as Document 2018-000395579. (See, Exhibit "F".) That same day RANDY NICKEL paid Ms. Gallian full and fair market value consideration for the SUBJECT PROPERTY of $379,000.00, via two Cashier's checks. (See, Exhibit "G".)

148. Over a month and a half later, on December 17, 2018, after the sale and title transfer of the SUBJECT PROPERTY had taken place and was recorded by the Orange County Recorder's office, the HOA proceeded to record an NDA against the SUBJECT PROPERTY in the amount of $6,788.10. (See, Exhibit "H".)

149. Despite the HOA, JASSO, PHILLIPS, BECK, PAULIN, BURRETT, GRAGNANO, and ELITE having actual and/or constructive knowledge that Ms. Gallian no longer had any legal interest in the SUBJECT PROPERTY, that it had been purchased by RANDY NICKEL and title had been recorded and transferred, the Defendants chose to record the NDA against the SUBJECT PROPERTY.

150. Defendant, ELITE's liability for aiding and abetting this scheme in agreeing to and participating in same, and in the actions taken by said Defendants as described above, had both actual and constructive knowledge of this specific primary wrong in recording the NDA, NOD, and multiple NOS that Defendant, ELITE substantially assisted. Defendant, ELITE provided assistance in these illegal and wrongful acts and was a substantial factor in causing the harm

THE MELLOR LAW FIRM
6800 INDIANA AVE., STE 220
RIVERSIDE, CA 92506
TEL: (951) 222-2100
FAX: (951) 222-2123
www.Mellorlawfirm.com

41

JASSO DECL. PAGE - 0661

1    suffered by Plaintiff, NICKEL. Defendant, ELITE's aiding and abetting the conspiracy of the

2    other named Defendants to breach a fiduciary duty owed to Plaintiff, NICKEL and Defendant,

3    ELITE thereby owed a fiduciary duty by providing substantial assistance to the other named

4    Defendants Board Members in breaching their fiduciary duty owed to Plaintiff, NICKEL.

5        151. Therefore, Defendant, ELITE's aiding and abetting the breach of fiduciary duty as a

6    conspiracy to breach a fiduciary duty similarly. Defendant, ELITE's liability for aiding and

7    abetting a breach of fiduciary duty arises when Defendant, ELITE, the aider and abettor

8    committed its independent tort when it made a conscious decision to participle in tortious activity

9    for the purpose of assisting the other named Defendants in performing the wrongful act of

10   attempting to foreclose on the SUBJECT PROPERTY.

11       152. Knowing how much of the reserve account for the HOA had been spent to further the

12   interests of Defendants, JASSO, PHILLIPS, BECK, PAULIN, BURRETT and GRAGNANO,

13   and pay for their personal attorneys' fees in the *Gallian* litigation, Defendants, HOA, JASSO,

14   PHILLIPS, BECK, PAULIN, BURRETT and GRAGNANO, knowingly and willfully conspired

15   and agreed among themselves in an attempt to cover up their conspiracy and expenditures from

16   their fellow HOA members reserve account and intentionally direct ELITE to record the NDA

17   against the SUBJECT PROPERTY in a scheme to foreclose on the SUBJECT PROPERTY and

18   use both the delinquent assessments and the anticipated judgment against Ms. Gallian to

19   reimburse themselves for attorney's fees incurred by the HOA, with a second judgment for

20   attorneys' fees expected from the court in favor of the HOA this time was expected immanently

21   from the court, and could be used with the other judgment and assessments as an offset to the

22   newfound equity in the SUBJECT PROPERTY after RANDY NICKEL's cash purchase with

23   Ms. Gallian. All to reimburse themselves and the illegally obtained reserve funds account, to

24   hide that fact from fellow HOA members and prevent the HOA from the filing of bankruptcy.

25       153. Pursuant to such conspiracy, and in furtherance thereof, Defendants, and each of them,

26   over a month and a half later, on December 17, 2018, did wrongfully proceeded to record an

27   NDA and proceed to foreclose on the SUBJECT PROPERTY by recording a NOD based on the

28   NDA recorded, dated August 30, 2019. Defendants have additionally recorded and/or continued

THE MELLOR LAW FIRM
6800 INDIANA AVE., STE 220
RIVERSIDE, CA 92506
TEL: (951) 222-2100
FAX: (951) 222-2122
www.Mellorlawfirm.com

42

JASSO DECL. PAGE - 0662

1  four NOS on December 16, 2019, March 23, 2020, August 17, 2020, and one which was set for

2  October 5, 2020 at 3:00 p.m., which necessitated the filing of the instant action in order to stop

3  the sale from occurring. (*See,* Exhibits "H" and "I" through "M".)

4    154.  As a proximate result of Defendants' wrongful acts pursuant to the conspiracy herein

5  alleged, HOA, JASSO, PHILLIPS, BECK, PAULIN, BURRETT, GRAGNANO, and ELITE did

6  wrongfully violate the CC&R's, Davis-Stirling Act and *Civil Code* section 5650. As such,

7  Defendants were in breach of their duty with the Plaintiff, RANDY NICKEL, who was now the

8  legal owner of the SUBJECT PROPERTY, Ms. Gallian no longer had any legal ownership

9  interest in the SUBJECT PROPERTY, as of October 31, 2018, RANDY NICKEL was not

10  delinquent in his HOA fees, ELITE, the HOA and the individual Board Members had both actual

11  and constructive knowledge that Ms. Gallian no longer owned the SUBJECT PROPERTY, that

12  the assessments alleged owing were not owed by RANDY NICKEL, that no *Civil Code* section

13  5660 notice was ever sent certified mail to RANDY NICKEL at least 30 days prior to the NDA

14  recording, and most importantly, that the CC&R's do not allow ELITE, the HOA, and/or the

15  Board Members to lien a new owner's property based upon a predecessing owner's unpaid

16  assessments. (*See,* Exhibit "A" Art. V, Art. 5.1, at p. 8-9.)

17    155. RANDY NICKEL has performed all conditions, covenants, and promises under the

18  contract on his part to be performed, except payment to the HOA for monies owed by Ms.

19  Gallian, the performance of which is excused on the grounds that pursuant to the CC&Rs on file

20  herein, *Civil Code* section 5650 and the Davis-Sterling Act, RANDY NICKEL legally does not

21  owe same and only allegedly owes them as a direct and proximate result of the conspiracy herein

22  alleged.

23    156.  Defendants, HOA, JASSO, PHILLIPS, BECK, PAULIN, BURRETT, GRAGNANO,

24  and ELITE's last overt act in pursuit of this conspiracy is scheduled to take place on October 5,

25  2020, by fraudulent NDA, NOD and NOS recorded illegally and improperly against the

26  SUBJECT PROPERTY.

27

28

THE MELLOR LAW FIRM
6800 INDIANA AVE., STE 220
RIVERSIDE, CA 92506
TEL: (951) 222-2100
FAX: (951) 222-2122
www.Mellorlawfirm.com

43

JASSO DECL. PAGE - 0663

157. As a direct and proximate result of the wrongful acts pursuant to the conspiracy herein alleged, RANDY NICKEL has been generally damaged in the sum according to proof at the time of trial, but no less than $500,000.00.

158. As a direct and proximate result of the defendant's wrongful acts herein alleged, RANDY NICKEL has further suffered the emotional rollercoaster caused by Defendants, and each of them, to his special damage in the sum according to proof at the time of trial.

159. Prior to and following the failed Mediation on August 24, 2020, Defendants' conduct was done with malice, oppression, and/or fraud knowing it was wrong and knowing they had to further their scheme and plan in order to reimburse themselves and the illegally obtained reserve funds account, to hide that fact from fellow HOA members and prevent the HOA from the filing of bankruptcy.

## **NINTH CAUSE OF ACTION**

**(Declaratory Relief as against all Defendants and DOES 1 through 100, inclusive)**

160. Plaintiff, RANDALL L. NICKEL incorporates by reference all of the allegations contained in Paragraphs 1 through 159 as though fully set forth herein.

161. An actual controversy exists between the parties to this action concerning their respective rights, duties and obligations.

162. Further, an actual controversy exists between Plaintiff, NICKEL and Defendant, ELITE as to their respective rights, duties, and obligations. In particular, Defendant, ELITE's rights, duties, and obligations as to said Defendants agreeing to and participating in the other named Defendants' scheme, as set forth above, as aiding and abetting scheme to foreclose on the SUBJECT PROPERTY.

163. RANDY NICKEL contends that he is without fault, responsibility or blame for any of the damages that the Defendants, and each of them, may have suffered. If there is any wrongful conduct that has occurred, these acts were committed by the Defendants HOA, JASSO, PHILLIPS, BECK, PAULIN, BURRETT, GRAGNANO, ELITE, NATIONWIDE, and SUPERIOR and not Plaintiff, RANDY NICKEL.

THE MELLOR LAW FIRM
6800 INDIANA AVE., STE 220
RIVERSIDE, CA 92506
TEL: (951) 222-2100
FAX: (951) 222-2122
www.Mellorlawfirm.com

44

JASSO DECL. PAGE - 0664

164. RANDY NICKEL is informed and believes and thereon alleges that Defendants dispute these allegations.

165. RANDY NICKEL desires a judicial determination of his rights, duties, and obligations to the Defendants, and each of them, and such declaration is necessary and appropriate at this time in order to avoid multiplicity of actions.

**WHEREFORE, PLAINTIFF PRAYS** for judgment as follows:

1. For an order requiring Defendants to show cause, if any, why it should not be enjoined as hereinafter set forth, during the pendency of this action;

2. For a temporary restraining order, a preliminary injunction, and a permanent injunction, all enjoining Defendants, and its agents, servants, and employees, and all persons acting under, in concert with, or for it:

    a. From conducting the sale of Plaintiff's SUBJECT PROPERTY, a condominium unit, on October 5, 2020, as presently noticed;

    b. From performing any act in furtherance of conducting the sale of Plaintiff's SUBJECT PROPERTY, a condominium unit on October 5, 2020 or on any other day to enforce the aforementioned lien against Plaintiff's SUBJECT PROPERTY, a condominium unit, resulting from the recording of the NDA on December 17, 2018 as Document No. 2018000469842 in the Official Records of the County of Orange, the NOD based on the NDA recorded August 30, 2019, as Document No. 2019000326771 in the Official Records of the County of Orange, and the NOS recorded on December 16, 2019 as Document No. 2019000526463 in the Official Records of the County of Orange, or of any other lien resulting from Ms. Gallian's past or future recording of a Notice of Assessment, the subject of which is from the unauthorized expenditure from the HOA reserves to reimburse the illegally obtained reserve funds account, to hide that fact from fellow HOA members and prevent the HOA from the filing of bankruptcy.

    c. From making any further demands on Plaintiff, RANDY NICKEL to pay the assessment which is the subject of this complaint.

THE MELLOR LAW FIRM
6800 INDIANA AVE , STE 220
RIVERSIDE, CA 92506
TEL: (951) 222-2100
FAX: (951) 222-2122
www.Mellorlawfirm.com

45

JASSO DECL. PAGE - 0665

d.  To forthwith cause to be recorded in the Office of the Recorder of the County of Orange, California an expungement of the NDA and Release of Lien and to perform all other acts necessary to remove the lien relating to collecting the assessment which is the subject of this complaint.

3.  That the HOA assessments, special assessments, and judgments against Ms. Gallian entered in the *Gallian* action be vacated as to enforcement against the SUBJECT PROPERTY and be expunged from the record encumbering the SUBJECT PROPERTY.

4.  For damages for pain and suffering according to proof;

5.  For punitive and exemplary damages;

6.  For attorney's fees and costs of suit incurred; and

7.  For such other and further relief as the court may deem proper.

Dated:  July 23, 2021                    THE MELLOR LAW FIRM


                                         _____
                                         MARK A. MELLOR, ESQ., Attorney for
                                         Plaintiff, RANDALL L. NICKEL

THE MELLOR LAW FIRM
6800 INDIANA AVE., STE 220
RIVERSIDE, CA 92506
TEL: (951) 222-2100
FAX: (951) 222-2123
www.Mellorlawfirm.com

46

JASSO DECL. PAGE - 0666

**Nickel v Huntington Beach Gables HOA**
5744-25099

## VERIFICATION

I have read the foregoing VERIFIED SECOND AMENDED COMPLAINT and know of its contents.

CHECK APPLICABLE PARAGRAPH          ☑

☒     I am a party to this action. The matters stated in the foregoing document are true of my own knowledge except as to those matters, which are stated, on information and belief, and as to those matters I believe them to be true.

☐     I am ☐ an Officer ☐ a partner ☐ Vice President of _____, a party to this action. I am authorized to make this verification for and on its behalf, and I make this verification for that reason. The information set forth in said document were gathered and collected by me and/or my agents. Said persons, acting through and pursuant to the instructions of Declarant with reference to the gathering and collecting of such material, have reported to Declarant that said Responses truly and correctly reflect the contents of my records with respect to the subject matter, to the best of their knowledge. Wherefore, Declarant states upon information and belief that said Responses are true and correct to the best of my knowledge according to and based upon my records and files and information transmitted to Declarant as aforesaid.

☐     I am one of the attorneys for _____, a party to this action. Such party is absent from the county of aforesaid where such attorneys have their offices, and I make this verification for and on behalf of that party for that reason. I am informed and believe and on that ground allege that the matters stated in the foregoing document are true.

Executed on July 23, 2021, at Riverside, California. I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

_____
RANDALL L. NICKEL

**Complaint Exhibit List:**

| Exhibit | Title |
|---|---|
| Exhibit "A" | CC&R's for the Huntington Beach Gables HOA recorded May 28, 1980. |
| Exhibit "B" | ELITE Document Order Form, Request for HOA documentation, two Money Orders dated October 22, 2018, and Federal Express Priority Overnight delivered to ELITE on October 23, 2018 |
| Exhibit "C" | Abstract of Judgment in the Gallian action filed November 15, 2018, issued November 16, 2018, and recorded November 19, 2018. |
| Exhibit "D" | Judgment for Attorneys' Fees by Individual Board Members in Gallian Action filed December 4, 2018. |
| Exhibit "E" | Judgment for Attorneys' Fees by HOA in Gallian Action filed May 6, 2019. |
| Exhibit "F" | Assignment of Ground Lease recorded October 31, 2018. |
| Exhibit "G" | Cashier's checks dated October 31, 2018 made out to Jamie Gallian. |
| Exhibit "H" | Notice of Delinquent Assessment recorded December 17, 2018. |
| Exhibit "I" | Notice of Default dated August 30, 2019 |
| Exhibit "J" | Notice of Sale dated December 16, 2019 |
| Exhibit "K" | Notice of Sale dated March 23, 2020 |
| Exhibit "L" | Notice of Sale dated August 17, 2020 |
| Exhibit "M" | Notice of Sale dated October 5, 2020 |
| Exhibit "N" | HOA Invoice No. 1069, Dated August 21, 2020, in the amount of $412,958.11 |

**EXHIBIT "A"**

CONFORMED COPY
Not Compared with Ori~ al

WHEN RECORDED RETURN TO:
Meserve, Mumper & Hughes
4440 Von Karman Avenue, Suite 330
Newport Beach, California 92660

Attn: Frank D. Stiefel, Esq.

RECORDED IN OFFICIAL RECORDS
OF ORANGE COUNTY, CALIFORNIA

-4 20 P.M.    MAY 28 '80

LEE A. BRANCH, County Recorder

$54.00
C7

## DECLARATION OF
## COVENANTS, CONDITIONS AND RESTRICTIONS
## FOR THE HUNTINGTON BEACH GABLES

LOTS 1 AND 2 OF TRACT NO. 10542
CITY OF HUNTINGTON BEACH
ORANGE COUNTY, CALIFORNIA

JOINT EXHIBIT - PAGE - 0041

## TABLE OF CONTENTS

Page

ARTICLE I       DEFINITIONS.................................. 2

Section 1.1     Association............................... 2
Section 1.2     Board of Directors/Board................. 2
Section 1.3     Common Area.............................. 3
Section 1.4     Condominium.............................. 3
Section 1.5     Condominium Plan......................... 3
Section 1.6     County.................................. 3
Section 1.7     Declarant............................... 3
Section 1.8     Lessee.................................. 3
Section 1.9     Lessor.................................. 3
Section 1.10    Member.................................. 3
Section 1.11    Mortgage................................ 3
Section 1.12    Mortgagee............................... 3
Section 1.13    Owner/Ownership......................... 3
Section 1.14    Project................................. 4
Section 1.15    Property................................ 4
Section 1.16    Unit.................................... 4
ARTICLE II      CREATION OF CONDOMINIUMS................ 4

Section 2.1     Creation................................ 4
Section 2.2     Elements of Condominium................. 4
Section 2.3     Boundaries of Units..................... 5
Section 2.4     Non-Severability........................ 5


ARTICLE III     MEMBERSHIP IN ASSOCIATION............... 5

Section 3.1     Membership.............................. 5
Section 3.2     Transfer................................ 5
Section 3.3     Voting Rights........................... 6


ARTICLE IV      PROPERTY RIGHTS IN THE COMMON AREAS..... 7

Section 4.1     Members' Easements of Enjoyment......... 7
Section 4.2     Delegation of Use....................... 7
Section 4.3     Waiver of Use........................... 7
Section 4.4     Common Area Improvements................ 7


ARTICLE V       COVENANT FOR ASSESSMENTS............... 8

Section 5.1     Creation of the Lien and Personal Obligation
                of Assessments.......................... 8
Section 5.2     General Purpose of Assessments.......... 9
Section 5.3     Regular Assessments..................... 9

JOINT EXHIBIT - PAGE - 0042

(a)   Purposes.................................. 9
(b)   Amount and Type of Payment.............. 10
(c)   Date of Commencement..................... 10

Section 5.4   Special Assessments.......................... 11
Section 5.5   Delinquency.................................. 11

(a)   Right of Association..................... 11
(b)   Notice of Lien.......................... 12
(c)   Foreclosure Sale........................ 12
(d)   Curing of Default....................... 12
(e)   Cumulative Remedies..................... 12
(f)   Subordination.......................... 13
(g)   Expiration of Lien...................... 13

Section 5.6   Exempt Property............................. 13
Section 5.7   Uniform Rate of Assessment................. 13
Section 5.8   No Offsets................................. 13


ARTICLE VI    ARCHITECTURAL CONTROL

Section 6.1   Architectural Approval..................... 14
Section 6.2   Requirements for Approval................. 14
Section 6.3   Term and Composition of Architectural      14
              Committee..................................
Section 6.4   Failure to Approve or Disapprove the Plans... 15
Section 6.5   No Liability............................... 15
Section 6.6   Notice of Noncompliance or Noncompletion..... 15
Section 6.7   Rules and Regulations..................... 16
Section 6.8   Variances................................. 16
Section 6.9   Appointment and Designation.............. 16
Section 6.10  Review Fee and Address................... 16
Section 6.11  Inspection................................ 16


ARTICLE VII   EASEMENTS

Section 7.1   Rights of Association..................... 17
Section 7.2   Rights of Declarant...................... 17
Section 7.3   Rights of Owners......................... 18
Section 7.4   Encroachments on Common Area............. 18
Section 7.5   Restricted Common Areas.................. 19
Section 7.6   Other Encroachments...................... 19


ARTICLE VIII  MANAGEMENT

Section 8.1   Powers of the Association................ 19
Section 8.2   Purposes of the Association.............. 19
Section 8.3   Contracting Authority.................... 20
Section 8.4   Duties.................................... 20
Section 8.5   Right of Entry........................... 24

Sevtion 8.6    Duties of Owners............................ 24
Section 8.7    Association to Defend Certain Actions........ 25


ARTICLE IX     GENERAL RESTRICTIONS


Section 9.1    Partition................................... 26
Section 9.2    Interior of Unit............................ 26
Section 9.3    Nuisance.................................... 26
Section 9.4    Use of Common Area.......................... 26
Section 9.5    Projections................................. 26
Section 9.6    Recreational Vehicles....................... 26
Section 9.7    Lavatory Facilities......................... 26
Section 9.8    Signs....................................... 27
Section 9.9    Animals..................................... 27
Section 9.10   Offensive Activities........................ 27
Section 9.11   Right of Inspection......................... 27
Section 9.12   Leases...................................... 27
Section 9.13   Misconduct.................................. 28
Section 9.14   Structural Changes.......................... 28
Section 9.15   Utilities................................... 28
Section 9.16   Receptacles................................. 28
Section 9.17   Television; Radio........................... 28


ARTICLE X      MORTGAGE PROTECTION

Section 10.1   Seventy-Five Percent Vote of Mortgagees...... 28
Section 10.2   Other Rights of First Mortgagees............ 29
Section 10.3   Mortgagees Furnishing Information........... 30
Section 10.4   Notice to First Mortgagees of Owner Default.. 30
Section 10.5   Right of First Refusal...................... 30
Section 10.6   Conflicts................................... 30
Section 10.7   Notice of Destruction or Taking............. 30
Section 10.8   Breach of Declaration....................... 31


ARTICLE XI     DESTRUCTION OF IMPROVEMENTS

Section 11.1   Destruction; Proceeds Exceed 85% of
               Reconstruction Costs........................ 31
Section 11.2   Destruction; Proceeds Less Than 85% of
               Reconstruction Costs........................ 31
Section 11.3   Rebuilding Procedures....................... 31
Section 11.4   Rebuilding Contract......................... 32
Section 11.5   Rebuilding Not Authorized................... 32
Section 11.6   Minor Repair and Reconstruction............. 33


ARTICLE XII    CONDEMNATION

Section 12.1   Sale by Unanimous Consent................... 33

JOINT EXHIBIT - PAGE - 0044

Section 12.2   Distribution of Proceeds of Sale............ 33
Section 12.3   Distribution of Condemnation Award.......... 33
Section 12.4   Revival of Right to Partition............... 33


ARTICLE XIII   PARTITION

Section 13.1   Suspension................................. 34
Section 13.2   Proceeds................................... 34
Section 13.3   Power of Attorney.......................... 34


ARTICLE XIV   GENERAL PROVISIONS

Section 14.1   Term....................................... 34
Section 14.2   Notices.................................... 34
Section 14.3   Enforcement................................ 35
Section 14.4   Severability............................... 35
Section 14.5   Construction............................... 35
Section 14.6   Singular Includes Plural................... 35
Section 14.7   Attorneys' Fees............................ 35
Section 14.8   Nuisance................................... 35
Section 14.9   Amendments................................. 36
Section 14.10  Annexation................................. 37

JOINT EXHIBIT - PAGE - 0045

DECLARATION OF
COVENANTS, CONDITIONS AND RESTRICTIONS
FOR THE HUNTINGTON BEACH GABLES

LOTS 1 AND 2 OF TRACT NO. 10542
CITY OF HUNTINGTON BEACH
ORANGE COUNTY, CALIFORNIA

THIS DECLARATION, made this __21st__ day of __May__,
19_80_, by THE ROBERT P. WARMINGTON CO., a California corporation,
(hereinafter referred to as "Declarant").

WITNESSETH:

WHEREAS, Declarant is the owner of a subleasehold
interest in certain real property in the City of Huntington
Beach, County of Orange, State of California, described as:

Lots 1 and 2 of Tract 10542 as per map recorded in
Book _456_, Pages _49_ and _50_, inclusive, of
Miscellaneous Maps, in the Office of the County
Recorder of Orange County, California.

WHEREAS, said real property is owned in fee by HOUSER
BROS. CO., a California limited partnership, in which Clifford C.
Houser and Vernon F. Houser are general partners, (hereinafter
referred to as "Lessor"); and

WHEREAS, said real property has been leased by Lessor to
Robert P. Warmington, an individual, (hereinafter referred to as
"Lessee") pursuant to a Ground Lease dated __October 19__, 1979,
and as evidenced by a Short Form Memorandum recorded on
__December 6__, 1979, in Book _13424_, pages _499_,
et seq., of the Official Records of Orange County,
California; and

WHEREAS, Lessee has subleased the Property to Declarant,
who now desires to divide its interest in the property and
improvements thereon into a condominium project as defined in
Sections 783 and 1350 of the California Civil Code in accordance
with a recorded condominium plan for the project, as hereinafter
defined; and

WHEREAS, Declarant has therefore deemed it desirable to
impose a general plan for the improvement and development of said
tract and all of the property described herein and the adoption
and establishment of covenants, conditions and restrictions upon
said real property and each and every lot and portion thereof and
upon the use, occupancy and enjoyment thereof, all for the

1.

JOINT EXHIBIT - PAGE - 0046

purpose of enhancing and protecting the value, desirability and attractiveness of said tract; and

WHEREAS, Declarant has deemed it desirable for the efficient preservation of the value, desirability and attractiveness of said tract to create a corporation to which should be delegated and assigned the powers of administering and enforcing these covenants, conditions and restrictions, and collecting and disbursing funds pursuant to the assessment and charges hereinafter created and referred to; and

WHEREAS, THE HUNTINGTON BEACH GABLES HOMEOWNERS ASSOCIATION, a nonprofit corporation, has been incorporated under the laws of the State of California for the purpose of exercising the powers and functions aforesaid; and

WHEREAS, Lessor and Lessee have agreed to the restrictions to be imposed hereby and authorize the recordation of this Declaration, and evidence this agreement and authorization by executing this Declaration below; and

NOW THEREFORE, Declarant hereby covenants, agrees and declares that all of said units and property described above shall be held, sold, assigned, leased, encumbered, hypothecated, used, improved, and conveyed subject to the following covenants, conditions and restrictions and easements which are hereby declared to be for the benefit of the whole tract and all of the property described herein and the owners thereof, their successors and assigns. These covenants, conditions and restrictions and easements shall run with the said real property and shall be binding on all parties having or acquiring any right, title or interest in the described real property or any part thereof and are imposed upon said real property and every part thereof as a servitude in favor of each and every parcel thereof as the dominant tenement or tenements.

## ARTICLE I
## DEFINITIONS

The following terms used in these covenants, conditions and restrictions shall be applicable to this Declaration and are defined as follows:

Section 1.1. Association: "Association" shall mean and refer to THE HUNTINGTON BEACH GABLES HOMEOWNERS ASSOCIATION, a nonprofit corporation, incorporated under the laws of the State of California, its successors and assigns.

Section 1.2. Board of Directors/Board: "Board of Directors" or "Board" shall mean and refer to the duly elected Board of Directors of the Association.

2.

Section 1.3.  Common Area:  "Common Area" means and refers to the entire Project, except the Units.

Section 1.4.  Condominium:  "Condominium" means a condominium as defined in Section 783 of the California Civil Code and as used herein means a Unit, together with (a) an undivided 1/80 interest as tenant in common in the Common Area, (b) certain exclusive or nonexclusive easements granted herein to an Owner, and (c) a Membership in the Association.

Section 1.5.  Condominium Plan:  "Condominium Plan" shall mean and refer to that certain Condominium Plan recorded or to be recorded by Declarant on the Project in the office of the County Recorder wherein the Property is located.

Section 1.6.  County:  "County" shall mean and refer to the County of Orange, State of California.

Section 1.7.  Declarant:  "Declarant" shall mean and refer to THE ROBERT P. WARMINGTON CO., a California corporation, its successors and assigns.

Section 1.8.  Lessee:  "Lessee" shall mean and refer to Robert P. Warmington, a married man, his heirs, successors, and assigns.

Section 1.9.  Lessor:  "Lessor" shall mean and refer to HOUSER BROS. CO., a California limited partnership, its successors and assigns.

Section 1.10.  Member:  "Member" shall mean and refer to every person or entity who holds Membership in the Association.

Section 1.11.  Mortgage:  "Mortgage" shall mean and refer to any mortgage, deed of trust, assignment of leasehold or subleasehold interest or other conveyance of a Unit, or any interest therein, including, but not limited to, the improvements developed thereon to secure the performance of an obligation, which obligation will be reconveyed upon completion of such performance.

Section 1.12.  Mortgagee:  "Mortgagee" shall mean and refer to mortgagees, trustees, beneficiaries and holders of deeds of trust, assignees of any leasehold or subleasehold interests, and the holders of any indebtedness secured by Mortgages.

Section 1.13.  Owner/Ownership:  "Owner" shall mean and refer to the record assignee of the rights of Declarant and/or Lessee to a Unit, but excluding those having such interest merely as security for the performance of an obligation.  Such term shall also mean and refer to the Lessee or Lessor if either succeeds to the rights of said assignee through termination of any lease or sublease or by any other means.  All references

3.

JOINT EXHIBIT - PAGE - 0048

herein to "ownership" shall mean and refer to the ownership of a leasehold or subleasehold interest.

Section 1.14.  Project:  "Project" shall mean and refer to the Property and all structures and other improvements thereon.

Section 1.15.  Property:  "Property" or "Properties" shall mean and refer to the leasehold interest in all of the real property hereinbefore described.

Section 1.16.  Unit:  "Unit" or "Units" shall mean and refer to the residential air space Units and related areas as shown on the recorded Condominium Plan, and means the elements of the Project which are not owned in common by the Owners of the Condominiums in the Project.

## ARTICLE II
## CREATION OF CONDOMINIUMS

Section 2.1.  Creation:  Declarant, in order to establish a plan of condominium ownership for the Project, hereby covenants and agrees that it hereby divides the Project as follows:

(a)  Into eighty (80) separately designated and legally described Units which are comprised of certain parcels of air space which are shown and more particularly described on the Condominium Plan; and

(b)  The remainder of the Project which shall be deemed the Common Area and shall be subject to certain easements and restrictions as set forth in this Declaration and the Condominium Plan.

Section 2.2.  Elements of Condominium:  Each Condominium shall be comprised of the following elements:

(a)  A Unit;

(b)  An undivided 1/80 leasehold interest as tenant in common in the Common Area;

(c)  Non-exclusive easement rights as described in this Declaration;

(d)  Certain exclusive easement rights over the Common Area, defined hereinafter as Restricted Common Areas; and

(e)  A membership in the Association.

4.

JOINT EXHIBIT - PAGE - 0049

Section 2.3.  **Non-Severability:**  Declarant, its successors, assigns, sublessees, and grantees, covenant and agree that the various elements of the Condominium Plan conveyed herewith shall not be separated or separately conveyed, and each such element shall be deemed to be conveyed or encumbered with its respective Unit even though the description in the instrument or conveyance or encumbrance may refer only to title to the Unit.

Section 2.4.  **Boundaries of Units:**  That portion of the Unit designed for use as a residence shall be bounded by and contained within the interior, undecorated surfaces of the perimeter walls, floors, ceilings, windows, fireplace boxes and doors.  The Units do not, however, contain bearing walls, columns, vertical supports, floors, roofs, foundation, railings, fences, gates, garage doors, central heating; central refrigeration and central air-conditioning equipment, reservoir tanks; pumps and other central services, pipes, ducts, flues, conduits, wires and other utility installations, wherever located except the outlets thereof when located within the Unit.

In interpreting assignments, leases, subleases, deeds, declarations, and plans, the existing physical boundaries of the Unit or of a Unit reconstructed in substantial accordance with the original plans thereof shall be conclusively presumed to be its boundaries rather than the metes and bounds (or other description) expressed in the deed, assignment, lease, sublease, plan or declaration, regardless of minor lateral movement of the building and regardless of minor variance between boundaries shown on the Condominium Plan or in the assignment, lease, sublease or deed, and Declaration and those of the building.

## ARTICLE III
## MEMBERSHIP IN ASSOCIATION

Section 3.1.  **Membership:**  Every Owner of a Unit which is subject to assessment shall be a Member of the Association, and ownership of such Unit shall be the sole qualification for such Membership.  The terms and provisions set forth in this Declaration, which are binding upon all Owners of all Units and all Members in the Association, are not exclusive, as the Member shall, in addition, be subject to the terms and provisions of the Articles of Incorporation and the Bylaws of the Association. Membership shall be appurtenant to and may not be separated from ownership of any Unit which is subject to assessment.

Section 3.2.  **Transfer:**  The Membership held by any Owner of a Unit shall not be transferred, pledged or alienated in any way, except upon the sale, assignment or encumbrance of such Unit and then only to the Purchaser or Mortgage holder of such Unit. Any attempt to make a prohibited transfer is void, and will not be reflected upon the books and records of the Association.  In the event the Owner of any Unit should fail or refuse to transfer

**5.**

JOINT EXHIBIT - PAGE - 0050

the Membership registered in his name to the assignee of such Unit, the Association shall have the right to record the transfer upon the books of the Association.

Section 3.3.  Voting Rights:  The Association shall have two (2) classes of voting Membership.

Class A:  Class A Members shall be all those Owners with the exception of the Declarant and shall be entitled to one vote for each Unit owned.  When more than one person holds an interest in any Unit, all such persons shall be Members.  The vote for such Unit shall be exercised as they determine, but in no event shall more than one vote be cast with respect to any Unit.

Class B:  The Class B Member shall be the Declarant. The Class B Member shall be entitled to three votes for each Unit in which it holds the interest required for Membership by Section 1 of this Article; provided that the Class B Membership shall cease and become converted to Class A Membership on the happening of any of the following events, whichever occurs earlier:

(a)  When the total votes outstanding in the Class A Membership equals the total votes outstanding in the Class B Membership;

(b)  The second anniversary of the Final Subdivision Public Report for this development.

All voting rights shall be subject to the restrictions and limitations provided herein and in the Articles and Bylaws of the Association.  Furthermore, notwithstanding any provisions herein excluding the vote of the Declarant, any provision herein calling for membership approval of action to be taken by the Association, except provisions with respect to the action referred to in Section 4.4, below to enforce the obligations of the Declarant, shall expressly require the vote or written assent of a prescribed percentage of each class of membership during the time that there are two outstanding classes of membership, as set forth above.  Furthermore any such provision calling for the vote or written assent of each class of membership for the initiation of action by or in the name of the Association, any requirement other than in Sections 4.4, and 14.9, below, and Section 10.1 of the Bylaws, that the vote of the Declarant shall be excluded in any such determination shall be applicable only if there has been a conversion of Class B to Class A shares and only for so long as the Declarant holds or directly controls twenty-five percent (25%) or more of the voting power of the Association.

6.

## ARTICLE IV
## PROPERTY RIGHTS IN THE COMMON AREAS

Section 4.1.  Members' Easements of Enjoyment:  Declarant hereby grants to the Owner of each Unit a non-exclusive easement for access over the Common Area.  Every Member shall have a right and easement of ingress and egress and of enjoyment in and to the Common Area which shall be appurtenant to and shall pass with the title to every Unit, subject to the following provisions:

(a)  The right of the Association to limit the number of guests of Members.

(b)  The right of the Association to establish uniform rules and regulations pertaining to the use of the Common Area and the recreational facilities thereof.

(c)  The right of the Association, in accordance with its Articles and Bylaws, to borrow money for the purpose of improving the Common Area and facilities and in aid thereof, to mortgage said property, provided that the rights of such mortgages shall be subordinate to the rights of the Members, and provided further that any such mortgage shall have the prior approval of at least seventy-five percent (75%) of all first Mortgagees, as set forth below.

(d)  The right of the Association to suspend the right to use of the recreational facilities by an Owner but only in accordance with the notice and hearing requirements set forth in the Bylaws.

(e)  Those easement rights set forth in Article VII below.

Section 4.2.  Delegation of Use:  Any Member may delegate, in accordance with the Bylaws, his right of enjoyment to the Common Area and facilities to the Members of his family, his tenants or contract purchasers who reside in his Unit.

Section 4.3.  Waiver of Use:  No Member may exempt himself from personal liability for assessments duly levied by the Association, nor release the Unit owned by him from the liens and charges hereof, by waiver of the use and enjoyment of the Common Area and the facilities thereon or by abandonment of his Unit.

Section 4.4.  Common Area Improvements:  If Common Area improvements which are to be erected upon the Common Area by Declarant have not been completed prior to the issuance of the Subdivision Public Report and the Association is the obligee under a bond or other arrangement (hereafter "Bond") to secure performance of the commitment of Declarant to complete the

7.

JOINT EXHIBIT - PAGE - 0052

improvements, the Board of Directors of the Association shall consider and vote on the question of action by the Association to enforce the obligations under the Bond with respect to any improvement for which a Notice of Completion has not been filed within sixty (60) days after the completion date specified for that improvement in the Planned Construction Statement appended to the Bond. If the Association has given an extension in writing for the completion of any Common Area improvement, the Board of Directors of the Association shall consider and vote on the question of action by the Association to enforce the obligations under the Bond if a Notice of Completion has not been filed within thirty (30) days after the expiration of the extension. If the Board of Directors of the Association determines that it will not initiate action to enforce the obligations under the Bond or fails to consider and vote on the question within the applicable time period set forth above, then, upon receipt of a petition signed by not less than ten percent (10%) of the total voting power of the Association, the Board of Directors of the Association shall hold a special meeting of Members not less than fifteen (15) days nor more than thirty (30) days after receipt of the petition for the purpose of voting to override the decision of the Board of Directors not to initiate action to enforce the obligations under the Bond or to consider and vote on the question if the Board of Directors has not acted. At this special meeting, a vote of a majority of the voting power of the Members, excluding Declarant, shall determine all matters presented regarding the enforcement of obligations under the Bond. Such vote to take action to enforce the obligations under the Bond shall be the decision of the Association and the Board of Directors shall thereafter implement this decision by initiating and pursuing appropriate action in the name of the Association.

### ARTICLE V
### COVENANT FOR ASSESSMENTS

Section 5.1. Creation of the Lien and Personal Obligation of Assessments: The Declarant, for each Unit owned by it within the Property, hereby covenants and agrees to pay, and each Owner of any Unit by acceptance of a lease therefor, whether or not it shall be so expressed in such lease, is deemed to covenant and agree to pay to the Association certain assessments as described below, such assessments to be fixed, established and collected as hereinafter provided. Such assessments together with such interest thereon and costs of collection thereof, as hereinafter provided, shall be a charge on the Unit and that portion of the leasehold estate appurtenant to said Unit and shall be a continuing lien upon said Unit and said leasehold estate against which each such assessment is made. Each such assessment, together with such interest, costs and reasonable attorneys' fees, shall also be the personal obligation of the person who was the Owner of such Unit at the time when the

8.

JOINT EXHIBIT - PAGE - 0053

assessment fell due.  The personal obligation shall not pass to
his successors in title until expressly assumed by them.

   Section 5.2.   General Purpose of Assessments:  The
assessments levied by the Association shall be used exclusively
for the purpose of promoting the recreation, health, safety, and
welfare of the Members of the Association, and, in particular,
for the improvement and maintenance of the properties, services
and facilities devoted to this purpose, or to the payment to or
reimbursement of other affected parties or governmental entities
for the improvement and maintenance thereof, and related to the
use and enjoyment of the Common Area and those Association
responsibilities set forth herein.

   Section 5.3.   Regular Assessments:  Regular Assessments
shall be levied and collected by the Association in accordance
with the following:

       (a)  Purposes:  To cover the following expenses:

          (1)  Maintenance, management, operation, repair
       and replacement of the Common Area and all other
       areas on the Property which are maintained by the
       Association;

          (2)  Costs relating to the maintaining of a
       security guard gate adjoining the Property as
       determined from time to time by the Association and
       the owner of said adjoining property;

          (3)  Unpaid assessments;

          (4)  Cost of management and administration of
       the Association, including, but not limited to,
       compensation paid by the Association to managers,
       accountants, attorneys and employees;

          (5)  The costs of utilities, trash pick up and
       disposal (if such services are provided) and other
       services benefiting the Owners and their Units to
       the extent such services are paid for by the
       Association;

          (6)  The costs of fire, casualty, liability,
       workmen's compensation and other insurance covering
       the Common Area;

          (7)  The costs of any other insurance obtained
       by the Association;

          (8)  Reasonable reserves as deemed appropriate
       by the Board;

9.

JOINT EXHIBIT - PAGE - 0054

notice of the regular assessment shall be sent to every
Owner subject thereto.  The due dates shall be
established by the Board of Directors.  The Association
shall, upon demand, and for a reasonable charge, furnish
a certificate signed by an officer of the Association
setting forth whether the assessments on a specified Unit
have been paid.  A properly executed certificate of the
Association as to the status of assessments on a Unit is
binding upon the Association as of the date of its
issuance.

**Section 5.4.  Special Assessments:**  In addition to the
regular assessments authorized above, the Association may levy in
any assessment year, a special assessment applicable to that year
only, for the purpose of defraying, in whole or in part, the cost
of any construction, reconstruction, repair or replacement of a
capital improvement upon the Common Area, including fixtures and
personal property related thereto, _provided that_ any such
assessments which in the aggregate exceed five percent (5%) of
the budgeted gross expenses of the Association for that year
shall require the vote or written assent of a majority of the
voting power of the Members, excluding Declarant.  In addition,
special assessments may be levied against and collected from a
particular owner and his Unit to reimburse the Association for
certain costs or expenses that have been incurred by the
Association or Declarant with respect to bringing the Owner and
his Unit into compliance with the terms of this Declaration or
with respect to materials or services furnished to such Owner or
his Unit at his request or on his behalf as may be provided
herein.

**Section 5.5.  Delinquency:**  Any assessment provided for
in this Declaration, which is not paid when due, shall be
delinquent, and shall be subject to the following provisions.
All references hereinafter made to the sale of a Unit shall also
include the assignment of the leasehold or subleasehold interest
therein.

(a)  **Right of Association:**  If any such assessment
is not paid within thirty (30) days after the due date,
the assessment shall bear interest from the date of
delinquency at the rate of six percent (6%) per annum,
and the Association may, at its option, bring an action
at law against the Owner personally obligated to pay the
same, or, upon compliance with the notice provisions set
forth herein to foreclose the lien against the Unit, and
there shall be added to the amount of such assessment,
the costs of preparing and filing the complaint in such
action, and in the event a judgment is obtained, such
judgment shall include said interest and a reasonable
attorneys' fee, together with the costs of action.  Each
Owner vests in the Association or its assigns, the right

11.

and power to bring all actions at law or lien foreclosure against such Owner or other Owners for the collection of such delinquent assessments.  No Owner may waive or otherwise escape the liability for the assessments provided for herein by non-use of the Common Area or abandonment of his Unit.

(b)  <u>Notice of Lien</u>:  No action shall be brought to foreclose said assessment lien or to proceed under the power of sale herein provided less than thirty (30) days after the date a notice of claim of lien (hereinafter referred to as "Notice of Delinquent Assessment") is deposited in the United States mail, certified or registered, postage prepaid, to the Owner of said Unit, and a copy thereof is recorded by the Association in the office of the County Recorder; said Notice of Delinquent Assessment must recite a good and sufficient legal description of any such Unit, the record Owner or reputed Owner thereof, the amount claimed (which shall include interest on the unpaid assessment at the rate of six percent (6%) per annum, plus reasonable attorneys' fees and expenses of collection in connection with the debt secured by said lien), and the name and address of the claimant.

(c)  <u>Foreclosure Sale</u>:  Any such sale provided for above is to be conducted in accordance with the provisions of Sections 2924, 2924b, and 2924c of the Civil Code of the State of California, applicable to the exercise of powers of sale in mortgages and deed of trust, or in any other manner permitted or provided by law.  The Association, through its duly authorized agents, shall have the power to bid on the Unit at foreclosure sale, and to acquire and hold, lease, mortgage and convey the same.

(d)  <u>Curing of Default</u>:  Upon the timely curing of any default for which a Notice of Delinquent Assessment was filed by the Association, the officers of the Association are hereby authorized to file or record, as the case may be, an appropriate release of such Notice of Delinquent Assessment, upon payment by the defaulting Owner of a reasonable fee, to cover the costs of preparing and filing or recording such release, together with the payment of such other costs, interest or fees as shall have been incurred.

(e)  <u>Cumulative Remedies</u>:  The assessment lien and the rights to foreclosure and sale thereunder shall be in addition to and not in substitution for all other rights, and remedies which the Association and its assigns may have hereunder and by law, including a suit to recover a money judgment for unpaid assessments, as above provided.

12.

(f) <u>Subordination</u>: A lien for regular and special assessments shall be subordinate to the lien of any first Mortgage. The sale or transfer of any Unit as a result of the exercise of a power of sale or a judicial foreclosure under a default under such first Mortgage or the termination of an Owner's interest in the Unit by Lessor shall extinguish the lien of such assessments as to payments which become due prior to such sale or transfer. No such transfer or termination as discussed above shall relieve the new Owner, be it the former beneficiary under the first Mortgage or other person, from liability for any assessments thereafter becoming due or from the lien thereof.

(g) <u>Expiration of Lien</u>: Unless sooner satisfied and released of the enforcement thereof initiated as hereafter provided such lien shall expire and be of no further force or effect one year from the date of recordation of the Notice of Delinquent Assessment. The one year period may be extended by the Association for not to exceed one additional year by recording a written extension thereof.

<u>Section 5.6</u>. <u>Exempt Property</u>: The following property subject to this Declaration shall be exempted from the assessments, charge and lien created herein: (a) all properties dedicated to and accepted by a local public authority; (b) all Common Area; and (c) all properties exempted from taxation by the laws of the State of California, upon the terms and to the extent of such legal exemption.

Notwithstanding any provision herein, no land or improvements devoted to residential dwelling use shall be exempt from said assessments, charges or liens.

<u>Section 5.7</u>. <u>Uniform Rate of Assessment</u>: Except as provided for in Section 5.4 relating to a special assessment levied against an individual Owner as described therein, both regular and special assessments shall be levied against each Owner according to the ratio of the number of Units owned by the Owner assessed to the total number of Units subject to assessment, and shall be collected on a monthly basis.

<u>Section 5.8</u>. <u>No Offsets</u>: No offsets for any reason shall be allowed against the full payment of any assessment levied pursuant to this Declaration, including, without limitation, a claim that the Association is not properly exercising its duties of maintenance or enforcement.

13.

## ARTICLE VI
## ARCHITECTURAL CONTROL

Section 6.1. Architectural Approval: Except for purposes of proper maintenance and repair, no person or entity shall install, erect, attach, build, place, construct or remove any lighting, shades, screens, signs, awnings, patio covers, decorations, fences, walls, aerials, antennas, landscaping or make any changes or otherwise alter (including the painting thereof) the exterior (or structurally alter the interior) of any Unit or the Common Area until plans and specifications (hereinafter the "Plans") as required in Section 6.2 shall have been reviewed and approved in writing by an Architectural Committee (hereinafter the "Architectural Committee") and Lessor. For purposes of this section, the term "exterior" shall mean any outside wall, outside surface, roof, outside door, balcony, patio, garage, or other outside structure of said Unit.

Section 6.2. Requirements for Approval: Said Plans shall be prepared by a duly licensed architect or other person approved by the Architectural Committee and shall include, where appropriate, the following: (a) color, shape, dimensions and materials to be used; (b) building plans; (c) exterior elevations, surfaces and sections, structural design and salient exterior details; (d) general exterior color schemes; and (e) landscaping plans showing plants, hedges, and fences. All such Plans shall be submitted in writing over the signature of the Owner or his authorized agent. Approval shall be based, among other things, on adequacy of site dimensions; adequacy of structural design and materials; conformity and harmony of external design with neighboring structures; effect of location and use of improvements and landscaping on neighboring property, improvements landscaping, operations and uses; preservation of view and aesthetic beauty; with respect to fences, walls and landscaping, assurance of adequate access to the Association in connection with the performance of its duties and the exercise of its power hereunder; conformity with such rules and regulations as may be adopted by the Architectural Committee in accordance with this Article; and conformity of the Plans to the purpose and general plan and intent of this Declaration.

Section 6.3. Term and Composition of Architectural Committee: The Architectural Committee shall be composed of three (3) members. Prior to the first anniversary date of the issuance of the original Public Report for the Project, Declarant may appoint the three (3) original members of the Architectural Committee and their replacements, if necessary. Declarant's appointees to the Architectural Committee need not be Members of the Association. Declarant shall retain the right to appoint a majority of the members of the Architectural Committee until the earlier occurrence of either of the following events:

14.

(a)  When ninety percent (90%) or more of the Units have been sold; or

(b)  On the fifth anniversary date of the original issuance of the Public Report for the Project.

After one year from the date of issuance of the original Public Report for the Project, the Board shall have the right to appoint one Member to the Architectural Committee, who shall be a member of the Association.

From and after the occurrence of any of the events referenced in (a) and (b) hereinabove, whichever occurs first, the Board shall have the power to appoint all members of the Architectural Committee who shall all be Members of the Association.

Section 6.4.  Failure to Approve or Disapprove the Plans: In the event the Lessor or the Architectural Committee, or its representatives designated in accordance with Section 6.9, fail to either approve or disapprove such Plans within thirty (30) days after the same have been submitted to them, it shall be conclusively presumed that the Lessor and the Architectural Committee have approved such Plans. All improvement work approved by the Lessor and Architectural Committee shall be diligently completed and constructed in accordance with the approved Plans.

Section 6.5.  No Liability:  Neither Declarant, Lessor, Lessee, Association, Architectural Committee, or the members or designated representatives thereof shall be liable in damages to anyone submitting Plans to them for approval, or to any Owner of property affected by this Declaration by reason of mistake in judgment, negligence, or nonfeasance arising out of or in connection with the approval or disapproval or failure to approve or disapprove any such Plans, or for any defect in any structure constructed from such Plans. Such Plans are not approved for engineering design. Every Owner and his authorized agent, if any, who submits Plans to the Architectural Committee for approval agrees, by reason of such submission, that no action or suit of any kind will be commenced against Declarant, Lessor, Lessee, Association, Architectural Committee, or any of the members or designated representatives thereof to recover any damages.

Section 6.6.  Notice of Noncompliance or Noncompletion: Notwithstanding anything to the contrary contained herein, after the expiration of the later of one year from the date of issuance of a building permit by a municipal or other governmental authority for any improvements or one year from the date of commencement of construction of any improvements within the Project, said improvements shall, in favor of purchasers and encumbrancers in good faith and for value, be deemed to be in

15.

compliance with all provisions of this Article, unless actual
notice of such noncompliance or noncompletion, executed by the
Architectural Committee or its designated representatives, shall
appear of record in the office of the County Recorder or unless
legal proceedings shall have been instituted to enforce
compliance or completion.

Section 6.7.  Rules and Regulations:  The Architectural
Committee may from time to time, in its sole discretion, adopt,
amend and repeal reasonable rules and regulations interpreting
and implementing the provisions hereof and establishing
reasonable architectural standards over the Project.

Section 6.8.  Variances:  Where circumstances such as
topography, location of property lines, location of trees,
configuration of the improvements on the Property, or other
matters require, the Architectural Committee, by the vote or
written assent of a majority of its members, may allow reasonable
variances as to any of the covenants, conditions or restrictions
contained in this Declaration under the jurisdiction of the
Architectural Committee, on such terms and conditions as it shall
require; provided, however, that all such variances shall be in
keeping with the general plan for the improvement and development
of the Project.

Section 6.9.  Appointment and Designation:  The
Architectural Committee may from time to time, by the vote or
written assent of a majority of its members, delegate any of its
rights or responsibilities hereunder to one or more duly licensed
architects or other qualified persons who shall have full
authority to act on behalf of said Architectural Committee in all
matters so delegated.

Section 6.10.  Review Fee and Address:  Any Plans
required by Section 6.2 shall be submitted in writing for review
and approval together with a reasonable processing fee.  The
address of the Architectural Committee shall be the principal
place of business of the Association, or such other place as the
Architectural Committee may from time to time designate in
writing to the Board.  Such address shall be the place for the
submittal of any plans and specifications and the place where the
current rules and regulations, if any, of the Architectural
Committee shall be kept.

Section 6.11.  Inspection:  Any member or agent of the
Architectural Committee may from time to time at any reasonable
hour or hours and upon reasonable notice enter and inspect any
property subject to the jurisdiction of said Architectural
Committee as to its improvements or maintenance in compliance
with the provisions hereof.

16.

# ARTICLE VII
## EASEMENTS

**Section 7.1.  Rights of Association:**  There is hereby reserved to the Association such easements as are necessary to perform the duties of the Association.

**Section 7.2.  Rights of Declarant:**  The Declarant, for itself and its successors and assigns, reserves the following rights and easements:

(a)  Easement over the Common Area for the installation and maintenance of electric, telephone, cable television, water, gas, and sanitary sewer lines and drainage facilities.

(b)  The right to use on a non-interference basis the Association clubhouse, if there be one constructed upon the Common Area, as a sales facility.  Such use by Declarant or its sales agents or representatives shall not unreasonably interfere with the Members in their use and enjoyment of the Common Area or recreational facilities thereon.  This reservation by Declarant shall terminate on the happening of either of the following events, whichever occurs earlier:

(1)  On the expiration of a three (3) year period from the date of issuance by the Department of Real Estate of the State of California of a Final Subdivision Public Report with respect to the Property; or

(2)  On the sale of all of the Units in the Project.

(c)  Easements over the Common Area for construction, display, maintenance, sales, and exhibit purposes in connection with the construction, development and sale or lease of the Project until the sale by Declarant of all Condominiums within the Project, provided, however, that the exercise of such easements by Declarant shall not unreasonably interfere with the reasonable use and enjoyment of the Units or the Common Area by the Owners.  Until the sale of all of the Units in the Project, Declarant may use any of the Units owned by it within the Project as model home sites and any of the Common Area as incidental parking.  Declarant reserves the right to alter its construction, development and design plans as it deems appropriate.

(d)  The right of Declarant (and its agents, employees and representatives) to enter on the Common Area to construct improvements on the Property and to

17.

JOINT EXHIBIT - PAGE - 0067
JASSO DECL. PAGE - 0690

make repairs and remedy construction defects if such
entry shall not interfere with the use of any occupied
Unit unless authorized by the Owner thereof; provided,
however, that the Declarant shall be responsible for the
timely repair of any damage caused to the Common Area or
any Unit by the Declarant (and its agents, employees and
representatives) in exercising this right.

(e)  So long as Declarant owns any Units in the
Project, this Declaration cannot be amended or modified
to change or eliminate the easements reserved herein to
Declarant without the prior written approval of
Declarant, and any attempt to do so shall be null and
void and shall have no effect whatsoever.

Section 7.3.  Rights of Owners:  The rights and duties of
the Owners of Units within the Property with respect to sanitary
sewer and water, electricity, gas and telephone and cable
television lines and drainage facilities shall be governed by the
following:

(a)  Wherever sanitary sewer house connections
and/or water house connections or electricity, gas or
telephone and cable television lines or drainage
facilities are installed within the Property, which
connection lines or facilities or any portion thereof,
lie in or upon the Common Area or lie in or upon Units
owned by others, then the Owner of a Unit served by said
connections, lines or facilities, shall have the right,
and is hereby granted an easement to the full extent
necessary therefor, to enter upon these Units or to have
utility companies enter upon these Units within the
properties in or upon which said connections, lines or
facilities, or any portion thereof, lie to repair,
replace, and generally maintain said connections as and
when the same may be necessary as set forth below.

(b)  Wherever sanitary sewer house connections
and/or water house connections or electricity, gas or
telephone or cable television lines or drainage
facilities are installed within the Property, which
connections serve more than one Unit, the Owner of each
Unit served by said connections shall be entitled to the
full use and enjoyment of such portions of said
connections as service his Unit.

Section 7.4.  Encroachments on Common Area:  Eaves,
window boxes, fireplace units, porches and air conditioner units
or similar improvements which may be erected or installed on the
Property by Declarant, may encroach onto the Common Area,
provided, however, that any such encroachment shall not exceed a
maximum of four (4) feet.

18.

Section 7.5.  Restricted Common Areas:  There is hereby
reserved and established for certain Owners, various exclusive
easements over the Common Area, which shall be deemed "Restricted
Common Areas".  These may include any or all of the following:

(a)  Entry areas or courts into the Units, which
rights shall be shared with the Unit Owners whose Units
abut such areas.

(b)  Attic space, which shall be for the exclusive
use of the Owners of the Unit to which such space
adjoins.

Such Restricted Common Areas are designated on the
Condominium Plan and are referenced in a manner necessary to
delineate to which Owner of a Unit the particular right exists.
The Owner to which the rights to a Restricted Common Area run
shall be obligated to keep and maintain such areas in a safe and
clean condition; provided, however, that general maintenance and
repair shall primarily remain the obligation of the Association.

Section 7.6.  Other Encroachments:  Each Unit and Common
Area improvements within the Project is hereby declared to have
an easement over all adjoining Units and Common Area for the
purpose of accommodating an encroachment due to engineering
errors, errors in original construction, settlement or shifting
of the building, or any other cause.  There shall be valid
easements for the maintenance of said encroachments so long as
they shall exist, and the rights and obligations of Owners shall
not be altered in any way to said encroachment, settlement or
shifting; provided, however, that in no event shall a valid
easement for encroachment be created in favor of an Owner or
Owners if said encroachment occurred due to the willful
misconduct of said Owner or Owners.  In the event a structure is
partially or totally destroyed, and then repaired or rebuilt, the
Owners of each Unit agree that minor encroachments over adjoining
Units shall be permitted and that there shall be valid easements
for the maintenance of said encroachments so long as they shall
exist.

ARTICLE VIII
MANAGEMENT

Section 8.1.  Powers of the Association:  All powers
relating to management, operation and maintenance of the Common
Area, as well as certain rights, duties and powers relating to
the Property, as set forth herein and in the Bylaws, shall be
vested in the Association.

Section 8.2.  Purposes of the Association:  The specific
and primary purposes of and powers of the Association are to
manage and maintain the Common Area, Monterey Lane, and all

19.

JOINT EXHIBIT - PAGE 0064

JASSO DECL. PAGE - 0692

facilities, improvements, and landscaping thereon, to maintain certain individual improvements on the Units, and to provide recreational activities for the Members, foster and support community activities of the Members, and perform the functions set forth in this Declaration of Covenants, Conditions and Restrictions, and the Association's Articles of Incorporation, and Bylaws.

Section 8.3. Contracting Authority: The Association shall have the right and power to employ or engage a manager and other employees or agents and contract for such services, labor and materials as it may deem reasonably necessary to operate and maintain the Common Area and the improvements thereon and to discharge its other duties as herein provided.

Section 8.4. Duties: The Association shall have the powers to and be responsible for:

(a) The enforcement of this Declaration, the Bylaws of the Association and other agreements of the Association.

(b) Subject to Section 8.6, below, maintaining the Common Area and facilities and improvements thereon (including furnishings and equipment related thereto) in a good, clean, attractive and sanitary order and repair.

(c) Providing water, sewer, refuse collection, electrical, telephone, gas and other necessary utilities service for the Common Area, and maintenance, gardening and landscaping for the Common Area.

(d) Granting easements where necessary for utilities and sewer facilities over the the Common Area to serve the Common Area and the Units.

(e) The payment of taxes and assessments which are or could become a lien on the Common Area or some portion thereof.

(f) Establishing and maintaining a working capital and contingency fund in an amount to be determined by the Board of Directors of the Association.

(g) Providing exterior maintenance of each Unit which is subject to assessment hereunder, only as follows:

(1) Paint, maintain, and repair and replace (if required because of normal wear, tear or deterioration) roofs, gutters, downspouts and exterior building surfaces, and maintain the

20.

landscaping (including the trees, shrubs, grass and
walks) within the Common Area.

(2)   Such exterior maintenance shall not
include:   glass surfaces; landscaping within the
private balcony areas of each Unit; balcony covers
or other additions built or maintained within
private balcony areas by an Owner; repairs or
replacements arising out of or caused by the willful
or negligent act of the Owner, his family, guests,
or invitees, or caused by any of the perils covered
by a standard form fire insurance policy with
extended coverage endorsement thereon, or caused by
flood, earthquake or other Acts of God.   Such
excluded items shall be the responsibility of each
Owner; provided, however, that if an Owner shall
fail to maintain or make the repairs or replacements
which are the responsibility of such Owner, as
provided above, then, upon vote of a majority of the
Board of Directors, and after not less than thirty
(30) days' notice to the Owner, the Association
shall have the right (but not the obligation) to
enter the Unit and provide such maintenance or make
such repairs or replacements, and the cost thereof
shall be added to the assessments chargeable to such
Unit and shall be payable to the Association by the
Owner of the Unit.

(3)   For the purposes solely of performing the
exterior maintenance authorized by this Section, the
Association's agents or employees shall have the
right, after reasonable notice to the Owner, to
enter upon any Unit at reasonable hours.

(h)   Obtaining and maintaining in force the
following policies of insurance:

(1)   Comprehensive public liability insurance
insuring the Association, any manager, the Lessee
and Declarant and the Owners and occupants of Units
and their respective family members, guests,
invitees, and the agents and employees of each,
against any liability incident to the Ownership or
use of the Common Area and including, if obtainable,
a cross-liability or severability of interest
endorsement insuring each insured against liability
to each other insured.   Such insurance shall include
coverage against water damage liability, liability
for nonowned and hired automobiles, liability for
property of others and any other liability or risk
customarily covered with respect to projects similar
in construction, location, and use.

21.

JOINT EXHIBIT - PAGE - 0086

(2)   Master or blanket policy of fire insurance
for the full insurable value of all of the
improvements within the Project.   The form, content,
and term of the policy and its endorsements and the
issuing company must be satisfactory to all
institutional Mortgagees.   If more than one
institutional Mortgagee has a loan of record against
the Project, or any part of it, the policy and
endorsements shall meet the maximum standards of the
various institutional Mortgagees represented in the
Project.   The policy shall contain an agreed amount
endorsement or its equivalent, an increased cost of
construction endorsement or a contingent liability
from operation of building laws endorsement or their
equivalent, an extended coverage endorsement,
vandalism, malicious mischief coverage, a special
form endorsement and a determinable cash adjustment
clause or a similar clause to permit cash settlement
covering full value of the improvements in cash of
partial destruction and a decision not to rebuild.
The policy shall be in the amounts as shall be
determined by the Board.   The policy shall name as
insured the Association, the Owners, Declarant, and
Lessee as long as Declarant or Lessee is the owner
of any Unit and all institutional Mortgagees as
their respective interests may appear, and may
contain a loss payable endorsement in favor of the
trustee described in this declaration.

(3)   Except as provided in this Section, no
Owner can separately insure his Unit or any part of
it against loss by fire or other casualty covered by
any insurance carrier under subparagraph (2).   If
any Owner violates this provision, any diminution in
insurance proceeds otherwise payable that results
from the existence of such other insurance will be
chargeable to the Owner who acquired other
insurance, and the Owner will be liable to the
Association to the extent of any such diminution.
An Owner can insure his personal property against
loss.   In addition, any improvements made by an
Owner to the real property within his Unit may be
separately insured by the Owner, but the insurance
is to be limited to the type and nature of coverage
commonly known as tenant's improvements.   All such
insurance that is individually carried must contain
a waiver of subrogation rights by the carrier as to
other Owners, the Association, Declarant, Lessor,
and Lessee.

(4)   All insurance proceeds payable hereunder
and subject to the rights of the Mortgagees, below,
may be paid to a trustee, to be held and expended

22.

for the benefit of the Owners, Mortgagees and others, as their respective interests shall appear. Said trustee shall be a commercial bank that agrees in writing to accept such trust. If repair or reconstruction is authorized, the Board shall have the duty to contract for sich work as provided for in this Declaration.

(5)  The Board may and, if required by any Mortgagee, shall purchase and maintain demolition insurance in adequate amounts to cover demolition in case of total or partial destruction and a decision not to rebuild, and a blanket policy of flood insurance.  The Board also shall purchase and maintain worker's compensation insurance, to the extent that it is required by law, for all employees of the Project.  The Board also shall purchase and maintain fidelity bonds or insurance (which shall be in an amount not less than 150% of each year's estimated annual operating expenses and reserves and shall contain an endorsement of coverage of any person who may serve without compensation) sufficient to meet the requirements of any Mortgagee.  The Board shall purchase and maintain such insurance on personal property owned by the Association, and any other insurance, that it deems necessary or that is required by any Mortgagee.

(6)  An Owner may carry whatever personal liability and property damage liability insurance with respect to his Unit that he desires.  However, any such policy shall include a waiver of subrogation clause acceptable to the Board and to any Mortgagee.

(7)  The Board is appointed attorney-in-fact by each Owner to negotiate and agree on the value and extent of any loss under any policy carried hereunder.  The Board is granted full right and authority to compromise and settle any claim or enforce any claim by legal action or otherwise and to execute releases in favor of any insurer.

(8)  Any Mortgagee has the option to apply insurance proceeds payable on account of a Unit in reduction of the obligation secured by the mortgage of such Mortgagee.

(9)  Notwithstanding the foregoing provisions of this Article, the Association shall continuously maintain in effect such casualty, flood and liability insurance and a fidelity bond meeting the insurance and fidelity bond requirements for

23.

T-70542

Nov 5/28/80

JOINT EXHIBIT - PAGE - 0068

condominium projects established by Federal National
Mortgage Association, Government National Mortgage
Association, Federal Home Loan Mortgage Corporation,
Federal Housing Administration, or Veterans'
Administration, so long as any one is a Mortgagee,
Owner, or insures or guarantees a mortgage within
the Property, except to the extent such coverage is
not available or has been waived in writing by the
foregoing entities.

(i)  Make lease payments, if any, required to be
paid on the Common Area.

(j)  Maintenance of Monterey Lane, and any guard-
gates thereon, pursuant to that certain Agreement
attached hereto as Exhibit "A".

Section 8.5.  Right of Entry:  The Association or its
agents may enter any Unit when necessary in connection with any
maintenance, landscaping or construction for which the
Association is responsible.  Upon consent of the Owner, which
consent shall not be unreasonably withheld, the Association or
its agents may enter a Unit to perform maintenance, repairs or
construction for which the Association is responsible.  Such
entry shall be made with as little inconvenience to the Owner as
reasonably possible, and any damage caused thereby shall be
repaired by the Association.

Section 8.6.  Duties of Owners:  In addition to all other
obligations set forth herein, the Owners shall be responsible for
the following:

(a)  In the event the Board shall determine that the
walls, ceilings, floors, doors or any other portion of
the Common Area forming the boundaries of a Unit have
been damaged from within the Unit, notwithstanding that
such damage may be to the Common Area, the Owner of the
Unit shall be responsible for repairing such damage in a
timely manner and in accordance with such rules as the
Board or Architectural Committee shall from time to time
adopt.  In the event such repair is not so accomplished
by the Owner, the Association or its delegates shall have
the right at reasonable times to enter the Unit to effect
such repair, and the cost thereof shall be charged to
said Owner and, if not paid in a timely manner, shall be
a special assessment.

(b)  The repair of any wall or fence separating
neighboring Units shall be the joint responsibility of
the Owners whose Units are separated by such wall or
fence, notwithstanding that such wall or fence may
consist in part of Common Area.  Such adjoining Owners
shall share the expense of such repair equally, but if

24.

one such Owner refuses to join in such repair, the other
may undertake such repair himself and shall receive
contribution from his neighbor for his neighbor's share
of the cost thereof.  In the event that such repair is
required because of the acts or negligence of one of such
adjoining Owners, such repair shall be accomplished by
such Owner at his sole expense.

(c)  Each Owner shall be responsible for the care,
maintenance and replacement of his electric garage door
opener, notwithstanding the fact that such may have been
installed by the Declarant.

Section 8.7.  Association to Defend Certain Actions:  In
the event that a lawsuit is brought against all or substantially
all of the Members within the Project which will or could result
in any lien or encumbrance being levied against an entire
Project, the following terms shall apply:

(a)  The Association shall defend such lawsuit and
the costs of such defense shall be a special assessment
against all of the Members within the Project joined as
defendants in such lawsuit; provided, however, in the
event that an insurance carrier is obligated to provide
such defense under a policy of insurance carried by the
Association, the Association shall be relieved of the
obligation to provide such defense.  Nothing contained
herein shall in any way limit the rights of any Member or
Members to retain counsel of their choice to represent
them in such lawsuit at their own expense.  In the event
that a Member so chooses, he shall not be relieved of
liability for the special assessment provided for in this
Section.

(b)  In the event that a lien or encumbrance not
covered by California Civil Code Section 1357 attaches to
all or substantially all of the Project by reason of a
judgment or otherwise, the Association shall promptly
take the appropriate steps to remove such lien,
including, but not limited to, the payment of money and
the posting of a bond.  The Association shall have the
power to borrow money and to take such other steps as are
necessary to free a Project of such liens.

(c)  Simultaneously with any action taken pursuant
to the above sections, the Association shall levy a
special assessment against each of the Members whose
Condominiums were subject to the lien or encumbrance
which caused the Association to act pursuant to said
Section equal to each such Member's pro rata share of
such lien or encumbrance.  In the event that such special
assessment is not paid within thirty (30) days of its due
date, the Board may effect the remedies of Section 1356

25.

T-10542

Rec 5/28/80

JOINT EXHIBIT - PAGE - 0070

of the California Civil Code and any other remedies
contained herein.

## ARTICLE IX
### GENERAL RESTRICTIONS

Section 9.1. Partition: The Common Area shall remain
undivided; and no Owner shall bring any action for partition,
excepting as otherwise herein provided, it being agreed that this
restriction is necessary in order to preserve the rights of the
Owners with respect to the operation and management of the
Project.

Section 9.2. Interior of Unit: Each Owner shall have
the right to paint, repaint, tile, wax, paper or otherwise
refinish and decorate the inner surfaces of the walls, ceiling
floors, windows and doors bounding his own Unit.

Section 9.3. Nuisance: Neither the Property, nor any
portion thereof, shall be used for any purpose tending to injure
the reputation thereof, or to disturb the neighborhood or
occupants of adjoining property, or to constitute a nuisance, or
in violation of any public law, ordinance, or regulation in any
way applicable thereto.

Section 9.4. Use of Common Area: The Common Area shall
be used for park, recreational, social and other purposes
directly related to the uses authorized under this Declaration.

Section 9.5. Projections: No projections of any type
shall be placed or permitted to remain above the roof of any
residential building with the exception of one or more chimneys
and one or more vent stacks. No outside air conditioning units,
evaporating coolers, television or radio pole or antenna shall be
constructed, erected or maintained on any building or on any Unit
or Common Area or connected in such manner as to be visible from
the outside of any such building, except as may be constructed by
Declarant.

Section 9.6. Recreational Vehicles: No mobile home,
recreational vehicle, motor home, camper, minihome, boat, truck
of size in excess of 3/4 ton, or trailer of any kind shall be
kept, stored, parked, maintained, constructed or repaired on any
part of the Project other than in specific designated parking
areas as approved by the Board of Directors.

Section 9.7. Lavatory Facilities: No privy shall be
erected, maintained or used upon any portion of a Unit or Common
Area, but a temporary privy may be permitted during the course of
construction of a building. Any lavatory, toilet or water closet
which shall be erected, maintained or used upon any portion of a
Unit or Common Area shall be enclosed and located within a

JOINT EXHIBIT - PAGE - 0075

T-19542

building permitted under this Declaration to be erected on the
Unit or Common Area, shall be properly connected with the sewer
system and shall be so constructed and operated that no offensive
odor shall arise or otherwise escape therefrom.

Section 9.8.   Signs:   Except for a sign having a maximum
face area of three (3) square feet and advertising the Property
for sale or rent, no sign or other advertising device of any
character shall be erected, maintained, or displayed upon any
part of the Property; provided, however, that Declarant may erect
and maintain on the Common Area or on any Unit owned by it such
signs and other advertising devices or structures, as it may deem
necessary or proper in connection with the conduct of its
operations for the development, improvement, subdivision and sale
of said property; provided further that residential signs having
a maximum face area of seventy-two (72) square inches giving the
name of the occupant and/or the address of a Unit may be
displayed on such Unit.   The Association or its agents may
summarily remove and destroy all signs not conforming to this
Section.

Section 9.9.   Animals:   No animals, fowl, reptiles or
poultry shall be kept on the Property, except that domestic dogs,
cats, birds and fish may be kept as household pets upon said
property provided that they are not kept, bred or raised thereon
for commercial purposes or in unreasonable quantities.
Notwithstanding the foregoing, no animals or fowl may be kept on
the Property which result in any annoyance or are obnoxious to
residents in the vicinity.

Section 9.10.   Offensive Activities:   No noxious or
offensive trades or activity shall be carried on upon any portion
of the Property, nor shall anything be done or maintained thereon
which may be or become an annoyance or nuisance to the
neighborhood, or which shall in any way interfere with the quiet
enjoyment of each of the Owners of his respective dwelling unit,
or which shall in any way increase the rate of insurance.

Section 9.11.   Right of Inspection:   During reasonable
hours and after reasonable notice, any agent of the Association
shall have the right to enter upon and inspect the Property or
any portion thereof and the improvements thereon for the purpose
of ascertaining whether or not the provisions of this Declaration
are being complied with and shall not be deemed guilty of
trespass by reason thereof.   Provided, however, that there shall
be no entry into any dwelling unit without the express consent of
the Owner.

Section 9.12.   Leases:   With the exception of a lender in
possession of a Unit following a default in a first Mortgage, a
foreclosure proceeding or any deed or other arrangement in lieu
of foreclosure, no Unit Owner shall be permitted to lease his
Unit for transient or hotel purposes.   No Unit Owner may lease

27.

JASSO DECL. PAGE - 0700

less than the entire Unit. Any lease between an Owner and lessee shall provide that the terms of the lease are subject in all respects to the provisions of this Declaration, the Articles of Incorporation and Bylaws of the Association, and that any failure by the lessee to comply with the terms of such documents shall be a default under the lease. All leases shall be in writing.

**Section 9.13. Misconduct:** Each Owner shall be liable to the Association for any damage to the Common Area or to any of the equipment or improvements thereon which may be sustained by reason of the negligence or willful misconduct of said Owner or of his family, relatives, guests or invitees, both minor and adult but only to the extent such Owner would be legally responsible under the laws of the State of California.

**Section 9.14. Structural Changes:** Nothing shall be done in any Unit, or in, on or to the Common Areas, which will impair the structural integrity of any building or which would structurally change any building without the prior written consent of the Board and Lessor.

**Section 9.15. Utilities:** Each Owner of a Unit shall be obligated to pay any and all assessments for water, sewage, gas, electricity, or other utilities, taxes and other charges assessed individually against such Unit.

**Section 9.16. Receptacles:** No Owner shall deposit any garbage, refuse or rubbish in or on the Common Area unless such matter is deposited in appropriate containers suitably placed as designated by the Board so as not to detract from the physical appearance of the Common Area or the Project. Trash bins may be placed upon the Common Area by each Owner only in accordance with such rules and regulations as may be promulgated by the Board and may remain upon the Common Areas only on trash pickup days.

**Section 9.17. Television; Radio:** No alteration to or modification of the radio and/or television antenna system, as developed by the Declarant, shall be permitted and no Owner may be permitted to construct and/or use and operate his own external radio and/or television antenna.

### ARTICLE X
### MORTGAGE PROTECTION

**Section 10.1. Seventy-Five Percent Vote of Mortgagees:** Except as provided by statute in case of condemnation or substantial loss to the Units and/or Common Area, without the prior written approval of at least seventy-five percent (75%) of all first Mortgagees, based one (1) vote for each Mortgagee, neither the Association nor the Members shall be entitled to do any of the following:

28.

JOINT EXHIBIT PAGE 00258/50

T-10542

(a)  By act or omission, dissolve the Association or abandon or terminate the Project.

(b)  By act or omission, abandon, partition, sell, alienate, subdivide, release, transfer, hypothecate, or otherwise encumber the Common Area.  This provision is not intended to restrict or otherwise prohibit an Owner from selling or encumbering his own Condominium, nor shall it prohibit the granting of easements for public utilities or other publiv purposes consistent with the intended use of the Common Area.

(c)  Partition or subdivide a Condominium.

(d)  Amend a material provision of this Declaration, the Bylaws or the Articles; for purposes of determining what provisions are material in this Declaration and in the Bylaws or the Articles, such provisions in these documents which are required by the rules, regulations or guidelines of programs administered by Federal National Mortgage Association, Government National Mortgage Association, and Federal Home Loan Mortgage Corporation shall be deemed material, but not by way of limitation, with respect to other provisions in these documents.

(e)  Effectuate any decision to terminate professional management and assume self management of the Association.

(f)  Change the pro rata interest or obligations of any individual Unit for the purpose of:  (i) levying assessments on charges or allocating distributions of hazard insurance proceeds on condemnation awards, or (ii) determining the pro rata share of ownership of each Unit in the Common Area.

(g)  Use hazard insurance proceeds for losses to any Property (whether to Units or to Common Areas) for other than the repair, replacement, or reconstruction of such Property.

Section 10.2.  Other Rights of First Mortgagees.  Any first Mortgagee shall, upon written request to the Association, be entitled to:

(a)  Inspect the books and records of the Association during normal business hours.

(b)  Receive the annual audited financial statements of the Association ninety (90) days following the end of the Association's fiscal year.

29.

JOINT EXHIBIT - PAGE - 0003 58/80

T-1954/2

(c)  Receive written notice on all annual and special meetings of the Members or of the Board, and first Mortgagees shall further be entitled to designate a representative to attend all such meetings in order to, among other things, draw attention to violations of this Declaration which have not been corrected or made the subject of remedial action by the Association; provided, however, nothing contained in this Section shall give a first Mortgagee the right to call a meeting of the Board or of the Members for any purpose or to vote at any such meeting.

Section 10.3.  Mortgagees Furnishing Information: Mortgagees are hereby authorized to furnish information to the Board concerning the status of any loan encumbering a Unit.

Section 10.4.  Notice to First Mortgagees of Owner Default:  Any first Mortgagee shall be entitled to written notification from the Association of any default in the performance of the obligations imposed by this Declaration by the Owner whose Unit is encumbered by such Mortgagee's mortgage, which default has not been cured within sixty (60) days of a request therefor by the Association; provided, however, the Association shall only be obligated to provide such notice to first Mortgagees who have previously requested such notice in writing.

Section 10.5.  Right of First Refusal:  The right of an Owner to sell, transfer or otherwise convey his Unit shall not be the subject of any right of first refusal or any similar restriction in favor of the Association.  In the event this Declaration is amended to provide for any right of first refusal in the Association, a Mortgagee who comes into possession of a Unit pursuant to a judicial foreclosure or a trustee's sale shall be exempt therefrom.

Section 10.6.  Conflicts:  In the event of any conflict between any of the provisions of this Article and any of the other provisions of this Declaration, the provisions of this Article shall control.

Section 10.7.  Notice of Destruction or Taking:  In the event that the Common Area or any Unit or any portion thereof is substantially damaged or is made the subject of any condemnation proceeding in eminent domain or is otherwise sought to be acquired by a condemning authority, the Board shall promptly notify any first Mortgagee affected by such destruction, taking or threatened taking.  For purposes herein, the term "substantially damaged" shall mean damages exceeding Ten Thousand Dollars ($10,000.00).  If requested in writing by a first Mortgagee, the Association shall evidence its obligations under this Section in a written agreement in favor of such first Mortgagee.

30.

**Section 10.8.** **Breach of Declaration:** A breach of any of the covenants, conditions or restrictions of this Declaration shall not defeat or render invalid the lien of any First Mortgage made in good faith and for value on any Unit of the Property or any portion thereof, but said covenants and restrictions shall be binding upon and effective against any Owner of any of said Units whose title is acquired by the foreclosure of any lien or mortgage thereon or sale under any deed of trust given to secure the payment of money.

## ARTICLE XI
## DESTRUCTION OF IMPROVEMENTS

**Section 11.1.** **Destruction; Proceeds Exceed 85% of Reconstruction Costs:** If there is a total or partial destruction of the improvements in the development, and if the available proceeds of the insurance carried pursuant to Article VIII are sufficient to cover not less than eighty-five percent (85%) of the costs of repair and reconstruction, the improvements shall be promptly rebuilt unless, within ninety (90) days from the date of destruction, Members then holding at least seventy-five percent (75%) of the total voting power of each class of Members present and entitled to vote, in person or by proxy, at a duly constituted meeting, determine that such repair and reconstruction shall not take place. If repair and reconstruction is to take place, the Board shall be required to execute, acknowledge and record in the office of the County Recorder, not later than one hundred twenty (120) days from the date of such destruction, a certificate declaring the intention of the Members to rebuild.

**Section 11.2.** **Destruction; Proceeds Less Than 85% of Reconstruction Costs:** If the proceeds of insurance are less than eighty-five percent (85%) of the costs of repair and reconstruction, repair and reconstruction may nevertheless take place if, within ninety (90) days from the date of destruction, Members then holding at least fifty-one percent (51%) of the total voting power of each class of Members present and entitled to vote, in person or by proxy, at a duly constituted meeting, determine that such repair and reconstruction shall take place. If repair and reconstruction is to take place, the Board shall be required to execute, acknowledge and record in the office of the Orange County Recorder, not later than one hundred twenty (120) days from the date of such destruction, a certificate declaring the intention of the Members to rebuild.

**Section 11.3.** **Rebuilding Procedures:** If the Members determine to rebuild pursuant to Sections 11.1 or 11.2, above, the Owner of each Unit located within a structure that has been totally or partially destroyed shall be obligated to contribute his proportionate share of the cost of reconstruction or restoration of the structure containing his Unit, over and above

31.

the available insurance proceeds, which proportionate share shall
be based upon the ratio of the square footage of the floor area
of the Unit to be assessed to the total square footage of the
floor area of all Units to be assessed. All Owners shall
contribute their proportionate share of the cost of
reconstruction or restoration of any portion of the Common Area
not comprising the structure within which a Unit is located, and
the proportionate share of each Owner shall be equal to a
fraction the numerator of which is one (1) and the denominator of
which is the total number of Units then comprising the Project.
If any Owner fails or refuses to pay his proportionate share, the
Board may levy a special assessment against the condominium of
such Owner which may be enforced under the lien provisions
contained in Article V or in any other manner provided in this
Declaration. If any Owner disputes the amount of his
proportionate liability under this Section, such Owner may
contest the amount of his liability by submitting to the Board
within ten (10) days after notice to the Owner of his share of
the liability written objections supported by cost estimates or
other information that the Owner deems to be material and may
request a hearing before the Board at which he may be represented
by counsel. Following such hearing, the Board shall give written
notice of its decision to all Owners, including any
recommendation that adjustments be made with respect to the
liability of any Owners. If such adjustments are recommended,
the notice shall schedule a special meeting of Members for the
purpose of acting on the Board's recommendation, including making
further adjustments, if deemed by the Members to be necessary or
appropriate. All adjustments shall be affirmed or modified by a
majority of the total voting power of each class of Members. If
no adjustments are recommended by the Board, the decision of the
Board shall be final and binding on all Owners, including any
Owner filing objections.

Section 11.4. Rebuilding Contract: If the Members
determine to rebuild, the Board or its authorized representative
shall obtain bids from at least two reputable contractors and
shall award the repair and reconstruction work to the lowest
bidder. The Board shall have the authority to enter into a
written contract with the contractor for such repair and
reconstruction, and the insurance proceeds held by the trustee
shall be disbursed to the contractor according to the terms of
the agreement. It shall be the obligation of the Board to take
all steps necessary to assure the commencement and completion of
authorized repair and reconstruction at the earliest possible
date.

Section 11.5. Rebuilding Not Authorized: If the Members
determine not to rebuild, then any insurance proceeds then
available for such rebuilding shall be distributed to the Owner
of each Unit or its Mortgagee in the same ratio as the fair
market value of his Unit bears to the fair market value of all of
the Units immediately prior to the destruction, in accordance

32.

with normal appraisal techniques.  The Board shall have the duty,
within one hundred and twenty (120) days from the date of such
destruction, to execute, acknowledge and record in the office of
the County Recorder, a certificate declaring the intention of the
Members not to rebuild.

Section 11.6.  Minor Repair and Reconstruction:  In any
case, the Board shall have the duty to repair and reconstruct
improvements, without the consent of Members and irrespective of
the amount of available insurance proceeds, in all cases of
partial destruction when the estimated cost of repair and
reconstruction does not exceed Twenty Thousand Dollars ($20,000).
The Board is expressly empowered to levy a special assessment for
the cost of repairing and reconstructing improvements to the
extent insurance proceeds are unavailable, such assessment to be
levied as described in Section 11.3 (but without the consent or
approval of Members despite any contrary provisions) in this
Declaration.

## ARTICLE XII
## CONDEMNATION

Section 12.1.  Sale by Unanimous Consent:  If an action
for condemnation of all or a portion of the Project is proposed
or threatened by any governmental agency having the right of
eminent domain, then, on unanimous written consent of all of the
owners and after written notice to at least seventy-five percent
(75%) of all first Mortgagees, the Project, or a portion of it
may be sold.

Section 12.2.  Distribution of Proceeds of Sale:  On a
sale occurring under Section 12.1 above, the proceeds shall be
distributed to the Owner and the Mortgagees of each Unit as their
respective interests may appear in the same ratio as that set
forth in Section 11.5, above.

Section 12.3.  Distribution of Condemnation Award:  If
the Project, or a portion of it, is not sold but is instead
taken, the judgment of condemnation shall by its terms apportion
the award among the Owners and their respective Mortgagees, and
in the same ratio as that set forth in Section 11.5, above.

Section 12.4.  Revival of Right to Partition:  On sale or
on taking that renders more than fifty percent (50%) of the Units
in the Project uninhabitable, the right of any Owner to partition
through legal action shall revive immediately.

33.

## ARTICLE XIII
## PARTITION

**Section 13.1. Suspension:** Except as specifically set forth to the contrary in this Declaration, the right or partition is suspended pursuant to the California Civil Code as to the Project. Nothing in this Declaration, however, shall prevent partition or division of interest between joint or common Owners of one (1) Unit, provided that the written approval of a first Mortgagee of such Unit is first obtained.

**Section 13.2. Proceeds:** Proceeds or property resulting from a partition shall be distributed to and among the respective Owners and their Mortgagees in the same ratio as that set forth in Section 12.2, above.

**Section 13.3. Power of Attorney:** Pursuant to the California Civil Code, each Owner grants the Association an irrevocable power of attorney to sell the Project for the benefit of the Owners when partition can be had. Exercise of the power is subject to the approval of Members.

## ARTICLE XIV
## GENERAL PROVISIONS

**Section 14.1. Term:** The covenants and restrictions of this Declaration shall run with and bind the Property, Association and any Owner, their legal representatives, heirs, successors and assigns, for a term of twenty (20) years from the date this Declaration is recorded, after which time they shall be automatically extended for successive periods of ten (10) years.

**Section 14.2. Notices:** Any notice to be given to an Owner or a Mortgagee under the provisions of this Declaration shall be in writing and may be delivered as follows:

(a) Notice to an Owner shall be deemed to have been properly delivered when delivered personally prepaid, to the most recent address furnished by such Owner in writing to the Association for the purpose of giving notice, or if no such address shall have been furnished, then to the street address of such Owner's Condominium in the Project. Any notice so deposited in the mail within the County, shall be deemed delivered forty-eight (48) hours after such deposit. In the case of co-Owners, any such notice may be delivered or sent to any one of the co-Owners on behalf of all co-Owners and shall be deemed delivered on all such co-Owners.

(b) Notice to a Mortgagee shall be deemed to have been properly delivered when placed in the first class United States mail, postage prepaid, to the address

34.

furnished to the Association by such Mortgagee for
purposes of notice or, if no such address is furnished,
to any office of the Mortgagee in the county, or, if no
such office is located in the county, to any office of
such Mortgagee.

Section 14.3.   Enforcement:  The Association, Lessor,
Lessee, any Owner, or their successor in interest, shall have the
right to enforce, by any proceeding at law or in equity, all
restrictions, conditions, covenants, reservations, liens and
charges now or hereafter imposed by the provisions of this
Declaration or any amendment thereto, including the right to
prevent the violation of any such restrictions, conditions,
covenants or reservations and the right to recover damages or
other dues for such violation; provided, however, that with
respect to assessment liens, the Association shall have the
exclusive right to the enforcement thereof.  Failure by the
Association or by any Owner to enforce any covenant or
restriction herein contained shall in no event be deemed a waiver
of the right to do so thereafter.

Section 14.4.   Severability:  Invalidation of any one of
these covenants, conditions or restrictions by judgment or court
order shall in no way affect any other provisions, which shall
remain in full force and effect.

Section 14.5.   Construction:  The provisions of this
Declaration shall be liberally construed to effectuate its
purpose of creating a uniform plan for the development of a
residential community or tract and for the maintenance of common
recreational facilities and Common Area.  Section headings are
inserted for convenience only and are not intended to be a part
of this document or in any way to define, limit or describe the
scope or intent of the particular section to which they refer.

Section 14.6.   Singular Includes Plural:  Whenever the
context of this Declaration requires it, the singular shall
include the plural and the masculine shall include the feminine.

Section 14.7.   Attorneys' Fees:  In the event action is
instituted against an Owner to enforce any of the provisions
contained in this Declaration, the party prevailing in such
action shall be entitled to recover from the other party thereto
as part of the judgment reasonable attorneys' fees and costs of
such action, which attorneys' fees and costs shall also be added
to such Owner's assessments.

Section 14.8.   Nuisance:  The result of every act or
omission whereby any of the covenants contained in this
Declaration or if the Bylaws are violated in whole or in part is
hereby declared to be and constitutes both a public and private
nuisance, and every remedy allowed by law or equity against every
such result and may be exercised by any Owner, by the Association

35.

JOINT EXHIBIT - PAGE - 0080

T-10542

or its successors in interest, or by the County of Orange or other affected governmental entity.  Such remedy shall be deemed cumulative and not exclusive.

Section 14.9.  Amendments:  Unless otherwise provided for herein, this Declaration of Covenants, Conditions and Restrictions may be amended only by the affirmative assent or vote of not less than seventy-five percent (75%) of the voting power of the Members and Lessor, excluding the Declarant; provided, however, that although Declarant has not obtained the Veterans' Administration ("VA") or Federal Housing Administration ("FHA") approval in connection with the development of this Project, such approval may be sought by Declarant.  In the event that the VA or FHA approval is so sought for the purpose of having FHA and/or VA insure or guarantee any mortgage or providing any form of assistance within the purview of such agencies with respect to this Project, the rules and regulations of FHA and/or VA, as the same exist at the date of recording of this Declaration, may require this Declaration to be amended in certain respects and additionally will require that FHA and/or VA participate in certain decisions affecting the Project and management of the Association.  Therefore, effective as of the date this Project receives FHA and/or VA approval, this Declaration is thereby amended as follows without the necessity of any vote or written assent of the Owners or Mortgagees:

(a)  The following actions will require the prior approval of the FHA and/or VA:

(1)  Alteration of any Unit, construction of additional improvements, the establishment of additional licenses, reservations and rights-of-way, or alteration of construction plans and designs by Declarant.

(2)  Merger or consolidation or dissolution of the Association.

(3)  Any amendment or modification of this Declaration, the Articles or By-Laws.

(b)  The Association shall submit to FHA and/or VA, sixty (60) days prior to the beginning of each fiscal year of the Association, for their review and approval, as the case may be, a budget of the expenses for the ensuing fiscal year, on the FHA and/or VA model form of budget, indicating the amount of assessments contemplated for the next fiscal year period.

In the event the FHA, VA, or both, approve the Project as provided herein, if requested to do so by FHA and/or VA, the Board shall be automatically authorized and shall be obligated to execute a Regulatory Agreement on FHA Form No. 3278 (revised

36.

August, 1969) or such later version thereof then in use or the
analogous VA form or both as modified to reflect any
peculiarities pertaining to the Property as shall be deemed
appropriate by FHA and/or VA.

Section 14.10. Annexation:  Additional residential
property and Common Area may be annexed to the Property with the
consent of two-thirds (2/3) of the voting power of the Members,
excluding Declarant.

IN WITNESS WHEREOF, the undersigned being the Declarant
herein, has hereunder set its hand this _____21ts_____ day of
_____MAY_____, 1980.

THE ROBERT P. WARMINGTON CO.,
a California corporation

By _____
Its_____

By _____
Its_____

The foregoing is hereby approved and agreed to this 21st
day of _____MAY_____, 1980.

_____
Robert P. Warmington, an individual

HOUSER BROS CO., a California
limited partnership

By _____
General Partner

By _____
General Partner

37.

CONSENT OF LIENHOLDER

AND SUBORDINATION OF LIEN

The undersigned beneficiary under that certain Deed of
Trust dated October 31, 1979 recorded as Instrument No.
1279084-WHB in Book 13375, pages 991 through 1012,
inclusive, of Official Records of Orange County, California,
consents to all of the provisions contained in the attached
Declaration of Covenants, Conditions and Restrictions and agrees
that the lien of the deed of trust shall be junior and
subordinate and subject to said Declaration.

Dated: _May 12, 1980_

Lienholder

By _CROCKER NATIONAL BANK_

By _Leslie S. Crocker_


STATE OF CALIFORNIA    )
                       ) ss.
COUNTY OF ORANGE       )

On _MAY 12_, 1980, before me, the undersigned, a
Notary public in and for said State, personally appeared
_____, known to me to be the President, and
_____, known to me to be the
Secretary of the corporation that executed the within Instrument,
known to me to be the persons who executed the within Instrument
on behalf of the corporation therein named, and acknowledged to
me that such corporation executed the within instrument pursuant
to its bylaws or a resolution of its board of directors.

WITNESS my hand and official seal.

_____
Notary Public in and for said
County and State

38.

_T-70544_

JOINT EXHIBIT - PAGE - 0088

JASSO DECL. PAGE - 0711

**STATE OF CALIFORNIA**
COUNTY OF _Orange_ } ss.

On _May 27, 1980_ before me, the undersigned, a Notary Public in and for
said State, personally appeared _Robert P. Warmington_

known to me to be the person ___ whose name _is_
subscribed to the within instrument and acknowledged to me
that _he_ executed the same.
WITNESS my hand and official seal.

Signature _Pearl L. Hunt_

OFFICIAL SEAL
PEARL L. HUNT
NOTARY PUBLIC - CALIFORNIA
ORANGE COUNTY
My Commission Expires Mar 25, 1983

_Pearl L. Hunt_
Name (Typed or Printed)

(This area for official notarial seal)

---

TO 1940 CA (8-76)
(Partnership)

TITLE INSURANCE
AND TRUST

**STATE OF CALIFORNIA**
COUNTY OF _ORANGE_ } SS.

On _May 21, 1980_
before me, the undersigned, a Notary Public in and for said State, personally appeared _Clifford C._
_Houser and Vernon F. Houser_

_____ known to me
to be _general_ XXXX partners of the partnership
that executed the within instrument, and acknowledged to me
that such partnership executed the same.
WITNESS my hand and official seal.

Signature _Irene B. Burnett_

OFFICIAL SEAL
IRENE B. BURNETT
Notary Public California
ORANGE COUNTY
My Commission Expires July 1, 1980

---

**STATE OF CALIFORNIA**
COUNTY OF _Orange_ } ss.

On _May 27, 1980_ before me, the undersigned, a Notary Public in and for
said State, personally appeared _Robert P. Warmington_
known to me to be the _____ President, and _Oliver N. Crary_
known to me to be the _Vice Pres._ XXXXXX of the corporation that executed the within instrument,
and known to me to be the persons who executed the within
instrument on behalf of the corporation therein named, and ac-
knowledged to me that such corporation executed the within
instrument pursuant to its by-laws or a resolution of its board of
directors.

WITNESS my hand and official seal.

Signature _Pearl L. Hunt_

OFFICIAL SEAL
PEARL L. HUNT
NOTARY PUBLIC - CALIFORNIA
ORANGE COUNTY
My Commission Expires Mar 25, 1983

_Pearl L. Hunt_

JOINT EXHIBIT - PAGE - 0084
_Rec 5/28/80_

CROCKER NATIONAL BANK

STATE OF CALIFORNIA )
                    ) ss.
COUNTY OF ORANGE    )

On *May 12*_____, 19*80*, before me, the undersigned, a Notary
Public in and for said State, personally appeared *LARILEE S. CEDAR*
and _____, known to me to be the *VICE*
*PRESIDENT* and _____ respectively, of CROCKER NA-
TIONAL BANK, the national banking association that executed the within instrument,
and also known to me to be the person(s) that executed the within instrument on
behalf of CROCKER NATIONAL BANK, the national banking association therein named,
and acknowledged to me that such national banking association executed the same
pursuant to its bylaws or a resolution of its board of directors.

WITNESS my hand and official seal.

PALMIRA OESTERREICH

OFFICIAL SEAL
PALMIRA OESTERREICH
NOTARY PUBLIC - CALIFORNIA
ORANGE COUNTY
My Commission Expires Sep. 17, 1982

JOINT EXHIBIT - PAGE - 0086
JT-19547a
Rev 5/28/80

## REIMBURSEMENT AGREEMENT

This Reimbursement Agreement is entered into this _____ day of _____, 1980, by and between Houser Bros.' Co., a California Limited Partnership ("Houser") and Huntington Beach Gables Homeowners Association, a California non-profit corporation ("Association").

## R E C I T A L S

A.  Houser has leased to Robert P. Warmington, an individual, certain real property in the City of Huntington Beach, more particularly described as Tract 10542, as per map recorded in Book 456, pages 49 and 50 of Miscellaneous Maps, Orange County which has been developed as a condominium project (the "Warmington Property").

B.  Houser is presently the owner of certain real property located adjacent and contiguous to the Warmington Property which property is presently developed as a mobile home park known as Rancho del Rey Mobile Estates (the "Houser Property").

C.  Located on the Houser Property, and adjacent to the Warmington Property, is a certain roadway known as Monterey Lane (the "Roadway"). The Warmington Property and the owners and residents thereof have an easement for ingress and egress over the Roadway. Houser and the Association agree that it would enhance the values of the Warmington Property and the Houser Property if guardgates (the "Guardgates") are con-

*Not to be Completed or Signed until Assoc. Takes Over.*

## EXHIBIT A

JOINT EXHIBIT - PAGE - 0086

JASSO DECL. PAGE - 0714

structed and maintained on the Roadway, and if the Roadway is maintained in a safe and clean manner.

D.    In order to enable the construction of the Guardgates, and to insure the continued maintenance of the Roadway and Guardgates by Houser, and the payment by the Association of its share of the costs incurred thereby, the parties hereto have entered into this Agreement.

## T E R M S

For valuable and complete consideration, the parties hereto hereby agree as follows:

I.    CONSTRUCTION OF GUARDGATES

Houser hereby agrees to construct or cause to be constructed, two Guardgates on the Roadway, in accordance with plans and specifications approved and agreed upon by Houser and the Association.    Except as specifically set forth below, all costs incurred in the construction of the Guardgates shall be borne solely by Houser.

II.    MAINTENANCE OF ROADWAY AND GUARDGATE

Houser hereby agrees to keep, maintain, repair and replace, when necessary, the Roadway and Guardgates in a safe, decent and proper condition, and subject to rights of reimbursement below, to pay the costs related thereto, which shall include, but shall not necessarily be limited to the following (the "Costs"):

(a)    Compensation, plus any necessary withholding taxes, social security and related payments, for one guard to operate the Guardgate daily.

IV.    TERM

This Agreement shall commence as of the execution hereof, and shall terminate on October 17, 2059.

V.    INDEMNIFICATION

The parties hereto acknowledge and agree that the Association's sole responsibility herein is the payment of its share of the costs as set forth above, and that Houser shall bear all responsibilities, obligations and liabilities related to the maintenance of the Roadway and Guardgates. In furtherance thereof, Houser agrees to indemnify, defend and hold the Association harmless from any and all claims or damages arising out of the maintenance and use of said Roadway and Guardgates.

VI.    MISCELLANEOUS

The parties further agree as follows:

(a)    In the event any action is instituted to enforce any provision contained herein, the prevailing party shall be entitled to attorney's fees and costs so incurred.

(b)    This Agreement shall bind and inure to the benefit of the successors and assigns of the parties hereto.

(c)    This Agreement may only be amended by written agreement between the parties hereto.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first above written.

HOUSER BROS. CO., a California          HUNTINGTON BEACH GABLES
Limited Partnership                     HOMEOWNERS ASSOCIATION, a
                                        California Non-Profit Corporation


By_____          By_____
                                                          President


By_____          By_____

so to Be Connected on

5002                                    BK 13600PG 1091

WHEN RECORDED RETURN TO:

RESERVE, KUMPER & HUGHES
5190 Campus Drive
Newport Beach, CA 92660

Attn:  Frank D. Stiefel

RECORDED IN OFFICIAL RECORDS
OF ORANGE COUNTY, CALIFORNIA

-3 02 P.M.    AUG 5'80

LEE A. BRANCH, County Recorder

$6.00
C1

## FIRST AMENDMENT TO
## DECLARATION OF COVENANTS, CONDITIONS & RESTRICTIONS
## FOR THE HUNTINGTON BEACH GABLES

Tract 10542
City of Huntington Beach
Orange County, California

This First Amendment to Declaration of Covenants, Conditions and Restrictions is made this 30 day of JULY ____, 1980, by THE ROBERT P. WARMINGTON CO., a California corporation ("RPW Co."), HOUSER BROS., a California limited partnership ("Houser") and ROBERT P. WARMINGTON, an individual ("Warmington").

WHEREAS, Houser is the owner of the fee interest in the following described property (the "Property"):

Lots 1 and 2 of Tract No. 10542 as per map recorded in Book 456, Pages 49 and 50, inclusive, of Miscellaneous Maps, in the Office of the County Recorder of Orange County, California; and

WHEREAS, Warmington is the lessee of the Property; and

WHEREAS, RPW Co. is the sublessee and the developer of the improvements constructed on the Property, and is also the Declarant as that term is defined in that certain Declaration of Covenants, Conditions and Restrictions recorded May 28, 1980, in Book 13618, pages 982 through 1030, inclusive, Official Records of Orange County, California (the "Declaration"); and

WHEREAS, Warmington and RPW Co. intend to assign, convey and set over to ultimate consumers, various leasehold and fee interests in the Condominium Units, as defined in the Declaration, which collectively shall constitute the Condominium to be acquired by said consumer; and

WHEREAS, Warmington, Houser and RPW Co. desire to clarify the Declaration to insure that the interests so conveyed are inseparable and constitute the entire interest to be conveyed, which clarification requires an amendment to the Declaration,

1

EXHIBIT PAGE 0089

BK 13890P0 1092

NOW THEREFORE, Warmington, Houser and RFW Co., do hereby declare as follows:

1.  That collectively they are the sole owners of the Property as their interests may appear.

2.  That they retain the exclusive and sole right to amend the Declaration.

3.  That, in furtherance of the foregoing, the following amendments are hereby made to the Declaration:

    (a)  Section 1.13 of the Declaration is hereby amended to read as follows:

"Section 1.13. Owner/Ownership: "Owner" shall mean and refer to the record assignee of the rights of Declarant and/or a lessee or sublessee to a Unit, but excluding those having such interest merely as security for the performance of an obligation. Such term shall also mean and refer to the Lessee or Lessor if either succeeds to the rights of said assignee through termination of any lease or sublease or by any other means. All references herein to "ownership" shall mean and refer to the ownership of a leasehold or subleasehold interest."

    (b)  Section 2.2 of the Declaration is hereby amended to read as follows:

"Section 2.2. Elements of Condominium: Each Condominium shall be comprised of the following elements:

    (a)  A leasehold or sub-leasehold estate in a Unit as shown and defined on the Condominium Plan, excepting that portion of a Unit consisting of buildings and other improvements;

    (b)  An undivided one-eightieth (1/80) interest in a leasehold or subleasehold interest in the Common Area as shown and defined on the Condominium Plan, excepting that portion of the Common Area consisting of building and other improvements;

    (c)  An exclusive easement on the leasehold or sub-leasehold estate referred to in item (b) above, which easement is defined as Restricted Common Area as described on the Condominium Plan for entry, staircase and attic space relating to each Unit, excepting that portion consisting of buildings and other improvements;

2

JOINT EXHIBIT - PAGE - 0090

BK 13690PG 1093

(d)  A non-exclusive easement and right to use the
leasehold or sub-leasehold estate referred to in
item (b) above except the Restricted Common Area,
excepting that portion consisting of buildings and
other improvements;

(e)  A fee interest in that portion of a Unit, as
shown and defined on the Condominium Plan, which
consists of buildings and other improvements;

(f)  An undivided one eightieth (1/80) fee interest
in and to those portions of the Common Area, as
shown and defined on the Condominium Plan which
consist of buildings and other improvements;

(g)  An exclusive easement on the fee estate
referred to in item (f) above which easement is
defined as Restricted Common Area as described on
the Condominium Plan for entry, staircases and attic
space relating to each Unit which consist of
buildings and other improvements;

(h)  A non-exclusive easement and right to use the
fee estate referred to in item (f) above except the
Restricted Common Area, which consist of buildings
and improvements; and

(i)  A membership in the Association."

4.   All other terms and conditions of the Declaration
shall remain in full force and effect.

     IN WITNESS WHEREOF, the parties hereto have executed this
First Amendment as of the day first above written, its
effective date.

                          THE ROBERT P. WARMINGTON CO.,
                          a California corporation

                          By _____

                          HOUSER BROS., CO., a California
                          Limited Partnership
                          By _____
                          By _____

                          _____
                          Robert P. Warmington

JOINT EXHIBIT - PAGE - 0091

BK 1360PG 1094

(Corporation)

STATE OF CALIFORNIA
COUNTY OF Orange } ss.

On July 31, 1981 before me, the undersigned, a Notary Public in and for said
State, personally appeared Roger D. Dorrell
known to me to be the Vice President, and
known to me to be the Secretary
of the corporation that executed the within instrument,
known to me to be the persons who executed the within
instrument on behalf of the corporation therein named, and
acknowledged to me that such corporation executed the
within instrument pursuant to its by-laws or a resolution of
its board of directors.
WITNESS my hand and official seal.

Signature Pearl L. Hunt

OFFICIAL SEAL
PEARL L. HUNT
NOTARY PUBLIC - CALIFORNIA
ORANGE COUNTY
My Commission Expires May 19, 1993

(This area for official notarial seal)

(Partnership)

STATE OF CALIFORNIA
COUNTY OF ORANGE } ss.

On AUGUST 4, 1980
before me, the undersigned, a Notary Public in and for said State, personally appeared
CLIFFORD C. HOUSER AND VERNON F. HOUSER
known to me
to be BOTH of the partners of the partnership
that executed the within instrument, and acknowledged to me
that such partnership executed the same.
WITNESS my hand and official seal.

Signature G. McDonald

OFFICIAL SEAL
G. McDONALD
NOTARY PUBLIC CALIFORNIA
PRINCIPAL OFFICE IN
ORANGE COUNTY
My Commission Expires June 15, 1984

(This area for official notarial seal)

(Individual)

STATE OF CALIFORNIA
COUNTY OF Orange } ss.

On July 31, 1980 before me, the undersigned, a Notary Public in and for said
State, personally appeared
Robert P. Warrington
known to me
to be the person whose name is subscribed
to the within instrument and acknowledged that he
executed the same.
WITNESS my hand and official seal.

Signature Pearl L. Hunt

OFFICIAL SEAL
PEARL L. HUNT
NOTARY PUBLIC - CALIFORNIA
ORANGE COUNTY
My Commission Expires May 19, 1993

(This area for official notarial seal)

JOINT EXHIBIT - PAGE - 0092

**EXHIBIT "B"**



## ...cument Order Form

...Gables CommunityAssoci...

...CKAGE to include all documents listed be...

| | | | |
|---|---|---|---|
| Initial each | | | |
| **Document** | | | |
| Demand Stat... | ...ncy assesment and any other | Section 4525 | $90.00 |
| unpaid obliga... | | Section 4525 (a)(1) | $20.00 |
| Articles of Inc... | | Section 4525 (a)(1) | $30.00 |
| Bylaws | ...strictions if any | Section 4525 (a)(1) | $60.00 |
| CC&R'S, with... | | Section 5310 | $20.00 |
| Insurance Dec... | | Section 4525 | $20.00 | N/A |
| ACC Guideline... | ...erve study disclosure if | Section 5300 & | |
| Annual Budge... | | 4525(a)(3) | $40.00 |
| applicable) | | Section 5305 | $20.00 |
| Financial State... | | Section 4525 (a)(1) | $25.00 |
| Rules & Regula... | | Section 4525 | $20.00 |
| 1 year of Regul... | | Sections 4525, 6000 & 6100 | $20.00 |
| Association Litlg... | | Sections 5855 & 4525(a)(5) | $0.00 |
| Notice(s) of viol... | | **All of the above** | **$300.00** |
| **FULL DOCUME...** | | | |
| Condo Question... | ...ormation and current Budget) | | $210.00 |
| 1 business day r... | | | $120.00 |
| **TOTAL DUE UP...** | ...fee) | | $ |
| | | **TO ELITE** | **$210.00** |

Please note, ...your order from the time that payment is received.  Please send your **completed order form and check** **(no personal checks please)** to:

**Elite Management**
**Attn: Escrow Department**
**38760 Sky Canyon Drive, Suite C**
**Murrieta, CA 92563**

Property Address: 4476 Airport #53   Escrow # 18 13845   Signature: _____

The seller may, in accordance with Section 4530 of the Civil Code, provide the prospective purchaser, at no cost, current copies of any documents specified in Section 4525 that are in the possession of the seller.  A seller may request to purchase some or all of these documents, but shall not be required to purchase all of the documents listed on this form.

*HOA - Oct. 2018*



11125 Knott Avenue, Suite E
_____, CA 90630

Huntington Beach Gables Homeowners Association
Elite Management Community



Property Address: 4476 Alder Port Drive #53, Huntington Beach C_____

An escrow has been opened in our office for the transfer of the above referenced property. Please
furnish the following information in connection with the Homeowner's Association affecting the
property:

Amount of Dues $_____ Payable: ( ) Monthly ( ) Quarterly ( ) Yearly

Dues are currently paid to _____ Next Due Date _____

Make checks for Dues payable to: _____

Transfer Fee of $_____ Payable to:

Other Fees, if any

Special Assessm

12 months of min
Association litigati

If there is a blanke

INSURANCE AGE

ADDRESS: _____

Please complete, s

FORM COMPLETI

We appreciate you

Sincerely,

Cheryl L. Shoats
Escrow Officer/Manager
Email:

Mailed    _10/22/18   by FedEx - Response 1day business Rush Rd._

$100.00 *



## Sender Information /
## Información del remitente

Name / Nombre: Eminence Escrow, Inc. ~Sheets~ *Cheryl*

Address / Dirección: c/o Jamie Gallian

11125 Knott Ave # E

Cypress, CA 90630

714-604-1657

Phone Number / Teléfono:

Email / Correo Electrónico:

Cheryl@eminenceescrow.com

Account number, if applicable / Número de cuenta:

## Recipient Information /
## Información del destinatario

Name / Nombre: Elite Management

Address / Dirección:

38760 Sky Canyon Dr. Ste C

Murrieta, CA 92563

Phone Number / Teléfono:

888-354-8322

Email / Correo Electrónico:

Linn@Elite mANagement.com

© 2016 FedEx. All rights reserved. 616.MK57.001        0023185PM



Address:         16901 GOLDENWEST ST
                 HUNTINGTON BEACH
                 CA 92647
Location:        JL8KK
Device ID:       -BTC02
Transaction:     920211932797

FedEx Priority Overnight
783380348872   0.2 lbs. (S)        6.54
    Declared Value   100

Recipient Address:
    Linn Joslyn/ Jessica
    ELITE MANAGEMENT
    38760 SKY CANYON DR
    STE C
    MURRIETA, CA 92563
    8883548322
    linn@elitemanagement.com

Scheduled Delivery Date 10/23/2018

Pricing option:
    STANDARD RATE

Package Information:

JASSO DECL. PAGE - 0724

**EXHIBIT "C"**

JASSO DECL. PAGE - 0725

1

Recorded in Official Records, Orange County
Hugh Nguyen, Clerk-Recorder                    97.00

2018000435011 2:30 pm 11/19/18
7 413 A03   2
0.00 0.00 0.00 0.00 3.00 10.00 0.000.0075.00 3.00

EJ-001

Recording Requested by and When Recorded Mail to
Joyce J. Kapsal          SBN: 091950
Epsten Grinnell & Howell, APC
10200 WILLOW CREEK ROAD, SUITE 100
SAN DIEGO, CA 92131
TEL NO: 858-527-0111    FAX NO (Optional): 858-527-1531
EMAIL ADDRESS (Optional):
[X] ATTORNEY  [X] JUDGMENT    [ ] ASSIGNEE
FOR           CREDITOR          OF RECORD

SUPERIOR COURT OF CALIFORNIA, COUNTY OF ORANGE
STREET ADDRESS 700 Civic Center Drive West
MAILING ADDRESS 700 Civic Center Drive West
CITY AND ZIP CODE: Santa Ana, CA 92701
BRANCH NAME Central Justice Center

FOR RECORDER'S USE ONLY

PLAINTIFF: The Huntington Beach Gables Homeowners Association
DEFENDANT: Jamie L. Galilan

CASE NUMBER
30-2017-00913985-CU-CO-CJC

ABSTRACT OF JUDGMENT—CIVIL
AND SMALL CLAIMS          [ ] Amended

FOR COURT USE ONLY

Pursuant to California Government
Code § 68150(h), the Clerk of the
Court hereby certifies this document
accurately reflects the official court
record. The electronic signature and
seal on this document have the
same validity and legal force and
effect as an original clerk's
signature and court seal. California
Government Code § 68150(g).

1. The [X] judgment creditor    [ ] assignee of record
   applies for an abstract of judgment and represents the following:
   a. Judgment debtor's
      Name and last known address

   Jamie L. Galilan
   4476 Aldenport Drive #53
   Huntington Beach, CA 92649

   b. Driver's license no. (last 4 digits) and state: 0742 / CA   [ ] Unknown
   c. Social security no. (last 4 digits): xxx-xx-3936           [ ] Unknown
   d. Summons or notice of entry of sister-state judgment was personally served or mailed to (name and address):
      Jamie L. Galilan, 4476 Aldenport Drive #53, Huntington Beach, CA 92649

2. [ ] Information on additional judgment debtors is
      shown on page 2.
3. Judgment creditor (name and address):
   The Huntington Beach Gables Homeowners Association
   c/o Epsten Grinnell & Howell, 10200 Willow
   Creek Rd, Ste 100, San Diego, CA 92131
   Date: November 9, 2018

   Joyce J. Kapsal
   (TYPE OR PRINT NAME)

4. [ ] Information on additional judgment creditors is
      shown on page 2.
5. [ ] Original abstract recorded in this county:
   a. Date:
   b. Instrument No.:

   (SIGNATURE OF APPLICANT OR ATTORNEY)

6. Total amount of judgment as entered or last renewed:
   $ 3,070.00
7. All judgment creditors and debtors are listed on this abstract.
8. a. Judgment entered on (date): 9/27/2018 [sanctions]
   b. Renewal entered on (date):

9. [ ] This judgment is an installment judgment.

David H. Yamasaki, Clerk of the Court

This abstract issued on (date):
12/16/2018

10. [ ] An   [ ] execution lien   [ ] attachment lien
       is endorsed on the judgment as follows:
    a. Amount: $
    b. In favor of (name and address):

11. A stay of enforcement has
    a. [X] not been ordered by the court.
    b. [ ] been ordered by the court effective until
        (date):

12. a. [X] I certify that this is a true and correct abstract of
          the judgment entered in this action.
    b. [ ] A certified copy of the judgment is attached.

    Clerk, by    S.Wilson    , Deputy

Form Adopted for Mandatory Use
Judicial Council of California
EJ-001 [Rev July 1, 2014]

ABSTRACT OF JUDGMENT—CIVIL
AND SMALL CLAIMS

Code of Civil Procedure, §§ 488.480,
674, 700.190
www.courts.ca.gov
Page 1 of 2

| PLAINTIFF: The Huntington Beach Gables Homeowners Association | COURT CASE NO.: |
|---|---|
| DEFENDANT: Jamie L. Gallian | 30-2017-00913985-CU-CO-CJC |

**NAMES AND ADDRESSES OF ADDITIONAL JUDGMENT CREDITORS:**

13. Judgment creditor *(name and address):*

14. Judgment creditor *(name and address):*

15. ☐ Continued on Attachment 16.

**INFORMATION ON ADDITIONAL JUDGMENT DEBTORS:**

16.　　　　Name and last known address

17.　　　　Name and last known address

Driver's license no. [last 4 digits] and state:　☐ Unknown

Social security no. [last 4 digits]:　☐ Unknown

Summons was personally served at or mailed to *(address):*

Driver's license no. [last 4 digits] and state:　☐ Unknown

Social security no. [last 4 digits]:　☐ Unknown

Summons was personally served at or mailed to *(address):*

18.　　　　Name and last known address

19.　　　　Name and last known address

Driver's license no. [last 4 digits] and state:　☐ Unknown

Social security no. [last 4 digits]:　☐ Unknown

Summons was personally served at or mailed to *(address):*

Driver's license no. [last 4 digits] and state:　☐ Unknown

Social security no. [last 4 digits]:　☐ Unknown

Summons was personally served at or mailed to *(address):*

20. ☐ Continued on Attachment 20.

EJ-001 [Rev. July 1, 2014]　　　　**ABSTRACT OF JUDGMENT—CIVIL**　　　　Page 2 of 2
**AND SMALL CLAIMS**

JOINT EXHIBIT - PAGE - 0388

**EXHIBIT "D"**

CIV-130

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address):* | FOR COURT USE ONLY |
|---|---|
| Brenda Radmacher (SBN: 185265) / James E. Hawley (SBN: 299723) GORDON REES SCULLY MANSUKHANI, LLP 633 W. 5th Street, 52nd Floor Los Angeles, CA 90071 | **ELECTRONICALLY FILED** Superior Court of California, County of Orange |

TELEPHONE NO: (213) 576-5000    FAX NO. *(Optional):* (877) 306-0043

E-MAIL ADDRESS *(Optional):* bradmacher@grsm.com / jhawley@grsm.com

ATTORNEY FOR *(Name):* X-Ds Gragnano; Phillips; Beck; Paulin; Jasso; Burrett

**12/07/2018** at 10:16:00 AM

Clerk of the Superior Court
By e Clerk,Deputy Clerk

SUPERIOR COURT OF CALIFORNIA, COUNTY OF Orange

STREET ADDRESS: 700 W. Civic Center Dr.

MAILING ADDRESS:

CITY AND ZIP CODE: Santa Ana, 92701

BRANCH NAME: Central Justice Center

PLAINTIFF/PETITIONER: Huntington Beach Gables Homeowners Assoc.

DEFENDANT/RESPONDENT: Sandra L. Bradley; Jamie L. Gallian et al.

| NOTICE OF ENTRY OF JUDGMENT OR ORDER | CASE NUMBER: 30-2017-00913985-CU-CO-CJC |
|---|---|

*(Check one):*  ☑ UNLIMITED CASE (Amount demanded exceeded $25,000)   ☐ LIMITED CASE (Amount demanded was $25,000 or less)

**TO ALL PARTIES :**

1. A judgment, decree, or order was entered in this action on *(date):* December 4, 2018

2. A copy of the judgment, decree, or order is attached to this notice.

Date: December 7, 2018

James E. Hawley

| (TYPE OR PRINT NAME OF  ☑ ATTORNEY   ☐ PARTY WITHOUT ATTORNEY) | *James Hawley* (SIGNATURE) |
|---|---|

Page 1 of 2

JOINT EXHIBIT - PAGE - 0349

JASSO DECL. PAGE - 0729

**CIV-130**

| | |
|---|---|
| PLAINTIFF/PETITIONER: The Huntington Beach Gables Homeowners Association | **CASE NUMBER:**<br>30-2017-00913985-CU-CO-CJC |
| DEFENDANT/RESPONDENT: Sandra L. Bradley; Jamie L. Gallian et al. | |

### PROOF OF SERVICE BY FIRST-CLASS MAIL
#### NOTICE OF ENTRY OF JUDGMENT OR ORDER

*(NOTE: You cannot serve the Notice of Entry of Judgment or Order if you are a party in the action. The person who served the notice must complete this proof of service.)*

1. I am at least 18 years old and not a party to this action. I am a resident of or employed in the county where the mailing took place, and my residence or business address is *(specify)*:   101 West Broadway, Suite 2000, San Diego, CA

2. I served a copy of the *Notice of Entry of Judgment or Order* by enclosing it in a sealed envelope with postage fully prepaid and *(check one)*:
   a. ☐  deposited the sealed envelope with the United States Postal Service.
   b. ☒  placed the sealed envelope for collection and processing for mailing, following this business's usual practices, with which I am readily familiar. On the same day correspondence is placed for collection and mailing, it is deposited in the ordinary course of business with the United States Postal Service.

3. The *Notice of Entry of Judgment or Order* was mailed:
   a. on *(date)*: December 7, 2018
   b. from *(city and state)*: San Diego, California

4. The envelope was addressed and mailed as follows:
   a. Name of person served:   Jamie L. Gallian            c. Name of person served:

      Street address:  5782 Pinon Drive                       Street address:
      City:  Huntington Beach                                       City:
      State and zip code:  CA 92649                              State and zip code:

   b. Name of person served:                                   d. Name of person served:

      Street address:                                                  Street address:
      City:                                                                 City:
      State and zip code:                                           State and zip code:

   ☒  Names and addresses of additional persons served are attached. *(You may use form POS-030(P).)*

5. Number of pages attached   2   .

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Date:  December 7, 2018

Jeanne P. Farrar
**(TYPE OR PRINT NAME OF DECLARANT)**

▶ *[signature]* Jeanne P. Farrar
**(SIGNATURE OF DECLARANT)**

Page 2 of 2

CIV-130 [New January 1, 2010]            **NOTICE OF ENTRY OF JUDGMENT OR ORDER**   JOINT EXHIBIT - PAGE - 0350

EXHIBIT "E"

JASSO DECL. PAGE - 0731



ELECTRONICALLY RECEIVED
Superior Court of California,
County of Orange
11/09/2018 at 10:23:23 AM
Clerk of the Superior Court
By eClerk, Deputy Clerk

3728619

**FILED**
SUPERIOR COURT OF CALIFORNIA
COUNTY OF ORANGE
CENTRAL JUSTICE CENTER

**DEC 0 4 2018**

DAVID H. YAMASAKI, Clerk of the Court

BY:_____,DEPUTY

8    SUPERIOR COURT OF THE STATE OF CALIFORNIA

9    FOR THE COUNTY OF ORANGE, CENTRAL JUSTICE CENTER

| | |
|---|---|
| THE HUNTINGTON BEACH GABLES HOMEOWNERS ASSOCIATION, a California Nonprofit Mutual Benefit Corporation,<br><br>Plaintiff,<br><br>v.<br><br>SANDRA L. BRADLEY, Individually and as Trustee of the Sandra L. Bradley Trust; JAMIE L. GALLIAN, an Individual; and DOES 1 through 25, Inclusive,<br><br>Defendants.<br><br>AND RELATED CROSS-ACTIONS. | Case No. 30-2017-00913985-CU-CO-CJC<br><br>*Honorable James L. Crandall*<br><br>[~~PROPOSED~~] JUDGMENT FOR ATTORNEYS' FEES<br><br>FAC Filed: May 16, 2017<br>Trial Date: December 10, 2018 |

-1-

[~~PROPOSED~~] JUDGMENT FOR ATTORNEYS' FEES

JOINT EXHIBIT - PAGE - 0351

1      The above-captioned matter came on regularly for hearing on Cross-Defendants Lee

2  Gragnano, Ted Phillips, Lindy Beck, Jennifer Paulin, Janine Jasso, and Lori Burrett's Motion for

3  Attorneys' Fees and Costs on November 1, 2018 and November 8, 2018, in Department C33 of

4  the Superior Court in and for the State of California, County of Orange, the Honorable James L.

5  Crandall presiding.

6      Cross-Defendants Lee Gragnano, Ted Phillips, Lindy Beck, Jennifer Paulin, Janine Jasso,

7  and Lori Burrett appeared by and through its attorneys, Brenda Radmacher of Gordon & Rees,

8  LLP. Cross-Complainant Jamie L. Gallian, in pro per, appeared on behalf of herself. After

9  hearing evidence and arguments, and good cause appearing;

10     **NOW, THEREFORE, IT IS ORDERED, ADJUDGED AND DECREED** that Cross-

11  Defendants Lee Gragnano, Ted Phillips, Lindy Beck, Jennifer Paulin, Janine Jasso, and Lori

12  Burrett are awarded their attorneys' fees in the amount of $46,138.00 against Cross-Complainant

13  Jamie L. Gallian. Post-judgment interest at a rate of ten (10) percent annum from the date hereof,

14  till paid, shall accrue on the amount above.

15     **IT IS SO ORDERED, ADJUDGED AND DECREED.**

16

17

18  Dated: /2 - 4 — , 2018          _JK Crandall_

                                     Honorable James L. Crandall

19                                    Judge of the Superior Court

20

21

22

23

24

25

26

27

28

-2-

ELECTRONICALLY RECEIVED
Superior Court of California,
County of Orange
04/02/2025 at 09:43:37 AM
Clerk of the Superior Court
By Nalatha Durham, Deputy Clerk

**FILED**
SUPERIOR COURT OF CALIFORNIA
COUNTY OF ORANGE
CENTRAL JUSTICE CENTER

MAY 06 2019

DAVID H. YAMABAKI, Clerk of the Court

BY_____,DEPUTY

1

2

3

4

5

6

7

8          SUPERIOR COURT OF THE STATE OF CALIFORNIA

9          COUNTY OF ORANGE, CENTRAL JUSTICE CENTER

10

11   THE HUNTINGTON BEACH GABLES            CASE NO. 37-2017-00913985-CU-CO-CJC
     HOMEOWNERS ASSOCIATION, a
12   California Nonprofit Mutual Benefit     Judge: James L. Crandall
     Corporation,                           Dept.: C33
13
                    Plaintiff,              [PROPOSED] JUDGMENT IN FAVOR OF
14                                          PLAINTIFF THE HUNTINGTON BEACH
            v.                              GABLES HOMEOWNERS ASSOCIATION
15                                          AND AGAINST DEFENDANT JAMIE L.
     SANDRA L. BRADLEY, individually and    GALLIAN
16   as Trustee of the Sandra L. Bradley Trust;
     JAMIE L. GALLIAN, an individual; and   Complaint Filed: April 11, 2017
17   DOES 1 through 25, inclusive,          First Amended Complaint filed: May 16, 2017
                                            Trial Date: September 9, 2019
18                  Defendants.

19

20          In this action for Breach of Governing Documents (Architectural Violations) and

21   Nuisance Defendant Jamie L. Gallian was personally served with the Summons and Complaint

22   on May 24, 2017. Defendant Gallian filed an answer to the Complaint, and to the First

23   Amended Complaint. Subsequently, due to her failure to timely respond to discovery, on

24   February 13, 2019 the Court ordered that Defendant's Answer to the Plaintiff's First Amended

25   Complaint be stricken, and on February 13, 2019 entered the default against Defendant.

26   Pursuant to the Court's order of February 13, 2019, Plaintiff The Huntington Beach Gables

27   Homeowners Association has presented evidence of its costs for abating the nuisance caused by

28   Defendant Gallian, as alleged in the First Amended Complaint.

3800902v1

1     Upon the Application of Plaintiff, The Huntington Beach Gables Homeowners

2  Association for judgment against Defendant, and upon having reviewed the evidence and

3  declarations, and proof having been made to the satisfaction of this Court, the Court finds in

4  favor of Plaintiff, The Huntington Beach Gables Homeowners Association ("Association"), and

5  against Defendant, Jamie L. Galilan ("Defendant") on all causes of action in the First Amended

6  Complaint filed herein on May 16, 2017.

7     IT IS HEREBY ADJUDGED, ORDERED AND DECREED, as follows:

8     1.    As to the First Cause of Action for Breach of Contract, the Court finds that

9  Defendant breached the Association's Governing Documents, including the "Declaration of

10  Covenants, Conditions and Restrictions for Huntington Beach Gables" containing the covenants,

11  conditions and restrictions which governing the properties located within the Association,

12  which was recorded on May 28, 1980, as Document No. 1980-28926 ("CC&Rs");

13     2.    At all times mentioned herein, Defendant was the tenant of, resident of, and/or

14  claimed some interest in the condominium unit located within the Association commonly known

15  as 4476 Aldenport Drive, Unit 53, Huntington Beach, CA 92649 ("Subject Property");

16     3.    As a result of Defendant's breach of contract, Plaintiff's damages include the cost

17  of repairing damage to the Common Area caused by Defendant's failing to adhere to the

18  architectural guidelines and specifications with respect to the construction of the patio cover and

19  by constructing a concrete pad and installing an air conditioning unit on the exterior of

20  Defendant's Subject Property which encroached upon the Association's common area and

21  destroying the Association's landscaping;

22     4.    As the Second Cause of Action for Nuisance, the Court finds that Defendant

23  created conditions on the Subject Property that are an annoyance and nuisance to the Association

24  and its residents, and as a result, the Association has incurred attorneys' fees and costs in

25  connection with abating the nuisance;

26     5.    Plaintiff is entitled to recover its reasonable attorneys' fees and costs from

27  Defendant pursuant to Civil Code section 5975(c) and Article XIV, Section 14. 7 of the

28  Association's CC&Rs;

2

6.    Plaintiff is further entitled to recover its costs to repair damage to the Common Area caused by unauthorized installation of the concrete pad and air conditioning unit, causing extensive damage to the landscaping pursuant to the CC&Rs, Article XIV, Section 14.8 as well as costs for removal of the concrete pad and landscaping repairs;

7.    Association as Plaintiff, as the prevailing party in the action and pursuant to Civil Code section 5975(o) and Article XIV, Section 14. 7 of the Association's CC&Rs, shall recover from Defendant its legal costs in the amount of $ *10,693.13* and attorneys' fees in the amount of $ *178,362.* Plaintiff shall also recover concrete removal and landscaping repair costs in the amount of $1,295.00;

8.    Association as Cross-Defendant, as the prevailing party in the action and pursuant to Civil Code section 5975(o) and Article XIV, Section 14. 7 of the Association's CC&Rs, shall recover from Cross-Complainant its legal costs in the amount of $ *6 0.50,47* and attorneys' fees in the amount of $ *120,183*

9.    Judgment is hereby entered in favor of Plaintiff The Huntington Beach Gables Homeowners Association for recovery of its attorney's fees and costs, and costs for concrete removal and landscaping repair costs, against Defendant Jamie L. Gallian, and Defendant is ordered to pay said sums to Plaintiff;

10.    Plaintiff The Huntington Beach Gables Homeowners Association is awarded judgment in the total amount of $ *316,583.59*, which will accrue interest at the rate of ten (10%) per annum from the date judgment is entered herein, until paid in full; and

11.    Pursuant to Code of Civil Procedure §§ 685.040, 685.080, Defendant Jamie L. Gallian shall pay to Plaintiff any and all sums reasonably incurred by Plaintiff in enforcing the Judgment.

IT IS SO ORDERED.

Dated: *5-6-* , 2019

The Honorable James L. Crandall
Judge of the Superior Court

3

3800992v1

JASSO DECL. PAGE - 0736

EXHIBIT "F"

JASSO DECL. PAGE - 0737

**RECORDING REQUESTED BY:**

Mr. Randy Nickel
4476 Alderport Drive
Huntington Beach, CA 92649

**MAIL TAX STATEMENTS TO:**

Mr. Randy Nickel
4476 Alderport Drive,
Huntington Beach, CA 92649

Lease from Present to 2059

Recorded In Official Records, Orange County
Hugh Nguyen, Clerk-Recorder

96.00

*SR0010 4 4 0 2 6 5*
2018000395579 2:35 pm 10/31/18
227 416 A34    5
0.00 0.00 0.00 0.00 12.00 0.00 0.00 0076.00 3.00

**TITLE OF DOCUMENT:    ASSIGNMENT OF CONDOMINIUM SUBLEASE**

JOINT EXHIBIT - PAGE - 0333
Requested By: Joann Herris , Printed: 4/5/2019 3:31 PM

WHEN RECORDED MAIL TO:
(Assignee's Name & Address)
MR. RANDALL L. NICKEL
4476 ALDERPORT DRIVE
HUNTINGTON BEACH, CA 92649

Mail tax statements to:
MR. RANDALL L NICKEL
4476 ALDERPORT DRIVE
HUNTINGTON BEACH, CA 92649

---

(Space Above this Line for Recorder's Use)

## ASSIGNMENT OF GROUND LEASE & CONDOMINIUM SUBLEASE

No Consideration.  Term of Lease Less Than 99 years.

WHEREAS
HOUSER BROS. CO., a limited partnership, as Landlord and ROBERT P. WARMINGTON, as Tenant, entered into that certain **GROUND LEASE** also known as the **MASTER LEASE dated October 19, 1979**, a Short Form Memorandum recorded in the Office of the Orange County, California Clerk Recorder in Book 13424, Page 499 inclusive.

WHEREAS
HOUSER BROS. CO., a limited partnership, as Landlord and ROBERT P. WARMINGTON, as Tenant, entered into a **PARTIAL CANCELLATION OF MASTER LEASE dated November 7, 1980** for that certain **MASTER LEASE dated October 19, 1979**; recorded in the Office of the Orange County, California Clerk Recorder in Book 13424, Pg(s) 1253-1255, **Instrument No. 8691.

WHEREAS
HOUSER BROS. CO., a limited partnership, as Landlord and ROBERT P. WARMINGTON, as Tenant, entered into that certain SUBLEASE dated October 19, 1979, a Short Form Memorandum recorded in the Office of the Orange County, California Clerk Recorder in Book 13424, Page 504, inclusive, with respect to those portions of Lots 1 and 2 of Tract No. 10542 in the City of Huntington Beach, California as shown on Miscellaneous Map(s) recorded in Book 456, Page(s) 49 and 50, in the Office of the Orange County, California Clerk Recorder.

WHEREAS
HOUSER BROS. CO., a limited partnership, as Landlord and ROBERT P. WARMINGTON, as Tenant, entered into a **PARTIAL CANCELLATION OF SUBLEASE** dated October 19, 1979) for that certain SUBLEASE dated November 7, 1980, a Short Form Memorandum recorded in the Office of the Orange County, California Clerk Recorder in Book 13824, Pg(s) 1256-1258, with respect to those portions of Lots 1 and 2 of Tract No. 10542 in the City of Huntington Beach, California recorded in Book 456, Page(s) 49 and 50 of Miscellaneous Maps, in the Office of the Orange County, California Clerk Recorder, **Instrument No. 8692;

WHEREAS
For valuable consideration, receipt of which is hereby acknowledged, the undersigned **JAMIEL GALLIAN**, hereby transfers and assigns to **RANDALL L NICKEL, a married man, as his sole and separate property** all right, title and interest of the undersigned, as Tenant, in and under that certain **MASTER LEASE/ Ground Lease, dated November 7, 1980**, recorded in the Office of the Orange County, California Clerk Recorder in Book 13824, Pg(s) 1259-1273, **Instrument No. 8693;

1

**JAMIE L GALLIAN**, hereby transfers and assigns to **RANDALL L NICKEL, a married man, as his sole and separate property,** all right, title and interest of the undersigned, as Tenant, in and under that certain **CONDOMINIUM SUBLEASE, dated August 1, 1980,** by and between ROBERT P. WARMINGTON, as Landlord, and JOHN F. TURNER AND VIRGINIA H. TURNER, HUSBAND AND WIFE AS JOINT TENANT, recorded on November 7, 1980, Office of the Orange County, California Clerk Recorder in Book 13824, Pg(s) 1274-1290, **Instrument No. 8694;

As amended by the **FIRST AMENDMENT TO CONDOMINIUM SUBLEASE** effective January 1, 2003, recorded in the Office of the Orange County, California Clerk Recorder as Document No. 2003-001044770 on August 28, 2003.

**JAMIE L GALLIAN**, hereby transfers and assigns to **RANDALL L NICKEL, a married man, as his sole and separate property** all right, title and interest of the undersigned, as Tenant, in and under that certain **CONVEYANCE OF REMAINDER INTEREST, dated November 7, 1980,** recorded in the Office of the Orange County, California Clerk Recorder in Book 13824, Pg(s) 1291-1293, **Instrument No. 8695;

**JAMIE L GALLIAN**, hereby transfers and assigns to **RANDALL L NICKEL, a married man, as his sole and separate property,** all right, title and interest of the undersigned, as Tenant, in and under that certain **CONDOMINIUM SUBLEASE (SHORT FORM – MEMORANDUM AND GRANT DEED, dated November 7, 1980,** recorded in the Office of the Orange County, California Clerk Recorder in Book 13824, Pg(s) 1294-1298, **Instrument No. 8696.

DATED:  10/31/18                                        _____
                                                        ASSIGNOR JAMIE L GALLIAN


STATE OF CALIFORNIA          )
                             ) ss.
COUNTY OF ORANGE

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

On 10/31/2018 , before me, Paul Dyer, Notary Public
Personally appeared  Jamie L Gallian                                          ,

Who proved to me on the basis of satisfactory evidence to be the person whose name is subscribed to the within instrument and acknowledged to me that she executed the same in her authorized capacity, and that by her signature on the instrument the person, or the entity upon behalf of which the person acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

PAUL DYER
Notary Public - California
Riverside County
Commission # 2211938
My Comm. Expires Aug 28, 2021

_____
Signature of Notary Public

                                                        (This space for Notary Seal)

2

Non-Order Search                          Page 9 of 27                  JOINT EXHIBIT - PAGE - 0335
Doc: 2018-395579 LSEASN 10-31-2018                        Requested By: Joann Harris , Printed: 4/5/2019 3:31 PM

JASSO DECL. PAGE - 0740

## ASSIGNMENT OF CONDOMINIUM SUBLEASE
### ACCEPTANCE AND AGREEMENT

The undersigned Assignee named in the foregoing Assignment hereby Accepts said Assignment and hereby agrees with for the benefit of the Master Lessor, Sublessor/Landlord, Tenant and under the Original Condominium Sublease commonly referred to throughout this document as "Condominium Sublease", described in said Assignment, to keep, perform and be bound by all the terms, covenants and conditions contained in said Condominium Sublease and as amended by the First Amendment to Condominium Sublease on the part of the Master Lessor, Sublessor/Landlord and Condominium Sublease Tenant therein to be kept and performed, to all intents and purposes as though the undersigned Assignee was the Original Condominium Sublease Tenant there under.

Assignee agrees to pay Sublessor/Landlord a late fee equal to 6% of any rent or other payment due under the Condominium Sublease, which is not received by Sublessor/Landlord within ten (10) days of its due date. Said late fee is in addition to the interest due on unpaid installment indebtedness of 10% as provided in Article 17(A) of the Condominium Sublease. The undersigned Assignee agrees to pay attorneys fees and costs incurred by Landlord to collect rent or other payment under the Condominium Sublease or to otherwise enforce Sublessor/Landlord rights under the Condominium Sublease.

DATED: 10·31·18

ASSIGNEE RANDALL L NICKEL

STATE OF CALIFORNIA          )
                             ) ss.
COUNTY OF ORANGE

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

On 10/31/2018 before me, Paul Over, Notary Public

Personally appeared Randall L Nickel

Who proved to me on the basis of satisfactory evidence to be the person whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his authorized capacity, and that by his signature on the instrument the person, or the entity upon behalf of which the person acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

PAUL OVER
Notary Public - California
Riverside County
Commission # 2211938
My Comm. Expires Aug 28, 2021

(This space for Notary Seal)

Signature of Notary Public

3

Non-Order Search
Doc: 2018-395579 LSEASN 10-31-2018

Page 10 of 27

JOINT EXHIBIT - PAGE - 0336
Requested By: Joann Harris , Printed: 4/5/2019 3:31 PM

JASSO DECL. PAGE - 0741

## EXHIBIT A (LEGAL)

The estate or interest in the land described:

A Ground leasehold and Condominium Sublease hold estate as to Parcels 1 and 2, said estate being more particularly described as the Lessees' interest under that certain Ground Lease set forth in subparagraph (A) herein below:

    (A)    That certain Ground Lease dated August 1, 1980, executed by Houser Bros. Co, A Limited Partnership organized under the Laws of the State of California, in which Clifford C. Houser and Vernon F. Houser constitute the sole General Partners, as Landlord, and by Robert P. Warmington, as Tenant, for the term ending December 31, 2059. Upon the Terms, Covenants and Conditions therein contained, recorded as follows in Official Records of said Orange County:    Book 13824 Page 1259-1273
                 APN: 937-63-053, Unit 53.

    (B)    That certain Condominium Sublease dated August 1, 1980, executed by Robert P. Warmington, as Sub-lessor and John F. Turner and Virginia H. Turner (Original Sublessee) for the term ending December 31, 2059. Upon the Terms, Covenants and Conditions therein contained, recorded as follows in Official Records of said Orange County: Book 13824 Page 1274-1290
                 APN: 937-63-053, Unit 53.

All that certain land interest situated in the State of California, County of Orange and is described as follows:

Parcel 1:
Unit 53 as shown and defined on a Condominium Plan (the "Condominium Plan") recorded in Book 13358 Page(s) 1193, et seq., Official Records of Orange County, California, excepting that portion consisting of buildings and other improvements;

Parcel 2:
An undivided one-eightieth (1/80th) interest as Tenants in Common in the Common Area of Lots 1 and 2 Tract No. 10542, in the City of Huntington Beach, County of Orange, State of California as shown on a map recorded in Book 456, Page(s) 49 and 50 of Miscellaneous Map, records of Orange County, California, as shown on the Condominium Plan, excepting that portion consisting of buildings and other improvements.

Except there from all minerals, oil, gas and other hydrocarbon substances lying below a depth of 500 feet below the surface of said Land without the right of surface entry above the depth of 500 feet from the surface, as reserved in deeds of record.

Parcel 3:
Those portions of Unit 53, building 14, inclusive, as shown and defined on the Condominium Plan, Consisting of buildings and other improvements.

Parcel 4:
An undivided one-eightieth (1/80th) interest as Tenants in Common, in and to those portions of the Common Area as shown and defined on the Condominium Plan, consisting of buildings or other improvements.

Parcel 5:
An easement for the exclusive use and occupancy of those portions of the restricted Common Area, as defined on said Condominium Plan for ground level entry, courtyard entry, staircases, garages, and attic space relating to said units.

Parcel 6:
A non-exclusive easement and right to use the Common Area as defined on said Condominium Plan, except the restricted Common Area(s).

4

Non-Order Search
Doc: 2018-395579 LSEASN 10-31-2018

Page 11 of 27

JOINT EXHIBIT - PAGE - 0337
Requested By: Joann Harris , Printed: 4/5/2019 3:31 PM

JASSO DECL. PAGE - 0742

**EXHIBIT "G"**

JASSO DECL. PAGE - 0743

PAGE   81

JOINT EXHIBIT - PAGE - 0339

VINTAGERJB

951 4061 331 951 4061.331

11/07/2018   16:40

**CASHIER'S CHECK**

SERIAL #:  0051500779

ACCOUNT#:  4861-505303

| | |
|---|---|
| 9089515 | 11-24 |
| Office AU # | 121058 |

Remitter:  RANDALL L NICKEL
Purchaser:  RANDALL L NICKEL
Purchaser Account:  152155755#
Operator I.D.:  u599203          u372234
Funding Source:  Paper Items(s)

October 31, 2018

PAY TO THE ORDER OF    ***JAMIE L. GALLIAN***

*** One hundred forty thousand dollars and no cents***.

**$140,000.00**

Payee Address:
Memo:

WELLS FARGO BANK, N.A.
825 N MCKINLEY ST
CORONA, CA 92879
FOR INQUIRIES CALL (480) 394-3122

NOTICE TO PURCHASER — IF THIS INSTRUMENT IS LOST,
STOLEN OR DESTROYED, YOU MAY REQUEST CANCELLATION
AND REISSUANCE, AS A CONDITION TO CANCELLATION AND
REISSUANCE, WELLS FARGO BANK MAY IMPOSE A FEE AND
REQUIRE AN INDEMNITY AGREEMENT AND BOND.

VOID IF OVER US$  140,000.00

**NON-NEGOTIABLE**

**Purchaser Copy**

FB004    M400 89179215

PAGE 02

VINTAGERUB

9514861331951406 1331

11/07/2010 16:40

JOINT EXHIBIT - PAGE - 0340

# CHASE ⬡

## Terms and Conditions (Remitter and Payee):

* Please keep this copy for your record of the transaction
* The laws of a specific state will consider these funds to be "abandoned"
  if the Cashier's Check is not cashed by a certain time
    - Please cash/deposit this Cashier's Check as soon as possible to
      prevent this from occurring
    - In most cases, the funds will be considered "abandoned"
      before the "Void After" Date
* Placing a Stop Payment on a Cashier's Check
    - Stop Payment can only be placed if the Cashier's Check
      is lost, stolen, or destroyed
    - We may not re-issue or refund the funds after the stop payment has
      been placed until 90 days after the original check was issued
* Please visit a Chase branch to report a lost, stolen, or destroyed Cashier's Check
  or for any other information about this item

FOR YOUR PROTECTION SAVE THIS COPY          Customer Copy
**CASHIER'S CHECK**                              1141939618

10/31/2018
Void after 7 years

Remitter:    RANDY NICKEL

$** 239,000.00 **

Pay To The    JAMIE L. GALLIAN
Order Of:

Drawer  JPMORGAN CHASE BANK, N.A.
**NON NEGOTIABLE**

Memo:——————————————————————
Note: For information only. Comment has no effect on bank's payment

**EXHIBIT "H"**

RECORDING REQUESTED BY AND
WHEN RECORDED MAIL TO:

The Huntington Beach Gables Homeowners Association
c/o Elite Community Management
38760 Sky Canyon Drive, Suite C
Murrieta, CA 92563

**Recorded in Official Records, Orange County**
**Hugh Nguyen, Clerk-Recorder**

129.00
* S R 0 0 1 0 5 3 3 9 0 4 5 *
2018000469842 2:27 pm 12/17/18
7 413 N16   16
0.00 0.00 0.00 0.00 45.00 0.00 0.000.0075.00 3.00

NOTICE OF DELINQUENT ASSESSMENT

NOTICE IS HEREBY GIVEN that the Board of Directors of THE HUNTINGTON BEACH GABLES
HOMEOWNERS' ASSOCIATION, pursuant to the powers conferred upon it by that certain Declaration of Covenants,
Conditions and Restrictions recorded in the Office of the Orange County Recorder, State of California, on May 28, 1980, as Book
13618/Page No. 982, and any amendments or restatements thereof, and Civil Code Section 5740, levied against assessments and
other charges on that certain unit located at 4476 Alderport, Huntington Beach, California, 92649, more particularly known as
Parcel No. 937-63-053, Unit #53 of Tract 10542, and further described in the Condominium Sublease dated August 1, 1980, by
and between Robert P. Warmington, an individual, as Landlord, which interest was subsequently assigned to DS INVESTORS,
LLC by mesne assignments of record, and JOHN F. TURNER AND VIRGINIA H. TURNER, HUSBAND AND WIFE AS
JOINT TENANTS as Tenant, recorded on NOVEMBER 7, 1980 in Book 13824, Page 1274 inclusive, as Instrument No. 8694 of
Official Records of Orange County, California, as amended by the First Amendment to Condominium Sublease recorded on
August 28, 2003 as Instrument No. 2003 0010447700.

1.    The amount of the lien imposed on the unit by this notice is the sum of $6788.10, plus any additional
assessments accrued and owing after the date of recordation to the date of satisfaction hereof, which includes the following:

a)    delinquent assessments and late charges in the amount of $6263.10, as of
December 15, 2018; and

b)    costs of collection in the amount of $525.00.    *See attached Exhibit A*

In addition to the amounts set forth in this paragraph, this lien shall include any other delinquent payments, credits, assessments and/or
interest which have become due and payable with respect to said unit, together with all costs (including attorney's fees), penalties and interest
which have been accrued on such amounts prior to the recording of this notice, and this lien shall also include any other delinquent payments,
assessments and interest which become due and payable with respec...
interest accrue subsequent to the levy of this assessment and/or recor...
OTHER COSTS MAY RESULT IN YOUR PROPERTY BEING FC...

2.    The purported owners of the unit is Jamie ...

3.    The name and address of the trustee autho...
Reconveyance Corporation, 525 East Main Street, El Cajon, C...

Dated: 12/17/18    By: [signature]
Janine Jasso,
Huntington B...

A notary public or other officer completing this certificate verifies o...
this certificate is attached, and not the truthfulness, accuracy, or vali...

STATE OF CALIFORNIA    )
)ss.
COUNTY OF ORANGE    )

On 12-17-18, before me, *Thomas G. Knaack*, Notary Public, personally
appeared *Janine Jasso*, who proved to me on the basis of satisfactory evidence to be the person whose name is subscribed
to the within instrument and acknowledged to me that she executed the same in her authorized capacity, and that by her signature on the
instrument the person, or the entity upon behalf of which the person acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

[signature]
Notary Public in and for said State

THOMAS G. KNAACK
Notary Public · California
Orange County
Commission # 2159910
My Comm. Expires Aug 11, 2020

EXHIBIT 15 PAGE 0050

U.S. Postal Service™
CERTIFIED MAIL® RECEIPT
Domestic Mail Only

For delivery information, visit our website at www.usps.com®.

HUNTINGTON BEACH, CA 92649

Certified Mail Fee    $3.45
Extra Services & Fees (check box, add fee as appropriate)
☐ Return Receipt (hardcopy)    $_____
☐ Return Receipt (electronic)    $_____
☐ Certified Mail Restricted Delivery    $_____
☐ Adult Signature Required    $_____
☐ Adult Signature Restricted Delivery $_____
Postage    $1.63
Total Postage and Fees    $7.83

Sent To    *Jamie L Gallian*
Street and Apt. No., or PO Box No.    *4476 Alderport*
City, State, ZIP+4®    *HB   CA   92649*

JASSO DECL. PAGE - 0747

RECORDING REQUESTED BY AND
WHEN RECORDED MAIL TO:

The Huntington Beach Gables Homeowners Association
c/o Elite Community Management
38760 Sky Canyon Drive, Suite C
Murrieta, CA 92563

Recorded in Official Records, Orange County
Hugh Nguyen, Clerk-Recorder

|||||||||||||||||||||||||||||||||  129.00
* $ R 0 0 1 0 5 3 3 9 0 4 $ *
2018000469842 2:27 pm 12/17/18
7 413 N16   16
0.00 0.00 0.00 0.00 45.00 0.00 0.000.0075.00 3.00

## NOTICE OF DELINQUENT ASSESSMENT

NOTICE IS HEREBY GIVEN that the Board of Directors of THE HUNTINGTON BEACH GABLES HOMEOWNERS' ASSOCIATION, pursuant to the powers conferred upon it by that certain Declaration of Covenants, Conditions and Restrictions recorded in the Office of the Orange County Recorder, State of California, on May 28, 1980, as Book 13618/Page No. 982, and any amendments or restatements thereof, and Civil Code Section 5740, levied against assessments and other charges on that certain unit located at 4476 Aldeport, Huntington Beach, California, 92649, more particularly known as Parcel No. 937-63-053, Unit #53 of Tract 10542, and further described in the Condominium Sublease dated August 1, 1980, by and between Robert P. Warmington, an individual, as Landlord, which interest was subsequently assigned to BS INVESTORS, LLC by mesne assignments of record, and JOHN F. TURNER AND VIRGINIA H. TURNER, HUSBAND AND WIFE AS JOINT TENANTS as Tenant, recorded on NOVEMBER 7, 1980 in Book 13824, Page 1274 inclusive, as Instrument No. 8694 of Official Records of Orange County, California, as amended by the First Amendment to Condominium Sublease recorded on August 28, 2003 as Instrument No. 2003 0010447700.

1.    The amount of the lien imposed on the unit by this notice is the sum of $6788.10, plus any additional assessments accrued and owing after the date of recordation to the date of satisfaction hereof, which includes the following:

a)    delinquent assessments and late charges in the amount of $6263.10, as of December 15, 2018; and

b)    costs of collection in the amount of $525.00.    *See attached Exhibit A*

In addition to the amounts set forth in this paragraph, this lien shall include any other delinquent payments, credits, assessments and/or interest which have become due and payable with respect to said unit, together with all costs (including attorney's fees), penalties and interest which have been accrued on such amounts prior to the recording of this notice; and this lien shall further include any delinquent payments, assessments and interest which become due and payable with respect to said unit, together with all costs (including attorney's fees), penalties and interest accrue subsequent to the levy of this assessment and/or recording of this Notice. FAILURE TO PAY ACCRUED ASSESSMENTS AND OTHER COSTS MAY RESULT IN YOUR PROPERTY BEING FORCLOSED UPON.

2.    The purported owners of the unit is Jamie Gallian.

3.    The name and address of the trustee authorized by the Association to enforce the lien by sale is Cal Western Reconveyance Corporation, 525 East Main Street, El Cajon, California, 92022-9004.

Dated: 12/17/18                By: _____
                                   Janine Jasso, Board Vice-President
                                   Huntington Beach Gables Homeowners Association

---

| A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document. |
| --- |

STATE OF CALIFORNIA       )
                          ) ss.
COUNTY OF ORANGE          )

On 12-17-18 , before me, THOMAS G. KNAACK , Notary Public, personally appeared JANINE JASSO , who proved to me on the basis of satisfactory evidence to be the person whose name is subscribed to the within instrument and acknowledged to me that she executed the same in her authorized capacity, and that by her signature on the instrument the person, or the entity upon behalf of which the person acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

_____
Notary Public in and for said State

THOMAS G. KNAACK
Notary Public - California
Orange County
Commission # 2169910
My Comm. Expires Aug 11, 2020

# Exhibit A

## HUNTINGTON BEACH GABLES

38760 Sky Canyon Drive Suite C

Murrieta, CA 92563

Jamie Gallian
4476 Alderport
Huntington Beach, CA  92649

Property Address:  4476 Alderport
Account #:      21776

| Code | Date | Amount | Balance | Check# | Memo |
|------|------|--------|---------|--------|------|
| Assessment | 4/1/2017 | 316.00 | 316.00 | | MONTHLY ASSESSMENT |
| Late Fee | 4/16/2017 | 10.00 | 326.00 | | |
| Assessment | 5/1/2017 | 316.00 | 642.00 | | MONTHLY ASSESSMENT |
| Payment - Mutual of Omaha | 5/11/2017 | -632.00 | 10.00 | 5697 | RBCCABLB20170501.dat |
| Payment - Mutual of Omaha | 5/16/2017 | -316.00 | -306.00 | 5745 | RBCCABLB20170516.dat |
| Assessment | 6/1/2017 | 316.00 | 10.00 | | MONTHLY ASSESSMENT |
| Payment - Mutual of Omaha | 6/5/2017 | -316.00 | -306.00 | 5731 | RBCCABLB20170605.dat |
| Assessment | 7/1/2017 | 316.00 | 10.00 | | MONTHLY ASSESSMENT |
| Payment - Mutual of Omaha | 7/3/2017 | -316.00 | -306.00 | 5762 | RBCCABLB20170703.dat |
| Payment - Mutual of Omaha | 7/13/2017 | -80.00 | -386.00 | 5787 | RBCCABLB20170713.dat |
| Assessment | 8/1/2017 | 316.00 | -70.00 | | MONTHLY ASSESSMENT |
| Assessment | 9/1/2017 | 316.00 | 246.00 | | MONTHLY ASSESSMENT |
| Assessment | 10/1/2017 | 316.00 | 562.00 | | MONTHLY ASSESSMENT |
| Payment - Mutual of Omaha | 10/3/2017 | -316.00 | 246.00 | 5810 | rcvd 9/1/17 |
| Assessment | 11/1/2017 | 316.00 | 562.00 | | MONTHLY ASSESSMENT |
| Payment - Mutual of Omaha | 11/1/2017 | -316.00 | 246.00 | 5829 | CK#5829 RCVD 10/9/17 |
| Payment - Mutual of Omaha | 11/6/2017 | -316.00 | -70.00 | 5846 | RBCCABLB20171106.dat |
| Assessment | 12/1/2017 | 316.00 | 246.00 | | MONTHLY ASSESSMENT |
| Payment - Mutual of Omaha | 12/11/2017 | -316.00 | -70.00 | 5867 | RBCCABLB20171211.dat |
| Assessment | 1/1/2018 | 316.00 | 246.00 | | MONTHLY ASSESSMENT |
| Payment - Mutual of Omaha | 1/8/2018 | -316.00 | -70.00 | 5884 | RBCCABLB20180108.dat |
| Assessment | 2/1/2018 | 316.00 | 246.00 | | MONTHLY ASSESSMENT |
| Late Fee | 2/16/2018 | 10.00 | 256.00 | | |
| Payment - Mutual of Omaha | 2/20/2018 | -316.00 | -60.00 | 5891 | RBCCABLB20180220.dat |
| Special Assessment | 2/20/2018 | 5,300.50 | 5,240.50 | | SPECIAL ASSESSMENT |
| Assessment | 3/1/2018 | 316.00 | 5,556.50 | | MONTHLY ASSESSMENT |
| Late Fee | 3/16/2018 | 10.00 | 5,566.50 | | |
| Payment - Mutual of Omaha | 3/19/2018 | -316.00 | 5,250.50 | 5921 | RBCCABLB20180319.dat |
| Assessment | 4/1/2018 | 316.00 | 5,566.50 | | MONTHLY ASSESSMENT |
| Payment - Mutual of Omaha | 4/13/2018 | -316.00 | 5,250.50 | 5932 | RBCCABLB20180413.dat |
| Special Assessment | 5/1/2018 | 189.60 | 5,440.10 | | SPECIAL ASSESSMENT |
| Assessment | 5/1/2018 | 316.00 | 5,756.10 | | MONTHLY ASSESSMENT |
| Payment - Mutual of Omaha | 5/16/2018 | -316.00 | 5,440.10 | 5947 | RBCCABLB20180516.dat |
| Late Fee | 5/16/2018 | 10.00 | 5,450.10 | | |

# HUNTINGTON BEACH GABLES

### 38760 Sky Canyon Drive Suite C

### Murrieta, CA 92563

| Code | Date | Amount | Balance | Check# | Memo |
|---|---|---|---|---|---|
| Assessment | 6/1/2018 | 316.00 | 5,766.10 | | MONTHLY ASSESSMENT |
| Late Fee | 6/16/2018 | 10.00 | 5,776.10 | | |
| Payment - Mutual of Omaha | 6/18/2018 | -316.00 | 5,460.10 | 5965 | RBCCABLB20180618.dat |
| Payment - Mutual of Omaha | 6/25/2018 | -189.00 | 5,271.10 | 5985 | RBCCABLB20180625.dat |
| Assessment | 7/1/2018 | 316.00 | 5,587.10 | | MONTHLY ASSESSMENT |
| Payment - Mutual of Omaha | 7/9/2018 | -316.00 | 5,271.10 | 5980 | RBCCABLB20180709.dat |
| Assessment | 8/1/2018 | 316.00 | 5,587.10 | | MONTHLY ASSESSMENT |
| Payment - Mutual of Omaha | 8/13/2018 | -316.00 | 5,271.10 | 5995 | RBCCABLB20180813.dat |
| Legal Fee | 8/15/2018 | 175.00 | 5,446.10 | | LEGAL FEE |
| Assessment | 9/1/2018 | 316.00 | 5,762.10 | | MONTHLY ASSESSMENT |
| Payment - Mutual of Omaha | 9/10/2018 | -316.00 | 5,446.10 | 6026 | RBCCABLB20180910.dat |
| Legal Fee | 9/24/2018 | 175.00 | 5,621.10 | | LEGAL FEE/PRE-LIEN |
| Assessment | 10/1/2018 | 316.00 | 5,937.10 | | MONTHLY ASSESSMENT |
| Late Fee | 10/16/2018 | 10.00 | 5,947.10 | | |
| Payment - Mutual of Omaha | 10/23/2018 | -326.00 | 5,621.10 | 5481 | |
| Assessment | 11/1/2018 | 316.00 | 5,937.10 | | MONTHLY ASSESSMENT |
| Late Fee | 11/16/2018 | 10.00 | 5,947.10 | | |
| Assessment | 12/1/2018 | 316.00 | 6,263.10 | | MONTHLY ASSESSMENT |

| Current | 30 - 59 Days | 60 - 89 Days | >90 Days | Balance: | 6,263.10 |
|---|---|---|---|---|---|
| 326.00 | 326.00 | 175.00 | 5,436.10 | | |

# HUNTINGTON BEACH GABLES

### 38760 Sky Canyon Drive Suite C

### Murrieta, CA 92563

Jamie Gallian
4476 Alderport
Huntington Beach, CA  92649

Property Address:  4476 Alderport

Account #:        22034

| Code | Date | Amount | Balance | Check# | Memo |
|------|------|--------|---------|--------|------|
| Fine | 2/20/2018 | 400.00 | 400.00 | | |
| Fine | 8/24/2018 | 11,050.00 | 11,450.00 | | |
| Fine | 10/18/2018 | 11,000.00 | 22,450.00 | | |

| Current | 30 - 59 Days | 60 - 89 Days | >90 Days | Balance: | 22,450.00 |
|---------|--------------|--------------|----------|----------|-----------|
| 0.00 | 11,000.00 | 0.00 | 11,450.00 | | |

Elite Management | 38760 Sky Canyon Drive Suite C | Murrieta, CA 92563 | (951) 699-1220
Make check payable to: HUNTINGTON BEACH GABLES

12/12/2018

JOINT EXHIBIT - PAGE 0074    Page 1 of 1

JASSO DECL. PAGE - 0751



**Epsten Grinnell & Howell** APC
Attorneys Serving Community Associations

10200 Willow Creek Road, Suite 100   Tel 1.858.527.0111
San Diego, CA 92131   Tel 1.800.300.1704
Fax 1.858.527.1531

ASSESSMENT RECOVERY DEPARTMENT

September 24, 2018

Certified Article Number

9414 7266 9904 2098 2935 81

Certified Article Number

9414 7266 9904 2098 2936 28

SENDER'S RECORD

**VIA CERTIFIED MAIL, RETURN RECEIPT
REQUESTED AND FIRST CLASS MAIL**

Jamie L. Galilan
4476 Alderport Drive
Huntington Beach, CA 92649

> Re:   The Huntington Beach Gables Homeowners Association
> Our Reference No.   5786.2002
> Association Account No. 21776
> Amount of Debt as of Date of This Letter: $5,621.10
> Property Located At: 4476 Alderport Drive, Huntington Beach, CA 92649

Dear Owner:

This communication is from a debt collector and is an attempt to collect a debt. Any information obtained will be used for that purpose. This law firm represents The Huntington Beach Gables Homeowners Association ("Association") with respect to the account referenced above. We are writing to advise you that as of the date of this letter you owe $5,621.10 on your assessment account with the Association.

Failure to pay your assessment account in full within thirty-five (35) days from the date of this letter will result in the recording of a lien against your property, after proper authorization by the Association's Board of Directors. All collection costs allowed by law may be charged to your assessment account. Because of accruing assessments, late charges, and other charges that may vary from day to day, the amount due on the day you pay may be greater. Hence, if you pay the amount shown above, an adjustment may be necessary after we receive your payment, in which event we will inform you before depositing the payment for collection. For further information, write the undersigned or call 1.800.300.1704. You can also call my assistant, Olivia M. Castro at 1.858.527.0111, ext. 269.

### IMPORTANT NOTICE:   IF YOUR SEPARATE INTEREST IS PLACED IN FORECLOSURE BECAUSE YOU ARE BEHIND IN YOUR ASSESSMENTS, IT MAY BE SOLD WITHOUT COURT ACTION.

Pursuant to California Civil Code section 5720(b)(2), the Association may not foreclose until the amount of the delinquent assessments secured by the lien, exclusive of any accelerated assessments, late charges, fees and costs of collection, attorney's fees, or interest, equals or exceeds one thousand eight hundred dollars ($1,800) or the assessments secured by the lien are more than 12 months delinquent.

September 24, 2018
Page 2 of 2
Jamie L. Gallian

Under California Civil Code sections 5660 and 5670, you have the following rights:

- You have the right to inspect the Association records pursuant to California Civil Code section 5205.

- You shall not be liable to pay the charges, interest, and costs of collection if it is determined the assessment was paid on time to the Association.

- As provided in California Civil Code section 5665, you have the right to submit a written request to meet with the Association's Board of Directors to discuss a payment plan for this debt.

- You have the right to dispute the assessment debt by submitting a written request for dispute resolution to the Association pursuant to the Association's "meet and confer" program required in California Civil Code section 5900 et seq., and the Board offers to participate in dispute resolution with you.

- You have the right to request alternative dispute resolution with a neutral third party pursuant to California Civil Code section 5925 et seq. before the Association may initiate foreclosure against your separate interest, except that binding arbitration shall not be available if the Association intends to initiate a judicial foreclosure.

Very truly yours,

EPSTEN GRINNELL & HOWELL, APC

Jillian M. Wright

JMW: omc

Enclosures: Association Collection Policy and Account History

cc:    Jamie L. Gallian
       18 Meadowbrook Dr., Cota De Caza, CA  92679

       (Via Certified Mail, Return Receipt Requested and First Class Mail with enclosures)

JOINT EXHIBIT - PAGE - 0376

JASSO DECL. PAGE - 0753

# HUNTINGTON BEACH GABLES

### 38760 Sky Canyon Drive Suite C

### Murrieta, CA 92563

Jamie Gallian
4476 Alderport
Huntington Beach, CA 92649

Property Address: 4476 Alderport
Account #:       21776

| Code | Date | Amount | Balance | Check# | Memo |
|------|------|--------|---------|--------|------|
| Assessment | 4/1/2017 | 316.00 | 316.00 | | MONTHLY ASSESSMENT |
| Late Fee | 4/16/2017 | 10.00 | 326.00 | | |
| Assessment | 5/1/2017 | 316.00 | 642.00 | | MONTHLY ASSESSMENT |
| Payment - Mutual of Omaha | 5/1/2017 | -632.00 | 10.00 | 6697 | RBCCABLB20170501.dat |
| Payment - Mutual of Omaha | 6/16/2017 | -316.00 | -306.00 | 5745 | RBCCABLB20170516.dat |
| Assessment | 6/1/2017 | 316.00 | 10.00 | | MONTHLY ASSESSMENT |
| Payment - Mutual of Omaha | 6/5/2017 | -316.00 | -306.00 | 5731 | RBCCABLB20170605.dat |
| Assessment | 7/1/2017 | 316.00 | 10.00 | | MONTHLY ASSESSMENT |
| Payment - Mutual of Omaha | 7/3/2017 | -316.00 | -306.00 | 5762 | RBCCABLB20170703.dat |
| Payment - Mutual of Omaha | 7/13/2017 | -80.00 | -386.00 | 5787 | RBCCABLB20170713.dat |
| Assessment | 8/1/2017 | 316.00 | -70.00 | | MONTHLY ASSESSMENT |
| Assessment | 9/1/2017 | 316.00 | 246.00 | | MONTHLY ASSESSMENT |
| Assessment | 10/1/2017 | 316.00 | 562.00 | | MONTHLY ASSESSMENT |
| Payment - Mutual of Omaha | 10/3/2017 | -316.00 | 246.00 | 5810 | rcvd 9/1/17 |
| Assessment | 11/1/2017 | 316.00 | 562.00 | | MONTHLY ASSESSMENT |
| Payment - Mutual of Omaha | 11/1/2017 | -316.00 | 246.00 | 5829 | CK#5829 RCVD 10/6/17 |
| Payment - Mutual of Omaha | 11/6/2017 | -316.00 | -70.00 | 5845 | RBCCABLB20171106.dat |
| Assessment | 12/1/2017 | 316.00 | 246.00 | | MONTHLY ASSESSMENT |
| Payment - Mutual of Omaha | 12/11/2017 | -316.00 | -70.00 | 5867 | RBCCABLB20171211.dat |
| Assessment | 1/1/2018 | 316.00 | 246.00 | | MONTHLY ASSESSMENT |
| Payment - Mutual of Omaha | 1/8/2018 | -316.00 | -70.00 | 5884 | RBCCABLB20180108.dat |
| Assessment | 2/1/2018 | 316.00 | 246.00 | | MONTHLY ASSESSMENT |
| Late Fee | 2/16/2018 | 10.00 | 256.00 | | |
| Payment - Mutual of Omaha | 2/20/2018 | -316.00 | -60.00 | 5891 | RBCCABLB20180220.dat |
| Special Assessment | 2/20/2018 | 6,300.50 | 6,240.50 | | SPECIAL ASSESSMENT |
| Assessment | 3/1/2018 | 316.00 | 6,556.50 | | MONTHLY ASSESSMENT |
| Late Fee | 3/16/2018 | 10.00 | 6,566.50 | | |
| Payment - Mutual of Omaha | 3/16/2018 | -316.00 | 6,250.50 | 5921 | RBCCABLB20180319.dat |
| Assessment | 4/1/2018 | 316.00 | 6,566.50 | | MONTHLY ASSESSMENT |
| Payment - Mutual of Omaha | 4/13/2018 | -316.00 | 6,250.50 | 5932 | RBCCABLB20180413.dat |
| Special Assessment | 5/1/2018 | 189.60 | 6,440.10 | | SPECIAL ASSESSMENT |
| Assessment | 5/1/2018 | 316.00 | 6,756.10 | | MONTHLY ASSESSMENT |
| Payment - Mutual of Omaha | 5/16/2018 | -316.00 | 6,440.10 | 5947 | RBCCABLB20180516.dat |
| Late Fee | 5/16/2018 | 10.00 | 6,450.10 | | |

Elite Management | 38760 Sky Canyon Drive Suite C | Murrieta, CA 92563 | (951) 699-1220
Make check payable to: HUNTINGTON BEACH GABLES

9/19/2018                                                                                   Page 1 of 2

JOINT EXHIBIT - PAGE - 0377

JASSO DECL. PAGE - 0754

# HUNTINGTON BEACH GABLES

38760 Sky Canyon Drive Suite C

Murrieta, CA 92563

| Code | Date | Amount | Balance | Check# | Memo |
|------|------|--------|---------|--------|------|
| Assessment | 6/1/2018 | 316.00 | 5,766.10 | | MONTHLY ASSESSMENT |
| Late Fee | 6/16/2018 | 10.00 | 5,776.10 | | |
| Payment - Mutual of Omaha | 6/18/2018 | -316.00 | 5,460.10 | 5955 | RBCCABLB20180618.dat |
| Payment - Mutual of Omaha | 6/25/2018 | -189.00 | 5,271.10 | 5985 | RBCCABLB20180625.dat |
| Assessment | 7/1/2018 | 316.00 | 5,587.10 | | MONTHLY ASSESSMENT |
| Payment - Mutual of Omaha | 7/9/2018 | -316.00 | 5,271.10 | 5980 | RBCCABLB20180709.dat |
| Assessment | 8/1/2018 | 316.00 | 5,587.10 | | MONTHLY ASSESSMENT |
| Payment - Mutual of Omaha | 8/13/2018 | -316.00 | 5,271.10 | 5995 | RBCCABLB20180813.dat |
| Legal Fee | 8/15/2018 | 175.00 | 5,446.10 | | LEGAL FEE |
| Assessment | 9/1/2018 | 316.00 | 5,762.10 | | MONTHLY ASSESSMENT |
| Payment - Mutual of Omaha | 9/10/2018 | -316.00 | 5,446.10 | 6026 | RBCCABLB20180910.dat |
| Legal Fee | | 175.00 | 5,621.10 | | |

Elite Management | 38760 Sky Canyon Drive Suite C | Murrieta, CA 92563 | (951) 699-1220

Make check payable to: HUNTINGTON BEACH GABLES

9/19/2018

Page 2 of 2

JOINT EXHIBIT - PAGE - 0378

JASSO DECL. PAGE - 0755

## Huntington Beach Gables Homeowners' Association
### Assessment Collection Policy

Being that the Board of Directors must enforce the obligation of all members to pay their assessments in a timely manner, the following assessment collection policies have been adopted, in accordance with Civil Code 1365.

1. Regular assessments are due and payable on the first day of each month. Each owner is responsible to pay each assessment on time, regardless of whether or not a statement or coupon is received.

2. Other assessments, including special assessments, are due and payable on the date specified in the notice of that assessment.

3. Assessments, late charges, interest, reasonable collection costs, and reasonable legal fees, if applicable, are the obligation of the owner of the property at the time that the assessment or other sums are levied. Owners shall be held responsible for all such amounts unless it is determined that all assessments were paid on time to the Association.

4. Assessments are delinquent fifteen (15) days after they are due. A late fee of $10.00 or 10% of the assessment, whichever is greater, will be charged for any assessment which is not paid in full within fifteen (15) days of the due date. A letter notifying the owner of this charge, and demanding payment, may be forwarded to the owner at their address of record with the Association.

5. Interest on the balance due will accrue at the rate of 6% per annum, commencing thirty (30) days after the assessment becomes due.

6. Payments received will be applied to any outstanding assessments first. Only after assessments owed are paid in full will the payments be applied to fees and costs of collection, late charges and/or interest. When an owner makes a payment, the owner may request a receipt and the Association shall provide it. The receipt shall indicate the date of payment and the person who received it. The mailing address for overnight payments is:

### Huntington Beach Gables H.O.A.
c/o Elite Management
38760 Sky Canyon Drive, Suite C
Murrieta, CA 92563

7. For liens recorded on or after January 1, 2006, the decision to record a lien for delinquent assessments shall be made only by the Board of Directors of the Association and may not be delegated to an agent of the association. The board shall approve the decision by a majority vote of the board members in an open meeting. The board shall record the vote in the minutes of that meeting.

JOINT EXHIBIT · PAGE · 0379

8. At least 30 days prior to the recording of a lien upon the separate interest of the owner of record to collect a debt that is past due, the association shall notify the owner of record in writing by certified mail of their intent to lien. The letter shall advise of the following:

    a. The delinquent status of the account (account history to be included)
    b. Impending collection action
    c. The owners' right to request and participate in internal dispute resolution process (IDR)
    d. The owners' right to request a payment plan or to meet with the board to discuss a payment plan

9. If an owner, whom receives an Intent to Lien letter, fails to respond and fails to request IDR within thirty (30) days, a lien for any delinquent assessments, late charges, interest and/or costs of collection, including attorneys' fees, may be recorded against the owner's property. The owner will be charged a fee for such lien.

10. A copy of the lien will be sent to the owner at their address of record via certified mail within ten (10) days of the lien being recorded.

11. After the expiration of thirty (30) days following the recording of the lien, the lien may be enforced in any manner permitted by law, including judicial or non-judicial foreclosure, granted it meets the requirements for such action. The Association may foreclose the lien by non-judicial or judicial foreclosure sale when either 1) the delinquent assessment amount totals $1,800.00 or more, excluding accelerated assessments and specified late charges and fees, or, 2) the assessments are delinquent for more than twelve (12) months.

12. The decision to move forward with foreclosure must be made by a majority of the Board of Directors, in an Executive Session Meeting. The decision must be recorded by the Board in the minutes of the next open meeting. Before proceeding with a foreclosure sale, the owner of the property must be afforded the right to participate in IDR or Alternative Dispute Resolution (ADR).

13. Foreclosure shall be handled by a law firm, approved by the Board of Directors. The law firm shall ensure that all legal requirements are met throughout the process.

14. Should an owner satisfy a lien, the Association shall record a release of lien and provide a copy to the owner of the release within twenty one (21) days of receiving the full payment.

15. Owners may provide a secondary mailing address to the Association. The request must be in writing and mailed to the Association in a way that shall indicate the Association has received it. The owner may identify or change a secondary address at any time. However, if the address is changed during the collection process, the Association is only required to send notices to the secondary address from the point that the Association receives the request.

16.  The Association has the right to request a vesting report on a property in preparation of the collection procedures.  The owner may be charged for any fees involved with obtaining such report.

17.  Members of the Association have the right to inspect Association records to verify their debt.

18.  The Association reserves the right to change the amount of any collection fee, without notice, and reserves the right to modify or amend this collection policy at any time.

The foregoing policies and procedures were adopted by the Board of Directors at its meeting held on _NOVEMBER 28_ , _2007_ .

Signed for Huntington Beach Gables H.O.A.:

_____
Signature

FRANK SPATES
_____
Printed Name

PRESIDENT
_____
Board Member Title

11-28-07
_____
Date

JOINT EXHIBIT - PAGE - 0381

November 3, 2011

Insurance Disclosure for:  Huntington Beach Gables

**General Liability Coverage**
1. Name of Insurer:      Travelers Casualty Ins. Co.
2. Policy Limits:        $1,000,000 per occurrence/$2,000,000 aggregate
3. Deductible:           None
4. Inception Date:       8/3/2011          Expiration Date: 8/3/2012

**Property Coverage**
1. Name of Insurer:      Travelers Casualty Ins. Co.
2. Policy Limits:        $17,812,972
3. Deductible:           $5,000
4. Inception Date:       8/3/2011          Expiration Date: 8/3/2012

**Fidelity Bond Coverage**
1. Name of Insurer:      Great American
2. Policy Limits:        $450,000
3. Deductible:           $2,500
4. Inception Date:       8/3/2011          Expiration Date: 8/3/2012

**Directors & Officers Coverage**
1. Name of Insurer:      Great American
2. Policy Limits:        $1,000,000
3. Deductible:           $1,000
4. Inception Date:       8/3/2011          Expiration Date: 8/3/2012

**Earthquake Coverage**
1. Name of Insurer:
2. Policy Limits:
3. Deductible:
4. Inception Date:                         Expiration Date:

**Umbrella Coverage**
1. Name of Insurer:      Great American
2. Policy Limits:        $1,000,000 (this extends over the General Liability and Directors & Officers)
3. Deductible:           None
4. Inception Date:       8/3/2011          Expiration Date: 8/3/2012

**Workers Compensation Coverage**
1. Name of Insurer:
2. Policy Limits:
3. Deductible:
4. Inception Date:                         Expiration Date:

In accordance with Section 1365 of the Civil Code:
This summary of the association's policies of insurance provides only certain information, as required by subdivision (f) of Section 1365 of the Civil Code, and should not be considered a substitute for the complete policy terms and conditions contained in the actual policies of insurance. Any association member may, upon request and provision of reasonable notice, review the association's insurance policies and, upon request and payment of reasonable duplication charges, obtain copies of those policies. Although the association maintains the policies of insurance specified in this summary, the association's policies of insurance may not cover your property, including personal property or, real property improvements to or around your dwelling, or personal injuries or other losses that occur within or around your dwelling. Even if a loss is covered, you may nevertheless be responsible for paying all or a portion of any deductible that applies. Association members should consult with their individual insurance broker or agent for appropriate additional coverage."
Agent of record: Alante Insurance Programs 5530 Trabuco Road, Irvine, CA 92620 Tel: (800) 370-0057; Fax: (949) 679-7249; License No. OC13480

JOINT EXHIBIT - PAGE - 0382



Epsten Grinnell&Howell
Attorneys Serving Community Associations

10200 Willow Creek Road, Suite 100   Tel 1.858.527.0111
San Diego, CA 92131   Tel 1.800.300.1704
Fax 1.858.527.1531

Certified Article Number

9434 7266 9904 2098 2906 58

SENDER'S RECORD

ASSESSMENT RECOVERY DEPARTMENT

August 17, 2018

**VIA CERTIFIED MAIL RETURN RECEIPT**
**REQUESTED AND FIRST CLASS MAIL**

Jamie L. Galilan
4476 Alderport Drive
Huntington Beach, CA 92649

Re:   The Huntington Beach Gables Homeowners Association (CREDITOR)
      Our Reference No.:   5786.2002
      Association Account No. 21776
      Amount of Debt as of Date of This Letter: $5,446.10
      Property Located At: 4476 Alderport Drive, Huntington Beach, CA  92649

Dear Owner:

This communication is from a debt collector and is an attempt to collect a debt.
Any information obtained will be used for that purpose. Please be advised that this law firm
represents The Huntington Beach Gables Homeowners Association ("Association") with respect
to the account referenced above.  As of the date of this letter, you owe $5,446.10 on your
account with the Association.  Because of accruing assessments, late charges, and other
charges that may vary from day to day, the amount due on the day you pay may be greater.
Hence, if you pay the amount shown above, an adjustment may be necessary after we receive
your payment, in which event we will inform you before depositing the payment for collection.
For further information, write the undersigned or call 1.800.300.1704.  You can also call my
assistant, Olivia M. Castro at 1.858.527.0111, ext. 269.

Unless you notify this office within thirty (30) days after receiving this notice that
you dispute the validity of the debt, or any portion thereof, this office will assume this
debt is valid.  If you notify this office in writing within thirty (30) days after receiving this
notice that the debt, or any portion thereof, is disputed, we will obtain verification of the
debt or a copy of a judgment against you (if applicable) and a copy of such verification or
judgment will be mailed to you.  Upon your written request within thirty (30) days after
receiving this notice, we will also provide you with the name and address of the original
creditor, if different from the current creditor.

The California state Rosenthal Fair Debt Collection Practices Act and the federal
Fair Debt Collection Practices Act require that, except under unusual circumstances,
collectors may not contact you before 8 a.m. or after 9 p.m. They may not harass you by
using threats of violence or arrest or by using obscene language.  Collectors may not
use false or misleading statements or call you at work if they know or have reason to
know that you may not receive personal calls at work.  For the most part, collectors may

August 17, 2018
Page 2 of 2
Jamie L. Gallian

not tell another person, other than your attorney or spouse, about your debt. Collectors may contact another person to confirm your location or enforce a judgment. For more information about debt collection activities, you may contact the Federal Trade Commission at 1-877-FTC-HELP or www.ftc.gov.

Very truly yours,

EPSTEN GRINNELL & HOWELL, APC

Debora M. Zumwalt

DMZ: omc

Enclosure: Account History

# HUNTINGTON BEACH GABLES

### 38760 Sky Canyon Drive Suite C

### Murrieta, CA 92563

Jamie Gallian
4476 Alderport
Huntington Beach, CA 92649

Property Address: 4476 Alderport
Account #:    21776

| Code | Date | Amount | Balance | Check# | Memo |
|---|---|---|---|---|---|
| Assessment | 4/1/2017 | 316.00 | 316.00 | | MONTHLY ASSESSMENT |
| Late Fee | 4/16/2017 | 10.00 | 326.00 | | |
| Assessment | 5/1/2017 | 316.00 | 642.00 | | MONTHLY ASSESSMENT |
| Payment - Mutual of Omaha | 5/1/2017 | -632.00 | 10.00 | 5697 | RBCCABLB20170501.dat |
| Payment - Mutual of Omaha | 5/16/2017 | -316.00 | -306.00 | 5745 | RBCCABLB20170516.dat |
| Assessment | 6/1/2017 | 316.00 | 10.00 | | MONTHLY ASSESSMENT |
| Payment - Mutual of Omaha | 6/5/2017 | -316.00 | -306.00 | 5731 | RBCCABLB20170605.dat |
| Assessment | 7/1/2017 | 316.00 | 10.00 | | MONTHLY ASSESSMENT |
| Payment - Mutual of Omaha | 7/3/2017 | -316.00 | -306.00 | 5762 | RBCCABLB20170703.dat |
| Payment - Mutual of Omaha | 7/13/2017 | -80.00 | -386.00 | 5787 | RBCCABLB20170713.dat |
| Assessment | 8/1/2017 | 316.00 | -70.00 | | MONTHLY ASSESSMENT |
| Assessment | 9/1/2017 | 316.00 | 246.00 | | MONTHLY ASSESSMENT |
| Assessment | 10/1/2017 | 316.00 | 562.00 | | MONTHLY ASSESSMENT |
| Payment - Mutual of Omaha | 10/3/2017 | -316.00 | 246.00 | 5810 | rcvd 9/1/17 |
| Assessment | 11/1/2017 | 316.00 | 562.00 | | MONTHLY ASSESSMENT |
| Payment - Mutual of Omaha | 11/1/2017 | -316.00 | 246.00 | 5829 | CK#5829 RCVD 10/6/17 |
| Payment - Mutual of Omaha | 11/9/2017 | -316.00 | -70.00 | 5845 | RBCCABLB20171106.dat |
| Assessment | 12/1/2017 | 316.00 | 246.00 | | MONTHLY ASSESSMENT |
| Payment - Mutual of Omaha | 12/11/2017 | -316.00 | -70.00 | 5867 | RBCCABLB20171211.dat |
| Assessment | 1/1/2018 | 316.00 | 246.00 | | MONTHLY ASSESSMENT |
| Payment - Mutual of Omaha | 1/8/2018 | -316.00 | -70.00 | 5884 | RBCCABLB20180108.dat |
| Assessment | 2/1/2018 | 316.00 | 246.00 | | MONTHLY ASSESSMENT |
| Late Fee | 2/16/2018 | 10.00 | 256.00 | | |
| Payment - Mutual of Omaha | 2/20/2018 | -316.00 | -60.00 | 6891 | RBCCABLB20180220.dat |
| Special Assessment | 2/20/2018 | 5,300.50 | 5,240.50 | | SPECIAL ASSESSMENT |
| Assessment | 3/1/2018 | 316.00 | 5,556.50 | | MONTHLY ASSESSMENT |
| Late Fee | 3/16/2018 | 10.00 | 5,566.50 | | |
| Payment - Mutual of Omaha | 3/19/2018 | -316.00 | 5,250.50 | 5921 | RBCCABLB20180319.dat |
| Assessment | 4/1/2018 | 316.00 | 5,566.50 | | MONTHLY ASSESSMENT |
| Payment - Mutual of Omaha | 4/13/2018 | -316.00 | 5,250.50 | 5932 | RBCCABLB20180413.dat |
| Special Assessment | 5/1/2018 | 189.60 | 5,440.10 | | SPECIAL ASSESSMENT |
| Assessment | 5/1/2018 | 316.00 | 5,756.10 | | MONTHLY ASSESSMENT |
| Payment - Mutual of Omaha | 5/16/2018 | -316.00 | 5,440.10 | 5947 | RBCCABLB20180516.dat |
| Late Fee | 5/16/2018 | 10.00 | 5,450.10 | | |

8/15/2018

Page 1 of 2

JOINT EXHIBIT - PAGE - 0385

# HUNTINGTON BEACH GABLES

## 38760 Sky Canyon Drive Suite C
## Murrieta, CA 92563

| Code | Date | Amount | Balance | Check# | Memo |
|---|---|---|---|---|---|
| Assessment | 6/1/2018 | 316.00 | 5,706.10 | | MONTHLY ASSESSMENT |
| Late Fee | 6/16/2018 | 10.00 | 5,776.10 | | |
| Payment - Mutual of Omaha | 6/18/2018 | -316.00 | 5,460.10 | 6966 | RBCCABLB20180618.dat |
| Payment - Mutual of Omaha | 6/25/2018 | -189.00 | 5,271.10 | 5985 | RBCCABLB20180625.dat |
| Assessment | 7/1/2018 | 316.00 | 5,587.10 | | MONTHLY ASSESSMENT |
| Payment - Mutual of Omaha | 7/8/2018 | -316.00 | 5,271.10 | 5980 | RBCCABLB20180709.dat |
| Assessment | 8/1/2018 | 316.00 | 5,587.10 | | MONTHLY ASSESSMENT |
| Payment - Mutual of Omaha | 8/13/2018 | -316.00 | 5,271.10 | 5995 | RBCCABLB20180813.dat |
| Legal Fees | | 175.00 | 5,446.10 | | |

**EXHIBIT "I"**

Recorded In Official Records, Orange County
Hugh Nguyen, Clerk-Recorder

87.00

* S R 0 0 1 1 0 9 0 6 4 7 5 *

2019000326771 12:29 pm 08/30/19

65 MASup N15   2

0.00 0.00 0.00 0.00 3.00 0.00 0.00 0.0075.00 3.00

RECORDING REQUESTED BY

AND WHEN RECORDED MAIL TO
Nationwide Reconveyance, LLC
5677 Oberlin Drive, Suite 210
San Diego, California 92121
844-252-6972
Attn: Foreclosure Department

Space above this line for recorder's use

Title Order No.: 95522653    Trustee Sale No.: NR-51545-CA Reference No.: The Huntington Beach
A.P.N.: 937-63-053

[ATTENTION RECORDER: PURSUANT TO CIVIL CODE 2923.3, THE SUMMARY OF INFORMATION
REFERENCED BELOW IS NOT ATTACHED TO THE RECORDED COPY OF THIS DOCUMENT BUT
ONLY TO THE COPIES PROVIDED TO THE TRUSTOR.]

NOTE: THERE IS A SUMMARY OF THE INFORMATION IN THIS DOCUMENT ATTACHED
注：本文件包含一个信息摘要
참고사항: 본 첨부 문서에 정보 요약서가 있습니다
NOTA: SE ADJUNTA UN RESUMEN DE LA INFORMACIÓN DE ESTE DOCUMENTO
TALA: MAYROONG BUOD NG IMPORMASYON SA DOKUMENTONG ITO NA NAKALAKIP
LƯU Ý: KÈM THEO ĐÂY LÀ BẢN TRÌNH BÀY TÓM LƯỢC VỀ THÔNG TIN TRONG TÀI LIỆU NÀY

## IMPORTANT NOTICE
## NOTICE OF DEFAULT AND ELECTION TO SELL UNDER PROPERTY ASSOCIATION LIEN

**IF YOUR PROPERTY IS IN FORECLOSURE BECAUSE YOU ARE BEHIND IN YOUR
PAYMENTS, IT MAY BE SOLD WITHOUT ANY COURT ACTION,** and you may have the
legal right to bring your account in good standing by paying all of your past due payments plus permitted
costs and expensed within the time permitted by law for reinstatement of your account, which is normally
five business days prior to the date set for sale of your property. No sale date may be set until
approximately 90 days from the date this notice of default may be recorded (which date of recordation
appears on this notice). The amount is $389,286.72 as of 8/27/2019 and will increase until your account
becomes current. While your property is in foreclosure, you must still pay other obligations (such as
insurance and taxes) required by your Covenants, Conditions and Restrictions. If you fail to make future
payments of your assessments, pay taxes on property, provide insurance on the property, or pay other
obligations as required in the Covenants, Conditions and Restrictions, the Association may insist that you
do so in order to reinstate your account in good standing. In addition, the association may require, as a
condition to reinstatement, that you provide reliable written evidence that you paid all senior liens,
property taxes, and hazard insurance premiums. Upon your written request, the Association will give
you a written itemization of the entire amount you must pay. You may not have to pay the entire unpaid
portion of your account, even though full payment was demanded, but you must pay all amounts in
default at the time payment is made. However, you and your Association may mutually agree in writing
prior to the time the notice of sale is posted (which may not be earlier than three months after this notice
of default is recorded) to, among other things, (1) provide additional time in which to cure the default by
transfer of the property or otherwise; or (2) establish a schedule of payments in order to cure your
default; or both (1) and (2). Following the expiration of the time period referred to in the first paragraph
of this notice, unless the obligation being foreclosed upon or a separate written agreement between you

JOINT EXHIBIT - PAGE - 0662

and your creditor permits a longer period, you have only the legal right to stop the sale of your property by paying the entire amount demanded by your creditor.

To find out the amount you must pay, or to arrange for payment to stop the foreclosure, or if your property is in foreclosure for any other reason, contact:

The Huntington Beach Gables Homeowners' Association
C/O Nationwide Reconveyance, LLC
5677 Oberlin Drive, Suite 210, San Diego, California 92121
844-252-6972

THIS NOTICE is given pursuant to Sections 2924 et seq., 5650 et seq. and 5700 et seq., of the California Civil Code, and pursuant to that certain Assessment Lien, recorded on 12/17/2018 as document no. 2018000469842 book XX page XX of official Records in the office of the Recorder of Orange County, California. Owner: Jamie Gallian

PROPERTY ADDRESS:    4476 Aldeport
                     Huntington Beach, CA 92649

If you have any questions, you should contact a lawyer or the government agency which may have insured your loan. Notwithstanding the fact that your property is in foreclosure, you may offer your property for sale, provided the sale is concluded prior to the conclusion of the foreclosure.

## REMEMBER, YOU MAY LOSE LEGAL RIGHTS IF YOU DO NOT TAKE PROMPT ACTION

NOTICE IS HEREBY GIVEN THAT: Nationwide Reconveyance, LLC is the duly appointed Trustee Agent under the above referenced Lien, dated 12/17/2018, executed by The Huntington Beach Gables Homeowners' Association (Association) to secure assessment obligations in favor of said Association, pursuant to the terms contained in that certain Declaration of Covenants, Conditions and Restrictions, Recorded on 5/28/1980 as document XX book no. 13618 page 982 of Official Records in the Office of the Recorder of Orange County, California, describing the land therein, that the beneficial interest under said Homeowners Association Lien and the obligations secured thereby are presently held by Restrictions as security has occurred in that the payment(s) have not been made of: Homeowner's assessments due from 8/16/2019 and all subsequent homeowner's assessments, monthly or otherwise, less credits and offsets, plus late charges, interest, association's fees and costs, trustee's fees and costs, and attorney's fees and costs.

That by reason thereof, the present Association under such Covenants, Conditions and Restrictions, has executed and delivered to said Trustee, a written Declaration and Demand for Sale, and has deposited with said duly appointed Trustee, such Covenants, Conditions and Restrictions and all documents evidencing the obligations secured thereby, and has declared and does hereby declare all sums secured hereby immediately due and payable and has elected and does hereby elect to cause the herein described property, lined by said Association, to be sold to satisfy the obligations secured thereby.

DATE: 8/27/2019

Nationwide Reconveyance, LLC  as Trustee

_Rhonda Rorie_

Rhonda Rorie, Trustee

JOINT EXHIBIT - PAGE - 0063

**EXHIBIT "J"**

Recorded in Official Records, Orange County
Hugh Nguyen, Clerk-Recorder

87.00

*$ R 0 0 1 1 3 5 0 4 9 2 3 *

2019000526463 3:20 pm 12/16/19

65 402 N34   2

0.00 0.00 0.00 0.00 3.00 0.00 0.000.0075.00 3.00

RECORDING REQUESTED BY

AND WHEN RECORDED MAIL TO
Nationwide Reconveyance, LLC
5677 Oberlin Drive, Suite 210
San Diego, California 92121
844-252-6972

SPACE ABOVE THIS LINE FOR RECORDER'S USE

Title Order No.: 95522653    Trustee Sale No.: NR-51545-CA    Reference No.: The Huntington
Beach APN No.: 937-63-053

## NOTICE OF TRUSTEE'S SALE
### (NOTICE OF LIEN SALE OF REAL PROPERTY UPON LIEN FOR HOMEOWNER'S ASSOCIATION DUES)
### (CALIFORNIA CIVIL CODE §§ 5700 and 5710)

[ATTENTION RECORDER: PURSUANT TO CIVIL CODE §2923.3, THE SUMMARY OF INFORMATION
REFERENCED BELOW IS NOT ATTACHED TO THE RECORDED COPY OF THIS DOCUMENT BUT
ONLY TO THE COPIES PROVIDED TO THE TRUSTOR.]

NOTE: THERE IS A SUMMARY OF THE INFORMATION IN THIS DOCUMENT ATTACHED

注：本文件包含一个信息摘要

참고사항: 본 첨부 문서에 정보 요약서가 있습니다

NOTA: SE ADJUNTA UN RESUMEN DE LA INFORMACIÓN DE ESTE DOCUMENTO
TALA: MAYROONG BUOD NG IMPORMASYON SA DOKUMENTONG ITO NA NAKALAKIP
LƯU Ý: KÈM THEO ĐÂY LÀ BẢN TRÌNH BÀY TÓM LƯỢC VỀ THÔNG TIN TRONG TÀI LIỆU NÀY

**YOU ARE IN DEFAULT UNDER A NOTICE OF DELINQUENT ASSESSMENT
DATED 12/17/2018. UNLESS YOU TAKE ACTION TO PROTECT YOUR PROPERTY,
IT MAY BE SOLD AT A PUBLIC SALE. IF YOU NEED AN EXPLANATION OF THE
NATURE OF THE PROCEEDINGS AGAINST YOU, YOU SHOULD CONTACT A
LAWYER.**

THIS PROPERTY IS BEING SOLD SUBJECT TO THE RIGHT OF REDEMPTION CREATED IN
CALIFORNIA CIVIL CODE SECTION 5715(b).

On 1/13/2020 at 3:00 PM, Nationwide Reconveyance, LLC

As the duly appointed Trustee under and pursuant to Notice of Delinquent Assessment, recorded on 12/17/2018 as
Document No. 2018000469842 Book XX Page XX of Official Records in the Office of the Recorder of Orange
County, California, property owned by: Jamie Gallian and described as follows:

As more fully described in the referenced Assessment Lien

WILL SELL AT PUBLIC AUCTION TO THE HIGHEST BIDDER FOR CASH, (payable at time of sale in lawful
money of the United States, by cash, a cashier's check drawn by a State or national bank, a check drawn by a state or
federal credit union, or a check drawn by a state or federal savings and loan association, savings association, or
savings bank specified in section 5102 of the Financial Code and authorized to do business in this state.) At: ON
THE FRONT STEPS TO THE ENTRANCE OF THE ORANGE CIVIC CENTER, 300 E. CHAPMAN AVENUE,
ORANGE, CA 92866

1

JOINT EXHIBIT - PAGE - 0665

All right, title and interest under said Notice of Delinquent Assessment in the property situated in said County, describing the land therein: 937-63-053

The street address and other common designation, if any of the real property described above is purported to be: 4476 Alderport
Huntington Beach, CA 92649

The undersigned Trustee disclaims any liability for any incorrectness of the street address and other common designation, if any, shown herein. Said sale will be made, but without covenant or warranty, expressed or implied, regarding title, possession, or encumbrances, to pay the remaining principal sum due under said Notice of Delinquent Assessment, with interest thereon, as provided in said notice, advances, if any, estimated fees, charges, and expenses of the Trustee, to-wit: $396,315.29 Estimated
Accrued interest and additional advances, if any, will increase this figure prior to sale

The claimant, The Huntington Beach Gables Homeowners' Association

under said Notice of Delinquent Assessment heretofore executed and delivered to the undersigned a written Declaration of Default and Demand for Sale, and a written Notice of Default and Election to Sell. The undersigned caused said Notice of Default and Election to Sell to be recorded in the county where the real property is located and more than three months have elapsed since such recordation.

NOTICE TO POTENTIAL BIDDERS: If you are considering bidding on this property lien, you should understand that there are risks involved in bidding at a trustee auction. You will be bidding on a lien, not on the property itself. Placing the highest bid at a trustee auction does not automatically entitle you to free and clear ownership of the property. You should also be aware that the lien being auctioned off may be a junior lien. If you are the highest bidder at the auction, you are or may be responsible for paying off all liens senior to the lien being auctioned off, before you can receive clear title to the property. You are encouraged to investigate the existence, priority, and size of outstanding liens that may exist on this property by contacting the county recorder's office or a title insurance company, either of which may charge you a fee for this information. If you consult either of these resources, you should be aware that the same lender may hold more than one mortgage or deed of trust on the property.

NOTICE TO PROPERTY OWNER: The sale date shown on this notice of sale may be postponed one or more times by the mortgagee, beneficiary, trustee, or a court, pursuant to Section 2924g of the California Civil Code. The law requires that information about trustee sale postponements be made available to you and to the public, as a courtesy to those not present at the sale. If you wish to learn whether your sale date has been postponed, and, if applicable, the rescheduled time and date for the sale of this property, you may call (714) 986-9342 or visit this Internet Web site www.superiordefault.com, using the file number assigned to this case NR-51545-CA. Information about postponements that are very short in duration or that occur close in time to the scheduled sale may not immediately be reflected in the telephone information or on the Internet Web site. The best way to verify postponement information is to attend the scheduled sale.

## PLEASE NOTE THAT WE ARE A DEBT COLLECTOR

Date: 12/10/2019

Nationwide Reconveyance, LLC
For Sales Information Please Call (714) 986-9342

Rhonda Rorie, Trustee

**EXHIBIT "K"**

Recorded in Official Records, Orange County
Hugh Nguyen, Clerk-Recorder

|||||||||||||||||||||||||||||||||||||||| 88.00
*$R 0 0 1 1 5 7 7 9 5 7 $*
2020000129752 1:19 pm 03/23/20
363 406A N34   2
0.00 0.00 0.00 0.00 3.00 0.00 0.00 0.0075.00 3.00

RECORDING REQUESTED BY

AND WHEN RECORDED MAIL TO
Nationwide Reconveyance, LLC
5677 Oberlin Drive, Suite 210
San Diego, California 92121
844-252-6972

SPACE ABOVE THIS LINE FOR RECORDER'S USE

Title Order No.: 95522653   Trustee Sale No.: NR-51545-CA   Ref No.: The Huntington Beach
APN No.: 937-63-053

## NOTICE OF TRUSTEE'S SALE
(NOTICE OF LIEN SALE OF REAL PROPERTY UPON LIEN FOR HOMEOWNER'S ASSOCIATION DUES)
**(CALIFORNIA CIVIL CODE §§ 5700 and 5710)**

[ATTENTION RECORDER: PURSUANT TO CIVIL CODE §2923.3, THE SUMMARY OF INFORMATION
REFERENCED BELOW IS NOT ATTACHED TO THE RECORDED COPY OF THIS DOCUMENT BUT
ONLY TO THE COPIES PROVIDED TO THE TRUSTOR.]

NOTE: THERE IS A SUMMARY OF THE INFORMATION IN THIS DOCUMENT ATTACHED
注：本文件包含一个信息摘要
참고사항: 본 첨부 문서에 정보 요약서가 있습니다
NOTA: SE ADJUNTA UN RESUMEN DE LA INFORMACIÓN DE ESTE DOCUMENTO
TALA: MAYROONG BUOD NG IMPORMASYON SA DOKUMENTONG ITO NA NAKALAKIP
LƯU Ý: KÈM THEO ĐÂY LÀ BẢN TRÌNH BÀY TÓM LƯỢC VỀ THÔNG TIN TRONG TÀI LIỆU NÀY

**YOU ARE IN DEFAULT UNDER A NOTICE OF DELINQUENT ASSESSMENT
DATED 12/17/2018. UNLESS YOU TAKE ACTION TO PROTECT YOUR PROPERTY,
IT MAY BE SOLD AT A PUBLIC SALE. IF YOU NEED AN EXPLANATION OF THE
NATURE OF THE PROCEEDINGS AGAINST YOU, YOU SHOULD CONTACT A
LAWYER.**

THIS PROPERTY IS BEING SOLD SUBJECT TO THE RIGHT OF REDEMPTION CREATED IN
CALIFORNIA CIVIL CODE SECTION 5715(b).

On 4/27/2020 at 3:00 PM, Nationwide Reconveyance, LLC

As the duly appointed Trustee under and pursuant to Notice of Delinquent Assessment, recorded on 12/17/2018 as
Document No. 2018000469842 Book XX Page XX of Official Records in the Office of the Recorder of Orange
County, California, property owned by: Jamie Gallian and described as follows:

As more fully described on the referenced Assessment Lien

WILL SELL AT PUBLIC AUCTION TO THE HIGHEST BIDDER FOR CASH, (payable at time of sale in lawful
money of the United States, by cash, a cashier's check drawn by a State or national bank, a check drawn by a state or
federal credit union, or a check drawn by a state or federal savings and loan association, savings association, or
savings bank specified in section 5102 of the Financial Code and authorized to do business in this state) At: ON
THE FRONT STEPS TO THE ENTRANCE OF THE ORANGE CIVIC CENTER, 300 E. CHAPMAN
AVENUE, ORANGE, CA 92866

1

All right, title and interest under said Notice of Delinquent Assessment in the property situated in said County, describing the land therein: 937-63-053

The street address and other common designation, if any of the real property described above is purported to be:
4476 Alderport
Huntington Beach, CA 92649

The undersigned Trustee disclaims any liability for any incorrectness of the street address and other common designation, if any, shown herein. Said sale will be made, but without covenant or warranty, expressed or implied, regarding title, possession, or encumbrances, to pay the remaining principal sum due under said Notice of Delinquent Assessment, with interest thereon, as provided in said notice, advances, if any, estimated fees, charges, and expenses of the Trustee, to-wit: **$407,335.74 Estimated**
Accrued Interest and additional advances, if any, will increase this figure prior to sale

The claimant, The Huntington Beach Gables Homeowners' Association

under said Notice of Delinquent Assessment heretofore executed and delivered to the undersigned a written Declaration of Default and Demand for Sale, and a written Notice of Default and Election to Sell. The undersigned caused said Notice of Default and Election to Sell to be recorded in the county where the real property is located and more than three months have elapsed since such recordation.

NOTICE TO POTENTIAL BIDDERS: If you are considering bidding on this property lien, you should understand that there are risks involved in bidding at a trustee auction. You will be bidding on a lien, not on the property itself. Placing the highest bid at a trustee auction does not automatically entitle you to free and clear ownership of the property. You should also be aware that the lien being auctioned off may be a junior lien. If you are the highest bidder at the auction, you are or may be responsible for paying off all liens senior to the lien being auctioned off, before you can receive clear title to the property. You are encouraged to investigate the existence, priority, and size of outstanding liens that may exist on this property by contacting the county recorder's office or a title insurance company, either of which may charge you a fee for this information. If you consult either of these resources, you should be aware that the same lender may hold more than one mortgage or deed of trust on the property.

NOTICE TO PROPERTY OWNER: The sale date shown on this notice of sale may be postponed one or more times by the mortgagee, beneficiary, trustee, or a court, pursuant to Section 2924g of the California Civil Code. The law requires that information about trustee sale postponements be made available to you and to the public, as a courtesy to those not present at the sale. If you wish to learn whether your sale date has been postponed, and, if applicable, the rescheduled time and date for the sale of this property, you may call **(714) 986-9342** or visit this Internet Web site www.superiordefault.com, using the file number assigned to this case **NR-51545-CA**. Information about postponements that are very short in duration or that occur close in time to the scheduled sale may not immediately be reflected in the telephone information or on the Internet Web site. The best way to verify postponement information is to attend the scheduled sale.

## PLEASE NOTE THAT WE ARE A DEBT COLLECTOR

Date: 3/17/2020

Nationwide Reconveyance, LLC
For Sales Information Please Call (714) 986-9342

_Rhonda Rorie_

Rhonda Rorie, Trustee

2

JOINT EXHIBIT - PAGE - 0669

**EXHIBIT "L"**

# Mark Mellor

| | |
|---|---|
| From: | Mark Mellor |
| Sent: | Monday, April 20, 2020 1:30 PM |
| To: | Randy Nickel |
| Cc: | Judy Taylor |
| Subject: | RE: 4476 Alderport HB |

Randy:

I went on the website http://www.superiordefault.com/ and obtained confirmation of the postponement for Trustee Sale No: nr-51545-ca. Now let us prepare for mediation and our court case prior to July 15, 2020. Please locate the documents we discussed for that purpose. Here is what I found:

# Results:

**2 orders matching the filters returned**
**Trustee Sale File #:** nr-51545-ca
**Client File #:** nr-51545-ca
**SDI #: 17957, TS #:** nr-51545-ca
**Original Sale Date:**
04/27/2020 3:00pm
**Current Sale Date:**
08/17/2020 3:00pm
**Sale Status:**
Postponed due to Beneficiaries Request
**Notice of Sale Amount:**
$0.00
**Opening Bid Amount:**
$0.00
**Sold Amount:**
$0.00
**Property County:**
Orange
**Property Address:**
 4476 Alderport Huntington Beach, Ca 92649
**State:**
California
**County:**
Orange
**City:**
Huntington Beach
**Sale Location:**
ON THE FRONT STEPS TO THE ENTRANCE OF THE ORANGE CIVIC CENTER, 300 E. CHAPMAN AVENUE, ORANGE, CA 92866
**Zip Code:**
92649

Very truly yours,

MARK A. MELLOR, ESQ.
THE MELLOR LAW FIRM
6800 Indiana Avenue
Suite 220
Riverside, CA  92506
951-222-2100 tel.
951-222-2122 fax
www.mellorlawfirm.com

IRS Circular 230 Disclosure:  Pursuant to Internal Revenue Service Circular 230, only formal opinions satisfying specific requirements may be relied on for the purpose of avoiding certain penalties under the Internal Revenue Code.  Any tax advice contained in this communication (including attachments) does not constitute a formal opinion satisfying such requirements.  Accordingly, we must advise you that any such tax advice was not intended or written to be used, and cannot be used, by you or any other person as such an opinion for the purpose of (i) avoiding penalties imposed under the Internal Revenue Code or (ii) promoting, marketing or recommending to another party any matters addressed herein.

This message and any attached documents contain information from THE MELLOR LAW FIRM, APLC that may be privileged and confidential and protected from disclosure.  If the reader of this message is not the intended recipient, or an employee or agent responsible for delivering this message to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited.  If you have received this communication in error, please notify us immediately by replying to the message and deleting it from your computer.  Thank you.

 Please consider the environment before printing this e-mail.

From: Randy Nickel <r.nickelproperties@yahoo.com>
Sent: Sunday, April 19, 2020 11:53 AM
To: Mark Mellor <mmellor@mellorlawfirm.com>
Cc: Judy Taylor <jtaylor@mellorlawfirm.com>
Subject: 4476 Alderport HB

Mark :
Are there any up dates with my property in HB ?
A group of people came by and wanted to view my property there today .
Wesley ( my Son-in-Law ) tried to ask them why they were coming by to check my place out , and they just scattered and walk out to their cars and left .
Needless to say ...my Daughter is STRESSED-OUT !!
You can call me today PLEASE and let me know if this property is still on the Auction Block .
Thank You
Randy Nickel
714.882.0591

**EXHIBIT "M"**

Nationwide Reconveyance, LLC
5677 Oberlin Drive, Suite 210
San Diego, California 92121
844-252-6972

## NOTICE TO BORROWER OF POSTPONEMENT OF TRUSTEE'S SALE

Re:    T.S. Number:        NR-51545-CA
       Property Address:   4476 Alderport
                           Huntington Beach, CA 92649

You are hereby notified that the above-referenced Trustee's Sale previously scheduled for
8/17/2020 at 3:00 PM has been postponed to 10/5/2020 at 3:00 PM at the place originally set
forth in the Notice of Trustee's Sale.

**YOU MAY NOT RECEIVE WRITTEN NOTICE OF POSTPONEMENT EACH TIME
THE TRUSTEE'S SALE IS POSTPONED. TO PROTECT YOUR INTEREST IN THE
PROPERTY, IT IS IMPORTANT THAT YOU MONITOR ALL POSTPONEMENTS OF
THE TRUSTEE'S SALE.** You may monitor trustee's sale postponements by attending the
scheduled trustee's sale at the place in the notice of trustee's sale and at the date and time in the
most recent public declaration of postponement. While a public declaration at the time set for
trustee's sale is the official method for postponing a trustee's sale, you can also obtain
information about further trustee's sale postponements by calling (714) 986-9342 or through the
following website: www.superiordefault.com and by accepting the terms and conditions for that
resource. **UNLESS YOU TAKE ACTION TO PROTECT YOUR PROPERTY, IT MAY
BE SOLD AT A PUBLIC SALE WITHOUT FURTHER NOTICE.**

Nationwide Reconveyance, LLC, as authorized agent of the beneficiary

Rhonda Rorie
Trustee

**EXHIBIT "N"**

**The Huntington Beach Gables
Homeowners Association**

| Invoice Date | Invoice # | **INVOICE** |
|---|---|---|
| 8/21/2020 | 1069 | |

5267 WarnerAve., #263
Huntington Beach, CA 92649

**Property:**

4476 Alderport

**Bill To:**

Jamie Gallian
4476 Alderport
Huntington Beach, CA 92649

**PLEASE PAY
THIS AMOUNT** ▶▶▶▶ **$412,958.11**

☐ Please check box if address is incorrect or has changed, and indicate change(s) on reverse side.

| Make checks payable to: | The Huntington Beach Gables Homeowners Assoc. 5267 Warner Ave., #263 Huntington Beach, CA 92649 |
|---|---|

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

The Huntington Beach Gables
Homeowners Association

**PLEASE DETACH AND RETURN TOP PORTION WITH PAYMENT**

5267 WarnerAve., #263
Huntington Beach, CA 92649

| Due Date | Account # |
|---|---|
| 9/1/2020 | 22034 |

| Transaction | Amount | Amount |
|---|---|---|
| September Assessment | 350.00 | 350.00 |
| | | |

| | | |
|---|---|---|
| Correspondence or questions should be emailed to the Association at thehbgableshoa@gmail.com. A Board member will respond accordingly. | **Total of the Current Month** | $350.00 |
| | **Total Balance Due Or Credit Balance (-)** | $412,958.11 |

**MARK A. MELLOR, ESQ. (State Bar No. 164304)**
**THE MELLOR LAW FIRM**
6800 Indiana Avenue, Suite 220
Riverside, California  92506-4269
Telephone: (951) 222-2100
Facsimile:   (951) 222-2122
www.MellorLawFirm.com

Attorney for Plaintiff, RANDALL L. NICKEL

SUPERIOR COURT OF THE STATE OF CALIFORNIA

IN AND FOR THE COUNTY OF ORANGE, CENTRAL JUSTICE CENTER

| | |
|---|---|
| RANDALL L. NICKEL, an individual | CASE NO. |
| Plaintiffs, | CERTIFICATE REGARDING ALTERNATIVE DISPUTE RESOLUTION |
| vs. | *[Civ. Code § 5950(a)(3)]* |
| THE HUNTINGTON BEACH GABLES HOMEOWNERS ASSOCIATION, a California Corporation; JANINE BARBARA JASSO, individually and as Board member and Vice-President, of the Huntington Beach Gables Homeowners Association; LEE S. GRAGNANO, individually and as Board member and President, of the Huntington Beach Gables Homeowners Association; THEODORE R. "TED" PHILLIPS, individually and as Board member of the Huntington Beach Gables Homeowners Association; LINDA JEAN "LINDY" BECK, individually and as Board member of the Huntington Beach Gables Homeowners Association; JENNIFER ANN PAULIN, individually and as Board member of the Huntington Beach Gables Homeowners Association; LORI ANN BURRETT, individually and as Board member of the Huntington Beach Gables Homeowners Association; RANCHO BERNARDO CONDOMINIUM MANAGEMENT dba ELITE COMMUNITY MANAGEMENT, a California Corporation; | |

THE MELLOR LAW FIRM
6800 INDIANA AVE., STE 220
RIVERSIDE, CA 92506
TEL. (951) 222-2100
FAX. (951) 222-2122
www.Mellorlawfirm.com

1

CERTIFICATE REGARDING ALTERNATIVE DISPUTE RESOLUTION
JASSO DECL. PAGE - 0780

NATIONWIDE RECONVEYANCE, LLC, a
California Limited Liability Company;
SUPERIOR DEFAULT SERVICES INC., a
California Corporation; and DOES 1 through
100, inclusive,

     Defendants.

I, RANDALL L. NICKEL, declare as follows:

1.    I am the plaintiff in this action and the owner of the Real Property located at 4476
Alderport, Huntington Beach, CA 92649, more particularly described as  APN #937-630-53;
LOT:1 SUBD: The Gables TR#:10542 TR 10542 LOT 1 Unit 53 of Project Located on AP 178-
771-03 Together with an UND 1/80 INT  in Lots 1 & 2, (hereinafter referred to as "SUBJECT
PROPERTY") which is part of THE HUNTINGTON BEACH GABLES HOMEOWNERS
ASSOCIATION.

2.    Preliminary, temporary, and permanent injunctive relief is necessary to protect my
rights with respect to the SUBJECT PROPERTY.

Dated:  September 30, 2020       PLAINTIFF

By: RANDALL L. NICKEL

THE MELLOR LAW FIRM
6800 INDIANA AVE., STE 220
RIVERSIDE, CA 92506
TEL: (951) 222-2100
FAX: (951) 222-2122
www.Mellorlawfirm.com

2

CERTIFICATE REGARDING ALTERNATIVE DISPUTE RESOLUTION
JASSO DECL. PAGE - 0781

## PROOF OF SERVICE

I, JUDY TAYLOR, declare as follows:

I am over eighteen years of age and not a party to the within action; my business address is 6800 Indiana Avenue, Suite 220, Riverside, California 92506. I am employed in Riverside County, California. I am readily familiar with my employer's practices for collection and processing of correspondence for mailing with the United States Postal Service.

On **July 23, 2021**, I served a copy of the following document(s) entitled: **SECOND AMENDED VERIFIED COMPLAINT**, as follows:

☐    **BY REGULAR MAIL.** I followed ordinary business practices and placed for collection and mailing at 6800 Indiana Avenue, Suite 220, Riverside, California 92506, a true copy of the above-entitled document(s), enclosed in a sealed envelope, with first class postage fully prepaid, for delivery with the U.S. Postal Service to all interested parties on the attached service list.

☐    **BY CERTIFIED MAIL, RETURN RECEIPT REQUESTED.** I followed ordinary business practices and placed for collection and mailing at 6800 Indiana Avenue, Suite 220, Riverside, California 92506, a true copy of the above-entitled document(s), enclosed in a sealed envelope, with postage fully prepaid, for delivery by certified mail, return receipt requested, first-class, with the U.S. Postal Service to all interested parties on the attached service list.

☐    **BY FAX TRANSMISSION.** Based on an agreement of the parties to accept service by fax transmission, I faxed the above-entitled document(s) on all interested parties on the attached service list. The facsimile machine I used complied with California Rules of Court and no error was reported by the fax machine I used. The fax machine printed a transmission record of the transmission, a copy of which is attached to this declaration.

☒    **BY ELECTRONIC SERVICE.** Based on a court order or an agreement of the parties to accept electronic service, I caused the above-entitled document(s) to be sent to all interested parties at the electronic service addresses on the attached service list.

☐    **BY OVERNIGHT DELIVERY:** I caused the above-entitled document(s) to be delivered overnight via an overnight carrier and addressed to all interested parties on the attached service list, I placed the envelope or package for collection and overnight delivery at an office or a regularly utilized drop box of the overnight delivery carrier, with delivery fee(s) fully prepaid.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct and that this declaration was executed on **July 23, 2021**, at Riverside, California.

_____
JUDY TAYLOR

THE MELLOR LAW FIRM
6800 INDIANA AVE , STE 220
RIVERSIDE, CA 92506
TEL: (951) 222-2100
FAX: (951) 222-2123
www.Mellorlawfirm.com

47

SECOND AMENDED VERIFIED COMPLAINT
JASSO DECL. PAGE - 0782

## MAILING LIST

| VIA E-SERVICE ONLY | VIA E-SERVICE ONLY |
|---|---|
| Mr. Stanley Feldsott, Esq.<br>**FELDSOTT & LEE**<br>23161 Mill Creek Drive, Suite 300<br>Laguna Hills, CA 92653<br><br>☏: Work: 949-729-8002<br>☏: Cell: 949-230-1053<br>☏: Fax:<br>E-Mail: feldsott@gmail.com<br>Assistant: Ruth Smith: Rsmith@cahoalaw.com<br><br>Attorney for Defendants, *HUNTINGTON BEACH GABLES HOMEOWNERS ASSOCIATION, JANINE BARBARA JASSO, LEE S. GRAGNANO, THEODORE R. "TED" PHILLIPS, LINDA JEAN "LINDY" BECK, JENNIFER ANN PAULIN, LORI ANN BURRETT, NATIONWIDE RECONVEYANCE, LLC, and SUPERIOR DEFAULT SERVICES INC.* | Audette Paul Morales, Esq. Partner<br>Christine Barker, Esq.<br>Jeffrey Tsair, Esq.<br>**GORDON REES SCULLY MANSUKHANI**<br>5 Park Plaza, Suite 1100<br>Irvine, CA 92614<br><br>☏: Direct: 949-255-6967<br>☏: Fax: 949-474-2060<br>E-Mail: amorales@grsm.com;<br>cbarker@grsm.com; jtsair@grsm.com;<br><br>Attorney for Defendant, *RANCHO BERNARDO CONDOMINIUM MANAGEMENT dba ELITE COMMUNITY MANAGEMENT* |
| *COURTESY COPY ONLY*<br><br>Jamie L. Gallian<br>16222 Monterey Lane, #376<br>Huntington Beach, CA 92649<br><br>☏: 714-321-3449<br>E-Mail: jamiegallian@gmail.com<br><br>Cross Defendant, *Pro Per* | |

THE MELLOR LAW FIRM
6800 INDIANA AVE., STE 220
RIVERSIDE, CA 92506
TEL: (951) 222-2100
FAX: (951) 222-2122
www.Mellorlawfirm.com

48

SECOND AMENDED VERIFIED COMPLAINT

# EXHIBIT 18

# Orange County

Name: NICKEL RANDALL L Allow Partial match: True Party Type: All

| Document Number | Grantor | Grantee | Grantor/Grantee | Document Type | Recording Date | Number of Pages |
|---|---|---|---|---|---|---|
| 19880469803 | O HARA RICHARD H | NICKEL RANDALL LEE | | GRANT DEED | 09/19/1988 | 2 |
| 19880469804 | NICKEL RANDALL LEE | S W MTG INC BFC | | TRUST DEED | 09/19/1988 | 9 |
| 19880469804 | NICKEL RANDALL LEE | SW MTG INC BFC | | TRUST DEED | 09/19/1988 | 9 |
| 19890188733 | S W MTG INC | TRAVELERS MTG SERVICES INC | NICKEL RANDALL LEE | ASGT TRUST DEED | 04/11/1989 | 2 |
| 19890188733 | SW MTG INC | TRAVELERS MTG SERVICES INC | NICKEL RANDALL LEE | ASGT TRUST DEED | 04/11/1989 | 2 |
| 19930213889 | NICKEL RANDALL LEE | NICKEL LUCINDA ANN | | GRANT DEED | 04/01/1993 | 3 |
| 19930213889 | NICKEL RANDALL LEE | NICKEL RANDALL LEE | | GRANT DEED | 04/01/1993 | 3 |
| 19930213889 | REED LUCINDA ANN | NICKEL RANDALL LEE | | GRANT DEED | 04/01/1993 | 3 |
| 19930213890 | NICKEL RANDALL LEE & RANDALL L | PACIFIC MTG GROUP INC BFC | | TRUST DEED | 04/01/1993 | 9 |
| 19930213891 | PACIFIC MTG GROUP INC | LOAN AMER FINL CORP | NICKEL RANDALL LEE | ASGT TRUST DEED | 04/01/1993 | 4 |
| 19930242371 | NICKEL RANDALL LEE | | | ABAND HOMESTEAD | 04/13/1993 | 3 |
| 19990704828 | DANIEL SUSAN L | NICKEL RANDALL L | | GRANT DEED | 10/04/1999 | 2 |
| 19990704828 | DAVIS CHRISTOPHER | NICKEL RANDALL L | | GRANT DEED | 10/04/1999 | 2 |

| Document Number | Grantor | Grantee | Grantor/Grantee | Document Type | Recording Date | Number of Pages |
|---|---|---|---|---|---|---|
| 19990704829 | NICKEL RANDALL L | COLUMBIA MTG CORP BFC | | TRUST DEED | 10/04/1999 | 11 |
| 19990750281 | COLUMBIA MTG CORP | CHASE MANHATTAN MTG CORP | NICKEL RANDALL L | ASGT TRUST DEED | 10/26/1999 | 2 |
| 20000179443 | NICKEL RANDALL L | LIPE LAYLA A | | GRANT DEED | 04/07/2000 | 5 |
| 20000232566 | MULLANE CINDI J | NICKEL RANDALL LEE | | GRANT DEED | 05/04/2000 | 2 |
| 20000232566 | MULLANE GEORGE F | NICKEL RANDALL LEE | | GRANT DEED | 05/04/2000 | 2 |
| 20000232567 | NICKEL RANDALL LEE | COLUMBIA MTG CORP BFC | | TRUST DEED | 05/04/2000 | 9 |
| 20000232734 | | NICKEL RANDALL L | | RECONVEYANCE | 05/04/2000 | 2 |
| 20000252717 | NICKEL RANDALL LEE | HUSE GORDON S | | GRANT DEED | 05/12/2000 | 5 |
| 20000319222 | | NICKEL RANDALL LEE | | RECONVEYANCE | 06/16/2000 | 1 |
| 20000345043 | COLUMBIA MTG CORP | CHASE MANHATTAN MTG CORP | NICKEL RANDALL LEE | ASGT TRUST DEED | 06/30/2000 | 2 |
| 20000450936 | FIDELITY NATL T I CO BY AGT | NICKEL RANDALL L | | RELEASE | 08/29/2000 | 1 |
| 2002000453695 | NICKEL RANDALL LEE | GREENLIGHT FINL SERV | | TRUST DEED | 05/30/2002 | 12 |
| 2002000453695 | NICKEL RANDALL LEE | MORTGAGE ELEC REGISTR SYSTEMS | | TRUST DEED | 05/30/2002 | 12 |
| 2002000510894 | | NICKEL RANDALL LEE | | RECONVEYANCE | 06/18/2002 | 2 |
| 2002001166896 | GREENLIGHT FINL SERV | WELLS FARGO HOME MTG INC | NICKEL RANDALL LEE | ASGT TRUST DEED | 12/20/2002 | 1 |
| 2003000658267 | NICKEL RANDALL LEE | GREENLIGHT FINL SERV | | TRUST DEED | 06/06/2003 | 12 |

| Document Number | Grantor | Grantee | Grantor/Grantee | Document Type | Recording Date | Number of Pages |
|---|---|---|---|---|---|---|
| 2003000658267 | NICKEL RANDALL LEE | MORTGAGE ELEC REGISTR SYSTEMS | | TRUST DEED | 06/06/2003 | 12 |
| 2003000806779 | | NICKEL RANDALL LEE | | RECONVEYANCE | 07/10/2003 | 1 |
| 2006000311751 | NICKEL RANDALL L | PLACER SIERRA BK BFC | | TRUST DEED | 05/09/2006 | 10 |
| 2015000579188 | | NICKEL RANDALL LEE | | RECONVEYANCE | 11/09/2015 | 1 |
| 2016000143010 | NICKEL RANDALL LEE TR | | | AFFIDAVIT | 04/04/2016 | 3 |
| 2016000143011 | NICKEL RANDALL LEE TR | NICKEL PHILIP A | | QUITCLAIM DEED | 04/04/2016 | 2 |
| 2016000290689 | | NICKEL RANDALL L | | RECONVEYANCE | 06/27/2016 | 1 |
| 2016000632318 | NICKEL RANDALL LEE TR | ORANGE COUNTY TREASURER-TAX | | DELINQUENT CTF | 12/13/2016 | 1 |
| 2016000632319 | NICKEL RANDALL LEE TR | ORANGE COUNTY TREASURER-TAX | | DELINQUENT CTF | 12/13/2016 | 1 |
| 2016000632320 | NICKEL RANDALL LEE TR | ORANGE COUNTY TREASURER-TAX | | DELINQUENT CTF | 12/13/2016 | 1 |
| 2017000498820 | NICKEL LUCINDA ANN | NICKEL RANDALL LEE | | GRANT DEED | 11/17/2017 | 2 |
| 2017000498820 | NICKEL RANDALL LEE | NICKEL RANDALL LEE | | GRANT DEED | 11/17/2017 | 2 |
| 2018000266910 | NICKEL RANDALL LEE | HAYNES ALLARIA L | | GRANT DEED | 07/20/2018 | 1 |
| 2018000395579 | GALLIAN JAMIE L | NICKEL RANDALL L | | ASGT SUBLEASE | 10/31/2018 | 5 |

Recorded in Official Records, County of San Bernardino

4/11/2019
1:15 PM
GA
SAN

RECORDING REQUESTED BY
RANdy Nickel

AND WHEN RECORDED MAIL DOCUMENT TO:

NAME RANdy Nickel

STREET ADDRESS 11619 Inwood dr

CITY, STATE & ZIP CODE Riverside Ca
92503

**BOB DUTTON**
ASSESSOR – RECORDER – CLERK

**P Counter**

Doc# 2019–0113353

| Titles | 1 | Pages | 3 |
|--------|---|-------|---|
| Fees | | | 20.00 |
| Taxes | | | 0.00 |
| CA SB2 Fee | | | 0.00 |
| Others | | | 0.00 |
| Paid | | | $20.00 |

SPACE ABOVE FOR RECORDER'S USE ONLY

Grant Deed
**Title of Document**

Pursuant to Senate Bill 2 – Building Homes and Jobs Act (GC Code Section 27388.1), effective January 1, 2018, a fee of seventy-five dollars ($75.00) shall be paid at the time of recording of every real estate instrument, paper, or notice required or permitted by law to be recorded, except those expressly exempted from payment of recording fees, per each single transaction per parcel of real property. The fee imposed by this section shall not exceed two hundred twenty-five dollars ($225.00).

**Reason for Exemption:**

☐ Exempt from fee per GC 27388.1, recorded in connection with a transfer subject to the imposition of documentary transfer tax (DTT), or

☒ Exempt from fee per GC 27388.1, recorded in connection with a transfer of real property that is a residential dwelling to an owner-occupier, or

☐ Exempt from fee per GC 27388.1, recorded in connection with a transfer that was subject to documentary transfer tax which was paid on document recorded previously on _____ (date) as document number _____ of Official Records. (Cap. $225.00)

☐ Exempt from fee per GC 27388.1, fee cap of $225.00 reached, and/or

☐ Exempt from fee per GC 27388.1, not related to real property

Failure to include an exemption reason will result in the imposition of the $75.00 Building Homes and Jobs Act fee. Fees collected are deposited to the State and may not be available for refund.

**THIS COVER SHEET ADDED TO PROVIDE ADEQUATE SPACE FOR RECORDING INFORMATION**
**($3.00 Additional Recording Fee Applies)**

JASSO DECL. PAGE - 0788

RECORDING REQUESTED BY:

*Andy Nickel*

AND WHEN RECORDED MAIL TO:

R. Nickel Properties, LLC
11619 Inwood Drive
Riverside, CA 92503

THIS SPACE FOR RECORDER'S USE ONLY:

AP#: 2328-166-21-0-000                    **GRANT DEED**

THE UNDERSIGNED GRANTOR(S) DECLARE(S)
                 **DOCUMENTARY TRANSFER TAX is $NONE**
[X] computed on full value of property conveyed, or
[ ] computed on full value less value of liens or encumbrances remaining at time of sale.
[X] Unincorporated area    [ ]          Big Bear Lake **AND**
"This conveyance establishes sole and separate property of a spouse, R & T 11911."
**This Conveyance is a bonafide gift and the Grantor received nothing in return. No Tax is due per R & T Code 11911.**
FOR A VALUABLE CONSIDERATION, receipt of which is hereby acknowledged,

**Randy L. Nickel, a Married Man, as his sole and separate property, who acquired title as an unmarried man and June Lovejoy, a married woman, his wife**

hereby GRANT(s) to:

**R. Nickel Properties, LLC, a California Limited Liability Company**

the real property in the _____, County of San Bernardino, State of California, described as:
LEGAL DESCRIPTION ATTACHED HERETO AS EXHIBIT "A" AND MADE A PART HEREOF
**Also Known as**: 41935 Switzerland Drive, Unit 56, Big Bear Lake, CA 92315

Dated March 7, 2019

_____
Randy L. Nickel

_____
June Lovejoy

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

STATE OF CALIFORNIA
COUNTY OF  Orange
On  3/22/2019  before me, Nancy Castaneda  A    Notary    Public
personally appeared Randy L. Nickel  &  June Lovejoy  who proved to me on the
basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and
acknowledged to me that ~~he/she~~/they executed the same in ~~his/her~~/their authorized capacity(ies), and that by ~~his/her~~/their
signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.
I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and
correct.
WITNESS my hand and official seal.

Signature _____

NANCY CASTANEDA
COMM. # 2178393
NOTARY PUBLIC ● CALIFORNIA
ORANGE COUNTY
Comm. Exp. JAN. 31, 2021

MAIL TAX STATEMENTS TO PARTY SHOWN BELOW; IF NO PARTY SHOWN, MAIL AS SHOWN ABOVE:

# EXHIBIT "A"

THE LAND REFERRED TO HEREIN IS SITUATED IN THE COUNTY OF SAN BERNARDINO, STATE OF CALIFORNIA, AND IS DESCRIBED AS FOLLOWS:

LOT 56 , TRACT 8456 IN THE CITY OF BIG BEAR LAKE, COUNTY OF SAN BERNARDINO, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 115 PAGES 69 TO 71 OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY,

TOGETHER WITH AN UNDIVIDED 1/128TH INTEREST IN AND TO LOT 1 OF TRACT 8456, COUNTY OF SAN BERNARDINO, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 115, PAGES 69 TO 71 OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

ASSESSOR'S PARCEL NUMBER: 2328-166-21-0-000

**To Whom It May Concern:**

# Notice is hereby, given pursuant to Government Code Section 12956.1(b)(1):

"If this document contains any restriction based on race, color, religion, sex, gender identity, gender expression, sexual orientation, familial status, marital status, disability, genetic information, national origin, source of income as defined in subdivision (p) of section 12955, ancestry, veteran or military status that restriction violates state and federal fair housing laws and is void, and may be removed pursuant to Section 12956.2 of the Government Code. Lawful restrictions under state and federal law on the age of occupants in senior housing or housing for older persons shall not be construed as restrictions based on familial status."

(Rev. 1/1/2020)

**RECORDING REQUESTED BY**
 Lawyers Title - IE
WHEN RECORDED MAIL THIS DOCUMENT
AND TAX STATEMENTS TO:
 Randy L. Nickel
 11619 Inwood Drive
 Riverside, CA 92503

APN: **2328-166-21-0-000**
Escrow No: **BBL10740-LT179-TT**
Title No: **616674266**

Electronically Recorded in Official Records, County of San Bernardino



**BOB DUTTON**
ASSESSOR - RECORDER - CLERK
867  SPL Title Services

11/21/2016
11:20 AM
CG

Doc #: **2016-0501740**

| | | |
|---|---|---|
| Titles: | 1 | Pages: 4 |
| Fees | | 24.00 |
| Taxes | | 242.00 |
| Other | | .00 |
| PAID | | 266.00 |

Space above this line for Recorder's use

# GRANT DEED

**THE UNDERSIGNED GRANTOR(S) DECLARE(S)**
 DOCUMENTARY TRANSFER TAX IS **$242.00**
  ☒ computed on full value of property conveyed
  ☒ City of Big Bear Lake, California

**FOR A VALUABLE CONSIDERATION**, receipt of which is hereby acknowledged,

**Donald E. Brown and Evelyn Diaz Brown, Trustees of The Donald E. Brown and Evelyn Diaz Brown 2003 Revocable Trust dated February 20, 2003**

hereby GRANT(S) to

**Randy L. Nickel** , an unmarried man

the following described real property in the city of Big Bear Lake, County of San Bernardino, State of CALIFORNIA:

**For legal description of the real property herein, see Exhibit A attached hereto and made a part hereof.**

Commonly known as: 41935 Switzerland Drive Unit 56, Big Bear Lake, CA 92315

Dated: __October 7, 2016__

Donald E. Brown and Evelyn Diaz Brown 2003 Revocable Trust dated February 20, 2003

By: Donald E. Brown, Trustee

By: Evelyn Diaz Brown, Trustee

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

STATE OF CALIFORNIA )
                                          ) SS.
COUNTY OF San Bernardino )

On 10-20-16 before me, Kim Ohlson , Notary Public, personally appeared Donald E Brown and Evelyn Diaz Brown , who proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature

KIM OHLSON
Commission # 2057593
Notary Public - California
San Bernardino County
My Comm. Expires Mar 10, 2018

MAIL TAX STATEMENTS AS DIRECTED ABOVE

## GOVERNMENT CODE 27361.7

I CERTIFY UNDER PENALTY OF PERJURY THAT THIS MATERIAL IS A TRUE COPY OF
THE ORIGINAL MATERIAL CONTAINED IN THE DOCUMENT:

Donald E. Brown and Evelyn Diaz Brown 2003 Revocable Trust
dated February 20, 2003

_____
By: Donald E. Brown, Trustee

_____
By: Evelyn Diaz Brown, Trustee

SPL INC, AS AGENT

DATE: __11_, _21_, _16_

**Place of Execution:  Riverside, CA**

_____
**Signature**
**Jodi L. Groves**

GOVERNMENT CODE 27361.7

I CERTIFY UNDER PENALTY OF PERJURY THAT THE NOTARY SEAL ON
THE DOCUMENT TO WHICH THIS STATEMENT IS ATTACHED READS
AS FOLLOWS:

NAME OF NOTARY: _____ Kim Ohlson _____

COMMISSION NO: _____ 2057593 _____

PLACE OF EXECUTION: _____ San Bernardino _____

DATE COMMISSION EXPIRES: _____ Mar 10, 2018 _____

MANUFACTURER/VENDER NO: _____ UNA1 _____

SIGNATURE: _____  DATE: _____ 11/21/16 _____

File No: 616674266

# EXHIBIT "A"

THE LAND REFERRED TO HEREIN IS SITUATED IN THE COUNTY OF SAN BERNARDINO, STATE OF CALIFORNIA, AND IS DESCRIBED AS FOLLOWS:

LOT 56 , TRACT 8456 IN THE CITY OF BIG BEAR LAKE, COUNTY OF SAN BERNARDINO, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 115 PAGES 69 TO 71 OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY,

TOGETHER WITH AN UNDIVIDED 1/128TH INTEREST IN AND TO LOT 1 OF TRACT 8456, COUNTY OF SAN BERNARDINO, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 115, PAGES 69 TO 71 OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

ASSESSOR'S PARCEL NUMBER: 2328-166-21-0-000

**To Whom It May Concern:**

## Notice is hereby, given pursuant to Government Code Section 12956.1(b)(1):

"If this document contains any restriction based on race, color, religion, sex, gender identity, gender expression, sexual orientation, familial status, marital status, disability, genetic information, national origin, source of income as defined in subdivision (p) of section 12955, ancestry, veteran or military status that restriction violates state and federal fair housing laws and is void, and may be removed pursuant to Section 12956.2 of the Government Code. Lawful restrictions under state and federal law on the age of occupants in senior housing or housing for older persons shall not be construed as restrictions based on familial status."

(Rev. 1/1/2020)

RECORDING REQUESTED BY:
**Stewart Title of California, Inc.**

WHEN RECORDED MAIL TO:
AND MAIL TAX STATEMENT TO:

Family Trust of Herman Hilkey and Darlene L. Hilkey
23196 Glendora Drive
Grand Terrace, CA 92313

ORDER NO.    857643
APN:    0276-301-48-0-000
TRA:    016001
Property Addr:  23204 Thompson Drive, Grand Terrace,
CA 92313

Electronically
Recorded in Official Records
County of San Bernardino
**Bob Dutton**
**Assessor-Recorder-County Clerk**

## DOC# 2020-0329841

| | | |
|---|---|---|
| 09/03/2020 | Titles: 1   Pages: 4 | |
| 03:54 PM | | |
| SAN | Fees | $23.00 |
| | Taxes | $561.00 |
| C9229 | CA SB2 Fee | 0.00 |
| | Total | $584.00 |

SPACE ABOVE THIS LINE FOR RECORDERS USE

## GRANT DEED

THE UNDERSIGNED GRANTOR(s) DECLARE(s)

DOCUMENTARY TRANSFER TAX is $561.00                    CITY TAX $0.00

☐ Monument Preservation Fee is:  $0
☒ computed on full value of property conveyed, or
☐ computed on full value less value of liens or encumbrances
remaining at time of sale.

Unincorporated area  X  City of Grand Terrace

FOR A VALUABLE CONSIDERATION, receipt of which is hereby acknowledged,

Randall Nickel, Successor Trustee of the Nickel Family Trust Dated March 20, 2008

**hereby GRANT(S) to**

                /as
Herman Hilkey and Darlene L. Hilkey, Trustees of the Family Trust of Herman Hilkey and Darlene L. Hilkey , dated
October 15, 2018

the following described real property in the City of Grand Terrace, County of San Bernardino, State of California:

See Exhibit "A" attached hereto and made a part hereof.


Date:  July 29, 2020


Nickel Family Trust dated March 20, 2008


By: _____
Randall Nickel, Successor Trustee


MAIL TAX STATEMENT AS DIRECTED ABOVE


Order No.:  857643                                                            Page 1 of 3
Grant Deed Sale

A notary public or other officer completing this certificate verifies only the
identity of the individual who signed the document to which this certificate is
attached and not the truthfulness, accuracy, or validity of that document.

State of California Riverside
County of _____

On August 5, 2020 before me Rene Johnson _____, Notary Public personally appeared
Randall Nickel _____, who proved to me on the
basis of satisfactory evidence to be the person(s), whose name(s) is/are subscribed to the within instrument and
acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their
signature(s) on the instrument the person(s) or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and
correct.

WITNESS my hand and official seal.

Signature _____

(seal)



RENE' JOHNSON
COMM. #2182270
NOTARY PUBLIC - CALIFORNIA
RIVERSIDE COUNTY
My Comm. Expires March 4, 2021

Order No.: 857643
Grant Deed Sale

Page 2 of 3

JASSO DECL. PAGE - 0798

# EXHIBIT "A"

## LEGAL DESCRIPTION

Order No.: 857643
Escrow No.: 857643

The land referred to herein is situated in the State of California, County of San Bernardino, City of Grand Terrace and described as follows:

Parcel No. 1:

That portion of the Northeast one-quarter of the Southeast one-quarter of Section 33, Township 1 South, Range 4 West, County of San Bernardino, State of California, according to the official Map thereof.

Commencing at a point on the East line of the Northeast one-quarter of the Southeast one-quarter of Section 33 at a point which is North 0° 01' 30" West along said East line 420 feet from the Southeast corner of said Northeast one-quarter of the Southeast one-quarter;
Thence North 36° 04' 30" West a distance of 347.13 feet along the Southwesterly line of the property conveyed to Richard F. Brown, et ux, by deed recorded November 23, 1964 in Book 6277, Page 894, Official Records to the most Northerly corner of the property conveyed to Thomas E. Litchfield, et ux., by deed recorded February 17, 1964 in Book 6089, Page 25, Official Records; said corner being the true point of beginning;
Thence South 37° 36' 30" West, a distance of 233.27 feet, more or less, to a point in the South line of that certain parcel of land set forth as Parcel No. 4 in the deed from Walter B. Townsend to Blue Mountain Service Company dated May 31, 1959 and recorded June 1, 1959 in Book 4834, Page 358, Official Records and re-recorded June 6, 1959 in Book 4848, Page 593, Official Records;
Thence along the South line of the property conveyed to said Blue Mountain Service Company, North 59° 20' 30" West, 159.75 feet to a point; Thence North 48° 31' 30" East, 130.03 feet to a point;
Thence North 56° 09' East, 63.90 feet to a point;
Thence North 50° 54' 30" East 93.83 feet to the Easterly corner of Lot 5, Tract No. 5773, as per Map recorded in Book 73 of Maps, Pages 34 and 35, records of said county;
Thence South 36° 04' 30" East, 95.92 feet to the true point of beginning.

Except therefrom that portion lying within the following described parcel:

A parcel of land 40 feet wide, the Southerly line of said Parcel Being described as follows:

Commencing at the intersection of the East line of Glendora Drive, as shown on the recorded Map of Tract No. 5773, as per Map recorded in Book 73 of Maps, Pages 34 and 35, records of said county, with the Southwesterly line Lot 5 said tract;
Thence South 20° 13' 00" West 28.45 feet to the true point of beginning;
Thence South 59° 20' 30" East, 373.40 feet;
Thence North 84° 41' 30" East, 192.36 feet to point "A". The Northerly line of said parcel shall terminate on the North in the Southerly line of Lot 5, Tract 5773 and shall terminate on the East in a line drawn North 36° 04' 30" West from point "A", set out hereinabove.

Parcel No. 2:

An easement for ingress and egress over that portion of the Northeast one-quarter of the Southeast one-quarter of Section 33, Township 1 South, Range 4 West, San Bernardino Base and Meridian, described as follows:

Beginning at the intersection of the east line of Glendora Drive, as shown on the recorded map of Tract No. 5773, as per Plat recorded in Book 73 of Maps, Pages 34 and 35, records of said County, with the

Southwesterly line of Lot 5 of said tract; thence South 71° 56' 30" East along the Southerly line of said Lot 5, 61.84 feet to a point which is South 55° 12' 00" West from the most Easterly corner of said Lot 5;
Thence South 59° 20' 30" East to the Southeasterly corner of Parcel No. 1 herein described;
Thence South 48° 31' 30 " West, 41.97 feet to a point in the south line of that certain parcel of land as set forth as Parcel No. 4 in the deed to Blue Mountain Service Company, dated May 31, 1959 and recorded June 1, 1959, in Book 4834, Page 358, Official Records, and rerecorded June 16, 1959, in Book 4848, Page 593, Official Records;
Thence along the South line of said Blue Mountain Service Company property North 59° 20' 30" West to the Easterly line of said Glendora Drive, 28.45 feet to the point of beginning.

Subject to restrictions, reservations, easements, covenants, oil, gas or mineral rights of record, if any.

APN: 0276-301-48-0-000

(End of Legal Description)

**To Whom It May Concern:**

# Notice is hereby, given pursuant to Government Code Section 12956.1(b)(1):

"If this document contains any restriction based on race, color, religion, sex, gender identity, gender expression, sexual orientation, familial status, marital status, disability, genetic information, national origin, source of income as defined in subdivision (p) of section 12955, ancestry, veteran or military status that restriction violates state and federal fair housing laws and is void, and may be removed pursuant to Section 12956.2 of the Government Code. Lawful restrictions under state and federal law on the age of occupants in senior housing or housing for older persons shall not be construed as restrictions based on familial status."

(Rev. 1/1/2020)

# EXHIBIT 19



18565 Jamboree Road, Suite 275
Irvine, CA 92612
(949) 476-5757

## PRELIMINARY REPORT

Update 2

Our Order Number  2930005415-61

Star Commercial Properties

Attention: DAVID PERRY

When Replying Please Contact:

Martin Vique
title.orange@ortc.com
Ph: (949)476-5755
Efax: (949)266-9509
Direct line: (855) 563-3827

Property Address:

4476 Alderport Unit 53, Huntington Beach, CA 92649

In response to the above referenced application for a policy of title insurance, OLD REPUBLIC TITLE COMPANY, as issuing Agent of Old Republic National Title Insurance Company, hereby reports that it is prepared to issue, or cause to be issued, as of the date hereof, a Policy or Policies of Title Insurance describing the land and the estate or interest therein hereinafter set forth, insuring against loss which may be sustained by reason of any defect, lien or encumbrance not shown or referred to as an Exception below or not excluded from coverage pursuant to the printed Schedules, Conditions and Stipulations of said policy forms.

The printed Exceptions and Exclusions from the coverage and Limitations on Covered Risks of said Policy or Policies are set forth in Exhibit I attached. The policy to be issued may contain an arbitration clause. When the Amount of Insurance is less than that set forth in the arbitration clause, all arbitrable matters shall be arbitrated at the option of either the Company or the Insured as the exclusive remedy of the parties. Limitations on Covered Risks applicable to the Homeowner's Policy of Title Insurance which establish a Deductible Amount and a Maximum Dollar Limit of Liability for certain coverages are also set forth in Exhibit I. Copies of the Policy forms should be read. They are available from the office which issued this report.

**Please read the exceptions shown or referred to below and the exceptions and exclusions set forth in Exhibit I of this report carefully. The exceptions and exclusions are meant to provide you with notice of matters which are not covered under the terms of the title insurance policy and should be carefully considered.**
**It is important to note that this preliminary report is not a written representation as to the condition of title and may not list all liens, defects, and encumbrances affecting title to the land.**

This report (and any supplements or amendments hereto) is issued solely for the purpose of facilitating the issuance of a policy of title insurance and no liability is assumed hereby. If it is desired that liability be assumed prior to the issuance of a policy of title insurance, a Binder or Commitment should be requested.

Dated as of  October 16, 2018, at 7:30 AM

**OLD REPUBLIC TITLE COMPANY**
For Exceptions Shown or Referred to, See Attached

JASSO DECL. PAGE - 0803

ORT 3158-A (Rev. 08/07/08)

**OLD REPUBLIC TITLE COMPANY**
**ORDER NO.**  2930005415-61
Update 2

The form of policy of title insurance contemplated by this report is:

Homeowner's Policy of Title Insurance - 2013; and ALTA Loan Policy - 2006.  A specific
request should be made if another form or additional coverage is desired.

The estate or interest in the land hereinafter described or referred or covered by this Report is:

A CONDOMINIUM, AS DEFINED IN SECTION 783 OF THE CALIFORNIA CIVIL CODE, FOR A
TERM OF YEARS AS SET FORTH IN THAT CERTAIN CONDOMINIUM SUBLEASE RECORDED
NOVEMBER 7, 1980 AS FILE NO. 8696, IN BOOK 13824 PAGE 1294, OFFICIAL RECORDS,
UPON AND SUBJECT TO ALL THE PROVISIONS THEREIN CONTAINED AND AS MODIFIED
THEREOF RECORDED AUGUST 28, 2003 AS INSTRUMENT NO. 03-1044770, OFFICIAL
RECORDS.

Title to said estate or interest at the date hereof is vested in:

JAMIE L. GALLIAN, A SINGLE WOMAN

The land referred to in this Report is situated in the County of Orange, City of Huntington Beach, State of California, and is
described as follows:

PARCEL 1:

UNIT 53, IN THE CITY OF HUNTINGTON BEACH, COUNTY OF ORANGE, STATE OF CALIFORNIA, AS SHOWN
AND DEFINED ON THAT CERTAIN CONDOMINIUM PLAN {"THE CONDOMINIUM PLAN"), RECORDED OCTOBER
18, 1979 IN BOOK 13358 PAGE 1193, ET SEQ., OFFICIAL RECORDS.

EXCEPT THEREFROM ALL OIL, GAS, MINERALS AND OTHE HYDROCARBON SUBSTANCES LYING BELOW A
DEPTH OF 500 FEET WITHOUT ANY RIGHT TO ENTER UPON THE SURFACE OR THE SUBSURFACE OF SAID
LAND ABOVE A DEPTH OF 500 FEET, AS PROVIDED IN INSTRUMENTS OF RECORD.

PARCEL 2:

AN UNDIVIDED 1/80TH INTEREST IN AND TO LOTS 1 AND 2 OF TRACT NO. 10542, IN THE CITY OF
HUNTINGTON BEACH, COUNTY OF ORANGE, STATE OF CALIFORNIA, AS SHOWN ON A MAP RECORDED IN
BOOK 456 PAGES 49 AND 50 OF MISCELLANEOUS MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF
SAID COUNTY TOGETHER WITH THOSE PORTIONS OF THE COMMON AREA AS SHOWN AND DEFINED ON
THE CONDOMINIUM PLAN, CONSISTING OF BUILDINGS AND OTHER IMPROVEMENTS.

EXCEPTING THEREFROM CONDOMINIUM UNITS 1 THROUGH 80 INCLUSIVE, LOCATED THEREON.

PARCEL 3:

AN EXCLUSIVE EASEMENT FOR THE USE AND OCCUPANCY OF THOSE PORTIONS OF RESTRICTED COMMON
AREA AS DEFINED ON THE CONDOMINIUM PLAN FOR ENTRY AND STAIRCASES AND ATTIC SPACE RELATING
TO SAID UNIT.

PARCEL 4:

ORT 3158-B

OLD REPUBLIC TITLE COMPANY
**ORDER NO.** 2930005415-61
Update 2

NON-EXCLUSIVE EASEMENT AND RIGHT TO USE THOSE PORTIONS OF THE COMMON AREA AS DEFINED ON THE CONDOMINIUM PLAN, EXCEPT RESTRICTED COMMON AREA.

APN: 937-630-53

At the date hereof exceptions to coverage in addition to the Exceptions and Exclusions in said policy form would be as follows:

1.      Taxes and assessments, general and special, for the fiscal year 2019 - 2020, a lien, but not yet due or payable.

2.      Taxes and assessments, general and special, for the fiscal year 2018 - 2019, as follows:

| | | | |
|---|---|---|---|
| Assessor's Parcel No | : | 937-630-53 | |
| Code No. | : | 04-007 | |
| 1st Installment | : | $1,888.50 | NOT Marked Paid |
| 2nd Installment | : | $1,888.50 | NOT Marked Paid |
| Land Value | : | $197,735.00 | |
| Imp. Value | : | $121,658.00 | |

3.      The lien of supplemental taxes, if any, assessed pursuant to the provisions of Section 75, et seq., of the Revenue and Taxation Code of the State of California.

4.      Water rights, claims or title to water, whether or not shown by the public records.

5.      Matters in various instruments of record which contain among other things easements and rights of way in, on, over and under the common area for the purpose of constructing, erecting, operating or maintaining thereon or thereunder overhead or underground lines, cables, wires, conduits, or other devices for electricity, telephone, storm water drains and pipes, water systems, sprinkling systems, water, heating and gas lines or pipes, and similar public or quasi-public improvements or facilities. also the right of use and enjoyment in and to and throughout the common area as well as the non-exclusive easements and rights for ingress, egress to the owner herein described.

Reference is hereby being made to various documents and maps of record for full and further particulars.

Affects the common area.

ORT 3158-B

**OLD REPUBLIC TITLE COMPANY**
ORDER NO.  2930005415-61
Update 2

6.      The fact that the ownership of said land does not include rights of access to or from the street or highway abutting said land, such rights having been relinquished by the map of said tract.

Affects: Edinger avenue abutting common areas

Said land however, abuts upon a public thoroughfare other than the road referred to above, over which rights of vehicular ingress and egress have not been relinquished.

7.      Matters in an instrument that, among other things, contain or provide for easements, assessments, liens and their subordination; provisions relating to partition, restrictions on severability of component interest, covenants, conditions and restrictions, which provide that no violation thereof and no enforcement of any lien provided for therein shall defeat or render invalid the lien of a mortgage or deed of trust made in good faith and for value, but omitting any covenants or restrictions if any, based upon race, color, religion, sex, handicap, familial status, or national origin unless and only to the extent that said covenant (a) is exempt under Title 42, Section 3607 of the United States Code or (b) relates to handicap but does not discriminate against handicapped persons.

Recorded           :     May 28, 1980 in Book 13618 of Official Records, Page 982

Modification thereof, but omitting any covenants or restrictions if any, based upon race, color, religion, sex, handicap, familial status, or national origin unless and only to the extent that said covenant (a) is exempt under Title 42, Section 3607 of the United States Code or (b) relates to handicap but does not discriminate against handicapped persons.

Recorded           :     August 5, 1980 in Book 13690 of Official Records, Page 1091

8.      A lease affecting the premises herein described, executed by and between the parties herein named, with certain terms, covenants, conditions and provisions set forth therein.

lessor:        Houser Bros, Co., a Limited Partnership
lessee:        Robert P. Warrington
recorded:     October 24, 1980 in book 13803, page 640, official records

The present ownership of the leasehold created by said lease and other matters affecting the interest of the lessee are not shown herein.

9.      We find no open Deeds of Trust of record.  Please verify by inquiry of Escrow Personnel and/or Agents whether or not we have overlooked something and advise the Title Department accordingly prior to closing.

ORT 3158-B

Case 8:21-ap-01096-SC    Doc 90-2    Filed 12/30/22    Entered 12/30/22 15:22:08    Desc

OLD REPUBLIC TITLE COMPANY
ORDER NO.  2930005415-61
Update 2

10.    Abstract of Judgment for the amount herein stated and any other amounts due.

| | | |
|---|---|---|
| Creditor | : | TD Bank |
| Debtor | : | Jamie L. Gallian |
| Entered | : | October 4, 2016 |
| Court | : | Superior Court of California County of Orange |
| Case No. | : | 30-2013-00863489-CL-CL-CJC |
| Amount | : | $2,179.25 |
| Dated | : | February 10, 2017 |
| Recorded | : | March 9, 2017 in Official Records as Instrument Number 2017-00096952 |

11.    Abstract of Judgment for the amount herein stated and any other amounts due.

| | | |
|---|---|---|
| Creditor | : | Capital One Bank |
| Debtor | : | Jamie L. Gallian |
| Entered | : | August 15, 2017 |
| Court | : | Superior Court of California County of Orange |
| Case No. | : | 30-2017-00925831-CL-CL-CJC |
| Amount | : | $4,332.92 |
| Dated | : | August 17, 2017 |
| Recorded | : | September 6, 2017 in Official Records as Instrument Number 2017-000378355 |

12.    The requirement that this Company be provided with an opportunity to inspect the land. The Company reserves the right to make additional exceptions and/or requirements upon completion of its inspection.

13.    The Homeowner's Policy applies only if each insured named in Schedule A is a Natural Person (as Natural Person is defined in said policy). If each insured to be named in Schedule A is not such a Natural Person, contact the Title Department immediately.

14.    The effect of instruments, proceedings, liens, decrees or other matters which do not specifically describe said land but which, if any do exist, may affect the title or impose liens or encumbrances thereon. The name search necessary to ascertain the existence of such matters has not been completed and, in order to do so, we require a signed Statement of Identity from or on behalf of Jamie L. Gallian.

ORT 3158-B

**OLD REPUBLIC TITLE COMPANY**
**ORDER NO.**  2930005415-61
Update 2

-------------------- **Informational Notes** -------------------

A.     The applicable rate(s) for the policy(s) being offered by this report or commitment appears
to be section(s) 1.1 and 2.1.


B.     The above numbered report (including any supplements or amendments thereto) is hereby
modified and/or supplemented to reflect the following additional items relating to the
issuance of an American Land Title Association loan form policy:

NONE

NOTE: Our investigation has been completed and there is located on said land a
condominium known as 4476 Alderport Unit 53, Huntington Beach, CA 92649.

The ALTA loan policy, when issued, will contain the CLTA 100 Endorsement and 116 series
Endorsement.

Unless shown elsewhere in the body of this report, there appear of record no transfers or
agreements to transfer the land described herein within the last three years prior to the date
hereof, except as follows:

NONE


C.     All transactions that close on or after March 1, 2015 will include a $20.00 minimum recording
service fee, plus actual charges required by the County Recorder.

ORT 3158-B

Exhibit I

**CLTA HOMEOWNER'S POLICY OF TITLE INSURANCE (12/02/13)**
**ALTA HOMEOWNER'S POLICY OF TITLE INSURANCE**
**EXCLUSIONS**

In addition to the Exceptions in Schedule B, You are not insured against loss, costs, attorneys' fees, and expenses resulting from:

1.  Governmental police power, and the existence or violation of those portions of any law or government regulation concerning:

    a.  building;
    b.  zoning;
    c.  land use;
    d.  improvements on the Land;
    e.  land division; and
    f.  environmental protection.

    This Exclusion does not limit the coverage described in Covered Risk 8.a., 14, 15, 16, 18, 19, 20, 23 or 27.

2.  The failure of Your existing structures, or any part of them, to be constructed in accordance with applicable building codes.  This Exclusion does not limit the coverage described in Covered Risk 14 or 15.

3.  The right to take the Land by condemning it. This Exclusion does not limit the coverage described in Covered Risk 17.

4.  Risks:

    a.  that are created, allowed, or agreed to by You, whether or not they are recorded in the Public Records;
    b.  that are Known to You at the Policy Date, but not to Us, unless they are recorded in the Public Records at the Policy Date;
    c.  that result in no loss to You; or
    d.  that first occur after the Policy Date - this does not limit the coverage described in Covered Risk 7, 8.e., 25, 26, 27 or 28.

5.  Failure to pay value for Your Title.

6.  Lack of a right:

    a.  to any land outside the area specifically described and referred to in paragraph 3 of Schedule A; and
    b.  in streets, alleys, or waterways that touch the Land.

    This Exclusion does not limit the coverage described in Covered Risk 11 or 21.

7.  The transfer of the Title to You is invalid as a preferential transfer or as a fraudulent transfer or conveyance under federal bankruptcy, state insolvency, or similar creditors' rights laws.

8.  Contamination, explosion, fire, flooding, vibration, fracturing, earthquake or subsidence.

9.  Negligence by a person or an Entity exercising a right to extract or develop minerals, water, or any other substances.

**LIMITATIONS ON COVERED RISKS**

Your insurance for the following Covered Risks is limited on the Owner's Coverage Statement as follows:

For Covered Risk 16, 18, 19, and 21 Your Deductible Amount and Our Maximum Dollar Limit of Liability shown in Schedule A.

The deductible amounts and maximum dollar limits shown on Schedule A are as follows:

|  | Your Deductible Amount | Our Maximum Dollar Limit of Liability |
|---|---|---|
| Covered Risk 16: | 1.00% of Policy Amount or $5,000.00 (whichever is less) | $25,000.00 |
| Covered Risk 18: | 1.00% of Policy Amount or $5,000.00 (whichever is less) | $25,000.00 |
| Covered Risk 19: | 1.00% of Policy Amount or $5,000.00 (whichever is less) | $25,000.00 |
| Covered Risk 21: | 1.00% of Policy Amount or $5,000.00 (whichever is less) | $25,000.00 |

Exhibit I

**AMERICAN LAND TITLE ASSOCIATION**
**LOAN POLICY OF TITLE INSURANCE - 2006**
**EXCLUSIONS FROM COVERAGE**

The following matters are expressly excluded from the coverage of this policy, and the Company will not pay loss or damage, costs, attorneys' fees, or expenses that arise by reason of:

1.  (a)  Any law, ordinance, permit, or governmental regulation (including those relating to building and zoning) restricting, regulating, prohibiting, or relating to
    (i)    the occupancy, use, or enjoyment of the Land;
    (ii)   the character, dimensions, or location of any improvement erected on the Land;
    (iii)  the subdivision of land; or
    (iv)   environmental protection; or the effect of any violation of these laws, ordinances, or governmental regulations. This Exclusion 1(a) does not modify or limit the coverage provided under Covered Risk 5.
    (b)  Any governmental police power.  This Exclusion 1(b) does not modify or limit the coverage provided under Covered Risk 6.

2.  Rights of eminent domain.  This Exclusion does not modify or limit the coverage provided under Covered Risk 7 or 8.

3.  Defects, liens, encumbrances, adverse claims, or other matters
    (a)  created, suffered, assumed, or agreed to by the Insured Claimant;
    (b)  not Known to the Company, not recorded in the Public Records at Date of Policy, but Known to the Insured Claimant and not disclosed in writing to the Company by the Insured Claimant prior to the date the Insured Claimant became an Insured under this policy;
    (c)  resulting in no loss or damage to the Insured Claimant;
    (d)  attaching or created subsequent to Date of Policy (however, this does not modify or limit the coverage provided under Covered Risk 11, 13, or 14); or
    (e)  resulting in loss or damage that would not have been sustained if the Insured Claimant had paid value for the Insured Mortgage.

4.  Unenforceability of the lien of the Insured Mortgage because of the inability or failure of an Insured to comply with applicable doing-business laws of the state where the Land is situated.

5.  Invalidity or unenforceability in whole or in part of the lien of the Insured Mortgage that arises out of the transaction evidenced by the Insured Mortgage and is based upon usury or any consumer credit protection or truth-in-lending law.

6.  Any claim, by reason of the operation of federal bankruptcy, state insolvency, or similar creditors' rights laws, that the transaction creating the lien of the Insured Mortgage, is
    (a)  a fraudulent conveyance or fraudulent transfer, or
    (b)  a preferential transfer for any reason not stated in Covered Risk 13(b) of this policy.

7.  Any lien on the Title for real estate taxes or assessments imposed by governmental authority and created or attaching between Date of Policy and the date of recording of the Insured Mortgage in the Public Records. This Exclusion does not modify or limit the coverage provided under Covered Risk 11(b).

**EXCEPTIONS FROM COVERAGE – SCHEDULE B, PART 1, SECTION ONE**

This policy does not insure against loss or damage (and the Company will not pay costs, attorneys' fees or expenses) that arise by reason of:

1.  (a) Taxes or assessments that are not shown as existing liens by the records of any taxing authority that levies taxes or assessments on real property or by the Public Records; (b) proceedings by a public agency that may result in taxes or assessments, or notices of such proceedings, whether or not shown by the records of such agency or by the Public Records.

2.  Any facts, rights, interests, or claims that are not shown by the Public Records but that could be ascertained by an inspection of the Land or that may be asserted by persons in possession of the Land.

3.  Easements, liens or encumbrances, or claims thereof, not shown by the Public Records.

4.  Any encroachment, encumbrance, violation, variation, or adverse circumstance affecting the Title that would be disclosed by an accurate and complete land survey of the Land and not shown by the Public Records.

5.  (a) Unpatented mining claims; (b) reservations or exceptions in patents or in Acts authorizing the issuance thereof; (c) water rights, claims or title to water, whether or not the matters excepted under (a), (b), or (c) are shown by the Public Records.

## ★ OLD REPUBLIC TITLE

## WHAT DOES OLD REPUBLIC TITLE
## DO WITH YOUR PERSONAL INFORMATION?

| Why? | Financial companies choose how they share your personal information. Federal law gives consumers the right to limit some but not all sharing. Federal law also requires us to tell you how we collect, share, and protect your personal information. Please read this notice carefully to understand what we do. |
|---|---|
| What? | The types of personal information we collect and share depend on the product or service you have with us. This information can include:<br>• Social Security number and employment information<br>• Mortgage rates and payments and account balances<br>• Checking account information and wire transfer instructions<br><br>When you are no longer our customer, we continue to share your information as described in this notice. |
| How? | All financial companies need to share customers' personal information to run their everyday business. In the section below, we list the reasons financial companies can share their customers' personal information; the reasons Old Republic Title chooses to share; and whether you can limit this sharing. |

| Reasons we can share your personal information | Does Old Republic Title share? | Can you limit this sharing? |
|---|---|---|
| For our everyday business purposes — such as to process your transactions, maintain your account(s), or respond to court orders and legal investigations, or report to credit bureaus | Yes | No |
| For our marketing purposes — to offer our products and services to you | No | We don't share |
| For joint marketing with other financial companies | No | We don't share |
| For our affiliates' everyday business purposes — information about your transactions and experiences | Yes | No |
| For our affiliates' everyday business purposes — information about your creditworthiness | No | We don't share |
| For our affiliates to market to you | No | We don't share |
| For non-affiliates to market to you | No | We don't share |

Go to www.oldrepublictitle.com (Contact Us)


| Who we are | |
| --- | --- |
| Who is providing this notice? | Companies with an Old Republic Title name and other affiliates. Please see below for a list of affiliates. |

| What we do | |
| --- | --- |
| How does Old Republic Title protect my personal information? | To protect your personal information from unauthorized access and use, we use security measures that comply with federal law. These measures include computer safeguards and secured files and buildings. For more information, visit http://www.OldRepublicTitle.com/newnational/Contact/privacy. |
| How does Old Republic Title collect my personal information? | We collect your personal information, for example, when you: <ul><li>Give us your contact information or show your driver's license</li><li>Show your government-issued ID or provide your mortgage information</li><li>Make a wire transfer</li></ul> We also collect your personal information from others, such as credit bureaus, affiliates, or other companies. |
| Why can't I limit all sharing? | Federal law gives you the right to limit only: <ul><li>Sharing for affiliates' everyday business purposes - information about your creditworthiness</li><li>Affiliates from using your information to market to you</li><li>Sharing for non-affiliates to market to you</li></ul> State laws and individual companies may give you additional rights to limit sharing. See the "Other important information" section below for your rights under state law. |

| Definitions | |
| --- | --- |
| Affiliates | Companies related by common ownership or control. They can be financial and nonfinancial companies. <br> • Our affiliates include companies with an Old Republic Title name, and financial companies such as Attorneys' Title Fund Services, LLC, Lex Terrae National Title Services, Inc., Mississippi Valley Title Services Company, and The Title Company of North Carolina. |
| Non-affiliates | Companies not related by common ownership or control. They can be financial and non-financial companies. <br> • Old Republic Title does not share with non-affiliates so they can market to you |
| Joint marketing | A formal agreement between non-affiliated financial companies that together market financial products or services to you. <br> • Old Republic Title doesn't jointly market. |


## Other Important Information

Oregon residents only:  We are providing you this notice under state law.  We may share your personal information (described on page one) obtained from you or others with non-affiliate service providers with whom we contract, such as notaries and delivery services, in order to process your transactions.  You may see what personal information we have collected about you in connection with your transaction (other than personal information related to a claim or legal proceeding).  To see your information, please click on "Contact Us" at www.oldrepublictitle.com and submit your written request to the Legal Department.  You may see and copy the information at our office or ask us to mail you a copy for a reasonable fee.  If you think any information is wrong, you may submit a written request online to correct or delete it.  We will let you know what actions we take.  If you do not agree with our actions, you may send us a statement.

## Affiliates Who May be Delivering This Notice

| | | | | |
|---|---|---|---|---|
| American First Abstract, LLC | American First Title & Trust Company | American Guaranty Title Insurance Company | Attorneys' Title Fund Services, LLC | Compass Abstract, Inc. |
| eRecording Partners Network, LLC | Genesis Abstract, LLC | Kansas City Management Group, LLC | L.T. Service Corp. | Lenders Inspection Company |
| Lex Terrae National Title Services, Inc. | Lex Terrae, Ltd. | Mara Escrow Company | Mississippi Valley Title Services Company | National Title Agent's Services Company |
| Old Republic Branch Information Services, Inc. | Old Republic Diversified Services, Inc. | Old Republic Exchange Company | Old Republic National Title Insurance Company | Old Republic Title and Escrow of Hawaii, Ltd. |
| Old Republic Title Co. | Old Republic Title Company of Conroe | Old Republic Title Company of Indiana | Old Republic Title Company of Nevada | Old Republic Title Company of Oklahoma |
| Old Republic Title Company of Oregon | Old Republic Title Company of St. Louis | Old Republic Title Company of Tennessee | Old Republic Title Information Concepts | Old Republic Title Insurance Agency, Inc. |
| Old Republic Title, Ltd. | Republic Abstract & Settlement , LLC | Sentry Abstract Company | The Title Company of North Carolina | Title Services, LLC |
| Trident Land Transfer Company, LLC | | | | |



# OLD REPUBLIC
**T I T L E   C O M P A N Y**

18565 Jamboree Road, Suite 275
Irvine, CA 92612
(949) 476-5757  Fax: (949) 266-9509

## ATTENTION: ESCROW/LOAN OFFICER

For Your Convenience...

We are enclosing an Exhibit "A" which contains the legal description of the subject property.

We hope that this will assist you in the preparation of the documents for this transaction.

THANK YOU FOR THE OPPORTUNITY TO SERVE!!!!

ORDER NO. : 2930005415

# EXHIBIT A

The land referred to is situated in the County of Orange, City of Huntington Beach, State of California, and is described as follows:

PARCEL 1:

UNIT 53, IN THE CITY OF HUNTINGTON BEACH, COUNTY OF ORANGE, STATE OF CALIFORNIA, AS SHOWN AND DEFINED ON THAT CERTAIN CONDOMINIUM PLAN {"THE CONDOMINIUM PLAN"), RECORDED OCTOBER 18, 1979 IN BOOK 13358 PAGE 1193, ET SEQ., OFFICIAL RECORDS.

EXCEPT THEREFROM ALL OIL, GAS, MINERALS AND OTHE HYDROCARBON SUBSTANCES LYING BELOW A DEPTH OF 500 FEET WITHOUT ANY RIGHT TO ENTER UPON THE SURFACE OR THE SUBSURFACE OF SAID LAND ABOVE A DEPTH OF 500 FEET, AS PROVIDED IN INSTRUMENTS OF RECORD.

PARCEL 2:

AN UNDIVIDED 1/80TH INTEREST IN AND TO LOTS 1 AND 2 OF TRACT NO. 10542, IN THE CITY OF HUNTINGTON BEACH, COUNTY OF ORANGE, STATE OF CALIFORNIA, AS SHOWN ON A MAP RECORDED IN BOOK 456 PAGES 49 AND 50 OF MISCELLANEOUS MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY TOGETHER WITH THOSE PORTIONS OF THE COMMON AREA AS SHOWN AND DEFINED ON THE CONDOMINIUM PLAN, CONSISTING OF BUILDINGS AND OTHER IMPROVEMENTS.

EXCEPTING THEREFROM CONDOMINIUM UNITS 1 THROUGH 80 INCLUSIVE, LOCATED THEREON.

PARCEL 3:

AN EXCLUSIVE EASEMENT FOR THE USE AND OCCUPANCY OF THOSE PORTIONS OF RESTRICTED COMMON AREA AS DEFINED ON THE CONDOMINIUM PLAN FOR ENTRY AND STAIRCASES AND ATTIC SPACE RELATING TO SAID UNIT.

PARCEL 4:

NON-EXCLUSIVE EASEMENT AND RIGHT TO USE THOSE PORTIONS OF THE COMMON AREA AS DEFINED ON THE CONDOMINIUM PLAN, EXCEPT RESTRICTED COMMON AREA.

APN: 937-630-53



# HUGH NGUYEN
## CLERK-RECORDER

BIRTH AND DEATH RECORDS
FICTITIOUS BUSINESS NAMES
MARRIAGE LICENSES/RECORDS
NOTARY REGISTRATION
ORANGE COUNTY ARCHIVES
PASSPORTS
PROPERTY RECORDS

# NOTICE

**RE: AB 1466 - Real property: discriminatory restrictions**

In 2021, the California Legislature amended Section 12956.1 of the Government Code, related to the removal of discriminatory restrictions which may be contained in real property documents.

A county recorder, title company, escrow company, real estate broker, real estate agent, or association that provides a copy of a declaration, governing document, or deed to any person is required to place a cover page or stamp on the first page of the previously recorded document or documents stating the following:

**"If this document contains any restriction based on age, race, color, religion, sex, gender, gender identity, gender expression, sexual orientation, familial status, marital status, disability, veteran or military status, genetic information, national origin, source of income as defined in subdivision (p) of Section 12955, or ancestry, that restriction violates state and federal fair housing laws and is void, and may be removed pursuant to Section 12956.2 of the Government Code by submitting a "Restrictive Covenant Modification" form, together with a copy of the attached document with the unlawful provision redacted to the county recorder's office. The "Restrictive Covenant Modification" form can be obtained from the county recorder's office and may be available on its internet website. The form may also be available from the party that provided you with this document. Lawful restrictions under state and federal law on the age of occupants in senior housing or housing for older persons shall not be construed as restrictions based on familial status."**

The Orange County Clerk-Recorder is committed to assisting the public in the removal of unlawful discriminatory restrictions from property records.  Please contact our office for assistance in completing a Restrictive Covenant Modification form.

NORTH COUNTY BRANCH OFFICE
WELLS FARGO BUILDING
222 S. HARBOR BLVD., STE 110
ANAHEIM, CALIFORNIA 92805

ORANGE COUNTY
COUNTY ADMINISTRATION SOUTH
601 N. ROSS STREET
SANTA ANA, CALIFORNIA 92701

OLD ORANGE COUNTY
COURTHOUSE
211 W. SANTA ANA BLVD. ROOM 201
SANTA ANA, CALIFORNIA 92701

SOUTH COUNTY BRANCH OFFICE
LAGUNA HILLS CIVIC CENTER
24031 EL TORO ROAD, SUITE 150
LAGUNA HILLS, CALIFORNIA 92653

**RECORDING REQUESTED BY:**
CIR Law Offices International



**AND WHEN RECORDED MAIL DOCUMENT TO:**

| | |
|---|---|
| **NAME** | Delina Guzman |
| **STREET ADDRESS** | 8665 Gibbs Drive Suite 150 |
| **CITY, STATE & ZIPCODE** | San Diego, California 92123 |

**Recorded in Official Records, Orange County**
**Hugh Nguyen, Clerk-Recorder**

25.00
* $ R 0 0 0 9 1 1 6 0 2 3 $ *
**2017000096952 9:12 am 03/09/17**
**143 422 A03 F13   3**
**0.00 0.00 0.00 0.00 6.00 10.00 0.00 0.00**

SPACE ABOVE LINE FOR RECORDER'S USE

Title(s)

Abstract of Judgment

**EJ-001**

ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, address, and State Bar number)*:
After recording, return to:
MICHAEL VLACHOS, ESQ. SBN 312398
CIR LAW OFFICES INTERNATIONAL, LLP
8665 Gibbs Drive, Suite 150, San Diego, CA 92123
File No.: 3643401
TEL NO.: 800-496-8909    FAX NO. (optional): 858-496-5977
E-MAIL ADDRESS (Optional):

[X] ATTORNEY FOR    [X] JUDGMENT CREDITOR    [ ] ASSIGNEE OF RECORD

SUPERIOR COURT OF CALIFORNIA, COUNTY OF ORANGE
STREET ADDRESS: 700 CIVIC CENTER DR. WEST
MAILING ADDRESS:
CITY AND ZIP CODE: SANTA ANA CA 92701
BRANCH NAME: SANTA ANA

PLAINTIFF: TD BANK USA, N.A.

DEFENDANT: JAMIE L GALLIAN;

**ABSTRACT OF JUDGMENT—CIVIL
AND SMALL CLAIMS**    [ ] Amended

FOR RECORDER'S USE ONLY

CASE NUMBER:
30-2016-00863489-CL-CL-CJC

FOR COURT USE ONLY

Pursuant to California Government Code § 68150(f), the Clerk of the Court hereby certifies this document accurately reflects the official court record. The electronic signature and seal on this document have the same validity and legal force and effect as an original clerk's signature and court seal. California Government Code § 68150(g).

1. The [X] judgment creditor [ ] assignee of record
   applies for an abstract of judgment and represents the following:
   a. Judgment debtor's

   Name and last known address

   JAMIE L GALLIAN
   4476 ALDERPORT DR
   HUNTINGTON BEACH CA 92649-2288

   b. Driver's license no. [last 4 digits] and state:    [X] Unknown
   c. Social security no. [last 4 digits]: ***-**-3936    [ ] Unknown
   d. Summons or notice of entry of sister-state judgment was personally served or mailed to *(name and address)*:

   JAMIE L GALLIAN
   4476 ALDERPORT DR  HUNTINGTON BEACH CA 92649-2288

2. [ ] Information on additional judgment debtors is shown on page 2.
3. Judgment creditor *(name and address)*:
   TD BANK USA, N.A.
   C/O CIR, Law Offices International
   8665 Gibbs Drive, Suite 150, San Diego, California 92123
   Date: 2/10/2017
   Michael Vlachos, Esq.
   _____
   (TYPE OR PRINT NAME)

4. [ ] Information on additional judgment creditors is shown on page 2.
5. [ ] Original abstract recorded in this county:
   a. Date:
   b. Instrument No.:

   ▶ _____
   (SIGNATURE OF APPLICANT OR ATTORNEY)

6. Total amount of judgment as entered or last renewed:
   $ 2179.25
7. All judgment creditors and debtors are listed on this abstract.
8. a. Judgment entered on *(date)*: October 4, 2016
   b. Renewal entered on *(date)*:
9. [ ] This judgment is an installment judgment.

10. [ ] An [ ] execution lien [ ] attachment lien
    is endorsed on the judgment as follows:
    a. Amount: $
    b. In favor of *(name and address)*:

11. A stay of enforcement has
    a. [X] not been ordered by the court.
    b. [ ] been ordered by the court effective until *(date)*:

12. a. [X] I certify that this is a true and correct abstract of the judgment entered in this action.
    b. [ ] A certified copy of the judgment is attached.

David H. Yamasaki, Clerk of the Court

This abstract issued on *(date)*:
2/24/2017

Clerk, by    *Mary Johnson*    , Deputy
Mary M Johnson

Form Adopted for Mandatory Use
Judicial Council of California
EJ-001 [Rev. July 1, 2014]

**ABSTRACT OF JUDGMENT—CIVIL
AND SMALL CLAIMS**

Page 1 of 2
Code of Civil Procedure, §§ 488.480, 674, 700.190

| PLAINTIFF:    TD BANK USA, N.A.<br><br>DEFENDANT: JAMIE L GALLIAN; | COURT CASE NO.:<br>30-2016-00863489-CL-CL-CJC |
| --- | --- |

**NAMES AND ADDRESSES OF ADDITIONAL JUDGMENT CREDITORS:**

13.  Judgment creditor *(name and address):*

14.  Judgment creditor *(name and address):*

15. ☐ Continued on Attachment 15.

**INFORMATION ON ADDITIONAL JUDGMENT DEBTORS:**

16.                Name and last known address

Driver's license no. [last 4 digits] and state:              ☐ Unknown

Social security no. [last 4 digits]:              ☐ Unknown

Summons was personally served at or mailed to *(address):*

17.                Name and last known address

Driver's license no. [last 4 digits] and state:              ☐ Unknown

Social security no. [last 4 digits]:              ☐ Unknown

Summons was personally served at or mailed to *(address):*

18.                Name and last known address

Driver's license no. [last 4 digits] and state:              ☐ Unknown

Social security no. [last 4 digits]:              ☐ Unknown

Summons was personally served at or mailed to *(address):*

19.                Name and last known address

Driver's license no. [last 4 digits] and state:              ☐ Unknown

Social security no. [last 4 digits]:              ☐ Unknown

Summons was personally served at or mailed to *(address):*

20. ☐ Continued on Attachment 20.



THIS IS A CERTIFIED COPY OF THE
RECORD IF IT BEARS THE SEAL, AND
SIGNATURE OF THE ORANGE
COUNTY CLERK-RECORDER.

DATE:_____11/10/2022_____

CERTIFICATION FEE:___4.00___

COUNTY CLERK-RECORDER

*Hugh Nguyen*

ORANGE COUNTY
STATE OF CALIFORNIA

# EXHIBIT 20A

```
 1              SUPERIOR COURT OF THE STATE OF CALIFORNIA

 2                    FOR THE COUNTY OF ORANGE

 3              CENTRAL JUSTICE CENTER - DEPARTMENT C33

 4

 5

 6   THE HUNTINGTON BEACH GABLES      )
     HOMEOWNERS ASSOCIATION, A        )
 7   CALIFORNIA NONPROFIT MUTUAL      )
     BENEFIT CORPORATION,             )
 8                                    )
         PLAINTIFF,                   )
 9                                    )
              VS.                     ) NO. 30-2017-00913985
10                                    )
     SANDRA L. BRADLEY, ET AL.,       )
11                                    )
         DEFENDANTS.                  )
12   _____)
                                      )
13   AND RELATED CROSS-ACTIONS.       )
     _____)
14

15       THE HONORABLE JAMES L. CRANDALL, JUDGE PRESIDING

16                    REPORTER'S TRANSCRIPT

17                     NOVEMBER 1, 2018

18

19   APPEARANCES OF COUNSEL:

20      FOR PLAINTIFF:      EPSTEN GRINNELL & HOWELL, APC
        (COURTCALL)         BY: JOYCE J. KAPSAL, ESQ.
21
        FOR CROSS-          GORDON & REES
22      DEFENDANTS:         BY:  BRENDA K. RADMACHER, ESQ.

23      FOR DEFENDANT       JAMIE L. GALLIAN
        JAMIE L. GALLIAN:   IN PROPRIA PERSONA
24      (COURTCALL)

25

26              KAREN A. HUTCHISON, CSR #6664
            APPROVED COURT REPORTER PRO TEMPORE
```

202

```
 1              SANTA ANA, CALIFORNIA – THURSDAY, NOVEMBER 1, 2018

 2                        AFTERNOON SESSION

 3          (THE FOLLOWING PROCEEDINGS WERE HELD IN

 4          OPEN COURT:)

 5

 6          THE COURT:  NUMBER 11, HUNTINGTON BEACH GABLES

 7   HOMEOWNERS ASSOCIATION VERSUS BRADLEY.

 8          MS. KAPSAL:  JOYCE KAPSAL APPEARING ON BEHALF OF

 9   THE ASSOCIATION ON COURTCALL, YOUR HONOR.

10          THE COURT:  GOOD AFTERNOON.

11          MS. RADMACHER:  BRENDA RADMACHER OF GORDON & REES,

12   YOUR HONOR, APPEARING TODAY ON BEHALF OF THE MOVING

13   PARTIES, THE INDIVIDUAL BOARD MEMBERS.  I DON'T THINK I

14   NEED TO NAME THEM ALL FOR THE RECORD.

15          THE COURT:  NO, WE HAVE IT.  IT'S IN MY TENTATIVE

16   TOO.

17          MS. RADMACHER:  IT IS.

18          THE COURT:  WE DID GET A CALL FROM MS. GALLIAN,

19   WHO SAID SHE WANTED TO CONTINUE IT.  IS SHE ON THE PHONE?

20          MS. GALLIAN:  YES, I AM, YOUR HONOR.

21          THE COURT:  GOOD AFTERNOON.  MS. GALLIAN, WERE YOU

22   ABLE TO GET AHOLD OF OPPOSING COUNSEL TO TRY TO GET THIS

23   MATTER CONTINUED, AS YOU ADVISED THE COURT YOU WERE GOING

24   TO?

25          MS. GALLIAN:  I DID, YOUR HONOR, AND SHE DENIED.

26          THE COURT:  OKAY.  SO WHAT'S THE BASIS FOR YOUR
```

1   REQUEST FOR A CONTINUANCE?

2        MS. GALLIAN:  I WAS IN THE HOSPITAL FOR TWO DAYS,

3   AND I GOT OUT THE NIGHT BEFORE YESTERDAY.  AND THIS HAS

4   BEEN VERY, VERY TAXING ON ME.  AND I NEED HEART SURGERY.

5   IT'S JUST TOO MUCH FOR ME.  AND SO I WANT IT TO END.

6        AND I HAD AGREED AND WROTE A PROPOSAL AGREEING TO

7   SELL MY HOUSE, AND THEY SAID THAT THEY WOULD TAKE SEVERAL

8   DAYS TO CONSIDER IT.

9        I HAD A SECOND BUYER, AND WE SENT THE DEMAND

10  LETTER A WEEK AGO, AND I PAID THE EXPEDITED FEE FOR A

11  ONE-DAY RESPONSE, AS REQUESTED, BY THE HOMEOWNERS

12  ASSOCIATION.  AND AGAIN, THEY DRUG IT OUT NOW.  I SENT THE

13  DEMAND AND THE MONEY ON THE 23RD OF OCTOBER.  IT IS NOW

14  NOVEMBER 1ST.  AND IT'S JUST A CONSTANT BARRAGE OF ATTACKS

15  COMING AT ME.

16       AND I ACCEPT IT THAT THEY DON'T WANT ME THERE, SO

17  I HAVE TO SELL THE HOUSE, AND THAT'S WHAT I'VE BEEN TRYING

18  TO DO.  BUT THEY DIDN'T SEND A DEMAND, AND I PAID THE

19  MONEY, AND HERE WE ARE.

20       MS. KAPSAL:  YOUR HONOR, IF I MAY BE HEARD, JOYCE

21  KAPSAL APPEARING ON BEHALF OF THE ASSOCIATION.  I'M NOT

22  SURE THAT THOSE ARGUMENTS ARE GERMANE TO THE MOTION THAT'S

23  BEFORE THE COURT THIS AFTERNOON.

24       THE COURT:  WELL, I THINK IT'S GERMANE.

25       MS. KAPSAL:  MS. GALLIAN MADE A REQUEST TO

26  CONTINUE THE HEARING, AND THE RESPONSE WAS NO, WE WANTED

1    THE HEARING TO GO FORWARD.

2         THE COURT:  HERE'S WHY I THINK IT'S GERMANE.

3         MS. KAPSAL:  THE ISSUE BEFORE THIS COURT REQUIRES

4    THAT WE GET A RULING ON THIS MOTION SO THAT WE KNOW WHAT

5    KIND OF DEMAND TO MAKE INTO ESCROW.

6         THE COURT:  WELL, HERE'S WHY I THINK IT'S GERMANE,

7    BECAUSE, AS I TOLD PEOPLE AT OUR LAST SETTLEMENT

8    CONFERENCE, PART OF THE FIRST, SECOND, OR THIRD

9    SETTLEMENT, WE HAD A NUMBER OF THEM, WAS THAT THE

10   INDIVIDUAL BOARD MEMBERS WOULD WAIVE THEIR CLAIMS,

11   INCLUDING COSTS AND FEES.  THAT WAS AGREED TO BY THE BOARD

12   MEMBERS, WHICH I TOLD THEIR COUNSEL WAS A GENEROUS OFFER,

13   AND SO I THINK MS. GALLIAN CONSIDERED THAT TO BE A DONE

14   DEAL.

15        WHEN THE SETTLEMENT FELL THROUGH, I, OF COURSE,

16   REMINDED HER THAT IF IT DOESN'T GET SETTLED, THAT MOTION

17   WILL BE BACK ON CALENDAR AND THERE MAY BE AN AWARD.

18        SO IN VIEW OF THE FACT THAT MS. GALLIAN IS SAYING

19   SHE WILL SELL HER HOUSE AND WILL MOVE, I'M NOT OPPOSED TO

20   GIVING THE PARTIES ANOTHER WEEK TO SEE IF THEY CAN PUT A

21   PACKAGE TOGETHER THAT IS SATISFACTORY TO ALL SIDES.

22        MS. RADMACHER:  YOUR HONOR, I CAN ADDRESS THAT

23   SLIGHTLY FOR YOU.

24        THE COURT:  PARDON ME?

25        MS. RADMACHER:  I CAN ADDRESS PART OF THE

26   ADDITIONAL DETAILS THAT HAVEN'T BEEN IDENTIFIED.

1          THE COURT:  OKAY.

2          MS. RADMACHER:  AS PART OF MS. GALLIAN'S OUTREACH

3   YESTERDAY TO US, SHE SENT US SEVERAL DIFFERENT PROPOSALS.

4   THEY WERE CONFUSING TO US.  IN FACT, SHE EVEN SENT AN

5   E-MAIL SAYING, "PLEASE HELP ME DRAFT SOMETHING THAT MAKES

6   SENSE," WHICH I CAN'T DO, AS YOU UNDERSTAND.  I'M NOT HER

7   ATTORNEY.  THE ISSUES --

8          THE COURT:  BUT YOU CAN DO SOMETHING THAT MAKES

9   SENSE TO YOUR CLIENTS.

10          MS. RADMACHER:  YES.  BUT THE TERMS OF WHAT SHE

11   WAS PROPOSING, WHICH HAVE NOT BEEN ADDRESSED AND I DON'T

12   THINK ARE APPROPRIATE TO ADDRESS IN THIS SETTING, ARE JUST

13   WOEFULLY INSUFFICIENT FOR THIS TIME.

14          MY CLIENTS ARE BOARD MEMBERS WHO HAVE INCURRED

15   ATTORNEY'S FEES AND COSTS IN THIS MATTER.  WHEN THE

16   SETTLEMENT WAS FIRST REACHED, THERE WAS AN AGREEMENT TO

17   WAIVE THESE FEES AND COSTS AT THAT TIME.

18          THE COURT:  I REMEMBER THAT.

19          MS. RADMACHER:  AND WE'RE STILL HERE, I'M STILL

20   HERE.  I'M STILL COMING BACK.  MY CLIENTS CONTINUE TO

21   INCUR COSTS AND FEES.

22          THE COURT:  OKAY, BUT THE --

23          MS. RADMACHER:  BUT WHERE THOSE SETTLEMENT

24   DISCUSSIONS GO, I JUST CAN'T SEE US REACHING AN AGREEMENT.

25          THE COURT:  I UNDERSTAND THAT.  BUT LET ME TELL

26   YOU, YOU'RE RIGHT ON YOUR MOTION, YOU'RE RIGHT ON THE LAW.

1    BUT THIS IS A SIGNIFICANT NUMBER WHICH COULD, IN FACT, END

2    UP VOIDING THE SETTLEMENT AND VOIDING THE SALE.  BECAUSE

3    WHY IS MS. GALLIAN GOING TO GO THROUGH WITH A SALE WHERE

4    THE ASSOCIATION GETS THE MONEY, NOT HER?

5            SO I WAS THINKING, NOW THAT I THINK MS. GALLIAN IS

6    AWARE, AND THANKS TO THE INTERVENTION OF A FEW LAWYERS,

7    THAT THIS MATTER HAS TO BE RESOLVED, I'M THINKING THE WAY

8    TO DO IT IS KEEP THAT MONEY IN PLAY, BUT RATHER THAN ENTER

9    THE DECISION THAT SHE OWES YOU $46,000, THAT WOULD BE A

10   CHIP THAT YOU CAN USE IN YOUR SETTLEMENT NEGOTIATIONS.

11           SO WHAT I'M THINKING IS THAT IN VIEW OF HER

12   HOSPITALIZATION, THAT I WOULD JUST CONTINUE THIS FOR A

13   WEEK KEEPING THE TENTATIVE IN PLACE.  BECAUSE IF THE CASE

14   DOESN'T GET SETTLED IN A WEEK, I'M GOING TO GRANT THE

15   MOTION.

16           MS. RADMACHER:  I HAVE A COUPLE OF SPECIFIC POINTS

17   ON THE TENTATIVE RULING THAT I'D LIKE TO BRING TO THE

18   COURT'S ATTENTION, IF I MAY.

19           THE COURT:  OKAY.  I KNOW YOU ASKED FOR MORE

20   MONEY.

21           MS. RADMACHER:  WELL, YES.  BUT THERE'S A

22   CLARIFICATION.  IN YOUR TENTATIVE, THERE WAS THE ITEM OF

23   COSTS WHICH WERE SOUGHT IN THE MOTION, WERE NOT ADDRESSED.

24           THE COURT:  I THOUGHT IT WAS NOT COSTS.  I THOUGHT

25   YOU HAVE TO MAKE A SEPARATE MOTION FOR COSTS.

26           MS. RADMACHER:  IT WAS INCLUDED IN BOTH OF THEM IN

1    THE ORIGINAL MOTION.

2         THE COURT:  COSTS ARE POSTJUDGMENT, THAT'S THE

3    POINT.  DOES YOUR HOA CONTRACT SAY ANYONE WHO OPPOSES

4    THESE GETS COSTS AND FEES?

5         MS. RADMACHER:  IT DOES, YOUR HONOR.  THESE ARE

6    COSTS ONLY FOR THE INDIVIDUAL BOARD MEMBERS, NOT FOR THE

7    ASSOCIATION.

8         THE COURT:  I UNDERSTAND THAT.

9         MS. RADMACHER:  AND IF WE NEED TO BRING IT

10   SEPARATELY --

11        MS. KAPSAL:  YOUR HONOR, THIS IS JOYCE KAPSAL.

12   THE CC&R'S DO ALLOW FOR RECOVERY OF FEES AND COSTS.

13        THE COURT:  CAN YOU DIFFERENTIATE COSTS BETWEEN

14   THE BOARD AND ASSOCIATION, THOUGH?

15        MS. RADMACHER:  YES.

16        THE COURT:  FILING FEES FOR THOSE PARTIES?

17        MS. RADMACHER:  CORRECT.

18        THE COURT:  SO THAT WOULD BE NOMINAL.  WHAT IS IT?

19        MS. RADMACHER:  IT'S $2,937.27, AS WAS SUBMITTED

20   IN OUR MOTION.

21        THE COURT:  IN VIEW OF MS. GALLIAN'S

22   HOSPITALIZATION, AND I DO HAVE TO SAY SHE'S BEEN HERE ON

23   EVERY OTHER APPEARANCE, SO MY TENTATIVE SETS FORTH THE

24   REASONS WHY THIS MOTION SHOULD BE GRANTED, BUT I THINK SHE

25   DOES HAVE --

26        MS. GALLIAN:  MAY I REPLY, YOUR HONOR?

208

1       THE COURT:  LET ME TELL YOU WHAT I'M GOING TO DO

2   FIRST.  I'M JUST SAYING I'M GOING TO TAKE THIS UNDER

3   SUBMISSION FOR A WEEK AND GIVE THE PARTIES A WEEK TO SEE

4   IF THEY CAN FINALIZE SOME KIND OF SETTLEMENT.  AND IF NOT,

5   I'LL HEAR THIS MOTION IN FULL AND GIVE YOU AN OPPORTUNITY

6   TO APPEAR IN PERSON NEXT WEEK.

7       BUT SINCE -- AS YOU CAN SEE, I LAY OUT ALL THE

8   AUTHORITY IN HERE AND ALL OF THE REASONS WHY.  IN FACT, I

9   TRIED TO PUT DOWN MS. GALLIAN'S ARGUMENTS AND WHY I'M NOT

10  ACCEPTING THEM.  SO ALL I CAN SAY IS, ALTHOUGH I'M ALWAYS

11  OPEN TO HEAR THE PARTIES' ARGUMENTS, THIS APPEARS LEGALLY

12  TO BE A JUSTIFIABLE AND RIGHTEOUS MOTION, AND I WOULD BE

13  INCLINED TO GRANT IT, AS I SAID IN MY TENTATIVE.

14      ALL I'M SAYING IS I'M GIVING MS. GALLIAN, BECAUSE

15  OF HER MEDICAL PROBLEMS, A WEEK TO WORK OUT A SETTLEMENT

16  WHERE YOU CAN WITHDRAW YOUR MOTION.  IF NOT, NEXT WEEK, IT

17  WILL MOST LIKELY BE GRANTED.

18      MS. RADMACHER:  YOUR HONOR, IN THAT VEIN, THE

19  COURT IN ITS TENTATIVE IDENTIFIED THAT FOUR HOURS WERE

20  REDUCED FROM THE TIME SOUGHT.

21      THE COURT:  YES.

22      MS. RADMACHER:  WE'RE GOING TO BE COMING BACK

23  AGAIN.

24      THE COURT:  OKAY, I UNDERSTAND.

25      MS. RADMACHER:  AND THAT WOULD BE SOMETHING WE

26  WOULD ASK THE COURT TO CONSIDER, THAT MY CLIENTS ARE

1    INCURRING ADDITIONAL COSTS.

2            THE COURT:  IF YOU HAVE TO COME BACK, I'LL

3    CONSIDER THAT AS WELL AS THE COSTS.  SO IT MIGHT NOT END

4    UP BEING 46,000; IT MAY BE 50,000 BY THEN.  I UNDERSTAND.

5    BUT I'M JUST SAYING, FOR ALL THE PARTIES, BOTH SIDES HAVE

6    WORKED SO HARD TO TRY TO GET A SETTLEMENT.  AND SINCE IT

7    FELL THROUGH --

8            MS. GALLIAN:  YOUR HONOR?

9            THE COURT:  YES.

10            MS. GALLIAN:  MAY I MOVE THE COURT TO ENFORCE THE

11    MARCH 2ND SETTLEMENT AGREEMENT?  I WILL WRITE THE CHECK

12    FOR $15,000 AND BE DONE WITH IT.  THE MARCH 2ND, IF THAT'S

13    WHAT THEY WANT, THAT'S WHAT IT IS AND --

14            THE COURT:  WELL, THAT'S NOT BEFORE THE COURT

15    RIGHT NOW.

16            MS. KAPSAL:  YOUR HONOR, THIS IS JOYCE KAPSAL.

17    THAT'S NOT BEFORE THIS COURT.  SHE'S ALREADY OBJECTED TO

18    THAT SETTLEMENT.  IT'S OFF THE TABLE.

19            THE COURT:  ALL RIGHT.

20            MS. GALLIAN:  EXCUSE ME, PLEASE.  LET ME FINISH.

21            THE COURT:  ALL I'M TELLING EVERYBODY IS YOU HAVE

22    A WEEK TO WORK IT OUT.  OKAY?  MS. GALLIAN, I HOPE YOU'RE

23    FEELING BETTER, AND I HOPE YOU HAVE AN OPPORTUNITY TO MEET

24    PERSONALLY WITH COUNSEL AND TRY TO SIT DOWN AND WORK

25    SOMETHING OUT.  OTHERWISE, THIS MOTION IS CONTINUED UNTIL

26    NEXT WEEK.

1          AND TWO IMPORTANT THINGS:  NO FURTHER BRIEFING --

2          MS. GALLIAN:  YOUR HONOR, I'M TRYING TO SAY

3     SOMETHING.  MAY I SAY SOMETHING, YOUR HONOR?

4          THE COURT:  GO AHEAD, SURE.

5          MS. GALLIAN:  THE HOUSE IS SOLD, THE HOUSE IS

6     GONE.

7          THE COURT:  GOOD.  OKAY.

8          MS. GALLIAN:  THAT'S WHAT I'VE BEEN TRYING TO TELL

9     THE COURT, IT'S GONE.  I COULDN'T TAKE ANYMORE.

10         THE COURT:  ALL RIGHT.  WELL, HOPEFULLY THAT WILL

11    MOTIVATE THE PLAINTIFF AND MOVING PARTIES TO TRY TO WORK

12    OUT A SETTLEMENT IN THE NEXT WEEK.  OTHERWISE, NEXT WEEK,

13    WE'LL HEAR THIS MOTION.  OKAY?

14         MS. GALLIAN:  I APPRECIATE THAT.

15         THE COURT:  MS. GALLIAN, I THINK THAT'S A WISE

16    DECISION TO SELL THE HOUSE.

17         MS. GALLIAN:  I DO TOO.

18         THE COURT:  AND HOPEFULLY EVERYTHING WILL WORK

19    OUT.  OKAY, THANK YOU.

20         MS. RADMACHER:  YOUR HONOR, IS THAT THURSDAY,

21    NOVEMBER 8, AT 1:30 P.M.?

22         THE COURT:  YES, THURSDAY, NOVEMBER 8, 1:30.

23         MS. RADMACHER:  NOTICE WAIVED, YOUR HONOR?

24         THE COURT:  OKAY.  MS. GALLIAN, NOTICE WAIVED?

25         MS. GALLIAN:  YES.

26         MS. KAPSAL:  THANK YOU, YOUR HONOR, NOTICE WAIVED.

211

1          THE COURT:  ALL PARTIES WAIVE NOTICE.  OKAY, THANK

2     YOU.

3          MS. RADMACHER:  THANK YOU, YOUR HONOR.

4          (PROCEEDINGS CONCLUDED.)

1

REPORTER'S CERTIFICATE

2

3  STATE OF CALIFORNIA    )
                          ) SS.
4  COUNTY OF ORANGE       )

5

6         I, CANDACE KHOROUZAN, CSR 11579, OFFICIAL

7  COURT REPORTER IN AND FOR THE SUPERIOR COURT OF THE

8  STATE OF CALIFORNIA, COUNTY OF ORANGE, DO HEREBY

9  CERTIFY THAT THE FOREGOING TRANSCRIPT, CONSISTING

10  OF PAGES 1 THROUGH 39, INCLUSIVE, IS A TRUE AND

11  CORRECT TRANSCRIPT OF MY SHORTHAND NOTES, AND IS A

12  FULL, TRUE, AND CORRECT STATEMENT OF THE PROCEEDINGS

13  HAD IN SAID CAUSE.

14         DATED THIS 3RD DAY OF JULY, 2019.

15

16

17

18         CANDACE KHOROUZAN, CSR #11579

19

20

21

22

23

24

25

26

# EXHIBIT 20B

## FW: 4476 Alderport Dr., Unit 53

From: Pejman D. Kharrazian (pkharrazian@epsten.com)

To: j9_jasso@yahoo.com; lgragnano@goldenstatefoods.com

Cc: jkapsal@epsten.com

Date: Monday, November 5, 2018 at 05:26 PM MST

FYI

**Pejman D. Kharrazian**
**Senior Attorney At Law**
10200 Willow Creek Road, Suite 100 | San Diego, CA 92131
Phone: 1.858.527.0111 | Fax: 1.858.527.1531 | www.epsten.com



San Diego | Coachella Valley | Inland Empire

  

This message contains information which may be confidential or legally privileged. Unless you are the addressee (or are authorized to receive e-mail for the addressee), you may not use, copy or disclose to anyone the message or any information contained in the message or any attachment. If you have received the message in error, please advise the sender by reply e-mail and delete the message and any attachments and destroy all hard copies. Thank you.

Federal Law Disclosure – If you are a person receiving this email communication in relation to a debt you owe, please be advised of the following, as required by Federal law: **This communication is from a debt collector and is an attempt to collect a debt. Any information obtained will be used for that purpose.**

**From:** Pejman D. Kharrazian
**Sent:** Monday, November 05, 2018 4:20 PM
**To:** r.nickelproperties@yahoo.com
**Cc:** Joyce J. Kapsal
**Subject:** 4476 Alderport Dr., Unit 53

Mr. Nickel,

Thank you for your time on the phone today. As I mentioned, Joyce Kapsal and I represent the The Huntington Beach Gables Homeowners Association.

I have attached two documents related to the ongoing civil lawsuit between the Association and Jamie Gallian:  (1) the First Amended Complaint and (2) the Preliminary Injunction ordering the unit to be brought into compliance with the Association's governing documents, clarifying that the unit is an airspace condominium, and clarifying that the owner of the unit has no right to landscape or perform maintenance in the common areas of the Association.

I have also attached the various restraining orders against Ms. Gallian.

We ask that you please:

1.   Send us copies of the purchase/sale agreements you have with Ms. Gallian;

2.   Send us proof that you paid Ms. Gallian for the unit (for example, a copy of the cancelled cashier's check); and

3.   Send us confirmation in writing that you are willing to work with the Association to bring the unit into compliance as discussed with you today (by moving the a/c unit, removing the corrugated roof on the patio cover, removing the gutters attached to the patio cover, and agreeing to removal of exterior items in the common area).

This will go a long way to demonstrating that you are indeed a good faith bona fide purchaser of the unit who is unrelated and unaffiliated with Ms. Gallian. Once we receive the requested information from you, we are glad to set up a meeting between you and representatives from the Association to discuss the work needed to the unit in more detail.

Please feel free to call Joyce or me with any questions.

Thank you,

**Pejman D. Kharrazian**
**Senior Attorney At Law**
10200 Willow Creek Road, Suite 100 | San Diego, CA 92131
Phone: 1.858.527.0111 | Fax: 1.858.527.1531 | www.epsten.com



San Diego | Coachella Valley | Inland Empire



---

This message contains information which may be confidential or legally privileged. Unless you are the addressee (or are authorized to receive e-mail for the addressee), you may not use, copy or disclose to anyone the message or any information contained in the message or any attachment. If you have received the message in error, please advise the sender by reply e-mail and delete the message and any attachments and destroy all hard copies. Thank you.

Federal Law Disclosure – If you are a person receiving this email communication in relation to a debt you owe, please be advised of the following, as required by Federal law: **This communication is from a debt collector and is an attempt to collect a debt. Any information obtained will be used for that purpose.**

 [CONFORMED] Order Granting Plaintiff_s Motion for Preliminary Injunction.PDF
119.9kB

 State of CA v. Gallian criminal case no 18WM05278 dated 042518.pdf
892.6kB

 Hobelman v Gallian Restraining Order 062617.pdf
5.3MB

 Sandra Bradley EARO against Gallian.pdf
333.5kB

 3477030_1_Huntington Beach – Temporary Restraining Order issued 12.22.20….pdf
324.1kB

 First Amended Complaint filed 5-16-2017 (without Exhs) - Huntington Beach Gallian v Bradley, Gallian.PDF
650.7kB

# EXHIBIT 21

**WHEN RECORDED MAIL TO:**
**(Assignee's Name & Address)**
**Mr. Randy Nickel**
**4476 Alderport Drive**
**Huntington Beach, CA 92649**

**Mail tax statements to:**
**Mr. Randy Nickel**
**4476 Alderport Drive**
**Huntington Beach, CA 92649**

---

(Space Above this Line for Recorder's Use)

## ASSIGNMENT OF GROUND LEASE & CONDOMINIUM SUBLEASE

No Consideration. Term of Lease Less Than 99 years.

**WHEREAS**
**HOUSER BROS. CO., a limited partnership, as Landlord and ROBERT P. WARMINGTON, as**
Tenant, entered into that certain **GROUND LEASE** also known as the **MASTER LEASE dated October 19, 1979**, a Short Form Memorandum recorded in the Office of the Orange County, California Clerk Recorder in Book 13424, Page 499 inclusive.

**WHEREAS**
**HOUSER BROS. CO., a limited partnership, as Landlord and ROBERT P. WARMINGTON, as**
Tenant, entered into a **PARTIAL CANCELLATION OF MASTER LEASE dated November 7, 1980**
for that certain **MASTER LEASE dated October 19, 1979**; recorded in the Office of the Orange County, California Clerk Recorder in Book 13424, Pg(s) 1253-1255, **\*\*Instrument No. 8691.**

**WHEREAS**
**HOUSER BROS. CO., a limited partnership, as Landlord and ROBERT P. WARMINGTON, as**
Tenant, entered into that certain **SUBLEASE dated October 19, 1979**, a Short Form Memorandum recorded in the Office of the Orange County, California Clerk Recorder in Book 13424, Page 504, inclusive, with respect to those portions of Lots 1 and 2 of Tract No. 10542 in the City of Huntington Beach, California as shown on Miscellaneous Map(s) recorded in Book 456, Page(s) 49 and 50, in the Office of the Orange County, California Clerk Recorder.

**WHEREAS**
**HOUSER BROS. CO., a limited partnership, as Landlord and ROBERT P. WARMINGTON, as**
Tenant, entered into a **PARTIAL CANCELLATION OF SUBLEASE dated October 19, 1979**; for that certain SUBLEASE dated November 7, 1980, a Short Form Memorandum recorded in the Office of the Orange County, California Clerk Recorder in Book 13824, Pg(s) 1256-1258, with respect to those portions of Lots 1 and 2 of Tract No. 10542 in the City of Huntington Beach, California recorded in Book 456, Page(s) 49 and 50 of Miscellaneous Maps, in the Office of the Orange County, California Clerk Recorder,
**\*\*Instrument No. 8692, Exhibit A attached hereto,**

**WHEREAS**
       For valuable consideration, receipt of which is hereby acknowledged, the undersigned **J-PAD LLC**, hereby transfers and assigns to **Randy Nickel, a married man, as his sole and separate property** all right, title and interest of the undersigned, as Tenant, in and under that certain **MASTER LEASE/ Ground Lease, dated November 7, 1980**, recorded in the Office of the Orange County, California Clerk Recorder in Book 13824, Pg(s) 1259-1273, **\*\*Instrument No. 8693;**

J-PAD, LLC hereby transfers and assigns to Randy Nickel, a married man, as his sole and separate property, all right, title and interest of the undersigned, as Tenant, in and under that certain CONDOMINIUM SUBLEASE, dated August 1, 1980, by and between ROBERT P. WARMINGTON, as Landlord, and JOHN F. TURNER AND VIRGINIA H. TURNER, HUSBAND AND WIFE AS JOINT TENANT, recorded on November 7, 1980, Office of the Orange County, California Clerk Recorder in Book 13824, Pg(s) 1274-1290, **Instrument No. 8694;
As amended by the FIRST AMENDMENT TO CONDOMINIUM SUBLEASE effective January 1, 2003, recorded in the Office of the Orange County, California Clerk Recorder as Document No. 2003-001044770 on August 28, 2003.

J-PAD, LLC hereby transfers and assigns to Randy Nickel, a married man, as his sole and separate property all right, title and interest of the undersigned, as Tenant, in and under that certain CONVEYANCE OF REMAINDER INTEREST, dated November 7, 1980, recorded in the Office of the Orange County, California Clerk Recorder in Book 13824, Pg(s) 1291-1293, **Instrument No. 8695;

J-PAD, LLC, hereby transfers and assigns to Randy Nickel, a married man, as his sole and separate property all right, title and interest of the undersigned, as Tenant, in and under that certain CONDOMINIUM SUBLEASE (SHORT FORM – MEMORANDUM AND GRANT DEED, dated November 7, 1980, recorded in the Office of the Orange County, California Clerk Recorder in Book 13824, Pg(s) 1294-1298, **Instrument No. 8696.

DATED: _10-30-18_ 

ASSIGNER JAMIE LYNN GALLIAN,
GENERAL PARTNER J-PAD, LLC


STATE OF CALIFORNIA )
) ss.
COUNTY OF ORANGE )


On _____, before me, _____

_____,

Personally appeared _____,

Who proved to me on the basis of satisfactory evidence to be the person whose name is subscribed to

the within instrument and acknowledged to me that she executed the same in her authorized

capacity, and that by her signature on the instrument the person, or the entity upon behalf of which

the person acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing

paragraph is true and correct.


WITNESS my hand and official seal.


_____

Signature of Notary Public

(This space for Notary Seal)

**CALIFORNIA ALL-PURPOSE ACKNOWLEDGMENT**                              CIVIL CODE § 1189

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California

County of ___Orange___ }

On ___10/30/2018___ before me, ___Joseph H. Reis   Notary Public___
         Date                              Here Insert Name and Title of the Officer

personally appeared ___Jamie lynn Gallian___
                                      Name(s) of Signer(s)

who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

JOSEPH H. REIS
Notary Public – California
Orange County
Commission # 2181172
My Comm. Expires Jan 23, 2021

*Place Notary Seal and/or Stamp Above*

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature _____
                        Signature of Notary Public

──────────── OPTIONAL ────────────

*Completing this information can deter alteration of the document or fraudulent reattachment of this form to an unintended document.*

**Description of Attached Document**
Title or Type of Document: ___Assignment of Ground leasel Condominium Sublea___
Document Date: ___10/30/2018___                              Number of Pages: ___4___
Signer(s) Other Than Named Above: ___N/A___

**Capacity(ies) Claimed by Signer(s)**

Signer's Name: ___Jamie lynn Gallian___          Signer's Name: ___N/A___
□ Corporate Officer – Title(s): _____          □ Corporate Officer – Title(s): _____
□ Partner – □ Limited □ General                 □ Partner – □ Limited □ General
☑ Individual          □ Attorney in Fact        □ Individual          □ Attorney in Fact
□ Trustee             □ Guardian of Conservator  □ Trustee             □ Guardian of Conservator
□ Other: _____                                  □ Other: _____
Signer is Representing: _____                    Signer is Representing: _____

©2017 National Notary Association

## ASSIGNMENT OF CONDOMINIUM SUBLEASE

### ACCEPTANCE AND AGREEMENT

The undersigned Assignee named in the foregoing Assignment hereby Accepts said Assignment and hereby agrees with for the benefit of the Master Lessor, Sublessor/Landlord, Tenant and under the Original Condominium Sublease commonly referred to throughout this document as "Condominium Sublease", described in said Assignment, to keep, perform and be bound by all the terms, covenants and conditions contained in said Condominium Sublease and as amended by the First Amendment to Condominium Sublease on the part of the Master Lessor, Sublessor/Landlord and Condominium Sublease Tenant therein to be kept and performed, to all intents and purposes as though the undersigned Assignee was the Original Condominium Sublease Tenant there under.

Assignee agrees to pay Sublessor/Landlord a late fee equal to 6% of any rent or other payment due under the Condominium Sublease, which is not received by Sublessor/Landlord within ten (10) days of its due date. Said late fee is in addition to the interest due on unpaid installment indebtedness of 10% as provided in Article 17(A) of the Condominium Sublease. The undersigned Assignee agrees to pay attorneys fees and costs incurred by Landlord to collect rent or other payment under the Condominium Sublease or to otherwise enforce Sublessor/Landlord rights under the Condominium Sublease.

DATED: _10-30-18_

_____
ASSIGNEE, RANDY NICKEL

STATE OF CALIFORNIA )
                     ) ss.
COUNTY OF ORANGE )

On _10/30/18_ before me, _Joseph H. Reis  Notary  Public_ ,
Personally appeared _Randall  Nickel_ ,
Who proved to me on the basis of satisfactory evidence to be the person whose name is subscribed to the within instrument and acknowledged to me that they executed the same in their authorized capacity, and that by her signature on the instrument the person, or the entity upon behalf of which the person acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

_____     (This space for Notary Seal)
**Signature of Notary Public**

_See Attached California All-Purpose Acknowledgment_

**CALIFORNIA ALL-PURPOSE ACKNOWLEDGMENT**                    CIVIL CODE § 1189

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California

County of ___Orange___

On ___10|30|2018___ before me, ___Joseph H. Reis   Notary Public___
      *Date*                                                    *Here Insert Name and Title of the Officer*

personally appeared ___Randall   Nickel___
      *Name(s) of Signer(s)*

who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

JOSEPH H. REIS
Notary Public – California
Orange County
Commission # 2181172
My Comm. Expires Jan 23, 2021

*Place Notary Seal and/or Stamp Above*

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature _____
      *Signature of Notary Public*

─────────────── OPTIONAL ───────────────
*Completing this information can deter alteration of the document or fraudulent reattachment of this form to an unintended document.*

**Description of Attached Document**
Title or Type of Document: ___Assignment  of  Condominium  Sublease___
Document Date: ___10|30|2018___ _____ Number of Pages: ___1___
Signer(s) Other Than Named Above: ___N/A___

**Capacity(ies) Claimed by Signer(s)**

| Signer's Name: Randall Nickel | Signer's Name: N/A |
|---|---|
| ☐ Corporate Officer – Title(s): _____ | ☐ Corporate Officer – Title(s): _____ |
| ☐ Partner – ☐ Limited ☐ General | ☐ Partner – ☐ Limited ☐ General |
| ☒ Individual   ☐ Attorney in Fact | ☐ Individual   ☐ Attorney in Fact |
| ☐ Trustee   ☐ Guardian of Conservator | ☐ Trustee   ☐ Guardian of Conservator |
| ☐ Other: _____ | ☐ Other: _____ |
| Signer is Representing: _____ | Signer is Representing: _____ |

©2017 National Notary Association

# EXHIBIT A (LEGAL)

The estate or interest in the land described:

A Ground leasehold and Condominium Sublease hold estate as to Parcels 1 and 2, said estate being more particularly described as the Lessees' interest under that certain Ground Lease set forth in subparagraph (A) herein below:

(A) That certain Ground Lease dated August 1, 1980, executed by Houser Bros. Co, A Limited Partnership organized under the Laws of the State of California, in which Clifford C. Houser and Vernon F. Houser constitute the sole General Partners, as Landlord, and by Robert P. Warmington, as Tenant, for the term ending December 31, 2059. Upon the Terms, Covenants and Conditions therein contained, recorded as follows in Official Records of said Orange County: **Book 13824 Page 1259-1273 APN: 937-63-053, Unit 53.**

(B) That certain Condominium Sublease dated August 1, 1980, executed by Robert P. Warmington, as Sub-lessor and John F. Turner and Virginia H. Turner (Original Sublessee) for the term ending December 31, 2059. Upon the Terms, Covenants and Conditions therein contained, recorded as follows in Official Records of said Orange County: **Book 13824 Page 1274-1290 APN: 937-63-053, Unit 53.**

All that certain land interest situated in the State of California, County of Orange and is described as follows:

Parcel 1:
Unit 53 as shown and defined on a Condominium Plan (the **"Condominium Plan"**) recorded in Book 13358 Page(s) 1193, et seq., Official Records of Orange County, California, excepting that portion consisting of buildings and other improvements;

Parcel 2:
An undivided one-eightieth (1/80th) interest as Tenants in Common in the Common Area of Lots 1 and 2 Tract No. 10542, in the City of Huntington Beach, County of Orange, State of California as shown on a map recorded in Book 456, Page(s) 49 and 50 of Miscellaneous Map, records of Orange County, California, as shown on the Condominium Plan, excepting that portion consisting of buildings and other improvements.

Except there from all minerals, oil, gas and other hydrocarbon substances lying below a depth of 500 feet below the surface of said Land without the right of surface entry above the depth of 500 feet from the surface, as reserved in deeds of record.

Parcel 3:
Those portions of Unit 53, building 14, inclusive, as shown and defined on the Condominium Plan, Consisting of buildings and other improvements.

Parcel 4:
An undivided one-eightieth (1/80th) interest as Tenants in Common, in and to those portions of the Common Area as shown and defined on the Condominium Plan, consisting of buildings or other improvements.

Parcel 5:
An easement for the exclusive use and occupancy of those portions of the restricted Common Area, as defined on said Condominium Plan for ground level entry, courtyard entry, staircases, garages, and attic space relating to said units.

Parcel 6:
A non-exclusive easement and right to use the Common Area as defined on said Condominium Plan, except the restricted Common Area(s).

JASSO DECL. PAGE - 0844

# CASHIER'S CHECK

SERIAL #:  005150X779
ACCOUNT#:  4861-565303

Office ALU #    11-24
00/05/15         12/10(8)

Remitter:            RANDALL L NICKEL
Purchaser:           RANDALL L NICKEL
Purchaser Account:   1327507651
Operator I.D.:       u500203
Funding Source:      Paper item(s)
                     c3772234

PAY TO THE ORDER OF    ***JAMIE L. GALLIAN***

October 31, 2018

***One hundred forty thousand dollars and no cents***

**$140,000.00**

VOID IF OVER US $  140,000.00

NON-NEGOTIABLE

Payee Address:
Memo:

WELLS FARGO BANK, N.A.
535 N MCKINLEY ST
CORONA, CA 92879
FOR INQUIRIES CALL (480) 394-3122

NOTICE TO PURCHASER – IF THIS INSTRUMENT IS LOST,
STOLEN OR DESTROYED, YOU MAY REQUEST CANCELLATION
AND REISSUANCE. AS A CONDITION TO CANCELLATION AND
REISSUANCE, WELLS FARGO BANK MAY IMPOSE A FEE AND
REQUIRE AN INDEMNITY AGREEMENT AND BOND.

## Purchaser Copy

FB004      woac 80173215

# CHASE ◯

## Terms and Conditions (Remitter and Payee):

* Please keep this copy for your record of the transaction

* The laws of a specific state will consider these funds to be "abandoned" if the Cashier's Check is not cashed by a certain time

  - Please cash/deposit this Cashier's Check as soon as possible to prevent this from occurring

  - In most cases, the funds will be considered "abandoned" before the "Void After" Date

* Placing a Stop Payment on a Cashier's Check

  - Stop Payment can only be placed if the Cashier's Check is lost, stolen, or destroyed

  - We may not re-issue or refund the funds after the stop payment has been placed until 90 days after the original check was issued

* Please visit a Chase branch to report a lost, stolen, or destroyed Cashier's Check or for any other information about this item

Remitter:     RANDY NICKEL

Pay To The
Order Of:     JAMIE L. GALLIAN

Memo:
Note: For information only. Comment has no effect on bank's payment

**FOR YOUR PROTECTION SAVE THIS COPY**
**CASHIER'S CHECK**

Customer Copy

10/31/2018                    1141939618
Void after 7 years

Drawer: JPMORGAN CHASE BANK, N.A.
**NON NEGOTIABLE**

$** 239,000.00 **

# EXHIBIT 22

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH DISTRICT - DIVISION THREE

––––––––––––

No. G057737

––––––––––––

| | |
|---|---|
| THE HUNTINGTON BEACH GABLES HOMEOWNERS ASSOCIATION, *Plaintiff and Respondent,* <br><br> v. <br><br> JAMIE L. GALLIAN, *Defendant and Appellant.* | Superior Court of California Orange County No. 30-2017-00913985 Hon. James Crandall |

––––––––––––

**Appellant's Opening Brief**

––––––––––––

Jamie Lynn Gallian
16222 Monterey Ln Suite 376
Huntington Beach, CA 92649
714-321-3449
jamiegallian@gmail.com
In Pro Per

Attorney for Defendant and Appellant Jamie L. Gallian

# CERTIFICATE OF
# INTERESTED ENTITIES OR PERSONS

This is the initial certificate of interested entities or persons submitted on behalf of Defendant and Appellant Jamie L. Gallian in the case number listed above.

The undersigned certifies that there are no interested entities or persons that must be listed in this Certificate under California Rules of Court, rule 8.208.

Dated: June 4, 2020                    By: /s/ Jamie Lynn Gallian

2

# TABLE OF CONTENTS

Page

COVER PAGE ............................................................................. 1

CERTIFICATE OF INTERESTED ENTITIES OR
PERSONS ................................................................................. 2

TABLE OF CONTENTS ............................................................. 3

TABLE OF AUTHORITIES .......................................................... 4

APPELLANT'S OPENING BRIEF ............................................... 5

   I.   INTRODUCTION .............................................................. 5

   II.   STATEMENT OF FACTS .................................................... 6

   III.   THE JUDGMENT SHOULD BE REVERSED
   AS A MATTER OF LAW AS A RESULT OF
   THE TRIAL COURT'S FAILURE TO OFFSET
   THE CO-DEFENDANT'S $10,000 SETTLEMENT ....... 17

   IV.   RESPONDENT SHOULD NOT BE DEEMED
   THE PREVAILING PARTY ........................................... 18

   V.   THE TRIAL COURT ABUSED ITS
   DISCRETION IN ISSUING TERMINATING
   SANCTIONS ................................................................. 21

   VI.   THE TRIAL COURT ABUSED ITS
   DISCRETION IN AWARDING ATTORNEY'S
   FEES IN EXCESS OF 243 TIMES THE DAMAGES .... 23

   VII.   CONCLUSION .............................................................. 25

CERTIFICATE OF COMPLIANCE ........................................... 27

PROOF OF SERVICE ................................................................ 28

JASSO DECL. PAGE - 0850

## TABLE OF AUTHORITIES

Page

**Cases:**

*Chavez v. City of Los Angeles*
(2010) 47 Cal.4th 970  ............................................................ 24

*Donald v. Cafe Royale, Inc.*
(1990) 218 Cal.App.3d 168  ................................................... 19

*Goodman v. Lozano*
(2010) 47 Cal.4th 1327  .......................................................... 18

*Heather Farms homeowners Assn. v. Robinson*
(1994) 21 Cal.App.4th 1568  .................................................. 19

*J.W. v. Watchtower Bible & Tract Soc'y of New York,
Inc.*
(2018) 29 Cal.App.5th 1142  ........................................... 22, 23

*Lopez v. Watchtower Bible & Tract Soc'y of New York,
Inc.*
(2016) 246 Cal.App.4th 566  .................................................. 23

*Rancho Mirage Country Club Homeowners Assn. v.
Hazelbaker*
(2016) 2 Cal.App.5th 252  ....................................................... 20

**Statutes:**

Code Civ. Proc., § 664.6  ......................................................... 15

Code Civ. Proc., § 877  ............................................... 14, 17, 18

Code Civ. Proc., § 1032  .......................................................... 18

Code Civ. Proc., § 1033  .......................................................... 24

JASSO DECL. PAGE - 0851

## Appellant's Opening Brief

### I.  INTRODUCTION

This is the second appeal arising out of the same trial court case between Respondent homeowner's association and Appellant homeowner. The first appeal is pending Court of Appeal Case No. G057737 between Appellant and six individual members of the Respondent.

In this second appeal, the **unlimited** trial court issued terminating discovery sanctions against Appellant, refused to apply as a set off, co-defendant's $10,000 settlement with Respondent HOA, determined Respondent HOA was the prevailing party and awarded Respondent HOA $1,295.00, in actual damages representing the billing cost for replacement of a different type of flowers, bags of mulch, the removal of a 32 x 32 cement A/C condenser pad from the adjacent common area of the Unit 53, and the cost of labor for planting similar existing plants to the restricted common area adjacent to Unit 53. The Court awarded attorneys' fees of $298,545.00. Appellant seeks to overturn the default judgment entered against her on the grounds that she should have been declared the prevailing party, and that the Court abused its discretion in issuing terminating sanctions and awarding unreasonable attorneys' fees.

JASSO DECL. PAGE - 0852

## II.  STATEMENT OF FACTS

The Huntington Beach Gables Homeowners Association is a
nonprofit 501(c)(4), Mutual Benefit Corporation, organized in
1980 under the laws of the State of California defined in Civil
Code section 4080. The Board of Directors consists of 5 duly
elected Board of Directors representing the Members of the
association, known as the managing body for The Huntington
Beach Gables Homeowners Association. A 2/3rd or 67% vote is
required per the CC&Rs [before] the Board of Directors transfers
any money's from the Association Reserve Accounts to the
operating account to pay for litigation expenses, that the
Association Members never voted to instigate against one of its
members.

The Association employs a Certified Community Manager
under contract to manage and oversee the assets of the
ASSOCIATION, per the CC&Rs.

Gallian was Bradley's tenant beginning December 3, 2009
until March 22, 2017. Gallian had no voting rights as a tenant,
nor was she a Member of the Association.

On November 23, 2009, Co-Defendant BRADLEY purchased
the 3 bedroom unit and held an interest in a determinate 80 year
Ground Lease and Condominium Sublease leasehold with
recorded title under a Grant Deed to a separate unit, and a
percentage ownership in the common area as tenants in common
within this Planned Unit Community defined in Civil Code
§4175.

6

A "planned development" is defined as a real property development other than a community apartment project, a condominium project, or stock cooperative, having either or both of the following features:

a. Common area that is owned as tenants in common by the owners of the separate interests who possess appurtenant rights to the beneficial use and enjoyment of the common area;

b. Common area and an Association that maintains the common area with the power to levy assessments that may become a lien upon the separate interests.

Each homeowner with legal recorded title of a unit is a Member of the homeowners association.

The Landlord to the Ground Lease assesses each unit approximately $ 9000.00 per year, for the use and enjoyment of the Ground Leasehold estate until 2059.

Real property taxes are assessed against each unit by the Orange County Tax Assessor for the value of the land and the buildings and units.

GALLIAN became record owner of the Ground Lease and sub-condominium leasehold on March 23, 2017, by way of Assignment of a Ground Lease for the remaining term of the 80-year Leasehold and an Assignment of the Grant Deed to Condominium Sublease for the remaining term. The Leasehold from BRADLEY, recorded in the Official Records of the County of Orange as Document Number 2017–000116815.

7

By virtue the Ground Lease contract, each Member owns an undivided 1/80th interest in the common area of Lot 1 and Lot 2 of Tract 10542, recorded in the Official Records of the County of Orange in Miscellaneous Maps Book 456, page(s) 49 & 50.

By recorded conveyance, the declarants interest in the common area conveyed to each owner of separate interest coupled with an undivided percentage interest as tenants in common and a Membership in the Homeowners Association.

**Subject to [ALL] Governing Documents of Record that concern and touch the land:**

a. **Covenant Running with The Land** recorded on October 19, 1979, in Book 13383, Pg(s) 1868–1870, for that certain real property in the City of Huntington Beach, County of Orange, State of California, described as Parcel 1 and 2 as shown on a Parcel Map recorded in Book 108, Pages 47 and 48;

b. **The Condominium Plan** recorded on October 18, 1979 as Document No. 79–28814 in the Orange County Recorder's Office;

b. **Tract Map** recorded on October 18, 1979 as Book 456, Pg(s) 49 & 50, in the Orange County Recorder's Office;

c. **Articles of Incorporation** for the Huntington Beach Gables Homeowners Association, recorded with the Secretary of State on May 22, 1980;

d. **The BYLAWS** for the Huntington Beach Gables Homeowners Association executed on May 23, 1980.

8

e. **Declaration of Covenants, Conditions and Restrictions** for Huntington Beach Gables ("CC&Rs") recorded on May 28, 1980 as Document No. 1980–28926 in the Orange County Recorder's Office;

f. **First Amendment to Declaration of Covenants, Conditions and Restrictions** for Huntington Beach Gables recorded on August 5, 1980 as Document No. 1980–5002 in the Orange County Recorder's Office;

g. **Partial Cancellation of Master Lease** recorded on November 7, 1980, Book 13424, Pg(s) 1253–1255, Instrument No. 8691, in the Orange County Recorder's Office;

h. **Partial Cancellation of Sublease** recorded on November 7, 1980, Book 13424, Pg(s) 1256–1258, Instrument No. 8692, in the Orange County Recorder's Office;

i. **Ground Lease,** dated November 7, 1980, recorded in the Orange County Recorder's Office; Bk13424, Pg(s) 1259–1273, Instrument No. 8693, in the Orange County Recorder's Office;

j. **Condominium Sublease,** dated November 7, 1980, recorded in the Orange County Recorder's Office; Bk13424, Pg(s) 1274–1290, Instrument No. 8694, in the Orange County Recorder's Office;

k. **Conveyance of Remainder Interest**, dated November 7, 1980, recorded in the Orange County Recorder's Office; Bk 13424, Pg(s) 1291–1293, Instrument No. 8695, in the Orange County Recorder's Office;

9

l. **Condominium Sublease (Short Form – Memorandum and Grant Deed**, dated November 7, 1980, recorded in the Orange County Recorder's Office; Bk13424, Pg(s) 1294–1298, Instrument No. 8696, in the Orange County Recorder's Office.

m. **First Amendment to the Condominium Sublease Unit 53,** effective January 1, 2003, recorded in the Office of the Orange County Clerk Recorder as Document No. 2003–001044770 on August 28, 2003.

n. **First Amendement to the Ground Lease Unit 53,** effective January 1, 2003, recorded in the Office of the Oranbe County Recorder as Document No. 3003001013605, on August 21, 2003.

o. **"Rules and Regulations"** adopted by the ASSOCIATION Board of Directors on August 26, 2003, as amended on October 1, 2012 ("Rules").

The dispute involves the right, responsibilities, and concerns the use and quiet enjoyment of the leased land in exchange for the consumer paying monies under the provisions of the 80-year Ground Lease Contract, Sub-condominium Leasehold, the Grant Deed, and the incorporation of Huntington Beach Gables Homeowners Association CC&Rs recorded on 5–28–1980, and the First Amendment to the CC&Rs subsequently recorded on 8–5-1980.

A FINAL Subdivision Report (White Report) was issued by the Department of Real Estate for the State of California, File No. 46370 LA, on June 19, 1980 for the subdivision.

10

Huntington Beach Gables Homeowners Association does have a published **Architectural Manual** with reference to allowable modifications to separate interest that do not require the approval of an Architectural Committee. Per the CC&Rs, an independent Architectural Committee is required to be formed consisting of Members of the Association apart from the Board of Directors.

The 2003 Rules & Regulations, amended in 2012, reference general architectural guidelines in addition to Section XI of the CC&Rs.

The ASSOCIATION alleges GALLIAN, while BRADLEY'S tenant since November 2009, acted on behalf of BRADLEY as her agent to allegedly violate the Governing Documents by Gallian working in her yard enjoying the upkeep and maintenance of maintaining the flowersbeds as allowed per the Rules & Regulatiuons on either side of the front porch area and appurtenant to Unit 53. Gallian enjoyed raking mounds of leaves and debris that accumulating in the flower beds, on the porch, the adjacent lawn area blown from the southerly direction by the off shore winds. Gallian would rake the leaves off the grass or water sweep the sharp and painful acorns off the sidewalk from the shedding by several 40+ year old trees planted in the restricted common area adjacent to front area to Unit 53. Appellant used her own hose connected to the water line from the unit, to water the plants within the area directly in front of or to the side and more importantly during the California severe drought in 2014 and 2015 and into early 2016. The grass area

11

adjacent to the unit directly in front of the fenced in patio of unit 53 was replaced by Gallian with a SOD lawn, with Board Approval, after the removal of a massive old pine tree causing damage to the adjacent sidewalk due to the expansion of the roots growing under-ground and on top of the grass area.

Sometime in late 2014, the original central heating system went out. The CC&Rs Section 7.4, allow the placement of an air conditioning unit, on the common area, not to exceed 4 feet from the building wall adjacent to a Unit. In 2015, BRADLEY replaced the orginal heater with an AC/Heater combination unit and placed the condensor unit in the approved CC&R location.

GALLIAN contends at all times while BRADLEY'S tenant, the ASSOCIATION Board President regularly walked by Unit 53 and specifically on the day the air-conditioning company was onsite commented to Gallian and the technician the Board discussed and approved by vote the placement of the condensor unit in the location it was placed and the City of Huntington Beach issued an electrical permit and thereafter after issued final inspection.

GALLIAN contends she never received a violation Notice(s) from the ASSOCIATION, nor did she receive any communication from the owner of the unit that Bradley had received any violation notices concerning landscaping, watering or raking. The only violation letter Gallian was informed of by BRADLEY when GALLIAN would occasionally leave her trash cans out for an extra day, or put her trash cans out a day early due to GALLIAN employement as a Flight Attendant and taking her away from home for several days at a time.

12

This action arose out of a dispute between Appellant and Respondent HOA over alleged violations of the CC&R's. Respondent cannot specifically point to any published violation of a CC&R other than to reference that the Board has the power.

Appellant was initially a tenant of Bradley since 2009, when the dispute commenced and her home was owned by co-defendant Sandra Bradley. Bradley transferred ownership of the home to Appellant 18 days before the HOA filed the original Complaint against Gallian and Bradley on April 11, 2017.

The disputed issues arose after the Board issued an Approval Letter dated April 11, 2016, approving the Architectural Application submitted on April 3, 2016. The Approval Letter in fact requested the notarized signature of BRADLEY agreeing to the terms in the approval letter. Bradley complied with the Boards request. The Board did not request Gallian provide a notarized approval letter for the proposed improvement consisting of a Patio Cover over an existing 20'x 20' cement slab inside the fenced in separate property patio area. GALLIAN was not the legal title owner and had not standing. The architectural application requested a Sun Cover over the existing cement slab to provide protection from the sun for Appellant and her 2 small animals due to the lack of shade in patio area of the 3 bedroom unit in particular unit 53 patio faces the east. The temperature of the asphalt would reach well over 120 degrees. The patio cover was issued a permit, built to code, and a final inspection was

13

conducted by the Building Department. No one from the Board or the management company come over to inspect the project during construction.

Subsequently after appellant was served the complaint on or around 5-26-17, notifying her of the alleged violation(s) of the patio cover, the HOA included mention for the first time, the location of air conditioning condenser unit placed in the approved location referenced in the CC&Rs Section 7.4. Appellant as the new legal homeowner as of 3-23-17, submitted an architectural application for the placement of an existing air-conditioning unit installed by a licensed company in 2015 at the direction of BRADLEY in the restricted common area adjacent to the unit not to exceed 4 feet into the common area per the CC&Rs, Section 7.4 to the unit, lighting caps on Appellant's fence posts and landscaping in an area that Appellant believed was hers to cultivate and maintain because that is what the Board President personally told her as late as April 7, 2017, in a text message to Appellate stating "they (the gardeners) do not maintain any of your front or side shubbery." This text message was delievered to the attorneys immediatly after the HOA filed a First Amended Complaint against Appellant and Sandra Bradley. [Apx 1–114 ]

The HOA and Bradley settled the lawsuit between them with Bradley paying the HOA Ten Thousand Dollars ($10,000.00.) This settlement was confirmed by the Trial Court to be a Good Faith settlement under California Code of Civil Procedure

14

Section 877 on December 4, 2017. [Apx 115–138 ] Gallian
presented the same offer at the first MSC conducted by the trial
Judge on 1-11-18. The offer was rejected.

On March 2, 2018 Appellant and HOA reached an oral
settlement that was placed on the record in front of the Trial
Court pursuant to California Code of Civil Procedure Section
664.6. Appellant agreed to sell her home at the suggestion of the
trial court, and agreed to pay the HOA $15,000 out of the
proceeds. The alleged violations of the CC&R's would be
remedied after by the HOA after GALLIAN moved from the
Association as GALLIAN believed she had not violated any
published Rule or violated any CC&R. All of the related litigation
between the parties would be dismissed and mutual releases
were given. [RT 88–121] The HOA failed to file notice of
settment, therefore when GALLIAN attempted to file the
Stipulation prepared by her attorney, GALLIANS notice of
settlement was rejected by the Clerk because the HOA had not
filed a date of settlement.

The written settlement agreement unnecessarily prepared by
the HOA's attorneys was not agreed to by Appellant because as
the trial court stated in the Courts 7 page minute order dated
7-19-18, the HOA included terms that were not agreed to by the
parties on the record and left out terms that were agreed to. The
HOA's Motion to Enforce the Settlement was denied by the Trial
Court. [CT 442] Gallian agreed to sign the copy of the Recorder's
Transcript as the trial court suggested ordering the transcript
and just sign the transcript and be done. GALLIAN signed the

transcript at the OSC hearing on 6-4-18, agreeing to its terms in front of the trial court, but the HOA insisted on pushing terms only favorable to plaintiff and ended up pushing to far in their proposed settlement agreement.

On September 27, 2018 the Trial Court granted HOA's four Motions to Compel Responses to further discovery propounded to Appellant [CT 1288–1291] Appellant had moved out of her home and vacated the HOA on September 11, 2018, pending sale of her home on October 31, 2018. This should have ended the controversy. Instead, on November 16, 2018 the HOA filed an ex parte application to advance hearing dates on a Motion for Terminating Sanctions after their request to continue the trial was denied on November 8, 2018 by the trial court and Motion for Attorney Fees [Apx 1190–1276] The Court granted both motions, struck Appellant's answer and her default was requested on February 13, 2019. [Apx 1287–1290]

The Request by the HOA to Enter Default indicated the $10,000 settlement from co-defendant Bradley. [Apx 1340–1341 ] On May 6, 2019 the Trial Court entered Judgment in favor of the HOA and against Appellant in the amount of $1,295.00 in actual damages for purchase of flowers, bags of mulch added to the common area and awarded attorneys' fees of $298,545.00. The Judgment did not reference the settlement with Bradley and did not provide any offset for that settlement. [Apx 1342–1344 ]

16

### III.    THE JUDGMENT SHOULD BE REVERSED AS A MATTER OF LAW AS A RESULT OF THE TRIAL COURT'S FAILURE TO OFFSET THE CO-DEFENDANT'S $10,000 SETTLEMENT

Respondent HOA was awarded a judgment for One Thousand Twelve Hundred and Ninety-Five Dollars ($1,295.00) against Appellant. [APX. 1342–1344], plus fees and costs totaling slightly more than Three Hundred and Fifteen Thousand Dollars ($315,000.) However, Respondent HOA had previously settled with Appellant's Co-Defendant, Sandra Bradley, in the amount of Ten Thousand Dollars ($10,000.00) and was granted a Good Faith Settlement on or about December 4, 2017. [APX. 115–129 ]

California Code of Civil Procedure Section 877 states, in pertinent part:

> Where a release, dismissal with or without prejudice, or a covenant not to sue or not to enforce judgment is given in good faith before verdict or judgment to one or more of a number of tortfeasors claimed to be liable for the same tort, or to one or more other co-obligors mutually subject to contribution rights, it shall have the following effect:
>
> (a) It shall not discharge any other such party from liability unless its terms so provide, but it shall reduce the claims against the others in the amount stipulated by the release, the dismissal or the covenant, or in the amount of the consideration paid for it, whichever is the greater. Cal Code Civ Proc § 877

17

The trial court ignored the provisions of Code of Civil Procedure section 877, and did not offset the $10,000 settlement with co-defendant Bradley, and incorrectly awarded Plaintiff HOA a monetary judgment in the amount of $1,295.00 instead of ordering the Plaintiff HOA to take nothing due to the settlement offset. (*Goodman v. Lozano* (2010) 47 Cal.4th 1327 [104 Cal.Rptr.3d 219, 223 P.3d 77].) modified, (*Cal. Mar. 30, 2010*) 2010 Cal. LEXIS 2356, modified, (Cal. Mar. 30, 2010), 2010 Cal. LEXIS 3186. Although Respondent may argue that the Court did not abuse its discretion in awarding damages to the HOA, the standard for reviewing a question of law is review de novo. *Goodman v. Lozano, supra*, at p. 1332. Therefore, the judgment must be reversed as a matter of law.

## IV.  RESPONDENT SHOULD NOT BE DEEMED THE PREVAILING PARTY

California Code of Civil Procedure section 1032, subdivision (a) states, in pertinent part:

> (4) "Prevailing party" includes the party with a net monetary recovery, a defendant in whose favor a dismissal is entered, a defendant where neither plaintiff nor defendant obtains any relief, and a defendant as against those plaintiffs who do not recover any relief against that defendant. If any party recovers other than monetary relief and in situations other than as specified, the "prevailing party" shall be as determined by the court, and under those circumstances, the court, in its discretion, may

18

allow costs or not and, if allowed, may apportion costs
between the parties on the same or adverse sides
pursuant to rules adopted under Section 1034.

The only relief awarded the HOA against Appellant in the
Judgment [Apx ]was a monetary award for damages in the
amount of $1,295.00,) plus fees and costs. As set forth above, if
the trial court had properly setoff the settlement with co-
defendant Bradley, the HOA should have taken nothing. If so, as
the HOA should not have recovered any relief against Appellant,
she would be "a defendant where neither plaintiff nor defendant
obtains any relief, and a defendant as against those plaintiffs
who do not recover any relief against that defendant."

The HOA will presumably argue that under *Heather Farms
homeowners Assn. v. Robinson* (1994) 21 Cal.App.4th 1568 that
they achieved their litigation objectives and should be deemed
the prevailing party. However, in the closely analogous case of
(*Donald v. Cafe Royale, Inc.* (1990) 218 Cal.App.3d 168 [266
Cal.Rptr. 804].) the Court of Appeal ruled differently where the
Plaintiff who had sought handicapped access was denied such
access when the restaurant ceased operations.

> In the instant case Donald filed his section 55 cause
> of action in order to enjoin Cafe Royale's operation in
> violation of the pertinent statutes and administrative
> code provisions. The cessation of Cafe Royale's
> operation of the restaurant achieved that result.
> Under these circumstances, it was an abuse [***34]
> of discretion for the court to determine that by going
> out of business and rendering the issue moot, Cafe

19

> Royale "prevailed" for purposes of attorney fees.
> Neither party prevailed for purposes of an award of
> attorney fees on the cause of action for injunctive
> relief. (*Donald v. Cafe Royale, Inc.* (1990) 218
> Cal.App.3d 168, 185 [266 Cal.Rptr. 804].)

The HOA should have received no monetary award from
Appellant. It received no injunctive or declaratory relief <u>against</u>
Appellant. Unless its sole purpose in this litigation was to drive
Appellant out of the community, it did not succeed on any level.

The HOA will presumably also cite (*Rancho Mirage Country
Club Homeowners Assn. v. Hazelbaker* (2016) 2 Cal.App.5th 252
[206 Cal.Rptr.3d 233].) to establish that it was a prevailing party
under Davis-Stirling. However, in that case the HOA achieved its
objective by requiring the homeowner to actually correct the
alleged violations of the CC&R's.

> The objective of the Association's enforcement action,
> including the prelitigation ADR process, is
> reasonably characterized broadly as seeking to force
> defendants to bring their property into compliance
> with the CC&Rs. It was successful in achieving that
> goal. (*Rancho Mirage Country Club Homeowners
> Assn. v. Hazelbaker* (2016) 2 Cal.App.5th 252, 261
> [206 Cal.Rptr.3d 233].)

The HOA stated it achieved its objective in filing suit against
Appellant in its Memorandum of Points and Authorities in
Support of its Motion to be Deemed Prevailing Party [Apx
1213–1226 ] It said:

> "As a result of the sale of the Subject Property,
> Gallian's ownership interest in the Subject Property
> and membership in the Association has been
> transferred to the new owner. Since all violations
> pertaining to the Subject Property are being
> corrected by the new owner and since Gallian no
> longer has access to the gated community and no
> ability to cause further harm or damage to the
> Association's common area, the Association's
> litigation objectives in this case have been met
> without need of a trial on the merits. At this
> juncture, the litigation is moot, as there is nothing
> left to be determined by a trier of fact." [Apx ]

The closure of the restaurant in <u>Donovan</u> is analogous to
Appellant's sale of her home in the case at bar. The sale rendered
the dispute between Appellant and HOA moot.

## V.  THE TRIAL COURT ABUSED ITS DISCRETION IN ISSUING TERMINATING SANCTIONS

On September 27, 2018 the Trial Court properly issued
monetary sanctions against Appellant and ordered her to provide
answers to four sets of discovery. [CT 1288–1291] Appellant did
not comply. Instead, she sold her house in October 2018 and the
new owner corrected the violations.[Apx Although admittedly
achieving its litigation objectives and declaring the litigation
moot, HOA filed a Motion for Terminating or Issue/Evidentiary
Sanctions that was argued on January 31, 2019. The Court

21

granted the Motion for Termination Sanctions and ordered Appellant's answer stricken on February 13, 2019 [Apx 1288–1290]

The Trial Court abused its discretion in issuing terminating sanctions because the discovery was not needed at the point in the litigation when the Motion was filed <u>after</u> Appellant sold her property and after the new owner had agreed to correct the alleged violations of the CC&R's. The case of (*J.W. v. Watchtower Bible & Tract Soc'y of New York, Inc.* (2018) 29 Cal.App.5th 1142 [241 Cal.Rptr.3d 62].) discussed when such sanctions should be ordered.

A trial court must be cautious when imposing a **terminating sanction** because the sanction eliminates a party's [***47] fundamental right to a trial, thus implicating due process rights. [Citation.] The trial court should select a sanction that is ""tailor[ed] … to the harm caused by the withheld discovery."" [Citation.] "'[S]anctions 'should be appropriate to the dereliction, and should not exceed that which is required to protect the interests of the party entitled to but denied discovery.'" [Citation.]

*HN11 CA(11)* **(11)** "The discovery statutes thus 'evince an incremental approach to discovery sanctions, starting with monetary sanctions and ending with the ultimate **sanction** of **termination**.' [Citation.] Although in extreme cases a court has the authority to order a **terminating sanction** as a first measure [citations], a **terminating sanction** should generally not be imposed until the court has attempted less severe

22

alternatives and found them to be unsuccessful and/or the record clearly shows lesser sanctions would be ineffective." (*Lopez v. Watchtower Bible & Tract Soc'y of New York, Inc.* (2016) 246 Cal.App.4th 566, 604 [201 Cal. Rptr. 3d 156], italics omitted.)

(*J.W. v. Watchtower Bible & Tract Soc'y of New York, Inc., supra,* 29 Cal.App.5th at p. 1169 [241 Cal.Rptr.3d 62].)

The Trial Court did not use an incremental approach. It did not tailor the sanctions to the harm caused. It could have dismissed Appellant's Cross-Complaint against the HOA. It could have imposed evidentiary or issue sanctions. It should have used a scalpel instead of a hammer. The Trial Court was told by HOA's attorney at a November 16, 2018 hearing to advance the January 17, 2019 scheduled hearing date for the Motion for Terminating Sanctions that: "And so it appears the trial is moot at this point, your honor [RT 233, lines 14–15] The Court responded to the HOA's request to continue the trial until after the Motion was heard "You've been here twice a week for a year. Everyone knows the case. I could try the case for either side. I know both sides' position." [RT 234, lines 21–23

## VI.   THE TRIAL COURT ABUSED ITS DISCRETION IN AWARDING ATTORNEY'S FEES IN EXCESS OF 243 TIMES THE DAMAGES

As a general rule, the parties to an action are required to bear their own attorneys' fees, unless otherwise provided by statute or

23

contract.[1] There is an exception to this rule applicable in this action. When "a prevailing party recovers a judgment that could have been rendered in a limited civil case," and the action was not brought as a limited civil case, Code of Civil Procedure section 1033, subdivision (a) states that "[c]osts or any portion of claimed costs shall be as determined by the court in its discretion..." *Chavez v. City of Los Angeles* (2010) 47 Cal.4th 970, 975.

Likewise, under Code of Civil Procedure section 1033, subdivision (b)(1), when a prevailing party in a limited civil case recovers a judgment that could have been rendered in a small claims court, "the court may, in its discretion, allow or deny costs to the prevailing party, or may allow costs in part in any amount as it deems proper."

Although there is no proportionality test between the amount of damages and the amount of attorney's fees, no rational business would

spend $400,000 of its own money to recover $1295.00 in damages. The Board of the HOA was not spending its own money; they were spending the HOA's money in this litigation. Given the amount spent versus the result, it is beyond reason to reward HOA with such an undeserved fee.

> Attorney fees are determined under the lodestar method, ""calculated by first multiplying the number of hours reasonably expended on the [*447] litigation by a reasonable hourly rate of compensation.""

---
[1]

24

(*Calvo Fisher & Jacob LLP v. Lujan* (2015) 234 Cal.App.4th 608, 619 [184 Cal. Rptr. 3d 225].) ***HN11*** """The "experienced trial judge is the best judge of the value of professional services rendered in [the] court, and while [the trial judge's] judgment is of course subject to review, it will not be disturbed [***33] unless the appellate court is convinced that it is clearly wrong"—meaning that it abused its discretion."' [Citation.]' Indeed, … the 'only proper basis of reversal of the amount of an attorney fees award is if the amount awarded is so large or small that it shocks the conscience and suggests that passion and prejudice influenced the determination.' [Citation.]" (*Id.* at p. 620.) ***HN12 CA(9) (9)*** "The party opposing the fee award can be expected to identify the particular charges it considers objectionable." (***Gorman v. Tassajara Development Corp. (2009) 178 Cal.App.4th 44, 101 [100 Cal. Rptr. 3d 152]***.) (*Pont v. Pont* (2018) 31 Cal.App.5th 428, 446–447 [242 Cal.Rptr.3d 616].)

The amount of the fees awarded (almost $300,000) given the relative lack of success and the simple issues involved suggests that passion and prejudice were involved in granting the fee award without stating any reasons therefor. This suggestion of prejudice is enhanced. By the Trial Court's granting of terminating sanctions against Appellant for failing to provide discovery to HOA at a time when the case was moot.

## VII.  CONCLUSION

The judgment should be reversed because of the failure by the Trial Court to setoff the settlement with co-defendant Bradley. As

25

the HOA did not achieve its litigation objective against Appellant it is not the prevailing party and should not have been awarded attorneys' fees, especially in such an amount that shocks the conscience. Terminating sanctions were wrongly imposed against Appellant as her discovery responses were no longer required given her sale of her home. In light of the foregoing, this Court is respectfully requested to reverse the judgment, reverse the award of fees and costs, and award Appellant her fees and costs on appeal.

In Pro Per

Respectfully submitted,

Dated: June 19, 2020          By: /s/ Jamie Lynn Gallian

Attorney for Defendant and Appellant Jamie L. Gallian

26

## CERTIFICATE OF COMPLIANCE

This brief is set using **13-pt Century Schoolbook**. According to TypeLaw.com, the computer program used to prepare this brief, this brief contains **4,894** words, excluding the cover, tables, signature block, and this certificate.

The undersigned certifies that this brief complies with the form requirements set by California Rules of Court, rule 8.204(b) and contains fewer words than permitted by rule 8.204(c), 8.360(b), 8.412(a) or by Order of this Court.


Dated: June 4, 2020              By: /s/ Jamie Lynn Gallian

27

## PROOF OF SERVICE

I declare:

At the time of service I was at least 18 years of age and not a party to this legal action. My business address is 21742 Anza Avenue, Torrance, CA 90503. I served document(s) described as Appellant's Opening Brief as follows:

### *By TrueFiling*

On June 5, 2020, I served via TrueFiling, and no error was reported, a copy of the document(s) identified above on:

Orange County County Superior Court
(for Honorable James L Crandall)

Rian Walter Jones
(for The Huntington Beach Gables Homeowners Association)

Pejman D Kharrazian
(for The Huntington Beach Gables Homeowners Association)

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Dated: June 4, 2020                    By: /s/ Robert McLelland

28

# EXHIBIT 23

## FW: Randy Nickel - 4476 Alderport

From: Linn Joslyn (linn@elitemanagement.com)

To: lgragnano@goldenstatefoods.com; j9_jasso@yahoo.com

Date: Wednesday, March 20, 2019, 05:37 PM PDT

Please read below.

I'll make hard copies for tomorrow's meeting.

Linn Joslyn, CMCA®

Community Manager

38760 Sky Canyon Drive, Suite C
Murrieta, CA 92563
Phone (951) 699-1220 / Fax (951) 699-1661

linn@elitemanagement.com

http://www.elitemanagement.com

PLEASE NOTE I AM IN THE OFFICE TUESDAY – THURSDAY, EMAILS WILL BE RETURNED ON
THOSE DAYS

THANK YOU

**Accredited Association Management Company (AAMC)®**



**Follow us on our social media:**

Confidentiality Notice and Disclaimer

This transmission is intended only of the use of the individual or entity to which it is addressed and may contain
information that is privileged and confidential. If the reader of this message is not the intended recipient then you are

hereby notified that any disclosure, distribution, or copying of this information is strictly prohibited. If you have received this transmission in error then please notify us immediately by telephone or fax.

---

**From:** Linn Joslyn
**Sent:** Wednesday, March 20, 2019 5:31 PM
**To:** Randy Nickel <r.nickelproperties@yahoo.com>
**Cc:** Linn Joslyn <linn@elitemanagement.com>
**Subject:** RE: Randy Nickel - 4476 Alderport

Randy-

Thank you for the email. I'll forward it to Lee Gragnano and Janine Jasso and make copies for the other three board members.

It will be discussed during executive session tomorrow night, March 21st.

Sincerely,

Linn Joslyn, CMCA®

Community Manager

38760 Sky Canyon Drive, Suite C
Murrieta, CA 92563
Phone (951) 699-1220 / Fax (951) 699-1661

linn@elitemanagement.com

http://www.elitemanagement.com

PLEASE NOTE I AM IN THE OFFICE TUESDAY – THURSDAY, EMAILS WILL BE RETURNED ON THOSE DAYS

THANK YOU

***Accredited Association Management Company (AAMC)®***

**Follow us on our social media:**

Confidentiality Notice and Disclaimer

This transmission is intended only of the use of the individual or entity to which it is addressed and may contain information that is privileged and confidential. If the reader of this message is not the intended recipient then you are hereby notified that any disclosure, distribution, or copying of this information is strictly prohibited. If you have received this transmission in error then please notify us immediately by telephone or fax.

---

**From:** Randy Nickel [mailto:r.nickelproperties@yahoo.com]
**Sent:** Wednesday, March 20, 2019 3:09 PM
**To:** Linn Joslyn <linn@elitemanagement.com>
**Subject:** Re: Randy Nickel - 4476 Alderport

Hello Ms. Jasso

The Escrow company I used was ONLY to check that the Title to my property at 4476 Alderport,HB , was in my name.

This was a cash sale . Papers were signed at my  Bank .

Title , and transaction paperwork were turned into the Recorders Office at time.

The transaction for this property ,was a little RUSHED . Per Gallians request .

We handled the payment quickly . I WISHED I HAD NOT move so swiftly , on this purchase .

The troubles and following problems that we have incurred on buying this property have been like NONE other in my experiences in Real Estate .

The personality problems we have had to deal with from Ms. Gallian and some of the " Connected " people to this transaction have almost caused me to sell this property a couple of times .

My Daughter was almost never going to moved in due to the comments and actions of the people involved .

We had several times where we had the property vandalized and damage done while we had yet moved in .

Getting further along .

Ms. Gallian was asked not to come back around .

So far .

So good .

My Daughter was VERY excited to get this property .

Sometimes a Dad listens to the children with his heart and NOT his better sense of business .

I asked the previous owner Ms. Gallian , to meet with me later in the week to draw-up a short sales agreement .

She has never met with us at this time , and I am NOT looking forward to ANY more contact .

My Daughter and Fiance like it there and are trying to get along with the HOA .

They are both VERY agreeable people .

Let me know if this is enough to settle this transaction .

Randy Nickel

On Wednesday, March 20, 2019 10:21 AM, Linn Joslyn <linn@elitemanagement.com> wrote:

Randy,
Please read email below.
Thanks,

Linn Joslyn, CMCA®
Community Manager
38760 Sky Canyon Drive, Suite C
Murrieta, CA 92563
Phone (951) 699-1220 / Fax (951) 699-1661
linn@elitemanagement.com
http://www.elitemanagement.com

PLEASE NOTE I AM IN THE OFFICE TUESDAY – THURSDAY, EMAILS WILL BE RETURNED ON
THOSE DAYS
THANK YOU

*Accredited Association Management Company (AAMC)®*

**Follow us on our social media:**

Confidentiality Notice and Disclaimer
This transmission is intended only of the use of the individual or entity to which it is addressed and may contain
information that is privileged and confidential. If the reader of this message is not the intended recipient then you are
hereby notified that any disclosure, distribution, or copying of this information is strictly prohibited. If you have
received this transmission in error then please notify us immediately by telephone or fax.

**From:** Janine Jasso [mailto:j9_jasso@yahoo.com]
**Sent:** Wednesday, March 20, 2019 10:15 AM
**To:** Linn Joslyn <linn@elitemanagement.com>
**Cc:** Lee Gragnano <lgragnano@goldenstatefoods.com>
**Subject:** Randy Nickel - 4476 Alderport

Dear Linn,
Could you please forward this to Randy?

Dear Randy,
Thank you for your messages.  I am Janine Jasso, the Association's Vice President.  The Association's attorney and Lee Gragnano, the Association's President, have asked you in person, on the phone and in writing to please send us your purchase agreement of 4476 Alderport.  To date, we still have not received it.  This documentation will help us review your request.  Please fax the purchase agreement to Linn at 951-699-1661 or  me at 413-723-1540 or scan and send a pdf to Linn Joslyn as soon as possible.  The Board is meeting tomorrow, and we would like to review your request then. Therefore, the sooner you can get this to us the more likely we can review your request tomorrow.  If you fax it, would you please email that you have sent the fax?  Please make sure you send it before 3pm today so that she can provide it to the Board by tomorrow.

You mentioned that you used an Escrow company, would you also provide us with the name of your Escrow company agent, phone number and escrow number?

Thank you very much and have a great day,
Janine
P: 213-247-6030
F: 413-723-1540
CONFIDENTIALITY NOTICE:  This communication constitutes an electronic communication within the meaning of the Electronic Communications Privacy Act [18 USC 2510] and it is intended to be received and read only by certain individuals for their sole use and benefit. This e-mail and any files transmitted with it are the property of Janine Jasso, Esq. and/or affiliates, are confidential. Any other use retention, dissemination, forwarding, printing, or copying of this e-mail is strictly prohibited. It may contain information that is privileged or protected from disclosure by law. Receipt by anyone other than the intended recipient does not constitute a loss of the confidential or privileged nature of the communication. Any review or distribution by others is strictly prohibited. If it has been misdirected, or if you suspect you have received this in error, please notify me by replying and then delete both the message and reply immediately from your computer. Thank you.

# EXHIBIT 24

RECORDING REQUESTED BY
AND WHEN RECORDED MAIL TO:

BS Investors
19100 Von Karman Ave., Suite 370
Irvine, CA 92612
Attn: Hugh M. Saddington

Recorded in Official Records, County of Orange
Tom Daly, Clerk-Recorder

‖ 34.00
2003001044770 12:56pm 08/28/03
118 4 A17 15
0.00 0.00 0.00 0.00 28.00 0.00 0.00 0.00

(Space Above For Recorder's Use)

## FIRST AMENDMENT TO CONDOMINIUM SUBLEASE

THIS FIRST AMENDMENT TO CONDOMINIUM SUBLEASE ("First Amendment"), effective as of January 1, 2003 (the "Effective Date"), is made and entered into by and between BS INVESTORS, LLC, a California limited liability company ("Landlord") and CAROLYN MARTIN and SUE TURNER ("Tenant").

### RECITALS

A.      Houser Bros. Co., a California limited partnership ("Master Lessor") is the fee owner of that certain real property (the "Houser Property") located in the City of Huntington Beach and more particularly described in Exhibit "A" attached hereto.

B.      On October 18, 1979, a Condominium Plan was recorded for the Houser Property in Book 13358, Pages 1193, et. seq., in the official records of Orange County, California (the "Condominium Plan"). After the Condominium Plan was recorded, a condominium project consisting of eighty (80) condominium units was constructed on the Houser Property in accordance with the Condominium Plan (the "Condominium Project").

C.      By a document entitled "Ground Lease", dated August 1, 1980, entered into by and between Master Lessor, as landlord, and Robert P. Warmington ("Warmington") as tenant, (the "Ground Lease"), Master Lessor leased to Warmington that certain real property described in Exhibit "B" attached hereto. The Ground Lease was recorded on November 7, 1980, in the Official Records of Orange County, California in Book 13824, at page 1259, et. seq.

D.      The property leased under the Ground Lease, described in Exhibit "B", is referred to in this First Amendment as the "Leased Land". The condominium unit that is identified in the legal description of the Leased Land is one unit in the Condominium Project pursuant to the Condominium Plan. Eighty (80) separate Ground Leases were entered into for the Condominium Project, one for each of the eighty (80) units located on the Houser Property.

E.      By a document entitled "Condominium Sublease", dated August 1, 1980, entered into by and between Warmington, as landlord, and JOHN F. TURNER and VIRGINIA H.

UNIT 53

4476 Alderport

TURNER (the "Original Tenant"), as Tenant, Warmington subleased the Leased Land to the Original Tenant (the "Condominium Sublease"). The Condominium Sublease was recorded on November 7, 1980, in the Official Records of Orange County, California in Book 13824, at page 1274, et. seq.

F.    On November 7, 1980, a document entitled Condominium Sublease (Short Form -- Memorandum) and Grant Deed was recorded for the Leased Land in the Official Records of Orange County, California in Book 13824, at page 1291, et. seq.

G.    The term of the Ground Lease and the term of the Condominium Sublease commenced on the date of the recording of the Condominium Sublease. The term ends on December 31, 2059.

H.    By a document entitled "Assignment and Assumption of Interest in Ground Lease and Subleases", Landlord acquired the tenant's (ground lessee's) interest in the Ground Lease to the Leased Land and the landlord's (sublessor's) interest in the Condominium Sublease. By such assignment document, Landlord also assumed and agreed to be bound by all the terms and conditions of the Ground Lease and the Condominium Sublease. The Memorandum of Assignment of Ground Lease and Subleases was recorded on July 23, 1999 in the official records of Orange County, California as Instrument No. 19990542301.

I.    Tenant is the assignee of the Original Tenant's (sublessee's) interest in the Condominium Sublease for the Leased Land, and Tenant is the current owner of the building and other improvements granted to the Original Tenant, pursuant to the Condominium Sublease (Short Form -- Memorandum) and Grant Deed.

J.    Article 3 of the Condominium Sublease provides that the tenant agreed to pay as the initial rental for the use and occupancy of the Leased Land during the term of the Sublease the sum of $1,500 per year. Article 3 of the Condominium Sublease further provides that the rental for the Leased Land is subject to adjustment at the time and in the manner provided for in Article 21 of the Condominium Sublease.

K.    Paragraph 21(B) of the Condominium Sublease provides that effective January 1, 1990, January 1, 2010, January 1, 2030 and January 1, 2050, the annual rental shall be adjusted upwards in accordance with the increase, if any, in the cost of living during the 10-year period preceding the rental adjustment based upon a Consumer Price Index identified therein. On January 1, 1990, pursuant to paragraph 21(B) of the Condominium Sublease, the annual rental payable for use and occupancy of the Leased Land under the Condominium Sublease was increased to $2,279.04 per year.

L.    In or about February 2000, a dispute arose among the parties to the Ground Lease and Condominium Sublease concerning the interpretation, application and enforceability of the provisions in paragraph 21(A) of the Condominium Sublease with respect to scheduled rental adjustments effective January 1, 2000, January 1, 2020 and January 1, 2040. As a result of such dispute, Master Lessor and Landlord, as co-plaintiffs, filed a Complaint for Declaratory Relief in the Superior Court of the State of California, for the County of Orange, case number 00CC09649 (the "Action"). In the Complaint, Master Lessor and Landlord requested that the Court

JASSO DECL. PAGE - 0884
Page 2 of 15
Order: 7101904967
Doc: OR:2003 01044770
Requested By: CTISBRNA, Printed: 4/16/2019 4:13 PM

determine the rights, duties and obligations of the Master Lessor, Landlord and Tenant under the Condominium Subleases with respect to the rental adjustments under Article 21 of the Condominium Sublease.

M.     Master Lessor, Landlord and Tenant have settled the Action pursuant to the terms of a written settlement agreement among them (the "Settlement Agreement").  The Settlement Agreement provides that the parties shall execute this First Amendment by which they amend and replace Article 21 of the Sublease to set forth the agreed amount of rental that shall be paid by Tenant for use and occupancy of the Leased Land from and after January 1, 2000 through the end of the Condominium Sublease term.

N.     Landlord has assigned its interest in the Condominium Sublease and the Leased Land to a trustee under a deed of trust for the benefit of a lender referred to herein as "Landlord's Mortgagee".  Landlord's Mortgagee and the deed of trust encumbering Landlord's interest in the Leased Land are identified on Exhibit "C", attached hereto and made a part hereof.

O.     Tenant has assigned its interest in the Condominium Sublease and the Leased Land to a trustee under a deed of trust for the benefit of a lender referred to herein as "Tenant's Mortgagee".  Tenant's Mortgagee and the deed of trust encumbering Tenant's interest in the Leased Land are identified on Exhibit "D", attached hereto made a part hereof.

NOW, THEREFORE, in consideration of the above-referenced Recitals and for other valuable consideration, receipt of which is hereby acknowledged, Landlord and Tenant hereby agree as follows:

## AMENDMENT

1.     AGREED RENTAL FOR PERIOD FROM JANUARY 1, 2000 TO DECEMBER 31, 2002

1.1     Agreed Rental Amount

The parties hereby agree that Tenant shall pay Landlord, and Landlord shall accept from Tenant, in full satisfaction of Tenant's rental obligation for use and occupancy of the Leased Land for the three-year period from January 1, 2000 through and including December 31, 2002 the aggregate sum of TWELVE THOUSAND THREE HUNDRED TWENTY-THREE DOLLARS AND FIFTY-SIX CENTS ($12,323.56).

1.2     Agreed Balance Due

Landlord hereby acknowledges its receipt from Tenant of rent in the amount of TEN THOUSAND FOUR HUNDRED TWENTY-SEVEN DOLLARS AND THIRTEEN CENTS ($10,427.13) paid prior to the effective date of this Amendment for the three-year period from January 1, 2000 to December 31, 2002. Landlord and Tenant agree that the remaining rent balance that Tenant shall pay Landlord for the three-year period from January 1, 2000 to December 31, 2002 shall be ONE THOUSAND EIGHT HUNDRED NINETY-SIX DOLLARS AND FORTY-FOUR CENTS ($1,896.44).

JASSO DECL. PAGE - 0885
Order: 7101904967                          Page 3 of 15                Requested By: CTISBRNA, Printed: 4/16/2019 4:13 PM
Doc: OR:2003 01044770

1.3    Payment of Agreed Balance Due

The parties agree that Tenant shall pay Landlord the agreed balance of $1,896.44.
[AND IF APPLICABLE] [along with the amount of _____
($_____) constituting past due attorneys' fees and costs due to Landlord] concurrently
with Tenant's execution of this First Amendment.

2.    AGREED RENTAL EFFECTIVE JANUARY 1, 2003

2.1    Agreed Rental Amount Effective January 1, 2003

The parties hereto agree that effective January 1, 2003, Tenant shall pay Landlord
as the annual rental for the use and occupancy of the Leased Land for the calendar year 2003, the
sum of FOUR THOUSAND SEVEN HUNDRED FORTY DOLLARS ($4,740). The annual
rental shall be subject to adjustment on January 1, 2004 and each subsequent January 1st of the
remaining Sublease term as provided in Section 3 of this First Amendment.

2.2    Payment of Agreed 2003 Rental

The 2003 annual rental shall be paid in four (4) quarterly installments of $1,185
each. Before the execution of this First Amendment by Tenant, Tenant has paid Landlord the
sum of $2,370 toward the annual rental for use and occupancy of the Leased Land for the
calendar year 2003. If Tenant has paid less than $2,370 for the first two (2) quarterly
installments of 2003 rental before Tenant's execution of this First Amendment, Tenant shall pay
the balance of such installments remaining due concurrently with Tenant's execution of this First
Amendment. The remaining two (2) quarterly installments shall be paid on July 1, 2003 and
October 1, 2003.

3.    ADJUSTMENTS TO ANNUAL RENTAL COMMENCING JANUARY 1, 2004

3.1    Annual Cost of Living Adjustments

On January 1, 2004, and on each subsequent January 1st of the remaining
Sublease term (the "Adjustment Date"), the annual rental payable by Tenant to Landlord for use
and occupancy of the Leased Land shall be subject to a cost of living adjustment as follows: On
each Adjustment Date, the annual rental payable during the calendar year immediately preceding
the applicable Adjustment Date shall be increased by an amount equal  to the lesser of the
following amounts:

(a)    An amount equal to seven percent (7%) of the annual rental payable in the
calendar year immediately preceding the applicable Adjustment Date; or

(b)    An amount equal to that percent of the annual rental payable in the
calendar year immediately preceding the applicable Adjustment Date that equals the
percent increase, if any, in the Consumer Price Index of the Bureau of Labor Statistics of
the U.S. Department of Labor for All Urban Consumers -- Los Angeles -- Riverside --
Orange County, All Items (Base Year 1982-1984 = 100) (the "Index") for the twelve-
month period between October of the calendar year that is fifteen (15) calendar months

JASSO DECL. PAGE - 0886
Page 4 of 15
Order: 7101904967                                                                    Requested By: CTISBRNA, Printed: 4/16/2019 4:13 PM
Doc: OR:2003 01044770

before the applicable Adjustment Date and October of the calendar year that is three (3) months before the applicable Adjustment Date. In no event, however, shall the annual rental be less than the annual rental payable in the calendar year immediately preceding the applicable Adjustment Date.

For example, if the applicable Adjustment Date is January 1, 2010, and the Index has increased by five percent (5%) between October 2008 and October 2009, the annual rental for the calendar year 2010 shall be increased effective January 1, 2010 by five percent (5%) of the annual rental payable in the year 2009. If the Index has increased by seven percent (7%) or more between October 2008 and October 2009, the annual rental shall be increased effective January 2010 by seven percent (7%) of the annual rental payable in the year 2009, which is the maximum cost of living increase on any Adjustment Date. If the Index has declined or not increased between October 2008 and October 2009, there would be no cost of living adjustment to the annual rental effective January 1, 2010.

If the Index is changed so that the base year differs from the base years 1982-1984, the Index shall be converted in accordance with the conversion factor published by the United States Department of Labor, Bureau of Labor Statistics. If the Index is discontinued or revised during the Lease Term or if its publication schedule is changed, the government index or computation with which it is replaced shall be used to obtain substantially the same result as if the Index had not been discontinued or revised. If the Index is discontinued and not replaced, the parties shall jointly select a replacement index that will obtain substantially the same result as the discontinued Index would have obtained if it had not been discontinued.

3.2     Additional Agreed Annual Rental Increases

The parties agree that the annual rental payable by Tenant for use and occupancy of the Leased Land shall also be increased by the sum of THREE HUNDRED SIXTY DOLLARS ($360) per year on each of the following Adjustment Dates: January 1, 2005, January 1, 2007, January 1, 2009, January 1, 2011 and January 1, 2013. Such agreed increases shall be in addition to the cost of living increases described in Section 3.1.

3.3     Notice of Rental Adjustment

Included with Tenant's rent invoice for the annual rental amount on each Adjustment Date, Landlord shall inform Tenant of the amount of the new annual rental effective on the Adjustment Date (and provide the CPI Index information for such Adjustment Date) determined in accordance with the provisions of Section 3.1 and Section 3.2 above. Landlord shall send Tenant such rent invoices at least ten (10) days before each applicable Adjustment Date.

3.4     Payment of Annual Rental

Tenant shall pay the annual rental for each year of the lease term from January 1, 2004 through the end of the term in four (4) equal quarterly installments in advance on the first day of the quarter of each calendar year. The amount of each installment shall be the amount of the annual rental due for the applicable calendar year divided by four.

JASSO DECL. PAGE - 0887
Page 5 of 15

Order: 7101904967                                                                Requested By: CTISBRNA, Printed: 4/16/2019 4:13 PM
Doc: OR:2003 01044770

4.    EFFECT OF AMENDMENT; CONFIRMATION OF SUBLEASE AS AMENDED

   4.1    Effect of Amendment

        The provisions of this First Amendment shall replace and supersede the provisions of Article 21 of the Condominium Sublease with respect to all rental adjustments effective on or after January 1, 2000. If there is any inconsistency between any provisions in this First Amendment and in the Condominium Sublease, or any other agreement or instrument entered into on or before this First Amendment, the provisions of this First Amendment shall prevail.

   4.2    Confirmation of Consistent Terms of Condominium Sublease

        Except to the extent expressly modified by this First Amendment, the terms of the Condominium Sublease are hereby confirmed and shall remain in full force and effect. The Condominium Sublease and this First Amendment contain and set forth all of the terms, covenants and conditions of the Condominium Sublease among the parties as of the Effective Date.

   4.3    Entire Agreement

        This First Amendment is the complete, final and exclusive statement among the parties with respect to the modifications and amendments to the Condominium Sublease that the parties have agreed to in connection with the Settlement Agreement. This First Amendment supersedes all prior and contemporaneous agreements and understandings among the parties relating to such modifications and amendments. This First Amendment may only be amended or modified by a written instrument signed by the parties hereto (or their respective successors and assigns).

5.    FURTHER ASSURANCES

        Each party to this First Amendment will at its own cost and expense execute and deliver such further documents or instruments and will take such other actions as may be reasonably required or appropriate to evidence or carry out the intent and purposes of this First Amendment.

6.    SUCCESSORS AND ASSIGNS

        The provisions of this First Amendment shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors, heirs, executors, administrators and assigns.

7.    NOTICES

        Any notice that may or must be given by either party under this First Amendment shall be delivered: (i) personally; (ii) by certified mail, return receipt requested; or (iii) by a nationally recognized overnight courier, addressed to the party to whom it is intended. Any notice given shall be sent to the respective address of the party set forth on the signature page below, or to such other address as that party may designate for service of notice by a notice given in

267/003708-0019
381986.04 a04/15/03

-6-

JASSO DECL. PAGE - 0888
Page 6 of 15

Order: 7101904967
Doc: OR:2003 01044770

Requested By: CTISBRNA, Printed: 4/16/2019 4:13 PM

accordance with the provisions of this Section 7. A notice sent pursuant to the terms of this Section 7, shall be deemed delivered: (a) when delivery is completed, if delivered personally; (b) two (2) days after deposit into the United States mail; or (c) the business day following deposit with a nationally recognized overnight courier.

IN WITNESS WHEREOF, the parties have executed this First Amendment on the date specified below.

"LANDLORD"

Dated: _6-24-03_

BS INVESTORS, LLC,
a California Limited Liability Company

By:    G/HB Investors,
       a California Limited Partnership
Its:    Member

By:    LPL Asset Management
       Corporation,
       a California corporation
Its:    General Partner

By: _____
      Hugh M. Saddington,
      Its:  President

"TENANT"

Dated: _4/19/03_

_____
SUE TURNER

_____
CAROLYN MARTIN

267/003708-0019
381986.04 a04/16/03

-7-

JASSO DECL. PAGE - 0889
Page 7 of 15

Order: 7101904967                                                           Requested By: CTISBRNA, Printed: 4/16/2019 4:13 PM
Doc: OR:2003 01044770

## CONSENT OF MASTER LESSOR

Master Lessor hereby consents to the First Amendment subject to the following terms and provisions:

This consent shall in no way release Landlord from any of its covenants, agreements, liabilities and duties under the Ground Lease. Nothing contained in the First Amendment shall be deemed a modification of any of Landlord's obligations under the Ground Lease or a waiver of any of Master Lessor's rights under the Ground Lease, except as expressly provided in the First Amendment and the Compromise Settlement and Release Agreement executed by Master Lessor, Landlord and Tenant.

The Sublease continues, in all respects, to be subject to and subordinate to the Ground Lease and to all the terms and provisions contained therein, subject to the non-disturbance provisions contained in the Ground Lease and Sublease, including paragraph 27 of the Ground Lease and paragraph 1 of the Sublease. The non-disturbance provisions contained in the Ground Lease and Sublease shall apply to the Sublease, as amended by the First Amendment.

Master Lessor's consent to the First Amendment shall be limited solely to the First Amendment and shall not relieve Landlord or Tenant from any obligation to obtain the consent of Master Lessor to any further modification or amendment as may be required under the Ground Lease or Sublease.

Nothing in the First Amendment or in this Consent of Master Lessor shall be deemed to have established privity of contract between Master Lessor and Subtenant or to have otherwise altered the legal relationship of Master Lessor and Subtenant that was established by the original Ground Lease and the original Sublease.

IN WITNESS WHEREOF, the undersigned has executed this consent as of the _1st_ day of _July_, 2003.

HOUSER BROS., CO.,
a California limited partnership

By: _Clifford Houser_
Clifford Houser,
Its general partner

267/003708-0019
381986.04 a04/15/03

-8-

Order: 7101904967
Doc: OR:2003 01044770

Requested By: CTISBRNA, Printed: 4/16/2019 4:13 PM

STATE OF CALIFORNIA )
) ss.
COUNTY OF Orange )

On April 19, 2003 , before me, Jani Wilson , Notary Public, personally appeared Carolyn Martin , personally known to me (or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s) or the entity upon behalf of which the person(s) acted, executed the instrument.

Witness my hand and official seal.

_____
Notary Public

[SEAL]

JANI WILSON
Commission # 1356570
Notary Public - California
Orange County
My Comm. Expires Jun 12, 2006

STATE OF CALIFORNIA )
) ss.
COUNTY OF Orange )

On April 19, 2003 , before me, Jani Wilson , Notary Public, personally appeared Sue Turner , personally known to me (or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s) or the entity upon behalf of which the person(s) acted, executed the instrument.

Witness my hand and official seal.

_____
Notary Public

[SEAL]

JANI WILSON
Commission # 1356570
Notary Public - California
Orange County
My Comm. Expires Jun 12, 2006

267/003708-0019
381986.04 a04/15/03

-9-

STATE OF CALIFORNIA       )
                            ) ss.

COUNTY OF ORANGE       )

On ___6-24-03___, before me, Judith D. Collins, Notary Public, personally appeared, Hugh M. Saddington, personally known to me, to be the person whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his authorized capacity, and that by his signature on the instrument the person or the entity upon behalf of which the person acted, executed the instrument.

Witness my hand and official seal.

_Signature of Notary Public_

JUDITH D. COLLINS
Commission # 1265596
Notary Public - California
Orange County
My Comm. Expires May 28, 2004

-10-

Order: 7101904967
Doc: OR:2003 01044770

Requested By: CTISBRNA, Printed: 4/16/2019 4:13 PM

STATE OF CALIFORNIA            )
                               )
                               )  ss.
COUNTY OF ORANGE               )

On ̄)-1-03 , before me, Virginia Langham, Notary Public,
personally appeared, Clifford Houser, personally known to me, to
be the person whose name is subscribed to the within instrument and
acknowledged to me that he executed the same in his authorized
capacity, and that by his signature on the instrument the person
or the entity upon behalf of which the person acted, executed the
instrument.

Witness my hand and official seal

VIRGINIA LANGHAM
Comm. # 1289473
NOTARY PUBLIC-CALIFORNIA
Orange County
My Comm. Expires Jan. 31, 2005

Signature of Notary Public

-11-

Order: 7101904967
Doc: OR:2003 01044770
Requested By: CTISBRNA, Printed: 4/16/2019 4:13 PM

## EXHIBIT "A"

### THE HOUSER PROPERTY

Lots 1 and 2 of Tract 10542 in the City of Huntington Beach, County of Orange, State of California, as shown on a map recorded in Book 456, Pages 49 to 50 of Maps, in the office of the County Recorder of said County.

267/003708-0019
381986.04 a04/15/03

### EXHIBIT "A"
## TO FIRST AMENDMENT TO CONDOMINIUM SUBLEASE

Order: 7101904967
Doc: OR:2003 01044770

Requested By: CTISBRNA, Printed: 4/16/2019 4:13 PM

## EXHIBIT "B"

### LEASED LAND

Those portions of Lots 1 and 2 of Tract 10542 in the City of Huntington Beach, County of Orange, State of California, as shown on a map recorded in Book 456, Pages 49 to 50 of Miscellaneous Maps, in the Office of the County Recorder of Orange County, California, described as follows:

PARCEL 1

Unit 53, as shown and defined on a Condominium Plan (the "Condominium Plan") recorded in Book 13358, Pages 1193, et. seq., Official Records of Orange County, California, excepting that portion consisting of buildings and other improvements.

PARCEL 2

An undivided one-eightieth (1/80) interest in the Common Area as shown and defined on the Condominium Plan, excepting that portion consisting of buildings and other improvements.

PARCEL 3

An easement for the exclusive use and occupancy of those portions of the Restricted Common Area as defined on said Condominium Plan for entry and staircases and attic space relating to said Unit, excepting that portion consisting of buildings and other improvements.

PARCEL 4

A non-exclusive easement and right to use the Common Area as defined on said Condominium Plan, except the Restricted Common Area, excepting that portion consisting of buildings and other improvements.

### EXHIBIT "B"
### TO FIRST AMENDMENT TO CONDOMINIUM SUBLEASE

## EXHIBIT "C"

### CONSENT OF LANDLORD'S MORTGAGEE

The undersigned, Fullerton Community Bank, F.S.B., with an address of _____, is the beneficiary under that certain Deed of Trust dated July 12, 1999, and recorded on July 23, 1999 in the Official Records of Orange County, California as Instrument No. 19990542302 (the "Deed of Trust"), and hereby consents to Landlord entering into this First Amendment, but such consent shall not be deemed a waiver of the undersigned's right to consent to or approve of any other modification or amendment to the Condominium Sublease so long as the indebtedness evidenced by the Deed of Trust remains outstanding.

FULLERTON COMMUNITY BANK, F.S.B

By: _____

Its_____

STATE OF CALIFORNIA          )
                             ) ss.
COUNTY OF _____)

On _____, before me, _____, Notary Public, personally appeared _____, personally known to me (or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s) or the entity upon behalf of which the person(s) acted, executed the instrument.

Witness my hand and official seal.

_____
Notary Public

[SEAL]

### EXHIBIT "C"
### TO FIRST AMENDMENT TO CONDOMINIUM SUBLEASE

Order: 7101904967
Doc: OR:2003 01044770                                              Requested By: CTISBRNA, Printed: 4/16/2019 4:13 PM

## EXHIBIT "D"

### CONSENT OF TENANT'S MORTGAGEE

The undersigned, HOMESIDE LENDING, with an address of P. O. BOX 7198, Pasadena, CA 91109-7198, is the beneficiary under that certain Deed of Trust dated _____, and recorded on April 23, 1987 in the Official Records of Orange County, California as Instrument No. 1987-00223072 (the "Deed of Trust"), and hereby consents to Tenant entering into this First Amendment, but such consent shall not be deemed a waiver of the undersigned's right to consent to or approve of any other modification or amendment to the Condominium Sublease so long as the indebtedness evidenced by the Deed of Trust remains outstanding.

By: _____

Its_____

STATE OF CALIFORNIA      )
                         ) ss.
COUNTY OF _____)

On _____, before me, _____, Notary Public, personally appeared _____, personally known to me (or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s) or the entity upon behalf of which the person(s) acted, executed the instrument.

Witness my hand and official seal.

_____
Notary Public

[SEAL]

267/003708-0019
381986.04 a05/06/03

### EXHIBIT "D"
### TO FIRST AMENDMENT TO CONDOMINIUM SUBLEASE

# EXHIBIT 25

**Statement of Account**



| Account Number | Statement Period | Page |
|---|---|---|
| 27055601 | 10/01/18 thru 10/31/18 | 1 of 4 |

PO Box 66945, 11545 W. Touhy Avenue
Chicago, IL 60666-0945
800-328-1935 (24/7)
alliantcreditunion.com

### ACCOUNT BALANCE SUMMARY

| ID | Account | Balance | |
|---|---|---|---|
| 01 | SAVINGS ACCOUNT | $ | 12.74 |
| 41 | CHECKING | $ | 5.81 |
| 42 | CHECKING | $ | 4,791.00 |

JAMIE L GALLIAN
4476 ALDERPORT DR
HUNTINGTON BEACH CA 92649-2288



We raised our savings rate!

**1.95%** APY

for balances over $100
as of November 1, 2018

## SAVINGS ACCOUNT (ID 01)

| Beginning Balance | Total Withdrawals (9) | Total Deposits (6) | Ending Balance | Annual Percentage Yield Earned | Dividends Earned | YTD Dividends |
|---|---|---|---|---|---|---|
| $58.58 | $12,702.80 | $12,656.96 | $12.74 | 1.900% | $6.96 | $8.69 |

| Posting Date | Transaction Description | Deposit | Withdrawal | Balance |
|---|---|---|---|---|
| **10/01/18** | **BEGINNING BALANCE** | | | **$ 58.58** |
| 10/01/18 | DEPOSIT TRANSFER FROM SHARE 41 | 100.00 | – | 158.58 |
| 10/05/18 | DEPOSIT SST TRANSFER FROM SHARE 41 | 10,000.00 | – | 10,158.58 |
| 10/07/18 | DEPOSIT ATM/CHECK CARD #828000008510 SCHOOLSFIRST 1020/7251 WARNER AVE. HUNTINGTN BCH CA S1A01020   Card 24 | 850.00 | – | 11,008.58 |
| 10/10/18 | WITHDRAWAL ATM/CHECK CARD #82836632 BANK OF AMERICA *BEACH & GARFIELD HUNTINGTON BE CA ICAD4340   Card 24 | – | -203.00 | 10,805.58 |
| 10/10/18 | WITHDRAWAL TRANSFER TO SHARE 41 | – | -2,053.89 | 8,751.69 |
| 10/10/18 | WITHDRAWAL TRANSFER TO SHARE 41 | – | -54.91 | 8,696.78 |
| 10/10/18 | WITHDRAWAL SST TRANSFER TO SHARE 41 | – | -2,400.00 | 6,296.78 |
| 10/11/18 | WITHDRAWAL ONLINE BANKING TRANSFER TO SHARE 42 | – | -100.00 | 6,196.78 |
| 10/12/18 | WITHDRAWAL SST TRANSFER TO SHARE 41 | – | -900.00 | 5,296.78 |
| 10/16/18 | DEPOSIT TRANSFER FROM SHARE 41 | 100.00 | – | 5,396.78 |
| 10/16/18 | WITHDRAWAL SST TRANSFER TO SHARE 41 | – | -500.00 | 4,896.78 |
| 10/25/18 | WITHDRAWAL ATM/CHECK CARD TRANSFER #829800004136 TO SHARE 41 SCHOOLSFIRST 1020/7251 WARNER AVE. HUNTINGTN BCH CA S1A01020   Card 24 | – | -1,800.00 | 3,096.78 |
| 10/26/18 | DEPOSIT ATM/CHECK CARD TRANSFER #829900004758 FROM SHARE 41 SCHOOLSFIRST 1020/7251 WARNER AVE. HUNTINGTN BCH CA S1A01020   Card 24 | 1,600.00 | – | 4,696.78 |
| 10/26/18 | INQ SCHOOLSFIRST 1020/7251 WARNER AVE. HUNTINGTN BCH CA S1A01020 | – | – | |
| 10/26/18 | WITHDRAWAL ATM/CHECK CARD TRANSFER #829900004761 TO SHARE 42 SCHOOLSFIRST 1020/7251 WARNER AVE. HUNTINGTN BCH CA S1A01020   Card 17 | – | -4,691.00 | 5.78 |
| 10/26/18 | INQ SCHOOLSFIRST 1020/7251 WARNER AVE. HUNTINGTN BCH CA S1A01020 | – | – | |
| 10/31/18 | DEPOSIT DIVIDEND 1.884% | 6.96 | – | 12.74 |
| | ANNUAL PERCENTAGE YIELD EARNED 1.900% FOR PERIOD FROM 10/01/18 THRU 10/31/18 BASED ON AVERAGE DAILY BALANCE OF: $4,350.33. | | | |
| **10/31/18** | **ENDING BALANCE** | | | **$ 12.74** |

JASSO DECL. PAGE - 0899

**Statement of Account**

| Account Number | Statement Period | Page |
|---|---|---|
| 27055601 | 10/01/18 thru 10/31/18 | 2 of 4 |

## CHECKING (ID 41)

| Beginning Balance | Total Withdrawals (65) | Total Deposits (17) | Ending Balance | Annual Percentage Yield Earned | Dividends Earned | YTD Dividends |
|---|---|---|---|---|---|---|
| $7,542.90 | $22,890.17 | $15,353.08 | $5.81 | 0.650% | $1.40 | $3.46 |

| Posting Date | Transaction Description | Deposit | Withdrawal | Balance |
|---|---|---|---|---|
| 10/01/18 | BEGINNING BALANCE | | | $ 7,542.90 |
| 10/01/18 | DEPOSIT ACH UNITED AIRLINES TYPE: DIR DEP ID: 2742099724 CO: UNITED AIRLINES | 1,168.82 | – | 8,711.72 |
| 10/01/18 | WITHDRAWAL TRANSFER TO SHARE 01 | – | -100.00 | 8,611.72 |
| 10/01/18 | DEPOSIT ATM/CHECK CARD #827400006372 SCHOOLSFIRST 1020/7251 WARNER AVE. HUNTINGTN BCH CA S1A01020   Card 24 | 500.00 | – | 9,111.72 |
| 10/02/18 | WITHDRAWAL PURCH. DATE 10/01/18 2443106827509193001305 Card 24 ORANGE CO SUPERIOR CRT ACARLSON@OCCO CA | – | -7.50 | 9,104.22 |
| 10/03/18 | DEPOSIT ATM/CHECK CARD #827600007078 SCHOOLSFIRST 1020/7251 WARNER AVE. HUNTINGTN BCH CA S1A01020   Card 24 | 5,700.00 | – | 14,804.22 |
| 10/03/18 | WITHDRAWAL ATM/CHECK CARD #827600007079 SCHOOLSFIRST 1020/7251 WARNER AVE. HUNTINGTN BCH CA S1A01020   Card 24 | – | -200.00 | 14,604.22 |
| 10/03/18 | WITHDRAWAL PURCH. DATE 10/02/18 2476147827603001142444 Card 24 HOT OFF THE GRILL HUNTI HUNTINGTON BE CA | – | -25.09 | 14,579.13 |
| 10/04/18 | WITHDRAWAL PURCH. DATE 10/03/18 2444500827700096992870 Card 24 BOSTON MARKET 0647 HUNTINGTON BE CA | – | -32.45 | 14,546.68 |
| 10/04/18 | WITHDRAWAL PURCH. DATE 10/03/18 2475542827716277358430 Card 24 LAX AIRPORT LOT P 7 LOS ANGELES CA | – | -30.00 | 14,516.68 |
| 10/04/18 | WITHDRAWAL PURCH. DATE 10/03/18 2407314827790001234365 Card 24 CHICK-FIL-A DENVER CO | – | -13.29 | 14,503.39 |
| 10/04/18 | CHECK 2768 | – | -3,400.00 | 11,103.39 |
| 10/05/18 | WITHDRAWAL PURCH. DATE 10/04/18 2443106827809195600106 Card 24 ORANGE CO SUPERIOR CRT ACARLSON@OCCO CA | – | -7.50 | 11,095.89 |
| 10/05/18 | WITHDRAWAL PURCH. DATE 10/04/18 2416405827837800176527 Card 24 EXXONMOBIL 97645642 HUNTINGTON BE CA | – | -63.45 | 11,032.44 |
| 10/05/18 | WITHDRAWAL SST TRANSFER TO SHARE 01 | – | -10,000.00 | 1,032.44 |
| 10/07/18 | WITHDRAWAL POINT OF SALE #828022587746 THE HOME DEPOT #6646 HUNTINGTON BC CA   Card 24 | – | -50.13 | 982.31 |
| 10/07/18 | WITHDRAWAL POINT OF SALE #828019775374 OC GOODWILL #406 5880 EDINGER AVE SANTA ANA CA   Card 24 | – | -38.37 | 943.94 |
| 10/07/18 | WITHDRAWAL POINT OF SALE #828012816097 VONS STORE 2090 HUNTINGTON BE CA   Card 24 | – | -127.65 | 816.29 |
| 10/09/18 | WITHDRAWAL ATM/CHECK CARD #82822706 BANK OF AMERICA *LAX-TERMINAL 7 DEPARTU LOS ANGELES CA WCAD0378   Card 24 | – | -163.00 | 653.29 |
| 10/09/18 | DEPOSIT ATM REBATE | 3.00 | – | 656.29 |
| 10/10/18 | WITHDRAWAL PURCH. DATE 10/09/18 2442733828272005894825 Card 24 MCDONALD'S F13573 DENVER CO | – | -7.37 | 648.92 |
| 10/10/18 | WITHDRAWAL POINT OF SALE #828398730901 NST THE HOME DEPOT 972033 7100 WARNER AVE. HUNTINGTON BC CA   Card 24 | – | -140.49 | 508.43 |
| 10/10/18 | WITHDRAWAL POINT OF SALE #828321211464 THE HOME DEPOT #6646 HUNTINGTON BC CA   Card 24 | – | -62.32 | 446.11 |
| 10/10/18 | DEPOSIT TRANSFER FROM SHARE 01 | 2,053.89 | – | 2,500.00 |
| 10/10/18 | CHECK 2770 | – | -2,500.00 | 0.00 |
| 10/10/18 | DEPOSIT TRANSFER FROM SHARE 01 | 54.91 | – | 54.91 |
| 10/10/18 | WITHDRAWAL POINT OF SALE #828320550983 PETCO 934 HUNTINGTON BE CA   Card 24 | – | -54.91 | 0.00 |
| 10/10/18 | DEPOSIT SST TRANSFER FROM SHARE 01 | 2,400.00 | – | 2,400.00 |
| 10/10/18 | DEPOSIT ATM REBATE | 3.00 | – | 2,403.00 |
| 10/11/18 | WITHDRAWAL POINT OF SALE #828475212726 OMO ANIMALIA 282125 16389 BOLSA CHICA ST HUNTINGTON BE CA   Card 24 | – | -30.00 | 2,373.00 |
| 10/11/18 | CHECK 2656 | – | -40.00 | 2,333.00 |
| 10/11/18 | WITHDRAWAL POINT OF SALE #828422228711 RITE AID STORE - 5745 HUNTINGTON BC CA   Card 24 | – | -28.32 | 2,304.68 |
| 10/12/18 | DEPOSIT ACH VENMO TYPE: VERIFYBAN ID: 7264681992 CO: VENMO | 0.16 | – | 2,304.84 |
| 10/12/18 | DEPOSIT ACH VENMO TYPE: VERIFYBAN ID: 7264681992 CO: VENMO | 0.32 | – | 2,305.16 |
| 10/12/18 | WITHDRAWAL ACH VENMO TYPE: VERIFYBAN ID: 8264681992 CO: VENMO | – | -0.16 | 2,305.00 |
| 10/12/18 | WITHDRAWAL ACH VENMO TYPE: VERIFYBAN ID: 8264681992 CO: VENMO | – | -0.32 | 2,304.68 |
| 10/12/18 | WITHDRAWAL PURCH. DATE 10/11/18 2443106828538300986947 Card 24 TB/PH # 28716 HUNTINGTON BE CA | – | -7.53 | 2,297.15 |
| 10/12/18 | DEPOSIT SST TRANSFER FROM SHARE 01 | 900.00 | – | 3,197.15 |
| 10/13/18 | WITHDRAWAL POINT OF SALE #828618042263 RITE AID STORE - 5745 HUNTINGTON BC CA   Card 24 | – | -34.99 | 3,162.16 |
| 10/14/18 | WITHDRAWAL PURCH. DATE 10/13/18 2407105828762714287618 Card 24 ANN HAIR NAIL AND SPA HUNTINGTON BE CA | – | -56.00 | 3,106.16 |



Statement of Account

PO Box 66945, 11545 W. Touhy Avenue
Chicago, IL 60666-0945
800-328-1935  (24/7)
**alliantcreditunion.com**

| Account Number | Statement Period | Page |
|---|---|---|
| 27055601 | 10/01/18 thru 10/31/18 | 3 of 4 |

## CHECKING (ID 41) (Continued)

| Posting Date | Transaction Description | Deposit | Withdrawal | Balance |
|---|---|---|---|---|
| 10/14/18 | WITHDRAWAL POINT OF SALE #828790461355 WAL WAL-MART STORE 642986 2636 WAL-SAMS HUNTINGTON BE CA  Card 24 | – | -247.42 | 2,858.74 |
| 10/14/18 | WITHDRAWAL ADJUSTMENT POINT OF SALE #828700137999 WAL-MART #2636 WAL-MART STORE HUNTINGTON BE CA  Card 24 | 52.80 | – | 2,911.54 |
| 10/15/18 | CHECK 2658 | | -850.00 | 2,061.54 |
| 10/15/18 | WITHDRAWAL POINT OF SALE #828823185052 RITE AID STORE - 5745 HUNTINGTON BC CA  Card 24 | | -11.68 | 2,049.86 |
| 10/16/18 | WITHDRAWAL PURCH. DATE 10/15/18 2475542828826288638870  Card 24 **Transaction Date:** 10/15/18 SIGNAL ATTORNEY SERVICE 562-5951337 CA | | -90.65 | 1,959.21 |
| 10/16/18 | DEPOSIT ACH VENMO TYPE: CASHOUT ID: 5264681992 CO: VENMO | 200.00 | – | 2,159.21 |
| 10/16/18 | WITHDRAWAL PURCH. DATE 10/14/18 2416405828937800302 6384  Card 24 EXXONMOBIL 97617765 HUNTINGTON BE CA | – | -43.57 | 2,115.64 |
| 10/16/18 | CHECK 2660 | | -150.00 | 1,965.64 |
| 10/16/18 | WITHDRAWAL TRANSFER TO SHARE 01 | – | -100.00 | 1,865.64 |
| 10/16/18 | DEPOSIT SST TRANSFER FROM SHARE 01 | 500.00 | – | 2,365.64 |
| 10/17/18 | DEPOSIT ACH UNITED AIRLINES TYPE: DIR DEP ID: 2742099724 CO: UNITED AIRLINES | 14.78 | – | 2,380.42 |
| 10/17/18 | WITHDRAWAL PURCH. DATE 10/17/18 2443106829002666673 5394  Card 24 ADOBE *ACROPRO SUBS 800-833-6687 CA | – | -14.99 | 2,365.43 |
| 10/18/18 | WITHDRAWAL PURCH. DATE 10/17/18 2475542829028290321 0436  Card 24 **Transaction Date:** 10/17/18 SIGNAL ATTORNEY SERVICE 562-5951337 CA | – | -435.00 | 1,930.43 |
| 10/18/18 | WITHDRAWAL PURCH. DATE 10/17/18 2449215829163777925 0438  Card 24 SP * LEGALDOCSPRO HTTPSLEGALDOC CA | – | -19.99 | 1,910.44 |
| 10/19/18 | WITHDRAWAL PURCH. DATE 10/18/18 2443106829209195000 3998  Card 24 ORANGE CO SUPERIOR CRT ACARLSON@OCCO CA | – | -7.50 | 1,902.94 |
| 10/20/18 | WITHDRAWAL PURCH. DATE 10/19/18 2475542829228292500 5119  Card 24 **Transaction Date:** 10/19/18 CA SOS BPD FILING COUNT SACRAMENTO CA | – | -15.00 | 1,887.94 |
| 10/20/18 | WITHDRAWAL PURCH. DATE 10/19/18 2475542829228292500 5127  Card 24 **Transaction Date:** 10/19/18 CA SOS BPD FILING COUNT SACRAMENTO CA | – | -15.00 | 1,872.94 |
| 10/20/18 | WITHDRAWAL PURCH. DATE 10/19/18 2475542829228292500 5135  Card 24 **Transaction Date:** 10/19/18 CA SOS BPD FILING COUNT SACRAMENTO CA | – | -15.00 | 1,857.94 |
| 10/20/18 | WITHDRAWAL PURCH. DATE 10/19/18 2449215829274023681 8281  Card 24 **Transaction Date:** 10/19/18 SQ *FRIENDLY CAB SACRAMENTO CA | – | -41.80 | 1,816.14 |
| 10/20/18 | WITHDRAWAL PURCH. DATE 10/19/18 2416407829090016532 265  Card 24 CMT SACRAMENTO27680016 SACRAMENTO CA | – | -37.50 | 1,778.64 |
| 10/20/18 | WITHDRAWAL PURCH. DATE 10/20/18 2469216829310080099 3730  Card 24 SMF DOS COYOTES SACRAMENTO CA | – | -7.53 | 1,771.11 |
| 10/20/18 | WITHDRAWAL POINT OF SALE #829300000638 PRO BEAUTY CENTE 5828 EDINGER AVE HUNTINGTON BE CA  Card 24 | – | -20.34 | 1,750.77 |
| 10/20/18 | WITHDRAWAL PURCH. DATE 10/19/18 2449398829309128201 4765  Card 24 JOHN WAYNE AIRPORT SANTA ANA CA | – | -20.00 | 1,730.77 |
| 10/20/18 | WITHDRAWAL POINT OF SALE #829319544022 OC GOODWILL #406 5880 EDINGER AVE SANTA ANA CA  Card 24 | – | -31.41 | 1,699.36 |
| 10/21/18 | WITHDRAWAL PURCH. DATE 10/20/18 2471705829417294306 7177  Card 24 EDWARDS HAIR SALON HUNTINGTON BE CA | – | -60.75 | 1,638.61 |
| 10/21/18 | WITHDRAWAL PURCH. DATE 10/20/18 2432743829423350153 7237  Card 24 OLIVE PIT GRILL HUNTINGTON BE CA | – | -20.69 | 1,617.92 |
| 10/21/18 | WITHDRAWAL PURCH. DATE 10/19/18 2430792829490001086 3015  Card 24 JOHN WAYNE 0402A SANTA ANA CA | – | -28.75 | 1,589.17 |
| 10/21/18 | WITHDRAWAL POINT OF SALE #829423449231 VERIZON WIRELESS 14268- HUNTINGTON BE CA  Card 24 | – | -130.36 | 1,458.81 |
| 10/21/18 | WITHDRAWAL POINT OF SALE #829500458710 VERIZON WIRELESS 14268- HUNTINGTON BE CA  Card 24 | – | -140.29 | 1,318.52 |
| 10/22/18 | WITHDRAWAL POINT OF SALE #829518167216 THE UPS STORE #0015 7071 WARNER AVE #F HUNTINGTON BE CA  Card 24 | – | -45.00 | 1,273.52 |
| 10/22/18 | WITHDRAWAL POINT OF SALE #829592754544 STATERBROS148 HUNTINGTON BE CA  Card 24 | – | -327.00 | 946.52 |
| 10/23/18 | WITHDRAWAL PURCH. DATE 10/22/18 2443106829609195400 0459  Card 24 ORANGE CO SUPERIOR CRT ACARLSON@OCCO CA | – | -15.00 | 931.52 |
| 10/23/18 | WITHDRAWAL PURCH. DATE 10/23/18 2416407829674123421 0425  Card 24 FEDEX 783380348872 MEMPHIS TN | – | -6.54 | 924.98 |

**Statement of Account**

| Account Number | Statement Period | Page |
|---|---|---|
| 27055601 | 10/01/18 thru 10/31/18 | 4 of 4 |

## CHECKING (ID 41)      (Continued)

| Posting Date | Transaction Description | Deposit | Withdrawal | Balance |
|---|---|---|---|---|
| 10/24/18 | WITHDRAWAL PURCH. DATE 10/22/18 24164078296069619986819  Card 24 FEDEXOFFICE 00010074 HUNTINGTON BE CA | – | -0.28 | 924.70 |
| 10/25/18 | WITHDRAWAL PURCH. DATE 10/24/18 24755428297272977754636  Card 24 **Transaction Date:** 10/24/18 CA SOS BPD FILING COUNT 916-6539165 CA | – | -75.00 | 849.70 |
| 10/25/18 | WITHDRAWAL PURCH. DATE 10/24/18 24755428297272977754917  Card 24 **Transaction Date:** 10/24/18 CA SOS BPD FILING COUNT 916-6539165 CA | – | -75.00 | 774.70 |
| 10/25/18 | WITHDRAWAL PURCH. DATE 10/24/18 24492158297740205184017  Card 24 **Transaction Date:** 10/24/18 SQ *COPETE LAW FIRM FOUNTAIN VALL CA | – | -850.00 | -75.30 |
| 10/25/18 | DEPOSIT ATM/CHECK CARD TRANSFER #829800004136 FROM SHARE 01 SCHOOLSFIRST 1020/7251 WARNER AVE. HUNTINGTN BCH CA S1A01020  Card 24 | 1,800.00 | – | 1,724.70 |
| 10/25/18 | WITHDRAWAL POINT OF SALE #829815359559 RITE AID STORE - 5745 HUNTINGTON BC CA    Card 24 | – | -35.30 | 1,689.40 |
| 10/26/18 | WITHDRAWAL PURCH. DATE 10/25/18 24755428298272988456501  Card 24 **Transaction Date:** 10/25/18 CA SOS BPD FILING COUNT 916-6539165 CA | – | -35.00 | 1,654.40 |
| 10/26/18 | WITHDRAWAL ATM/CHECK CARD TRANSFER #829900004758 TO SHARE 01 SCHOOLSFIRST 1020/7251 WARNER AVE. HUNTINGTN BCH CA S1A01020   Card 24 | – | -1,600.00 | 54.40 |
| 10/26/18 | INQ SCHOOLSFIRST 1020/7251 WARNER AVE. HUNTINGTN BCH CA S1A01020 | – | – | |
| 10/27/18 | WITHDRAWAL PURCH. DATE 10/26/18 24492158299637175129238  Card 24 ROCKET LAWYER US WWW.ROCKETLAW CA | – | -49.99 | 4.41 |
| 10/31/18 | DEPOSIT DIVIDEND 0.648% | 1.40 | – | 5.81 |
| | ANNUAL PERCENTAGE YIELD EARNED 0.650% FOR PERIOD FROM 10/01/18 THRU 10/31/18 BASED ON AVERAGE DAILY BALANCE OF: $2,542.99. | | | |
| **10/31/18** | **ENDING BALANCE** | | | **$ 5.81** |

### Check Summary

| Check # | Date | Amount | | Check # | Date | Amount | | Check # | Date | Amount | | Check # | Date | Amount |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2656 | 10/11 | 40.00 | | 2660* | 10/16 | 150.00 | | 2768* | 10/04 | 3,400.00 | | 2770* | 10/10 | 2,500.00 |
| 2658* | 10/15 | 850.00 | | | | | | | | | | | | |

\* Indicates check or share draft out of sequence

| TOTAL OVERDRAFT FEES | Month-to-Date | Year-to-Date |
|---|---|---|
| COURTESY PAY FEES | $ 0.00 | $ 56.00 |
| TOTAL NSF FEES | $ 0.00 | $ 0.00 |

## CHECKING (ID 42)

| Beginning Balance | Total Withdrawals (0) | Total Deposits (2) | Ending Balance | Annual Percentage Yield Earned | Dividends Earned | YTD Dividends |
|---|---|---|---|---|---|---|
| $0.00 | | $4,791.00 | $4,791.00 | – | – | – |

| Posting Date | Transaction Description | Deposit | Withdrawal | Balance |
|---|---|---|---|---|
| **10/11/18** | **BEGINNING BALANCE** | | | **$ 0.00** |
| 10/11/18 | DEPOSIT ONLINE BANKING TRANSFER FROM SHARE 01 | 100.00 | – | 100.00 |
| 10/26/18 | DEPOSIT ATM/CHECK CARD TRANSFER #829900004761 FROM SHARE 01 SCHOOLSFIRST 1020/7251 WARNER AVE. HUNTINGTN BCH CA S1A01020   Card 17 | 4,691.00 | – | 4,791.00 |
| 10/26/18 | INQ SCHOOLSFIRST 1020/7251 WARNER AVE. HUNTINGTN BCH CA S1A01020 | – | – | |
| **10/31/18** | **ENDING BALANCE** | | | **$ 4,791.00** |

| TOTAL OVERDRAFT FEES | Month-to-Date | Year-to-Date |
|---|---|---|
| COURTESY PAY FEES | $ 0.00 | $ 0.00 |
| TOTAL NSF FEES | $ 0.00 | $ 0.00 |

## REPORTING INFORMATION FOR 2018:

Total Dividends Paid Year to Date:     $ 12.15



**Federally insured by NCUA**

EQUAL HOUSING OPPORTUNITY