# EXHIBIT 65


**BANK OF AMERICA**

P.O. Box 15284
Wilmington, DE 19850

Business Advantage
Relationship Rewards

**Customer service information**

J-PAD, LLC
16222 MONTEREY LN SPC 376
HUNTINGTON BEACH, CA  92649-2258

📱  1.888.BUSINESS (1.888.287.4637)

🖥  bankofamerica.com

✉  Bank of America, N.A.
P.O. Box 25118
Tampa, FL 33622-5118

# Your Business Fundamentals Checking Relationship Rewards Platinum

for December 1, 2019 to December 31, 2019

Account number: 3251 3015 1274

**J-PAD, LLC**

## Account summary

| | |
|---|---:|
| Beginning balance on December 1, 2019 | $26,526.70 |
| Deposits and other credits | 0.00 |
| Withdrawals and other debits | -9,849.46 |
| Checks | -0.00 |
| Service fees | -0.00 |
| **Ending balance on December 31, 2019** | **$16,677.24** |

# of deposits/credits: 0

# of withdrawals/debits: 24

# of items-previous cycle[1]: 0

# of days in cycle: 31

Average ledger balance: $19,176.26

[1]Includes checks paid,deposited items&other debits

---

**Bank of America Business Advantage**

## What's on your mind?

Business owners like you can join the Bank of America® Advisory Panel to help us understand what you like and don't like.
Enter code **SBDD** at **bankofamerica.com/AdvisoryPanel** to learn more and join.

Inclusion on the Advisory Panel subject to qualifications.

SSM-01-19-2128.D1 | ARG377KX

# IMPORTANT INFORMATION:
## BANK DEPOSIT ACCOUNTS

How to Contact Us - You may call us at the telephone number listed on the front of this statement.

Updating your contact information - We encourage you to keep your contact information up-to-date. This includes address, email and phone number. If your information has changed, the easiest way to update it is by visiting the Help & Support tab of Online Banking.

Deposit agreement - When you opened your account, you received a deposit agreement and fee schedule and agreed that your account would be governed by the terms of these documents, as we may amend them from time to time. These documents are part of the contract for your deposit account and govern all transactions relating to your account, including all deposits and withdrawals. Copies of both the deposit agreement and fee schedule which contain the current version of the terms and conditions of your account relationship may be obtained at our financial centers.

Electronic transfers: In case of errors or questions about your electronic transfers - If you think your statement or receipt is wrong or you need more information about an electronic transfer (e.g., ATM transactions, direct deposits or withdrawals, point-of-sale transactions) on the statement or receipt, telephone or write us at the address and number listed on the front of this statement as soon as you can. We must hear from you no later than 60 days after we sent you the FIRST statement on which the error or problem appeared.

– Tell us your name and account number.
– Describe the error or transfer you are unsure about, and explain as clearly as you can why you believe there is an error or why you need more information.
– Tell us the dollar amount of the suspected error.

For consumer accounts used primarily for personal, family or household purposes, we will investigate your complaint and will correct any error promptly. If we take more than 10 business days (10 calendar days if you are a Massachusetts customer) (20 business days if you are a new customer, for electronic transfers occurring during the first 30 days after the first deposit is made to your account) to do this, we will provisionally credit your account for the amount you think is in error, so that you will have use of the money during the time it will take to complete our investigation.

For other accounts, we investigate, and if we find we have made an error, we credit your account at the conclusion of our investigation.

Reporting other problems - You must examine your statement carefully and promptly. You are in the best position to discover errors and unauthorized transactions on your account. If you fail to notify us in writing of suspected problems or an unauthorized transaction within the time period specified in the deposit agreement (which periods are no more than 60 days after we make the statement available to you and in some cases are 30 days or less), we are not liable to you and you agree to not make a claim against us, for the problems or unauthorized transactions.

Direct deposits - If you have arranged to have direct deposits made to your account at least once every 60 days from the same person or company, you may call us to find out if the deposit was made as scheduled. You may also review your activity online or visit a financial center for information.

© 2019 Bank of America Corporation

Bank of America, N.A. Member FDIC and  Equal Housing Lender

JASSO DECL. PAGES - 1268

**BANK OF AMERICA**

## Your checking account

J-PAD, LLC  |  Account # 3251 3015 1274  |  December 1, 2019 to December 31, 2019

## Withdrawals and other debits

| Date | Description | Amount |
|------|-------------|-------:|
| 12/03/19 | Zelle Transfer Conf# 7694085ff; STEVEN | -5,000.00 |
| 12/19/19 | CA TLR cash withdrawal from CHK 1274 | -1,500.00 |
| 12/31/19 | Zelle Transfer Conf# a6364c14e; OANH | -75.00 |

Card account # XXXX XXXX XXXX 5571

| Date | Description | Amount |
|------|-------------|-------:|
| 12/02/19 | BKOFAMERICA ATM 12/02 #000005285 WITHDRWL HUNTINGTON HARBO    HUNTINGTON BE CA | -700.00 |
| 12/03/19 | CVS/PHARM 0937  12/03 #000033813 PURCHASE CVS/PHARM 09373-- HUNTINGTON BC CA | -6.84 |
| 12/03/19 | CVS/PHARMACY #  12/03 #000338045 PURCHASE CVS/PHARMACY #09   HUNTINGTON BC CA | -71.28 |
| 12/03/19 | CVS/PHARMACY #  12/03 #000909993 PURCHASE CVS/PHARMACY #09   HUNTINGTON BC CA | -69.48 |
| 12/03/19 | CVS/PHARMACY #  12/03 #000904837 PURCHASE CVS/PHARMACY #09   HUNTINGTON BC CA | -75.46 |
| 12/04/19 | BKOFAMERICA ATM 12/04 #000008991 WITHDRWL HUNTINGTON HARBO    HUNTINGTON BE CA | -700.00 |
| 12/05/19 | CHECKCARD  1205 CHEVRON 0207378 HUNTINGTON BECA 24692169339100388340479 CKCD 5542 XXXXXXXXXXXX5571 XXXX XXXX XXXX 5571 | -49.86 |
| 12/16/19 | BKOFAMERICA ATM 12/16 #000002350 WITHDRWL HUNTINGTON HARBO    HUNTINGTON BE CA | -100.00 |
| 12/18/19 | CHECKCARD  1217 WALLIN AND KLARICH GN TUSTIN       CA 24493989352200000000032 CKCD 8111 XXXXXXXXXXXX5571 XXXX XXXX XXXX 5571 | -250.00 |
| 12/19/19 | CHECKCARD  1217 STARBUCKS STORE 09289 HUNTINGTON BECA 24692169352100844392678 CKCD 5814 XXXXXXXXXXXX5571 XXXX XXXX XXXX 5571 | -4.75 |
| 12/19/19 | CHECKCARD  1217 FANTASTIC CAFE - WESTM WESTMINSTER  CA 24269799352500745905683 CKCD 5812 XXXXXXXXXXXX5571 XXXX XXXX XXXX 5571 | -7.60 |
| 12/19/19 | CHECKCARD  1218 EDWARD S HAIR SALON HUNTINGTN BCHCA 24755429353153533058937 CKCD 7230 XXXXXXXXXXXX5571 XXXX XXXX XXXX 5571 | -65.75 |
| 12/20/19 | BKOFAMERICA ATM 12/20 #000006022 WITHDRWL ALBERTSONS 6102    HUNTINGTON BE CA | -200.00 |
| 12/23/19 | CHECKCARD  1222 CHEVRON 0093069 HUNTINGTON BECA 24692169356100527723724 CKCD 5542 XXXXXXXXXXXX5571 XXXX XXXX XXXX 5571 | -49.04 |
| 12/23/19 | ALBERTSONS #08  12/21 #000738947 PURCHASE ALBERTSONS #080    HUNTINGTON BE CA | -50.00 |
| 12/24/19 | SMART AND FINA  12/24 #000331954 PURCHASE SMART AND FINAL    HUNTINGTON B  CA | -122.50 |
| 12/24/19 | DICKS SPORTING  12/24 #000411982 PURCHASE DICKS SPORTING GO HUNTINGTON BE CA | -282.76 |
| 12/26/19 | CHECKCARD  1225 FEDEX 779222363304 MEMPHIS       TN 24164079359741234880948 CKCD 4215 XXXXXXXXXXXX5571 XXXX XXXX XXXX 5571 | -21.65 |

<em>continued on the next page</em>



Bank of America **Business Advantage**

Your Digital Tip

## Sign up for online alerts today[1]

Stay up to date on your balances, and receive alerts when transactions have posted and when your payments are due.

Log in or enroll at **bankofamerica.com/SmallBusiness** and click on **Alerts** in the Activity Center.

[1] You may elect to receive alerts via text or email. Bank of America does not charge for this service but your mobile carrier's message and data rates may apply. Delivery of alerts may be affected or delayed by your mobile carrier's coverage. You must be enrolled in Online Banking.    ARJ5TCBJ | SSM-02-19-0703.B

JASSO DECL. PAGES - 1269

J-PAD, LLC  |  Account # 3251 3015 1274  |  December 1, 2019 to December 31, 2019

## Withdrawals and other debits - continued

| Date | Description | Amount |
|------|-------------|--------|
| 12/27/19 | BKOFAMERICA ATM 12/27 #000001613 WITHDRWL HUNTINGTON HARBO  HUNTINGTON BE CA | -400.00 |
| 12/30/19 | CHECKCARD  1227 LIVING SCRIPTURES INC 801-6272000  UT 24767909361907100396039 CKCD 5973 XXXXXXXXXXXX5571 XXXX XXXX XXXX 5571 | -9.99 |
| 12/30/19 | CHECKCARD  1227 ORANGE CO SUPERIOR CRT ACARLSON@OCCOCA 24431069362091955001438 CKCD 9399 XXXXXXXXXXXXX5571 XXXX XXXX XXXX 5571 | -37.50 |
| **Subtotal for card account # XXXX XXXX XXXX 5571** | | **-$3,274.46** |
| **Total withdrawals and other debits** | | **-$9,849.46** |

## Service fees

The Monthly Fee on your Business Fundamentals Checking account was waived for the statement period ending 11/29/19. A check mark below indicates the requirement(s) you have met to qualify for the Monthly Fee waiver on the account.

- ☑ $250+ in new net purchases on a linked Business debit card
- ○ $250+ in new net purchases on a linked Business credit card
- ☑ $3,000+ minimum daily balance in primary checking account
- ☑ $5,000+ average monthly balance in primary checking account
- ☑ $15,000+ combined average monthly balance in linked business accounts
- ☑ enrolled in Business Advantage Relationship Rewards

For information on how to open a new product, link an existing service to your account, or about Business Advantage Relationship Rewards please call 1.888.BUSINESS or visit bankofamerica.com/smallbusiness.

## Daily ledger balances

| Date | Balance ($) | Date | Balance($) | Date | Balance ($) |
|------|-------------|------|------------|------|-------------|
| 12/01 | 26,526.70 | 12/16 | 19,753.78 | 12/24 | 17,221.38 |
| 12/02 | 25,826.70 | 12/18 | 19,503.78 | 12/26 | 17,199.73 |
| 12/03 | 20,603.64 | 12/19 | 17,925.68 | 12/27 | 16,799.73 |
| 12/04 | 19,903.64 | 12/20 | 17,725.68 | 12/30 | 16,752.24 |
| 12/05 | 19,853.78 | 12/23 | 17,626.64 | 12/31 | 16,677.24 |

JASSO DECL. PAGES - 1270

J-PAD, LLC  |  Account # 3251 3015 1274  |  December 2016 — December 2016

This page intentionally left blank

J-PAD, LLC  |  Account # 3251 3015 1274  |  December 2016 - December 2017

This page intentionally left blank

This page intentionally left blank

J-PAD, LLC   |   Account # 3251 3015 1274   |   December 1 - December 31, 2019

This page intentionally left blank

JASSO DECL. PAGES - 1274

# EXHIBIT 66


**BANK OF AMERICA**

P.O. Box 15284
Wilmington, DE 19850

Business Advantage
Relationship Rewards

**Customer service information**

J-PAD, LLC
16222 MONTEREY LN SPC 376
HUNTINGTON BEACH, CA  92649-2258

📱 1.888.BUSINESS (1.888.287.4637)

✉️ bankofamerica.com

✉️ Bank of America, N.A.
P.O. Box 25118
Tampa, FL 33622-5118

# Your Business Fundamentals Checking
# Relationship Rewards Platinum

for January 1, 2020 to January 31, 2020

Account number: 3251 3015 1274

**J-PAD, LLC**

## Account summary

| | | |
|---|---|---|
| Beginning balance on January 1, 2020 | $16,677.24 | # of deposits/credits: 0 |
| Deposits and other credits | 0.00 | # of withdrawals/debits: 30 |
| Withdrawals and other debits | -15,455.19 | # of items-previous cycle¹: 0 |
| Checks | -0.00 | # of days in cycle: 31 |
| Service fees | -0.00 | Average ledger balance: $13,510.89 |
| **Ending balance on January 31, 2020** | **$1,222.05** | ¹Includes checks paid,deposited items&other debits |


Your Digital Tip

BANK OF AMERICA BUSINESS ADVANTAGE

## Dreading the shredding?

Go paperless — you'll have security without the hassle of storing and shredding old statements. View your statements online any time.

You can enroll today by logging in to Online Banking at **bankofamerica.com/SmallBusiness** and clicking on **Profiles & Settings** (in the upper right, next to Sign Out).

ARWY4MJB | SSM-04-19-0138.B

JASSO DECL. PAGES - 1276

J-PAD, LLC  |  Account # 3251 3015 1274  |  January 01, 2021 to January 31, 2021

# IMPORTANT INFORMATION:
## BANK DEPOSIT ACCOUNTS

How to Contact Us - You may call us at the telephone number listed on the front of this statement.

Updating your contact information - We encourage you to keep your contact information up-to-date. This includes address, email and phone number. If your information has changed, the easiest way to update it is by visiting the Help & Support tab of Online Banking.

Deposit agreement - When you opened your account, you received a deposit agreement and fee schedule and agreed that your account would be governed by the terms of these documents, as we may amend them from time to time. These documents are part of the contract for your deposit account and govern all transactions relating to your account, including all deposits and withdrawals. Copies of both the deposit agreement and fee schedule which contain the current version of the terms and conditions of your account relationship may be obtained at our financial centers.

Electronic transfers: In case of errors or questions about your electronic transfers - If you think your statement or receipt is wrong or you need more information about an electronic transfer (e.g., ATM transactions, direct deposits or withdrawals, point-of-sale transactions) on the statement or receipt, telephone or write us at the address and number listed on the front of this statement as soon as you can. We must hear from you no later than 60 days after we sent you the FIRST statement on which the error or problem appeared.

- Tell us your name and account number.
- Describe the error or transfer you are unsure about, and explain as clearly as you can why you believe there is an error or why you need more information.
- Tell us the dollar amount of the suspected error.

For consumer accounts used primarily for personal, family or household purposes, we will investigate your complaint and will correct any error promptly. If we take more than 10 business days (10 calendar days if you are a Massachusetts customer) (20 business days if you are a new customer, for electronic transfers occurring during the first 30 days after the first deposit is made to your account) to do this, we will provisionally credit your account for the amount you think is in error, so that you will have use of the money during the time it will take to complete our investigation.

For other accounts, we investigate, and if we find we have made an error, we credit your account at the conclusion of our investigation.

Reporting other problems - You must examine your statement carefully and promptly. You are in the best position to discover errors and unauthorized transactions on your account. If you fail to notify us in writing of suspected problems or an unauthorized transaction within the time period specified in the deposit agreement (which periods are no more than 60 days after we make the statement available to you and in some cases are 30 days or less), we are not liable to you and you agree to not make a claim against us, for the problems or unauthorized transactions.

Direct deposits - If you have arranged to have direct deposits made to your account at least once every 60 days from the same person or company, you may call us to find out if the deposit was made as scheduled. You may also review your activity online or visit a financial center for information.

© 2020 Bank of America Corporation

Bank of America, N.A. Member FDIC and   Equal Housing Lender



**BANK OF AMERICA**                  **Your checking account**

J-PAD, LLC  |  Account # 3251 3015 1274  |  January 1, 2020 to January 31, 2020

## Withdrawals and other debits

| Date | Description | Amount |
|------|-------------|-------:|
| 01/02/20 | Zelle Transfer Conf# 4d1a81880; LISA | -10.00 |
| 01/13/20 | Zelle Transfer Conf# 9c4a804da; LISA | -100.00 |
| 01/27/20 | Zelle Transfer Conf# ff8ee3d9b; LISA | -100.00 |
| 01/28/20 | Customer Withdrawal Image | -7,500.00 |
| 01/28/20 | Customer Withdrawal Image | -5,000.00 |

Card account # XXXX XXXX XXXX 5571

| Date | Description | Amount |
|------|-------------|-------:|
| 01/02/20 | CHECKCARD  1231 PROGRESSIVE LEASING https://progIUT 24055230001400462011683 CKCD 7394 XXXXXXXXXXXX5571 XXXX XXXX XXXX 5571 | -326.96 |
| 01/02/20 | CHECKCARD  1231 JACK IN THE BOX 0285 HUNTINGTON BECA 24692160001100054752599 CKCD 5814 XXXXXXXXXXXX5571 XXXX XXXX XXXX 5571 | -9.14 |
| 01/03/20 | BKOFAMERICA ATM 01/02 #000002810 WITHDRWL HUNTINGTON HARBO  HUNTINGTON BE CA | -500.00 |
| 01/09/20 | CHECKCARD  0108 GEORGES MEXICAN FOOD HUNTINGTON BECA 24801970009200443400322 CKCD 5812 XXXXXXXXXXXX5571 XXXX XXXX XXXX 5571 | -15.14 |
| 01/10/20 | CHECKCARD  0109 SPECTRUM 855-707-7328 CA 24692160009100042243661 CKCD 4899 XXXXXXXXXXXX5571 XXXX XXXX XXXX 5571 | -196.50 |
| 01/13/20 | CHECKCARD  0110 CA SECRETARY OF STATE W 916-6951338  CA 24755420010170109446613 CKCD 9399 XXXXXXXXXXXX5571 XXXX XXXX XXXX 5571 | -20.00 |
| 01/13/20 | CHECKCARD  0110 TST* THE OLIVE PIT - HU HUNTINGTON BECA 24137460010100204752800 CKCD 5812 XXXXXXXXXXXX5571 XXXX XXXX XXXX 5571 | -36.20 |
| 01/13/20 | CHECKCARD  0110 HOT OFF THE GRILL HUNTI HUNTINGTON BECA 24761470012030013996142 CKCD 5814 XXXXXXXXXXXX5571 XXXX XXXX XXXX 5571 | -11.31 |
| 01/13/20 | CHECKCARD  0110 ROMAN'S MEXI-CALI GRILL HUNTINGTON BECA 24687200012030030146657 CKCD 5814 XXXXXXXXXXXX5571 XXXX XXXX XXXX 5571 | -14.56 |
| 01/13/20 | CHECKCARD  0111 STARBUCKS STORE 09289 HUNTINGTON BECA 24692160011100477264816 CKCD 5814 XXXXXXXXXXXX5571 XXXX XXXX XXXX 5571 | -4.75 |
| 01/14/20 | CHECKCARD  0112 H2GO EXPRESS CAR WASH HUNTINGTON BECA 24269790013500597683461 CKCD 7542 XXXXXXXXXXXX5571 XXXX XXXX XXXX 5571 | -6.00 |
| 01/15/20 | CHECKCARD  0113 FEDEX OFFIC10000010074 HUNTINGTON BECA 24164070014069989648997 CKCD 7338 XXXXXXXXXXXX5571 XXXX XXXX XXXX 5571 | -0.78 |
| 01/16/20 | CHECKCARD  0115 WEST JUSTICE CENTER T C WESTMINSTER  CA 24755420016130161868660 CKCD 9399 XXXXXXXXXXXX5571 XXXX XXXX XXXX 5571 | -26.00 |
| 01/16/20 | CHECKCARD  0115 EDWARD S HAIR SALON HUNTINGTN BCHCA 24755420016150163733514 CKCD 7230 XXXXXXXXXXXX5571 XXXX XXXX XXXX 5571 | -95.75 |

*continued on the next page*



Bank of America **Business Advantage**

**Your Digital Tip**

## Guaranteed next-day or 3-day delivery of direct bank-to-bank transfers

Pay individuals, vendors and suppliers who bank at other financial institutions — right from Online Banking. Just log in and click the **Transfers | Send** tab, then select **Send Money to Someone or a Business.**

Fees apply to wires and certain transfers. See the Online Banking Service Agreement at bankofamerica.com/serviceagreement for details. Data connection required for online and mobile transfers. Wireless carrier fees may apply.    ARFKPB7J | SSM-02-19-0704.B

**JASSO DECL. PAGES - 1278**

J-PAD, LLC  |  Account # 3251 3015 1274  |  January 1, 2020 to January 31, 2020

## Withdrawals and other debits - continued

| Date | Description | Amount |
|------|-------------|--------|
| 01/17/20 | CHECKCARD  0116 TST* THE OLIVE PIT - HU HUNTINGTON BECA 24137460016100206945349 CKCD 5812 XXXXXXXXXXX5571 XXXX XXXX XXXX 5571 | -27.11 |
| 01/17/20 | CHECKCARD  0116 Capital One Card Pymt D 800-9557070  VA 24906410016086667146200 CKCD 6012 XXXXXXXXXXX5571 XXXX XXXX XXXX 5571 | -300.00 |
| 01/17/20 | MACY'S    300  01/17 #000401583 PURCHASE MACY'S    300 WES  WESTMINSTER  CA | -120.71 |
| 01/21/20 | CHECKCARD  0118 OC-GOODWILL - MARINA V HUNTINGTON BECA 24000970019039804799972 CKCD 5931 XXXXXXXXXXX5571 XXXX XXXX XXXX 5571 | -33.94 |
| 01/21/20 | SMART AND FINA  01/18 #000095005 PURCHASE SMART AND FINAL    HUNTINGTON B  CA | -75.20 |
| 01/27/20 | CHECKCARD  0124 TST* THE OLIVE PIT - HU HUNTINGTON BECA 24137460024100208218638 CKCD 5812 XXXXXXXXXXX5571 XXXX XXXX XXXX 5571 | -62.80 |
| 01/27/20 | CHECKCARD  0123 STARBUCKS STORE 09289 HUNTINGTON BECA 24692160024100586913456 CKCD 5814 XXXXXXXXXXX5571 XXXX XXXX XXXX 5571 | -4.75 |
| 01/27/20 | BKOFAMERICA ATM 01/26 #000007490 WITHDRWL HUNTINGTON HARBO    HUNTINGTON BE CA | -700.00 |
| 01/27/20 | CHECKCARD  0126 CVS/PHARMACY #09373 HUNTINGTON BECA 24137460027001302995062 CKCD 5912 XXXXXXXXXXX5571 XXXX XXXX XXXX 5571 | -122.60 |
| 01/28/20 | CHECKCARD  0127 LIVING SCRIPTURES INC 801-6272000  UT 24767900027090900134580 CKCD 5973 XXXXXXXXXXX5571 XXXX XXXX XXXX 5571 | -9.99 |
| 01/29/20 | CHECKCARD  0128 FOUNTAIN VALLEY ADULTS FOUNTAIN VALLCA 24270740028016705847190 CKCD 8011 XXXXXXXXXXX5571 XXXX XXXX XXXX 5571 | -25.00 |
| **Subtotal for card account # XXXX XXXX XXXX 5571** | | **-$2,745.19** |
| **Total withdrawals and other debits** | | **-$15,455.19** |

## Service fees

The Monthly Fee on your Business Fundamentals Checking account was waived for the statement period ending 12/31/19. A check mark below indicates the requirement(s) you have met to qualify for the Monthly Fee waiver on the account.

&#10003;  $250+ in new net purchases on a linked Business debit card

&#9711;  $250+ in new net purchases on a linked Business credit card

&#10003;  $3,000+ minimum daily balance in primary checking account

&#10003;  $5,000+ average monthly balance in primary checking account

&#10003;  $15,000+ combined average monthly balance in linked business accounts

&#10003;  enrolled in Business Advantage Relationship Rewards

For information on how to open a new product, link an existing service to your account, or about Business Advantage Relationship Rewards please call 1.888.BUSINESS or visit bankofamerica.com/smallbusiness.

**BANK OF AMERICA**

# Your checking account

J-PAD, LLC   |   Account # 3251 3015 1274   |   January 1, 2020 to January 31, 2020

## Daily ledger balances

| Date | Balance ($) | Date | Balance($) | Date | Balance ($) |
|------|------------|------|-----------|------|-------------|
| 01/01 | 16,677.24 | 01/13 | 15,432.68 | 01/21 | 14,747.19 |
| 01/02 | 16,331.14 | 01/14 | 15,426.68 | 01/27 | 13,757.04 |
| 01/03 | 15,831.14 | 01/15 | 15,425.90 | 01/28 | 1,247.05 |
| 01/09 | 15,816.00 | 01/16 | 15,304.15 | 01/29 | 1,222.05 |
| 01/10 | 15,619.50 | 01/17 | 14,856.33 | | |

JASSO DECL. PAGES - 1280

J-PAD, LLC   |   Account # 3251 3015 1274   |   January through January 31, 2019

This page intentionally left blank

JASSO DECL. PAGES - 1281



Amount:          $5,000.00
Account:         4570029317l7
Bank Number:     54086010

Sequence Number: 2852895760
Capture Date:    01/28/2020
Check Number:    824622220

Cashier's Check - CREDIT COPY

Void After 90 Days

No. 0824622220
Date 01/28/20 01:17:27 PM

91-1701221
NAZ

00-53-3364B  11-2010

FOUNTAIN VALLEY
0012      0000690           0093

Pay

**Five Thousand and 00/100 Dollars**

To The
Order Of      BAIL BONDS DIRECT
              FBO JAMIE LYNN GALLIAN

Notice to Purchaser - In the event that this check is lost, mutilated or stolen, a more stringent and 90-day waiting period will be required prior to replacement. This check should be negotiated within 90 days.

BANK OF AMERICA

**$5,000.00**

Remitter (Purchased By): J-PAD, LLC

Bank of America, N.A.
PHOENIX, AZ

Not-Negotiable
Credit Copy

⑈0824622220⑈ ⑆540860108⑆ 4570029317l7⑈

Electronic Endorsements
Date        Sequence          Bank #          Endrs Type    TRN    RRC    Bank Name
01/28/2020  2852895760        122000661       Rtn Loc/BOFD   Y             Bank of America NA



Amount:         $5,000.00
Account:        457002931717
Bank Number:    54086010

Sequence Number:  2852895760
Capture Date:     01/28/2020
Check Number:     824622220

Seq: 436
Batch: 307139
Date: 01/28/20

Electronic Endorsements

Date          Sequence       Bank #          Endrs Type      TRN    RRC    Bank Name
01/28/2020    2852895760     122000661       Rtn Loc/BOFD    Y             Bank of America NA



Amount:        $5,000.00
Account:       325130151274
Bank Number:   54093013

Sequence Number: 2852895761
Capture Date:    01/28/2020
Check Number:    0



Seq: 437
Batch: 307139
Date: 01/28/20

Electronic Endorsements
Date        Sequence        Bank #         Endrs Type    TRN    RRC    Bank Name
01/28/2020  2852895761      122000661      Rtn Loc/BOFD  Y             Bank of America NA



Amount: $7,500.00
Account: 4570029317717
Bank Number: 54086010

Sequence Number: 2852895762
Capture Date: 01/28/2020
Check Number: 8246222219

Cashier's Check - CREDIT COPY

No. 0824622219

Void After 90 Days

Date 01/28/20 01:12:41 PM

91-170/1221
NAZ

00-53-3364B  11-2010

Notice to Purchaser - In the event that this check is lost, stolen, misplaced or stolen, a proper statement and 90-day waiting period will be required prior to replacement. This check should be registered within 90 days.

FOUNTAIN VALLEY
0012        0000690        0092

Pay
**Seven Thousand Five Hundred and 00/100 Dollars**

To The
Order Of      BAIL BONDS DIRECT
              FBO JAMIE LYNN GALLIAN

Remitter (Purchased By): J-PAD, LLC

Bank of America, N.A.
PHOENIX, AZ

BANK OF AMERICA

***$7,500.00**

Not-Negotiable
Credit Copy

⑈0824622219⑈ ⑆541086010⑈ 4570029317117⑈

Electronic Endorsements
Date       Sequence
01/28/2020 2852895762

Bank #        Endrs Type   TRN   RRC   Bank Name
122000661     Rtn Loc/BOFD  Y                Bank of America NA



Amount:          $7,500.00
Account:         457002931717
Bank Number:     54086010

Sequence Number:    2852895762
Capture Date:       01/28/2020
Check Number:       82462219

**06194912O**

22/11
E2/80
$7,500.00
3151 Initial Check Paid
Tlr 00012
13113    WCA

Tran 60092
R/TN 540930135   CC 00000650   DDA0630135   3751701151274
Account #  3751701151274

Batch: 307139
Date: 01/28/20
Seq: 438

Electronic Endorsements
Date           Sequence        Bank #          Endrs Type      TRN    RRC    Bank Name
01/28/2020     2852895762      122000661       Rtn Loc/BOFD    Y                     Bank of America NA



Amount:          $7,500.00
Account:         325130151274
Bank Number:     54093013

Sequence Number: 2852895763
Capture Date:    01/28/2020
Check Number:    0

For CA Use Only    05-14-3075B   05-2012

**Bank of America**

Name and Address
16222 J Pad LLC
Huntington Beach CA

Telephone No. (    )

Credit Card Cash Advance/Withdrawal

Not Negotiable - Withdrawals are permitted only through payment to the depositor

Seven Thousand Five Hundred

Date  1/28/2020

X _____ Signature

**Dollars**

Save time in line and help us avoid errors. The next time you make a withdrawal, please use your pre-printed withdrawal slips for your account.

Account Number
3251 30151274

$  7500.-

**Total Withdrawal**

⑆54093013⑆:

3251 30151274

**DEBIT**

Electronic Endorsements
Date              Sequence
01/28/2020        2852895763

Bank #            Endrs Type    TRN    RRC
122000661         Rtn Loc/BOFD   Y

Bank Name
Bank of America NA



Amount:          $7,500.00
Account:         325130151274
Bank Number:     54093013

Sequence Number: 2852895763
Capture Date:    01/28/2020
Check Number:    0

Seq: 439
Batch: 307139
Date: 01/28/20

Electronic Endorsements
Date          Sequence       Bank #        Endrs Type      TRN   RRC   Bank Name
01/28/2020    2852895763     122000661     Rtn Loc/BOFD    Y                 Bank of America NA

# EXHIBIT 67


**BANK OF AMERICA**

P.O. Box 15284
Wilmington, DE 19850

J-PAD, LLC
16222 MONTEREY LN SPC 376
HUNTINGTON BEACH, CA  92649-2258

BANK OF AMERICA
Preferred Rewards
For Business

**Customer service information**

📱  1.888.BUSINESS (1.888.287.4637)

✉  bankofamerica.com

✉  Bank of America, N.A.
P.O. Box 25118
Tampa, FL 33622-5118

🔔 | Please see the **Important Messages - Please Read** section of your statement for important details that could impact you.

# Your Business Advantage Fundamentals™ Banking Preferred Rewards for Bus Platinum

for March 1, 2021 to March 31, 2021                    Account number: 3251 3015 1274

**J-PAD, LLC**

## Account summary

| | | |
|---|---|---|
| Beginning balance on March 1, 2021 | $4,553.70 | # of deposits/credits: 0 |
| Deposits and other credits | 0.00 | # of withdrawals/debits: 11 |
| Withdrawals and other debits | -408.10 | # of items-previous cycle¹: 0 |
| Checks | -0.00 | # of days in cycle: 31 |
| Service fees | -0.00 | Average ledger balance: $4,375.32 |
| **Ending balance on March 31, 2021** | **$4,145.60** | ¹Includes checks paid,deposited items&other debits |

BUSINESS ADVANTAGE

## Keep your business and personal banking with you, wherever you go

With the Mobile Banking app, you can stay on top of both your small business banking and personal accounts, wherever you are. Download the app today from your app store or visit **bankofamerica.com/GoMobile**.

Your
Digital
Tools

Mobile Banking requires that you download the Mobile Banking app and
is only available for select mobile devices. Message and data rates may apply.            SSM-10-20-0838.B | 3220188

JASSO DECL. PAGES - 1291

## IMPORTANT INFORMATION:
### BANK DEPOSIT ACCOUNTS

How to Contact Us - You may call us at the telephone number listed on the front of this statement.

Updating your contact information - We encourage you to keep your contact information up-to-date. This includes address, email and phone number. If your information has changed, the easiest way to update it is by visiting the Help & Support tab of Online Banking.

Deposit agreement - When you opened your account, you received a deposit agreement and fee schedule and agreed that your account would be governed by the terms of these documents, as we may amend them from time to time. These documents are part of the contract for your deposit account and govern all transactions relating to your account, including all deposits and withdrawals. Copies of both the deposit agreement and fee schedule which contain the current version of the terms and conditions of your account relationship may be obtained at our financial centers.

Electronic transfers: In case of errors or questions about your electronic transfers - If you think your statement or receipt is wrong or you need more information about an electronic transfer (e.g., ATM transactions, direct deposits or withdrawals, point-of-sale transactions) on the statement or receipt, telephone or write us at the address and number listed on the front of this statement as soon as you can. We must hear from you no later than 60 days after we sent you the FIRST statement on which the error or problem appeared.

- – Tell us your name and account number.
- – Describe the error or transfer you are unsure about, and explain as clearly as you can why you believe there is an error or why you need more information.
- – Tell us the dollar amount of the suspected error.

For consumer accounts used primarily for personal, family or household purposes, we will investigate your complaint and will correct any error promptly. If we take more than 10 business days (10 calendar days if you are a Massachusetts customer) (20 business days if you are a new customer, for electronic transfers occurring during the first 30 days after the first deposit is made to your account) to do this, we will provisionally credit your account for the amount you think is in error, so that you will have use of the money during the time it will take to complete our investigation.

For other accounts, we investigate, and if we find we have made an error, we credit your account at the conclusion of our investigation.

Reporting other problems - You must examine your statement carefully and promptly. You are in the best position to discover errors and unauthorized transactions on your account. If you fail to notify us in writing of suspected problems or an unauthorized transaction within the time period specified in the deposit agreement (which periods are no more than 60 days after we make the statement available to you and in some cases are 30 days or less), we are not liable to you and you agree to not make a claim against us, for the problems or unauthorized transactions.

Direct deposits - If you have arranged to have direct deposits made to your account at least once every 60 days from the same person or company, you may call us to find out if the deposit was made as scheduled. You may also review your activity online or visit a financial center for information.

© 2021 Bank of America Corporation

Bank of America, N.A. Member FDIC and  Equal Housing Lender

**BANK OF AMERICA**

## Your checking account

J-PAD, LLC  |  Account # 3251 3015 1274  |  March 1, 2021 to March 31, 2021

## Withdrawals and other debits

| Date | Description | Amount |
|------|-------------|--------|
| 03/04/21 | Zelle Transfer Conf# 104e205db; SUSAN | -60.00 |
| 03/15/21 | Zelle Transfer Conf# e5a32d89b; ISRAEL | -40.00 |
| 03/17/21 | Zelle Transfer Conf# 165060028; ISRAEL | -60.00 |
| 03/22/21 | Zelle Transfer Conf# jz5hz2qyi; ISRAEL | -60.00 |
| 03/22/21 | Zelle Transfer Conf# mj7nu326q; OANH | -63.00 |
| 03/31/21 | Zelle Transfer Conf# pf8thh9vh; ISRAEL | -60.00 |

Card account # XXXX XXXX XXXX 5571

| Date | Description | Amount |
|------|-------------|--------|
| 03/05/21 | CHECKCARD 0304 OneLegal CCSALE03146966 800-9388815  CA 24906411063115631600917 CKCD 8111 XXXXXXXXXXXX5571 XXXX XXXX XXXX 5571 | -15.70 |
| 03/19/21 | CHECKCARD 0318 OneLegal CCSALE03175131 800-9388815  CA 24906411077116711975009 CKCD 8111 XXXXXXXXXXXX5571 XXXX XXXX XXXX 5571 | -12.35 |
| 03/19/21 | CHECKCARD 0318 OneLegal CCSALE03175447 800-9388815  CA 24906411077116716302902 CKCD 8111 XXXXXXXXXXXX5571 XXXX XXXX XXXX 5571 | -12.35 |
| 03/22/21 | CHECKCARD 0319 OneLegal CCSALE03177321 800-9388815  CA 24906411078116800909363 CKCD 8111 XXXXXXXXXXXX5571 XXXX XXXX XXXX 5571 | -12.35 |
| 03/23/21 | CHECKCARD 0322 OneLegal CCSALE03180629 800-9388815  CA 24906411081117033199066 CKCD 8111 XXXXXXXXXXXX5571 XXXX XXXX XXXX 5571 | -12.35 |

| **Subtotal for card account # XXXX XXXX XXXX 5571** | **-$65.10** |
|------|------|
| **Total withdrawals and other debits** | **-$408.10** |

## Service fees

The Monthly Fee on your primary Business Advantage Fundamentals Banking account was waived for the statement period ending 02/26/21.
A check mark below indicates the requirement(s) you have met to qualify for the Monthly Fee waiver on the account.

○  $250+ in new net purchases on a linked Business debit card has not been met

○  $5,000+ combined average monthly balance in linked business accounts has not been met

✓  Become a member of Preferred Rewards for Business has been met

For information on how to open a new product, link an existing service to your account, or about Preferred Rewards for Business please
call 1.888.BUSINESS or visit bankofamerica.com/smallbusiness.



BUSINESS ADVANTAGE

# Go paperless today!

Reduce the risk of lost or stolen mail. Plus, you can view your statements securely
and easily—online or from our mobile app—24/7 from virtually anywhere.[1]

You can enroll today by logging in to Online Banking at **bankofamerica.com/SmallBusiness**
and clicking on **Profiles & Settings** (in the upper right, next to Sign Out).

[1]Mobile Banking requires that you download the Mobile Banking app and is only available for select mobile devices. Message and data rates may apply.   SSM-04-20-0031.B | 3012579

JASSO DECL. PAGES - 1293

J-PAD, LLC  |  Account # 3251 3015 1274  |  March 1, 2021 to March 31, 2021

## Daily ledger balances

| Date | Balance ($) | Date | Balance($) | Date | Balance ($) |
|---|---|---|---|---|---|
| 03/01 | 4,553.70 | 03/15 | 4,438.00 | 03/22 | 4,217.95 |
| 03/04 | 4,493.70 | 03/17 | 4,378.00 | 03/23 | 4,205.60 |
| 03/05 | 4,478.00 | 03/19 | 4,353.30 | 03/31 | 4,145.60 |

JASSO DECL. PAGES - 1294

# Important Messages - Please Read

We want to make sure you stay up-to-date on changes, reminders, and other important details that could impact you.

**In the next few months, we are making changes to our Overdraft Protection Service and fees. We have outlined each change along with the applicable effective date. Please review these updates in our Deposit Agreement and Disclosures bankofamerica.com/deposits and Business Schedule of Fees at bankofamerica.com/businessfeesataglance.**

| Change | Effective Date | What to Expect After the Change Is Effective |
|---|---|---|
| **Eligible business deposit accounts may have the ability to enroll in multiple Overdraft Protection plans and link up to 5 eligible business accounts for overdraft protection** | • June 18, 2021 for business deposit account(s) opened in GA, IL, KY, MI or TN<br>• August 20, 2021 for business deposit account(s) opened in any location | • When you link more than one business account for overdraft protection and the available funds in your first linked business account are not enough to cover the necessary amount including any applicable transfer fee, the next linked business account(s) will transfer/advance available funds to cover the remaining amount including any applicable transfer fee.<br>• If your linked business accounts do not have enough available funds to cover the necessary amount, we may decline to make the transfer.<br>• This functionality is not available for all business accounts. |
| **Overdraft Protection Transfer Fee changes for transfers made from a linked Bank of America business credit card, business charge card or business line of credit card to your business deposit account (covered account)** | • June 18, 2021 for business deposit account(s) opened in GA, IL, KY, MI or TN<br>• August 20, 2021 for business deposit account(s) opened in any location | • Your covered account may be charged a $12.00 Overdraft Protection Transfer Fee when overdraft protection transfers are made from a linked business credit card, business charge card or business line of credit card to cover the overdraft and the applicable transfer fee on your account. Keep in mind, this fee may be higher than what you are currently charged when transfers are made from your linked credit card.<br>• The applicable transfer fee will be charged to your covered business account; previously the fee was charged to your business credit card, business charge card or business line of credit.<br>• The amount of the applicable transfer fee may be included in the amount transferred from your linked credit card account.<br>• We will only charge one Overdraft Protection Transfer Fee any day a transfer is made to a given covered account, regardless of the number of items covered or whether funds are transferred/advanced from multiple accounts.<br>• We will not charge this fee if all individual items covered by the transfer are $1.00 or less.<br>• We will not charge this fee if your covered account is overdrawn by a total amount of $1.00 or less (previously less than $12.00) before we apply overdraft protection.<br>• Preferred Rewards for Business members qualify for a waiver of this fee. |
| **The dollar amount transferred for overdraft protection from a linked Bank of America business credit card, business charge card or business line of credit to your covered business deposit account** | August 20, 2021 | • Overdraft protection transfers from a linked business credit card, business charge card or business line of credit will be made for the amount  required to cover the overdraft and the applicable transfer fee on the covered account (previously in increments of $100.00). |
| **The name of Overdraft Protection will change to Balance Connect(TM)** | August 20, 2021 | • You will see the new name, Balance Connect(TM), on your statement and in Mobile and Online Banking. |

## We are here to help

If you have questions about these changes, feel free to schedule an appointment with us at bankofamerica.com/appointments.

J-PAD, LLC   |   Account # 3251 3015 1274   |   March 22 - December 21, 2017

This page intentionally left blank


**BANK OF AMERICA**

P.O. Box 15284
Wilmington, DE 19850

J-PAD, LLC
16222 MONTEREY LN SPC 376
HUNTINGTON BEACH, CA  92649-2258

BANK OF AMERICA
Preferred Rewards
For Business

**Customer service information**

📱  1.888.BUSINESS (1.888.287.4637)

🖥  bankofamerica.com

✉  Bank of America, N.A.
P.O. Box 25118
Tampa, FL 33622-5118

# Your Business Advantage Fundamentals™ Banking
# Preferred Rewards for Bus Platinum

for July 1, 2021 to July 31, 2021                          Account number: 3251 3015 1274

**J-PAD, LLC**

## Account summary

| | | |
|---|---|---|
| Beginning balance on July 1, 2021 | $2,454.20 | # of deposits/credits: 2 |
| Deposits and other credits | 166.64 | # of withdrawals/debits: 11 |
| Withdrawals and other debits | -826.26 | # of items-previous cycle[1]: 0 |
| Checks | -0.00 | # of days in cycle: 31 |
| Service fees | -12.00 | Average ledger balance: $2,162.36 |
| **Ending balance on July 31, 2021** | **$1,782.58** | [1]Includes checks paid,deposited items&other debits |

BANK OF AMERICA BUSINESS ADVANTAGE

## What's on your mind?

Business owners like you can join the Bank of America® Advisory Panel to help us understand what you like and don't like.
Enter code **SBDD** at **bankofamerica.com/AdvisoryPanel** to learn more and join.

Inclusion on the Advisory Panel subject to qualifications.                          SSM-10-20-0074.B | 3255564

JASSO DECL. PAGES - 1297

# IMPORTANT INFORMATION:
## BANK DEPOSIT ACCOUNTS

How to Contact Us - You may call us at the telephone number listed on the front of this statement.

Updating your contact information - We encourage you to keep your contact information up-to-date. This includes address, email and phone number. If your information has changed, the easiest way to update it is by visiting the Help & Support tab of Online Banking.

Deposit agreement - When you opened your account, you received a deposit agreement and fee schedule and agreed that your account would be governed by the terms of these documents, as we may amend them from time to time. These documents are part of the contract for your deposit account and govern all transactions relating to your account, including all deposits and withdrawals. Copies of both the deposit agreement and fee schedule which contain the current version of the terms and conditions of your account relationship may be obtained at our financial centers.

Electronic transfers: In case of errors or questions about your electronic transfers - If you think your statement or receipt is wrong or you need more information about an electronic transfer (e.g., ATM transactions, direct deposits or withdrawals, point-of-sale transactions) on the statement or receipt, telephone or write us at the address and number listed on the front of this statement as soon as you can. We must hear from you no later than 60 days after we sent you the FIRST statement on which the error or problem appeared.

- Tell us your name and account number.
- Describe the error or transfer you are unsure about, and explain as clearly as you can why you believe there is an error or why you need more information.
- Tell us the dollar amount of the suspected error.

For consumer accounts used primarily for personal, family or household purposes, we will investigate your complaint and will correct any error promptly. If we take more than 10 business days (10 calendar days if you are a Massachusetts customer) (20 business days if you are a new customer, for electronic transfers occurring during the first 30 days after the first deposit is made to your account) to do this, we will provisionally credit your account for the amount you think is in error, so that you will have use of the money during the time it will take to complete our investigation.

For other accounts, we investigate, and if we find we have made an error, we credit your account at the conclusion of our investigation.

Reporting other problems - You must examine your statement carefully and promptly. You are in the best position to discover errors and unauthorized transactions on your account. If you fail to notify us in writing of suspected problems or an unauthorized transaction within the time period specified in the deposit agreement (which periods are no more than 60 days after we make the statement available to you and in some cases are 30 days or less), we are not liable to you and you agree to not make a claim against us, for the problems or unauthorized transactions.

Direct deposits - If you have arranged to have direct deposits made to your account at least once every 60 days from the same person or company, you may call us to find out if the deposit was made as scheduled. You may also review your activity online or visit a financial center for information.

© 2021 Bank of America Corporation

**Bank of America, N.A. Member FDIC and**  **Equal Housing Lender**

# BANK OF AMERICA

**Your checking account**

J-PAD, LLC  |  Account # 3251 3015 1274  |  July 1, 2021 to July 31, 2021

## Deposits and other credits

| Date | Description | | Amount |
|------|-------------|---|--------|
| 07/09/21 | BKOFAMERICA ATM 07/09 #000006919 DEPOSIT BELLA TERRA | HUNTINGTON BE CA | 106.64 |
| 07/09/21 | BKOFAMERICA ATM 07/09 #000006923 DEPOSIT BELLA TERRA | HUNTINGTON BE CA | 60.00 |
| **Total deposits and other credits** | | | **$166.64** |

## Withdrawals and other debits

| Date | Description | Amount |
|------|-------------|--------|
| 07/14/21 | RETURN ITEM CHARGEBACK | -106.64 |
| 07/28/21 | Zelle Transfer Conf# h9cf46r2d; CHRISTOPHER L BLANK ATTORNEY AT LAW | -210.00 |
| 07/28/21 | Zelle Transfer Conf# s9nrme1wb; OANH | -58.00 |

Card account # XXXX XXXX XXXX 1450

| Date | Description | Amount |
|------|-------------|--------|
| 07/12/21 | STAPLES 0152   07/11 #000908120 PURCHASE STAPLES 0152        HUNTINGTON BE CA | -104.49 |
| 07/12/21 | KOHLS 0654 777  07/11 #000300891 PURCHASE KOHLS 0654 7777 E  HUNTINGTON BE CA | -145.97 |
| 07/14/21 | CHECKCARD 0713 FEDEX 281373516212 MEMPHIS        TN 24164071194741214899906 CKCD 4215 XXXXXXXXXXXX1450 XXXX XXXX XXXX 1450 | -11.19 |
| **Subtotal for card account # XXXX XXXX XXXX 1450** | | **-$261.65** |

Card account # XXXX XXXX XXXX 5571

| Date | Description | Amount |
|------|-------------|--------|
| 07/06/21 | CHECKCARD 0703 Capital One Card Pymt D 800-9557070  VA 24906411184125049325407 CKCD 6012 XXXXXXXXXXXX5571 XXXX XXXX XXXX 5571 | -150.00 |
| 07/08/21 | CHECKCARD 0707 ORANGE CO SUPERIOR CRT ACARLSON@OCCOCA 24431061189091953003707 CKCD 9399 XXXXXXXXXXXX5571 XXXX XXXX XXXX 5571 | -8.27 |
| 07/15/21 | CHECKCARD 0714 OneLegal PYMNT1223519 800-9388815  CA 24906411195125800424008 CKCD 8111 XXXXXXXXXXXX5571 XXXX XXXX XXXX 5571 | -15.70 |
| 07/26/21 | CHECKCARD 0723 TST* HANGOUT - HUNTINGT HUNTINGTON BECA 24137461204100384245363 CKCD 5812 XXXXXXXXXXXX5571 XXXX XXXX XXXX 5571 | -16.00 |
| **Subtotal for card account # XXXX XXXX XXXX 5571** | | **-$189.97** |
| **Total withdrawals and other debits** | | **-$826.26** |

BANK OF AMERICA BUSINESS ADVANTAGE

## Stay on top of your accounts

Start receiving online alerts today to know when transactions have posted and when payments are due.
Sign in or enroll at **bankofamerica.com/SmallBusiness** and click on **Alerts** in the Activity Center.

You may elect to receive alerts via text or email. Bank of America does not charge for this service, but your mobile carrier's message and data rates may apply.
Delivery of alerts may be affected or delayed by your mobile carrier's coverage.

SSM-10-20-0848.B | 3293316

J-PAD, LLC  |  Account # 3251 3015 1274  |  July 1, 2021 to July 31, 2021

## Service fees

The Monthly Fee on your primary Business Advantage Fundamentals Banking account was waived for the statement period ending 06/30/21.
A check mark below indicates the requirement(s) you have met to qualify for the Monthly Fee waiver on the account.

◯  $250+ in new net purchases on a linked Business debit card has not been met

◯  $5,000+ combined average monthly balance in linked business accounts has not been met

✓  Become a member of Preferred Rewards for Business has been met

For information on how to open a new product, link an existing service to your account, or about Preferred Rewards for Business please
call 1.888.BUSINESS or visit bankofamerica.com/smallbusiness.

| Date | Transaction description | Amount |
|------|------------------------|--------|
| 07/14/21 | RETURNED ITEM CHARGEBACK FEE | -12.00 |
| **Total service fees** | | **-$12.00** |

*Note your Ending Balance already reflects the subtraction of Service Fees.*

## Daily ledger balances

| Date | Balance ($) | Date | Balance($) | Date | Balance ($) |
|------|------------|------|-----------|------|------------|
| 07/01 | 2,454.20 | 07/09 | 2,462.57 | 07/15 | 2,066.58 |
| 07/06 | 2,304.20 | 07/12 | 2,212.11 | 07/26 | 2,050.58 |
| 07/08 | 2,295.93 | 07/14 | 2,082.28 | 07/28 | 1,782.58 |

JASSO DECL. PAGES - 1300


**BANK OF AMERICA**

P.O. Box 15284
Wilmington, DE 19850

J-PAD, LLC
16222 MONTEREY LN SPC 376
HUNTINGTON BEACH, CA  92649-2258

BANK OF AMERICA
Preferred Rewards
For Business

**Customer service information**

📱 1.888.BUSINESS (1.888.287.4637)

✉ bankofamerica.com

✉ Bank of America, N.A.
P.O. Box 25118
Tampa, FL 33622-5118

# Your Business Advantage Fundamentals™ Banking
# Preferred Rewards for Bus Platinum

for November 1, 2021 to November 30, 2021                    Account number: 3251 3015 1274

**J-PAD, LLC**

## Account summary

| | | |
|---|---|---|
| Beginning balance on November 1, 2021 | $15.98 | # of deposits/credits: 2 |
| Deposits and other credits | 16,100.00 | # of withdrawals/debits: 16 |
| Withdrawals and other debits | -14,769.40 | # of items-previous cycle[1]: 0 |
| Checks | -0.00 | # of days in cycle: 30 |
| Service fees | -0.00 | Average ledger balance: $3,339.50 |
| **Ending balance on November 30, 2021** | **$1,346.58** | [1]Includes checks paid,deposited items&other debits |

BANK OF AMERICA BUSINESS ADVANTAGE

## Remember, you've got a banking partner ready to help.

As your dedicated Small Business Banker, I'm here to guide you and help with all your business's financial needs.
If you'd like to meet, please contact me.

Angelina Pham
714.266.1865
angelina.pham@bofa.com

SSM-07-21-0006.B | 3646943

JASSO DECL. PAGES - 1301

# IMPORTANT INFORMATION:
## BANK DEPOSIT ACCOUNTS

How to Contact Us - You may call us at the telephone number listed on the front of this statement.

Updating your contact information - We encourage you to keep your contact information up-to-date. This includes address, email and phone number. If your information has changed, the easiest way to update it is by visiting the Help & Support tab of Online Banking.

Deposit agreement - When you opened your account, you received a deposit agreement and fee schedule and agreed that your account would be governed by the terms of these documents, as we may amend them from time to time. These documents are part of the contract for your deposit account and govern all transactions relating to your account, including all deposits and withdrawals. Copies of both the deposit agreement and fee schedule which contain the current version of the terms and conditions of your account relationship may be obtained at our financial centers.

Electronic transfers: In case of errors or questions about your electronic transfers - If you think your statement or receipt is wrong or you need more information about an electronic transfer (e.g., ATM transactions, direct deposits or withdrawals, point-of-sale transactions) on the statement or receipt, telephone or write us at the address and number listed on the front of this statement as soon as you can. We must hear from you no later than 60 days after we sent you the FIRST statement on which the error or problem appeared.

- – Tell us your name and account number.
- – Describe the error or transfer you are unsure about, and explain as clearly as you can why you believe there is an error or why you need more information.
- – Tell us the dollar amount of the suspected error.

For consumer accounts used primarily for personal, family or household purposes, we will investigate your complaint and will correct any error promptly. If we take more than 10 business days (10 calendar days if you are a Massachusetts customer) (20 business days if you are a new customer, for electronic transfers occurring during the first 30 days after the first deposit is made to your account) to do this, we will provisionally credit your account for the amount you think is in error, so that you will have use of the money during the time it will take to complete our investigation.

For other accounts, we investigate, and if we find we have made an error, we credit your account at the conclusion of our investigation.

Reporting other problems - You must examine your statement carefully and promptly. You are in the best position to discover errors and unauthorized transactions on your account. If you fail to notify us in writing of suspected problems or an unauthorized transaction within the time period specified in the deposit agreement (which periods are no more than 60 days after we make the statement available to you and in some cases are 30 days or less), we are not liable to you and you agree to not make a claim against us, for the problems or unauthorized transactions.

Direct deposits - If you have arranged to have direct deposits made to your account at least once every 60 days from the same person or company, you may call us to find out if the deposit was made as scheduled. You may also review your activity online or visit a financial center for information.

© 2021 Bank of America Corporation

Bank of America, N.A. Member FDIC and  Equal Housing Lender

JASSO DECL. PAGES - 1302

 **BANK OF AMERICA**

# Your checking account

J-PAD, LLC  |  Account # 3251 3015 1274  |  November 1, 2021 to November 30, 2021

**Important change regarding ATM withdrawals that overdraw your account.**

Starting February 16, 2022, customers will no longer be given the opportunity to agree to our overdraft practices to make an ATM withdrawal that overdraws their account. Going forward, if an ATM withdrawal amount is more than the available balance, we will decline the transaction.

**We are here to help**
If you have questions or you would like to discuss this change to our overdraft practices, please call the number on your statement or schedule an appointment at bankofamerica.com/appointments.

The United States Postal Service (USPS) began changing first class mail delivery timeframes in October. This change may result in mailed statements, new or replacement cards and payments you mail taking longer to arrive. For fast and easy access to your account information and to schedule payments 24/7 for your Bank of America credit card and loan accounts, use our Mobile Banking app and Online Banking digital solutions.

Mobile Banking requires that you download the Mobile Banking app and is only available for select mobile devices. Message and data rates may apply.

## Deposits and other credits

| Date | Description | | | Amount |
|------|-------------|---|---|-------:|
| 11/01/21 | BKOFAMERICA MOBILE 10/30 3608422952 DEPOSIT | *MOBILE | CA | 15,000.00 |
| 11/05/21 | Counter Credit | | | 1,100.00 |
| **Total deposits and other credits** | | | | **$16,100.00** |

## Withdrawals and other debits

| Date | Description | Amount |
|------|-------------|-------:|
| 11/05/21 | Customer Withdrawal Image | -13,709.45 |
| 11/09/21 | Zelle Transfer Conf# wqpz5f6p3; CHRISTOPHER L BLANK ATTORNEY AT LAW | -209.00 |
| Card account # XXXX XXXX XXXX 1450 | | |
| 11/15/21 | VONS #2090     11/15 #000170975 PURCHASE VONS #2090        HUNTINGTON BE CA | -8.30 |
| 11/15/21 | JONS MARK 1530  11/15 #000947881 PURCHASE JONS MARK 15300 G  WESTMINSTER   CA | -4.34 |
| 11/16/21 | CHECKCARD  1115 TST* TAMA SUSHI HUNTINGTON BECA 24137461319100228857755 CKCD 5812 XXXXXXXXXXX1450 XXXX XXXX XXXX 1450 | -29.26 |
| **Subtotal for card account # XXXX XXXX XXXX 1450** | | **-$41.90** |

*continued on the next page*



## Introducing security you can see

Our new security meter lets you visualize your account security and moves up as you take additional steps to help protect your account.

Visit the Security Center in the Mobile Banking app or Online Banking to see your security level today. To learn more, scan this code or visit **bofa.com/SecurityCenter.**



Mobile Banking requires that you download the Mobile Banking app and is only available for select mobile devices. Message and data rates may apply.

SSM-07-21-0033.B  |  3647905

JASSO DECL. PAGES - 1303

J-PAD, LLC  |  Account # 3251 3015 1274  |  November 1, 2021 to November 30, 2021

## Withdrawals and other debits - continued

| Date | Description | Amount |
|------|-------------|--------|
| | Card account # XXXX XXXX XXXX 5571 | |
| 11/08/21 | CHECKCARD  1105 24 Hour Fitness USA, I 800-4326348  CA 24204291309000449537437 CKCD 7997 XXXXXXXXXXXX5571 XXXX XXXX XXXX 5571 | -89.56 |
| 11/08/21 | CHECKCARD  1105 RETURN ENGAGEMENT HUNTINGTON BECA 24137461309300709957890 CKCD 5621 XXXXXXXXXXXX5571 XXXX XXXX XXXX 5571 | -253.79 |
| 11/08/21 | THE HOME DEPOT  11/06 #000926513 PURCHASE THE HOME DEPOT #0  WESTMINSTER   CA | -203.63 |
| 11/09/21 | CHECKCARD  1108 OneLegal CCSALE03649945 800-9388815  CA 24906411312133900323748 CKCD 8111 XXXXXXXXXXXX5571 XXXX XXXX XXXX 5571 | -16.73 |
| 11/09/21 | CHECKCARD  1108 OneLegal CCSALE03651491 800-9388815  CA 24906411312133913615312 CKCD 8111 XXXXXXXXXXXX5571 XXXX XXXX XXXX 5571 | -15.70 |
| 11/10/21 | CHECKCARD  1109 OneLegal CCSALE03653003 800-9388815  CA 24906411313133964514876 CKCD 8111 XXXXXXXXXXXX5571 XXXX XXXX XXXX 5571 | -15.70 |
| 11/10/21 | STAPLES 0152   11/10 #000181598 PURCHASE STAPLES 0152       HUNTINGTON BE CA | -119.58 |
| 11/17/21 | CVS/PHARMACY #  11/17 #000609588 PURCHASE CVS/PHARMACY #09   HUNTINGTON BC CA | -48.20 |
| 11/22/21 | CHECKCARD  1119 Subway 38347 Anaheim        CA 24204291323009819004946 CKCD 5814 XXXXXXXXXXXX5571 XXXX XXXX XXXX 5571 | -13.33 |
| 11/22/21 | TRADER JOE'S #  11/20 #000819799 PURCHASE TRADER JOE'S #244  HUNTINGTNBCH  CA | -17.13 |
| 11/23/21 | CHECKCARD  1122 OneLegal CCSALE03679677 800-9388815  CA 24906411326134833412396 CKCD 8111 XXXXXXXXXXXX5571 XXXX XXXX XXXX 5571 | -15.70 |
| **Subtotal for card account # XXXX XXXX XXXX 5571** | | **-$809.05** |
| **Total withdrawals and other debits** | | **-$14,769.40** |

## Service fees

The Monthly Fee on your primary Business Advantage Fundamentals Banking account was waived for the statement period ending 10/29/21. A check mark below indicates the requirement(s) you have met to qualify for the Monthly Fee waiver on the account.

◯  $250+ in new net purchases on a linked Business debit card has not been met

◯  $5,000+ combined average monthly balance in linked business accounts has not been met

✓  Become a member of Preferred Rewards for Business has been met

For information on how to open a new product, link an existing service to your account, or about Preferred Rewards for Business please call 1.888.BUSINESS or visit bankofamerica.com/smallbusiness.

## Daily ledger balances

| Date | Balance ($) | Date | Balance($) | Date | Balance ($) |
|------|-------------|------|------------|------|-------------|
| 11/01 | 15,015.98 | 11/10 | 1,482.84 | 11/17 | 1,392.74 |
| 11/05 | 2,406.53 | 11/15 | 1,470.20 | 11/22 | 1,362.28 |
| 11/08 | 1,859.55 | 11/16 | 1,440.94 | 11/23 | 1,346.58 |
| 11/09 | 1,618.12 | | | | |

# EXHIBIT 68

MR_CE_BLLGKWBBBMLWX_BBBBB 20210930

INVESTMENT REPORT
**July 1, 2021 - September 30, 2021**

Envelope # BLLGKWBBBMLWX

JAMIE LYNN GALLIAN
16222 MONTEREY LN SPC 376
HUNTINGTN BCH CA 92649-2258

Fidelity Rollover IRA JAMIE LYNN GALLIAN - ROLLOVER IRA -
FIDELITY MANAGEMENT TRUST CO - CUSTODIAN
▶ **Account Number: 169-638064**

## Your Account Value: **$7,252.21**

Change from Last Period: ▲ $0.18

| | This Period | Year-to-Date |
|---|---|---|
| **Beginning Account Value** | $7,252.03 | $7,251.67 |
| Change in Investment Value * | 0.18 | 0.54 |
| **Ending Account Value ** ** | **$7,252.21** | **$7,252.21** |
| Accrued Interest (AI) | 0.00 | |
| Ending Account Value Incl. AI | $7,252.21 | |

\*   Reflects appreciation or depreciation of your holdings due to price changes, transactions from Other Activity In or Out and Multi-currency transactions, plus any distribution and income earned during the statement period.
\*\*  Excludes unpriced securities.

Contact Information

| | |
|---|---|
| Online | Fidelity.com |
| FAST℠-Automated Telephone | (800) 544-5555 |
| Customer Service | (800) 544-6666 |

The 2021 Fidelity Investments and Fidelity Funds Privacy Notice is available at Fidelity.com/privacy.

Brokerage services provided by Fidelity Brokerage Services LLC (FBS), Member NYSE, SIPC (800) 544-6666. Brokerage accounts carried by National Financial Services LLC (NFS), Member NYSE, SIPC.



H69744093020210930

MR._CE_BLLGKWBBBMLWX_BBBB8 20210930

INVESTMENT REPORT
July 1, 2021 - September 30, 2021

Account # 169-638064
JAMIE LYNN GALLIAN - ROLLOVER IRA

# Account Summary

## Account Value: $7,252.21

### Change in Account Value    ▲ $0.18

|  | This Period | Year-to-Date |
|---|---|---|
| **Beginning Account Value** | **$7,252.03** | **$7,251.67** |
| **Change in Investment Value *** | **0.18** | **0.54** |
| **Ending Account Value** | **$7,252.21** | **$7,252.21** |
| Accrued Interest (AI) | 0.00 | |
| Ending Account Value Incl. AI | $7,252.21 | |

Total Account Trades Oct 2020 - Sep 2021: 0

*    Reflects appreciation or depreciation of your holdings due to price changes, transactions from Other Activity In or Out and Multi-currency transactions, plus any distribution and income earned during the statement period.

## Core Account and Credit Balance Cash Flow
Core Account: FIDELITY GOVERNMENT MONEY MARKET

|  | This Period | Year-to-Date |
|---|---|---|
| **Beginning Balance** | **$7,252.03** | **$7,251.67** |
| **Investment Activity** | | |
| Dividends, Interest & Other Income D | 0.18 | 0.54 |
| **Total Investment Activity** | **$0.18** | **$0.54** |
| **Ending Balance** | **$7,252.21** | **$7,252.21** |

D    Includes dividend reinvestments.

## Account Holdings



100% Core Account ($7,252)

### Top Holdings

| Description | Value | Percent of Account |
|---|---|---|
| Fidelity Government Money Market | $7,252 | 100% |
| **Total** | **$7,252** | **100%** |

Please note that, due to rounding, percentages may not add to 100%.

### Income Summary

|  | This Period | Year-to-Date |
|---|---|---|
| **Tax-deferred** | **$0.18** | **$0.54** |
| **Total** | **$0.18** | **$0.54** |

# Fidelity INVESTMENTS

**INVESTMENT REPORT**
July 1, 2021 - September 30, 2021

Account # 169-638064
JAMIE LYNN GALLIAN - ROLLOVER IRA

## Holdings

### Core Account

| Description | Beginning Market Value Jul 1, 2021 | Quantity Sep 30, 2021 | Price Per Unit Sep 30, 2021 | Ending Market Value Sep 30, 2021 | EAI ($) / EY (%) |
|---|---|---|---|---|---|
| FIDELITY GOVERNMENT MONEY MARKET (SPAXX) | $7,252.03 | 7,252.210 | $1.0000 | $7,252.21 | $0.73 0.010% |
| 7-day yield: 0.01% | | | | | |
| **Total Core Account (100% of account holdings)** | **$7,252.03** | | | **$7,252.21** | **$0.73** |
| **Total Holdings** | | | | **$7,252.21** | **$0.73** |

EAI   **Estimated Annual Income (EAI) & Estimated Yield (EY)-** EAI is an estimate of annual income for a specific security position over the next rolling 12 months. EAI may be negative on short
& EY  positions. EY is calculated by dividing the current EAI for a security position by its statement closing date market value. EAI and EY are estimates only and may include return of principal
       and/or capital gains, which would render them overstated. Actual income and yield might be lower or higher than the estimated amounts. **For calculation details, refer to the**
       **"Additional Information and Endnotes" section.**

## Activity

### Dividends, Interest & Other Income

*(Includes dividend reinvestment)*

| Settlement Date | Security Name | Symbol/ CUSIP | Description | Quantity | Price | Amount |
|---|---|---|---|---|---|---|
| 07/30 | FIDELITY GOVERNMENT MONEY MARKET | 31617H102 | Dividend Received | - | - | $0.06 |
| 08/31 | FIDELITY GOVERNMENT MONEY MARKET | 31617H102 | Dividend Received | - | - | 0.06 |
| 09/30 | FIDELITY GOVERNMENT MONEY MARKET | 31617H102 | Dividend Received | - | - | 0.06 |
| **Total Dividends, Interest & Other Income** | | | | | | **$0.18** |

INVESTMENT REPORT
July 1, 2021 - September 30, 2021

Account # 169-638064
JAMIE LYNN GALLIAN - ROLLOVER IRA

## Activity

### Core Fund Activity

*For more information about the operation of your core account, please refer to your Customer Agreement.*

**Settlement Account**

| Date | Type | Transaction | Description | Quantity | Price | Amount | Balance |
|------|------|-------------|-------------|----------|-------|--------|---------|
| 07/30 | CASH | Reinvestment | **FIDELITY GOVERNMENT MONEY MARKET** REINVEST @ $1.000 | 0.060 | $1.0000 | $0.06 | $7,252.09 |
| 08/31 | CASH | Reinvestment | **FIDELITY GOVERNMENT MONEY MARKET** REINVEST @ $1.000 | 0.060 | 1.0000 | 0.06 | 7,252.15 |
| 09/30 | CASH | Reinvestment | **FIDELITY GOVERNMENT MONEY MARKET** REINVEST @ $1.000 | 0.060 | 1.0000 | 0.06 | 7,252.21 |
| **Total Core Fund Activity** | | | | | | **$0.18** | |

## Additional Information and Endnotes

▲ As a result of Securities and Exchange Commission (SEC) regulatory changes that went into effect on September 28, 2021, any orders to sell "over-the-counter" (OTC) securities classified as "Pink-No Information," "Grey Market," "Caveat Emptor," and "Expert Market" will be treated as "Grey Market" securities when sent for execution and will not be displayed, which could impact the quality of your execution. There may be difficulty or delays in processing orders to sell or close your position, and your order could execute at a price that differs significantly from the last price provided when you place your order. In addition, you may notice that pricing is no longer provided on the security, which may impact the market value of that security in your account. See our Trading FAQs at https://www.fidelity.com/trading/faqs-placing-orders-for more information.

▲ Order Flow Practices: As the introducing broker for your account, FBS routes your orders to our clearing firm affiliate, National Financial Services ("NFS"). In deciding where to send orders received for execution, NFS looks at a number of factors, such as size of the order, trading characteristics of the security, favorable execution prices (including the opportunity for price improvement), access to reliable market data, availability of efficient automated transaction processing, and execution cost. Some market centers or broker-dealers may execute orders at prices superior to the publicly quoted market. NFS's order routing policies are designed to result in transaction processing that is favorable to its customers. Where a customer directs the market center to which an order is routed, FBS or NFS will route the order to such market center in accordance with the customer's instructions without regard to its general order-routing practices.

FBS and/or NFS receives remuneration, compensation, or other consideration for directing customer orders to certain market centers. Such consideration may take the form of financial credits, monetary payments, rebates, volume discounts, or reciprocal business. The details of any credit, payment, rebate, or other form of compensation received in connection with the routing of a particular order will be provided on your request. Unless your account is managed on a discretionary basis by Strategic Advisers LLC, an affiliate of NFS, NFS may execute certain transactions as principal. In addition, from time to time, Fidelity may provide aggregated trade execution data to customers and prospective customers.

## Additional Information and Endnotes

Order Routing Disclosure Quarterly reports: Quarterly information regarding the routing of orders by NFS in listed equity securities and listed options is available online at Fidelity.com. The reports are formatted in accordance with Securities and Exchange Commission requirements. Investor Inquiry: You can request your specific order routing and execution information for the preceding six months. This information will include the identity of the marketplace where your orders were routed for execution, whether the orders were directed or non-directed, and, if executed, the time of the execution. You may contact Fidelity for additional details on the information that is available.

BrokerCheck(R) by FINRA: As part of the Financial Industry Regulatory Authority (FINRA) BrokerCheck program, you have access to the BrokerCheck hotline at 800-289-9999 and FINRA website at www.finra.org. You can call or email your inquiries and request a brochure that includes information detailing the BrokerCheck program.

Municipal Securities Rulemaking Board Investor Brochure: Fidelity Brokerage Services LLC is registered with the U.S. Securities and Exchange Commission (SEC) and the Municipal Securities Rulemaking Board (MSRB). An investor brochure may be obtained at MSRB.org that describes the protections that may be provided by the MSRB and how to file a complaint with an appropriate regulatory authority.

▲  Important Notice about updates to Fidelity's Disclosures. Effective September 30, 2021, the Fidelity Brokerage Services LLC Products, Services, and Conflicts of Interest disclosure document is updated to include important information about investment advice we provide to your Retirement Account(s). The "Retirement and Other Tax-Advantaged Accounts" section of the document is updated in its entirety to read as follows: Retirement and Other Tax-Advantaged Accounts. We offer a variety of retirement and other tax-advantaged accounts (including IRAs, workplace savings plan accounts, Health Savings Accounts ("HSAs"), and other similar accounts, collectively "Retirement Accounts"). We have a best interest obligation when we provide a recommendation as part of our brokerage services to your Retirement Account.

When we provide investment advice to you regarding your Retirement Account within the meaning of Title I of the Employee Retirement Income Security Act (ERISA) and/or the Internal Revenue Code (IRC), as applicable, we are a fiduciary within the meaning of these laws governing retirement accounts. The way we make money creates some conflicts with your interests, so when we provide such investment advice, we operate under special rules that require us to act in your best interest and not put our interest ahead of yours. Under these special rules, we must: meet a professional standard of care when making investment recommendations (give prudent advice); never put our financial interests ahead of yours when making recommendations (give loyal advice); avoid misleading statements about conflicts of interest, fees, and investments; follow policies and procedures designed to ensure that we give advice that is in your best interest; charge no more than is reasonable for our services; and give you basic information about conflicts of interest.

The above fiduciary acknowledgement applies solely with respect to the following types of recommendations (each a "Covered Recommendation"): Transfer and Account Recommendations. From time to time, we may recommend that you transfer or roll over assets from a Workplace Savings Plan to a brokerage or advisory IRA (or another Workplace Savings Plan). We may also recommend that you transfer assets in your Workplace Savings Plan to an advisory program or transfer IRA assets to an advisory program. Investment Recommendations. If you have a Retirement Account with us, we may, from time to time, recommend that you buy, sell, or hold securities or other investment property for your Account. We may also recommend that you hire third parties to provide you with investment advice for your IRA. Please refer to the Investment Advisory Services section of this document for a description of these services. It is important to understand that we will not be a fiduciary in connection with all of our interactions with you regarding your Retirement Account.

**Account # 169-638064**
**JAMIE LYNN GALLIAN - ROLLOVER IRA**

## Additional Information and Endnotes

Specifically, we provide non-fiduciary assistance and education regarding Retirement Accounts and this information is not intended to be individualized to your particular circumstances and should not be considered as a primary basis for your investment decisions. This type of assistance includes: execution of self-directed, or unsolicited, transactions or trades; general descriptions, information and education about our products and services or with respect to plan distribution or rollover decisions; communications that are not an individualized/personalized suggestion for you to take a particular course of action with respect to your retirement assets; assistance for workplace savings plan accounts that are not subject to Title I of ERISA (e.g., certain plans maintained by governmental or tax-exempt employers and non-qualified deferred compensation plans); recommendations with respect to accounts other than Retirement Accounts that you maintain with us; or any communications that are not fiduciary investment advice (as defined by ERISA or the IRC).

We have also updated other sections of the document and we encourage you to read the entire updated document available at https://communications.fidelity.com/information/crs/ or by calling Fidelity at 800-544-6666 for an updated copy.

▲ Fidelity is required by the Securities Exchange Act of 1934 to provide certain financial information from the Statement of Financial Condition of National Financial Services LLC (NFS). At July 31, 2021, NFS, an affiliate of Fidelity Brokerage Services LLC, had net capital of $5,493 million, which was 11.19% of aggregate debit items and exceeded its minimum requirement by $4,511 million. To acquire the Statement of Financial Condition of National Financial Services LLC (NFS), log on to Fidelity.com. If you wish to obtain a copy of this document at no cost, or have any questions regarding its contents, please call Fidelity at 800-343-3548.

▲ Please review our Customer Relationship Summary (CRS) disclosure outlining our responsibility and commitment to you. This document explains the relationships and services our firm offers to retail investors, including fees and costs, conflicts of interest, and standards of conduct.

If you are receiving your statement by U.S. mail, this disclosure is included with your statement. If you are receiving your statement electronically, the link to this document is included in the email that we send when your new statement is available online.

You can also view this disclosure online at: Fidelity.com/fbs-fpwa-crs.

▲ NOTIFICATION OF YOUR TAX WITHHOLDING OPTIONS IN REGARD TO DISTRIBUTIONS FROM YOUR IRA. Federal Income Tax Withholding – IRS regulations require us to withhold federal income tax at a rate of 10% from your total IRA distribution (excluding Roth IRA distributions) unless you elect not to have federal income tax withholding apply (provided you have supplied Fidelity with a U.S. address) or you elect to increase the rate of withholding. Federal income tax will not be withheld from distributions from a Roth IRA unless you elect to have such tax withheld or are otherwise subject to withholding because you are a non-resident alien. If taken under a periodic distribution plan, your election will remain in effect on checkwriting or periodic distributions taken from your IRA until revoked by you. You can change your withholding elections for future distributions at any time by contacting Fidelity.

State Income Tax Withholding – If federal income tax withholding is applied to your distribution, state income tax may also apply. Your state of residence will determine your state income tax withholding requirements, if any. Please refer to the lists below. Your state of residence is determined by the legal address of record on your IRA. For residents of AR, IA, KS, MA, ME, OK and VT, if federal income tax withholding is applied to your distribution, state income tax will also apply. For residents of CA, DE, NC or OR, if federal income tax withholding is applied to your distribution, state income tax will also apply unless you elect not to have state income tax withheld.

For residents of DC, if you take a distribution of your entire account balance and do not directly roll that amount over to another eligible retirement account, DC requires that a minimum amount be withheld from the taxable portion of the distribution, whether or not federal income tax is withheld. For residents of CT or MI, state

**Account # 169-638064**
**JAMIE LYNN GALLIAN - ROLLOVER IRA**

## Additional Information and Endnotes

income tax applies regardless of whether or not federal income tax withholding is applied to your distribution. Please reference the CT or MI W-4P Form for information and to calculate the amount to withhold from your distribution. Tax withholding is not required if you meet certain CT or MI requirements governing pension and retirement benefits. For residents of MS, state income tax withholding will apply regardless of whether or not federal income tax withholding is applied to your distribution, unless you elect not to have state income tax withheld.

For residents of SC, you must provide a valid Social Security number; individual tax identification number; or tax identification number for a nonresident alien, if not SC requires that 7% tax be withheld from the distribution. For residents of AK, FL, HI, NH, SD, TN, TX, WA or WY, state income tax withholding is not available on IRA distributions. For residents of all other states, you are not subject to mandatory state income tax withholding; however you may elect voluntary state income tax withholding in a percentage. If you elect to have state income taxes withheld an your state provides a minimum amount or percentage for withholding, you must elect a percentage that is not less than your state's minimum withholding requirements. If the percentage you elect for withholding is less than your state's minimum withholding requirements, your state's minimum amount or percentage will be withheld.

Whether or not you elect to have federal and/or state income tax withheld from your distribution(s), you are responsible for the full payment of federal income tax, any state or local taxes, and any penalties which may apply. You may be responsible for estimated tax payments and could incur penalties if your estimated tax payments are not sufficient. Please contact Fidelity for more information, or contact your state taxing authority for assistance. THE INFORMATION PROVIDED ABOVE IS GENERAL IN NATURE AND SHOULD NOT BE CONSIDERED LEGAL OR TAX ADVICE.

**Estimated Annual Income (EAI) & Estimated Yield (EY)**  - EAI for fixed income is calculated using the coupon rate. For all other securities, EAI is calculated using an indicated annual dividend (IAD). The IAD is an estimate of a security's dividend payments for the next 12 months calculated based on prior and/or declared dividends for that security. EY reflects only the income generated by an investment and not changes in its price which may fluctuate. Interest and dividend rates are subject to change at any time and may be affected by current and future economic, political and business conditions. EAI and EY are provided for informational purposes only and should not be used or relied on for making investment, trading or tax decisions. EAI and EY are based on data obtained from information providers believed to be reliable, but no assurance can be made as to accuracy, timeliness or completeness.  **Please refer to the Help/Glossary on Fidelity.com for additional information regarding these calculations.**

For more information about your statement, please refer to our  **Frequently Asked Questions** document at **Fidelity.com/statements** .

## Information About Your Fidelity Statement

TDD Service for the Hearing-Impaired Call 800-544-0118, 9 am – 9 pm ET, 7 days a week.

**Lost or Stolen Cards** For 24-Hour worldwide customer service, call 800-529-2164 for American Express or 800-323-5353 for Fidelity® Debit Card.

**Additional Investments with Fidelity** Make checks payable to Fidelity Investments. Include your account number on the check. For retirement and health savings accounts (HSA), designate in the memo field whether your contribution is for the current or prior year. Mail checks or other inquiries to: Fidelity Investments, P.O. Box 770001, Cincinnati, OH 45277-0003.

**Income Summary** Shows income by tax status for the statement and year-to-date periods. Except for interest income earned on, or distributed by, tax-exempt securities, Fidelity reports dividends and capital gains held in taxable accounts as taxable income. A portion of income reported as tax-exempt income may be subject to alternative minimum taxes and/or state and local taxes. In Traditional IRAs, Rollover IRAs, SEP-IRAs, SIMPLE IRAs and Keoghs, earnings are reported as tax-deferred income. In Roth IRAs and HSAs, earnings are reported as tax-exempt income because these accounts may provide for tax-free distributions under certain conditions.

**Cost Basis, Gain/Loss, and Holding Period Information** NFS is required to report certain cost basis and holding period information to the IRS on Form 1099-B. Unless otherwise specified, NFS applies the average cost method for open-end mutual funds and the first-in, first-out (FIFO) method for all other securities. Cost basis is adjusted for wash sales on securities with the same CUSIP (nominal and income reinvestment (if applicable), return of capital, corporate actions, and/or other adjustments as appropriate). Your statement may not reflect all adjustments required for tax purposes. Customers should consult their tax advisors for further information.

**Cost** Fidelity provides purchase cost information for securities held in retirement and HSA accounts. Such information may be adjusted for certain transactions and does not reflect dividends or capital gains held in retirement accounts. The cost basis for mutual fund shares held in retirement and HSA accounts held in Traditional IRAs, Rollover IRAs, SEP-IRAs, or HSA account. Transaction, profit or loss is calculated by subtracting purchase cost from sales proceeds

using the FIFO method if shares were purchased at different times or prices. **Statement Mailing** We deliver statements at least four times during the calendar year for any account with a balance.

**Statement Discrepancies Please review your statement and report any inaccuracies or discrepancies. Inquiries, concerns or questions regarding your brokerage account or the activity therein should be directed to FBS by calling 800-544-6666, and NFS, who carries your brokerage accounts, by calling 866-408-1188.** Any oral communications regarding inaccuracies or discrepancies should be reconfirmed in writing to protect your rights, including those under the Securities Investor Protection Act (SIPA).

**Material Changes** Please advise us of material changes in your investment objectives or financial situation related to your brokerage account(s).

**Mutual Funds and Performance** Before investing, consider the funds' investment objectives, risks, charges and expenses. Contact Fidelity for a prospectus or a prospectus containing this information. Read it carefully.

**Performance data shown represents past performance and is no guarantee of future results. Investment return and principal value will fluctuate, so you may have a gain or loss when shares are sold. Current performance may be higher or lower than that quoted. Visit Fidelity.com/performance for most recent month-end performance.**

**Sales Loads & Fees** Each fund reserves the right to terminate or modify its exchange privilege in the future. In connection with (i) access to, purchase or redemption of, and/or maintenance of positions in mutual funds and other investment products such as alternative investments or private placements ("funds") or (ii) infrastructure and support related to such products and/or services, Fidelity receives compensation for shareholder services, start-up fees, infrastructure support and maintenance, and marketing, engagement and analytics programs. Additional information about the source(s) and amount(s) of compensation as well as other remuneration received by FBS or NFS will be furnished to you upon written request. At the time you purchase shares of funds those shares will have an established share price. Valuations may not reflect the most current value. When you subsequently sell those shares, any fees applicable to your transaction will be assessed based on the status assigned to the shares at the time of purchase.

**Executing Orders on the Floor of the NYSE** The Floor broker may permit the Designated Market Maker to trade on parity with the order for some or all of the executions associated with filling that order, where such permission would not be inconsistent with the broker's best execution obligations.

**SIPC** Securities in accounts carried by NFS, a Fidelity Investments company, are protected in accordance with the SIPC up to $500,000 (including cash claims limited to $250,000). For details, including the SIPC brochure, please see www.sipc.org, or call 1-202-371-8300. NFS has arranged for additional protection for cash and covered securities to supplement its SIPC coverage. Neither coverage protects against a decline in the market value of securities.

**Fidelity Investments** Fidelity Distributors Company LLC (FDC), is the distributor for Fidelity Funds with marketing and shareholder services provided by FBS or NFS. **Brokerage services are provided by FBS, which clears all transactions through its affiliate, NFS. NFS carries all brokerage accounts. FBS and NFS are members of the NYSE and SIPC.** Upon written request, Fidelity will mail an NFS financial statement, which is also available for inspection at its office. Fidelity Investments (with pyramid logo) is a trademark of FMR LLC.

**FPWA Services** Fidelity Go®, Fidelity® Personalized Planning & Advice and Fidelity® Strategic Disciplines are advisory services offered by FPWA, a registered investment adviser. Fidelity® Strategic Disciplines includes the Breckinridge Intermediate Municipal Strategy, the Fidelity® Equity-Income Strategy, the Fidelity® Tax-Managed U.S. Equity Index Strategy, the Fidelity® U.S. Large Cap Equity Strategy, the Fidelity® International Equity Strategy, the Fidelity® Intermediate Municipal Strategy and the Fidelity® Core Bond Strategy. Fidelity® Wealth Services are advisory services offered by FPWA or Fidelity Personal Trust Company, FSB (FPTC), a federal savings bank. Nondeposit investment products and trust services offered by FPTC and its affiliates are not insured or guaranteed by the Federal Deposit Insurance Corporation or any other agency. If you deposit securities are also FPTC, FBS, and are subject to risk, including possible loss of principal. These advisory services are provided for a fee. FBS, NFS, FDC, FPWA and FPTC are direct or indirect subsidiaries of FMR LLC.

**Ratings Information from Standard & Poors ("S&P")** may not be reproduced. S&P credit ratings are statements of opinion and are not statements of fact or recommendations to purchase, hold, or sell securities, nor do they address the suitability of securities for investment purposes, and should not be relied on as investment advice. S&P does not guarantee the accuracy, completeness, timeliness or availability of any information, including ratings, and is not responsible for errors or omissions (negligent or otherwise). S&P gives no express or implied warranties, including but not limited to any warranties of merchantability or fitness for a particular purpose or use. S&P shall not be liable for any direct, indirect, incidental, exemplary, compensatory, punitive, special or consequential damages, costs, expenses, legal fees, or losses (including lost income or profits and opportunity costs) in connection with any use of ratings.

**Miscellaneous** Mutual fund shares, other securities held in your account and insurance products are neither deposits nor obligations of, nor endorsed or guaranteed by, any bank or other depository institution, nor are they federally insured by the FDIC or any other agency. If you deposit a certain amount of securities, the information may not be the same as the information originally provided. To confirm that an authorized, direct deposit has been made to your Fidelity Account or Fidelity Mutual Fund Account, call 1-800-544-5555.

588130.45.0

## Additional Information About Your Brokerage Account, If Applicable

**Free credit balances (FCB)** are funds payable to you on demand. FCB are subject to open commitments such as undealed checks and exclude proceeds from sales of certificated securities without delivery of the certificate. If your FCB is swept to a core position, you can liquidate the core position and have the proceeds sent to you or held in your account subject to the terms of your account agreement. Required rule (10b-10(a)) and information not contained herein will be provided on written request. Fidelity may use this free credit balance in connection with its business, subject to applicable law. **Assets Separate from Your Brokerage Account** Only securities in the margin portion of your brokerage account contribute to margin and maintenance requirements. Other (non-sweep) assets may be held by NFS but are not part of your margin or maintenance calculations. Assets held in brokerage FBS and Fidelity Insurance Agency, Inc. and mutual fund only accounts held directly with the fund (Fidelity Mutual Fund Accounts) are not carried by NFS, not covered by the Securities Investor Protection Corporation (SIPC), and do not count toward your margin and maintenance requirements. Assets held in brokerage accounts and positions established through a Fidelity Brokerage Services LLC (FBS) account, and held in a brokerage account by NFS (the "margin account") do count toward your margin and maintenance requirements. **Short Account Balances** Securities sold short are held in a segregated short account. These securities are marked-to-market for margin purposes, and any increase or decrease from the previous week's value is transferred weekly to your margin account. Fidelity represents your short account balance as of the last weekly mark-to-market, not as of the settle date on which your balances reflect. Registration information about transactions is generally delivered to you contains full information about commissions and other charges, and such information is available promptly upon request. Assignments of American and European-style options are allocated among customer short positions pursuant to a random allocation procedure, a description is available upon request. Short positions in American-style options may be assigned at any time. An assignment notice for an option is subject to exercise assignment only during the exercise period. For more information, please call Fidelity at 800-544-6666. **Equity Dividend Reinvestment** Shares credited to your account result from either transactions by FBS acting as agent for your account, or the Depository Trust Company (DTC). **Price Information/Total Market Value** The Total Market Value has been calculated out to 9 decimal places, however, the individual share prices are displayed in 2-decimal places. The Total Market Value represents prices obtained from various sources, may be impacted by the frequency with which such prices are reported and such prices are not guaranteed. Prices received from pricing vendors are generally based on current market quotes, but when such quotes are not available the pricing vendors use a variety of techniques to estimate value. These estimates, particularly for fixed income securities, may be based on certain information, including amounts (e.g. $1 million) and may not reflect all of the factors that affect the value of the security, including liquidity risk. The prices provided are not firm bids or offers. Certain securities may reflect N/A or unavailable where the price for such security is generally not available from a pricing source. The Market Value of a security, including those priced at par value, may differ from its purchase price and may not closely reflect the value at which you can sell or redeem a particular security. Fixed income prices may be more readily available for round lots than for odd lots. Prices for Certificates of Deposits (CDs) on your statement are generally estimates and are not based on actual market prices. The secondary market for CDs is generally illiquid. You should always request a current valuation for your securities prior to making a financial decision or placing an order.



# EXHIBIT 69



**STATE OF CALIFORNIA**
*Office of the Secretary of State, Alex Padilla*
**NOTICE OF JUDGMENT LIEN (JL 1)**
California Secretary of State
1500 11th Street
Sacramento, California 95814
(916) 653-3516

| For Office Use Only |
| --- |
| **-FILED-** |
| File #: U200003862424 |
| Date Filed: 7/23/2020 |

Submitter Information:
  Contact Name
  Organization Name
  Phone Number
  Email Address
  Address                                    None

Judgment Debtor Information:

| Judgment Debtor Name | Mailing Address |
| --- | --- |
| Jamie Gallian | 16222 Monterey Ln Spc 376<br>Huntington Beach, CA 92649 |

Judgment Creditor Information:

| Judgment Creditor Name | Mailing Address |
| --- | --- |
| Janine Jasso | 16025 Warmington Lane<br>Huntington Beach, CA 92649 |

Judgment Information:

| | |
| --- | --- |
| A. Name of Court Where Judgment Was Entered | Orange County Superior Court |
| B. Title of the Action | The Huntington Beach Gables HOA v. Bradley, Gallian, et al. |
| C. Case Number | 30-2017-00913985-CU-CO-CJC |
| D. Date Judgment Was Entered | 12/04/2018 |

| E. Date(s) of Subsequent Renewal of Judgment (if any) |
| --- |
| None Entered |

| | |
| --- | --- |
| F. Date of This Notice | 07/23/2020 |
| G. Amount Required to Satisfy Judgment at This Date of Notice | $53,684.41 |

All property subject to enforcement of a Money Judgment against the Judgment Debtor to which a Judgment Lien on personal property may attach under Section 697.530 of the Code of Civil Procedure is subject to this Judgment Lien.

Declaration and Signature:
Declaration:                            I am a Judgment Creditor listed on the Judgment Lien.

☒ I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

*Janine Jasso*                                    07/23/2020
Sign Here                                         Date

B0303-7141 07/23/2020 3:55 PM Received by California Secretary of State

# EXHIBIT 70

UNITED STATES BANKRUPTCY COURT

CENTRAL DISTRICT

---oOo---

In Re

JAMIE LYNN GALLIAN,

          Debtor
_____

HOUSER BROS. CO. Dba RANCHO DEL
REY MOBILE HOME ESTATES,
          ,
          Plaintiff,

vs.                              No. 8:21-bk-11710-ES

JAMIE LYNN GALLIAN,

          Defendants.
_____/

**CERTIFIED COPY**

REMOTE CONFERENCING DEPOSITION OF JAMIE GALLIAN

Taken before NICOLE HATLER

CSR No. 13730

June 28, 2022

JOB No. 22-112744



1              UNITED STATES BANKRUPTCY COURT

2                    CENTRAL DISTRICT

3                       ---oOo---

4    In Re

5    JAMIE LYNN GALLIAN,

6            Debtor
     _____
7    HOUSER BROS. CO. Dba RANCHO DEL
     REY MOBILE HOME ESTATES,
8             ,                      **CERTIFIED COPY**
              Plaintiff,
9
     vs.                         No. 8:21-bk-11710-ES
10
     JAMIE LYNN GALLIAN,
11
            Defendants.
12   _____/

13

14

15      REMOTE CONFERENCING DEPOSITION OF JAMIE GALLIAN

16

17

18

19            Taken before NICOLE HATLER

20                 CSR No. 13730

21                 June 28, 2022

22

23

24

25   JOB No. 22-112744

1                        I N D E X

2                                            PAGE

3   EXAMINATION BY MR. HAYS........................4

4

5

6

7

8                    E X H I B I T S

9                                            PAGE

10  PLAINTIFF'S

11  Exhibit 1    Pages 3 through 5 of 461...........79

12  Exhibit 2    Tax clearance certificate..........80

13  Exhibit 3    Page 396 of 461....................83

14  Exhibit 4    Page 11 of 461....................103

15  Exhibit 5    Page 13 of 461....................103

16  Exhibit 6    Page 14 of 461....................104

17  Exhibit 7    Page 18 of 461....................105

18  Exhibit 8    Page 20 of 461....................105

19  Exhibit 9    Page 346 of 461...................110

20  Exhibit 10  Page 356 of 461...................110

21  Exhibit 11  Page 358 of 461...................110

22  Exhibit 12  Page 360 of 461...................111

23

24

25

1    **REMOTE CONFERENCING DEPOSITION OF JAMIE GALLIAN**

2

3

4            BE IT REMEMBERED, that pursuant to Notice, and on

5    the 28th day of June 2022, commencing at the hour of 8:11

6    a.m., in the respective locations via Zoom, before me,

7    NICOLE HATLER, a Certified Shorthand Reporter, State of

8    California, personally appeared JAMIE GALLIAN, produced

9    as a witness in said action, and being by me first duly

10   sworn, was thereupon examined as a witness in said cause.

11                        ---oOo---

12   APPEARANCES ALL REMOTELY VIA ZOOM

13   For the Plaintiff:

14            ED HAYS
             Marshack Hays LLP
15           870 Roosevelt
             Irvine, California   92620
16           (949)333-7777
             ehays@marshackhays.com
17
     For the Defendant:
18
             JAMIE LYNN GALLIAN
19           In pro per
             16222 Monterey Lane, Spc 376
20           Huntington Beach, CA 92649
             (714) 321-3449
21           Jamiegallian@gmail.com

22

23

24

25

```
1                        JAMIE GALLIAN

2                      sworn as a witness

3                     testified as follows:

4             THE REPORTER:  Good morning.  My name is Nicole

5    Hatler, California Certified Shorthand Reporter No.

6    13730.  This deposition will be stenographically reported

7    pursuant to CCP 2025.

8             Counsel, you may proceed.

9             MR. HAYS:  Thank you.

10   EXAMINATION BY MR. HAYS:

11        Q.  Good morning, Ms. Gallian.  We've met several

12   times before, but for the record, my name is Ed Hays, and

13   I am the attorney for the plaintiff and creditor in your

14   bankruptcy proceeding, which is Houser Bros.

15             Ms. Gallian, have you ever been deposed before?

16        A.  Yes.

17        Q.  And can you estimate for me how many times

18   you've been deposed?

19        A.  I think once.

20        Q.  And --

21        A.  I believe it was once.

22        Q.  And how long ago was that?

23        A.  I believe it was -- I believe it was at the

24   beginning of 2020.

25        Q.  And in what matter was that in connection with?
```

| | |
|---|---|
| 1 | A. Gables Huntington Beach. |
| 2 | Q. And that was litigation between you and Gables |
| 3 | Huntington Beach? |
| 4 | A. Yes, the homeowners' association. |
| 5 | Q. Yes. And that's been a couple of years, so let |
| 6 | me just give you a couple of reminders. And the court |
| 7 | reporter also gave us a couple of reminders. |
| 8 | Please do not start talking or answering my |
| 9 | question until I'm done so that we're not talking at the |
| 10 | same time, which makes her job a whole lot easier, and |
| 11 | also makes for a cleaner record so the entire question is |
| 12 | there and then your answer will be there. I will do my |
| 13 | best not to start asking you the next question until |
| 14 | you're done answering the first question. |
| 15 | This is also a deposition of you. So I'm the |
| 16 | person who gets to ask the questions today, and so, I |
| 17 | would ask you to refrain from asking me any questions |
| 18 | other than, perhaps, a question to clarify what I am |
| 19 | asking you. |
| 20 | The -- is there any reason why the examination |
| 21 | cannot proceed this morning? |
| 22 | (Technical interruption.) |
| 23 | (A recess was held from 8:13 a.m. until 8:18 a.m.) |
| 24 | THE WITNESS: No, not at this time. |
| 25 | // |

1  BY MR. HAYS:

2      Q. And let me -- I think that the next question had

3  been, Ms. Gallian, what was the highest level of

4  education that you had completed?

5      A. High school, some college, no degree.

6      Q. No degree. Thank you.

7         And Ms. Gallian, are you currently employed?

8      A. Yes.

9      Q. And what is your job?

10     A. Assistant manager for Walgreens pharmacy.

11     Q. And how long have you worked for Walgreens?

12     A. Since the end of March 2022.

13     Q. And when were you last employed prior to this

14  job with Walgreens?

15     A. I worked for, I believe, two or three days for

16  Albertsons, but the injury hadn't healed yet, so I was

17  not able to continue.

18         Prior to that, my normal career as a flight

19  attendant October 2018.

20     Q. Is when you last worked --

21     A. Yes.

22     Q. -- as a flight attendant, correct?

23     A. Yes.

24     Q. Okay. Speaking of October 2018, at that time,

25  were you the owner of a property located at 4476

1    Alderport Unit 53 in Huntington Beach?

2         A.   Potentially.

3         Q.   And can you explain why you used the word

4    potentially?

5         A.   I discovered that when Sandra Bradley in 2010

6    filed a document in the recorder's office, she was trying

7    to -- she was trying to -- you're probably better than

8    this than I am, but she was trying to put the home, which

9    she had purchased November 23rd, 2009, into the name of

10   her trust.  However, it never made it into the name of

11   her trust.  Instead, it made it into Houser Bros. name as

12   a grant deed.

13        Q.   When did you first start occupying the Alderport

14   property?

15        A.   On the -- tenancy -- my tenancy began for

16   Ms. Bradley on November 23rd, 2009.

17        Q.   And when you say tenancy, is that because you

18   were renting as opposed to owning?

19        A.   That's correct.

20        Q.   At some point, did you purchase the property?

21        A.   No, I did not.

22        Q.   Were you ever the owner of the property?

23        A.   I was assigned an assignment of something.  I'm

24   not sure if it was the unit or if it was the ground

25   lease.

1      Q.   What did you pay in exchange for receiving that

2   assignment?

3      A.   I didn't pay anything.  It was a part of my

4   inheritance is what I was told.

5      Q.   And was Ms. Bradley related to you?

6      A.   She was my father's wife.

7      Q.   And when you say part of your inheritance, does

8   that mean that, after Ms. Bradley passed away, you

9   received this assignment?

10     A.   No.

11     Q.   What triggered your inheritance which included

12   receiving this assignment?

13     A.   Ms. Bradley is still alive.

14     Q.   That wasn't my question.

15          My question is, you said you were told this is

16   part of an inheritance, and I'm asking what triggered

17   your right to inherit.

18     A.   She called me up and said, I'm gifting you the

19   property.  Go down to the trust office and sign the

20   documents.

21     Q.   And when you said that she was your father's

22   wife, is that your biological father?

23     A.   Yes, it is.  To the best of my knowledge, yes,

24   it is.

25     Q.   And what is his name?

1        A.   Charles Bradley, Jr.

2        Q.   So when Ms. Bradley gifted you the property,

3   what document did you receive?

4             Was it a grant deed or something else?

5        A.   It was an assignment -- that's all that it said.

6   It was an assignment.

7        Q.   That was the title of the document?

8        A.   That was the title of it.

9        Q.   And was the assignment recorded with the county

10  recorder?

11       A.   Yes.

12       Q.   And do you know when that was recorded?

13       A.   March 23rd, I believe.

14       Q.   Of which year?

15       A.   2017.

16       Q.   Is that what time the gift was made to you?

17       A.   Yes.

18       Q.   In March of 2017?

19       A.   Yes.

20       Q.   So just to make sure I'm understanding, you

21  first --

22       A.   I --

23       Q.   -- you first started living there in November of

24  2009 as a tenant, and you then became the owner by

25  receipt of a gift in March of 2017?

1     A.   That's correct.

2     Q.   The assignment that was recorded in your favor,

3  was your individual name listed as the assignee?

4     A.   I believe it was.  I was looking to see if I had

5  it readily available, but I don't.

6     Q.   At some point, did you sell the Alderport

7  property?

8     A.   Yes.

9     Q.   And when was that?

10    A.   October 31st, 2018.  October 31st.

11    Q.   Yes, I heard, Halloween.

12         So who was the buyer from you at that time?

13    A.   Randall Nickel.

14    Q.   And how did you come about selling the property?

15         Did you retain a broker and put it on the

16  Multiple Listing Service, or was there some other process

17  you used?

18    A.   Originally, it was listed on the MLS.  That

19  contract was canceled.  Then I listed it for sale by

20  owner on multiple listing sites as, like, Zillow for

21  example, Zillow or Trulia or those types of internet.

22    Q.   And so, the buyer that was found, Mr. Nickel,

23  was somebody that responded to some of your for sale by

24  owner advertisements?

25    A.   His wife responded.

1      Q.  And had you ever met or heard of Mr. Nickel

2   before that response?

3      A.  No.  His wife -- his wife originally contacted

4   me through Zillow.

5      Q.  And you never heard of him or his wife?

6      A.  No.

7      Q.  Prior to that initial contact, correct?

8      A.  That's correct.

9      Q.  Okay.  And what was the sale price?

10     A.  $379,000.

11     Q.  And what was the price at which the property had

12  been listed when you were represented by a broker?

13     A.  I believe the property -- this was several years

14  ago, but I believe the property when the broker was --

15  listed for 461 or 441.  It was -- it was higher than what

16  I ended up selling it at.

17     Q.  Understood.

18         Was there a traditional escrow that was opened

19  and used in connection with the sale of the property?

20     A.  No.

21     Q.  And how was the sale of the property handled in

22  the absence of an escrow?

23     A.  Well, let me -- let me with rephrase.

24         I was working as a referral from Old Republic

25  to -- I'm trying to think what that company's name was.

1    I remember the person that was working with me was

2    Cheryl, but I can't remember right this second what the

3    name of the escrow company was.  So I was working with an

4    escrow company for several months.

5         Q.   In connection with the actual sale?

6         A.   There -- Mr. Nickel was the third buyer.  So

7    there was -- there was potential -- previous buyers that

8    were -- that were canceled, fell through, whatever.

9         Q.   Let me -- let me try to clarify.

10             In connection with the sale to Mr. Nickel, was

11   there an escrow that was handling receipt of documents

12   and money and doing the recordings and all of the

13   traditional functions of an escrow?

14        A.   No.

15        Q.   And so, then the question I had for you was in

16   the absence of that escrow, in connection with your

17   actual sale to Mr. Nickel, how were the documents and

18   money handled?

19        A.   It's a title.  So the -- and I owned it

20   unencumbered.  I provided a preliminary title report from

21   the Old Republic title company, offered title insurance

22   and had notebooks full of all the governing documents and

23   e-mails of receipt that I had sent a demand.  I just --

24   basically, it was a -- an assignment.

25        Q.   So let me see if I can try to summarize and make

```
 1   sure I understand.

 2          The document that you signed to transfer title

 3   to Mr. Nickel, was that done at the same time that

 4   Mr. Nickel handed you the money?

 5       A.   That's correct.

 6       Q.   So if this were a used car as opposed to a

 7   mobile home, it would have been handled in a similar

 8   fashion to --

 9       A.   There --

10          (Multiple speakers simultaneously.)

11          THE REPORTER:  I'm sorry.  I couldn't --

12          THE WITNESS:  I interrupted -- I -- go ahead.

13   Go ahead, Mr. Hays.

14   BY MR. HAYS:

15       Q.   Would have been handled in a similar fashion to

16   the sale of a used car, correct?

17       A.   The chattel, yes.

18       Q.   And when you're saying chattel, you're referring

19   to the mobile home, correct?

20       A.   No.

21       Q.   What are you referring to?

22       A.   The assignment on the -- you're asking about the

23   Alderport address.

24       Q.   Oh, I'm sorry.  You are correct.  The -- the

25   real property.
```

13

1          So in what form did Mr. Nickel pay the $379,000?

2     A.   Cashiers.

3     Q.   Cashier's check.

4          And was the cashier's check made payable to you

5     individually?

6     A.   Yes.

7     Q.   And what did you do with the cashier's check?

8     A.   Deposited them, both checks, into the Santa Ana

9     branch of Chase Bank.

10    Q.   And you said both checks.

11         There were two cashier's checks?

12    A.   That's correct.

13    Q.   And you deposited them at the Santa Ana branch

14    of Chase Bank into accounts in the name of whom?

15    A.   Jamie Gallian.

16    Q.   At or about the same time, did you purchase the

17    mobile home located at 16222 Monterey Lane, space 376, in

18    Huntington Beach?

19    A.   Yes.

20    Q.   And what was the date of your purchase of the

21    mobile home?

22    A.   I received the -- trying to get the name of the

23    on the back of the document -- I received the

24    surrendered -- I received the surrendered certificate of

25    title November 1st.

                                                              14

1      Q.  Of 2000 --

2      A.  2018.

3      Q.  And the seller of the mobile home was Ms. Ryan?

4      A.  Yes.

5      Q.  And what was your purchase price?

6      A.  Originally, it was 225, but I ended up paying

7  185.

8      Q.  And how is the one -- how are you coming up with

9  185 number?

10         Because I think I've seen 175, 179, some number

11  around that.  How is it that you're coming up with 185?

12     A.  Because I gave her $10,000 cash as a deposit.

13     Q.  And then you paid an additional 175?

14     A.  That's correct.

15     Q.  Okay.  That explains it.

16         How did you pay her the money?

17     A.  In Chase cashier's checks.

18     Q.  And so, you went down to the Santa Ana branch of

19  Chase and got cashier's checks out of the account that

20  was in your name that was holding the sales proceeds from

21  Alderport?

22     A.  I don't know if it was the Santa Ana branch, but

23  it was a Chase branch.

24     Q.  Okay.  More important than the particular branch

25  was you took the money out of the account in which you

1    had deposited the sales proceeds of Alderport, correct?

2         A.   That's correct.

3         Q.   And there were two separate cashier's checks for

4    10,000, and 175,000?

5         A.   No.   They were $50,000 checks and a $20,000

6    check and $10,000 in cash.

7         Q.   So the deposit of 10,000 was cash?

8         A.   Yes.   That -- that was the deposit.

9         Q.   And was the -- when was the deposit paid?

10             Was it before or after you sold Alderport?

11        A.   After.

12        Q.   So were the proceeds of Alderport constituting

13   the full 185,000 that you paid to Ms. Ryan?

14        A.   That's correct.

15        Q.   And so, the 185, you said 10,000 was cash, and

16   the balance was a series of cashier's checks totalling

17   175,000?

18        A.   I remember -- it's been so long -- I remember

19   there was three $50,000 checks, and a $20,000 check,

20   maybe there was a 5,000, but I don't recall.   But I do

21   remember the $10,000 cash and then the other three --

22   four -- I guess it would be four -- three 50,000s and a

23   20 and maybe there was a 5, but I remember it was 175.

24        Q.   Okay.   If you sold the property at Alderport for

25   379,000 and then you used 185 to purchase the property --

1    the mobile home, that leaves approximately $194,000 of

2    excess sales proceeds.

3          What happened to that money?

4    A.   $175,000 of it was a loan to J Sandcastle, and

5    the balance was just paid to attorneys.

6                (Reporter clarification.)

7    BY MR. HAYS:

8    Q.   And Ms. Gallian, that's J as in Jamie, for

9    example, and is Sandcastle one word or two words?

10   A.   One.

11   Q.   And that's an LLC?

12   A.   That's correct.

13   Q.   And you loaned $175,000 to J Sandcastle, you

14   were just telling us.

15         Do you know when that occurred?

16   A.   I signed the loan documents on November 16th,

17   2018, at the courthouse in Santa Ana.

18   Q.   And why did J Sandcastle borrow money from you?

19   A.   I don't recall at this time.  It's been so long.

20   Q.   When Ms. Ryan transferred the title to the

21   mobile home --

22   A.   She surrendered.

23   Q.   Surrendered?

24   A.   She surrendered the certificate of title.

25   Q.   Surrendered, transferred, I think it means the

1   same thing, but I'll try to use your word.  The -- when

2   she surrendered it, which name went on title?

3            Was it your name, individually?

4       A.  It was two documents that go into a surrender of

5   a certificate of title.  You have to give notice, and my

6   name was on the notice.  There's a -- it's a -- it's an

7   HCD document, Housing and Community Development document,

8   and its notice -- I believe the document says -- it's one

9   of your documents here.  It says notice or transfer of

10  something, and my name was on the line for the purchaser.

11      Q.  Okay.  And then you said there were two

12  documents.  What's the second document?

13      A.  The actual certificate, the original certificate

14  that's surrendered.

15      Q.  So procedurally, please explain what happens

16  with the actual certificate.

17           Is there an actual certificate similar to a

18  vehicle's pink slip that the seller signs off and then

19  hands to the buyer, and then the buyer submits that to

20  HCD and then a new certificate gets issued?

21           Is that how that works?

22      A.  That's correct.  That's the way I have come to

23  find out.  Yes.

24      Q.  Okay.  So when the actual certificate was

25  reissued showing the new registered owner, which name

```
1    appeared as the new registered owner of the mobile home?
2             Was it you, individually, or was it J
3    Sandcastle?
4        A.  No.  The -- the notice of transfer was
5    subsequently changed from Jamie Gallian to J Sandcastle.
6    If you'll -- if you'll notice your document -- I was
7    trying to find the document.  You'll notice that it's
8    whited out on the document, and on November 15th,
9    Ms. Ryan re-signed it, the notice of transfer, and on
10   the -- the back of your document, you actually have the
11   notarization of her signature on November 15th.
12       Q.  Not --
13       A.  And the --
14       Q.  I'm not sure I heard the answer to the question.
15           When --
16       A.  I was -- I was getting to the second sentence.
17       Q.  Okay.
18       A.  Okay.  So then on November 16th, when I drove
19   the actual original certificate, I listed as the
20   registered -- I registered the manufactured home in the
21   name of J Sandcastle on November 16th.
22       Q.  And -- and I've been saying mobile home.  You
23   just said manufactured home.
24       A.  Yes.
25       Q.  We're referring to the same thing, right?
```

1        A.  Yes.

2        Q.  The property that's located at space 376?

3        A.  That's correct.

4        Q.  Okay.  Is it more correct to say manufactured

5   home over mobile home?

6        A.  In California, they kind of use it

7   interchangeably.  Manufactured homes is probably more

8   accurate.  Mobile home, kind of, means it -- things like,

9   you know, you can park -- you know, back in your

10  grandma's 1962 Chevy and pull it out it.  It's -- it

11  doesn't move, doesn't have any wheels on it.

12       Q.  I understand.

13       A.  Probably manufactured is more accurate.

14       Q.  Okay.  I will attempt to remember manufactured

15  home.

16       A.  Okay.

17       Q.  So we speak the same language here.

18       A.  Sure.

19       Q.  So when the certificate was reissued from

20  Ms. Ryan as owner, HCD reissued it in the name of J

21  Sandcastle, correct?

22       A.  As the registered party, yes.

23       Q.  Okay.  And by registered owner, does that mean

24  similar to a vehicle, who is the owner of the car, as

25  opposed to a lienholder, which would be the legal owner?

1           Are -- did you understand my question?

2      A.   Yeah.  I'm just re-reading it.

3           Because at the time, I was not familiar with a

4  lot of HCD policies like I am now.  So at the time, I

5  didn't consider it a big pink slip, but you're right.  It

6  is exactly like a giant pink slip, as a car.

7           So when you -- when you register a home -- the

8  home in the name of one person, if there's no legal

9  owner, they are one and the same.

10     Q.   And then the legal owner would be similar to

11  buying a vehicle that a bank or a credit union finances,

12  the legal owner is the party that holds the lien secured

13  by the title, correct?

14     A.   That's correct.

15     Q.   Okay.  So why did you put J Sandcastle down as

16  the registered owner of the manufactured home upon

17  acquisition?

18     A.   Okay.  Because when Lisa Ryan, on November 1st,

19  gave notice on the transfer document, the Houser attorney

20  filed a writ of execution without notice, without

21  approval from the court, and in the name of Lisa Ryan and

22  executed -- well, let me see -- did she send it to me?

23  How did I get that?  I'm trying to think of how I got the

24  writ.

25           Because that was the whole reason why I

1    requested Lisa Ryan to re-sign that notice on

2    November 15th is because of that writ.  I didn't -- I was

3    going to back out of the deal.  I was not happy that

4    after the certificate of title had been surrendered and

5    the notice was given -- signed on November 1st that I was

6    the purchaser, I was not happy with Houser's attorney

7    interfering with the sale of the home.

8          So I had was at court on November 16th at Santa

9    Ana, and it was a decision.  It was -- it was whether I

10    was going to back out of the deal or whether I was going

11    to go through with the deal.  And obviously, I went

12    through with the deal.  However, I registered the home in

13    the name of J Sandcastle.

14        Q.  Let me unpack a little bit of what you just said

15    to make sure that the record is clear.  You're saying

16    that the Houser's attorney had filed a writ of execution

17    against Lisa Ryan.

18          Are you saying that the Houser Bros. were in

19    litigation against Lisa Ryan, correct?

20        A.  I wasn't aware of that at the time.

21        Q.  I'm not asking what you were aware of at the

22    time.  I just want to try to explain and make sure that

23    your answer from a minute ago was clear.

24          You were referring to litigation between Houser

25    Bros. and Lisa Ryan, correct?

1      A.  I can't state that -- I can't tell you what I'm

2   referring to back when I was became aware of that writ.

3   I didn't even know what a writ was.

4      Q.  But -- but my point is the Houser Bros. were not

5   in litigation with you in November of 2018, correct?

6      A.  No.  I was not a party.

7      Q.  Yes.  So whatever this litigation was, was not

8   against you, but it was against Lisa Ryan, and the Houser

9   Bros. attorneys did something that you said caused there

10   to be a lien against the title.

11         Is that what you said?

12      A.  No.  What I said was -- is that I became aware

13   of an execution -- a writ of execution after I purchased

14   the home with the money that I got from the sale of

15   Alderport, and I believe that writ -- the notice was

16   dated November 1st -- the notice of transfer was dated

17   November 1st, and I believe the writ was dated either

18   November 11th or the 14th.  I don't remember exactly what

19   date and I became very concerned because the writ was --

20   to my knowledge as I remember it, I believe that the writ

21   was on the space -- not the home, the space, the ground,

22   the -- the real property.

23      Q.  So -- so just to make sure I'm following you

24   because it's important that I understand what you're

25   saying.

23

1        A.   Sure.

2        Q.   You acquired the property by surrender on

3   November 1st?

4        A.   That's correct.

5        Q.   But then there was this writ of execution that

6   pops up on November 11th to 14th, somewhere in that time

7   frame?

8        A.   That's correct.

9        Q.   And that --

10       A.   But it was not in my name --

11            (Multiple speakers simultaneously.)

12            THE REPORTER:  Hold on.  Everybody has to

13   remember one at a time.  I can't get you both

14            THE WITNESS:  Yep.  Sorry.

15            MR. HAYS:  And me, as well.

16   BY MR. HAYS:

17       Q.   So -- so when you discovered this, you were

18   deciding whether to try to back out of the sale or not,

19   and then you ultimately went forward with the purchase,

20   correct?

21       A.   That's correct.

22       Q.   Okay.  And then you were saying you made a

23   decision at that time to put title -- the registered

24   owner in the name of J Sandcastle.

25            Can you tell us any reasons that you would have

1    done that?

2         A.   Because I loaned -- I made the loan on the

3    same -- November 16th.  So on November 15th, I met with

4    Lisa Ryan and shared her with my concerns and -- you

5    know, again, not being familiar with the difference

6    between personal property and real property and, you

7    know, I did not consider my manufactured home as a used

8    car, and that's exactly what it is, and I was not

9    familiar with that.  I did not believe that when I

10   purchased it.

11        So I was a little leery, and I went ahead and

12   registered it in the name of J Sandcastle.  And I also

13   loaned J Sandcastle an amount of money and executed a

14   security agreement and promissory note and secured it

15   with the house.

16        Q.   And when you said you loaned an amount of money,

17   was that the $175,000 that you referenced earlier?

18        A.   No.  The loan amount is 225.

19        Q.   I believe earlier you testified that 175 was a

20   loan to J Sandcastle.

21        Is that the amount of money that went from the

22   account in your name to an account in the name of J

23   Sandcastle?

24        A.   Yes.  That is correct.  That is the cashier's

25   check -- that I drew a cashier's check for 175 from my

```
 1    private account and placed it in the account of J

 2    Sandcastle.  Yes.  You are absolutely correct.

 3         Q.  And then there was the promissory note, but the

 4    promissory note was in the amount of 225,000?

 5         A.  Yes, in contemplation of future advances or

 6    if -- if they needed more money.

 7         Q.  And then you also said that you signed a

 8    security agreement in favor of J Sandcastle?

 9         A.  That's correct.

10         Q.  And what was the collateral in this security

11    agreement?

12         A.  The home.

13         Q.  What did J Sandcastle give you in exchange for

14    receipt of the money and receipt of your executed

15    promissory note and receipt of the security agreement

16    pledging the property as collateral?

17         A.  The promissory note to pay it back.

18         Q.  Well, no.  You -- you gave -- you gave the cash

19    to J Sandcastle.  You signed a promissory note in favor

20    or -- it -- it signed a promissory note in favor of you?

21         A.  Correct.

22         Q.  Okay.  I had it backwards from what you were

23    saying?

24         A.  Correct.

25         Q.  And then the security agreement was J Sandcastle
```

```
 1    pledging the home as collateral to secure repayment?
 2         A.   Correct.
 3         Q.   All right.  When was J Sandcastle formed?
 4         A.   October 18th, 2018.
 5         Q.   Was it formed in contemplation of your purchase
 6    of the manufactured home?
 7         A.   No.
 8         Q.   Why did you form it?
 9         A.   I liked the name.
10         Q.   But why did you form an entity?
11              Why did you form an LLC at that time?
12         A.   There isn't a reason.  That's the reason.  I
13    secured -- or I -- what do you call it -- what do you
14    call that when, you know, you have to search to see if
15    even a name is available?
16         Q.   You ran the name search to see if the entity was
17    available --
18         A.   Yes.
19         Q.   -- is that what you're saying?
20         A.   Yes.
21         Q.   All right.  When did you decide to use the name
22    J Sandcastle as the registered owner if it wasn't formed
23    for that purpose?
24         A.   On November 16, 2018.
25         Q.   At the time that J Sandcastle was formed, were
```

1    you 100 the owner and member?

2        A.  Yes.

3        Q.  Has there ever been a change of ownership from

4    its inception to the present?

5        A.  No.

6        Q.  You have always been the 100 percent owner?

7        A.  Yes.

8        Q.  What did J Sandcastle do with the 175,000 of

9    cash that it received from you?

10       A.  I don't remember.  I don't -- that was almost

11   five years ago.

12       Q.  Did anybody, other than yourself, ever have

13   signature writing authority on the J Sandcastle bank

14   account?

15       A.  I believe -- and I'm not 100 percent sure, but

16   Bob McLelland has a -- he signed a signatory card, but I

17   was not --  I'm not sure if it's on the J Sandcastle

18   account.  It probably is.  I'm going to say 90 percent

19   sure that it's Bob McLelland.  He's never signed

20   anything, though, but he's on the signature card.

21       Q.  Can you spell McLelland for us?

22       A.  M-C-L --

23           THE REPORTER:  Say that one more time?

24           THE WITNESS:  M-C-capital L-L-E -- L-L -- let's

25   see, oh, my God.  M-C-L-E-L-L-A-N-D, I believe.

1    BY MR. HAYS:

2        Q.   And then who is Mr. McLelland?

3        A.   He's just a friend that I've known since

4    probably 2010.

5        Q.   And why was he on the signature card for J

6    Sandcastle?

7        A.   Emergency reasons.

8        Q.   To the best of your knowledge, he never signed

9    anything to withdraw, transfer, or pay money out of the J

10   Sandcastle account?

11       A.   No, he did not.

12       Q.   Okay.   How much money is currently on deposit in

13   the J Sandcastle accounts?

14       A.   I don't think anything.

15       Q.   How much money was in the J Sandcastle accounts

16   when you filed your bankruptcy petition in July of 2021?

17       A.   I believe it was -- well, maybe a little bit

18   more than $9,000.   It might have been a little bit more,

19   little bit less, but it was around 9.

20       Q.   Has J Sandcastle ever filed its own tax returns?

21       A.   No.

22       Q.   And --

23       A.   Hasn't done any business.

24       Q.   Is it a passthrough entity and whatever it would

25   be doing is something that gets reflected on your

29

1  personal tax returns?

2       A.  That's correct.

3       Q.  Was any of the $175,000 transferred to anyone or

4  any other entity in the form of a loan or a gift or was

5  it basically spent on living expenses?

6       A.  I don't believe that that -- you said living

7  expenses.  I don't believe that I've ever even made that

8  statement.

9       Q.  I'm asking what happened to the money.  Was any

10 of it gifted away or --

11      A.  No.

12      Q.  -- loaned to anyone else?

13      A.  No.

14      Q.  And --

15      A.  No.

16      Q.  So if it wasn't gifted or loaned by J

17 Sandcastle, describe for me what you think the $175,000

18 was used for?

19      A.  I don't know.  I -- I think I -- it's already

20 been answered.  That was five years ago.  I don't -- it

21 could be a myriad of things, attorneys fees, insurance,

22 just -- just whatever -- whatever the company needed is,

23 it's -- that's their money.

24      Q.  When you say whatever the company needed and

25 that you previously said it wasn't living expenses -- and

1    I never said you said that -- I -- that's what I was

2    assuming, and apparently incorrectly.  So let me just ask

3    and be very clear.

4            Was any of the $175,000 used by you for living

5    expenses, including food or utilities or, you know, car

6    payments or anything else that would traditionally be

7    used as living expenses?

8        A.   They -- the -- the J Sandcastle, I believe, paid

9    my car payment, it might have paid my insurance for the

10   car, and my cell phone bill.  Just basic items that a

11   company would normally pay for its manager.

12       Q.   When you said that the money was used by the

13   company for company purposes, including, you know, what

14   could be described as perks, was that your money or was

15   that J Sandcastle's money?

16       A.   It's J Sandcastle's money.

17       Q.   And so, if some creditor of you came along and

18   tried to collect from you, they would not have been able

19   to take that money that was in the J Sandcastle account,

20   correct?

21       A.   I can't speak to that.  I don't know.  I don't

22   know the legal ramifications of that.

23       Q.   I'm just asking for your personal understanding.

24       A.   I don't know.  I cannot answer that.  That's a

25   legal question.

1       Q.   I'm just -- I'm not asking you from a legal

2   question, what would a judge say.  I'm asking from your

3   personal belief.

4       A.   I don't --

5       Q.   Was that your money?

6       A.   I don't know.

7       Q.   Let me just ask you this question.

8            Was that your money or J Sandcastle's money?

9       A.   J Sandcastle's.

10      Q.   How many different certificates of title has HCD

11   issued for the manufactured home?

12           From the very first one, being re-issuance from

13   Ryan to J Sandcastle as registered owner, that's No. 1,

14   how many different certificates of title from that point

15   forward?

16      A.   Can you be a little more specific?

17      Q.   Well, if -- if we're equating the certificate of

18   title to a car's pink slip, there's the one you get

19   issued when you purchase, and then I understand that

20   there have been a couple of, you know, one or more

21   different certificates after that point in time that

22   changes the owner or legal owner.

23           I just want to make sure I understand how many

24   different certificates of title has there been from the

25   time that the Ryan sale to J Sandcastle was first

32

1    reported to HCD.

2        A.   Okay.  I believe in 2020 -- in August 2020 was

3    the first -- maybe it was the second.  J Sandcastle has

4    always remained the registered owner, but I believe that

5    a lienholder was added January 14th and then again

6    August 20th of 2020.

7        Q.   So there's the first one in -- that resulted

8    from the January 2018 purchase.

9             And when was that certificate of title issued?

10       A.   Sometime in 2019.

11       Q.   Okay.  And then the next change would have been

12   in January of 2020 --

13       A.   No.

14       Q.   -- and then in August of 2020?

15       A.   January 14th was the next change, 2019.

16       Q.   And then?

17       A.   WJC.

18       Q.   And then when?

19       A.   Then August 20th, 2020.

20       Q.   And so, there's three?  There's the one issued

21   in January 2019 reflecting the sale from Ryan to J

22   Sandcastle, that's No. 1.  Then there's one in January of

23   2019, that's No. 2.  And then there's one in August of

24   2020, and that's No. 3?

25       A.   That's correct.

1          Q.  And then there hasn't been any since then?

2          A.  January -- February.  February 24th, 2021, and

3    then February 25th, 2000 and -- was it 21?  God, it's

4    been so -- so February 24th and then February 25th is

5    when the registered owner changed, 2021.

6          Q.  So there's been five certificates of title since

7    you first started occupying the manufactured home?

8          A.  Because of lienholders added and removed, yes.

9          Q.  Okay.  But -- but five -- five is the number,

10   you're very confident of that?

11         A.  Four or five, yeah.

12         Q.  Okay.  Going to the January 2019 certificate of

13   title, that's the first one that reflected J Sandcastle

14   as the registered owner, correct?

15         A.  That's correct.

16         Q.  And who was listed as the legal owner at that

17   time?

18         A.  Well, at that time, I was not aware of how

19   relevant a certificate of title was with what they refer

20   to something as COTA in the State of California.  The

21   only thing that I perfected was -- or J Sandcastle or

22   JPad perfected was the UCC on January 14th, 2019.  In

23   hindsight, that should have also been reflected on what

24   they call COTA, certificate of title.

25         Q.  Well, do you know what CODA stands for, if CODA

1    is C-O-D-A?

2        A.   It's COTA, C-O-T-A.

3        Q.   But what's the A for?

4             Certificate of title would be the COT.  What's

5    the A for?

6        A.   I -- that's just what they call it, COTA.  I

7    don't know why they call it COTA.  I, kind of, thought

8    the same thing.  I know that certificate of title law is,

9    or code, whatever they call it.  I don't know what the A

10   is.

11       Q.   So who was reflected as the legal owner on that

12   first certificate of title?

13       A.   The only perfected filing was under the Uniform

14   Commercial Code on --

15       Q.   I --

16       A.   -- February 14th, so there wasn't anybody

17   because I wasn't aware of COTA yet.

18       Q.   Okay.  So that -- the answer was -- the answer

19   is there -- there was no legal owner listed at that time

20   on the first certificate of title, correct?

21       A.   That's correct with HCD.

22       Q.   Okay.  But what you're trying to explain to me

23   is that there's was, in fact, a UCC1 that had been filed

24   and should have been reflected on that certificate of

25   title?

1        A.   That's correct.

2        Q.   And who filed that first UCC1?

3        A.   I did.

4        Q.   And who was listed as the secured party?

5        A.   So when I did the UCC, the secured party was

6   myself, and then I realized that I had listed myself as

7   the debtor.  So then I did an AD -- what they said, AD-1,

8   my name was removed.  And then my name was then listed as

9   the assignor to JPad.

10        Q.   So when you're saying that your name was

11   removed, you're saying your name was removed as the

12   debtor, correct?

13        A.   That's correct.

14        Q.   And then at that same time, you changed the

15   secured party from yourself to JPad LLC?

16        A.   That's correct.

17        Q.   When was JPad LLC formed?

18        A.   February -- I don't remember the exact date, but

19   February 2018.

20        Q.   Was it formed to become the secured party on the

21   manufactured home?

22        A.   No.  This is February 2018.

23        Q.   I'm sorry.  So -- I had my date wrong.  Why was

24   JPad formed?

25        A.   Same reasons as J Sandcastle.  I secured the

36

```
 1   name.
 2        Q.  So no particular reason upon --
 3        A.  No.
 4        Q.  -- formation?
 5        A.  No.
 6        Q.  Why was JPad listed as the secured party and
 7   legal owner of the manufactured home?
 8        A.  At that time.  There were some other
 9   circumstances in my life that were going on, and I needed
10   a manager to have authority to make decisions in my
11   absence -- or any person I gave the authority to in my
12   absence.  I didn't have a will.  I didn't have a living
13   trust.  I didn't have any of those things.
14        Q.  What agreements existed between J Sandcastle and
15   JPad that gave JPad the -- a lien against the property?
16        A.  I was the signer.
17        Q.  You were the signer, like you signed something?
18        A.  Assignor, A-S-S-I-G-N-O-R.  I was the assignor.
19        Q.  Of what?
20        A.  Of the note.
21        Q.  So you're saying you assigned the note and your
22   rights under the security agreement as a lienholder to
23   JPad?
24        A.  That's correct.
25        Q.  And the result of that transaction was that JPad
```

1 became the recipient of the right to collect on the

2 $225,000 note that was secured by the manufactured home?

3      A.  That's correct.

4      Q.  What, if anything, did JPad give to you in

5 exchange for this assignment?

6      A.  Again, there's a security note.  There's a note

7 and a promissory note.  It's secured, the home.

8      Q.  No, no.  I'm asking, you gave up your right to

9 the note and the lien to JPad.

10          What did JPad give to you, if anything?

11      A.  I don't have an answer to that because, again,

12 my intent was to -- because of personal situations or

13 circumstances that were going on at the time, I needed to

14 have somebody step into my shoes in my absence.

15      Q.  So --

16      A.  That was the whole purpose.

17      Q.  So JPad didn't give you money to purchase the

18 note?

19      A.  No.

20      Q.  And the lien, correct?

21      A.  No.

22      Q.  And did it give you any other asset or thing of

23 value?

24      A.  No.

25      Q.  Upon its formation, who was -- who was or who

1   were the owners or members of JPad?

2        A.  The only member of JPad at the time that it was

3   formed was Anthony Calderon, and a subsequent article of

4   organization, an L2 I believe it was, was executed on

5   October 18th, 2018, where I became the member.

6        Q.  So by the time you were purchasing the

7   manufactured home, you were the only member of JPad,

8   correct?

9        A.  I don't recall --

10       Q.  Well --

11       A.  -- I don't recall what happened to Anthony.  I

12   don't -- that was back in 2018, so I don't recall --

13       Q.  All I'm saying is you gave us the date that you

14   became the sole member on October 18th of 2018 --

15       A.  No.  It's --

16       Q.  -- I believe you previously said you purchased

17   the manufactured home on October 31st of 2000 -- or

18   November 1st of 2018.

19            So at the time that you closed your purchase,

20   you were the only member of JPad?

21       A.  No.  That's not what I said.

22       Q.  Okay.  So please clarify.

23       A.  Okay.  So I believe that Anthony organized, I

24   guess, so to speak, JPad on February 9th, 2018.  I

25   believe on October 18th, 2018, an LLC -- or I believe it

1    was an LC -- or L2 is an amendment to the article of

2    organization which added me, Jamie Gallian, to JPad, and

3    the document reflected that there was one or more

4    managers or members at that time.

5         Q.   So what percent membership interest did you have

6    in JPad when you were added by this amendment in October

7    of 2018?

8         A.   I don't recall.

9         Q.   Was it less than 100 percent because it was

10   reflecting you and Mr. Calderon as members?

11        A.   That's -- that's -- that's correct.  I would --

12   yes, I would agree with that.

13        Q.   Who is Mr. Calderon in relation to you?

14        A.   Nobody.  I don't know him.

15        Q.   How did you come to find him?

16        A.   I didn't find him.  He is a friend of Ron, my

17   ex-husband's.  And I believe that Anthony was the

18   organizer.

19        Q.   What is Ron's last name?

20        A.   Pierpont, P-I-E-R-P-E-O-N.

21             (Reporter clarification.)

22        THE WITNESS:  P-I-E-R-P-O-N-T.

23   BY MR. HAYS:

24        Q.   So is it -- is my understanding correct that it

25   was your idea to form JPad, and it was your idea for the

1    name of JPad, correct?

2         A.   No.

3         Q.   Okay.  So whose idea was it to form JPad?

4         A.   I believe it was Ron's.

5         Q.   And when did you first ever hear of JPad?

6         A.   After Ron told me that it had been formed.  And

7    I thought, Well, that's cool.  Okay.  JPad, J Sandcastle.

8    So it was -- in Ron's mind, it was supposed to be Jamie's

9    pad and Jamie's sandcastle.

10        Q.   So I just want to be clear because I think I

11   heard something originally when you were talking about

12   formation of JPad in February of 2018 and what I'm

13   hearing now, so I just want to make sure it's clear.

14        A.   Uh-huh, uh-huh.

15        Q.   It was not your idea to form JPad, and you never

16   heard of JPad until after it had been formed by

17   Mr. Pierpont and/or Mr. Calderon, correct?

18        A.   No.  The only person who formed it was Anthony.

19   The person who told me about it was Ron.

20        Q.   But -- but again, you only learned about it

21   after it had been formed by Mr. Calderon?

22        A.   That's correct.

23        Q.   Okay.

24        A.   Ms. Court Reporter, Calderon is spelled

25   C-A-L-D-E-R-O-N.

1      (Whereupon an off-the-record discussion was held.)

2   BY MR. HAYS:

3      Q.  Ms. Gallian, when you were added as a member of

4   JPad in October of 2018, did you pay any money to

5   Mr. Caldron in exchange for your acquisition of that

6   membership interest?

7      A.  No.

8      Q.  Can you explain to us the history of ownership

9   of JPad -- finish the history, if you will?

10         You told us it was 100 percent Mr. Calderon, and

11   then you were added for some unknown percent in October

12   of 2018.  What happened after that?

13      A.  I believe what I said was the only function of

14   Mr. Calderon was the organizer or the -- he was the one

15   that did the paperwork, the incorporator I guess is what

16   you would call it.  That's all I know.

17      Q.  Who -- let me just make sure I got this point

18   clear.

19         Was the owner, upon formation, Mr. Calderon or

20   was it Mr. Pierpont?

21      A.  Mr. Calderon.

22      Q.  So Mr. Calderon was the owner and organizer upon

23   formation, and to the best of your knowledge, you were

24   added for some unknown percent, and that was the next

25   change in ownership in October of 2018?

                                                          42

1     A.  Right.  And you have to remember, you're dealing

2  with lay people.  So when you talk about owners and those

3  types of things, I have learned a lot more now five years

4  later.

5     Q.  All we're looking for here is the, like, actual

6  history.

7          So after October 2018, did the membership

8  interests in JPad change again?

9     A.  I believe it did.  However, I believe that the

10  tax returns did not reflect BIFs, and it was just opening

11  up too many cans of worms as far as -- yeah.  I just --

12  there wasn't enough time in the -- time to investigate

13  everything.  So I -- if you want to know exactly where it

14  stands, my intent is -- was that -- when it was amended

15  on October 18th, was that it was managed or members of

16  more than one.  However, relationships have come and

17  gone, and -- and things have changed.

18     Q.  I'm going to try to unpack that.

19          You -- you referenced tax returns.

20     A.  Right.

21     Q.  Had JPad filed tax returns at any point in time?

22     A.  No.  So again, that is another one of the

23  entities that comes over to mine, and my intent was to

24  gift a percentage to each one of the children.  I

25  think -- I think, from what I was told -- again, you're

1   talking to a layperson here.  I believe that the gift

2   amount each year was $15,000.  And I believe that my

3   intent was to gift each one of my children and my

4   granddaughter $15,000 per year, but it just was getting

5   too complicated.  I didn't know enough to be able to do

6   something like that.

7            So to answer your question, my intent was -- is

8   that a percentage amount would have been gifted to them

9   every year, but as far as reflecting that on my tax

10  return, that was not done.

11       Q.  After you became a member of JPad in October of

12  2018, did documents ever get filed with the Secretary of

13  State to reflect that ownership of JPad changed after

14  that point in time?

15       A.  I believe that there was always the SOI form,

16  the 12 form, was changed or updated, you know, on

17  whenever -- whenever the -- the date is you're supposed

18  to file it -- reflecting different managers at the time.

19       Q.  And were the filings of those forms accurate

20  when they were filed?

21       A.  I believe so.

22       Q.  And so, if I wanted a more precise history of

23  ownership and membership interest in JPad, I would just

24  have to pull those forms and look at them?

25       A.  But I don't think a manager is an owner.  I

1    think -- I think you're missing that -- that it was --

2    the company was managed, as I have already testified,

3    that -- that I needed, in my absence, to be able to have

4    managers make decisions for me, and that's why the SOI

5    was updated.

6         Q.   So -- so going back to my original question,

7    what is the history of ownership?

8              And so, I thought you were saying that the forms

9    that got filed were reflecting the different ownership

10   over time, but apparently that was reflecting the

11   different managers over time.

12        A.   That's correct.

13        Q.   So sticking specifically to the owners, what

14   were -- who were the owners at all times from

15   October 2018 to the present?

16        A.   Just me.

17        Q.   Did any document ever get filed removing

18   Mr. Calderon as an owner?

19        A.   We only did the L2 that one time on October 18th

20   adding me.  I believe he was listed as a manager only.

21        Q.   And so, earlier I think I asked you, when you

22   became an owner, what was your percent ownership, and you

23   said, Unknown.

24        A.   Right.

25        Q.   And I said that is less than 100 percent, and

                                                              45

1  you said, correct.

2      A.  Right.

3      Q.  You are now saying you are the 100 percent

4  owner?

5      A.  Right.

6      Q.  So did anything change from October 2018 to

7  remove Mr. Calderon as an owner?

8      A.  No.  I don't believe so.

9      Q.  Nothing formal, but your understanding is he's

10 not an owner?

11     A.  No.  I don't believe -- I think he was just the

12 the organizer -- I don't know, organizer, incorporator.

13 So no, he -- he was not an owner.  He's not an owner.

14 He's a manager.

15     Q.  So when you became a member in October 2018, are

16 you now saying that you believed you became the

17 100 percent owner?

18     A.  That's correct.

19     Q.  Member?

20     A.  That's correct.

21     Q.  Okay.  And that's been the same from

22 October 2018 to the present?

23     A.  That's correct.

24         THE REPORTER:  If we can take a break at a

25 convenient time?

1        MR. HAYS:  We can take a break right now.  How

2   long would you suggest, Ms. Reporter?  Ten minutes?

3        Okay.  So we'll reconvene at 9:40, which is 11

4   1/2 minutes.

5        THE WITNESS:  Okay.

6        MR. HAYS:  Thank you, everybody.

7   (A recess was held from 9:28 a.m. until 9:46 a.m.)

8        MR. HAYS:  Okay.  We're back on the record at

9   9:46.

10  BY MR. HAYS:

11      Q.  And when we took a break, I think you had been

12  testifying about ownership of JPad from October 2018 to

13  the present.  And you said, at all times during that

14  period, you were the 100 percent owner, correct?

15      A.  That's correct.

16      Q.  Is JPad still an active LLC in good standing

17  with the Secretary of State?

18      A.  They're in good standing with the Secretary of

19  State, both LLCs are.  However, I was told, whether good,

20  bad, or indifferent -- or counselled that in order for me

21  to avoid paying the $800, I needed to file the document

22  with them, the Secretary of State, and -- I don't

23  remember exactly what the document was called -- inactive

24  or something -- something.  It was basically just to

25  avoid having to pay the extra $800 per month for both --

1    or per year that California state tax or something.

2         Q.  When you say you were counselled, who was

3    telling you this?

4         A.  One of the attorneys, I'm not sure I remember

5    exactly which one.

6         Q.  One of your attorneys?

7         A.  Or a attorney.  I can't even remember which one.

8    But I just remember that was the reason.  They said, you

9    know, that you want to always remain in good standing

10   with the -- the -- California so that you're not, I don't

11   know, default or something.  So that's what they told me

12   to do, which I did.

13        Q.  When was this document filed that you're

14   referring to?

15        A.  I believe in November of 2021.  I don't recall

16   the exact date.

17        Q.  Is JPad currently listed as the legal owner on

18   the certificate of title to the manufactured home?

19        A.  Yes.

20        Q.  Earlier we discussed the promissory note which

21   is listed in writing with a principle amount of $225,000.

22             Were payments ever made on account of that note?

23        A.  The note's not due until 2048.  So there have

24   been principle payments made, however, not on a regular

25   basis.  It wasn't anticipated that Covid would happen or

1   that I would lose my job or that -- for a variety of

2   reasons.  So I re-read the note and made sure that it

3   states that it hasn't -- it's still in effect until

4   2048 -- or to 40 -- 2048.

5       Q.  I think that you said -- and I'm looking at the

6   realtime transcript -- you re-read the note.  That's what

7   you said?

8       A.  Yeah, just to make sure that there wasn't

9   something in there --

10      Q.  I just needed to hear that --

11      A.  Yeah, yeah.  I really just -- I hadn't read it

12  in several years.

13      Q.  Okay.  And I just wanted to make sure I heard

14  the word correctly.

15      A.  Yeah, yeah.

16      Q.  So under the -- what are the terms of the note?

17  Let's discuss that for a second.

18      A.  I don't --

19      Q.  Do you -- do you --

20      A.  I don't have it in front of me.  It wasn't part

21  of, you know, the discussion.

22      Q.  Hold on.  Hold on.

23          J Sandcastle is the obligor that owes the money,

24  correct?

25      A.  That's correct.  That's the way it was

1   originally set up.

2         Q.   And the beneficiary of the money is you,

3   personally, correct?

4         A.   I was the lender.  Yes.

5         Q.   Is there an interest rate in the note?

6         A.   I believe you asked me that before, and I

7   believe it's 5 -- 5 percent or 5 1/2.  Or maybe it wasn't

8   you that asked me.  Somebody asked me what the interest

9   rate was.  No.  It was you in the 341.

10         Q.   And what does the note provide as far as

11   payments?

12              Is it interest only?  Principle only?

13   Principle --

14         A.   I don't recall.

15         Q.   -- tell -- tell me what you recall.

16              THE REPORTER:  Sorry.  I -- just real quick.  I

17   really need you to remember to wait until the question is

18   finished.  I'm missing when you guys interrupt each

19   other.  So just pause and then finish.

20              THE WITNESS:  So I don't recall what the

21   specific terms of the note are.  You've asked me at the

22   341 -- I believe that I stated that the -- it was a fully

23   amortized note.  I believe that the due date is 2048.  I

24   believe that -- it seems to me that I might recall

25   something about $1,200, and that would probably seem

1 | about right if the note was amortized out for 30 years.

2 | BY MR. HAYS:

3 |     Q.  So your recollection is a 30-year term, fully

4 | amortized, with a monthly  payment of approximately

5 | $1,200?

6 |     A.  I believe that -- it sounds correct, yes.

7 |     Q.  Okay.  And a minute or two ago, I think you said

8 | some principle payments have been made.

9 |        Can you elaborate on that?

10 |     A.  I've tried to do the best that I can as far --

11 | so I don't recall exactly dates, times when, amounts.  I

12 | don't recall that.  Again, this was five years ago, and

13 | the intent was completely different than what has

14 | happened five years later.

15 |     Q.  How many payments would you estimate J

16 | Sandcastle made to you?

17 |     A.  Again, I don't -- I don't have a specific

18 | amount.

19 |     Q.  Do you believe it was more or less than 12?

20 |     A.  I don't know.

21 |     Q.  Do you know if it was more or less than 24?

22 |     A.  I don't remember.  I don't know.  I don't have

23 | an amount in my head.  It's completely different than

24 | what the initial purpose was set up for.  It's -- it's

25 | been completely changed.  It's -- the terms -- the terms,

1  the purpose, the intent, it's -- it's five years later

2  and --

3        Q.   So -- so -- hold on.

4        A.   The whole thing needs to be redone.

5        Q.   So -- so let's -- let's talk now about the

6  initial purpose and intent is what --

7        A.   The initial purpose and intent was, for several

8  years -- and I think you and I have talked about this

9  before -- that the initial payment was -- the initial

10  intent of setting up the loan was all of my savings,

11  retirement.  It was more of -- to force -- to force the

12  amount not to be squandered away, and to be paid, and

13  that eventually I would have income.  That's the whole --

14  that was the whole purpose.

15           I didn't know whether I was going to be able to

16  get out of that three-year loan -- or that three-year

17  rental agreement.  I didn't know if I was going to have

18  to rent this house.  I didn't even know if I was going to

19  be allowed to rent the house.  The purpose was -- has

20  been completely changed.

21        Q.   You referred to a three-year rental agreement.

22        A.   Yes.

23        Q.   What is that?

24        A.   So after the battery over at the Gables, I

25  wanted to get out of there as quickly as possible.  So I

1    rented a home and signed a three-year lease agreement

2    with Henry Newton for the property at 5782 Pinon Drive.

3    It was a three-year term.  It was $3,400 a month.

4        Q.  So you're saying one of the purposes of setting

5    up the loan was that you had signed this three-year lease

6    and you weren't sure if you were going to be able to get

7    out of the lease, correct?

8        A.  Well, because that would meant -- that would

9    mean -- I had been looking to purchase a home in here.

10   The first two fell through.  I had opened escrow in July

11   of 2018, two months before I even signed that note.  I

12   mean, everything was -- you know, I was flying a lot that

13   summer and everything was just moving so fast in here.  I

14   mean, there was things that had offers on it before it

15   actually even was listed to the public.

16            And I didn't have money to be able -- or even

17   anything, I didn't have -- the house at Alderport hadn't

18   sold yet.  So there was a whole lot of reasons to protect

19   the money and make sure that it was getting paid back as

20   income if I had to rent this house if -- because if I had

21   to -- to stay in the other house.  I mean, there was a

22   whole lot of different reasons.

23       Q.  When did you sign this three-year lease?

24       A.  9-11-18.

25       Q.  And were you ultimately able to get out of the

53

1  lease?

2      A.  I did.  If you look closely enough, the last

3  payment -- if you look closely enough at the Chase -- my

4  chase account, I paid the rent through -- what do you

5  call those, like, when the landlord wants you to pay,

6  like, direct deposits -- I believe the last payment I

7  made was December of 2018 or November of 2018, one of

8  those months.  However, I had to pay all the utilities on

9  the property through February of 2019.

10          My deposit check finally came after much

11 negotiation back and forth.  So I believe that when the

12 deposit check finally came and then I paid the last

13 utility, I believe that I was finally relieved of my

14 three-year obligation by February 2019.

15     Q.  So one of the purposes of putting title to the

16 manufactured home in J Sandcastle and putting a lien

17 against the property was to protect the money because of

18 this three-year lease, correct?

19     A.  Because it was -- it was really possible that I

20 would have had to do, you know, short-term leases,

21 whatever the city ordinance here allows -- Huntington

22 Beach now does allow short-term leases, and I wanted to

23 be protected if there were going to be tenants in here,

24 subtenants I guess, and I wanted the money to go towards

25 paying off the -- the note.

1          I think Ron and I were putting our marriage back

2     together, and I'm certainly not going to support a man.

3     So again, the whole purpose was -- the way that I looked

4     at it is -- I was a bank and I was making a loan, and

5     that my upside of that was to be able to collect interest

6     over the term of the loan and have income.  I didn't -- I

7     was on a leave of absence -- the medical leave of

8     absence.  So that was the whole purpose.  But that all

9     changed.  I didn't realize that the -- the injury was as

10    bad as it did; the marriage, you know, fell apart again;

11    and then this nonsense with Houser started.  So things

12    changed.

13         Q.  What -- what benefit was there to -- I'm not

14    following entirely?

15         A.  Okay.

16         Q.  So what benefit was there to you of using the

17    LLCs to be on title as registered owner and legal owner

18    as opposed to you individually?

19         A.  Because I didn't live here, it was going to be a

20    rental.  It was going to be a rental, you know, for -- to

21    protect me for whatever the renters did.  That was the

22    purpose.  But that all changed.

23         Q.  Can --

24         A.  Lisa Ryan, you know, had asked if she could take

25    over the three-year, and I'm, like, No, I don't -- I

1    don't want to get -- I don't want to get involved in

2    this.  I think she submitted or contacted the landlord to

3    see if she could take over it, but I wasn't willing to

4    assign a three-year lease.  No.  I wanted off the lease.

5         Q.  When did you first start residing in the

6    manufactured home?

7         A.  Sometime in November.  I was back and forth

8    between both of the homes.

9         Q.  And so, sometime in November 2018 to the

10   present, you've been exclusively in the manufactured

11   home?

12        A.  That's correct.

13        Q.  Okay.  How was J Sandcastle going to earn money

14   in order to service the note by making the payments?

15        A.  For the rental.  That was the purpose is renting

16   this house at fair market value, and they were going to

17   service the note to me with the interest, and that was

18   the point is so that I could have income.

19        Q.  How is that any different than if you had become

20   the owner and rented and would have received the income

21   directly from the tenants?

22        A.  Because I didn't live here and it was a

23   liability -- it's a liability on me personally to have

24   renters in the home.  That's just the way I did it.

25   Again, I didn't have a legal background.  It's just what

1    I came up with --

2          Q.   And you --

3          A.   -- trying to solve the problem.

4          Q.   And then you've been living there exclusively

5    since November 2018 without renting it to third parties

6    with you living elsewhere.   So --

7          A.   I -- you have to slow down.   You have to repeat

8    that again.   I kind of lost you there.

9          Q.   Sure.   So you said at first you set this up

10   thinking you might have to rent the property and then you

11   didn't want to be on title and be the landlord

12   individually to these renters and have liability or

13   potential liability to the renters, I think you said.

14         A.   Correct.

15         Q.   So the question is, when that changed and you

16   moved into the home exclusively in 2018 to the present,

17   why did you leave J Sandcastle on as registered owner and

18   JPad on as legal owner?

19         A.   That -- that's important to mention.   I'm glad

20   you asked that question because the whole -- it -- a lot

21   of things happened during that 60-day period.

22              You've got the Houser attorney continuing to

23   file documents in the -- the -- Lisa Ryan's name.   So

24   that was the biggest -- that was the biggest question is,

25   like, why is this -- why is this happening?   Why -- if

1   you know I'm the owner, you've been given notice by the

2   owner, you made an agreement that she was going to sell

3   the home, you knew she was going to sell the home, she

4   sold the home, you moved out, you were paid the amount,

5   it's like, why are you still filing documents in the old

6   owner's name?  It's -- it's like the whole thing is just,

7   like, a cluster you-know-what.  It just didn't make sense

8   to me.  So that's why.

9       Q.  But -- but you --

10      A.  You know, and --

11      Q.  Hold on.

12          How is putting the registered owner and legal

13  owner in the name of the LLCs any different or providing

14  you any additional protection than just putting it in

15  your individual name?  That's the part I'm not following.

16      A.  Mr. Hays, I don't know the legal ramifications

17  of whether it's good, bad, or indifferent.  I just know

18  that this is what I've seen happen, that, if you have a

19  rental property, you put it in the name of the LLC, it

20  protects you personally, you're only exposed to something

21  about as far as the LLC, they can't come after you.  That

22  was the whole purpose.

23      Q.  But -- but I understand that that was the

24  initial purpose, but then things changed during the

25  60-day period, you reference.

1        A.   Right, right.

2        Q.   And you said it was important I brought it up.

3        A.   Right.

4        Q.   And then you discussed that the Houser Bros.

5    kept pursuing Lisa Ryan, and so, that was the reason why

6    you kept things in the LLC --

7        A.   Well --

8        Q.   -- instead of just putting it your individual

9    name --

10       A.   Well, however --

11       Q.   Hold on.  Hold on.  That's the part that I'm not

12   following --

13       A.   Okay.

14       Q.   -- that I need you to tell us what your intent

15   was and why you thought the LLCs would provide you better

16   protection than having it in your individual name

17   vis-a-vis the Lisa Ryan issue.

18       A.   Correct.  Okay.  So one of the things that we

19   haven't touched on was J Sandcastle as the registered

20   owner was also the resident applicant.  So -- with the

21   residency application.  However, at that time, I think

22   there was some -- and I can't speak for Houser, but it

23   appears that Houser focused in on Jamie Gallian instead

24   of reading that Jamie Gallian signed as the member of J

25   Sandcastle.  So I believe that J Sandcastle was the --

1  the applicant, J Sandcastle was the registered owner,

2  Jamie Gallian had a three-year lease hanging over her

3  head, the home quite possibly could have had to be rented

4  as a short-term rental, but all of the -- all of those --

5  all of those situations changed and -- and I ended up

6  getting out of the lease.  I ended up moving over here,

7  but yet the -- the issue with Houser continuing to

8  convolute and recognize J Sandcastle or Jamie Gallian or

9  anybody else besides Lisa Ryan continued until April of

10  2019.

11      Q.  Did you -- at the time you were purchasing the

12  manufactured home, isn't it true that you had some

13  litigation that you were a party to with the Gables or

14  somebody else?

15      A.  That's correct.

16      Q.  And was putting -- was using the LLCs on title

17  and lienholder also protecting your equity in the

18  property?

19      A.  No.  Because it -- my -- I didn't have any

20  liens.  There were no judgements.  I sold the home

21  unencumbered, so it wasn't a thought.

22      Q.  I'm saying you were -- I'm saying you were a

23  party to litigation which could have resulted in a

24  judgment against you, and did you view using the LLCs on

25  title and as lienholder as providing you some protection

1    against any possible judgment that would be entered

2    against you in the future?

3         A.   No.   I don't believe that ever even came into my

4    mind.   I was very transparent with the judge, and the

5    judge was very supportive of me getting out of there, and

6    that's exactly what I did.   The judge and the attorneys

7    for HOA -- the HOA, and the HOA, I think it's no -- it's

8    no secret that, you know, we -- I had agreed in March of

9    2018 to sell the property.

10             The landlord or sublessor, or whatever you want

11   to call them, was very supportive.   My attorneys were in

12   contact with him almost daily.   They sent me an e-mail on

13   November 1st and approved the sale.   So there would be no

14   reason for that -- those thoughts to come into my head.

15        Q.   But isn't it true that judgements were later

16   entered against you in that litigation?

17        A.   That was months later.   So I didn't think of it.

18   I didn't -- it didn't -- as a -- as a layperson, you

19   don't -- I wasn't even thinking that.   I mean, I was

20   completely shocked, as well as anybody that was in my

21   circle or my attorneys -- completely shocked when that

22   judgment came down, what, eight months later.

23        Q.   You were talking earlier about the number of

24   certificates of title, and I think you said it was four

25   or five, and the very first one was J Sandcastle as

1  registered owner with no legal owner, correct?

2      A.  Except for the UCC I mentioned.

3      Q.  I'm just talking about what appeared on the face

4  of the document.

5          And then because the document wasn't accurate,

6  there was the amendment in early 2019 to add JPad as the

7  secured creditor or lienholder, right?

8      A.  Say that again.  Oh, I'm sorry.  My screen went

9  black here.  Okay.

10     Q.  Do you need me to repeat?

11     A.  No.  I got it here.  Sure.  Go ahead.

12     Q.  Because that original certificate of title did

13 not reflect the lienholder, but there was a UCC 1 out

14 there that had been filed, the certificate of title was

15 amended in early 2019 to reflect JPad as the lienholder,

16 correct?

17     A.  No.  I don't believe that's when it happened,

18 but -- I --

19     Q.  When did --

20     A.  -- believe that it wasn't recorded.  I don't --

21 I believe that it didn't hit the HCDs certificate of

22 title -- God, I don't even recall when they -- when they

23 changed the certificate of -- every time you change or

24 add something to the CD, the certificate of title, it

25 takes months for it to get processed.  So I don't recall

1   when it finally got entered or corrected -- or not

2   corrected.  That's not a right word.  But when I finally

3   got the next original in the mail, I don't recall when it

4   was.

5         I do recall that I was not familiar with COTA

6   and that the way to give public notice was through UCC

7   filings.  That's what I was aware of.

8         Q.  Earlier you said the date of January 14, 2019,

9   in connection with this issue.  What was that date?

10        A.  Those are the -- those are the recordings of the

11  UCC filings.  That's the recording date or the file date

12  with the State of California giving public notice of the

13  encumbrance.

14        Q.  And so, sometime after that date, a request was

15  made of HCD to reissue the certificate of title?

16        A.  I believe it -- they both happened at the same

17  time.  You know, Mr. -- Mr. Hays, quite honestly, I don't

18  know -- I -- I don't know the exact date.  I just know

19  that when the -- the UCCs were recorded, the file dates

20  are January 14, 2019, with public notice, the next

21  certificate of title seem to be August 20th, 2028, and I

22  think that was the typo because the -- the notarization

23  is the 28th.  So I don't know why they put the 20th.

24        Q.  And what year was that?

25        A.  2020.

1    Q.  So you think the next certificate of title is in

2  August of 2020, correct?

3    A.  That's the next one that reflects the actual

4  COTA changing to JPad and Ron Pierpont.

5    Q.  And this is the first certificate of title that

6  reflects on its face the JPad Pierpont lienholder?

7    A.  That's correct.

8    Q.  So that would be the second certificate of

9  title, correct?

10    A.  Second or third.

11    Q.  Do you think --

12    A.  I don't recall.  I don't have the documents in

13  front of me, but --

14    Q.  But -- but I'm asking you to give me a

15  recollection.  And the first one reflected J Sandcastle

16  as registered owner and no legal owner.  And then there

17  was a second one that was issued to reflect J Sandcastle

18  as registered owner and JPad as legal owner.

19         And you believe this was in August of 2020,

20  correct?

21    A.  That's correct.

22    Q.  All right.

23    A.  Yeah.  To the best of what I can remember

24  without documents in front of me or being shown to me,

25  that's correct.  I believe it was August of 2020.

1       Q.   Okay.  What do you believe to be the next

2    certificate of title that was issued?

3       A.   The 24th of February 2021.

4       Q.   And that's not the issued date, though, correct?

5       A.   That's the date that it was -- it is effective.

6       Q.   That's not --

7       A.   The --

8       Q.   -- that's not the date that the HCD handed you a

9    piece of paper, correct?

10       A.   No.  I believe that is the date.  I believe it's

11    right down there in tiny, tiny little print on the face

12    of that document.  It says 2-24.

13       Q.   I thought that what that was -- and you tell me

14    if you believe it's different -- is that the February 24,

15    2021, date is the date that a transfer was effective.

16    That transfer then gets submitted to HCD for an

17    application to modify the title, and then the modified

18    title comes out later; is that correct?

19       A.   With the effective date of the transfer is the

20    way that I understand it.

21       Q.   I understand.  I'm just trying to get the timing

22    down here.

23       A.   Yeah, yeah.

24       Q.   And so --

25       A.   I believe it started -- if -- if -- I know I

1  provided tons of e-mails between HCD and me.  I believe

2  that transaction started at the beginning of February,

3  and I don't know why it took them three or four weeks to

4  finally get it right, but I know that they kept calling

5  me because they were -- something about having

6  "Mr. Pierpont and" -- with a company -- or with the name

7  of the LLC -- they were saying -- I would do it one way

8  and then they would call and say, No, we found out that

9  you have to do it this way, and then they would change it

10  again.

11        So the -- the -- those are two separate -- two

12  separate.  Mr. Pierpont is not a member of JPad.

13     Q.  All right.  I think that there's a date stamp on

14  the front of the title that says -- that has the

15  February 24, 2021, date that says July 14, 2021.

16     A.  That's correct.  That's the day that I have

17  since -- and if you actually -- this is how I came up

18  with that, because I'm, like, July 14th -- where did that

19  come from?  So I called and asked.

20        That's the day that they opened the envelope.

21  They stamp it.  Or like when I turned in the Lisa Ryan

22  certificate, it's stamped November 16th, but you don't

23  get it until months later.

24     Q.  So my -- my question, if I can finish, is that

25  that July 14th of 2021 date stamp is a stamp put on the

1    document by the HCD, correct?

2        A.   That's what I would think.

3        Q.   But -- but --

4        A.   It seems like it -- seemed like it made sense.

5        Q.   -- it wasn't put on the document by you,

6    correct?

7        A.   No, no.

8        Q.   And the date that you received this document

9    back from HCD would have been some date after July 14 of

10   2021?

11       A.   That's correct.

12       Q.   Okay.  And do you know when you received the

13   document back?

14       A.   I believe my first inquiry was through these

15   $35 -- it may have been $25, but I think it was 35 --

16   title searches.  Because I'm, like, what is taking so

17   long?  Then I -- then I got a title search that said --

18   it reflected Jamie Gallian as 2-25-2021, and I'm, like,

19   what happened to JPad?  Because they took JPad and Ron

20   Pierpont off.  It wasn't supposed to be both.  It was

21   supposed to be one.  It was supposed to be only Ron

22   Pierpont.

23            So then I contacted them and I said -- actually,

24   that was during COVID, so we weren't sure whether the

25   office was even open -- there's one in San Luis Obisbo,

1   one in Riverside, what office is going to be open.  I

2   contacted them -- I believe the e-mail I have is July 7th

3   or 8th -- and said, Are you open?

4          And I finally got an e-mail back that said, Yes,

5   we're open, limited hours.  So I told them what the

6   situation was and they said, Have you gotten the original

7   from Sacramento?  I said no.  They said, Well, you have

8   to wait until you get the original.

9          So I believe I got it around -- the original,

10  around August 4th, and I think the following workday

11  would have -- or the next workday would have been, like,

12  the 5th or 6th, and I actually drove it out there.  They

13  said that I had to bring it to them in order to correct

14  it to put JPad back on.  And that's how that happened.

15      Q.  And that resulted in another, new, fourth

16  certificate of title?

17      A.  Yeah.  I had to deliver the -- the one that took

18  JPad and Ron off, delivered that back to them, had to pay

19  another $115 or 16, whatever it was.  They said, You know

20  we're going to charge you again?  I said, I know.  It's

21  okay.  So I paid it there at the office.

22          And then I got an e-mail from a technician with

23  another title search that it was corrected, and they

24  said, you know, give it some time because these only come

25  from Sacramento.  However, the first document that comes

1    is the registration card -- well -- yeah, the

2    registration card is just a white, soft, 8 1/2 x 11 piece

3    of paper.  And then the registration -- or the

4    certificate of title card is sent to the address that

5    reflects the legal owner, which was Torrance.  And I --

6    and he got it really quick, Mr. -- Bob got it really

7    quick.  The way that they made it sound like it would be

8    weeks, and I think he got it within, like, a week.

9         Q.   So the February 25, 2021, date?

10        A.   Uh-huh.

11        Q.   That's a date that or J Sandcastle or JPad,

12   somebody puts on a form to submit to HCD, correct?

13        A.   No.  That's the day that I released -- well, not

14   I.  That's the day that J Sandcastle released their

15   interest as the registered owner in the manufactured home

16   to me.

17        Q.   My -- my question was, that's a date provided to

18   HCD by you or J Sandcastle.  That's not a date that HCD

19   would otherwise have on its own, correct?

20        A.   No.  That's the -- that HCD document -- or that

21   date that the HCD takes is on the back of the certificate

22   of title form.

23        Q.   But -- but I'm saying that's a date that you

24   provide to them --

25        A.   Yeah.

1      Q.   -- correct?

2      A.   It was a notarized signature, yes.

3      Q.   Okay.  And that was my next question is how do

4   we know that it happened at or about that time --

5      A.   Because --

6      Q.   -- and --

7      A.   -- it was notarized, twice.

8      Q.   And you've provided us with that notary

9   acknowledgement in the documents, correct?

10      A.   Yes, I have.

11      Q.   And --

12      A.   It's in your -- it's in your documents, as well.

13      Q.   And I'll -- I think I have it up on the screen

14   here.  So let me see if I'm smart enough to do a screen

15   share.

16      A.   And I think that -- I believe I asked -- sent

17   you back your documents yesterday and put page numbers,

18   if we could use the page numbers so that I can get to it

19   easily.

20      Q.   It's page 5 of 461.

21      A.   Okay.

22      Q.   In the PDF.  And that's an acknowledgement of

23   February 25, 2021, by a notary Greg Buysman, or something

24   like that.

25      A.   Yeah.  He's at the local UPS store here.

1        Q.  Okay.  And so -- oh, Buysman.  I see it -- it's

2   spelled out below.  I was trying to read the printing.

3   B-U-Y-S-M-A-N.

4        And so, you went into the UPS store and had this

5   notary acknowledge that this document -- this certificate

6   of title was being signed on February 25th of 2021,

7   correct?

8        A.  That's correct.  However -- if you stop

9   scrolling for a second -- what he notarized -- go up a

10   little bit.  No, up, up, up, up.  Okay.  Okay.  So what

11   he's notarizing -- I'm sorry.  Can you show me the first

12   line under the signature?  No.  Go, go -- well, I guess

13   down.  Is that what you're -- okay.  Stop.

14        So what he's notarizing is this section right

15   here, the date that I released section B is what he's --

16   what he's -- you see the 2-25 right here?

17        Q.  Yeah.  I see it.  So that's what's notarized and

18   then ultimately submitted to HCD, correct?

19        A.  Yes.  However, don't forget the tax clearance

20   certificate.  That was a nightmare

21                  (Reporter clarification.)

22        THE WITNESS:  It's called the tax clearance

23   certificate.

24   BY MR. HAYS:

25        Q.  So why don't you tell us what this is and why it

71

1   was a nightmare?

2       A.  Well, because the HCD does not change a --

3   change a certificate of title without paying the current

4   taxes and a year in advance, and I didn't have the money

5   for that.  And that's why there's such a difference

6   between -- you see this date right here is July 9th.

7       Q.  Of 2021, correct?

8       A.  That's right.  That's the day that I filed

9   bankruptcy.  That's when I had -- that's the only time I

10  had the money to pay all that.  I didn't realize that

11  they -- they charge so -- they -- they --

12          And I go, Why are you charging me, like, two or

13  three years?

14          That's our policy.

15          I'm like, That can't be the policy.  But it's --

16  it's what they do.

17      Q.  So you submitted the request for the title to be

18  reissued --

19      A.  Uh-huh.

20      Q.  -- based on the February 2021 release?

21      A.  Right, but I didn't have a tax clearance

22  certificate.

23      Q.  And then you were notified that they would not

24  reissue the title until you get this tax clearance

25  certificate?

1    A.   That's correct.  And that's why, finally, when I

2  got everything, that's why I believed that July 14th

3  stamp is finally on when they started making -- when they

4  finally officially started making the change.

5    Q.   And so, when -- what resulted in this tax

6  clearance certificate getting issued?  You submitted some

7  money?

8    A.   Yeah.  You have to pay the current plus a year

9  in advance.

10    Q.   And the money that you paid was paid on

11  July 9th --

12    A.   Correct.

13    Q.   -- 2021?

14    A.   That's correct.

15    Q.   And in what form did you pay it?

16    A.   My Capital One charge card, my VISA card.

17    Q.   Did you have to submit any other paperwork on

18  that date or was it just make the payment?

19    A.   No.  You order it online and you go and pick it

20  up with -- and, you know, obviously besides give the

21  money, but that's it.

22    Q.   So on July 9, you go online on the computer --

23    A.   And order it again.  Because, see, it's only

24  good for -- when you order it -- I ordered it in -- you

25  know, a long time ago, but I didn't know they were going

1    to charge me two years.  So I never went and picked it up

2    the first time.  And then it wasn't until the 9th that I

3    had all the money.  I went down there, I paid it, and

4    then that certificate is good for 90 days.

5         Q.  Okay.  Let me stop you right there.  You said

6    you went down and paid it, and earlier I thought you said

7    you paid online with your charge card?

8         A.  No, no, no.  You order it.  No.  You order the

9    certificate.  Okay.  They don't -- you -- you have to

10   order it.  You can go to the Orange County tax assessor

11   and you drop down to the mobile home, and you type in

12   there, and you order this tax clearance certificate, and

13   they call you and tell you when it's ready.

14        Or you can follow up and say, Hey, you know

15   what, I've been waiting a long time, you know, can you

16   possibly find the time to do this today?  And I went down

17   to the office, the tax clearance -- or the tax assessor's

18   office and paid the bill with my Capital One VISA card.

19        Q.  So --

20        A.  And then they give you this document.

21        Q.  So on July 9th of 2021, you were standing in the

22   tax collector's office with a charge card paying the

23   money that they required?

24        A.  Yes.  Before I filed bankruptcy.  It was in the

25   morning that I was there and the -- the -- I don't know,

1   Bankruptcy Court was in the afternoon, like, 2:00 or

2   something.

3       Q.   And then when you got this piece of paper --

4       A.   Uh-huh.

5       Q.   -- handed to you, this original piece of paper

6   with the fancy stamp on it?

7       A.   Yep.

8       Q.   What do you do with that?

9       A.   You have to send it up to Sacramento.

10      Q.   So you then mailed it to Sacramento?

11      A.   Or I could have scanned it into my computer,

12  either one.  I don't remember which, how -- how it got

13  there.  But they have the original, so I think I followed

14  up with the original.

15      Q.   So you think you mailed the original to them and

16  that's why, on July 14, five days later, they finally put

17  a stamp on it like they're now processing all of this?

18      A.   That's correct.

19      Q.   Okay.  And then sometime after July 14th, you

20  get the brand new, original certificate of title back in

21  the mail?

22      A.   Yeah.  Well, yeah, but I think that what I said

23  was -- is that I had thought, you know, what is taking so

24  long?  I didn't realize that Sacramento is the only one

25  that -- that processes original, you know, so to speak,

1    these big pink slips.  So anyway -- so that's what

2    happened.

3             So I remember I said that I had to wait because

4    I noticed on the -- what do you call it -- the title

5    search that whoever processed it took JPad and Ron

6    Pierpont off, and that was not the intent.

7        Q.  I understand.  So the -- I want to make sure

8    that the documents are -- that we've been referring to

9    are clearly marked as exhibits.  And so --

10       A.  They are, but they're out of order, and you've

11   got -- and that's why I wanted to do the page numbers so

12   that --

13       Q.  But -- but just hold on.  Hold on.

14       A.  Go ahead.  I'm sorry.

15       Q.  I'm trying to -- I'm trying to ask a question

16   and we need to --

17       A.  I'm sorry.

18       Q.  -- keep the reporter happy with both of us.

19            So the first piece of paper that shows the

20   July 14th stamp is now up on the screen.  It's page of 3

21   of 461.

22            Is that the front page of the title that got

23   issued after the tax clearance certificate?

24       A.  No.  That's the -- that's the original

25   certificate of title, the February 24th one, 2021.  If

1  you look down here at the bottom -- if you go up a little

2  bit -- tiny, tiny print, there should be -- okay.  See

3  right there underneath the word "department," see

4  right -- those -- those numbers down there 02-24, way

5  down underneath the word, Department.

6       Q.  Yes, yes.

7       A.  That's the day I come to find out -- or come to

8  learn that's their little date on there where they mail

9  this document, but that's just my own -- I don't work

10  there, so I don't know what they do.

11       Q.  So --

12       A.  -- I, kind of, figured out that's -- must be

13  what that means.

14       Q.  Hold on.  Hold on.  I'm trying to figure out

15  because all of this is in one big PDF --

16       A.  Uh-huh.

17       Q.  -- what is the first page of the title.

18           Is this the first page?

19       A.  Correct.

20       Q.  Okay.  And is it a one-page document?

21       A.  This is the back.

22       Q.  So the back of page 3 of 461 is what's up on the

23  screen now, which is page 4 of 461.

24       A.  Correct.  But that -- that -- this document that

25  was submitted to HCD wasn't -- well, let's see.  No.

1    Okay.

2          So because the tax clearance certificate had J

3    Sandcastle and Jamie Gallian, they said I had to sign it

4    and put it in both names, and I said, No, that defeats

5    the whole purpose.  So we argued about that back and

6    forth, and I think one of your exhibits here -- Rebecca

7    whatever, I don't know, O'Laughlin or something, does

8    a -- does a memo or something that she spoke to me after

9    I contacted the tax assessor's office.

10         And I said, Why would you put both names on

11   there?  Because that's not how -- when you go online

12   under the tax assessor's portal and order this document,

13   that's not what it said.  It did not say Jamie Gallian

14   and J Sandcastle, or J Sandcastle and Jamie Gallian.  So

15   I don't know why they did that, and I didn't notice it

16   when I -- when I picked it up.  And so, she called me.

17         Q.   Let me stop for a second.  I'm trying to figure

18   out which pages of this big PDF constitute a single

19   document so that I can -- can call that Exhibit 1 for the

20   record.

21         A.   Okay.

22         Q.   So -- so going to page 3, it's entitled,

23   Certificate of title, near the top.

24         A.   Uh-huh.

25         Q.   And that's the front page of a document, and

1    then page 4 is the back of that same document, correct?

2        A.   That's correct.

3        Q.   And -- and that's the only pages that are part

4    of that document?

5        A.   That's -- that's correct.

6        Q.   Okay.

7        A.   But it -- yeah, the hard copy.  It's, like, a --

8        Q.   So -- so --

9        A.   -- a beige color or something.

10       Q.   So pages 3 and 4 will be marked as Exhibit 1 for

11   purposes of reference.

12       A.   Uh-huh.

13           (Exhibit 1 was marked for identification.)

14   BY MR. HAYS:

15       Q.   The acknowledgement, which is page 5, is not

16   something that was physically stapled to the certificate

17   that HCD issued, correct?

18       A.   It -- well, yeah.  I had to give it to them.  I

19   gave it to them at the same time, but that -- I sent the

20   original.  They have the original acknowledgement.

21       Q.   So --

22       A.   They have the wet copy, I guess, is what they

23   referred to it as.

24       Q.   So when they mailed you Exhibit 1 back, the

25   acknowledgement was on it?  This -- this piece of paper

1    was included?

2        A.   No, no.  That's -- no.  The original was already

3    at HCD, is already at HCD, the -- they have the wet inked

4    copy, both of them.

5        Q.   So this should be as hard as it is.  I don't

6    know if it's me or you, but let me try one more time.

7            When you opened the mail and you got Exhibit 1

8    which is pages 3 and 4, was --

9        A.   No.

10       Q.   -- was that the only piece of paper in the

11   envelope?

12       A.   Okay.  I didn't get 3 and 4.  I sent 3 and 4.

13   3, 4, and 5 went to HCD.

14       Q.   So -- so 3, 4, and 5 is a single document, which

15   will be marked as Exhibit 1, which was your application

16   and submission to HCD.

17       A.   Uh-huh.  With --

18       Q.   Okay.

19       A.   -- the tax clearance certificate, eventually.

20       Q.   And then, subsequently, the tax clearance

21   certificate gets submitted to them, which we will call

22   Exhibit 2.

23       A.   Okay.

24           (Exhibit 2 was marked for identification.)

25   //

1   BY MR. HAYS:

2       Q.   Okay.  And then in response, they issued an --

3   an original certificate of title?

4       A.   Right.  And that's your next document right

5   there.  Go -- go -- stop.  See right there where it says

6   August 3rd?

7       Q.   Yes.

8       A.   Okay.  That's when they actually -- and if you

9   go down to the bottom, it will say August 3rd, right --

10  see right there, August 3rd, 2021?

11          Okay.  That's when they mailed it, and I believe

12  I got it on the 5th.  And that's when I took that

13  document and drove it to HCD and gave to them, because

14  this August 3rd took off JPad.

15      Q.   And so, this August 10th down at the bottom is

16  an HCD stamp?

17      A.   That's right.  That's when they got it back up

18  in Sacramento and they processed it -- keep going down --

19  keep going.

20      Q.   I don't --

21      A.   Whenever -- whenever you see the HCD, that's, I

22  think, August 10th or 11th.  That's what that is, is they

23  mailed it again.

24      Q.   Okay.  And so -- and so, the -- it's not

25  included in these exhibits, but I understand what you're

1   saying.

2        A.   You have it in there or something, Exhibit 22,

3   or something.  It's there.

4        Q.   You -- you marked it as Exhibit 22?

5        A.   It's down there somewhere.  Something -- it's

6   one of those way at the bottom.

7        Q.   I'm going back to what you had marked.  These

8   are the ones that you had sent.

9        A.   Oh, I'm -- okay.  I'm sorry.  I'm sorry.  I saw

10  it in there -- you know what, I might -- I might be

11  confusing it with your exhibits in the motion.

12        Q.   Yeah.

13        A.   That's probably where --

14             (Multiple speakers simultaneously.)

15             THE REPORTER:  Okay.  I'm sorry.  I cannot get

16  you both at the same time.  One at a time, please.

17             THE WITNESS:  So Mr. Hays, stay right there --

18  right there.  See -- see right there, August 11th, Sylvia

19  Cruz, so that's when -- what I figured out -- again, I

20  don't work there, but what I figured out by staring at

21  all these documents, that's the day -- that date will be

22  on the bottom, again, what is that -- see -- no.  That's

23  not -- that's not the one -- you have to find the one

24  that says, Issued August 11th, and at the bottom, it will

25  say the same thing.

82

1    BY MR. HAYS:

2         Q.   Okay.  At least I understand now.

3         A.   Okay.

4         Q.   And --

5         A.   That's all -- again, I don't work there, but

6    this is, kind of, what my own personal -- just in -- and

7    the way things are cycled and when I received things.

8              So if you look at that one document that you

9    just scrolled through -- just -- keep -- no, up a little

10   bit, okay.  See that date right there, August 6th, that's

11   the day that I had to provide this Statement of Facts

12   with the original August 3rd certificate and pay the

13   extra, the second payment.  That was the document, and

14   it's dated August 6th because I executed it there.

15        Q.   And this is page 396 of 461 which we will mark

16   as Exhibit 3.

17             (Exhibit 3 was marked for identification.)

18   BY MR. HAYS:

19        Q.   And the purpose of this document was to get a

20   new title issued that still reflected JPad as the legal

21   owner, correct?

22        A.   Correct.

23        Q.   Okay.  And that's the way that title remains to

24   this day is -- as reflected on the August 11th

25   certificate of title?

1        A.   That's correct.

2        Q.   And that is J Sandcastle as legal owner -- or,

3   no, Jamie as legal owner and JPad -- Jamie as registered

4   owner and JPad as legal owner?

5        A.   Correct.

6        Q.   Okay.

7                  (Off the record discussion.)

8   BY MR. HAYS:

9        Q.   Ms. Gallian, what prompted J Sandcastle to

10   transfer its registered owner status to you in 2021?

11        A.   Houser and I participated in one mediation and a

12   second mandatory settlement conference, and I also

13   received an e-mail from the attorney stating that Houser

14   will not issue a lease agreement in the name of a

15   company.  And I had told the mediator in the Zoom room or

16   whatever, I said, Fine.  I said, I will put it in my

17   name.  And he said, Fine.  That was it.

18        Q.   Do you recall when that mediation occurred?

19        A.   I don't remember.  I don't remember.  I have the

20   e-mail, I -- I -- if you need it, I will forward -- I

21   will forward it to you.

22        Q.   Let's leave a blank in the transcript.  And

23   Ms. Gallian, you're going to get a chance to read the

24   transcript and make sure it's accurate.  And can you fill

25   in the blank what you believe the date of the mediation

84

1    was?

2         A.   There was two.

3         Q.   The dates, plural, of the mediations, plural,

4    and then if you could also just separately forward that

5    e-mail you're referring to?

6         A.   Yeah, of course.  No problem.

7    _____

8    _____.

9         Q.   Does the promissory note still exist in the

10   sense that it's still an obligation of J Sandcastle to

11   repay the debt?

12        A.   I need to get legal advice on what to do,

13   because I still have the intent of replenishing and just

14   trying either -- either to rent the house or to do

15   something that forces the obligation to be satisfied.

16        Q.   So -- so the debt still exists, and you're

17   saying you want to do something to --

18        A.   I want to get -- I want to get legal advice.

19        Q.   Hold on.  Hold on.

20        A.   Right.

21        Q.   The debt still exists and you want to do

22   something to put J Sandcastle in a position to be able to

23   repay the obligation?

24        A.   Well, I don't know if it will be J Sandcastle.

25   It could be changed to somebody else.  I mean, J

1   Sandcastle has been removed, you know.  I -- they

2   surrendered -- they surrendered the title.  It's now in

3   my name.  Whether I rewrite the note -- I don't know.  I

4   need to get legal advice because now it just seems

5   that -- that the purpose is just so convoluted now,

6   especially with, now, the bankruptcy that came out --

7   that came up.  You know, the whole -- the whole reason --

8   now I'm living in it, you know, and my income is changed,

9   I have a job now.  So things are just -- the -- the

10   circumstances have changed.

11        Q.  But -- but to confirm, J Sandcastle did not

12   repay the note in full, correct?

13        A.  No.

14        Q.  And there are no agreements currently -- and

15   you're referencing you're going to seek counsel.  There

16   are no agreements right now with respect to the note,

17   correct?

18        A.  I don't know -- I can't -- I can't speak to the

19   legal ramifications, I mean, because -- just because I --

20   I -- it doesn't make sense to me that it can just

21   disappear.  So I don't know what -- I just don't know

22   what the -- the -- the legal ramifications are of that

23   security agreement and the promissory note.  I don't

24   know.  I -- I have no idea.

25        Q.  And I'm not asking you for the legal

1   ramifications.

2          I'm asking, is it correct that there are no

3   agreements that release J Sandcastle from its obligation

4   to repay the note?

5      A.   Again, I can't speak to that because they

6   released the title to me.  So that would seem like that

7   they -- to me, it would appear that it's -- the debt has

8   been -- or, not the debt, the -- the collateral has been

9   surrendered to the lender.  So, I mean, that would make

10  sense to me, so that's why I need to get advice on what

11  to do.

12          You know, it depends on how this whole thing

13  with Houser works out.  It might turn out that I move and

14  I use it -- I go back to using it as a rental.  I don't

15  know.

16     Q.   But -- but again, all I'm asking is, is there

17  any agreement in existence now -- and I'm not asking

18  about legal ramifications or releasing title -- I'm --

19  I'm just asking.  Because if there is an agreement, I

20  would like to see a copy of it.

21     A.   Right.

22     Q.   Is there or is there not an agreement?

23     A.   Just the original 11-16 agreements, that's it.

24  That's all that exists.

25     Q.   Do you --

1      A.  Nothing else has been changed.  It hasn't been

2  amended there.  Nothing -- no.  The answer is no.

3      Q.  Let me -- okay.

4          And when you say the original 11-16 agreement,

5  you're referring to the promissory note and security

6  agreements from 2018?

7      A.  That's correct.

8      Q.  Okay.  Thank you.

9          THE REPORTER:  And whenever it's convenient, I'd

10  like to take a break.

11          MR. HAYS:  Sure.  How much break are you

12  thinking about now so we can pick a time to resume?

13          THE REPORTER:  Ten minutes is fine.

14          MR. HAYS:  I didn't hear you, Nicole.

15          THE REPORTER:  Ten minutes is fine.

16          MR. HAYS:  Ten minutes is fine.  So it's 10:50.

17  We'll resume at about 11:00.  Thank you.

18    (A recess was held from 10:51 a.m. until 11:03 a.m.)

19  BY MR. HAYS:

20      Q.  Ms. Gallian, you first transferred title to J

21  Sandcastle and then you transferred $175,000 of funds to

22  J Sandcastle in connection with the execution of the

23  note, correct?

24      A.  Okay.  So that's a little gray, that statement,

25  so you have to reprint because I think because of the --

1  what I'm hearing you say is that because the dollar

2  amount is the same, you think that they're one and the

3  same transaction.  There was two transactions.  So I

4  purchased the home, but I loaned $175,000 to J

5  Sandcastle.

6       Q.  What -- what I'm trying to clarify -- and I know

7  they're two different transactions, is two different

8  things went from you to J Sandcastle.  One was title to

9  the property, and two was $175,000 of cash?

10       A.  Uh-huh.

11       Q.  And J Sandcastle has now transferred title to

12  the property back to you individually, but you said that

13  it made some note -- some payments on the note, you don't

14  recall how many, but that it did not fully repay the

15  $175,000 back, correct?

16       A.  Yes.  And if I may clarify that statement?

17       Q.  Sure.

18       A.  So -- okay.  So again, the intent of how it was

19  the -- the -- how it was set up and how it was supposed

20  to flow and work did not happen because there were

21  attorneys' fees that J Sandcastle paid for.  So I'm not

22  the best bookkeeper and I have, you know, given

23  everything to a CPA to go through and go, You know what,

24  make sense of this.  Okay.  What realistically is the

25  bottom line number?  What is it?

1        Q.   And you said that you currently have somebody

2   looking into that?

3        A.   Well, I gave them all the documents, but, you

4   know, that -- they get around to it when they get around

5   to it, but I -- I would like a more -- you know, from a

6   CPA when you just dump off boxes of papers and go, Look,

7   I need spreadsheets or something, you know, with all of

8   the checks that J Sandcastle has paid out, I need to know

9   where -- where the note stands.

10            I don't know.   And that's honest -- honest to

11   God, I don't know.

12       Q.   So let's leave two blanks in the transcript.

13   One will be for the amount of payments actually made

14   pursuant to the note, and a second will be for the

15   amounts, if any, that you or your CPA believe should be

16   credited against the note for other things such as

17   payment of attorneys fees', for example.   Okay?

18       A.   Yeah.   I mean, that's fair.

19   _____

20   _____.

21       Q.   Okay.   Now which litigation would J Sandcastle

22   have been paying for counsel on?

23            Which case or cases are we talking about?

24       A.   Uh-huh.   Well, everything is related to the

25   Gables, everything stems from the Gables.   So the

1   appellate attorney, Mr. Cassello [phonetic], I believe

2   Ms. Garrels [phonetic], you know, the criminal nonsense.

3   So it -- it just seemed like everything -- everything

4   stemmed --

5            THE REPORTER:  I'm sorry.  You have to stop when

6   the dog barks.  I can't hear both.

7            THE WITNESS:  Yeah.  It's very busy out there on

8   the street.

9            Okay.  So that's why I'm trying to figure out --

10  and again, I'm not a CPA.  I'm not any of those things,

11  you know.  I don't know if the CPA is going to come back

12  and say none of this stuff -- I don't know -- or all of

13  it.  I don't know.  So to answer your question -- did I

14  answer it the best I could?

15  BY MR. HAYS:

16     Q.  And I'm trying -- I'm trying not to talk when

17  you're talking.

18            The question was, which litigation would J

19  Sandcastle have been paying the attorneys on?  And I

20  think your answer is, It's all related to the Gables?

21     A.  Well, it is.  You're right.  Because -- because

22  that -- that's a correct statement because the Housers

23  are related to the Gables, the Gables are related to the

24  Housers, the leases.  I mean, all -- there's all sorts of

25  stuff.

1      Q.  Well, let's stop for a second.  Instead of
2  lumping it into, It's all related to the Gables, can you
3  try to break it down for me, such as, there is one
4  lawsuit where the Gables sued me, and this is what
5  happened to it; and then there's another lawsuit -- can
6  you just try to break it down --
7      A.  Sure.
8      Q.  -- for me?
9      A.  Sure.  Okay.  Well -- and I think what's in my
10  mind is -- and I wish I knew the date that I did that
11  deposition for Mr. Fellsot [phonetic], but right before
12  that deposition is when I learned that the Gables home
13  was never transferred to Sandra Bradley's trust.  That's
14  where I got the assignment was from the Sandra Bradley
15  trust.  So what's the ramifications of that?  I don't
16  know.
17          You know, how did Houser ever get on the title?
18  I don't know.  I just know the date that they got on
19  there.  That was in 2010.  So --
20      Q.  So just go case by case, if you can.
21      A.  Well -- but that is -- that is -- it's the
22  Gables case.  It's the 913985 case.
23      Q.  And is J Sandcastle a party to that case?
24      A.  No.  They are the -- they are a party to the
25  Houser Bros., which is a party of that case.  Well,

1    not -- not -- not on paper, but that's why I -- when I

2    amended my bankruptcy, I'm like, there isn't a cross --

3    you know, there's not a cross-complaint filed yet.

4    Because we've got some real problems with it.  It's --

5         Q.  So hold on.  What do you refer to this case --

6    you mentioned a case number.  What do you --

7         A.  That's the Gables HOA that started the whole

8    thing.

9         Q.  So the Gables HOA case.  And what you're saying

10   is that J Sandcastle is currently not a named party as

11   plaintiff, defendant, or otherwise, correct?

12        A.  That's correct.  Neither are they any of those

13   things on the Houser v. Gallian case.

14        Q.  And is there any other pending litigation

15   outside of the Bankruptcy Court?

16        A.  Yeah, there is.  There is the Gallian v.

17   Huntington Beach Gables, the personal injury, which is

18   going to end up dragging Houser in because they're the

19   property owner -- they claim to be the property owner of

20   that parcel of land over there.  So --

21        Q.  So there's -- there's three cases.  Anything

22   else?

23        A.  Let's see Houser v -- or I mean, Gallian v. HOA

24   and Hosso [phonetic], I can't think of anything else

25   besides just the Houser v. Gallian case that, you know,

1    Jeanine Hosso in these adversaries are trying to drag

2    JPad and J Sandcastle in.  So that's why I mentioned it.

3          Q.   Okay.  So three separate cases pending in state

4    court, correct?

5          A.   The -- well, the Randy Nickel case.

6          Q.   So there's four?

7          A.   Randy Nickel -- well, Randy Nickel versus

8    Huntington, then Huntington counter-sued to drag me back

9    into it.

10         Q.   So four cases?

11         A.   I would think so.  Is that four?  Yeah.

12   Personal, Nickel, Houser.  I can't think of anything

13   else.

14         Q.   What's the Nickel lawsuit about?

15         A.   I'm not involved in that.  I just know that I

16   get the papers and -- the only thing that I can think of

17   is that Jeanine Hosso got herself into a mess and just --

18   because she has a bar number, I believe she made some

19   poor decisions and she got herself and other people sued.

20   And she tried to do things without a court order, and she

21   just thought she was going to bully her way through, and

22   Mr. Nickel is not somebody you can bully.

23         Q.   You said Nickel versus Huntington, then

24   Huntington counter-sued to drag you back in.

25               Huntington Gables?

1          A.   Yeah.   Huntington Beach Gables, yes.

2          Q.   Just trying to make the record clear.

3          A.   Yeah.

4          Q.   And so, you believe it's possible that J

5    Sandcastle funded some of the attorneys' fees in some of

6    these four cases even though it was not a named party,

7    correct?

8          A.   Well, because that's where all the money is.   I

9    mean, there was only -- you know, as you said in the

10   beginning, you know, there's only $379,000.   Okay.   Well,

11   if 185 of it went over to here, you know, what's left?

12   And, well, 175 went over here.   Okay.   Well, you know, I

13   took money out of my 401(k) because all the money is

14   gone.   There is no more,.

15          And so, the problem -- I think -- I think -- let

16   me just -- let me just say this.   What's convoluted about

17   all of this is the fact that I've been trying to be very,

18   very frugal in trying to not spend money that I believe

19   didn't belong to me, meaning that I am -- I was J

20   Sandcastle's tenant.   Okay.

21          And I was paying rent to J Sandcastle, so, you

22   know, yeah, though I'm the member also, I -- in my mind,

23   they are separate -- separate.   And it's -- I paid rent

24   just as if a stranger off the street, like I said, that

25   if I was forced to have to -- to rent this place.

1           That's -- that's why that $9,000 was there.

2   It's like -- it's not -- it doesn't belong to Jamie

3   Gallian any more.  It's rent paid to J Sandcastle because

4   they are the legal owner who's trying to pay the debt of

5   the space.  So it just gets so convoluted when you --

6   when -- and I know that you're doing -- we've been very

7   patient with each other; however, it's not simple.  It's

8   not a simple answer because it's been almost five years.

9        Q.  So let me clarify something you just said.  I

10  believe you said you've been paying rent to J Sandcastle;

11  is that correct?

12       A.  That's correct.  Well, until February 25th.

13       Q.  And so, from November of 2018 through February

14  of 2021, you were making monthly payments to J Sandcastle

15  for rent?

16       A.  Yeah, or I would make -- give deposits to them

17  so that -- you know, I was the tenant.  Okay.  They're

18  still entitled to be paid rent for the person who lives

19  in -- in the unit.  And that's the way I was trying to

20  treat it is that the -- the rent goes to them and --

21       Q.  So -- so on a monthly basis, you would pay rent?

22       A.  Yes.

23       Q.  And what was the amount of the rent?

24       A.  1,086, exactly what the ground lease -- or what

25  the last ground lease payment or amount was here, that

1   was in the UD action.

2        Q.   So from November of 2018 through February of

3   2021, that's a little bit more than two years --

4        A.   Correct.

5        Q.   -- it's about two years and three or

6   four months?

7        A.   Yes.

8        Q.   And at just over $1,000 a month, that's roughly

9   $25,000, give or take, correct?

10       A.   That's -- that's correct.  That's correct.

11       Q.   So --

12       A.   However -- okay.  However, circumstances

13   changed, okay, where there were many months that I

14   couldn't pay that because I lost my job.  Okay.  And my

15   disability was exhausted.  Okay.  Thank God, you know,

16   COVID relief money came.  So yeah, about 20,000 --

17       Q.   Is there --

18       A.   -- about $20,000 is -- is about what I believe

19   that I have set aside, specifically, that is due Houser

20   because of the rent that I need to pay that I set aside

21   for J Sandcastle, who should have paid Houser, but that

22   whole thing fell apart, so now I'm paying Houser -- or

23   JPad is paying Houser.

24       Q.   Let me -- let me clarify.

25            So on a monthly basis, you would take the money

1    from a Jamie Gallian account and transfer it over to a J

2    Sandcastle account?

3        A.   Pretty much.  Or -- or if there was a lump sum

4    that I put into that account, meaning, I think, there was

5    one or two when my career ended at United, the 401(k)

6    payments -- so those went to J Sandcastle.  So that's why

7    I'm so interested in getting with the CPA to figure out,

8    you know, this money was paid on my behalf for the

9    purpose, because I was their tenant, and that's the way I

10   had always intended to treat it, if that makes sense.

11       Q.   But again, whether it was each and every month

12   or periodically, you paid rent by transferring money from

13   your account to a J Sandcastle's account over this period

14   of time?

15       A.   Yes.

16       Q.   And then the rent stopped in February of 2021

17   after J Sandcastle transferred title back to you?

18       A.   Released.  Yeah.  Released their interest in

19   the -- in the home.  Then I never paid out of the J

20   Sandcastle account again.

21       Q.   And so, from that point in February of 2021

22   forward, you now considered yourself an owner and not a

23   tenant or renter?

24       A.   Yeah, so to speak.  Then I -- then it was really

25   my responsibility to keep separate, you know, the rent

1   ongoing from February 21st forward.  I think that I got a

2   little confused because, not only is J Sandcastle's name

3   printed on the check, but Jamie Gallian's name was

4   printed on the check.  So, you know, it made sense to me

5   that -- wait a minute -- no, no, no, no.

6          It's J Sandcastle's account number on the

7   bottom, so it's not Jamie Gallian's account, and that was

8   my mistake.  So I believe May or June is when I just

9   completely stopped making any payments for rent to Houser

10   and used the Alliant account only, or paid cash.

11          Q.   Let me -- let me try to clarify what you just

12   said because I'm trying to make sure I understand it when

13   I'm looking at the realtime, but I'm not sure I'm getting

14   it.

15          A.   Yeah.

16          Q.   So rent payments continued after February

17   because you were confused about accounts or something?

18          A.   No, no, no.  That's not what I'm saying.  What

19   I'm saying is, if you look at J Sandcastle's checks that

20   I paid every single month to Houser and then they sent

21   them back, I needed to make sure that when I filed

22   bankruptcy in July, that there was a clear line, okay,

23   that Jamie Gallian and the Alliant account because they

24   weren't accepting them, I needed to keep a running total,

25   and that was the whole reason why I started at the end of

1  June, I believe it was, trying to get them to do an

2  invoice.  So I obtained an invoice from a neighbor here

3  that lives a couple of doors down, and I was just trying

4  to keep a running balance because they refused to send me

5  anything.

6     Q.  So -- so two different -- two different things

7  going on here --

8     A.  Right.

9     Q.  -- and I want to make sure I have them straight.

10    A.  Right.

11    Q.  One is you were making payments from a Jamie

12 Gallian account to a J Sandcastle account --

13    A.  Correct.

14    Q.  -- periodically on account of rent over --

15    A.  Because I was their --

16    Q.  -- this 2 1/2 year period?

17    A.  -- tenant, yes.  I believed I was their tenant.

18    Q.  Please -- please, try to let me finish my

19 question.  Let's keep our reporter happy.

20    A.  Of course.

21    Q.  Second thing that was going on was that, even

22 after February of 2021, J Sandcastle kept tendering

23 payments to Houser Bros. even though it was no longer the

24 registered owner.

25         Is that what you're saying?  I'm just trying to

1    understand here.

2         A.   Let me try to think for a second.

3              Okay.  So February -- because it wasn't until

4    the beginning of March -- no.  It was -- let's see.

5    February 25th is when I signed as the member to release

6    title.  So I believe March and April and May, or March

7    and April were cash that was dropped off as rent with a

8    receipt.  Okay.

9         Q.   Okay.  And -- and from which account did the

10   cash come?

11        A.   It might have come from the EDD Bank of America

12   card because by that COVID happened again and they

13   were -- they were putting money back on my card because

14   that's the only income I had.

15        Q.   So you're not sure, but you think it was from

16   your --

17        A.   It was either --

18        Q.   -- personal account?

19        A.   Oh, I know it was the personal account.  That's

20   the only -- that's the only income that I had was the

21   COVID money that went into the Allient account, you know,

22   the two payments of, I don't know what was it, 1,400 or

23   $1,500.  So that was the -- because the -- you know, I

24   hadn't worked at United since October, then the COVID

25   money started happening again, but that went on the EDD

1   Bank of America card.

2       Q.  Chase account ending in 4589, whose account is

3   that?

4       A.  4589 that -- 45 -- wait a second.  I pulled out

5   my statements today.  I pulled these thinking you might

6   ask me questions.

7       Q.  The easy place to maybe get an answer to this,

8   Ms. Gallian, is --

9       A.  It doesn't sound -- it doesn't sound familiar to

10  me.  I know that Sandcastle is 7860.  4589, and that's

11  Chase?

12      Q.  Yes.  And let me finish my statement here.

13      A.  Sorry.

14      Q.  The exhibits that we sent you --

15      A.  Uh-huh.

16      Q.  -- include some checks at the beginning of the

17  file.  And so, for example --

18      A.  Do you have a page number?

19      Q.  Yeah.  And I'm looking it up.  Oh, that's --

20  that's check number 4589, so 7860 is the account number

21  and there's -- it's page 11 of 461, and on the name in

22  the check on the top left corner, it says, J Sandcastle

23  Company LLC, and then underneath it, it says Jamie

24  Gallian.

25      A.  That's right.

1        Q.   So is account 7860 the J Sandcastle money?

2        A.   That's correct.

3        Q.   Okay.  And so, we will mark and I will write

4   down this page 11 as Exhibit 4.

5             (Exhibit 4 was marked for identification.)

6   BY MR. HAYS:

7        Q.   And so, this check is dated in March of 2021,

8   correct?

9        A.   Yes, that's right.  March --

10       Q.   And it says, Pay to the order of, and I'm not

11  sure I'm reading your writing correctly.

12            Can you tell us what that says?

13       A.   R-D-R-M-H-E.

14       Q.   And what does that sound for?

15       A.   Rancho Del Rey.

16       Q.   Mobile Home --

17       A.   Mobile Home Estates, yes, for space 376.

18       Q.   And then, if we flip two more pages to page 13,

19  there is another check --

20       A.   Uh-huh.

21       Q.   -- from the same account with the same payee

22  dated in April of 2021, correct?

23       A.   That's correct.

24       Q.   That will be Exhibit 5, which is page 13.

25            (Exhibit 5 was marked for identification.)

1    BY MR. HAYS:

2        Q.   And then it looks like on page 15, there's --

3    no, page 14, it is a handwritten note that appears to be

4    from you saying, Please credit to the account.

5             Is this the cash payment you were referring to

6    starting in May of 2021?

7        A.   Yeah.  And there was another one up -- also, I

8    thought there was another one before that, but maybe I'm

9    mistaken.  Oh, no.  There was another one.  Got it.

10       Q.   Just -- just hold on.

11            And so, you signed this note.  Is that your

12   handwriting?

13       A.   Yes.

14       Q.   And that is -- you signed this J Gallian,

15   member.  Is that what that reads?

16       A.   That's correct.  Right.

17       Q.   So we will mark this page 14 as Exhibit 6.

18         (Exhibit 6 was marked for identification.)

19   BY MR. HAYS:

20       Q.   And if you skip to page 18, there's a letter

21   from J Sandcastle dated June 4th, 2021, that bears the

22   sender of Steven Gallian, and that would show that J

23   Sandcastle tendered $1,100 in cash in June of 2021,

24   correct?

25       A.   Correct.

1        Q.  And that will be Exhibit 7 page 18.

2            (Exhibit 7 was marked for identification.)

3    BY MR. HAYS:

4        Q.  And then if you'll skip to page 20, there's a

5    typed note with a handwritten signature that appears to

6    be yours, dated July 1st of 2021, where you're signing as

7    the member of J Sandcastle.

8            Is that your signature?

9        A.  Yes.

10       Q.  So Exhibit 8 will be page 20.

11           (Exhibit 8 was marked for identification.)

12   BY MR. HAYS:

13       Q.  So J Sandcastle continued to make the tender of

14   payments to Rancho Del Rey even after the February 2021

15   transfer where they got off of title, correct?

16       A.  That's correct.  Because it hadn't been

17   processed yet.  The title hadn't been processed and that

18   was the whole reason.  Because if anybody was to do a

19   title search, it still shows J Sandcastle.  So yes,

20   that's correct.

21       Q.  Okay.

22       A.  And they're the only ones that had any money.

23       Q.  So the title hadn't been processed, the transfer

24   wasn't official, if you will.  And so, J Sandcastle kept

25   making the --

1        A.   But --

2             THE REPORTER:  I'm sorry.  I didn't hear the

3   question.  So J Sandcastle kept making the --

4   BY MR. HAYS:

5        Q.   -- payments, correct?

6             THE REPORTER:  I couldn't hear an answer.

7             THE WITNESS:  Oh, yes.  The registration hadn't

8   been processed through Sacramento, correct.  I had the --

9   a copy of it, but if anybody was to do a title search, it

10  would still show J Sandcastle, as well as J Sandcastle is

11  the only one that had any money because the COVID rent

12  relief money didn't start until the first quarter of

13  2021.

14  BY MR. HAYS:

15       Q.   I believe you testified earlier that, at all

16  times since you acquired your interest in JPad, you have

17  been the 100 percent owner, correct?

18       A.   That is eventually what happened.  That was not

19  the intent, but that's what eventually happened.

20       Q.   In your bankruptcy, you filed, I think, at least

21  ten different sets of schedules, correct?

22       A.   Uh-huh.

23       Q.   And in some of those schedules, isn't it true

24  that you're listing your ownership interest in JPad to be

25  various different percentages?

1    A.   That's correct.  As a layperson, yes, that is

2    correct.  That -- I was subsequently told by the -- what

3    is that -- Jeffrey Golden recommended that I contact

4    the -- there's, like, these help center whatever's --

5    help -- these attorneys that come in on their lunch hour

6    or something that help and you could ask questions.  And

7    they said don't worry about filing amendments.  It's --

8    whatever was filed previous to the next amendment is

9    disregarded.

10    Q.   My -- my point is, you -- you filed various

11    different sets of schedules with varying different

12    ownership interest in JPad, correct?

13    A.   That's correct.

14    Q.   And then, on advice of counsel from one of the

15    pro per clinics that the court makes available, you

16    changed your ownership interest in JPad to 100 percent at

17    some point in time, correct?

18    A.   That's correct.  Because I explained to the

19    attorneys that I hadn't gifted the percentage as I

20    intended to do; I hadn't put it on my tax returns; and

21    the relationship with the boys, as I've testified at

22    numerous 341s, is -- you know, they're kids.  You know,

23    yeah, they think it would be great to have an interest in

24    a home, but yet, then when anything legal happens,

25    everybody runs.  They have more money than God anyway, so

1    they don't need it.

2        Q.   So on your original and first amended schedules,

3    you listed that you were a 1/3 owner in JPad.

4            And who would the other 2/3s interest be owned

5    by?

6        A.   My intent was, as you saw in the August 30th,

7    2020, Brian and Steven were the others.

8        Q.   And who are Brian and Steven?

9        A.   Those are my sons.

10       Q.   And are those your only two children?

11       A.   I have three, three boys.  I have Justin --

12   Justin, he's so much older than the other two that he's

13   off on his own thing.

14       Q.   Which explains why it's just Brian and Steven

15   that you were thinking were the other two 1/3 owners,

16   correct?

17       A.   Right.

18       Q.   And were any documents ever filed with the

19   Secretary of State reflecting Brian or Steven as owners

20   of JPad?

21       A.   I believe one of -- I'm trying to think --

22   not -- not L2s, just the 12s.

23       Q.   And you said earlier the 12s --

24       A.   But they're only managers.

25       Q.   -- reflect managers, not owners?

108

1      A.  Right, right, right.  And that was only to --

2    just for, you know, as I said, that with -- whether I was

3    going to be available, and I testified at the 341

4    meeting -- you and I talked about this before that --

5    once they found out -- once they said, No, we don't want

6    it -- if you actually look at one of your documents here,

7    if you actually see the one that's got all this White Out

8    over it -- do you know what page that was in here?

9      Q.  No, not offhand.

10      A.  Okay.  So I'll scroll through it because it's

11    very easy to point to -- oh, here it is.  If you go to

12    page -- it's the August 20th certificate -- let me see a

13    second, because I just saw it -- it's got a line through

14    it on the certificate of title, and at the 341 meeting, I

15    said, Yeah, it's because at first they wanted to have an

16    interest, and then they changed their minds.  So I put

17    Ron, and then they were pissed.  So then they wanted the

18    UCC filing done in December.

19          So yeah, it's -- that's the boys.  Oh, there it

20    is.  It's 346 of 461.  It's all White Out because they

21    can't make up their minds.

22      Q.  So on page 346 -- and since we're referring to

23    it --

24      A.  Yep.

25      Q.  -- we'll refer to it as Exhibit 9.

1        A.  Yep.  And --

2            (Exhibit 9 was marked for identification.)

3    BY MR. HAYS:

4        Q.  Hold on.  Hold on.  You're -- you're -- you put

5    down new legal owners were Brian and Steven as joint

6    tenants with right of survivorship with -- it would be J

7    Sandcastle, correct?

8        A.  Correct.  The -- the corresponding statement of

9    fact is on page 356.

10       Q.  And was page 346 and page 356 submitted to HCD?

11       A.  Yes, they were.

12       Q.  And page 356 will be listed as Exhibit 10.

13           (Exhibit 10 was marked for identification.)

14           THE WITNESS:  With 358, as well.

15   BY MR. HAYS:

16       Q.  And 358 will be Exhibit 11.

17           (Exhibit 11 was marked for identification.)

18   BY MR. HAYS:

19       Q.  And page 360 also shows that they are

20   lienholders under section 4?

21       A.  Let me look at the date here.  So I believe --

22   was that -- well, because it's -- it's executed the same

23   day, 8-20, as those other documents.  Yep.

24       Q.  Okay.  So Exhibit 12 will be page 360 out of

25   that folder.

1          (Exhibit 12 was marked for identification.)

2     BY MR. HAYS:

3          Q.  On --

4          A.  And 354 is what -- is when they all said, Nope,

5     nope, we don't want anything to do with it, and then Ron

6     did it.  And that's 354.

7          Q.  Was a new certificate of title ever issued by

8     HCD reflecting either Brian or Steven as a registered

9     owner or a legal owner?

10         A.  No.  They were just on these documents.  They

11    were -- they were put on as UCCs, and then Ron was put on

12    for his loan to me, and then eventually taken off

13    July 9th.

14         Q.  Okay.  So just to be clear, the title itself

15    never reflected Brian or Steven as registered owner or

16    legal owner, correct?

17         A.  No, just the UCC.

18         Q.  And the documents submitted to HCD that had

19    Brian and Steven's names on it, they were successfully --

20    you managed to successfully keep HCD from issuing the

21    certificates after these documents had been submitted?

22         A.  Yeah.  I sent them an e-mail, and that's why

23    there's a line through and all that White Out, because I

24    whited it all out and put a line through it, and this --

25    this actual copy is in their file.  That's where I

1    thought you got this.

2        Q.  And then the -- the -- but the UCCs did get

3    filed with Brian and Steven being listed as secured

4    parties, correct?

5        A.  Yeah.  Because those are my sons.  And again, if

6    I was unavailable, they are my sons, they're my family.

7    Those are the ones that would take over and be able to

8    make legal decisions in my absence.

9        Q.  And you were saying earlier that these were

10   gifts, Brian and Steven weren't paying you any money to

11   acquire interest, correct?

12       A.  No.  These were -- from what I understand --

13   what I was told by CPSs, you can give 15,000 per year to

14   anybody.

15       Q.  I understand.  So then in your bankruptcy

16   schedules after saying you were a 1/3 owner of JPad, I

17   think you filed an amended schedule on September 22,

18   2021, saying you were a 1/7 owner of JPad, and who would

19   have been the other six owners?

20       A.  Well, by this time, we were full blown COVID,

21   and everybody was helping me if -- they happen to have

22   been Ron -- I think you and I have talked about this and

23   I testified at 341, it would have been Ron, and Bob,

24   Brian, Steven, and Justin, and Emma -- EJ.

25       Q.  Who is Emma?

1        A.   My granddaughter.

2        Q.   And did any of them ever pay you money to become

3   a partial owner of JPad?

4        A.   No.   This was -- and I -- I -- I gave this --

5   this agreement to Mr. Golden.   I gave this -- this --

6   JPad's operating agreement to Mr. Golden with all of --

7   all of these 15, 15, 15, 15, 15, 15 and -- and reducing

8   my ownership.   But I did not -- I thought the only way to

9   make it legal is you actually have to put it on your tax

10  return.   I don't know if that's true or not true.

11        Again, you know, I was having a rough time with

12  the boys and trying to do what moms -- what parents do,

13  is they -- they leave things to their kids.   That's all I

14  wanted.

15        Q.   So then you filed next an amended schedule on

16  October 14th of 2021 saying that you had a 70 percent

17  interest in JPad.   Who would have been the other

18  30 percent owners?

19        A.   Well, by that time -- by this time now,

20  relationships with the kids changed because, you know,

21  this -- all this legal nonsense, especially with Sandy

22  and nobody wanted to have any part of anything, and they

23  didn't want anything, they didn't want any gifts.   So now

24  I -- I'm like, Okay, fine.   I'll just keep it myself

25  then.   And -- but still Ron and Bob were very helpful

1    during the time that I lost my job.  And so, I -- I --

2    the only thing that I had left was to repay them by a

3    percentage of JPad.

4         Q.  And when you say repay them, how much money had

5    Ron loaned to you?

6         A.  He paid for the bond, two bonds, and he was

7    just -- he was the one that -- that I would call when

8    that crazy woman would lie and get me arrested and I was

9    horrified.

10        Q.  You said he paid for two bonds.  How much was

11   each bond, roughly?

12        A.  I think the first one was for 50,000.  So I

13   think that was, like, 7 1/2 or 8 percent.  And then this

14   second one was 250,000, and I think that was 7 1/2 or 8

15   percent.  And the only thing I had -- he didn't want

16   anything.  He just, like, No, you know, you'll -- you'll

17   pay me back eventually.

18             I go, No, no, no.  It's okay.

19             So I gave him -- gave him an interest in the

20   house until I could pay him back.

21        Q.  And when you gave him an interest in the house,

22   you did it by giving him a partial interest in the --

23        A.  The encumbrance.  No.  Well, no, the

24   encumbrance.

25        Q.  Let me finish my statement and let's not talk on

114

1    top of each other.

2        A.   Sorry.

3        Q.   You -- you were trying to pay him back by giving

4    him the partial ownership interest in JPad which held the

5    legal interest against the house?

6        A.   No.  I never gave a membership interest in JPad

7    to anybody, only a manager interest.  That's it.  And a

8    manager interest, that is my ignorance.  Okay.  I never

9    gave any membership interests.  Okay.  Whether I misspoke

10   or anything, okay.  I gave them an encumbrance on the

11   house.  That was it.  Okay.

12       Q.   Well --

13       A.   Because --

14       Q.   Hold on.

15       A.   Let me --

16       Q.   Hold on.  Hold on.  You're now saying you gave

17   them an encumbrance on the house.

18            What are you referring to?

19       A.   I'm sorry.  Say that again?

20       Q.   You said you gave them an encumbrance on the

21   house.  What are you referring to?  A UCC1?  An ownership

22   interest in JPad?  What are you referring to?

23       A.   No.  At the time, as best as I could recall,

24   again, not having legal advice, okay.  Just trying to be

25   thankful that I was out of jail, just trying to just be

115

1    thankful that I had somebody's help.

2        Q.  I'm asking you what I -- what I hope is a very

3    simple question, and that is, you said you wanted to

4    repay them and be fair to them by giving them a lien

5    against the house.

6        A.  Right, right.

7        Q.  I'm asking -- I'm asking in what manner did you

8    accomplish that?

9            Was it through a UCC1 or was it through

10   something else?

11       A.  I think it was just in the statement to

12   encumber.  Was it -- you have the document here.  Right

13   there.  It's an -- I think it was the statement to

14   encumber.

15       Q.  So -- so the -- the liens that you're referring

16   to -- to repay Ron and Bob --

17       A.  Just --

18       Q.  -- was just -- just -- we're starting to talk on

19   top of each other.

20       A.  Sorry.

21       Q.  The -- the liens -- the liens that you are

22   referring to are liens that are referenced in statements

23   to encumber, correct?

24       A.  I believe -- I believe so.  It is, I believe --

25   I believe that's what I did.  I believe that's what I

1    did.

2         Q.   Okay.  And when you were filing the various sets

3    of amended bankruptcy schedules listing varying

4    percentage ownership interests in JPad, what were you

5    thinking was the reason that you were not the 100 percent

6    owner of JPad?

7              Was it because of the gifts and the statements

8    to encumber that we're now talking about?

9         A.   No.  It was -- it was in addition to that.

10   It's -- I didn't have a job.  I didn't have any income

11   and I had, you know, Bob that would bring groceries or --

12   or -- and I just felt like I needed to -- just felt like

13   I needed to show -- you know, show my appreciation

14   that -- that he had something for the money.  I didn't

15   want it to be considered charity or a gift or whatever;

16   that it would be paid back or that, if I sold the house,

17   that I would pay it back.

18        Q.   And I --

19        A.   And that was the only purpose.

20        Q.   I understand the motivation.  I just want to

21   make sure I understand how you implemented that

22   motivation.

23             So when you're filling out the schedules listing

24   varying different percentage ownership interest in JPad,

25   how was it that -- what were you thinking about was the

JASSO DECL. PAGES - 1434

1    reason you were not the 100 percent owner?

2            So we've covered a couple of things.  One is you

3    had signed statements to encumber in giving liens to --

4        A.  Just that one person.

5        Q.  -- to -- to Ron, right?

6        A.  Yeah, for the huge -- yeah.

7        Q.  Okay.  And so, when you're listing Bob or

8    thinking Bob is an owner of JPad, what is it you're

9    thinking of --

10       A.  Just that he's been -- he moved in, originally,

11   to protect me, just to physically protect me because I

12   was scared to be in the house by myself.  After -- after

13   March 4th, 2019, I couldn't sleep.  And so, I was alone.

14   And so, he came just to have somebody else here because I

15   was afraid to be in the house by myself, and to me, that

16   was value.

17       Q.  So -- so in in appreciation of that value, you

18   considered Bob to be a partial owner of JPad?

19       A.  I just wanted him to have something where --

20       Q.  I -- I understand the motivation --

21       A.  Well that --

22       Q.  I -- I'm just trying to --

23           (Multiple speakers simultaneously.)

24           THE REPORTER:  I don't have it.  I just don't.

25   //

```
 1   BY MR. HAYS:
 2        Q.  You're talking on top of me, Ms. Gallian.
 3            I understand why you wanted to do it.  I'm
 4   asking what, if anything, did you do to implement that?
 5   Did you tell him, You're now a partial owner of JPad?
 6        A.  I think I -- yes.  Yes, I did.
 7        Q.  Did you --
 8        A.  I -- you have --
 9        Q.  Did you put anything in writing that got filed
10   with HCD?
11        A.  No.  It just was in a -- just an agreement.  And
12   I -- I believe the -- the JPad agreement, whatever you
13   call it, operating agreement or something, was given to
14   the trustee.
15        Q.  So the way you implemented it, you're saying --
16   and I'm just trying to understand, is that in the JPad
17   operating agreement and its minutes and books and
18   records --
19        A.  Yes.
20        Q.  -- there were notations reflecting that Bob is
21   now a partial owner of JPad?
22        A.  Yes.
23        Q.  Okay.
24        A.  And Ron.
25        Q.  And Ron?
```

1      A.  Yes.

2      Q.  And --

3      A.  And the boys, they were, too.  But yet, then

4  they decided they didn't want it, so they did more

5  minutes.

6      Q.  So -- so there are initial minutes that say that

7  Brian and Steven are partial owners, and then there are

8  subsequent minutes that say they're no longer partial

9  owners?

10     A.  Yes.

11     Q.  And for Emma, your granddaughter, same thing?

12     A.  That didn't start until 2020.

13     Q.  But are there minutes --

14     A.  Yeah.

15     Q.  -- at JPad reflecting that she is now a partial

16  owner?

17     A.  Yes.  And then that was changed.  But yes.

18     Q.  And then she was no longer a partial owner?

19     A.  Yeah.  Because her dad, my son, Brian, is her

20  father.  He didn't want her to have -- none of them

21  wanted to be involved because of all this litigation.

22  They just said no.

23     Q.  So then at some point in time, your bankruptcy

24  schedule starts saying that you're the 100 percent owner

25  of JPad.

1          Are there notations on the minutes of JPad books

2   and records reflecting that Ron, Bob, Brian, Steven,

3   Justin, and Emma are no longer owners?

4       A.  No.  I think the last schedule just showed --

5   I'm trying to think of what the last schedule shows.  I

6   don't know if that's what you call it.  I think we called

7   it a schedule, like, a C or D or something like that.  I

8   don't think there was any -- any amendments after that

9   because everybody just was -- just -- it just wasn't fun

10  anymore.  It just wasn't -- just wasn't --

11      Q.  So --

12      A.  -- what I intended.  It's kind of like, you

13  know, I almost think sometimes that I used it as a --

14  what do you call that -- not a will -- or something

15  probably like a will, you know, you want to leave your

16  things to your children.  It just -- just wasn't working

17  anymore.  Just too convoluted.

18      Q.  So the last set of JPad books and records

19  reflect whom as the owners?

20      A.  I think the seven people is what I think.  I

21  think it -- it had -- I think that it had notations where

22  for three years there was 15, 15, 15 for all three boys,

23  and then Emma came -- came along, and I think she got 15,

24  and then I don't remember what the amounts were listed

25  for Ron and Bob.

1        Q.   So the JPad books and records still reflect

2   seven owners, correct?

3        A.   That's seven -- four, five, six -- well, if you

4   count me, I would be the seventh.

5        Q.   Yeah.  Exactly.  Okay.

6        A.   But now it's --

7        Q.   How much --

8        A.   I.

9        Q.   -- it -- you were talking about Ron loaned you

10  money for the bonds, and you were saying 7 1/2 to 8

11  percent of 50 grand, and 7 1/2 or 8 percent of 200 grand.

12           Was that the extent of the money he loaned you?

13       A.   No -- oh, you mean the bond amount.  What the --

14  what the bond company charges.  They were caught

15  charging -- I think it was 7 percent of 50,000, so

16  whatever that is.

17       Q.   I understand.  It's --

18       A.   Yeah.

19       Q.   -- 3,500, yeah, your testimony had been 7 1/2 or

20  8 percent --

21       A.   Yeah.

22       Q.   -- of the bond amount was the premium they

23  charged you --

24       A.   Right.

25       Q.   -- to issue the bond.

1     A.  Right.

2     Q.  So if you take the 7 1/2 or 8 percent of 50

3  grand or the 7 1/2 or 8 percent of 200 grand --

4     A.  Right.

5     Q.  -- that's the amount of -- that's the amount of

6  money that Ron loaned you.

7     Were there other monies that Ron loaned you?

8     A.  Just -- he said it wasn't a loan, but he paid an

9  attorney, his first name is John -- John -- oh, God,

10  what's his first name -- Newport Beach on Birch Street,

11  John Graber maybe?  He paid his bill.

12     Q.  And when was that?

13     A.  I believe January of 2020.  It was a Sunday, and

14  he -- he got cashier's checks and paid them.

15     Q.  And that's 2020, not 2021?

16     A.  Right.

17     Q.  Okay.  And then was there ever any written

18  documents where you said to Ron, I promise to repay you X

19  amount of money?

20     A.  The -- just the encumbrance.  Just -- just the

21  statement to encumber, and I said, No, I don't want this

22  hanging over my head.  You'll get your money back.

23     Q.  Okay.  Now with respect to Bob, did you -- did

24  he ever loan you money or pay for things for you in

25  exchange for you putting him down as an owner of JPad?

1    A.   He never asked and he never -- I just -- I was

2    just so grateful that I came up with an amount and I

3    said, I'm going to pay you back.

4    Q.   But he never said, This is a loan, correct?

5    A.   No, No.

6    Q.   Okay.

7    A.   And I did not consider any of these gifts.

8    These were just -- these were things that -- anyway.

9    Q.   Okay.  You and/or J Sandcastle applied to be

10   tenants in the park, correct?

11   A.   J Sandcastle originally applied by itself, and

12   because the park was adamant about not issuing any lease

13   agreements with a business, then subsequently I applied a

14   couple times.  I had a co-signer, Ron, apply with me, and

15   when Ron and I were having problems, then Bob -- then I

16   applied again, but then Bob applied with me for the

17   income qualification.

18   Q.   And these applications are being made over what

19   period of time, November 2018 through?

20   A.   All the way through 2021.

21   Q.   And --

22   A.   No.  Wait a minute.  All the way through -- I

23   believe it was September of 2020 was the last one.

24   Q.   So the very first one you said was submitted by

25   J Sandcastle, correct?

1          A.   Solely, yeah.

2          Q.   And was that one approved or disapproved?

3          A.   Neither.  They didn't -- they didn't even

4     acknowledge J Sandcastle.  They just chose me, and

5     they -- everything came in my name.

6          Q.   But -- but the response to the application to

7     become tenants was the application was denied, correct?

8          A.   That -- yeah, yeah.  Yes.  The application --

9          Q.   Okay.

10         A.   The application was denied without acknowledging

11    that J Sandcastle was the submitter, yes.

12         Q.   Okay.  And I know that you take issue that the

13    denial was not proper, correct?

14         A.   No, it wasn't.  They -- they --

15         Q.   Okay.  I'm just --

16         A.   -- ran my name without permission.

17         Q.   And then when did you get notice that the

18    application was denied?

19         A.   Sometime toward the end of November --

20         Q.   Of --

21         A.   -- the Pinon Drive address.

22         Q.   And that was in 2018, correct?

23         A.   Yes.

24         Q.   And so, when you moved onto the property, you

25    had not yet been approved to be a tenant, correct?

1        A.   That's true.

2        Q.   When you were disapproved, why did you continue

3   to remain on the property as opposed to moving?

4        A.   Because I was the purchaser under, you know, I

5   was under the color of being a bona fide purchaser.

6        Q.   Why did you not just sell the property if you

7   weren't accepted as a tenant and --

8        A.   I tried.

9        Q.   -- in this thing -- and so, what efforts did you

10  make to sell it?

11       A.   I did.  I did many times.  Well, at first, I was

12  lied to.  I was lied to by the attorneys for Houser.

13  They told me I had to move the house.  So, foolishly, I

14  called contractors -- local contractors here in

15  Huntington Beach.  One of them was Coast, and they

16  thought I was nuts.  They're going, You want to what?

17            I said, I bought this -- this home, and they're

18  saying that I have to move it.

19            And they go, Who told you that?

20            And I told them the company.  Well, they gave me

21  a phone number to call, which was a person by the name of

22  Richard Hair [phonetic] at Star.

23            I called Star and I told them what I was told.

24  He goes, That's impossible.   He goes, Are you in the

25  Ryan home?

1          And I said, Yes.

2          He goes, I built that home.  He goes, I have --

3    I am the one that probably puts 90 -- well, he is the

4    one -- 90 -- or, maybe it was a greater percentage.  He

5    said, I don't build homes in there to move.  If you try

6    to move that home, it would be uninhabitable, were his

7    exact words.  He then asked me, Who denied your tenancy?

8          And I told him.  And he called the office and

9    spoke to whoever.  I don't know who he spoke to.  I

10   wasn't privy to the conversation.  So he tried to work

11   out something with the park, and they were just adamant

12   that they wanted this house moved.

13         And he goes, They can't force you to move the

14   house.  He goes, That's ridiculous.

15         And then that was the end of that.

16   Q.   What efforts did you make to sell the house?

17   A.   I listed the house.  However, I had two or three

18   people -- and even to this day when anybody contacts me,

19   I don't waste their time.  I immediately refer them to

20   the park because the park is going to either give them an

21   application to complete or just discourage them somehow.

22         Well, it was more of the latter because a couple

23   of brokers that I had asked to represent me contacted the

24   park, and Chris Houser wrote a letter to one of the

25   brokers and said, The house cannot not be sold in place.

127

1          So it's -- again, nobody wants to get involved

2   when it's messy.  So I've been trying to sell it on my

3   own as just an in-place house; however, with the prices

4   of homes now and the rents and not going back to United

5   yet, and, you know, just various reasons, I -- when I was

6   participating in the mediation, one of the solutions was

7   for Houser to purchase an equal home in another park, and

8   the mediator thought that was a great idea.  He goes,

9   I -- I don't think I see anything wrong with that.  He

10  goes, They don't want you to live there.  He goes, So

11  that's a great solution.  However, they wouldn't do it.

12  They -- they just wanted to give me money, and I said,

13  No, I don't need money.  I need a home.  So that fell

14  out -- that fell apart.

15         So then -- and the second solution was put the

16  registration in Jamie Gallian's name and maybe they'll

17  reconsider and issue a lease and this all nonsense will

18  be over.  And that didn't happen.  So those are the

19  efforts.  Even Judge Bower told them -- he goes, If --

20  told the attorney, he goes, If I find out, if you have --

21  I don't remember his exact words, but I have the

22  transcript.  He goes, If you denied, you know,

23  wrongfully, a potential tenants, we're going to have a

24  problem.  So -- and then he retired.

25         Q.  So are you saying that your present feeling and

1    intention is that you would be willing to have the

2    property sold if you could get cooperation, if you will,

3    from Houser Bros. to allow someone to purchase and get a

4    tenancy?

5        A.   Yeah.   In fact, it was about -- I have the phone

6    number, and you can call him and confirm it, but, in

7    fact, I sent -- a couple months ago, I sent them a

8    potential buyer and -- I think people nowadays want to

9    see if they qualify for a tenancy in a park.   They

10   wouldn't even talk to them.   They wouldn't even consider

11   letting them fill out an application.   It had to be --

12   the purchase had to have been already in place, you know,

13   like, beginning.

14            And a lot of people just want to see -- they

15   don't want to go through all that.   They want to see if

16   they're even going to qualify as tenants.   They wouldn't

17   even speak to them.

18       Q.   Yeah.   But again, my question was, you would be

19   willing to participate in a sale if the Houser Bros.

20   would consider potential buyers?

21       A.   Well, it's not as simple as all that, but

22   that's -- that's -- that has always been the goal.

23       Q.   How many different UCC1s were recorded against

24   the house -- the manufactured home from and after

25   November 1st of 2018?

1        A.   Well, there's been several depending on who

2   filed them.  I know that I have no problem writing Jamie

3   Gallian at the top.  A lot of people want to file it, but

4   they don't want to put anything at the top.

5             Then Bob and Ron got started doing it, and in

6   November -- I think it was around September -- maybe it

7   was September, August or September of 2021, they started

8   filing stuff because now they're -- they believed that I

9   was being -- I think -- I think everybody's interest was

10  just unclear.  I think everybody was panicking and the

11  only thing -- the only UCCs that I filed was the initial

12  three or four, the one on August -- or was it December,

13  it might have been December -- with Brian, Steven, and I

14  filed the two because Jeanine Hosso filed UCCs that I

15  didn't approve or I didn't agree to.  So then I filed

16  UCC5s that said, No, she doesn't have a claim to my home.

17  I filed those.

18            And then I think I filed -- I know I filed the

19  last two that said -- making the correction that I was

20  never a debtor to begin with, and that was filed in

21  error, the ones in 2019.

22       Q.   I --

23       A.   If you're looking for a number, I have no idea.

24       Q.   On the day you filed bankruptcy, what was the

25  state of UCC filings?

1      A.   Are you looking for a number?

2      Q.   No.

3      A.   Or which ones were -- were --

4      Q.   Just what --

5      A.   The -- the --

6      Q.   Hold --

7      A.   -- the only legal ones are the -- the one I

8   think it ends in 27 -- or, not legal.  That's not the

9   right word.  But 27 is the -- is one at the beginning on

10  1-14.  The one in December --

11     Q.   1-14 of what year?

12     A.   '19.

13     Q.   And then the one in December of '19?

14     A.   The one in December, I believe it was

15  December 2020.  What was after that?

16     Q.   So my question is, on the day you filed

17  bankruptcy, if somebody did a UCC search, what would they

18  have found in terms of who were the lienholders of

19  record?

20     A.   The one from 2019, I believe.  Actually --

21     Q.   What --

22     A.   -- there were three -- there were three, 2019

23  and the 8 -- the 2020 --

24     Q.   You're saying --

25     A.   The --

1    Q.  -- you're saying there would be three, but I've

2    got January 14th of 2019 and December 2020.

3          What's the third one?

4    A.  Well, there were three on January 14th, 2019.

5    There's the one that ends in 74.

6    Q.  And then there's the one in December of 2020 --

7    A.  Right.

8    Q.  -- so that would be four liens --

9    A.  That's the fourth.

10   Q.  Hold on.  Don't -- don't talk on top of me --

11   A.  Sorry -- sorry.

12   Q.  -- please.

13         There would be four liens of record that had not

14   been terminated as of the day of bankruptcy, correct?

15   A.  Well, isn't a -- isn't an AD-1 -- isn't that a

16   replacement for an error?

17   Q.  I -- I don't know the forms by form number the

18   way you're referring to them.

19   A.  Okay.

20   Q.  I just want to know, like, what would the title

21   have shown as far as liens --

22   A.  Right.

23   Q.  -- by running a UCC search.

24         There were four separate things that were

25   outstanding at that time?

1      A.   I believe, yes.  There was three on the 19th of

2   20 -- 2019 and one for 2020.

3      Q.   And what do those four UCC1s show as far as who

4   were the secured lienholders?

5      A.   Jamie Gallian, JPad, Brian and Steven Gallian.

6      Q.   Jamie, JPad, Brian and Steven, and you said the

7   one that reflected you as a secured creditor was

8   incorrect?

9      A.   No.  That was the one that reflected me as a

10  debtor.

11     Q.   That was incorrect.

12     A.   That was incorrect.  And I thought -- I wasn't

13  sure, but I believed -- at the time when I was trying to

14  figure out how to correct it, I believed that the AD-1

15  corrected it, but it never got corrected.  So that's why

16  I -- I made sure that I did a 5, a UC-5, I thought was

17  the amendments that you record when you want to change

18  something to make it clear.

19     Q.   What was the thought for why you personally were

20  a secured creditor against the home?

21     A.   I believe that -- do you have a timeframe?

22     Q.   Well, you're -- you're saying that one of these

23  four filings reflected you as a secured creditor --

24     A.   Oh.

25     Q.   -- as an individual name, correct?

1          A.   January -- January 14th, 2019, I was the secured

2     party, and I assigned it to JPad.

3          Q.   Okay.  So that's one and the same lien?

4          A.   Yeah.  That's the same document.

5          Q.   Okay.  So as of the petition date, the three

6     lienholders would be JPad as assignee of you

7     individually, plus Brian, plus Steven?

8          A.   Correct.

9          Q.   Okay.

10         A.   Yeah.  I don't believe Ron was ever added to a

11    UCC.  I could be mistaken, I'm not sure, but I don't

12    remember any.  I just remember he was on the statement to

13    encumber.

14         Q.   And the amounts or percentages that Brian and

15    Steven were due under these UCCs will be reflected in the

16    minutes of JPad?

17         A.   Yeah.  The 15,000 for three years.

18         Q.   For each of them?

19         A.   Yeah.  For those two and Justin, but Justin was

20    never added to a UCC.  He was just added in the -- in the

21    document, in the minutes.

22         Q.   Yeah, but as far as Brian and Steven, according

23    to the JPad minutes, it would be $45,000 each?

24         A.   Yeah.  And Justin would be 45, as well, and Emma

25    would only be 15.

1    Q.  But -- but I'm -- I'm talking about -- let me

2  finish my sentence.

3        I'm talking about what was the amount secured by

4  the actual UCC1 filing.  For Brian, it would be --

5    A.  The --

6    Q.  -- wait.

7        For Brian, it would be 45,000, and for Steven,

8  it would be 45,000, correct?

9    A.  Yeah.  But that doesn't say that on there.

10 That's just what you're assuming, but --

11   Q.  I'm not assuming.  I'm -- I'm repeating your

12 testimony that it was 15,000 a year for three years, so

13 they would have been owed 45,000 each --

14   A.  Correct.

15   Q.  And then the UCC filing -- let me finish,

16 please.

17       The UCC filing would be evidence of their lien,

18 which secures the $45,000 claims, correct?

19   A.  Yes.

20   Q.  Okay.  Thank you.

21       THE REPORTER:  Counsel, if we can take a break

22 whenever it's convenient.

23       MR. HAYS:  If people can hang on -- oh,

24 actually, let's just do a ten-minute break and then I

25 think I'm probably 15 minutes or less from being done as

1    opposed to taking a one-hour lunch break, if that works

2    for people.

3              THE WITNESS:  Yeah.  That's fine.  I'm okay.

4              MR. HAYS:  Nicole, does that work for you?

5              THE REPORTER:  Ten minutes is fine, and then we

6    can come back and finish it up.

7              MR. HAYS:  Okay.  Great.  Thank you.

8      (A recess was held from 12:17 p.m. until 12:34 p.m.)

9    BY MR. HAYS:  Okay.  I do not have any further questions.

10   And so, we just need to do a little bit of housekeeping

11   here.  The court reporter will type up an official

12   transcript.  What you're seeing in realtime is not the

13   official transcript.  And then she will e-mail it to you,

14   if you could provide her with the e-mail address you

15   would like her to use.  You want to just do that right

16   now?

17         A.  Well --

18         Q.  Or we can --

19         A.  I don't want -- yeah.  I don't want to mess up

20   the screen because I might not get you back.

21         Q.  So is 30 days enough time for you to read the

22   transcript and make sure it accurately -- you believe the

23   reporter accurately transcribed your testimony?

24         A.  Yes.

25         Q.  And then you will have an opportunity to make

JASSO DECL. PAGES - 1453

1   any changes and then sign and return that within the

2   30 days.  But just be aware that if I asked you a yes/no

3   question and you said yes today but then you changed that

4   to no, that that could be used to impeach your

5   credibility because you've now completely flipped your

6   answer, for example.

7       A.   Okay.

8       Q.   So just -- just be aware as you're making the

9   changes that you, you know, you want it to be accurate for

10  what you said here today.  I would also ask that -- you

11  mentioned the minutes of JPad --

12      A.   Uh-huh.

13      Q.   -- that you said you sent to the trustee.  We

14  got a lot of stuff from the trustee, but I don't believe

15  we got all of those minutes.  Can I get your agreement on

16  the record to just --

17      A.   Yeah.

18      Q.   -- e-mail that to Brad Lay Lanais?

19      A.   Do you just the minutes or do you want the whole

20  book?

21      Q.   The book will be fine, if you have it, just to

22  make sure that the --

23      A.   Just -- it's just a bunch of stuff.

24      Q.   Okay.  Just go ahead and send it.

25      A.   All right.  I'll send to you what I can find.

137

1      Q.   Okay.  And then the court reporter traditionally

2  has a duty under the law to maintain custody of the

3  original transcript.

4           And Nicole, you said that's your preference for

5  how to handle things?  She's nodding yes.

6           So do I have your agreement, Ms. Gallian, that

7  she will retain the original and that you and I can

8  purchase copies of that?

9      A.   Sure.  That's fine.

10     Q.   Okay.  I think that covers everything.  And so,

11 unless anybody else has anything to say, I think we can

12 go off the record and we will be done with the

13 deposition.

14          But before you disconnect, Ms. Gallian, the

15 reporter does have some questions with regard to

16 spellings, and she will need the e-mail address from you.

17     A.   Okay.

18     Q.   Okay.  So we're off the record now.

19          (Whereupon proceedings concluded at 12:37 p.m.)

20

21

22

23

24

25

138

1        **SIGNATURE OF DEPONENT**

2

3          I, the undersigned, JAMIE GILLIAN, do hereby

4    certify that I have read the foregoing deposition and

5    find it to be a true and accurate transcription of my

6    testimony, with the following corrections, if any:

7

8    **PAGE     LINE                    CHANGE/REASON**

9    _____    _____    _____

10   _____    _____    _____

11   _____    _____    _____

12   _____    _____    _____

13   _____    _____    _____

14   _____    _____    _____

15   _____    _____    _____

16   _____    _____    _____

17   _____    _____    _____

18   _____    _____    _____

19   _____    _____    _____

20   _____    _____    _____

21   _____    _____    _____

22   _____    _____    _____

23

24                    _____
                      **JAMIE GILLIAN, Date**
25

1                 **REPORTER'S CERTIFICATE**

2

3

4        I, NICOLE HATLER, a Shorthand Reporter, State of

5 California, do hereby certify:

6        That JAMIE GILLIAN, in the foregoing deposition

7 named, was present and by me sworn as a witness in the

8 above-entitled action at the time and place therein

9 specified;

10        That said deposition was taken before me at said

11 time and place, and was taken down in shorthand by me, a

12 Certified Shorthand Reporter of the State of California,

13 and was thereafter transcribed into typewriting, and that

14 the foregoing transcript constitutes a full, true and

15 correct report of said deposition and of the proceedings

16 that took place;

17        IN WITNESS WHEREOF, I have hereunder subscribed

18 my hand this 19th day of July 2022.

19

20        _____
       NICOLE HATLER, CSR NO. 13730

21        State of California

22

23

24

25

**Exhibits**

**Gallian Exhibit 1**
2:11 78:19 79:10,13,24
80:7,15

**Gallian Exhibit 2**
2:12 80:22,24

**Gallian Exhibit 3**
2:13 83:16,17

**Gallian Exhibit 4**
2:14 103:4,5

**Gallian Exhibit 5**
2:15 103:24,25

**Gallian Exhibit 6**
2:16 104:17,18

**Gallian Exhibit 7**
2:17 105:1,2

**Gallian Exhibit 8**
2:18 105:10,11

**Gallian Exhibit 9**
2:19 109:25 110:2

**Gallian Exhibit 10**
2:20 110:12,13

**Gallian Exhibit 11**
2:21 110:16,17

**Gallian Exhibit 12**
2:22 110:24 111:1

**$**

**$1,000**
97:8

**$1,100**
104:23

**$1,200**
50:25 51:5

**$1,500**
101:23

**$10,000**
15:12 16:6,21

**$115**
68:19

**$15,000**
44:2,4

**$175,000**
17:4,13 25:17 30:3,17
31:4 88:21 89:4,9,15

**$194,000**
17:1

**$20,000**
16:5,19 97:18

**$225,000**
38:2 48:21

**$25**
67:15

**$25,000**
97:9

**$3,400**
53:3

**$35**
67:15

**$379,000**
11:10 14:1 95:10

**$45,000**
134:23 135:18

**$50,000**
16:5,19

**$800**
47:21,25

**$9,000**
29:18 96:1

**0**

**02-24**
77:4

**1**

**1**
32:13 33:22 62:13
78:19 79:10,13,24 80:7,
15

**1,086**
96:24

**1,400**
101:22

**1-14**
131:10,11

**1/2**

47:4 50:7 69:2 100:16
114:13,14 122:10,11,19
123:2,3

**1/3**
108:3,15 112:16

**1/7**
112:18

**10**
110:12,13

**10,000**
16:4,7,15

**100**
28:1,6,15 40:9 42:10
45:25 46:3,17 47:14
106:17 107:16 117:5
118:1 120:24

**10:50**
88:16

**10:51**
88:18

**10th**
81:15,22

**11**
47:3 69:2 102:21 103:4
110:16,17

**11-16**
87:23 88:4

**11:00**
88:17

**11:03**
88:18

**11th**
23:18 24:6 81:22 82:18,
24 83:24

**12**
44:16 51:19 110:24
111:1

**12:17**
136:8

**12:34**
136:8

**12:37**
138:19

**12s**
108:22,23

**13**
103:18,24

**13730**
4:6

**14**
63:8,20 66:15 67:9
75:16 104:3,17

**14th**
23:18 24:6 33:5,15
34:22 35:16 66:18,25
73:2 75:19 76:20
113:16 132:2,4 134:1

**15**
104:2 113:7 121:22,23
134:25 135:25

**15,000**
112:13 134:17 135:12

**15th**
19:8,11 22:2 25:3

**16**
27:24 68:19

**16222**
14:17

**16th**
17:16 19:18,21 22:8
25:3 66:22

**175**
15:10,13 16:23 25:19,
25 95:12

**175,000**
16:4,17 28:8

**179**
15:10

**18**
104:20 105:1

**185**
15:7,9,11 16:15,25
95:11

**185,000**
16:13

**18th**
27:4 39:5,14,25 43:15
45:19

**19**
131:12,13

**1962**
20:10

**19th**
133:1

**1st**
14:25 21:18 22:5 23:16,
17 24:3 39:18 61:13
105:6 129:25

**2**

**2**
33:23 80:22,24 100:16

**2-24**
65:12

**2-25**
71:16

**2-25-2021**
67:18

**2/3s**
108:4

**20**
16:23 105:4,10 133:2

**20,000**
97:16

**200**
122:11 123:3

**2000**
15:1 34:3 39:17

**2009**
7:9,16 9:24

**2010**
7:5 29:4 92:19

**2017**
9:15,18,25

**2018**
6:19,24 10:10 15:2
17:17 23:5 27:4,24 33:8
36:19,22 39:5,12,14,18,
24,25 40:7 41:12 42:4,
12,25 43:7 44:12 45:15
46:6,15,22 47:12 53:11
54:7 56:9 57:5,16 61:9
88:6 96:13 97:2 124:19
125:22 129:25

**2019**
33:10,15,21,23 34:12,

22 54:9,14 60:10 62:6,
15 63:8,20 118:13
130:21 131:20,22
132:2,4 133:2 134:1

**2020**
4:24 33:2,6,12,14,19,24
63:25 64:2,19,25 108:7
120:12 123:13,15
124:23 131:15,23
132:2,6 133:2

**2021**
29:16 34:2,5 48:15
65:3,15 66:15,25 67:10
69:9 70:23 71:6 72:7,20
73:13 74:21 76:25
81:10 84:10 96:14 97:3
98:16,21 100:22 103:7,
22 104:6,21,23 105:6,
14 106:13 112:18
113:16 123:15 124:20
130:7

**2022**
6:12

**2025**
4:7

**2028**
63:21

**2048**
48:23 49:4 50:23

**20th**
33:6,19 63:21,23
109:12

**21**
34:3

**21st**
99:1

**22**
82:2,4 112:17

**225**
15:6 25:18

**225,000**
26:4

**23rd**
7:9,16 9:13

**24**
51:21 65:14 66:15

**24th**

34:2,4 65:3 76:25

**25**
69:9 70:23

**250,000**
114:14

**25th**
34:3,4 71:6 96:12 101:5

**27**
131:8,9

**28th**
63:23

**2:00**
75:1

**3**

**3**
33:24 76:20 77:22
78:22 79:10 80:8,12,13,
14 83:16,17

**3,500**
122:19

**30**
51:1 113:18 136:21
137:2

**30-year**
51:3

**30th**
108:6

**31st**
10:10 39:17

**341**
50:9,22 109:3,14
112:23

**341s**
107:22

**346**
109:20,22 110:10

**35**
67:15

**354**
111:4,6

**356**
110:9,10,12

**358**
110:14,16

**360**
110:19,24

**376**
14:17 20:2 103:17

**379,000**
16:25

**396**
83:15

**3rd**
81:6,9,10,14 83:12

**4**

**4**
77:23 79:1,10 80:8,12,
13,14 103:4,5 110:20

**40**
49:4

**401(k)**
95:13 98:5

**441**
11:15

**4476**
6:25

**45**
102:4 134:24

**45,000**
135:7,8,13

**4589**
102:2,4,10,20

**461**
11:15 70:20 76:21
77:22,23 83:15 102:21
109:20

**4th**
68:10 104:21 118:13

**5**

**5**
16:23 50:7 70:20 79:15
80:13,14 103:24,25
133:16

**5,000**
16:20

**50**
122:11 123:2

**50,000**
114:12 122:15

**50,000s**
16:22

**53**
7:1

**5782**
53:2

**5th**
68:12 81:12

---

**6**

**6**
104:17,18

**60-day**
57:21 58:25

**6th**
68:12 83:10,14

---

**7**

**7**
105:1,2 114:13,14
122:10,11,15,19 123:2,
3

**70**
113:16

**74**
132:5

**7860**
102:10,20 103:1

**7th**
68:2

---

**8**

**8**
69:2 105:10,11 114:13,
14 122:10,11,20 123:2,
3 131:23

**8-20**
110:23

**8:13**
5:23

**8:18**
5:23

**8th**
68:3

---

**9**

**9**
29:19 73:22 109:25
110:2

**9-11-18**
53:24

**90**
28:18 74:4 127:3,4

**913985**
92:22

**9:28**
47:7

**9:40**
47:3

**9:46**
47:7,9

**9th**
39:24 72:6 73:11 74:2,
21 111:13

---

**A**

**A-S-S-I-G-N-O-R**
37:18

**a.m.**
5:23 47:7 88:18

**absence**
11:22 12:16 37:11,12
38:14 45:3 55:7,8 112:8

**absolutely**
26:2

**accepted**
126:7

**accepting**
99:24

**accomplish**
116:8

**account**
15:19,25 25:22 26:1
28:14,18 29:10 31:19
48:22 54:4 98:1,2,4,13,
20 99:6,7,10,23 100:12,
14 101:9,18,19,21

102:2,20 103:1,21
104:4

**accounts**
14:14 29:13,15 99:17

**accurate**
20:8,13 44:19 62:5
84:24 137:9

**accurately**
136:22,23

**acknowledge**
71:5 125:4

**acknowledgement**
70:9,22 79:15,20,25

**acknowledging**
125:10

**acquire**
112:11

**acquired**
24:2 106:16

**acquisition**
21:17 42:5

**action**
97:1

**active**
47:16

**actual**
12:5,17 18:13,16,17,24
19:19 43:5 64:3 111:25
135:4

**AD**
36:7

**AD-1**
36:7 132:15 133:14

**adamant**
124:12 127:11

**add**
62:6,24

**added**
33:5 34:8 40:2,6 42:3,
11,24 134:10,20

**adding**
45:20

**addition**
117:9

**additional**
15:13 58:14

**address**
13:23 69:4 125:21
136:14 138:16

**advance**
72:4 73:9

**advances**
26:5

**adversaries**
94:1

**advertisements**
10:24

**advice**
85:12,18 86:4 87:10
107:14 115:24

**afraid**
118:15

**afternoon**
75:1

**agree**
40:12 130:15

**agreed**
61:8

**agreement**
25:14 26:8,11,15,25
37:22 52:17,21 53:1
58:2 84:14 86:23 87:17,
19,22 88:4 113:5,6
119:11,12,13,17 137:15
138:6

**agreements**
37:14 86:14,16 87:3,23
88:6 124:13

**ahead**
13:12,13 25:11 62:11
76:14 137:24

**Albertsons**
6:16

**Alderport**
7:1,13 10:6 13:23 15:21
16:1,10,12,24 23:15
53:17

**alive**
8:13

**Alliant**

99:10,23

**Allient**
101:21

**allowed**
52:19

**amended**
43:14 62:15 88:2 93:2
108:2 112:17 113:15
117:3

**amendment**
40:1,6 62:6 107:8

**amendments**
107:7 121:8 133:17

**America**
101:11 102:1

**amortized**
50:23 51:1,4

**amount**
25:13,16,18,21 26:4
44:2,8 48:21 51:18,23
52:12 58:4 89:2 90:13
96:23,25 122:13,22
123:5,19 124:2 135:3

**amounts**
51:11 90:15 121:24
134:14

**Ana**
14:8,13 15:18,22 17:17
22:9

**and/or**
41:17 124:9

**answering**
5:8,14

**Anthony**
39:3,11,23 40:17 41:18

**anticipated**
48:25

**anymore**
121:10,17

**apparently**
31:2 45:10

**appeared**
19:1 62:3

**appears**
59:23 104:3 105:5

**appellate**
91:1

**applicant**
59:20 60:1

**application**
59:21 65:17 80:15
125:6,7,8,10,18 127:21
129:11

**applications**
124:18

**applied**
124:9,11,13,16

**apply**
124:14

**appreciation**
117:13 118:17

**approval**
21:21

**approve**
130:15

**approved**
61:13 125:2,25

**approximately**
17:1 51:4

**April**
60:9 101:6,7 103:22

**argued**
78:5

**arrested**
114:8

**article**
39:3 40:1

**assessor**
74:10

**assessor's**
74:17 78:9,12

**asset**
38:22

**assign**
56:4

**assigned**
7:23 37:21 134:2

**assignee**
10:3 134:6

**assignment**
7:23 8:2,9,12 9:5,6,9
10:2 12:24 13:22 38:5
92:14

**assignor**
36:9 37:18

**Assistant**
6:10

**association**
5:4

**assuming**
31:2 135:10,11

**attempt**
20:14

**attendant**
6:19,22

**attorney**
4:13 21:19 22:6,16 48:7
57:22 84:13 91:1 123:9
128:20

**attorneys**
17:5 23:9 30:21 48:4,6
61:6,11,21 90:17 91:19
107:5,19 126:12

**attorneys'**
89:21 95:5

**August**
33:2,6,14,19,23 63:21
64:2,19,25 68:10 81:6,
9,10,14,15,22 82:18,24
83:10,12,14,24 108:6
109:12 130:7,12

**authority**
28:13 37:10,11

**avoid**
47:21,25

**aware**
22:20,21 23:2,12 34:18
35:17 63:7 137:2,8

---

**B**

**B-U-Y-S-M-A-N**
71:3

**back**
14:23 19:10 20:9 22:3,
10 23:2 24:18 26:17
39:12 45:6 47:8 53:19

54:11 55:1 56:7 67:9,13
68:4,14,18 69:21 70:17
75:20 77:21,22 78:5
79:1,24 81:17 82:7
87:14 89:12,15 91:11
94:8,24 98:17 99:21
101:13 114:17,20 115:3
117:16,17 123:22 124:3
128:4 136:6,20

**background**
56:25

**backwards**
26:22

**bad**
47:20 55:10 58:17

**balance**
16:16 17:5 100:4

**bank**
14:9,14 21:11 28:13
55:4 101:11 102:1

**bankruptcy**
4:14 29:16 72:9 74:24
75:1 86:6 93:2,15 99:22
106:20 112:15 117:3
120:23 130:24 131:17
132:14

**bar**
94:18

**barks**
91:6

**based**
72:20

**basic**
31:10

**basically**
12:24 30:5 47:24

**basis**
48:25 96:21 97:25

**battery**
52:24

**Beach**
5:1,3 7:1 14:18 54:22
93:17 95:1 123:10
126:15

**bears**
104:21

**began**
7:15

**begin**
130:20

**beginning**
4:24 66:2 95:10 101:4
102:16 129:13 131:9

**behalf**
98:8

**beige**
79:9

**belief**
32:3

**believed**
46:16 73:2 100:17
130:8 133:13,14

**belong**
95:19 96:2

**beneficiary**
50:2

**benefit**
55:13,16

**BIFS**
43:10

**big**
21:5 76:1 77:15 78:18

**biggest**
57:24

**bill**
31:10 74:18 123:11

**biological**
8:22

**Birch**
123:10

**bit**
22:14 29:17,18,19
71:10 77:2 83:10 97:3
136:10

**black**
62:9

**blank**
84:22,25

**blanks**
90:12

**blown**
112:20

**Bob**
28:16,19 69:6 112:23
113:25 116:16 117:11
118:7,8,18 119:20
121:2,25 123:23
124:15,16 130:5

**bona**
126:5

**bond**
114:6,11 122:13,14,22,
25

**bonds**
114:6,10 122:10

**book**
137:20,21

**bookkeeper**
89:22

**books**
119:17 121:1,18 122:1

**borrow**
17:18

**bottom**
77:1 81:9,15 82:6,22,24
89:25 99:7

**bought**
126:17

**Bower**
128:19

**boxes**
90:6

**boys**
107:21 108:11 109:19
113:12 120:3 121:22

**Brad**
137:18

**Bradley**
7:5,16 8:5,8,13 9:1,2
92:14

**Bradley's**
92:13

**branch**
14:9,13 15:18,22,23,24

**brand**
75:20

**break**
46:24 47:1,11 88:10,11
92:3,6 135:21,24 136:1

**Brian**
108:7,8,14,19 110:5
111:8,15,19 112:3,10,
24 120:7,19 121:2
130:13 133:5,6 134:7,
14,22 135:4,7

**bring**
68:13 117:11

**broker**
10:15 11:12,14

**brokers**
127:23,25

**Bros**
4:14 7:11 22:18,25
23:4,9 59:4 92:25
100:23 129:3,19

**brought**
59:2

**build**
127:5

**built**
127:2

**bully**
94:21,22

**bunch**
137:23

**business**
29:23 124:13

**busy**
91:7

**buyer**
10:12,22 12:6 18:19
129:8

**buyers**
12:7 129:20

**buying**
21:11

**Buysman**
70:23 71:1

**C**

**C-A-L-D-E-R-O-N**
41:25

**C-O-D-A**
35:1

**C-O-T-A**
35:2

**Calderon**
39:3 40:10,13 41:17,21,
24 42:10,14,19,21,22
45:18 46:7

**Caldron**
42:5

**California**
4:5 20:6 34:20 48:1,10
63:12

**call**
27:13,14 34:24 35:6,7,9
42:16 54:5 61:11 66:8
74:13 76:4 78:19 80:21
114:7 119:13 121:6,14
126:21 129:6

**called**
8:18 47:23 66:19 71:22
78:16 121:6 126:14,23
127:8

**calling**
66:4

**canceled**
10:19 12:8

**cans**
43:11

**Capital**
73:16 74:18

**car**
13:6,16 20:24 21:6 25:8
31:5,9,10

**car's**
32:18

**card**
28:16,20 29:5 69:1,2,4
73:16 74:7,18,22
101:12,13 102:1

**career**
6:18 98:5

**case**
90:23 92:20,22,23,25
93:5,6,9,13,25 94:5

**cases**
90:23 93:21 94:3,10

95:6

**cash**
15:12 16:6,7,15,21
26:18 28:9 89:9 99:10
101:7,10 104:5,23

**cashier's**
14:3,4,7,11 15:17,19
16:3,16 25:24,25
123:14

**Cashiers**
14:2

**Cassello**
91:1

**caught**
122:14

**caused**
23:9

**CCP**
4:7

**CD**
62:24

**cell**
31:10

**center**
107:4

**certificate**
14:24 17:24 18:5,13,16,
17,20,24 19:19 20:19
22:4 32:17 33:9 34:12,
19,24 35:4,8,12,20,24
48:18 62:12,14,21,23,
24 63:15,21 64:1,5,8
65:2 66:22 68:16 69:4,
21 71:5,20,23 72:3,22,
25 73:6 74:4,9,12 75:20
76:23,25 78:2,23 79:16
80:19,21 81:3 83:12,25
109:12,14 111:7

**certificates**
32:10,14,21,24 34:6
61:24 111:21

**Certified**
4:5

**chance**
84:23

**change**
28:3 33:11,15 42:25

43:8 46:6 62:23 66:9
72:2,3 73:4 133:17

**changed**
19:5 34:5 36:14 43:17
44:13,16 51:25 52:20
55:9,12,22 57:15 58:24
60:5 62:23 85:25 86:8,
10 88:1 97:13 107:16
109:16 113:20 120:17
137:3

**changing**
64:4

**charge**
68:20 72:11 73:16 74:1,
7,22

**charged**
122:23

**charges**
122:14

**charging**
72:12 122:15

**charity**
117:15

**Charles**
9:1

**chase**
14:9,14 15:17,19,23
54:3,4 102:2,11

**chattel**
13:17,18

**check**
14:3,4,7 16:6,19 25:25
54:10,12 99:3,4 102:20,
22 103:7,19

**checks**
14:8,10,11 15:17,19
16:3,5,16,19 90:8 99:19
102:16 123:14

**Cheryl**
12:2

**Chevy**
20:10

**children**
43:24 44:3 108:10
121:16

**chose**
125:4

**Chris**
127:24

**circle**
61:21

**circumstances**
37:9 38:13 86:10 97:12

**city**
54:21

**claim**
93:19 130:16

**claims**
135:18

**clarification**
17:6 40:21 71:21

**clarify**
5:18 12:9 39:22 89:6,16
96:9 97:24 99:11

**cleaner**
5:11

**clear**
22:15,23 31:3 41:10,13
42:18 95:2 99:22
111:14 133:18

**clearance**
71:19,22 72:21,24 73:6
74:12,17 76:23 78:2
80:19,20

**clinics**
107:15

**closed**
39:19

**closely**
54:2,3

**cluster**
58:7

**co-signer**
124:14

**Coast**
126:15

**CODA**
34:25

**code**
35:9,14

**collateral**
26:10,16 27:1 87:8

**collect**
31:18 38:1 55:5

**collector's**
74:22

**college**
6:5

**color**
79:9 126:5

**Commercial**
35:14

**Community**
18:7

**company**
12:3,4,21 30:22,24
31:11,13 45:2 66:6
84:15 102:23 122:14
126:20

**company's**
11:25

**complete**
127:21

**completed**
6:4

**completely**
51:13,23,25 52:20
61:20,21 99:9 137:5

**complicated**
44:5

**computer**
73:22 75:11

**concerned**
23:19

**concerns**
25:4

**concluded**
138:19

**conference**
84:12

**confident**
34:10

**confirm**
86:11 129:6

**confused**
99:2,17

**confusing**
82:11

**connection**
4:25 11:19 12:5,10,16
63:9 88:22

**considered**
98:22 117:15 118:18

**constitute**
78:18

**constituting**
16:12

**contact**
11:7 61:12 107:3

**contacted**
11:3 56:2 67:23 68:2
78:9 127:23

**contacts**
127:18

**contemplation**
26:5 27:5

**continue**
6:17 126:2

**continued**
60:9 99:16 105:13

**continuing**
57:22 60:7

**contract**
10:19

**contractors**
126:14

**convenient**
46:25 88:9 135:22

**conversation**
127:10

**convolute**
60:8

**convoluted**
86:5 95:16 96:5 121:17

**cool**
41:7

**cooperation**
129:2

**copies**
138:8

**copy**
79:7,22 80:4 87:20
106:9 111:25

**corner**
102:22

**correct**
6:22 7:19 10:1 11:7,8
13:5,16,19,24 14:12
15:14 16:1,2,14 17:12
18:22 20:3,4,21 21:13,
14 22:19,25 23:5 24:4,
8,20,21 25:24 26:2,9,
21,24 27:2 30:2 31:20
33:25 34:14,15 35:20,
21 36:1,12,13,16 37:24
38:3,20 39:8 40:11,24
41:1,17,22 45:12 46:1,
18,20,23 47:14,15
49:24,25 50:3 51:6 53:7
54:18 56:12 57:14
59:18 60:15 62:1,16
64:2,7,9,20,21,25 65:4,
9,18 66:16 67:1,6,11
68:13 69:12,19 70:1,9
71:7,8,18 72:7 73:1,12,
14 75:18 77:19,24 79:1,
2,5,17 83:21,22 84:1,5
86:12,17 87:2 88:7,23
89:15 91:22 93:11,12
94:4 95:7 96:11,12
97:4,9,10 100:13 103:2,
8,22,23 104:16,24,25
105:15,16,20 106:5,8,
17,21 107:1,2,12,13,17,
18 108:16 110:7,8
111:16 112:4,11 116:23
122:2 124:4,10,25
125:7,13,22,25 132:14
133:14,25 134:8 135:8,
14,18

**corrected**
63:1,2 68:23 133:15

**correction**
130:19

**correctly**
49:14 103:11

**COT**
35:4

**COTA**
34:20,24 35:2,6,7,17
63:5 64:4

**counsel**
4:8 86:15 90:22 107:14
135:21

**counselled**
47:20 48:2

**count**
122:4

**counter-sued**
94:8,24

**county**
9:9 74:10

**couple**
5:5,6,7 32:20 100:3
118:2 124:14 127:22
129:7

**court**
5:6 21:21 22:8 41:24
75:1 93:15 94:4,20
107:15 136:11 138:1

**courthouse**
17:17

**covered**
118:2

**covers**
138:10

**Covid**
48:25 67:24 97:16
101:12,21,24 106:11
112:20

**CPA**
89:23 90:6,15 91:10,11
98:7

**CPSS**
112:13

**crazy**
114:8

**credibility**
137:5

**credit**
21:11 104:4

**credited**
90:16

**creditor**
4:13 31:17 62:7 133:7,
20,23

**criminal**
91:2

**cross**
93:2

**cross-complaint**
93:3

**Cruz**
82:19

**current**
72:3 73:8

**custody**
138:2

**cycled**
83:7

**D**

**dad**
120:19

**daily**
61:12

**date**
14:20 23:19 36:18,23
39:13 44:17 48:16
50:23 63:8,9,11,14,18
65:4,5,8,10,15,19
66:13,15,25 67:8,9
69:9,11,17,18,21,23
71:15 72:6 73:18 77:8
82:21 83:10 84:25
92:10,18 110:21 134:5

**dated**
23:16,17 83:14 103:7,
22 104:21 105:6

**dates**
51:11 63:19 85:3

**day**
66:16,20 69:13,14 72:8
77:7 82:21 83:11,24
110:23 127:18 130:24
131:16 132:14

**days**
6:15 74:4 75:16 136:21
137:2

**deal**
22:3,10,11,12

**dealing**
43:1

**debt**
85:11,16,21 87:7,8 96:4

**debtor**
36:7,12 130:20 133:10

**December**
54:7 109:18 130:12,13
131:10,13,14,15 132:2,
6

**decide**
27:21

**decided**
120:4

**deciding**
24:18

**decision**
22:9 24:23

**decisions**
37:10 45:4 94:19 112:8

**deed**
7:12 9:4

**default**
48:11

**defeats**
78:4

**defendant**
93:11

**degree**
6:5,6

**Del**
103:15 105:14

**deliver**
68:17

**delivered**
68:18

**demand**
12:23

**denial**
125:13

**denied**
125:7,10,18 127:7
128:22

**department**
77:3,5

**depending**
130:1

**depends**
87:12

**deposed**
4:15,18

**deposit**
15:12 16:7,8,9 29:12
54:10,12

**deposited**
14:8,13 16:1

**deposition**
4:6 5:15 92:11,12
138:13

**deposits**
54:6 96:16

**describe**
30:17

**Development**
18:7

**difference**
25:5 72:5

**direct**
54:6

**directly**
56:21

**disability**
97:15

**disappear**
86:21

**disapproved**
125:2 126:2

**disconnect**
138:14

**discourage**
127:21

**discovered**
7:5 24:17

**discuss**
49:17

**discussed**
48:20 59:4

**discussion**
42:1 49:21 84:7

**disregarded**
107:9

**document**
7:6 9:3,7 13:2 14:23
18:7,8,12 19:6,7,8,10
21:19 40:3 45:17 47:21,
23 48:13 62:4,5 65:12
67:1,5,8,13 68:25 69:20
71:5 74:20 77:9,20,24
78:12,19,25 79:1,4
80:14 81:4,13 83:8,13,
19 116:12 134:4,21

**documents**
8:20 12:11,17,22 17:16
18:4,9,12 44:12 57:23
58:5 64:12,24 70:9,12,
17 76:8 82:21 90:3
108:18 109:6 110:23
111:10,18,21 123:18

**dog**
91:6

**dollar**
89:1

**doors**
100:3

**drag**
94:1,8,24

**dragging**
93:18

**drew**
25:25

**Drive**
53:2 125:21

**drop**
74:11

**dropped**
101:7

**drove**
19:18 68:12 81:13

**due**
48:23 50:23 97:19
134:15

**dump**
90:6

**duty**
138:2

**E**

**e-mail**
61:12 68:2,4,22 84:13,
20 85:5 111:22 136:13,
14 137:18 138:16

**e-mails**
12:23 66:1

**earlier**
25:17,19 45:21 48:20
61:23 63:8 74:6 106:15
108:23 112:9

**early**
62:6,15

**earn**
56:13

**easier**
5:10

**easily**
70:19

**easy**
102:7 109:11

**Ed**
4:12

**EDD**
101:11,25

**education**
6:4

**effect**
49:3

**effective**
65:5,15,19

**efforts**
126:9 127:16 128:19

**EJ**
112:24

**elaborate**
51:9

**Emergency**
29:7

**Emma**
112:24,25 120:11
121:3,23 134:24

**employed**
6:7,13

**encumber**
116:12,14,23 117:8
118:3 123:21 134:13

**encumbrance**
63:13 114:23,24
115:10,17,20 123:20

**end**
6:12 93:18 99:25
125:19 127:15

**ended**
11:16 15:6 60:5,6 98:5

**ending**
102:2

**ends**
131:8 132:5

**entered**
61:1,16 63:1

**entire**
5:11

**entities**
43:23

**entitled**
78:22 96:18

**entity**
27:10,16 29:24 30:4

**envelope**
66:20 80:11

**equal**
128:7

**equating**
32:17

**equity**
60:17

**error**
130:21 132:16

**escrow**
11:18,22 12:3,4,11,13,
16 53:10

**Estates**
103:17

**estimate**
4:17 51:15

**eventually**
52:13 80:19 106:18,19
111:12 114:17

**everybody's**
130:9

**evidence**
135:17

**ex-husband's**
40:17

**exact**
36:18 48:16 63:18
127:7 128:21

**examination**
4:10 5:20

**excess**
17:2

**exchange**
8:1 26:13 38:5 42:5
123:25

**exclusively**
56:10 57:4,16

**executed**
21:22 25:13 26:14 39:4
83:14 110:22

**execution**
21:20 22:16 23:13 24:5
88:22

**exhausted**
97:15

**exhibit**
78:19 79:10,13,24 80:7,
15,22,24 82:2,4 83:16,
17 103:4,5,24,25
104:17,18 105:1,2,10,
11 109:25 110:2,12,13,
16,17,24 111:1

**exhibits**
76:9 78:6 81:25 82:11
102:14

**exist**
85:9

**existed**
37:14

**existence**
87:17

**exists**
85:16,21 87:24

**expenses**
30:5,7,25 31:5,7

**explain**
7:3 18:15 22:22 35:22
42:8

**explained**
107:18

**explains**
15:15 108:14

**exposed**
58:20

**extent**
122:12

**extra**
47:25 83:13

———————————

**F**

**face**
62:3 64:6 65:11

**fact**
35:23 95:17 110:9
129:5,7

**Facts**
83:11

**fair**
56:16 90:18 116:4

**familiar**
21:3 25:5,9 63:5 102:9

**family**
112:6

**fancy**
75:6

**fashion**
13:8,15

**fast**
53:13

**father**
8:22 120:20

**father's**
8:6,21

**favor**
10:2 26:8,19,20

**February**
34:2,3,4 35:16 36:18,
19,22 39:24 41:12 54:9,
14 65:3,14 66:2,15 69:9
70:23 71:6 72:20 76:25

96:12,13 97:2 98:16,21
99:1,16 100:22 101:3,5
105:14

**feeling**
128:25

**fees**
30:21 89:21 95:5

**fees'**
90:17

**fell**
12:8 53:10 55:10 97:22
128:13,14

**Fellsot**
92:11

**felt**
117:12

**fide**
126:5

**figure**
77:14 78:17 91:9 98:7
133:14

**figured**
77:12 82:19,20

**file**
44:18 47:21 57:23
63:11,19 102:17 111:25
130:3

**filed**
7:6 21:20 22:16 29:16,
20 35:23 36:2 43:21
44:12,20 45:9,17 48:13
62:14 72:8 74:24 93:3
99:21 106:20 107:8,10
108:18 112:3,17 113:15
119:9 130:2,11,14,15,
17,18,20,24 131:16

**filing**
35:13 58:5 107:7
109:18 117:2 130:8
135:4,15,17

**filings**
44:19 63:7,11 130:25
133:23

**fill**
84:24 129:11

**filing**
117:23

**finally**
54:10,12,13 63:1,2 66:4
68:4 73:1,3,4 75:16

**finances**
21:11

**find**
18:23 19:7 40:15,16
74:16 77:7 82:23
128:20 137:25

**fine**
84:16,17 88:13,15,16
113:24 136:3,5 137:21
138:9

**finish**
42:9 50:19 66:24
100:18 102:12 114:25
135:2,15 136:6

**finished**
50:18

**flight**
6:18,22

**flip**
103:18

**flipped**
137:5

**flow**
89:20

**flying**
53:12

**focused**
59:23

**folder**
110:25

**follow**
74:14

**food**
31:5

**foolishly**
126:13

**force**
52:11 127:13

**forced**
95:25

**forces**
85:15

**forget**
71:19

**form**
14:1 27:8,10,11 30:4
40:25 41:3,15 44:15,16
69:12,22 73:15 132:17

**formal**
46:9

**formation**
37:4 38:25 41:12 42:19,
23

**formed**
27:3,5,22,25 36:17,20,
24 39:3 41:6,16,18,21

**forms**
44:19,24 45:8 132:17

**forward**
24:19 32:15 84:20,21
85:4 98:22 99:1

**found**
10:22 66:8 109:5
131:18

**fourth**
68:15 132:9

**frame**
24:7

**friend**
29:3 40:16

**front**
49:20 64:13,24 66:14
76:22 78:25

**frugal**
95:18

**full**
12:22 16:13 86:12
112:20

**fully**
50:22 51:3 89:14

**fun**
121:9

**function**
42:13

**functions**
12:13

**funded**
95:5

**funds**
88:21

**future**
26:5 61:2

**G**

**Gables**
5:1,2 52:24 60:13 90:25
91:20,23 92:2,4,12,22
93:7,9,17 94:25 95:1

**Gallian**
4:1,11,15 6:3,7 14:15
17:8 19:5 40:2 42:3
59:23,24 60:2,8 67:18
78:3,13,14 84:9,23
88:20 93:13,16,23,25
96:3 98:1 99:23 100:12
102:8,24 104:14,22
119:2 130:3 133:5
138:6,14

**Gallian's**
99:3,7 128:16

**Garrels**
91:2

**gave**
5:7 15:12 21:19 26:18
37:11,15 38:8 39:13
79:19 81:13 90:3 113:4,
5 114:19,21 115:6,9,10,
16,20 126:20

**giant**
21:6

**gift**
9:16,25 30:4 43:24
44:1,3 117:15

**gifted**
9:2 30:10,16 44:8
107:19

**gifting**
8:18

**gifts**
112:10 113:23 117:7
124:7

**give**
5:6 18:5 26:13 38:4,10,
17,22 63:6 64:14 68:24
73:20 74:20 79:18
96:16 97:9 112:13

127:20 128:12

**giving**
63:12 114:22 115:3
116:4 118:3

**glad**
57:19

**goal**
129:22

**God**
28:25 34:3 62:22 90:11
97:15 107:25 123:9

**Golden**
107:3 113:5,6

**good**
4:4,11 47:16,18,19 48:9
58:17 73:24 74:4

**governing**
12:22

**Graber**
123:11

**grand**
122:11 123:3

**granddaughter**
44:4 113:1 120:11

**grandma's**
20:10

**grant**
7:12 9:4

**grateful**
124:2

**gray**
88:24

**great**
107:23 128:8,11 136:7

**greater**
127:4

**Greg**
70:23

**groceries**
117:11

**ground**
7:24 23:21 96:24,25

**guess**
16:22 39:24 42:15
54:24 71:12 79:22

**guys**
50:18

---

**H**

**Hair**
126:22

**Halloween**
10:11

**handed**
13:4 65:8 75:5

**handle**
138:5

**handled**
11:21 12:18 13:7,15

**handling**
12:11

**hands**
18:19

**handwriting**
104:12

**handwritten**
104:3 105:5

**hang**
135:23

**hanging**
60:2 123:22

**happen**
48:25 58:18 89:20
112:21 128:18

**happened**
17:3 30:9 39:11 42:12
51:14 57:21 62:17
63:16 67:19 68:14 70:4
76:2 92:5 101:12
106:18,19

**happening**
57:25 101:25

**happy**
22:3,6 76:18 100:19

**hard**
79:7 80:5

**Hatler**
4:5

**Hays**
4:9,10,12 6:1 13:13,14

17:7 24:15,16 29:1
40:23 42:2 47:1,6,8,10
51:2 58:16 63:17 71:24
79:14 81:1 82:17 83:1,
18 84:8 88:11,14,16,19
91:15 103:6 104:1,19
105:3,12 106:4,14
110:3,15,18 111:2
119:1 135:23 136:4,7,9

**HCD**
18:7,20 20:20 21:4
32:10 33:1 35:21 63:15
65:8,16 66:1 67:1,9
69:12,18,20,21 71:18
72:2 77:25 79:17 80:3,
13,16 81:13,16,21
110:10 111:8,18,20
119:10

**HCDS**
62:21

**head**
51:23 60:3 61:14
123:22

**healed**
6:16

**hear**
41:5 49:10 88:14 91:6
106:2,6

**heard**
10:11 11:1,5 19:14
41:11,16 49:13

**hearing**
41:13 89:1

**held**
5:23 42:1 47:7 88:18
115:4 136:8

**helpful**
113:25

**helping**
112:21

**Henry**
53:2

**Hey**
74:14

**High**
6:5

**higher**
11:15

**highest**
6:3

**hindsight**
34:23

**history**
42:8,9 43:6 44:22 45:7

**hit**
62:21

**HOA**
61:7 93:7,9,23

**hold**
24:12 49:22 52:3 58:11
59:11 76:13 77:14
85:19 93:5 104:10
110:4 115:14,16 131:6
132:10

**holding**
15:20

**holds**
21:12

**home**
7:8 13:7,19 14:17,21
15:3 17:1,21 19:1,20,
22,23 20:5,8,15 21:7,8,
16 22:7,12 23:14,21
25:7 26:12 27:1,6 32:11
34:7 36:21 37:7 38:2,7
39:7,17 48:18 53:1,9
54:16 56:6,11,24 57:16
58:3,4 60:3,12,20 69:15
74:11 89:4 92:12 98:19
103:16,17 107:24
126:17,25 127:2,6
128:7,13 129:24 130:16
133:20

**homeowners'**
5:4

**homes**
20:7 56:8 127:5 128:4

**honest**
90:10

**honestly**
63:17

**hope**
116:2

**horrified**
114:9

**Hosso**
93:24 94:1,17 130:14

**hour**
107:5

**hours**
68:5

**house**
25:15 52:18,19 53:17,
20,21 56:16 85:14
114:20,21 115:5,11,17,
21 116:5 117:16
118:12,15 126:13
127:12,14,16,17,25
128:3 129:24

**housekeeping**
136:10

**Houser**
4:14 7:11 21:19 22:18,
24 23:4,8 55:11 57:22
59:4,22,23 60:7 84:11,
13 87:13 92:17,25
93:13,18,23,25 94:12
97:19,21,22,23 99:9,20
100:23 126:12 127:24
128:7 129:3,19

**Houser's**
22:6,16

**Housers**
91:22,24

**Housing**
18:7

**huge**
118:6

**Huntington**
5:1,3 7:1 14:18 54:21
93:17 94:8,23,24,25
95:1 126:15

---

**I**

**idea**
40:25 41:3,15 86:24
128:8 130:23

**identification**
79:13 80:24 83:17
103:5,25 104:18 105:2,
11 110:2,13,17 111:1

**ignorance**
115:8

**immediately**
127:19

**impeach**
137:4

**implement**
119:4

**implemented**
117:21 119:15

**important**
15:24 23:24 57:19 59:2

**impossible**
126:24

**in-place**
128:3

**inactive**
47:23

**inception**
28:4

**include**
102:16

**included**
8:11 80:1 81:25

**including**
31:5,13

**income**
52:13 53:20 55:6 56:18,
20 86:8 101:14,20
117:10 124:17

**incorporator**
42:15 46:12

**incorrect**
133:8,11,12

**incorrectly**
31:2

**indifferent**
47:20 58:17

**individual**
10:3 58:15 59:8,16
133:25

**individually**
14:5 18:3 19:2 55:18
57:12 89:12 134:7

**inherit**
8:17

**inheritance**
8:4,7,11,16

**initial**
11:7 51:24 52:6,7,9
58:24 120:6 130:11

**injury**
6:16 55:9 93:17

**inked**
80:3

**inquiry**
67:14

**insurance**
12:21 30:21 31:9

**intended**
98:10 107:20 121:12

**intent**
38:12 43:14,23 44:3,7
51:13 52:1,6,7,10 59:14
76:6 85:13 89:18
106:19 108:6

**intention**
129:1

**interchangeably**
20:7

**interest**
40:5 42:6 44:23 50:5,8,
12 55:5 56:17 69:15
98:18 106:16,24
107:12,16,23 108:4
109:16 112:11 113:17
114:19,21,22 115:4,5,6,
7,8,22 117:24 130:9

**interested**
98:7

**interests**
43:8 115:9 117:4

**interfering**
22:7

**internet**
10:21

**interrupt**
50:18

**interrupted**
13:12

**interruption**
5:22

**investigate**
43:12

**invoice**
100:2

**involved**
56:1 94:15 120:21
128:1

**issue**
59:17 60:7 63:9 84:14
122:25 125:12 128:17

**issued**
18:20 32:11,19 33:9,20
64:17 65:2,4 73:6 76:23
79:17 81:2 82:24 83:20
111:7

**issuing**
111:20 124:12

**items**
31:10

———————

**J**

**jail**
115:25

**Jamie**
4:1 14:15 17:8 19:5
40:2 59:23,24 60:2,8
67:18 78:3,13,14 84:3
96:2 98:1 99:3,7,23
100:11 102:23 128:16
130:2 133:5,6

**Jamie's**
41:8,9

**January**
33:5,8,12,15,21,22
34:2,12,22 63:8,20
123:13 132:2,4 134:1

**Jeanine**
94:1,17 130:14

**Jeffrey**
107:3

**job**
5:10 6:9,14 49:1 86:9
97:14 114:1 117:10

**John**
123:9,11

**joint**
110:5

**JPAD**
34:22 36:9,15,17,24
37:6,15,23,25 38:4,9,
10,17 39:1,2,7,20,24
40:2,6,25 41:1,3,5,7,12,
15,16 42:4,9 43:8,21
44:11,13,23 47:12,16
48:17 57:18 62:6,15
64:4,6,18 66:12 67:19
68:14,18 69:11 76:5
81:14 83:20 84:3,4 94:2
97:23 106:16,24
107:12,16 108:3,20
112:16,18 113:3,17
114:3 115:4,6,22 117:4,
6,24 118:8,18 119:5,12,
16,21 120:15,25 121:1,
18 122:1 123:25 133:5,
6 134:2,6,16,23 137:11

**JPad's**
113:6

**Jr**
9:1

**judge**
32:2 61:4,5,6 128:19

**judgements**
60:20 61:15

**judgment**
60:24 61:1,22

**July**
29:16 53:10 66:15,18,
25 67:9 68:2 72:6 73:2,
11,22 74:21 75:16,19
76:20 99:22 105:6
111:13

**June**
99:8 100:1 104:21,23

**Justin**
108:11,12 112:24 121:3
134:19,24

———————

**K**

**kids**
107:22 113:13,20

**kind**
20:6,8 35:7 57:8 77:12
83:6 121:12

**knew**
58:3 92:10

**knowledge**
8:23 23:20 29:8 42:23

---

**L**

**L-L**
28:24

**L-L-E**
28:24

**L2**
39:4 40:1 45:19

**L2s**
108:22

**Lanais**
137:18

**land**
93:20

**landlord**
54:5 56:2 57:11 61:10

**Lane**
14:17

**language**
20:17

**law**
35:8 138:2

**lawsuit**
92:4,5 94:14

**lay**
43:2 137:18

**layperson**
44:1 61:18 107:1

**LC**
40:1

**learn**
77:8

**learned**
41:20 43:3 92:12

**lease**
7:25 53:1,5,7,23 54:1,
18 56:4 60:2,6 84:14
96:24,25 124:12 128:17

**leases**
54:20,22 91:24

**leave**
55:7 57:17 84:22 90:12
113:13 121:15

**leaves**
17:1

**leery**
25:11

**left**
95:11 102:22 114:2

**legal**
20:25 21:8,10,12 31:22,
25 32:1,22 34:16 35:11,
19 37:7 48:17 55:17
56:25 57:18 58:12,16
62:1 64:16,18 69:5
83:20 84:2,3,4 85:12,18
86:4,19,22,25 87:18
96:4 107:24 110:5
111:9,16 112:8 113:9,
21 115:5,24 131:7,8

**lender**
50:4 87:9

**letter**
104:20 127:24

**letting**
129:11

**level**
6:3

**liability**
56:23 57:12,13

**lie**
114:8

**lied**
126:12

**lien**
21:12 23:10 37:15 38:9,
20 54:16 116:4 134:3
135:17

**lienholder**
20:25 33:5 37:22 60:17,
25 62:7,13,15 64:6

**lienholders**
34:8 110:20 131:18
133:4 134:6

**liens**
60:20 116:15,21,22
118:3 132:8,13,21

**life**
37:9

**limited**
68:5

**Lisa**
21:18,21 22:1,17,19,25
23:8 25:4 55:24 57:23
59:5,17 60:9 66:21

**listed**
10:3,18,19 11:12,15
19:19 34:16 35:19 36:4,
6,8 37:6 45:20 48:17,21
53:15 108:3 110:12
112:3 121:24 127:17

**listing**
10:16,20 106:24 117:3,
23 118:7

**litigation**
5:2 22:19,24 23:5,7
60:13,23 61:16 90:21
91:18 93:14 120:21

**live**
55:19 56:22 128:10

**lives**
96:18 100:3

**living**
9:23 30:5,6,25 31:4,7
37:12 57:4,6 86:8

**LLC**
17:11 27:11 36:15,17
39:25 47:16 58:19,21
59:6 66:7 102:23

**LLCS**
47:19 55:17 58:13
59:15 60:16,24

**loan**
17:4,16 25:2,18,20 30:4
52:10,16 53:5 55:4,6
111:12 123:8,24 124:4

**loaned**
17:13 25:2,13,16 30:12,
16 89:4 114:5 122:9,12
123:6,7

**local**
70:25 126:14

**located**
6:25 14:17 20:2

**long**
4:22 6:11 16:18 17:19
47:2 67:17 73:25 74:15

75:24

**longer**
100:23 120:8,18 121:3

**looked**
55:3

**lose**
49:1

**lost**
57:8 97:14 114:1

**lot**
5:10 21:4 43:3 53:12,
18,22 57:20 129:14
130:3 137:14

**Luis**
67:25

**lump**
98:3

**lumping**
92:2

**lunch**
107:5 136:1

---

**M**

**M-C-CAPITAL**
28:24

**M-C-L**
28:22

**M-C-L-E-L-L-A-N-D**
28:25

**made**
7:10,11 9:16 14:4 24:22
25:2 30:7 48:22,24 49:2
51:8,16 54:7 58:2 63:15
67:4 69:7 89:13 90:13
94:18 99:4 124:18
133:16

**mail**
63:3 75:21 77:8 80:7

**mailed**
75:10,15 79:24 81:11,
23

**maintain**
138:2

**make**
9:20 12:25 22:15,22
23:23 32:23 37:10

41:13 42:17 45:4 49:8,
13 53:19 58:7 73:18
76:7 84:24 86:20 87:9
89:24 95:2 96:16 99:12,
21 100:9 105:13 109:21
112:8 113:9 117:21
126:10 127:16 133:18
136:22,25 137:22

**makes**
5:10,11 98:10 107:15

**making**
55:4 56:14 73:3,4 96:14
99:9 100:11 105:25
106:3 130:19 137:8

**man**
55:2

**managed**
43:15 45:2 111:20

**manager**
6:10 31:11 37:10 44:25
45:20 46:14 115:7,8

**managers**
40:4 44:18 45:4,11
108:24,25

**mandatory**
84:12

**manner**
116:7

**manufactured**
19:20,23 20:4,7,13,14
21:16 25:7 27:6 32:11
34:7 36:21 37:7 38:2
39:7,17 48:18 54:16
56:6,10 60:12 69:15
129:24

**March**
6:12 9:13,18,25 61:8
101:4,6 103:7,9 118:13

**mark**
83:15 103:3 104:17

**marked**
76:9 79:10,13 80:15,24
82:4,7 83:17 103:5,25
104:18 105:2,11 110:2,
13,17 111:1

**market**
56:16

**marriage**

**55:1,10

**matter**
4:25

**Mclelland**
28:16,19,21 29:2

**meaning**
95:19 98:4

**means**
17:25 20:8 77:13

**meant**
53:8

**mediation**
84:11,18,25 128:6

**mediations**
85:3

**mediator**
84:15 128:8

**medical**
55:7

**meeting**
109:4,14

**member**
28:1 39:2,5,7,14,20
42:3 44:11 46:15,19
59:24 66:12 95:22
101:5 104:15 105:7

**members**
39:1 40:4,10 43:15

**membership**
40:5 42:6 43:7 44:23
115:6,9

**memo**
78:8

**mention**
57:19

**mentioned**
62:2 93:6 94:2 137:11

**mess**
94:17 136:19

**messy**
128:2

**met**
4:11 11:1 25:3

**mind**
41:8 61:4 92:10 95:22

**minds**
109:16,21

**mine**
43:23

**minute**
22:23 51:7 99:5 124:22

**minutes**
47:2,4 88:13,15,16
119:17 120:5,6,8,13
121:1 134:16,21,23
135:25 136:5 137:11,
15,19

**missing**
45:1 50:18

**misspoke**
115:9

**mistake**
99:8

**mistaken**
104:9 134:11

**MLS**
10:18

**mobile**
13:7,19 14:17,21 15:3
17:1,21 19:1,22 20:5,8
74:11 103:16,17

**modified**
65:17

**modify**
65:17

**moms**
113:12

**money**
12:12,18 13:4 15:16,25
17:3,18 23:14 25:13,16,
21 26:6,14 29:9,12,15
30:9,23 31:12,14,15,16,
19 32:5,8 38:17 42:4
49:23 50:2 53:16,19
54:17,24 56:13 72:4,10
73:7,10,21 74:3,23
95:8,13,18 97:16,25
98:8,12 101:13,21,25
103:1 105:22 106:11,12
107:25 112:10 113:2
114:4 117:14 122:10,12
123:6,19,22,24 128:12,
13

**monies**
123:7

**Monterey**
14:17

**month**
47:25 53:3 97:8 98:11
99:20

**monthly**
51:4 96:14,21 97:25

**months**
12:4 53:11 54:8 61:17,
22 62:25 66:23 97:6,13
129:7

**morning**
4:4,11 5:21 74:25

**motion**
82:11

**motivation**
117:20,22 118:20

**move**
20:11 87:13 126:13,18
127:5,6,13

**moved**
57:16 58:4 118:10
125:24 127:12

**moving**
53:13 60:6 126:3

**multiple**
10:16,20 13:10 24:11
82:14 118:23

**myriad**
30:21

**N**

**named**
93:10 95:6

**names**
78:4,10 111:19

**needed**
26:6 30:22,24 37:9
38:13 45:3 47:21 49:10
99:21,24 117:12,13

**negotiation**
54:11

**neighbor**
100:2

**Newport**
123:10

**Newton**
53:2

**Nickel**
10:13,22 11:1 12:6,10,
17 13:3,4 14:1 94:5,7,
12,14,22,23

**Nicole**
4:4 88:14 136:4 138:4

**nightmare**
71:20 72:1

**nodding**
138:5

**nonsense**
55:11 91:2 113:21
128:17

**normal**
6:18

**notarization**
19:11 63:22

**notarized**
70:2,7 71:9,17

**notarizing**
71:11,14

**notary**
70:8,23 71:5

**notations**
119:20 121:1,21

**note**
25:14 26:3,4,15,17,19,
20 37:20,21 38:2,6,7,9,
18 48:20,22 49:2,6,16
50:5,10,21,23 51:1
53:11 54:25 56:14,17
85:9 86:3,12,16,23 87:4
88:5,23 89:13 90:9,14,
16 104:3,11 105:5

**note's**
48:23

**notebooks**
12:22

**notice**
18:5,6,8,9 19:4,6,7,9
21:19,20 22:1,5 23:15,
16 58:1 63:6,12,20
78:15 125:17

**noticed**
76:4

**notified**
72:23

**November**
7:9,16 9:23 14:25 17:16
19:8,11,18,21 21:18
22:2,5,8 23:5,16,17,18
24:3,6 25:3 27:24 39:18
48:15 54:7 56:7,9 57:5
61:13 66:22 96:13 97:2
124:19 125:19 129:25
130:6

**nowadays**
129:8

**number**
15:9,10 34:9 61:23
89:25 93:6 94:18 99:6
102:18,20 126:21 129:6
130:23 131:1 132:17

**numbers**
70:17,18 76:11 77:4

**numerous**
107:22

**nuts**
126:16

**O**

**O'LAUGHLIN**
78:7

**Obisbo**
67:25

**obligation**
54:14 85:10,15,23 87:3

**obligor**
49:23

**obtained**
100:2

**occupying**
7:13 34:7

**occurred**
17:15 84:18

**October**
6:19,24 10:10 27:4
39:5,14,17,25 40:6
42:4,11,25 43:7,15
44:11 45:15,19 46:6,15,

22 47:12 101:24 113:16

**off-the-record**
42:1

**offered**
12:21

**offers**
53:14

**offhand**
109:9

**office**
7:6 8:19 67:25 68:1,21
74:17,18,22 78:9 127:8

**official**
105:24 136:11,13

**officially**
73:4

**older**
108:12

**one-hour**
136:1

**one-page**
77:20

**ongoing**
99:1

**online**
73:19,22 74:7 78:11

**open**
67:25 68:1,3,5

**opened**
11:18 53:10 66:20 80:7

**opening**
43:10

**operating**
113:6 119:13,17

**opportunity**
136:25

**opposed**
7:18 13:6 20:25 55:18
126:3 136:1

**Orange**
74:10

**order**
47:20 56:14 68:13
73:19,23,24 74:8,10,12
76:10 78:12 94:20

103:10

**ordered**
73:24

**ordinance**
54:21

**organization**
39:4 40:2

**organized**
39:23

**organizer**
40:18 42:14,22 46:12

**original**
18:13 19:19 45:6 62:12
63:3 68:6,8,9 75:5,13,
14,15,20,25 76:24
79:20 80:2 81:3 83:12
87:23 88:4 108:2 138:3,
7

**originally**
10:18 11:3 15:6 41:11
50:1 118:10 124:11

**outstanding**
132:25

**owed**
135:13

**owes**
49:23

**owned**
12:19 108:4

**owner**
6:25 7:22 9:24 10:20,24
18:25 19:1 20:20,23,24,
25 21:9,10,12,16 24:24
27:22 28:1,6 32:13,22
33:4 34:5,14,16 35:11,
19 37:7 42:19,22 44:25
45:18,22 46:4,7,10,13,
17 47:14 48:17 55:17
56:20 57:17,18 58:1,2,
12,13 59:20 60:1 62:1
64:16,18 69:5,15 83:21
84:2,3,4,10 93:19 96:4
98:22 100:24 106:17
108:3 111:9,15,16
112:16,18 113:3 117:6
118:1,8,18 119:5,21
120:16,18,24 123:25

**owner's**
58:6

**owners**
39:1 43:2 45:13,14
108:15,19,25 110:5
112:19 113:18 120:7,9
121:3,19 122:2

**ownership**
28:3 42:8,25 44:13,23
45:7,9,22 47:12 106:24
107:12,16 113:8 115:4,
21 117:4,24

**owning**
7:18

---

## P

**P-I-E-R-P-E-O-N**
40:20

**P-I-E-R-P-O-N-T**
40:22

**p.m.**
136:8 138:19

**pad**
41:9

**pages**
78:18 79:3,10 80:8
103:18

**paid**
15:13 16:9,13 17:5
31:8,9 52:12 53:19
54:4,12 58:4 68:21
73:10 74:3,6,7,18 89:21
90:8 95:23 96:3,18
97:21 98:8,12,19 99:10,
20 114:6,10 117:16
123:8,11,14

**panicking**
130:10

**paper**
65:9 69:3 75:3,5 76:19
79:25 80:10 93:1

**papers**
90:6 94:16

**paperwork**
42:15 73:17

**parcel**
93:20

**parents**
113:12

**park**
20:9 124:10,12 127:11,
20,24 128:7 129:9

**part**
8:3,7,16 49:20 58:15
59:11 79:3 113:22

**partial**
113:3 114:22 115:4
118:18 119:5,21 120:7,
8,15,18

**participate**
129:19

**participated**
84:11

**participating**
128:6

**parties**
57:5 112:4

**party**
20:22 21:12 23:6 36:4,
5,15,20 37:6 60:13,23
92:23,24,25 93:10 95:6
134:2

**passed**
8:8

**passthrough**
29:24

**patient**
96:7

**pause**
50:19

**pay**
8:1,3 14:1 15:16 26:17
29:9 31:11 42:4 47:25
54:5,8 68:18 72:10
73:8,15 83:12 96:4,21
97:14,20 103:10 113:2
114:17,20 115:3 117:17
123:24 124:3

**payable**
14:4

**payee**
103:21

**paying**
15:6 47:21 54:25 72:3
74:22 90:22 91:19
95:21 96:10 97:22,23

112:10

**payment**
31:9 51:4 52:9 54:3,6
73:18 83:13 90:17
96:25 104:5

**payments**
31:6 48:22,24 50:11
51:8,15 56:14 89:13
90:13 96:14 98:6 99:9,
16 100:11,23 101:22
105:14 106:5

**PDF**
70:22 77:15 78:18

**pending**
93:14 94:3

**people**
43:2 94:19 121:20
127:18 129:8,14 130:3
135:23 136:2

**percent**
28:6,15,18 40:5,9
42:10,11,24 45:22,25
46:3,17 47:14 50:7
106:17 107:16 113:16,
18 114:13,15 117:5
118:1 120:24 122:11,
15,20 123:2,3

**percentage**
43:24 44:8 107:19
114:3 117:4,24 127:4

**percentages**
106:25 134:14

**perfected**
34:21,22 35:13

**period**
47:14 57:21 58:25
98:13 100:16 124:19

**periodically**
98:12 100:14

**perks**
31:14

**permission**
125:16

**person**
5:16 12:1 21:8 37:11
41:18,19 96:18 118:4
126:21

**personal**
25:6 30:1 31:23 32:3
38:12 83:6 93:17 94:12
101:18,19

**personally**
50:3 56:23 58:20
133:19

**petition**
29:16 134:5

**pharmacy**
6:10

**phone**
31:10 126:21 129:5

**phonetic**
91:1,2 92:11 93:24
126:22

**physically**
79:16 118:11

**pick**
73:19 88:12

**picked**
74:1 78:16

**piece**
65:9 69:2 75:3,5 76:19
79:25 80:10

**Pierpont**
40:20 41:17 42:20 64:4,
6 66:6,12 67:20,22 76:6

**pink**
18:18 21:5,6 32:18 76:1

**Pinon**
53:2 125:21

**pissed**
109:17

**place**
95:25 102:7 127:25
129:12

**plaintiff**
4:13 93:11

**pledging**
26:16 27:1

**plural**
85:3

**point**
7:20 10:6 23:4 32:14,21
42:17 43:21 44:14

56:18 98:21 107:10,17
109:11 120:23

**policies**
21:4

**policy**
72:14,15

**poor**
94:19

**pops**
24:6

**portal**
78:12

**position**
85:22

**possibly**
60:3 74:16

**potential**
12:7 57:13 128:23
129:8,20

**potentially**
7:2,4

**precise**
44:22

**preference**
138:4

**preliminary**
12:20

**premium**
122:22

**present**
28:4 45:15 46:22 47:13
56:10 57:16 128:25

**Pretty**
98:3

**previous**
12:7 107:8

**previously**
30:25 39:16

**price**
11:9,11 15:5

**prices**
128:3

**principle**
48:21,24 50:12,13 51:8

**print**
65:11 77:2

**printed**
99:3,4

**printing**
71:2

**prior**
6:13,18 11:7

**private**
26:1

**privy**
127:10

**pro**
107:15

**problem**
57:3 85:6 95:15 128:24
130:2

**problems**
93:4 124:15

**procedurally**
18:15

**proceed**
4:8 5:21

**proceeding**
4:14

**proceedings**
138:19

**proceeds**
15:20 16:1,12 17:2

**process**
10:16

**processed**
62:25 76:5 81:18
105:17,23 106:8

**processes**
75:25

**processing**
75:17

**promise**
123:18

**promissory**
25:14 26:3,4,15,17,19,
20 38:7 48:20 85:9
86:23 88:5

**prompted**
84:9

**proper**
125:13

**property**
6:25 7:14,20,22 8:19
9:2 10:7,14 11:11,13,
14,19,21 13:25 16:24,
25 20:2 23:22 24:2 25:6
26:16 37:15 53:2 54:9,
17 57:10 58:19 60:18
61:9 89:9,12 93:19
125:24 126:3,6 129:2

**protect**
53:18 54:17 55:21
118:11

**protected**
54:23

**protecting**
60:17

**protection**
58:14 59:16 60:25

**protects**
58:20

**provide**
50:10 59:15 69:24
83:11 136:14

**provided**
12:20 66:1 69:17 70:8

**providing**
58:13 60:25

**public**
53:15 63:6,12,20

**pull**
20:10 44:24

**pulled**
102:4,5

**purchase**
7:20 14:16,20 15:5
16:25 24:19 27:5 32:19
33:8 38:17 39:19 53:9
128:7 129:3,12 138:8

**purchased**
7:9 23:13 25:10 39:16
89:4

**purchaser**
18:10 22:6 126:4,5

**purchasing**
39:6 60:11

**purpose**
27:23 38:16 51:24 52:1,
6,7,14,19 55:3,8,22
56:15 58:22,24 78:5
83:19 86:5 98:9 117:19

**purposes**
31:13 53:4 54:15 79:11

**pursuant**
4:7 90:14

**pursuing**
59:5

**put**
7:8 10:15 21:15 24:23
58:19 63:23 66:25 67:5
68:14 70:17 75:16 78:4,
10 84:16 85:22 98:4
107:20 109:16 110:4
111:11,24 113:9 119:9
128:15 130:4

**puts**
69:12 127:3

**putting**
54:15,16 55:1 58:12,14
59:8 60:16 101:13
123:25

---

**Q**

**qualification**
124:17

**qualify**
129:9,16

**quarter**
106:12

**question**
5:9,11,13,14,18 6:2
8:14,15 12:15 19:14
21:1 31:25 32:2,7 44:7
45:6 50:17 57:15,20,24
66:24 69:17 70:3 76:15
91:13,18 100:19 106:3
116:3 129:18 131:16
137:3

**questions**
5:16,17 102:6 107:6
136:9 138:15

**quick**
50:16 69:6,7

**quickly**
52:25

---

**R**

**R-D-R-M-H-E**
103:13

**ramifications**
31:22 58:16 86:19,22
87:1,18 92:15

**ran**
27:16 125:16

**Rancho**
103:15 105:14

**Randall**
10:13

**Randy**
94:5,7

**rate**
50:5,9

**re-issuance**
32:12

**re-read**
49:2,6

**re-reading**
21:2

**re-sign**
22:1

**re-signed**
19:9

**read**
49:11 71:2 84:23
136:21

**readily**
10:5

**reading**
59:24 103:11

**reads**
104:15

**ready**
74:13

**real**
13:25 23:22 25:6 50:16
93:4

**realistically**
89:24

**realize**
55:9 72:10 75:24

**realized**
36:6

**realtime**
49:6 99:13 136:12

**reason**
5:20 21:25 27:12 37:2
48:8 59:5 61:14 86:7
99:25 105:18 117:5
118:1

**reasons**
24:25 29:7 36:25 49:2
53:18,22 128:5

**Rebecca**
78:6

**recall**
16:20 17:19 39:9,11,12
40:8 48:15 50:14,15,20,
24 51:11,12 62:22,25
63:3,5 64:12 84:18
89:14 115:23

**receipt**
9:25 12:11,23 26:14,15
101:8

**receive**
9:3

**received**
8:9 14:22,23,24 28:9
56:20 67:8,12 83:7
84:13

**receiving**
8:1,12

**recess**
5:23 47:7 88:18 136:8

**recipient**
38:1

**recognize**
60:8

**recollection**
51:3 64:15

**recommended**
107:3

**reconsider**

128:17

**reconvene**
47:3

**record**
4:12 5:11 22:15 47:8
78:20 84:7 95:2 131:19
132:13 133:17 137:16
138:12,18

**recorded**
9:9,12 10:2 62:20 63:19
129:23

**recorder**
9:10

**recorder's**
7:6

**recording**
63:11

**recordings**
12:12 63:10

**records**
119:18 121:2,18 122:1

**redone**
52:4

**reducing**
113:7

**refer**
34:19 93:5 109:25
127:19

**reference**
58:25 79:11

**referenced**
25:17 43:19 116:22

**referencing**
86:15

**referral**
11:24

**referred**
52:21 79:23

**referring**
13:18,21 19:25 22:24
23:2 48:14 76:8 85:5
88:5 104:5 109:22
115:18,21,22 116:15,22
132:18

**reflect**
43:10 44:13 62:13,15

64:17 108:25 121:19
122:1

**reflected**
29:25 34:13,23 35:11,
24 40:3 64:15 67:18
83:20,24 111:15 133:7,
9,23 134:15

**reflecting**
33:21 40:10 44:9,18
45:9,10 108:19 111:8
119:20 120:15 121:2

**reflects**
64:3,6 69:5

**refrain**
5:17

**refused**
100:4

**regard**
138:15

**register**
21:7

**registered**
18:25 19:1,20 20:22,23
21:16 22:12 24:23
25:12 27:22 32:13 33:4
34:5,14 55:17 57:17
58:12 59:19 60:1 62:1
64:16,18 69:15 84:3,10
100:24 111:8,15

**registration**
69:1,2,3 106:7 128:16

**regular**
48:24

**reissue**
63:15 72:24

**reissued**
18:25 20:19,20 72:18

**related**
8:5 90:24 91:20,23 92:2

**relation**
40:13

**relationship**
107:21

**relationships**
43:16 113:20

**release**

72:20 87:3 101:5

**released**
69:13,14 71:15 87:6
98:18

**releasing**
87:18

**relevant**
34:19

**relief**
97:16 106:12

**relieved**
54:13

**remain**
48:9 126:3

**remained**
33:4

**remains**
83:23

**remember**
12:1,2 16:18,21,23
20:14 23:18,20 24:13
28:10 36:18 43:1 47:23
48:4,7,8 50:17 51:22
64:23 75:12 76:3 84:19
121:24 128:21 134:12

**reminders**
5:6,7

**remove**
46:7

**removed**
34:8 36:8,11 86:1

**removing**
45:17

**rent**
52:18,19 53:20 54:4
57:10 85:14 95:21,23,
25 96:3,10,15,18,20,21,
23 97:20 98:12,16,25
99:9,16 100:14 101:7
106:11

**rental**
52:17,21 55:20 56:15
58:19 60:4 87:14

**rented**
53:1 56:20 60:3

**renter**

**renters**
55:21 56:24 57:12,13

**renting**
7:18 56:15 57:5

**rents**
128:4

**repay**
85:11,23 86:12 87:4
89:14 114:2,4 116:4,16
123:18

**repayment**
27:1

**repeat**
57:7 62:10

**repeating**
135:11

**rephrase**
11:23

**replacement**
132:16

**replenishing**
85:13

**report**
12:20

**reported**
4:6 33:1

**reporter**
4:4,5 5:7 13:11 17:6
24:12 28:23 40:21
41:24 46:24 47:2 50:16
71:21 76:18 82:15 88:9,
13,15 91:5 100:19
106:2,6 118:24 135:21
136:5,11,23 138:1,15

**represent**
127:23

**represented**
11:12

**reprint**
88:25

**Republic**
11:24 12:21

**request**
63:14 72:17

**requested**
22:1

**required**
74:23

**residency**
59:21

**resident**
59:20

**residing**
56:5

**respect**
86:16 123:23

**responded**
10:23,25

**response**
11:2 81:2 125:6

**responsibility**
98:25

**result**
37:25

**resulted**
33:7 60:23 68:15 73:5

**resume**
88:12,17

**retain**
10:15 138:7

**retired**
128:24

**retirement**
52:11

**return**
44:10 113:10 137:1

**returns**
29:20 30:1 43:10,19,21
107:20

**rewrite**
86:3

**Rey**
103:15 105:14

**Richard**
126:22

**ridiculous**
127:14

**rights**

37:22

**Riverside**
68:1

**Ron**
40:16 41:6,19 55:1 64:4
67:19,21 68:18 76:5
109:17 111:5,11
112:22,23 113:25 114:5
116:16 118:5 119:24,25
121:2,25 122:9 123:6,7,
18 124:14,15 130:5
134:10

**Ron's**
40:19 41:4,8

**room**
84:15

**rough**
113:11

**roughly**
97:8 114:11

**running**
99:24 100:4 132:23

**runs**
107:25

**Ryan**
15:3 16:13 17:20 19:9
20:20 21:18,21 22:1,17,
19,25 23:8 25:4 32:13,
25 33:21 55:24 59:5,17
60:9 66:21 126:25

**Ryan's**
57:23

**S**

**Sacramento**
68:7,25 75:9,10,24
81:18 106:8

**sale**
10:19,23 11:9,19,21
12:5,10,17 13:16 22:7
23:14 24:18 32:25
33:21 61:13 129:19

**sales**
15:20 16:1 17:2

**San**
67:25

**sandcastle**
17:4,9,13,18 19:3,5,21
20:21 21:15 22:13
24:24 25:12,13,20,23
26:2,8,13,19,25 27:3,
22,25 28:8,13,17 29:6,
10,13,15,20 30:17 31:8,
19 32:13,25 33:3,22
34:13,21 36:25 37:14
41:7,9 49:23 51:16
54:16 56:13 57:17
59:19,25 60:1,8 61:25
64:15,17 69:11,14,18
78:3,14 84:2,9 85:10,
22,24 86:1,11 87:3
88:21,22 89:5,8,11,21
90:8,21 91:19 92:23
93:10 94:2 95:5,21
96:3,10,14 97:21 98:2,
6,17,20 100:12,22
102:10,22 103:1
104:21,23 105:7,13,19,
24 106:3,10 110:7
124:9,11,25 125:4,11

**Sandcastle's**
31:15,16 32:8,9 95:20
98:13 99:2,6,19

**Sandra**
7:5 92:13,14

**Sandy**
113:21

**Santa**
14:8,13 15:18,22 17:17
22:8

**satisfied**
85:15

**savings**
52:10

**scanned**
75:11

**scared**
118:12

**schedule**
112:17 113:15 120:24
121:4,5,7

**schedules**
106:21,23 107:11 108:2
112:16 117:3,23

**school**
6:5

**screen**
62:8 70:13,14 76:20
77:23 136:20

**scroll**
109:10

**scrolled**
83:9

**scrolling**
71:9

**search**
27:14,16 67:17 68:23
76:5 105:19 106:9
131:17 132:23

**searches**
67:16

**secret**
61:8

**Secretary**
44:12 47:17,18,22
108:19

**section**
71:14,15 110:20

**secure**
27:1

**secured**
21:12 25:14 27:13 36:4,
5,15,20,25 37:6 38:2,7
62:7 112:3 133:4,7,20,
23 134:1 135:3

**secures**
135:18

**security**
25:14 26:8,10,15,25
37:22 38:6 86:23 88:5

**seek**
86:15

**sell**
10:6 58:2,3 61:9 126:6,
10 127:16 128:2

**seller**
15:3 18:18

**selling**
10:14 11:16

**send**
21:22 75:9 100:4
137:24,25

**sender**
104:22

**sense**
58:7 67:4 85:10 86:20
87:10 89:24 98:10 99:4

**sentence**
19:16 135:2

**separate**
16:3 66:11,12 94:3
95:23 98:25 132:24

**separately**
85:4

**September**
112:17 124:23 130:6,7

**series**
16:16

**service**
10:16 56:14,17

**set**
50:1 51:24 57:9 89:19
97:19,20 121:18

**sets**
106:21 107:11 117:2

**setting**
52:10 53:4

**settlement**
84:12

**seventh**
122:4

**share**
70:15

**shared**
25:4

**shocked**
61:20,21

**shoes**
38:14

**short-term**
54:20,22 60:4

**Shorthand**
4:5

**show**
71:11 104:22 106:10
117:13 133:3

**showed**
121:4

**showing**
18:25

**shown**
64:24 132:21

**shows**
76:19 105:19 110:19
121:5

**sign**
8:19 53:23 78:3 137:1

**signatory**
28:16

**signature**
19:11 28:13,20 29:5
70:2 71:12 105:5,8

**signed**
13:2 17:16 22:5 26:7,
19,20 28:16,19 29:8
37:17 53:1,5,11 59:24
71:6 101:5 104:11,14
118:3

**signer**
37:16,17

**signing**
105:6

**signs**
18:18

**similar**
13:7,15 18:17 20:24
21:10

**simple**
96:7,8 116:3 129:21

**simultaneously**
13:10 24:11 82:14
118:23

**single**
78:18 80:14 99:20

**sites**
10:20

**situation**
68:6

**situations**
38:12 60:5

**skip**
104:20 105:4

**sleep**
118:13

**slip**
18:18 21:5,6 32:18

**slips**
76:1

**slow**
57:7

**smart**
70:14

**soft**
69:2

**SOI**
44:15 45:4

**sold**
16:10,24 53:18 58:4
60:20 117:16 127:25
129:2

**sole**
39:14

**Solely**
125:1

**solution**
128:11,15

**solutions**
128:6

**solve**
57:3

**somebody's**
116:1

**son**
120:19

**sons**
108:9 112:5,6

**sorts**
91:24

**sound**
69:7 102:9 103:14

**sounds**
51:6

**space**
14:17 20:2 23:21 96:5
103:17

**speak**
20:17 31:21 39:24

59:22 75:25 86:18 87:5
98:24 129:17

**speakers**
13:10 24:11 82:14
118:23

**Speaking**
6:24

**specific**
32:16 50:21 51:17

**specifically**
45:13 97:19

**spell**
28:21

**spelled**
41:24 71:2

**spellings**
138:16

**spend**
95:18

**spent**
30:5

**spoke**
78:8 127:9

**spreadsheets**
90:7

**squandered**
52:12

**stamp**
66:13,21,25 73:3 75:6,
17 76:20 81:16

**stamped**
66:22

**standing**
47:16,18 48:9 74:21

**stands**
34:25 43:14 90:9

**stapled**
79:16

**Star**
126:22,23

**staring**
82:20

**start**
5:8,13 7:13 56:5 106:12
120:12

**started**
9:23 34:7 55:11 65:25
66:2 73:3,4 93:7 99:25
101:25 130:5,7

**starting**
104:6 116:18

**starts**
120:24

**state**
23:1 34:20 44:13 47:17,
19,22 48:1 63:12 94:3
108:19 130:25

**stated**
50:22

**statement**
30:8 83:11 88:24 89:16
91:22 102:12 110:8
114:25 116:11,13
123:21 134:12

**statements**
102:5 116:22 117:7
118:3

**states**
49:3

**stating**
84:13

**status**
84:10

**stay**
53:21 82:17

**stemmed**
91:4

**stems**
90:25

**stenographically**
4:6

**step**
38:14

**Steven**
104:22 108:7,8,14,19
110:5 111:8,15 112:3,
10,24 120:7 121:2
130:13 133:5,6 134:7,
15,22 135:7

**Steven's**
111:19

**sticking**
45:13

**stop**
71:8,13 74:5 78:17 81:5
91:5 92:1

**stopped**
98:16 99:9

**store**
70:25 71:4

**straight**
100:9

**stranger**
95:24

**street**
91:8 95:24 123:10

**stuff**
91:12,25 130:8 137:14,
23

**sublessor**
61:10

**submission**
80:16

**submit**
69:12 73:17

**submits**
18:19

**submitted**
56:2 65:16 71:18 72:17
73:6 77:25 80:21
110:10 111:18,21
124:24

**submitter**
125:11

**subsequent**
39:3 120:8

**subsequently**
19:5 80:20 107:2
124:13

**subtenants**
54:24

**successfully**
111:19,20

**sued**
92:4 94:19

**suggest**

47:2

**sum**
98:3

**summarize**
12:25

**summer**
53:13

**Sunday**
123:13

**support**
55:2

**supportive**
61:5,11

**supposed**
41:8 44:17 67:20,21
89:19

**surrender**
18:4 24:2

**surrendered**
14:24 17:22,23,24,25
18:2,14 22:4 86:2 87:9

**survivorship**
110:6

**sworn**
4:2

**Sylvia**
82:18

---

**T**

**takes**
62:25 69:21

**taking**
67:16 75:23 136:1

**talk**
43:2 52:5 91:16 114:25
116:18 129:10 132:10

**talked**
52:8 109:4 112:22

**talking**
5:8,9 41:11 44:1 61:23
62:3 90:23 91:17 117:8
119:2 122:9 135:1,3

**tax**
29:20 30:1 43:10,19,21
44:9 48:1 71:19,22

72:21,24 73:5 74:10,12,
17,22 76:23 78:2,9,12
80:19,20 107:20 113:9

**taxes**
72:4

**technical**
5:22

**technician**
68:22

**telling**
17:14 48:3

**ten**
47:2 88:13,15,16
106:21 136:5

**ten-minute**
135:24

**tenancy**
7:15,17 127:7 129:4,9

**tenant**
9:24 95:20 96:17 98:9,
23 100:17 125:25 126:7

**tenants**
54:23 56:21 110:6
124:10 125:7 128:23
129:16

**tender**
105:13

**tendered**
104:23

**tendering**
100:22

**term**
51:3 53:3 55:6

**terminated**
132:14

**terms**
49:16 50:21 51:25
131:18

**testified**
4:3 25:19 45:2 106:15
107:21 109:3 112:23

**testifying**
47:12

**testimony**
122:19 135:12 136:23

**thankful**
115:25 116:1

**thing**
18:1 19:25 34:21 35:8
38:22 52:4 58:6 82:25
87:12 93:8 94:16 97:22
100:21 108:13 114:2,15
120:11 126:9 130:11

**things**
20:8 30:21 37:13 43:3,
17 53:14 55:11 57:21
58:24 59:6,18 83:7 86:9
89:8 90:16 91:10 93:13
94:20 100:6 113:13
118:2 121:16 123:24
124:8 132:24 138:5

**thinking**
57:10 61:19 88:12
102:5 108:15 117:5,25
118:8,9

**thought**
35:7 41:7 45:8 59:15
60:21 65:13 74:6 75:23
94:21 104:8 112:1
113:8 126:16 128:8
133:12,16,19

**thoughts**
61:14

**three-year**
52:16,21 53:1,3,5,23
54:14,18 55:25 56:4
60:2

**time**
5:10,24 6:24 9:16 10:12
13:3 14:16 17:19 21:3,4
22:20,22 24:6,13,23
27:11,25 28:23 32:21,
25 34:17,18 35:19
36:14 37:8 38:13 39:2,
6,19 40:4 43:12,21
44:14,18 45:10,11,19
46:25 59:21 60:11
62:23 63:17 68:24 70:4
72:9 73:25 74:2,15,16
79:19 80:6 82:16 88:12
98:14 107:17 112:20
113:11,19 114:1 115:23
120:23 124:19 127:19
132:25 133:13 136:21

**timeframe**
133:21

**times**
4:12,17 45:14 47:13
51:11 106:16 124:14
126:11

**timing**
65:21

**tiny**
65:11 77:2

**title**
9:7,8 12:19,20,21 13:2
14:25 17:20,24 18:2,5
21:13 22:4 23:10 24:23
32:10,14,18,24 33:9
34:6,13,19,24 35:4,8,
12,20,25 48:18 54:15
55:17 57:11 60:16,25
61:24 62:12,14,22,24
63:15,21 64:1,5,9 65:2,
17,18 66:14 67:16,17
68:16,23 69:4,22 71:6
72:3,17,24 75:20 76:4,
22,25 77:17 78:23 81:3
83:20,23,25 86:2 87:6,
18 88:20 89:8,11 92:17
98:17 101:6 105:15,17,
19,23 106:9 109:14
111:7,14 132:20

**today**
5:16 74:16 102:5 137:3,
10

**told**
8:4,15 41:6,19 42:10
43:25 47:19 48:11 68:5
84:15 107:2 112:13
126:13,19,20,23 127:8
128:19,20

**tons**
66:1

**top**
78:23 102:22 115:1
116:19 119:2 130:3,4
132:10

**Torrance**
69:5

**total**
99:24

**totalling**
16:16

**touched**
59:19

**traditional**
11:18 12:13

**traditionally**
31:6 138:1

**transaction**
37:25 66:2 89:3

**transactions**
89:3,7

**transcribed**
136:23

**transcript**
49:6 84:22,24 90:12
128:22 136:12,13,22
138:3

**transfer**
13:2 18:9 19:4,9 21:19
23:16 29:9 65:15,16,19
84:10 98:1 105:15,23

**transferred**
17:20,25 30:3 88:20,21
89:11 92:13 98:17

**transferring**
98:12

**transparent**
61:4

**treat**
96:20 98:10

**triggered**
8:11,16

**true**
60:12 61:15 106:23
113:10 126:1

**Trulia**
10:21

**trust**
7:10,11 8:19 37:13
92:13,15

**trustee**
119:14 137:13,14

**turn**
87:13

**turned**
66:21

**type**
74:11 136:11

**typed**
105:5

**types**
10:21 43:3

**typo**
63:22

---

## U

**UC-5**
133:16

**UCC**
34:22 36:5 62:2,13
63:6,11 109:18 111:17
130:25 131:17 132:23
134:11,20 135:15,17

**UCC1**
35:23 36:2 115:21
116:9 135:4

**UCC1S**
129:23 133:3

**UCC5S**
130:16

**UCCS**
63:19 111:11 112:2
130:11,14 134:15

**UD**
97:1

**uh-huh**
41:14 69:10 72:19 75:4
77:16 78:24 79:12
80:17 89:10 90:24
102:15 103:20 106:22
137:12

**ultimately**
24:19 53:25 71:18

**unavailable**
112:6

**unclear**
130:10

**underneath**
77:3,5 102:23

**understand**
13:1 20:12 21:1 23:24
32:19,23 58:23 65:20,
21 76:7 81:25 83:2
99:12 101:1 112:12,15
117:20,21 118:20

119:3,16 122:17

**understanding**
9:20 31:23 40:24 46:9

**Understood**
11:17

**unencumbered**
12:20 60:21

**Uniform**
35:13

**uninhabitable**
127:6

**union**
21:11

**unit**
7:1,24 96:19

**United**
98:5 101:24 128:4

**unknown**
42:11,24 45:23

**unpack**
22:14 43:18

**updated**
44:16 45:5

**UPS**
70:25 71:4

**upside**
55:5

**utilities**
31:5 54:8

**utility**
54:13

---

## V

**variety**
49:1

**varying**
107:11 117:3,24

**vehicle**
20:24 21:11

**vehicle's**
18:18

**versus**
94:7,23

**view**
60:24

**vis-a-vis**
59:17

**VISA**
73:16 74:18

---

## W

**wait**
50:17 68:8 76:3 99:5
102:4 124:22 135:6

**waiting**
74:15

**Walgreens**
6:10,11,14

**wanted**
44:22 49:13 52:25
54:22,24 56:4 76:11
109:15,17 113:14,22
116:3 118:19 119:3
120:21 127:12 128:12

**waste**
127:19

**week**
69:8

**weeks**
66:3 69:8

**wet**
79:22 80:3

**whatever's**
107:4

**wheels**
20:11

**white**
69:2 109:7,20 111:23

**whited**
19:8 111:24

**wife**
8:6,22 10:25 11:3,5

**withdraw**
29:9

**WJC**
33:17

**woman**
114:8

**word**
7:3 17:9 18:1 49:14
63:2 77:3,5 131:9

**words**
17:9 127:7 128:21

**work**
77:9 82:20 83:5 89:20
127:10 136:4

**workday**
68:10,11

**worked**
6:11,15,20 101:24

**working**
11:24 12:1,3 121:16

**works**
18:21 87:13 136:1

**worms**
43:11

**worry**
107:7

**writ**
21:20,24 22:2,16 23:2,
3,13,15,17,19,20 24:5

**write**
103:3

**writing**
28:13 48:21 103:11
119:9 130:2

**written**
123:17

**wrong**
36:23 128:9

**wrongfully**
128:23

**wrote**
127:24

---

Y

**year**
9:14 44:2,4,9 48:1
63:24 72:4 73:8 100:16
112:13 131:11 135:12

**years**
5:5 11:13 28:11 30:20
43:3 49:12 51:1,12,14
52:1,8 72:13 74:1 96:8

97:3,5 121:22 134:17
135:12

**yes/no**
137:2

**yesterday**
70:17

**you-know-what**
58:7

---

Z

**Zillow**
10:20,21 11:4

**Zoom**
84:15

# EXHIBIT 71

SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF ORANGE-CENTRAL JUSTICE CENTER


RANDALL NICKEL, an individual, )
                               )
          Plaintiff,           )
                               )
             -vs-              )
                               )Case No.
THE HUNTINGTON BEACH GABLES    )30-2020-01163055
HOMEOWNERS ASSOCIATION, a      )CU-OR-CJC
California corporation; et al.,)
                               )
          Defendants.          )
_____)
THE HUNTINGTON BEACH GABLES    )
HOMEOWNERS ASSOCIATION, a      )
California nonprofit mutual     )
benefit corporation'           )
                               )
          Cross-Complaint.     )
_____)



DEPOSITION OF JAMIE GALLIAN, VOLUME I

Taken on Tuesday, April 20, 2021, at 10:32 A.M.






REPORTED BY:

AMY M. LEMACKS

CSR NO. 13425


1

**Gallian, Jamie**
**Nickel v. The Huntington Beach Gables HOA**

1           SUPERIOR COURT OF THE STATE OF CALIFORNIA

2        FOR THE COUNTY OF ORANGE-CENTRAL JUSTICE CENTER

3

4   RANDALL NICKEL, an individual, )
                                   )
5           Plaintiff,             )
                                   )
6             -vs-                 )
                                   )Case No.
7   THE HUNTINGTON BEACH GABLES    )30-2020-01163055
    HOMEOWNERS ASSOCIATION, a      )CU-OR-CJC
8   California corporation; et al.,)
                                   )
9           Defendants.            )
    _____    )
10  THE HUNTINGTON BEACH GABLES    )
    HOMEOWNERS ASSOCIATION, a      )
11  California nonprofit mutual    )
    benefit corporation'           )
12                                 )
            Cross-Complaint.       )
13  _____    )

14

15

16

17

18

19

20

21        Deposition of JAMIE GALLIAN, taken on behalf of

22   the Cross-Complainant, at 10:32, Tuesday,

23   April 20, 2021, before Amy M. Lemacks, CSR #13425, as

24   a Certified Shorthand Reporter within and for the

25   County of Los Angeles, State of California, via Zoom.

**Jilio-Ryan Court Reporters**
**ph. 714.424.9902  info@jilioryan.com**
JASSO DECL. PAGES - 1484

```
 1    APPEARANCES

 2    For the Plaintiff/Cross-Defendant RANDALL NICKEL:

 3         THE MELLOR LAW FIRM
           BY:   Mark A. Mellor, Esq.
 4         6800 Indiana Avenue, Suite 220
           Riverside, California 92506
 5         (951) 221-4744
           mmellor@mellorlawfirm.com
 6
      For the Defendants/Cross-Complainants THE HUNTINGTON
 7    BEACH GABLES HOMEOWNERS ASSOCIATION; JANINE JASSO;
      LEE GRAGNANO; TED PHILLIPS; LINDY BECK; JENNIFER
 8    PAULLIN; LORI BURRETT; NATIONWIDE RECONVEYANCE, LLC;
      SUPERIOR DEFAULT SERVICES INC.:
 9
           FELDSOTT & LEE, APC
10         BY:   Stanley Feldsott, Esq.
                 Michael Poole
11         23161 Mill Creek Drive, Suite 300
           Laguna Hills, California 92653
12         (949) 729-8002
           feldsott@gmail.com
13
14    For RANCHO BERNARDO dba ELITE COMMUNITY MANAGEMENT:

15         GORDON, REES, SCULLY MANSUKHANI
           BY:   Audette Paul Morales, Esq.
16         5 Park Plaza, Suite 1100
           Irvine, California 92614
17         (949) 255-6950
           amorales@grsm.com
18
      In Pro Per:
19
           Jamie L. Gallian
20         16222 Monterey Lane, #376
           Huntington Beach, California 92649
21         jamiegallian@gmail.com

22

23

24

25
```

```
1                           INDEX
2    Examination                                      Page
3    Mr. Feldsott                                       5
4
5
6
7                          EXHIBITS
8    Number              Description              Page
9                     (None offered.)
10
11
12
13                  MARKED BY COUNSEL
14                  Page        Line
15                  16          7
16                  52          9
17
18
19
20
21
22
23
24
25
```

```
 1                    Tuesday, April 20, 2021

 2                         oo0oo

 3                    JAMIE GALLIAN,

 4     was called as a witness, and having been first duly

 5       sworn by the Certified Shorthand Reporter, was

 6              examined and testified as follows:

 7

 8                       EXAMINATION

 9    BY MR. FELDSOTT:

10        Q    Okay.  Would you state your full name for

11    the record.

12        A    Jamie Lynn Gallian.

13        Q    Okay.  Ms. Gallian, if you will wait till I

14    finish my question until you answer the question,

15    we'll have a much cleaner record and not interrupt

16    me.  So we've already broken two of those rules with

17    swearing you in.

18             Okay.  Where do you currently reside?

19        A    16222 Alder -- I'm sorry -- Monterey Lane,

20    Unit 376, Huntington Beach, California 92649.

21        Q    Is that next to Huntington Beach Gables?

22        A    Yes, it is.

23        Q    Okay.  This in sort of a mobile home park

24    there?

25        A    Yes, it is.
```

5

1      Q      Okay.  How long have you resided there?

2      A      Since November 1st, 2018.

3      Q      Did you previously own a unit at -- I'll

4    just, for brevity sake -- the Gables?

5      A      It's come to my attention recently that I'm

6    not sure if I received clear title.  So I'm going to

7    have to defer that answer until I've got a -- a First

8    American Title is looking into that.

9      Q      Well, putting aside the matter of record

10   titles, is it your understanding you have an

11   ownership interest in the -- the unit you owned at

12   the Gables?

13     A      At the time of this deposition, I do not

14   believe I had clear title.

15     Q      Okay.  What is the address of the unit that

16   you did own?  We'll just --

17     A      I've never owned -- if I did not have clear

18   title I never owned a property.  I -- I've been a

19   renter.

20     Q      Who were you renting from?

21     A      Sandra Bradley.

22     Q      And, to your knowledge, was there -- how

23   long had you been renting the unit from

24   Ms. Bradley?

25     A      I began my rental with Ms. Bradley

```
 1    November 23rd, 2019 -- 2009.

 2        Q    And you rented continuously from her

 3    until --

 4        A    Yes.

 5        Q    -- you moved to your mobile home?

 6        A    No.

 7        Q    All right.  Was there someone else you

 8    rented to or rented from?

 9        A    I moved from the Gables and rented a home in

10    Huntington Beach after I was battered by a board

11    member's husband.

12        Q    Okay.  And what was the address of the place

13    you moved to in Huntington Beach?

14        A    The street address was Pinion Drive in

15    Huntington Beach.  I believe it might have been

16    either 5702 or 5902, but it was Pinion Drive.  My

17    lease began there on September 11th, 2018.

18        Q    And then you moved from there to the

19    development right next to the Gables?

20        A    After -- yes, that's correct.  After I sold

21    my home, the day after I moved here.

22        Q    Okay.  What home did you sell?

23        A    Pardon me?

24        Q    What home did you sell?

25        A    The Alderport address.  You've already been
```

7

```
 1    informed that.

 2        Q     What was that address?

 3        A     4476 Alderport Drive.

 4        Q     Is that in the Gables?

 5        A     Yes.

 6        Q     So you lived at 4476.

 7              What was the address you were renting from

 8    Ms. Bradley?

 9        A     That's the address.  I just gave it to you.

10    4476 Alderport.

11        Q     And did you rent that unit from her

12    continuously --

13        A     Mr. Feldsott, you've asked the same question

14    three times.

15        Q     Well, I'm trying to get an answer.  If you

16    will not interrupt me --

17        A     One at a time.  Okay.  I've already

18    answered --

19        Q     There's no question pending right now.  If

20    you will wait till I ask the question --

21        A     Stop asking the same question over and over.

22    You've asked it three times.

23        Q     This is not your deposition.  You're here --

24        A     Okay.

25        Q     -- here to answer --
```

8

Gallian, Jamie
Nickel v. The Huntington Beach Gables HOA

```
 1      A    Yeah.  Then ask one question and then move
 2   on and stop asking it the same time.  If you're too
 3   senile then ask your assistant to do it.
 4      Q    Okay.  I'll ask you, again:  4476 Alderport,
 5   is that the unit you were renting from Ms. Bradley?
 6      A    Yes.
 7      Q    And was there a written lease?
 8      A    Yes.
 9      Q    And did that lease terminate at some
10   point?
11      A    Not to my knowledge.
12      Q    So you still have a lease ownership in that
13   unit?
14      A    That's not what you asked me.
15      Q    That's what I'm asking you right now.
16      A    Well, if I didn't have clear title I don't
17   believe I have a leasehold interest.
18      Q    I'm not asking you if you have clear title.
19   I'm asking you if you had a leasehold interest.
20           Is that the same interest that you told me
21   about that you had with Ms. Bradley from 11/23/09
22   until, I believe the current -- or up until the time
23   you moved in November 2018?
24      A    That would be no.
25      Q    Okay.  When did the lease at Alderport
```

**Jilio-Ryan Court Reporters**
**ph. 714.424.9902  info@jilioryan.com**
JASSO DECL. PAGES - 1491

Gallian, Jamie
Nickel v. The Huntington Beach Gables HOA

```
 1   terminate?
 2       A    What lease?
 3       Q    It's my understanding you were leasing that
 4   from Ms. Bradley.
 5       A    We had a rental agreement.
 6       Q    Okay.  When did the rental agreement
 7   terminate?
 8       A    I haven't received a termination letter.
 9       Q    So, as far as you know, you're still renting
10   that unit?
11       A    I have not received a termination letter in
12   regards to the rental agreement that she and I
13   signed.
14       Q    I did not ask you if you received a
15   termination letter.
16            I'm asking you is it your belief that you're
17   still renting that unit from Ms. Bradley?
18       A    No.
19       Q    Okay.  When did you stop renting the unit
20   from Ms. Bradley?
21       A    Probably the day that -- I'm going to say
22   March 23, 2017, when I recorded what I thought was a
23   proper assignment.
24       Q    Okay.  Are you employed?
25       A    I'm on a leave of absence.
```

10

Gallian, Jamie
**Nickel v. The Huntington Beach Gables HOA**

1      Q    Okay.  A leave of absence from what?

2      A    From the battery that occurred on

3   August 5th, 2018, at the Gables.

4      Q    Okay.  Well, prior to your going on leave of

5   absence, were you working somewhere?

6      A    Yes.

7      Q    Where were you employed?

8      A    United Airlines Los Angeles.

9      Q    And what was your position?

10     A    Flight attendant.

11     Q    And how long had you been employed by

12  United?

13     A    Twenty-two years.

14     Q    Now, you indicated that you did not believe

15  you had or had conveyed clear title to your -- and

16  let's just call it the Alder property.  Would that be

17  confusing you to?

18     A    No.  That's fine.

19     Q    Okay.  What -- you entered into some

20  transaction with someone concerning the Alder

21  property and it's title; is that true?

22     A    Yes.

23     Q    And I think you've told us that you don't

24  believe you had clear title or that there was some

25  things against the title?

**Jilio-Ryan Court Reporters**
**ph. 714.424.9902  info@jilioryan.com**
JASSO DECL. PAGES - 1493

Gallian, Jamie
**Nickel v. The Huntington Beach Gables HOA**

```
 1        A     That's not what I said, but I will restate
 2   what I said if you need me to.
 3        Q     Yes, please.
 4        A     Recently after this -- this deposition was
 5   set, I have discovered documents that were
 6   transferred or -- or were -- let's see.  How do I say
 7   it?  They were intervened maybe.  Intercepted would
 8   probably by a really good word.  Intercepted in 2010
 9   and another party filed a grant deed on that unit.
10        Q     And do you know who that other party, what
11   their name was?
12        A     Yes, I do.
13        Q     What is that?
14        A     Houser brothers.
15        Q     Pardon?
16        A     Houser brothers.
17        Q     And how was it, if you know, that it came
18   that they intercepted some documents and got a grant
19   deed to your property?
20        A     How do I know that?
21        Q     Yeah.
22        A     First American Title.
23        Q     Had you sold your property to them?
24        A     No.  I had nothing to do with it.
25        Q     Have you --
```

12

1      A    I just found this out, this information out

2  within the last few days.

3      **Q    Oh, okay.  Have you reported it to the**

4  **police?**

5      A    I haven't done anything yet, Mr. Feldsott.

6  I'm still investigate -- this is still

7  being investigated through the title company and

8  myself.

9      **Q    Okay.  Houser brothers, did -- do you have**

10  **any idea who they were?**

11      A    Yes.

12      **Q    Who?**

13      A    Houser brothers is the master leasor for the

14  individual Robert Warmington and Lorring Warmington.

15      **Q    Okay.  Alderport 4476 Co, LLC, is that an**

16  **LLC that you owned?**

17      A    It's a name that I had reserved.  It's never

18  been used or activated.  It's been dissolved.

19      **Q    And when was it dissolved?**

20      A    Probably about two months ago.

21      **Q    Okay.  Who is Steven Gallian?**

22      A    Those are my sons.

23      **Q    Okay.  Were there any assets in Alderport**

24  **4476?**

25      A    No.

13

```
 1              (Reporter clarification.)

 2    BY MR. FELDSOTT:

 3         Q    Jay Castle Co, LLC, what is the nature of

 4    that company?

 5         A    That's an LLC that I applied for.

 6         Q    And when did you apply for that?

 7         A    October 18th, 2018.

 8         Q    Okay.  Is there any assets in that

 9    company?

10         A    Yes.

11         Q    And what assets are in that company?

12         A    The personal property located at 16222

13    Monterey Lane, No. 376, APN 89165962.

14         Q    Okay.  What was your purpose of setting up

15    Jay Sand Castle Co?

16         A    I liked the name because it's been in our

17    family for quite a while.  A variation.

18         Q    What about Jay Pad?  Is that one of your

19    companies?

20         A    It's not mine solely.  There's several

21    owners.

22         Q    And what percentage do you own of Jay Pad?

23         A    Probably my portion now is 35 percent.

24    Maybe a little bit less.

25         Q    What's the business of Jay Pad?
```

14

1    A    Several things.  They have products.  They

2    distribute products.  They're in cleaning.  Let's

3    see.  What else?  They're, like, cleaning supplies

4    for car detailing.

5    **Q    So those would be the products they**

6    **supply?**

7    A    The products that they own and distribute,

8    yes.

9    **Q    Oh, okay.  And their business address, is it**

10   **still 2702 North Gaft Street?**

11   A    No.  It's my address.

12   **Q    And so you -- this Jay Pad works out of your**

13   **mobile home?**

14   A    Well, we haven't really been even starting

15   business because of Covid.

16   **Q    Okay.  When you say "we," who is the we?**

17   A    The other members of the Jay Pad.

18   **Q    And who are they?**

19   A    I don't have permission to disclose that.

20   **Q    Well, you're under a court order to --**

21   **essentially to answer questions.  If you have an**

22   **objection to the question you can interpose it but --**

23   A    Well --

24   **Q    -- you don't get to choose which one you**

25   **answer.**

1      A    Well, let's -- if we could just -- just --
2   I'm going to pass on that one.  You can make a note
3   that we can come back to that one.  I'll see if I can
4   text somebody, but we can stick with questions that
5   are relative to Mr. Nickel's case.
6           MR. FELDSOTT:  Well, thank you.  Right now
7   we'll list it as a refusal to answer the question and
8   when we continue this session you can then answer it
9   or not.
10          MR. MELLOR:  Can I ask a question?
11  Mr. Nickel is not a member of J Pad, LLC; correct,
12  ma'am?
13          THE WITNESS:  No, he is not.
14          MR. MELLOR:  Thank you.
15          MR. MELLOR:  He has never been a member of
16  Jay Pad, LLC; correct?
17          THE WITNESS:  No.  No Jay Pad was formed in
18  February of 2018 and he is not a member.  Mr. Nickel
19  is not a member, has nothing to do with Jay Pad.
20          MR. MELLOR:  Thank you.
21  BY MR. FELDSOTT:
22      Q    Okay.  When did you first meet
23  Mr. Nickels?
24      A    October 30th, 2018.
25      Q    And what were the circumstances of the two

1   of you meeting?

2      A   I received a message on Zillow.  I believe

3   it was his wife that sent a message with their phone

4   number, that they were interested in the property and

5   left their phone number, and asked me to call back

6   and I did.

7      Q   Okay.  Let me -- have you had your

8   deposition taken before?

9      A   For about three hours with the HOA.

10      Q   Is that the only time?

11      A   Yes.

12      Q   Okay.  Let me -- usually I make some

13   preparatory remarks concerning a depo.  As the

14   reporter's already indicated to you -- well, for a

15   number of reasons we cannot both speak at the same

16   time, and we've kind of gone over we need to wait and

17   not talk over each other.

18         The reporter has administered the oath to

19   you.  And although we're meeting here somewhat

20   informally, your testimony carries with it the same

21   solemnity as if you were sitting in a courtroom right

22   now testifying before a judge or a jury.

23         Do you understand that?

24      A   Yes.

25      Q   Okay.  You understand your testimony is

17

1    under penalty of perjury?

2        A    Yes.

3        Q    Okay.  Have you taken any medication or

4    consumed any beverages in the last 24 hours that

5    would impact your ability to recall events?

6        A    I've had Covid-19, yes.

7        Q    And when did you have that?

8        A    Third week of December.

9        Q    And you believe that's still impacting your

10   ability to recall events?

11       A    Yes.  I'm going to the doctor today.

12       Q    Were you hospitalized?

13       A    No.

14       Q    Okay.  We're going to be speaking about

15   events that occurred several years ago.  No one

16   expects you to have total recall.  I am entitled to

17   your best recollection.  If you have an estimate I'm

18   entitled to that estimate.  I don't want you to

19   guess, however.

20           Do you understand the difference between a

21   guess and an estimate?

22       A    Yes.

23       Q    Okay.  At the conclusion of the oral portion

24   of these proceedings, you will receive a booklet --

25   we'll call it a transcript -- that contains all of

```
 1    the questions and answers, everything that was said

 2    on the record.  You'll have an opportunity to review

 3    that transcript, make any changes, additions, or

 4    deletions that you might like.

 5           Try as best you can to give the testimony

 6    you wish to have in the record.  If you do make any

 7    changes, deletions at the time of trial I'd have a

 8    right to comment upon those.  Now, if you correct a

 9    spelling error or punctuation, that's not likely to

10    elicit a comment from me, but if you change "never"

11    to "always" or "white" to "black," that is likely to

12    produce a comment from me.  So try as best you can to

13    give the testimony you wish to have.

14           This is not an endurance record.  If you

15    need a break just say so, and we'll try and

16    accommodate you.  I usually don't want to take a

17    break when we're in the middle of a question or I'm

18    waiting for an answer to a question.

19           If I ask you a question and you answer the

20    question it will be assumed that you understood what

21    the question was and that was the question to which

22    you were responding.

23           Do you understand that?

24    A     Yes.

25    Q     If I ask you a question and you don't
```

| | |
|---|---|
| 1 | understand it, tell me you don't understand.  Okay? |
| 2 | A    Yes. |
| 3 | Q    Okay.  So Ms. -- |
| 4 | A    I have -- I'd like to put a couple things on |
| 5 | record before we start here. |
| 6 | Q    No. |
| 7 | A    Yes. |
| 8 | Q    No, you don't get to -- |
| 9 | (Simultaneous speakers.) |
| 10 | THE WITNESS:  I will end it right now. |
| 11 | BY MR. FELDSOTT: |
| 12 | Q    That your -- |
| 13 | A    Okay -- |
| 14 | (Simultaneous speakers.) |
| 15 | BY MR. FELDSOTT: |
| 16 | Q    We will make a motion -- |
| 17 | A    -- statement.  I'm allowed to make a |
| 18 | statement. |
| 19 | Q    You're not allowed to make up the law. |
| 20 | A    Okay. |
| 21 | Q    Either answer my questions -- |
| 22 | (Simultaneous speakers.) |
| 23 | THE WITNESS:  I am involved in five |
| 24 | different cases with these people.  If you would like |
| 25 | the court case numbers I can reflect that.  That |

```
 1   there are certain privileged information and comments

 2   that I will not allow me to answer at this deponent.

 3   So if that comes up, I will give you the case number

 4   that it's relative to that I will not be able to

 5   answer the question.

 6          MR. FELDSOTT:  Okay.  Ms. Reporter, please

 7   strike all of that from the record.

 8          MR. POOLE:  You went off the record.

 9          (Off-the-record discussion.)

10          MR. FELDSOTT:  I'll strike all that.  Okay.

11   BY MR. FELDSOTT:

12      Q    So what are all these procedures and cases

13   you're involved in?

14      A    You know about them.  You criticize me every

15   day about it.  You send me a nasty email so why are

16   you asking me?

17      Q    I'm asking you --

18      A    That's why we have a protective order this

19   afternoon.  It's due at 3:00.  That's what we're

20   going to be discussing tomorrow.  And I have gotten

21   personal appearance to be able to go before that

22   judge personally.  It's not going to be video.

23      Q    My question to you --

24      A    You know what?  You want to be -- if you

25   want respect from me stop with your comments.  It's
```

```
 1    not relative --

 2        Q    I have --

 3             (Simultaneous speakers.)

 4    BY MR. FELDSOTT:

 5        Q    -- your responses referring that I was

 6    senile.

 7        A    You are passing -- you are passing nasty,

 8    inaccurate information through ten people in one

 9    email.  Stop it.  And I will now -- okay.  So you

10    know what --

11             (Simultaneous speakers.)

12             THE WITNESS:  -- let's make sure --

13    BY MR. FELDSOTT:

14        Q    You close your mouth and just respond to my

15    question.

16             (Simultaneous speakers.)

17             THE WITNESS:  All of you know no more email.

18    You send me now something in the mail.  You want an

19    answer, you send it in the mail.

20             MR. FELDSOTT:  Okay.  We're doing to

21    continue this -- I'm going to terminate this

22    deposition at this point.

23             THE WITNESS:  That's probably a good idea

24    because you owe me apology.

25             MR. FELDSOTT:  We will continue this at
```

22

```
 1    deposition.
 2              (Simultaneous speakers.)
 3              THE WITNESS:  -- nasty, nasty things that
 4    you said to me last night.
 5    BY MR. FELDSOTT:
 6         Q    I've never spoken to you before.
 7         A    You sent me an email and you said some
 8    really nasty, inappropriate things.
 9         Q    Oh, do tell us what those nasty things were.
10         A    So you know what?  Go ahead and tell your
11    colleagues.  Okay.  You're a liar --
12              (Simultaneous speakers.)
13              THE WITNESS:  If you have a question that
14    you want to ask me ask me.  No more harassing me.
15    You want to get through this let's get through it.
16    BY MR. FELDSOTT:
17         Q    We're only going to get through it --
18         A    You owe me an apology.
19         Q    It's obvious that you're not --
20         A    You owe me a an apology for the way that you
21    speak to me, the nasty emails that you send me.  So
22    ask me a question that's relevant to one cause of
23    action in a civil complaint.
24         Q    That is not the --
25         A    You're not --
```

```
 1              (Simultaneous speakers.)
 2              THE WITNESS:  -- not fishing expedition --
 3    okay? -- for the Housers or for Vivian Aldstead or
 4    for Janine Jasso.  This is not a fishing
 5    expedition.
 6    BY MR. FELDSOTT:
 7        Q    This is a question -- this is a deposition.
 8    I am entitled to ask you any question --
 9        A    No.
10        Q    Why don't you close your mouth because you
11    can't work your brain apparently when your mouth is
12    running?
13              The deposition entitles me to --
14              (Simultaneous speakers.)
15              THE WITNESS:  Are we on the record, court
16    reporter?
17              MR. FELDSOTT:  Yes.
18              THE REPORTER:  Yes.
19    BY MR. FELDSOTT:
20        Q    The question -- the deposition entitles me
21    to ask you any relevant question or question that
22    might lead to the discovery of relevant testimony.
23    So it will go a lot quicker if you save your comments
24    for the judge and just answer the questions.
25              This is the only case that I'm involved in
```

1    with my firm is with you; is that correct?

2            Ms. Gallian?  Did you hear my question?

3       A    Is this the only case?

4       Q    Yes.

5       A    I don't think so.

6       Q    Okay.  There's another collection case that

7    my office is handling with respect to you as with

8    the; is that true?

9       A    Why did you ask me the question then if you

10   already -- you made a statement that this was the

11   only case that you're involved in and you knew the

12   answer.  So why would you ask me that question?

13      Q    I don't owe you an explanation.

14      A    Then be honest.

15      Q    Your answer to the first question would have

16   been no.  Your answer --

17      A    That's not true.

18      Q    My question is there's a collection case

19   that our office is handling for you; correct?

20      A    Then ask a question, okay?

21      Q    I just did.  Is my office handling a

22   collection case fee with respect to you?

23      A    I don't know anything about a collection

24   case.

25      Q    Okay.  Is my office representing the

25

```
 1    association and a number of people in this matter;
 2    correct?
 3        A    What matter?  Be specific.  I've got five
 4    going on.
 5        Q    The case that you're here for today.
 6             Do you know what case you're here for today?
 7        A    Mr. Nickel's case.
 8        Q    Okay.
 9        A    Mr. Randy Nickels.
10        Q    Okay.  So you -- Mr. Nickels called you on
11    October 30th in response to an add you were running
12    on Zillow; is that correct?
13        A    That's not what I said.
14        Q    What did you say?
15             THE WITNESS:  Ms. Reporter, read it back do
16    him.
17             MR. FELDSOTT:  Do not read it back to him.
18             THE WITNESS:  Then ask a question or listen.
19    BY MR. FELDSOTT:
20        Q    I'm going to ask you again.
21             You testified you received a phone call on
22    October 30th from Mr. Nickels.  Do you wish to change
23    your testimony?
24        A    Ms. Recorder, read back what my answer was,
25    please.
```

26

1    Q    Are you refusing to answer the question?

2    A    I answered question.  You're just misstating

3    it.  You're misstating the answer.

4    Q    Okay.  As best you can recall, what did you

5    and Mr. Nickels discuss in your phone conversation?

6    A    I never spoke to Mr. Nickel.  I got an email

7    from Zillow.

8    Q    And what did the email say?

9    A    There was an inquiry into the house and left

10   a phone number.  I was in the hospital when I got the

11   message on my phone.

12   Q    Okay.  And did you call that number from the

13   hospital?

14   A    Yes.

15   Q    Okay.  I take it that had nothing to do with

16   Covid?

17   A    No, it was not.

18   Q    Okay.  So you got a call or an email from

19   Zillow and you made a phone call.

20        Who did you call?

21   A    I don't know who I called.  It was a phone

22   number.  I left a voicemail message and Mr. Nickels

23   called me back.

24   Q    Okay.  What did the voicemail message say?

25   A    I am the owner of this property -- the owner

1   listed this property on Zillow and I'm returning your

2   call.

3       Q    Okay.  And so then Mr. Nickels called --

4       A    Called back.

5       Q    -- and what did you and Mr. Nickels

6   discuss?

7       A    I told him that I was in the hospital.  He

8   asked me if I could make an appointment or he could

9   make an appointment with me to see the property.

10      Q    And what did you tell him?

11      A    I said yes.

12      Q    Okay.  Were you in the hospital as just a

13  day patient or were you in there for some period of

14  time prior --

15      A    I was there for three days.

16      Q    Okay.  And when were you released?

17      A    I don't remember the date.

18      Q    Well, were you still in the hospital when

19  you spoke to Mr. Nickels?

20      A    Yes.

21      Q    And was that on the same date you received

22  the email from Zillow?

23      A    No.

24      Q    Okay.  Did you know Mr. Nickels prior to the

25  time he called you?

```
1      A    No.

2      Q    Okay.  About how many days after your phone

3   conversation with Mr. Nickels did you agree to meet

4   him at the property?

5      A    Same day.

6      Q    Same day.  So the day you spoke to him was

7   the day you were being discharged?

8      A    No.

9      Q    Were you discharged from the hospital at the

10  time you spoke to him?

11     A    No.

12     Q    So even though you weren't discharged did

13  you leave against doctor's orders?

14     A    Yes.

15     Q    Were you there because of some mental

16  condition?

17     A    No.

18     Q    Okay.  Do you recall the date that you first

19  met Mr. Nickels?

20     A    The day that I showed him the house.

21     Q    Yeah.  What date was it?

22     A    October 30th, 2018.

23     Q    And I take it you and Mr. Nickels were

24  there.

25          Who else, if anyone, was present?
```

1    A    Ms. June, his wife.

2    Q    **Approximately how long did they stay**

3    **there?**

4    A    I don't recall.

5    Q    **No recollection at all?**

6    A    We were there.  I showed them the house.  I

7    don't know how long the period was, but he was there

8    with me and I was there.

9    Q    **Is it more than two hours?**

10    A    I don't recall.

11    Q    **Was it for than three hours?**

12    A    I don't recall.

13    Q    **Did he spend --**

14    A    It was a -- I don't remember if they -- if I

15    left and they stayed or they got there before I did.

16    I don't remember what -- if the question is how long

17    did I interact with him at the property -- the house

18    was not that big so maybe an hour, an hour and a

19    half.

20    Q    **Okay.  And Mr. Nickels and June Nickels were**

21    **present at this time?**

22    A    Yes.

23    Q    **Now, did you leave them in the house and go**

24    **or were you there during the entire period that they**

25    **were there at your house?**

```
1        A    I was with them when I showed them the

2   interior of the house.  I don't remember if they went

3   and looked at the grounds.  I don't remember that.  I

4   don't remember if they did or not or -- but I was

5   with them when I showed them the house and told them,

6   you know, as many details as I could.

7        Q    Okay.  Your testimony, as I understand it,

8   is you have no idea whether they spent any time

9   afterwards looking at the exterior of your house or

10  the development itself; is that correct?

11       A    Yes.

12       Q    Okay.  Had you previously been in escrow on

13  that house immediately before Mr. Nickels?

14       A    Not in escrow, per se.  In contact with two

15  other buyers and title company and their preferred

16  escrow company.

17       Q    Okay.  Well, being in escrow is kind of like

18  being pregnant.  Either you or you aren't.

19            Did you sign escrow instructions with

20  someone else before you met with Mr. Nickels?

21       A    Again, Mr. Feldsott, let me explain this to

22  you, okay?  A title company referred their particular

23  escrow company to me.  I called them.  There were

24  two -- three -- no.  There was probably four

25  purchasers that were contemplating a -- probably
```

1    around September, I guess.  September of 2018.  So

2    there was no formal -- if you're saying, you know, do

3    you deposit money into an escrow account, no.

4        **Q    Well, when you sell property you don't**

5    **generally deposit money into escrow.  You do sign**

6    **escrow instructions.**

7        A    I did sign some papers but I don't recall

8    what they were.

9        **Q    Okay.  Did you -- and this would have been**

10   **when?**

11       A    September 2018.

12       **Q    Okay.  These some papers that you signed, do**

13   **you recall what they were?**

14       A    No.  They came from the -- the escrow

15   company.  It might have been just general basic

16   questions.  You know, name address, phone number.

17   You know, if there was a lien on the house, you know,

18   a mortgage-holder type thing.  It was -- I believe it

19   was that type of -- type of comment or type of form.

20       **Q    Did you enter into a signed agreement to**

21   **sell your home to someone prior to whatever happened**

22   **between you and Mr. Nickels?**

23       A    Yes.

24       **Q    And who was that?**

25       A    That was the Genestras.

1      Q    And do you recall what the sales price

2  was?

3      A    410-.

4      Q    Pardon me.  410-?

5      A    410-.

6      Q    And were there real estate agents

7  involved?

8      A    N.

9      Q    Who contacted the title company?

10     A    I believe my testimony was is that I

11 contacted the title company that was referred to by

12 the previous real estate agent.  He had a

13 relationship with them.  So when he was no longer the

14 real estate agent I called to ask questions about the

15 procedure of getting a title report, making sure

16 that -- that I didn't have any liens on the property

17 that I was unaware of.  That's why I contacted them.

18     Q    Okay.  What was the name of this real estate

19 agent?

20     A    Last name is Perry, P-e-r-r-y.

21     Q    You remember his first name?

22     A    No.

23     Q    Was he with a real estate office?

24     A    I believe Star.

25     Q    Okay.  Had you --

```
1    A    It was -- he was only the agent for a couple
2  of weeks.
3    Q    Did you list the property for sale with
4  Star?
5    A    Yes.
6    Q    And when did you list it with Star?
7    A    I believe it was January or February of
8  2018.
9    Q    2000- --
10   A    '18.
11   Q    And other than this Mr. Perry, do you
12 remember anyone else that you may have dealt with at
13 Star?
14   A    Not at Star but I've dealt -- I had a couple
15 of other agents.  One of them comes to mind.  Her
16 name was Donna.  She sold other properties there in
17 the Gables.
18   Q    Did she come to you while the property was
19 listed with Star to discuss a buyer?
20   A    The property was only listed with Star for a
21 couple of weeks and then contract was terminated.
22   Q    And who terminated the contract?
23   A    It was a mutual termination.
24   Q    Okay.  Who initiated the termination?
25   A    It was a mutual termination.
```

**Jilio-Ryan Court Reporters**
ph. 714.424.9902 info@jilioryan.com
JASSO DECL. PAGES - 1516

1          Q      And what was the reason for this mutual

2     termination?

3          A      Conflict of interest.

4          Q      **Pardon?**

5          A      Conflict of interest.

6          Q      **And who had a conflict?**

7          A      The realtor.

8          Q      **And what was the nature of that conflict?**

9          A      His daughter and I were friends.

10         Q      **And so it's your testimony that because the**

11    **real estate agent's daughter and you were friends**

12    **that you mutually decided this was a conflict in**

13    **interest?**

14         A      Yes.

15         Q      **What's the daughter's name?**

16         A      Dana.

17         Q      **Does she have a last name?**

18         A      Perry.

19         Q      **Okay.  Do you know where she resides?**

20         A      No.

21         Q      **Okay.  So you terminate the listing with**

22    **Star after about two weeks.**

23                **You recall the termination date?**

24         A      No.

25         Q      **Okay.  Do you recall the month that you**

1    terminated?

2        A    Probably had to have been at the end of

3    February, beginning of -- beginning of March of 2018.

4        Q    Okay.  Did you then list the property with

5    someone else?

6        A    Yes.

7        Q    Who?

8        A    I listed it as a for-sale-by-owner on

9    multiple web companies; Zillow, realestate.com,

10    Trulia.  All of those types of companies.

11        Q    Okay.  What was the listing price at Star?

12        A    410.

13        Q    410-.

14            Then did you put it into multiple listing?

15        A    No.  I don't have a real estate license.

16        Q    Okay.  So what was the asking price on the

17    properties you did list it with, like Zillow -- and I

18    don't know -- Redfin or these other companies?

19        A    I believe it -- it started at -- I think

20    when I first decided to sell it it started at 451-.

21    Then it went down a little bit.  Then it -- I listed

22    it with Star at 410-, and then when I listed it

23    myself it seems like that I had it listed before

24    Mr. Nickels bought it at 399-.  And when I was in the

25    hospital that I had dropped the price by $20,000, is

```
 1    what I recall.  So the ending price was 379-.

 2        Q    Okay.  Do you -- when did you purchase the

 3    Alder property?

 4        A    I never purchased it.

 5        Q    When did you acquire possession of it?

 6        A    I've lived in it since November 23rd, 2009.

 7    If that's possession, that's the day I came.

 8        Q    Okay.  And it's your sworn testimony that

 9    you never purchased that property?

10        A    No, I did not.

11        Q    And I understand there are two leases

12    involved and one's a ground lease -- is that

13    correct? -- on the Alder property?

14        A    That's what I heard.

15        Q    You don't know?

16        A    Well, now I do, yes.

17        Q    You didn't at the time?

18        A    No.

19        Q    Okay.  That's because you were renting it

20    from Ms. Bradley?

21        A    That's true.

22        Q    Okay.  Did you -- at some point you stop

23    renting it from her; is that correct?

24        A    Yes.

25        Q    And that would have been prior to the time
```

1  **you listed it for sale with Star?**

2      A     No.  Her name remained on the house.  That

3  was one of the issues that Star brought to my

4  attention, is that her name was still on the house.

5      **Q     Did you ever clear title with respect to her**

6  **name?**

7      A     Say that again.

8      **Q     Did you ever clear Mrs. Bradley's name off**

9  **the title?**

10     A     I believe that her agent -- I believe she

11  had Chicago Title, and I believe that I contacted the

12  selling agent to get that information and I believe

13  that Mr. Perry, the real estate broker, and -- or

14  maybe I was there too in a phone call, contacted

15  Chicago Title with the -- her agent who represented

16  her in the purchase back in 2009.

17          I believe that there were discussions back

18  then as to the -- there was -- there was something

19  wrong with it.  I don't know why -- you know, I

20  guess -- I guess when -- when agents were contacting

21  me they would always call me Ms. Bradley.  And, you

22  know, I had it listed as my name in -- in, like,

23  Zillow and all these places but I would -- it was

24  listed with her.

25     **Q     Okay.  When you listed it at Zillow and all**

1    these places --

2        A    Right.

3        Q    -- did you list yourself as the owner?

4        A    Yes.

5        Q    And when do you believe you became owner of

6    the property?

7        A    I believe -- I was informed by Triage

8    Management -- Tracey Thompson is her name.  In April

9    of 2017 she said to me, quote, you don't have a grant

10   deed, she basically just made you responsible for the

11   ground lease.

12       Q    Okay.  Let me try this again because I

13   didn't ask you who told you what.

14            There was some point at which you believed

15   you were the owner of the Alder property; is that

16   correct?

17       A    I believed I was owner of debt that was

18   used -- that was due on a ground lease for the

19   unexpired term of the lease.

20       Q    Did you believe that you ever became the

21   owner of the Alder property?

22       A    I believe -- I believed that I became

23   responsible for the leasehold, which is a piece of

24   paper.

25       Q    Owner.  Do you understand the word "owner"?

1        A     Yes.

2        **Q     Is there any time that you believed you**

3   **became the owner of the Alder property?**

4        A     Sure.

5        **Q     And when was that?**

6        A     March 23rd, 2017.

7        **Q     And what occurred in March 2017 that caused**

8   **you to believe you were the owner of the Alder**

9   **property?**

10       A     When my stepmother called me up and said I

11  want you to go over to the trust attorney's office,

12  I'm gifting you the property.

13       **Q     And get what?**

14       A     Gift.  I'm gifting you the property.  Go

15  over and sign the documents.

16       **Q     Okay.  And did you do that?**

17       A     Yep.  Well, actually, there were a few steps

18  before I went over there.

19       **Q     But eventually you went over and gifted the**

20  **property to your mother?**

21       A     Restate the question.  I think you misspoke

22  there.

23            MR. FELDSOTT:  I asked you was it then that

24  you -- okay.  Would you read back the question,

25  Ms. Reporter.

**Jilio-Ryan Court Reporters**
**ph. 714.424.9902  info@jilioryan.com**
JASSO DECL. PAGES - 1522

```
 1            (Whereupon the record was read by the Court
 2    Reporter.)
 3            THE WITNESS:  Is that the question you're
 4    asking?
 5    BY MR. FELDSOTT:
 6        Q    Yes.
 7        A    Okay.  Okay.
 8        Q    It's a yes or no question.
 9        A    I didn't gift the property to my mother.  My
10    father's widow gifted the property to me.
11        Q    Oh, okay.  And so in 2017 someone gifted the
12    property to you?
13        A    Yes.
14        Q    Okay.  And this was your father's widow?
15        A    Yes.
16        Q    What was her name?
17        A    Sandra Bradley.
18        Q    Okay.  Do you know where she currently
19    resides?
20        A    18 Meadow Wood Cota de Caza, California
21    92679.
22        Q    Okay.  Is she still alive?
23        A    Yes.
24        Q    Okay.  So in March of 2017 you believed you
25    owned the Alder property; correct?
```

1      A    I believed I owned the -- I -- this is --

2    this is the part where it's confusing because Tracey

3    Thompson said that I was only assigned a piece of

4    paper; not a grant deed.

5      **Q    I'm not asking you what someone told you.**

6      A    Okay.  I think the confusing part with me is

7    I have since, in the last few days, I still haven't

8    sorted it out in my head, okay, the information, you

9    know.  If I didn't know this information I'd be able

10   to answer differently, but now that I have this

11   question in my mind that's the problem.

12          And I'm not trying to be difficult.  I'm

13   just trying to be fair to -- to, you know, the court

14   and to my answer because it changes now.

15     **Q    Okay.  Look, we're taking your deposition**

16   **today.  It's under oath.  We would get through this a**

17   **lot quicker if you would just answer my questions.  I**

18   **don't know is a perfectly acceptable answer.  I don't**

19   **understand your question is a perfectly acceptable**

20   **answer.**

21          **If I ask you about in March of 2017 did you**

22   **own the Alder property, it's either I don't know or**

23   **yes, I do or no, I didn't.**

24          MR. MELLOR:  Dan, I think the problem with

25   you question is it's vague and ambiguous as to the

1   "property," "Alder property," and the term "owned."

2   That's the --

3          MR. FELDSOTT:  Well, the Alder property

4   is --

5          MR. MELLOR:  Hold on.  Let me make my

6   objection.  So I think that's the issue.  If you can

7   define the term "owned"  and "the property" you may

8   be able to get around the Deponent's distinction

9   between ownership or assignment of ground lease

10  rights and what property you were trying to say she

11  owned.  We all know what you're trying to get to and

12  that she sold the property listed as, you know, 4476

13  Alder Port, but when you use those terms I think this

14  Deponent is looking at --

15         MR. FELDSOTT:  Okay.  If you want to testify

16  you can.

17         MR. MELLOR:  Dan, I'm just trying.

18         MR. FELDSOTT:  You want to object ambiguous

19  just say ambiguous.

20         MR. MELLOR:  Vague and ambiguous.

21  BY MR. FELDSOTT:

22      **Q    Okay.  Do you understand my question,**

23  **Ms. Gallian?**

24      A    I believe that you need to define, as

25  stated, whether -- what you mean by "property,"

43

```
 1    whether -- what you mean by a chattel piece of paper

 2    or chattel.  I think you need to define what it is

 3    that you mean.

 4         Q    Okay.  Pieces of paper may be evidence of

 5    something, okay?  Belief is up in your head.  And so

 6    I'm asking you do you believe that you owned Alder

 7    wood?

 8         A    I believe I -- no, it's not Alder wood.

 9    It's Alder Port.

10         Q    Alder Port.

11         A    Okay.  I believed that I had a leasehold

12    assignment to the ground.

13         Q    Okay.  Didn't you also have a leasehold

14    estate in the common area of the structure that you

15    were in?

16         A    At that time I was not aware of any other

17    rights.

18         Q    Okay.  So you didn't -- in March of 2017,

19    you didn't know there were two leases?

20         A    No.

21         Q    And you didn't know there was a grant deed

22    as to the physical structure outside of the common

23    area?

24         A    Nope.

25         Q    Okay.  So you had no idea what the title was
```

44

1   when it was given to you; is that correct?

2       A    That's correct.

3       Q    Okay.  When you met with Mr. Nickels, did

4   you tell him that you had no idea what the ownership

5   situation was?

6       A    No.

7       Q    Did you tell him you were the owner of the

8   property?

9       A    Yes.

10      Q    At the time you told him that, did you

11  believe that to be true?

12      A    Yes.

13      Q    Okay.  So it's only since that initial

14  meeting with Mr. Nickels that you became -- you used

15  the word "confused" with the nature of your title.

16           Would that be fair?

17      A    No.  It was after I was served the

18  lawsuit.

19      Q    Which --

20      A    May 29th.  May 29th, 2019, is when I

21  discovered something was wrong.

22      Q    Is that the current lawsuit?

23      A    The -- I don't know.  I call it the flower

24  and watering lawsuit.

25           MR. MELLOR:  I'm sorry.  Did you say 2017 or

45

```
 1    2019?
 2           THE WITNESS:  The day I was served the
 3    lawsuit was May -- I believe May 27, 2019.  Let's
 4    see.  Let me think for a second.  May -- wasn't I --
 5    I lost a year.  So that's why it's really hard with
 6    this covid thing.  Okay.  The lawsuit was served
 7    4/11/17 and it was when I -- or filed.  I was served
 8    on 5 -- so 5/29/17 is when I learned that the --
 9    the -- I don't know -- rights, I guess, that I really
10    owned.
11    BY MR. FELDSOTT:
12        Q    Okay.  Now, this lawsuit that you're being
13    deposed in was filed October 1st, 2020?
14        A    Yes.
15        Q    So you're talking about some other
16    lawsuit?
17        A    I thought that's what we were talking about.
18    That's why I asked you if you ask me a question and
19    tell me which lawsuit that you want me to answer
20    relative to.  You are -- you started back with my
21    property of selling the house.  And you -- you
22    haven't changed.  So I've been talking about things
23    relative to -- I thought you were following a
24    timeline.
25        Q    If you would just answer my questions
```

1   instead of -- well...

2      A    Your questions are just not clear.  They're

3   vague.

4      Q    Okay.

5      A    I understand that you want me to get an

6   answer and you want to use it a specific way, but

7   tell me what case that you want me to answer the

8   question relative to.

9      Q    Okay.  My question right now is you're being

10  deposed in the case that was filed October 1st,

11  2020?

12     A    Yes.

13     Q    Okay.  You don't need the case number?

14     A    No.

15     Q    Okay.  Prior to this case, you were involved

16  in another lawsuit -- is that correct? -- with the

17  association?

18     A    Which one?

19     Q    Oh, I don't know.  How about the Huntington

20  Beach Gables?

21     A    But there's probably four.  Which one?  I

22  have been involved with four lawsuits with these

23  people.

24     Q    The one --

25     A    Pick one.

1      Q      The one immediately proceeding this current

2   suit.

3      A      Either your not informed about all of the

4   case numbers or you're being just vague but there are

5   four case numbers.  Pick one.

6      Q      The most recent one not counting the current

7   suit.

8      A      I'm not going to do your work for you.  Pick

9   a case, ask me a question about it.

10      Q      Are you refusing to answer the question?

11      A      You haven't told me what case you're talking

12   about.  There are several.

13      Q      I have no idea how many people have sued

14   you.  I'm sure there have been many.

15      A      You know what?  Keep talking to me.

16      Q      Okay.

17      A      Go ahead.

18      Q      I'm asking you the suit immediately --

19      A      Which one?

20      Q      -- brought -- how many -- were there several

21   suits immediately --

22      A      Yes.

23      Q      -- prior?

24      A      Yes.  To this particular case.

25      Q      How many?

Gallian, Jamie
Nickel v. The Huntington Beach Gables HOA

```
 1      A     Three.

 2      Q     Three.  Okay.  Tell me about --

 3      A     Possibly four.

 4      Q     Possibly four.

 5            And were these involving the association?

 6      A     Yes.

 7      Q     And were these cases in which the

 8  association sued you?

 9      A     Yes.

10      Q     And are these -- and at least one of the

11  cases went, in fact, to the Court of Appeals; is that

12  correct?

13      A     That's correct.

14      Q     And the Court of Appeals ruled against

15  you?

16      A     That's correct.

17      Q     And, ultimately, the association was awarded

18  a judgment against you in excess --

19      A     Actually, that is inaccurate.  Just about a

20  month ago their motion for attorney's fees of $30,000

21  was denied.

22      Q     Wasn't there a prior motion for --

23      A     That's correct.  No.  The prior one was for

24  47-.

25      Q     Was for 47,000?
```

1      A    Yes.

2      Q    And the current one would have been for the

3  cost of the appeal?

4      A    Yes.

5      Q    And you're saying the trial court denied

6  them the attorney's fees on the Court of Appeals?

7      A    Yes.  $30,000.

8      Q    Well, did they award some fees?

9      A    I think they only ordered cost, about $1,000

10  in cost.

11      Q    And they were denied attorney's fees?

12      A    Yes.

13      Q    Okay.  Let's go back to Mr. Nickels so that

14  you're not confused now.

15           Okay.  So, as I recall, your testimony was

16  Mr. Nickels and his wife came over, spent you don't

17  recall how long there in your home.

18      A    I said an hour and a half inside the home.

19  I don't know how long they spent outside.

20      Q    Correct.  Okay.  Did they make an offer at

21  that time?

22      A    They purchased the house.

23      Q    At that very moment?

24      A    Yes.

25      Q    What was the purchase price?

```
 1      A    379-.
 2      Q    And how much cash, if any, did you receive
 3  out of that purchase?
 4      A    I received no cash.
 5      Q    I was under the impression that Mr. Nickels
 6  had given you some cashier's checks?
 7      A    Then ask the question did you receive
 8  cashier's checks?  You asked me if I received cash.
 9      Q    Keep your mouth closed.  I will ask --
10      A    You have one more chance.  You are rude to
11  me one more time and we're going to stop, okay?  You
12  asked me if I received cash and I said no.
13      Q    I see.  You received a cashier's check.  Is
14  that what --
15      A    Thank you.  Yes.
16      Q    How many cashier's checks did you receive?
17      A    Two.
18      Q    And how much did they total?
19      A    $379,000.
20      Q    So your property was free and clear?
21      A    Yes, it was.
22      Q    What did you do with the 379,000?
23      A    None of your business.  Not relevant.
24      Q    You're refusing to answer that question?
25      A    Not relevant.
```

1      Q    I'm not asking you for your legal opinion.

2  I'm asking you are you refusing to answer the

3  question?

4      A    It's not relevant.  I object.

5      Q    Okay.  And you understand relevancy is not

6  the standard in a depo?

7      A    Okay.

8          MR. FELDSOTT:  Okay.  Reporter, if you will

9  note the refusal to answer.

10 BY MR. FELDSOTT:

11     Q    Okay.  Had Mr. Nickels -- was there any

12 escrow between you and Mr. Nickels?

13     A    Define "escrow."

14     Q    Do you understand "escrow company"?

15     A    I do.  A person -- a third party that holds

16 money.

17     Q    Okay.  Well, a licensed third party known as

18 an escrow company.

19     A    Uh-huh.

20     Q    Was there an escrow company involved in your

21 transaction with Mr. Nickels?

22     A    No.

23     Q    Pardon?

24     A    No.

25     Q    Okay.  Was there a third party who was going

Gallian, Jamie
**Nickel v. The Huntington Beach Gables HOA**

```
 1    to hold the $379,000?

 2        A    No.

 3        Q    Did Mr. -- who was -- did you insist that

 4    payment be immediately?

 5        A    No.

 6        Q    Who wanted to make the payment

 7    immediately?

 8        A    I offered to sell it.  He purchased it.

 9    Mutual.

10        Q    I see.  And the terms of the offer was he

11    was to give you $379,000 right then and there?

12        A    Right then and there.

13        Q    And he gave you the 379- right then and

14    there?

15        A    Couple hours later.

16             MR. MELLOR:  Vague and ambiguous as to "then

17    and there."

18    BY MR. FELDSOTT:

19        Q    Oh, couple of hours later.

20             Had he left his walk-through of the house

21    and was gone for a while, you didn't know where?

22        A    I'm the one that left.  I had to go back to

23    the hospital.

24        Q    Oh, okay.  And did Mr. Nickels then come to

25    the hospital and bring --
```

**Jilio-Ryan Court Reporters**
**ph. 714.424.9902  info@jilioryan.com**
JASSO DECL. PAGES - 1535

```
 1       A    No.

 2       Q    -- the $379,000?

 3       A    No.

 4       Q    When did he give you the $379,000?

 5       A    I met him at Chase Bank.

 6       Q    And when was that?

 7       A    Later on that evening before it closed.

 8       Q    So make sure I have this right.  You left

 9   the hospital against doctor's orders, you showed him

10   the house, then you went back to the hospital; is

11   that correct?

12       A    Yes.

13       Q    Mr. Nickels then came over later with a

14   check or checks for $379,000?

15            MR. MELLOR:  Misstates the witness's

16   testimony.

17            MR. FELDSOTT:  Pardon?

18            MR. MELLOR:  Misstates the witness's

19   testimony.

20   BY MR. FELDSOTT:

21       Q    You can go ahead and answer.

22       A    Ask the question again, please.

23            MR. FELDSOTT:  Could you read the question,

24   Ms. Reporter.

25            (Whereupon the record was read by the Court
```

54

```
 1   Reporter.)
 2          MR. MELLOR:  Same objection.
 3          THE WITNESS:  Misstates testimony.
 4   BY MR. FELDSOTT:
 5      Q    Pardon?
 6      A    Misstates testimony.  That's -- that --
 7   what's the question?  The venue -- you're not getting
 8   the venue right, for first of all.  I've already
 9   stated where we met.
10      Q    Listen, I don't need a story from you.  All
11   you have to do is say, no, that's not correct when I
12   ask it.
13          When did Mr. Nickels bring you the check?
14      A    Later on that evening at the bank.  We met
15   at Chase Bank.
16      Q    Okay.  So you left the hospital to meet him
17   at Chase Bank?
18      A    Yes.
19      Q    Was this against doctor's orders, this -- or
20   were you being discharged at that time?
21      A    Correct.
22      Q    Correct, you were being discharged?
23      A    Yes.
24      Q    And so you went straight from the hospital
25   to Chase Bank?
```

```
1      A    No.

2      Q    Where did you go?

3      A    To my home on Pinion.

4      Q    To what?  I'm sorry.

5      A    To my home on Pinion.

6      Q    That's the mobile home park?

7      A    No.

8      Q    Where was this property, this one -- did you

9    say Canyon or Pinion?

10     A    Pinion.  Pinion Drive.

11     Q    What's that address?

12     A    I gave it to you in the beginning of the

13   deposition.  It's where I lived.

14     Q    Okay.  So you went home?

15     A    I went to my home on Pinion Drive.

16     Q    Okay.

17     A    I picked up two black notebooks containing

18   as much information that I had in my possession about

19   the HOA.

20     Q    Okay.  Now, in connection with your

21   deposition, you were requested to bring a number of

22   documents.

23          You brought any of those documents?

24     A    I have documents here if you need me to

25   refer to something.
```

1      Q     No.  We want to see -- we're entitled to the

2    documents or copies of them.

3      A     Okay.

4      Q     When we resume this deposition -- and I

5    don't think we're going to finish today, if you can,

6    between the two dates --

7      A     They were just documents from -- that were

8    listed on the demand letter that the association was

9    supposed to provide.

10     Q     Okay.  Under the onus of your deposition you

11   were requested to bring certain documents.  And the

12   question is did you bring any of the documents in the

13   notice?  And I think --

14     A     Bring them where?  Bring them where?

15     Q     To our office.

16     A     Why would I take them to your office?  You

17   already have them.

18     Q     Okay.  Now, have you been to my office?

19     A     Never.

20     Q     Do you know what documents I have?

21     A     I assume you're talking about the documents

22   that were in the black notebooks, the disclosure and

23   all the information that I had about the HOA.  I just

24   passed it on to the new owner.

25            MR. FELDSOTT:  Okay.  Madam Reporter --

Gallian, Jamie
Nickel v. The Huntington Beach Gables HOA

```
 1              THE WITNESS:  That's the question you
 2    asked.
 3              MR. FELDSOTT:  Do you have --
 4        A    You're asking me what I gave them.
 5              MR. FELDSOTT:  Madam Reporter, do you have a
 6    copy of the notice of the depo with the request for
 7    documents?
 8              THE REPORTER:  I'd have to check.
 9              MR. FELDSOTT:  Because if you do I'd like to
10    you split the screen and --
11              (Off-the-record discussion.)
12    BY MR. FELDSOTT:
13        Q    You saw Exhibit A to your notice of
14    deposition?
15        A    Yes.
16        Q    Okay.  Have you produced any of those
17    documents today?
18        A    No.
19        Q    Okay.  When we resume this deposition,
20    probably not this afternoon but on another day, I
21    will expect you to have produced to our office copies
22    of the documents requested in Exhibit A.  And if you
23    don't, we will have to bring a motion to compel
24    production, okay?
25              Do we understand each other?
```

58

1          Ms. Gallian?

2     A    Yes, sir.

3     Q    Do we understand each other?

4     A    Sure.

5     Q    Okay.  Okay.  Unfortunately, because of the

6     fact we couldn't get an answer from you if you were

7     going to appear today I have --

8     A    You got an answer from me.  You just didn't

9     like the answer.

10     Q    The answer was a yes or no are you going to

11     appear?  And instead we got a story.  In any event, I

12     have to do another depo starts at noon.  What time

13     will you be available this afternoon?

14     A    As soon as the court reporter's done.  I

15     think she has an appointment.

16     Q    Okay.  What time are you available this

17     afternoon?

18     A    Whenever the court reporter -- whenever you

19     need me.

20     Q    Okay.  I thought you had an appointment this

21     afternoon?

22     A    Mine is before the court reporter's.

23     Q    Okay.  And what time -- I don't know why you

24     have such a problem answering questions.  I know you

25     have --

**Jilio-Ryan Court Reporters**
**ph. 714.424.9902  info@jilioryan.com**
JASSO DECL. PAGES - 1541

1      A     Because I don't like you and the way that

2   you talk down to people.

3      **Q     Okay.  I know you think you're really --**

4      A     Okay.

5      **Q     -- cute.**

6            **What time is your appointment?**

7      A     The way that you -- just ask the question.

8   I've already -- you've already asked me that.  You

9   asked me.  I told you at 1:30 I had to leave.

10           MR. FELDSOTT:  Ms. Reporter, what time is

11   your question?  Or you have an appointment at 2:30?

12           THE REPORTER:  I would have to leave at 2:30

13   and I would be done for the day.  Doesn't mean you

14   couldn't get another reporter if one is available.

15           MR. FELDSOTT:  Probably not after you tell

16   them about the depo.  Okay.  Why don't we do this, is

17   we're going to continue the depo to a date that's

18   acceptable for all parties.  And is there some date

19   in the end of -- let's see.

20           What date would you be available,

21   Ms. Gallian, in April?

22      A     I'm not available in the rest of April.

23      **Q     Okay.**

24      A     I made a special appearance today because

25   you had to have this today.

1     Q     No.  Because you never gave us an answer.

2     A     I gave you an answer, Mr. Feldsott.  You

3  just didn't like the answer.

4     Q     Okay.  My question to you is what date in

5  May are you available?

6     A     I'm not available in May.

7     Q     Okay.  We will bring a motion to compel you.

8     A     That would probably be a good idea.

9     Q     Unless you've got some good reason --

10     A     Well, you told me the reason.  You told me

11  the reason in your email attack last night.  So make

12  sure you put that in there, too, in your -- in your

13  request.  Make sure that the -- the court's going to

14  love that.  That was real professional.

15     Q     This may come as a real shock to you but I

16  don't take orders from you.

17     A     Imagine that.

18     Q     Will do.

19     A     Imagine that.

20          MR. FELDSOTT:  Ms. Reporter, we're going to

21  terminate this deposition to be continued a later

22  date.  Volume I will be per Code.  No stipulation.

23          (The deposition concluded at 11:55 A.M.)

24

25

**Jilio-Ryan Court Reporters**
**ph. 714.424.9902  info@jilioryan.com**
JASSO DECL. PAGES - 1543

1

2

3

4                              *  *  *  *

5

6

7          I do solemnly declare under penalty of perjury

8    that the foregoing is my deposition under oath; are the

9    questions asked of me and my answers thereto; that I have

10   read same and have made the necessary corrections,

11   additions or changes to my answers that I deem necessary.

12

13         I witness thereof, I hereby subscribe my name

14   this _____ day of _____,_____.

15

16

17                    _____

18                    JAMIE GALLIAN

19

20

21

22

23

24

25

**Gallian, Jamie**
**Nickel v. The Huntington Beach Gables HOA**

```
 1                          CERTIFICATION

 2                              OF

 3                  CERTIFIED SHORTHAND REPORTER

 4

 5            The undersigned certified shorthand reporter

 6    of the state of California does hereby certify:

 7            That the foregoing deposition was taken before

 8    me at the time and place therein set forth, at which

 9    time the witness was duly sworn by me;

10            That the testimony of the witness and all

11    objections made at the time of the deposition were

12    recorded stenographically by me and thereafter

13    transcribed, said transcript being a true copy of my

14    shorthand notes thereof.

15            In witness whereof, I have subscribed my name

16    this date May 10, 2021.

17

18

19            _____

20            AMY M. LEMACKS
              Certificate No.: 13425

21

22

23

24

25
```

1    CASE NAME: _____

2    WITNESS NAME: _____

3    DATE TAKEN: _____

4                    TRANSCRIPT ERRATA SHEET

5    The reasons for making changes are as follow:
         1. To Clarify the record;
6        2. To conform to the facts;
         3. To correct major transcription errors.
7    _____
      PAGE        LINE           CORRECTION & REASON
8    _____

9    _____

10   _____

11   _____

12   _____

13   _____

14   _____

15   _____

16   _____

17   _____

18   _____

19   _____

20   _____

21   _____

22   _____

23   _____

24   _____        _____
     Signature of Deponent                      Date
25

# EXHIBIT 72

```
1              UNITED STATES BANKRUPTCY COURT

2              CENTRAL DISTRICT OF CALIFORNIA

3                 SANTA ANA DIVISION

4

5   In Re:                    Case No.: 8:21-bk-11710-ES

6

7   JAMIE LYNN GALLIAN,

8                                    Chapter 7

9

10            Debtor.

11   _____/

12

13

14

15        TRANSCRIPT OF REMOTE AUDIO-RECORDED

16          341 MEETING OF CREDITORS

17                  BEFORE

18        JEFFREY I. GOLDEN, Trustee

19            August 18, 2021

20

21

22

23

24   Transcribed By:
     TERRI NESTORE
25   CSR No. 5614, RPR, CRR
```

## Page 2

1  APPEARANCES:
2  ED HAYS, ESQ., MARSHACK HAYS, Plaintiff/Creditor Houser
   Bros. Co.
3
   MICHAEL POOLE, ESQ., Feldsott & Lee, Creditor The
4  Huntington Beach Gables Homeowners Association
5  JEFFORD DAVIS, ESQ., Creditor Lisa Ryan
6  CHRIS HOUSER, Creditor Houser Bros. Co.
7  JAMIE LYNN GALLIAN, Debtor-Defendant
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

## Page 3

1      THE TRUSTEE:  Thank you.  Is anybody else on the
2  phone for the Jamie Gallian matter?  Are you ready?
3      MR. HAYS:  Yes, I am.
4      THE TRUSTEE:  Ms. Gallian, could you please raise
5  your right hand.
6
7           JAMIE LYNN GALLIAN,
8       having been first duly sworn,
9  was examined and testified further as follows:
10
11     THE TRUSTEE:  Will you state your name.
12  Can you speak up a little bit.
13     MS. GALLIAN:  Sure.  Jamie Lynn Gallian.
14     THE TRUSTEE:  Did you upload original ID and
15  Social Security documents?
16     MS. GALLIAN:  Yes, I did.
17     THE TRUSTEE:  And are you represented by a lawyer
18  on the phone?
19     MS. GALLIAN:  No.  I tried -- I'm trying but it's
20  -- it's difficult because I've already filed the petition.
21     THE TRUSTEE:  I understand.
22     I'm going to make sure that we take care of one
23  technical thing.  Thank you, I understand.
24     So why don't we go around who is on the phone,
25  first of all, could you make an appearance on the phone,

## Page 4

1  please.  Who is on the phone?  State your name, please.
2      Who is on the phone?  State your name, please.
3      MR. POOLE:  Good morning.  This is Michael Poole
4  of the firm Feldsott & Lee.  We're counsel for creditor
5  Huntington Beach Gables Homeowners Association.
6      THE TRUSTEE:  Thank you.
7      And who else is on the phone, please?
8      MR. DAVIS:  Good morning.  This is Jefford Davis.
9      I'm the attorney for Lisa Ryan.
10     THE TRUSTEE:  Thank you.  And on the Zoom, can
11  you make appearances, please.
12     MR. HAYS:  Good morning.  For creditor Houser
13  Bros. dba Rancho Delray Mobile Home Estates, my name is
14  Ed Hays of Marshack Hays.
15     THE TRUSTEE:  Thank you.
16     MR. HOUSER:  Houser Bros. Co.
17     I'm here to observe.
18     THE TRUSTEE:  Thank you.
19     Ms. Gallian, please raise -- we did it already.
20     Q.  Did you upload original identification and Social
21  Security documents to me?
22     A.  Yes, sir.
23     Q.  And did you get any help with any lawyer or
24  paraprofessional, in connection with your petition?
25     A.  No, I have not.

## Page 5

1      Q.  I need you to speak up a little bit.
2      A.  No, I have not.
3      Q.  Did you pay anybody in connection with the
4  preparation of this petition?
5      A.  No, I did not.
6      Q.  And is your address correct on the schedules?
7      A.  Yes, it is.
8      Q.  Did you do an information sheet?
9      A.  Yes, I did.
10     Q.  Have you filed bankruptcy before?
11     A.  Twenty years ago.
12     Q.  And did you review everything before you signed
13  the petition?
14     A.  Yes, I did.
15     Q.  And did you list all of your assets and all of
16  your liabilities?
17     A.  Yes, I did, for the exception of the new
18  Certificate of Title that I received a few days ago.
19     Q.  Are you going to amend accordingly for that?
20     A.  Yes, sir.
21     Q.  And is your Social Security number correct on the
22  bankruptcy papers?
23     A.  Yes, it is.
24     Q.  And other than what you've said, you've listed
25  all your assets and liabilities, correct?

Page 6

1    A.  Yes, I did.

2    Q.  Everything is otherwise true and correct?

3    A.  Yes, sir.

4    Q.  No other errors or omissions?

5    A.  No, I don't believe so.  I've been trying to

6  study it and make sure that it's correct, other than make

7  amendments if I have to choose the right exemption code.

8    Q.  Do you pay any alimony or support?

9    A.  No, I do not.

10    Q.  Speak up, please.

11    A.  No, I do not.

12    Q.  Are you employed?

13    A.  No, not at this time.

14    Q.  Were you employed when the petition was filed?

15    A.  No.

16    Q.  Is 2020 the last year in which you filed a tax

17  return?

18    A.  Yes, sir.

19        THE TRUSTEE:  And one of the things -- I'm going

20  to let people ask questions in a minute and I may have

21  more questions afterwards, but one of the things on your

22  schedules -- and I do have your pro se declaration -- but

23  on your schedules, you list certain assets that are in

24  unknown amounts, various claims and the like.

25        Do you know what I'm referring to?

Page 7

1        THE WITNESS:  Yes, sir.

2        THE TRUSTEE:  And I'm going to ask you, not now

3  but afterwards, to try and put some ranges on what you

4  think those claims are worth so I can better evaluate

5  them, and also to get me any documentation that you have

6  regarding each of those claims as well.

7        THE WITNESS:  Yes, sir.

8        THE TRUSTEE:  We'll do that offline, but I'll be

9  asking for all of the claims that are there.

10        THE WITNESS:  Yes, sir.

11        THE TRUSTEE:  And all the unknown amounts.

12        With that said -- and I'll reserve some other

13  questions -- I'll turn the questioning over to --

14  Mr. Hays, do you want to start?

15        MR. HAYS:  Sure.  That would be great, thank you.

16    Q.  Good morning, Ms. Gallian.  My name is Ed Hays.

17        I'm an attorney representing Houser Bros.

18        In reviewing your bankruptcy schedules, on your

19  Schedule A/B you list a 2014 Skyline Custom Villa

20  manufactured home located on Monterey Lane, Space 376.

21        Is that your home?

22    A.  Yes, it is.

23    Q.  And you put a value of $235,000.

24        How did you arrive at that value?

25    A.  I did -- I paid for the NADA evaluation and then

Page 8

1  I added $20,000.  And the second way I did it was I

2  checked about 20 of the last sold units here in the park

3  and I did an average.

4    Q.  And how long have you owned this home?

5        Since November of 2018?

6    A.  November 1st, 2018.

7    Q.  And from whom did you acquire it?

8    A.  Ms. Ryan, Lisa Ryan.

9    Q.  And was the home already in Space 376?

10    A.  Yes, it was.

11    Q.  And what was the purchase price?

12    A.  175.

13    Q.  And how did you pay for the purchase price?

14    A.  With the day before I sold my home right across

15  the street on the same parcel of land at the Gables.

16    Q.  And who did you sell that home to?

17    A.  Mr. Randy L. Nickel.

18    Q.  And how did Mr. Nickel pay you?

19    A.  In checks, cashier's checks, two cashier's

20  checks.

21    Q.  And how much was the sales price?

22    A.  379,000.

23    Q.  And what happened to that $379,000?

24    A.  Um, probably about a hundred -- now under a

25  140,000 has been absorbed in ongoing litigation,

Page 9

1  attorneys' fees, and then the purchase of a home.

2    Q.  And so 175 of the 379 went into the purchase of

3  your existing home?

4    A.  Yes.

5    Q.  And what was the flow of money?

6        It went from Mr. Nickel, and was it deposited

7  into an account in your name?

8    A.  I believe it was.

9    Q.  And then what happened to the funds?

10    A.  They...

11    Q.  Did you take the funds out of an account in your

12  name and transfer them to Ms. Ryan?

13    A.  Yes.  She got cashier's checks for the purchase

14  of the home.

15    Q.  I see that title, according to your schedules, is

16  held in the name of J-Sandcastle Company, LLC, correct?

17    A.  That is incorrect at this time.

18    Q.  On the schedules, on the petition date it was

19  held in J-Sandcastle; is that correct?

20    A.  Yes, it is.

21    Q.  Okay.  And did you ever transfer money to

22  J-Sandcastle for it to purchase the property or did you

23  pay Ms. Ryan directly and just put title in the name of

24  J-Sandcastle?

25    A.  No, I did transfer money to J-Sandcastle.

Page 10

1    Q.  And then it was the one that purchased the
2  cashier's check from Ms. Ryan?
3    A.  I don't recall at this time.  I wasn't prepared
4  to answer that question.  I'd have to go back.  I do have
5  records of the cashier's checks that were given to
6  Ms. Ryan for the purchase of her home.
7    Q.  We would ask that you produce those records to
8  the trustee that show the flow of funds of the $379,000.
9       You said the Certificate of Title has now been
10  changed.  Who is the new owner?
11    A.  The park will not issue a lease in the name of
12  J-Sandcastle and we participated in a mandatory settlement
13  conference and I was asked to put the home in my name, and
14  so that's how it got to be in my name, so that I could
15  hopefully get a lease.
16    Q.  And what's the date the new certificate of title
17  was issued?
18    A.  2/25 -- February 25th, 2021.
19    Q.  But that was before you filed bankruptcy,
20  correct?
21    A.  Yes, it was.
22    Q.  So on the day of bankruptcy, the title was in
23  your individual name and not J-Sandcastle?
24    A.  No, the HCD, I just received the actual paperwork
25  in the mail.  It takes several months.

Page 11

1       Once you send paperwork to HCD, it's a very long
2  process.  And I have the envelope that I have forwarded to
3  the trustee when I got the paperwork.
4    Q.  So you requested the new title in February but
5  the new title wasn't issued until after the bankruptcy?
6    A.  Right.
7    Q.  Okay.  Why did you put title in the name of
8  J-Sandcastle?
9    A.  I don't recall.  That was three years ago.
10       I don't recall.
11    Q.  Other than the home, did J-Sandcastle have any
12  assets on the day you filed bankruptcy?
13    A.  Just a small bank account.
14    Q.  That held about $8,000, if I recall?
15    A.  That's correct.
16    Q.  And does J-Sandcastle have any other business or
17  income or was it only to hold title to the home?
18    A.  That's correct.
19    Q.  And do you have any contracts or ground lease
20  that permits you to live in Space 376?
21    A.  It's under litigation at this point.  I believe
22  that I do.  I have lived on the property since 2009.
23    Q.  So which contracts or leases do you have that you
24  believe support your right to be in Space 376?
25    A.  I have the original ground lease that was

Page 12

1  recorded back in 1980 and on the left-hand corner the APN
2  No. 178-011-01 is written on the contract from 40 years
3  ago, and that is exactly where my home sits.
4       I believe that it was the same property.
5    Q.  But how is it that you have rights under this
6  1980 contract, when you weren't living there in 1980?
7       Can you please explain that?
8    A.  The home in the Gables right across the street is
9  a ground leasehold.  I read the contract and believed that
10  when I purchased the home, after I sold the home to
11  Mr. Nickel when I went across the street after I turned
12  55, I believed it was the same contract because it had the
13  same APN number on the contract.
14    Q.  And we'd ask that you produce a copy of the
15  contract to the trustee.
16       Does anyone else live in the home with you?
17    A.  We have a person who his permanent residence is
18  in Torrance but he works here in Huntington Beach and I
19  have known him for -- he used to live over here -- he used
20  to rent a room from me over there at the Gables and then
21  he left for a short time and now he's back here in
22  Huntington Beach, and so he does stay in my extra room
23  when he doesn't feel like driving all the way back to
24  Torrance, yes.  It's just a friendship.
25       There's not -- we're not a couple or anything.

Page 13

1    Q.  What's this individual's name?
2    A.  Mr. McLelland.
3    Q.  Is that Rob McLelland?
4    A.  Robert, yes.
5    Q.  Does he pay rent for staying at the home?
6    A.  No.
7    Q.  On your Schedule I, there's a thousand dollars of
8  income per month reflected.
9       What's the source of that thousand dollars?
10    A.  And that will also be amended.  It is from the
11  EDD and it is in the wrong location.
12    Q.  Are you married, Ms. Gallian?
13    A.  No, I am not.
14    Q.  Have you been married at any point in the last
15  eight years?
16    A.  I was divorced in 2016, so that was over five
17  years ago.
18    Q.  And I believe on your schedules there's
19  indication that you were not married at any point in the
20  last eight years, so I think you'll also probably need to
21  amend that, for the record to be correct.
22    A.  Okay.
23    Q.  Who is Ron Pierpont?
24    A.  That is my ex-husband.
25    Q.  What is J-Pad, LLC?

Page 14

1    A.  That is a LLC that myself, Ron, Anthony, my two
2  older sons and Rob, back in February it was established.
3    Q.  Do you own one-third of this LLC?
4    A.  I do.
5    Q.  And who owns the other two-thirds?
6    A.  Well, depending on who you ask today, it's Ron,
7  myself, and Robert.  My sons just want me to get my life
8  under order and they don't want anything.
9    Q.  And when you say "Robert," you're referring to
10  Mr. McLelland.
11    A.  Yes.
12    Q.  And when you say "Ron" you're referring to
13  Mr. Pierpont, correct?
14    A.  Yes, sir.
15    Q.  And are these one-third interests for each of the
16  three of you?
17    A.  Yes.
18    Q.  And what assets does J-Pad LLC own?
19    A.  Just the note, the UCC note.
20    Q.  And when you say a note, how much is owed on the
21  note?
22    A.  I don't have the exact balance at this time
23  because there have been a lot of payments and then I've
24  had to borrow the money back for.
25    Q.  What was the face amount of the original loan?

Page 15

1    A.  225.
2    Q.  And who is the obligor required to make payments
3  on that 225,000-dollar note?
4    A.  Say that again.
5    Q.  Who is the obligor required to make payments?
6    A.  What is that?  What is that?
7    Q.  Who is required to make the payments under the
8  225,000-dollar note?
9    A.  Myself and J-Sandcastle.
10    Q.  And then the payments are made and owed to J-Pad,
11  correct?
12    A.  That's correct.
13    Q.  And what did J-Pad give in exchange for getting
14  this 225,000-dollar note?
15        Did it transfer $225,000 of cash to anyone?
16    A.  Can you ask the question again, and be more
17  specific?
18    Q.  So you sign a promissory note that requires you
19  to pay $225,000 to J-Pad.  What did J-Pad give you in
20  exchange for your promise to pay it $225,000?  Did it
21  actually loan you that amount of money?
22    A.  I will have to get -- I have a file.  This was
23  way in the beginning of February 2018 when the products
24  were developed.  J-Pad has products and I invested in the
25  company.  We all did.  And my investment was the home from

Page 16

1  the sale of Alderport, so I'm the one that has been kind
2  of funding J-Pad.
3    Q.  But then why are you paying money to J-Pad, if
4  you were the one putting money into J-Pad?
5    A.  Because it was my portion for them to be able to
6  use.  I put the money in.  I have to pay back my portion.
7    Q.  I'm totally confused, I'm sorry.
8    A.  Okay.
9    Q.  You individually fund money into J-Pad, correct?
10    A.  Um, fund money into J-Pad.  Fund money...
11    Q.  Did you make transfers of property, cash?
12    A.  I apologize, it's not that difficult of a
13  question; however, it was back in February and with all of
14  the time that has gone by, I'm trying to think of how much
15  -- I know what I put in because I know what my portion --
16  I know what my portion is.
17    Q.  So how much did you put into J-Pad?
18    A.  Well, originally I was putting the whole purchase
19  price of my home.  Originally I transferred my home in
20  Alderport.  Before Mr. Nickel bought it, I transferred it
21  to J-Pad.  It was going to be an asset of J-Pad so that
22  they could borrow money against it, to get financing.
23        Well, that didn't end up going through because of
24  issues over at the Gables that happened with these
25  lawsuits, so I didn't ever record it.

Page 17

1        And then several months later Mr. Nickel
2  contacted me, I had my home listed for sale and I sold the
3  property and so I never was able to do anything with
4  helping J-Pad get off with the products.
5    Q.  So you sell the home to Mr. Nickel, you get the
6  $379,000.  Did any of that money go into J-Pad?
7    A.  Just about I would say...  I'm going to have to
8  say yes, because that's what I did with it.  The 175,000
9  purchase -- we purchased the home, okay?
10        So maybe it's because the UCC -- because I know
11  that there are two UCC filings.
12        One of them was -- originally it was me loaning
13  the money to J-Sandcastle for 175,000, then something
14  happened -- maybe it had to do with the Houser Bros.
15  situation -- and so then either I assigned that note over
16  to J-Pad, but then I took money out of my 401(k) and it's
17  like I just feel like that that's what I'm living on.
18    Q.  I would ask that you provide information to the
19  trustee showing --
20    A.  Absolutely.
21    Q.  -- what J-Pad gave to you in exchange for your
22  promise to pay J-Pad $225,000.
23    A.  Sure.
24    Q.  How much are the monthly payments on this loan?
25    A.  The loan is set up for -- well, it's already

Page 18

1 amortized out.  It has an interest rate on it that -- at
2 the time when it was -- when it was drawn up, it was drawn
3 up on November 16th, 2018, the interest rate back then was
4 five percent, but we've all pretty much because of the
5 situation that has happened and the litigation that is and
6 COVID and a myriad of things, it's like the plans have
7 changed.  The products aren't even being developed.
8      Q.  My question was how much is the monthly payment
9 you were required to make to J-Pad under this law?
10      A.  That's what I said, is that we haven't done
11 anything -- we have the actual document but it's -- right
12 now it's 1278, if it's amortized out.
13      Q.  So it's 1278 per month but you're not actually
14 making the payments; is that correct?
15      A.  Not making a payment of $1,278.  It sounds kind
16 of confusing and I'm actually confused myself.  It's
17 because I've had to borrow money from the other two
18 people, Ron and Bob, because of -- and I listed them on my
19 bankruptcy -- because of certain debt that I had to pay.
20      Q.  So how much in payments are you making to J-Pad?
21      A.  I'm not making anything.
22      Q.  Okay.  When was the last time you made a payment
23 to J-Pad?
24      A.  The last?  It's listed on my bankruptcy.
25          The last time that I made a payment to -- I've

Page 19

1 made no payments.  No payment.  No payments.
2      Q.  Okay.  Thank you.
3          What other assets does J-Pad own, other than this
4 note?
5      A.  Just the note and probably 4 or $5,000 in a bank
6 account.
7      Q.  You mentioned something about developing
8 products.  It doesn't have any inventory or work in
9 process or anything?
10      A.  No, COVID happened.  I mean they're made, but
11 COVID happened and everything stopped.  The product comes
12 from Japan.  It's a melamine product.
13      Q.  So it does have some inventory of melamine
14 product?
15      A.  I don't know.  I'm not connected with that part
16 of the business.
17      Q.  Can you please explain your contention for why
18 you think you have rights on a ground lease?
19          Is it because you purchased from Ms. Ryan or is
20 it something else?
21      A.  I've lived on the property since 2009 and never
22 knew that the manufactured home park next door -- I never
23 knew who the Housers were until I went to the office one
24 day, the park office after receiving a letter from a
25 person named Katherine Curtis, that I wasn't allowed to

Page 20

1 hold an open house and it was in April of 2018.
2          I went to the office, she introduced herself.
3          I told her that my house was for sale and I asked
4 her why I could not hold an open house.  Because of the
5 ongoing litigation with the park -- not the park -- but
6 the Gables, I had agreed to sell the property.
7          And she explained it to me, we had a very nice
8 conversation, and I said to her that what is going to
9 happen to the 80-year ground lease?  And we both kind of
10 laughed a little bit because we'll both be dead when 2059
11 gets here and she thought that it would just be continued.
12          And that's the first time that I realized that it
13 was the same ground.  I didn't know before.
14      Q.  You included in your schedules that you have
15 rights to your late father's probate estate.
16          What are those rights?
17      A.  I don't know what they are.  My father died
18 20 years ago and my stepmother never opened probate.
19          So I, in 2017, opened up probate myself.  She
20 challenged me, she had priority, so the probate was -- she
21 was -- she's the administrator and she has not done any
22 schedules, she hasn't done any inventory, she hasn't done
23 anything.  So I don't even know if it's too late, if the
24 statute of limitations has run out.  I have no idea.
25          I listed it just as a potential.

Page 21

1      Q.  And when you opened the probate in 2017, was your
2 understanding that your rights would stem from a will or a
3 trust or something else?
4      A.  When I opened the petition, it was because I have
5 learned that my stepmother put my father's will in a paper
6 shredder and destroyed all of the documents.
7          Well, I didn't know that back in 2000 when he
8 died.  I learned it in 2017 and that's what prompted me to
9 file the probate, because she refused to file it.
10          My father has -- his sister and brother are still
11 alive, so it's not just me.
12      Q.  Do you have any siblings from your father?
13      A.  No.
14      Q.  Okay.  In your schedules you indicated you were
15 injured as a flight attendant for United Airlines in
16 August of 2018?
17      A.  No, I did not.  I did not.  I did not.  I did not
18 indicate that I was injured as a flight attendant.
19          I was injured in my yard when I came home from a
20 trip, after flying.  I was attacked in my yard by one of
21 the HOA board member's husband's.
22      Q.  I appreciate the clarification.
23          I wasn't trying to misstate everything, so
24 obviously I didn't understand the comments in the
25 schedules.  Thank you for clearing that up.

Page 22

1    In your schedule you indicated that you received
2 about $32,000 in retirement income in the last year or
3 two.  What was the source of that money?
4    A.  That is another amendment on the schedule.  So
5 what that is, is a 1099 that I received from Fidelity and
6 I was on the phone in fact yesterday with them.  It's kind
7 of misleading because it is a distribution that I had
8 taken but half of it, what it is is if when you're off of
9 work and you can't pay back a loan that you have borrowed
10 against your 401(k), when you're defaulted, it's added as
11 a distribution and that's how I got that 1099.
12    Q.  Which retirement account is this?
13    A.  It's the retirement account, it's a 401(k) from
14 United that I had initially borrowed against since I have
15 been off work because of injury.
16    Q.  Do you still have any monies on deposit in the
17 United 401(k)?
18    A.  No, I do not.  It's completely gone.
19    Q.  And your schedules also indicate that you've paid
20 about $113,000 to various attorneys from 2018 to 2020.
21    Were these the proceeds from the sale of your
22 prior home?
23    A.  Yes, it is.
24    Q.  And do you have any monies on deposit with any of
25 these lawyers?  And by that I'm saying have you paid a

Page 23

1 retainer that they have not yet already consumed by
2 providing you legal services?
3    A.  No.  All the money's used up.  I owe.
4    MR. HAYS:  And those are my questions.
5    Thank you, Mr. Golden.
6    MS. GALLIAN:  Thank you.
7    THE TRUSTEE:  On the phone...
8    On the phone, are there any questions at this
9 point?  I may continue the matter.
10    MR. POOLE:  This is Michael Poole, counsel for
11 the Gables.  I believe Mr. Hays covered any of the
12 questions I had.
13    THE TRUSTEE:  Okay, wonderful.  Wonderful.
14    Then what I'm going to do is --
15    MR. DAVIS:  Mr. Golden, I'm sorry to interrupt
16 you.  This is Jeff Davis on behalf of Lisa Ryan.
17    THE TRUSTEE:  Of course.
18    MR. DAVIS:  If you're going to continue this
19 matter, as I have some questions -- even though Mr. Hays
20 did a wonderful job of covering a lot of what I had --
21 would I be able to ask these questions at the continued
22 hearing?
23    THE TRUSTEE:  So you can, if you'd like to ask a
24 few questions now and if you'd like to ask some questions
25 at the continued hearing meeting, that's totally fine as

Page 24

1 well.  I don't know if I'm going to have a meeting -- I'm
2 going to have at least one more meeting, that might be the
3 last meeting, but I've asked Ms. Gallian for some
4 documents.  And I agree with Mr. Hays, I'd like to get
5 copies of some of the documents that he asked for as well.
6    So Ms. Gallian, I may have some questions for you
7 regarding those.
8    So, sir, if you want to ask a few questions now
9 or if you prefer to just wait until the continued meeting.
10    MR. DAVIS:  Oh, I'd like to see what is documents
11 say.  I have a number of questions for her regarding some
12 of these transactions, as well as her relationship with my
13 client.  And so I see it's 10:51.
14    I don't think I can get -- I prefer not to start
15 and then stop, is really what I'm getting at.
16    THE TRUSTEE:  That's fine.
17    Are there any other documents that you would like
18 to request, other than what has been identified?
19    MR. DAVIS:  Yeah, I would like to request if
20 Ms. Gallian has any written agreements relating to the
21 purchase of the property from my client, Lisa Ryan, on or
22 around November of 2018.
23    THE TRUSTEE:  She's nodding.  If you have any,
24 you will provide those, right, Ms. Gallian?
25    MS. GALLIAN:  Yes.  It's the same documents that

Page 25

1 Ms. Ryan has, but I can give counsel a copy, if he would
2 like.
3    THE TRUSTEE:  So I'm going to go ahead and
4 continue this, then, to September 22nd.  Do you think,
5 Ms. Gallian, you can get me whatever documents we talked
6 about in the next two weeks, do you think?
7    MS. GALLIAN:  Yes.  Obviously I'm nervous and if
8 somebody could either email me a list of exactly the
9 documents.  I couldn't pay attention to the question and
10 write at the same time and it was a pretty extensive list
11 and they would be readily available, I just need to upload
12 them to you.  I just need a list, to make sure that I -- I
13 didn't write down and listen at the same time.
14    THE TRUSTEE:  Understood.  I think I could put
15 together a list of documents I want and I think counsel on
16 the phone and Zoom could help participate by giving me a
17 list of the documents that they identified as well, to
18 make sure that we didn't miss anything, and I think we can
19 get you a list I think probably pretty soon.
20    And so if we got you that in the next few days or
21 so --
22    MS. GALLIAN:  Absolutely.
23    THE TRUSTEE:  -- let's say within the next week,
24 then by mid -- within two weeks or thereafter, you think
25 you can provide --

Page 26

1    MS. GALLIAN:  Oh, absolutely.

2    And with that being said, I just wanted to make

3 sure that everybody knows that the petition is going to be

4 amended.  It has several errors.

5    THE TRUSTEE:  So when do you think you're going

6 to be making amendments to the schedules?

7    MS. GALLIAN:  You said when?

8    THE TRUSTEE:  When.  In the same time frame?

9    MS. GALLIAN:  Whatever you prefer, sir.  If it's

10 proper to do it before, I'll do it before.  If it's proper

11 to wait and do it after, I'll do it after.

12    THE TRUSTEE:  If possible, I'd like you to do it

13 within the same time frame of you getting the documents

14 done.  So if within two weeks of us giving you the list of

15 documents, if you could also make the schedule amendments,

16 that would be great as well.

17    MS. GALLIAN:  Yes, sir.

18    THE TRUSTEE:  Is September 22nd... is

19 September 22nd too soon?

20    MS. GALLIAN:  No, that's fine, sir.

21    For me it's fine.

22    THE TRUSTEE:  I'm going to want and get the

23 documents at least probably ten days in advance of the

24 meeting.  So do you think --

25    MS. GALLIAN:  So the meeting will be the 22nd,

Page 27

1 and then as far as having the documents, say maybe by the

2 first business day after Labor Day; is that okay with

3 everybody?

4    THE TRUSTEE:  That would be great.

5    That would be wonderful.

6    MS. GALLIAN:  As soon as I get the list, I'll put

7 it together and send it, and I just want to make sure that

8 I just upload it to the court.

9    THE TRUSTEE:  Yeah, Lori, what time on the 22nd?

10    MS. WERNER:  Either -- we want an hour that

11 doesn't have any other matters; is that correct, Jeff?

12    THE TRUSTEE:  Yes.

13    MS. WERNER:  Do you want to do 1:30?

14    THE TRUSTEE:  Yeah.

15    Do we have any in the morning?

16    MS. WERNER:  We might have some at 11:00 so I

17 didn't want to do -- continue it to 11:00.

18    So you can do noon, but that's lunchtime.

19    I don't know what people feel about that.

20    THE TRUSTEE:  Let me just check my schedule.

21    September 22nd.

22    All right.  Unless people have strong feelings,

23 why don't we just do the 22nd at 1:30.  Does that work?

24    MR. HAYS:  Yes, thank you.

25    THE TRUSTEE:  Okay.  All right, great.

Page 28

1    All right.  Thank you, everybody.

2    MS. GALLIAN:  Just to confirm, should I -- make

3 sure I understand, I will get one email from the trustee's

4 assistant and then I will compile that list of documents

5 and then forward them to the trustee or everybody or how

6 would you like that to be done?

7    THE TRUSTEE:  To make it easier for you, you can

8 just take the documents and just send them to -- it would

9 be great if you send them to everybody, but if not, if you

10 just send them to me, then I'll make sure that everybody

11 gets a copy of it.  So either way works.

12    MS. GALLIAN:  Okay.  Thank you very much.

13    I appreciate it.

14    THE TRUSTEE:  Thank you, everybody.  Anything

15 else for anybody?  Thank you, everyone, very much.

16    MS. GALLIAN:  And then if I could get the other

17 counsel, Ms. Ryan's, address.  I don't have any contact

18 information regarding him, if I need that, to list him.

19    THE TRUSTEE:  He's going to send it to you.

20    MS. GALLIAN:  Perfect.  Thank you.

21    THE TRUSTEE:  Thank you, everybody.

22    (End of recording.)

23

24

25

Page 29

1         C E R T I F I C A T E

2

3

4    I, TERRI NESTORE, Certified Shorthand Reporter/

5 Transcriptionist, do hereby certify that I was authorized

6 to transcribe the foregoing recorded proceeding, and that

7 the transcript is a true and accurate transcription of my

8 shorthand notes, to the best of my ability, taken while

9 listening to the provided recording.

10

11    I further certify that I am not of counsel or

12 attorney for either or any of the parties to said

13 proceedings, nor in any way interested in the events of

14 this cause, and that I am not related to any of the

15 parties thereto.

16

17

18 Dated this 11th day of April, 2022.

19

20

21              _Terri Nestore_

              TERRI NESTORE, CSR 5614, RPR, CRR

22

23

24

25

## $

**$1,278**  18:15
**$113,000**
  22:20
**$20,000**  8:1
**$225,000**
  15:15,19,20
  17:22
**$235,000**  7:23
**$32,000**  22:2
**$379,000**  8:23
  10:8 17:6
**$5,000**  19:5
**$8,000**  11:14

## 1

**1099**  22:5,11
**10:51**  24:13
**11:00**  27:16,
  17
**1278**  18:12,13
**140,000**  8:25
**16th**  18:3
**175**  8:12 9:2
**175,000**  17:8,
  13
**178-011-01**
  12:2
**1980**  12:1,6
**1:30**  27:13,23
**1st**  8:6

## 2

**2/25**  10:18
**20**  8:2 20:18
**2000**  21:7
**2009**  11:22
  19:21
**2014**  7:19
**2016**  13:16
**2017**  20:19
  21:1,8

**2018**  8:5,6
  15:23 18:3
  20:1 21:16
  22:20 24:22
**2020**  6:16
  22:20
**2021**  10:18
**2059**  20:10
**225**  15:1
**225,000-dollar**
  15:3,8,14
**22nd**  25:4
  26:18,19,25
  27:9,21,23
**25th**  10:18

## 3

**376**  7:20 8:9
  11:20,24
**379**  9:2
**379,000**  8:22

## 4

**4**  19:5
**40**  12:2
**401(k)**  17:16
  22:10,13,17

## 5

**55**  12:12

## 8

**80-year**  20:9

## A

**A/b**  7:19
**absolutely**
  17:20 25:22
  26:1
**absorbed**  8:25

**account**  9:7,
  11 11:13 19:6
  22:12,13
**acquire**  8:7
**actual**  10:24
  18:11
**added**  8:1
  22:10
**address**  5:6
  28:17
**administrator**
  20:21
**advance**  26:23
**agree**  24:4
**agreed**  20:6
**agreements**
  24:20
**ahead**  25:3
**Airlines**
  21:15
**Alderport**
  16:1,20
**alimony**  6:8
**alive**  21:11
**allowed**  19:25
**amend**  5:19
  13:21
**amended**  13:10
  26:4
**amendment**
  22:4
**amendments**
  6:7 26:6,15
**amortized**
  18:1,12
**amount**  14:25
  15:21
**amounts**  6:24
  7:11
**Anthony**  14:1
**APN**  12:1,13
**apologize**
  16:12
**appearance**
  3:25
**appearances**
  4:11

**April**  20:1
**arrive**  7:24
**asset**  16:21
**assets**  5:15,
  25 6:23 11:12
  14:18 19:3
**assigned**
  17:15
**assistant**
  28:4
**Association**
  4:5
**attacked**
  21:20
**attendant**
  21:15,18
**attention**
  25:9
**attorney**  4:9
  7:17
**attorneys**
  22:20
**attorneys'**
  9:1
**August**  21:16
**average**  8:3

## B

**back**  10:4
  12:1,21,23
  14:2,24 16:6,
  13 18:3 21:7
  22:9
**balance**  14:22
**bank**  11:13
  19:5
**bankruptcy**
  5:10,22 7:18
  10:19,22
  11:5,12
  18:19,24
**Beach**  4:5
  12:18,22
**beginning**
  15:23

**behalf** 23:16
**believed**
  12:9,12
**bit** 3:12 5:1
  20:10
**board** 21:21
**Bob** 18:18
**borrow** 14:24
  16:22 18:17
**borrowed**
  22:9,14
**bought** 16:20
**Bros** 4:13,16
  7:17 17:14
**brother** 21:10
**business**
  11:16 19:16
  27:2

**C**

**care** 3:22
**cash** 15:15
  16:11
**cashier's**
  8:19 9:13
  10:2,5
**certificate**
  5:18 10:9,16
**challenged**
  20:20
**changed** 10:10
  18:7
**check** 10:2
  27:20
**checked** 8:2
**checks** 8:19,
  20 9:13 10:5
**choose** 6:7
**claims** 6:24
  7:4,6,9
**clarification**
  21:22
**clearing**
  21:25
**client** 24:13,
  21

**code** 6:7
**comments**
  21:24
**company** 9:16
  15:25
**compile** 28:4
**completely**
  22:18
**conference**
  10:13
**confirm** 28:2
**confused** 16:7
  18:16
**confusing**
  18:16
**connected**
  19:15
**connection**
  4:24 5:3
**consumed** 23:1
**contact** 28:17
**contacted**
  17:2
**contention**
  19:17
**continue**
  23:9,18 25:4
  27:17
**continued**
  20:11 23:21,
  25 24:9
**contract**
  12:2,6,9,12,
  13,15
**contracts**
  11:19,23
**conversation**
  20:8
**copies** 24:5
**copy** 12:14
  25:1 28:11
**corner** 12:1
**correct** 5:6,
  21,25 6:2,6
  9:16,19 10:20
  11:15,18
  13:21 14:13

  15:11,12 16:9
  18:14 27:11
**counsel** 4:4
  23:10 25:1,15
  28:17
**couple** 12:25
**court** 27:8
**covered** 23:11
**covering**
  23:20
**COVID** 18:6
  19:10,11
**creditor** 4:4,
  12
**Curtis** 19:25
**Custom** 7:19

**D**

**date** 9:18
  10:16
**Davis** 4:8
  23:15,16,18
  24:10,19
**day** 8:14
  10:22 11:12
  19:24 27:2
**days** 5:18
  25:20 26:23
**dba** 4:13
**dead** 20:10
**debt** 18:19
**declaration**
  6:22
**defaulted**
  22:10
**Delray** 4:13
**depending**
  14:6
**deposit**
  22:16,24
**deposited** 9:6
**destroyed**
  21:6
**developed**
  15:24 18:7

**developing**
  19:7
**died** 20:17
  21:8
**difficult**
  3:20 16:12
**directly** 9:23
**distribution**
  22:7,11
**divorced**
  13:16
**document**
  18:11
**documentation**
  7:5
**documents**
  3:15 4:21
  21:6 24:4,5,
  10,17,25
  25:5,9,15,17
  26:13,15,23
  27:1 28:4,8
**dollars** 13:7,
  9
**door** 19:22
**drawn** 18:2
**driving** 12:23
**duly** 3:8

**E**

**easier** 28:7
**Ed** 4:14 7:16
**EDD** 13:11
**email** 25:8
  28:3
**employed**
  6:12,14
**end** 16:23
  28:22
**envelope** 11:2
**errors** 6:4
  26:4
**established**
  14:2
**estate** 20:15

Estates  4:13
evaluate  7:4
evaluation
  7:25
ex-husband
  13:24
exact  14:22
examined  3:9
exception
  5:17
exchange
  15:13,20
  17:21
exemption  6:7
existing  9:3
explain  12:7
  19:17
explained
  20:7
extensive
  25:10
extra  12:22

**F**

face  14:25
fact  22:6
father  20:17
  21:10,12
father's
  20:15 21:5
February
  10:18 11:4
  14:2 15:23
  16:13
feel  12:23
  17:17 27:19
feelings
  27:22
fees  9:1
Feldsott  4:4
Fidelity  22:5
file  15:22
  21:9
filed  3:20
  5:10 6:14,16

10:19 11:12
filings  17:11
financing
  16:22
fine  23:25
  24:16 26:20,
  21
firm  4:4
flight  21:15,
  18
flow  9:5 10:8
flying  21:20
forward  28:5
forwarded
  11:2
frame  26:8,13
friendship
  12:24
fund  16:9,10
funding  16:2
funds  9:9,11
  10:8

**G**

Gables  4:5
  8:15 12:8,20
  16:24 20:6
  23:11
Gallian  3:2,
  4,7,13,16,19
  4:19 7:16
  13:12 23:6
  24:3,6,20,24,
  25 25:5,7,22
  26:1,7,9,17,
  20,25 27:6
  28:2,12,16,20
gave  17:21
give  15:13,19
  25:1
giving  25:16
  26:14
Golden  23:5,
  15
Good  4:3,8,12
  7:16

great  7:15
  26:16 27:4,25
  28:9
ground  11:19,
  25 12:9 19:18
  20:9,13

**H**

half  22:8
hand  3:5
happen  20:9
happened  8:23
  9:9 16:24
  17:14 18:5
  19:10,11
Hays  3:3
  4:12,14 7:14,
  15,16 23:4,
  11,19 24:4
  27:24
HCD  10:24
  11:1
hearing
  23:22,25
held  9:16,19
  11:14
helping  17:4
HOA  21:21
hold  11:17
  20:1,4
home  4:13
  7:20,21 8:4,
  9,14,16 9:1,
  3,14 10:6,13
  11:11,17
  12:3,8,10,16
  13:5 15:25
  16:19 17:2,5,
  9 19:22 21:19
  22:22
Homeowners
  4:5
hour  27:10
house  20:1,3,
  4

Houser  4:12,
  16 7:17 17:14
Housers  19:23
hundred  8:24
Huntington
  4:5 12:18,22
husband's
  21:21

**I**

ID  3:14
idea  20:24
identification
  4:20
identified
  24:18 25:17
included
  20:14
income  11:17
  13:8 22:2
incorrect
  9:17
indication
  13:19
individual
  10:23
individual's
  13:1
individually
  16:9
information
  5:8 17:18
  28:18
initially
  22:14
injured
  21:15,18,19
injury  22:15
interest
  18:1,3
interests
  14:15
interrupt
  23:15
introduced
  20:2

inventory
  19:8,13 20:22
invested
  15:24
investment
  15:25
issue  10:11
issued  10:17
  11:5
issues  16:24

### J

J-PAD  13:25
  14:18 15:10,
  13,19,24
  16:2,3,4,9,
  10,17,21
  17:4,6,16,21,
  22 18:9,20,23
  19:3
J-SANDCASTLE
  9:16,19,22,
  24,25 10:12,
  23 11:8,11,16
  15:9 17:13
Jamie  3:2,7,
  13
Japan  19:12
Jeff  23:16
  27:11
Jefford  4:8
job  23:20

### K

Katherine
  19:25
kind  16:1
  18:15 20:9
  22:6
knew  19:22,23

### L

Labor  27:2

land  8:15
Lane  7:20
late  20:15,23
laughed  20:10
law  18:9
lawsuits
  16:25
lawyer  3:17
  4:23
lawyers  22:25
learned  21:5,
  8
lease  10:11,
  15 11:19,25
  19:18 20:9
leasehold
  12:9
leases  11:23
Lee  4:4
left  12:21
left-hand
  12:1
legal  23:2
letter  19:24
liabilities
  5:16,25
life  14:7
limitations
  20:24
Lisa  4:9 8:8
  23:16 24:21
list  5:15
  6:23 7:19
  25:8,10,12,
  15,17,19
  26:14 27:6
  28:4,18
listed  5:24
  17:2 18:18,24
  20:25
listen  25:13
litigation
  8:25 11:21
  18:5 20:5
live  11:20
  12:16,19

lived  11:22
  19:21
living  12:6
  17:17
LLC  9:16
  13:25 14:1,3,
  18
loan  14:25
  15:21 17:24,
  25 22:9
loaning  17:12
located  7:20
location
  13:11
long  8:4 11:1
Lori  27:9
lot  14:23
  23:20
lunchtime
  27:18
Lynn  3:7,13

### M

made  15:10
  18:22,25
  19:1,10
mail  10:25
make  3:22,25
  4:11 6:6
  15:2,5,7
  16:11 18:9
  25:12,18
  26:2,15 27:7
  28:2,7,10
making  18:14,
  15,20,21 26:6
mandatory
  10:12
manufactured
  7:20 19:22
married
  13:12,14,19
Marshack  4:14
matter  3:2
  23:9,19

matters  27:11
Mclelland
  13:2,3 14:10
meeting  23:25
  24:1,2,3,9
  26:24,25
melamine
  19:12,13
member's
  21:21
mentioned
  19:7
Michael  4:3
  23:10
mid  25:24
minute  6:20
misleading
  22:7
misstate
  21:23
Mobile  4:13
money  9:5,21,
  25 14:24
  15:21 16:3,4,
  6,9,10,22
  17:6,13,16
  18:17 22:3
money's  23:3
monies  22:16,
  24
Monterey  7:20
month  13:8
  18:13
monthly  17:24
  18:8
months  10:25
  17:1
morning  4:3,
  8,12 7:16
  27:15
myriad  18:6

### N

NADA  7:25
named  19:25

nervous  25:7
nice  20:7
Nickel  8:17,
 18 9:6 12:11
 16:20 17:1,5
nodding  24:23
noon  27:18
note  14:19,
 20,21 15:3,8,
 14,18 17:15
 19:4,5
November  8:5,
 6 18:3 24:22
number  5:21
 12:13 24:11

**O**

obligor  15:2,
 5
observe  4:17
office  19:23,
 24 20:2
offline  7:8
older  14:2
omissions  6:4
one-third
 14:3,15
ongoing  8:25
 20:5
open  20:1,4
opened  20:18,
 19 21:1,4
order  14:8
original  3:14
 4:20 11:25
 14:25
originally
 16:18,19
 17:12
owe  23:3
owed  14:20
 15:10
owned  8:4
owner  10:10
owns  14:5

**P**

paid  7:25
 22:19,25
paper  21:5
papers  5:22
paperwork
 10:24 11:1,3
paraprofession
al  4:24
parcel  8:15
park  8:2
 10:11 19:22,
 24 20:5
part  19:15
participate
 25:16
participated
 10:12
pay  5:3 6:8
 8:13,18 9:23
 13:5 15:19,20
 16:6 17:22
 18:19 22:9
 25:9
paying  16:3
payment  18:8,
 15,22,25 19:1
payments
 14:23 15:2,5,
 7,10 17:24
 18:14,20 19:1
people  6:20
 18:18 27:19,
 22
percent  18:4
Perfect  28:20
permanent
 12:17
permits  11:20
person  12:17
 19:25
petition  3:20
 4:24 5:4,13
 6:14 9:18
 21:4 26:3

phone  3:2,18,
 24,25 4:1,2,7
 22:6 23:7,8
 25:16
Pierpont
 13:23 14:13
plans  18:6
point  11:21
 13:14,19 23:9
Poole  4:3
 23:10
portion  16:5,
 6,15,16
potential
 20:25
prefer  24:9,
 14 26:9
preparation
 5:4
prepared  10:3
pretty  18:4
 25:10,19
price  8:11,
 13,21 16:19
prior  22:22
priority
 20:20
pro  6:22
probate
 20:15,18,19,
 20 21:1,9
proceeds
 22:21
process  11:2
 19:9
produce  10:7
 12:14
product
 19:11,12,14
products
 15:23,24 17:4
 18:7 19:8
promise  15:20
 17:22
promissory
 15:18

prompted  21:8
proper  26:10
property  9:22
 11:22 12:4
 16:11 17:3
 19:21 20:6
 24:21
provide  17:18
 24:24 25:25
providing
 23:2
purchase
 8:11,13 9:1,
 2,13,22 10:6
 16:18 17:9
 24:21
purchased
 10:1 12:10
 17:9 19:19
put  7:3,23
 9:23 10:13
 11:7 16:6,15,
 17 21:5 25:14
 27:6
putting  16:4,
 18

**Q**

question  10:4
 15:16 16:13
 18:8 25:9
questioning
 7:13
questions
 6:20,21 7:13
 23:4,8,12,19,
 21,24 24:6,8,
 11

**R**

raise  3:4
 4:19
Rancho  4:13
Randy  8:17

ranges 7:3
rate 18:1,3
read 12:9
readily 25:11
ready 3:2
realized
 20:12
recall 10:3
 11:9,10,14
received 5:18
 10:24 22:1,5
receiving
 19:24
record 13:21
 16:25
recorded 12:1
recording
 28:22
records 10:5,
 7
referring
 6:25 14:9,12
reflected
 13:8
refused 21:9
relating
 24:20
relationship
 24:12
rent 12:20
 13:5
represented
 3:17
representing
 7:17
request
 24:18,19
requested
 11:4
required
 15:2,5,7 18:9
requires
 15:18
reserve 7:12
residence
 12:17

retainer 23:1
retirement
 22:2,12,13
return 6:17
review 5:12
reviewing
 7:18
rights 12:5
 19:18 20:15,
 16 21:2
Rob 13:3 14:2
Robert 13:4
 14:7,9
Ron 13:23
 14:1,6,12
 18:18
room 12:20,22
run 20:24
Ryan 4:9 8:8
 9:12,23 10:2,
 6 19:19 23:16
 24:21 25:1
Ryan's 28:17

S

sale 16:1
 17:2 20:3
 22:21
sales 8:21
schedule 7:19
 13:7 22:1,4
 26:15 27:20
schedules 5:6
 6:22,23 7:18
 9:15,18 13:18
 20:14,22
 21:14,25
 22:19 26:6
Security 3:15
 4:21 5:21
sell 8:16
 17:5 20:6
send 11:1
 27:7 28:8,9,
 10,19

September
 25:4 26:18,19
 27:21
services 23:2
set 17:25
settlement
 10:12
sheet 5:8
short 12:21
show 10:8
showing 17:19
shredder 21:6
siblings
 21:12
sign 15:18
signed 5:12
sir 4:22 5:20
 6:3,18 7:1,7,
 10 14:14 24:8
 26:9,17,20
sister 21:10
sits 12:3
situation
 17:15 18:5
Skyline 7:19
small 11:13
Social 3:15
 4:20 5:21
sold 8:2,14
 12:10 17:2
sons 14:2,7
sounds 18:15
source 13:9
 22:3
Space 7:20
 8:9 11:20,24
speak 3:12
 5:1 6:10
specific
 15:17
start 7:14
 24:14
state 3:11
 4:1,2
statute 20:24

stay 12:22
staying 13:5
stem 21:2
stepmother
 20:18 21:5
stop 24:15
stopped 19:11
street 8:15
 12:8,11
strong 27:22
study 6:6
support 6:8
 11:24
sworn 3:8

T

takes 10:25
talked 25:5
tax 6:16
technical
 3:23
ten 26:23
testified 3:9
thing 3:23
things 6:19,
 21 18:6
thought 20:11
thousand
 13:7,9
time 6:13
 9:17 10:3
 12:21 14:22
 16:14 18:2,
 22,25 20:12
 25:10,13
 26:8,13 27:9
title 5:18
 9:15,23 10:9,
 16,22 11:4,5,
 7,17
today 14:6
told 20:3
Torrance
 12:18,24

**totally**  16:7
  23:25
**transactions**
  24:12
**transfer**
  9:12,21,25
  15:15
**transferred**
  16:19,20
**transfers**
  16:11
**trip**  21:20
**true**  6:2
**trust**  21:3
**trustee**  3:1,
  4,11,14,17,21
  4:6,10,15,18
  6:19 7:2,8,11
  10:8 11:3
  12:15 17:19
  23:7,13,17,23
  24:16,23
  25:3,14,23
  26:5,8,12,18,
  22 27:4,9,12,
  14,20,25
  28:5,7,14,19,
  21
**trustee's**
  28:3
**turn**  7:13
**turned**  12:11
**Twenty**  5:11
**two-thirds**
  14:5

---

**U**

---

**UCC**  14:19
  17:10,11
**understand**
  3:21,23 21:24
  28:3
**understanding**
  21:2
**Understood**
  25:14

**United**  21:15
  22:14,17
**units**  8:2
**unknown**  6:24
  7:11
**upload**  3:14
  4:20 25:11
  27:8

---

**V**

---

**Villa**  7:19

---

**W**

---

**wait**  24:9
  26:11
**wanted**  26:2
**week**  25:23
**weeks**  25:6,24
  26:14
**WERNER**  27:10,
  13,16
**wonderful**
  23:13,20 27:5
**work**  19:8
  22:9,15 27:23
**works**  12:18
  28:11
**worth**  7:4
**write**  25:10,
  13
**written**  12:2
  24:20
**wrong**  13:11

---

**Y**

---

**yard**  21:19,20
**year**  6:16
  22:2
**years**  5:11
  11:9 12:2
  13:15,17,20
  20:18
**yesterday**

  22:6
**yet already**
  23:1

---

**Z**

---

**Zoom**  4:10
  25:16

JASSO DECL. PAGES - 1562

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is:
7101 N. Mesa, Ste 355
El Paso, TX 79912

A true and correct copy of the foregoing document entitled (*specify*): __**Declaration of Janine Jasso In Support of**__
__**Motion and Motion for Entry of Default Judgments Against Defendants J-Pad, LLC and J-Sandcastle Co LLC and**__
__**Plaintiff's Brief In Support Thereof (filed concurrently with Motion)**__ will be served or was served **(a)** on the judge in
chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**: Pursuant to controlling General
Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*)
____12/30/2022_____, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and
determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email
addresses stated below:

See NEF for confirmation of electronic transmission to the U.S. trustee, any trustee in this case, and to any attorneys who
received service by NEF.

☐ Service information continued on attached page

**2.  SERVED BY UNITED STATES MAIL**:
On (*date*) _12/30/22_____, I served the following persons and/or entities at the last known addresses in this
bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United
States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that
mailing to the judge <u>will be completed</u> no later than 24 hours after the document is filed.

| | | |
|---|---|---|
| DEBTOR AND DEFENDANT | DEFENDANT J-PAD, LLC | DEFENDANT J-SANDCASTLE CO LLC |
| JAMIE LYNN GALLIAN | ROBERT L MCLELLAND, CEO | RONALD J PIERPONT, CEO 16222 |
| MONTEREY LANE, SPC 376 | 16222 MONTEREY LANE, SPC 376 | MONTEREY LANE, SPC 376 |
| HUNTINGTON BEACH, CA 92649 | HUNTINGTON BEACH, CA 92649 | HUNTINGTON BEACH, CA 92649 |

☐ Service information continued on attached page

**3.  SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method
for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*) ___12/30/22_____, I
served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in
writing to such service method), by facsimile transmission and/or email as follows. Listing the judge here constitutes a
declaration that personal delivery on, or overnight mail to, the judge <u>will be completed</u> no later than 24 hours after the
document is filed.

The Honorable Scott Clarkson, USBC, 411 West Fourth Street, Santa Ana, CA 92701

Courtesy Copy via email: Aaron De Leest, Esq., adeleest@danninggill.com

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| | | |
|---|---|---|
| 12-30-2022 | David Jasso | |
| *Date* | *Printed Name* | *Signature* |

---

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

**F 9013-3.1.PROOF.SERVICE**