1  Janine Jasso
   P.O. Box 370161
2  El Paso, TX 79937
   Plaintiff, IN PRO PER
3

4

5

6

7

8              **UNITED STATES BANKRUPTCY COURT**

9         **CENTRAL DISTRICT OF CALIFORNIA – SANTA ANA DIVISION**

10

11  In Re: JAMIE LYNN GALLIAN          **CASE NO. 8:21-bk-11710-ES**

12  _____   **Chapter 7**

13  JANINE JASSO, an individual,       **Adversary No. 8:21-ap-01096-ES**

14              Plaintiff,

15          v.                         **SECOND AMENDED COMPLAINT FOR**
                                       **DETERMINATION OF**
16  JAMIE LYNN GALLIAN, an individual; J-   **DISCHARGEABILITY AND OBJECTING**
    PAD, LLC, a California Limited Liability   **TO DEBTOR'S DISCHARGE PURSUANT**
17  Company, J-Sandcastle Co LLC, a      **TO SECTIONS 523 AND 727 OF THE**
    California Limited Liability Company, and   **BANKRUPTCY CODE**
18  DOES 1 through 100, inclusive,

19              Defendants.            Status Conference
                                       Hearing: February 14, 2023
20                                     Time: 1:30 p.m.
                                       Ctrm:5C - Virtual
21                                     Location 411 W Fourth St., Santa Ana, CA
                                       92701
22

23

24

25

26  TO THE HONORABLE SCOTT CLARKSON, UNITED STATES BANKRUPTCY JUDGE,

27

28  DEFENDANT AND HER ATTORNEY OF RECORD, AND TO ALL INTERESTED

                                    1

PARTIES:

Plaintiff-Creditor JANINE JASSO ("Plaintiff" or "Creditor"), as and for her Complaint against Defendant-Debtor Jamie Lynn Gallian (the "Defendant" or "Debtor"), Defendant J-PAD, LLC ("JP" or "JP LLC") and Defendant J-SANDCASTLE CO LLC ("JSC" or "JSC LLC") respectfully alleges as follows:

## JURISDICTION AND VENUE

1.      On July 9, 2021, the Debtor filed a voluntary petition ("Petition") for relief under chapter 7 of Title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Central District of California.  By virtue of the filing, Defendant has voluntarily subjected herself to the jurisdiction and venue of this Court.  The United States Bankruptcy Court for the Central District of California, Santa Ana Division, is the proper venue for this matter pursuant to 28 U.S Code § 1408, because the Debtor's principal assets were located in this district for one-hundred-and-eighty days immediately preceding commencement of this action.

2.      The Debtor's first duly noticed meeting of creditors was held pursuant to Section 341(a) of the Bankruptcy Code (the "Section 341 Meeting") was held on August 18, 2021. The Debtor's Section 341 Meeting has been continued multiple times.  A second meeting was held on October 14, 2021, a third meeting will be held on November 10, 2021, and a fourth meeting was held on February 28, 2022.

3.      As of the date of this Complaint the Debtor has not been granted a discharge.

4.      This Complaint is timely because the date by which a Complaint objecting to the Debtor's discharge or to determine dischargeability of a debt expires on October 18, 2021. In Paragraph 4 of Dockets 4, 13, 14, 15, 16, 17, and 18, Debtor answered and admitted this allegation is true.  On October 18, 2021, the Court filed Plaintiff's original Complaint,

accepted Plaintiff's filing fee and issued a Summons. The Court had the right to file Plaintiff's Complaint on October 18, 2021. On or before January 10, 2023, the Court posted its tentative ruling regarding Debtor's motion for judgment on the pleadings, finding that the Debtor admitted to the timeliness of the Complaint. At the hearing on January 10, 2023, the Debtor on the record submitted on the tentative ruling thereby acknowledging her satisfaction with the tentative ruling. As provided in Docket 104, both parties submitting on the January 10, 2023 tentative ruling on the record, the Court's tentative ruling became the Court's final order which confirmed the timeliness of the Complaint and granted Plaintiff leave to amend the Complaint. Therefore, Plaintiff's Complaint filed herein is timely.

5.      This is an adversary proceeding in which the Plaintiff is objecting to the Debtor's discharge under Bankruptcy Code § § 727(a)(3), 727(a)(4), 727(a)(5) and is seeking a determination as to the dischargeability of the debt owed by the Debtor to plaintiff under Bankruptcy Code § § 523(a)(2)(A) and 523(a)(7).  The Debtor answered and admitted this allegation is true under Paragraph 5, Dockets 13-18.

6.      The Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. § 1334 and Bankruptcy Code § § 523 and 727.  The Debtor answered and admitted this allegation is true under Paragraph 6, Dockets 13-18.

7.      Plaintiff's claims are not core proceedings, and Plaintiff does not consent to the entry of judgment on this claim by the bankruptcy court.

## **PARTIES**

8.      Plaintiff is the Creditor in the above-captioned case and at all relevant times is a resident of Orange County, California.   The Debtor answered and admitted this allegation is true under Paragraph 8, Dockets 13-18.

9.      Defendant is the Debtor in the above-captioned case and at all relevant times is a resident of Orange County, California.   The Debtor answered and admitted this allegation is true under Paragraph 9, Dockets 13-18.

10.     From October 18, 2018 through November 22, 2021, JP was at all relevant times an active California single-member limited liability corporation wholly-owned and operated by Defendant with a principal place of business of Debtor's residential address, including, but not limited to, 16222 Monterey Lane, Space 376, City of Huntington Beach, Orange County, State of California. On November 22, 2021, Defendant, as JP's sole member and per Defendant's March 16, 2022 Form 1007-4 Corporate Ownership Statement filed under penalty of perjury as Docket 29, filed a State of California Secretary of State Certificate of Cancellation terminating JP.

11.     From October 18, 2018 through November 22, 2021, JSC was at all relevant times an active California single-member limited liability corporation wholly-owned and operated by Defendant with a principal place of business of Debtor's residential address, including, but not limited to, 16222 Monterey Lane, Space 376, City of Huntington Beach, Orange County, State of California. On November 22, 2021, Defendant, as JSC's sole member and per Defendant's March 16, 2022 Form 1007-4 Corporate Ownership Statement filed under penalty of perjury as Docket 29, filed a State of California Secretary of State Certificate of Cancellation terminating JSC.

FACTUAL BACKGROUND

12.     Plaintiff at all relevant times mentioned herein, has been a homeowner, and Board Member of The Huntington Beach Gables Homeowners Association ("Association"), and a Plaintiff in this action.  Plaintiff also served as Vice President of the Board of Directors ("Board").

13.     Debtor became the Sublessee of record of the property located at 4476 Alderport Drive, Unit 53, Huntington Beach, CA 92649 ("4476 Alderport") on or about March 22, 2017, by way of a recorded Assignment of Condominium Sublease ("Sublease"). The prior owner, Sandra Bradley, was a member of the Association, Debtor's landlord and widow of Debtor's former stepfather. The Debtor answered and admitted this allegation true under Paragraph 13, Dockets 13-18.

14.     4476 Alderport is one of only 80 an air-space condominiums located within the Association.  The Association is located within two miles of Sunset Beach and less than a mile from Huntington Harbor. The Association is a very small, non-profit organization with very low monthly dues.  The residents are subject to a triple-net land lease, requiring owners to pay rent to a separate landlord, BS Investors LLC, the property taxes and insurance. The Association is a very close-knit community, where residents know their neighbors as their friends.  The residents take care of the inside of their condos and patios, and the Association maintains everything outside, i.e. the common area.

15.     Only the Association and condominiums are located on the entire Orange County real estate tract 10542. The Condominium Plan for the entire tract is recorded with Orange County Recorder's office as Book 13358 Page 1193, as Instrument No. 28814. See attached **Exhibit 1.**  No Rancho Del Rey mobile homes are located on the same real estate tract as the Association.

16.     The Sublessee of every unit within the Association is subject to the provisions of various governing documents, including but not limited to, the "Declaration of Covenants, Conditions and Restrictions for The Huntington Beach Gables," recorded on May 28, 1980 as file/document number 80-28926 ("CC&Rs"), Rules and Regulations adopted by the Board on August 26, 2003, and the Condominium Plan recorded on October 18, 1979 as Book 13358 Page 1193, as Instrument No. 28814.  A true and correct copy of the CC&Rs is attached as **Exhibit 2.**

17.     The CC&Rs create and establish the Association as the governing body for the management, administration, and operation of the Association.  Civil Code section 5975,

1    subdivision (a) provides in part:

2            The covenants and restrictions in the declaration shall be
        enforceable equitable servitudes, unless unreasonable, and shall
3        inure to the benefit of and bind all owners of separate interests in
        the development.
4
    The Debtor answered and admitted this allegation true under Paragraph 17, Dockets 13-18.
5
6        18.    The equitable servitudes contained on page 2 of the CC&Rs set forth the

7    owners'/sublessees' obligations.  As an owner/sublessee, Article III, Section 3 .1 of the CC&Rs

8    required Debtor to abide by the covenants, conditions and restrictions set forth in the CC&Rs.

9        19.    Debtor violated the governing documents in various ways by failing to adhere to

10    the architectural guidelines, maintenance standards, and specifications set forth in the CC&Rs

11    and creating a nuisance in the Association's common areas. As a result, the Association receive

12    mounting homeowner complaints and demands that the nuisance activities be abated by the

13    Association.

14        20.    Despite the Association's and Ms. Bradley's numerous attempts to bring the

15    condominium into compliance with the CC&Rs, the Debtor refused to comply.  Due to Debtor's

16    refusal to comply, the Association began its enforcement lawsuit in April 2017 ("Enforcement

17    Lawsuit") to enjoin the Debtor from her actions in the common area and recover damages.

18        21.    During the course of the Enforcement Lawsuit, the Debtor continued to refuse to

19    comply with the governing documents, doubled-down by increasing her unsafe nuisance

20    activities affecting all the residents in the common area, causing the homeowners to complain

21    even more about the Debtor and threaten litigation against the Board members.  Her nuisance

22    activity in the common area caused the Association's insurance and legal fees to increase as

23    well.   As a result, the Court issued a temporary restraining order in September 2017 ("TRO")

24    and a preliminary injunction in January 2018 ("PI").

25        22.    As part of the TRO and PI legal proceedings against the Debtor, the Court

26    determined that Debtor was the owner of the condominium airspace parcel and that the

27    Association's common area included all of the property in the Association exterior to the

28    condominium, from the walls of each condominium out.  The Court ordered Debtor, and any of

her associates, employees, guests and tenants to comply with the TRO and preliminary

injunction as well in order to protect the Association and its vendors from further harm.

23.    The Debtor in apparent retaliation began trespassing, threatening, stalking,

harassing, making false-accusations and bullying Plaintiff, the other Board members and family

members, requiring the Association to obtain a Workplace Violence restraining order against

Debtor. At the trial on the merits, the Court found that Debtor had targeted Plaintiff and other

Board members and family members showing a pattern of conduct threatening the safety of all

of the protected parties and issued a permanent Workplace Violence restraining order until July

2022.  In August 2022, the Court ordered the extension of the Workplace Violence restraining

order until July 2025.

24.    In March 2018, the Debtor violated the Workplace Violence restraining order

protecting Plaintiff and my then 7-year-old daughter.  Under Criminal Case No. 18WM05278, a

criminal trial was held, and Debtor was convicted of two counts of Contempt of Court for

violating the Workplace Place Violence restraining order. After Debtor violated the Workplace

Violence Restraining Order, Plaintiff sought an additional personal restraining order on the

advice of the Huntington Beach Police Department.  A separate permanent civil restraining order

protects Plaintiff and my family members until December 2023.

25.    In addition, during the course of the criminal case, a criminal protective order

was issued protecting Plaintiff and my daughter due to Debtor's continuing threats against

Plaintiff. After Debtor's conviction, the Criminal Court ordered Debtor to remain 100 yards

away from Plaintiff's home, daughter and Plaintiff. And, shortly after the Debtor's sentencing of

30 days in jail and 3 years of probation, Debtor was found guilty of violating her probation as a

result of the extortion letter she wrote to Plaintiff, a copy of which Debtor provided to the

Bankruptcy Trustee.

26.    Under state law, after a criminal Court restitution hearing on the merits regarding

Plaintiff's claimed expenses related to the Debtor's criminal conduct, the criminal Court ordered

criminal restitution in favor of Plaintiff, payment of which is a condition of Debtor's court-

ordered probation. Shortly after, the Court issued an abstract of judgment and instructed Plaintiff

to record the abstract with the Orange County Recorder's Office. A true and correct copy is attached as **Exhibit 3**.

27.    The State of California's restitution order in favor of Plaintiff is listed in numerous locations under Debtor's Bankruptcy Schedules, including the October 14, 2021 amended schedules.   The Debtor answered and admitted this allegation is true under Paragraph 27, Dockets 13-18.

28.    In a possible effort to increase confusion for the Bankruptcy Trustee about the legitimacy of the criminal restitution judgment, the Debtor provided the Bankruptcy Trustee with a copy of Debtor's fabricated court brief filed in multiple court cases in 2021.  In it, Debtor claims that Plaintiff and my daughter were not her victims, were not entitled to state victim restitution, and that Plaintiff illegally recorded the restitution abstract of judgment issued by the Criminal Court as provided above. Plaintiff believes that Debtor may be projecting Debtor's own fraud onto Plaintiff. To date, the Debtor's claim has been denied in three different hearings by three different courts, including the California local Criminal court, the Criminal Appellate Court and the Civil Court of Appeals for the 4th District.  The Debtor answered and admitted this allegation is true under Paragraph 28, Dockets 13-18.

29.    During the same time period, the Debtor cross-sued against the Plaintiff and the other individual, volunteer Board members in the Association's civil Enforcement Lawsuit. After enduring false claims and defending Debtor's out-of-control litigation tactics designed to hurt people rather than prove a civil claim, Debtor lost her civil cross-claims on demurrer. Debtor ultimately dismissed her suit against Plaintiff and the other Board members. Per the governing documents and state law, known as Davis-Stirling, Plaintiff as a Board member was entitled to attorney's fees and costs for defending herself against the Debtor's cross-suit in the Enforcement Lawsuit.

30.    After a properly noticed motion for attorney's fees on August 7, 2018, the Court issued a tentative ruling on October 31, 2018 in favor of Plaintiff and the other Board members.

1    On November 1, 2018, the Court held its scheduled hearing and found in favor of Plaintiff and

2    the other Board members on the merits, issuing a final order of $46,138 plus 10 percent interest

3    per annum, on November 8, 2018.  See attached **Exhibit 4** which is a true and correct copy

4    thereof. An Abstract of Judgment was issued and recorded at the Orange County Recorder's

5    office on December 14, 2018.  Debtor appealed and lost on September 15, 2020, California 4th

6    Appellate District Division 3, Case No. G058198.

7          31.    On or about October 17, 2018, Debtor's landlord, BS Investors, filed its unlawful

8    detainer suit against Debtor after notifying Debtor in August 2018 that she was being evicted for

9    nonpayment of the HOA's special assessments, which resulted in Debtor defaulting on her

10    condominium sublease.

11          32.    On October 18, 2018, Debtor created her ownership interest in JP.  Debtor

12    provided documents to the Bankruptcy Trustee demonstrating her efforts to transfer the

13    condominium's defaulted sublease to her own LLC prior to transferring the sublease to Mr.

14    Nickel. On October 30, 2018, Ms. Gallian and Mr. Nickel tried to transfer the condo from JP to

15    Mr. Nickel. There was no purchase agreement, escrow or title policy.

16          33.    On or before November 1, 2018, the Debtor disclosed to Mr. Nickel that an

17    unlawful detainer action was instituted by Debtor's landlord, BS Investor, for defaulting on her

18    condominium sublease.

19          34.    Mr. Nickel's emails to Debtor in 2020 show that Mr. Nickel had no information

20    regarding any checks he gave to Debtor for the purported purchase of the condominium.

21          35.    In the Debtor's 341 hearing and documents provided by the Debtor to the

22    Bankruptcy Trustee, the Debtor claimed she rescinded the transfer of the condominium from JP

23    to Mr. Nickel on October 31, 2018 and recorded Debtor's new, concealed transfer of her

24    defaulted sublease to Mr. Nickel for no consideration, no transfer taxes paid and without a

25    purchase agreement, escrow or title policy.

26          36.    Per the Debtor's documents provided to the Bankruptcy Trustee and Debtor's

27    statements in the 341 hearings, Debtor received $379,000 in cashier's checks from Mr. Nickel

28    on October 30, 2018 payable to JP and then another set of cashier's checks from Mr. Nickel to

9

the Debtor on October 31, 2018 totaling $379,000. The Debtor answered and admitted this allegation is true under Paragraph 36, Dockets 13-18.

37.     Debtor never provided any bank statements proving Debtor or her alter ego, JP, returned funds to Mr. Nickel. The Debtor answered and admitted this allegation is true under Paragraph 37, Dockets 13-18.

38.     California law provides a 4 year look back period, but the Debtor has refused to provide the creditors with her 2018-2019 personal and LLC bank statements tracing the funds.

39.     The Debtor provide the Bankruptcy Trustee with emails between the Debtor and Mr. Nickel starting October 31, 2018 through September 2020. The Debtor answered and admitted this allegation is true under Paragraph 39, Dockets 13-18.

40.     These emails show that in 2018, the Debtor knew she was legally responsible for all seller disclosures, and referred to her Mr. Nickel as a very savvy investor after Debtor recorded her purported transfer of the sublease. The emails show that the Debtor and Mr. Nickel knew that the Debtor had defaulted on the sublease and was being evicted by the landlord of the condominium.  And, in September 2019, the emails show Mr. Nickel investigating Debtor's outstanding debts on the condominium 4476 Alderport.

41.     The emails show Mr. Nickel and the Debtor lied in their ongoing civil lawsuit against Plaintiff by claiming an escrow agent sent the HOA an escrow demand, when Debtor admittedly sent the fabricated HOA escrow demand. The same email further shows that Debtor lied to Mr. Nickel about paying her outstanding HOA regular and special assessments, falsely stating that Debtor had a credit balance on her HOA account on October 31, 2018. Finally, the same email shows the Debtor advising Mr. Nickel, in 2019 months after the purported transfer of the condominium sublease, to obtain a preliminary title report for the condominium and "tuck it away".

42.     The emails show Mr. Nickel requesting information after the purported purchase of the condominium for documents proving Debtor's liens were released prior to the transfer of

the defaulted sublease.  From what Plaintiff could ascertain from the Orange County Recorder's office, no release has been recorded for at least one of Debtor's recorded debts that attached to the condominium in 2017. The Debtor answered and admitted this allegation is true under Paragraph 42, Dockets 13-18.

43.    On or about October 18, 2018, Debtor and Mr. Anthony Calderon began jointly owning JP LLC or Debtor became the sole owner of JP LLC.  See California Secretary of State Statement of Information for JP dated October 18, 2018 attached as **Exhibit 5** which is a true and correct copy thereof. Shortly thereafter, according to Debtor's documents provided to the Bankruptcy Trustee, Mr. Nickel apparently gave Debtor's alter-ego, JP LLC, $379,000 on October 30, 2018.

44.    On or about October 18, 2018, Debtor created the real estate investment company called JSC. In her 341 hearings, Debtor stated that JSC is and has been always wholly owned by Debtor. The Debtor answered and admitted this allegation is true under Paragraph 44, Dockets 13-18.

45.    On or about November 16, 2018, the Civil Court in the Enforcement Lawsuit ordered an Abstract of Judgment against Debtor for failing pay the court-ordered sanctions related to Court's finding that the Debtor would not comply with the civil settlement with the HOA and Board members, and therefore was required to comply with discovery.  A true and correct copy of the Court's September 2018 Order Granting the Association's Motions to Compel Discovery and the Court's Abstract of Judgment for the unpaid sanctions are attached as **Exhibit 6**.    The Debtor answered and admitted this allegation is true under Paragraph 45, Dockets 13-18.

46.    Debtor provided the Bankruptcy Trustee with copies of the front of four cashier's checks payable to Lisa Ryan on November 16, 2018 drawn on Debtor's personal Chase checking account. The Debtor answered and admitted this allegation is true under Paragraph 46, Dockets 13-18.

47.     Debtor stated in her 341 hearing that she gave Lisa Ryan $10,000 cash on or about November 16, 2018 and paid some of Ms. Ryan's debts from Debtor's personal Alliant checking or savings account.  The Debtor answered and admitted this allegation is true under Paragraph 47, Dockets 13-18.

48.     From what Plaintiff could ascertain, on or around November 1, 2018, JSC LLC became the title owner of Lisa Ryan's mobile home located at 16222 Monterey Lane, Space 376, in the Rancho Del Rey Mobile Home Park pursuant to a purported, concealed sale without a purchase agreement at a time when Ms. Ryan claimed in an online fundraiser that Houser Bros Co. owned Ms. Ryan's mobile home.

49.     Debtor has not provided copies of any personal Chase or Alliant bank statements related to 2018-2019 proving her claimed payments to Ms. Ryan or on behalf of Ms. Ryan.

50.     Debtor provided documents to the Bankruptcy Trustee asserting that in or about 2018, Debtor lent JSC $225,000 to be paid back to her alter-ego JP LLC. These documents appear to be missing signatures and dates.  Furthermore, Debtor stated in her first 341 hearing that no loan payments were ever made on this purported loan, and there appear to be no documentation of any loan payments.

51.     On or about October 18, 2018, Debtor also created another real estate investment company called Alderport 4476 Co LLC that was owned jointly by JP LLC and JSC LLC.

52.     On or about January 14, 2019, and after the Association's and the Plaintiff's recorded court judgments, Debtor filed on behalf of JP, a UCC lien against both Debtor herself and her JSC, UCC Financing Statement Document Number 76027030002/Filing Number 19-7691905279, thereby putting a purported UCC lien on the JSC mobile home asset, in favor of Debtor's and Mr. Calderon's joint JP real estate investment company.  No financing statement or trust deed was recorded in the Orange County Recorder's office for this purported lien. The Debtor answered and admitted this allegation is true under Paragraph 52, Dockets 13-18.

53.     On or about January 14, 2019, after filing the UCC lien above, Debtor filed a second

UCC lien Document Number 76027940003/Filing Number 19-7691916827, on behalf of herself putting a lien on JSC only in favor of Debtor and JP, and assigning her rights as a secured party to JP. This UCC Financing Statement was provided to the Bankruptcy Trustee on October 14, 2021. No financing statement or trust deed was ever recorded in the Orange County Recorder's office for this purported lien. The Debtor answered and admitted this allegation is true under Paragraph 53, Dockets 13-18.

54.     On or about January 19, 2019, the State of California Department of Housing and Community Development ("HCD") registered the title of the mobile home in the name of JSC, with a purchase price of $175,000 paid on November 1, 2018. In her continued 341 hearing, Ms. Gallian stated that she submitted the change of ownership request on November 16, 2018 in the HCD office in Riverside. The Debtor answered and admitted this allegation is true under Paragraph 54, Dockets 13-18.

55.     On or about January 31, 2019, the Court heard the Association's motion for terminating sanctions in HOA Enforcement Lawsuit. The Court ruled in favor of the Association due to Debtor's continued refusal to comply with court-ordered discovery and failure to pay court-ordered sanctions. On May 6, 2019, default judgment was entered in favor of the Association for over $300,000. The abstract of judgment was recorded with the Orange County Recorder's office in May 2019. The Debtor answered and admitted this allegation is true under Paragraph 55, Dockets 13-18.

56.     The Debtor appealed the judgments.  In Debtor's appellate opening brief, the Debtor stated that rather than pay the judgments she owed, Debtor sold the condo to Mr. Nickel. The Debtor's appeal of the Association's judgment was dismissed in June of 2020. The Debtor answered and admitted this allegation is true under Paragraph 56, Dockets 13-18.

57.     On or about February 26, 2019, Debtor and JSC became the joint owners of JP.

See California Secretary of State Statement of Information dated February 26, 2019 attached as **Exhibit 7** which is a true and correct copy thereof.  As of result of this change of ownership of this LLC, Debtor owned JSC's assets and all of JP's assets.

58.     On or about January 8, 2020, Robert McClelland, a person Debtor lived with for many years in the Association, became the sole owner of JP. See California Secretary of State Statement of Information dated January 8, 2020 attached as **Exhibit 8** which is a true and correct copy thereof.  The transfer of ownership appears to be without consideration.

59.     On or about January 29, 2020, JP and family members of Debtor became owners of JSC and Debtor was removed as an owner. See California Secretary of State Statement of Information dated January 29, 2020 attached as **Exhibit 9** which is a true and correct copy thereof.

60.     On or about July 23, 2020, Plaintiff filed a UCC judgment lien regarding the Plaintiff's recorded, civil abstract of judgment for attorney's fees and costs.  Debtor provided a copy of the UCC judgment lien to the Bankruptcy Trustee.

61.     In apparent retaliation for the filing of the UCC lien, Debtor used her personal account funds to pay HCD to add her husband and JP as legal owners of the mobile home, and added language regarding Debtor's unrecorded, back-dated personal and JSC UCC lien on the mobile home HCD title document, fabricating evidence of a loan between Debtor and JSC for which Debtor admitted no repayment has ever been made.

62.     Debtor stated that in August 2020 she added her husband, Ron Pierpont and JP as legal owners of the mobile home and adding a lien that she claims had been perfected against the mobile home in favor of JP LLC, which appeared to be solely owned by Robert McClelland.

63.     At the 341 hearings, Debtor stated JSC and Debtor have always been one and the same.

64.     In May 2021, Plaintiff filed a UCC lien for the criminal restitution Abstract of Judgment against the Debtor.

65.     On or about July 8, 2021, Debtor refused to comply with the court-ordered debtor's examination in civil Court and the attached request for production of documents related

SECOND AMENDED COMPLAINT – ADVERSARY PROCEEDING

to the Debtor's financial condition. A warrant was issued for her arrest and the Debtor immediately filed for this Chapter 7 bankruptcy protection. The Debtor answered and admitted this allegation is true under Paragraph 65, Dockets 13-18.

66.     On or about August 2021, Debtor changed the registered owner of the mobile home to herself and continued to show the JSC loan and lien against the asset held by her alter-ego JP LLC. Debtor also stated in her 341 hearings that she owned one-third ($1/3^{rd}$) of the JP, and then stated she owned one-seventh ($1/7^{th}$) and then stated she owned seventy percent (70%). After Plaintiff's months of discovery, Debtor filed a corporate ownership statement claiming 100% ownership since 2018 of her alter-ego, single member JP LLC (Docket 29).

67.     On September 7, 2021, Debtor claimed in her Bankruptcy schedules that she became the new registered owner of the JSC mobile home via a new HCD registration of title that she filed on behalf of JSC, and back-dated the change of ownership to February 25, 2021. The Debtor answered and admitted this allegation is true under Paragraph 67, Dockets 13-18.

68.     On or about September 12, 2021, after filing for Bankruptcy, Debtor began filing a series of new UCC filings showing numerous family and friends financing liens against the mobile home or any other assets owned by JSC, and Debtor's ownership interest in J-Sandcastle Co appears to have changed several times with the addition and subtraction of family and friends in 2020 and 2021. No liens or title changes were recorded with the Orange County recorder's office, or the Secretary of State related to these purported UCC liens.

69.     On or about October 14, 2021, Debtor filed amended schedules for the second time, claiming personal ownership of the JSC mobile home and the landlord's ground underneath the mobile home in fee simple.  This appears to be a lie.  If true, the mobile home value would necessarily increase in value to well over $900,000 based on recent sales of single homes adjacent to JSC's mobile home.  The Debtor answered and admitted this allegation is true under Paragraph 69, Dockets 13-18.

70.     In addition, Debtor claimed in her 341 hearing and in documents provided to the

Bankruptcy Trustee that she has a monthly rental agreement with Houser Bros Co., dba Rancho Del Rey Mobile Home Park.  Per Houser Bros Co. adversary complaint, Houser Bros Co. instituted legal action against Debtor for unlawful detainer in the Orange County Superior Court Case No. 30-2019-01041423-CL-UD-CJC, which provides that Debtor does not have a legal lease agreement. Further Debtor's bank records show there is has been no payment of rent to Houser Bros Co. for the space 16222 Monterey Lane, Space 376, on which JSC's mobile home sits.

71.    For financial records, California provides a four year look back period in bankruptcy court and ten years when the Internal Revenue Service is a creditor in a bankruptcy proceeding.

72.    In October 2021, Debtor provided some Bank of America and Chase 2020 and 2021 bank statements to the Bankruptcy Trustee for JSC and JP and one new personal Bank of America checking account.  Importantly, JSC and JP LLC bank statements show payments of Debtor's personal items and personal withdrawals, like a personal bank account.  In addition, the statements show Debtor's personal funds deposited into these same LLC bank accounts. Finally, the best the Plaintiff could ascertain is that one of the Debtor's personal bank accounts paid the 2020 annual Franchise Tax Board tax debt required for LLC corporations. The Debtor answered and admitted this allegation is true under Paragraph 72, Dockets 13-18.

73.    In 2019, the Association received notice that the Bank of Account had been closed shortly after the notice of the Association's bank levy on this account. The Debtor has failed to provide the creditors with copies of her monthly statements for her personal Bank of America bank account in the last four digits #0827 from January 2018 through the close of this personal bank account.

74.    Although the Debtor provide some 2020-2021 personal and business bank statements to the Bankruptcy Trustee, the Debtor has not provided personal bank statements starting January 2018 for her Alliant credit union bank accounts, her new Bank of America bank

account with the last 4 digits ending in #7357, her Chase personal bank account from which she gave money to Lisa Ryan, her Fidelity investment account, or her United Airlines Group Universal Life policy account, which are all relevant to the judgment debts Debtor incurred in 2018 and shortly thereafter.

75.    One of Debtor's JSC LLC Chase checking accounts shows that in 2020 Debtor deposited personal funds from her Fidelity account into this JSC Chase account.  It also shows that Debtor paid her personal Target and cell phone bills from the JSC Chase bank account. It also shows that Debtor transferred JSC monies to JP and to Debtor's personal Fidelity account and Alliant credit union account. Further, Debtor withdrew $16,000 of cash on the date she filed this bankruptcy petition, which was also the day after the Civil court issued a warrant for her arrest for failure to sit for her debtor's examination, and made personal withdrawals after the bankruptcy petition was filed.

76.    The Debtor has listed the Plaintiff's criminal restitution judgment lien in various forms including as a secured creditor.

77.    The Debtor has listed the Plaintiff's civil judgment lien in various forms including as a secured creditor.

**FIRST CAUSE OF ACTION**

**FOR ORDER DENYING DISCHARGE OF DEBTOR'S FIRST**

**CRIMINAL RESTITUION JUDGMENT OWED TO PLAINTIFF**

**PURSUANT TO 11 U.S. CODE § 523(a)(7) (GOVERNMENT**

**(Against JAMIE LYNN GALLIAN and DOES 1 Through 100)**

78.     Plaintiff incorporates the previous paragraphs of this Complaint as if set forth in full.

79.    Under 11 U.S. Code § 523(a)(7), a debt is not dischargeable "to the extent such debt is for a fine, penalty, or forfeiture payable to and for the benefit of a governmental unit". The Debtor answered and admitted this allegation is true under Paragraph 79, Dockets 13-18.

80.    The US Supreme Court determined that this statute applied to state criminal

1    restitution orders in Chapter 7 bankruptcy proceedings. *See Kelly v. Robinson* (1986) 479 U.S.

2    36.

3         81.     As detailed above, because the first debt owed to Plaintiff is ordered by the State

4    of California for criminal restitution and judgment to be paid by Debtor to Plaintiff, as part of

5    Debtor's criminal sentence and a condition of her probation, the State of California's restitution

6    order in favor of Plaintiff and Plaintiff's related restitution judgment lien is not dischargeable in

7    bankruptcy.

8    **SECOND CAUSE OF ACTION**

9    **FOR ORDER DENYING DISCHARGE OF DEBTOR'S SECOND**

10    **CIVIL JUDGMENT OWED TO PLAINTIFF**

11    **PURSUANT TO 11 U.S. CODE § 523(a)(2)(A) (ACTUAL FRAUD)**

12    **(Against JAMIE LYNN GALLIAN and DOES 1 Through 100)**

13         82.     Plaintiff incorporates the previous paragraphs of this Complaint as if set forth in

14    full.

15         83.     Under 11 U.S. Code § 524(a)(2)(A), Plaintiff's civil judgment debt, attached as

16    **Exhibit 4**, is nondischargeable as it results from Debtor's intentionally fraudulent litigation

17    which was an immoral, fraudulent debt Debtor incurred, like Debtor's many years of targeting

18    people and entities for her pro per false and out-of-control litigation.   Debtor targeted Plaintiff

19    by intentionally filing a fabricated indemnification cross-claim against Plaintiff for Debtor's

20    liability under the Association's Enforcement Lawsuit as detailed in Paragraphs 12-29, *supra*.

21    Debtor's false cross-claims were designed to hurt Plaintiff rather than prove a legitimate claim.

22    Defendant acted fraudulently by intentionally and falsely claiming Plaintiff owned Debtor's

23    4476 Alderport condominium and that Plaintiff was responsible for Debtor's actions in violation

24    of the recorded governing documents.  As provided in Paragraph 13, *supra*, Debtor admitted

25    Debtor was the owner of the condominium starting March 22, 2017.  In September 2017, as part

26    of the court's order imposing a restraining order against Debtor, the state court found that Debtor

27    was the owner of the 4476 Alderport condominium Sublease, making the Debtor the legal

28    sublessee of the condominium subject to the CC&Rs, the Condominium Plan and the

1    condominium sublease.  Debtor's fraudulent claims caused Plaintiff to defend herself against

2    Debtor in reliance on state law and the recorded governing documents that provided Plaintiff

3    with a continuous, ongoing lien on the 4476 Alderport condominium. The civil court gave

4    Debtor several opportunities to amend her complaint to remove Debtor's lies and false claims

5    against Plaintiff, but Debtor did not and instead doubled-down on her intentional harm by

6    destroying the Association's common area, as well as stalking and threatening Plaintiff and my

7    family.  In addition, days before Plaintiff's attorney filed a motion for attorney's fees in

8    accordance with the CC&Rs and state law, Debtor pretended to settle the Enforcement Lawsuit

9    with the HOA, the Plaintiff and the other Board members. Plaintiff relied on Debtor's false

10    representation that Debtor intended to comply with the terms of the settlement, postponing

11    Plaintiff's motion in reliance on Debtor's settlement representations.  After Debtor's refusal to

12    live up to the terms of the settlement, Debtor used her false settlement representation to cause

13    Plaintiff to incur additional attorney's fees. **Exhibit 4** is the civil judgment attorney's fees

14    awarded to Plaintiff on November 1, 2018 and on November 8, 2018 against Debtor which was

15    affirmed on appeal.  The state court found that Debtor's arguments against Plaintiff's motion due

16    to timeliness were invalid because of Plaintiff's good faith efforts to settle with Debtor.  The

17    appellate court agreed with the state court, finding Debtor's tactics a red herring.  The state court

18    and appellate court found that the attorneys fees award was valid under California's HOA law

19    and the Association's governing documents.  Under Articles 5 and 14 of the CC&Rs, Debtor

20    provided Plaintiff and the Association with an ongoing continuance lien the 4476 Alderport

21    condominium due to Debtor's fraudulent cross-suit pinning Debtor's ownership of the 4476

22    Alderport condo Sublease and her violations of the recorded governing documents on Plaintiff,

23    the other Board members and the Association.

24        84.    Under 11 U.S. Code § 524(a)(2)(A), the U.S. Supreme Court determined that the

25    definition of "actual fraud" encompasses fraudulent transfer schemes engaged in by the Debtor

26    and her related or affiliated single member LLCs, JP and JSC, to shield assets that could be

27    utilized to satisfy debts of creditors. *See Husky International Electronic, Inc. v. Ritz* (2016) 578

28    U.S. 356, 359, 136 S. Ct. 1581, 1586, 194 L. ED. 2d 655 ("*Husky International*"). Fraud is

1   actual if it impairs the creditor's ability to collect the debt or if the debtor intended by the

2   transfer to hinder his creditors. *In re Wigley*, 15 F.4th 1208, 1211 (8th Cir. 2021).

3         85.    Just like in *Husky International*, Debtor owed the judgment debts she created by

4   making intentionally false lawsuits against Plaintiff, the Board and the Association under the

5   Association's governing documents.  Within four years of the Petition date, and while so

6   indebted to Plaintiff and other creditors, Debtor's fraudulent transfer scheme began with

7   Debtor's concealed transfer of Debtor's condominium located at 4476 Alderport, Unit 53 on

8   without paying the liens Debtor created in favor of Plaintiff and the other creditors. The

9   transferee, Mr. Nickel, a real-estate flipper with significant experience with buying, selling and

10  living in California HOAs, knew everything about the ongoing Enforcement Lawsuit, the

11  Association's judgments and the Plaintiff's imminent award of attorney's fees under the

12  Enforcement Lawsuit at the time of the transfer of 4476 Alderport. Debtor hid the concealed

13  transfer, hid Mr. Nickel's identity and falsely claimed to be indigent after the transfer. As

14  provided in Paragraph 56, *supra*, Debtor admitted that instead of paying her judgment debts,

15  Debtor transferred the condominium to Mr. Nickel.  Therefore, Debtor's actions were done with

16  actual intent to hinder, delay or defraud Plaintiff and Debtor's other creditors.

17        86.    Debtor, within four years of the Petition date, and with the actual intent to hinder,

18  delay and defraud her creditors, created JSC LLC and JP LLC as her alter-ego wholly owned,

19  single member limited liability companies shortly before the transfer of 4476 Alderport to Mr.

20  Nickel. Debtor used her JSC LLC and JPS LLC to conceal and drain funds, including the funds

21  Debtor received from Mr. Nickel.  The following examples include, but are not limited to:

22              1.  On or about October 30, 2018 and October 31, 2018, Debtor received

23                  concealed cashier's checks from Mr. Nickel totaling at least $379,000, most

24                  of which Debtor concealed by depositing or transferring approximately

25                  $355,000 into Debtor's newly created JSC LLC Chase account ending in

26                  #7860 via stacks of cashier's checks without first paying her debts owed to

27                  Plaintiff and other creditors. Debtor claimed in her 341 hearings that she

28                  purchased the mobile home with her own money and then transferred

1    $175,000 of the $379,000 to JSC LLC as a purported loan. She made these

2    false statements when she knew she transferred nearly double that amount to

3    her alter-ego JSC LLC.  Debtor never received anything in exchange for her

4    deposits into her JSC LLC bank account. Debtor eventually admitted JSC

5    LLC never operated as a business under Debtor's Corporate Ownership

6    Statement filed on March 16, 2022 under Docket 29.

7    2.  Within days of the above transfer transfers, Debtor caused JSC LLC to

8    transfer $150,000 from JSC LLC to Lisa Ryan for the purported concealed,

9    purchase of the mobile home, located at 16222 Monterey Lane Space 376,

10    Huntington Beach, CA.  Debtor admitted in her 341 hearing on October 14,

11    2021 that there was no purchase agreement. As part of her fraudulent

12    conveyance scheme, Debtor lied to the Trustee, Plaintiff and the other

13    creditors by providing the front copies of four cashier's checks payable to

14    Lisa Ryan totaling $170,000 and claimed that she paid Lisa Ryan $180,000

15    via the four personal cashier's checks totaling $170,000 plus an additional

16    $10,000 in cash.  Debtor's intended to hinder, delay or defraud creditors by

17    hiding $355,000 of collectible funds in JSC LLC, transferring three JSC LLC

18    cashier's checks totaling $150,000 to Lisa Ryan in a concealed transfer and

19    then lying about giving Lisa Ryan personal cashier's checks and further lied

20    by failing to tell the Trustee, Plaintiff and the other creditors that Debtor kept

21    the fourth JSC LLC $20,000 cashier's check in Lisa Ryan's name and

22    deposited it into Debtor's personal account.  There is no evidence that Lisa

23    Ryan received $10,000 in cash from Debtor.  Debtor further claimed in her

24    initial 341 hearing that she used $113,000 for payments of her personal

25    attorney's fees.  However, Debtor never provided any verifiable

26    documentation proving these listed payments to attorneys, including those on

27    subsequent amended Schedule 107 filed in Debtor's Main Case No. 8:21-bk-

28    11710-SC ("Main Case") Schedule 107, DK 1 Item 16, Schedule 107, DK

15, DK 16, DK 37, DK 38, DK 72 Item 18. In fact, Plaintiff found one $7,000 payment to attorney Michael Devereux who refunded $7500 back to Debtor. Based on Plaintiff's discovery, Debtor only paid approximately $30,000 of her JSC LLC's cash for Debtor's legal fees and approximately $2800 for court transcript/record fees. Debtor used JSC LLC funds for personal expenses such as car lease payments, cell phone bills, restaurants bills, hair salon, personal credit card payments, McDonald's, Starbucks, groceries, 401k loan payments, and criminal court fines. Debtor never paid any rent, water, trash, electricity or gas bills, as she appears to have been squatting in the Rancho Del Rey mobile home park since December 1, 2018. Plaintiff could not account for approximately $24,000 of cash withdrawn by Debtor from the $379,000 of Mr. Nickel's October 18, 2018 cashier's checks. Plaintiff could also not account for approximately $100,000 of cash that was withdrawn in cashier's checks or cash. Debtor also appears to have lied about payments of approximately $80,000 to attorneys in order to hinder, delay or defraud Plaintiff and her other creditors.

3. Debtor intentionally lied to the Trustee and the creditors claiming that she transferred the mobile home from JSC LLC to herself via a purported pre-petition, notarized, and back-dated transfer on February 25, 2021. However, on or about April 20, 2021, prior to the Petition date, Debtor sat for her deposition in the Association CUVTA collection case and testified that JSC LLC was an ongoing business and was the title owner of the mobile home on April 20, 2021. Further, the Debtor's purported notarization of the February 25, 2021 transfer was also a lie. These lies were intended by Debtor to hinder, delay or defraud Plaintiff and other creditors from collecting the debt from Debtor's assets.

4. In May 2019, Debtor transferred $96,000 from Debtor's JSC LLC Chase account ending in #7860 to Debtor's personal Fidelity IRA account #169-

1   638064, when Debtor claimed to be indigent in California's criminal court

2   case 18WM05278 against the Debtor for violating the workplace violence

3   protection order protecting Plaintiff and my then 7-year-old daughter. While

4   concealing Debtor's funds available to creditors in her Fidelity IRA account,

5   Debtor claimed indigency to obtain a public defender.  In August 2019, after

6   the criminal court appointed a public defender for Debtor, Debtor transferred

7   approximately $89,373.62 back to her JSC LLC. Debtor then transferred

8   approximately $75,000 from Debtor's JSC LLC to Debtor's new JP LLC

9   Bank of America bank account ending in #1274, which Debtor used to pay

10  her criminal bail, totaling $13,500, and other personal expenses and debts,

11  including but not limited to restaurants, Macy's, cash withdrawals of over

12  $40,000, Subway, hair salon, Jack N the Box, her personal Capitol One credit

13  card, her personal Alliant Visa card and personal court cost. Debtor then

14  intentionally falsely claimed $7400 on her original bankruptcy Petition and

15  multiple filed amendments on Schedule A/B Item 21, Main Case DK 1, DK

16  16,  DK 22, DK 37, DK 38,  DK 39, DK 72, when Debtor knew that all but

17  $75.89 of the Fidelity IRA funds came from Debtor's $96,000 transfer from

18  her JSC LLC Chase account #7860 to her Fidelity IRA rollover account.

19  Therefore, Debtor intentionally lied on her bankruptcy schedules about non-

20  exempt personal assets she held in her personal Fidelity IRA in order to

21  hinder, delay and defraud Plaintiff and the other creditors.

22  5.  On July 27, 2020, <u>within 1 year prior to the bankruptcy petition date</u>, Debtor

23  took a taxable distribution of her United Airlines 401k plan account balance

24  held by Fidelity in the amount of $14,002.53, which immediately changed the

25  qualified retirement plan money to Debtor's personal cash assets. Debtor

26  transferred and hid the $14,002.53 directly into the Debtor's JSC LLC Chase

27  #7860 account. Debtor did not receive anything for the cash transferred to

28  JSC LLC.  Debtor originally scheduled $31,922.58 as retirement plan income

1    within the previous two years on Main Case DK 1, Schedule 107, Part 2, Item

2    5. After the original Schedule 107, Part 2, Item, Debtor testified under oath in

3    her August 18, 2021 initial 341 hearing that the $31,922.58 was related to a

4    defaulted 401k loan, which, if true, would have solely been a taxable

5    withdrawal "on paper" without any actual money distributed to Debtor.

6    Debtor never explained that approximately $14,000 was distributed in cash to

7    her JSC LLC Chase #7860 account at her directions.  Debtor's Fidelity 401k

8    plan records as wells as Debtor's Defendant JSC LLC July 2020 bank

9    statements clearly shows that Debtor lied on Main Case, DK 1, DK 15, DK

10    16, DK 38, DK 72, Schedule 107, Part 2, Item 5. Debtor intentionally lied

11    about her transfer of personal $14002.53 funds to her alter-ego JSC LLC in

12    order to hinder, delay and defraud Plaintiff and her other creditors.

13    6.  Debtor transferred $355,000 to her alter-ego JSC LLC.  Debtor testified that

14    she deposited $175,000 into her alter-ego JSC LLC.  Debtor testified in her

15    341 hearing that she loaned $225,000 to her alter-ego JSC LLC. Debtor gave

16    the Trustee and creditors unsigned and undated loan and security agreement

17    documents which Debtor claimed JSC LLC gave to Debtor to document a

18    security interest in the mobile home for the $225,000 loan and lien. Debtor

19    claimed she then transferred her security agreement and lien to JP LLC so

20    that JP LLC would be the lien holder of the unsigned and undated promissory

21    note and security agreement and the receiver of JSC LLC's repayments of the

22    loan. Debtor never received anything from JP LLC for Debtor's transfer of

23    the promissory note and security agreement to JP LLC. Debtor then created

24    and filed UCC lien documents in January 2019 and HCD lienholder

25    paperwork in February 2021 in favor of JP LLC and, after Plaintiff and other

26    creditors recorded their liens.  Debtor falsely claimed that she filed HCD

27    lienholder paperwork in August 2020.  Debtor admitted there were never any

28    loan payments made by JSC LLC to JP LLC.  Debtor's JSC LLC and JP LLC

SECOND AMENDED COMPLAINT – ADVERSARY PROCEEDING

bank statements show there were never any loan repayments by JSC LLC to

JP LLC.  Debtor created a false lien held by her alter-ego JP LLC on her

alter-ego JSC LLC's mobile home asset in order to hinder, delay or defraud

Plaintiff and other creditors from collecting her debts.

87.    In addition, on September 22, 2021, after her original and amended schedules

were filed, Debtor suddenly amended her schedules again and added Debtor's right to her

reversionary interest in 4476 Alderport Unit 53 Sublease on  Main Case DK 16, Schedule A/B

Item 34.4.  Debtor added it again to a new amended DK 22 Schedule A/B, Item 34.3.  Debtor

added it again to a new amended DK 37 Schedule A/B, Item 34.5 and on another amended DK

38 Schedule A/B, Item 34.5.  In contrast to her bankruptcy schedules, Debtor testified in the 341

hearing to have sold her 4476 Alderport condominium Sublease to Mr. Nickel on October 31,

2018.  In addition, in March of 2021, Mr. Nickel claimed he was entitled to his money back from

Debtor. Therefore, Debtor appears to have only temporarily transferred the asset "on paper" to

Mr. Nickel to hold for her until Debtor obtains a discharge of the Plaintiff's civil judgment lien

through these Chapter 7 bankruptcy proceedings.

88.    As a direct and proximate result of Defendant's false pretenses, false

representations, or actual fraud, Plaintiff has suffered damages in an amount that now exceeds

$60,000. Due to actual fraud carried out with the intent to hinder, delay or defraud Plaintiff, the

Defendant is therefore not entitled to have the Defendant's civil judgment debt owed to Plaintiff

discharged in these bankruptcy proceedings.

## THIRD CAUSE OF ACTION FOR AN ORDER DENYING DISCHARGE
## PURSUANT TO 11. U.S. CODE § 727(a)(3) OF THE BANKRUPTCY CODE
### (Against JAMIE LYNN GALLIAN and Does 1 through 100)

89.    Plaintiff incorporates the previous paragraphs of this Complaint as if set forth in

full.

90.    Bankruptcy Code §727(a)(3) provides, in relevant part, that a debt may not be

discharged if the debtor has "concealed, destroyed, mutilated, falsified, or failed to keep or

preserve any recorded information, including books, documents, records, and papers, from which the debtor's financial condition or business transactions might be ascertained, unless such act or failure to act was justified under all the circumstances of the case." The Debtor answered and admitted this allegation is true under Paragraph 90, Dockets 13-18.

91.    This requires debtors to "produce records that provide enough information to ascertain the debtor's financial condition and track his financial dealings with substantial completeness and accuracy for a reasonable period past to present." *Union Planters Bank, N.A. v. Connors,* 283 F.3d 896, 899 (7th Cir. 2002). A creditor does "not need to prove that the debtor intended to defraud them in order to demonstrate a § 727(a)(3) violation." *Peterson v. Scott* (*In re Scott*), 172 F.3d 959, 969 (7th Cir. 1999) (quoting *In re Juzwiak,* 89 F.3d 424, 430 (7th Cir. 1996)). The language of the statute "places an affirmative duty on the debtor to create books and records accurately documenting his business affairs." *Scott,* 172 F.3d at 969 (citing *Juzwiak,* 89 F.3d at 429). "A creditor states a prima facie case under §727(a)(3) by showing '(1) that that the debtor failed to maintain and preserve adequate records, and (2) that such failure makes it impossible to ascertain the debtor's financial condition and material business transactions.' " *In re Caneva*, 550 F.3d 755, 761 (9th Cir. 2008), citing *Landowne v. Cox (In re Cox)*, 41 F.3d 1294, 1296 (9th Cir. 1994) (quoting *Meridian Bank v. Alten*, 958 F.2d 1226, 1231 (3rd Cir. 1992)).

92.    Prior to filing for bankruptcy and within days of state court's award for Plaintiff's attorney's fees against Debtor, she created or became a sole owner or partial owner of three California limited liability companies, Alderport 4476 Co LLC, J-Sandcastle Co LLC and J-Pad LLC.  On April 20, 2021, a couple of months before filing her bankruptcy petition, Debtor testified in the Association CUVTA collection case that JP LLC was a business that sold cleaning products since 2018.  On April 20, 2021, Debtor testified that JSC LLC owned a

mobile home.  Debtor never explained or even mentioned that JP LLC owned a security lien on the JSC LLC mobile home asset, nor any information regarding deposits of funds into JSC LLC nor JP LLC.

93.     In addition, prior to filing for bankruptcy, Debtor refused to comply with written discovery requests for documents related to JSC LLC and JP LLC, as part of her court-ordered debtor's examination, Orange County Superior Court, Case No. 2017-30-00913985, The Huntington Beach Gables HOA v. Bradley, Gallian et. al.  Debtor further refused to comply with the court-ordered debtor's examination, claiming that if the state court required her to sit for her debtor's exam, then Debtor would plead the 5th amendment against self-incrimination.  The court still ordered Debtor to appear for her debtor's exam.  Instead of complying with the court's order to appear, Debtor filed for bankruptcy protection after the court issued a warrant for Debtor arrest related to her refusal to sit for her civil debtor's examination.

94.     On July 9, 2021, Debtor initially scheduled on Schedule A/B and testified that she was the sole owner of JSC LLC, a California single member limited liability company. Debtor scheduled and testified that she was a 33.33% owner of JP LLC under Schedule A/B under her original (Main Case Dk 1) and her first amended (Main Case Dk 15).

95.     On August 18, 2021, Debtor testified under oath at her initial 341 hearing that she owned one-third of JP LLC.  When Debtor was subsequently asked who owned the other two-thirds, Debtor responded "Well, depending on who you ask today, it's Ron, myself, and Robert."  Based on this response, Debtor appeared to claim she owned 55.6% of JP LLC, even though she had just testified that she owned one-third.

96.     After the August 2021 341 hearing, Debtor filed her second amended Schedule A/B. Debtor changed and scheduled her JP LLC ownership interest to $1/7^{th}$ (Maine Case Dks

16-17). At the next 341 hearing in October 2021, Debtor was asked several times to explain how the ownership of JP LLC changed. Debtor talked about JSC LLC and would not answer until after several repeated questions. Debtor finally answered that the owners of JP LLC were "my family members, myself, and Ron and Bob have a small portion". Debtor would not give the names of the owners and testified "I listed them on the petition as well." However, Debtor did not list them on her second amended Schedule A/B. Eventually, Debtor testified that the names of JP LLC's owners were "myself, my oldest son Justin, Steven, Brian, EJ, Bob and Ron." Debtor was asked what percent of JP LLC she owned, and Debtor testified "It depends on what day it is."

97.     After the October 2021 341 hearing, Debtor filed a third amended Schedule A/B in which Debtor changed and scheduled her JP LLC ownership interest to 70%.   Shortly after the November 10, 2021 341 hearing, Debtor filed a fourth amended Schedule A/B in which Debtor changed and scheduled her JP LLC ownership interest to 33.33% (Main Case Dk 37).

98.     After Plaintiff filed and served Plaintiff's First Amended Complaint which added JP LLC and JSC LLC as additional defendants, Debtor terminated JSC LLC and JP LLC. Debtor then amended her Schedule A/B again scheduling a new 100% ownership interest in both JSC LLC and JP LLC without accounting for the change in the ownership percentages.

99.     Debtor testified in April 2021 that JP LLC was not wholly owned. Debtor filed so many conflicting Schedule A/Bs for months and testified in a less than candid manner that Debtor appeared to be playing a game of hide-n-seek regarding accurate ownership and accounting information of Debtor's JSC LLC and JP LLC. Debtor failed to produce any business records accounting for Debtor's ownership interests or the operations of JSC LLC and JP LLC, including failing to produce an accounting of funds deposited and withdrawn by either JSC LLC

or JP LLC.  After Plaintiff incurred months of expensive discovery, Debtor only filed a late Corporate Ownership Statement form on March 16, 2022 claiming she was the 100% sole owner of the single member JP LLC and single member JSC LLC since October 18, 2018 (Docket 29). Debtor continues to fail to provide any verifiable business ownership or operation records for JSC LLC or JP LLC.

100.    In addition, Debtor has claimed in her bankruptcy documents provided to the Bankruptcy Trustee that she received two cashier's checks from Mr. Nickel on October 30, 2018 payable to JP for a total of $379,000, and against on October 31, 2018 for a total of $379,000 payable to Debtor.  Debtor also claimed that the JP cashier's checks were rescinded.  However, since a bank's rescission of a cashier's check can take up to 90 days and Debtor did not provide proof of tracing those funds back to Mr. Nickel, Debtor appears to be hiding the funds from the cashier's checks in business or personal bank, life insurance or investment accounts since 2018. The Debtor answered and admitted this allegation under the First Amended Complaint Paragraph 94, Docket 6, is true under Debtor Answer Paragraph 94, Dockets 13-18.

101.    On August 18, 2021 in her initial 341 hearing, Debtor testified under oath that she sold her 4476 Alderport Sublease to Mr. Nickel for $379,000. Debtor testified that she took $175,000 of the $379,000 to purchase a mobile home from Lisa Ryan. She testified she paid Lisa Ryan with four cashier's checks from her personal account in which she had deposited the $379,000 from Mr. Nickel.   Debtor testified that she never transferred money to JSC LLC for it to purchase the mobile home. Debtor also testified that she used approximately $140,000 of the $379,000 received from Mr. Nickel on October 18, 2018 for personal legal fees.  In the initial 341 hearing, Debtor was asked to produce the records to the Trustee showing the flow of the $379,000.  Debtor never produced any records proving the flow of the $379,000.

102.    Debtor admitted there was no purchase agreement with Lisa Ryan regarding the

purchase of the mobile home. Debtor was asked in her initial 341 hearing what documents exist,

if any.  Debtor testified that there were copies of cashier's checks that she sent to the Trustee and

a handwritten note from Lisa Ryan when Debtor gave her the cash.  Debtor produced four

cashier's checks payable to Lisa Ryan, three for $50,000 each and one for $20,000; however,

Debtor did not provide any verifiable, independent proof from which account the four cashier's

checks were obtained nor any proof of where the four cashier's checks were cashed or deposited

into.  Therefore, Debtor provided no verifiable, independent documentation regarding the

purchase proceeds of the mobile home.

103.    In the first 341 hearing, Debtor testified that she loaned JSC LLC $225,000

which was secured by a lien on the JSC LLC mobile home asset. Debtor subsequently testified

that JP LLC was solely a lienholder of JSC LLC's security note between JSC LLC and Debtor

on the mobile home.  Debtor testified that the sole purpose of Debtor's alter-ego JSC LLC was

to be the title owner of a mobile home and JSC LLC pay JP LLC monthly payments on the JSC

LLC-Debtor security note, as the lien holder of JSC LLC security note, pursuant to an

amortization schedule. In her second 341 hearing, Debtor testified that she was working "with a

CPA to get a profit and loss as to where we actually are on that note, how close it is to being paid

back."  Debtor never provided the name of the CPA or any independent, verifiable business

documentation proving any receipts of funds or payment of funds made by Debtor's alter-ego

JSC LLC or JP LLC to anyone or any entity including between JSC LLC and JP LLC.

104.    In the second 341 hearing, Debtor testified that she also loaned $175,000 to JSC

LLC to pay "anything that came up and any legal fees, my car payment, you know".  On her

bankruptcy Schedule 107, Debtor scheduled payments she made to personal lawyers starting in

2017 (Schedule 107, DK 1 Item 16, Schedule 107, DK 15, DK 16, DK 37, DK 38, DK 72 Item

18).  Debtor never provided any business or personal accurate accounting records that showed

1   that Debtor's JSC LLC or Debtor paid the legal fees listed on Schedule 107, nor independent

2   bank records verifying the payments despite creditor's requests for such records starting months

3   before Debtor filed for Chapter 7 bankruptcy and in 341 hearings.

4
5       105.    Debtor admitted that she received at least $379,000 from Mr. Nickel and

6   admitted that JP LLC received $379,000 from Mr. Nickel.  Despite multiple requests, Debtor

7   continued to fail to provide Plaintiff and the other creditors with independent, verifiable records

8   tracing the funds.  Debtor went to great lengths to prevent creditors for learning the truth about

9   her collectible assets.  During collection efforts by Debtor's creditors, Debtor's deposition

10  testimony prior to filing for bankruptcy, her refusal to produce personal and business records,

11  and her refusal to sit for her debtor's exam to the point of a warrant issued for her arrest contrasts

12  with the information Debtor scheduled on her multiple changing bankruptcy schedules and 341

13  hearing testimony regarding Debtor's and her JSC LLC's and JP LLC's assets, loans and

14  payments to third parties.  Because Debtor concealed the true, verifiable information about her

15  personal and alter-ego business assets, Debtor failed to provide Plaintiff and the other creditors

16  with complete disclosure of verifiable records accurately documenting Debtor's assets, debts and

17  transfers of assets to and from herself and her alter-egos JSC LLC and JP LLC since October

18  2018. Debtor's failure to provide accurate, verifiable records caused creditors to spend

19  significant resources to discover this financial information.  Therefore, Debtor should be denied

20
21  discharge pursuant to 11 U.S.C §727(a)(3).

22

23  **FOURTH CAUSE OF ACTION FOR AN ORDER DENYING DISCHARGE**

24  **PURSUANT TO 11 U.S. CODE § 727(a)(4) of THE BANKRUPTCY CODE**

25  **(Against JAMIE LYNN GALLIAN and Does 1 through 100)**

26      106.    Plaintiff incorporates the previous paragraphs of this Complaint as if set forth in

27  full.

28      107.    Pursuant to 11 U.S.C 727(a)(4)(A), a debtor shall not receive a discharge if "the

31

debt knowing and fraudulently, in or in connection with the case—made a false oath or

account." *See Retz v. Samson (In Re Retz)*, 606 F.3d 1189, 1200 (9th Cir. 2010).

108.    Debtor signed her Chapter 7 Petition, Bankruptcy Schedules, Statements of

Financial Affairs and other documents filed with the Court under penalty of perjury,

acknowledging that the information provided therein was true and correct, even though she knew

some of the information provided was not true or correct.

109.    At her initial, August 18, 2021 341 hearing, under penalty of perjury, Debtor

answered in the affirmative that she signed, read and was personally familiar with the petition,

schedules, state of financial affairs and related documents, and that there were no errors or

omission.  Debtor nevertheless made several material omission and false oaths.

110.    First, Debtor provided the Trustee with Debtor's purported claim under penalty

of perjury that Plaintiff is not one of Debtor's victims under the Debtor's criminal convictions,

Case No. 18WM05278.   Further, Debtor claimed in her documents that Plaintiff's recording of

the criminal abstract of judgment issued by the Court in May 2021 was unlawful and a felony.

This is a false oath, as no less than 3 different courts in 3 different motions or filings have all

denied the Debtor's claims prior to submitting this filing to the Bankruptcy Trustee as proof of

her claim that Plaintiff does not have a legitimate criminal restitution claim against the Debtor.

The Debtor answered Plaintiff's First Amended Complaint and admitted this allegation is true in

Paragraph 100, Dockets 13-18.

111.    Second, on Debtor's Schedule A/B in the Main Case, she stated under penalty of

perjury that she originally held a 33.33% interest in JP.  However, in her initial 341 hearing

dated August 18, 2021, Debtor first testified that she owned 1/3rd of JP, but then stated she and

her ex-husband Ron and Bob, the man she lives with, own the other two-thirds of JP.

Subsequently, Debtor scheduled under penalty of perjury a change in ownership to a 1/7th

interest in JP on her amended Schedule A/B and as testified in her second October 14, 2021 341

hearing, naming herself, Debtor's family members and friends.  Debtor then amended her

1    Schedule A/B again changing her JP ownership interest to 70%. After that, Debtor amended her

2    Schedule A/B again changing her JP ownership interest to 33.33%. Each amendment to her

3    schedules was done without accounting for the change in interest/value. Despite requests by

4    creditors, Debtor never provided any business records explaining any of the changes in her

5    ownership interest. As provided in more detail in Paragraphs 92-99, *supra*, Debtor never filed a

6    Corporate Ownership Statement until March 16, 2022 long after Plaintiff spent huge amount of

7    time and resources on discovery of the Debtor's JSC LLC and JP LLC. Therefore, Debtor made

8    false oaths about her ownership interest in JP LLC on her bankruptcy schedules in order to

9    hinder, delay or defraud Plaintiff and the other creditors.

10        112.    Third, Debtor claimed on her bankruptcy schedules that JP LLC's sole asset was

11    holding a security lien on a promissory note on JSC LLC's mobile home and then on her mobile

12    home which she transferred to herself after filing for Chapter 7 bankruptcy. However, this was a

13    false oath. Debtor sole documentation provided to the Trustee was an unsigned and undated

14    document that Debtor claimed was proof of her loan of $225,000 to her alter ego JSC LLC and

15    her assignment of her rights under the loan to her other alter-ego JP LLC. As described in

16    Paragraph 103, *supra*, Debtor further testified in her October 14, 2021 341 hearing that her CPA

17    would provide the creditors with her businesses' profit and loss accounting statement to prove

18    the loan repayments. Only after Plaintiff spent months of time and resources on discovery,

19    Debtor admitted that JSC LLC never made any payments on the loan held by JP LLC. In

20    addition, the bank records show that Debtor transferred approximately $75,000 into JP LLC

21    which Debtor concealed while paying her criminal bail amounts, restaurants, personal credit

22    cards, and some legal fees at a time when she falsely claimed she was indigent in criminal court

23    in order to obtain a public defender and a public appellate attorney to represent her in OCSC

24    Case No. 18WM05278. In addition, the bank records show that Debtor withdrew JP LLC funds

25    in tens of thousands of dollars in cash and cashier's checks without any business records and

26    which should have been properly accounted for. These omissions are false oaths, which were

27    intended to hinder and delay Plaintiff's and other creditors from collecting debts. They are

28    material because they are relevant to debtor's financial affairs and business dealings, which

1    Trustee must assess in order to properly administer the estate, including pursuing possible

2    fraudulent transfer actions on behalf of the estate.

3        113.    Fourth, Debtor scheduled a $7400 Fidelity IRA account balance on Schedule A/B

4    in the Main Case (Schedule A/B, Item 21, DK 1, DK 16, DK 22, DK 37, DK 38, DK 39, DK 72)

5    claiming all of it to be qualified retirement plan exempt assets when Debtor knew that

6    approximately $7300 in her Fidelity IRA account came from her transfer of funds from JSC

7    LLC, which originated from cashier's checks from Mr. Nickel. Despite filing numerous

8    amended bankruptcy schedules, Debtor never disclosed the truth about the funds she listed on

9    Schedule A/B as Fidelity IRA qualified rollover funds. These false oaths are material because

10    they concealed collectible bankruptcy estate funds.

11        114.    Fifth, on Debtor's statement of financial affairs (SOFA) filed in the Main Case,

12    she stated that she had not sold, traded, or otherwise transferred any property to anyone outside

13    the ordinary course of business within the past two years prior to bankruptcy.  However, Debtor

14    appears to have engaged in a series of transfers of personal funds from Mr. Nickel between her

15    JSC LLC Chase account ending in #7860, her Fidelity IRA account, and her JP LLC Bank of

16    America account ending in #1274, as well as transfers of funds from her United Airlines 401k

17    plan to JSC LLC Chase account ending in #7860.  Specifically, Debtor scheduled income from

18    her United Airlines 401k plan within 1 year of filing her original bankruptcy petition.  Debtor

19    amended her schedules to claim that the 401k plan income was due to a defaulted 401k loan,

20    which, if true, meant that the 401k plan income was solely "on paper" without receiving a

21    distribution of cash.  On Debtor's amended her schedules, Debtor never disclosed that a little

22    more than $14,000 of the 401k plan income was directly transferred from her United Airlines

23    401k plan to her JSC LLC Chase account ending in #7860 on or about July 27, 2020. This false

24    oath is material because it conceals a fraudulent transfer of estates assets available for the

25    Trustee to pay the debts of the Debtor.  Without knowledge of these transfers, Trustee would be

26    unable to pursue a fraudulent transfer action to recover assets benefit of the state and its creditor.

27        115.    Sixth, as detailed in Paragraph 102, supra, Debtor admitted she took $175,000

28    from $379,000 from Mr. Nickel and gave it to Lisa Ryan.  Debtor then testified under oath that

1    she paid Lisa Ryan four cashier's checks totaling $170,000 from Debtor's personal account and

2    gave the Trustee copies of the front of four Chase cashier's checks that appear to match her

3    testimony and schedules. After Plaintiff expended substantial fees for discovery to obtain bank

4    records for the Debtor, Debtor's alter-ego JSC LLC and alter-ego JP LLC from January 1, 2018

5    through the date of the subpoenas, Plaintiff had to spend months searching through hundreds of

6    pages of records and stacks of cashier's checks that ultimately showed that Debtor only gave

7    Lisa Ryan the three $50,000 cashier's checks totaling $150,000 from Debtor's newly opened

8    JSC LLC's Chase bank account ending in #7860 in November 2018. The bank records show that

9    Debtor kept the $20,000 cashier's check payable to Lisa Ryan and deposited it into Debtor's

10   personal Chase account ending in #0186 in December 2018 and then Debtor transferred $18,000

11   of that amount into her JSC LLC Chase account ending in #7860 on the same day. Debtor

12   provided no proof and Plaintiff could not located any evidence that Lisa Ryan received any cash

13   from Debtor nor Debtor's alter-egos JSC LLC or JP LLC. This false oath is material because it

14   conceals a fraudulent transfer of estates assets available for the Trustee to pay the debts of the

15   Debtor.  Without knowledge of these transfers, Trustee would be unable to pursue a fraudulent

16   transfer action to recover assets benefit of the state and its creditor.

17        116.    Seventh, as detailed in Paragraph 86, *supra*, Debtor scheduled on Schedule 107

18   and testified that she paid $113,000 in personal legal fees. Debtor further testified in her October

19   14, 2021 341 hearing that she transferred $175,000 of $379,000 Mr. Nickel funds to JSC LLC to

20   pay her legal fees and other expenses.  After Plaintiff incurred substantial expenses for discovery

21   to obtain bank records for the Debtor, Debtor's alter-ego JSC LLC and alter-ego JP LLC from

22   January 1, 2018 through the date of the subpoenas, Plaintiff had to spend many weeks reviewing

23   hundreds of pages of records and analyzing stacks of cashier's checks which totaled $355,000

24   that Debtor deposited into her alter ego JSC LLC Chase bank account ending in #7860.  Plaintiff

25   also spent weeks reviewing the bank records to determine what amount, if any, was paid for

26   Debtor's legal fees.  Plaintiff located approximately $30,000 in legal fees and $2800 in court

27   transcript/costs paid by JSC LLC to Debtor's personal attorneys and court case costs.  Therefore,

28   Debtor's scheduled attorney's fees on her SOFA, original and amended Schedule 107

1    (Scheduled 107, DK 1 Item 16, Schedule 107, DK 15, DK 16, DK 37, DK 38, DK 72 Item 18)

2    continue to be false oaths. These false oaths are material because they concealed collectible

3    bankruptcy estate funds.

4        117.    Eighth, Debtor states in her schedules that she has an unexpired ground lease

5    allegedly involving Tract 10542, Unit 4, Lot 376 16222 Monterey Lane. Debtor's allegation that

6    the mobile home located at 16222 Monterey Lane, Space 376 is in Tract 10542 is a false oath.

7    As Plaintiff provided in **Exhibit 1**, the Condominium Plan shows only condominiums in the

8    Association are located in Tract 10542. There is a defaulted sublease between BS Investors and

9    Debtor for the condominium, 4476 Alderport.  Debtor then made another false oath alleging she

10   is entitled to California Covid Relief rent relief program funds based on Debtor's lease

11   agreement with the owners of the mobile home park.  However, Debtor admitted under penalty

12   of perjury on January 19, 2022 in her pleadings in the state court interpleader action, Houser

13   Bros. Co. v. Gallian, OCSC Case No. 30-2021-01236940, ROA #21, that Houser Bros. Co., the

14   mobile home park owner, denied Debtor's application to rent a mobile home park space and

15   therefore never entered into a rental agreement with Debtor.  Therefore, Debtor's false oaths

16   regarding a non-existent mobile home park lease and covid relief rent monies are material

17   because these false oaths, along with the multiple false oaths enumerated above on her

18   schedules, indicate a pattern of intentional deceit on her schedules in order to hinder, delay or

19   defraud Plaintiff and the other creditors.

20       118.    Ninth, on Schedule A/B, Part 3, Item 8, Debtor initially scheduled that she did

21   not have any collectible items.  In fact, Debtor has an extensive Lladro porcelain figurine

22   collection.  Debtor amended her Schedule A/B, Part 3, Item 8, amended her schedules and

23   admitting she has 20 figurines, and then scheduling a fair market value of $1900 for the

24   collection.  However, Debtor's schedule claiming the twenty (20) figurines are only worth a total

25   of $1900 is a false (Schedule A/B, Item 8, Dk 15, Dk 16, Dk 22, Dk 37, Dk 38, Dk 72).  Debtor

26   received at least seven (7) Lladro porcelain figurines from Sandra Bradley, who supplied a list

27   under penalty of perjury attached as an exhibit to Ms. Bradley request for an elder-abuse

28   restraining order against the Debtor, Bradley v. Gallian, OCSC Case No. 30-2017-00924559-

1  PR-OP-CJC, attached hereto as **Exhibit 10**.  Ms. Bradley's listed the purchase prices of these

2  seven Lladro figurines, which total $12,520.  Therefore, Debtor's scheduled value of twenty (20)

3  Lladro porcelain figurines at $1900 is a false oath that has never been cured by any of Debtor's

4  amended schedules. These false oaths are material because they concealed collectible

5  bankruptcy estate assets.

6        119.    Debtor made the foregoing omissions and false oath knowingly by acting

7  deliberately and consciously.  Debtor deliberately and consciously signed the schedules and

8  statement of financial affairs knowing that the information provided was not completely true and

9  correct.  Thereafter, at her section 341 hearing of the creditors, Debtor testified under penalty of

10  perjury that there were no inaccuracies in her schedules or statement of financial affairs.  This

11  supports a finding that Debtor acted knowingly in making the omissions and false oaths.

12        120.    According, Debtor is not entitled to a discharge pursuant to 11 U.S.C §727(a)(4).

13        **FIFTH CAUSE OF ACTION FOR AN ORDER DENYING DISCHARGE**

14        **PURSUANT TO 11. U.S. CODE § 727(a)(5) OF THE BANKRUPTCY CODE**

15            **(Against JAMIE LYNN GALLIAN and Does 1 through 100)**

16        121.    Plaintiff incorporates the previous paragraphs of this Complaint as if set forth in

17  full.

18        122.    Bankruptcy Code §727(a)(5) provides, in relevant part, that a debt may not be

19  discharged if the debtor "has failed to explain satisfactorily, before determination of denial of

20  discharge under this paragraph, any loss of assets or deficiency of assets to meet the debtor's

21  liabilities."

22        123.    Debtor is not entitled to bankruptcy discharge because Debtor has failed to

23  explain satisfactorily, before determination of denial of discharge under this paragraph, any loss

24  of assets or deficiency of assets to meet the debtor's liabilities.

25        124.    Debtor has failed to explain satisfactorily the purchase and series of transfers

26  involving the mobile home, 16222 Monterey Lane, Space 376, including but not limited to the

27  circumstances surrounding the alleged loan of $225,000 between JP, JSC, and Debtor for the

28  purchase of the mobile home.  Debtor has further failed to explain the purported purchase sum of

$175,000 via four cashier's checks payable to Lisa Ryan in a concealed transfer between Debtor's alter-ego JSC LLC and Lisa Ryan, and specifically the loss of $20,000 from one of these cashier's checks that Debtor kept for herself and could be used to pay Plaintiff's judgments.

125.   Debtor has failed to explain satisfactorily, namely produce any documentation, evidencing that there exists any lease agreement or that there exists any legal right to Covid relief rent program funds that may be assets available to pay creditors.

126.   Debtor, as detailed in Paragraph 87, *supra*, has been unable to explain the terms of the purported sale of 4476 Alderport in October 2018, how much she sold 4476 Alderport for and where the proceeds went, including any agreements between herself and the subsequent purchaser for the return of the condominium to the Debtor and the Debtor's reversionary interest held in the condominium listed on Debtor's Scheduled A/B that could be used to pay her judgment debts.

127.   Debtor has made ever-changing claims regarding her ownership interest in her alter-ego JP LLC, by filing multiple California Secretary of State Statements of Information since 2018, via deposition testimony, filing bankruptcy schedules and testifying in 341 hearings. After Plaintiff sued Debtor's alter-egos JP LLC and JSC LLC, Debtor terminated these companies.  Plaintiff spent thousands of dollars on discovery and months of work trying to analyze the hundreds of pages of financial records that showed the Debtor hid approximately $75,000 in her JP LLC in order to gain public defenders and pay her bail for her arrests for continuing to violate the restraining order protecting Plaintiff and my then 7-year-old daughter. Debtor suddenly filed a late Corporate Ownership Statement under Docket 29 for the first time claiming that she was the sole owner of both JP LLC and JSC LLC since October 2018.

128.   To date, the Debtor appears to have hidden and/or transferred away her personal assets to related entities or close associates created within days of incurring court judgments in favor of Plaintiff and the Association.  Debtor's actions allowed Debtor to claim she was

indigent in order to obtain public defenders and public appellate attorneys for free for her

criminal court cases. Debtor's transfers of assets occurred without business records, without

purchase agreements, without valid lease agreements, and without transparent escrows to ensure

proper payment to secured creditors, including Plaintiff.  Instead, Debtor claims on her original

and multiple amended SOFA, Schedule 107 (Scheduled 107, DK 1 Item 16; Schedule 107, DK

15, DK 16, DK 37, DK 38, DK 72 Item 18) to have spent over $100,000 on her personal legal

fees without providing any verifiable evidence of where those funds came from, to which

attorney the funds were paid with verifiable payment receipts, despite Plaintiff and her other

creditors requesting the flow of the funds she received from Mr. Nickel in a purported concealed

purchase of 4476 Alderport condominium Sublease.  Debtor also failed to disclose on her

original and amended SOFA, Schedule 107 (DK 1, DK 15, DK 16, DK 37, DK 38, DK 72,

Schedule 107, Part 2, Item 5), that she transferred $14002.53 of personal funds to her alter-ego

JSC LLC from her United 401k plan within 1 year of filing her original petition, testified and

scheduled it as income "on paper" due to her defaulted 401k retirement plan loan and failed to

explain with verifiable bank and other business records what happened to those monies. Debtor

had no rent nor utility bills due to Debtor squatting in the JSC LLC's mobile home in a mobile

park without a rental agreement since November or December 2018. Debtor's failure to explain

the thousands of dollars withdrawn from of JP LLC, JSC LLC and Debtor's personal bank

accounts that should have been dedicated to the payment of her judgment debts should result in a

denial of discharge pursuant to 11 U.S.C. § 727(a)(5).

129.    As a result of her failure to explain satisfactorily material issues related to Debtor

deficiencies of assets held personally and through her alter-ego limited liability companies,

Debtor should be denied discharge pursuant to 11 U.S.C. § 727(a)(5).

//

//

# PRAYER FOR RELIEF

WHEREFORE, Plaintiff pray for judgment against Defendants, and each of them, as follows:

1. For and Order denying a discharge of Plaintiff and Creditor, Janine Jasso's claim against Debtor Gallian for Plaintiff's criminal restitution judgment;

2. For an Order denying a discharge of Plaintiff and Creditor, Janine Jasso's claim against Debtor Gallian for Plaintiff's civil judgment;

3. For an Order adding Debtor's alter-egos JP and JSC LLCs as named debtors on both the criminal restitution judgment and civil judgments;

4. For an Order setting aside the purported assignment of the condominium sublease from Debtor Gallian to Nickel;

5. For an Order setting aside the transfers of funds from JP or JSC to the Debtor, Mr. Randall Nickel, Ms. Lisa Ryan, and between JP and JSC LLCs;

6. For an order determining Debtor should be denied discharge;

7. For damages according to proof at trial;

8. For reasonable attorney's fees;

9. For costs of suit incurred herein; and

10. For such other and further relief as may be just and proper.

DATED: January 27, 2023

Janine Jasso
In Pro Per

# EXHIBIT 1

28814

BK 13358 PG 1193

SHEET 1 OF 5 SHEETS

BK 13358 PG 1194

# CONDOMINIUM PLAN
## LOT NUMBER 1 & 2
# TRACT NO. 10542

IN THE CITY OF HUNTINGTON BEACH
COUNTY OF ORANGE
STATE OF CALIFORNIA

WHEN RECORDED MAIL TO
FIRST AMERICAN TITLE INS CO
114 EAST FIFTH STREET
SANTA ANA, CALIFORNIA 92701
ATTN: GRACE HOWLEY

RECORDED IN OFFICIAL RECORDS
OF ORANGE COUNTY, CALIFORNIA
*12 49 PM OCT 18 1979
LEE A. BRANCH, County Recorder

BK 13358 PG 1195

BK 13358 PG 1196

### CERTIFICATE UNDER CALIFORNIA CIVIL CODE SECTION 1351

WE THE UNDERSIGNED, BEING ALL OF THE RECORD OWNERS OF AND RECORD
HOLDERS OF SECURITY INTERESTS IN THE REAL PROPERTY, DESCRIBED IN
THE DOCUMENTS HEREINAFTER MENTIONED, DO HEREBY CERTIFY THAT:

WE HEREBY CONSENT TO THE RECORDATION OF THE PLAN OF CONDOMINIUM,
PURSUANT TO CHAPTER 1, TITLE 6, PART 4, DIVISION SECOND, OF THE
CIVIL CODE, CONSISTING OF (I) THIS DESCRIPTION OF SURVEY MAPS OF THE
SURFACE OF THE LAND INCLUDED WITHIN THE PROJECT, AS SUCH DESCRIPTION
OF SURVEY MAPS ARE SET FORTH UPON OR CONSTITUTED BY THE SUBDIVISION
MAP SHOWING LOT 1 & 2 OF TRACT NO. 10542 IN THE CITY OF HUNTINGTON
BEACH, COUNTY OF ORANGE, STATE OF CALIFORNIA, AS PER MAP RECORDED IN
BOOK ___, PAGES ___ OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER
OF SAID COUNTY, AND WHICH SUBDIVISION MAP IS HEREBY BY REFERENCE IN-
CORPORATED HEREIN; (II) THE DIAGRAMATIC FLOOR PLANS ATTACHED HERETO
AND MADE A PART HEREOF; AND (III) THIS CERTIFICATE.

DATE: Oct 4 1979

HOUSER BROS., CO., A LIMITED PARTNERSHIP

VERNON F. HOUSER                        CHARLES P. HOUSER
GENERAL PARTNER                         GENERAL PARTNER

ROBERT P. WARMINGTON, OPTIONEE UNDER AN OPTION AGREEMENT RECORDED
IN BOOK 12912, PAGE 1053 OF OFFICIAL RECORDS.

ROBERT P. WARMINGTON
OPTIONEE

STATE OF CALIFORNIA)
                   ) SS
COUNTY OF ORANGE   )

ON THIS 4TH DAY OF October 1979, BEFORE ME,
_____, A NOTARY PUBLIC IN AND FOR
SAID STATE, PERSONALLY APPEARED VERNON F. HOUSER
AND CHARLES P. HOUSER KNOWN TO ME TO BE THE PART-
NERS OF HOUSER BROS. CO., A LIMITED PARTNERSHIP,
THE PARTNERSHIP THAT EXECUTED THE WITHIN INSTRU-
MENT AND ACKNOWLEDGED TO ME THAT SUCH PARTNERSHIP
EXECUTED THE SAME.

MY COMMISSION EXPIRES 12/12/80
                          WITNESS MY HAND AND
                          OFFICIAL SEAL.

MARY LOU C. FIVE
NOTARY PUBLIC-CALIFORNIA
ORANGE COUNTY

NOTARY PUBLIC IN AND FOR SAID STATE

STATE OF CALIFORNIA)
                   ) SS
COUNTY OF ORANGE   )

ON THIS 4TH DAY OF October, 1979, BEFORE ME,
_____, A NOTARY PUBLIC IN
AND FOR SAID STATE, PERSONALLY APPEARED ROBERT P. WARMINGTON
KNOWN TO ME TO BE THE PERSON DESCRIBED IN, AND WHOSE
NAME IS SUBSCRIBED TO THE WITHIN INSTRUMENT AND
ACKNOWLEDGED TO ME THAT HE EXECUTED THE SAME.

MY COMMISSION EXPIRES 6/26/81   WITNESS MY HAND
AND OFFICIAL SEAL.

YVONNE S. COOK
NOTARY PUBLIC-CALIFORNIA
ORANGE COUNTY
My Commission Expires June 26, 1981

NOTARY PUBLIC IN AND FOR SAID STATE

I HEREBY CERTIFY THAT I AM A REGISTERED CIVIL ENGINEER OF THE STATE OF
CALIFORNIA, THAT THIS PLAN, CONSISTING OF 6 SHEETS, CORRECTLY REPRESENTS
A TRUE AND COMPLETE SURVEY OF THIS CONDOMINIUM PROJECT AND THE DELINEA-
TION OF THE UNITS TO BE CONTAINED IN THE BUILDING AS BUILT THEREON.

DATED: 10-2-79

H. MADDUX, R.C.E. NO. 14814

This Project consists of all of the land and real property
included within the boundary lines of Lot 1 and 2 of Tract 10542 in
the City of Huntington Beach, County of Orange, State of California
as shown on a map recorded in Book 418, pages 49 to 50, inclusive of
Miscellaneous Maps, in the office of the County Recorder of said
County.

DEFINITIONS

1.  Common Area: The term "Common Area" shall mean and refer
to all of the property described above, except the Units, as described
below.

2.  Unit: The term "Unit" shall mean and refer to all of
the elements of a Condominium, as defined below, not owned in common
with the other owners of Condominiums in the Project.

3.  Restricted Common Area: The term "Restricted Common
Area" shall mean and refer to those portions of the Common Area which
are reserved for the exclusive use of owners of particular units, as
described herein.

4.  Condominium: The term "Condominium" shall mean and refer
to an interest in the Project consisting of (a) a Unit, (b) an undivided
1/80 interest in the Common Area, (c) certain designated exclusive right-
to-use easements over restricted Common Areas, (d) non-exclusive ease-
ment rights over the Common Area, and (e) a membership in the Huntington
Beach Gables, Homeowners Association.

GENERAL NOTES

1.  This Project is composed of Common Area and eighty (80)
Units, which have been numbered from 1 to 80.

2.  Each Unit shall contain or be composed of the following
air parcels as defined below:

(a)  A dwelling area air space parcel.

     (1)  Designated herein by the letter "D".

     (2)  Lateral boundaries for each dwelling area air
          space parcel are as shown on the typical dia-
          grammatic plans attached hereto as Sheets 4
          and 5.

     (3)  Elevations for dwelling area air parcels are
          as shown in the elevation tabulation attached
          hereto as Sheet 2.

     (4)  The boundaries of a dwelling area air space
          parcel are the interior surfaces of the per-
          imeter walls, floors, ceilings, windows and
          doors thereof, and said air space parcel in-
          cludes both the surfaces so described and the
          air space so encompassed.

(b)  A Patio air space parcel.

     (1)  Designated herein by the letter "P".

     (2)  Shall only exist on lower levels.

     (3)  Shall be owned by and be a part of the Unit
          to which it adjoins.

     (4)  Lateral boundaries for each patio air space
          parcel shall be the exterior finished surfaces
          of the perimeter wall, windows and doors of
          the adjoining Unit and partition walls, fences
          and rails where they exist; otherwise, they
          are the vertical planes at the limits of the
          horizontal dimensions set forth on the typical
          diagramatic plans attached hereto as Sheets 4
          and 5.

     (5)  Elevations for patio air space parcels are as
          indicated in note no.9 under Elevation Tabulation as shown
          on sheet no. 2.

(c)  A Garage air space parcel.

     (1)  Designated herein by the letter "G".

     (2)  Shall only exist on lower levels.

     (3)  Shall be owned by and be a part of the Unit
          for which it is designated on the typical
          diagramatic plans attached hereto as Sheets
          4 and 5.

     (4)  Lateral boundaries for each garage air space
          parcel are as shown on the typical diagramatic
          plans attached hereto as Sheets 4 and 5.

     (5)  Elevations for garage air space parcels are as
          shown in the elevation tabulation attached here-
          to as Sheet 2.

     (6)  The boundaries of a garage air space parcel are
          the interior surfaces of the perimeter walls,
          floors, ceilings and doors thereof, and said
          air space parcel includes both the surfaces so
          described, and the air space so encompassed.

BK 13358 PG 1197

BK 13358 PG 1198

# CONDOMINIUM PLAN

LOT NUMBER 1 & 2

# TRACT NO. 10542

IN THE CITY OF HUNTINGTON BEACH
COUNTY OF ORANGE
STATE OF CALIFORNIA

3. The Units do not contain bearing walls, columns, vertical supports, floors, roofs, foundation, railings, fences, gates, garage doors, central heating, central refrigeration and central air-conditioning equipment, reservoir tanks, pumps and other central services, pipes, ducts, flues, conduit, wires and other utility installations wherever located except the outlets thereof when located within the Unit.

In interpreting deeds, declarations, and plans, the existing physical boundaries of the Unit or of a Unit reconstructed in substantial accordance with the original plans thereof shall be conclusively presumed to be its boundaries rather than the metes and bounds (or other description) expressed in the deed, plan or declaration, regardless of minor lateral movement of the Building and regardless of minor variance between boundaries shown on the condominium plan or in the deed and declaration and those of the building.

4. In addition to the air space parcels referred to above, certain Units include rights to certain Restricted Common Areas, as defined below:

(a) Entry Courts and Staircases.

(1) Designated herein by the letter "E".

(2) Lateral boundaries for entry courts are as shown on the typical diagrammatic plans attached hereto as Sheets 4 and 5.

(3) Shall be for the exclusive use and enjoyment of the owners of the Unit which adjoins said entry court, and shall be designated as Restricted Common Areas.

(4) Entry courts on those buildings which have upper levels shall also include staircases to said upper levels. Such staircases shall be for exclusive use of the owners of the upper level Units to which they adjoin.

(b) Attic Space

(1) Designated herein by the letter "A".

(2) Shall be for the exclusive use and enjoyment of the owners of the Unit which adjoins said attic space.

(3) Lateral boundaries of attic space shall be the same as that shown for the Dwelling on each floor on diagrammatic plans attached hereto as Sheets 4 and 5.

5. All boundary lines intersect at right angles unless otherwise indicated.

6. All elevations and dimensions are in feet.

7. All wall thicknesses are as shown on diagrammatic plans on Sheets 4 and 5.

8. Bench Mark: HB-229-72    1972 ADJUSTED ELEV. 11,183 IN THE SOUTHWEST PART OF THE INTERSECTION OF BOLSA CHICA STREET AND EDINGER AVE., 190 FT. SOUTH OF THE CENTERLINE OF EDINGER, 58.5 FT. WEST OF CENTERLINE OF BOLSA CHICA, 10.5 FT. WEST OF THE CURB FACE, 1 FT. SOUTH OF A 36 FT. CONC. DRIVEWAY DEPRESSION, 4' SOUTHEAST OF THE CENTER OF A 5 INCH DIAMETER STEEL LAMP POST; SET IN THE TOP OF A CONCRETE POST, 0.7 FOOT HIGHER THAN THE CURB.

BK 13358 PG 1199

BK 13358 PG 1200

## ELEVATION TABULATION

| UNIT NO. | TYPICAL FOR ALL FIRST FLOOR DWELLING FINISHED FLOOR ELEVATIONS. | TYPICAL FOR ALL GARAGE FINISHED FLOOR ELEVATIONS AT ENTRANCE. | TYPICAL FOR ALL GARAGE CEILING ELEVATIONS. |
|---|---|---|---|
| 1-4 | 18.53 | 9.53 | 18.64 |
| 5-8 | 10.76 | 9.76 | 18.86 |
| 9-12 | 10.76 | 9.76 | 18.86 |
| 13-16 | 10.40 | 9.40 | 18.50 |
| 17-20 | 10.70 | 9.70 | 18.80 |
| 21-24 | 10.90 | 9.90 | 19.00 |
| 25-28 | 11.50 | 10.50 | 19.60 |
| 29-32 | 11.50 | 10.50 | 19.60 |
| 33-36 | 11.40 | 10.40 | 18.90 |
| 37-40 | 11.90 | 10.90 | 20.00 |
| 41-44 | 11.90 | 10.90 | 20.00 |
| 45-48 | 11.90 | 10.90 | 20.00 |
| 49-52 | 11.70 | 10.70 | 19.80 |
| 53-56 | 11.70 | 10.70 | 19.80 |
| 57-60 | 11.78 | 10.70 | 19.80 |
| 61-64 | 10.80 | 9.80 | 18.90 |
| 65-68 | 10.80 | 9.80 | 18.90 |
| 69-72 | 10.63 | 9.63 | 18.75 |
| 73-76 | 18.76 | 9.76 | 18.86 |
| 77-80 | 10.52 | 9.52 | 18.68 |

NOTES:

1. ALL FINISHED CEILINGS FOR FIRST FLOOR DWELLING AREAS ARE TYPICALLY 9.1' ABOVE THEIR RESPECTIVE FIRST FLOOR DWELLING AREA FINISHED FLOOR AS TABULATED ABOVE, UNLESS SHOWN OTHERWISE.

2. ALL SECOND FLOOR FINISHED FLOOR ELEVATIONS ARE TYPICALLY 9.1' ABOVE THE FINISHED FLOOR FOR THEIR RESPECTIVE FIRST FLOOR DWELLING AREA AS TABULATED ABOVE, UNLESS SHOWN OTHERWISE.

3. ALL SECOND FLOOR FINISHED CEILING ELEVATIONS ARE TYPICALLY 9.1' ABOVE THEIR RESPECTIVE SECOND FLOOR DWELLING AREA FINISHED FLOOR ELEVATION AS INDICATED IN NOTE 2.

4. IN THE CASE OF UNITS 4, 8, 12, 16-20, 24, 28, 32, 36, 40, 44, 48, 52, 56, 60, 64, 68, 72, 76 & 80 (SECOND FLOOR UNITS ONLY) THE FINISHED FLOOR ELEVATIONS ARE THE SAME AS THE ADJACENT SECOND FLOOR UNITS WITHIN THE SAME BUILDING.

5. ALL PATIOS ARE AT FIRST FLOOR LEVEL AND THEREFROM SUBJECT TO THE FIRST FLOOR DWELLING FINISHED FLOOR ELEVATIONS TO WHICH THEY ADJOIN AND ATTACHED. THE VERTICAL ELEMENT OF THE PATIO AIR SPACE IS TYPICALLY 8.49' ABOVE THEIR FINISH SURFACE.









# EXHIBIT 2

WHEN RECORDED RETURN TO:
Meserve, Mumper & Hughes
4440 Von Karman Avenue, Suite 330
Newport Beach, California 92660

Attn: Frank D. Stiefel, Esq.

RECORDED IN OFFICIAL RECORDS
OF ORANGE COUNTY, CALIFORNIA

4 20 P.M.   MAY 28 '80

LEE A. BRANCH, County Recorder

$54.00
C7

## DECLARATION OF
## COVENANTS, CONDITIONS AND RESTRICTIONS
## FOR THE HUNTINGTON BEACH GABLES

### LOTS 1 AND 2 OF TRACT NO. 10542
### CITY OF HUNTINGTON BEACH
### ORANGE COUNTY, CALIFORNIA

T 10542.
Rec. 5/28/80

<u>TABLE OF CONTENTS</u>

                                                           <u>Page</u>

ARTICLE I       DEFINITIONS.................................  2

Section 1.1     Association............................  2
Section 1.2     Board of Directors/Board...............  2
Section 1.3     Common Area............................  3
Section 1.4     Condominium............................  3
Section 1.5     Condominium Plan.......................  3
Section 1.6     County.................................  3
Section 1.7     Declarant..............................  3
Section 1.8     Lessee.................................  3
Section 1.9     Lessor.................................  3
Section 1.10    Member.................................  3
Section 1.11    Mortgage...............................  3
Section 1.12    Mortgagee..............................  3
Section 1.13    Owner/Ownership........................  3
Section 1.14    Project................................  4
Section 1.15    Property...............................  4
Section 1.16    Unit...................................  4
ARTICLE II      CREATION OF CONDOMINIUMS...............  4

Section 2.1     Creation...............................  4
Section 2.2     Elements of Condominium................  4
Section 2.3     Boundaries of Units....................  5
Section 2.4     Non-Severability.......................  5


ARTICLE III     MEMBERSHIP IN ASSOCIATION..............  5

Section 3.1     Membership.............................  5
Section 3.2     Transfer...............................  5
Section 3.3     Voting Rights..........................  6


ARTICLE IV      PROPERTY RIGHTS IN THE COMMON AREAS.....  7

Section 4.1     Members' Easements of Enjoyment........  7
Section 4.2     Delegation of Use......................  7
Section 4.3     Waiver of Use..........................  7
Section 4.4     Common Area Improvements...............  7


ARTICLE V       COVENANT FOR ASSESSMENTS...............  8

Section 5.1     Creation of the Lien and Personal Obligation
                of Assessments.........................  8
Section 5.2     General Purpose of Assessments.........  9
Section 5.3     Regular Assessments....................  9

T-10543
Rec 5/28/80

| | | |
|---|---|---|
| (a) | Purposes | 9 |
| (b) | Amount and Type of Payment | 10 |
| (c) | Date of Commencement | 10 |
| Section 5.4 | Special Assessments | 11 |
| Section 5.5 | Delinquency | 11 |
| (a) | Right of Association | 11 |
| (b) | Notice of Lien | 12 |
| (c) | Foreclosure Sale | 12 |
| (d) | Curing of Default | 12 |
| (e) | Cumulative Remedies | 12 |
| (f) | Subordination | 13 |
| (g) | Expiration of Lien | 13 |
| Section 5.6 | Exempt Property | 13 |
| Section 5.7 | Uniform Rate of Assessment | 13 |
| Section 5.8 | No Offsets | 13 |

ARTICLE VI     ARCHITECTURAL CONTROL

| Section 6.1 | Architectural Approval | 14 |
|---|---|---|
| Section 6.2 | Requirements for Approval | 14 |
| Section 6.3 | Term and Composition of Architectural Committee | 14 |
| Section 6.4 | Failure to Approve or Disapprove the Plans | 15 |
| Section 6.5 | No Liability | 15 |
| Section 6.6 | Notice of Noncompliance or Noncompletion | 15 |
| Section 6.7 | Rules and Regulations | 16 |
| Section 6.8 | Variances | 16 |
| Section 6.9 | Appointment and Designation | 16 |
| Section 6.10 | Review Fee and Address | 16 |
| Section 6.11 | Inspection | 16 |

ARTICLE VII     EASEMENTS

| Section 7.1 | Rights of Association | 17 |
|---|---|---|
| Section 7.2 | Rights of Declarant | 17 |
| Section 7.3 | Rights of Owners | 18 |
| Section 7.4 | Encroachments on Common Area | 18 |
| Section 7.5 | Restricted Common Areas | 19 |
| Section 7.6 | Other Encroachments | 19 |

ARTICLE VIII     MANAGEMENT

| Section 8.1 | Powers of the Association | 19 |
|---|---|---|
| Section 8.2 | Purposes of the Association | 19 |
| Section 8.3 | Contracting Authority | 20 |
| Section 8.4 | Duties | 20 |
| Section 8.5 | Right of Entry | 24 |

Sevtion 8.6    Duties of Owners................................ 24
Section 8.7    Association to Defend Certain Actions........ 25


ARTICLE IX     GENERAL RESTRICTIONS


Section 9.1    Partition...................................... 26
Section 9.2    Interior of Unit............................... 26
Section 9.3    Nuisance....................................... 26
Section 9.4    Use of Common Area............................. 26
Section 9.5    Projections.................................... 26
Section 9.6    Recreational Vehicles.......................... 26
Section 9.7    Lavatory Facilities............................ 26
Section 9.8    Signs.......................................... 27
Section 9.9    Animals........................................ 27
Section 9.10   Offensive Activities........................... 27
Section 9.11   Right of Inspection............................ 27
Section 9.12   Leases......................................... 27
Section 9.13   Misconduct..................................... 28
Section 9.14   Structural Changes............................. 28
Section 9.15   Utilities...................................... 28
Section 9.16   Receptacles.................................... 28
Section 9.17   Television; Radio.............................. 28


ARTICLE X      MORTGAGE PROTECTION

Section 10.1   Seventy-Five Percent Vote of Mortgagees...... 28
Section 10.2   Other Rights of First Mortgagees............. 29
Section 10.3   Mortgagees Furnishing Information............ 30
Section 10.4   Notice to First Mortgagees of Owner Default.. 30
Section 10.5   Right of First Refusal....................... 30
Section 10.6   Conflicts.................................... 30
Section 10.7   Notice of Destruction or Taking.............. 30
Section 10.8   Breach of Declaration........................ 31


ARTICLE XI     DESTRUCTION OF IMPROVEMENTS

Section 11.1   Destruction; Proceeds Exceed 85% of
               Reconstruction Costs.......................... 31
Section 11.2   Destruction; Proceeds Less Than 85% of
               Reconstruction Costs.......................... 31
Section 11.3   Rebuilding Procedures......................... 31
Section 11.4   Rebuilding Contract........................... 32
Section 11.5   Rebuilding Not Authorized..................... 32
Section 11.6   Minor Repair and Reconstruction.............. 33


ARTICLE XII    CONDEMNATION

Section 12.1   Sale by Unanimous Consent.................... 33

T 70542,
Ree 5/28/80

Section 12.2  Distribution of Proceeds of Sale............ 33
Section 12.3  Distribution of Condemnation Award.......... 33
Section 12.4  Revival of Right to Partition.............. 33


ARTICLE XIII   PARTITION

Section 13.1  Suspension................................. 34
Section 13.2  Proceeds................................... 34
Section 13.3  Power of Attorney.......................... 34


ARTICLE XIV    GENERAL PROVISIONS

Section 14.1  Term....................................... 34
Section 14.2  Notices.................................... 34
Section 14.3  Enforcement................................ 35
Section 14.4  Severability............................... 35
Section 14.5  Construction............................... 35
Section 14.6  Singular Includes Plural................... 35
Section 14.7  Attorneys' Fees............................ 35
Section 14.8  Nuisance................................... 35
Section 14.9  Amendments................................. 36
Section 14.10 Annexation................................. 37

T-19572
Rec 5/28/80

DECLARATION OF
COVENANTS, CONDITIONS AND RESTRICTIONS
FOR THE HUNTINGTON BEACH GABLES

LOTS 1 AND 2 OF TRACT NO. 10542
CITY OF HUNTINGTON BEACH
ORANGE COUNTY, CALIFORNIA


THIS DECLARATION, made this _21st_ day of ___May_____,
19_80_, by THE ROBERT P. WARMINGTON CO., a California corporation,
(hereinafter referred to as "Declarant").


WITNESSETH:

WHEREAS, Declarant is the owner of a subleasehold
interest in certain real property in the City of Huntington
Beach, County of Orange, State of California, described as:

Lots 1 and 2 of Tract 10542 as per map recorded in
Book _456_, Pages __49_ and __50_, inclusive, of
Miscellaneous Maps, in the Office of the County
Recorder of Orange County, California.


WHEREAS, said real property is owned in fee by HOUSER
BROS. CO., a California limited partnership, in which Clifford C.
Houser and Vernon F. Houser are general partners, (hereinafter
referred to as "Lessor"); and

WHEREAS, said real property has been leased by Lessor to
Robert P. Warmington, an individual, (hereinafter referred to as
"Lessee") pursuant to a Ground Lease dated _October 19___, 19_79_,
and as evidenced by a Short Form Memorandum recorded on
_December 6_____, 19_79_, in Book _13424____, pages _499___,
et seq.,            of the Official Records of Orange County,
California; and

WHEREAS, Lessee has subleased the Property to Declarant,
who now desires to divide its interest in the property and
improvements thereon into a condominium project as defined in
Sections 783 and 1350 of the California Civil Code in accordance
with a recorded condominium plan for the project, as hereinafter
defined; and

WHEREAS, Declarant has therefore deemed it desirable to
impose a general plan for the improvement and development of said
tract and all of the property described herein and the adoption
and establishment of covenants, conditions and restrictions upon
said real property and each and every lot and portion thereof and
upon the use, occupancy and enjoyment thereof, all for the

1.

T-10542,
Rec 5/28/80

purpose of enhancing and protecting the value, desirability and attractiveness of said tract; and

WHEREAS, Declarant has deemed it desirable for the efficient preservation of the value, desirability and attractiveness of said tract to create a corporation to which should be delegated and assigned the powers of administering and enforcing these covenants, conditions and restrictions, and collecting and disbursing funds pursuant to the assessment and charges hereinafter created and referred to; and

WHEREAS, THE HUNTINGTON BEACH GABLES HOMEOWNERS ASSOCIATION, a nonprofit corporation, has been incorporated under the laws of the State of California for the purpose of exercising the powers and functions aforesaid; and

WHEREAS, Lessor and Lessee have agreed to the restrictions to be imposed hereby and authorize the recordation of this Declaration, and evidence this agreement and authorization by executing this Declaration below; and

NOW THEREFORE, Declarant hereby covenants, agrees and declares that all of said units and property described above shall be held, sold, assigned, leased, encumbered, hypothecated, used, improved, and conveyed subject to the following covenants, conditions and restrictions and easements which are hereby declared to be for the benefit of the whole tract and all of the property described herein and the owners thereof, their successors and assigns. These covenants, conditions and restrictions and easements shall run with the said real property and shall be binding on all parties having or acquiring any right, title or interest in the described real property or any part thereof and are imposed upon said real property and every part thereof as a servitude in favor of each and every parcel thereof as the dominant tenement or tenements.

## ARTICLE I
## DEFINITIONS

The following terms used in these covenants, conditions and restrictions shall be applicable to this Declaration and are defined as follows:

Section 1.1. Association: "Association" shall mean and refer to THE HUNTINGTON BEACH GABLES HOMEOWNERS ASSOCIATION, a nonprofit corporation, incorporated under the laws of the State of California, its successors and assigns.

Section 1.2. Board of Directors/Board: "Board of Directors" or "Board" shall mean and refer to the duly elected Board of Directors of the Association.

2.

T-10542
Rec 5/28/8

**Section 1.3.**  **Common Area:**  "Common Area" means and refers to the entire Project, except the Units.

**Section 1.4.**  **Condominium:**  "Condominium" means a condominium as defined in Section 783 of the California Civil Code and as used herein means a Unit, together with (a) an undivided 1/80 interest as tenant in common in the Common Area, (b) certain exclusive or nonexclusive easements granted herein to an Owner, and (c) a Membership in the Association.

**Section 1.5.**  **Condominium Plan:**  "Condominium Plan" shall mean and refer to that certain Condominium Plan recorded or to be recorded by Declarant on the Project in the office of the County Recorder wherein the Property is located.

**Section 1.6.**  **County:**  "County" shall mean and refer to the County of Orange, State of California.

**Section 1.7.**  **Declarant:**  "Declarant" shall mean and refer to THE ROBERT P. WARMINGTON CO., a California corporation, its successors and assigns.

**Section 1.8.**  **Lessee:**  "Lessee" shall mean and refer to Robert P. Warmington, a married man, his heirs, successors, and assigns.

**Section 1.9.**  **Lessor:**  "Lessor" shall mean and refer to HOUSER BROS. CO., a California limited partnership, its successors and assigns.

**Section 1.10.**  **Member:**  "Member" shall mean and refer to every person or entity who holds Membership in the Association.

**Section 1.11.**  **Mortgage:**  "Mortgage" shall mean and refer to any mortgage, deed of trust, assignment of leasehold or subleasehold interest or other conveyance of a Unit, or any interest therein, including, but not limited to, the improvements developed thereon to secure the performance of an obligation, which obligation will be reconveyed upon completion of such performance.

**Section 1.12.**  **Mortgagee:**  "Mortgagee" shall mean and refer to mortgagees, trustees, beneficiaries and holders of deeds of trust, assignees of any leasehold or subleasehold interests, and the holders of any indebtedness secured by Mortgages.

**Section 1.13.**  **Owner/Ownership:**  "Owner" shall mean and refer to the record assignee of the rights of Declarant and/or Lessee to a Unit, but excluding those having such interest merely as security for the performance of an obligation.  Such term shall also mean and refer to the Lessee or Lessor if either succeeds to the rights of said assignee through termination of any lease or sublease or by any other means.  All references

3.

T-10542
Rec 5/28/80

herein to "ownership" shall mean and refer to the ownership of a
leasehold or subleasehold interest.

Section 1.14. Project: "Project" shall mean and refer
to the Property and all structures and other improvements
thereon.

Section 1.15. Property: "Property" or "Properties"
shall mean and refer to the leasehold interest in all of the real
property hereinbefore described.

Section 1.16. Unit: "Unit" or "Units" shall mean and
refer to the residential air space Units and related areas as
shown on the recorded Condominium Plan, and means the elements of
the Project which are not owned in common by the Owners of the
Condominiums in the Project.


ARTICLE II
CREATION OF CONDOMINIUMS

Section 2.1. Creation: Declarant, in order to establish
a plan of condominium ownership for the Project, hereby covenants
and agrees that it hereby divides the Project as follows:

(a) Into eighty (80) separately designated and
legally described Units which are comprised of certain
parcels of air space which are shown and more
particularly described on the Condominium Plan; and

(b) The remainder of the Project which shall be
deemed the Common Area and shall be subject to certain
easements and restrictions as set forth in this
Declaration and the Condominium Plan.

Section 2.2. Elements of Condominium: Each Condominium
shall be comprised of the following elements:

(a) A Unit;

(b) An undivided 1/80 leasehold interest as tenant
in common in the Common Area;

(c) Non-exclusive easement rights as described in
this Declaration;

(d) Certain exclusive easement rights over the
Common Area, defined hereinafter as Restricted Common
Areas; and

(e) A membership in the Association.


4.

T70542
Rec 5/28/8

**Section 2.3.  Non-Severability:** Declarant, its
successors, assigns, sublessees, and grantees, covenant and agree
that the various elements of the Condominium Plan conveyed
herewith shall not be separated or separately conveyed, and each
such element shall be deemed to be conveyed or encumbered with
its respective Unit even though the description in the instrument
or conveyance or encumbrance may refer only to title to the Unit.

**Section 2.4.  Boundaries of Units:** That portion of the
Unit designed for use as a residence shall be bounded by and
contained within the interior, undecorated surfaces of the
perimeter walls, floors, ceilings, windows, fireplace boxes and
doors.  The Units do not, however, contain bearing walls,
columns, vertical supports, floors, roofs, foundation, railings,
fences, gates, garage doors, central heating; central
refrigeration and central air-conditioning equipment, reservoir
tanks; pumps and other central services, pipes, ducts, flues,
conduits, wires and other utility installations, wherever located
except the outlets thereof when located within the Unit.

In interpreting assignments, leases, subleases, deeds,
declarations, and plans, the existing physical boundaries of the
Unit or of a Unit reconstructed in substantial accordance with
the original plans thereof shall be conclusively presumed to be
its boundaries rather than the metes and bounds (or other
description) expressed in the deed, assignment, lease, sublease,
plan or declaration, regardless of minor lateral movement of the
building and regardless of minor variance between boundaries
shown on the Condominium Plan or in the assignment, lease,
sublease or deed, and Declaration and those of the building.

## ARTICLE III
## MEMBERSHIP IN ASSOCIATION

**Section 3.1.  Membership:** Every Owner of a Unit which is
subject to assessment shall be a Member of the Association, and
ownership of such Unit shall be the sole qualification for such
Membership.  The terms and provisions set forth in this
Declaration, which are binding upon all Owners of all Units and
all Members in the Association, are not exclusive, as the Member
shall, in addition, be subject to the terms and provisions of the
Articles of Incorporation and the Bylaws of the Association.
Membership shall be appurtenant to and may not be separated from
ownership of any Unit which is subject to assessment.

**Section 3.2.  Transfer:** The Membership held by any Owner
of a Unit shall not be transferred, pledged or alienated in any
way, except upon the sale, assignment or encumbrance of such Unit
and then only to the Purchaser or Mortgage holder of such Unit.
Any attempt to make a prohibited transfer is void, and will not
be reflected upon the books and records of the Association.  In
the event the Owner of any Unit should fail or refuse to transfer

the Membership registered in his name to the assignee of such
Unit, the Association shall have the right to record the transfer
upon the books of the Association.

Section 3.3.  Voting Rights:  The Association shall have
two (2) classes of voting Membership.

Class A:  Class A Members shall be all those Owners
with the exception of the Declarant and shall be entitled to one
vote for each Unit owned.  When more than one person holds an
interest in any Unit, all such persons shall be Members.  The
vote for such Unit shall be exercised as they determine, but in
no event shall more than one vote be cast with respect to any
Unit.

Class B:  The Class B Member shall be the Declarant.
The Class B Member shall be entitled to three votes for each Unit
in which it holds the interest required for Membership by Section
1 of this Article; provided that the Class B Membership shall
cease and become converted to Class A Membership on the happening
of any of the following events, whichever occurs earlier:

(a)  When the total votes outstanding in the
Class A Membership equals the total votes
outstanding in the Class B Membership;

(b)  The second anniversary of the Final
Subdivision Public Report for this development.

All voting rights shall be subject to the restrictions
and limitations provided herein and in the Articles and Bylaws of
the Association.  Furthermore, notwithstanding any provisions
herein excluding the vote of the Declarant, any provision herein
calling for membership approval of action to be taken by the
Association, except provisions with respect to the action
referred to in Section 4.4, below to enforce the obligations of
the Declarant, shall expressly require the vote or written assent
of a prescribed percentage of each class of membership during the
time that there are two outstanding classes of membership, as set
forth above.  Furthermore any such provision calling for the vote
or written assent of each class of membership for the initiation
of action by or in the name of the Association, any requirement
other than in Sections 4.4, and 14.9, below, and Section 10.1 of
the Bylaws, that the vote of the Declarant shall be excluded in
any such determination shall be applicable only if there has been
a conversion of Class B to Class A shares and only for so long as
the Declarant holds or directly controls twenty-five percent
(25%) or more of the voting power of the Association.

6.

## ARTICLE IV
## PROPERTY RIGHTS IN THE COMMON AREAS

**Section 4.1.   Members' Easements of Enjoyment:**   Declarant
hereby grants to the Owner of each Unit a non-exclusive easement
for access over the Common Area.   Every Member shall have a right
and easement of ingress and egress and of enjoyment in and to the
Common Area which shall be appurtenant to and shall pass with the
title to every Unit, subject to the following provisions:

    (a)   The right of the Association to limit the
number of guests of Members.

    (b)   The right of the Association to establish
uniform rules and regulations pertaining to the use of
the Common Area and the recreational facilities thereof.

    (c)   The right of the Association, in accordance
with its Articles and Bylaws, to borrow money for the
purpose of improving the Common Area and facilities and
in aid thereof, to mortgage said property, provided that
the rights of such mortgages shall be subordinate to the
rights of the Members, and provided further that any such
mortgage shall have the prior approval of at least
seventy-five percent (75%) of all first Mortgagees, as
set forth below.

    (d)   The right of the Association to suspend the
right to use of the recreational facilities by an Owner
but only in accordance with the notice and hearing
requirements set forth in the Bylaws.

    (e)   Those easement rights set forth in Article VII,
below.

**Section 4.2.   Delegation of Use:**   Any Member may
delegate, in accordance with the Bylaws, his right of enjoyment
to the Common Area and facilities to the Members of his family,
his tenants or contract purchasers who reside in his Unit.

**Section 4.3.   Waiver of Use:**   No Member may exempt
himself from personal liability for assessments duly levied by
the Association, nor release the Unit owned by him from the liens
and charges hereof, by waiver of the use and enjoyment of the
Common Area and the facilities thereon or by abandonment of his
Unit.

**Section 4.4.   Common Area Improvements:**   If Common Area
improvements which are to be erected upon the Common Area by
Declarant have not been completed prior to the issuance of the
Subdivision Public Report and the Association is the obligee
under a bond or other arrangement (hereafter "Bond") to secure
performance of the commitment of Declarant to complete the

SAC EXHIBITS - 0059

T7p542
Rec 5/28/80

improvements, the Board of Directors of the Association shall
consider and vote on the question of action by the Association to
enforce the obligations under the Bond with respect to any
improvement for which a Notice of Completion has not been filed
within sixty (60) days after the completion date specified for
that improvement in the Planned Construction Statement appended
to the Bond.  If the Association has given an extension in
writing for the completion of any Common Area improvement, the
Board of Directors of the Association shall consider and vote on
the question of action by the Association to enforce the
obligations under the Bond if a Notice of Completion has not been
filed within thirty (30) days after the expiration of the
extension.  If the Board of Directors of the Association
determines that it will not initiate action to enforce the
obligations under the Bond or fails to consider and vote on the
question within the applicable time period set forth above, then,
upon receipt of a petition signed by not less than ten percent
(10%) of the total voting power of the Association, the Board of
Directors of the Association shall hold a special meeting of
Members not less than fifteen (15) days nor more than thirty (30)
days after receipt of the petition for the purpose of voting to
override the decision of the Board of Directors not to initiate
action to enforce the obligations under the Bond or to consider
and vote on the question if the Board of Directors has not acted.
At this special meeting, a vote of a majority of the voting power
of the Members, excluding Declarant, shall determine all matters
presented regarding the enforcement of obligations under the
Bond.  Such vote to take action to enforce the obligations under
the Bond shall be the decision of the Association and the Board
of Directors shall thereafter implement this decision by
initiating and pursuing appropriate action in the name of the
Association.

## ARTICLE V
### COVENANT FOR ASSESSMENTS

    Section 5.1.  Creation of the Lien and Personal
Obligation of Assessments:  The Declarant, for each Unit owned by
it within the Property, hereby covenants and agrees to pay, and
each Owner of any Unit by acceptance of a lease therefor, whether
or not it shall be so expressed in such lease, is deemed to
covenant and agree to pay to the Association certain assessments
as described below, such assessments to be fixed, established and
collected as hereinafter provided.  Such assessments together
with such interest thereon and costs of collection thereof, as
hereinafter provided, shall be a charge on the Unit and that
portion of the leasehold estate appurtenant to said Unit and
shall be a continuing lien upon said Unit and said leasehold
estate against which each such assessment is made.  Each such
assessment, together with such interest, costs and reasonable
attorneys' fees, shall also be the personal obligation of the
person who was the Owner of such Unit at the time when the

8.

T-10542
Rec 5/28/0

assessment fell due.  The personal obligation shall not pass to
his successors in title until expressly assumed by them.

Section 5.2.  General Purpose of Assessments:  The
assessments levied by the Association shall be used exclusively
for the purpose of promoting the recreation, health, safety, and
welfare of the Members of the Association, and, in particular,
for the improvement and maintenance of the properties, services
and facilities devoted to this purpose, or to the payment to or
reimbursement of other affected parties or governmental entities
for the improvement and maintenance thereof, and related to the
use and enjoyment of the Common Area and those Association
responsibilities set forth herein.

Section 5.3.  Regular Assessments:  Regular Assessments
shall be levied and collected by the Association in accordance
with the following:

(a)  Purposes:  To cover the following expenses:

(1)  Maintenance, management, operation, repair
and replacement of the Common Area and all other
areas on the Property which are maintained by the
Association;

(2)  Costs relating to the maintaining of a
security guard gate adjoining the Property as
determined from time to time by the Association and
the owner of said ajoining property;

(3)  Unpaid assessments;

(4)  Cost of management and administration of
the Association, including, but not limited to,
compensation paid by the Association to managers,
accountants, attorneys and employees;

(5)  The costs of utilities, trash pick up and
disposal (if such services are provided) and other
services benefiting the Owners and their Units to
the extent such services are paid for by the
Association;

(6)  The costs of fire, casualty, liability,
workmen's compensation and other insurance covering
the Common Area;

(7)  The costs of any other insurance obtained
by the Association;

(8)  Reasonable reserves as deemed appropriate
by the Board;

9.

T-10543
An chele

(9)   The costs of bonding any members of the Board, any professional management agent, or any other person handling the funds of the Association;

(10)   Taxes paid by the Association;

(11)   Amounts paid by the Association for discharge of any lien or encumbrance levied against the Common Area or portions thereof;

(12)   Costs incurred by any committees established by the Board;

(13)   The costs of any other item or items designated by, or in accordance with other expenses incurred by the Association for any reason whatsoever in connection with the Common Area, this Declaration, the Articles or the By-laws or in furtherance of the purposes of the Association or in the discharge of any obligations imposed on the Association by this Declaration;

(14)   Lease payments, if any, required to be made on the Common Areas; and

(15)   Association's proportionate share of the costs incurred for maintenance of Monterey Lane and the guard gates maintained thereon, if any, pursuant to that certain Agreement attached hereto as Exhibit "A".

(b)   Amount and Type of Payment:   Until the expiration of one (1) year immediately following the conveyance of the first Unit to an Owner, the maximum regular assessment shall be as set forth in the Final Subdivision Report for the Property.   From and after said year, the maximum regular assessment may be increased each year by the Board of Directors, but not more than twenty percent (20%) above the maximum regular assessment for the previous year.   The maximum regular assessment may be increased above twenty percent (20%) only by the vote or written assent of a majority of the voting power of the Members excluding Declarant.

(c)   Date of Commencement:   The regular assessments provided for herein shall commence as to all Units on the first day of the month following the closing of escrow on the sale of the first Unit to an Owner.   The first regular assessment shall be adjusted according to the number of months remaining in the calendar year.   The Board of Directors shall fix the amount of the regular assessment against each Unit at least thirty (30) days in advance of each regular assessment period.   Written

notice of the regular assessment shall be sent to every
Owner subject thereto.  The due dates shall be
established by the Board of Directors.  The Association
shall, upon demand, and for a reasonable charge, furnish
a certificate signed by an officer of the Association
setting forth whether the assessments on a specified Unit
have been paid.  A properly executed certificate of the
Association as to the status of assessments on a Unit is
binding upon the Association as of the date of its
issuance.

Section 5.4.  Special Assessments:  In addition to the
regular assessments authorized above, the Association may levy in
any assessment year, a special assessment applicable to that year
only, for the purpose of defraying, in whole or in part, the cost
of any construction, reconstruction, repair or replacement of a
capital improvement upon the Common Area, including fixtures and
personal property related thereto, provided that any such
assessments which in the aggregate exceed five percent (5%) of
the budgeted gross expenses of the Association for that year
shall require the vote or written assent of a majority of the
voting power of the Members, excluding Declarant.  In addition,
special assessments may be levied against and collected from a
particular owner and his Unit to reimburse the Association for
certain costs or expenses that have been incurred by the
Association or Declarant with respect to bringing the Owner and
his Unit into compliance with the terms of this Declaration or
with respect to materials or services furnished to such Owner or
his Unit at his request or on his behalf as may be provided
herein.

Section 5.5.  Delinquency:  Any assessment provided for
in this Declaration, which is not paid when due, shall be
delinquent, and shall be subject to the following provisions.
All references hereinafter made to the sale of a Unit shall also
include the assignment of the leasehold or subleasehold interest
therein.

(a)  Right of Association:  If any such assessment
is not paid within thirty (30) days after the due date,
the assessment shall bear interest from the date of
delinquency at the rate of six percent (6%) per annum,
and the Association may, at its option, bring an action
at law against the Owner personally obligated to pay the
same, or, upon compliance with the notice provisions set
forth herein to foreclose the lien against the Unit, and
there shall be added to the amount of such assessment,
the costs of preparing and filing the complaint in such
action, and in the event a judgment is obtained, such
judgment shall include said interest and a reasonable
attorneys' fee, together with the costs of action.  Each
Owner vests in the Association or its assigns, the right

11.

and power to bring all actions at law or lien foreclosure against such Owner or other Owners for the collection of such delinquent assessments. No Owner may waive or otherwise escape the liability for the assessments provided for herein by non-use of the Common Area or abandonment of his Unit.

(b) <u>Notice of Lien</u>: No action shall be brought to foreclose said assessment lien or to proceed under the power of sale herein provided less than thirty (30) days after the date a notice of claim of lien (hereinafter referred to as "Notice of Delinquent Assessment") is deposited in the United States mail, certified or registered, postage prepaid, to the Owner of said Unit, and a copy thereof is recorded by the Association in the office of the County Recorder; said Notice of Delinquent Assessment must recite a good and sufficient legal description of any such Unit, the record Owner or reputed Owner thereof, the amount claimed (which shall include interest on the unpaid assessment at the rate of six percent (6%) per annum, plus reasonable attorneys' fees and expenses of collection in connection with the debt secured by said lien), and the name and address of the claimant.

(c) <u>Foreclosure Sale</u>: Any such sale provided for above is to be conducted in accordance with the provisions of Sections 2924, 2924b, and 2924c of the Civil Code of the State of California, applicable to the exercise of powers of sale in mortgages and deed of trust, or in any other manner permitted or provided by law. The Association, through its duly authorized agents, shall have the power to bid on the Unit at foreclosure sale, and to acquire and hold, lease, mortgage and convey the same.

(d) <u>Curing of Default</u>: Upon the timely curing of any default for which a Notice of Delinquent Assessment was filed by the Association, the officers of the Association are hereby authorized to file or record, as the case may be, an appropriate release of such Notice of Delinquent Assessment, upon payment by the defaulting Owner of a reasonable fee, to cover the costs of preparing and filing or recording such release, together with the payment of such other costs, interest or fees as shall have been incurred.

(e) <u>Cumulative Remedies</u>: The assessment lien and the rights to foreclose and sale thereunder shall be in addition to and not in substitution for all other rights and remedies which the Association and its assigns may have hereunder and by law, including a suit to recover a money judgment for unpaid assessments, as above provided.

(f)  Subordination:  A lien for regular and special
assessments shall be subordinate to the lien of any first
Mortgage.  The sale or transfer of any Unit as a result
of the exercise of a power of sale or a judicial
foreclosure under a default under such first Mortgage or
the termination of an Owner's interest in the Unit by
Lessor shall extinguish the lien of such assessments as
to payments which become due prior to such sale or
transfer.  No such transfer or termination as discussed
above shall relieve the new Owner, be it the former
beneficiary under the first Mortgage or other person,
from liability for any assessments thereafter becoming
due or from the lien thereof.

(g)  Expiration of Lien:  Unless sooner satisfied
and released of the enforcement thereof initiated as
hereafter provided such lien shall expire and be of no
further force or effect one year from the date of
recordation of the Notice of Delinquent Assessment.  The
one year period may be extended by the Association for
not to exceed one additional year by recording a written
extension thereof.

Section 5.6.  Exempt Property:  The following property
subject to this Declaration shall be exempted from the
assessments, charge and lien created herein:  (a) all properties
dedicated to and accepted by a local public authority; (b) all
Common Area; and (c) all properties exempted from taxation by the
laws of the State of California, upon the terms and to the extent
of such legal exemption.

Notwithstanding any provision herein, no land or
improvements devoted to residential dwelling use shall be exempt
from said assessments, charges or liens.

Section 5.7.  Uniform Rate of Assessment:  Except as
provided for in Section 5.4 relating to a special assessment
levied against an individual Owner as described therein, both
regular and special assessments shall be levied against each
Owner according to the ratio of the number of Units owned by the
Owner assessed to the total number of Units subject to
assessment, and shall be collected on a monthly basis.

Section 5.8.  No Offsets:  No offsets for any reason
shall be allowed against the full payment of any assessment
levied pursuant to this Declaration, including, without
limitation, a claim that the Association is not properly
exercising its duties of maintenance or enforcement.

SAC  EXHIBITS - 0065

ARTICLE VI
ARCHITECTURAL CONTROL

Section 6.1.  Architectural Approval:  Except for
purposes of proper maintenance and repair, no person or entity
shall install, erect, attach, build, place, construct or remove
any lighting, shades, screens, signs, awnings, patio covers,
decorations, fences, walls, aerials, antennas, landscaping or
make any changes or otherwise alter (including the painting
thereof) the exterior (or structurally alter the interior) of any
Unit or the Common Area until plans and specifications
(hereinafter the "Plans") as required in Section 6.2 shall have
been reviewed and approved in writing by an Architectural
Committee (hereinafter the "Architectural Committee") and Lessor.
For purposes of this section, the term "exterior" shall mean any
outside wall, outside surface, roof, outside door, balcony,
patio, garage, or other outside structure of said Unit.

Section 6.2.  Requirements for Approval:  Said Plans
shall be prepared by a duly licensed architect or other person
approved by the Architectural Committee and shall include, where
appropriate, the following:  (a) color, shape, dimensions and
materials to be used; (b) building plans; (c) exterior
elevations, surfaces and sections, structural design and salient
exterior details; (d) general exterior color schemes; and (e)
landscaping plans showing plants, hedges, and fences.  All such
Plans shall be submitted in writing over the signature of the
Owner or his authorized agent.  Approval shall be based, among
other things, on adequacy of site dimensions; adequacy of
structural design and materials; conformity and harmony of
external design with neighboring structures; effect of location
and use of improvements and landscaping on neighboring property,
improvements landscaping, operations and uses; preservation of
view and aesthetic beauty; with respect to fences, walls and
landscaping, assurance of adequate access to the Association in
connection with the performance of its duties and the exercise of
its power hereunder; conformity with such rules and regulations
as may be adopted by the Architectural Committee in accordance
with this Article; and conformity of the Plans to the purpose and
general plan and intent of this Declaration.

Section 6.3.  Term and Composition of Architectural
Committee:  The Architectural Committee shall be composed of
three (3) members.  Prior to the first anniversary date of the
issuance of the original Public Report for the Project, Declarant
may appoint the three (3) original members of the Architectural
Committee and their replacements, if necessary.  Declarant's
appointees to the Architectural Committee need not be Members of
the Association.  Declarant shall retain the right to appoint a
majority of the members of the Architectural Committee until the
earlier occurrence of either of the following events:

14.
SAC EXHIBITS - 0066

T 70542
Rec 5/28/80

(a)  When ninety percent (90%) or more of the Units have been sold; or

(b)  On the fifth anniversary date of the original issuance of the Public Report for the Project.

After one year from the date of issuance of the original Public Report for the Project, the Board shall have the right to appoint one Member to the Architectural Committee, who shall be a member of the Association.

From and after the occurrence of any of the events referenced in (a) and (b) hereinabove, whichever occurs first, the Board shall have the power to appoint all members of the Architectural Committee who shall all be Members of the Association.

Section 6.4.  Failure to Approve or Disapprove the Plans: In the event the Lessor or the Architectural Committee, or its representatives designated in accordance with Section 6.9, fail to either approve or disapprove such Plans within thirty (30) days after the same have been submitted to them, it shall be conclusively presumed that the Lessor and the Architectural Committee have approved such Plans.  All improvement work approved by the Lessor and Architectural Committee shall be diligently completed and constructed in accordance with the approved Plans.

Section 6.5.  No Liability:  Neither Declarant, Lessor, Lessee, Association, Architectural Committee, or the members or designated representatives thereof shall be liable im damages to anyone submitting Plans to them for approval, or to any Owner of property affected by this Declaration by reason of mistake in judgment, negligence, or nonfeasance arising out of or in connection with the approval or disapproval or failure to approve or disapprove any such Plans, or for any defect in any structure constructed from such Plans.  Such Plans are not approved for engineering design.  Every Owner and his authorized agent, if any, who submits Plans to the Architectural Committee for approval agrees, by reason of such submission, that no action or suit of any kind will be commenced against Declarant, Lessor, Lessee, Association, Architectural Committee, or any of the members or designated representatives thereof to recover any damages.

Section 6.6.  Notice of Noncompliance or Noncompletion: Notwithstanding anything to the contrary contained herein, after the expiration of the later of one year from the date of issuance of a building permit by a municipal or other governmental authority for any improvements or one year from the date of commencement of construction of any improvements within the Project, said improvements shall, in favor of purchasers and encumbrancers in good faith and for value, be deemed to be in

15.

T70543
Rec 5/28/8

compliance with all provisions of this Article, unless actual notice of such noncompliance or noncompletion, executed by the Architectural Committee or its designated representatives, shall appear of record in the office of the County Recorder or unless legal proceedings shall have been instituted to enforce compliance or completion.

Section 6.7. Rules and Regulations: The Architectural Committee may from time to time, in its sole discretion, adopt, amend and repeal reasonable rules and regulations interpreting and implementing the provisions hereof and establishing reasonable architectural standards over the Project.

Section 6.8. Variances: Where circumstances such as topography, location of property lines, location of trees, configuration of the improvements on the Property, or other matters require, the Architectural Committee, by the vote or written assent of a majority of its members, may allow reasonable variances as to any of the covenants, conditions or restrictions contained in this Declaration under the jurisdiction of the Architectural Committee, on such terms and conditions as it shall require; provided, however, that all such variances shall be in keeping with the general plan for the improvement and development of the Project.

Section 6.9. Appointment and Designation: The Architectural Committee may from time to time, by the vote or written assent of a majority of its members, delegate any of its rights or responsibilities hereunder to one or more duly licensed architects or other qualified persons who shall have full authority to act on behalf of said Architectural Committee in all matters so delegated.

Section 6.10. Review Fee and Address: Any Plans required by Section 6.2 shall be submitted in writing for review and approval together with a reasonable processing fee. The address of the Architectural Committee shall be the principal place of business of the Association, or such other place as the Architectural Committee may from time to time designate in writing to the Board. Such address shall be the place for the submittal of any plans and specifications and the place where the current rules and regulations, if any, of the Architectural Committee shall be kept.

Section 6.11. Inspection: Any member or agent of the Architectural Committee may from time to time at any reasonable hour or hours and upon reasonable notice enter and inspect any property subject to the jurisdiction of said Architectural Committee as to its improvements or maintenance in compliance with the provisions hereof.

16.

*T705⁴2
Rec 5/28/80*

## ARTICLE VII
### EASEMENTS

**Section 7.1.** **Rights of Association:** There is hereby reserved to the Association such easements as are necessary to perform the duties of the Association.

**Section 7.2.** **Rights of Declarant:** The Declarant, for itself and its successors and assigns, reserves the following rights and easements:

(a) Easement over the Common Area for the installation and maintenance of electric, telephone, cable television, water, gas, and sanitary sewer lines and drainage facilities.

(b) The right to use on a non-interference basis the Association clubhouse, if there be one constructed upon the Common Area, as a sales facility. Such use by Declarant or its sales agents or representatives shall not unreasonably interfere with the Members in their use and enjoyment of the Common Area or recreational facilities thereon. This reservation by Declarant shall terminate on the happening of either of the following events, whichever occurs earlier:

(1) On the expiration of a three (3) year period from the date of issuance by the Department of Real Estate of the State of California of a Final Subdivision Public Report with respect to the Property; or

(2) On the sale of all of the Units in the Project.

(c) Easements over the Common Area for construction, display, maintenance, sales, and exhibit purposes in connection with the construction, development and sale or lease of the Project until the sale by Declarant of all Condominiums within the Project, provided, however, that the exercise of such easements by Declarant shall not unreasonably interfere with the reasonable use and enjoyment of the Units or the Common Area by the Owners. Until the sale of all of the Units in the Project, Declarant may use any of the Units owned by it within the Project as model home sites and any of the Common Area as incidental parking. Declarant reserves the right to alter its construction, development and design plans as it deems appropriate.

(d) The right of Declarant (and its agents, employees and representatives) to enter on the Common Area to construct improvements on the Property and to

**17.**

make repairs and remedy construction defects if such
entry shall not interfere with the use of any occupied
Unit unless authorized by the Owner thereof; provided,
however, that the Declarant shall be responsible for the
timely repair of any damage caused to the Common Area or
any Unit by the Declarant (and its agents, employees and
representatives) in exercising this right.

(e)  So long as Declarant owns any Units in the
Project, this Declaration cannot be amended or modified
to change or eliminate the easements reserved herein to
Declarant without the prior written approval of
Declarant, and any attempt to do so shall be null and
void and shall have no effect whatsoever.

Section 7.3.  Rights of Owners:  The rights and duties of
the Owners of Units within the Property with respect to sanitary
sewer and water, electricity, gas and telephone and cable
television lines and drainage facilities shall be governed by the
following:

(a)  Wherever sanitary sewer house connections
and/or water house connections or electricity, gas or
telephone and cable television lines or drainage
facilities are installed within the Property, which
connection lines or facilities or any portion thereof,
lie in or upon the Common Area or lie in or upon Units
owned by others, then the Owner of a Unit served by said
connections, lines or facilities, shall have the right,
and is hereby granted an easement to the full extent
necessary therefor, to enter upon these Units or to have
utility companies enter upon these Units within the
properties in or upon which said connections, lines or
facilities, or any portion thereof, lie to repair,
replace, and generally maintain said connections as and
when the same may be necessary as set forth below.

(b)  Wherever sanitary sewer house connections
and/or water house connections or electricity, gas or
telephone or cable television lines or drainage
facilities are installed within the Property, which
connections serve more than one Unit, the Owner of each
Unit served by said connections shall be entitled to the
full use and enjoyment of such portions of said
connections as service his Unit.

Section 7.4.  Encroachments on Common Area:  Eaves,
window boxes, fireplace units, porches and air conditioner units
or similar improvements which may be erected or installed on the
Property by Declarant, may encroach onto the Common Area,
provided, however, that any such encroachment shall not exceed a
maximum of four (4) feet.

Section 7.5.    Restricted Common Areas:    There is hereby reserved and established for certain Owners, various exclusive easements over the Common Area, which shall be deemed "Restricted Common Areas".    These may include any or all of the following:

(a)  Entry areas or courts into the Units, which rights shall be shared with the Unit Owners whose Units abut such areas.

(b)  Attic space, which shall be for the exclusive use of the Owners of the Unit to which such space adjoins.

Such Restricted Common Areas are designated on the Condominium Plan and are referenced in a manner necessary to delineate to which Owner of a Unit the particular right exists. The Owner to which the rights to a Restricted Common Area run shall be obligated to keep and maintain such areas in a safe and clean condition; provided, however, that general maintenance and repair shall primarily remain the obligation of the Association.

Section 7.6.    Other Encroachments:    Each Unit and Common Area improvements within the Project is hereby declared to have an easement over all adjoining Units and Common Area for the purpose of accommodating an encroachment due to engineering errors, errors in original construction, settlement or shifting of the building, or any other cause.  There shall be valid easements for the maintenance of said encroachments so long as they shall exist, and the rights and obligations of Owners shall not be altered in any way to said encroachment, settlement of shifting; provided, however, that in no event shall a valid easement for encroachment be created in favor of an Owner or Owners if said encroachment occurred due to the willful misconduct of said Owner or Owners.  In the event a structure is partially or totally destroyed, and then repaired or rebuilt, the Owners of each Unit agree that minor encroachments over adjoining Units shall be permitted and that there shall be valid easements for the maintenance of said encroachments so long as they shall exist.

ARTICLE VIII
MANAGEMENT

Section 8.1.    Powers of the Association:    All powers relating to management, operation and maintenance of the Common Area, as well as certain rights, duties and powers relating to the Property, as set forth herein and in the Bylaws, shall be vested in the Association.

Section 8.2.    Purposes of the Association:    The specific and primary purposes of and powers of the Association are to manage and maintain the Common Area, Monterey Lane, and all

19.

facilities, improvements, and landscaping thereon, to maintain certain individual improvements on the Units, and to provide recreational activities for the Members, foster and support community activities of the Members, and perform the functions set forth in this Declaration of Covenants, Conditions and Restrictions, and the Association's Articles of Incorporation, and Bylaws.

Section 8.3. Contracting Authority: The Association shall have the right and power to employ or engage a manager and other employees or agents and contract for such services, labor and materials as it may deem reasonably necessary to operate and maintain the Common Area and the improvements thereon and to discharge its other duties as herein provided.

Section 8.4. Duties: The Association shall have the powers to and be responsible for:

(a) The enforcement of this Declaration, the Bylaws of the Association and other agreements of the Association.

(b) Subject to Section 8.6, below, maintaining the Common Area and facilities and improvements thereon (including furnishings and equipment related thereto) in a good, clean, attractive and sanitary order and repair.

(c) Providing water, sewer, refuse collection, electrical, telephone, gas and other necessary utilities service for the Common Area, and maintenance, gardening and landscaping for the Common Area.

(d) Granting easements where necessary for utilities and sewer facilities over the the Common Area to serve the Common Area and the Units.

(e) The payment of taxes and assessments which are or could become a lien on the Common Area or some portion thereof.

(f) Establishing and maintaining a working capital and contingency fund in an amount to be determined by the Board of Directors of the Association.

(g) Providing exterior maintenance of each Unit which is subject to assessment hereunder, only as follows:

(1) Paint, maintain, and repair and replace (if required because of normal wear, tear or deterioration) roofs, gutters, downspouts and exterior building surfaces, and maintain the

20.

landscaping (including the trees, shrubs, grass and walks) within the Common Area.

(2)   Such exterior maintenance shall not include:  glass surfaces; landscaping within the private balcony areas of each Unit; balcony covers or other additions built or maintained within private balcony areas by an Owner; repairs or replacements arising out of or caused by the willful or negligent act of the Owner, his family, guests, or invitees, or caused by any of the perils covered by a standard form fire insurance policy with extended coverage endorsement thereon, or caused by flood, earthquake or other Acts of God.  Such excluded items shall be the responsibility of each Owner; provided, however, that if an Owner shall fail to maintain or make the repairs or replacements which are the responsibility of such Owner, as provided above, then, upon vote of a majority of the Board of Directors; and after not less than thirty (30) days' notice to the Owner, the Association shall have the right (but not the obligation) to enter the Unit and provide such maintenance or make such repairs or replacements, and the cost thereof shall be added to the assessments chargeable to such Unit and shall be payable to the Association by the Owner of the Unit.

(3)   For the purposes solely of performing the exterior maintenance authorized by this Section, the Association's agents or employees shall have the right, after reasonable notice to the Owner, to enter upon any Unit at reasonable hours.

(h)  Obtaining and maintaining in force the following policies of insurance:

(1)   Comprehensive public liability insurance insuring the Association, any manager, the Lessee and Declarant and the Owners and occupants of Units and their respective family members, guests, invitees, and the agents and employees of each, against any liability incident to the Ownership or use of the Common Area and including, if obtainable, a cross-liability or severability of interest endorsement insuring each insured against liability to each other insured.  Such insurance shall include coverage against water damage liability, liability for nonowned and hired automobiles, liability for property of others and any other liability or risk customarily covered with respect to projects similar in construction, location, and use.

21.

(2)  Master or blanket policy of fire insurance
for the full insurable value of all of the
improvements within the Project.  The form, content,
and term of the policy and its endorsements and the
issuing company must be satisfactory to all
institutional Mortgagees.  If more than one
institutional Mortgagee has a loan of record against
the Project, or any part of it, the policy and
endorsements shall meet the maximum standards of the
various institutional Mortgagees represented in the
Project.  The policy shall contain an agreed amount
endorsement or its equivalent, an increased cost of
construction endorsement or a contingent liability
from operation of building laws endorsement or their
equivalent, an extended coverage endorsement,
vandalism, malicious mischief coverage, a special
form endorsement and a determinable cash adjustment
clause or a similar clause to permit cash settlement
covering full value of the improvements in cash of
partial destruction and a decision not to rebuild.
The policy shall be in the amounts as shall be
determined by the Board.  The policy shall name as
insured the Association, the Owners, Declarant, and
Lessee as long as Declarant or Lessee is the owner
of any Unit and all institutional Mortgagees as
their respective interests may appear, and may
contain a loss payable endorsement in favor of the
trustee described in this declaration.

(3)  Except as provided in this Section, no
Owner can separately insure his Unit or any part of
it against loss by fire or other casualty covered by
any insurance carrier under subparagraph (2).  If
any Owner violates this provision, any diminution in
insurance proceeds otherwise payable that results
from the existence of such other insurance will be
chargeable to the Owner who acquired other
insurance, and the Owner will be liable to the
Association to the extent of any such diminution.
An Owner can insure his personal property against
loss.  In addition, any improvements made by an
Owner to the real property within his Unit may be
separately insured by the Owner, but the insurance
is to be limited to the type and nature of coverage
commonly known as tenant's improvements.  All such
insurance that is individually carried must contain
a waiver of subrogation rights by the carrier as to
other Owners, the Association, Declarant, Lessor,
and Lessee.

(4)  All insurance proceeds payable hereunder
and subject to the rights of the Mortgagees, below,
may be paid to a trustee, to be held and expended

22.

T-10542

rec 5/21/80

for the benefit of the Owners, Mortgagees and others, as their respective interests shall appear. Said trustee shall be a commercial bank that agrees in writing to accept such trust. If repair or reconstruction is authorized, the Board shall have the duty to contract for such work as provided for in this Declaration.

(5) The Board may and, if required by any Mortgagee, shall purchase and maintain demolition insurance in adequate amounts to cover demolition in case of total or partial destruction and a decision not to rebuild, and a blanket policy of flood insurance. The Board also shall purchase and maintain worker's compensation insurance, to the extent that it is required by law, for all employees of the Project. The Board also shall purchase and maintain fidelity bonds or insurance (which shall be in an amount not less than 150% of each year's estimated annual operating expenses and reserves and shall contain an endorsement of coverage of any person who may serve without compensation) sufficient to meet the requirements of any Mortgagee. The Board shall purchase and maintain such insurance on personal property owned by the Association, and any other insurance, that it deems necessary or that is required by any Mortgagee.

(6) An Owner may carry whatever personal liability and property damage liability insurance with respect to his Unit that he desires. However, any such policy shall include a waiver of subrogation clause acceptable to the Board and to any Mortgagee.

(7) The Board is appointed attorney-in-fact by each Owner to negotiate and agree on the value and extent of any loss under any policy carried hereunder. The Board is granted full right and authority to compromise and settle any claim or enforce any claim by legal action or otherwise and to execute releases in favor of any insurer.

(8) Any Mortgagee has the option to apply insurance proceeds payable on account of a Unit in reduction of the obligation secured by the mortgage of such Mortgagee.

(9) Notwithstanding the foregoing provisions of this Article, the Association shall continuously maintain in effect such casualty, flood and liability insurance and a fidelity bond meeting the insurance and fidelity bond requirements for

23.

T-10542

Rec 5/28/80

44

condominium projects established by Federal National
Mortgage Association, Government National Mortgage
Association, Federal Home Loan Mortgage Corporation,
Federal Housing Administration, or Veterans'
Administration, so long as any one is a Mortgagee,
Owner, or insures or guarantees a mortgage within
the Property, except to the extent such coverage is
not available or has been waived in writing by the
foregoing entities.

(i)  Make lease payments, if any, required to be
paid on the Common Area.

(j)  Maintenance of Monterey Lane, and any guard-
gates thereon, pursuant to that certain Agreement
attached hereto as Exhibit "A".

Section 8.5.  Right of Entry:  The Association or its
agents may enter any Unit when necessary in connection with any
maintenance, landscaping or construction for which the
Association is responsible.  Upon consent of the Owner, which
consent shall not be unreasonably withheld, the Association or
its agents may enter a Unit to perform maintenance, repairs or
construction for which the Association is responsible.  Such
entry shall be made with as little inconvenience to the Owner as
reasonably possible, and any damage caused thereby shall be
repaired by the Association.

Section 8.6.  Duties of Owners:  In addition to all other
obligations set forth herein, the Owners shall be responsible for
the following:

(a)  In the event the Board shall determine that the
walls, ceilings, floors, doors or any other portion of
the Common Area forming the boundaries of a Unit have
been damaged from within the Unit, notwithstanding that
such damage may be to the Common Area, the Owner of the
Unit shall be responsible for repairing such damage in a
timely manner and in accordance with such rules as the
Board or Architectural Committee shall from time to time
adopt.  In the event such repair is not so accomplished
by the Owner, the Association or its delegates shall have
the right at reasonable times to enter the Unit to effect
such repair, and the cost thereof shall be charged to
said Owner and, if not paid in a timely manner, shall be
a special assessment.

(b)  The repair of any wall or fence separating
neighboring Units shall be the joint responsibility of
the Owners whose Units are separated by such wall or
fence, notwithstanding that such wall or fence may
consist in part of Common Area.  Such adjoining Owners
shall share the expense of such repair equally, but if

24.

T7054/2
Rec 5/22/30

one such Owner refuses to join in such repair, the other
may undertake such repair himself and shall receive
contribution from his neighbor for his neighbor's share
of the cost thereof. In the event that such repair is
required because of the acts or negligence of one of such
adjoining Owners, such repair shall be accomplished by
such Owner at his sole expense.

(c) Each Owner shall be responsible for the care,
maintenance and replacement of his electric garage door
opener, notwithstanding the fact that such may have been
installed by the Declarant.

Section 8.7.    Association to Defend Certain Actions:    In
the event that a lawsuit is brought against all or substantially
all of the Members within the Project which will or could result
in any lien or encumbrance being levied against an entire
Project, the following terms shall apply:

(a) The Association shall defend such lawsuit and
the costs of such defense shall be a special assessment
against all of the Members within the Project joined as
defendants in such lawsuit; provided, however, in the
event that an insurance carrier is obligated to provide
such defense under a policy of insurance carried by the
Association, the Association shall be relieved of the
obligation to provide such defense. Nothing contained
herein shall in any way limit the rights of any Member or
Members to retain counsel of their choice to represent
them in such lawsuit at their own expense. In the event
that a Member so chooses, he shall not be relieved of
liability for the special assessment provided for in this
Section.

(b) In the event that a lien or encumbrance not
covered by California Civil Code Section 1357 attaches to
all or substantially all of the Project by reason of a
judgment or otherwise, the Association shall promptly
take the appropriate steps to remove such lien,
including, but not limited to, the payment of money and
the posting of a bond. The Association shall have the
power to borrow money and to take such other steps as are
necessary to free a Project of such liens.

(c) Simultaneously with any action taken pursuant
to the above sections, the Association shall levy a
special assessment against each of the Members whose
Condominiums were subject to the lien or encumbrance
which caused the Association to act pursuant to said
Section equal to each such Member's pro rata share of
such lien or encumbrance. In the event that such special
assessment is not paid within thirty (30) days of its due
date, the Board may effect the remedies of Section 1356

25.

T-10542

Rec 5/28/80

of the California Civil Code and any other remedies
contained herein.

## ARTICLE IX
### GENERAL RESTRICTIONS

Section 9.1. Partition: The Common Area shall remain
undivided; and no Owner shall bring any action for partition,
excepting as otherwise herein provided, it being agreed that this
restriction is necessary in order to preserve the rights of the
Owners with respect to the operation and management of the
Project.

Section 9.2. Interior of Unit: Each Owner shall have
the right to paint, repaint, tile, wax, paper or otherwise
refinish and decorate the inner surfaces of the walls, ceiling
floors, windows and doors bounding his own Unit.

Section 9.3. Nuisance: Neither the Property, nor any
portion thereof, shall be used for any purpose tending to injure
the reputation thereof, or to disturb the neighborhood or
occupants of adjoining property, or to constitute a nuisance, or
in violation of any public law, ordinance, or regulation in any
way applicable thereto.

Section 9.4. Use of Common Area: The Common Area shall
be used for park, recreational, social and other purposes
directly related to the uses authorized under this Declaration.

Section 9.5. Projections: No projections of any type
shall be placed or permitted to remain above the roof of any
residential building with the exception of one or more chimneys
and one or more vent stacks. No outside air conditioning units,
evaporating coolers, television or radio pole or antenna shall be
constructed, erected or maintained on any building or on any Unit
or Common Area or connected in such manner as to be visible from
the outside of any such building, except as may be constructed by
Declarant.

Section 9.6. Recreational Vehicles: No mobile home,
recreational vehicle, motor home, camper, minihome, boat, truck
of size in excess of 3/4 ton, or trailer of any kind shall be
kept, stored, parked, maintained, constructed or repaired on any
part of the Project other than in specific designated parking
areas as approved by the Board of Directors.

Section 9.7. Lavatory Facilities: No privy shall be
erected, maintained or used upon any portion of a Unit or Common
Area, but a temporary privy may be permitted during the course of
construction of a building. Any lavatory, toilet or water closet
which shall be erected, maintained or used upon any portion of a
Unit or Common Area shall be enclosed and located within a

T-10542

Rec 5/28/80

building permitted under this Declaration to be erected on the
Unit or Common Area, shall be properly connected with the sewer
system and shall be so constructed and operated that no offensive
odor shall arise or otherwise escape therefrom.

Section 9.8. Signs: Except for a sign having a maximum
face area of three (3) square feet and advertising the Property
for sale or rent, no sign or other advertising device of any
character shall be erected, maintained, or displayed upon any
part of the Property; provided, however, that Declarant may erect
and maintain on the Common Area or on any Unit owned by it such
signs and other advertising devices or structures, as it may deem
necessary or proper in connection with the conduct of its
operations for the development, improvement, subdivision and sale
of said property; provided further that residential signs having
a maximum face area of seventy-two (72) square inches giving the
name of the occupant and/or the address of a Unit may be
displayed on such Unit. The Association or its agents may
summarily remove and destroy all signs not conforming to this
Section.

Section 9.9. Animals: No animals, fowl, reptiles or
poultry shall be kept on the Property, except that domestic dogs,
cats, birds and fish may be kept as household pets upon said
property provided that they are not kept, bred or raised thereon
for commercial purposes or in unreasonable quantities.
Notwithstanding the foregoing, no animals or fowl may be kept on
the Property which result in any annoyance or are obnoxious to
residents in the vicinity.

Section 9.10. Offensive Activities: No noxious or
offensive trades or activity shall be carried on upon any portion
of the Property, nor shall anything be done or maintained thereon
which may be or become an annoynance or nuisance to the
neighborhood, or which shall in any way interfere with the quiet
enjoyment of each of the Owners of his respective dwelling unit,
or which shall in any way increase the rate of insurance.

Section 9.11. Right of Inspection: During reasonable
hours and after reasonable notice, any agent of the Association
shall have the right to enter upon and inspect the Property or
any portion thereof and the improvements thereon for the purpose
of ascertaining whether or not the provisions of this Declaration
are being complied with and shall not be deemed guilty of
trespass by reason thereof. Provided, however, that there shall
be no entry into any dwelling unit without the express consent of
the Owner.

Section 9.12. Leases: With the exception of a lender in
possession of a Unit following a default in a first Mortgage, a
foreclosure proceeding or any deed or other arrangement in lieu
of foreclosure, no Unit Owner shall be permitted to lease his
Unit for transient or hotel purposes. No Unit Owner may lease

27.

*T-710542
Rec 5/28/80*

less than the entire Unit.  Any lease between an Owner and lessee
shall provide that the terms of the lease are subject in all
respects to the provisions of this Declaration, the Articles of
Incorporation and Bylaws of the Association, and that any failure
by the lessee to comply with the terms of such documents shall be
a default under the lease.  All leases shall be in writing.

   Section 9.13.  Misconduct:  Each Owner shall be liable to
the Association for any damage to the Common Area or to any of
the equipment or improvements thereon which may be sustained by
reason of the negligence or willful misconduct of said Owner or
of his family, relatives, guests or invitees, both minor and
adult but only to the extent such Owner would be legally
responsible under the laws of the State of California.

   Section 9.14.  Structural Changes:  Nothing shall be done
in any Unit, or in, on or to the Common Areas, which will impair
the structural integrity of any building or which would
structurally change any building without the prior written
consent of the Board and Lessor.

   Section 9.15.  Utilities:  Each Owner of a Unit shall be
obligated to pay any and all assessments for water, sewage, gas,
electricity, or other utilities, taxes and other charges assessed
individually against such Unit.

   Section 9.16.  Receptacles:  No Owner shall deposit any
garbage, refuse or rubbish in or on the Common Area unless such
matter is deposited in appropriate containers suitably placed as
designated by the Board so as not to detract from the physical
appearance of the Common Area or the Project.  Trash bins may be
placed upon the Common Area by each Owner only in accordance with
such rules and regulations as may be promulgated by the Board and
may remain upon the Common Areas only on trash pickup days.

   Section 9.17.  Television; Radio:  No alteration to or
modification of the radio and/or television antenna system, as
developed by the Declarant, shall be permitted and no Owner may
be permitted to construct and/or use and operate his own external
radio and/or television antenna.


ARTICLE X
MORTGAGE PROTECTION

   Section 10.1.  Seventy-Five Percent Vote of Mortgagees:
Except as provided by statute in case of condemnation or
substantial loss to the Units and/or Common Area, without the
prior written approval of at least seventy-five percent (75%) of
all first Mortgagees, based one (1) vote for each Mortgagee,
neither the Association nor the Members shall be entitled to do
any of the following:

28.
SAC EXHIBITS - 0080

T-10542
/bc 5/28/30

(a)   By act or omission, dissolve the Association or abandon or terminate the Project.

(b)   By act or omission, abandon, partition, sell, alienate, subdivide, release, transfer, hypothecate, or otherwise encumber the Common Area.   This provision is not intended to restrict or otherwise prohibit an Owner from selling or encumbering his own Condominium, nor shall it prohibit the granting of easements for public utilities or other publiv purposes consistent with the intended use of the Common Area.

(c)   Partition or subdivide a Condominium.

(d)   Amend a material provision of this Declaration, the Bylaws or the Articles; for purposes of determining what provisions are material in this Declaration and in the Bylaws or the Articles, such provisions in these documents which are required by the rules, regulations or guidelines of programs administered by Federal National Mortgage Association, Government National Mortgage Association, and Federal Home Loan Mortgage Corporation shall be deemed material, but not by way of limitation, with respect to other provisions in these documents.

(e)   Effectuate any decision to terminate professional management and assume self management of the Association.

(f)   Change the pro rata interest or obligations of any individual Unit for the purpose of:  (i) levying assessments on charges or allocating distributions of hazard insurance proceeds on condemnation awards, or (ii) determining the pro rata share of ownership of each Unit in the Common Area.

(g)   Use hazard insurance proceeds for losses to any Property (whether to Units or to Common Areas) for other than the repair, replacement, or reconstruction of such Property.

Section 10.2.   Other Rights of First Mortgagees.  Any first Mortgagee shall, upon written request to the Association, be entitled to:

(a)   Inspect the books and records of the Association during normal business hours.

(b)   Receive the annual audited financial statements of the Association ninety (90) days following the end of the Association's fiscal year.

29.

T-1954P
Roo 5/28/80

(c)  Receive written notice on all annual and special meetings of the Members or of the Board, and first Mortgagees shall further be entitled to designate a representative to attend all such meetings in order to, among other things, draw attention to violations of this Declaration which have not been corrected or made the subject of remedial action by the Association; provided, however, nothing contained in this Section shall give a first Mortgagee the right to call a meeting of the Board or of the Members for any purpose or to vote at any such meeting.

Section 10.3.  Mortgagees Furnishing Information: Mortgagees are hereby authorized to furnish information to the Board concerning the status of any loan encumbering a Unit.

Section 10.4.  Notice to First Mortgagees of Owner Default:  Any first Mortgagee shall be entitled to written notification from the Association of any default in the performance of the obligations imposed by this Declaration by the Owner whose Unit is encumbered by such Mortgagee's mortgage, which default has not been cured within sixty (60) days of a request therefor by the Association; provided, however, the Association shall only be obligated to provide such notice to first Mortgagees who have previously requested such notice in writing.

Section 10.5.  Right of First Refusal:  The right of an Owner to sell, transfer or otherwise convey his Unit shall not be the subject of any right of first refusal or any similar restriction in favor of the Association.  In the event this Declaration is amended to provide for any right of first refusal in the Association, a Mortgagee who comes into possession of a Unit pursuant to a judicial foreclosure or a trustee's sale shall be exempt therefrom.

Section 10.6.  Conflicts:  In the event of any conflict between any of the provisions of this Article and any of the other provisions of this Declaration, the provisions of this Article shall control.

Section 10.7.  Notice of Destruction or Taking:  In the event that the Common Area or any Unit or any portion thereof is substantially damaged or is made the subject of any condemnation proceeding in eminent domain or is otherwise sought to be acquired by a condemning authority, the Board shall promptly notify any first Mortgagee affected by such destruction, taking or threatened taking.  For purposes herein, the term "substantially damaged" shall mean damages exceeding Ten Thousand Dollars ($10,000.00).  If requested in writing by a first Mortgagee, the Association shall evidence its obligations under this Section in a written agreement in favor of such first Mortgagee.

T-10547
Rec 5/28/80

Section 10.8.   Breach of Declaration:   A breach of any of
the covenants, conditions or restrictions of this Declaration
shall not defeat or render invalid the lien of any First Mortgage
made in good faith and for value on any Unit of the Property or
any portion thereof, but said covenants and restrictions shall be
binding upon and effective against any Owner of any of said Units
whose title is acquired by the foreclosure of any lien or
mortgage thereon or sale under any deed of trust given to secure
the payment of money.

## ARTICLE XI
## DESTRUCTION OF IMPROVEMENTS

Section 11.1.   Destruction; Proceeds Exceed 85% of
Reconstruction Costs:   If there is a total or partial destruction
of the improvements in the development, and if the available
proceeds of the insurance carried pursuant to Article VIII are
sufficient to cover not less than eighty-five percent (85%) of
the costs of repair and reconstruction, the improvements shall be
promptly rebuilt unless, within ninety (90) days from the date of
destruction, Members then holding at least seventy-five percent
(75%) of the total voting power of each class of Members present
and entitled to vote, in person or by proxy, at a duly
constituted meeting, determine that such repair and
reconstruction shall not take place.   If repair and
reconstruction is to take place, the Board shall be required to
execute, acknowledge and record in the office of the County
Recorder, not later than one hundred twenty (120) days from the
date of such destruction, a certificate declaring the intention
of the Members to rebuild.

Section 11.2.   Destruction; Proceeds Less Than 85% of
Reconstruction Costs:   If the proceeds of insurance are less than
eighty-five percent (85%) of the costs of repair and
reconstruction, repair and reconstruction may nevertheless take
place if, within ninety (90) days from the date of destruction,
Members then holding at least fifty-one percent (51%) of the
total voting power of each class of Members present and entitled
to vote, in person or by proxy, at a duly constituted meeting,
determine that such repair and reconstruction shall take place.
If repair and reconstruction is to take place, the Board shall be
required to execute, acknowledge and record in the office of the
Orange County Recorder, not later than one hundred twenty (120)
days from the date of such destruction, a certificate declaring
the intention of the Members to rebuild.

Section 11.3.   Rebuilding Procedures:   If the Members
determine to rebuild pursuant to Sections 11.1 or 11.2, above,
the Owner of each Unit located within a structure that has been
totally or partially destroyed shall be obligated to contribute
his proportionate share of the cost of reconstruction or
restoration of the structure containing his Unit, over and above

31

T-10542
Rev. 5/28/80

the available insurance proceeds, which proportionate share shall
be based upon the ratio of the square footage of the floor area
of the Unit to be assessed to the total square footage of the
floor area of all Units to be assessed.  All Owners shall
contribute their proportionate share of the cost of
reconstruction or restoration of any portion of the Common Area
not comprising the structure within which a Unit is located, and
the proportionate share of each Owner shall be equal to a
fraction the numerator of which is one (1) and the denominator of
which is the total number of Units then comprising the Project.
If any Owner fails or refuses to pay his proportionate share, the
Board may levy a special assessment against the condominium of
such Owner which may be enforced under the lien provisions
contained in Article V or in any other manner provided in this
Declaration.  If any Owner disputes the amount of his
proportionate liability under this Section, such Owner may
contest the amount of his liability by submitting to the Board
within ten (10) days after notice to the Owner of his share of
the liability written objections supported by cost estimates or
other information that the Owner deems to be material and may
request a hearing before the Board at which he may be represented
by counsel.  Following such hearing, the Board shall give written
notice of its decision to all Owners, including any
recommendation that adjustments be made with respect to the
liability of any Owners.  If such adjustments are recommended,
the notice shall schedule a special meeting of Members for the
purpose of acting on the Board's recommendation, including making
further adjustments, if deemed by the Members to be necessary or
appropriate.  All adjustments shall be affirmed or modified by a
majority of the total voting power of each class of Members.  If
no adjustments are recommended by the Board, the decision of the
Board shall be final and binding on all Owners, including any
Owner filing objections.

   Section 11.4.  Rebuilding Contract:  If the Members
determine to rebuild, the Board or its authorized representative
shall obtain bids from at least two reputable contractors and
shall award the repair and reconstruction work to the lowest
bidder.  The Board shall have the authority to enter into a
written contract with the contractor for such repair and
reconstruction, and the insurance proceeds held by the trustee
shall be disbursed to the contractor according to the terms of
the agreement.  It shall be the obligation of the Board to take
all steps necessary to assure the commencement and completion of
authorized repair and reconstruction at the earliest possible
date.

   Section 11.5.  Rebuilding Not Authorized:  If the Members
determine not to rebuild, then any insurance proceeds then
available for such rebuilding shall be distributed to the Owner
of each Unit or its Mortgagee in the same ratio as the fair
market value of his Unit bears to the fair market value of all of
the Units immediately prior to the destruction, in accordance

T 79542
Rec 5/28/80

with normal appraisal techniques.  The Board shall have the duty,
within one hundred and twenty (120) days from the date of such
destruction, to execute, acknowledge and record in the office of
the County Recorder, a certificate declaring the intention of the
Members not to rebuild.

Section 11.6.  Minor Repair and Reconstruction:  In any
case, the Board shall have the duty to repair and reconstruct
improvements, without the consent of Members and irrespective of
the amount of available insurance proceeds, in all cases of
partial destruction when the estimated cost of repair and
reconstruction does not exceed Twenty Thousand Dollars ($20,000).
The Board is expressly empowered to levy a special assessment for
the cost of repairing and reconstructing improvements to the
extent insurance proceeds are unavailable, such assessment to be
levied as described in Section 11.3 (but without the consent or
approval of Members despite any contrary provisions) in this
Declaration.

ARTICLE XII
CONDEMNATION

Section 12.1.  Sale by Unanimous Consent:  If an action
for condemnation of all or a portion of the Project is proposed
or threatened by any governmental agency having the right of
eminent domain, then, on unanimous written consent of all of the
owners and after written notice to at least seventy-five percent
(75%) of all first Mortgagees, the Project, or a portion of it
may be sold.

Section 12.2.  Distribution of Proceeds of Sale:  On a
sale occurring under Section 12.1 above, the proceeds shall be
distributed to the Owner and the Mortgagees of each Unit as their
respective interests may appear in the same ratio as that set
forth in Section 11.5, above.

Section 12.3.  Distribution of Condemnation Award:  If
the Project, or a portion of it, is not sold but is instead
taken, the judgment of condemnation shall by its terms apportion
the award among the Owners and their respective Mortgagees, and
in the same ratio as that set forth in Section 11.5, above.

Section 12.4.  Revival of Right to Partition:  On sale or
on taking that renders more than fifty percent (50%) of the Units
in the Project uninhabitable, the right of any Owner to partition
through legal action shall revive immediately.

33.

T-19542
Rec 5/28/80

## ARTICLE XIII
## PARTITION

**Section 13.1.**  **Suspension:**  Except as specifically set forth to the contrary in this Declaration, the right or partition is suspended pursuant to the California Civil Code as to the Project.  Nothing in this Declaration, however, shall prevent partition or division of interest between joint or common Owners of one (1) Unit, provided that the written approval of a first Mortgagee of such Unit is first obtained.

**Section 13.2.**  **Proceeds:**  Proceeds or property resulting from a partition shall be distributed to and among the respective Owners and their Mortgagees in the same ratio as that set forth in Section 12.2, above.

**Section 13.3.**  **Power of Attorney:**  Pursuant to the California Civil Code, each Owner grants the Association an irrevocable power of attorney to sell the Project for the benefit of the Owners when partition can be had.  Exercise of the power is subject to the approval of Members.

## ARTICLE XIV
## GENERAL PROVISIONS

**Section 14.1.**  **Term:**  The covenants and restrictions of this Declaration shall run with and bind the Property, Association and any Owner, their legal representatives, heirs, successors and assigns, for a term of twenty (20) years from the date this Declaration is recorded, after which time they shall be automatically extended for successive periods of ten (10) years.

**Section 14.2.**  **Notices:**  Any notice to be given to an Owner or a Mortgagee under the provisions of this Declaration shall be in writing and may be delivered as follows:

(a)  Notice to an Owner shall be deemed to have been properly delivered when delivered personally prepaid, to the most recent address furnished by such Owner in writing to the Association for the purpose of giving notice, or if no such address shall have been furnished, then to the street address of such Owner's Condominium in the Project.  Any notice so deposited in the mail within the County, shall be deemed delivered forty-eight (48) hours after such deposit.  In the case of co-Owners, any such notice may be delivered or sent to any one of the co-Owners on behalf of all co-Owners and shall be deemed delivered on all such co-Owners.

(b)  Notice to a Mortgagee shall be deemed to have been properly delivered when placed in the first class United States mail, postage prepaid, to the address

34.

T-10547
Rec 5/28/80

furnished to the Association by such Mortgagee for
purposes of notice or, if no such address is furnished,
to any office of the Mortgagee in the county, or, if no
such office is located in the county, to any office of
such Mortgagee.

Section 14.3. Enforcement: The Association, Lessor,
Lessee, any Owner, or their successor in interest, shall have the
right to enforce, by any proceeding at law or in equity, all
restrictions, conditions, covenants, reservations, liens and
charges now or hereafter imposed by the provisions of this
Declaration or any amendment thereto, including the right to
prevent the violation of any such restrictions, conditions,
covenants or reservations and the right to recover damages or
other dues for such violation; provided, however, that with
respect to assessment liens, the Association shall have the
exclusive right to the enforcement thereof. Failure by the
Association or by any Owner to enforce any covenant or
restriction herein contained shall in no event be deemed a waiver
of the right to do so thereafter.

Section 14.4. Severability: Invalidation of any one of
these covenants, conditions or restrictions by judgment or court
order shall in no way affect any other provisions, which shall
remain in full force and effect.

Section 14.5. Construction: The provisions of this
Declaration shall be liberally construed to effectuate its
purpose of creating a uniform plan for the development of a
residential community or tract and for the maintenance of common
recreational facilities and Common Area. Section headings are
inserted for convenience only and are not intended to be a part
of this document or in any way to define, limit or describe the
scope or intent of the particular section to which they refer.

Section 14.6. Singular Includes Plural: Whenever the
context of this Declaration requires it, the singular shall
include the plural and the masculine shall include the feminine.

Section 14.7. Attorneys' Fees: In the event action is
instituted against an Owner to enforce any of the provisions
contained in this Declaration, the party prevailing in such
action shall be entitled to recover from the other party thereto
as part of the judgment reasonable attorneys' fees and costs of
such action, which attorneys' fees and costs shall also be added
to such Owner's assessments.

Section 14.8. Nuisance: The result of every act or
omission whereby any of the covenants contained in this
Declaration or if the Bylaws are violated in whole or in part is
hereby declared to be and constitutes both a public and private
nuisance, and every remedy allowed by law or equity against every
such result and may be exercised by any Owner, by the Association

T-10542
Mee 5/28/st

or its successors in interest, or by the County of Orange or other affected governmental entity. Such remedy shall be deemed cumulative and not exclusive.

Section 14.9. Amendments: Unless otherwise provided for herein, this Declaration of Covenants, Conditions and Restrictions may be amended only by the affirmative assent or vote of not less than seventy-five percent (75%) of the voting power of the Members and Lessor, excluding the Declarant; provided, however, that although Declarant has not obtained the Veterans' Administration ("VA") or Federal Housing Administration ("FHA") approval in connection with the development of this Project, such approval may be sought by Declarant. In the event that the VA or FHA approval is so sought for the purpose of having FHA and/or VA insure or guarantee any mortgage or providing any form of assistance within the purview of such agencies with respect to this Project, the rules and regulations of FHA and/or VA, as the same exist at the date of recording of this Declaration, may require this Declaration to be amended in certain respects and additionally will require that FHA and/or VA participate in certain decisions affecting the Project and management of the Association. Therefore, effective as of the date this Project receives FHA and/or VA approval, this Declaration is thereby amended as follows without the necessity of any vote or written assent of the Owners or Mortgagees:

(a) The following actions will require the prior approval of the FHA and/or VA:

(1) Alteration of any Unit, construction of additional improvements, the establishment of additional licenses, reservations and rights-of-way, or alteration of construction plans and designs by Declarant.

(2) Merger or consolidation or dissolution of the Association.

(3) Any amendment or modification of this Declaration, the Articles or By-Laws.

(b) The Association shall submit to FHA and/or VA, sixty (60) days prior to the beginning of each fiscal year of the Association, for their review and approval, as the case may be, a budget of the expenses for the ensuing fiscal year, on the FHA and/or VA model form of budget, indicating the amount of assessments contemplated for the next fiscal year period.

In the event the FHA, VA, or both, approve the Project as provided herein, if requested to do so by FHA and/or VA, the Board shall be automatically authorized and shall be obligated to execute a Regulatory Agreement on FHA Form No. 3278 (revised

T-10547
Rec 5/28/80

August, 1969) or such later version thereof then in use or the
analogous VA form or both as modified to reflect any
peculiarities pertaining to the Property as shall be deemed
appropriate by FHA and/or VA.

     **Section 14.10.** **Annexation:** Additional residential
property and Common Area may be annexed to the Property with the
consent of two-thirds (2/3) of the voting power of the Members,
excluding Declarant.

     IN WITNESS WHEREOF, the undersigned being the Declarant
herein, has hereunder set its hand this ___21ˢᵗ___ day of
___MAY___, 1980.

                    THE ROBERT P. WARMINGTON CO.,
                    a California corporation

                    By _____
                    Its _____

                    By _____
                    Its _____

     The foregoing is hereby approved and agreed to this 21ˢᵗ
day of ___MAY___, 1980.

                    _____
                    Robert P. Warmington, an individual

                    HOUSER BROS CO., a California
                    limited partnership

                    By _____
                    General Partner

                    By _____
                    General Partner

                **37.**

T-10542
Rec 5/28/80

CONSENT OF LIENHOLDER

AND SUBORDINATION OF LIEN

        The undersigned beneficiary under that certain Deed of
Trust dated October 31, 1979 recorded as Instrument No.
1279084-WHB in Book 13375 , pages 991 through 1012 ,
inclusive, of Official Records of Orange County, California,
consents to all of the provisions contained in the attached
Declaration of Covenants, Conditions and Restrictions and agrees
that the lien of the deed of trust shall be junior and
subordinate and subject to said Declaration.

Dated: ___May 12, 1980___

                                    Lienholder

                        By _CROCKER NATIONAL BANK_

                        By _Leslie S. Cooder_


STATE OF CALIFORNIA    )
                       )    SS.
COUNTY OF ORANGE       )

        On MAY 12 , 1980, before me, the undersigned, a
Notary public in and for said State, personally appeared
_____, known to me to be the President, and
_____, known to me to be the
Secretary of the corporation that executed the within Instrument,
known to me to be the persons who executed the within Instrument
on behalf of the corporation therein named, and acknowledged to
me that such corporation executed the within instrument pursuant
to its bylaws or a resolution of its board of directors.

        WITNESS my hand and official seal.


                        _____
                        Notary Public in and for said
                        County and State


38.

T-10542
New 5/28/80

STATE OF CALIFORNIA

COUNTY OF __Orange__ } ss.

On __May 27, 1980__ before me, the undersigned, a Notary Public in and for

said State, personally appeared __Robert P. Warmington__

Known to me to be the person___ whose name __is__

subscribed to the within instrument and acknowledged to me

that __he__ executed the same.

WITNESS my hand and official seal.

Signature _Pearl L. Hunt_

Pearl L. Hunt

Name (Typed or Printed)

OFFICIAL SEAL
PEARL L HUNT
NOTARY PUBLIC · CALIFORNIA
ORANGE COUNTY
My Commission Expires Mar 25, 1983

(This area for official notarial seal)

---

TO 1948 CA (8-74)
(Partnership)

TITLE INSURANCE AND TRUST
A TICOR COMPANY

STATE OF CALIFORNIA

COUNTY OF __ORANGE__ } SS.

On __May 21, 1980__

before me, the undersigned, a Notary Public in and for said State, personally appeared __Clifford C.__
__Houser and Vernon F. Houser__

___known to me

to be __general__ xxxx partners of the partnership

that executed the within instrument, and acknowledged to me

that such partnership executed the same.

WITNESS my hand and official seal.

Signature _Irene B. Burnett_

OFFICIAL SEAL
IRENE B. BURNETT
Notary Public · California
ORANGE COUNTY
My Commission Expires July 1, 1980

---

STATE OF CALIFORNIA

COUNTY OF __Orange__ } ss.

On __May 27, 1980__ before me, the undersigned, a Notary Public in and for

said State, personally appeared __Robert P. Warmington__

Known to me to be the ___President, and __Oliver N. Crary__

Known to me to be the __Vice Pres.__ xxxxx of the corporation that executed the within instrument,

and known to me to be the persons who executed the within

instrument on behalf of the corporation therein named, and ac-

knowledged to me that such corporation executed the within

instrument pursuant to its by-laws or a resolution of its board of

directors.

WITNESS my hand and official seal.

Signature _Pearl L. Hunt_ EXHIBITS - 0091

Pearl L. Hunt

OFFICIAL SEAL
PEARL L HUNT
NOTARY PUBLIC · CALIFORNIA
ORANGE COUNTY
My Commission Expires Mar 25, 1983

T-10542

Rec 5/28/80

CROCKER NATIONAL BANK

STATE OF CALIFORNIA    )
                       ) SS.
COUNTY OF ORANGE       )

On _May 12_____, 19 80, before me, the undersigned, a Notary
Public in and for said State, personally appeared _LORILEE S. CEDAR_
and _____, known to me to be the _VICE_
_PRESIDENT_ and _____ respectively, of CROCKER NA-
TIONAL BANK, the national banking association that executed the within instrument,
and also known to me to be the person(s) that executed the within instrument on
behalf of CROCKER NATIONAL BANK, the national banking association therein named,
and acknowledged to me that such national banking association executed the same
pursuant to its bylaws or a resolution of its board of directors.

WITNESS my hand and official seal.

_PALMIRA OESTERREICH_

OFFICIAL SEAL
PALMIRA OESTERREICH
NOTARY PUBLIC - CALIFORNIA
ORANGE COUNTY
My Commission Expires Sep. 17, 1982

T-10542
Rec 5/28/80

## REIMBURSEMENT AGREEMENT

This Reimbursement Agreement is entered into this _____ day of _____, 1980, by and between Houser Bros. Co., a California Limited Partnership ("Houser") and Huntington Beach Gables Homeowners Association, a California non-profit corporation ("Association").

## R E C I T A L S

A.   Houser has leased to Robert P. Warmington, an individual, certain real property in the City of Huntington Beach, more particularly described as Tract 10542, as per map recorded in Book 456, pages 49 and 50 of Miscellaneous Maps, Orange County which has been developed as a condominium project (the "Warmington Property").

B.   Houser is presently the owner of certain real property located adjacent and contiguous to the Warmington Property which property is presently developed as a mobile home park known as Rancho del Rey Mobile Estates (the "Houser Property").

C.   Located on the Houser Property, and adjacent to the Warmington Property, is a certain roadway known as Monterey Lane (the "Roadway"). The Warmington Property and the owners and residents thereof have an easement for ingress and egress over the Roadway. Houser and the Association agree that it would enhance the values of the Warmington Property and the Houser Property if guardgates (the "Guardgates") are con-

*Not to be Completed or Signed until Assoc. Takes Over.*

EXHIBIT A

SAC_HBH_TS_A-0093

T-10542
Rec 5/28/80

structed and maintained on the Roadway, and if the Roadway is maintained in a safe and clean manner.

D.  In order to enable the construction of the Guardgates, and to insure the continued maintenance of the Roadway and Guardgates by Houser, and the payment by the Association of its share of the costs incurred thereby, the parties hereto have entered into this Agreement.

## T E R M S

For valuable and complete consideration, the parties hereto hereby agree as follows:

## I.  CONSTRUCTION OF GUARDGATES

Houser hereby agrees to construct or cause to be constructed, two Guardgates on the Roadway, in accordance with plans and specifications approved and agreed upon by Houser and the Association.  Except as specifically set forth below, all costs incurred in the construction of the Guardgates shall be borne solely by Houser.

## II.  MAINTENANCE OF ROADWAY AND GUARDGATE

Houser hereby agrees to keep, maintain, repair and replace, when necessary, the Roadway and Guardgates in a safe, decent and proper condition, and subject to rights of reimbursement below, to pay the costs related thereto, which shall include, but shall not necessarily be limited to the following (the "Costs"):

(a)  Compensation; plus any necessary withholding taxes, social security and related payments, for one guard to operate the Guardgate daily.

IV.   TERM

This Agreement shall commence as of the execution hereof, and shall terminate on October 17, 2059.

V.   INDEMNIFICATION

The parties hereto acknowledge and agree that the Association's sole responsibility herein is the payment of its share of the costs as set forth above, and that Houser shall bear all responsibilities, obligations and liabilities related to the maintenance of the Roadway and Guardgates. In furtherance thereof, Houser agrees to indemnify, defend and hold the Association harmless from any and all claims or damages arising out of the maintenance and use of said Roadway and Guardgates.

VI.   MISCELLANEOUS

The parties further agree as follows:

(a)   In the event any action is instituted to enforce any provision contained herein, the prevailing party shall be entitled to attorney's fees and costs so incurred.

(b)   This Agreement shall bind and inure to the benefit of the successors and assigns of the parties hereto.

(c)   This Agreement may only be amended by written agreement between the parties hereto.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first above written.

HOUSER BROS. CO., a California          HUNTINGTON BEACH GABLES
Limited Partnership                      HOMEOWNERS ASSOCIATION, a
                                         California Non-Profit Corporation

By_____               By_____
                                                           President

By_____               By_____
                                                           Secretary

to De Connected on

SAC EXHIBITS - 0095

TX0542

5002

BK 13690 PG 1091

WHEN RECORDED RETURN TO:

MESERVE, MUMPER & HUGHES
5190 Campus Drive
Newport Beach, CA  92660

Attn:  Frank D. Stiefel

$6.00
C1

RECORDED IN OFFICIAL RECORDS
OF ORANGE COUNTY, CALIFORNIA

-3 00 P.M.    AUG 5 '80

LEE A. BRANCH, County Recorder

### FIRST AMENDMENT TO
### DECLARATION OF COVENANTS, CONDITIONS & RESTRICTIONS
### FOR THE HUNTINGTON BEACH GABLES

Tract 10542
City of Huntington Beach
Orange County, California

This First Amendment to Declaration of Covenants,
Conditions and Restrictions is made this ‾3̲0̲‾ day of
‾J̲U̲L̲Y̲‾, 1980, by THE ROBERT P. WARMINGTON CO., a
California corporation ("RPW Co."), HOUSER BROS. CO., a
California limited partnership ("Houser") and ROBERT P.
WARMINGTON, an individual ("Warmington").

WHEREAS, Houser is the owner of the fee interest in the
following described property (the "Property"):

Lots 1 and 2 of Tract No. 10542 as per map recorded in
Book 456, Pages 49 and 50, inclusive, of Miscellaneous
Maps, in the Office of the County Recorder of Orange
County, California; and

WHEREAS, Warmington is the lessee of the Property; and

WHEREAS, RPW Co. is the sublessee and the developer of
the improvements constructed on the Property, and is also the
Declarant as that term is defined in that certain Declaration
of Covenants, Conditions and Restrictions recorded May 28,
1980, in Book 13618, pages 982 through 1030, inclusive,
Official Records of Orange County, California (the
"Declaration"); and

WHEREAS, Warmington and RPW Co. intend to assign, convey
and set over to ultimate consumers, various leasehold and fee
interests in the Condominium Units, as defined in the
Declaration, which collectively shall constitute the
Condominium to be acquired by said consumer; and

WHEREAS, Warmington, Houser and RPW Co. desire to clarify
the Declaration to insure that the interests so conveyed are
inseparable and constitute the entire interest to be conveyed,
which clarification requires an amendment to the Declaration.

1

BK 13890PG 1092

NOW THEREFORE, Warmington, Houser and RPW Co., do hereby
declare as follows:

1.    That collectively they are the sole owners of the
Property as their interests may appear.

2.    That they retain the exclusive and sole right to
amend the Declaration.

3.    That, in furtherance of the foregoing, the following
amendments are hereby made to the Declaration:

(a)  Section 1.13 of the Declaration is hereby
amended to read as follows:

"Section 1.13.  Owner/Ownership:  "Owner" shall mean and
refer to the record assignee of the rights of Declarant
and/or a lessee or sublessee to a Unit, but excluding
those having such interest merely as security for the
performance of an obligation.  Such term shall also mean
and refer to the Lessee or Lessor if either succeeds to
the rights of said assignee through termination of any
lease or sublease or by any other means.  All references
herein to "ownership" shall mean and refer to the
ownership of a leasehold or subleasehold interest."

(b)  Section 2.2 of the Declaration is hereby
amended to read as follows:

"Section 2.2.  Elements of Condominium:  Each Condominium
shall be comprised of the following elements:

(a)  A leasehold or sub-leasehold estate in a Unit
as shown and defined on the Condominium Plan,
excepting that portion of a Unit consisting of
buildings and other improvements;

(b)  An undivided one-eightieth (1/80) interest in a
leasehold or subleasehold interest in the Common
Area as shown and defined on the Condominium Plan,
excepting that portion of the Common Area consisting
of building and other improvements;

(c)  An exclusive easement on the leasehold or sub-
leasehold estate referred to in item (b) above,
which easement is defined as Restricted Common Area
as described on the Condominium Plan for entry,
staircases and attic space relating to each Unit,
excepting that portion consisting of buildings and
other improvements;

2

BK 13690 PG 1093

(d) A non-exclusive easement and right to use the leasehold or sub-leasehold estate referred to in item (b) above except the Restricted Common Area, excepting that portion consisting of buildings and other improvements;

(e) A fee interest in that portion of a Unit, as shown and defined on the Condominium Plan, which consists of buildings and other improvements;

(f) An undivided one eightieth (1/80) fee interest in and to those portions of the Common Area, as shown and defined on the Condominium Plan which consist of buildings and other improvements;

(g) An exclusive easement on the fee estate referred to in item (f) above which easement is defined as Restricted Common Area as described on the Condominium Plan for entry, staircases and attic space relating to each Unit which consist of buildings and other improvements;

(h) A non-exclusive easement and right to use the fee estate referred to in item (f) above except the Restricted Common Area, which consist of buildings and improvements; and

(i) A membership in the Association."

4.   All other terms and conditions of the Declaration shall remain in full force and effect.

IN WITNESS WHEREOF, the parties hereto have executed this First Amendment as of the day first above written, its effective date.

THE ROBERT P. WARMINGTON CO.,
a California corporation

By _____

HOUSER BROS., CO., a California
Limited Partnership

By _____
By _____

_____
Robert P. Warmington

3

BK 13690P6 1094

TO 1949 CA (6-76)
(Corporation)

TITLE INSURANCE
AND TRUST
A TICOR COMPANY

STATE OF CALIFORNIA
COUNTY OF _Orange_ } ss.
On _July 31, 1980_ before me, the undersigned, a Notary Public in and for said
State, personally appeared _Roger D. Darnell_
known to me to be the _Vice_ President, and
known-to-me-to-be- _____ Secretary
of the corporation that executed the within instrument,
known to me to be the persons who executed the within
instrument on behalf of the corporation therein named, and
acknowledged to me that such corporation executed the
within instrument pursuant to its by-laws or a resolution of
its board of directors.

WITNESS my hand and official seal.

Signature _Pearl L. Hunt_

OFFICIAL SEAL
PEARL L. HUNT
NOTARY PUBLIC - CALIFORNIA
ORANGE COUNTY
My Commission Expires Mar 25, 1983

(This area for official notarial seal)

TO 1944 CA (9-74)
(Partnership)

TITLE INSURANCE
AND TRUST
A TICOR COMPANY

STATE OF CALIFORNIA
COUNTY OF _ORANGE_ } ss.
On _AUGUST 4, 1980_
before me, the undersigned, a Notary Public in and for said State, personally appeared
_CLIFFORD C. HOUSER AND VERNON F. HOUSER_

_____ known to me
to be _BOTH_ of the partners of the partnership
that executed the within instrument, and acknowledged to me
that such partnership executed the same.

WITNESS my hand and official seal.

Signature _G. McDonald_

OFFICIAL SEAL
G. McDONALD
NOTARY PUBLIC CALIFORNIA
PRINCIPAL OFFICE IN
ORANGE COUNTY
My Commission Expires June 15, 1984

(This area for official notarial seal)

TO 1944 CA (6-74)
(Individual)

TITLE INSURANCE
AND TRUST
A TICOR COMPANY

STATE OF CALIFORNIA
COUNTY OF _Orange_ } SS.
On _July 31, 1980_ before me, the undersigned, a Notary Public in and for said
State, personally appeared
_Robert P. Warmington_

_____, known to me
to be the person_ whose name _is_ _____ subscribed
to the within instrument and acknowledged that _he_
executed the same.

WITNESS my hand and official seal.

Signature _Pearl L. Hunt_

OFFICIAL SEAL
PEARL L. HUNT
NOTARY PUBLIC - CALIFORNIA
ORANGE COUNTY
My Commission Expires Mar 25, 1983

(This area for official notarial seal)

RECORDED

# EXHIBIT 3

340

**CR-111/JV-791**

ATTORNEY OR PERSON WITHOUT ATTORNEY *(Name, State Bar number, and address):*

[X] Recording requested by and return to:

Janine Jasso
16025 Warmington Lane
Huntington Beach, CA 92649

**Recorded in Official Records, Orange County**
**Hugh Nguyen, Clerk-Recorder**

101.00

`*$R001285868 1$*`

**2021000348287 11:32 am 05/27/21**

**340 414A A03   3**

**0.00 0.00 0.00 0.00 6.00 10.00 0.000.0075.00 3.00**

TELEPHONE NO.: 213-247-6030          FAX NO. *(Optional):*

E-MAIL ADDRESS *(Optional):* j9_jasso@yahoo.com

[ ] ATTORNEY FOR:   [X] JUDGMENT CREDITOR   [ ] ASSIGNEE OF RECORD

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF** Orange

STREET ADDRESS: 8141  13th Street

MAILING ADDRESS:

CITY AND ZIP CODE: Westminister, CA, 92683

BRANCH NAME: West Justice Center

*FOR RECORDER'S USE ONLY*

CASE NUMBER:

18WM05278

CASE NAME: People of the State of California v. Gallian

**ABSTRACT OF JUDGMENT—RESTITUTION**   [ ] Amended

*FOR COURT USE ONLY*

**FILED**
SUPERIOR COURT OF CALIFORNIA
COUNTY OF ORANGE

**MAY 26 2021**

DAVID H. YAMASAKI, Clerk of the Court

BY:_____T. TRAN_____,DEPUTY

π
3P
1D
FF
SB

1. The [X] judgment creditor   [ ] assignee of record   [ ] other *(specify):*

   Janine Jasso

   applies for an abstract of judgment and represents the following:

   a. Judgment debtor's

   **Name and last known address**

   Jamie Gallian
   16222 Monterey Lane, Space 376
   Huntington Beach, CA, 92649

   b. [X] Driver's license no. [last 4 digits] and state: 0742 /CA      [ ] Unknown
   c. [X] Social security no. [last 4 digits]: 3936                      [ ] Unknown
   d. [X] Date of birth: 11-16-1962                                      [ ] Unknown

Date: 05/26/2021

Janine Jasso
(TYPE OR PRINT NAME)

*(SIGNATURE OF APPLICANT OR ATTORNEY)*
[X] ON INFORMATION AND BELIEF

Page 1 of 2

Form Approved for Optional Use
Judicial Council of California
CR-111/JV-791 [Rev. July 1, 2015]

**ABSTRACT OF JUDGMENT—RESTITUTION**

Penal Code, §§ 1202.4(i), (m), 1214;
Welfare and Institutions Code, § 730.6(i), (r);
Code of Civil Procedure, § 674
www.courts.ca.gov

CR-111/JV-791

| CASE NAME: People of the State of California v. Jamie Gallian | CASE NUMBER:<br>18WM05278 |
| --- | --- |

## CERTIFICATION

2.  I certify that the following is a true and correct judgment entered in this action.

3.  Judgment creditor *(name):* Janine Jasso
    [X] whose address or whose attorney's address appears on this form above the
    court's name.

4.  Judgment debtor *(full name as it appears in judgment):* Jamie Gallian

5.  Judgment entered on *(date):* 12/12/2019

6.  Total amount of judgment as entered or last renewed: $ 13,229.24

7.  [ ]  A stay of enforcement was ordered on:                 and is effective until:
    [X]  A stay of enforcement was not ordered.

[SEAL]

This abstract of judgment was issued on *(date):* MAY 2 6 2021

Clerk, by _____ , Deputy

T. TRAN

Page 2 of 2

**ABSTRACT OF JUDGMENT—RESTITUTION**
SAC EXHIBITS - 0102
Document Number: 2021000348287 Page: 2 of 4

Print this form    Save this form    Clear this form

SUPERIOR COURT OF THE STATE OF CALIFORNIA, COUNTY OF ORANGE
WEST JUSTICE CENTER
8141 13th Street, Westminster, CA 92683

## NOTICE TO DEFENDANT

Defendant Name: **Gallian, Jamie Lynn**                Case No: **18WM05278**

Address:       16222 MONTEREY Lane 376,              Date Sentenced: 12/12/19
               Huntington Beach, CA 92649 USA

AKAs:          Barclay, Jamie Lynn ; Gallian, Jamie ; Gallian, Jamie Lynn ;
               Gallian-Pierpont, Jamie ; Peters, Jamie Lynn ; Pierpont, Jamie ;
               Stone, Jamie Lynn

Date of Order: 05/03/21   Judicial Officer: Haskins, Kevin        Dept: W18

## OC Pay #: 9466479

Balance Due $13,229.24

Charging Doc:   Original Complaint

| CNT OL CHARGE | CNT OL CHARGE |
|---|---|
| 1  M  166(a)(4) PC | 2  M  166(a)(4) PC |

Hearing held on 05/03/2021 at 09:00 AM in Department W18 for Chambers Work

The Court has reviewed correspondence and rules as follows:

Request for copy of defendant's statement of assets is denied.

Case Processing directed to send notice by letter .

Notice to defendant issued.

You can obtain additional case information through the court's Public Access Website at
www.occourts.org .

I hereby certify the foregoing instrument consisting of ___/___ page(s)
is a true and correct copy of the original on file in this court.

MAY 2 6 2021

ATTEST: (DATE)
DAVID H. YAMASAKI, EXECUTIVE OFFICER AND CLERK OF THE
SUPERIOR COURT OF CALIFORNIA, COUNTY OF ORANGE

BY _Patty Conde_ , DEPUTY

PATTY CONDE



THIS IS A CERTIFIED COPY OF THE
RECORD IF IT BEARS THE SEAL, AND
SIGNATURE OF THE ORANGE
COUNTY CLERK-RECORDER.

06/01/2021
DATE:_____

4.00
CERTIFICATION FEE:_____

COUNTY CLERK-RECORDER

*Hugh Nguyen*

ORANGE COUNTY
STATE OF CALIFORNIA

# EXHIBIT 4

CIV-130

| | |
|---|---|
| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address):*<br>Brenda Radmacher (SBN: 185265) / James E. Hawley (SBN: 299723)<br>GORDON REES SCULLY MANSUKHANI, LLP<br>633 W. 5th Street, 52nd Floor<br>Los Angeles, CA 90071<br>TELEPHONE NO.: (213) 576-5000   FAX NO. *(Optional):* (877) 306-0043<br>E-MAIL ADDRESS *(Optional):* bradmacher@grsm.com / jhawley@grsm.com<br>ATTORNEY FOR *(Name):* X-Ds Gragnano; Phillips; Beck; Paulin; Jasso; Burrett | **FOR COURT USE ONLY**<br><br>**ELECTRONICALLY FILED**<br>Superior Court of California,<br>County of Orange<br>**12/07/2018** at 10:16:00 AM<br>Clerk of the Superior Court<br>By e Clerk,Deputy Clerk |

| | |
|---|---|
| SUPERIOR COURT OF CALIFORNIA, COUNTY OF Orange | |
| STREET ADDRESS: 700 W. Civic Center Dr. | |
| MAILING ADDRESS: | |
| CITY AND ZIP CODE: Santa Ana, 92701 | |
| BRANCH NAME: Central Justice Center | |

PLAINTIFF/PETITIONER: Huntington Beach Gables Homeowners Assoc.
DEFENDANT/RESPONDENT: Sandra L. Bradley; Jamie L. Gallian et al.

| | |
|---|---|
| **NOTICE OF ENTRY OF JUDGMENT**<br>**OR ORDER**<br><br>*(Check one):*  ☑ **UNLIMITED CASE**  ☐ **LIMITED CASE**<br>(Amount demanded     (Amount demanded was<br>exceeded $25,000)     $25,000 or less) | CASE NUMBER:<br>30-2017-00913985-CU-CO-CJC |

**TO ALL PARTIES :**

1. A judgment, decree, or order was entered in this action on *(date):* December 4, 2018

2. A copy of the judgment, decree, or order is attached to this notice.

Date: December 7, 2018

James E. Hawley

(TYPE OR PRINT NAME OF  ☑ ATTORNEY  ☐ PARTY WITHOUT ATTORNEY)

► *James Hawley*

(SIGNATURE)

Page 1 of 2

Form Approved for Optional Use
Judicial Council of California
CIV-130 [New January 1, 2010]

*www.courtinfo.ca.gov*

**NOTICE OF ENTRY OF JUDGMENT OR ORDER**

SAC EXHIBITS - 0106

CIV-130

| | |
|---|---|
| PLAINTIFF/PETITIONER: The Huntington Beach Gables Homeowners Association | CASE NUMBER:<br>30-2017-00913985-CU-CO-CJC |
| DEFENDANT/RESPONDENT: Sandra L. Bradley; Jamie L. Gallian et al. | |

## PROOF OF SERVICE BY FIRST-CLASS MAIL
### NOTICE OF ENTRY OF JUDGMENT OR ORDER

*(NOTE: You cannot serve the Notice of Entry of Judgment or Order if you are a party in the action. The person who served the notice must complete this proof of service.)*

1. I am at least 18 years old and **not a party to this action.** I am a resident of or employed in the county where the mailing took place, and my residence or business address is *(specify):*  101 West Broadway, Suite 2000, San Diego, CA

2. I served a copy of the *Notice of Entry of Judgment or Order* by enclosing it in a sealed envelope with postage fully prepaid and *(check one):*
   a. ☐ deposited the sealed envelope with the United States Postal Service.
   b. ☒ placed the sealed envelope for collection and processing for mailing, following this business's usual practices, with which I am readily familiar. On the same day correspondence is placed for collection and mailing, it is deposited in the ordinary course of business with the United States Postal Service.

3. The *Notice of Entry of Judgment or Order* was mailed:
   a. on *(date):* December 7, 2018
   b. from *(city and state):* San Diego, California

4. The envelope was addressed and mailed as follows:
   a. Name of person served: Jamie L. Gallian
      Street address:  5782 Pinon Drive
      City:  Huntington Beach
      State and zip code:  CA 92649
   c. Name of person served:
      Street address:
      City:
      State and zip code:
   b. Name of person served:
      Street address:
      City:
      State and zip code:
   d. Name of person served:
      Street address:
      City:
      State and zip code:

   ☒ Names and addresses of additional persons served are attached. *(You may use form POS-030(P).)*

5. Number of pages attached  2 .

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Date:  December 7, 2018

Jeanne P. Farrar
*(TYPE OR PRINT NAME OF DECLARANT)*          *(SIGNATURE OF DECLARANT)*

CIV-130 [New January 1, 2010]          NOTICE OF ENTRY OF JUDGMENT OR ORDER
SAC EXHIBITS 0107

3728619

Superior Court of California,
County of Orange
11/09/2018 at 10:23:23 AM
Clerk of the Superior Court
By eClerk, Deputy Clerk

**FILED**
SUPERIOR COURT OF CALIFORNIA
COUNTY OF ORANGE
CENTRAL JUSTICE CENTER

**DEC 0 4 2018**

DAVID H. YAMASAKI, Clerk of the Court

BY:_____,DEPUTY

1

2

3

4

5

6

7

8          SUPERIOR COURT OF THE STATE OF CALIFORNIA

9          FOR THE COUNTY OF ORANGE, CENTRAL JUSTICE CENTER

10

| | |
|---|---|
| 11  THE HUNTINGTON BEACH GABLES | ) Case No. 30-2017-00913985-CU-CO- |
| 12  HOMEOWNERS ASSOCIATION, a California Nonprofit Mutual Benefit | ) CJC |
| 13  Corporation, | ) *Honorable James L. Crandall* |
| 14            Plaintiff, | ) **[PROPOSED] JUDGMENT FOR** |
| 15       v. | ) **ATTORNEYS' FEES** |
| 16  SANDRA L. BRADLEY, individually and | ) FAC Filed: May 16, 2017 |
|    as Trustee of the Sandra L. Bradley Trust; | ) Trial Date: December 10, 2018 |
| 17  JAMIE L. GALLIAN, an individual; and DOES 1 through 25, inclusive, | ) |
| 18            Defendants. | ) |
| 19 | ) |
| 20 | ) |
| 21  AND RELATED CROSS-ACTIONS. | ) |
| 22 | ) |
| 23 | ) |
| 24 | ) |
| 25 | ) |
| 26 | ) |
| 27 | ) |

28

-1-

1       The above-captioned matter came on regularly for hearing on Cross-Defendants Lee

2 Gragnano, Ted Phillips, Lindy Beck, Jennifer Paulin, Janine Jasso, and Lori Burrett's Motion for

3 Attorneys' Fees and Costs on November 1, 2018 and November 8, 2018, in Department C33 of

4 the Superior Court in and for the State of California, County of Orange, the Honorable James L.

5 Crandall presiding.

6       Cross-Defendants Lee Gragnano, Ted Phillips, Lindy Beck, Jennifer Paulin, Janine Jasso,

7 and Lori Burrett appeared by and through its attorneys, Brenda Radmacher of Gordon & Rees,

8 LLP.  Cross-Complainant Jamie L. Gallian, in pro per, appeared on behalf of herself.  After

9 hearing evidence and arguments, and good cause appearing;

10       **NOW, THEREFORE, IT IS ORDERED, ADJUDGED AND DECREED** that Cross-

11 Defendants Lee Gragnano, Ted Phillips, Lindy Beck, Jennifer Paulin, Janine Jasso, and Lori

12 Burrett are awarded their attorneys' fees in the amount of $46,138.00 against Cross-Complainant

13 Jamie L. Gallian. Post-judgment interest at a rate of ten (10) percent annum from the date hereof,

14 till paid, shall accrue on the amount above.

15       **IT IS SO ORDERED, ADJUDGED AND DECREED.**

16

17

18 Dated: _/ 2 - 4 -_, 2018

                          _____
19                               Honorable James L. Crandall
                              Judge of the Superior Court

20

21

22

23

24

25

26

27

28

-2-
[PROPOSED] JUDGMENT FOR ATTORNEYS' FEES
SAC EXHIBITS - 0109

# EXHIBIT 5

18 - 324020

| | Secretary of State<br>**Statement of Information**<br>(Limited Liability Company) | LLC-12 |
|---|---|---|

141

**FILED**
**Secretary of State**
**State of California**

**OCT 19 2018**

7/NF/CC
*Above Space For Office Use Only*

IMPORTANT — This form can be filed online at bizfile.sos.ca.gov.
*Read instructions* before completing this form.
Filing Fee – **$20.00**
Copy Fees – First page $1.00; each attachment page $0.50;
Certification Fee - $5.00 plus copy fees

**1. Limited Liability Company Name** (Enter the exact name of the LLC. If you registered in California using an alternate name, *see instructions*.)

J-Pad, LLC

| **2. 12-Digit Secretary of State Entity (File) Number** | **3. State, Foreign Country or Place of Organization** (only if formed outside of California) |
|---|---|
| 201804010750 | |

**4. Business Addresses**

| | City (no abbreviations) | State | Zip Code |
|---|---|---|---|
| a. Street Address of Principal Office - Do not list a P.O. Box<br>2702 N. GAFF ST | ORANGE | CA | 92865 |
| b. Mailing Address of LLC, if different than Item 4a<br>2702 N. GAFF ST | ORANGE | CA | 92865 |
| c. Street Address of California Office, if Item 4a is not in California - Do not list a P.O. Box<br>2702 N. GAFF ST | ORANGE | CA | 92865 |

**5. Manager(s) or Member(s)**

If no **managers** have been appointed or elected, provide the name and address of each member. At least one name **and** address must be listed. If the manager/member is an individual, complete Items 5a and 5c (leave Item 5b blank). If the manager/member is an entity, complete Items 5b and 5c (leave Item 5a blank). Note: The LLC cannot serve as its own manager or member. If the LLC has additional managers/members, enter the name(s) and address(es) on *Form LLC-12A*.

| a. First Name, if an individual - Do not complete Item 5b | Middle Name | Last Name | Suffix |
|---|---|---|---|
| ANTHONY | | CALDERON | |

| b. Entity Name - Do not complete Item 5a |
|---|
| |

| c. Address | City (no abbreviations) | State | Zip Code |
|---|---|---|---|
| 2702 N. GAFF ST | ORANGE | CA | 92865 |

**6. Service of Process** (Must provide either Individual OR Corporation.)

INDIVIDUAL – Complete Items 6a and 6b only. Must include agent's full name and California street address.

| a. California Agent's First Name (if agent is not a corporation) | Middle Name | Last Name | Suffix |
|---|---|---|---|
| RON | | PIERPONT | |

| b. Street Address (if agent is not a corporation) - Do not enter a P.O. Box | City (no abbreviations) | State | Zip Code |
|---|---|---|---|
| 5782 PINON DR | HUNTINGTON BEACH | CA | 92649 |

CORPORATION – Complete Item 6c only. Only include the name of the registered agent Corporation.

| c. California Registered Corporate Agent's Name (if agent is a corporation) – Do not complete Item 6a or 6b |
|---|
| |

**7. Type of Business**

Describe the type of business or services of the Limited Liability Company

INVESTMENT

**8. Chief Executive Officer, if elected or appointed**

| a. First Name | Middle Name | Last Name | Suffix |
|---|---|---|---|
| ANTHONY | D | CALDERON | |

| b. Address | City (no abbreviations) | State | Zip Code |
|---|---|---|---|
| 2702 N. GAFF ST | ORANGE | CA | 92865 |

**9. The Information contained herein, including any attachments made part of this document, is true and correct.**

| 10-18-18 | ANTHONY CALDERON | CEO | |
|---|---|---|---|
| Date | Type or Print Name of Person Completing the Form | Title | Signature |

LLC-12 (REV 01/2018)

SAC EXHIBITS - 0111    1/3

2018 California Secretary of State
bizfile.sos.ca.gov

18 - 324020

| | |
|---|---|
| **Attachment to**<br>**Statement of Information**<br>(Limited Liability Company) | **LLC-12A**<br>**Attachment** |

A. Limited Liability Company Name (Enter the exact name on file with the California Secretary of State.)

J-Pad, LLC

*Above Space For Office Use Only*

| B. 12-Digit Secretary of State Entity (File) Number | C. State, Foreign Country, or Place of Organization (only if formed outside of California) |
|---|---|
| 201804010750 | |

D. **List of Additional Manager(s) or Member(s)** - If the manager/member is an individual, enter the individual's name and address. If the manager/member is an entity, enter the entity's name and address. Note: The LLC cannot serve as its own manager or member.

| First Name | Middle Name | Last Name | Suffix |
|---|---|---|---|
| 2a. JAMIE | LYNN | GALLIAN | |
| 2b. Entity Name – Do not complete Item 2a | | | |

| 2c. Address | City (no abbreviations) | State | Zip Code |
|---|---|---|---|
| 4476 ALDERPORT DRIVE | HUNTINGTON BEACH | CA | 92649 |

| First Name | Middle Name | Last Name | Suffix |
|---|---|---|---|
| 3a. | | | |
| 3b. Entity Name – Do not complete Item 3a | | | |

| 3c. Address | City (no abbreviations) | State | Zip Code |
|---|---|---|---|
| | | | |

| First Name | Middle Name | Last Name | Suffix |
|---|---|---|---|
| 4a. | | | |
| 4b. Entity Name – Do not complete Item 4a | | | |

| 4c. Address | City (no abbreviations) | State | Zip Code |
|---|---|---|---|
| | | | |

| First Name | Middle Name | Last Name | Suffix |
|---|---|---|---|
| 5a. | | | |
| 5b. Entity Name – Do not complete Item 5a | | | |

| 5c. Address | City (no abbreviations) | State | Zip Code |
|---|---|---|---|
| | | | |

| First Name | Middle Name | Last Name | Suffix |
|---|---|---|---|
| 6a. | | | |
| 6b. Entity Name – Do not complete Item 6a | | | |

| 6c. Address | City (no abbreviations) | State | Zip Code |
|---|---|---|---|
| | | | |

| First Name | Middle Name | Last Name | Suffix |
|---|---|---|---|
| 7a. | | | |
| 7b. Entity Name – Do not complete Item 7a | | | |

| 7c. Address | City (no abbreviations) | State | Zip Code |
|---|---|---|---|
| | | | |

| First Name | Middle Name | Last Name | Suffix |
|---|---|---|---|
| 8a. | | | |
| 8b. Entity Name – Do not complete Item 8a | | | |

| 8c. Address | City (no abbreviations) | State | Zip Code |
|---|---|---|---|
| | | | |

# ATTACHMENT
## TO CERTIFICATE OF AMENDMENT to ARTICLES of ORGANIZATION of a LIMITED LIABILITY COMPANY (LLC)
### (FORM LLC –12,12a)


## J-PAD, LLC

11.    I certify under penalty of perjury that the contents of this Document are true.  I declare I am the person who executed this instrument, which execution is my act and deed.

Signature of Authorized Person:

ANTHONY CALDERON, Chief Executive Officer/Manager of J-Pad, LLC

# EXHIBIT 6

**SUPERIOR COURT OF CALIFORNIA,**
**COUNTY OF ORANGE**
**CENTRAL JUSTICE CENTER**

**MINUTE ORDER**

DATE: 09/27/2018                    TIME: 01:30:00 PM          DEPT:  C33

JUDICIAL OFFICER PRESIDING: James Crandall
CLERK:  P. Rief
REPORTER/ERM: (ACRPT) Cheri Violette CSR# 3584
BAILIFF/COURT ATTENDANT:  Julie Carney

CASE NO: **30-2017-00913985-CU-CO-CJC** CASE INIT.DATE: 04/11/2017
CASE TITLE: **The Huntington Beach Gables Homeowners Association vs. Bradley**
CASE CATEGORY: Civil - Unlimited        CASE TYPE: Contract - Other

---

EVENT ID/DOCUMENT ID: 72875934

**EVENT TYPE**: Motion to Compel Response to Requests for Admissions
MOVING PARTY: The Huntington Beach Gables Homeowners Association
CAUSAL DOCUMENT/DATE FILED: Motion to Compel Answers to Request for Admissions, 08/23/2018

EVENT ID/DOCUMENT ID: 72875943

**EVENT TYPE**: Motion to Compel Answers to Special Interrogatories
MOVING PARTY: The Huntington Beach Gables Homeowners Association
CAUSAL DOCUMENT/DATE FILED: Motion to Compel Answers to Interrogatories Special, 08/23/2018

EVENT ID/DOCUMENT ID: 72875946

**EVENT TYPE**: Motion to Compel Answers to Form Interrogatories
MOVING PARTY: The Huntington Beach Gables Homeowners Association
CAUSAL DOCUMENT/DATE FILED: Motion to Compel Answers to Interrogatories Form, 08/23/2018

Additional events listed on last page.

---

**APPEARANCES**
Pejman D. Kharrazian, Esq., from Epsten Grinnell & Howell, APC, present for Cross -
Defendant,Plaintiff(s).
Jamie L. Gallian, self represented Cross - Defendant, present.
 David R. Flyer, Esq., specially appearing.

Tentative Ruling posted on the Internet.

The court hears oral argument. The court, having fully considered the arguments of all parties, both
written and oral, as well as the evidence presented, now rules as follows: The Tentative Ruling, as
amended, will become the final ruling of the court. Plaintiff's requests for sanctions as to the motions to
compel further responses are denied.

The court rules as follows:

**1. Motion by Plaintiff The Huntington Beach Gables Homeowners Association for an Order to
Compel Responses to Form Interrogatories (Set One) from Defendant Jamie Gallian and Request**

---

CASE TITLE: The Huntington Beach Gables              CASE No. 30-2017-00913985-CU-CO-CJC
Homeowners Association vs. Bradley

for **Sanctions:**

Plaintiff The Huntington Beach Gables Homeowners Association's unopposed Motion to Compel Responses to Form Interrogatories and Imposition of Sanctions is GRANTED. (See Code Civ. Proc. § 2030.290, subd. (a)).

Defendant Jamie L. Gallian is ordered to serve verified responses without objections to Plaintiff's Form Interrogatories, Set No. One, within ten days. The court imposes monetary sanctions against Defendant Jamie L. Gallian in the amount of $1,535.00, payable to counsel for Plaintiff within thirty days.

**2. Motion by Plaintiff The Huntington Beach Gables Homeowners Association for an Order to Compel Further Responses to Special Interrogatories (Set One) and Request for Sanctions:**

The court GRANTS Plaintiff's Request For Judicial Notice.

Plaintiff The Huntington Beach Gables Homeowners Association's Motion to Compel Further Responses to Plaintiff's Special Interrogatories Set No. 1 is GRANTED. (See Code Civ. Proc. § 2030.300).

The court finds that Defendant is equitably estopped from asserting that the Plaintiff's motions are not timely filed, because these motions were initially timely filed, and ordered off calendar by the court in reliance upon a settlement between the parties placed on the record before the court. Once it became clear that defendant was unwilling to live up to the terms reached before the court, Plaintiff timely renewed the motions.

Defendant Jamie L. Gallian is ordered to serve further, non-evasive responses to Plaintiff's Special Interrogatories Set No. 1 without objections within ten days.

The request for monetary sanctions against Defendant Jamie L. Gallian is denied.

**3. Motion by Plaintiff The Huntington Beach Gables Homeowners Association for an Order to Compel Responses to Request for Production of Documents (Set One) and Request for Sanctions:**

Plaintiff's Request For Judicial Notice is GRANTED.

Plaintiff The Huntington Beach Gables Homeowners Association's Motion to Compel Responses to Inspection Demands and Imposition of Sanctions is GRANTED. (See Code Civ. Proc. § 2031.300, subd. (a)).

Defendant Jamie L. Gallian is ordered to serve verified responses without objections to Plaintiff's Inspection Demand, Set No. One, which fully complies with Code Civ. Proc. § 2031.210(a), and all responsive documents (whatever their source), within ten days.

The court also imposes monetary sanctions against Defendant Jamie L. Gallian in the amount of $1,535.00, payable to counsel for Plaintiff within thirty days. (See Code Civ. Proc. § 2031.300, subd. (h)).

**4. Motion by Plaintiff The Huntington Beach Gables Homeowners Association for an Order to Compel Further Responses to Request for Admissions (Set One) and Request for Sanctions:**

---

CASE TITLE: The Huntington Beach Gables
Homeowners Association vs. Bradley

CASE NO: **30-2017-00913985-CU-CO-CJC**

Plaintiff The Huntington Beach Gables Homeowners Association's Motion to Compel to Further Responses to Plaintiff's Requests For Admissions, Set No. 1, is GRANTED. (See Code Civ. Proc. § 2033.290).

The court finds that Defendant is equitably estopped from asserting that the Plaintiff's motions are not timely filed, because these motions were initially timely filed and ordered off calendar by the court in reliance upon a settlement between the parties placed on the record before the court. Once it became clear that defendant was unwilling to live up to the terms reached before the court, Plaintiff timely renewed the motions.

Defendant Jamie L. Gallian is ordered to serve further, non-evasive responses to Plaintiff's Requests For Admissions Set No. 1 without objections within ten days.

The request for monetary sanctions against Defendant Jamie L. Gallian is denied.

Defendant's request for imposition of monetary sanctions is denied.

Defendant to give notice.


A Mandatory Settlement Conference is scheduled for 10/05/2018 at 09:00 AM in Department C33.

Defendant Jamie L. Gallian's oral Ex Parte Request to advance the hearing date on her Motion for Judgment on the Pleadings, set for 12/13/2018, is granted.

The Motion by Defendant Jamie L. Gallian for Judgment on the Pleadings, set for 12/13/2018, is ordered advanced to 12/06/2018 at 01:30 PM in this department.

Court orders defendant to give notice.

CASE TITLE: The Huntington Beach Gables
Homeowners Association vs. Bradley

CASE NO: **30-2017-00913985-CU-CO-CJC**

ADDITIONAL EVENTS:

EVENT ID/DOCUMENT ID: 72875949
**EVENT TYPE:** Motion to Compel Production
MOVING PARTY: The Huntington Beach Gables Homeowners Association
CAUSAL DOCUMENT/DATE FILED: Motion to Compel Production/Inspection of Documents or Things,
08/23/2018

# EXHIBIT 7

LLC-12

19-A78778

**Secretary of State**
**Statement of Information**
(Limited Liability Company)

**FILED**

In the office of the Secretary of State
of the State of California

FEB 26, 2019

**IMPORTANT — Read instructions before completing this form.**

**Filing Fee – $20.00**

**Copy Fees** – First page $1.00; each attachment page $0.50;
Certification Fee - $5.00 plus copy fees

**This Space For Office Use Only**

| 1. Limited Liability Company Name (Enter the exact name of the LLC. If you registered in California using an alternate name, see instructions.) |
|---|
| J-PAD, LLC. |

| 2. 12-Digit Secretary of State File Number | 3. State, Foreign Country or Place of Organization (only if formed outside of California) |
|---|---|
| 201804010750 | CALIFORNIA |

**4. Business Addresses**

| | City (no abbreviations) | State | Zip Code |
|---|---|---|---|
| a. Street Address of Principal Office - Do not list a P.O. Box<br>16222 Monterey Ln 376 | Huntington Beach | CA | 92649 |
| b. Mailing Address of LLC, if different than item 4a<br>16222 Monterey Ln 376 | Huntington Beach | CA | 92649 |
| c. Street Address of California Office, if Item 4a is not in California - Do not list a P.O. Box<br>16222 Monterey Ln 376 | Huntington Beach | CA | 92649 |

**5. Manager(s) or Member(s)**

If no **managers** have been appointed or elected, provide the name and address of each **member**. At least one name **and** address must be listed. If the manager/member is an individual, complete Items 5a and 5c (leave Item 5b blank). If the manager/member is an entity, complete Items 5b and 5c (leave Item 5a blank). Note: The LLC cannot serve as its own manager or member. If the LLC has additional managers/members, enter the name(s) and addresses on Form LLC-12A (see instructions).

| a. First Name, if an individual - Do not complete Item 5b | Middle Name | Last Name | Suffix |
|---|---|---|---|
| | | | |

| b. Entity Name - Do not complete Item 5a |
|---|
| J-Sandcastle Co, LLC |

| c. Address | City (no abbreviations) | State | Zip Code |
|---|---|---|---|
| 16222 Monterey Ln 376 | Huntington Beach | CA | 92649 |

**6. Service of Process** (Must provide either Individual OR Corporation.)

**INDIVIDUAL** – Complete Items 6a and 6b only. Must include agent's full name and California street address.

| a. California Agent's First Name (if agent is not a corporation) | Middle Name | Last Name | Suffix |
|---|---|---|---|
| Steven | | Gallian | |

| b. Street Address (if agent is not a corporation) - Do not enter a P.O. Box | City (no abbreviations) | State | Zip Code |
|---|---|---|---|
| 821 W 16th Street | Costa Mesa | CA | 92663 |

**CORPORATION** – Complete Item 6c only. Only include the name of the registered agent Corporation.

| c. California Registered Corporate Agent's Name (if agent is a corporation) – Do not complete Item 6a or 6b |
|---|
| |

**7. Type of Business**

| a. Describe the type of business or services of the Limited Liability Company |
|---|
| Residential Investments |

**8. Chief Executive Officer, if elected or appointed**

| a. First Name | Middle Name | Last Name | Suffix |
|---|---|---|---|
| | | | |

| b. Address | City (no abbreviations) | State | Zip Code |
|---|---|---|---|
| | | | |

**9. The Information contained herein, including any attachments, is true and correct.**

| 02/26/2019 | Jamie I Gallian | | Its Member | |
|---|---|---|---|---|
| Date | Type or Print Name of Person Completing the Form | Title | | Signature |

**Return Address (Optional)** (For communication from the Secretary of State related to this document, or if purchasing a copy of the filed document enter the name of a person or company and the mailing address. This information will become public when filed. SEE INSTRUCTIONS BEFORE COMPLETING.)

Name:

Company:

Address:

City/State/Zip:

SAC EXHIBITS - 0120

| | | | |
|---|---|---|---|
| **Attachment to**<br>**Statement of Information**<br>(Limited Liability Company) | **LLC-12A**<br>**Attachment** | | 19-A78778 |

**A. Limited Liability Company Name**

J-PAD, LLC.

This Space For Office Use Only

| **B. 12-Digit Secretary of State File Number** | **C. State or Place of Organization** (only if formed outside of California) |
|---|---|
| 201804010750 | CALIFORNIA |

**D. List of Additional Manager(s) or Member(s) -** If the manager/member is an individual, enter the individual's name and address. If the manager/member is an entity, enter the entity's name and address. Note: The LLC cannot serve as its own manager or member.

| First Name | Middle Name | Last Name | Suffix |
|---|---|---|---|
| Entity Name<br>Jamie L Gallian | | | |

| Address | City (no abbreviations) | State | Zip Code |
|---|---|---|---|
| 16222 Monterey Ln 376 | Huntington Beach | CA | 92649 |

| First Name | Middle Name | Last Name | Suffix |
|---|---|---|---|
| Entity Name | | | |

| Address | City (no abbreviations) | State | Zip Code |
|---|---|---|---|
| | | | |

| First Name | Middle Name | Last Name | Suffix |
|---|---|---|---|
| Entity Name | | | |

| Address | City (no abbreviations) | State | Zip Code |
|---|---|---|---|
| | | | |

| First Name | Middle Name | Last Name | Suffix |
|---|---|---|---|
| Entity Name | | | |

| Address | City (no abbreviations) | State | Zip Code |
|---|---|---|---|
| | | | |

| First Name | Middle Name | Last Name | Suffix |
|---|---|---|---|
| Entity Name | | | |

| Address | City (no abbreviations) | State | Zip Code |
|---|---|---|---|
| | | | |

| First Name | Middle Name | Last Name | Suffix |
|---|---|---|---|
| Entity Name | | | |

| Address | City (no abbreviations) | State | Zip Code |
|---|---|---|---|
| | | | |

| First Name | Middle Name | Last Name | Suffix |
|---|---|---|---|
| Entity Name | | | |

| Address | City (no abbreviations) | State | Zip Code |
|---|---|---|---|
| | | | |

# EXHIBIT 8

**LLC-12**

20-A11795

(SEAL OF THE STATE OF CALIFORNIA)

**Secretary of State**
**Statement of Information**
(Limited Liability Company)

**FILED**

In the office of the Secretary of State
of the State of California

**JAN 08, 2020**

**IMPORTANT** — Read instructions before completing this form.

**Filing Fee** – $20.00

**Copy Fees** – First page $1.00; each attachment page $0.50;
Certification Fee - $5.00 plus copy fees

**This Space For Office Use Only**

**1. Limited Liability Company Name** (Enter the exact name of the LLC.  If you registered in California using an alternate name, see instructions.)

J-PAD, LLC.

| 2.  12-Digit Secretary of State File Number | 3.   State, Foreign Country or Place of Organization (only if formed outside of California) |
|---|---|
| 201804010750 | CALIFORNIA |

**4.  Business Addresses**

| | City (no abbreviations) | State | Zip Code |
|---|---|---|---|
| a. Street Address of Principal Office - Do not list a P.O. Box<br>16222 Monterey Ln #376 | Huntington Beach | CA | 92649 |
| b. Mailing Address of LLC, **if different than item 4a**<br>16222 Monterey Ln #376 | Huntington Beach | CA | 92649 |
| c. Street Address of **California** Office, if Item 4a is not in California - Do not list a P.O. Box<br>16222 Monterey Ln #376 | Huntington Beach | CA | 92649 |

**5.  Manager(s) or Member(s)**

If no **managers** have been appointed or elected, provide the name and address of each **member**. At least one name **and** address must be listed. If the manager/member is an individual, complete Items 5a and 5c (leave Item 5b blank).  If the manager/member is an entity, complete Items 5b and 5c (leave Item 5a blank).  Note:  The LLC cannot serve as its own manager or member.  If the LLC has additional managers/members, enter the name(s) and addresses on Form LLC-12A (see instructions).

| a. First Name, if an individual - Do not complete Item 5b | Middle Name | Last Name | Suffix |
|---|---|---|---|
| Robert | | McLelland | |

| b. Entity Name - Do not complete Item 5a |
|---|
| |

| c. Address | City (no abbreviations) | State | Zip Code |
|---|---|---|---|
| 21742 Anza Avenue | Torrance | CA | 90503 |

**6.  Service of Process** (Must provide either Individual OR Corporation.)

**INDIVIDUAL** – Complete Items 6a and 6b only.  Must include agent's full name and California street address.

| a. California Agent's First Name (if agent is **not** a corporation) | Middle Name | Last Name | Suffix |
|---|---|---|---|
| Robert | | McLelland | |

| b. Street Address (if agent is **not** a corporation) - **Do not enter a P.O. Box** | City (no abbreviations) | State | Zip Code |
|---|---|---|---|
| 21742 Anza Avenue | Torrance | CA | 90503 |

**CORPORATION** – Complete Item 6c only.  Only include the name of the registered agent Corporation.

| c. California Registered Corporate Agent's Name (if agent is a corporation) – Do not complete Item 6a or 6b |
|---|
| |

**7.  Type of Business**

| a. Describe the type of business or services of the Limited Liability Company |
|---|
| Residential Management |

**8.  Chief Executive Officer, if elected or appointed**

| a. First Name | Middle Name | Last Name | Suffix |
|---|---|---|---|
| | | | |

| b. Address | City (no abbreviations) | State | Zip Code |
|---|---|---|---|
| | | | |

**9.  The Information contained herein, including any attachments, is true and correct.**

| 01/08/2020 | Jamie Lynn Gallian | Secretary | |
|---|---|---|---|
| Date | Type or Print Name of Person Completing the Form | Title | Signature |

**Return Address (Optional)** (For communication from the Secretary of State related to this document, or if purchasing a copy of the filed document enter the name of a person or company and the mailing address. This information will become public when filed.  SEE INSTRUCTIONS BEFORE COMPLETING.)

Name:

Company:

Address:

City/State/Zip:

# EXHIBIT 9

**Secretary of State**
**Statement of Information**
(Limited Liability Company)

**LLC-12**

20-A44402

# FILED

In the office of the Secretary of State
of the State of California

**JAN 29, 2020**

**IMPORTANT — Read instructions before completing this form.**

**Filing Fee – $20.00**

**Copy Fees** – First page $1.00; each attachment page $0.50;
Certification Fee - $5.00 plus copy fees

**This Space For Office Use Only**

**1. Limited Liability Company Name** (Enter the exact name of the LLC.  If you registered in California using an alternate name, see instructions.)

J-SANDCASTLE CO, LLC

| 2. 12-Digit Secretary of State File Number | 3. State, Foreign Country or Place of Organization (only if formed outside of California) |
|---|---|
| 201829810053 | CALIFORNIA |

**4. Business Addresses**

| | City (no abbreviations) | State | Zip Code |
|---|---|---|---|
| a. Street Address of Principal Office - Do not list a P.O. Box<br>16222 Monterey Lane #376 | Huntington Beach | CA | 92649 |
| b. Mailing Address of LLC, **if different than item 4a**<br>16222 Monterey Lane #376 | Huntington Beach | CA | 92649 |
| c. Street Address of **California** Office, if Item 4a is not in California - Do not list a P.O. Box<br>16222 Monterey Lane #376 | Huntington Beach | CA | 92649 |

**5. Manager(s) or Member(s)**

If no **managers** have been appointed or elected, provide the name and address of each **member**. At least one name **and** address must be listed. If the manager/member is an individual, complete Items 5a and 5c (leave Item 5b blank). If the manager/member is an entity, complete Items 5b and 5c (leave Item 5a blank).  Note:  The LLC cannot serve as its own manager or member.  If the LLC has additional managers/members, enter the name(s) and addresses on Form LLC-12A (see instructions).

| a. First Name, if an individual - Do not complete Item 5b | Middle Name | Last Name | Suffix |
|---|---|---|---|
| Ronald | J | Pierpont | |

b. Entity Name - Do not complete Item 5a

| c. Address | City (no abbreviations) | State | Zip Code |
|---|---|---|---|
| 16222 Monterey Lane #376 | Huntington Beach | CA | 92649 |

**6. Service of Process** (Must provide either Individual **OR** Corporation.)

**INDIVIDUAL** – Complete Items 6a and 6b only.  Must include agent's full name and California street address.

| a. California Agent's First Name (if agent is **not** a corporation) | Middle Name | Last Name | Suffix |
|---|---|---|---|
| Steven | A | Fink | Esq. |

| b. Street Address (if agent is **not** a corporation) - **Do not enter a P.O. Box** | City (no abbreviations) | State | Zip Code |
|---|---|---|---|
| 13 Corporate Plaza Dr. Ste.150 | Newport Beach | CA | 92660 |

**CORPORATION** – Complete Item 6c only.  Only include the name of the registered agent Corporation.

c. California Registered Corporate Agent's Name (if agent is a corporation) – Do not complete Item 6a or 6b

**7. Type of Business**

a. Describe the type of business or services of the Limited Liability Company
Residential Management

**8. Chief Executive Officer, if elected or appointed**

| a. First Name | Middle Name | Last Name | Suffix |
|---|---|---|---|
| Ronald | J | Pierpont | |

| b. Address | City (no abbreviations) | State | Zip Code |
|---|---|---|---|
| 16222 Monterey Lane #376 | Huntington Beach | CA | 92649 |

**9. The Information contained herein, including any attachments, is true and correct.**

| 01/29/2020 | Jamie  Lynn  Gallian | Secretary | |
|---|---|---|---|
| Date | Type or Print Name of Person Completing the Form | Title | Signature |

**Return Address (Optional)** (For communication from the Secretary of State related to this document, or if purchasing a copy of the filed document enter the name of a person or company and the mailing address. This information will become public when filed.  SEE INSTRUCTIONS BEFORE COMPLETING.)

Name:

Company:

Address:

City/State/Zip:

LLC-12 (REV 01/2017)

2017 California Secretary of State
www.sos.ca.gov/business/be

| | Attachment to **Statement of Information** (Limited Liability Company) | LLC-12A Attachment | 20-A44402 |
|---|---|---|---|

**A. Limited Liability Company Name**

J-SANDCASTLE CO, LLC

This Space For Office Use Only

| **B. 12-Digit Secretary of State File Number** | **C. State or Place of Organization** (only if formed outside of California) |
|---|---|
| 201829810053 | CALIFORNIA |

**D. List of Additional Manager(s) or Member(s) -** If the manager/member is an individual, enter the individual's name and address. If the manager/member is an entity, enter the entity's name and address. Note: The LLC cannot serve as its own manager or member.

| First Name | | Middle Name | Last Name | Suffix |
|---|---|---|---|---|
| **Entity Name** J-Pad, LLC | | | | |
| **Address** 16222 Monterey Lane #376 | **City (no abbreviations)** Huntington Beach | | **State** CA | **Zip Code** 92649 |
| **First Name** Steven | | **Middle Name** D | **Last Name** Gallian | |
| **Entity Name** | | | | |
| **Address** 16222 Monterey Lane #376 | **City (no abbreviations)** Huntignton Beach | | **State** CA | **Zip Code** 92649 |
| **First Name** Justin | | **Middle Name** D | **Last Name** Barclay | |
| **Entity Name** | | | | |
| **Address** 16222 Monterey Lane #376 | **City (no abbreviations)** Huntington Beach | | **State** CA | **Zip Code** 92649 |
| **First Name** Brian | | **Middle Name** J | **Last Name** Gallian | |
| **Entity Name** | | | | |
| **Address** 16222 Monterey Lane #376 | **City (no abbreviations)** Huntignton Beach | | **State** CA | **Zip Code** 92649 |
| **First Name** | | **Middle Name** | **Last Name** | Suffix |
| **Entity Name** | | | | |
| **Address** | **City (no abbreviations)** | | **State** | **Zip Code** |
| **First Name** | | **Middle Name** | **Last Name** | Suffix |
| **Entity Name** | | | | |
| **Address** | **City (no abbreviations)** | | **State** | **Zip Code** |
| **First Name** | | **Middle Name** | **Last Name** | Suffix |
| **Entity Name** | | | | |
| **Address** | **City (no abbreviations)** | | **State** | **Zip Code** |

# EXHIBIT 10

**EA-100**    **Request for Elder or Dependent Adult Abuse Restraining Orders**

Read *Can an Elder or Dependent Adult Abuse Restraining Order Help Me?* (form EA-100-INFO) before completing this form. Also fill out *Confidential CLETS Information* (form CLETS-001), with as much information as you know.

*Clerk stamps date here when form is filed.*

> **ELECTRONICALLY FILED**
> Superior Court of California,
> County of Orange
> **06/07/2017** at 09:11:31 AM
> Clerk of the Superior Court
> By Jeffrey Smith, Deputy Clerk

**(1) Elder or Dependent Adult in Need of Protection**

a. Full Name: Sandra L. Bradley

Sex: ☐ M   ☒ F   Age: 68

**(2) Person From Whom Protection Is Sought**

Full Name: Jamie Lynn Gallian

Address *(if known):* 4472 Alderport Drive

City: Huntington Beach     State: CA  Zip: 92649

*Fill in court name and street address:*

**Superior Court of California, County of Orange**
700 W. Civic Center Drive
Santa Ana, CA 92701

**(3) Person Requesting Order**

Who is asking the court for protection? *(Check a, b, or c):*

a. ☒ The elder or dependent adult named in (1).

b. ☐ Name: _____

     conservator of the ☐ person  ☐ estate  ☐ person and estate
     of the person named in (1), appointed by *(name of court):* _____
     Case No.:

c. ☐ Other *(name)* _____

     *(Show this person's legal authority to make this request on an attached sheet of paper. Write "Attachment 3c—Information About Person Requesting Protective Order" for a title. You may use form MC-025, Attachment.)*

*Court fills in case number when form is filed.*

**Case Number:**
30-2017-00924559-PR-OP-CJC

**(4) Contact Information**

Contact information for the person asking the court for protection:

a. Your Lawyer *(if you have one for this case):*

Name: Gianna Gruenwald     State Bar No.: 228969

Firm Name: Ross Wersching & Wolcott, LLP

b. Your Address *(If you have a lawyer, give your lawyer's information. If you do not have a lawyer and want to keep your home address private, you may give a different mailing address instead. The person in (1) does not have to give telephone, fax, or e-mail.):*

Address: 3151 Airway Ave., Suite S-1

City: Costa Mesa     State: CA  Zip: 92626

Telephone: 714-444-3900     Fax: 714-444-3901

E-Mail Address: gianna@rossllp.com

---

**This is not a Court Order.**

Judicial Council of California, www.courts.ca.gov
Revised January 1, 2017, Mandatory Form
Welfare & Institutions Code, § 15657.03
Code of Civil Procedure, § 527.9

**Request for Elder or Dependent Adult Abuse
Restraining Orders**
(Elder or Dependent Adult Abuse Prevention)

EA-100, Page 1 of 8


**Case Number:**
30-2017-00924559-PR-OP-CJC

**(5) Description of Protected Person**

Describe the person named in ①. *(Check a or b):*

a. ☒ Is age 65 or older and a resident of California.

b. ☐ Is a resident of California and an adult under age 65. This person has physical or mental limitations that restrict his or her ability to carry out normal activities or to protect his or her rights. *(Briefly describe limitations on the attached sheet of paper or form MC-025. Write "Attachment 5—Description of Protected Person" for a title.)*

**(6) Additional Protected Persons**

a. Are you asking for protection for any other family or household members or for the conservator of the elder or dependent adult listed in ①? ☐ Yes ☒ No    *(If yes, list them):*

| Full Name | Sex | Age | Lives with you? | How are they related to you? |
|---|---|---|---|---|
| | | | ☐ Yes ☐ No | |
| | | | ☐ Yes ☐ No | |
| | | | ☐ Yes ☐ No | |
| | | | ☐ Yes ☐ No | |

☐ *Check here if there are more persons. Attach a sheet of paper and write "Attachment 6a—Additional Protected Persons" for a title. You may use form MC-025, Attachment.*

b. Why do these people need protection? *(Explain below):*

☐ *Check here if there is not enough space for your answer. Put your complete answer on the attached sheet of paper or form MC-025 and write "Attachment 6b—Why Others Need Protection" for a title.*

_____
_____
_____
_____

**(7) Relationship of Parties**

How does the person in ① know the person in ②? *(Explain below):*

☐ *Check here if there is not enough space for your answer. Put your complete answer on the attached sheet of paper or form MC-025 and write "Attachment 7—Relationship of Parties" for a title.*

Jamie Gallian is Sandra's deceased husband's stepdaughter from a prior marriage. He never legally adopted her.

**(8) Venue**

Why are you filing in this county? *(Check all that apply):*

a. ☒ The person in ② lives in this county.

b. ☒ The person in ① was abused by the person in ② in this county.

c. ☐ Other *(specify):* _____

**This is not a Court Order.**

**Request for Elder or Dependent Adult Abuse
Restraining Orders
(Elder or Dependent Adult Abuse Prevention)**

EA-100, Page 2 of 8
→

Case Number:
30-2017-00924559-PR-OP-CJC

**(9) Other Court Cases**

a. Has the person in (1) or any of the persons named in (6) been involved in another court case with the person in
(2)?  ☐ No  ☒ Yes  *(If yes, specify the kind of each case and indicate where and when each was filed):*

| | Kind of Case | Filed in *(County/State)* | Year Filed | Case Number *(if known)* |
|---|---|---|---|---|
| (1) | ☐ Elder or Dependent Adult Abuse | | | |
| (2) | ☐ Civil Harassment | | | |
| (3) | ☐ Domestic Violence | | | |
| (4) | ☐ Divorce, Nullity, Legal Separation | | | |
| (5) | ☐ Paternity, Parentage, Child Custody | | | |
| (6) | ☐ Eviction | | | |
| (7) | ☐ Guardianship | | | |
| (8) | ☐ Workplace Violence | | | |
| (9) | ☐ Small Claims | | | |
| (10) | ☐ Criminal | | | |
| (11) | ☒ Other *(specify):* | Orange | 2017 | 30-2017-00915711-PR |
| | Probate, civil | Orange | 2017 | 30-2017-00913985-CU-CO-CJC |

b. Are there now any protective or restraining orders in effect relating to the person in (1) or any of the persons
named in (6) and the person in (2)?  ☒ No  ☐ Yes  *(If yes, attach a copy if you have one.)*

**(10) Description of Abuse**

a. Abuse means either:

(1) Physical abuse, neglect, financial abuse, abandonment, isolation, abduction, or other treatment with
resulting physical harm or pain or mental suffering; or

(2) The withholding by a caretaker of goods or services that are necessary to avoid physical harm or mental
suffering.

b. Tell the court about the last time the person in (2) abused the person in (1).

(1) When did it happen? *(Provide date or estimated date):*  March 2017 - ongoing

(2) Who else was there?
Myself and Jamie Gallian.

(3) Describe what happened below.
☒ *Check here if there is not enough space for your answer. Put your complete answer on the attached
sheet of paper or form MC-025 and write "Attachment 10b(3)—Describe Abuse" for a title.*

(4) Was the abuse **solely financial abuse** unaccompanied by force, threat, harassment, intimidation, or any
other form of abuse?

☐ Yes, only financial abuse.  ☒ No, the abuse included other forms of abuse described above.

**This is not a Court Order.**

**Request for Elder or Dependent Adult Abuse
Restraining Orders**
(Elder or Dependent Adult Abuse Prevention)

EA-100, Page 3 of 8
→

Case Number:
30-2017-00924559-PR-OP-CJC

(5) Did the person in ② use or threaten to use a gun or any other weapon?
    ☐ Yes  ☒ No  *(If yes, explain below):*
    ☐ *Check here if there is not enough space for your answer. Put your complete answer on the attached*
    *sheet of paper or form MC-025 and write "Attachment 10b(5)—Use of Weapons" for a title.*

_____
_____
_____
_____

(6) Was the person in ① harmed or injured as a result of the acts of abuse described above?
    ☒ Yes  ☐ No  *(If yes, explain below):*
    ☐ *Check here if there is not enough space for your answer. Put your complete answer on the attached*
    *sheet of paper or form MC-025 and write "Attachment 10b(6)—Harm or Injury" for a title.*
    Respondent's behavior has caused Petitioner significant stress, anxiety, and deprivation of sleep.

_____
_____
_____

(7) Did the police come? ☐ Yes  ☒ No
    If yes, did they give the person in ① or the person in ② an Emergency Protective Order? ☐ Yes  ☐ No
    If yes, the order protects *(check all that apply):*
    a. ☐ The person in ①  b. ☐ The person in ②  c. ☐ The persons in ⑥
    *(Attach a copy of the order if you have one.)*

c. Is the person in ② a care custodian who deprived the person in ① of (kept from him or her, did not allow him
or her to have or receive, or did not provide him or her with) goods or services that the person needed to avoid
physical harm or mental suffering?
    ☐ Yes  ☒ No  *(If yes, describe below what the person was deprived of and how that affected him or her):*
    ☐ *Check here if there is not enough space for your answer. Put your complete answer on the attached sheet of*
    *paper or form MC-025 and write "Attachment 10c—Deprivation by Care Custodian" for a title.*

_____
_____
_____

d. Has the person in ② abused the person in ① at other times?
    ☐ Yes  ☒ No  *(If yes, describe prior incidents and provide dates below):*
    ☐ *Check here if there is not enough space for your answer. Put your complete answer on the attached sheet of*
    *paper or form MC-025 and write "Attachment 10d—Previous Abuse" for a title.*

_____
_____
_____
_____
_____
_____

**This is not a Court Order.**

**Request for Elder or Dependent Adult Abuse**
**Restraining Orders**
**(Elder or Dependent Adult Abuse Prevention)**

EA-100, Page 4 of 8


**Case Number:**
30-2017-00924559-PR-OP-CJC

**Check the orders you want.** ☑

(11) ☒ **Personal Conduct Orders**

I ask the court to order the person in ② **not** to do any of the following things to the person in ① or to any person to be protected listed in ⑥:

a. ☒ Physically abuse, financially abuse, intimidate, molest, attack, strike, stalk, threaten, assault (sexually or otherwise), hit, harass, destroy the personal property of, or disturb the peace of the person.

b. ☒ Contact the person, either directly or indirectly, in **any** way, including, but not limited to, in person, by telephone, in writing, by public or private mail, by interoffice mail, by e-mail, by text message, by fax, or by other electronic means.

c. ☐ Other *(specify):*

  ☐ *Check here if there is not enough space for your answer. Put your complete answer on the attached sheet of paper or form MC-025 and write "Attachment 11c—Other Personal Conduct Orders," for a title.*

_____

_____

_____

*The person in ② will be ordered not to take any action to get the addresses or locations of any protected person unless the court finds good cause not to make the order.*

(12) ☒ **Stay-Away Orders**

a. I ask the court to order the person in ② to stay at least __100__ yards away from *(check all that apply):*

  (1) ☒ The elder or dependent adult in ①

  (2) ☐ The persons in ⑥

  (3) ☒ The home of the elder or dependent adult

  (4) ☐ The job or workplace of the elder or dependent adult

  (5) ☒ The vehicle of the elder or dependent adult

  (6) ☒ Other *(specify):* 76757 Chrysanthemum Way, Palm Desert, CA 92211

_____

b. If the court orders the person in ② to stay away from all the places listed above, will he or she still be able to get to his or her home, school, or job?  ☒ Yes  ☐ No  *(If no, explain below):*

  ☐ *Check here if there is not enough space for your answer. Put your complete answer on the attached sheet of paper or form MC-025 and write "Attachment 12b—Stay-Away Orders," for a title.*

_____

_____

_____

_____

**This is not a Court Order.**

Revised January 1, 2017

**Request for Elder or Dependent Adult Abuse
Restraining Orders**
(Elder or Dependent Adult Abuse Prevention)

EA-100, Page 5 of 8


| Case Number: |
|---|
| 30-2017-00924559-PR-OP-CJC |

(13) ☐ **Move-Out Order**

I ask the court to order the person in ② to move out from and not return to the residence at *(address):*

The person in ① will suffer physical or emotional harm if the person in ② does not leave the residence. The person in ② is not named in the title or lease of the residence, either alone or with others beside the person in ①.

☐ I ask for this move-out order right away to last until the hearing, because:

a. The person in ② assaulted or threatened the person in ①; and

b. The person in ① has the right to live at the above residence. *(Explain below):*

☐ *Check here if there is not enough space for your answer. Put your complete answer on the attached sheet of paper or form MC-025 and write "Attachment 13—My Right to Residence," for a title.*

_____
_____
_____
_____

(14) **Guns or Other Firearms and Ammunition**

Does the person in ② own or possess any guns or other firearms?    ☐ Yes ☐ No ☒ I don't know

*Unless the abuse is only financial, if the judge grants a protective order, the person in ② will be prohibited from owning, possessing, purchasing, receiving, or attempting to purchase or receive a gun, other firearm, and ammunition while the protective order is in effect. The person in ② will also be ordered to turn in to law enforcement, or sell to or store with a gun dealer, any guns or firearms within his or her immediate possession or control.*

(15) **Immediate Orders**

Do you want the court to make any of these orders now that will last until the hearing without notice to the person in ②?   ☐ Yes ☒ No    *(If you answered yes, explain why below):*

☐ *Check here if there is not enough space for your answer. Put your complete answer on the attached sheet of paper or form MC-025 and write "Attachment 15—Immediate Orders" for a title.*

_____
_____

(16) ☐ **Request to Give Less Than Five-Days' Notice**

*You must have your papers personally served on the person in ② at least five days before the hearing, unless the court orders a shorter time for service. (Form EA-200-INFO explains* What Is "Proof of Personal Service"? *Form EA-200,* Proof of Personal Service, *may be used to show the court that the papers have been served.)*

If you want there to be fewer than five days between service and the hearing, explain why below:

☐ *Check here if there is not enough space for your answer. Put your complete answer on the attached sheet of paper or form MC-025 and write "Attachment 16—Request to Give Less Than Five-Days' Notice" for a title.*

_____
_____

**This is not a Court Order.**

Revised January 1, 2017

**Request for Elder or Dependent Adult Abuse
Restraining Orders**
(Elder or Dependent Adult Abuse Prevention)

EA-100, Page 6 of 8
→

Case Number:
30-2017-00924559-PR-OP-CJC

(17) **No Fee to Serve Orders** *If you want the sheriff or marshal to serve (notify) the person in* ② *about the orders for free, ask the court clerk what you need to do.*

(18) ☒ **Lawyer's Fees and Costs**

I ask the court to order payment of my:   a. ☐ Lawyer's fees   b. ☐ Court costs

The amounts requested are:

| Item | Amount | Item | Amount |
|---|---|---|---|
| Attorney fees | $ TBD | | $ |
| | $ | | $ |
| | $ | | $ |

☐ *Check here if there are more items. Put the items and amounts on the attached sheet of paper or form MC-025 and write "Attachment 18—Lawyer's Fees and Costs" for a title.*

(19) ☐ **Possession and Protection of Animals**

I ask the court to order the following:

a. ☐ That the person in ① be given the sole possession, care, and control of the animals listed below, which he/she owns, possesses, leases, keeps, or holds, or which reside in his/her household.
*(Identify animals by, e.g., type, breed, name, color, sex.)*

_____
_____
_____
_____

I request sole possession of the animals because *(specify good cause for granting order)*:

☐ *Check here if there is not enough space for your answer. Put your complete answer on the attached sheet of paper or form MC-025 and write "Attachment 19a—Possession of Animals" for a title.*

_____
_____
_____
_____
_____
_____
_____
_____

b. ☐ That the person in ② must stay at least _____ yards away from, and not take, sell, transfer, encumber, conceal, molest, attack, strike, threaten, harm, or otherwise dispose of, the animals listed above.

**This is not a Court Order.**

Revised January 1, 2017

**Request for Elder or Dependent Adult Abuse
Restraining Orders**
(Elder or Dependent Adult Abuse Prevention)

EA-100, Page 7 of 8
 →

Case Number:
30-2017-00924559-PR-OP-CJC

**(20)** ☐ **Additional Orders Requested**

I ask the court to make the following additional orders *(specify)*:

☐ *Check here if there is not enough space for your answer. Put your complete answer on the attached sheet of paper or form MC-025 and write "Attachment 20—Additional Orders Requested," for a title.*

_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

**(21)** Number of pages attached to this form, if any:  12

Date:  June 7, 2017

Glenn Greenwald                              _____
Lawyer's name (if any)                        Lawyer's signature

I declare under penalty of perjury under the laws of the State of California that the information above and on all attachments is true and correct.

Date:  June 7, 2017

Sandra Bradley                               _____
Type or print your name                       Signature of person filling out this request

This is not a Court Order

EA-100, Page 3 of 8

**Request for Elder or Dependent Adult Abuse
Restraining Orders**
(Elder or Dependent Adult Abuse Prevention)

### Attachment 10b(3) – Describe Abuse

Jamie Gallian has been continuously harassing Sandra Bradley since March 2017. The harassment has included threats and demands for money.

Sandra Bradley was married to Charles James Bradley, Jr. since 1978. Charles died in an automobile accident on June 18, 2000. Charles had no children. He did have two stepdaughters from a prior marriage, Jamie Gallian being one of them. Charles was divorced from Jamie's mother when she was a minor and he never adopted her.

Sandra, who is unrelated to Jamie, has been very generous with Jamie and her sons since Charles's death. She has gifted to Jamie and Jamie's sons over $700,000 in assets from the kindness of her heart and has had <u>no obligation</u> to do so. Attached as *Exhibit A* is a list of gifts from 1998 and continuing past the time of Charles' death in 2000.

Now, seventeen years after Charles' death, Jamie has decided to pursue a probate on his estate. Jamie's claims on the estate are without merit. Because Sandra has stopped giving money and gifts to Jamie, and because she objects to Jamie's probate petition, Jamie has started to threaten and abuse Sandra.

Jamie has sent numerous emails and made many calls to Sandra harassing and threatening her. She has done so in an effort to unduly influence and harass Sandra so that she will give her money. Attached as *Exhibit B* are some threatening and harassing emails Jamie sent to Sandra.

Some excerpts from the emails from Jamie to Sandra include:

- "You should sue [your attorney] yourself for breach of fiduciary duty. It's probably the only way you won't go to jail." (April 10, 2017)
- "If I come after the truth and have to find it from someone other than you, I will come at you twice as hard." (April 10, 2017)
- "I already have started gathering the evidence. Either way it will turn out badly. I just wonder if you [sic] health can withstand the stress." (April 10, 2017)
- "Remember what goes around always comes back around. And you are due." (May 25, 2017)

Jamie also left Sandra threatening and harassing voicemails. For example, on May 25, 2017, Jamie left Sandra a phone message calling her a "fucking bitch" because Sandra had removed her from her Costco account.

Sandra has told Jamie multiple times to stop communicating with her, but Jamie refuses to stop. Sandra's counsel has told Jamie's counsel that communications should only be through counsel. It appears that Jamie also refuses to follow her counsel's advice.

# Exhibit A

Gifts to Jamie Gallian

| Date | Description | Amount |
|---|---|---|
| 2/98 | Loan to open J & J's Juice | $125,000.00 |
| 2/19/99 | 3 months house payment | $7739.00 |
| 3/26/99 | House payment | $2519.00 |
| 5/13/99 | House payment | $2519.00 |
| 6/23/99 | Partial house payment | $1000.00 |
| 7/28/99 | Cosign on HB J & J's | $6560.00 |
| 12/10/99 | Mortuary for Pat (Julie paid half)  $6796 | $3398.00 |
| 2000 | College fund for Justin, Brian, Steven 3 x $50,000 | $150,000.00 |
| 2/3/06 | Car for Brian | $26,495.00 |
|  | Cash: | |
| 12/19/04 | | $1000.00 |
| 12/13/06 | | $500.00 |
| 6/16/14 | | $1150.00 |
| 11/12/14 | | $500.00 |
| 12/20/13 | Holiday Inn | $487.00 |
| 2/12/14 | Chase credit card | $7008.00 |
| 12/09 | Purchase of 4476 Alderport | $205,000.00 |
|  | Condo improvements: | |
|  | Kitchen & laundry cabinets | $3130.00 |
|  | Hardware & faucets | $325.00 |
|  | Kitchen pantry | $950.00 |
|  | Granite | $2200.00 |
|  | Exhaust fans | $550.00 |
|  | Other | $1130.00 |
| 5/10 | Sales tax on cabinets | $439.00 |
| 11/11 | Sliding door ($740 + $350 installation) | $1096.00 |
| 6/15 | Repair kitchen plumbing | $350.00 |
| 4/16 | Heater and installation of both heater and a/c | $4900.00 |
|  | Homeowner association: | |
| 1/14 | | $632.00 |
| 11/14 | | $316.00 |
| 3/15 | | $632.00 |
| 6/15 | | $316.00 |
| 12/15 | | $623.00 |
|  | Land lease: | |
| 2010 | 4 X $1749 | $6996.00 |
| 2011 | 4 x $1851 | $7404.00 |
| 2012 | 4 x $1902 | $7608.00 |

1

| | | |
|---|---|---|
| 2013 | 4 x $2049 | |
| 2014 | 4 x $2049 | $8196.00 |
| 2015 | 4 x $2078 | $8196.00 |
| 2016 | 4 x $2100 | $8312.00 |
| 2017 | 3 x 2145 | $8400.00 |
| | Property taxes: | $6435.00 |
| 2010 | | |
| 2011 | | $3378.00 |
| 2012 | | $3230.00 |
| 2013 | | $3139.00 |
| 2014 | | $3161.00 |
| 2015 | | $3454.00 |
| 2016 | | $3525.00 |
| | Condo Insurance: | $3577.00 |
| 2010 | | |
| 2011 | | $196.00 |
| 2012 | | $197.00 |
| 2013 | | $198.00 |
| 2014 | | $200.00 |
| 2015 | | $201.00 |
| 2016 | | $204.00 |
| | | $205.00 |
| | Lladro gifts. Prices shown are what was paid for them: | |
| | #1497 Quixote & Windmill | $2000.00 |
| | #1776 Conquered by Love | $3000.00 |
| | #5215 Fishing with Gramps | $995.00 |
| | #5341 I've Found Thee Dulcenea | $2000.00 |
| | #5847 Voyage of Columbus | $1450.00 |
| | #6395 Through the Park | $2350.00 |
| | #6630 A Little Romance | $725.00 |
| 2000 | NY Life policy with ex-wife as beneficiary.  Since she had passed, it was split between Jamie & Julie $29,062/2 | $14,531.00 |
| | | $671927.00 |
| 2005 | 2000 Lexus LS 400 (value unknown) | |
| | Various pieces of furniture including roll top desk, tv cabinet, sleigh bed, massage chair | |

2

# Exhibit B

**From:** Jamie Gallian <jamiegallian@gmail.com>
**Subject: Re: Stuff**
**Date:** May 25, 2017 at 5:31:10 PM PDT
**To:** Sandy Bradley <sandybrad@cox.net>

Nice try. Karen had nothing to do with me contacting LuAnn, Erika and Bill. I apologized to
each of them on behalf of my dad for the way they have been treated. Get your head out of your
ass and hope the court doesn't afford you the same courtesy you showed LuAnn and her kids.
Of course family members call when they need money or help. You should be used to it by now,
your brother does it all the time. Stop being so ignorant. Remember what goes around always
comes back around. And you are due.

Jamie Gallian
Sent from my iPhone

From: **Jamie Gallian** jamiegallian@gmail.com
Subject: Re: letter from hoa
Date: April 10, 2017 at 4:46 PM
To: Sandy Bradley sandybrad@cox.net

Of course the attorney would say that. I wouldn't expect him to say anything different. He is in a lot of trouble. You should sue him yourself for breach of fiduciary duty. It's probably the only way you won't go to jail.
It is not going to work for to long.
His colleagues are pretty surprised at the evidence I am gathering. Please remember the only two people that this involves is me and you. The boys still want me to work this out with you. They are reserving judgement which is the best position for them to take. It is sad, money makes people do terrible things. People and attorneys always assume they will never get caught. Here we are 17 years later. Who would ever expect this to happen. Everything will come out. A lot of lives will be effect
ed. Some people you will be surprised that I found after all these years.
You know me Sandy. If I come after the truth and have to find it from someone other than you, I will come at you twice as hard.  Please think long and hard whether you want to answer the questions with me and the boys in a room with you, or in a courtroom.

I already have started gathering the evidence. Either way it will turn out badly. I just wonder if you health can withstand the stress. That is my concern.

I spoke to two of my dads best friends who have since retired from Fluor. They are the persons who told me to keep trying to talk to you.

Jamie Gallian
Sent from my iPhone

> On Apr 10, 2017, at 3:03 PM, Sandy Bradley <sandybrad@cox.net> wrote:
>
> I mailed you the documents although I'm pretty sure I had sent them to you before as they are the same.
> My attorney has advised me to not talk to you.
> Sandy
>> On Apr 8, 2017, at 8:28 PM, Jamie Gallian <jamiegallian@gmail.com> wrote:
>>
>> Please forward me a copy of the letter.
>>
>> Jamie Gallian
>> Sent from my iPhone
>>
>>> On Apr 8, 2017, at 12:28 PM, Sandy Bradley <sandybrad@cox.net> wrote:
>>>
>>> <Bradley letterhead.pages>

From: **Jamie Gallian** jamiegallian@gmail.com
Subject: Re: Charles Bradley DOD 6-18-2000
Date: April 6, 2017 at 10:39 AM
To: Sandy Bradley sandybrad@cox.net
Cc: hjclaw@aol.com



I wanted to advise you that I am opening a probate for my dad and petitioning the court to be assigned Administer.

I gave you every opportunity to tell me the truth and come clean with everything you and Attorney Coopersmith have fraudulently colluded regarding my dads community property and separate property.

As always, I am available to discuss alternative solutions to avoid embarrassing and humiliating situations for you.

Sincerely,

Jamie Gallian
Sent from my iPhone

On Mar 28, 2017, at 3:28 PM, Apple CS <jamiegallian@gmail.com> wrote:

Sandy,

Thank you for your prompt response to my email.  Shortly you will receive an email I wrote to Mr. Coopersmith and cc'd you on.

On Mar 28, 2017, at 2:12 PM. Sandy Bradley <sandybrad@cox.net> wrote:

He had no attorney nor a will.  There was also no probate.
Sandy
On Mar 28, 2017, at 12:57 PM, Jamie Gallian <jamiegallian@gmail.com> wrote:

Sandy,

A dispute has risen regarding the estate of my father Charles James Bradley, Jr.  The date of his death was 6/18/2000.
As you were the wife of my father at the time of his death, please accept this as Notice of Potential Litigation regarding the estate of Charles J. Bradley, Jr.

As you may know, the Will of Charles J. Bradley, Jr. is the basis for the action.

You are hereby requested to provide the name, address, phone number of my father's attorney at the time of his death to me  immediately.

If a Probate Case was opened after the date of my father's death, please forward me the filed case number and the Court Location as well as the Attorney's name and phone number who filed the case.

Further delay will only result in unnecessary legal assessments by the Probate Court.

Sincerely,

•••••o Verizon LTE                2:33 PM                              Redacted

Edit          Messages                                                4/2/17

                                                         Today 7:09 AM

Did you inadvertently forget to place the property on Gaviota in Signal Hill in your trust of 10-18-01 that dad paid $76,000 dollars for. California is a community property state regardless whether a persons name is on title to the property.

Also filing a fraudulent Affidavit with the Recorders office on the Rae's Creek house wasn't a smart idea. All I have to do is call the title company that the new owners have on record and tell them to take another look at the trail of Deeds. This is another reason to purchase title insurance to guarantee a clean title of which this is not. The Rae's Creek Deed was titled Community Property not Joint Tenancy. Not a smart move trying to file a "small affidavit" especially when my dad wrote a check for $535,000 if his separate property to pay for the house. That's why you purposely titled the house community property so you would "think" you would get 50%. Sorry to tell you it doesn't work that way. There is a clear trail of "separate property" of $535,000. Try convincing the court that you contributed to that when you didn't even have a job.

The moral of the story.

Once you tell one lie, you have to continually tell a different lie to cover the last lie.

Aren't you tired from all the lies you tell?

Here's the deal using your words

"It's a one time offer" $125,000 cash. That is the land lease amount for the next 15 years. Also I want my dad's Ivory Collection and coin collection. It's about the only thing left of his personal property. You should take the deal. It will cost you a lot more in attorney fees and interest due for the last 17 years of fraudulent acts.




 **Jamie Gallian**                                    Sunday
Did you inadvertently forget to
place the property on Gaviota...

From: **Jamie Gallian** jamiegallian@gmail.com
Subject: Charles Bradley DOD 6-18-2000
Date: March 28, 2017 at 1:05 PM
To: Sandy Bradley sandybrad@cox.net
Cc: Joseph E. Mudd joseph.mudd@ffslaw.com

Sandy,

A dispute has risen regarding the estate of my father Charles James Bradley, Jr.  The date of his death was 6/18/2000.

As you were the wife of my father at the time of his death, please accept this as Notice of Potential Litigation regarding the estate of Charles J. Bradley, Jr.

As you may know, the Will of Charles J. Bradley, Jr. is the basis for the action.

You are hereby requested to provide the name, address, phone number of my father's attorney at the time of his death to me  immediately.

If a Probate Case was opened after the date of my father's death, please forward me the filed case number and the Court Location as well as the Attorney's name and phone number who filed the case.

Further delay will only result in unnecessary legal assessments by the Probate Court.

Sincerely,

Jamie Gallian
Sent from my iPhone



From: **Jamie Gallian** jamiegallian@gmail.com
Subject: **Re:**
Date: March 26, 2017 at 1:08 PM
To: Sandy Bradley sandybrad@cox.net

---

Sandy
You are mistaken again. You're right "you did initiate your trust "after" my dad died.

That does not protect you or the attorney from acts done the date of my dates death.

You can twist it anyway you want in your own head. The law is very clear. You and the attorney
committed fraud as it relates to my dad's estate and absolutely had a Fiduciary Duty to uphold.
I don't have to debate this with you and will not.
As far as the land lease, you will be responsible for the 2017 payments. If you chose to not
make the payments as indicated in your email "I think not"
roll the dice and see who will lose and be financially tied up for years.
Thank you for giving me my condo which has been mine anyway.
Please send me receipt if the Land Lease for 2017 had been paid in full.


Jamie Gallian
Sent from my iPhone

> On Mar 26, 2017, at 7:41 AM, Sandy Bradley <sandybrad@cox.net> wrote:
>
>
> I have no idea what you think I have done that is dishonest or fraudulent.  My trust was
> initiated after Chuck died.  If he was so concerned about making sure you were taken care of,
> he would have done so in his life.  Instead he left everything to me to do as I wish.
> Instead of thanking me for the house, you send me stuff like this and expect me to continue to
> make land lease and property tax payments.  I don't think so.
> Sandy


> On Mar 25, 2017, at 4:42 PM, Jamie Gallian <jamiegallian@gmail.com> wrote:
>
> Just to recap.
> The minute I arrived at my father's attorneys office, Mr. Coopersmith at your request to come
> there to sign papers after you were long gone.  I remembered everything.
> I had been there before with my father after lunch. I recognized that voice and those
> mannerisms the moment the Attorney approached me and handed me an envelop saying to
> me "this is for you.
> I was ashamed of you ever being apart of my dad's life.
> The deceit and fraudulent behavior you and my dad's Attorney, Mr. Coopersmith engaged in
> after the passing of my dad is sickening. You, I am not surprised by in the least. I knew
> something was wrong all night. I didn't sleep a minute. The entire morning I was sick to me
> stomach. Your threats, your urgency, your constant texting I knew if I listened to my gut, all
> would be revealed to me.
> My father's Attorney, Mr. Coppersmith, a sworn officer of the court in addition to the Fiduciary
> Duty owed to my father and his estate. I am surprised by his unethical position.
> I am shocked and sickened, after all these years you and my dad's attorney Mr. Coppersmith
> continued this conspiracy.
> Your willful dishonesty and fraudulent behavior is finally going to be brought out in a probate

court.

I promise you until the day I die, I will never let up, you will be punished and sanctions or better yet the loss of Attorney Coopersmith Bar License will be entered for his part in the deceit.

Go ahead, I dare you. If you pick up the phone one more time and ever call one of my sons again and one more word comes out of your lying mouth see what will happen.

Jamie Gallian
Sent from my iPhone

I hereby certify the foregoing instrument consisting of _____ page(s)
is a true and correct copy of the original on file in this court.

**JUN 1 6 2021**

ATTEST: (DATE)_____
DAVID H. YAMASAKI, EXECUTIVE OFFICER AND CLERK OF THE
SUPERIOR COURT OF CALIFORNIA, COUNTY OF ORANGE

BY _____ DEPUTY

PATTY CONDE

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is:
7101 N. Mesa, Ste 355
El Paso, TX 79912

A true and correct copy of the foregoing document entitled (*specify*):  __Second Amended Complaint For Determination Of Dischargeability And Objecting To Debtor's Discharge Pursuant To Sections 523 and 727 Of The Bankruptcy Code__  will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

1.  **TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*) ___1/28/2023_____, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

See NEF for confirmation of electronic transmission to the U.S. trustee, any trustee in this case, and to any attorneys who received service by NEF.

☐ Service information continued on attached page

2.  **SERVED BY UNITED STATES MAIL**:
On (*date*) ___1/28/2023_____, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

DEBTOR AND DEFENDANT
JAMIE LYNN GALLIAN
16222 MONTEREY LANE, SPC 376
HUNTINGTON BEACH, CA 92649

☐ Service information continued on attached page

3.  **SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served):  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*) ___1/28/2023_____, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

The Honorable Scott Clarkson, United States Bankruptcy Court, 411 West Fourth Street, Santa Ana, CA, 92701

Courtesy Copy via email: Aaron De Leest, Esq.,

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| | | |
|---|---|---|
| 01-28-2023 | David Jasso | |
| *Date* | *Printed Name* | *Signature* |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.